**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

```
------------------------------------------------------- x
                                                        :
In re:                                                  :   Chapter 11
                                                        :
RUNITONETIME LLC, et al.,                               :   Case No. 25-90191 (ARP)
                                                        :
                    Debtors.¹                           :   (Joint Administration Requested)
                                                        :
------------------------------------------------------- x
```

**<u>EMERGENCY</u> MOTION OF DEBTORS FOR
AN ORDER (I) AUTHORIZING THE DEBTORS TO (A) PAY
CERTAIN EMPLOYEE COMPENSATION AND BENEFITS AND (B) CONTINUE
SUCH BENEFITS AND OTHER EMPLOYEE-RELATED PROGRAMS;
(II) MODIFYING THE AUTOMATIC STAY WITH RESPECT TO
<u>WORKERS' COMPENSATION CLAIMS; AND (III) GRANTING RELATED RELIEF</u>**

---

**Emergency relief has been requested.  Relief is requested not later than 1:00 p.m. (prevailing Central Time) on July 15, 2025.**

**If you object to the relief requested or you believe that emergency consideration is not warranted, you must appear at the hearing if one is set, or file a written response prior to the date that relief is requested in the preceding paragraph.  Otherwise, the Court may treat the pleading as unopposed and grant the relief requested.**

**A hearing will be conducted on this matter on July 15, 2025, at 1:00 p.m. (prevailing Central Time) in Courtroom 404, 4th floor, 515 Rusk Street, Houston, Texas 77002.  Participation at the hearing will only be permitted by an audio and video connection.**

**Audio communication will be by use of the Court's dial-in facility.  You may access the facility at (832) 917-1510.  Once connected, you will be asked to enter the conference room number.  Judge Perez's conference room number is 282694.  Video communication will be by use of the GoToMeeting platform.  Connect via the free GoToMeeting application or click the link on Judge Perez's homepage.  The meeting code is "JudgePerez".  Click the settings icon in the upper right corner and enter your name under the personal information setting.**

**Hearing appearances must be made electronically in advance of both electronic and in-person hearings.  To make your appearance, click the "Electronic Appearance" link on Judge Perez's homepage.  Select the case name, complete the required fields and click "Submit" to complete your appearance.**

---

¹     A complete list of the Debtors in the Chapter 11 Cases may be obtained on the website of the Debtors' proposed claims and noticing agent at https://restructuring.ra.kroll.com/RunItOneTime/.  The Debtors' mailing address is 12530 NE 144th Street, Kirkland, Washington 98304.

The above-captioned debtors in possession (collectively, the "***Debtors***") respectfully state as follows in support of this motion (this "***Motion***"):

## RELIEF REQUESTED

1.      By this Motion, the Debtors seek entry of an order (the "***Proposed Order***"), substantially in the form attached hereto: (a) authorizing, but not directing, the Debtors to (i) pay or satisfy, in their discretion, the Employee Obligations (as defined below), and (ii) maintain and continue postpetition, in the ordinary course of business, the workforce-related plans, programs, and policies in effect immediately prior to the filing of these cases (collectively, the "***Employee Programs***"); (b) modifying the automatic stay to allow Workers' Compensation Claims to proceed under the applicable Workers' Compensation Policy (as defined below); and (c) granting related relief.

## JURISDICTION AND VENUE

2.      The United States Bankruptcy Court for the Southern District of Texas (the "***Court***") has jurisdiction to consider this Motion under 28 U.S.C. § 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b) and the Court may enter a final order consistent with Article III of the United States Constitution.  Venue is proper under 28 U.S.C. §§ 1408 and 1409.

3.      The statutory and legal predicates for the relief requested herein are sections 105(a), 362(d), 363(b), 503, 507(a), 1107(a), and 1108 of title 11 of the United States Code (the "***Bankruptcy Code***"), Rules 6003 and 6004 of the Federal Rules of Bankruptcy Procedure (the "***Bankruptcy Rules***"), Rule 9013-1 of the Bankruptcy Local Rules for the Southern District of Texas (the "***Bankruptcy Local Rules***"), and the Procedures for Complex Cases in the Southern District of Texas.

## BACKGROUND

4.     On the date hereof (the "***Petition Date***"), the Debtors each commenced with the Court a voluntary case (the "***Chapter 11 Cases***") under chapter 11 of the Bankruptcy Code.  The Debtors continue to operate their business and manage their properties as debtors in possession under sections 1107(a) and 1108 of the Bankruptcy Code.  No trustee, examiner, or statutory committee has been appointed in the Chapter 11 Cases.

5.     Contemporaneously with the filing of the Motion, the Debtors filed a motion requesting joint administration of the Chapter 11 Cases pursuant to Bankruptcy Rule 1015(b) and Bankruptcy Local Rule 1015-1.

6.     The Debtors are a privately held gaming and entertainment company focused on acquiring undervalued gaming assets and implementing operational changes to improve profitability.  The Debtors own and operate a portfolio of casinos, card rooms, hotels, and other gaming- and hospitality-related assets across Washington State, Nevada, and Colorado, including 17 card rooms in Washington State, and several casinos and hotels in Nevada and Colorado, reflecting a total of approximately 2,500 slot machines, 320 table games, 1,200 hotel rooms, and 30 restaurants.  The Debtors' operating businesses also include the EGads! fabrication and installation business, a gaming and hospitality industry leader in the design, fabrication, assembly and installation of casino interiors, custom signage, lighting, and architectural treatments ("***Egads***"), and the Utah Trailways charter company, which facilitates customer gaming excursions from Salt Lake City, Utah, to the Debtors' operating properties in Wendover, Nevada.

7.     The factual background regarding the Debtors, including their business, their capital structure, and the events leading to the commencement of the Chapter 11 Cases is set forth

in the *Declaration of Jeff Seery in Support of Chapter 11 Petitions and First Day Relief* (the "***First Day Declaration***"), filed contemporaneously herewith and incorporated herein by reference.[2]

## I.       The Debtors' Workforce

8.       As of the Petition Date, the Debtors employ approximately 2,900 employees (the "***Employees***") across their operations in Washington, Nevada, Colorado, and Utah.  The Employees perform a variety of critical functions throughout the Debtors' businesses including, among other things, operating the Debtors' gaming facilities, ancillary properties, and other operating businesses, supplying food and beverage and hospitality services, and providing necessary administrative, managerial, and financial support services.

9.       Approximately 1,250 of the Employees (collectively, the "***Union Employees***") are represented by the Teamsters Local Union Nos. 38, 117, 760, and 839 (the "***Unions***").  All of the Union Employees work in hourly roles as non-supervisory card dealers, food and beverage employees, and security personnel.  The Debtors' relationship with the Unions are reflected in a collective bargaining agreement that runs through February 28, 2027 (the "***CBA***").

