## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

```
------------------------------------------------------------ x
                                         :
In re:                                   :    Chapter 11
                                         :
RUNITONETIME LLC, et al.,                :    Case No. 25-90191 (ARP)
                                         :
            Debtors.¹                    :    (Joint Administration Requested)
                                         :
------------------------------------------------------------ x
```

### <u>EMERGENCY</u> MOTION OF DEBTORS FOR ENTRY OF AN ORDER (I) AUTHORIZING DEBTORS TO (A) HONOR THEIR PREPETITION OBLIGATIONS TO CUSTOMERS, AND (B) CONTINUE THEIR CUSTOMER PROGRAMS; AND (II) GRANTING RELATED RELIEF

> **Emergency relief has been requested. Relief is requested not later than 1:00 p.m. (prevailing Central Time) on July 15, 2025.**
>
> **If you object to the relief requested or you believe that emergency consideration is not warranted, you must appear at the hearing if one is set, or file a written response prior to the date that relief is requested in the preceding paragraph. Otherwise, the Court may treat the pleading as unopposed and grant the relief requested.**
>
> **A hearing will be conducted on this matter on July 15, 2025, at 1:00 p.m. (prevailing Central Time) in Courtroom 404, 4th floor, 515 Rusk Street, Houston, Texas 77002. Participation at the hearing will only be permitted by an audio and video connection.**
>
> **Audio communication will be by use of the Court's dial-in facility. You may access the facility at (832) 917-1510. Once connected, you will be asked to enter the conference room number. Judge Perez's conference room number is 282694. Video communication will be by use of the GoToMeeting platform. Connect via the free GoToMeeting application or click the link on Judge Perez's homepage. The meeting code is "JudgePerez". Click the settings icon in the upper right corner and enter your name under the personal information setting.**
>
> **Hearing appearances must be made electronically in advance of both electronic and in-person hearings. To make your appearance, click the "Electronic Appearance" link on Judge Perez's homepage. Select the case name, complete the required fields and click "Submit" to complete your appearance.**

The above-captioned debtors in possession (collectively, the "***Debtors***") respectfully state

as follows in support of this motion (this "***Motion***"):

---

¹   A complete list of the Debtors in the Chapter 11 Cases may be obtained on the website of the Debtors' proposed claims and noticing agent at https://restructuring.ra.kroll.com/RunItOneTime/. The Debtors' mailing address is 12530 NE 144th Street, Kirkland, Washington 98304.

**RELIEF REQUESTED**

1.      By this Motion, the Debtors seek entry of an order (the "***Proposed Order***"), substantially in the form attached hereto (a) authorizing, but not directing, the Debtors to (i) fulfill and honor (through payment, credit, setoff, or otherwise) all prepetition obligations related to the Customer Programs (as defined below) as they deem appropriate, and (ii) continue, enforce, renew, replace, terminate, and implement new Customer Programs and any other customer practices as they deem appropriate, without further application to the Court; and (b) granting related relief.

**JURISDICTION AND VENUE**

2.      The United States Bankruptcy Court for the Southern District of Texas (the "***Court***") has jurisdiction to consider this Motion under 28 U.S.C. § 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b) and the Court may enter a final order consistent with Article III of the United States Constitution. Venue is proper under 28 U.S.C. §§ 1408 and 1409.

3.      The statutory and legal predicates for the relief requested herein are sections 105(a) and 363(b) of title 11 of the United States Code (the "***Bankruptcy Code***"), rules 6003 and 6004 of the Federal Rules of Bankruptcy Procedure (the "***Bankruptcy Rules***"), rule 9013-1 of the Bankruptcy Local Rules for the Southern District of Texas (the "***Bankruptcy Local Rules***"), and the Procedures for Complex Cases in the Southern District of Texas.

