## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

```
---------------------------------------------------------- x
                                                           :
In re:                                                     :   Chapter 11
                                                           :
RUNITONETIME LLC, et al.,                                  :   Case No. 25-90191 (ARP)
                                                           :
            Debtors.¹                                      :   (Joint Administration Requested)
                                                           :
---------------------------------------------------------- x
```

### EMERGENCY MOTION OF DEBTORS FOR ENTRY OF INTERIM AND FINAL ORDERS (I) AUTHORIZING THE DEBTORS TO PAY CERTAIN PREPETITION CLAIMS OF (A) CRITICAL VENDORS, (B) 503(B)(9) CLAIMANTS, (C) LIEN CLAIMANTS, AND (D) PACA/PASA CLAIMANTS; (II) CONFIRMING ADMINISTRATIVE EXPENSE PRIORITY; (III) AUTHORIZING FINANCIAL INSTITUTIONS TO HONOR AND PROCESS RELATED CHECKS AND TRANSFERS; AND (IV) GRANTING RELATED RELIEF

> **Emergency relief has been requested.  Relief is requested not later than 1:00 p.m. (prevailing Central Time) on July 15, 2025.**
>
> **If you object to the relief requested or you believe that emergency consideration is not warranted, you must appear at the hearing if one is set, or file a written response prior to the date that relief is requested in the preceding paragraph.  Otherwise, the Court may treat the pleading as unopposed and grant the relief requested.**
>
> **A hearing will be conducted on this matter on July 15, 2025, at 1:00 p.m. (prevailing Central Time) in Courtroom 404, 4th floor, 515 Rusk Street, Houston, Texas 77002.  Participation at the hearing will only be permitted by an audio and video connection.**
>
> **Audio communication will be by use of the Court's dial-in facility.  You may access the facility at (832) 917-1510.  Once connected, you will be asked to enter the conference room number.  Judge Perez's conference room number is 282694.  Video communication will be by use of the GoToMeeting platform.  Connect via the free GoToMeeting application or click the link on Judge Perez's homepage.  The meeting code is "JudgePerez".  Click the settings icon in the upper right corner and enter your name under the personal information setting.**
>
> **Hearing appearances must be made electronically in advance of both electronic and in-person hearings.  To make your appearance, click the "Electronic Appearance" link on Judge Perez's homepage.  Select the case name, complete the required fields and click "Submit" to complete your appearance.**

---

[1]   A complete list of the Debtors in the Chapter 11 Cases may be obtained on the website of the Debtors' proposed claims and noticing agent at https://restructuring.ra.kroll.com/RunItOneTime/.  The Debtors' mailing address is 12530 NE 144th Street, Kirkland, Washington 98304.

The above-captioned debtors in possession (collectively, the "***Debtors***") respectfully state as follows in support of this motion (this "***Motion***"):

## RELIEF REQUESTED

1.      By this Motion, the Debtors seek entry of an interim order (the "***Proposed Interim Order***") and a final order (the "***Proposed Final Order***," and together with the Proposed Interim Order, the "***Proposed Orders***"), substantially in the forms attached hereto:

      a.      authorizing, but not directing, the Debtors to pay in the ordinary course of business certain prepetition claims held by (i) the Critical Vendors (as defined below) up to certain specified amounts set forth in each of the Proposed Orders; (ii) the 503(b)(9) Claimants (as defined below); (iii) Lien Claimants (as defined below); and (iv) the PACA/PASA Claimants (as defined below);

      b.      confirming the administrative expense priority status of Outstanding Orders (as defined below) and authorizing, but not directing, the Debtors to pay prepetition amounts related to the Outstanding Orders;

      c.      authorizing financial institutions to honor and process related checks and transfers; and

      d.      granting certain related relief.

## JURISDICTION AND VENUE

2.      The United States Bankruptcy Court for the Southern District of Texas (the "***Court***") has jurisdiction to consider this Motion under 28 U.S.C. § 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b) and the Court may enter a final order consistent with Article III of the United States Constitution.  Venue is proper under 28 U.S.C. §§ 1408 and 1409.

3.      The statutory and legal predicates for the relief requested herein are sections 105(a), 362(d), 363(b), 503, 507(a), 1107(a), and 1108 of title 11 of the United States Code (the "***Bankruptcy Code***"), Rules 6003 and 6004 of the Federal Rules of Bankruptcy Procedure (the "***Bankruptcy Rules***"), Rule 9013-1 of the Local Rules for the Southern District of Texas

(the "***Bankruptcy Local Rules***"), and the Procedures for Complex Cases in the Southern District of Texas.

## BACKGROUND

4.      On the date hereof (the "***Petition Date***"), the Debtors each commenced with the Court a voluntary case (the "***Chapter 11 Cases***") under chapter 11 of the Bankruptcy Code.  The Debtors continue to operate their business and manage their properties as debtors in possession under sections 1107(a) and 1108 of the Bankruptcy Code.  No trustee, examiner, or statutory committee has been appointed in the Chapter 11 Cases.

5.      Contemporaneously with the filing of the Motion, the Debtors filed a motion requesting joint administration of the Chapter 11 Cases pursuant to Bankruptcy Rule 1015(b) and Local Rule 1015-1.

6.      The Debtors are a privately held gaming and entertainment company focused on acquiring undervalued gaming assets and implementing operational changes to improve profitability.  The Debtors own and operate a portfolio of casinos, card rooms, hotels, and other gaming- and hospitality-related assets across Washington State, Nevada, and Colorado, including 17 card rooms in Washington State and several casinos and hotels in Nevada and Colorado, reflecting a total of approximately 2,500 slot machines, 320 table games, 1,200 hotel rooms, and 30 restaurants.  The Debtors' operating businesses also include the EGads! fabrication and installation business (the "***Egads Business***"), a gaming and hospitality industry leader in the design, fabrication, assembly and installation of casino interiors, custom signage, lighting, and architectural treatments, and the Utah Trailways charter company, which facilitates customer gaming excursions from Salt Lake City, Utah, to the Debtors' operating properties in Wendover, Nevada.

