**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

------------------------------------------------------------ x
                                                   :

In re:                                      :     Chapter 11
                                                   :

RUNITONETIME LLC, *et al.*,          :     Case No. 25-90191 (ARP)
                                                   :

           Debtors.[1]                 :     (Joint Administration Requested)
                                                   :
------------------------------------------------------------ x

<u>**EMERGENCY**</u> **MOTION OF DEBTORS FOR ENTRY OF INTERIM
AND FINAL ORDERS (I) AUTHORIZING DEBTORS TO (A) CONTINUE
EXISTING CASH MANAGEMENT SYSTEM, (B) MAINTAIN EXISTING
BUSINESS FORMS AND INTERCOMPANY ARRANGEMENTS, AND (C) CONTINUE
<u>INTERCOMPANY TRANSACTIONS; AND (II) GRANTING RELATED RELIEF</u>**

> **Emergency relief has been requested.  Relief is requested not later than 1:00 p.m. (prevailing Central Time) on July 15, 2025.**
>
> **If you object to the relief requested or you believe that emergency consideration is not warranted, you must appear at the hearing if one is set, or file a written response prior to the date that relief is requested in the preceding paragraph.  Otherwise, the Court may treat the pleading as unopposed and grant the relief requested.**
>
> **A hearing will be conducted on this matter on July 15, 2025, at 1:00 p.m. (prevailing Central Time) in Courtroom 404, 4th floor, 515 Rusk Street, Houston, Texas 77002.  Participation at the hearing will only be permitted by an audio and video connection.**
>
> **Audio communication will be by use of the Court's dial-in facility.  You may access the facility at (832) 917-1510.  Once connected, you will be asked to enter the conference room number. Judge Perez's conference room number is 282694.  Video communication will be by use of the GoToMeeting platform.  Connect via the free GoToMeeting application or click the link on Judge Perez's homepage.  The meeting code is "JudgePerez".  Click the settings icon in the upper right corner and enter your name under the personal information setting.**
>
> **Hearing appearances must be made electronically in advance of both electronic and in-person hearings.  To make your appearance, click the "Electronic Appearance" link on Judge Perez's homepage.  Select the case name, complete the required fields and click "Submit" to complete your appearance.**

The above-captioned debtors in possession (collectively, the "**Debtors**") respectfully state

as follows in support of this motion (this "**Motion**"):

---

[1]    A complete list of the Debtors in the Chapter 11 Cases may be obtained on the website of the Debtors' proposed claims and noticing agent at https://restructuring.ra.kroll.com/RunItOneTime/.  The Debtors' mailing address is 12530 NE 144th Street, Kirkland, Washington 98304.

**RELIEF REQUESTED**

1.       By this Motion, the Debtors seek entry of an interim order (the "***Proposed Interim Order***") and thereafter a final order (the "***Proposed Final Order***", and together with the Proposed Interim Order, the "***Proposed Orders***"), substantially in the forms attached hereto: (i) authorizing, but not directing, the Debtors to:

(a)       continue operating their existing cash management system (the "***Cash Management System***"), including, without limitation, to continue to maintain their existing accounts and business forms;

(b)       implement changes to the Cash Management System in the ordinary course of business insofar as such changes relate to the Debtors' participation in, or control of, the Cash Management System, including, without limitation, opening new accounts or closing existing accounts owned by the Debtors;

(c)       continue to perform under and honor intercompany transactions among the Debtors and their non-Debtor affiliates in the ordinary course of business;

(d)       provide administrative expense priority for postpetition Intercompany Claims (as defined below) against the Debtors;

(e)       honor and pay all prepetition and postpetition Cash Management System Fees (as defined below) payable by the Debtors; and

(f)       continue utilizing the Credit Card Programs (as defined below) in the ordinary course and pay prepetition amounts thereunder.

2.       The Debtors further request that the United States Bankruptcy Court for the Southern District of Texas (the "***Court***"): (a) waive, on a conditional 45-day basis, certain requirements under section 345 of the Bankruptcy Code (as defined below) and the Guidelines for Debtors-in-Possession (the "***U.S. Trustee Guidelines***"); and (b) authorize and direct the financial institutions at which the Debtors maintain various accounts (the "***Banks***") to (i) continue to maintain, service, and administer the Debtors' accounts, and (ii) debit the Debtors' accounts in the ordinary course of business on account of (1) electronic transfers (including wire transfers, book transfers, and ACH transfers) or checks drawn on the Debtors' accounts, and (2) all amounts owed to the Banks for maintenance of the Debtors' accounts, including, without limitation, any account fees, credit card processing fees, service charges and other fees, costs, charges, chargebacks, and

expenses associated with the Debtors' accounts and the Cash Management System, whether arising before or after the commencement of the Chapter 11 Cases (as defined below); and (b) grant related relief.

## JURISDICTION AND VENUE

3.      The Court has jurisdiction to consider this Motion under 28 U.S.C. § 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b) and the Court may enter a final order consistent with Article III of the United States Constitution.  Venue is proper under 28 U.S.C. §§ 1408 and 1409.

4.      The statutory and legal predicates for the relief requested herein are sections 105(a), 345, 363(b)(1), 363(c)(1), 364(a), and 1107(a) of title 11 of the United States Code (the "***Bankruptcy Code***"), rules 6003 and 6004 of the Federal Rules of Bankruptcy Procedure (the "***Bankruptcy Rules***"), rule 9013-1 of the Bankruptcy Local Rules for the Southern District of Texas (the "***Bankruptcy Local Rules***"), and the Procedures for Complex Cases in the Southern District of Texas.

## BACKGROUND

5.      On the date hereof (the "***Petition Date***"), the Debtors each commenced with the Court a voluntary case (the "***Chapter 11 Cases***") under chapter 11 of the Bankruptcy Code.  The Debtors continue to operate their business and manage their properties as debtors in possession under sections 1107(a) and 1108 of the Bankruptcy Code.  No trustee, examiner, or statutory committee has been appointed in the Chapter 11 Cases.

6.      Contemporaneously with the filing of the Motion, the Debtors filed a motion requesting joint administration of the Chapter 11 Cases pursuant to Bankruptcy Rule 1015(b) and Bankruptcy Local Rule 1015-1.

7.     The Debtors are a privately held gaming and entertainment company focused on acquiring undervalued gaming assets and implementing operational changes to improve profitability.  The Debtors own and operate a portfolio of casinos, card rooms, hotels, and other gaming- and hospitality-related assets across Washington State, Nevada, and Colorado, including 17 card rooms in Washington State and several casinos and hotels in Nevada and Colorado, reflecting a total of approximately 2,500 slot machines, 320 table games, 1,200 hotel rooms, and 30 restaurants.  The Debtors' operating businesses also include the EGads! fabrication and installation business, a gaming and hospitality industry leader in the design, fabrication, assembly and installation of casino interiors, custom signage, lighting, and architectural treatments, and the Utah Trailways charter company, which facilitates customer gaming excursions from Salt Lake City, Utah, to the Debtors' operating properties in Wendover, Nevada.