10.      Approximately 250 of the Debtors' non-union Employees are salaried (such Employees, the "***Salaried Employees***") and approximately 1,400 of the non-union Employees are paid hourly (such employees, the "***Hourly Employees***").  Approximately 1,150 of the Hourly Employees work full-time, and approximately 250 of the Hourly Employees work part-time.

---

[2]      Capitalized terms used but not defined herein have the meanings given to them in the First Day Declaration.

11.     The following chart summarizes the information set forth in Paragraphs 9 and 10:

| Category of Employee | Number of Employees[3] |
|---|---|
| Salaried Employees | 250 |
| Full Time Hourly Employees | 1,150 |
| Part Time Hourly Employees | 250 |
| Union Employees | 1,250 |
| *Total Employees* | 2,900 |

## II.     EMPLOYEE OBLIGATIONS

12.     In the ordinary course, the Debtors incur a number of obligations to, or for the benefit of, their Employees, which include:

(a)     wage and salary obligations and related compensation programs (including certain employee incentive programs, stipends, paid time off, payment of gratuities, and director compensation), expense reimbursements, and all related administrative and incidental costs (collectively, and together with all other compensation-related obligations, the "***Employee Compensation Obligations***");

(b)     health and welfare benefit obligations and savings and other retirement programs (collectively, and together with all other benefit obligations, the "***Employee Benefit Obligations***");

(c)     obligations for payroll deductions, garnishments, retirement and other employee benefit plan contributions and voluntary deductions (collectively, the "***Payroll Deduction Obligations***");

(d)     obligations relating to the Workers' Compensation Policies (defined below) and Workers' Compensation Claims (defined below) (collectively, the "***Workers' Compensation Obligations***," and together with the Employee Compensation Obligations, the Employee Benefit Obligations, the Payroll Deduction Obligations, and all related obligations owed to the Employees, the "***Employee Obligations***").

13.     The Debtors seek authority to pay amounts due on account of the Employee Obligations to the Employees (or the applicable third-party administrator, consultant, agent, or provider) as and when they come due, as further described herein.

---

[3]     The amounts set forth in this chart are approximations.

14.     The Debtors estimate that, as of the Petition Date, the total aggregate amount of outstanding prepetition Employee Obligations approximates $3,500,000.  Such obligations fall into several categories that are summarized in the following table and further discussed below:

| Employee Obligations | Estimated Prepetition Amounts[4] |
|---|---:|
| Wage and Salary Obligations | $3,400,000 |
| *Employees* | *$2,900,000* |
| *Payroll Deduction Obligations and Garnishments* | *$500,000* |
| Payroll Processing Services | $15,000 |
| Employee Compensation Programs | $2,207,750 |
| *Employee Incentive Programs* | *$0* |
| *Security Stipend* | *$6,750* |
| *Gratuities* | *$2,200,000* |
| *Severance* | *$0* |
| *Director Compensation* | *$0* |
| *Commuter Benefits* | *$1,000* |
| Expense Reimbursements | $3,000 |
| Health and Welfare Benefits | $150,000 |
| Other Employee Benefit Obligations | $1,000 |
| Savings and Other Retirement Obligations | $225,000 |
| Payroll Taxes | $432,000 |
| Workers' Compensation Obligations | $25,000 |
| Payments to Administrators | $0 |
| *Total Employee Obligations* | ~$6,500,000 |

A.     **Wage and Salary Obligations**

15.     In general, each Employee  is paid via check or direct deposit on a biweekly basis. In aggregate, the Debtors pay the Employees approximately $5,500,000 during each two-week period, inclusive of Payroll Taxes.[5]   The Debtors estimate that, as of the Petition Date, they owe

---

[4]     The amounts set forth in this chart are estimates.  For the avoidance of doubt, the Debtors are seeking authority in this Motion to pay all Employee Obligations pursuant to the Proposed Order.

[5]     However, payroll is disbursed weekly as employees have varying biweekly pay schedules.

$6,480,000 in wage and salary obligations to Employees (all such claims for unpaid salary or wages, the "***Wage and Salary Obligations***"), none of which exceeds the priority wage cap imposed by section 507(a)(4) of the Bankruptcy Code (the "***Wage Cap***").

### B.    Payroll Processing Services

16.    The Debtors' payroll is administered through Paylocity Holding Corporation (the "***Payroll Administrator***").  The ongoing services of the Payroll Administrator are imperative to the Debtors' payroll processing and, more broadly, to the smooth functioning of the Debtors' operations.  The Debtors pay monthly fees for the Payroll Administrator's services that total approximately $350,000 annually.  As of the Petition Date, the Debtors estimate that they owe approximately $15,000 in accrued but unpaid obligations on account of the Payroll Administrator's services.

### C.    Employee Compensation Programs

#### 1.  Employee Incentive Programs[6]

17.    In the ordinary course of business, to encourage and reward outstanding performance, Employees historically have been able to earn additional pay under various incentive programs (the "***Employee Incentive Programs***") by achieving specific individual and business targets, recruiting new employees, and obtaining certain licenses.

18.    All of the Employee Incentive Programs are discretionary.  As of the Petition Date, the Debtors believe there are no accrued and unpaid prepetition amounts due and owing on account of the Employee Incentive Programs.  The Debtors do not intend to make any payments to Employees on account of the Employee Incentive Programs during the first 21 days of the Chapter

---

[6]    Any description of the Employee Incentive Programs is for illustration purposes only, is not intended to be a comprehensive recitation of all the applicable terms and conditions and is qualified in its entirety by the governing agreements.

11 Cases.  However, the Debtors may evaluate their ability to resume payments under some or all these programs during the course of the Chapter 11 Cases.  Accordingly, the Debtors request the authority, but not direction, to continue and honor any obligations under the following Employee Incentive Programs in their absolute discretion during these Chapter 11 Cases, and in each case to pay any accrued amounts thereunder as they become due.

19.     ***Discretionary Bonus Program***.  In the ordinary course of business, to encourage and reward outstanding performance, the Debtors have historically offered eligible full-time Employees (including, but not limited to, executive and director-level managers and casino hosts) the opportunity to earn discretionary bonuses on an annual basis (the "***Discretionary Bonus Program***").  The incentive amounts range from 1.0% to 35.0% percent of the respective Employee's base compensation.  The incentives under the Discretionary Bonus Program were historically paid out to eligible Employees in the quarter subsequent to the calendar year.

20.     ***Employee Referral Bonus Program.***  Employees were historically entitled to a referral bonus of $300 for each employee candidate that they referred to, and was hired by, the Debtors.