**BACKGROUND**

4.      On the date hereof (the "***Petition Date***"), the Debtors each commenced with the Court a voluntary case (the "***Chapter 11 Cases***") under chapter 11 of the Bankruptcy Code. The Debtors continue to operate their business and manage their properties as debtors in possession under sections 1107(a) and 1108 of the Bankruptcy Code. No trustee, examiner, or statutory committee has been appointed in the Chapter 11 Cases.

5.    Contemporaneously with the filing of the Motion, the Debtors filed a motion requesting joint administration of the Chapter 11 Cases pursuant to Bankruptcy Rule 1015(b) and Bankruptcy Local Rule 1015-1.

6.    The Debtors are a privately held gaming and entertainment company focused on acquiring undervalued gaming assets and implementing operational changes to improve profitability. The Debtors own and operate a portfolio of casinos, card rooms, hotels, and other gaming- and hospitality-related assets across Washington State, Nevada, and Colorado, including 17 card rooms in Washington State and several casinos and hotels in Nevada and Colorado, reflecting a total of approximately 2,500 slot machines, 320 table games, 1,200 hotel rooms, and 30 restaurants. The Debtors' operating businesses also include the EGads! fabrication and installation business, a gaming and hospitality industry leader in the design, fabrication, assembly and installation of casino interiors, custom signage, lighting, and architectural treatments, and the Utah Trailways charter company, which facilitates customer gaming excursions from Salt Lake City, Utah, to the Debtors' operating properties in Wendover, Nevada.

7.    The factual background regarding the Debtors, including their business, their capital structure, and the events leading to the commencement of the Chapter 11 Cases is set forth in the *Declaration of Jeff Seery in Support of Chapter 11 Petitions and First Day Relief* (the "***First Day Declaration***"), filed contemporaneously herewith and incorporated herein by reference.[2]

## BACKGROUND

### I.    The Customer Programs

8.    The Debtors traditionally have maintained various customer-related programs in the ordinary course of business designed to enrich their customers' loyalty and goodwill and

---

[2]    Capitalized terms used but not defined herein have the meanings given to them in the First Day Declaration.

sustain the Debtors' positive reputation in the marketplace. Among others, these programs include: (a) providing Customer Comps and Discounts, (b) holding Customer Deposits, (c) incurring Progressive Gaming Obligations, (d) issuing and honoring Gaming Currency, and (e) offering Gift Certificates (each as defined herein, and together with all other similar customer claims, obligations, and offerings, the "***Customer Programs***").

## II.    Customer Comps and Discounts

9.      In the ordinary course of business and commensurate with the practices of other gaming enterprises, the Debtors offer a variety of programs designed to enhance their customers' experience, reward continued patronage, and drive new and repeat business, including, among other things, customer loyalty rewards programs, "free play" and "match play" offers,[3] cash comps, and other various promotions and giveaways (collectively, the "***Customer Comps and Discounts***").

10.      The Debtors believe that, as of the Petition Date, their prepetition obligations with respect to the Customer Comps and Discounts total approximately $8.6 million. The Debtors seek authority to honor all prepetition Customer Comps and Discounts as of the Petition Date and to continue to honor, in their discretion, Customer Comps and Discounts in the ordinary course of business.

### A.    Loyalty Rewards Programs

11.      The Debtors maintain customer loyalty rewards programs through the use of reward cards that track customer activity and award points based on play volumes. The customer can then redeem those points for some combination of food and beverage, retail purchases, or free play or

---

[3]    "Free play" offers are a type of credit or bonus that allows customers to play table and other casino and card games without using their own money. "Match play" are similarly credits or coupons where, when produced, the Debtors will match the customer's bet on a particular game. Match play coupons have no value by themselves.

match play coupons. Certain high-earning players may also earn non-points based compensation, which the Debtors may award at their discretion, in the form of additional complimentary offers.