7.     The factual background regarding the Debtors, including their business, their capital structure, and the events leading to the commencement of the Chapter 11 Cases is set forth in the *Declaration of Jeff Seery in Support of Chapter 11 Petitions and First Day Relief* (the "***First Day Declaration***"), filed contemporaneously herewith and incorporated herein by reference.[2]

## I.     The Essential Creditors

8.     As set forth in greater detail in the First Day Declaration, to operate its casinos, card rooms, hotels, other gaming- and hospitality-related assets, and the Egads Business, the Debtors rely on essential goods and services that are provided by the following creditors (the "***Essential Creditors***" and, the claims of such creditors, the "***Essential Claims***"):

(a)     certain domestic suppliers of goods and services, with whom the Debtors continue to do business and whose goods and services are critical and essential to the Debtors' operations (the "***Critical Vendors***" and, the claims of Critical Vendors, the "***Critical Vendor Claims***");

(b)     certain suppliers of goods that the Debtors received within the 20 days before the Petition Date (the "***503(b)(9) Claimants***" and, the claims of 503(b)(9) Claimants, the "***503(b)(9) Claims***");

(c)     certain parties whose failure to receive timely payment from the Debtors for services performed by such parties may give rise to the assertion of statutory liens against the Debtors' equipment, facilities, and property (the "***Lien Claimants***" and, the claims of the Lien Claimants, the "***Lien Claims***")[3]; and

(d)     certain suppliers of goods whose claims are covered by the Perishable Agricultural Commodities Act of 1930, as amended, 7 U.S.C. §§ 499a et seq. ("***PACA***") and/or the Packers and Stockyards Act of 1921 as amended, 7 U.S.C. § 181 et seq. ("***PASA***" and, collectively with PASA, the "***PACA/PASA Claimants***" and such claims collectively, the "***PACA/PASA Claims***").

---

[2]     Capitalized terms used but not defined herein have the meanings given to them in the First Day Declaration.

[3]     The Debtors do not concede that any liens described in this Motion are valid, and the Debtors expressly reserve the right to contest the extent, validity, and perfection of any and all such liens, and to seek avoidance thereof.

9.     In addition, the Debtors seek authority to pay amounts due for goods and services for which orders were placed before the Petition Date but will not be delivered or performed until after the Petition Date (the "***Outstanding Orders***").

10.     The following is a summary chart showing the categories of relief sought under this Motion and the estimated amounts outstanding as of the Petition Date attributable to each:

| Claim Type | Relief Sought |
|---|---|
| Critical Vendors (that are not 503(b)(9) Claimants or PACA/PASA Claimants) | $4.1 million[4] |
| 503(b)(9) Claimants | $1.2 million |
| Lien Claimants | $0 |
| PACA/PASA Claimants (that are not also 503(b)(9) Claimants) | $2.2 million |
| **Total** | $7.5 million |

11.     At the outset of these Chapter 11 Cases, to preserve and maximize the value of the Debtors' estates for all stakeholders, the Debtors are focused on ensuring that their delivery of services and experiences to their customers continues without interruption.  To do so, the Debtors must assure their customers, vendors and employees that the Debtors will continue to provide a high-quality casino entertainment and hospitality experience during the Chapter 11 Cases. Without a full supply of food, room amenities, adequate games and slot machines, among many other things, the Debtors would be unable to provide such an experience, jeopardizing customer loyalty and interest and causing irreparable harm to the Debtors' business.  The Debtors therefore believe that a crucial component of their efforts to maximize value is to maintain their relationships

---

[4]     Though some of the 503(b)(9) Claimants and PACA/PASA Claimants are Critical Vendors, this value does not include the estimated amount attributable to 503(b)(9) Claims and PACA/PASA Claims that is outstanding as of the Petition Date.  By this Motion, the Debtors request, *inter alia* (a) authority, but not direction, to pay 503(b)(9) Claims and PACA/PASA Claims held by the 503(b)(9) Claimants and PACA/PASA Claimants who are Critical Vendors and (b) separate authority, but not direction, to pay any amounts due to 503(b)(9) Claimants and PACA/PASA Claimants (a) who are not Critical Vendors or (b) in the event that certain 503(b)(9) Claimants and PACA/PASA Claimants that are Critical Vendors are subsequently determined not to be Critical Vendors.

with the Essential Creditors (most of whom do not have contracts with the Debtors) so that they may preserve the value of their businesses as they endeavor to restructure.

12.     However, the Debtors have real concerns that certain of the Essential Creditors will refuse to perform postpetition unless paid the prepetition amounts owed to them or that they may be entitled to administrative expense claims against the Debtors' estates.  For these reasons, and to achieve the objectives noted above, the Debtors require the flexibility to pay the Essential Claims subject to the limitations set forth in the Proposed Interim Order and the Proposed Final Order, when they believe, in the prudent exercise of their business judgment (as discussed below), that doing so is in the best interests of their estates.

13.     Importantly, the Debtors are not seeking to pay the entire amounts set forth above immediately or in one lump sum; rather, the Debtors intend to pay the Essential Claims as they become due and payable in the ordinary course of the Debtors' business, subject to any trade agreements with the Essential Creditors.  Concurrently with the filing of this Motion, the Debtors have filed the *Emergency Motion of Debtors for Interim and Final Orders (I) Authorizing the Debtors to (A) Obtain Senior Secured Priming Superpriority Postpetition Financing and (B) Use Cash Collateral, (II) Granting Liens and Providing Claims with Superpriority Administrative Expense Status, (III) Granting Adequate Protection to the Prepetition Secured Parties, (IV) Modifying the Automatic Stay, and (V) Granting Related Relief* (the "**DIP Motion**") which, if granted, in addition to the cash generated by the Debtors' businesses, will provide the necessary additional liquidity for the Debtors to continue operating in the ordinary course of business during the pendency of the Chapter 11 Cases.  As set forth in the 13-week cash flow annexed to the DIP Motion, the Debtors' proposed expenditures include payment of the Essential Claims the Debtors seek authority to pay in this Motion on an interim and final basis.