8.     The factual background regarding the Debtors, including their business, their capital structure, and the events leading to the commencement of the Chapter 11 Cases is set forth in the *Declaration of Jeff Seery in Support of Chapter 11 Petitions and First Day Relief* (the "***First Day Declaration***"), filed contemporaneously herewith and incorporated herein by reference.[2]

## I.     The Debtors' Cash Management System

### A.     Overview of the Cash Management System

9.     The Debtors' Cash Management System is an integrated, centralized cash management system used to collect, transfer, and disburse funds generated by the Company's operations.  The Cash Management System facilitates cash monitoring, forecasting, and reporting and enables the Debtors to maintain control over the administration of approximately 98 bank accounts (together with any other accounts the Debtors may open in the ordinary course of their

---

[2]     Capitalized terms used but not defined herein have the meanings given to them in the First Day Declaration.

business, the "**_Accounts_**") maintained with multiple Banks, including those set forth on <u>**Exhibit A**</u>[3] attached hereto, and reflected on the schematic of the Cash Management System, attached hereto as <u>**Exhibit B**</u>, which sets forth the flow of funds among the Accounts.  The Debtors' treasury department maintains daily oversight of the Cash Management System and implements cash management controls for entering, processing, and releasing funds.

10.     The Cash Management System is comparable to those commonly employed by businesses within the gaming industry of comparable size and scale to the Debtors.  The Cash Management System is tailored to meet the Company's operating needs and enables the Company to control and monitor corporate funds, ensure cash availability and liquidity, comply with the requirements of their financing agreements, and reduce administrative expenses by facilitating the movement of funds and the development of accurate account balances.

### B.     Accounts

11.     As of the Petition Date, the Cash Management System includes a total of 98 Accounts, 94 of which are held through U.S. Bank, National Association ("**_U.S. Bank_**"), which is the Debtors' primary cash management Bank and is an authorized bank depository (an "**_Authorized Depository_**") under the U.S. Trustee Guidelines, and 2 of which are held at Nevada State Bank ("**_Nevada State_**").  The Debtors also hold one Account at Lexicon Bank ("**_Lexicon Bank_**") and one Account at GBank ("**_GBank_**" and together with U.S. Bank, Nevada State, and Lexicon Bank, the "**_Banks_**").[4]  The Accounts at Lexicon Bank and GBank, along with certain of the Debtors' other accounts, hold _de minimis_ balances and have had little to no activity in the

---

[3]   The Debtors have undertaken reasonable efforts to ensure that <u>**Exhibit A**</u> lists all of the accounts that comprise the Cash Management System.  In the event that any account has been inadvertently omitted from <u>**Exhibit A**</u>, the Debtors request that the relief sought by this Motion be deemed to apply to any such account.

[4]   Nevada State, Lexicon Bank and GBank are not Authorized Depositories.

period immediately prior to the Petition Date.  These Accounts are therefore considered by the Debtors to be non-operational Dormant Accounts (as further described below).

12.     As of the end of day on July 11, 2025, the Debtors held an aggregate amount of approximately $8.61 million in the Accounts.  The Accounts can be grouped into separate categories based on their function within the broader cash management system, described in detail below:[5]

**Operational Accounts**

| Accounts | Account Description |
|---|---|
| **Main Operating Accounts**<br><br>**U.S. Bank:**<br><br>Maverick Gaming LLC (3949)[6] (the "Corporate Main Operating Account")<br><br>Maverick Colorado LLC (3956) (the "Colorado Main Operating Account")<br><br>Maverick NV LLC (3964) (the "Nevada Main Operating Account")<br><br>Maverick Washington LLC (3972) (the "Washington Main Operating Account") | The Main Operating Accounts serve as the top level account for the Debtors' operations in Nevada, Washington, Colorado and corporate-level functions of the Debtors.<br><br>The Main Operating Accounts have also been historically used to fund certain disbursements (including vendor and tax payments applicable to the relevant category or region (Nevada, Washington, Colorado or corporate).  The Colorado Main Operating Account also serves as the primary payroll Account for the Debtors in the Colorado region, and the Nevada Main Operating Account also funds certain payroll-related expenses (*e.g.*, withholding) for the Debtors in the Nevada region.<br><br>The Main Operating Accounts are funded primarily through transfers from other operating accounts and are used to concentrate funds and facilitate manual excess cash transfers up through the corporate structure into the Money Market Accounts.  The Main Operating Accounts also facilitate transfers back into the lower-level Operating Accounts on an as-needed basis. |
| **Concentration Accounts (WA)**<br><br>**U.S. Bank:**<br><br>Great American Gaming Corporation (4285) | The Concentration Accounts were created to facilitate consolidated tax payments across certain of the Debtors.  Historically, these tax payments have instead been made through either the Washington Main Operating Account or the Corporate Main Operating Account, and the Concentration Accounts have been used primarily to consolidate funds from Operating Accounts supporting the Washington operations. |

---

[5]     Certain of the below categories are defined to include only Accounts connected with the Debtors' operations in Nevada, Washington, or Colorado, as applicable, generally reflecting unique operational or regulatory structures present in such state.  Other categories include Accounts connected with the Debtors' operations in each state, or in support of corporate operations across all states.

[6]     Maverick Gaming LLC is the former name of debtor RunItOneTime LLC.  The Debtors are working with the Banks to change the name associated with such Accounts.

| Accounts | Account Description |
|---|---|
| Nevada Gold & Casinos Inc. (4475) | |
| **Landlord Accounts (NV)**<br><br>**U.S. Bank:**<br><br>Maverick Elko LLC (4145)<br><br>Maverick Wendover LLC (4137) | The Landlord Accounts are used to concentrate funds conveyed from the Nevada Licensed Operators (as defined below) for the purpose of facilitating rent payments to the applicable landlords for the Debtors' Nevada gaming operations.<br><br>The Landlord Accounts are funded from the Operating Accounts associated with the Nevada Licensed Operators, and excess funds from the Landlord Accounts are transferred to the Nevada Main Operating Account. |
| **General Operating Accounts**<br><br>**U.S. Bank:**<br><br>E.Gads LLC (4004)<br><br>Maverick Poker Operator LLC (4737)<br><br><u>Washington:</u><br><br>Evergreen Entertainment Corporation (4335)<br><br>Grand Central Casino, Inc (4319)<br><br>Maverick Kirkland II, LLC (4376)<br><br>Maverick Kirkland, LLC (4350)<br><br>Maverick Lakewood, LLC (4418)<br><br>Maverick Tukwila, LLC (4434)<br><br>Maverick Yakima, LLC (4392)<br><br>Myers LLC (8080)<br><br>NG Washington II LLC (4566)<br><br>NG Washington II LLC (4582)<br><br>NG Washington II LLC (4624) | The General Operating Accounts are the individual Debtors' primary accounts used to collect revenues and fund disbursements.  The General Operating Accounts are generally funded by customer receipts and cash deposits.  The General Operating Accounts are used to make disbursements on account of vendors, license payments, cash orders, and, solely for certain of the Debtors in Nevada, payroll.  Excess funds in the Operating Accounts are ordinarily conveyed (either directly or through a Concentration Account) to a Main Operating Account.<br><br>Debtors NG Washington LLC, NG Washington II LLC, and NG Washington III LLC each maintain multiple General Operating Accounts, each of which is associated with an independent operating property.<br><br>Debtors Red Lion Operator, LLC and Z Casino Black Hawk Operator, LLC also maintain independent General Operating Accounts in support of operations at owned-and-operated gas stations.  These Gas Station Accounts receive customer receipts and disburse vendor payments associated with the gas station operations.  Excess funds from the Gas Station Accounts are conveyed to the associated Debtor's General Operating Account. |