21.     ***Surveillance Bonus Program***.  Employees in Washington may be eligible for bonuses ranging from $25 to $1,000 for reporting incidents of misdealing, bet capping, pinching, card switching, theft, and collusion, among others (the "***Surveillance Bonus Program***").  The Surveillance Bonus Program was recently implemented in June 2025.

22.     ***Maverick of the Year Recognition Program.***  In Colorado, the Company historically maintained a recognition program for exceptional individual performance.  Under the Maverick of the Year Program (the "***MOY Program***"), approximately $500 may be rewarded each month to five Employees, $1,100 to five "Team Members of the Year", and the ultimate "Maverick

of the Year" (the "***MOY***") may be rewarded $5,000.  Monthly and annual cash awards under the MOY Program are paid out as determined by the Debtors.

### 2.  Security Stipend

23.     ***Security Specialist Gaming License Stipend***.  Union Employees that are employed as security specialists would historically receive an annual stipend of $150 (the "***Security Stipend***").  The stipend is intended to offset the out-of-pocket costs of licensing for all non-probationary security Union Employees who do not have more than one active written warning for anything other than attendance.  Approximately 69 Employees receive the Security Stipend.  The annual cost to the Debtors is approximately $10,350.  As of the Petition Date, the Debtors estimate that they owe approximately $6,750 in accrued but unpaid obligations on account of the Security Stipend.  By this Motion, the Debtors request authority, but not direction, to continue funding the Security Stipend.

### 3.  Payment of Gratuities

24.     In the ordinary course of the Debtors' businesses, customers pay gratuities to Employees for the Employee's services (the "***Gratuities***").  The Debtors process gratuities depending on the Employee's state of employment (the "***Gratuities Programs***"). For Washington Employees, all Gratuities to dealers are remitted through payroll, and food and beverage Employees receive their Gratuities in cash.  Colorado and Nevada Employees are able to elect the portion of their Gratuities that are taken in cash versus through payroll at the end of each shift.  Any amounts not elected to be taken in cash are remitted through payroll.  Thus, although the Debtors collect Gratuities for the benefit of their Employees on a daily basis, a portion of the Gratuities are paid in arrears.  The numbers vary from day to day, but the average amount in Gratuities over a two-week period is approximately $1,000,000.  As of the Petition Date, the Debtors estimate that they owe approximately $2,200,000 in accrued but unpaid obligations on

account of the Gratuities Programs to the Employees.  Because certain of the Employees rely on tips for the majority of their pay, uninterrupted payment of such Gratuities to the Employees entitled to them is critical to the Debtors' continued operations and to avoid Employee hardship. The Debtors therefore request authority to pay the amount owed on account of Gratuities earned prepetition and seek to continue the Gratuities Programs in the ordinary course of business.

### 4.    Paid Time Off

25.    The Debtors provide all Employees with paid time off ("**PTO**") pursuant to certain policies and as discussed further below.  The Debtors submit that accrued but unpaid PTO obligations in Washington and Nevada do not represent a true "cash" liability for the Debtors, as the Debtors anticipate that eligible Employees will use most of their PTO in the ordinary course of business.  That said, the Debtors pay Employees for accrued, unused PTO in accordance with applicable state and local laws, and subject to certain buyouts in Colorado.  The Debtors anticipate that approximately $300,000 in accrued PTO obligations may come due and owing on account of any payouts and buyouts in Colorado.

26.    Because the PTO constitutes an essential feature of the employment package provided to the Debtors' Employees, and failure to provide these benefits would harm Employee morale and encourage the premature departure of valuable Employees, the Debtors request authority to honor all of their PTO obligations as and when they come due in the ordinary course of business.

27.    ***Non-Union Employees.*** Generally, Non-Union Employees accrue PTO on an annual basis pursuant to a formula and based on the Employee's number of years of service.  PTO generally is not carried over from year to year, except in Colorado, and in Washington as described below, or paid out at termination, except in Colorado.  PTO for all Employees in Washington is consistent with the state sick leave policy, which, among other things, permits Employees to carry

over a maximum of 40 hours of unused and accrued paid PTO leave into the following year. Unused PTO is not paid out to employees at termination under the state sick leave policy.  In Colorado, Full-Time Hourly Employees may elect to buy out their accrued but unused PTO up to a maximum of two times per year, at a rate of 50% of the earned amount.

28.     ***Union Employees.*** PTO for Union Employees is governed by the terms of the CBA, as set forth in the table below. Union Employees must be employed for at least six months to qualify for PTO, and accrue PTO based on straight-time hours paid and length of tenure. Unused PTO is not paid out to employees at termination.

| Years of Continuous Service | Vacation Eligibility in Hours |
|---|---|
| 1-2 | 0.0192 hours per hour paid, up to 40 hours |
| 3-9 | 0.0385 hours per hour paid, up to 80 hours |
| 10-14 | 0.0577 hours per hour paid, up to 120 hours |
| 15th year+ | 0.0769 hours per hour paid, up to 160 hours |

### 5. Severance

29.     In the ordinary course of business, the Debtors do not maintain a severance program or policy with its Employees. However, nine of the Debtors' Employees have employment agreements that provide for severance pay (the "***Severance Benefits***") upon a qualifying termination of employment or other qualifying event (a "***Qualifying Event***").  Severance Benefits compensation is generally calculated for a period of time based on an Employee's base compensation, subject to certain increases/adjustments on an individual basis.[7]  The Severance

---

[7]   Currently, the Debtors have agreements with Employees providing Severance Benefits upon a Qualifying Event that provide for payment totaling either (i) six or 12 months of the Employee's base compensation, (ii) one year of the Employee's base compensation, plus a 100% bonus, or (iii) a payout amount equal to the annual base pay for remainder of the Employee's term of employment under the employment agreement.

Benefits are generally payable upon a Qualifying Event according to the Debtors' regular pay schedule (i.e., the next pay period following the applicable Qualifying Event).  The Severance Benefits are also generally subject to the Employee's agreement to enter into a release and waiver of claims against the Company.

30.     In the 12-month period before the Petition Date, the Debtors incurred $27,500 on account of Severance Benefits that were paid on a discretionary basis to certain Employees.  As of the Petition Date, the Debtors are unaware of any outstanding prepetition obligations on account of the Severance Benefits.  The Debtors are not seeking authority at this time to pay any Severance Benefits.  However, the Debtors reserve the right to seek Court approval by separate motion to making such payments in the future, as necessary.

### 6.  Director Compensation

31.     The Debtors compensate and provide expense reimbursement for three non-Employee independent managers that serve on the Special Committee of the governing body of Maverick Debtors (as defined in the First Day Declaration) (such fees paid and expenses reimbursed, collectively, the "***Director Compensation***").  The Debtors are obligated to pay each such independent manager $25,000 monthly in advance for services provided and an additional $5,000 per diem payment for each day for which the manager is required to spend more than four hours addressing tasks outside routine matters as a member of the Debtors' governing bodies.  As of the Petition Date, the Debtors estimate that they have no outstanding prepetition obligations on account of the Director Compensation.