12.     As customers accumulate comp points, the Debtors accrue the associated expense in the form of non-cash obligations. As of the Petition Date, approximately $750,000 in costs related to reward points have accrued under the Debtors' loyalty rewards programs.[4]

### B.     "Free Play" and "Match Play" Offers

13.     The Debtors issue loyalty program members and other key customers periodic "free play" and "match play" offers, which provide customers a certain amount of credits to play the Debtors' casino and card room games. The amount of free play or match play offered to each target customer is based on, among other things, the amount of loyalty reward points redeemed or the customers' level of spend at the Debtors' gaming establishments. Free play and match play are also rewarded to participants of various in-house promotions.

14.     As customers accumulate free play and match play, the Debtors incur the associated expense as they are redeemed. As of the Petition Date, approximately $7.2 million has not yet been redeemed relating to free play and match play. Though these incurred costs are non-cash obligations, the Debtors seek authority to continue to honor, in their discretion, their obligations with respect to these Customer Comps and Discounts in the ordinary course of business.

### C.     Cash Comps

15.     To encourage high-earning customers to continue playing at the Debtors' gaming establishments, the Debtors allow certain customers to receive a credit or a discount on their losses

---

[4]     Approximately $1.5 million in redeemable points exist in the Debtors' player databases. However, the vast majority of comp points are spent to purchase slot "free play," and obligations with respect to such spend are included in the Debtors' outstanding prepetition liability for "free and match play," as described below. Accordingly, this figure only reflects the outstanding costs related to reward points that are *not* redeemed for free play or match play.

("***Cash Comp***"). Cash Comps are highly discretionary and are only awarded to customers who have certain financial credentials. The monthly estimate of Cash Comp credits and discounts given to the Debtors' customers is approximately $2.5 million. The Debtors believe that, as of the Petition Date, there is approximately $2 million outstanding with respect to Cash Comp credits and discounts.

### D. Promotions and Giveaways

16.     Periodically, the Debtors hold various promotions or giveaways for cash and non-cash prices (e.g., cash, merchandise, free play and match play, rewards program incentives and food and beverage) to attract new and existing customers. Typically, the Debtors have multiple promotions running simultaneously throughout a given month with certain promotions on specific days and others on a weekly or monthly basis. The Debtors vary their promotions based upon the season and the promotions offered by competitor casinos.

17.     The Debtors estimate they spend approximately $600,000 to $800,000 per month on giveaways and promotions. The Debtors believe that, as of the Petition Date, there is approximately $500,000 worth of promotions and giveaways that have not yet been collected.

### III. Customer Deposits

18.     Customers deposit money with the Debtors in connection with hotel stays ("***Room Rental Deposits***") as well as advance ticket sales for events and performances held at the Debtors' establishments ("***Advance Ticket Sales***" and together with the Room Rental Deposits, the "***Customer Deposits***"). Customers providing Room Rental Deposits utilize the Debtors' services, including use of the room and catering costs, as anticipated, and the Room Rental Deposit is offset against the cost of such services. Under certain circumstances, if the customer cancels the reservation, the Room Rental Deposit is fully refundable. With respect to the Advance Ticket Sales, customers receive refunds under limited circumstances where the event is cancelled or

postponed. The Debtors believe that as of the Petition Date, approximately $27,000 in refundable Customer Deposits liability has accrued.

## IV.    Progressive Gaming Obligations

19.    The Debtors offer in-house slot progressive gaming machines and table games to their customers in the ordinary course of business. Slot progressive gaming machines—electronic games that progressively accumulate funds wagered until such funds are won and paid out—and table games accrue value over a period of time based on amount of customer play. In Nevada and Colorado, the accumulated funds belong to the Debtors until such funds are won and paid out to customers. In Washington, applicable gaming regulations provide that such accumulated funds must be segregated for the benefit of the customers, apart from a certain amount of "seed" money that the Debtors contribute to start the progressive gaming program. Accordingly, the Debtors maintain separate bank accounts for each respective location to hold Washington progressive gaming obligations in "trust" for their customers.[5]