### A.     Critical Vendors

14.     In the ordinary course of business, the Debtors rely on a large number of Critical Vendors who supply the Debtors with the food products, material goods, supplies, and services that are essential to the successful operation of the Debtors' business and their ability to maintain a high-end experience expected by their customers.   The Critical Vendors include (a) gaming vendors that provide gaming devices, related software, and ancillary goods and services for the Debtors' casino and card games, including parts, cards, dice, chips, and tiles; (b) food and beverage vendors providing a variety of consumable goods (and as further described below with respect to the PACA/PASA Claimants), and (c) marketing and entertainment vendors.  For the twelve months preceding the Petition Date, the Debtors paid the Critical Vendors an average of approximately $1.5 million per month. The Debtors estimate that, as of the Petition Date, they owe Critical Vendors who do not qualify for administrative expense treatment approximately $4.1 million and approximately $1.0 million of which will become due within the first 21 days of the Chapter 11 Cases.

15.     To identify the Critical Vendors, certain of the Debtors' employees who are responsible for maintaining, and have intimate knowledge of, the Debtors' vendor and service-provider relationships worked with certain of the Debtors' advisors to extensively analyze and review the Debtors' immediate needs for goods and services.   Determinations as to which of the Debtors' service providers and suppliers constitute Critical Vendors have been (and continue to be) guided by an analysis of whether maintaining the relationship with a particular counterparty is essential to preserve the value of the Debtors' businesses.  These criteria included:

(a)     whether a vendor or service provider is located in the United States or constitutes a Foreign Critical Vendor;

(b)     whether an agreement exists by which the Debtors could compel a vendor or service provider to continue performing on prepetition terms;

(c)     whether the vendor or service provider is a sole-source or limited-source provider;

(d)     if the vendor is not a sole-source provider, whether the Debtors have insufficient inventory of goods or in-house capabilities to continue operations while a replacement is found;

(e)     whether the Debtors receive advantageous pricing or other terms from a vendor or service provider such that a postpetition replacement of the vendor or service provider would result in significantly higher costs;

(f)     whether alternative vendors or service providers are available that can provide requisite volumes of similar goods or services on equal (or better) terms on short notice without causing significant disruption to the Debtors' business operations and customer service and, if so, whether the Debtors would be able to continue operating while transitioning business thereto;

(g)     the degree to which replacement costs (including pricing, transition expenses, professional fees, and lost sales or future revenue) exceed the amount of a vendor's or service provider's prepetition claim; and

(h)     whether failure to pay all or part of a particular vendor's or service provider's claim could cause that party to hold goods owned by the Debtors, or to refuse to ship inventory or to provide critical services on a postpetition basis.

The Debtors are confident that this process has and will continue to result in designating as Critical Vendors only those vendors and service providers that are truly critical to the Debtors' businesses.

16.     Furthermore, and as set forth below, the Debtors propose that the Court provide them with the authority (but not the direction) to condition the payment of each Critical Vendor Claim on the agreement of the applicable Critical Vendor to continue supplying goods and/or services to the Debtors on the same or better trade terms (including, without limitation, credit limits, pricing, timing of payments, allowances, rebates, discounts, and other applicable terms and programs) that such Critical Vendor offered the Debtors immediately before the Petition Date or, if more favorable, within the six-month period before the Petition Date (the "***Customary Trade Terms***"), or pursuant to such other terms, trade practices, and programs that the Debtors deem, in their reasonable business judgment, more favorable to the Debtors.

8

## B.      503(b)(9) Claimants

17.      The Debtors have received certain goods and other materials from various 503(b)(9) Claimants within the 20 days before the Petition Date.  The outstanding amount of these claims is approximately $1.2 million.[5]  Many of the Debtors' relationships with the 503(b)(9) Claimants are not governed by formal long-term contracts; rather, the Debtors typically place such orders on an order-by order basis.  As a result, 503(b)(9) Claimants may refuse to supply new orders without payment of their prepetition claims. Further, the 503(b)(9) Claims will be entitled to administrative priority under section 503(b)(9) of the Bankruptcy Code.  Accordingly, the Debtors seek authority to pay the 503(b)(9) Claims in full in the ordinary course of business.

## C.      Lien Claimants

18.      The Debtors do not anticipate owing any amounts on account of Lien Claims as of the Petition Date.  Out of an abundance of caution, however, by this Motion, the Debtors request the authority, but not direction, to pay and discharge, on a case-by-case basis, any Lien Claims that the Debtors believe could give rise to any liens against the Debtors' property, regardless of whether the Lien Claimants have already perfected their interests.  Pursuant to section 362(b)(3) of the Bankruptcy Code, the act of perfecting certain liens, to the extent consistent with section 546(b) of the Bankruptcy Code, is expressly excluded from the automatic stay.[6]  Where feasible, the Debtors intend to condition payment to the Lien Claimants on the acceptance of the Customary Trade Terms discussed below.

---

[5]      As noted above, this amount is not included in the estimate of Critical Vendor Claims.  The Debtors are seeking separate authority in this Motion to pay any amounts due to 503(b)(9) Claimants (a) that are not Critical Vendors and (b) in the event that certain 503(b)(9) Claimants are subsequently determined not to be Critical Vendors.

[6]      Under section 546(b) of the Bankruptcy Code, a debtor's lien avoidance powers "are subject to any generally applicable law that . . . permits perfection of an interest in property to be effective against an entity that acquires rights in such property before the date of perfection."  11 U.S.C. § 546(b)(1)(A).