| Accounts | Account Description |
|---|---|
| NG Washington III LLC (4640) | |
| NG Washington III LLC (4657) | |
| NG Washington LLC (4483) | |
| NG Washington LLC (4509) | |
| NG Washington LLC (4525) | |
| Pair O'Dice Investments, LLC (4293) | |
| Pete's Flying Aces Inc (5296) | |
| Epstein Gaming LLC (5262) | |
| Riverside Casino Inc. (5239) | |
| Tacoma Casino LLC (5288) | |
| The Royal Club Limited Liability Company (4459) | |
| Nevada: | |
| High Desert Operator, LLC (4244) | |
| Red Garter Operator, LLC (4202) | |
| Red Lion Operator, LLC (4178) | |
| Gold Country Operator, LLC (4152) | |
| Wendover Nugget Operator, LLC (4228) | |
| Utah Trailways Charter Bus Company, LLC (9315) | |
| Colorado: | |
| Grand Z Casino Operator, LLC (4012) | |

| Accounts | Account Description |
|---|---|
| Johnny Z Casino Operator, LLC (4046)<br><br>Z Casino Black Hawk Operator, LLC (4079)<br><br>Gas Station Accounts:<br><br>Red Lion Operator, LLC (4186)<br><br>Z Casino Black Hawk Operator, LLC (4095) | |
| **Payroll & Benefits Accounts**<br><br>**U.S. Bank:**<br><br>Maverick Gaming LLC (3998)<br><br>Maverick Washington LLC (3980)<br><br>Utah Trailways Charter Bus Company, LLC (9323) | The Debtors' Payroll & Benefits Accounts are used to make disbursements on account of the Debtor's payroll and certain other employee obligations.<br><br>The Payroll & Benefits Accounts for corporate employees and employees based in Washington are funded through either the Corporate Main Operating Account (covering benefits for all employees), the Washington Main Operating Account (for Washington and corporate payroll), or through an Operating Account (in the case of Debtor Utah Trailways Charter Bus Company, LLC), as applicable.<br><br>Payroll for Colorado employees is disbursed directly through the Colorado Main Operating Account.<br><br>Payroll for Nevada employees is disbursed primarily through the Operating Account for each applicable Debtor, with certain payroll-related expenses (*e.g.*, withholding) funded by the Nevada Main Operating Account. |
| **License-Related Rent Payment Accounts**<br><br>**U.S. Bank:**<br><br>Colorado Resorts Operator LLC (4111)<br><br>Elko Resorts Operator LLC (4277)<br><br>Wendover Resorts Operator LLC (4269) | The License-Related Rent Payment Accounts are used for the sole purpose of disbursing the License-Related Rent Payments (each as defined below).  The License-Related Rent Payment Accounts are funded through a retained amount of operating receipts from each Licensed Operator, in each case pursuant to the License-Related Rent Agreements. |
| **Petty Cash Accounts (Colorado)**<br><br>**U.S. Bank:**<br><br>Grand Z Casino Operator, LLC (4036)<br><br>Johnny Z Casino Operator, LLC (4061)<br><br>Z Casino Black Hawk Operator, LLC (4103) | The Colorado Licensed Operators maintain Petty Cash Accounts which are funded by the Operating Accounts and used solely to fund payments to small vendors who require payment by check. |
| **Investment Accounts**<br><br>**U.S. Bank:** | The Debtors' Investment Accounts hold excess funds in short-term money market funds (each administered by U.S. Bank).  Funds held in the Investment Accounts are generally available within one-to-two business days, depending on the investment. |

| Accounts | Account Description |
|---|---|
| Maverick Gaming LLC (0897)<br><br>Maverick Gaming LLC (0122) | Account (*0897) is used as the Debtors' general Investment Account for excess funds across the corporate structure, and is funding through operational receipts and other cash proceeds that are transferred through the Main Operating Accounts.  Account (*0122) maintains a consistent balance to support certain available cash requirements which are applicable to the Nevada Licensed Operators under Nevada gaming law (the "***Nevada Regulatory Investment Account***").  Accrued interest in the Nevada Regulatory Investment Account is automatically swept to the Corporate Main Operating Account on a monthly basis. |
| **Dormant Accounts**<br><br>**U.S. Bank:**<br><br>NG Washington II LLC (4608)<br><br>15743 Ambaum LLC (4665)<br><br>Maverick Colorado LLC (4129)[7]<br><br>**Nevada State Bank:**<br><br>Maverick Gaming LLC (6039)<br><br>Maverick Washington LLC (5411)<br><br>**Lexicon Bank:**<br><br>Maverick Gaming LLC (3080)<br><br>**GBank:**<br><br>Grand Z Casino Operator LLC (7254) | The Dormant Accounts have had little-to-no activity in the period immediately prior to the Petition Date.[8]  The Dormant Accounts hold *de minimis* funds for the purpose of satisfying legacy vendor debits, for the purpose of maintaining such accounts pending possible resumption of use, or pending closure. |

---

[7]   As further described in the *Emergency Motion of Debtors for Entry of an Order (I) Prohibiting Utility Companies from Altering or Discontinuing Service on Account of Prepetition Invoices; (II) Approving the Debtors' Proposed Form of Adequate Assurance; (III) Establishing Procedures for Resolving Requests by Utility Companies for Additional Assurance of Payment; and (IV) Granting Related Relief* (the "**Utilities Motion**"), the Debtors are seeking to designate the Dormant Account held by Debtor Maverick Colorado LLC with the last four digits (*4129) as the Utility Deposit Account (as defined in the Utilities Motion).

[8]   The Dormant Accounts held at Nevada State Bank historically operated as Concentration Accounts in respect of Operating Accounts that certain of the Debtors held at Nevada State Bank.  However, the associated Operating Accounts were closed prior to the Petition Date, and the Debtors do not anticipate material usage of the remaining accounts held at Nevada State Bank during the Chapter 11 Cases.

**Gaming-Related Accounts**

| Accounts | Account Description |
|---|---|
| **Progressive Accounts (Washington)**<br><br>**U.S. Bank:**<br><br>15743 AMBAUM LLC (5791)<br><br>Epstein Gaming LLC (8196)<br><br>Evergreen Entertainment Corporation (5962)<br><br>Maverick Kirkland II LLC (5767)<br><br>Maverick Lakewood LLC (5759)<br><br>Maverick Tukwila LLC (5742)<br><br>Maverick Yakima LLC (5734)<br><br>NG Washington II LLC (5643)<br><br>NG Washington II LLC (5650)<br><br>NG Washington II LLC (5668)<br><br>NG Washington II LLC (5676)<br><br>NG Washington III LLC (5684)<br><br>NG Washington LLC (5601)<br><br>NG Washington LLC (5627)<br><br>NG Washington LLC (5635)<br><br>Pair O'Dice Investments LLC (5700)<br><br>Pete's Flying Aces Inc (8220) | Under Washington gaming regulations, the applicable Debtors are required to deposit customer receipts from progressive jackpot games into dedicated accounts. These receipts are held to contribute to the progressive or "player supported jackpot"(in the case of card games) for the applicable game. The Debtors periodically transact with these Progressive and PSJ Accounts through the applicable Operating Accounts either to deposit "seed amounts" to fund an initial jackpot, or to recoup certain funds representing the Debtors' "take" of the progressive jackpot total. |

| Accounts | Account Description |
|---|---|
| Riverside Casino Inc (8212) | |
| Tacoma Casino LLC (8204) | |
| The Royal Club LLC (5726) | |
| **Player Supported Jackpot (PSJ) Accounts (Washington)** | |
| **U.S. Bank:** | |
| 15743 AMBAUM LLC (5783) | |
| Grand Central Casino Inc. (5718) | |
| Maverick Kirkland LLC (5775) | |
| Maverick Tukwila LLC (9548) | |
| Maverick Yakima LLC (5674) | |
| Myers LLC (5942) | |
| NG Washington II LLC (3363) | |
| NG Washington III LLC (5809) | |
| NG Washington LLC (5619) | |