32.     The Directors' services are necessary for the continued management of the Debtors and, accordingly, it is essential that the Debtors continue to pay all Director Compensation in the ordinary course.  By this Motion, the Debtors request authority, but not direction, to continue the

Director Compensation and pay all Director Compensation as it comes due in the ordinary course of business.

**D.      Expense Reimbursements**

33.      The Debtors, in the ordinary course of business, reimburse Employees for a variety of ordinary, necessary, and reasonable business-related expenses incurred on behalf of the Debtors in the scope of their employment (the "***Expense Reimbursements***").[8]  Expense Reimbursements may include expenses for business travel (including lodging, automobile rentals, and meals), business-related transportation and mileage costs, and other general business-related expenses. The Debtors process Expense Reimbursements in accordance with the regular payroll schedule and all claimed Expense Reimbursements are subject to a review and approval process by management.

34.      As of the Petition Date, the Debtors estimate that they owe approximately $3,000 in prepetition Expense Reimbursements to Employees.  By this Motion, the Debtors seek authority to pay all accrued and unpaid prepetition Expense Reimbursements, and to continue such practices on a postpetition basis in the ordinary course of business.

**E.      Health and Welfare and Other Employee Benefits**

35.      Eligible Employees are offered a comprehensive benefits package, including, but not limited to, medical and prescription drug coverage, dental coverage, vision coverage, flexible spending accounts, health savings accounts, life insurance, disability insurance, and other health and welfare benefit programs (collectively, the "***Health and Welfare Benefits***").[9]  Newly hired

---

[8]      In addition to the Expense Reimbursements, the Debtors also maintain a credit card program for certain Employees.  The details of, and the relief requested with respect to, these programs is set forth in the Cash Management Motion.

[9]      Full-time Employees in Colorado, Nevada, and Utah are eligible if they work at least thirty (30) hours per week; in Washington, full-time salaried and non-union Employees are eligible (the "***Eligible Employees***").  Eligible

Employees are eligible on the first day of the month following sixty (60) days of employment.  By this Motion, the Debtors seek authority to pay all accrued and unpaid prepetition obligations relating to the Health and Welfare Benefits and continue the Health and Welfare Benefits postpetition in the ordinary course of business.  As of the Petition Date, the Debtors estimate that they owe approximately $10,000 in reported but unpaid obligations on account of the Health and Welfare Benefits.

### 1.   Medical Plans

36.     All eligible Employees, including both Non-Union Employees and Union Employees, have the opportunity to obtain medical and prescription drug benefits through the Debtors (the "***Medical Plans***").   Under the Medical Plans, participants receive coverage for, among other things, preventative care, doctor visits, hospital care, prescription drugs, and wellness. The Medical Plans are similar in the types of services they cover but vary in costs for in-network and out-of-network services, provider access, and the overall deductible and corresponding paycheck deductions.  Eligible Employees are offered three coverage options provided by UMR, the Debtors' third-party administrator: (a) the Foundation plan, which is a traditional co-pay PPO plan (b) the Premium plan, which is a traditional co-pay PPO plan, and (c) the Savers plan, which is a high-deductible health plan.  Eligible Union Employees, in addition to having access to the Foundation, Premium, or Savers plans, also have access to a "Buy-Up" plan, which is a traditional co-pay PPO plan.  The Medical Plans are self-funded employer health plans and are funded both through Employee contributions and by the Debtors.  The Debtors pay UMR directly for the benefits pursuant to the Medical Plans. The Medical Plans include a prescription drug benefit

---

Employees are eligible for Health and Welfare Benefits on the first day of the month following sixty (60) days of employment.

program, provided through PrudentRx.  The prescription drug offering is provided to Employees that elect the Foundation or Premium Medical Plans and is 100% funded by the Debtors.

37.     Approximately 920 Employees are enrolled in the Medical Plans.  The total cost of the Medical Plans, inclusive of the "Buy-Up" plan, is approximately $450,000 per month, of which $200,000 is funded by the Debtors and $250,000 is funded by participating Employees.  As of the Petition Date, the Debtors estimate that they owe approximately $37,704.47 in accrued and unpaid prepetition obligations related to the Medical Plans.

## 2.  Dental Plans

38.     All Eligible Employees, including both Non-Union Employees and Union Employees, may also obtain dental benefits through a PPO plan or a "Buy-Up" plan (the "***Dental Plans***") each administered by Delta Dental.  The Dental Plans offer similar services and coverage and vary based on costs for services, the overall deductible and corresponding paycheck deductions.  Premiums owed on account of the Dental Plan are fully paid by participating Employees. Employee contributions are collected through payroll deductions each pay period.  As of the Petition Date, approximately 917 Employees participate in the Dental Plans.

39.     As of the Petition Date, the Debtors do not believe they owe any amounts in connection with the Dental Plans.  However, in an abundance of caution, to the extent that the Debtors hold funds representing amounts withheld from Employees' paychecks in connection with the Dental Plans, the Debtors seek authority to remit such funds on behalf of the Employees in the ordinary course of business.

## 3.  Vision Benefits

40.     Eligible Employees also have the option to enroll in vision benefits (the "***Vision Plan***") administered by VSP Vision Care ("***VSP***").  The Vision Plan generally covers Employees' routine eye exams, eyeglass frames and lenses, and contact lenses to varying degrees depending

on the service and whether the provider is within network or is outside the network (the latter option being more costly to the Employee).  Premiums owed on account of the Vision Plan are fully paid by participating Employees.  As of the Petition Date, approximately 800 Employees participate in the Vision Plan.

41.     As of the Petition Date, the Debtors do not believe they owe any amounts in connection with the Vision Plan.  However, in an abundance of caution, to the extent that the Debtors hold funds representing amounts withheld from Employees' paychecks in connection with the Vision Plans, the Debtors seek authority to remit such funds on behalf of the Employees in the ordinary course of business.

### 4.  Health and Welfare Savings Accounts

42.     Employees have the opportunity to contribute, through pre-tax payroll deductions, to a flexible spending account to be used for dependent care expenses (the "***FSAs***") and to a health savings account to be used for personal or dependent health care expenses (the "***HSAs***" and, together with the FSAs, the "***HSA/FSAs***"), subject to limits imposed by federal law.  Employees enroll in FSAs through Paylocity and must submit eligible claims to the administrator, UMR. Optum Bank, which administers the claims under the HSAs, provides participating Employees a debit card that may be used to pay for eligible expenses directly.  To be reimbursed for eligible expenses not paid with the debit card, Employees must submit eligible claims to Optum Bank, which then remits reimbursements to the Employees.  The Debtors do not believe they have any prepetition liability on account of the HSA/FSAs but to the extent that the Debtors hold funds representing amounts withheld from Employees' paychecks in connection with the HSA/FSAs, the Debtors seek authority to remit such funds on behalf of the Employees in the ordinary course of business.