20.    As of the Petition Date, the Debtors have approximately $2.6 million in accrued prepetition obligations related to progressive gaming machines and table games in Nevada and Colorado (collectively, the "***Non-Trust Progressive Gaming Obligations***").  The Debtors have approximately $6 million in segregated accounts on account of accrued prepetition progressive gaming obligations in Washington (the "***Trust Fund Progressive Gaming Obligations***" and together with the Non-Trust Progressive Gaming Obligations, the "***Progressive Gaming Obligations***"), but, as such amounts are held for the benefit of the customers, the Debtors do not believe that they have any prepetition liability with respect to the Trust Fund Progressive Gaming

---

[5]    In the event that the Debtors remove a progressive game from play or permanently close any properties prior to the Washington progressive gaming obligations being paid out, the Debtors are required to either distribute the funds to patrons through promotions approved by the regulatory authority or donate the funds to a charitable organization in Washington State.  See Washington Administrative Code Sections 230-15-415 and 230-15-710.

Obligations, and request authority to pay any amounts required from the segregated accounts as such obligations come due.

## V.      Outstanding Gaming Currency

21.      As is customary in the casino business, the Debtors routinely issue gaming chips, slot vouchers and the like to customers for use at gaming tables and slot machines ("***Gaming Currency***"). Customers possess Gaming Currency while on the Debtors' property, and some customers, whether advertently or inadvertently, retain Gaming Currency after they leave the properties—hopefully for later use upon their return. While it is difficult to ascertain the exact amount, as of the Petition Date, the Debtors estimate that customers are in possession of approximately $1.3 million in Outstanding Gaming Currency.

## BASIS FOR RELIEF

## I.      Section 363 of the Bankruptcy Code Supports the Continuation of the Customer Programs.

22.      To the extent that the continuation of the Customer Programs would be deemed to constitute a use of property outside the ordinary course of business, a basis for authorizing such continuation is found under section 363(b) of the Bankruptcy Code.  Section 363(b)(1) of the Bankruptcy Code empowers the Court to allow a debtor to "use, sell, or lease, other than in the ordinary course of business, property of the estate[.]" 11 U.S.C. § 363(b)(1).  Courts in the Fifth Circuit have granted a debtor's request to use of property of the estate outside of the ordinary course of business where the debtor in possession has articulated a good business reason for such use.  *See, e.g.*, *Institutional Creditors of Cont'l Air Lines, Inc. v. Cont'l Air Lines, Inc. (In re Cont'l Air Lines, Inc.)*, 780 F.2d 1223, 1226 (5th Cir. 1986) (holding that section 363(b) of the Bankruptcy Code requires that "there must be some articulated business justification for using, selling, or leasing the property outside the ordinary course of business"); *In re Crutcher Res. Corp.*, 72 B.R.

628, 631 (Bankr. N.D. Tex. 1987) ("A Bankruptcy Judge has considerable discretion in approving a § 363(b) sale of property of the estate other than in the ordinary course of business, but the movant must articulate some business justification for the sale . . . .").

23.      Where a debtor has articulated a valid business justification for a proposed transaction, courts generally apply the business judgment rule in evaluating such transaction. *See, e.g.*, *ASARCO, Inc. v. Elliott Mgmt. (In re ASARCO L.L.C.)*, 650 F.3d 593 (5th Cir. 2011) ("Section 363 of the Bankruptcy Code addresses the debtor's use of property of the estate and incorporates a business judgment standard. . . . The business judgment standard in section 363 is flexible and encourages discretion.").  The business judgment rule is not an onerous standard; indeed, "[g]reat judicial deference is given to the [debtor's] exercise of business judgment." *GBL Holding Co., Inc. v. Blackburn/Travis/Cole, Ltd. (In re State Park Bldg. Grp., Ltd.)*, 331 B.R. 251, 254 (N.D. Tex. 2005).  As long as a transaction "appears to enhance a debtor's estate, court approval of a debtor-in-possession's decision to [enter into the transaction] should only be withheld if the debtor's judgment is clearly erroneous, too speculative, or contrary to the Bankruptcy Code." *Richmond Leasing Co. v. Capital Bank, N.A.*, 762 F.2d 1303, 1309 (5th Cir. 1985) (internal citation and quotation marks omitted).