### D.    PACA/PASA Claimants

19.    As set forth in the First Day Declaration, the Debtors' portfolio of gaming properties not only provide customers with high-quality gaming entertainment and hospitality experiences, but include over 1,200 hotel rooms and 30 restaurants, offering fine and casual dining experiences, catering, and in-room dining.  In connection therewith, the Debtors purchase a variety of consumable goods, including goods that may be deemed "perishable agricultural commodities" under PACA.  PACA's definition of "perishable agricultural commodity" generally includes "fresh fruits and fresh vegetables of every kind and character."  7 U.S.C § 499a(b)(4).  Under PACA, eligible produce suppliers and their agents are the beneficiaries of a statutory trust (the "***PACA Trust***") in all of the buyer's perishable agricultural commodity inventory or other derivatives of perishable agricultural commodities, the products derived therefrom, and the proceeds related to any sale of the commodities or products (collectively, the "***PACA Trust Assets***").  *See* 7 U.S.C. § 499e(c)(2).  PACA Trust Assets are preserved as a non-segregated floating trust and may be commingled with non-trust assets.  The PACA Trust beneficiaries may be able to assert claims that are entitled to receive payment ahead of other creditors of the Debtors.

20.    Similarly, certain of the Debtors' Critical Vendors may be eligible to assert claims under PASA, which prescribes the conditions of operations for businesses dealing in livestock and poultry (the "***PASA Claimants***").  PASA creates a statutory trust (the "***PASA Trust***" and, together with the PACA Trust, the "***Statutory Trusts***") scheme which is virtually identical to PACA in respect of delivery of livestock, meat products and related products, products derived therefrom and the proceeds related to the sale of such commodities or products (collectively, the "***PASA Trust Assets***" and, together with the PACA Trust Assets, the "***Trust Assets***").  *See In re Delta Produce, L.P.*, 845 F.3d 609, 613 (5th Cir. 2016) ("These [PACA Trust] amendments were modeled after the [PASA Trust] provisions that Congress added to the Packers and Stockyards Act

10

in 1976."); *In re W.L. Bradley Co.*, 75 B.R. 505, 509 (Bankr. E.D. Pa. 1987) ("The Legislative history expressly notes that the [PACA Trust] was modeled on the trust amendment to the Packers and Stockyards Act.").  The PASA Claimants may be eligible to assert potential claims under the respective statutes for outstanding payments owed on account of applicable goods (collectively, the "***PASA Claims***").  Because the PASA Claimants may impose a statutory trust on certain of the goods and thereby obtain priority ahead of all other secured and unsecured creditors of the Debtors' estates, payment of valid PASA Claims will not prejudice or affect the amount available for distributions to other creditors of the Debtors.  In certain circumstances, shareholders, officers, or directors of a corporate entity who are in a position to control trust assets but breach the fiduciary duty to preserve those assets may be held personally liable under PACA or PASA, as applicable.

21.     Any PACA/PASA Claimant that accepts payment from the Debtors in satisfaction of its valid PACA/PASA Claim will be deemed to have waived any and all claims of whatever type, kind, or priority, against the Debtors, their property, their estates, and any Trust Assets, but only to the extent that payment has been received by such PACA/PASA Claimant on account of its PACA/PASA Claim.

22.     The Debtors believe that the fruits, vegetables, and meat products purchased from certain of the Essential Creditors may be covered by PACA and PASA.  As a result, insofar as those vendors abide by the statutory requirements of PACA and PASA, such vendors could be eligible to assert PACA/PASA Claims granting them priority ahead of all other secured and unsecured creditors in the Chapter 11 Cases.  If the Debtors' officers or directors were subject to lawsuits by not paying the PACA/PASA Claims, it would detract from the Debtors' chapter 11 efforts and, moreover, could lead to the assertion of substantial indemnification claims under the Debtors' governing documents, employment agreements, and applicable laws.  Further, payment

of PACA/PASA Claims also ensures the continuity of supply to ensure that the Debtors are able to pursue their sale process.

23.     The Debtors believe that as of the Petition Date, they owe approximately $2.2 million on account of prepetition PACA/PASA Claims.[7]   The Debtors request authority, but not direction, in their discretion, to continue to pay such claims in the ordinary course of business and consistent with their historical practices.

## II.     Discretionary Conditions to Payment of Essential Claims in the Ordinary Course

24.     Unless otherwise ordered by the Court, the Debtors request authority (but not direction) to pay all Essential Claims on the following terms and conditions:

    (a)     The Debtors, in their sole discretion, may require, as a condition to receiving payment on account of Essential Claims, that the Essential Creditors agree to continue to provide goods or services to the Debtors on the Customary Trade Terms during the pendency of the Chapter 11 Cases.  If, after receiving a payment under the Proposed Interim Order or Proposed Final Order, an Essential Creditor ceases to provide Customary Trade Terms, then the Debtors may, in consultation with the Backstop Parties, seek an order from the Court to (i) determine that any payment on a prepetition claim received by such Essential Creditor be an unauthorized voidable postpetition transfer under section 549 of the Bankruptcy Code that the Debtors may recover in cash or goods, or (ii) deem such payment to apply instead to any postpetition amount that may be owing to such Essential Creditor.

    (b)     Before making a payment to an Essential Creditor under the Proposed Interim Order or Proposed Final Order, the Debtors may, in their discretion, settle all or some of the prepetition claims of such Essential Creditor for less than their face amount without further notice or hearing.