| Accounts | Account Description |
|---|---|
| **AP/Jackpot Accounts (Nevada)**<br><br>**U.S. Bank:**<br><br>Gold Country Operator, LLC (4160)<br><br>High Desert Operator, LLC (4251)<br><br>Red Garter Operator, LLC (4210)<br><br>Red Lion Operator, LLC (4194)<br><br>Wendover Nugget Operator, LLC (4236) | The Nevada Licensed Operators maintain AP/Jackpot Accounts which are funded by the Operating Accounts and used solely to disburse payments by check to vendors and in respect of jackpot awards.<br><br>Jackpot awards not disbursed by check are ordinarily paid out of funds in the Casino Cages (as defined below), which are, in turn, funded through cash orders from the General Operating Account associated with the applicable Nevada Licensed Operator. |
| **Cage Accounts (Colorado)**<br><br>**U.S. Bank:**<br><br>Grand Z Casino Operator, LLC (4020)<br><br>Johnny Z Casino Operator, LLC (4053)<br><br>Z Casino Black Hawk Operator, LLC (4087) | The Colorado Licensed Operators disburse gaming-related jackpot awards through the Cage Accounts.  Disbursements from the Cage Accounts are funded through transfers from the Operating Accounts associated with each Colorado Licensed Operator. |

13.    The Debtors incur periodic service charges and other fees, charges, costs, and expenses in connection with the maintenance of the Accounts in the Cash Management System (the "***Account Fees***").  The Account Fees are paid monthly and are automatically deducted from the Debtors' Accounts as they are assessed by their respective Banks.  The Debtors typically pay approximately $36,000 per month in Account Fees (though the exact amount varies somewhat month-to-month based on transaction volume).  As of the Petition Date, the Debtors estimate that no amounts in respect of the Account Fees are accrued and outstanding.  None of the Accounts are subject to any control agreements in favor of any third-party.

### C.   Casino Cages

14.    Each of the Debtors' casino properties maintains one or more physically secured areas (the "***Casino Cages***") to support its ongoing gaming operations.  The Casino Cages are a centralized location for receipts and disbursements related to the Debtors' gaming and casino operations.  Thus, the Casino Cages perform customer transactions, including, but not limited to, chip redemptions for cash, jackpot payouts, cash advances on credit cards, and check cashing.  The Debtors also maintain a number of cash kiosks and ATMs on each casino property, which are periodically refilled from the Casino Cages.[9]  Each Casino property must maintain adequate funds in the Casino Cages both for regulatory requirements and to fund expected levels of cash demand at any given time.  The amount of cash fluctuates based on the day of the week, the seasonality of each casino property's gaming business, and the occurrence of attractions or events.  The cash held in the Casino Cages is not subject to any liens or encumbrances.

15.    The minimum available cash requirements are set by the applicable gaming regulator in each jurisdiction in which the Debtors operate gaming properties (the "***Regulatory Minimum Balances***").[10]  Washington regulations require that the Regulatory Minimum Balances be satisfied only through cash on-site, while Nevada and Colorado regulations allow the Regulatory Minimum Balances to be satisfied through a mixture of cash on-site and available cash held in Accounts (the "***Regulatory Restricted Account Cash***").[11]  In Nevada, the Debtors hold the

---

[9]    All of the Debtors' cash located in the Casino Cages, kiosks, and ATMs is considered cash on-site for purposes of satisfying the Regulatory Minimum Balances (as defined below).

[10]   As of July 11, 2025, the Regulatory Minimum Balance was approximately $1.50 million across the Debtors' Washington properties, approximately $2.18 million across the Debtors' Nevada properties, and approximately $2.53 million across the Debtors' Colorado properties.

[11]   In Nevada and Colorado, the Debtors are provided a level of discretion regarding the allocation between cash on-site and Regulatory Restricted Account Cash.  The Debtors' on-site cash therefore fluctuates based on projected operational needs for a given period.  As of July 11, 2025, the Debtors had approximately $3.48 million in cash on-site across their Washington properties, approximately $3.23 million across their Nevada properties, and approximately $1.4 million across their Colorado properties.

majority of the Regulatory Restricted Account Cash in the Nevada Regulatory Investment Account, while in Colorado, the Debtors hold the Regulatory Restricted Account Cash in the applicable Operating Accounts.  The Debtors rebalance cash across the Accounts in each jurisdiction on an as-needed basis to ensure compliance with the Regulatory Minimum Balances on an ongoing basis.

16.     The Debtors also regularly transfer physical cash between the Casino Cages and applicable Operating Accounts, in the form of cash deposits (the "***Cash Deposits***") and cash orders (the "***Cash Orders***").  The Debtors facilitate Cash Deposits and Cash Orders for various reasons in the ordinary course of business, including (i) to transfer excess on-site cash into the Accounts, (ii) to replenish on-site cash balances in compliance with regulatory requirements and in support of operational needs, and (iii) to exchange denominations of currency.[12]  The Cash Orders and Cash Deposits are facilitated through the Debtors' use of armored car and security services (the "***Cash Protective Services***").  The Debtors incur fees in exchange for the Cash Protective Services (the "***Cash Protective Fees***" and together with the Account Fees, the "***Cash Management System Fees***") on an as-needed basis and in proportion to the Debtors' use of such services.  The Debtors historically average approximately $100,000 to $160,000 per month in Cash Protective Fees.[13]

**D.     Credit Cards**

**1.     Virtual Card Program**

17.     In the ordinary course of business, the Debtors maintain a credit card program to facilitate the purchase of goods and services essential to the operation of the Debtors' business in the ordinary course (the "***Virtual Card Program***").  The Virtual Cards are issued on a per-payment

---

[12]   Exchanges between denominations of currency are transacted solely in U.S. Dollars and reflect general customer preferences for certain bills or coins (*e.g.*, $100 bills).

[13]   The Cash Protective Services are provided by Garda CL Northwest, Inc. for the Debtors' Washington operations, Loomis for the Debtors' Nevada operations, and Brink's Inc. for the Debtors' Colorado operations, respectively.

basis, with no physical holder, and are primarily used for one-time payments where card information is transmitted directly to the merchant to process the transaction.  The Debtors pre-fund the Virtual Card Program such that there is no outstanding balance in the Virtual Card Program at any given time.  In June, 2025, the Debtors made approximately $111,951.80 in purchases through the Virtual Card Program.

### 2.     The Corporate Credit Card Program

18.     In the ordinary course of business, the Debtors maintain a credit card program for a limited number of employees to make expenditures for certain expenses in the ordinary course (the "***Corporate Credit Card Program***" and together with the Virtual Card Program, the "***Credit Card Programs***").  The Corporate Credit Card Program includes approximately 14 open credit cards issued by U.S. Bank and which are held by the Debtors' employees, subject to managers' approval.  The Debtors pre-fund the Corporate Credit Card Program such that there is no outstanding balance in the Corporate Credit Card Program at any given time.  In June, 2025, the Debtors made approximately $308,290.76 in purchases through the Corporate Credit Card Program.

### E.     Intercompany Transactions

19.     The Debtors have historically engaged in routine intercompany transactions with other Debtors in the ordinary course of business (the "***Debtor Intercompany Transactions***") and occasionally with non-Debtor affiliates (the "***Non-Debtor Intercompany Transactions***" and together with the Debtor Intercompany Transactions, the "***Intercompany Transactions***" and, each intercompany receivable and payable generated pursuant to an Intercompany Transaction, an "***Intercompany Claim***").  The Intercompany Transactions are subject to both formal and informal arrangements, including general accounting mechanisms used among the Debtors, as well as arrangements based on administrative convenience.