### 5.   Life and Disability Insurance

43.     All Eligible Employees receive, at the Debtors' cost, basic life insurance and accidental death and dismemberment ("***AD&D***") insurance.  The basic life insurance plan pays the Employee's designated beneficiary a life insurance benefit of a lump sum amount of $25,000.

44.     Employees also have the opportunity to purchase more substantial life insurance and AD&D insurance (including for dependents), subject to medical questions and evidence of insurability, which is provided through Symetra Financial Corporation ("***Symetra***").  Additionally, the Debtors offer Employees short-term disability insurance, long-term disability insurance, voluntary accident insurance, and voluntary critical illness insurance (collectively, with basic life insurance and AD&D insurance, the "***Life and Disability Insurance***"), which are also administered by Symetra.  The scope of Employees' benefits and eligibility under the Life and Disability Insurance varies depending on factors such as the Employee's start date and the Employee's base compensation, among other things.  As of the Petition Date, the Debtors estimate that they owe approximately $94,088.38 in accrued but unpaid obligations on account of Life and Disability Insurance for Employees.

### 6.   COBRA

45.     Upon termination, former Employees are entitled to continue their coverage under the Medical Plan, the Dental Plan, the Vision Plan, and the HSA/FSAs under the Consolidated Omnibus Budget Reconciliation Act ("***COBRA***"), which allows covered Employees and their qualified beneficiaries to continue their coverage at their expense, but subject to the Debtors' group rates, plus an administration fee.

### 7.   Employee Assistance Program

46.     All Employees, at the expense of the Debtors, may utilize counseling and mental health services through an employee assistance program (the "***EAP***") offered through Symetra.

Eligible Employees may utilize the EAP for telephonic or in-person counseling services.  As of the Petition Date, the Debtors estimate that they do not owe any accrued but unpaid prepetition obligations on account of the EAP but seek authorization to continue the EAP postpetition in the ordinary course of business.

### 8.   Identity Protection Program

47.     The Debtors offer Employees voluntary identity-theft protection services (the "***Identity Protection Program***") through Symetra.  Employees fully fund the cost of coverage under the Identity Protection Program through payroll deductions.  As of the Petition Date, the Debtors estimate that they do not owe any accrued but unpaid prepetition obligations on account of the Identity Protection Program but seek authorization to continue the Identity Protection Program postpetition in the ordinary course of business.

48.     ***Commuter Benefits.***  Employees in Colorado are eligible for a subsidy for public transportation commuting expenses (the "***Commuter Benefits***").  The Commuter Benefits cover five round trips on public transportation per week.  The Debtors pay approximately $50,000 annually in administrative expenses on account of the Commuter Benefits.  The Debtors estimate that, as of the Petition Date, they owe approximately $1,000 in accrued and unpaid prepetition amounts on account of the Commuter Benefits.  The Debtors seek authority to continue the Commuter Benefits and pay prepetition and postpetition obligations related to the Commuter Benefits as they come due in the ordinary course of business.

### 9.   Tuition Benefits

49.     Eligible Employees located in Colorado are eligible for reimbursement up to a maximum of $5,250 per calendar year for accredited continuing education programs that offer growth in an area related to their position or that may lead to promotional opportunities (the "***Tuition Benefits***").  As of the Petition Date, the Debtors estimate that they do not owe any

accrued but unpaid prepetition obligations on account of the Tuition Benefits but seek authorization to continue the Tuition Benefits postpetition in their discretion in the ordinary course of business.

**F.      Retirement Benefits**

50.      Eligible Non-Union Employees may elect to participate in the Debtors' 401(k) savings plan (the "*401(k) Plan*") administered by Voya Financial ("*Voya*").   Employees are eligible for the 401(k) Plan after three months of employment and if they are at least 21 years old. The Debtors do not match 401(k) Plan contributions.  Employees may contribute up to the federal statutory cap of $23,500 per year (or $31,000 per year for eligible Employees aged 50 or over). Approximately 600 Non-Union Employees participate in the 401(k) Plan.  As of the Petition Date, the Debtors do not believe that they owe any prepetition amounts on account of the 401(k) Plan but seek authority to continue the 401(k) Plan postpetition in the ordinary course of business.

51.      Eligible Union Employees are automatically enrolled in a pension plan (the "*Pension Plan*"), whereby Maverick Washington LLC makes certain contributions to the Western Conference of Teamsters Pension Trust Fund on account of each Union Employee in the amount of $1.10 for each hour for which the Union Employee is compensated, up to a maximum of 2,080 hours per calendar year.[10]  Approximately 1,250 Union Employees participate in the Pension Plan.  As of the Petition Date, the Debtors estimate they owe approximately $225,000 in accrued and unfunded prepetition amounts account of the Pension Plan.  By this Motion, the Debtors request authority, but not direction, to continue funding the Pension Plan.

---

[10]     The rate was recently increased from $1.00 to $1.10, effective April 1, 2025. The Pension Plan is also subject to certain adjustments for probationary Union Employees.

### G.     Payroll Deduction Obligations

52.     Applicable statutory authority requires the Debtors to match and pay additional amounts for Social Security, Medicare taxes, and federal and state unemployment insurance (the "*Company Payroll Taxes*").   As of the Petition Date, the Debtors estimate that they owe approximately $432,000 on account of accrued and unpaid prepetition Company Payroll Taxes. The Debtors request authority to pay and remit the unpaid Company Payroll Taxes in the ordinary course of business and consistent with past practice and to continue paying and remitting the Company Payroll Taxes in the ordinary course on a postpetition basis.

53.     In addition, during each applicable payroll period, the Debtors routinely deduct certain amounts from Employee compensation that the Debtors are required to transmit to third parties, including, without limitation, (a) the Employee portion of payroll taxes (the "*Employee Payroll Taxes*" and together with the Company Payroll Taxes, the "*Payroll Taxes*"); (b) other pre- and post-tax deductions payable pursuant to certain of the Employee Benefit Obligations discussed herein (such as an Employee's share of health care benefits and insurance premiums, contributions under flexible spending plans, 401(k) contributions, and other miscellaneous deductions); (c) Union dues and assessments (for Union Employees); and (d) garnishments, child support, service charges, and similar deductions (collectively, the "*Payroll Deduction Obligations*").