24.      Finally, section 363(c) of the Bankruptcy Code authorizes a debtor in possession operating its business pursuant to section 1108 of the Bankruptcy Code to "enter into transactions . . . in the ordinary course of business without notice or a hearing, and may use property of the estate in the ordinary course of business without notice or a hearing."  11 U.S.C. § 363(c)(1). Section 363 of the Bankruptcy Code is designed to allow a debtor "to continue its daily operations without excessive court or creditor oversight and protect[ ] secured creditors and others from dissipation of the estate's assets." *U.S. ex rel. Harrison v. Est. of Deutscher*, 115 B.R. 592, 599

(M.D. Tenn. 1990) (citations omitted); *see also Phelps v. U.S. Bank Nat'l Ass'n.*, Case No. 2:13-CV-361, 2014 WL 991803, at *3 (S.D. Tex. Mar. 13, 2014) (citing section 363 of the Bankruptcy Code and holding that "[a]n assignment that is made in the ordinary course of business does not require the pre-approval of the Bankruptcy Court of the lifting of the automatic stay"). Moreover, the "'ordinary course of business' standard is intended to allow a debtor the flexibility it needs to run its business and respond quickly to changes in the business climate." *Harrison*, 115 B.R. at 598 (quoting *In re Johns-Manville Corp.*, 60 B.R. 612, 617 (Bankr. S.D.N.Y. 1986)).

25.     The Debtors submit that the requested relief represents a sound exercise of the Debtors' business judgment, is necessary to avoid immediate and irreparable harm, and is justified under sections 363(b) and 363(c) of the Bankruptcy Code.  If the Debtors are prohibited from honoring and maintaining their Customer Programs consistent with their past business practices, customers will likely lose confidence in the Debtors and may begin to patronize the Debtors' competitors that do provide such programs.  The damage from refusing to honor these commitments thus far exceeds the costs associated with honoring prepetition commitments and continuing these practices. Moreover, failure to maintain the Customer Programs and honor the Customer Obligations will cause irreparable damage to the Debtors' reputation in the gaming industry.  The relief requested herein will protect the Debtors' goodwill during this critical time and help maintain the Debtors' ability to generate revenue and the going-concern value of their estates.  Consequently, all of the Debtors' creditors will benefit if the requested relief is granted.

26.     In addition, bankruptcy courts have historically authorized debtors operating in the niche gaming industry to administer their customer programs and honor their prepetition customer obligations on a postpetition basis. *See, e.g.*, *In re Caesars Enter. Operating Co., Inc.*, No. 15-

01145 (ABG) (Bankr. N.D. Ill. Jan. 15, 2015); *In re Revel AC, Inc.*, No. 14-22654 (GMB) (Bankr. D.N.J. July 7, 2014).

27.     Accordingly, the Debtors request that they be authorized, in their discretion, to continue, renew, replace, enforce, implement new or terminate the existing Customer Programs and any other customer practices as they deem appropriate, without further application to the Court.  Any delay in the relief sought—indeed, even being forced to advise customers that further judicial relief is necessary—could result in the Debtors losing a portion of their customer base to the detriment of the Debtors and their estates.  Accordingly, the requested relief is necessary to avoid immediate and irreparable harm to the Debtors and to their estates, which would far outweigh the cost of the Customer Programs.

## II.     Section 105 of the Bankruptcy Code and the "Doctrine of Necessity" Support the Continuation of the Customer Programs.