25.     To ensure that the Essential Creditors transact with the Debtors on Customary Trade Terms, the Debtors propose that a letter agreement (a "***Trade Agreement***") substantially in

---

[7]     As noted above, this amount is not included in the estimate of Critical Vendor Claims.  The Debtors are seeking separate authority in this Motion to pay any amounts due to PACA/PASA Claimants (a) that are not Critical Vendors and (b) in the event that certain PACA/PASA Claimants are subsequently determined not to be Critical Vendors.

the form attached hereto as **Exhibit A** be sent to the Essential Creditors for execution, together with a copy of the Proposed Interim Order or Proposed Final Order, as applicable.  The Debtors propose that each Trade Agreement include, without limitation:

(a)     the amount of the relevant Essential Claims, accounting for any setoffs, other credits, and discounts thereto; provided, however, such amount shall be used only for the purposes of determining a given Essential Creditor's claim subject to the Proposed Interim Order or the Proposed Final Order, as applicable, and shall not be deemed a claim allowed by the Court, and the rights of all interested persons to object to such claim shall be fully preserved until further order of the Court;

(b)     the Customary Trade Terms applicable to such Essential Creditor, or such other terms as the Essential Creditor and the Debtors may agree, and the Essential Creditor's agreement to provide goods or services to the Debtors under such terms for the duration of these Chapter 11 Cases unless the Debtors fail to make timely payments under the agreed-upon trade terms;

(c)     the Essential Creditor's agreement not to file or otherwise assert, directly or indirectly, against the Debtors, their estates, or any of their assets or property, any lien (a "***Lien***"), claim for reclamation (a "***Reclamation Claim***"), or claim under section 503(b)(9) of the Bankruptcy Code, regardless of the statute or other legal authority upon which such Lien, Reclamation Claim, or claim under section 503(b)(9) of the Bankruptcy Code may be asserted, related in any way to any remaining prepetition amounts allegedly owed to the Essential Creditor by the Debtors arising from  agreements or other arrangements entered into before the Petition Date; and, to the extent the Essential Creditor has already obtained or otherwise asserted such a Lien, Reclamation Claim, or claim under section 503(b)(9) of the Bankruptcy Code, the Essential Creditor shall take (at such vendor's own expense) whatever actions are necessary to remove such Lien or withdraw such Reclamation Claim or claim under section 503(b)(9) of the Bankruptcy Code, unless the Essential Creditor's participation in the program to pay Essential Claims authorized by the Proposed  Interim Order or the Proposed Final Order, as applicable, is terminated;

(d)     the Essential Creditor's agreement not to file a motion to compel assumption or rejection of any contract under which the Critical Vendor Claim arises; and

(e)     the Essential Creditor's acknowledgment that it has reviewed the terms and provisions of the Proposed Interim Order or the Proposed Final Order, as applicable, sought hereby and is bound thereby.

26.      By this Motion, the Debtors request only the authorization to enter into Trade Agreements when the Debtors determine that payment of such Essential Claims is necessary to enable the Debtors to realize their chapter 11 objectives and that such Trade Agreements are advisable.  The Debtors also request authorization to make payments on account of Essential Claims in the absence of a Trade Agreement if the Debtors determine, in their business judgment, that the failure to pay such Essential Claims will result in harm to the Debtors' businesses.

27.      In the event that an Essential Creditor party to a Trade Agreement refuses to supply goods or services to the Debtors on Customary Trade Terms (or such other terms as are agreed by the parties) following receipt of payment on its Essential Claim, or otherwise fails to comply with its Trade Agreement with the Debtors, the Debtors reserve their rights to return the parties to the positions they held immediately before entry of the Proposed Interim Order or Proposed Final Order, as applicable, approving this Motion with respect to all prepetition claims.  Further, the Debtors reserve their rights to and may seek approval of the Court to: (a) declare that any Trade Agreement between the Debtors and the Essential Creditor is terminated; (b) seek entry of an order declaring that payments made to such Essential Creditor on account of its Essential Claims be deemed to have been in payment of any then-outstanding (or subsequently accruing) postpetition claims of such Essential Creditor; and (c) seek entry of an order directing such Essential Creditor to disgorge any payment made to such Essential Creditor on account of its Essential Claims to the extent that such payments exceed the value of the postpetition claims of such Essential Creditor, without giving effect to any rights of setoff, claims, provision for payment of reclamation or trust fund claims, or other defenses.  In addition, the Debtors reserve the right to seek damages or other appropriate remedies against any breaching Essential Creditor.

28.     The Debtors further propose that any Trade Agreement terminated as a result of a Essential Creditor's refusal to comply with the terms thereof may be reinstated if the underlying default under the Trade Agreement is fully cured by the Essential Creditor not later than five business days following the Debtors' notification to the Essential Creditor of such a default; or the Debtors reach a favorable alternative agreement with the Essential Creditor.

## III.     Outstanding Orders

29.     Before the commencement of the Chapter 11 Cases, the Debtors placed various orders for goods and services that will not be delivered or performed until on or after the Petition Date (collectively, the "***Outstanding Orders***").  The suppliers of these goods and services may be concerned that because the Debtors' obligations under the Outstanding Orders arose before the Petition Date, such obligations will be treated as general unsecured claims in the Chapter 11 Cases. To prevent disruption to the Debtors' operations, the Debtors request entry of an order (a) confirming administrative expense priority under section 503(b)(1) of the Bankruptcy Code for all undisputed obligations of the Debtors arising from the acceptance of goods and services included in the Outstanding Orders; and (b) authorizing the Debtors to satisfy such obligations in the ordinary course of business, *provided*, *however*, that the Debtors retain all rights to cancel any Outstanding Orders in the exercise of their business judgment including, but not limited to, Outstanding Orders related to business segments that the Debtors and their advisors determine to exit as part of the Debtors' chapter 11 objectives.  The Debtors do not anticipate owing any amounts on account of Outstanding Orders as of the Petition Date.