20.     One notable Debtor Intercompany Transaction involves the Debtors' gaming licenses.  Certain of the Debtors maintain licenses and permits that are necessary under applicable gaming regulations to operate the Debtors' gaming business (the "***Licensed Operators***").[14]  The Licensed Operators are party to agreements with certain of the Debtors pursuant to which the Licensed Operators operate gaming-regulated enterprises on property owned or leased by such counterparty Debtors (the "***License-Related Rent Payment Agreements***").  Pursuant to the License-Related Rent Payment Agreements, the Licensed Operators remit 100% of their Total Net Cash Flow (as defined in the License-Related Rent Payment Agreements) to the applicable counterparty Debtor, subject to a $5,000 monthly fee which is retained by each applicable Licensed Operator and ultimately conveyed to the underlying license-holder through the Licensed-Related Rent Payment Accounts (the "***License-Related Rent Payments***").[15]

21.     The Debtors have also historically engaged in a limited number of Non-Debtor Intercompany Transactions.  Most notably, Debtor E.Gads LLC engages in a limited number of Non-Debtor Intercompany Transactions with non-Debtor affiliate Egads de Mexico SA de CV in the ordinary course of operating the Debtors' signage business.  The Debtors do not anticipate that these or any other Non-Debtor Intercompany Transactions will be material to the Debtors' operations or cash-flow during the Chapter 11 Cases.

22.     The Intercompany Transactions also include, without limitation, (i) cash transfers between the Accounts for operational purposes and administrative efficiency; and (ii) transfers and setoffs related to general corporate services and operational expenses, including the payment of

---

[14]     The Licensed Operators include Debtors Red Garter Operator, LLC, Wendover Nugget Operator, LLC, Gold Country Operator, LLC, Red Lion Operator, LLC and High Desert Operator, LLC (the "***Nevada Licensed Operators***") and Debtors Johnny Z Casino Operator LLC, Grand Z Casino Operator LLC, and Z Casino Black Hawk Operator LLC (the "***Colorado Licensed Operators***").

[15]     The underlying license-holder for the Licensed Operators is Eric Persson, an insider and the CEO of the Debtors.

wages and benefits.  As a result of the Intercompany Transactions, a Debtor may have claims against other Debtors and vice versa.  Accordingly, the Debtors request authority to honor Intercompany Claims arising from prepetition and postpetition Intercompany Transactions.

23.     The Intercompany Transactions and the related Intercompany Claims, as well as the resulting cash flows and set offs through the Cash Management System, are integral to the smooth operation of the Debtors' businesses and are administratively beneficial to the Debtors' operations.  Importantly, the benefits of these Intercompany Transactions ultimately inure to the Debtors' estates, and failing to honor prepetition Intercompany Claims among Debtors and non-Debtor affiliates, or ceasing Intercompany Transactions in the ordinary course postpetition, would negatively impact the Debtors' ability to operate in chapter 11.

24.     The Debtors maintain, and will continue to maintain, records of these transfers of cash and bookkeeping entries on a postpetition basis (if any) and will implement such other internal mechanisms as needed to permit them, with the assistance of their advisors, to accurately track the balance of and account for all prepetition and postpetition Intercompany Transactions on demand.

## II.     U.S. Trustee Guidelines

### A.     Authorized Depositories and Compliance with Section 345(b) of the Bankruptcy Code

25.     The U.S. Trustee Guidelines and section 345(b) of the Bankruptcy Code generally require chapter 11 debtors to keep all estate funds in accounts with Authorized Depositories.  As noted above, certain of the Banks are not Authorized Depositories.  These Banks, however, are highly-rated financial institutions that are well-capitalized and financially stable.  Further, the accounts at these Banks are Dormant Accounts that hold *de minimis* amounts.  The Debtors believe that their approach to managing their cash reserves balances their need to access liquidity on a

daily basis with the return on investment and protection of estate resources. Therefore, the Debtors submit that maintenance of Accounts at these institutions will not jeopardize any party in interest.

26.     The Cash Management System is complex and critical to the ongoing stability of the Debtors' businesses and smooth transition into the Chapter 11 Cases. Requiring the Debtors to transfer any of their applicable Accounts to an Authorized Depository would place a needless and excessive administrative burden on the Debtors and impose significant, value-destructive costs to the Debtors' estates, and these costs are not justified in a prepackaged case. Accordingly, the Debtors request an initial 45-day waiver of the deposit and investment requirements of section 345(b) of the Bankruptcy Code and the U.S. Trustee Guidelines upon entry of the Proposed Interim Order.

**B.     Debtors' Existing Business Forms and Records**

27.     The Debtors use a variety of preprinted business forms, including checks, letterhead, correspondence forms, invoices, purchase orders, and other business forms in the ordinary course of business (collectively, and as they may be modified from time to time, the "***Business Forms***"). The Debtors also maintain books and records to document their financial results and a wide array of necessary operating information (collectively, the "***Books and Records***"). To avoid a material disruption to their business operations that would result from a disruption of the Cash Management System and to avoid unnecessary expense, the Debtors request authorization to continue using all of the Business Forms and Books and Records in use immediately before the Petition Date (and as may be amended or modified in the ordinary course from time to time), including with respect to the Debtors' ability to update authorized signatories and services, as needed—without reference to the Debtors' status as debtors in possession—rather than requiring the Debtors to incur the expense and delay of ordering new Business Forms and creating new Books and Records.

### C.      Debtor-in-Possession Accounts

28.      The Debtors' Cash Management System is complex and maintaining it in the ordinary course is critical to the continued stability of the Debtors' businesses and smooth transition into the Chapter 11 Cases.  Considering the breadth and complexity of the Debtors' businesses and financial affairs and the sheer volume of collections, disbursements, and movement of funds through the Cash Management System on a daily basis, closing the Accounts and opening new ones, as well as complying with the other provisions of the U.S. Trustee Guidelines relating to the Cash Management System, would severely disrupt the ordinary financial operations of the Debtors by reducing efficiencies and causing unnecessary expense.  Accordingly, cause exists to allow the Debtors to continue utilizing the existing Accounts in the ordinary course, consistent with historical practices.

## BASIS FOR RELIEF

### I.      Continuation of Cash Management System Is in Best Interests of Debtors and All Other Parties in Interest.

29.      The efficient and economical operation of the Debtors' business requires that the Cash Management System continue during the Chapter 11 Cases.  As a practical matter, it would be difficult and expensive to establish and maintain a separate cash management system for each Debtor.  Further, requiring the Debtors to adopt new, segmented cash management systems at this early and critical stage of the Chapter 11 Cases would be expensive, create unnecessary administrative burdens, and be extraordinarily disruptive to their business operations.  Any such disruption would have a severe and adverse impact upon the success of the Chapter 11 Cases. Accordingly, the Debtors seek authority to continue using the Cash Management System in the same manner as the Cash Management System was utilized prior to the Petition Date, and to

implement ordinary course changes to it consistent with past practices.  The Bankruptcy Code provides for such relief.