54.     Periodically, the states in which the Debtors have Employees are permitted to adjust their unemployment tax rates and, in doing so, additional, unforeseen Employee Payroll Taxes may be owed by the Debtors.   To the extent this occurs, the Debtors seek permission to pay any additional Employee Payroll Taxes owed as a result.

55.     On average, on account of the Payroll Deduction Obligations, the Debtors deduct a total of approximately $2,500,000 from Employee compensation per month, which the Debtors then forward to the appropriate third-party recipients.   The Company currently estimates that

$500,000 on account of Payroll Deduction Obligations is currently accrued and outstanding.  The Debtors request authority to remit the Payroll Deduction Obligations in the ordinary course of business and consistent with past practice and to continue collecting and remitting the Payroll Deduction Obligations in the ordinary course of business on a postpetition basis.

H.     **Workers' Compensation**

56.     The Debtors carry workers' compensation insurance that provides coverage in the event of an Employee's injury, disability, or death, as prescribed by state and federal workers' compensation laws and other statutes in the states in which they operate.  In connection with these requirements, the Debtors maintain workers' compensation insurance policies, depending upon the state in which the covered Employees work.

57.     The Debtors' Employees are covered under workers' compensation insurance policies through either (a) CNA Insurance, for Colorado, Nevada, Utah, and Egads, or (b) the Washington State Department of Labor and Industries ("**L&I**"), for Washington State (the "**Workers' Compensation Policies**").  The Debtors pay the full amount of the premiums associated with each of the Workers' Compensation Policies.  Under the policies with CNA Insurance, the Debtors pay a total annual policy premium of approximately $250,000.  The Egads policy runs from September 30, 2024, through September 30, 2025.  The policy for Colorado, Nevada and Utah runs from December 1, 2024, through December 1, 2025.  Under the policies with L&I, the Debtors pay a total annual policy premium of approximately $180,000, which runs from July 1, 2025, through June 30, 2026.

58.     As of the Petition Date, there are approximately 20 current workers' compensation claims (the "**Workers' Compensation Claims**") open against the Debtors.[11]  The Debtors estimate

---

[11]   To the best of the Debtors' knowledge, this Motion accurately reflects all current outstanding obligations relating to Workers' Compensation Claims.  Nonetheless, out of an abundance of caution, to the extent that any formerly

that, as of the Petition Date, they owe approximately $25,000 in accrued but unpaid prepetition obligations on account of the current Workers' Compensation Claims.

59.     Failure to maintain the Workers' Compensation Policies would likely result in administrative or legal proceedings against the Debtors and their directors and officers and could cause Employee departures, which would disrupt the business.  Accordingly, to facilitate the ordinary course handling of Workers' Compensation Claims, the Debtors request authority to modify the automatic stay of section 362 of the Bankruptcy Code to allow Workers' Compensation Claims to proceed under the applicable Workers' Compensation Policy and to allow the Debtors, their affiliates, their insurance providers, or their third-party administrators to negotiate, settle, or litigate Workers' Compensation Claims, and pay resulting amounts, whether such claims arose before or after the Petition Date.

## I.     Payments to Administrators

60.     The Debtors rely on certain third-party providers or administrators to administer and deliver payments and benefits to the Employees (collectively, the "***Administrators***") including, but not limited to, the Payroll Administrator, Delta Dental, VSP, Symetra, Voya, CNA Insurance, UMR, PrudentRx, Optum Bank and others, all as described herein.  As of the Petition Date, the Debtors estimate that they do not owe any accrued but unpaid prepetition obligations to the Administrators but seek authorization to continue to remit payment to the Administrators for their services postpetition in the ordinary course of business.

---

closed Workers' Compensation Claims are re-opened during the pendency of these Debtors' Chapter 11 Cases, the Debtors also seek authority, by this Motion, to apply the relief requested in this Motion to such claims.  The Debtors reserve all rights related thereto.

**BASIS FOR RELIEF**

**I.    Paying the Employee Obligations is Warranted Under Sections 105(a), 363(b), and 1107 of the Bankruptcy Code.**

61.    The Court may grant the relief requested herein pursuant to section 363(b) of the Bankruptcy Code, which provides, in relevant part, that "[t]he [debtor], after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate. . . ." 11 U.S.C. § 363(b)(1).  Courts in the Fifth Circuit have granted a debtor's request to use property of the estate outside of the ordinary course of business pursuant to section 363(b) of the Bankruptcy Code upon a finding that such use is supported by sound business reasons.  *See, e.g.*, *Black v. Shor (In re BNP Petroleum Corp.)*, 642 F. App'x 429, 435 (5th Cir. 2016) (noting that section 363 "requires that a sale of the estate's assets be supported by an articulated business justification, good business judgment, or sound business reasons") (internal quotation and citation omitted); *Inst. Creditors of Cont'l Air Lines, Inc. v. Cont'l Air Lines, Inc.* (*In re Cont'l Air Lines*, *Inc.),* 780 F.2d 1223, 1226 (5th Cir. 1986) ("[F]or the debtor-in-possession or trustee to satisfy its fiduciary duty to the debtor, creditors and equity holders, there must be some articulated business justification for using, selling, or leasing the property outside the ordinary course of business." (citation omitted)).

62.    In addition, the Court has authority, pursuant to its equitable powers under section 105(a) of the Bankruptcy Code, to authorize the relief requested herein because such relief is necessary for the Debtors to carry out their duties under section 1107(a) of the Bankruptcy Code. Section 1107(a) of the Bankruptcy Code "contains an implied duty of the debtor-in-possession to 'protect and preserve the estate, including an operating business' going-concern value.'" *In re CEI Roofing, Inc.*, 315 B.R. 50, 59 (Bankr. N.D. Tex. 2004) (quoting *In re CoServ, L.L.C.*, 273 B.R. 487, 497 (Bankr. N.D. Tex. 2002)).  Under section 105(a) of the Bankruptcy Code, "[t]he court may issue any order, process, or judgment that is necessary or appropriate to carry out the

provisions of this title." 11 U.S.C. § 105(a); *see CoServ*, 273 B.R. at 491-93 & n.6 (holding that sections 105 and 1107 of the Bankruptcy Code provide authority for a debtor-in-possession to pay prepetition claims); *see also In re Tusa-Expo Holdings, Inc.*, Case No. 08-45057-DML-11, 2008 WL 4857954, at *1 (Bankr. N.D. Tex. Nov. 7, 2008); *CEI Roofing*, 315 B.R. at 56.  Moreover, Bankruptcy Rule 6003 itself implies that the payment of prepetition obligations may be permissible within the first 21 days of a case where doing so is "needed to avoid immediate and irreparable harm."  Fed. R. Bankr. P. 6003.  Accordingly, the Bankruptcy Code authorizes the postpetition payment of prepetition claims where, as here, such payments are critical to preserving the going-concern value of the Debtors' estates.