28.     In addition, the Debtors submit that the Court may grant the relief requested herein under the "doctrine of necessity" and to the extent applicable, section 105(a) of the Bankruptcy Code.  *In re Scotia Dev., LLC*, No. 07-20027, 2007 WL 2788840, at *1 (Bankr. S.D. Tex. Sept. 21, 2007) (acknowledging the existence of the doctrine of necessity).  Section 105(a) of the Bankruptcy Code empowers bankruptcy courts to "issue any order, process or judgment that is necessary or appropriate to carry out the provisions of this title."  11 U.S.C § 105(a).  Section 1107(a) of the Bankruptcy Code "contains an implied duty of the debtor-in-possession" to "protect and preserve the estate, including operating business' going-concern value," on behalf of the debtors' creditors and other parties in interest.  *In re CEI Roofing, Inc.*, 315 B.R. 50, 59 (Bankr. N.D. Tex. 2004) (quoting *In re CoServ, L.L.C.*, 273 B.R. 487, 497 (Bankr. N.D. Tex. 2002)).

29.     Moreover, Bankruptcy Rule 6003 itself implies that the payment of prepetition obligations may be permissible within the first 21 days of a case where doing so is "needed to

avoid immediate and irreparable harm." Fed. R. Bankr. P. 6003. Accordingly, the Bankruptcy Code authorizes the postpetition payment of prepetition claims where, as here, such payments are critical to preserving the going-concern value of a debtor's estates. For the reasons set forth above, and in light of the need for the Debtors to preserve the going-concern value of their businesses, the relief requested herein is proper and should be granted.

## CAUSE EXISTS TO AUTHORIZE THE BANKS TO HONOR CHECKS AND ELECTRONIC FUND TRANSFERS

30. The Debtors further request that the Court authorize applicable banks and other financial institutions (collectively, the "***Banks***") to receive, process, honor, and pay any and all checks issued, or to be issued, and electronic funds transfers requested, or to be requested, by the Debtors relating to the Customer Programs (whether such checks or fund transfers were presented before or after the Petition Date), to the extent that sufficient funds are on deposit in available funds in the applicable bank accounts to cover such payment. The Debtors also seek authority to issue new postpetition checks or effect new postpetition electronic funds transfers in replacement of any checks or fund transfer requests on account of prepetition Customer Programs dishonored or rejected as a result of the commencement of the Chapter 11 Cases.

## EMERGENCY CONSIDERATION

31. The Debtors respectfully request emergency consideration of this Motion pursuant to Local Rule 9013-1 and Bankruptcy Rule 6003, which authorize the Court to grant relief within the first 21 days after the commencement of a chapter 11 case to the extent that relief is necessary to avoid immediate and irreparable harm. As described in detail above and in the First Day Declaration, immediate and irreparable harm would result if the relief requested herein is not granted. Accordingly, the Debtors submit that the requirements of Bankruptcy Rule 6003 are satisfied.

## DEBTORS' COMPLIANCE WITH BANKRUPTCY RULE
## 6004(A) AND WAIVER OF BANKRUPTCY RULE 6004(A) AND (H)

32.     With respect to any aspect of the relief sought herein that constitutes a use of property under section 363(b) of the Bankruptcy Code, the Debtors request that the Court find that notice of this Motion is adequate under Bankruptcy Rule 6004(a) and waive the 14-day stay under Bankruptcy Rule 6004(h).  As described above, the relief that the Debtors seek in this Motion is necessary to avoid immediate and irreparable harm to the Debtors.  Thus, cause exists for the Court to find that notice of this Motion satisfies Bankruptcy Rule 6004(a) and waive the 14-day stay under Bankruptcy Rule 6004(h).