## BASIS FOR RELIEF

## I.     Payment of the Essential Claims is Warranted Under the Bankruptcy Code.

30.     A bankruptcy court may authorize a debtor to pay certain prepetition obligations pursuant to section 363(b) of the Bankruptcy Code.  11 U.S.C. § 363(b)(1).  Section 363(b)(1)

authorizes courts, after notice and a hearing, to permit a debtor to "use, sell, or lease, other than in the ordinary course of business, property of the estate."  11 U.S.C. § 363(b)(1); s*ee also In re Ionosphere Clubs, Inc*., 98 B.R. 174, 175 (Bankr. S.D.N.Y. 1989) ("Section 363(b) gives the court broad flexibility in tailoring its orders to meet a wide variety of circumstances.").  Courts in the Fifth Circuit have granted a debtor's request to use property of the estate outside of the ordinary course of business upon a finding that such use is supported by sound business reasons.  *See, e.g., In re BNP Petrol. Corp.*, 642 F. App'x 429, 434-35 (5th Cir. 2016) (*citing In re Cont'l Air Lines, Inc.*, 780 F.2d 1223, 1226 (5th Cir. 1986)) ("[F]or the debtor-in-possession or trustee to satisfy its fiduciary duty to the debtor, creditors and equity holders, there must be some articulated business justification for using, selling, or leasing the property outside the ordinary course of business").

31.     Where a debtor has articulated a valid business justification for a proposed transaction, courts generally apply the business judgment rule in evaluating such transaction.  *See In re Cont'l Airlines, Inc.*, 780 F.2d at 1226 (holding that section 363(b) requires that "there must be some articulated business justification for using, selling, or leasing the property outside the ordinary course of business"); *In re Terrace Gardens Park P'ship*, 96 B.R. 707, 714 (Bankr. W.D. Tex. 1989) (applying *Continental* to require "articulated business justification" for section 363 transaction); *In re Global Crossing Ltd.*, 295 B.R. 726, 743 (Bankr. S.D.N.Y. 2003) ("a § 363 application requires a showing that there is a 'good business reason to grant such an application.'") (quoting *Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063, 1071 (2d Cir. 1983)).

32.     In addition, the Court has authority, pursuant to its equitable powers under section 105(a) of the Bankruptcy Code, to authorize the relief requested herein because such relief is necessary for the Debtors to carry out their duties under section 1107(a) of the Bankruptcy Code.

Section 1107(a) of the Bankruptcy Code "contains an implied duty of the debtor-in-possession to 'protect and preserve the estate, including an operating business' going-concern value.'" *In re CEI Roofing, Inc.*, 315 B.R. 50, 59 (Bankr. N.D. Tex. 2004) (quoting *In re CoServ, L.L.C.*, 273 B.R. 487, 497 (Bankr. N.D. Tex. 2002)). Under section 105(a) of the Bankruptcy Code, "[t]he court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a); *see In re CoServ*, 273 B.R. at 491-93 & n.6 (holding that sections 105 and 1107 of the Bankruptcy Code provide authority for a debtor-in-possession to pay prepetition claims). Moreover, Bankruptcy Rule 6003 itself implies that the payment of prepetition obligations may be permissible within the first 21 days of a case where doing so is "needed to avoid immediate and irreparable harm." Fed. R. Bankr. P. 6003. Accordingly, the Bankruptcy Code authorizes the postpetition payment of prepetition claims where, as here, such payments are critical to preserving the going-concern value of the Debtors' estates.

33. Here, as discussed above, it is the Debtors' business judgment that the failure to pay the Essential Claims could have a material adverse impact on the day-to-day operations of their business. The potential harm to the value of the Debtors' estates if the Motion is not granted and certain Essential Creditors refuse to perform key services or supply essential goods cannot be overstated. Were that to occur, the Debtors' ability to meet their obligations to their valued customer base could be disrupted and, in certain instances, halted altogether. As a result, business operations could be severely harmed resulting in significant losses to the Debtors' estates.

34. Additionally, the PACA/PASA Claims should also be paid to maximize the value of the Debtors' estates. The PACA/PASA Claimants may seek to assert that certain assets in the Debtors' possession, including the agricultural goods they deliver and the products and proceeds of those goods, are held in trust and not property of the Debtors' estates. Thus, PACA and PASA

would entitle the PACA/PASA Claimants to those goods, products, and proceeds to satisfy the PACA/PASA Claims, ahead of all of the Debtors' other creditors.  The cost and disruption associated with a PACA/PASA Claimants' assertion of these rights and with replacing a PACA/PASA Claimant if it refuses to continue delivering goods could be material and could harm the value of the Debtors' estates.  Thus, the Debtors submit that their other creditors will be no worse off from implementation of the relief sought herein, and in fact will fare far better, if the Debtors are empowered to honor such payments to achieve a smooth transition into bankruptcy with minimal disruption to their operations.

35.     Additionally, the Lien Claimants, if any, could assert liens against the Debtors' property or equipment, or in some instances the Debtors' customers, goods, equipment, or other property for the amounts owed on account of the Lien Claims, and the Lien Claimants may also refuse to provide future services for the Debtors.  For these reasons, and to avoid a major interruption of their businesses, as well as to maximize the value of their estates for the benefit of all stakeholders, the Debtors respectfully request that the Court authorize them to pay such claims.

36.     Payment of the Essential Claims as authorized by the Proposed Orders is therefore necessary and appropriate under Bankruptcy Code section 105(a) to maximize the value of the estates by ensuring that the Debtors continue to receive essential goods and services while preserving critical relationships with key vendors and customers.

## II.     Certain Essential Claims Are Administrative Expenses.

37.     The 503(b)(9) Claims may be entitled to the statutory priority for goods delivered to the Debtors in the ordinary course of business within 20 days before the Petition Date.  Section 503(b)(9) of the Bankruptcy Code provides that such claims constitute administrative expenses of the applicable Debtor's estate.  11 U.S.C. § 503(b)(9).  The Debtors would, therefore, be required to pay such 503(b)(9) Claims in full to confirm a plan of reorganization.  *See* 11 U.S.C.