30.     Section 363(c)(1) of the Bankruptcy Code authorizes the debtor in possession to "enter into transactions, including the sale or lease of property of the estate, in the ordinary course of business . . . and may use property of the estate in the ordinary course of business without notice or a hearing."  11 U.S.C. § 363(c)(1).  The purpose of section 363(c)(1) is to provide a debtor in possession with the flexibility to engage in the ordinary transactions required to operate its business without unneeded oversight by its creditors or the court.  *In re HLC Props., Inc*., 55 B.R. 685, 686 (Bankr. N.D. Tex. 1985) (finding "no need to further burden the docket or the staff of the Court with a superfluous order" when a transaction is in the ordinary course of business).  Included within the purview of section 363(c) is a debtor's ability to continue the "routine transactions" necessitated by a debtor's cash management system.  *Amdura Nat'l Distrib. Co. v. Amdura Corp. (In re Amdura Corp.)*, 75 F.3d 1447, 1453 (10th Cir. 1996).  A cash management system allows a debtor "to administer more efficiently and effectively its financial operations and assets."  *Southmark Corp. v. Grosz (In re Southmark Corp.)*, 49 F.3d 1111, 1114 (5th Cir. 1995).  Accordingly, section 363(c)(1) authorizes the continuation of the Cash Management System as it operated prepetition without the Court's approval.

31.     To the extent the relief requested herein is found to fall outside of the Debtors' ordinary course of business, the Court may grant such relief pursuant to section 363(b) of the Bankruptcy Code, which provides, in relevant part, that "[t]he [debtor], after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate."  11 U.S.C. § 363(b)(1).  Courts in the Fifth Circuit have granted a debtor's request to use property of the estate outside of the ordinary course of business pursuant to section 363(b) of the Bankruptcy

Code upon a finding that such use is supported by sound business reasons.  *See, e.g.*, *Black v. Shor (In re BNP Petroleum Corp.)*, 642 F. App'x 429, 435 (5th Cir. 2016) (noting that section 363 "requires that a sale of the estate's assets be supported by an articulated business justification, good business judgment, or sound business reasons" (quotation and citation omitted)); *Inst. Creditors of Cont'l Air Lines, Inc. v. Cont'l Air Lines, Inc. (In re Cont'l Air Lines, Inc.)*, 780 F.2d 1223, 1226 (5th Cir. 1986) ("[F]or the debtor-in-possession or trustee to satisfy its fiduciary duty to the debtor, creditors and equity holders, there must be some articulated business justification for using, selling, or leasing the property outside the ordinary course of business.") (internal citation omitted).

32.     In addition, the Court has authority, pursuant to its equitable powers under section 105(a) of the Bankruptcy Code, to authorize the relief requested herein because such relief is necessary for the Debtors to carry out their duties under section 1107(a) of the Bankruptcy Code. Section 1107(a) of the Bankruptcy Code "contains an implied duty of the debtor-in-possession to 'protect and preserve the estate, including an operating business' going-concern value.'"  *In re CEI Roofing, Inc.*, 315 B.R. 50, 59 (Bankr. N.D. Tex. 2004) (quoting *In re CoServ, L.L.C.*, 273 B.R. 487, 497 (Bankr. N.D. Tex. 2002)).  Under section 105(a) of the Bankruptcy Code, "[t]he court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a); *see CoServ*, 273 B.R. at 491-93 & n.6 (holding that sections 105 and 1107 of the Bankruptcy Code provide authority for a debtor-in-possession to pay prepetition claims).  Moreover, Bankruptcy Rule 6003 itself implies that the payment of prepetition obligations may be permissible within the first twenty-one (21) days of a case where doing so is "needed to avoid immediate and irreparable harm."  Fed. R. Bankr.  P. 6003.  Accordingly, the Bankruptcy Code authorizes the postpetition payment of prepetition claims where, as here, such payments are critical to preserving the going-concern value of a debtor's estates.

33.     Moreover, Bankruptcy Rule 6003 itself implies that the payment of prepetition obligations may be permissible within the first 21 days of a case where doing so is "necessary to avoid immediate and irreparable harm."  Fed. R. Bankr. P. 6003.  Accordingly, the Bankruptcy Code authorizes the postpetition payment of prepetition claims, including the Cash Management System Fees, where, as here, such payments are critical to preserving the going-concern value of the Debtors' estates.

34.     Maintaining the existing Cash Management System is in the best interests of the Debtors' estates and all parties in interest and, therefore, should be approved.  If the Debtors are required to alter the way in which they collect and disburse cash throughout the Cash Management System, their operations will experience severe disruptions, which would ultimately frustrate the Debtors' ability to maximize the value of their estates.  Further, the Cash Management System provides material benefits to the Debtors, including the ability to (a) ensure the maximum availability of funds when and where necessary, including distributing funds to those Debtors with immediate liquidity needs, and (b) reduce costs and administrative expenses by facilitating the movement of funds and the development of more timely and accurate account information.

## II.     The Debtors Should Be Authorized to Continue Intercompany Transactions and Certain Intercompany Claims Should be Granted Administrative Expense Priority.

35.     As stated above, under section 363(c)(1) of the Bankruptcy Code, a debtor in possession "may use property of the estate in the ordinary course of business without notice or a hearing."  11 U.S.C. § 363(c)(1).  Accordingly, the Debtors believe that they do not require the Court's approval to continue entering into and performing Intercompany Transactions in the ordinary course of business.  The Debtors and their non-Debtor affiliates enter into and perform Intercompany Transactions "in the ordinary course of business" within the meaning of section 363(c)(1) of the Bankruptcy Code.  Intercompany Transactions are not just a matter of routine in

the Debtors' business; they are the sort of transactions that are common among many business enterprises that operate through multiple affiliates.  It is precisely because of their routine nature that the Intercompany Transactions are integral to the Debtors' ability to operate their business and successfully emerge from the Chapter 11 Cases.

36.     The Debtors also request that the Court grant administrative expense status to all Intercompany Claims arising postpetition as a result of Intercompany Transactions under section 503(b)(1)(A) of the Bankruptcy Code, which provides "[a]fter notice and a hearing, there shall be allowed administrative expenses . . . including . . . the actual, necessary costs and expenses of preserving the estate . . . ."  If the Intercompany Claims are accorded administrative expense status, each entity that participates in the Cash Management System and provides a benefit to the Debtors' estates will be assured that it will be compensated for its efforts.

**III.    An Initial 45-Day Waiver of the U.S. Trustee Guidelines and Section 345 of the Bankruptcy Code Are Warranted.**

37.     The U.S. Trustee Guidelines generally require chapter 11 debtors to, among other things: (a) close all existing bank accounts and open new debtor in possession bank accounts; (b) establish one debtor in possession account for all estate monies required for the payment of taxes (including payroll taxes); (c) physically set aside all monies required by law to be withheld from employees or collected from others for taxes; (d) open a new set of books and records as of the commencement date of the case; (e) use new business forms indicating the debtor-in-possession status of the chapter 11 debtor, including checks that bear the designation "debtor in possession" and reference the bankruptcy case number on such checks; and (f) make all disbursements of estate funds by check with a notation representing the reason for the disbursement.  These guidelines are intended to provide a clear line of demarcation between

prepetition and postpetition transactions and operations and to prevent inadvertent payment of prepetition claims.

38.     In addition, section 345(a) of the Bankruptcy Code provides that a debtor may deposit or invest estate funds in a manner that "will yield the maximum reasonable net return on such money, taking into account the safety of such deposit or investment."  11 U.S.C § 345(a). For deposits that are not "insured or guaranteed by the United States or by a department, agency, or instrumentality of the United States or backed by the full faith and credit of the United States," the estate must require from the entity with which the money is deposited or invested a bond in favor of the United States secured by the undertaking of a corporate security, "unless the court for cause orders otherwise."  11 U.S.C § 345(b).