63.     The relief requested in this Motion represents a sound exercise of the Debtors' business judgment as it is directed at preserving the resources and value of their estates.  Continued payment, without interruption, of the Employee Obligations, and the continued funding, without interruption, of the compensation and benefits plans, policies, programs, and practices attendant to such obligations, as reasonably necessary and as described in this Motion, are vital to the Debtors' businesses.  Furthermore, the relief requested herein will ensure a smooth transition into chapter 11 and enhance the value of the Debtors' assets, which is necessary to the effectuate the Debtors' sale strategy under the Transaction Support Agreement and the Restructuring.

64.     Without the relief requested herein being granted, the Debtors are at risk of significant Employee attrition, as the Debtors' Employees may seek alternative opportunities, potentially with the Debtors' competitors given the nature of the Debtors' industry.  Employee attrition would cause the Debtors to incur additional expenses to find appropriate and experienced replacements, severely disrupting the Debtors' operations in light of their current liquidity position. Further, any delay or failure to pay wages, salaries, benefits, incentive programs, and

other similar items would further negatively impact the Employees' morale, dedication, confidence, and cooperation and adversely impact the Debtors' relationships with their Employees, at a time when the support of their Employees is critical to maximizing the value of the Debtors' assets. To that end, if the relief requested in this Motion is not granted, the Debtors' business operations will suffer to the detriment of the Debtors' estates, creditors, and other stakeholders.

65.    The majority of the Debtors' Employees rely exclusively on their compensation, benefits, and reimbursement of expenses to satisfy their daily living expenses.  These Employees will be exposed to significant financial difficulties and other distractions if the Debtors are not permitted to honor their obligations for unpaid compensation, benefits and reimbursable expenses. Similarly, if the Court does not authorize the Debtors to honor their various obligations under the Employee Benefits, many Employees will lose access to health coverage at a time when the Debtors need their Employees to perform their jobs at peak efficiency.  The loss in morale and potential distraction of Employees worrying about paying their bills and their healthcare costs will harm the Debtors' ability to operate and serve customers at their standard high levels, causing an erosion in the Debtors' value.

66.    Similarly, continued payment of administrative fees to the Administrators that administer the Debtors' Employee Obligations and related Employee Programs is necessary. Without the continued services of the Administrators, the Debtors will be unable to continue to honor the Employee Obligations in an efficient and cost-effective manner.

67.    The Motion is intended only to permit the Debtors, in their discretion, to: (i) make payments consistent with the Debtors' existing policies to the extent that, without the benefit of an order approving the Motion, such payments may be inconsistent with the relevant provisions of the Bankruptcy Code; and (ii) honor their practices, programs, and policies with respect to their

Employees, as such practices, programs, and policies were in effect as of the Petition Date. By this Motion, the Debtors are not currently seeking relief to pay amounts to insiders on account of any Severance Benefits or any bonus programs in excess of the limitations set forth in section 503(c) of the Bankruptcy Code.

## II.    Payment of Employee Obligations Would Not Prejudice Parties in Interest.

68.    Many (if not the vast majority) of the Employee Obligations constitute priority claims under sections 507(a)(4) and (5) of the Bankruptcy Code. Under section 507(a)(4)(A) of the Bankruptcy Code, claims for "wages, salaries, or commissions, including vacation, severance, and sick leave pay" earned within 180 days before the Petition Date are afforded priority unsecured status to the extent of $15,150 per Employee. Similarly, section 507(a)(5) of the Bankruptcy Code provides that claims for contributions to certain employee benefit plans also are afforded priority unsecured status to the extent of $15,150 per Employee covered by such plan, less any amount paid pursuant to section 507(a)(4).

69.    Because of the number of Employees working for the Debtors, and because some amounts are unknown pending submission of claims, the Debtors do not know the exact amount due to each Employee for the prepetition period. However, the majority of the Debtors' Employees are owed amounts under the $15,150 cap and the Debtors do not anticipate owing any amounts in excess of the Wage Cap. By this Motion, the Debtors seek authority pursuant to the Proposed Order to pay the Prepetition Employee Obligations up to $15,150 per Employee. As priority claims, the Employee Obligations need to be paid in full before any general unsecured obligations of the Debtors may be satisfied. Accordingly, the relief requested herein may affect only the timing of the payment of these priority obligations and should not prejudice the rights of general unsecured creditors or other parties in interest.

### III.    Payment of Certain Employee Obligations is Required by Law.

70.    The Debtors also seek authority to remit certain Payroll Deduction Obligations to the appropriate entities.   These amounts principally represent Employee earnings that governments, Employees, and judicial authorities have designated for deduction from Employees' paychecks.   Indeed, certain Payroll Deduction Obligations, including contributions to the Employee Benefit Obligations and child support and alimony payments, are not property of the Debtors' estates because they have been withheld from Employees' paychecks on another party's behalf.  *See* 11 U.S.C. § 541(b).

71.    Further, federal and state laws require the Debtors and their officers to make certain tax payments that have been withheld from their Employees' paychecks.  *See* 26 U.S.C. §§ 6672 and 7501(a); *see also City of Farrell v. Sharon Steel Corp.*, 41 F.3d 92, 95-97 (3d Cir. 1994) (finding that state law requiring a corporate debtor to withhold city income tax from its employees' wages created a trust relationship between debtor and the city for payment of withheld income taxes); *In re DuCharmes & Co.*, 852 F.2d 194, 196 (6th Cir. 1988) (noting that individual officers of a company may be held personally liable for failure to pay trust fund taxes).  Because certain Payroll Deduction Obligations are not property of the Debtors' estates, the Debtors request that the Court authorize them to transmit the Payroll Deduction Obligations to the proper parties in the ordinary course of business.

72.    For the foregoing reasons, payment of the Employee Obligations, as requested herein and in accordance with the Debtors' prepetition business practices, is necessary, appropriate, and in the best interests of the Debtors, their estates, and all other parties in interest in these cases.  Accordingly, the Court should authorize the relief requested by the Debtors.

**IV.     The Automatic Stay Should Be Modified for Workers' Compensation Claims**

73.     Section 362(a) of the Bankruptcy Code "operates as a stay, applicable to all entities, of—the commencement or continuation, including the issuance or employment of process, of a judicial, administrative, or other action or proceeding against the debtor that was or could have been commenced before the commencement of the case under this title, or to recover a claim against the debtor that arose before the commencement of the case under this title." *See* 11 U.S.C. § 362(a)(1).