## RESERVATION OF RIGHTS

33.     Nothing in this Motion is intended to be nor shall be deemed: (a) an implication or admission as to the amount of, basis for, or validity of any claim against the Debtors; (b) a waiver or limitation of the Debtors' or any other party in interest's right to dispute the amount of, basis for, or validity of any claim; (c) a waiver of the Debtors' or any other party in interest's rights under the Bankruptcy Code or any other applicable non-bankruptcy law; (d) a waiver of the obligation of any party in interest to file a proof of claim; (e) a promise or requirement to pay any particular claim; (f) a waiver of any claims or causes of action which may exist against any entity under the Bankruptcy Code or any other applicable law; (g) an admission as to the validity, priority, enforceability, or perfection of any lien on, security interest in, or other encumbrance on property of the Debtors' estates; or (h) a request or authorization to assume, adopt, or reject any agreement, contract, or lease pursuant to section 365 of the Bankruptcy Code. Likewise, if the Court grants the relief sought herein, any payment made pursuant to the Court's order is not intended to be and should not be construed as an admission to the validity of any claim or a waiver of the Debtors' or any other party in interest's rights to dispute such claim subsequently.

**NOTICE**

34.     Notice of the Motion will be given to: (a) the Office of the United States Trustee for the Southern District of Texas; (b) counsel to the Ad Hoc Group and Backstop Parties; (c) counsel to the Prepetition Agent; (d) the creditors listed on the Debtors' consolidated list of 30 creditors holding the largest unsecured claims; (e) the Gaming Regulators; (f) the United States Attorney for the Southern District of Texas; (g) the Internal Revenue Service; (h) the state attorneys general for states in which the Debtors conduct business; and (i) any party that has requested notice pursuant to Bankruptcy Rule 2002.   The Debtors submit that, under the circumstances, no other or further notice is required.

35.     A   copy   of   this   Motion   is   available   on   (a)   the   Court's   website,   at www.txs.uscourts.gov, and (b) the website maintained by the Debtors' proposed Claims and Noticing       Agent,       Kroll       Restructuring       Administration       LLC,       at https://restructuring.ra.kroll.com/RunItOneTime/.

*[Remainder of page intentionally left blank.]*

**WHEREFORE**, the Debtors respectfully request that the Court enter the Proposed Orders granting the relief requested in the Motion and such other and further relief as may be just and proper.

Dated: July 14, 2025
Houston, Texas

Respectfully submitted,

*/s/ Timothy A. ("Tad") Davidson II*

**HUNTON ANDREWS KURTH LLP**
Timothy A. ("Tad") Davidson II (Texas Bar No. 24012503)
Ashley L. Harper (Texas Bar No. 24065272)
Philip M. Guffy (Texas Bar No. 24113705)
600 Travis Street, Suite 4200
Houston, TX 77002
Telephone: (713) 220-4200
Email:  taddavidson@hunton.com
        ashleyharper@hunton.com
        pguffy@hunton.com

- and -

**LATHAM & WATKINS LLP**
Jeffrey E. Bjork (*pro hac vice* pending)
Helena G. Tseregounis (*pro hac vice* pending)
Nicholas J. Messana (California Bar No. 332355)
355 South Grand Avenue, Suite 100
Los Angeles, California 90071-1560
Telephone: (213) 485-1234
E-mail:  jeff.bjork@lw.com
         helena.tseregounis@lw.com
         nicholas.messana@lw.com

- and -

**LATHAM & WATKINS LLP**
Ray C. Schrock (NY Bar No. 4860631)
Andrew Sorkin (NY Bar No. 4597944)
555 Eleventh Street, NW, Suite 1000
1271 Avenue of the Americas
New York, NY 10020
Telephone: (212) 906-1200
E-mail:  ray.schrock@lw.com
         andrew.sorkin@lw.com

*Proposed Attorneys for the Debtors and Debtors in Possession*

15

## CERTIFICATE OF SERVICE

I certify that on July 14, 2025, a true and correct copy of the foregoing document was served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas on those parties registered to receive electronic notices.

*/s/ Timothy A. ("Tad") Davidson II*
Timothy A. ("Tad") Davidson II