§ 1129(a)(9)(A).  Any plan proposed by the Debtors will provide for payment in full of administrative expenses in the ordinary course of business or, otherwise, on the effective date of such plan, or as soon as practicable thereafter.  Accordingly, payment of the 503(b)(9) Claims will only change the timing of the payment of such prepetition claims and not the amounts.  *See, e.g.*, *In re CEI Roofing*, 315 B.R. at 60 ("[T]he payment of prepetition . . . claims . . . that qualify as priority . . . claims . . . does not trigger the same concerns (i.e., upsetting priorities under the Code and unfair discrimination among general unsecured claims)").  Thus, allowing the relief requested herein with respect to these prepetition Essential Claims will not prejudice any creditors or parties in interest.  Finally, authorizing the Debtors to pay the 503(b)(9) Claims pursuant to the terms set forth herein should eliminate the burden on the Court and the Debtors arising from numerous individual motions requesting payment on account of 503(b)(9) Claims.  Accordingly, the Debtors seek authority to pay such claims in the ordinary course of business to minimize disruptions to their operations and preserve the value of their estates.

### III.    Payment of Essential Claims Is a Valid Exercise of the Debtors' Fiduciary Duties.

38.    In addition, authority for payment of the Essential Claims may be found in sections 1107(a) and 1108 of the Bankruptcy Code.  The Debtors, operating their businesses as debtors in possession under sections 1107(a) and 1108 of the Bankruptcy Code, are fiduciaries "holding the bankruptcy estate[s] and operating the business[es] for the benefit of [their] creditors and (if the value justifies) equity owners."  *In re CoServ*, 273 B.R. at 497.  Implicit in the duties of a chapter 11 debtor in possession is the duty "to protect and preserve the estate, including an operating business's going-concern value."  *Id.*

39.    The *CoServ* court has noted that there are instances in which a debtor in possession can fulfill its fiduciary duty "only . . . by the preplan satisfaction of a prepetition claim."  *Id.*; *see also In re Mirant Corp.*, 296 B.R. 427, 429-30 (Bankr. N.D. Tex. 2003) (allowing debtors to pay

claims "reasonably believe[d]" to be authorized under the *CoServ* test or whose payment was necessary "in the exercise of their business judgment . . . in order for [the] [d]ebtors to continue their respective businesses"). The *CoServ* court specifically noted that preplan satisfaction of prepetition claims would be a valid exercise of a debtor's fiduciary duty when the payment "is the only means to effect a substantial enhancement of the estate," *id.* at 497, and also when the payment was to "sole suppliers of a given product." *Id.* at 498. The court provided a three-pronged test for determining whether a preplan payment on account of a prepetition claim was a valid exercise of a debtor's fiduciary duty:

> First, it must be critical that the debtor deal with the claimant. Second, unless it deals with the claimant, the debtor risks the probability of harm, or, alternatively, loss of economic advantage to the estate or the debtor's going concern value, which is disproportionate to the amount of the claimant's prepetition claim. Third, there is no practical or legal alternative by which the debtor can deal with the claimant other than by payment of the claim.

*Id.*

40.     Payment of the Essential Claims meets each element of the *CoServ* court's standard. First, any further disruptions of the Debtors' operations that result from non-payment of such claims would cost the Debtors' estates substantial amounts in lost revenues. The harm and economic disadvantage that would stem from the Debtors' failure to pay the Essential Claims are grossly disproportionate to the amount of the prepetition claims that would have to be paid. In addition, the Debtors have examined other options short of paying certain of the Essential Claims and could not discern any practical or legal alternative other than paying such Essential Claims if significant disruption of the Debtors' business operations is to be avoided. And, in any event the Lien Claims, if any, and 503(b)(9) Claims must be paid in full, in cash, for the Debtors to emerge from chapter 11. Therefore, the Debtors only can fulfill their fiduciary duties as debtors in

20

possession under sections 1107(a) and 1108 of the Bankruptcy Code by paying certain of the Essential Claims.

IV.     **Confirmation of Administrative Expense Status of Prepetition Purchase Orders Is Appropriate and Necessary to the Debtors' Reorganization.**

41.     Pursuant to section 503(b) of the Bankruptcy Code, obligations that arise in connection with the postpetition delivery of goods and services—including those ordered prepetition—are, in fact, administrative expense priority claims because they benefit the estate postpetition.  11 U.S.C. § 503(b)(1)(A); *see also In re John Clay & Co.*, 43 B.R. 797, 809–10 (Bankr. D. Utah 1984) (holding that goods ordered prepetition but delivered postpetition are entitled to administrative expense priority).  Thus, granting the relief sought herein with respect to the Outstanding Orders will not afford such claimants any greater priority than they otherwise would have if the relief requested herein were not granted and will not prejudice any other party in interest.

42.     Absent such relief, however, the Debtors may be required to expend substantial time and effort reissuing the Outstanding Orders to provide certain suppliers with assurance of such administrative priority.  Such a disruption to the continuous and timely flow of critical goods and services to the Debtors would force the Debtors to potentially halt operations, damage the Debtors' business reputation, erode the Debtors' customer base, and ultimately lead to a loss of revenue, all to the detriment of the Debtors and their creditors.  Accordingly, the Debtors submit that the Court should confirm the administrative expense priority status of the Outstanding Orders and should authorize the Debtors to pay the Outstanding Orders in the ordinary course of business.

## CAUSE EXISTS TO AUTHORIZE THE BANKS TO HONOR CHECKS AND ELECTRONIC FUND TRANSFERS

43.     The Debtors further request that the Court authorize applicable banks and other financial institutions (collectively, the "***Banks***") to receive, process, honor, and pay any and all

checks issued, or to be issued, and electronic funds transfers requested, or to be requested, by the Debtors relating to the Essential Claims (whether such checks or fund transfers were presented before or after the Petition Date), to the extent that sufficient funds are on deposit in available funds in the applicable bank accounts to cover such payment.  The Debtors also seek authority to issue new postpetition checks or effect new postpetition electronic funds transfers in replacement of any checks or fund transfer requests on account of prepetition Essential Claims dishonored or rejected as a result of the commencement of the Chapter 11 Cases.