39.     For the reasons set forth below, the Debtors submit that cause exists for the Court to authorize an initial 45-day waiver of certain requirements of the U.S. Trustee Guidelines and section 345 of the Bankruptcy Code.

**A.      Authorizing the Banks to Continue to Maintain, Service, and Administer the Accounts in the Ordinary Course of Business Is Warranted.**

40.     In the ordinary course of business, the Debtors conduct numerous transactions by checks, wire transfers, ACH transfers, and other electronic means.  If the Debtors are denied the opportunity to conduct transactions through these means, their businesses operations would be disrupted unnecessarily, burdening the Debtors and their creditors with additional costs.

41.     Accordingly, the Debtors request that the Court authorize the Banks to receive, process, honor, and pay, to the extent funds are available in the applicable Account, any and all checks, electronic fund transfer, ACH payments, and other instructions and drafts payable through, or drawn on, such Accounts, irrespective of whether such checks, drafts, electronic fund transfers, or ACH payments are dated prior or subsequent to the Petition Date.  The Debtors also request

that, to the extent a Bank honors a prepetition check or other item drawn on any Account in a good-faith belief that the Court has authorized such prepetition check or item to be honored, such Bank will not be liable on account thereof because the Banks are not able to independently verify or audit whether a particular item may be paid in accordance with a Court order or otherwise.

      **B.**    **Maintenance of Debtors' Existing Accounts and Business Forms Is Warranted.**

      42.    The Debtors seek a waiver of the requirements of the U.S. Trustee Guidelines, which would require, among other things, the closure of the Accounts and the opening of new deposit accounts.  Strict enforcement of the U.S. Trustee Guidelines at the outset of the Chapter 11 Cases with respect to the Cash Management System will severely disrupt the Debtors' ordinary financial operations by reducing efficiencies, increasing administrative burdens, and creating unnecessary expenses.  The Chapter 11 Cases will be more orderly if the Debtors are permitted to maintain all Accounts with the same account numbers during the outset of these cases.  By preserving business continuity and avoiding the disruption and delay to the Debtors' disbursement obligations, all parties-in-interest, including employees, vendors, and customers, will be best served by the relief requested herein.  Furthermore, the Debtors' continued use of their existing Business Forms will not prejudice parties in interest because parties doing business with the Debtors will know of the Debtors' status as debtors in possession.  In addition, to the extent necessary, the Debtors request authority to make ordinary course changes to the Cash Management System, such as opening or closing their accounts in accordance with the Debtors' prepetition practices.

C.      **Cause Exists for an Initial 45-Day Waiver of the U.S. Trustee Guidelines and
        Certain Requirements of Section 345 of the Bankruptcy Code Regarding
        Authorized Depositories.**

43.     The Debtors seek an initial 45-day waiver of the deposit and investment
requirements of section 345 of the Bankruptcy Code and certain requirements of the U.S. Trustee
Guidelines.

44.     As the legislative history of the 1994 amendments to the Bankruptcy Code explains:

> Section 345 of the [Bankruptcy] Code governs investments of funds of bankruptcy
> estates.  The purpose is to make sure that funds of a bankrupt that are obliged to
> creditors are invested prudently and safely with the eventual goal of being able to
> satisfy all claims against the bankruptcy estate.  Under current law, all investments
> are required to be FDIC insured, collateralized or bonded.  While this requirement
> is wise in the case of smaller debtors with limited funds that cannot afford a risky
> investment to be lost, it can work to needlessly handcuff larger, more sophisticated
> debtors.  Th[e proposed amendment] would . . . allow the courts to approve
> investments other than those permitted by [s]ection 345(b) for just cause . . . .

*In re Serv. Merch, Co., Inc.*, 240 B.R. 894, 896 (Bankr. M.D. Tenn. 1999) (quoting H.R. Rep. 103-
834, 103rd Cong., 2nd Sess. 224 (Oct. 4, 1994); 140 Cong. Rec. H10767 (Oct. 4, 1994)).  In
evaluating whether the requisite "cause" exists, courts consider the "totality of the circumstances,"
including such factors as:

(i)      the sophistication of the debtor's business;

(ii)     the size of the debtor's business operations;

(iii)    the amount of the investments involved;

(iv)     the bank ratings (Moody's and Standard & Poor) of the financial institutions where
         the debtor in possession funds are held;

(v)      the complexity of the case;

(vi)     the safeguards in place within the debtor's own business for ensuring the safety of
         the funds;

(vii)    the debtor's ability to reorganize in the face of a failure of one or more of the
         financial institutions;

(viii)   the benefit to the debtor;

(ix)     the harm, if any, to the debtor;

(x)      the harm, if any, to the estate; and

(xi)    the reasonableness of the debtor's request for relief from section 345(b) requirements in light of the overall circumstances of the case.

*See Serv. Merch. Co.*, 240 B.R. at 896.

45.    As set forth above, the Debtors' primary cash-management Bank *is* an Authorized Depository, and given the concentration of funds with that Bank at any given time, the risk of any loss of the Debtors' funds attributable to a bank failure at a Bank that is not an Authorized Depository is relatively low.  Continued access to the existing structure of the Cash Management System, including the Accounts, is vital to the Debtors' ability to operate under the stringent cash reserve requirements imposed by state gaming regulators.  Any interruption in the Debtors' access to the Accounts could result in catastrophic consequences if such interruption were to prevent the Debtors from satisfying these regulatory requirements for even a short period of time.  The Debtors submit that "cause" exists to waive the requirements of section 345(b) of the Bankruptcy Code because (i) all or substantially all of the Debtors' cash is held at Banks that are highly rated, well-capitalized, and/or financially stable institutions subject to oversight by federal or foreign banking regulators, (ii) the Debtors retain the right to remove funds held at the Banks and establish new bank accounts as needed, (iii) the cost associated with satisfying the requirements of section 345(b) is excessive, and (iv) the process of satisfying those requirements is otherwise unduly burdensome and would lead to needless inefficiencies in the administration of the estates.

46.    In light of the foregoing, the Debtors submit that cause exists to grant an initial 45-day waiver of the requirements of section 345 of the Bankruptcy Code and the U.S. Trustee guidelines.

## IV.    The Court Should Authorize the Debtors to Pay Prepetition Cash Management System Fees.

47.    The Court should authorize the Debtors to pay Cash Management System Fees and similar charges, if any, incurred prior to the commencement of the Chapter 11 Cases.  As the

*CoServ* court stated, "it is only logical that the bankruptcy court be able to use section 105(a) of the Code to authorize satisfaction of the prepetition claim in aid of preservation or enhancement of the estate." *CoServ*, 273 B.R. at 497.

48.     Here, payment of any prepetition Cash Management System Fees is in the best interests of the Debtors and all parties-in-interest in these cases because it will prevent any disruption to the Cash Management System and ensure that the Debtors' receipt of and access to funds is not delayed.  Further, because the Banks may have setoff rights for the Account Fees, payment of such prepetition amounts should not alter the rights of unsecured creditors in the Chapter 11 Cases.

**V.     The Court Should Authorize the Debtors to Maintain Their Credit Card Programs and Pay All Obligations Related Thereto.**

49.     As stated above, under section 363(c)(1) of the Bankruptcy Code, a debtor in possession may use property of the estate in the ordinary course of business without a hearing. Furthermore, section 364(a) of the Bankruptcy Code permits a debtor in possession to "obtain unsecured credit and incur unsecured debt in the ordinary course of business" without a court order.  11 U.S.C. § 364(a).  Purchases made using the Credit Card Programs fall within the ordinary course of business under section 363(c)(1) of the Bankruptcy Code.  The use of credit cards and similar payment methods is widespread as a means of facilitating day-to-day business activities. As a result, the Debtors believe they do not require the Court's approval to continue the Credit Card Programs on a postpetition basis.