74.     Section 362(d) of the Bankruptcy Code, however, permits a debtor or other party-in-interest to request a modification or termination of the automatic stay for "cause."  There is cause to modify the automatic stay, because staying the Workers' Compensation Claims could cause unnecessary employee departures or otherwise harm Employee morale, which could severely disrupt the Debtors' business at this critical time.  Accordingly, the Debtors request the Court authorize the Debtors, in their discretion, to agree to modify the automatic stay under Section 362 of the Bankruptcy Code with respect to the Workers' Compensation Claims.

## CAUSE EXISTS TO AUTHORIZE THE BANKS TO HONOR CHECKS AND ELECTRONIC FUND TRANSFERS

75.     The Debtors further request that the Court authorize applicable banks and other financial institutions (collectively, the "***Banks***") to receive, process, honor, and pay any and all checks issued, or to be issued, and electronic funds transfers requested, or to be requested, by the Debtors relating to the Employee Obligations (whether such checks or fund transfers were presented before or after the Petition Date), to the extent that sufficient funds are on deposit in available funds in the applicable bank accounts to cover such payment.  The Debtors also seek authority to issue new postpetition checks or effect new postpetition electronic funds transfers in

replacement of any checks or fund transfer requests on account of prepetition Employee Obligations dishonored or rejected as a result of the commencement of the Chapter 11 Cases.

## EMERGENCY CONSIDERATION

76.      The Debtors respectfully request emergency consideration of this Motion pursuant to Local Rule 9013-1 and Bankruptcy Rule 6003, which authorize the Court to grant relief within the first 21 days after the commencement of a chapter 11 case to the extent that relief is necessary to avoid immediate and irreparable harm.  As described in detail above and in the First Day Declaration, immediate and irreparable harm would result if the relief requested herein is not granted.  Accordingly, the Debtors submit that the requirements of Bankruptcy Rule 6003 are satisfied.

## DEBTORS' COMPLIANCE WITH BANKRUPTCY RULE 6004(A) AND WAIVER OF BANKRUPTCY RULE 6004(A) AND (H)

77.      With respect to any aspect of the relief sought herein that constitutes a use of property under section 363(b) of the Bankruptcy Code, the Debtors request that the Court find that notice of this Motion is adequate under Bankruptcy Rule 6004(a) and waive the 14-day stay under Bankruptcy Rule 6004(h).  As described above, the relief that the Debtors seek in this Motion is necessary to avoid immediate and irreparable harm to the Debtors.  Thus, cause exists for the Court to find that notice of this Motion satisfies Bankruptcy Rule 6004(a) and waive the 14-day stay under Bankruptcy Rule 6004(h).

## RESERVATION OF RIGHTS

78.      Nothing in this Motion is intended to be nor shall be deemed:  (a) an implication or admission as to the amount of, basis for, or validity of any claim against the Debtors; (b) a waiver or limitation of the Debtors' or any other party in interest's right to dispute the amount of, basis for, or validity of any claim; (c) a waiver of the Debtors' or any other party in interest's rights

under the Bankruptcy Code or any other applicable non-bankruptcy law; (d) a waiver of the obligation of any party in interest to file a proof of claim; (e) a promise or requirement to pay any particular claim; (f) a waiver of any claims or causes of action which may exist against any entity under the Bankruptcy Code or any other applicable law; (g) an admission as to the validity, priority, enforceability, or perfection of any lien on, security interest in, or other encumbrance on property of the Debtors' estates; (h) an admission that any lien satisfied pursuant to this Motion is valid (and all rights to contest the extent, validity, or perfection or seek avoidance of all such liens are expressly reserved); or (i) a request or authorization to assume, adopt, or reject any agreement, contract, or lease pursuant to section 365 of the Bankruptcy Code.  Likewise, if the Court grants the relief sought herein, any payment made pursuant to the Court's order is not, nor shall it be, construed as an admission to the validity of any claim or a waiver of the Debtors' or any other party in interest's rights to dispute such claim subsequently.

## NOTICE

79.     Notice of the Motion will be given to:  (a) the Office of the United States Trustee for the Southern District of Texas; (b) counsel to the Ad Hoc Group and Backstop Parties; (c) counsel to the Prepetition Agent; (d) the creditors listed on the Debtors' consolidated list of 30 creditors holding the largest unsecured claims; (e) the Gaming Regulators, (f) the United States Attorney for the Southern District of Texas; (g) the Internal Revenue Service; (h) the state attorneys general for states in which the Debtors conduct business; (i) the Unions; (j) the Administrators; and (k) any party that has requested notice pursuant to Bankruptcy Rule 2002. The Debtors submit that, under the circumstances, no other or further notice is required.

80.     A copy of this Motion is available on (a) the Court's website, at www.txs.uscourts.gov, and (b) the website maintained by the Debtors' proposed Claims and

Noticing        Agent,        Kroll        Restructuring        Administration        LLC,        at
https://restructuring.ra.kroll.com/RunItOneTime/

[*Remainder of page intentionally left blank.*]

**WHEREFORE**, the Debtors respectfully request that the Court enter the Proposed

Orders granting the relief requested in the Motion and such other and further relief as may be just

and proper.

Dated: July 14, 2025    Respectfully submitted,
Houston, Texas

*/s/ Timothy A. ("Tad") Davidson II*

**HUNTON ANDREWS KURTH LLP**
Timothy A. ("Tad") Davidson II (Texas Bar No. 24012503)
Ashley L. Harper (Texas Bar No. 24065272)
Philip M. Guffy (Texas Bar No. 24113705)
600 Travis Street, Suite 4200
Houston, TX 77002
Telephone:  (713) 220-4200
Email:  taddavidson@hunton.com
        ashleyharper@hunton.com
        pguffy@hunton.com

- and -

**LATHAM & WATKINS LLP**
Jeffrey E. Bjork (*pro hac vice* pending)
Helena G. Tseregounis (*pro hac vice* pending)
Nicholas J. Messana (California Bar No. 332355)
355 South Grand Avenue, Suite 100
Los Angeles, California 90071-1560
Telephone:  (213) 485-1234
E-mail:  jeff.bjork@lw.com
        helena.tseregounis@lw.com
        nicholas.messana@lw.com

- and -

**LATHAM & WATKINS LLP**
Ray C. Schrock (NY Bar No. 4860631)
Andrew Sorkin (NY Bar No. 4597944)
1271 Avenue of the Americas
New York, NY 10020
Telephone:  (212) 906-1200
E-mail:  ray.schrock@lw.com
        andrew.sorkin@lw.com

*Proposed Attorneys for the Debtors and
Debtors in Possession*

32

## CERTIFICATE OF SERVICE

I certify that on July 14, 2025, a true and correct copy of the foregoing document was served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas on those parties registered to receive electronic notices.

*/s/ Timothy A. ("Tad") Davidson II*
Timothy A. ("Tad") Davidson II