### EMERGENCY CONSIDERATION

44.    The Debtors respectfully request emergency consideration of this Motion pursuant to Local Rule 9013-1 and Bankruptcy Rule 6003, which authorize the Court to grant relief within the first 21 days after the commencement of a chapter 11 case to the extent that relief is necessary to avoid immediate and irreparable harm.  As described in detail above and in the First Day Declaration, immediate and irreparable harm would result if the relief requested herein is not granted.  Accordingly, the Debtors submit that the requirements of Bankruptcy Rule 6003 are satisfied.

### DEBTORS' COMPLIANCE WITH BANKRUPTCY RULE 6004(A) AND WAIVER OF BANKRUPTCY RULE 6004(A) AND (H)

45.    With respect to any aspect of the relief sought herein that constitutes a use of property under section 363(b) of the Bankruptcy Code, the Debtors request that the Court find that notice of this Motion is adequate under Bankruptcy Rule 6004(a) and waive the 14-day stay under Bankruptcy Rule 6004(h).  As described above, the relief that the Debtors seek in this Motion is necessary to avoid immediate and irreparable harm to the Debtors.  Thus, cause exists for the Court to find that notice of this Motion satisfies Bankruptcy Rule 6004(a) and waive the 14-day stay under Bankruptcy Rule 6004(h).

## RESERVATION OF RIGHTS

46.     Nothing in this Motion is intended to be nor shall be deemed:  (a) an implication or admission as to the amount of, basis for, or validity of any claim against the Debtors; (b) a waiver or limitation of the Debtors' or any other party in interest's right to dispute the amount of, basis for, or validity of any claim; (c) a waiver of the Debtors' or any other party in interest's rights under the Bankruptcy Code or any other applicable non-bankruptcy law; (d) a waiver of the obligation of any party in interest to file a proof of claim; (e) a promise or requirement to pay any particular claim; (f) a waiver of any claims or causes of action which may exist against any entity under the Bankruptcy Code or any other applicable law; (g) an admission as to the validity, priority, enforceability, or perfection of any lien on, security interest in, or other encumbrance on property of the Debtors' estates; (h) an admission that any lien satisfied pursuant to this Motion is valid (and all rights to contest the extent, validity, or perfection or seek avoidance of all such liens are expressly reserved); (i) a request or authorization to assume, adopt, or reject any agreement, contract, or lease pursuant to section 365 of the Bankruptcy Code.  Likewise, if the Court grants the relief sought herein, any payment made pursuant to the Court's order is not intended to be and should not be construed as an admission to the validity of any claim or a waiver of the Debtors' or any other party in interest's rights to dispute such claim subsequently.

## NOTICE

47.     Notice of the Motion will be given to:  (a) the Office of the United States Trustee for the Southern District of Texas; (b) counsel to the Ad Hoc Group and Backstop Parties; (c) counsel to the Prepetition Agent; (d) the creditors listed on the Debtors' consolidated list of 30 creditors holding the largest unsecured claims; (e) the Gaming Regulators, (f) the United States Attorney for the Southern District of Texas; (g) the Internal Revenue Service; (h) the state attorneys general for states in which the Debtors conduct business; and (i) any party that has

requested notice pursuant to Bankruptcy Rule 2002. The Debtors submit that, under the circumstances, no other or further notice is required.

48. A copy of this Motion is available on (a) the Court's website, at www.txs.uscourts.gov, and (b) the website maintained by the Debtors' proposed Claims and Noticing Agent, Kroll Restructuring Administration LLC, at https://restructuring.ra.kroll.com/RunItOneTime/.

*[Remainder of Page Intentionally Left Blank]*

**WHEREFORE**, the Debtors respectfully request that the Court enter the Proposed Orders granting the relief requested in the Motion and such other and further relief as may be just and proper.

Dated: July 14, 2025
Houston, Texas

Respectfully submitted,

*/s/ Timothy A. ("Tad") Davidson II*

**HUNTON ANDREWS KURTH LLP**
Timothy A. ("Tad") Davidson II (Texas Bar No. 24012503)
Ashley L. Harper (Texas Bar No. 24065272)
Philip M. Guffy (Texas Bar No. 24113705)
600 Travis Street, Suite 4200
Houston, TX 77002
Telephone:  (713) 220-4200
Email:  taddavidson@hunton.com
          ashleyharper@hunton.com
          pguffy@hunton.com]

- and -

**LATHAM & WATKINS LLP**
Jeffrey E. Bjork (*pro hac vice* pending)
Helena G. Tseregounis (*pro hac vice* pending)
Nicholas J. Messana (California Bar No. 332355)
355 South Grand Avenue, Suite 100
Los Angeles, California 90071-1560
Telephone:  (213) 485-1234
E-mail:  jeff.bjork@lw.com
          helena.tseregounis@lw.com
          nicholas.messana@lw.com

- and -

**LATHAM & WATKINS LLP**
Ray C. Schrock (NY Bar No. 4860631)
Andrew Sorkin (NY Bar No. 4597944)
555 Eleventh Street, NW, Suite 1000
1271 Avenue of the Americas
New York, NY 10020
Telephone: (212) 906-1200
E-mail:  ray.schrock@lw.com
          andrew.sorkin@lw.com

*Proposed Attorneys for the Debtors and
Debtors in Possession*

## CERTIFICATE OF SERVICE

I certify that on July 14, 2025, a true and correct copy of the foregoing document was served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas on those parties registered to receive electronic notices.

*/s/ Timothy A. ("Tad") Davidson II*
Timothy A. ("Tad") Davidson II