50.     Nonetheless, out of an abundance of caution, the Debtors request authority to continue the Credit Card Programs in the ordinary course of business and consistent with past practices, and to pay all obligations related thereto, including any obligations that arose before the Petition Date but remain outstanding.  Solely to the extent that the Court finds that such

transactions do not fall within the ordinary course of business, the Debtors request authority pursuant to sections 363(b)(1) and 105(a) of the Bankruptcy Code to continue using the Credit Card Programs and to pay all obligations related thereto.

51.     Continued use of the Credit Card Programs is integral to the success and stability of the Debtors' businesses.  The Debtors rely on the ability of their employees to pay for expenses incurred in the ordinary course and to make other reasonable work-related purchases necessary to fulfill their day-to-day professional obligations.  Permitting the Debtors to continue using the Credit Card Programs will ensure that the Debtors' employees are able to fulfill their daily professional obligations and, in turn, prevent significant disruption to the Debtors' business operations.

52.     Because the Debtors' Credit Card Programs are pre-funded, or funded through debits against the Accounts, the Debtors do not believe that they owe any prepetition amounts under the Credit Card Programs.  However, out of an abundance of caution, the Debtors also seek authorization to pay all outstanding prepetition amounts owing under the Credit Card Programs. If the Debtors do not pay any outstanding amounts which may be owing, there is a significant risk that U.S. Bank could restrict the Debtors' access to their Credit Card Programs or cease extending credit to the Debtors after the Petition Date.  If that were to occur, it would be costly, disruptive to the Debtors' operations, burdensome to the Debtors and their estates, and time-consuming for the Debtors to establish new credit card programs with one or more alternative providers. Accordingly, the Court should authorize the Debtors to maintain their Credit Card Programs and pay all obligations related thereto.

## EMERGENCY CONSIDERATION

53.     The Debtors respectfully request emergency consideration of this Motion pursuant to Bankruptcy Local Rule 9013-1 and Bankruptcy Rule 6003, which authorize the Court to grant

relief within the first 21 days after the commencement of a chapter 11 case to the extent that relief is necessary to avoid immediate and irreparable harm. As described in detail above and in the First Day Declaration, immediate and irreparable harm would result if the relief requested herein is not granted. Accordingly, the Debtors submit that the requirements of Bankruptcy Rule 6003 are satisfied.

### DEBTORS' COMPLIANCE WITH BANKRUPTCY RULE 6004(a) AND WAIVER OF BANKRUPTCY RULE 6004(a) AND (h)

54.     With respect to any aspect of the relief sought herein that constitutes a use of property under section 363(b) of the Bankruptcy Code, the Debtors request that the Court find that notice of this Motion is adequate under Bankruptcy Rule 6004(a) and waive the 14-day stay under Bankruptcy Rule 6004(h). As described above, the relief that the Debtors seek in this Motion is necessary to avoid immediate and irreparable harm to the Debtors. Thus, cause exists for the Court to find that notice of this Motion satisfies Bankruptcy Rule 6004(a) and waive the 14-day stay under Bankruptcy Rule 6004(h).

### RESERVATION OF RIGHTS

55.     Nothing in this Motion is intended to be nor shall be deemed: (a) an implication or admission as to the amount of, basis for, or validity of any claim against the Debtors; (b) a waiver or limitation of the Debtors' or any other party in interest's right to dispute the amount of, basis for, or validity of any claim; (c) a waiver of the Debtors' or any other party in interest's rights under the Bankruptcy Code or any other applicable non-bankruptcy law; (d) a waiver of the obligation of any party in interest to file a proof of claim; (e) a promise or requirement to pay any particular claim; (f) a waiver of any claims or causes of action which may exist against any entity under the Bankruptcy Code or any other applicable law; (g) an admission as to the validity, priority, enforceability, or perfection of any lien on, security interest in, or other encumbrance on

property of the Debtors' estates; (h) an admission that any lien satisfied pursuant to this Motion is valid (and all rights to contest the extent, validity, or perfection or seek avoidance of all such liens are expressly reserved); or (i) a request or authorization to assume, adopt, or reject any agreement, contract, or lease pursuant to section 365 of the Bankruptcy Code.  Likewise, if the Court grants the relief sought herein, any payment made pursuant to the Court's order is not, and should not be construed as, an admission to the validity of any claim or a waiver of the Debtors' or any other party in interest's rights to dispute such claim subsequently.

## NOTICE

56.     Notice of the Motion will be given to:  (a) the Office of the United States Trustee for the Southern District of Texas; (b) counsel to the Ad Hoc Group and Backstop Parties; (c) counsel to the Prepetition Term Loan Agent; (d) the creditors listed on the Debtors' consolidated list of 30 creditors holding the largest unsecured claims; (e) the Banks; (f) the Gaming Regulators; (g) the United States Attorney for the Southern District of Texas; (h) the Internal Revenue Service; (i) the state attorneys general for states in which the Debtors conduct business; and (j) any party that has requested notice pursuant to Bankruptcy Rule 2002.  The Debtors submit that, under the circumstances, no other or further notice is required.

57.     A copy of this Motion is available on (a) the Court's website, at www.txs.uscourts.gov, and (b) the website maintained by the Debtors' proposed Claims and Noticing       Agent,       Kroll       Restructuring       Administration       LLC,       at https://restructuring.ra.kroll.com/RunItOneTime/.

*[Remainder of page intentionally left blank.]*

**WHEREFORE**, the Debtors respectfully request that the Court enter the Proposed Orders granting the relief requested in the Motion and such other and further relief as may be just and proper.

Dated:   July 14, 2025
        Houston, Texas

Respectfully submitted,

*/s/ Timothy A. ("Tad") Davidson II*

**HUNTON ANDREWS KURTH LLP**
Timothy A. ("Tad") Davidson II (Texas Bar No. 24012503)
Ashley L. Harper (Texas Bar No. 24065272)
Philip M. Guffy (Texas Bar No. 24113705)
600 Travis Street, Suite 4200
Houston, TX 77002
Telephone:  (713) 220-4200
Email:  taddavidson@hunton.com
        ashleyharper@hunton.com
        pguffy@hunton.com

- and –

**LATHAM & WATKINS LLP**
Jeffrey E. Bjork (*pro hac vice* pending)
Helena G. Tseregounis (*pro hac vice* pending)
Nicholas J. Messana (California Bar No. 332355)
355 South Grand Avenue, Suite 100
Los Angeles, California 90071-1560
Telephone:  (213) 485-1234
E-mail:  jeff.bjork@lw.com
        helena.tseregounis@lw.com
        nicholas.messana@lw.com

- and -

**LATHAM & WATKINS LLP**
Ray C. Schrock (NY Bar No. 4860631)
Andrew Sorkin (NY Bar No. 4597944)
1271 Avenue of the Americas
New York, NY 10020
Telephone:  (212) 906-1200
E-mail:  ray.schrock@lw.com
        andrew.sorkin@lw.com

*Proposed Attorneys for the Debtors and*
*Debtors in Possession*

## CERTIFICATE OF SERVICE

I certify that on July 14, 2025, a true and correct copy of the foregoing document was served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas on those parties registered to receive electronic notices.

*/s/ Timothy A. ("Tad") Davidson II*
Timothy A. ("Tad") Davidson II