**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

```
------------------------------------------------------- x
                                                        :
In re:                                                  :    Chapter 11
                                                        :
RUNITONETIME LLC, et al.,                               :    Case No. 25-90191 (ARP)
                                                        :
                    Debtors.¹                           :    (Joint Administration Requested)
                                                        :
------------------------------------------------------- x
```

**DECLARATION OF JEFF SEERY IN SUPPORT OF**
**<u>CHAPTER 11 PETITIONS AND FIRST DAY RELIEF</u>**

I, Jeff Seery, hereby declare that the following is true to the best of my knowledge, information, and belief:

1.      I am the Chief Restructuring Officer of the Maverick Debtors (as defined below) and the Liquidity Employee of the Licensed Operator Affiliate Debtors (as defined below), the debtors and debtors in possession in the above-captioned chapter 11 cases (collectively, the "**Debtors**" or the "**Company**"), and the Chief Financial Officer of RunItOneTime LLC. I am authorized to submit this declaration (this "**Declaration**") on behalf of the Debtors.

2.      I have served as Chief Financial Officer of certain of the Maverick Debtors since August 2020 and was appointed as Chief Restructuring Officer of the Maverick Debtors and Liquidity Employee of the Licensed Operator Affiliate Debtors in July 2025. I have more than 10 years of gaming and hospitality industry experience and experience across all aspects of corporate finance. Prior to joining the Company in June 2019, I spent five years with Las Vegas Sands as a Senior Vice President of Corporate Finance Management, and over ten years with CBRE as a

---

¹     A complete list of the Debtors in the Chapter 11 Cases may be obtained on the website of the Debtors' proposed claims and noticing agent at https://cases.ra.kroll.com/runitonetime. The Debtors' mailing address is 12530 NE 144th Street, Kirkland, Washington 98304.

Senior Vice President of Business Development. I have a Masters in Business Administration from UCLA's Anderson School of Management and a bachelor's degree in economics and political science from Tufts University.

3.      On the date hereof (the "**Petition Date**") the Debtors commenced voluntary cases (the "**Chapter 11 Cases**") under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**"). I submit this Declaration on behalf of the Debtors in support of their (a) voluntary petitions for relief and (b) all "first-day" pleadings filed by the Debtors (collectively, the "**First Day Pleadings**").

4.      As set forth above, I am knowledgeable about and familiar with the Debtors' day-to-day operations, business and financial affairs, books and records, and the circumstances that led to the commencement of the Chapter 11 Cases. Except as otherwise indicated herein, the facts set forth in this Declaration are based upon my personal knowledge, my review of relevant documents, information provided to me by the Company's other officers, directors, and restructuring advisors, including professionals at Latham & Watkins LLP ("**Latham**"), Hunton Andrews Kurth LLP ("**Hunton**"), GLC Advisors & Co., LLC ("**GLC**"), Portage Point Partners ("**Portage Point**"), and Kroll Restructuring Administration LLC ("**Kroll**" and, together with Latham, Hunton, GLC, and Portage Point, the "**Advisors**"), and my opinion based upon experience, knowledge, and information concerning the Company's operations and financial condition. If called upon to testify, I would testify to the facts as set forth in this Declaration.

5.      I have reviewed the Debtors' petitions and the First Day Pleadings, or have otherwise had their contents explained to me, and it is my belief that the relief sought therein is essential to ensure the continued operation of the Debtors' business and to successfully maximize the value of the Debtors' estates.

6.     This Declaration is organized into five parts.  Part I of this First Day Declaration provides a general overview of the Debtors' business and the chapter 11 filing. Part II provides an overview of the Debtors' organizational structure and operations.  Part III provides an overview of the Debtors' prepetition capital structure.  Part IV provides an overview of the circumstances leading to the commencement of the Chapter 11 Cases and the Debtors' proposed path forward in chapter 11.  Part V lists the First Day Pleadings and provides support for the relief requested therein.

## I.     Introduction and Overview

7.     Founded in 2017 by former Las Vegas Sands executives Eric Persson and Justin Beltram, the Debtors are a privately held gaming and entertainment company focused on acquiring undervalued gaming assets and implementing operational changes to improve profitability.  The Debtors own and operate 17 card rooms in Washington State and own several casino hotels in Nevada and Colorado.  In Nevada and Colorado, the Debtors' casinos offer a variety of games, including roulette, craps, sports betting, and dealer-assisted electronic table games.  The Debtors also have an industry-leading business they acquired in 2020, called EGads!, that specializes in the design, fabrication, assembly and installation of casino interiors, custom signage, lighting, and architectural treatments.

8.     Despite successes in turning around many of the gaming assets it has acquired, the Company has faced a variety of factors that have severely limited its growth in the last few years, precipitating the current financial distress and inability to address its capital structure that have led to the commencement of these Chapter 11 Cases. These factors include significant competition from tribal casinos in their key Washington market, operational misalignments, and industry headwinds more generally.  In addition, the Debtors have faced significant liquidity pressure arising from their significant debt service obligations under their Prepetition Credit Facility (as

defined herein), which is secured by substantially all of the assets of the Debtors. These collective issues have in turn put increasing pressure on the Company's revenues and its ability to meet certain of its obligations and financial covenants under its recently refinanced Prepetition Credit Facility.

9.      Recognizing these financial challenges, the Debtors' management evaluated and pursued a number of paths over recent months to attempt to raise additional financing, including considering and pursuing third party sources of capital.  I understand that in April 2025, the Debtors, with the support of GLC, also began focused discussions with an organized ad hoc group of lenders under the Prepetition Credit Facility (the "*Ad Hoc Group*") to determine whether a deal could be reached with their existing lenders.  Ultimately, the Company determined that the only viable path forward to pursue the financing necessary to continue operations would require a deal with their existing lenders.

10.      I understand that after numerous rounds of negotiations, the Company, Mr. Persson (in his capacity as the majority equity holder of the Debtors and including his heirs, successors and assigns, the "*Supporting Shareholder*") and prepetition lenders that collectively beneficially own or control approximately (a) 78% of the aggregate principal amount of outstanding First Out Term Loans (as defined herein) and (b) 70% of the aggregate principal amount of Second Out Term Loans (as defined herein) under the Prepetition Credit Facility (collectively, the "*Supporting Lenders*") reached agreement on the terms of that certain Transaction Support Agreement, dated as of June 25, 2025 (the "*Transaction Support Agreement*"), a copy of which is attached hereto as **Exhibit A**.  The restructuring transactions contemplated by the Transaction Support Agreement call for the sale or other disposition of substantially all of the Company's core assets in three

separate business segments through either a section 363 sale process or a plan of reorganization (the "***Restructuring***"), as further described below.

11.     The Transaction Support Agreement separates the Debtors' business operations into three categories: (1) "PokerCo," which is composed of the following Washington card rooms: Aces Poker Lakewood, Aces Poker Mountlake Terrace, Caribbean Casino and Caribbean Cardroom (including any working capital available that is required to operate the businesses), (2) "LeaseCo," which is composed of the properties subject to the Blue Owl Master Lease (as described in more detail below), and (3) "MainCo," which is composed of the remainder of the Debtors' existing businesses, interests, and tangible and intangible assets. With respect to these three categories of operations, the Transaction Support Agreement generally provides[2]:

(1)     ***PokerCo.***  The Debtors and the Supporting Shareholder (or its designee, in such capacity, "***EP BidCo***"), shall enter into a binding stalking-horse purchase agreement, pursuant to which the Supporting Shareholder shall agree to be a staking horse bidder for the PokerCo assets (the "***PokerCo Stalking Horse Purchase Agreement***") pursuant to section 363 of the Bankruptcy Code for a cash purchase price of $13 million, subject to a court-approved marketing and sale process and court approval.

The PokerCo Stalking Horse Purchase Agreement shall provide that such sale is subject to (i) an earnout agreement that shall be effective in the event of certain subsequent sales of the PokerCo assets, (ii) the assumption of certain liabilities and (iii) customary expense reimbursement and overbid protections.

(2)     ***LeaseCo.***  The Debtors, in consultation with the Requisite Supporting Lenders, will negotiate in good faith for an amendment or modification to the Blue Owl Master Lease.

(3)     ***MainCo.***  The Debtors will (i) conduct a sale and marketing process for MainCo pursuant to section 363 of the Bankruptcy Code, subject to a credit bid by the Prepetition Lenders or (ii) pursue confirmation of a chapter 11 plan that results in the conversion of a portion or all of the existing term loans under the Prepetition Credit Facility into equity of MainCo on a reorganized basis, or (iii) pursue such

---

[2]     The summary of the Transaction Support Agreement terms set forth below are qualified in all respects by the Transaction Support Agreement.  In the event of any inconsistency with this summary and the Transaction Support Agreement, the terms of the Transaction Support Agreement control.  Capitalized terms used but not defined in this summary have the meanings ascribed to them in the Transaction Support Agreement.

other alternative restructuring transactions as may be appropriate under the cirucmstances.

*Licensing Agreement.* Entry into a licensing agreement between the Requisite Supporting Lenders, the Debtors, and EP BidCo, where EP BidCo will (i) enter into a non-exclusive license of certain of the Debtors' intellectual property (the "***Maverick/Aces IP***") in exchange for $100,000 payment and revenue-sharing arrangement entitling the Debtors (or MainCo, if it acquires the respective assets) to 25% of the adjusted EBITDA generated by EP BidCo from current and future poker partnerships using the Debtors' IP for three years from the closing date of the sale transaction and (ii) the transfer of Maverick/Aces IP to EPBidCo (or a designee thereof) on the closing date.

12.    Despite the progress reflected in the Transaction Support Agreement, the Debtors' limited liquidity, ongoing business deterioration, and financial circumstances have made it difficult for the Debtors to negotiate and finalize a reorganized balance sheet and emergence capital structure for each of the proposed reorganized business silos before the commencement of these chapter 11 cases.  The Debtors are therefore expecting to continue working with its prepetition lenders and economic stakeholders on the implementation of a restructuring under the purview of this Court.  A critical component, therefore, of these chapter 11 cases is the Debtors' proposed postpetition debtor-in-possession financing (the "***DIP Financing***").  Certain members of the Ad Hoc Group (the "***Backstop Parties***") have agreed to provide the DIP Financing to the Debtors (the "***DIP Facility***" and the lenders thereunder, the "***DIP Lenders***") in the amount of $7.5 million of new money and $15 million as a roll-up of the First Out Term Loans (as defined below) on a 2:1 basis, to be made available pursuant to the Interim Order, to fund the Debtors' operations for a four-week period while the Debtors and the Prepetition Lenders determine the funding requirements to facilitate a value-maximizing transaction.

13.    I understand that the Transaction Support Agreement and the Restructuring are the product of extensive, arm's-length negotiations among the Company and its key stakeholders. I understand further that the Debtors, with the support of their Advisors, have evaluated all potential

strategic alternatives to address their capital structure and mounting liquidity issues. I am not aware of any other alternative transactions that would be possible without the existing lenders' involvement and support. With these goals in mind, the Debtors have determined that the commencing the Chapter 11 Cases in order to effectuate the Restructuring memorialized in the Transaction Support Agreement is the best available path for the Company to strengthen its operations by addressing its funded debt, while providing their businesses with the best chance of success on a go-forward basis.

## II.      Company and Operations

### A.      Corporate Organization

14.      RunItOneTime HoldCo, Inc. ("***RunItOneTime Parent***"), is the ultimate parent of, and owns, directly or indirectly, all of the Debtor entities other than the Licensed Operator Affiliate Debtors (the "***Maverick Debtors***").  The Licensed Operator Affiliate Debtors are affiliates of the Maverick Debtors that hold most of the gaming licenses used in the Debtors' businesses. The Licensed Operator Affiliates Debtors are majority owned by the Supporting Shareholder and are affiliated with the Maverick Debtors by virtue of majority common ownership by the Supporting Shareholder.[3] A capitalization table reflecting the ownership of the Licensed Operator Affiliate Debtors is provided in Section III.B below and an organizational chart of the Debtors is attached hereto as **Exhibit B**.

### B.      Headquarters and Employees

15.      The Debtors maintain their corporate headquarters in Kirkland, Washington, and are led by a management team with extensive experience in the gaming and hospitality industry.

---

[3]      The "Licensed Operator Affiliates" include Debtors Wendover Resorts Operator, LLC, Elko Resorts Operator, LLC, Colorado Resorts Operator, LLC, Red Garter Operator, LLC, Wendover Nugget Operator, LLC, Gold Country Operator, LLC, Red Lion Operator, LLC, High Desert Operator LLC, Johnny Z Casino Operator LLC, Z Casino Black Hawk Operator LLC, and Grand Z Casino Operator LLC.

The Debtors also maintain separate company headquarters in Las Vegas, Nevada for the EGads! business. As of the Petition Date, the Debtors have approximately 2,900 employees based in Nevada, Washington, Colorado, and Utah.

### C.  Business Operations

16.     The Debtors own and operate a portfolio of casinos, card rooms, hotels, and other gaming- and hospitality-related assets across Washington, Nevada, and Colorado. The existing portfolio includes 26 operating properties, with 17 card rooms in Washington State, four hotel-casino properties and a gas station/convenience store in Nevada, and one hotel-casino property, two casinos, and a gas station/convenience store in Colorado.  Collectively, the Debtors' properties include a total of approximately 2,500 slot machines, 320 table games, 1,200 hotel rooms, and 30 restaurants.   The Debtors' portfolio also includes (a) the EGads! fabrication and installation business, (b) the Utah Trailways charter company that facilitates customer gaming excursions from Salt Lake City, Utah, to the Debtors' operating properties in Wendover, Nevada, and (c) nine non-operating properties.[4]

### 1.  Property Portfolio

17.     ***Washington.*** The Debtors' Washington property portfolio includes 17 operating and five non-operating properties, reflecting approximately 260 table games over 297,000 square feet of casino space. The Debtors' properties in Washington include the following[5]:

| Property Name | Location | Casino Sq. Ft. | Table Games | Property Type |
|---|---|---|---|---|
| Great American Tukwila | Tukwila, WA | 14,000 | 15 | Card Room |
| Riverside | Tukwila, WA | 21,000 | 15 | Card Room |

---

[4]   The non-operating properties include one hotel property in Nevada and eight card rooms in Washington that were closed to consolidate gaming revenue.

[5]   Greyed-out rows in this and the following tables in this section reflect non-operating (i.e., closed or sold) properties.

| Property Name | Location | Casino Sq. Ft. | Table Games | Property Type |
|---|---|---|---|---|
| Silver Dollar SeaTac | SeaTac, WA | 7,506 | 12 | Card Room |
| Great American Casino Everett | Everett, WA | 10,900 | 15 | Card Room |
| Silver Dollar Casino Mill Creek | Bothell, WA | 18,216 | 12 | Card Room |
| CrazyMoose Casino Mountlake | Mountlake Terrace, WA | 5,000 | 15 | Card Room |
| All Star Casino | Silverdale, WA | 45,600 | 15 | Card Room & Poker |
| Goldies | Shoreline, WA | 12,800 | 15 | Card Room |
| Aces Poker Mountlake Terrace | Mountlake Terrace, WA | 7,200 | 15 | Poker |
| Caribbean Casino | Kirkland, WA | 16,160 | 15 | Card Room |
| Caribbean Cardroom – Poker | Kirkland, WA | 7,000 | 15 | Poker |
| Ace's Poker Lakewood | Lakewood, WA | 24,456 | 15 | Poker |
| Macau Casino Lakewood | Lakewood, WA | 14,158 | 14 | Card Room |
| Chips Casino | Lakewood, WA | 15,130 | 15 | Card Room |
| Palace Casino | Lakewood, WA | 10,246 | 0 | Arcade |
| CrazyMoose Casino | Pasco, WA | 17,500 | 15 | Card Room & Poker |
| Coyote Bob's Roadhouse Casino | Kennewich, WA | 4,820 | 12 | Card Room |
| Casino Caribbean | Yakima, WA | 25,000 | 15 | Card Room & Poker |
| Silver Dollar Renton | Renton, WA | 20,000 | 15 | Card Room & Poker |
| Roman | Seattle, WA | 13,860 | 15 | Card Room |
| Macau Casino Tukwila | Southcenter, WA | 7,500 | 15 | Card Room |
| Wizards | Burien, WA | 14,320 | 12 | Card Room |
| Red Dragon Poker | Mountlake Terrace, WA | 15,000 | 15 | Poker |
| Royal Casino Everett | South Everett, WA | 13,000 | 7 | Card Room |

18.    *Nevada*. The Debtors' Nevada property portfolio includes five operating and one non-operating property, reflecting approximately 1,400 slots and 41 table games over 118,000 square feet of casino space, 1,000 hotel rooms, and a gas station/convenience store. The Debtors' properties in Nevada include the following:

| Property Name | Location | Casino Sq. Ft. | Slots | Table Games | Hotel Rooms | Property Type |
|---|---|---|---|---|---|---|
| Wendover Nugget Hotel & Casino | West Wendover, NV | 73,000 | 574 | 23 | 489 | Casino |
| Red Garter Hotel & Casino | West Wendover, NV | 21,353 | 408 | 10 | 183 | Casino |
| Maverick Hotel & Casino | Elko, NV | 19,000 | 289 | 8 | 222 | Casino |
| Gold Country Inn & Casino | Elko, NV | 5,076 | 113 | 0 | 150 | Casino |
| Mobil Gas Station | Elko, NV | N/A | N/A | N/A | N/A | Gas Station |
| High Desert Inn | Elko, NV | N/A | N/A | N/A | 171 | Hotel |

19.     ***EGads!*** The Debtors' Nevada operations also include the EGads! business. Opened in 1988, EGads! designs, manufactures, installs, and services displays, themed elements, specialty fabrications, and architectural treatments for casinos and other gaming-related operations throughout the United States and abroad. The Company acquired EGads! in 2020 for approximately $11 million. EGads!'s headquarters is located in Las Vegas, Nevada, and encompasses over 200,000 square feet of in-house design space, as well as lighting design, electrical, sheet metal and welding, computer numerical control (CNC) routing and plasma cutting, sculpting, mold making, resin manufacturing, painting, and faux finishing operations. EGads! has four strategically placed service and installation facilities in California, Mississippi, Oklahoma, and Nebraska. The company employs approximately 150 employees. The EGads! design team consists of nine internationally known artists, designers, and sculptors.

20.     EGads! has been one of the more profitable segments of the Company's business in recent years due to various operational improvements implemented by the Debtors' management team. Since 2022, EGads! has, among other things, (a) gained significant market share with slot machine original equipment manufacturers (OEMs) due to the Company's management team leveraging their long-standing relationships with OEM executives;

(b) increased manufacturing efficiencies by shifting metal fabrication to Mexico, and (c) lowered its cost of goods sold (COGS) and increased liquidity by increasing bulk purchasing on key manufacturing goods.  Net revenue grew from $22.1 million in 2022 to $33.2 million in 2024, with EBITDA rising from $4.9 million to $10.6 million in the same period.

21.     *Colorado.* The Debtors' Colorado property portfolio includes four operating properties, reflecting approximately 1,100 slots and 18 table games over 49,000 square feet of casino space, 118 hotel rooms, and a gas station/convenience store.  The Debtors' properties in Colorado include the following:

| Property Name | Location | Casino Sq. Ft. | Slots | Table Games | Hotel Rooms | Property Type |
|---|---|---|---|---|---|---|
| Grand Z Casino & Hotel | Central City, CO | 28,933 | 576 | 8 | 118 | Casino |
| Dragon Tiger Casino | Central City, CO | 8,325 | 215 | 10 | N/A | Casino |
| Z Casino | Black Hawk, CO | 12,119 | 313 | 0 | N/A | Casino |
| Mobil Gas Station | Golden, CO | N/A | N/A | N/A | N/A | Gas Station |

**2.     Sale-Leasebacks**

22.     A number of the Debtors' properties are subject to sale-leaseback arrangements with (a) certain affiliates of Blue Owl Capital Inc. (collectively, including their predecessors, successors, and assigns, "***Blue Owl***") and (b) certain affiliates of Angelo, Gordon & Co., LP (collectively, including their predecessors, successors, and assigns, "***Angelo Gordon***"), in connection with a series of transactions from 2021 to 2023, as described below.

23.     ***Blue Owl.*** Certain of the Debtors are party to that certain Second Amended and Restated Master Lease, dated as of July 6, 2023, with Blue Owl (as may be amended, restated, or supplemented from time to time, the "***Blue Owl Master Lease***").  On September 1, 2022, the Company initially sold Coyote Bob's Casino, Casino Caribbean (Yakima, Washington), Crazy

Moose Casino (Pasco, Washington), Great American Casino Everett, and Macau Casino Lakewood (collectively, the "***Original Facilities***") to Blue Owl for approximately $110.3 million, and contemporaneously entered into a sale-leaseback arrangement with respect to these properties pursuant to the Blue Owl Master Lease.  The Company subsequently entered into further sale-leasebacks with Blue Owl pursuant to the Blue Owl Master Lease, including (a) the sale of the Great American Casino Tukwila (the "***Tukwila Facility***"), Gold Country Inn & Casino, Maverick Casino Hotel Elko, and Mobil Gas Station (Elko, Nevada) (collectively, the "***Elko Facilities***") on October 6, 2022, for $47.3 million, (b) the sale of the Riverside Casino, Chips Casino, and Palace Casino (collectively, the "***Evergreen Facilities***") on June 1, 2023, for $40.5 million, and (d) the sale of the All Star Casino (the "***All Star Facility***," and together with the Original Facilities, the Tukwila Facility, the Elko Facilities, the Evergreen Facilities, and the All Star Facilities, the "***Blue Owl Facilities***") on July 1, 2023, for $7 million.

24.     The initial term under the Blue Owl Master Lease the 40th anniversary of July 6, 2023, and beginning on the date each of the Blue Owl Facilities added to the Blue Owl Master Lease; specifically, (i) September 2, 2022, with respect to the Original Facilities, (ii) October 6, 2022, with respect to the Tukwila Facility and Elko Facilities, (iii) June 5, 2023, with respect to the Evergreen Facilities, and (iv) July 6, 2023, with respect to the All Star Facility.  The Blue Owl Master Lease provides that parties may agree to subsequent 20-year renewal terms prior to expiration of the initial term.  As of the Petition Date, total rent payments under Blue Owl Master Lease are approximately $17.8 million annually.

25.     As a result of liquidity challenges, the Debtors have not funded rent payments to Blue Owl since April 2025.  As of the Petition Date, the Debtors owe approximately $5.9 million in unpaid rent to Blue Owl under the Blue Owl Master Lease with $1.5 million coming due August

1, 2025. The Debtors are in discussions with Blue Owl and will look to address the treatment of the Blue Owl Master Lease as part of the Chapter 11 Cases.

26. **_Angelo Gordon._** Certain of the Debtors are party to that certain Master Lease, dated as of September 3, 2021, with Angelo Gordon (as may be amended, restated, or supplemented from time to time, the "**_Angelo Gordon Lease_**"). On September 1, 2021, the Company sold the land under the Wendover Nugget Hotel & Casino, Red Garter Hotel & Casino, Grand Z Casino Hotel, and Johnny Z's Casino to Angelo Gordon for approximately $93 million and contemporaneously entered into a sale-leaseback arrangement with respect to these properties pursuant to the Angelo Gordon Lease.

27. The initial term of the Angelo Gordon Lease is 20 years, which began on September 3, 2021. The Angelo Gordon Lease provides that the parties may agree to four separate renewal terms of seven years prior to expiration of the then-current term. As of the Petition Date, total rent payments under Angelo Gordon Lease are approximately $8.5 million annually.

28. The Company also incurred approximately $26 million in capital gains taxes with respect to tax years 2022 and 2023 related to the sale-leaseback transactions with Blue Owl and Angelo Gordon. The Company has sought to address these liabilities through an offer-in-compromise (OIC) submitted to the Internal Revenue Service in October 2024. Although the OIC has yet to be accepted, the Company made eight payments in respect of the OIC prior to the Petition Date. Given the Chapter 11 Cases, the Company will seek to address the outstanding tax liability as part of its in-court restructuring process.

### 3. Gaming Regulations and Operating Structure

29. The Debtors' gaming enterprises and the EGads! business are subject to applicable gaming regulations in each of the three states in which the Debtors operate, including requiring that operators hold gaming licenses in the relevant jurisdictions to operate. In general, gaming

licenses are not freely transferable, as they are considered "revocable privileges" from the state licensing authority. In certain jurisdictions, the state gaming authorities and regulatory bodies (collectively, with the local and federal gaming authorities and regulatory bodies to whose jurisdiction the Debtors are subject, the "**Gaming Regulators**") require suitability reviews or other licensing requirements for any entity or individual who holds any amount of ownership or control over gaming operations.

30.     In Nevada and Colorado, the Debtors address the gaming regulatory regime in part through a structure under which the Licensed Operator Affiliate Debtors hold the required gaming and liquor licenses and (a) lease or sublease certain regulated properties and (b) contract with the PropCos (defined below) to operate such regulated properties (the "**OpCos**"). The underlying regulated properties are owned or leased by certain of the Maverick Debtor entities in the corporate structure (the "**PropCos**"). A chart summarizing the OpCo/PropCo structure is provided below.

| OpCo Entity | PropCo Entity | Facility |
|---|---|---|
| Red Garter Operator, LLC | Maverick Wendover LLC | Red Garter Hotel & Casino |
| Wendover Nugget Operator, LLC | Maverick Wendover LLC | Wendover Nugget Hotel & Casino |
| Gold Country Operator, LLC | Maverick Elko LLC | Gold Country Inn & Casino |
| Red Lion Operator, LLC | Maverick Elko LLC | Maverick Casino Hotel Elko<br>High Desert Inn<br>Mobil Gas Station |
| High Desert Operator LLC | Maverick Elko LLC | High Desert Inn |
| Johnny Z Casino Operator LLC | Maverick Z Casinos LLC | Johnny Z's Casino |
| Grand Z Casino Operator | Maverick Z Casinos LLC | Grand Z Casino |
| Z Casino Black Hawk Operator | Maverick Z Casinos LLc | Z Casino<br>Z Stop Gas Station |

31.     In general, the OpCos hold the gaming and liquor licenses required by the state and local municipalities and own the gaming assets and liquor inventories. For example, the Nevada properties subject to the Blue Owl Lease are leased by Debtor Maverick Elko LLC, but these properties are operated pursuant to lease agreements between Maverick Elko LLC and Debtors

Gold Country Operator, LLC and Red Lion Operator, LLC. This OpCo/PropCo structure streamlines the applicable gaming and liquor license process since the individuals and entities required to be licensed are limited to the OpCo entities.

## III.    Prepetition Capital Structure

32.    Below are the Debtors' material outstanding liabilities as of the Petition Date and current equity holdings.

### A.    Prepetition Credit Facility

33.    The Debtors are party to that certain Credit Agreement, dated as of September 3, 2021 (as amended by that certain Amendment No. 1, dated as of December 23, 2021, as further amended by that certain Amendment No. 2, dated as of February 27, 2023, as further amended by that certain Amendment No. 3, dated as of June 21, 2023, as further amended by that certain Amendment, Resignation, Waiver, and Appointment Agreement, dated as of February 20, 2024, and as further amended by that certain Amendment No. 4, dated as of April 3, 2024 (the "*Fourth Amendment*"), and further amended, restated, supplemented or otherwise modified from time to time, the "*Prepetition Credit Agreement*"), with the lenders party thereto (the "*Prepetition Lenders*") and Alter Domus (US) LLC (the "*Prepetition Agent*").

34.    The Prepetition Credit Agreement originally consisted of a syndicated credit facility (the "*Prepetition Credit Facility*") consisting of a $310 million term loan B and a $55 million revolving credit facility.  The facility was amended a number of times, and the Fourth Amendment effected a more broad-ranging restructuring.

35.    In sum, the Fourth Amendment (a) converted the existing $55 million revolver into $55 million of fully funded term loans with first priority under the Prepetition Credit Agreement (the "*First Out Term Loans*"), provided $10 million of new money additional First Out Term Loans and issued $12 million of additional First Out Term Loans as consideration for the lenders

to agree to and provide the First Out Term Loans; (b) exchanged the majority of the then-$258 million outstanding under the existing term B loan into term loans with second priority under the Prepetition Credit Agreement (the "***Second Out Term Loans***") at a 15% discount to par and a small minority of the existing term B loan into term loans with third priority under the Prepetition Credit Agreement (the "***Third Out Term Loans***", together with the First Out Term Loans and Second Out Term Loans, the "***Priority Term Loans***") at a 10% discount to par, (c) provided the Company the ability to make paid-in-kind (PIK) interest on the Second Out Term Loans and Third Out Term Loans through and including December 31, 2024, (d) loosened the Company's financial maintenance covenants; and (e) extended the maturity of the First Out Term Loans, Second Out Term Loans, and Third Out Term Loans to June 2028.  Holders of approximately $14 million of existing term B loans did not consent to the terms of the Fourth Amendment and retained their existing loans, which are behind the Priority Term Loans in priority (the "***Term B Loans***").

36.     As of the Petition Date, the outstanding principal amount under the Prepetition Credit Facility is $305,854,469 in the aggregate, divided as follows across the following tranches:

(a)     $77,000,000 outstanding principal amount of First Out Term Loans;

(b)     $214,726,510 outstanding principal amount of Second Out Term Loans;

(c)     $202,257 outstanding principal amount of Third Out Term Loans; and

(d)     $13,925,702 outstanding principal amount of Term B Loans.

37.     The Prepetition Credit Facility is secured by a first priority security interest in substantially all of the Debtors' assets.  The owners of the equity interests in the Leased Operator Affiliate Debtors have also granted pledges of such equity interests in the Leased Operator Affiliate Debtors as collateral under the Prepetition Credit Agreement.   Priority with respect to any payments or proceeds received by the Agent in respect of any part of the collateral is each of the

Priority Term Loans in order (i.e., First Out Term Loans, followed by Second Out Term Loans, followed by Third Out Term Loans) followed by the Term B Loans.

**B.      Trade Obligations**

38.      In the ordinary course of business, the Debtors utilize certain vendors and service providers who supply goods and services (the "***Trade Creditors***"). The Trade Creditors are a vital part of the Company's ongoing business. Any interruption in the flow of goods and services from such creditors would risk an immediate and adverse impact on the Debtors' ability to continue operating. As discussed in greater detail in the critical vendor motion, certain trade claims are entitled to statutory priority, such as under section 503(b)(9) of the Bankruptcy Code. As of the Petition Date, the Debtors estimate that the aggregate amount of trade claims outstanding is approximately $14.7 million.

**C.      Equity**

39.      The Debtors are privately held. As of the Petition Date, co-founder and Chief Executive Officer Eric Persson holds 57.9% of RunItOneTime Parent's outstanding common stock, with co-founder and Chief Operating Officer Justin Beltram holding approximately 12.8%. Eric Persson directly or indirectly owns 100% of the equity in the Licensed Operator Affiliated Debtors.

**IV.      Events Leading to the Commencement of the Chapter 11 Cases**

**A.      Internal and External Business Challenges**

40.      The Debtors operate their businesses by acquiring underperforming gaming assets and implementing operational changes to recognize improvements in revenue and profits. As a general matter, performance improvements take time to materialize. Set against the backdrop of the significant financing and capital outlays needed to consummate the initial acquisitions, the Company realized net losses for the first few years of its existence.

41.     The Company has overall been successful in driving revenue via its turnaround efforts with acquired gaming assets.  In Nevada, the Wendover properties used to consistently produce approximately $4 million in annual EBITDA prior to the Debtors' acquisition of the properties. Under the Debtors' ownership, these properties produce in excess of $17 million in annual EBITDA. The Company also doubled EBITDA at the Elko properties after the first year of ownership. The Company saw similar initial increases in Colorado.  Despite these improvements, the Company's operations faced substantial challenges in 2020 through 2022 due to a variety of factors. Among other things, the COVID-19 epidemic forced facility closures and subsequent, restrictive re-opening regulations hampered the Company's growth opportunities while it was in its nascent stages.  In Washington, for example, card rooms were closed for multiple months following the imposition of the shelter-in-place mandates.  When allowed to reopen, the Company was required to operate outdoors in parking lot tents and—once allowed back indoors, 25% of casino walls were required to remain open air for circulation, all of which took a substantial toll on customer traffic.

42.     Certain operational setbacks beginning in 2022 have also hampered projected growth.  In Colorado, 2022 performance suffered due to the problems with the initial roll out of new initiatives under the Company's customer loyalty rewards program, losses from the Company's sports betting operations, and severe slot system upgrade setbacks. Specifically, a botched slot system upgrade derailed the Company's slot machines in Colorado for weeks. The situation was compounded by the Company inadvertently rolling out too many "free play" offers under its rewards program, which severely impacted profitability and devastated results for at least four to five months. The Company's newly created sports betting operation also saw detrimental volatility in payouts, which led to almost a million dollars in losses until the program was

terminated.  Additionally, the reopening and expansion of competitor Monarch Casino Resort Spa in Black Hawk, Colorado in March 2022 diverted much of the higher-end business that accounts for the majority of the Company's slot and table game revenue. Although the Company has enacted substantial operational improvements that have positively driven net revenue in subsequent years, figures still remain materially below pre-2022 levels due to these operational challenges.

**B.    Competition and Regulation in Washington**

43.    The Company's financial performance has been significantly affected by competition from nearby tribal casinos in Washington, which have benefited competitively from certain regulatory advantages.  Much of the regulatory impact on the Debtors' operations in Washington is due to state gaming restrictions on card rooms, *e.g.*, prohibiting slot machines, roulette, craps, and other casino-style gaming, sports betting and the provision of consumer credit, which restrictions are not applicable to tribal casinos.  These regulatory restrictions have made tribal casinos a more attractive option for many of the Company's customers. In addition, many of the Company's key tribal casino competitors have expanded operations into key parts of the Washington region where the Debtors operate since 2020.

44.    Significant minimum wage increases in the Tukwila market have also caused a substantial increase in labor costs on the Company's Tukwila properties.  Between 2022 and 2025, the Tukwila minimum wage increased 46%, while the remainder of Washington State increased by only 15%.  Together with the significant competition described above, these factors continue to impact the Company's key revenue generating assets in Washington.

**C.    Resulting Decline in Revenue**

45.    These operational and competitive challenges have had a significant impact on revenues.  To illustrate, in 2021, the Company recognized EBITDA of $52.1 million.  In just the following year, EBITDA fell to $18.5 million, and in 2023, to $16.5 million.

**D.      Capital Structure and Capital Lease Overhang**

46.      Operational and competitive challenges and resulting decline in revenue have, in turn, created additional challenges with respect to the Company's funded debt load.  As noted above, the Company's debt balance totals approximately $306 million, exclusive of capital lease obligations.  In 2025, debt service obligations will total approximately $8.6 million per quarter, plus approximately $400,000 per quarter for the Term B Loans, and capital lease obligations will total approximately $9.1 million if the capital structure and capital leases remain unchanged.  The substantial size of the debt-service and capital-lease expenses put significant pressure on the business.

47.      The Company's balance sheet profile has also been the subject of focus from ratings agencies, with the Company experiencing downgrades including a downgrade to 'D' from 'CCC' by S&P Global Ratings in May 2024.  Such downgrades have, in turn, impacted the Company's substantial operating challenges.

**E.      Restructuring Negotiations**

48.      Notwithstanding the financial restructuring undertaken pursuant to the Fourth Amendment to the Prepetition Credit Facility, including loosened covenants in connection therewith, the Debtors have struggled to comply with financial covenants under the Prepetition Credit Facility in recent months, leading to the Agent declaring an Event of Default in May 2025 (as further described below).

49.      Due to the factors described above, the Company's management recognized that it needed to evaluate strategic alternatives, including exploring whether it could raise additional financing or otherwise refinance its obligations to the Prepetition Lenders.

50.      I understand that in January 2025, the Debtors management began engaging in earnest in negotiations with certain of their Prepetition Lenders, and eventually, with the Ad Hoc

Group after its formation, in an attempt to evaluate possible resolutions to the Debtors' obligations under the Prepetition Credit Agreement.  Simultaneously, I understand the Debtors' management was pursuing opportunities to raise new capital with third parties.

51.     I understand that substantive negotiations began in and initially culminated with the Ad Hoc Group delivering a term sheet proposal to the Company on February 23, 2025.  I understand that the Debtors' management continued to evaluate third party sources of financing and, in parallel, engaged with the Ad Hoc Group to see if an out-of-court solution was possible. During this time, the Company's financial position continued to deteriorate. On May 12, 2025, the Prepetition Agent delivered a default notice to the Company declaring an Event of Default under the Prepetition Credit Facility. The Company subsequently defaulted under its Prepetition Credit Facility when filing its covenant compliance certificate for the first quarter of 2025 on May 15. Subsequently, the Debtors were unable to fund their debt service payment on the Term B Loans on May 28.  The Debtors and the Ad Hoc Group ultimately agreed to a standstill of remedies under the Prepetition Credit Facility through June 19, 2025. The Debtors were further unable to make their debt service payments on its First Out Term Loans and Second Out Term Loans on July 3, 2025.

52.     In June 2025, the Debtors formed a special committee of each entity's governing body (the "**Special Committee**") comprised of two recently appointed independent directors, Lawrence Perkins and Tobias Keller, each with substantial restructuring experience to properly evaluate all available strategic alternatives.

53.     I further understand that, through these continued negotiations and the Debtors' evaluation of potential alternative sources of capital, it became evident that (1) no viable third-party sources of capital were available on the timeline necessary for the Debtors to remain

operational as a going concern and (2) the Prepetition Lenders were open to supporting and providing financing for a restructuring, subject to the Debtors agreeing to pursue an in-court process. On June 12, 2025, the Ad Hoc Group delivered a proposed term sheet outlining a chapter 11 restructuring proposal developed in part through the negotiations with the Company. After subsequent extensions of the standstill agreement, I am advised that the parties continued to engage in arm's-length negotiations to refine the proposal and reached agreement on the definitive terms of a restructuring transaction on June 25, which is reflected in the Transaction Support Agreement. I am not aware of any other viable transactions or alternatives available to the Debtors that would not require the support of the Prepetition Lenders.

54.     Among other things, the Transaction Support Agreement required the Debtors to (a) appoint me, Jeff Seery, as Chief Restructuring Officer of the Maverick Debtors and as an employee of the Licensed Operator Affiliate Debtors with authority to manage all cash receipts and disbursements (the "***Liquidity Employee***");[6] (b) appoint a lender-designated member to the Special Committee (the "***Lender Designee***"), with any approvals, actions, or recommendations by the Special Committee to require the affirmative consent of the Lender Designee; (c) delegate to the Special Committee the right to approve or manage the transactions under the Transaction Support Agreement, the Chapter 11 Cases, and any matters arising with respect thereto, in each case in a manner acceptable to the Requisite Supporting Lenders, and (d) take all reasonable steps to appoint an employee of an entity to replace the Licensed Operator Affiliate Debtors (a "***Replacement Operator***") subject to such employee obtaining the requisite gaming licenses or

---

[6]     In recognition of my agreement to serve as Chief Restructuring Officer of the Maverick Debtors and Liquidity Employee of the Licensed Operator Affiliate Debtors in addition to my usual responsibilities as Chief Financial Officer of RunItOneTime LLC, on July 13, 2025, the Special Committee approved an amendment to my employment agreement providing (i) a permanent increase to my "Base Salary" and (ii) an additional temporary increase of my Base Salary for a period of one year equivalent to my "Annual Bonus." The Debtors do not intend to seek approval or authorization from the Court or any other relief with respect to such amendment.

suitability determination. The Transaction Support Agreement also imposed certain milestones with respect to the proposed chapter 11 process, including requirements to reach agreement on the relevant milestones for the sale documentation and other bankruptcy-documents within 14 days of execution.

55.     As discussed above, the Transaction Support Agreement contemplates a comprehensive Restructuring that is supported by the Debtors, the Supporting Shareholder, and the Supporting Lenders and will holistically address the Debtors' funded debt obligations while endeavoring to preserve jobs and the Company's operations as a going concern.  The Restructuring further provides the Debtors with access to financing through the provision of approximately $7.5 million in new money term loans under the DIP Facility, which will provide financing for a four-week period in the Chapter 11 Cases while the Debtors and the Prepetition Lenders determine the funding needs for the remainder of the anticipated Chapter 11 process].

## V.     First Day Pleadings

56.     In furtherance of their objective of preserving value for all stakeholders, the Debtors have filed the following First Day Pleadings and related orders (the "***Proposed Orders***") contemporaneously herewith and have therein requested that the Court consider entering the Proposed Orders granting the relief sought in First Day Pleadings. For the avoidance of doubt, as to those First Day Pleadings that seek authorization to pay prepetition obligations, the Debtors seek authority, but not direction, to pay amounts or satisfy obligations that are the subject of the First Day Pleadings. The facts set forth in each of the First Day Pleadings are incorporated herein in their entirety. The First Day Pleadings include:

### A.     Administrative and Procedural Pleadings

(i)     *Emergency Motion of Debtors for Entry of an Order (I) Authorizing Joint Administration of the Chapter 11 Cases and (II) Granting Related Relief*

(ii) *Emergency Motion of Debtors for Entry of an Order (I) Authorizing the Debtors to File a Consolidated Creditor Matrix and List of the 30 Largest Unsecured Creditors, (II) Authorizing the Debtors to Redact Certain Personally Identifiable Information; (III) Approving the Form and Manner of Notice of Commencement; and (IV) Granting Related Relief*

(iii) *Emergency Motion of Debtors for an Order (I) Extending the Time to File Schedules of Assets and Liabilities, Schedules of Executory Contracts and Unexpired Leases, Statements of Financial Affairs, and 2015.3 Reports; and (II) Granting Related Relief*

(iv) *Debtors' Emergency* Ex Parte *Application for Entry of an Order Authorizing the Employment and Retention of Kroll Restructuring Administration, LLC as Claims, Noticing, and Solicitation Agent*

(v) *Notice of Designation as Complex Bankruptcy Case*

**B.    Business Operations and Financing Motions**

(i) *Emergency Motion of Debtors for Entry of Interim and Final Orders (I) Authorizing Debtors to (A) Continue Existing Cash Management System, (B) Maintain Existing Business Forms and Intercompany Arrangements, and (C) Continue Intercompany Transactions; and (II) Granting Related Relief*

(ii) *Emergency Motion of Debtors for Entry of an Order Interim and Final Orders (I) Authorizing the Debtors to Pay Certain Prepetition Claims of (A) Critical Vendors, (B) 503(B)(9) Claimants, (C) Lien Claimants, and (D) PACA/PASA Claimants, (II) Confirming Administrative Expense Priority, (III) Authorizing Financial Institutions to Honor and Process Related Checks and Transfers; and (IV) Granting Related Relief*

(iii) *Emergency Motion of Debtors for Entry of an Order (I) Authorizing Debtors to (A) Honor their Prepetition Obligations to Customers and (B) Continue their Customer Programs; and (II) Granting Related Relief*

(iv) *Emergency Motion of Debtors for Entry of an Order (I) Authorizing the Debtors to (A) Pay Prepetition Insurance Program Obligations, (B) Maintain the Insurance Policies Postpetition, and (II) Granting Related Relief*

(v) *Emergency Motion of Debtors for Entry of an Order (I) Authorizing the Debtors to (A) Pay Certain Employee Compensation and Benefits and (B) Maintain and Continue Such Benefits and Other Employee-Related Programs; (II) Granting Relief from Automatic Stay with Respect to Workers' Compensation Claims; and (III) Granting Related Relief*

(vi) *Emergency Motion of Debtors for Entry of an Order (I) Authorizing Debtors to Pay Certain Prepetition Taxes and Fees and (II) Granting Related Relief*

(vii) *Emergency Motion of Debtors for an Order (I) Prohibiting Utility Companies from Altering or Discontinuing Service on Account of Prepetition Invoices, (II) Approving the Debtors' Proposed Form of Adequate Assurance, (III) Establishing Procedures for Resolving Requests by Utility Companies for Additional Assurance of Payment, (IV) Authorizing Payment of any Prepetition Service Fees and (V) Granting Related Relief*

(viii) *Emergency Motion of Debtors for Entry of Interim and Final Orders (I) Authorizing Postpetition Financing and Use of Cash Collateral and (II) Granting Related Relief* (the "**DIP Motion**")

57.     The Transaction Support Agreement and the transactions and agreements contemplated under the foregoing will accomplish a fully consensual restructuring of the Debtors' funded debt obligations. As a result of the diligent negotiations and hard work by the various constituents, including the Debtors, the Supporting Lenders, and the advisors to each, the Debtors have preserved the going-concern value of the business, maximized creditor and stakeholder recovery, and minimized disruption to the day-to-day operations. Accordingly, the expedited Chapter 11 Cases will best position the Debtors for future success while providing the most value for the Debtors' estates and stakeholders.

58.     I have reviewed each of the First Day Pleadings, Proposed Orders, and exhibits thereto, or have otherwise had their contents explained to me, and the facts set forth therein are true and correct to the best of my knowledge, information, and belief. Moreover, I believe that the relief sought in each of the First Day Pleadings (a) is vital to enabling the Debtors to make the transition to, and operate in, chapter 11 with minimal employee attrition and disruption to their businesses, and without loss of productivity or value; (b) is necessary to preserve valuable relationships with customers, Trade Creditors, and other creditors; and (c) constitutes a critical element in the Debtors' ability to successfully maximize value for the benefit of their estates and a prudent exercise of the Debtors' business judgement.

### C.     DIP Motion

59.     In parallel with the restructuring transaction negotiations, and as further detailed in the DIP Motion and the *Declaration of Michael Sellinger in Support of the Debtors' Motion to Obtain Postpetition Debtor-in-Possession Financing*, filed contemporaneously herewith, the Debtors engaged in good faith, arm's-length negotiations with the Backstop Parties and the Ad Hoc Group regarding the DIP Facility and the consensual use of Cash Collateral (as defined in the DIP Motion).

60.     Pursuant to the relief requested in the DIP Motion and proposed orders, the Debtors will use the proceeds of the DIP Facility and Cash Collateral to fund operating expenses associated with the Debtors' businesses and the administrative expenses of the Chapter 11 Cases for a four-week interim period in the Chapter 11 Cases while the Debtors and the Prepetition Lenders assess the funding needs for the remainder of the anticipated Chapter 11 process and engage in negotiations concerning additional new-money financing and the Debtors' path forward more generally. The DIP Facility will be secured on a priming basis by all property and assets of the Debtors other than assets specifically identified in the DIP Documents as "Excluded Assets," DIP Collateral will include, subject to entry of a Final DIP Order providing for such relief, the proceeds of avoidance actions. In addition, the Debtors will pay the DIP Lenders a 3% structuring fee, 4% upfront fee, and 3% backstop fee (all payable on the new money portion of the DIP only) on account of the DIP Lenders' structuring of the DIP Facility, capital commitments, and other undertakings relating to the DIP Facility. In exchange for the use of the Prepetition Lenders' Cash Collateral and agreement to be primed by the DIP Facility, the Debtors have agreed to provide the Prepetition Lenders with an adequate protection package that includes replacement liens and superpriority claims, payment of professional fees and expenses, and certain reporting and budgeting obligations.

61.     Based on my review of the Debtors' actual and projected cash flows (as reflected on the Approved Budget annexed hereto as **Exhibit C** and incorporated herein by reference) and underlying books and records, and based on discussions with the Debtors' advisors, I believe it is vital that the Debtors obtain immediate approval of the DIP Facility to ensure that the Debtors have immediate access to the interim new money financing and access to Cash Collateral necessary to continue operations.  Without immediate access to the proceeds of the proposed DIP Facility and use of cash collateral, the Debtors will lack sufficient liquidity to maintain their business operations after the Petition Date and would have no choice but to immediately cease operations.

62.     Indeed, as detailed in the DIP Motion, the Debtors have approximately $500,000 in cash as of the Petition Date and will be unable to satisfy their next payroll run (scheduled for Thursday, July 17, 2025) absent immediate access to the DIP Facility. Further, the Debtors anticipate having negative cash flow during the Chapter 11 Cases, and the liquidity provided by the DIP Facility is critical to provide operating liquidity across Debtor entities and to meet the Debtors' working capital needs for the immediate period following commencement of the Chapter 11 Cases.

63.     The DIP Facility is a critical requirement for the Debtors' consensual Cash Collateral. Absent the DIP Facility, I understand that the Debtors' lenders would be unwilling to agree to the Debtors' use of their Cash Collateral and would not agree to the priming of their prepetition liens that would otherwise be necessary to obtain postpetition financing. The Debtors' use of the funds available under the DIP Facility will be governed by the Approved Budget (subject to permitted variances).  The overall size of the DIP Facility was determined under the assumption that the Debtors would also have access to existing Cash Collateral and receipts generated postpetition (primarily related to continued collection of accounts receivable and proceeds from

continued operations).  The Debtors' use of Cash Collateral alone would be insufficient to meet the Debtors' cash disbursement needs during the period of effectiveness of the proposed Interim DIP Order. The Debtors would be unable to meet their obligations over the next four weeks absent both the use of Cash Collateral and access to additional postpetition financing.

64.     Without access to Cash Collateral and the incremental liquidity provided by the DIP Facility, the Debtors would face severe, immediate, and irreparable harm.  As noted above, the Debtors have insufficient liquidity to manage their working capital needs and pay the various disbursements identified in the Approved Budget.  The disbursements set forth in the Approved Budget include, among other critical payments, payroll and benefits and payments contemplated by the Debtors' proposed "first day" orders.  Any disruption in paying the Debtors' employees and vendors will result in the attrition of the Debtors' workforce and the destruction of key vendor relationships, which in turn will impact the Debtors' ability to attract and retain their customers. Moreover, time is of the essence for the Debtors, given their upcoming payroll obligations and mounting pressure from trade and other creditors.

65.     Accordingly, I believe that the Debtors' access to the DIP Facility and Cash Collateral is necessary to fund the Debtors' immediate operational needs and should therefore be approved.

**CONCLUSION**

66.     The above describes the Debtors' business and capital structure, the factors that precipitated the commencement of the Chapter 11 Cases, and the critical need for the Debtors to obtain the relief set forth in the First Day Pleadings.  The Debtors enter the Chapter 11 Cases with an intent to undergo a financial reorganization and reestablish themselves as a healthy economic

enterprise able to effectively compete in their industry for the benefit of their economic stakeholders and employees.

*[Remainder of Page Intentionally Left Blank]*

I declare under penalty of perjury that, to the best of my knowledge and after reasonable inquiry, the foregoing is true and correct.

Dated: July 14, 2025
        Las Vegas, Nevada


                                        /s/ Jeff Seery
                                        Jeff Seery

**Exhibit A**

**Transaction Support Agreement**

*Execution Version*

THIS TRANSACTION SUPPORT AGREEMENT DOES NOT CONSTITUTE, AND SHALL NOT BE DEEMED, AN OFFER TO SELL, OR A SOLICITATION OF AN OFFER TO BUY WITH RESPECT TO ANY SECURITIES. ANY SUCH OFFER OR SOLICITATION WILL COMPLY WITH ALL APPLICABLE SECURITIES LAWS. NOTHING CONTAINED IN THIS TRANSACTION SUPPORT AGREEMENT SHALL BE AN ADMISSION OF FACT OR LIABILITY OR, UNTIL THE OCCURRENCE OF THE SUPPORT EFFECTIVE DATE ON THE TERMS DESCRIBED HEREIN, DEEMED BINDING ON ANY OF THE PARTIES HERETO.

THIS TRANSACTION SUPPORT AGREEMENT DOES NOT PURPORT TO SUMMARIZE ALL OF THE TERMS, CONDITIONS, REPRESENTATIONS, WARRANTIES, AND OTHER AGREEMENTS WITH RESPECT TO THE TRANSACTIONS DESCRIBED IN THIS TRANSACTION SUPPORT AGREEMENT, WHICH TRANSACTIONS WILL BE SUBJECT TO THE EXECUTION OF DEFINITIVE DOCUMENTS INCORPORATING THE TERMS AND CONDITIONS SET FORTH IN THIS TRANSACTION SUPPORT AGREEMENT AND THE CLOSING OF ANY TRANSACTION SHALL BE SUBJECT TO THE TERMS AND CONDITIONS SET FORTH IN SUCH DEFINITIVE DOCUMENTS.

## <u>TRANSACTION SUPPORT AGREEMENT</u>

This *Transaction Support Agreement* (together with all annexes, exhibits, schedules, and attachments hereto and, as amended, restated, supplemented, or otherwise modified from time to time in accordance with the terms hereof, this "<u>Agreement</u>") is entered into on June 25, 2025 by and among the below parties (each of following described in sub-clauses (a) through (c), a "<u>Party</u>", and collectively, the "<u>Parties</u>"):

(a)     RunItOneTime LLC and each of its affiliates and licensed gaming affiliates listed on **<u>Schedule 1</u>** to this Agreement (collectively, the "<u>Company Parties</u>");

(b)     the undersigned beneficial owners, or investment advisors or managers for the account of beneficial owners signatories hereto (including those parties that subsequently become Parties to this Agreement by executing and delivering a Joinder Agreement in compliance with <u>Section 4(c)</u>) of Existing Term Loans (as defined herein) under the *Credit Agreement* dated September 3, 2021 (as amended, restated, or otherwise modified from time to time, the "<u>Existing Credit Agreement</u>"), between the Company Parties, the lenders party thereto, Alter Domus (US) LLC as administrative agent and collateral agent (in its capacity as such, and any successor, the "<u>Existing Term Loan Agent</u>"), and the lenders party thereto (such undersigned holders, along with subsequent joinders, collectively, the "<u>Supporting Lenders</u>"); and

(c)     Mr. Eric Persson in his personal capacity or through one more entities created to effectuate the Transaction (excluding the Company Parties) and in his capacity as (i) principal shareholder of Maverick Gaming HoldCo, Inc. ("<u>Maverick HoldCo</u>") and (ii) indirect majority holder of the Existing Interests (as defined herein) in the other Company Parties (Mr. Persson, together with his successors and assigns,

the "Supporting Shareholder" and together with the Supporting Lenders, the "Supporting Stakeholders").

## RECITALS

**WHEREAS**, the Parties (as of the date hereof) have in good faith and at arm's length negotiated a series of transactions (collectively, the "Transactions") with respect to the Company Parties on the terms set forth in this Agreement, including the term sheet attached hereto as **Exhibit A** (the "Transaction Term Sheet"), which constitutes a part of and is deemed fully incorporated into this Agreement, and the Definitive Documents (as defined below); and

**WHEREAS**, as of the date of this Agreement, the Supporting Lenders and the Supporting Shareholder collectively beneficially own or control approximately (a) 78.1% of the aggregate principal amount of outstanding Existing First Out Term Loans (as defined herein), (b) 69.9% of the aggregate principal amount of Existing Second Out Term Loans (as defined herein), (c) 57.9% of the Existing Interests in Maverick HoldCo, and (d) 100.0% of the Existing Interests in the Company Parties;

**NOW, THEREFORE**, the Parties agree as follows:

**Section 1.**   *Certain Definitions; Rules of Construction*.

As used in this Agreement, the following terms have the following meanings:

(a)   "Ad Hoc Group" means the ad hoc group composed of beneficial holders (or investment managers or advisors to beneficial holders) of Existing Term Loans represented by the Ad Hoc Group Advisors.

(b)   "Ad Hoc Group Advisors" means (i) Ropes & Gray LLP as lead restructuring counsel; (ii) Orrick, Herrington & Sutcliffe LLP as Washington gaming counsel; (iii) Brownstein Hyatt Farber Schreck, LLP as Nevada and Colorado gaming counsel; (iv) one local counsel (for the Chapter 11 Cases) for the Ad Hoc Group; and (v) such other attorneys, accountants, other professionals, advisors, and consultants for the Ad Hoc Group, as may be agreed by the Ad Hoc Group and the Company Parties, in each case, in accordance with the respective engagement letters for such professionals.

(c)   "Affiliate" has the meaning set forth in section 101(2) of the Bankruptcy Code as if such entity was a debtor in a case under the Bankruptcy Code; provided, that the Company Parties and the Supporting Shareholder are not considered Affiliates under this Agreement.

(d)   "Alternative Transaction" means (i) any inquiry, proposal, offer, bid, term sheet, discussion, or agreement with respect to a sale, disposition, new-money investment, restructuring, reorganization, merger, amalgamation, acquisition, consolidation, dissolution, debt investment, equity investment, liquidation, tender offer, recapitalization, plan of reorganization, share exchange, business combination, or similar transaction involving any one or more Company Parties or the debt, equity,

2

or other interests in any one or more Company Parties that is an alternative to one or more of the Restructuring Transactions or (ii) any other transaction involving one or more of the Company Parties that is an alternative to or materially inconsistent with one or more of the Transactions (taken as a whole).

(e)     "<u>Bankruptcy Code</u>" means title 11 of the United States Code, 11 U.S.C. §§ 101–1532, as amended.

(f)     "<u>Bankruptcy Court</u>" means the United States Bankruptcy Court in which the Chapter 11 Cases are commenced or another United States Bankruptcy Court with jurisdiction over the Chapter 11 Cases.

(g)     "<u>Bankruptcy Documents</u>" means the following documents related to the Chapter 11 Cases:

  (i)     all petitions, first-day pleadings filed by the Debtors, second-day pleadings filed by the Debtors, and any orders sought in connection therewith;

  (ii)    any motions by the Debtors seeking debtor-in-possession financing or the use of cash collateral, any transaction documents providing for debtor-in-possession financing, and any order sought by the debtors approving such financing or use of cash collateral;

  (iii)   any motion seeking confirmation of the Plan, the Plan, any supplement to the Plan, and any order seeking confirmation of the Plan;

  (iv)    any motion seeking approval of the Disclosure Statement, the Disclosure Statement, all solicitation materials in respect of the Plan, and any order seeking approval of the Disclosure Statement;

  (v)     any orders sought by the Debtors related to the assumption or rejection of the Blue Owl Master Lease; and

  (vi)    any order sought by the Debtors related to a sale of their assets.

(h)     "<u>Blue Owl Master Lease</u>" means the *Second Amended and Restated Master Lease*, dated July 6, 2023, by and among (a) Project Evergreen WA LLC and Project Evergreen NV Owner LLC, as Landlord, and (b) certain Company Parties as Tenant (as amended, restated, amended and restated, supplemented, or otherwise modified from time to time in accordance with its terms).

(i)     "<u>Business Day</u>" means any day other than a Saturday, Sunday, "legal holiday" (as defined in Bankruptcy Rule 9006(a)) or another day on which commercial banks in New York are required or permitted under applicable Laws or regulations to close.

(j)     "<u>Cause of Action</u>" means any and all claims, interests, damages, remedies, causes of action, demands, rights, actions, controversies, proceedings, agreements, suits, obligations, reimbursement claims, contribution claims, recoupment rights, debts,

3

third-party claims, liabilities, accounts, defenses, offsets, powers, privileges, licenses, liens, indemnities, guaranties, and franchises, avoidance actions, counterclaims and cross claims, of any kind or character whatsoever, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, contingent or non-contingent, liquidated or unliquidated, secured or unsecured, asserted, assertable, or unasserted, directly or derivatively, choate or inchoate, reduced to judgment or otherwise, matured or unmatured, suspected or unsuspected, disputed or undisputed, in contract, tort, law, equity, or otherwise.

(k)     "<u>Claim</u>" has the meaning set forth in section 101(5) of the Bankruptcy Code.

(l)     "<u>Closing Date</u>" means the date of satisfaction or waiver of all of the conditions set forth in the Definitive Documents and this Agreement, and the occurrence of the Plan Effective Date if the Chapter 11 Cases are commenced.

(m)     "<u>Control</u>" (including the terms "<u>controlling</u>," "<u>controlled by</u>" and "<u>under common control with</u>"), with respect to the relationship between or among two or more Entities, means the possession, directly or indirectly, of the power to direct or cause the direction of the affairs or management of an Entity, whether through the ownership of voting securities, as trustee or executor, by contract or otherwise.

(n)     "<u>Debtors</u>" means the Company Parties that commence Chapter 11 Cases.

(o)     "<u>Definitive Documents</u>" means all documents, agreements, and instruments (including all exhibits, schedules, supplements, appendices, annexes, and attachments thereto) that are utilized to implement or effectuate, or that otherwise relate to, the Transactions, including:

(i)     the Transaction Term Sheet, including any annexes thereto;

(ii)     the Bankruptcy Documents;

(iii)     the Maverick/Aces IP Documents;

(iv)     the Sale Documents, including the PokerCo Stalking Horse Documents;

(v)     the Transition Services Agreement;

(vi)     any amendment to the Operator Leases, or a comparable lease agreement between the Company Parties and a Replacement Operator;

(vii)     any other documents or agreements relating to any of the foregoing and the Transactions (including all exhibits, schedules, supplements, appendices, annexes, instructions and attachments to any of the foregoing);

in each case, containing terms and conditions consistent with this Agreement, including the Transaction Term Sheet and otherwise in form and substance (1) reasonably satisfactory to the Company Parties; and (2) as to the foregoing items

4

(ii) and (iv) and those documents set forth in (vi) that are related to the foregoing items (ii) and (iv), acceptable to the Requisite Supporting Lenders in their sole discretion, and otherwise reasonably acceptable to the Requisite Supporting Lenders; provided, that the PokerCo Stalking Horse Documents, Maverick/Aces IP Documents, and the Transition Services Agreement must also be in form and substance reasonably satisfactory to the Supporting Shareholder.

(p)     "Disclosure Statement" means the disclosure statement with respect to the Plan.

(q)     "Entity" has the meaning set forth in section 101(15) of the Bankruptcy Code.

(r)     "Existing Credit Agreement" means the *Credit Agreement*, dated September 3, 2021, by and among certain of the Company Parties, the Existing Term Lenders, and the Existing Term Loan Agent (as amended, restated, amended and restated, supplemented, or otherwise modified from time to time in accordance with its terms).

(s)     "Existing Debt Documents" means collectively, the Existing Credit Agreement and all "Loan Documents" as defined therein.

(t)     "Existing First Out Term Loans" means the outstanding First Out Term Loans under the Existing Credit Agreement.

(u)     "Existing Interests" means with respect to any Entity, the shares (or any class thereof) of capital stock (including common stock and preferred stock), limited liability company interests, partnership interests and any other equity, ownership, beneficial or profits interests of such Entity, and options, warrants, rights, stock appreciation rights, phantom stock or units, incentives, commitments, calls, redemption rights, repurchase rights or other securities, arrangements or agreements to acquire or subscribe for, or which are convertible into, or exercisable or exchangeable for, the shares (or any class thereof) of capital stock (including common stock and preferred stock), limited liability company interests, partnership interest or any other equity, ownership, beneficial, or profits interests of such Entity (in each case whether or not arising under or in connection with any employment agreement).

(v)     "Existing Lenders" means the holders of Existing Term Loans under the Existing Credit Agreement.

(w)     "Existing Second Out Term Loans" means the outstanding Second Out Term Loans under the Existing Credit Agreement.

(x)     "Existing Term Loans" means the outstanding Term Loans under the Existing Credit Agreement, including the Existing First Out Term Loans and the Existing Second Out Term Loans.

(y)     "Gaming Decisions" means a decision by a Supporting Shareholder or governing body of a Company Party that, under Gaming Laws, can only be made

5

by individuals holding the relevant and necessary gaming license or having been found suitable under the states of Colorado and Nevada relating to any alterations to the licensed facilities, including a reduction or enlargement in (i) the total number of gaming devices on the gaming floor, or a reduction in the hours in which the gaming devices or gaming floor are operational, inclusive of slots, table games or other gaming devices that are permitted within the applicable jurisdiction; (ii) the operation of non-gaming amenities, including but not limited to food and beverage, lodging, retail, wellness (spa, gym, pool or similar amenities), (iii) any contracts related to the use, acquisition, or disposition of gaming equipment that exceed $100,000 per contract, (iv) any key employees under Gaming Laws in which the total compensation is more than $100,000 per person or (v) other categories of amenity that have previously been offered by the Company Parties or the Licensed Operating Affiliates to customers at any of the licensed locations throughout the jurisdictions where the Company Parties or the Licensed Operating Affiliates operate.

(z)     "Gaming Laws" means the Nevada Gaming Control Act, the Regulations of the Nevada Gaming Commission and Nevada Gaming Control Board, the Colorado Limited Gaming Act, and the Rules of the Colorado Limited Gaming Control Commission.

(aa)    "Governmental Body" means any applicable federal, state, local, or foreign government or any agency, bureau, board, commission, court or arbitral body, department, political subdivision, regulatory or administrative authority, tribunal or other instrumentality thereof, or any self-regulatory organization.

(bb)    "Joinder Agreement" has the meaning set forth in Section 4(c)(i).

(cc)    "Law" means any federal, state, local, or foreign law (including, in each case, any common law), statute, code, ordinance, rule, regulation, decree, injunction, order, ruling, assessment, writ or other legal requirement, or judgment, in each case, that is validly adopted, promulgated, issued, or entered by a Governmental Body.

(dd)    "Licensed Operator Affiliates" means collectively, Colorado Resorts Operator LLC; Grand Z Casino Operator LLC; Johnny Z Casino Operator LLC; Z Casino Black Hawk Operator LLC; Elko Resorts Operator, LLC; Gold Country Operator, LLC; High Desert Operator LLC; Red Lion Operator, LLC; Wendover Resorts Operator, LLC; Red Garter Operator, LLC; and Wendover Nugget Operator, LLC.

(ee)    "Maverick/Aces IP" the "Maverick" and "Aces" brands and associated trademarks, along with any intellectual property developed using those brands and trademarks in connection with current and future poker partnerships.

(ff)    "Maverick/Aces IP Documents" means those licenses, sub-licenses, instruments, agreements, or other documents or arrangements governing the use or ownership of the Maverick/Aces IP in accordance with the Transaction Term Sheet.

6

(gg)  "Operator Leases" means, collectively, the (i) *Lease*, dated March 28, 2019, by and between Maverick Wendover LLC and Red Garter Operator, LLC, (ii) *Lease*, dated March 28, 2019, by and between Maverick Wendover LLC and Wendover Nugget Operator, LLC, (iii) *Lease*, dated May 31, 2019, by and between Maverick Elko LLC and Gold Country Operator LLC, (iv) *Lease*, dated May 31, 2019, by and between Maverick Elko LLC and Red Lion Operator LLC, (v) *Lease*, dated December 11, 2019, by and between Maverick Z Casinos LLC and Grand Z Casino Operator LLC, (vi) *Lease*, dated December 11, 2019, by and between Maverick Z Casinos LLC and Z Casino Black Hawk Operator LLC, and (vii) *Lease*, dated December 11, 2019, by and between Maverick Z Casinos LLC and Johnny Z Casino Operator, LLC.

(hh)  "Outside Date" means 11:59 p.m. (Eastern Time) on December 31, 2025; provided, that if the only remaining condition to consummation of the Transactions is obtaining regulatory approvals then the Outside Date will be extended to December 31, 2026 and the Outside Date may otherwise be extended upon written consent (not to be unreasonably withheld, conditioned, or delayed) between the Company Parties and the Requisite Supporting Lenders (e-mail via counsel being sufficient).

(ii)  "Parties" has the meaning set forth in the preamble to this Agreement.

(jj)  "Plan" means a chapter 11 plan encompassing the terms and conditions set forth in the Transaction Term Sheet.

(kk)  "Plan Effective Date" means the occurrence of the effective date of the Plan in accordance with its terms.

(ll)  "PokerCo Stalking Horse Documents" means:

(i)  the stalking horse purchase agreement between the Debtors and the Supporting Shareholder (or a designee thereof) providing for the initial bid for the purchase of the PokerCo (as defined in the Transaction Term Sheet), consistent with the Transaction Term Sheet; and

(ii)  the earnout and contingent sharing agreement between the Existing Lenders (or an entity to be formed by the Existing Lenders ("EarnoutCo")) and the Supporting Shareholder (or a designee thereof) providing for an earnout to be paid to the Existing Lenders (or EarnoutCo) upon the signing of definitive documentation related to a change of control of any facility within PokerCo occurring within five years of the Closing Date, and entitling the Existing Lenders (or EarnoutCo) to receive 50% of the proceeds distributable to the Supporting Shareholder (or a designee thereof) after deducting (x) the cash price the Supporting Shareholder (or a designee thereof) paid for PokerCo (the "PokerCo Cash Price"), and (y) transaction expenses.   If less than all of PokerCo is sold, then the PokerCo Cash Price for the sold facility will be deemed to be the pro rata share of the final purchase price, with the numerator being the adjusted EBITDA of the

7

facility for the trailing 12 months and the denominator being total PokerCo adjusted EBITDA for the trailing 12 months.

(mm)  "<u>Proceeding</u>" means any action, claim, complaint, petition, suit, arbitration, mediation, alternative dispute resolution procedure, hearing, audit, examination, investigation or other proceeding by or before any Governmental Body.

(nn)  "<u>Qualified Marketmaker</u>" means an entity that (i) holds itself out to the public, the syndicated loan market, the high yield bond market, or the applicable private markets as standing ready in the ordinary course of business to purchase from customers and sell to customers Claims against the Company Parties, or enter with customers into long and short positions in Claims against the Company Parties, in its capacity as a dealer or market maker in such Claims and (ii) is, in fact, regularly in the business of making a market in Claims against issuers or borrowers (including term loans, or debt or equity securities).

(oo)  "<u>Regulatory Entities</u>" means any Governmental Body in any jurisdiction with regulatory, licensing, enforcement or administrative authority or jurisdiction over any gambling activity or similar gaming business, enterprise or establishment (including physical property or assets ancillary thereto and used in connection therewith, as well as online gambling, betting, lottery, sweepstakes, bingo, fantasy contests, skill games, social games or similar contests), or with regulatory, licensing or permitting authority or jurisdiction over any gaming, or non-gaming operation such as the service of alcoholic beverages, (or proposed gaming or non-gaming operation) owned, managed, leased or operated by the Company Parties.

(pp)  "<u>Replacement Operator</u>" means one or more third-party gaming operating companies or their affiliates that will replace the Licensed Operating Affiliates, which (i) before entry of an order of the Bankruptcy Court approving a sale of any facility of the Company Parties, will be determined by the Company Parties and acceptable to the Requisite Supporting Lenders and (ii) after entry of an order of the Bankruptcy Court approving a sale of any facility of the Company Parties, by the winning bidder as it relates to the affected locations.

(qq)  "<u>Requisite Supporting Lenders</u>" means, as of any date of determination, (i) at least two Supporting Lenders that are unaffiliated and (ii) that hold, own, or control as of such date more than 50% of the Existing First Out Term Loans and the Existing Second Out Term Loans (taken as a whole) held by all of the Supporting Lenders.

(rr)  "<u>Sale Documents</u>" means, collectively, the documents governing the sale of PokerCo and, if applicable, MainCo and LeaseCo (as defined in the Transaction Term Sheet), including:

(i)  the bidding procedures governing the bidding, auction, stalking horse protections, and sale of the Company Parties' assets, and the order approving the same;

(ii)  the PokerCo Stalking Horse Documents;

(iii)    if applicable, the stalking horse purchase agreement related to the Existing Lenders' credit bid for MainCo;

(iv)    any definitive documents effectuating a sale of the Debtors' assets as approved by the Bankruptcy Code, including a sale of PokerCo or MainCo;

(v)    all orders of the Bankruptcy Court related to the sale of the Debtors' assets, including PokerCo or MainCo; and

(vi)    all agreements, documents, and instruments related thereto.

(ss)    "Special Committee" means a special committee of the board or other governing body of each Company Party with the authority set forth in Section 2(a), which will be composed of three directors or managers of which (i) two members will be Tobias Keller and Lawrence Perkins (or, in each case, their duly appointed successor) and (ii) one member will be designated by the Requisite Supporting Lenders; provided that any approvals, action, or recommendation by the Special Committee will require the affirmative consent of the member designated by the Requisite Supporting Lenders referenced in (ii).

(tt)    "Support Effective Date" means the date when each of the following conditions have been satisfied or waived by the appropriate Party or Parties in accordance with this Agreement:  (i) the delivery of duly authorized and executed signature pages to this Agreement by (A) the Company Parties, (B) the Supporting Lenders party hereto, and (C) the Supporting Shareholder; and (ii) the Company Parties shall have paid or caused to be paid, all Transaction Expenses for which an invoice has been received by the Company Parties.

(uu)    "Support Period" means the period commencing on the Support Effective Date and ending on the earlier of (i) the Closing Date and (ii) the date on which this Agreement is terminated in accordance with Section 6 hereof.

(vv)    "Transactions" has the meaning set forth in the recitals to this Agreement.

(ww)    "Transaction Expenses" means all reasonable and documented fees, costs and expenses of the Ad Hoc Group Advisors, whether incurred before, on, or after the Agreement Effective Date, in each case (i) in connection with the negotiation, formulation, preparation, execution, delivery, implementation, consummation, or enforcement of this Agreement or any of the other Definitive Documents, the transactions contemplated hereby or thereby, including any amendments, waivers, consents, supplements, or other modifications to any of the foregoing and (ii) consistent with any engagement letters or fee reimbursement letters entered into between the applicable Company Parties and the Ad Hoc Group.

(xx)    "Transition Services Agreement" means the transition services agreement between the Supporting Shareholder and the Company Parties, that set forth the terms on which the Supporting Shareholder will continue providing services to the Company Parties through the Closing Date.

9

Unless otherwise specified, references in this Agreement to any Section or clause refer to such Section or clause as contained in this Agreement.  The words "herein", "hereof", and "hereunder" and other words of similar import in this Agreement refer to this Agreement as a whole, and not to any particular Section or clause contained in this Agreement.  Wherever from the context it appears appropriate, each term stated in either the singular or plural shall include the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and neuter genders.  Capitalized terms defined only in the plural or singular form shall nonetheless have their defined meanings when used in the opposite form.  Unless otherwise specified, all references herein to "Sections" are references to Sections of this Agreement.  References to "shareholders," "directors," or "officers" shall also include "members" or "managers," as applicable, as such terms are defined under the applicable limited liability company Laws.  The words "including", "includes", and "include" shall each be deemed to be followed by the words "without limitation".  The phrase "hold, own, or control" shall be deemed to be followed by the words "(including through beneficial ownership or as investment advisors or managers for the account of a beneficial owner)".  Unless otherwise specified, any reference in this Agreement to an existing document, schedule, or exhibit shall mean such document, schedule, or exhibit, as it may have been or may be amended, restated, amended and restated, supplemented, or otherwise modified or replaced from time to time; provided, that notwithstanding the foregoing, any capitalized terms in this Agreement which are defined with reference to another agreement (other than the Transaction Term Sheet), are defined with reference to such other agreement as of the date of this Agreement, without giving effect to any termination of such other agreement or amendments to or modifications of such capitalized terms in any such other agreement following the date of this Agreement.

**Section 2.** *Implementation of Transaction; Milestones.*  Upon the Support Effective Date, the Company Parties and the Supporting Stakeholders will promptly work to effectuate the transactions in accordance with the below milestones:

(a) *Governance*.  Within three calendar days of the Support Effective Date and at all times thereafter, the Company Parties will:

(i) appoint a Chief Restructuring Officer (the "CRO") or otherwise delegate to an officer the authority to manage the cash receipts and disbursements, and such other managerial controls not constituting Gaming Decisions (unless such CRO has obtained the requisite approvals to make the Gaming Decisions, in which case those controls will be vested in the CRO) of the Company Parties, which CRO will report to and can be terminated only with the consent of the Special Committee; provided, that the appointment of Jeff Seery, in the first instance, as the initial CRO, subject to replacement by a successor CRO with the consent of the Requisite Supporting Lenders, is acceptable to the Requisite Supporting Lenders and satisfies the requirements of this clause (i); provided further, that with respect to the Licensed Operator Affiliates, Jeff Seery (or another individual acceptable to the Requisite Supporting Lenders) will be appointed as an employee with authority to manage all cash receipts and disbursements;

10

(ii) delegate to the Special Committee the right to approve, manage, or decline to approve or manage, the Transactions, the Chapter 11 Cases, and any matters that may arise related to this Agreement, the Transactions, and the Chapter 11 Cases, in each case in a manner acceptable to the Requisite Supporting Lenders; and

(iii) commence and promptly take all steps reasonably to appoint an employee of a Replacement Operator, subject to such employee obtaining the requisite gaming licensing or suitability determination, as an officer or key employee of the Licensed Operator Affiliates, on terms acceptable to the Requisite Supporting Lenders;

provided, that if applicable Gaming Laws prohibit or limit the scope of any of the foregoing, then any alternative arrangement or modifications must be acceptable to the Requisite Supporting Lenders in their sole discretion.

(b) *Regulatory Approvals*.  Within 21 days of the Support Effective Date, the Company Parties and Supporting Shareholder will commence discussions with, and at all times take all steps required by, the Regulatory Entities in relation to the operation of the Company Parties in the States of Nevada, Washington, and Colorado regarding (i) in addition to the requirements in Section 2(a)(iii), the appointment of a Replacement Operator to manage the gaming and relevant non-gaming operations of the Company Parties, (ii) to the extent practicable, the transition or assignment of all applicable gaming licenses and assets, as well as all other licenses required for the operation of the Company Parties, including but not limited to relevant liquor, food service and hotel occupancy licenses, by the Supporting Shareholder to the Replacement Operator, and where not practicable, having an Entity acceptable to the Requisite Supporting Lenders apply for and receive relevant licenses and approvals by the Regulatory Entities, and (iii) the potential change of control resulting from the Transactions, and will at all times (to the extent practicable) consult with and include in the discussions the Ad Hoc Group Advisors on all material discussions with such gaming regulators.

(c) *Shareholder Cooperation*.  Upon request of the Requisite Supporting Lenders, the Supporting Shareholder will promptly:

(i) negotiate and execute the Transition Services Agreement before commencement of the Chapter 11 Cases and in any event within 14 days of the Support Effective Date;

(ii) negotiate and execute a non-compete agreement lasting three years from the Closing Date with respect to the business of e.gads LLC, if not covered by the Transition Services Agreement; and

(iii) execute all documents or consents (and provide all information) necessary for the Company Parties and the Licensed Operator Affiliates to accomplish their obligations under this Agreement.

154513756_28

(d)  *Sale and Marketing Process*:  At the request of the Requisite Supporting Lenders, the Company Parties will undertake the following steps related to a sale and marketing process:

  (i)  within seven days of such request, deliver or cause to be delivered to the Ad Hoc Group Advisors a proposed confidential information memorandum (the "CIM") for the sale of PokerCo, LeaseCo, and MainCo, along with a list of prospective buyers for each;

  (ii)  the CIM shall be in form and substance reasonably acceptable to the Requisite Supporting Lenders and within two days of approval of the CIM by the Requisite Supporting Lenders, the Company parties shall deliver or cause to be delivered the CIM to prospective bidders and purchasers of PokerCo, LeaseCo, and MainCo with a request for initial indications of interest within a time mutually agreed by the Company Parties and the Requisite Supporting Lenders; provided, that such prospective bidders and purchasers shall only be entitled to receive a CIM to the extent they are subject to a confidentiality agreement with the Company Parties and, to the extent they are not, shall instead receive a teaser;

  (iii)  promptly update the Requisite Supporting Lenders and the Ad Hoc Group Advisors of all indications of interest, bids, material developments, or offers made by third-parties with respect to the acquisition of PokerCo, LeaseCo, or MainCo; and

  (iv)  take all such other steps reasonably necessary to market the assets of the Company Parties to comply with section 363 of the Bankruptcy Code.

(e)  *Chapter 11 Preparation Milestones*:  Within 14 days of the Support Effective Date, the Company Parties will:

  (i)  deliver to Ropes & Gray LLP (x) an analysis of the projected cost and claims arising from assumption or rejection of the Blue Owl Master Lease, (y) an analysis of the administrative and unsecured claims of the Company Parties remaining after a pro-forma sale of PokerCo, and (z) a proposed budget with respect to the use of cash collateral or any debtor-in-possession financing necessary to consummate the Chapter 11 Cases; and

  (ii)  reach agreement with the Requisite Supporting Lenders on the relevant milestones for the delivery and filing of Sale Documents and Bankruptcy Documents by the Company Parties and approval thereof by the Bankruptcy Court, the deadline for commencement of Chapter 11 Cases, and the deadline for confirmation and consummation of the Plan (such milestones, the "Additional Agreed Milestones").

**Section 3.**     *Agreements of the Company Parties*.

(a)     *Support of Transaction*.  In addition to the other obligations set forth in this Agreement and subject to <u>Section 6</u> hereof, each of the Company Parties, jointly and severally, agrees that for the duration of the Support Period it shall (and shall cause each of its direct and indirect subsidiaries to):

    (i)     (A) conduct its business and operations in the ordinary course in a manner that is consistent with past practices and in compliance with Law; and (B) use reasonable efforts to preserve intact its business organizations and relationships with trade creditors, lessors, licensors, vendors, customers, suppliers, distributors, Governmental Bodies, and employees;

    (ii)     support, pursue, and take in good faith all reasonably necessary and appropriate actions to facilitate and cause the implementation and consummation of the Transactions in a timely manner and within the time frames contemplated by this Agreement, including (A) taking all actions necessary and appropriate to support and complete the Transactions and all other reasonable actions contemplated in connection therewith in this Agreement and under the Definitive Documents, (B) taking all necessary actions to obtain any and all required licenses, determinations, approvals or consents from the relevant Regulatory Entity for the implementation and consummation of the Transactions, and (C) refraining from taking any actions inconsistent with, and not failing or omitting to take an action that is required by, this Agreement or the Definitive Documents;

    (iii)     on a timely basis, negotiate in good faith, enter into, implement, and effectuate the Definitive Documents within the timeframes contemplated herein; <u>provided</u>, that no Company Party shall be obligated to (A) waive (to the extent it has the power or right to waive) any condition to the consummation of any part of the Transactions set forth in any Definitive Document or (B) approve any Definitive Document that is not in form and substance consistent with this Agreement (including the Transaction Term Sheet and the consent rights set forth herein and therein);

    (iv)     to the extent any legal, regulatory, or structural impediment arises that would prevent, hinder, or delay the consummation of the Plan or Transactions, negotiate in good faith and use commercially reasonable efforts to execute and deliver any appropriate additional or alternative provisions or agreements to address any such impediment;

    (v)     negotiate in good faith concerning financing arrangements for the prepetition period and the Chapter 11 Cases, including consensual use of cash collateral and, if necessary, debtor-in-possession financing for the Company Parties;

(vi)    support and not object to approval of and entry of orders regarding the Definitive Documents and confirmation and consummation of the Plan and the Transactions, in each case consistent with the terms and conditions, and within the timeframes contemplated by, this Agreement (including the Transaction Term Sheet);

(vii)    subject to any confidentiality restrictions of the Company Parties, promptly provide the Ad Hoc Group with any documentation or information that is reasonably requested by the Ad Hoc Group, or that is reasonably necessary to consummate the Transactions;

(viii)    promptly notify the Supporting Lenders and the Supporting Shareholders of: (A) any breach of any obligations, representations, warranties, or covenants set forth in this Agreement; (B) any occurrence, or failure to occur, of any event of which the Company Parties are aware which occurrence or failure to occur would be likely to cause any condition precedent in the Definitive Documents not to occur or become impossible to satisfy; (C) receipt of any written notice from any third party alleging that the consent of such party is or may be required in connection with the Transactions; and (D) any action commenced, or, to the knowledge of such party, threatened, relating to or involving or otherwise affecting the transactions contemplated by the Transactions (including any action challenging the validity of the transactions contemplated by this Agreement or any Definitive Document or seeking to enjoin, restrain or prohibit this Agreement or any Definitive Document or the consummation of the transactions contemplated hereby or thereby);

(ix)    cooperate in good faith to structure the Transactions in a manner that (A) eliminates or minimizes to the maximum extent possible any cash taxes payable by the Company Parties, the Supporting Shareholder, and the Supporting Lenders as a result of the consummation of the Transactions and (B) optimizes the tax efficiency (including by way of the preservation or enhancement of favorable tax attributes) of the Transactions to the Company Parties, the Supporting Shareholder, and the Supporting Lenders as a result of the consummation of the Transactions, in each case as reasonably determined by the Company Parties and the Requisite Supporting Lenders;

(x)    use reasonable efforts to oppose and object to the efforts of any Entity seeking in any manner to object to, delay, impede, or take any other action to interfere with the acceptance, implementation, or consummation of the Transactions to the extent such opposition or objection is reasonably necessary to facilitate implementation of the Transactions after consultation with the Requisite Supporting Lenders;

14

(xi)     to the extent this Agreement remains in effect, promptly pay when due all Transaction Expenses that are properly incurred and invoiced in accordance with the relevant engagement letters or fee arrangements;

(xii)    if any Company Party receives an Alternative Transaction proposal, provide, on a professional eyes only basis, written notice to Ropes & Gray LLP within two Business Days after the receipt of such Alternative Transaction proposal in accordance with Section 20, with such notice to include the material terms thereof;

(xiii)   to promptly provide the Ad Hoc Group Advisors: (A) timely responses to all diligence requests and any documentation or information that is requested by the Ad Hoc Group Advisors, and (B) upon reasonable request from the Requisite Supporting Lenders, reasonable access to the Chief Restructuring Officer;

(xiv)    with respect to any Gaming Decisions, which will be undertaken in accordance with Gaming Laws, consult with the CRO (who shall in turn consult with the Special Committee) and obtain their favorable written recommendation regarding any Gaming Decisions before any such decisions are undertaken by the applicable entity and promptly inform the Ad Hoc Group Advisors if a Company Party or Supporting Shareholder approves of or undertakes a Gaming Decision that is contrary to the recommendation of the CRO or Special Committee; and

(xv)     except as expressly permitted by this Agreement or with the prior written consent of the Requisite Supporting Lenders, the Company Parties will not:

    (1)     declare, set aside or pay any dividend or other distribution (whether in cash, stock or property or any combination thereof) in respect of the capital stock of the Company or another Company Party, or redeem, repurchase or otherwise acquire or offer to redeem, repurchase, or otherwise acquire any shares of the Company's or a Company Party's capital stock (other than to another Company Party in the ordinary course or pursuant to the Company Parties' executive compensation plans, long-term incentive plans, or tax distributions as permitted under the Existing Debt Documents);

    (2)     enter into or amend, establish, adopt, restate, supplement, or otherwise modify or accelerate any deferred compensation, incentive, success, retention, bonus, indemnification, or other compensation or benefit plans or arrangements, policies, programs, practices, plans or agreements, including, without limitation, offer letters, employment agreements, consulting agreements, severance arrangements, indemnification arrangements, change in control agreements or any other similar arrangement or arrangements with

15

or for the benefit of any current or former director, manager, officer, insider or executive level employee of any Company Party;

(3)    adopt, terminate the employment of, or otherwise amend or terminate any existing compensation or benefit plans or arrangements (including employment agreements) with or for the benefit of any current officer of any Company Party without the prior authorization of or in contravention of the favorable written recommendation of the Special Committee;

(4)    make any loan, advance, payment, capital contribution to, or investment in or any other similar arrangement or arrangements with or for the benefit of any current or former director, manager, officer, insider or executive level employee of any Company Party without the prior authorization of or in contravention of the favorable written recommendation of the Special Committee;

(5)    make any loans, advances or capital contributions to, or investments in, any other Person that is not a Company Party and is material to the Company Parties;

(6)    make any material payment in satisfaction of any existing debt;

(7)    commence, support or join any litigation or adversary proceeding against the Supporting Lenders;

(8)    amend, renew, or otherwise modify the Blue Owl Master Lease; or

(9)    create, incur, assume or otherwise be liable with respect to any indebtedness for borrowed money or guarantees thereof (other than with respect to the existing debt).

(b)    *Additional Provisions Regarding Company Parties' Commitments.* Notwithstanding anything to the contrary in this Agreement, nothing in this Agreement shall: (1) affect the ability of any Company Party to consult with any Supporting Lender, the Supporting Shareholder, or any other holder of Claims against or Existing Interests in the Company Parties, or any party-in-interest in the Chapter 11 Cases; (2) impair or waive the rights of any Company Party to assert or raise any objection permitted under this Agreement or any Definitive Document in connection with the Transactions; (3) prevent any Company Party from enforcing this Agreement or any Definitive Document or asserting or contesting whether any matter, fact, or thing is a breach of, or is inconsistent with, this Agreement or any Definitive Document; or (4) prevent any Company Party, or the board of directors, board of managers, or similar governing body of a Company Party (or any member thereof), from taking any action or refraining to take any action to the extent that it determines (after consultation with outside counsel) that taking or failing to take such action would be inconsistent with applicable Law or its fiduciary obligations under applicable Law; <u>provided</u>, that if any Company Party proposes to take any

16

action or refrain from taking any action, in each case, that is otherwise inconsistent with this Agreement or the Transactions, to comply with applicable Law or its fiduciary obligations, such Company Party shall provide, to the extent possible without violating applicable Law or its fiduciary obligations, at least three Business Days' advance written notice to the Parties.

**Section 4.**     ***Agreements of the Supporting Lenders.***

(a)     *Support of Transactions Generally.*  In addition to the other obligations set forth in this Agreement and subject to <u>Section 6</u> hereof, each Supporting Lender, severally and not jointly, agrees that for the duration of the Support Period such Supporting Lender shall to the extent applicable to such Supporting Lender:

(i)     support and take all commercially reasonable actions reasonably necessary to facilitate the implementation of the Transactions within the timeframes outlined herein and in the Definitive Documents and vote and exercise any powers or rights available to it, in each case in favor of any matter requiring approval to the extent necessary to implement the Transactions;

(ii)     not seek, solicit, encourage, propose, file, support, consent to, or vote for, or enter into or participate in any discussions, agreements, understandings or other arrangements with any Entity regarding, or pursue or consummate, any Alternative Transaction;

(iii)     negotiate in good faith, enter into, implement and effectuate the Definitive Documents to which it is required to be a party; <u>provided</u>, that no Supporting Lender shall be obligated to (A) waive (to the extent such Supporting Lender has the power or right to waive) any condition to the consummation of any part of the Transactions set forth in any Definitive Document or (B) approve any Definitive Document that is not in form and substance consistent with this Agreement (including the Transaction Term Sheet) and the consent rights set forth herein;

(iv)     not initiate or have initiated on its behalf, or permit to exist, any Proceeding of any kind with respect to this Agreement, the Definitive Documents, the Transactions, or the other Parties other than to enforce this Agreement or any Definitive Document or as otherwise permitted under this Agreement;

(v)     not exercise, or direct any other Entity to exercise, any right or remedy for the enforcement, collection, or recovery of any claims against the Company Parties, including any Existing Term Loans; <u>provided</u>, that nothing in this Agreement shall prevent any Supporting Lender from enforcing this Agreement or any other Definitive Document or claims as otherwise expressly permitted under this Agreement;

(vi)     subject to the Company Parties' compliance with <u>Section 2(e)(i)(z)</u>, negotiate in good faith concerning financing arrangements for the prepetition period and the Chapter 11 Cases, including consensual use of

17

cash collateral and, if necessary, debtor-in-possession financing for the Company Parties; *provided*, that the foregoing shall not constitute any commitment or undertaking to extend financing to any Company Party;

(vii)    promptly notify the Company Parties, as soon as reasonably practicable (and in no event more than three Business Days after the occurrence thereof) as to: (A) the occurrence, or failure to occur, of any event of which the Supporting Lender is aware that would be likely to cause such Supporting Lender to be unable to satisfy any condition precedent in the Definitive Documents; and (B) any breach of any obligations, representations, warranties, or covenants set forth in this Agreement by such Supporting Lender to the extent such information is not otherwise publicly known or already known by the Company Parties; and

(viii)   refrain from directly or indirectly taking any action that would be inconsistent with this Agreement and the Transactions unless otherwise required by Law.

(b)    *Additional Existing Term Loans*.  Each Supporting Lender agrees to be bound by this Agreement in respect of all Existing Term Loans set forth on its signature page to this Agreement (including any Joinder Agreement signature page).  If any Supporting Lender acquires or has executed an agreement to acquire additional Existing Term Loans (whether directly or indirectly and including by way of assignment or participation), such Supporting Lender agrees that all such additional Existing Term Loans shall automatically and immediately be deemed to be subject to the provisions of this Agreement and such Supporting Lender shall notify the Company Advisors within three Business Days of acquiring such additional Existing Term Loans.

(c)    *Transfers*.  Each Supporting Lender agrees that, for the duration of the Support Period, and in addition to any transfer restrictions in the Existing Credit Agreements, it shall not sell, transfer, loan, issue, hypothecate, assign, grant, encumber, or otherwise dispose of (including by way of participation), directly or indirectly, in whole or in part, any Existing Term Loans or other Claims against any Company Party now or hereafter directly or beneficially owned or controlled by such Supporting Lender (and any investment funds, accounts, and other investment vehicles managed by such Party) or for which it now or hereafter serves as the nominee, investment manager, or advisor for beneficial holders, as applicable, or any option thereon or any right or interest therein (including granting any proxies, depositing any such Existing Term Loans or Claims into a voting trust, or entering into a voting agreement with respect to any such Existing Term Loans) (collectively, a "Transfer"), unless the Transfer complies with the below requirements:

(i)     the Transfer must be made either (A) to another Supporting Lender or (B) if the transferee of Existing Term Loans (the "Transferee") is not a Supporting Lender, then before the effectiveness of such Transfer, after such proposed

18

Transferee agrees in writing to become a Supporting Lender and to be bound by all of the terms of this Agreement applicable to a Supporting Lender (including with respect to all Existing Term Loans and other Claims against any Company Party the Transferee already may then or subsequently own or control) by executing a joinder agreement, in form and substance substantially similar to the form attached to this Agreement as **Exhibit B** (each, a "Joinder Agreement");

(ii)     the Transferee delivers an executed copy of the Joinder Agreement to the Company Advisors (in accordance with the notice provisions set forth in Section 20 hereof and before the effectiveness of such Transfer), (x) the Transferee (and any investment funds, accounts, and other investment vehicles managed by such Transferee) shall be deemed to be a Supporting Lender hereunder with respect to all of its directly or beneficially owned or controlled Existing Term Loans and other Claims against any Company Party and (y) the transferor Supporting Lender shall be deemed to relinquish its rights, and be released from its obligations, under this Agreement other than any liability for its breach or non-performance of its obligations hereunder before the effectiveness of such Joinder Agreement and other than on account of any Existing Term Loans or other Claims against any Company Party that such Supporting Lender continues to own; and

(iii)    if at the time of a proposed Transfer to a Qualified Marketmaker, such Existing Term Loans may be tendered or consent solicited with respect to the Transaction, then the proposed transferor must first tender or consent with respect to such Existing Term Loans in accordance with Section 4(a).

A Qualified Marketmaker that acquires any Existing Term Loans or other Claims against any Company Party with the purpose and intent of acting as a Qualified Marketmaker for such Existing Term Loans shall not be required to execute and deliver a Joinder Agreement or otherwise become a Supporting Lender in respect of such Existing Term Loans if (i) such Qualified Marketmaker subsequently transfers such Existing Term Loans or other Claims against any Company Party (by purchase, sale assignment, participation, or otherwise) within ten Business Days of its acquisition, to a transferee that is an Entity that is not an Affiliate, affiliated fund, or affiliated Entity with a common investment advisor; and (ii) the Transfer otherwise is a permitted Transfer under this Section 4(c). To the extent that a Supporting Lender is acting in its capacity as a Qualified Marketmaker, it may Transfer any right, title or interests in Existing Term Loans and other Claims against any Company Party that the Qualified Marketmaker acquires from a holder of the Existing Term Loans that is not a Supporting Lender without the requirement that the transferee be a Transferee under this Section 4(c).

Each Supporting Lender agrees that any Transfer of any Existing Term Loans that does not comply with the terms and procedures set forth in this Section 4(c) shall be deemed void ab initio, and the Company Parties and each other Party shall have the right to enforce the voiding of such Transfer and the terms hereof.

(d)    *Additional Provisions Regarding the Supporting Lenders' Commitments.* Notwithstanding anything to the contrary in this Agreement, nothing in this Agreement shall: (i) affect the ability of any Supporting Lender to consult with any other Term Lender or the Supporting Shareholder or the Company Parties; (ii) impair or waive the rights of any Supporting Lender to assert or raise any objection permitted under this Agreement or any Definitive Document in connection with the Transactions; (iii) prevent any Supporting Lender from enforcing this Agreement or any Definitive Document or asserting or contesting whether any matter, fact, or thing is a breach of, or is inconsistent with, this Agreement or any Definitive Document; (iv) limit the ability of a Supporting Lender to purchase, sell, or enter into any transactions regarding any claims against any Company Party, including the Existing Term Loans, or the Company Parties' Existing Interests, subject to the terms of this Agreement; (v) except as and to the extent explicitly set forth in this Agreement, constitute a waiver or amendment of any term or provision of, or alter or diminish any right or obligation in, any Debt Document; (vi) except as and to the extent explicitly set forth in this Agreement, constitute a termination or release of any liens on, or security interests in, any of the assets or properties of the Company Parties that secure the obligations under any Debt Document; (vii) except as and to the extent explicitly set forth in this Agreement, require any Supporting Lender to incur, assume, become liable in respect of or suffer to exist any expenses, liabilities, or other obligations, or agree to or become bound by any commitments, undertakings, concessions, indemnities, or other arrangements that could result in expenses, liabilities, or other obligations to such Supporting Lender; (viii) prevent a Supporting Lender from taking any action that is required in order to comply with applicable Law or failing to take any action that may conflict or is inconsistent with such Supporting Lenders' governing documents, internal policies, or applicable Law; provided, that if any Supporting Lender proposes to take any action that is otherwise inconsistent with this Agreement or the Transactions to comply with applicable Law, such Supporting Lender shall provide, to the extent possible without violating applicable Law, at least three Business Days' advance, written notice to the Parties; or (ix) require any Supporting Lender to fund or commit to fund any additional amounts (other than as agreed herein) without such Supporting Lender's express written consent.

**Section 5.**    *Agreements of the Supporting Shareholder.*

(a)    *Support of Transactions.*    In addition to the other obligations set forth in this Agreement and subject to <u>Section 6</u> hereof, the Supporting Shareholder agrees that for the duration of the Support Period it shall:

(i)    support, pursue, and take in good faith all reasonably necessary and appropriate actions to maintain all licenses necessary for the Company Parties to operate in the ordinary course of business and otherwise promptly take all steps necessary to obtain approval by the Regulatory Entities of the Transactions or such other related actions necessary to effectuate the Transactions, as may be requested by the Company Parties or the Requisite Supporting Lenders;

20

(ii)    support, pursue, and promptly take in good faith all actions reasonably requested by the Company Parties to facilitate the appointment of personnel from the Replacement Operator as an officer or key employee at each of the Licensed Operator Affiliates, consistent with Section 2(a);

(iii)   subject to compliance with Gaming Laws, with respect to any Gaming Decisions of the Licensed Operator Affiliates and subject to the terms of the Transition Services Agreement when executed, consult with the CRO (who shall in turn consult with the Special Committee) and obtain their recommendation regarding any Gaming Decisions before any such decision is approved or undertaken by the applicable entity;

(iv)    support, pursue, and take in good faith all reasonably necessary and appropriate actions to cause each Licensed Operator Affiliate to (A) conduct its business and operations in the ordinary course in a manner that is consistent with past practices and in compliance with Law; and (B) to preserve intact its business organizations and relationships with trade creditors, lessors, licensors, vendors, customers, suppliers, distributors, Governmental Bodies, and employees;

(v)     support and take all commercially reasonable actions reasonably necessary to facilitate the implementation of the Transactions, including any required transfer of assets in connection therewith, within the timeframes outlined herein and in the Definitive Documents and vote and exercise any powers or rights available to it, in each case in favor of any matter requiring approval to the extent necessary to implement the Transactions;

(vi)    not seek, solicit, encourage, propose, file, support, consent to, or vote for, or enter into or participate in any discussions, agreements, understandings or other arrangements with any Entity regarding, or pursue or consummate, any Alternative Transaction;

(vii)   negotiate in good faith, enter into, implement and effectuate the Definitive Documents to which it is required to be a party within the timeframes contemplated herein; provided, that the Supporting Shareholder shall not be obligated to (A) waive (to the extent such Supporting Shareholder has the power or right to waive) any condition to the consummation of any part of the Transactions set forth in any Definitive Document or (B) approve any Definitive Document that is not that is not in form and substance consistent with this Agreement (including the Transaction Term Sheet) and the consent rights set forth herein;

(viii)  promptly notify the Supporting Lenders and the Company Parties, as soon as reasonably practicable (and in no event more than three Business Days after the occurrence thereof) as to: (A) the occurrence, or failure to occur, of any event of which the Supporting Shareholder is or would be aware upon reasonable inquiry that would be likely to cause such Supporting

21

Shareholder to be unable to satisfy any condition precedent in the Definitive Documents; and (B) any breach of any obligations, representations, warranties, or covenants set forth in this Agreement to the extent such information is not otherwise publicly known or already known by the Supporting Lenders Company Parties, in each case, subject to compliance with Gaming Laws;

(ix)    cooperate in good faith to structure the Transactions in a manner that (a) eliminates or minimizes to the maximum extent possible any cash taxes payable by the Company Parties, the Supporting Shareholder, and the Supporting Lenders as a result of the consummation of the Transactions and (b) optimizes the tax efficiency (including, but not limited to, by way of the preservation or enhancement of favorable tax attributes) of the Transactions to the Company Parties, the Supporting Shareholder, and the Supporting Lenders as a result of the consummation of the Transactions, in each case as reasonably determined by the Company Parties and the Requisite Supporting Lenders;

(x)     to the extent any legal or structural impediment arises that would prevent, hinder, or delay the consummation of the Transactions, take all steps reasonably necessary and desirable to address any such impediment; and

(xi)    refrain from directly or indirectly taking any action that would be inconsistent with this Agreement and the Transactions unless otherwise required by Law.

(b)    *No Transfer*.  The Supporting Shareholder agrees that, for the duration of the Support Period, it shall not sell, transfer, loan, issue, hypothecate, assign, grant, encumber, or otherwise dispose of (including by way of participation), directly or indirectly, in whole or in part, any Existing Interests now or hereafter directly or beneficially owned or controlled by the Supporting Shareholder.

(c)    *Additional Provisions Regarding the Supporting Shareholder's Commitments*. Notwithstanding anything to the contrary in this Agreement, nothing in this Agreement shall: (i) affect the ability of the Supporting Shareholder to consult with any Supporting Lender or the Company Parties; (ii) impair or waive the rights of the Supporting Shareholder to assert or raise any objection permitted under this Agreement or any Definitive Document in connection with the Transactions; (iii) prevent any Supporting Shareholder from enforcing this Agreement or any Definitive Document or asserting or contesting whether any matter, fact, or thing is a breach of, or is inconsistent with, this Agreement or any Definitive Document; or (iv) prevent the Supporting Shareholder from taking any action that is required in order to comply with applicable Law; provided, that if the Supporting Shareholder proposes to take any action that is otherwise inconsistent with this Agreement or the Transactions to comply with applicable Law, such Supporting Shareholder shall provide, to the extent possible without violating applicable Law, at least three Business Days' advance written notice to the Parties.

22

**Section 6.**      *Termination of Agreement*.

(a)      *Generally*.  No Party may terminate this Agreement if (i) the basis for such termination is principally the result of the action or omission of the Party seeking to terminate this Agreement or (ii) such Party fails to perform or comply in all material respects with the terms and conditions of this Agreement (unless such failure to perform or comply arises as a result of another Party's actions or inactions in breach of such other Party's obligations under this Agreement).

(b)      *Company Parties Termination Events*. Upon written notice from the Company Parties to the other Parties delivered in accordance with <u>Section 20</u>, the Company Parties may terminate this Agreement at any time as to all Parties after the occurrence, and during the continuation, of any of the following events:

(i)      the breach in any material respect by one or more of the Supporting Lenders of any of the representations, warranties, covenants, or other obligations of such Supporting Lender set forth in this Agreement, in each case, that remains uncured for a period of the earlier of three Business Days after written notice from any Company Party and the Outside Date; <u>provided</u>, that if the non-breaching Supporting Lenders still own, control, or constitute, (A) before the commencement of Chapter 11 Cases, the "Required Lenders" as defined in the Existing Credit Agreement as of such date, or (B) after the commencement of Chapter 11 Cases, at least 66-2/3% of the aggregate outstanding principal amount of Existing Term Loans, such termination shall only be effective as to the breaching Supporting Lender;

(ii)      the entry of a final, non-appealable judgment or order by any Governmental Body, including any regulatory authority or court of competent jurisdiction, of any ruling, judgment, or order enjoining the consummation of a material portion of the Transactions such that it would be impossible to consummate the Transactions, unless, in each case, such ruling, judgment, or order has been issued at the request of the Company Parties, or, in all other circumstances, such ruling, judgment or order has been stayed, reversed, or vacated within five Business Days after such issuance;

(iii)      the Requisite Supporting Lenders collectively publicly announce or state in writing their intention to pursue, consummate, or enter into a binding agreement to consummate, in each case, an Alternative Transaction;

(iv)      the Special Committee determines, after consulting with outside counsel, that proceeding with the Transactions (or taking or refraining from taking any action with respect to the Transactions that is required to be so taken or not taken in accordance with the terms hereof) would be inconsistent with the exercise of applicable fiduciary duties or applicable Law;

(v)     <u>Bankruptcy Termination Events</u>:  Upon commencement of the Chapter 11 Cases, the occurrence of the below events will also constitute Termination Events:

(1)     the Bankruptcy Court enters an order granting relief from the automatic stay imposed by section 362 of the Bankruptcy Code that would materially and adversely affect the Company Parties' and their subsidiaries' ability to operate their businesses in the ordinary course, unless such order has been issued at the request of the Debtors or the Supporting Shareholder or supported by the Debtors;

(2)     the Bankruptcy Court enters an order in the Chapter 11 Cases terminating any Company Party's exclusive right to file a plan or plans of reorganization or to solicit acceptances thereof pursuant to section 1121 of the Bankruptcy Code, unless such order has been issued at the request of the Debtors or the Supporting Shareholder or supported by the Debtors;

(3)     the Bankruptcy Court enters an order denying confirmation of the Plan;

(4)     any order approving the Plan, the Disclosure Statement, or the related solicitation procedures is reversed, dismissed, vacated, modified or amended in a manner that is inconsistent in any material respect with this Agreement;

(5)     the Bankruptcy Court or a court of competent jurisdiction enters an order (A) converting the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code, (B) dismissing the Chapter 11 Cases, or (C) appointing a trustee for the Chapter 11 Cases, which order in each case has not been reversed, stayed, or vacated by the later of (I) the date on which the Bankruptcy Court confirms the Plan and (II) ten (10) Business Days after the Company Parties provide written notice to the other Parties that such order is materially inconsistent with this Agreement;

(6)     the Supporting Lenders file any motion or pleading with the Bankruptcy Court that is materially inconsistent with this Agreement, and such motion has not been withdrawn or amended within three Business Days of receipt by the filing Supporting Lenders, of written notice from the terminating Company Parties that such motion or pleading is inconsistent with this Agreement; or

(vi)    the Closing Date has not occurred by the Outside Date;

(c)     *Requisite Supporting Lenders Termination Events*.  Upon written notice from the Requisite Supporting Lenders to the other Parties delivered in accordance with <u>Section 20</u> hereof, the Requisite Supporting Lenders may terminate this Agreement

24

at any time as to all Parties after the occurrence, and during the continuation, of any of the following events:

(i)     the breach in any material respect by any Company Party or by the Supporting Shareholder of any of its covenants, obligations, representations, or warranties contained in this Agreement, in each case, that remains uncured for a period of the earlier of three Business Days after written notice from the Requisite Supporting Lenders and the Outside Date;

(ii)    the failure of the Company Parties or the Supporting Shareholder to comply with any obligation in Section 2 or any Additional Agreed Milestone;

(iii)   the entry of a judgment or order by any Governmental Body, including any regulatory authority or court of competent jurisdiction, of any ruling, judgment, or order enjoining the consummation of a material portion of the Transactions such that it would be impossible to consummate the Transactions, unless, in each case, such ruling, judgment, or order has been issued at the request of the Supporting Lenders, or, in all other circumstances, such ruling, judgment or order has been stayed, reversed, or vacated within five Business Days after such issuance;

(iv)    any Definitive Document is entered into, amended, supplemented, or otherwise modified in a manner that is inconsistent with the terms of this Agreement without the consent of the Requisite Supporting Lenders;

(v)     subject to any confidentiality restrictions, failure by any Company Party to promptly provide the Ad Hoc Group Advisors, timely responses to all reasonable diligence requests and any documentation or information that is reasonably requested by the Ad Hoc Group Advisors and such failure remains uncured for a period of five Business Days after notice from the Requisite Supporting Lenders;

(vi)    any Company Party or the Supporting Shareholder (A)(I) publicly announces or states in writing its intention to pursue, (II) consummates, or (III) enters into a binding agreement to consummate, in each case, an Alternative Transaction or (B) publicly announces, or states in writing its intention to not pursue the Transactions, subject to Section 3(b) of this Agreement;

(vii)   except as otherwise expressly set forth in this Agreement, failure of any Company Party to (A) conduct its businesses and operations in the ordinary course in a manner that is consistent with past practices and in compliance with applicable Law, (B) maintain its books and records in the ordinary course in a manner that is consistent with past practices, and in compliance with applicable Law, (C) maintain all insurance policies, or suitable replacements therefor, in full force and effect, in a manner that is consistent with past practices, and in compliance with applicable Law, (D) preserve

25

intact its business organizations and relationships with third parties (including creditors, lessors, licensors, and contract counterparties) and employees in the ordinary course in a manner that is consistent with past practices, and in compliance with appliable law; or (E) maintain all gaming and other licenses required to operate in the ordinary course of business;

(viii)   during the Support Period, the Company Parties or Supporting Shareholder (A) amend the authority, constitution, or scope of the CRO or the Special Committee, (B) fail to seek the favorable recommendation of the CRO (who shall in turn seek the favorable recommendation of the Special Committee) before approving or undertaking any Gaming Decisions, or (C) at any Licensed Operator Affiliate, terminate the employment or limit the scope of duties of, or otherwise amend or terminate any existing compensation or benefit plans or arrangements (including employment agreements) with or for the benefit of Mr. Seery (or a successor), in contravention of the favorable recommendation of the Special Committee.

(ix)   the occurrence during the Support Period of a default of any operating covenant contained in Article IX or Article X of the Existing Credit Agreement, and such default has not been cured within five Business Days of notice by the Requisite Supporting Lenders;

(x)   failure of any Company Party to maintain its good standing under the laws of the state or other jurisdiction in which it is incorporated or organized, except to the extent that any failure to maintain such Company Party's good standing arises (A) solely from the filing of the Chapter 11 Cases or (B) pursuant to the Plan;

(xi)   the Company Parties (including any Licensed Operator Affiliate) pay or cause to be paid to or for the benefit of the Supporting Shareholder fees, expenses, reimbursements, benefits, compensation, or consideration (exclusive of payment of any License-Related Rent Payments (as defined in the Transaction Term Sheet)) in the aggregate in excess of $550,000;

(xii)   failure of the Company Parties to pay all Transaction Expenses, as and when required under this Agreement, if such failure is not cured within five Business Days of notice by the Requisite Supporting Lenders, as applicable; and

(xiii)   Bankruptcy Termination Events:  Upon commencement of the Chapter 11 Cases, the occurrence of the below events will also constitute Termination Events:

(1)   any Company Party withdraws the Plan or its support therefor;

(2)   any Company Party seeks or obtains an order of the Bankruptcy Court authorizing the rejection of this Agreement;

(3)     the Bankruptcy Court enters an order granting relief from the automatic stay imposed by section 362 of the Bankruptcy Code that would materially and adversely affect the Company Parties' and their subsidiaries' ability to operate their businesses in the ordinary course;

(4)     the Bankruptcy Court enters an order invalidating, disallowing, subordinating, recharacterizing, or limiting, as applicable, any of the Supporting Lenders' Existing Term Loans or Claims arising from Existing Debt Documents;

(5)     the Bankruptcy Court enters an order in the Chapter 11 Cases terminating any Company Party's exclusive right to file a plan or plans of reorganization or to solicit acceptances thereof pursuant to section 1121 of the Bankruptcy Code;

(6)     the Bankruptcy Court enters an order denying confirmation of the Plan;

(7)     (A) any order approving the Plan, the Disclosure Statement, or the related solicitation procedures is reversed, dismissed, vacated, modified or amended in a manner that is inconsistent in any material respect with this Agreement, or (B) a motion for reconsideration, reargument, or rehearing with respect to any such order has been filed in the Bankruptcy Court and the Company Parties have failed to timely object to such motion;

(8)     the failure of the Debtors to timely file a formal objection to any motion filed with the Bankruptcy Court seeking the entry of an order (A) directing the appointment of a trustee or examiner, (B) converting the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code, or (C) dismissing the Chapter 11 Cases;

(9)     the Bankruptcy Court or a court of competent jurisdiction enters an order (A) converting the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code, (B) dismissing the Chapter 11 Cases, or (C) appointing a trustee for the Chapter 11 Cases;

(10)    any Company Party or the Supporting Shareholder files any motion or pleading with the Bankruptcy Court that is materially inconsistent with this Agreement, and such motion has not been withdrawn or amended within three Business Days of receipt by the filing Company Party or the Supporting Shareholder, as applicable, of written notice from the terminating Supporting Lenders that such motion or pleading is inconsistent with this Agreement;

(xiv)   the Closing Date has not occurred by the Outside Date.

27

(d)     *Supporting Shareholder Termination Events*.   Upon written notice from the Supporting Shareholder to the other Parties delivered in accordance with <u>Section 20</u> hereof, the Supporting Shareholder may terminate this Agreement at any time as to all Parties after the occurrence, and during the continuation, of any of the following events:

(i)      the breach in any material respect by one or more of the Supporting Lenders of any of the representations, warranties, covenants, or other obligations of such Supporting Lender set forth in this Agreement, in each case, that remains uncured for three Business Days after written notice from the Supporting Shareholder; <u>provided</u>, that if the non-breaching Supporting Lenders still own, control, or constitute, (A) before the commencement of Chapter 11 Cases, the "Required Lenders" as defined in the Existing Credit Agreement as of such date, or (B) after the commencement of Chapter 11 Cases, at least 66-2/3% of the aggregate outstanding principal amount of Existing Term Loans, such termination shall only be effective as to the breaching Supporting Lender;

(ii)     the entry of a final, non-appealable judgment or order by any Governmental Body, including any regulatory authority or court of competent jurisdiction, of any ruling, judgment, or order enjoining the consummation of a material portion of the Transactions such that it would be impossible to consummate the Transactions, unless, in each case, such ruling, judgment, or order has been issued at the request of the Supporting Shareholder, or, in all other circumstances, such ruling, judgment or order has been stayed, reversed, or vacated within five Business Days after such issuance;

(iii)    the Bankruptcy Court or a court of competent jurisdiction enters an order (A) converting the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code, (B) dismissing the Chapter 11 Cases, or (C) appointing a trustee for the Chapter 11 Cases, which order in each case has not been reversed, stayed, or vacated by the later of (I) the date on which the Bankruptcy Court confirms the Plan and (II) ten (10) Business Days after the Company Parties provide written notice to the other Parties that such order is materially inconsistent with this Agreement; or

(iv)    the Closing Date has not occurred by the Outside Date.

(e)     *Mutual Termination*. This Agreement may be terminated by mutual written agreement among the Company Parties, the Supporting Shareholder, and the Requisite Supporting Lenders.

(f)     *Automatic Termination*. This Agreement shall automatically terminate (i) upon the Closing Date or (ii) other than with the consent of the Requisite Supporting Lenders, upon the commencement of a voluntary or involuntary proceeding seeking bankruptcy, winding up, dissolution, liquidation, administration, moratorium, reorganization, assignment for the benefit of creditors or other relief in respect of

154513756_28

any Company Party, or its debts, or a substantial part of their assets, under any federal, state or foreign bankruptcy, insolvency, administrative, receivership or similar Law now or hereinafter in effect; provided, that with respect to an involuntary proceeding, such involuntary proceeding is not dismissed within a period of seven days after the filing thereof or any court order grants the relief sought in petitions for such involuntary proceeding.

(g)     *Effect of Termination*. If this Agreement is terminated pursuant to Section 6 hereof before closing the Transactions, then (i) the obligations of the terminating Parties under this Agreement shall terminate and each such Party shall be immediately released from its obligations, commitments, undertakings and agreements hereunder and will have all the rights and remedies that it would have had and will be entitled to take all actions that it would have been entitled to take had it not entered into this Agreement, including all rights under the Existing Debt Documents; provided, however, that in no event shall any such termination relieve any Party from (x) liability for its breach or non-performance of its obligations under this Agreement before termination with respect to such Party or (y) obligations under this Agreement which by their terms expressly survive termination of this Agreement.  Nothing in this Agreement shall be construed as prohibiting a Company Party or any of the Supporting Stakeholders from contesting whether any such termination is in accordance with its terms or to seek enforcement of any rights under this Agreement that arose or existed before the applicable terminate date.  Except as expressly provided in this Agreement, nothing herein is intended to, or does, in any manner waive, limit, impair, or restrict any right or ability of any Company Party or Supporting Stakeholders to protect and preserve its rights (including rights under this Agreement), remedies, and interests, including its claims against any other Party.

**Section 7.     *Good Faith Cooperation; Further Assurances; Acknowledgement*.**

Each Party shall cooperate with one another in good faith and shall coordinate their activities with one another (to the extent practicable and subject to the terms hereof) in respect of: (a) all matters concerning the negotiation and implementation of the Transactions; (b) the pursuit and support of the Transactions; and (c) the negotiation, drafting and execution and delivery of the Definitive Documents. Furthermore, subject to the terms hereof, each of the Parties shall take such actions as may be reasonably necessary to carry out the purposes and intent of this Agreement and the Transactions and shall refrain from taking any action that would frustrate the purposes and intent of this Agreement and the Transactions.

**Section 8.     *Representations and Warranties*.**

(a)     Each of the Parties, as applicable, severally and not jointly, represents and warrants to the other Parties that the following statements are true, correct and complete as of the date hereof (or as of the date a Transferee becomes a party hereto):

(i)     such Party is validly existing and in good standing under the Laws of its jurisdiction of incorporation or organization, has all requisite corporate,

29

partnership, limited liability company, or similar power and authority to enter into this Agreement, perform its obligations hereunder, and carry out the Transactions, and the execution and delivery of this Agreement by such Party and the performance of such Party's obligations under this Agreement have been duly authorized by all necessary corporate, limited liability company, partnership, or other similar action on its part;

(ii)  this Agreement is the legally valid and binding obligation of such Party, enforceable in accordance with its terms, except as the enforcement thereof may be limited by bankruptcy, insolvency, reorganization, moratorium or other similar laws relating to or affecting the rights and remedies of creditors or by general equitable principles; and

(iii)  the entry into and performance by it of, and the transaction contemplated by, this Agreement do not, and will not (assuming consummation of the Transactions), conflict in any material respect with any Law applicable to such Party.

(b)  Each Company Party severally and not jointly represents and warrants that as of the date hereof:

(i)  the Company Parties listed on Schedule 1 hereto collectively own all of the gaming facilities and related assets comprising and used in the business of the Company Parties; and

(ii)  the Licensed Operator Affiliates set forth in Section 1(dd) comprise all of the gaming operator entities involved in the business of the Company Parties.

(c)  Each Supporting Stakeholder severally and not jointly represents and warrants that, as of the date hereof (or as of the date such Supporting Stakeholder becomes a party hereto):

(i)  it is the sole beneficial owner or investment advisor or manager for the account of beneficial owners of the Existing Term Loans, other Claims against the Company Parties and Existing Interests set forth below its name on the signature page hereof (or below its name on the signature page of a Joinder Agreement for any Supporting Stakeholder that becomes a party hereto after the date hereof), or has, with respect to the beneficial owners of such Existing Term Loans, other Claims against the Company Parties and Existing Interests, (1) full power and authority to consent to matters concerning such Existing Term Loans, other Claims against the Company Parties and Existing Interests or to exchange, assign, and Transfer such Existing Term Loans and Existing Interests; or (2) full power and authority to bind, or act on behalf of, such beneficial owners with respect to such Existing Term Loans, other Claims against the Company Parties and Existing Interests;

154513756_28

(ii)    it has made no prior assignment, sale, participation, grant, encumbrance, conveyance, or other Transfer of, and has not entered into any other agreement to assign, sell, participate, grant, encumber, convey, or otherwise Transfer, in whole or in part, any portion of its right, title, or interests in any Existing Term Loans, other Claims against the Company Parties or Existing Interests that is inconsistent with the representations and warranties of such Supporting Stakeholder herein or would render such Supporting Stakeholder otherwise unable to comply with this Agreement and perform its obligations hereunder;

(iii)   the Existing Term Loans, other Claims against the Company Parties and Existing Interests set forth below its signature hereto (or below its name on the signature page of a Joinder Agreement for any Supporting Stakeholder that becomes a party hereto after the date hereof) are free and clear of any pledge, lien, security interest, charge, encumbrance, claim, equity, option, proxy, voting restriction, right of first refusal, or other limitation on disposition or encumbrance of any kind, that would adversely affect in any way its performance of its obligations contained in this Agreement at the time such obligations are required to be performed; and

(iv)    it (and any investment funds, accounts, and other investment vehicles managed by such Party) directly or beneficially owns or controls or investment advisor or manager for the account of beneficial owners no Existing Term Loans, other Claims against the Company Parties or Existing Interests that have not been set forth on the signature page hereof (or below its name on the signature page of a Joinder Agreement for any Supporting Stakeholder that becomes a party hereto after the date hereof).

**Section 9.    *Amendments and Waivers*.**  This Agreement may not be modified, amended, or supplemented except in a writing signed by the Company Parties and the Requisite Supporting Lenders; provided, that any modification, amendment, waiver or supplement (a) to this Section 9 requires the consent of each Party; (b) to the definition of "Requisite Supporting Lenders" requires the consent of each Supporting Lender; (c) that adversely affects the economic treatment of the Existing Term Loans held by any Party in a manner that is disproportionate to the Existing Term Loans held by similarly situated parties shall require the written consent of such Party; and (d) to Section 5, Section 6(d), the PokerCo Stalking Horse Agreements, or the Definitive Documents solely as they relate to the "Other Shareholder Provisions" in the Transaction Term Sheet, require the consent of the Supporting Shareholder.  Any modification, amendment, waiver, or supplement to a Definitive Document that is in effect in accordance with the terms thereof will be governed as set forth in such Definitive Document.  In determining whether any consent or approval has been given or obtained by the Requisite Supporting Lenders or the Supporting Shareholder, any party that is in breach of its covenants, obligations, or representations under this Agreement shall be excluded from such determination.

**Section 10.    *Effectiveness*.**  This Agreement shall become effective and binding upon each Party upon the Support Effective Date or, if such Party joins this Agreement via a Joinder Agreement, upon the date of such Joinder Agreement.

**Section 11.**     *GOVERNING LAW; JURISDICTION; WAIVER OF JURY TRIAL.* THIS AGREEMENT AND ANY DISPUTE, CLAIM, COUNTERCLAIM OR CAUSE OF ACTION (WHETHER IN CONTRACT, TORT OR OTHERWISE AND WHETHER IN EQUITY OR AT LAW) ARISING UNDER, OUT OF OR IN CONNECTION WITH THIS AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE INTERNAL LAWS OF THE STATE OF NEW YORK, WITHOUT REGARD TO ANY CONFLICTS OF LAW PROVISIONS WHICH WOULD REQUIRE THE APPLICATION OF THE LAW OF ANY OTHER JURISDICTION. BY EXECUTION AND DELIVERY OF THIS AGREEMENT, EACH OF THE PARTIES HEREBY IRREVOCABLY AND UNCONDITIONALLY AGREES THAT ANY LEGAL ACTION, SUIT, DISPUTE, OR PROCEEDING (WHETHER IN CONTRACT, TORT OR OTHERWISE AND WHETHER IN EQUITY OR AT LAW) ARISING UNDER, OUT OF OR IN CONNECTION WITH THIS AGREEMENT SHALL BE BROUGHT IN THE FEDERAL OR STATE COURTS LOCATED IN THE STATE OF NEW YORK, COUNTY OF NEW YORK, AND THE PARTIES HERETO IRREVOCABLY CONSENT TO THE JURISDICTION OF SUCH COURTS AND WAIVE ANY OBJECTIONS AS TO VENUE OR INCONVENIENT FORUM. EACH PARTY IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING (WHETHER IN CONTRACT, TORT OR OTHERWISE AND WHETHER IN EQUITY OR AT LAW) ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.

**Section 12.**     *Specific Performance/Remedies.* Each Party hereto recognizes and acknowledges that a breach by it of any covenants or agreements contained in this Agreement will cause other Parties to sustain damages for which such Parties would not have an adequate remedy at law for money damages, and therefore each Party agrees that in the event of any such breach, in addition to any other remedy to which such non-breaching Party may be entitled, including but not limited to monetary damages, at Law or in equity, such non-breaching Party shall be entitled, to the extent available, to the remedy of specific performance of such covenants and agreements including without limitation, to seek the order of any court of competent jurisdiction requiring any Party to comply promptly with any of its obligations hereunder.   Each Party agrees to waive any requirement for the securing or posting of a bond in connection with such remedy.

**Section 13.**     *Disclosure; Publicity; Non-Disparagement.* The Company Parties shall submit drafts to the Ad Hoc Group Advisors of any press releases and public documents that constitute disclosure of the existence or terms of this Agreement or any amendment to the terms of this Agreement at least two Business Days before making any such disclosure, and shall afford them a reasonable opportunity under the circumstances to comment on such documents and disclosures and shall incorporate any such reasonable comments in good faith; provided, that nothing contained in this Section 13 shall apply to disclosures made by the Company Parties to any Supporting Stakeholder in furtherance of the Transactions.  No Party or its advisors shall use the name of any Supporting Lender in any public manner (including in any press release or public filing) with respect to this Agreement, the Transactions, or any of the Definitive Documents without such Supporting Lender's consent.  During the Support Period, no Party shall make directly or indirectly, any public statement, written or oral, that materially disparages and adversely affects the business, products, services, or reputation of the Company Parties, the Supporting Shareholder, the Supporting Lenders, or their affiliates, or any of their respective officers, managers, directors, or employees; provided, that nothing in this Section 13 shall prevent such

32

Entity from (a) giving truthful testimony or making truthful statements in the course of any legal proceeding compelled through subpoena, (b) providing truthful information pursuant to investigation by any Governmental Body, (c) engaging in the conduct described in Section 26 below, or (d) otherwise complying with applicable Law.

**Section 14.    *Survival*.** Notwithstanding the termination of this Agreement pursuant to Section 6 hereof, the agreements and obligations of the Parties in Section 12, Section 13, this Section 14, Section 16, Section 17, Section 18,  Section 19, Section 20, Section 21, Section 22, Section 24, Section 25, Section 26, and Section 27 (solely with respect to accrued Transaction Expenses as of the date of termination) hereof shall survive such termination and shall continue in full force and effect in accordance with the terms hereof.

**Section 15.    *Headings*.** The headings of the sections, paragraphs, and subsections of this Agreement are inserted for convenience only and shall not affect the interpretation hereof or, for any purpose, be deemed a part of this Agreement.

**Section 16.    *Successors and Assigns; Severability; Several Obligations*.** This Agreement is intended to bind and inure to the benefit of the Parties and their respective successors, permitted assigns, heirs, executors, administrators, and representatives; provided, however, that nothing contained in this Section 16 shall be deemed to permit sales, assignments, or other Transfers of the Existing Loans or the Existing Interests other than in accordance with Section 2 of this Agreement. If any provision of this Agreement, or the application of any such provision to any Entity or circumstance, shall be held invalid or unenforceable in whole or in part, such invalidity or unenforceability shall attach only to such provision or part thereof and the remaining part of such provision hereof and this Agreement shall continue in full force and effect; provided, however, that nothing in this Section 16 shall be deemed to amend, supplement, or otherwise modify, or constitute a waiver of any default under this Agreement.  In the event of any inconsistencies between the provisions of this Agreement and the provisions of the Transaction Term Sheet, the provisions of the Transaction Term Sheet shall govern and prevail.

**Section 17.    *No Third-Party Beneficiaries*.** Unless expressly stated herein, this Agreement shall be solely for the benefit of the Parties and no other Entity shall be a third-party beneficiary hereof.

**Section 18.    *Prior Negotiations; Entire Agreement*.** This Agreement, including any Exhibits and schedules hereto, constitutes the entire agreement of the Parties, and supersedes all other prior negotiations and agreements, with respect to the subject matter hereof, except that the Parties acknowledge that any confidentiality agreements heretofore executed between the Company Parties and the Supporting Stakeholders shall continue in full force and effect.

**Section 19.    *Counterparts*.** This Agreement may be executed in several counterparts, each of which shall be deemed to be an original, and all of which together shall be deemed to be one and the same agreement. Execution copies of this Agreement may be delivered by e-mail, which shall be deemed to be an original for the purposes of this Section 19.  Without in any way limiting the provisions hereof, additional Supporting Stakeholders may elect to become Parties by executing and delivering to the Company Parties a Joinder Agreement in accordance with the terms hereof. Such additional holder shall become a Party to this Agreement in accordance with the terms of this Agreement.  Delivery of an executed signature page of this Agreement by facsimile, ".pdf" or

other electronic transmission will be effective as delivery of a manually executed counterpart of this Agreement.  The words "execution," "signed," "signature," "delivery," and words of like import in this Agreement shall be deemed to include electronic signatures or electronic records, each of which shall be of the same legal effect, validity or enforceability as a manually executed signature or the use of a paper-based recordkeeping system, as the case may be, to the extent and as provided for in any applicable Law, including the Federal Electronic Signatures in Global and National Commerce Act, the New York State Electronic Signatures and Records Act, or any other similar state law based on the Uniform Electronic Transactions Act.

**Section 20.**   *Notices*.  All notices, requests, demands, document deliveries, and other communications under this Agreement shall be in writing and shall be deemed to have been duly given, provided or made (a) when delivered personally; (b) when sent by electronic mail; or (c) two Business Days after deposit with an overnight courier service, with postage prepaid to the Parties at the following addresses (or at such other addresses for a Party as shall be specified by like notice):

If to the Company Parties:

> RunItOneTime LLC
> 2026 Montessori Street
> Las Vegas, Nevada 89117

with a copy to (which shall not constitute notice):

> Latham & Watkins LLP
> 1271 Avenue of the Americas
> New York, New York 10020
> Attn:        Jeff Bjork, Andrew Sorkin, Helena Tseregounis
> Email:      jeff.bjork@lw.com
>                  andrew.sorkin@lw.com
>                  helena.tseregounis@lw.com

If to the Supporting Lenders:

To each Supporting Lender at the addresses or e-mail addresses set forth below the Supporting Lender's signature page to this Agreement (or to the signature page to a Joinder Agreement)

with a copy to (which shall not constitute notice):

> Ropes & Gray LLP
> 1211 Avenue of the Americas
> New York, New York 10036
> Attn:        Ryan Preston Dahl, Leonard Klingbaum, and Daniel Gwen
> Email:      ryan.dahl@ropesgray.com
>                  leonard.klingbaum@ropesgray.com
>                  daniel.gwen@ropesgray.com

154513756_28

If to the Supporting Shareholder:

> Eric Persson
> Email:    Eric@maverickgaming.com

with a copy to (which shall not constitute notice):

> Womble Bond Dickinson LLP
> 3993 Howard Hughes Parkway
> Suite 600
> Las Vegas, NV US 89169
> Attn:    Glenn Light
> Email:    Glenn.Light@wbd-us.com

**Section 21.     *Reservation of Rights; No Admission*.** Subject to and except as expressly provided in this Agreement or in any amendment thereof agreed upon by the Parties pursuant to the terms hereof, nothing herein is intended to, or does, in any manner waive, limit, impair, or restrict the ability of each of the Parties to protect and preserve its rights, remedies, and interests, including its claims against any of the other Parties (or their respective Affiliates or subsidiaries).  Without limiting the foregoing sentence in any way, if the Transactions are not consummated, or if this Agreement is terminated for any reason, nothing in this Agreement shall be construed as a waiver by any Party of any or all of such Party's rights, remedies, claims, and defenses, and the Parties expressly reserve any and all of their respective rights, remedies, claims, and defenses.

**Section 22.     *Representation by Counsel*.** Each Party acknowledges that it has been represented by counsel with respect to this Agreement and the Transactions.  Accordingly, any applicable Law that would provide any Party with a defense to the enforcement of the terms of this Agreement against such Party based upon lack of legal counsel shall have no application and is expressly waived.  No Party shall be considered to be the drafter of this Agreement or any of its provisions for the purpose of any applicable Law would, or might cause, any provision to be construed against such Party.

**Section 23.     *E-mail Consents*.**  If a written consent, acceptance, approval, or waiver is required pursuant to or contemplated by this Agreement, including a written approval by the Company Parties or the applicable Supporting Stakeholders, then such written consent, acceptance, approval, or waiver shall be deemed to have occurred if, by agreement between counsel to the applicable Parties submitting and receiving such consent, acceptance, approval, or waiver, it is conveyed in writing (including e-mail) between each such counsel without representations or warranties of any kind on behalf of such counsel.

**Section 24.     *No Recourse*.** This Agreement may only be enforced against the named parties hereto (and then only to the extent of the specific obligations undertaken by such parties in this Agreement).  All causes of action (whether in contract, tort, equity or any other theory) that may be based upon, arise out of or relate to this Agreement, or the negotiation, execution or performance of this Agreement, may be made only against the Entity that are expressly identified as parties hereto (and then only to the extent of the specific obligations undertaken by such parties herein); provided, however, that the foregoing shall not apply to any Definitive Documents

executed in connection with this Agreement. No past, present or future direct or indirect director, manager, officer, employee, incorporator, member, partner, stockholder, equity holder, trustee, Affiliate, controlling Entity, agent, attorney or other representative of any Party (including any Entity negotiating or executing this Agreement on behalf of a Party), nor any past, present or future direct or indirect director, manager, officer, employee, incorporator, member, partner, stockholder, equity holder, trustee, Affiliate, controlling Entity, agent, attorney or other representative of any of the foregoing and in their capacities as such (other than any of the foregoing that is a Party), shall have any liability with respect to this Agreement or with respect to any Proceeding (whether in contract, tort, equity or any other theory that seeks to "pierce the corporate veil" or impose liability of an Entity against its owners or Affiliates or otherwise) that may arise out of or relate to this Agreement, or the negotiation, execution or performance of this Agreement, except for claims related to any act or omission constituting actual fraud, gross negligence, or willful misconduct.

**Section 25.** *Relationship among Parties*. Notwithstanding anything herein to the contrary, the duties and obligations of the Supporting Stakeholders under this Agreement shall be several, not joint. It is understood and agreed that no Supporting Stakeholder has any duty of trust or confidence of any kind or form with respect to any other Supporting Stakeholder or the Company Parties and, except as expressly provided in this Agreement, there are no commitments between or among them. In this regard, it is understood and agreed that any Supporting Stakeholder may trade in the Existing Loans or Existing Interests without the consent of the Company Parties or any other Supporting Stakeholder, subject to applicable Laws and the terms of this Agreement. No prior history, pattern, or practice of sharing confidences between or among the Supporting Stakeholders or the Company Parties shall in any way affect or negate this Agreement. No Supporting Stakeholder shall, as a result of its entering into and performing its obligations under this Agreement, be deemed to be part of a "group" (as that term is used in Section 14(d) of the Exchange Act and the rules and regulations promulgated thereunder) with any of the other Supporting Stakeholders.

**Section 26.** *Confidentiality and Redactions*. No Party shall disclose to any Entity (including for the avoidance of doubt, any other Supporting Stakeholder) the principal amount or percentage of the Existing Term Loans or Existing Interests held by any Supporting Stakeholder; provided, however, that (a) a Party may disclose the foregoing information as may be required by applicable Law, (b) the Parties shall be permitted to disclose the foregoing information at any time to legal, accounting, financial and other advisors to the Company Parties and the Ad Hoc Group Advisors, and (c) the Company Parties shall be permitted to disclose at any time (i) the foregoing information on a confidential basis to its Affiliates and (ii) the aggregate principal amount of, and aggregate percentage of, any class of the Existing Term Loans or Existing Interests held by the Supporting Stakeholders collectively. The Supporting Stakeholders hereby consent to the disclosure of the execution, terms and contents of this Agreement by the Company Parties in the Definitive Documents or as otherwise required by Law; provided, further, that (a) if any of the Company Parties determines that they are required to attach a copy of this Agreement, any Joinder Agreement to any Definitive Documents or any other filing or similar document relating to the transactions contemplated hereby, they will redact any reference to or concerning a specific Supporting Lender or such Supporting Lender's holdings of Existing Loans or Existing Interests and (b) if disclosure of additional identifying information of any Supporting Lender is required by applicable Law, advance notice of the intent to disclose, if permitted by applicable Law, shall be given by the disclosing Party to each affected Supporting Lender (who shall have the right to seek

a protective order before disclosure). The Company Parties further agree that such information shall be redacted from "closing sets" or other representations of the fully executed Agreement or any Joinder Agreement, which redacted closing sets may be shared with the Supporting Stakeholders.

**Section 27.** *Transaction Expenses*. Subject to the terms of the applicable engagement letter or fee reimbursement letter, the Company Parties hereby agree, on a joint and several basis, to pay in cash, the Transaction Expenses as follows:

(a)     all Transaction Expenses shall be paid in full in cash on the Support Effective Date;

(b)     on the day before commencement of the Chapter 11 Cases, all accrued and unpaid Transaction Expenses through that time; and

(c)     during the pendency of the Chapter 11 Cases, in accordance with an order of the Bankruptcy Court.

**Section 28.** *Identified Business Units or Trading Desks*. If a Supporting Lender enters into or accedes to this Agreement through an identified business unit or trading desk in respect of any debt (as specified in the signature page to this Agreement or a Joinder to this Agreement), then the terms of this Agreement shall apply only to that identified business unit or trading desks and not any other business units or trading desks within the legal entity which has not signed or acceded to this Agreement (in accordance with the terms of this Agreement) separately in respect of any debt or other instrument which it legally or beneficially owns and, therefore, that Supporting Lender shall not be required to procure compliance with this Agreement on behalf of such other business units or trading desks within that legal entity.

*[Signature Pages Follow]*

154513756_28

IN WITNESS WHEREOF, the Parties have caused this Agreement to be executed and delivered by their respective duly authorized officers, solely in their respective capacity as officers of the undersigned and not in any other capacity, as of the date first set forth above.

**RUNITONETIME LLC**,
a Washington limited liability company

By: _____
Eric Persson, Chief Executive Officer

[Signature Page to Transaction Support Agreement]

**MAVERICK GAMING HOLDCO, INC.,**
a Washington corporation

By: _____
Eric Persson, Chief Executive Officer

**15743 AMBAUM LLC**,
a Washington limited liability company

By:     Maverick Wizards LLC, its Manager

        By:     Maverick Washington LLC, its
               Manager
            By:     RunItOneTime LLC, its
                   Manager

                     By: _____
                          Eric Persson, Lead Manager

**EVERGREEN ENTERTAINMENT CORPORATION**,
a Washington corporation

By: _____
     Eric Persson, Secretary

**GRAND CENTRAL CASINO, INC.**,
a Washington corporation

By: _____
     Eric Persson, Secretary

**GRAND CENTRAL PROPERTIES EVERETT LLC**,
a Washington limited liability company

By:     Great American Gaming Corporation, its Manager

        By: _____
           Eric Persson, Secretary

[Signature Page to Transaction Support Agreement]

**GRAND CENTRAL PROPERTIES TACOMA LLC**,
a Washington limited liability company

By:    Great American Gaming Corporation, its Manager

    By: _____
         Eric Persson, Secretary

**GRAND CENTRAL PROPERTIES TUKWILA LLC**,
a Washington limited liability company

By:    Great American Gaming Corporation, its Manager

    By: _____

**GREAT AMERICAN GAMING CORPORATION**,
a Washington corporation

By: _____
    Eric Persson, Secretary

**MAVERICK AMERICAN LLC**,
a Nevada limited liability company

By:    Maverick Washington LLC, its Manager

    By:    RunItOneTime LLC, its Manager

        By: _____

**MAVERICK INDIANOLA LLC**,
a Nevada limited liability company

By:    Maverick Washington LLC, its Manager

    By:    RunItOneTime LLC, its Manager

        By: _____
           Eric Persson, Lead Manager

**MAVERICK CARIBBEAN LLC**,
a Nevada limited liability company

By:    Maverick Washington LLC, its Manager

       By:    RunItOneTime LLC, its Manager

              By:      _____
                             Eric Persson, Lead Manager


**MAVERICK COLORADO LLC**,
a Nevada limited liability company

By:    RunItOneTime LLC, its Manager

       By:    _____


**MAVERICK ELKO LLC**,
a Nevada limited liability company

By:    Maverick NV LLC, its Manager

       By:    RunItOneTime LLC, its Manager

              By:    _____


**MAVERICK GOLD LLC**,
a Nevada limited liability company

By:    Maverick Washington LLC, its Manager

       By:    RunItOneTime LLC, its Manager

               By:      _____
                             Eric Persson, Lead Manager

**MAVERICK KIRKLAND LLC**,
a Nevada limited liability company

By:    Maverick Caribbean LLC, its Manager

    By:    Maverick Washington LLC, its
    Manager
       By:    RunItOneTime LLC, its
       Manager

          By:    Eric Persson, Lead
                Manager

**MAVERICK KIRKLAND II LLC**,
a Nevada limited liability company

By:    Maverick Caribbean LLC, its Manager

    By:    Maverick Washington LLC, its
    Manager
       By:    RunItOneTime LLC, its
       Manager

          By:    Eric Persson, Lead
                Manager

**MAVERICK LAKEWOOD LLC**,
a Nevada limited liability company

By:    Maverick Caribbean LLC, its Manager

    By:    Maverick Washington LLC, its
    Manager
       By:    RunItOneTime LLC, its
       Manager

          By:    Eric Persson, Lead
                Manager

**MAVERICK DESIGN LLC**,
a Nevada limited liability company

By:    RunItOneTime LLC, its Manager

    By:    Eric Persson, Lead Manager

[Signature Page to Transaction Support Agreement]

**E.GADS, LLC**,
a Nevada limited liability company

By:      Maverick Design LLC, its Manager

      By:      RunItOneTime LLC, its Manager

            By: _____
                 Eric Persson, Lead Manager

**MAVERICK NV LLC**,
a Nevada series limited liability company

By:      RunItOneTime LLC, its Manager

      By: _____
          Eric Persson, Lead Manager

**MAVERICK ROMAN LLC**,
a Nevada limited liability company

By:      Maverick Washington LLC, its Manager

      By:      RunItOneTime LLC, its Manager

            By: _____
                 Eric Persson, Lead Manager

**MAVERICK TUKWILA LLC**,
a Nevada limited liability company

By:      Maverick Caribbean LLC, its Manager

      By:      Maverick Washington LLC, its Manager

         By:      RunItOneTime LLC, its Manager

            By: _____
                 Eric Persson, Lead Manager

[Signature Page to Transaction Support Agreement]

**MAVERICK WASHINGTON LLC**,
a Nevada limited liability company

By:    RunItOneTime LLC, its Manager

      By:    _____
           Eric Persson, Lead Manager

**MAVERICK WENDOVER LLC**,
a Nevada limited liability company

By:    Maverick NV LLC, its Manager

      By:    RunItOneTime LLC, its Manager

           By:    _____
                Eric Persson, Lead Manager

**MAVERICK WIZARDS LLC**,
a Nevada limited liability company

By:    Maverick Washington LLC, its Manager

      By:    RunItOneTime LLC, its Manager

           By:    _____
                Eric Persson, Lead Manager

**MAVERICK YAKIMA LLC**,
a Nevada limited liability company

By:    Maverick Caribbean LLC, its Manager

      By:    Maverick Washington LLC, its Manager

           By:    RunItOneTime LLC, its Manager

                By:    _____
                    Eric Persson, Lead Manager

[Signature Page to Transaction Support Agreement]

**MAVERICK Z CASINOS LLC**,
a Nevada limited liability company

By:    Maverick Colorado LLC, its Manager

      By:    RunItOneTime LLC, its Manager

           By: _____
               Eric Persson, Lead Manager

**NEVADA GOLD & CASINOS, INC.**,
a Nevada corporation

By: _____
    Eric Persson, Secretary

**NG WASHINGTON, LLC**,
a Washington limited liability company

By:    Nevada Gold & Casinos, Inc., its Manager

      By: _____
        Eric Persson, Secretary

**NG WASHINGTON II, LLC**,
a Washington limited liability company

By:    NG Washington II Holdings, LLC, its Manager

      By:    Nevada Gold & Casinos, Inc., its
           Manager

           By: _____
               Eric Persson, Secretary

**NG WASHINGTON II HOLDINGS, LLC**,
a Delaware limited liability company

By:    Nevada Gold & Casinos, Inc., its Manager

      By: _____
        Eric Persson, Secretary

[Signature Page to Transaction Support Agreement]

**NG WASHINGTON III, LLC**,
a Washington limited liability company

By:   Nevada Gold & Casinos, Inc., its Manager

    By: _____
          Eric Persson, Secretary

**PAIR O' DICE INVESTMENTS LLC**,
a Washington limited liability company

By:   Great American Gaming Corporation, its
Manager

    By: _____
          Eric Persson, Secretary

**SKYWAY CENTER LLC**,
a Washington limited liability company

By:   Maverick Roman LLC, its Manager

    By:   Maverick Washington LLC, its
        Manager
        By:   RunItOneTime LLC, its
            Manager

            By: _____
                Eric Persson, Lead
                Manager

**THE ROYAL CLUB LIMITED LIABILITY
COMPANY**,
a Washington limited liability company

By:   Maverick Roman LLC, its Manager

    By:   Maverick Washington LLC, its
        Manager
        By:   RunItOneTime LLC, its
            Manager

            By: _____
                Eric Persson, Lead
                Manager

[Signature Page to Transaction Support Agreement]

**CCI LEASING, LLC**,
a Utah limited liability company

By:    Maverick Wendover LLC, its Manager

    By:    Maverick NV LLC, its Manager

        By:    RunItOneTime LLC, its
        Manager

            By:    _____
            Eric Persson, Lead
            Manager

**UTAH TRAILWAYS CHARTER BUS
COMPANY, LLC**,
a Utah limited liability company

By:    Wendover Transportation, LLC, its Manager

    By:    Maverick Wendover LLC, its Manager

        By:    Maverick NV LLC, its Manager

            By:    RunItOneTime LLC its
            Manager

                By:    _____
                Eric Persson, Lead
                Manager

**WENDOVER TRANSPORTATION,
LLC**, a Nevada limited liability company

By:    Maverick Wendover LLC, its Manager

    By:    Maverick NV LLC, its Manager

        By:    RunItOneTime LLC, its
        Manager

            By:    _____
             Eric Persson, Lead
             Manager

**CASINO CARAVANS, INC.,**
a Utah corporation

By: _____
      Eric Persson, Secretary


**COLORADO MG 1031 LLC,**
a Colorado limited liability company

By: _____
      Eric Persson, Manager


**GOLD COUNTRY OPERATOR, LLC,**
a Nevada limited liability company

By: _____
      Eric Persson, Manager


**GRAND Z CASINO OPERATOR LLC,**
a Nevada limited liability company

By: _____
      Eric Persson, Manager


**JOHNNY Z CASINO OPERATOR LLC,**
a Nevada limited liability company

By: _____
      Eric Persson, Manager


[Signature Page to Transaction Support Agreement]

**RED GARTER OPERATOR, LLC**,
a Nevada limited liability company

By: _____
Eric Persson, Manager

**RED LION OPERATOR, LLC**,
a Nevada limited liability company

By: _____
Eric Persson, Manager

**WENDOVER NUGGET OPERATOR, LLC**,
a Nevada limited liability company

By: _____
Eric Persson, Manager

**Z CASINO BLACK HAWK OPERATOR LLC**,
a Nevada limited liability company

By: _____
Eric Persson, Manager

**HIGH DESERT OPERATOR LLC**,
a Nevada limited liability company

By: _____
Eric Persson, Manager

[Signature Page to Transaction Support Agreement]

**MAVERICK EVERGREEN LLC,**
a Nevada limited liability company

By: its Manager
Maverick Washington LLC
a Washington limited liability company

    By: its Manager
    RunItOneTime LLC
    a Washington limited liability company

    Eric Persson, Lead Manager


**WASHINGTON GAMING, INC.,**
a Washington corporation

By: Eric Persson, President


**14040 GAMING, LLC,**
a Washington limited liability company

By: its Manager
Washington Gaming, Inc.
a Washington Corporation

By: Eric Persson, President

**PUGET SOUND GAMING, LLC,**
a Washington limited liability company

By: its Manager
Washington Gaming, Inc.
a Washington Corporation

By: _____
Eric Persson, President


**EPSTEIN GAMING, LLC,**
a Washington limited liability company

By: its Manager
Puget Sound Gaming, LLC
a Washington limited liability company

    By: its Manager
    Washington Gaming, Inc.
    a Washington Corporation

    By: _____
    Eric Persson, President


**LA CENTER GAMING, LLC,**
a Washington limited liability company

By: its Manager
Puget Sound Gaming, LLC
a Washington limited liability company

    By: its Manager
    Washington Gaming, Inc.
    a Washington Corporation

    By: _____
Eric Persson, President

**TACOMA CASINO, L.L.C.,**
a Washington limited liability company

By: its Manager
Puget Sound Gaming, LLC
a Washington limited liability company

    By: its Manager
    Washington Gaming, Inc.
    a Washington Corporation

    By: _____
    Eric Persson, President


**GAMING CONSULTANTS, INC.,**
a Washington corporation


By: _____
Eric Persson, Secretary


**GAMING MANAGEMENT, INC.,**
a Washington limited liability company


By: _____
Eric Persson, Secretary

[Signature Page to Transaction Support Agreement]

**RIVERSIDE CASINO, INC.,**
a Washington corporation

By: _____
Eric Persson, Secretary

**PETE'S FLYING ACES, INC.,**
a Washington corporation

By: _____
Eric Persson, Secretary

**MAVERICK ACQUISITION CANADA ULC.,**

By: _____
Eric Persson, Director

[Signature Page to Transaction Support Agreement]

**MYERS LLC,**
a Washington limited liability company

By: its Manager
Maverick All Star LLC
a Nevada limited liability company

    By: its Manager
    Maverick Washington LLC
    a Nevada limited liability company

        By: its Manager
        RunItOneTime LLC
        a Washington limited liability company

        Eric Persson, Lead Manager

**MAVERICK ALL STAR LLC,**
a Washington limited liability company

    By: its Manager
    Maverick Washington LLC
    a Nevada limited liability company

        By: its Manager
        RunItOneTime LLC
        a Washington limited liability company

        Eric Persson, Lead Manager

**MAVERICK POKER OPERATOR LLC**,
a Washington limited liability company

By:    RunItOneTime LLC, its Manager

    By:

        Eric Persson, Lead Manager

[Signature Page to Transaction Support Agreement]

**COLORADO RESORTS OPERATOR LLC,**
a Nevada limited liability company

By: _____
Eric Persson, Manager

**ELKO RESORTS OPERATOR, LLC,**
a Nevada limited liability company

By: _____
Eric Persson, Manager

**WENDOVER RESORTS OPERATOR, LLC,**
a Nevada limited liability company

By: _____
Eric Persson, Manager

**ERIC PERSSON**, in his personal capacity as the Supporting Shareholder

By: _____

Eric Persson

[Signature Page to Transaction Support Agreement]

*Execution Version*

## <u>Schedule 1</u>
## Company Parties

1.  Maverick Gaming HoldCo, Inc.
2.  RunItOneTime LLC (f/k/a Maverick Gaming LLC)
3.  Maverick Colorado LLC
4.  Maverick Z Casinos LLC
5.  Colorado MG 1031 LLC
6.  Maverick Washington LLC
7.  Maverick Gold LLC
8.  Nevada Gold & Casinos, Inc.
9.  NG Washington III, LLC
10. NG Washington, LLC
11. NG Washington II Holdings, LLC
12. NG Washington II, LLC
13. Maverick Wizards LLC
14. 15743 Ambaum LLC
15. Maverick Roman LLC
16. The Royal Club Limited Liability Company
17. Skyway Center LLC
18. Maverick Indianola LLC
19. Maverick All Star LLC
20. Myers LLC
21. Maverick Evergreen LLC
22. Maverick Acquisition Canada ULC
23. Washington Gaming, Inc.
24. 14040 Gaming, LLC
25. Riverside Casino, Inc.
26. Gaming Consultants, Inc.
27. Gaming Management, Inc.
28. Puget Sound Gaming, LLC
29. Epstein Gaming LLC
30. LA Center Gaming, LLC
31. Pete's Flying Aces, Inc.
32. Tacoma Casino, L.L.C.
33. Maverick American LLC
34. Great American Gaming Corporation
35. Evergreen Entertainment Corporation
36. Grant Central Properties Everett LLC
37. Pair O'Dice Investments LLC
38. Grand Central Properties Tukwila LLC
39. Grand Central Properties Tacoma LLC
40. Grand Central Casino, Inc.
41. Maverick Caribbean LLC
42. Maverick Tukwila LLC
43. Maverick Yakima LLC

44. Maverick Kirkland II LLC
45. Maverick Kirkland LLC
46. Maverick Lakewood LLC
47. Maverick NV LLC
48. Maverick Elko LLC
49. Maverick Wendover LLC
50. CCI Leasing, LLC
51. Wendover Transportation, LLC
52. Utah Trailways Charter Bus Company, LLC
53. Casino Caravans, Inc.
54. Maverick Design LLC
55. e.gads, LLC
56. Maverick Poker Operator LLC

**Licenssed Operator Affiliates**
57. Colorado Resorts Operator LLC
58. Grand Z Casino Operator LLC
59. Johnny Z Casino Operator LLC
60. Z Casino Black Hawk Operator LLC
61. Elko Resorts Operator, LLC
62. Gold Country Operator, LLC
63. High Desert Operator LLC
64. Red Lion Operator, LLC
65. Wendover Resorts Operator, LLC
66. Red Garter Operator, LLC
67. Wendover Nugget Operator, LLC

## **EXHIBIT A**

**Transaction Term Sheet**

*Execution Version*

## RUNITONETIME LLC AND ITS AFFILIATES

### TRANSACTION TERM SHEET

This term sheet (this "Term Sheet"), is the Transaction Term Sheet defined in the *Transaction Support Agreement*, dated June 25, 2025 (the "TSA") to which this Term Sheet is attached, and sets forth the material terms and conditions of proposed transactions (the "Transactions") providing for the restructuring of the existing secured indebtedness and other obligations of RunItOneTime LLC (together with certain affiliates listed in the TSA, the "Company Parties"). Capitalized terms used but not otherwise defined herein have the meanings set forth in the TSA.

This Term Sheet does not include a description of or address all terms, conditions, or other provisions that would be required in connection with the Transactions or are to be contained in the Definitive Documents governing the Transactions, which remain subject to negotiation and completion in accordance with the TSA and applicable Law.  The Definitive Documents shall contain terms and conditions that are consistent with this Term Sheet.

THE REGULATORY, TAX, ACCOUNTING, AND OTHER LEGAL AND FINANCIAL MATTERS AND EFFECTS RELATED TO THE TRANSACTIONS OR ANY RELATED TRANSACTIONS OR SIMILAR TRANSACTION HAVE NOT BEEN FULLY EVALUATED AND ANY SUCH EVALUATION MAY AFFECT THE TERMS AND STRUCTURE OF ANY OF THE TRANSACTIONS OR RELATED TRANSACTIONS.

THIS TERM SHEET DOES NOT CONSTITUTE (NOR SHALL IT BE CONSTRUED AS) AN OFFER WITH RESPECT TO ANY SECURITIES, LOANS, OR OTHER INSTRUMENTS OR A SOLICITATION OF ACCEPTANCES OR REJECTIONS AS TO ANY CHAPTER 11 PLAN, IT BEING UNDERSTOOD THAT SUCH AN OFFER OR SOLICITATION, IF ANY, WILL BE MADE ONLY IN COMPLIANCE WITH APPLICABLE LAW, INCLUDING THE BANKRUPTCY CODE.  NOTHING CONTAINED IN THIS TERM SHEET SHALL BE AN ADMISSION OF FACT OR LIABILITY OR, UNTIL THE OCCURRENCE OF THE SUPPORT EFFECTIVE DATE UPON THE TERMS DESCRIBED HEREIN, DEEMED BINDING ON ANY OF THE PARTIES HERETO.

| Overview | |
|---|---|
| **Transactions Summary** | Pursuant to the TSA, and subject to the terms and conditions thereof, the Parties have agreed to implement, consummate, support and consent to, as applicable, the Transactions, including, *inter alia*, (a) the commencement of voluntary cases (the "Chapter 11 Cases") by some or all of the Company Parties (as debtors and debtors in possession, the "Debtors") pursuant to chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in a United States Bankruptcy Court to be determined with the consent of the Requisite Supporting Lenders (the "Bankruptcy Court"); (b) a sale of PokerCo (as defined below) under section 363 of the Bankruptcy Code to be proposed by the Debtors in the Chapter 11 Cases; (c) the sale or other disposition of MainCo (as defined below); (d) the sale or other disposition of LeaseCo (as defined |

| | |
|---|---|
| | below); (e) the transition of certain gaming licenses from Mr. Eric Persson (and his heirs, successors, and assigns, the "<u>Supporting Shareholder</u>") and Mr. Justin L. Beltram; (f) the entry into a Transition Services Agreement with the Supporting Shareholder; and (g) any other transactions, documents, or steps reasonably necessary to consummate any of the foregoing.<br><br>The Transactions shall result in the following allocation of assets:<br><br>• "<u>PokerCo</u>" to be composed of Aces Poker Lakewood, Aces Poker Mountlake Terrace, Caribbean Casino, Caribbean Cardroom, including working capital required to operate the businesses (to the extent available);<br><br>• "<u>LeaseCo</u>" to be composed of the properties subject to the Blue Owl Master Lease; and<br><br>• "<u>MainCo</u>" to be composed of the remainder of the Company Parties' existing businesses, interests, and tangible and intangible assets, including (i) "Maverick" and "Aces" trademarks and associated brands (the "<u>Maverick/Aces IP</u>"), subject to the provisions hereof with respect to the Maverick/Aces IP, (ii) Nevada locations (including the Nevada properties subject to the Blue Owl Master Lease, as contemplated herein), (iii) the Colorado locations, and (iv) e.gads, LLC businesses, except as set forth below.<br><br>The Transactions will be subject to the Definitive Documents, pursuant to the terms of, and the consent and approval rights set forth in, the TSA (including the attachments thereto). |
| **Sale and Marketing Process** ||
| **Implementation; Sale and Marketing Process** | The Transactions will be implemented pursuant to sale of assets pursuant to section 363 of the Bankruptcy Code or implementation pursuant to a chapter 11 plan, in each case as determined by the Company Parties and the Requisite Supporting Lenders. |
| **PokerCo Stalking Horse** | Subject to approval by the Bankruptcy Court, the Debtors and the Supporting Shareholder or its designee (in such capacity, "<u>EP BidCo</u>") shall enter into a binding stalking horse purchase agreement (the "<u>PokerCo Stalking Horse Purchase Agreement</u>") providing for the sale and purchase of PokerCo.<br><br>Stalking Horse Bid:<br><br>• <u>Scope</u>: EP BidCo will bid on PokerCo, which will include assumption of administrative expenses, current assets, current liabilities, and any long-term liabilities of PokerCo (other than the obligations under the Existing Credit Agreement). EP BidCo |

|  | will make offers of employment to all employees of PokerCo, and assume all liabilities related to the same. |
|  | • Cash Purchase Price.  The cash purchase price provided for in the PokerCo Stalking Horse Purchase Agreement will be $13 million. |
|  | • Earnout Agreement.  If EP BidCo is the successful bidder for PokerCo, as part of EP BidCo's bid (including EP BidCo's stalking horse bid), then EP BidCo shall enter into an agreement granting the Existing Lenders (or an entity to be formed for the benefit of the Existing Lenders ("EarnoutCo")) an earnout payable upon the signing of definitive documentation related to a change of control of all or any facility within PokerCo occurring within five years from the closing of the Transactions, entitling the Existing Lenders (or EarnoutCo) to receive 50% of the proceeds distributable to EP BidCo after deducting (x) the cash price EP BidCo paid for PokerCo[1] and (y) transaction expenses. |
|  | • Expense Reimbursement.  The PokerCo Stalking Horse Purchase Agreement shall include terms and conditions customarily found in stalking horse purchase agreements of this type, including an expense reimbursement of up to $150,000 in reasonable costs and expenses incurred by EP BidCo in connection with its bid. |
|  | • Other Bid Protections.  To be negotiated between the parties but to include in any event that the non-cash components (including the Earnout Agreement and Post-Closing Income Arrangement) of any EP BidCo bid (including EP BidCo's stalking horse bid) to be valued at $3 million and initial minimum third-party overbid shall be $16 million, with each subsequent bid at $500,000 increments. |
| **MainCo Credit Bid or Chapter 11 Plan** | At the election of the Requisite Supporting Lenders, the Company Parties will (1) conduct a sale and marketing of MainCo pursuant to section 363 of the Bankruptcy Code, subject to a credit bid by the Existing Lenders (the "MainCo Sale Process"), (2) pursue confirmation of a chapter 11 plan that results in the conversion of a portion or all of the Existing Term Loans into equity of MainCo on a reorganized basis (the "MainCo Plan Process"), or (3) such alternative transaction structure acceptable to the Requisite Supporting Lenders. |

---

[1]   If less than all of PokerCo is sold, then the cash price for the sold facility will be deemed to be the pro rata share of the final purchase price, with the numerator being the adjusted EBITDA of the facility for the trailing 12 months and the denominator being total PokerCo adjusted EBITDA for the trailing 12 months.

| | |
|---|---|
| | **MainCo Sale Process**<br><br>If the MainCo Sale Process is elected by the Requisite Supporting Lenders, then the Debtors will take all steps necessary to sell MainCo pursuant to section 363 of the Bankruptcy Code, including if necessary marketing MainCo before the commencement of Chapter 11 Cases, designating the Existing Lenders' credit bid as a "qualified bid," or entering into a stalking horse agreement (the "MainCo Stalking Horse Purchase Agreement") with a designee of the Existing Lenders ("MC BidCo") providing for such credit bid.<br><br>**MainCo Plan Process**<br><br>If the MainCo Plan Process is elected by the Requisite Supporting Lenders, then the Debtors will take all steps necessary to propose, confirm, and consummate a chapter 11 plan acceptable to the Requisite Supporting Lenders that results in a portion or all of the Existing Term Loans being converted into the equity of MainCo on a reorganized basis. The Company Parties and the Requisite Supporting Lenders will work in good faith regarding the treatment and classification of claims, including the deficiency claims for Existing Term Loans and any rejection of the Blue Owl Master Lease. |
| **Blue Owl Master Lease** | The Company Parties, in consultation with the Requisite Supporting Lenders, will use good-faith efforts to negotiate an amendment or modification to the Blue Owl Master Lease providing for, among other things, the continued leasing of the Nevada properties thereunder by MainCo.<br><br>The Company Parties will prepare an analysis on the projected costs associated with potential assumption of and potential claims arising from potential rejection of the Blue Owl Master Lease, including any analysis as to claim amounts that may be capped by section 502(b)(6) of the Bankruptcy Code. |
| **Other Transaction Terms** ||
| **Cooperation; Transition Services Agreement** | At all times during the Support Period, the Supporting Shareholder will provide cooperation and assistance, as requested, for transition of licenses to an operator approved by the Requisite Supporting Lenders and the process of receiving regulatory approvals necessary to consummate the Transaction.<br><br>Within 14 days of the Support Effective Date, the Parties shall negotiate in good faith a transition services agreement (the "Transition Services Agreement") providing for:<br><br>• the appointment in accordance with Gaming Laws of one or more officers or employees from a third-party gaming operator |

to the Licensed Operator Affiliates to assist with the operations of the Licensed Operator Affiliates on an interim basis pending the Closing Date;

- the transfer or sale of the equity interests or gaming assets of the Licensed Operator Affiliates to a replacement operator identified by the stalking horse or winning bidders for the Company Parties' assets;

- the post-Closing Date assistance of the Supporting Shareholder and Mr. Beltram with regulatory and licensing clearance, access to licenses, or transition of licenses for continued operation of the business of the Company Parties (including any Debtors reorganized pursuant to any chapter 11 plan in the Chapter 11 Cases);

- the Supporting Shareholder and EP BidCo's noncompetition and non-solicitation agreement with respect to e.gads, LLC or any successor thereto, and agreement not to establish an entity that would compete with e.gads, LLC or any successor thereto, for a term of three years from the Closing Date;

- the payment of license-related rent payments to the Supporting Shareholder until the licenses are transferred, pursuant to the Operator Leases; provided that the total license-related rent payments payable to the Supporting Shareholder will be reduced by one-third per state upon the completion of the transition of the gaming operations to an operator designated by the Requisite Supporting Lenders (such payments, as adjusted pursuant to the terms of this paragraph, the "License-Related Rent Payments"); and

- that each of the Company Parties and the Supporting Stakeholders shall refrain from making, causing to be made, publishing, ratifying or endorsing any materially disparaging remarks or derogatory statements to any party in respect of and adversely affecting any of the Company Parties and the Supporting Stakeholders.

During such time as the Supporting Shareholder is continuing to assist with the foregoing services and until such time as the all regulatory approvals have been obtained with respect to the Transaction, the Supporting Shareholder shall be entitled to receive, in addition to the License-Related Rent Payments set forth above, fees of: (a) $90,000 for the month of July 2025, (b) $90,000 for the month of August 2025, (c) $60,000 for the month of September 2025, and (b) $50,000 per month thereafter; provided that the foregoing fee arrangement will be the only consideration available to the Supporting Shareholder, and the total fees, expenses, reimbursements, benefits, compensation, or

| | |
|---|---|
| | consideration paid to or for the benefit of the Supporting Shareholder by the Company Parties (including through the Licensed Operator Affiliates) under all agreements or arrangements will not exceed the sum of (a) $550,000 in the aggregate, regardless of the source and (b) the License-Related Rent Payments.  The Supporting Shareholder will execute such documents or amendments necessary to the *Amended & Restated Executive Employment Agreement* dated November 23, 2020 and the Operating Leases, and any other documents under which he receives payments or benefits, to conform to this Term Sheet. |
| **Maverick/Aces IP** | The Requisite Supporting Lenders, the Company Parties, and EP BidCo will execute such licenses, sub-licenses, instruments, agreements, or other documents or arrangements providing for (i) a non-exclusive license of the Maverick/Aces IP by the Company Parties to EP BidCo substantially contemporaneously with the execution of the Transition Services Agreement in exchange for $100,000 and a revenue-sharing arrangement whereby EP BidCo pays the Company Parties (or MainCo, if it acquires the respective assets) 25% of the adjusted EBITDA generated by EP BidCo from current and future poker partnerships using the Maverick/Aces IP for a period of three years from the Closing Date and (ii) the transfer of the Maverick/Aces IP to EP BidCo (or a designee thereof) on the Closing Date; <u>provided</u> that EP BidCo's right to use and acquire the Maverick/Aces IP will be conditioned on, among other things, (1) no breach of the Transition Services Agreement and (2) the Company Parties' (or MainCo's) permission to continue to use the Maverick/Aces IP on a post-closing basis and limited basis, without expansion, to the extent necessary, for a period of three years after the Closing Date or until MainCo is sold (whichever is sooner) without license, royalty, or other fees to EP BidCo. |
| **Mutual Releases** | Upon the Closing Date, each of the Company Parties, Supporting Lenders and the Supporting Shareholder shall provide mutual and customary releases to each other, pursuant to a standalone release agreement or pursuant to a chapter 11 plan, which releases shall be in form and substance substantially consistent with those set forth in **Exhibit A** attached hereto and effective as of the Closing Date. |
| **Tax Matters** | The Transactions shall be implemented in a tax-efficient and cost-effective manner, as agreed among the Company Parties, the Requisite Supporting Lenders, and the Supporting Shareholder. |
| **Conditions Precedent to Closing Date** | The occurrence of the Closing Date shall be subject to the satisfaction or waiver of the following conditions precedent:<br><br>(a) The TSA shall continue to be in full force and effect; |

(b) The applicable gaming authorities for the States of Nevada, Colorado, and Washington will have provided all prior approvals necessary to consummate the Transaction;

(c) All Definitive Documents for the Transactions shall have been executed, delivered, and remain in full force and effect (as applicable), which Definitive Documents shall satisfy the requirements set forth in the TSA and this Term Sheet;

(d) All Transaction Expenses invoiced at least one (1) Business Day before the Closing Date shall have been paid as set forth in the TSA; and

(e) The conditions to the effectiveness of the Definitive Documents (other than the occurrence of the Closing Date) shall have been satisfied or waived in accordance with their terms, which conditions shall be conditions with the conditions set forth in this Term Sheet.

## EXHIBIT A

### Form of Plan Release and Exculpation Language[2]

"Exculpated Parties" means, collectively, and in each case in its capacity as such: (a) the Debtors; (b) the directors or managers and officers of any Debtor, for conduct within the scope of their duties; and (c) any statutory committees appointed in the Chapter 11 Cases and each of their respective members, solely in their respective capacities as such.

"Final Order" means an order or judgment of the Bankruptcy Court, or court of competent jurisdiction with respect to the subject matter that has not been reversed, stayed, modified, dismissed, vacated, or reconsidered, as entered on the docket in any Chapter 11 Case or the docket of any court of competent jurisdiction, and as to which the time to appeal, or seek certiorari or move for a new trial, reargument, or rehearing has expired and no appeal or petition for certiorari or other proceedings for a new trial, reargument, or rehearing has been timely taken, or as to which any appeal that has been taken or any petition for certiorari that has been or may be timely Filed has been withdrawn or resolved by the highest court to which the order or judgment was appealed or from which certiorari was sought or the new trial, reargument, or rehearing will have been denied, resulted in no stay pending appeal of such order, or has otherwise been dismissed with prejudice; *provided* that the possibility that a motion under Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules, may be Filed with respect to such order will not preclude such order from being a Final Order.

"Related Party" means, collectively, with respect to any Person or Entity, each of, and in each case in its capacity as such, such Person's or Entity's current and former directors, managers, officers, committee members, members of any governing body, equityholders (regardless of whether such interests are held directly or indirectly), affiliated investment funds or investment vehicles, managed accounts or funds, predecessors, participants, successors, assigns, subsidiaries, Affiliates, partners, limited partners, general partners, principals, members, management companies, fund advisors or managers, employees, agents, trustees, advisory board members, financial advisors, attorneys (including any other attorneys or professionals retained by any current or former director or manager in his or her capacity as director or manager of an Entity), accountants, investment bankers, consultants, representatives, and other professionals and advisors and any such Person's or Entity's respective heirs, executors, estates, and nominees.

"Released Parties" means, collectively, and in each case in its capacity as such: (a) the Debtors; (b) the Reorganized Debtors; (c) the DIP Lenders; (d) the Agents; (e) the Supporting Stakeholders; (f) all holders of Claims; (g) all holders of Interests; (h) each current and former Affiliate of each Entity in clause (a) through (g); and (i) each Related Party of each Entity in clause (a) through (h); *provided*, *however*, that, in each case, an Entity shall not be a Released Party if it:

---

[2]     Capitalized terms used but not defined in this section shall have meanings consistent with their common usage in the context of a chapter 11 plan.  To the extent the releases are provided pursuant to a standalone agreement, appropriate conforming changes shall be made.  Scope and beneficiaries of release to be adjusted subject to chapter 11 process and ongoing diligence. Scope of Releasing Parties, Released Parties, and Related Parties as they related to an individual Supporting Lender or such Supporting Lender's Affiliates or Related Parties may be limited in accordance with such Supporting Lender's applicable signature page or joinder to the TSA.

(x) elects to opt out of the Third-Party Release; or (y) timely objects to the Third-Party Release, and such objection is not resolved before Confirmation.

"Releasing Parties" means, collectively, and in each case in its capacity as such:  (a) the Debtors; (b) the Reorganized Debtors; (c) the DIP Lenders; (d) the Agents; (e) the Supporting Stakeholders; (f) all holders of Claims; (g) all holders of Interests; (h) each current and former Affiliate of each Entity in clause (a) through the following clause (i); and (i) each Related Party of each Entity in clause (a) through this clause (i); *provided*, *however*, that, in each case, an Entity shall not be a Releasing Party if it:  (x) elects to opt out of the Third-Party Release; or (y) timely objects to the Third-Party Release and such objection is not resolved before Confirmation.

*Releases by the Debtors.*

Notwithstanding anything contained in this Plan to the contrary, pursuant to section 1123(b) of the Bankruptcy Code, in exchange for good and valuable consideration, the adequacy of which is hereby confirmed, on and after the Plan Effective Date, in each case except for Claims arising under, or preserved by, the Plan, to the fullest extent permitted under applicable Law, each Released Party is, and is deemed to be, hereby conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged by the Debtors, the Reorganized Debtors, and their Estates, in each case on behalf of themselves and their respective successors, assigns, and representatives, and any and all Entities who may purport to assert any Claim or Cause of Action, directly or derivatively, by, through, for, or because of the foregoing Entities, from any and all Claims and Causes of Action whatsoever (including any Avoidance Actions and any derivative claims, asserted or assertable on behalf of any of the Debtors, the Reorganized Debtors, and their Estates), whether liquidated or unliquidated, fixed or contingent, known or unknown, foreseen or unforeseen, matured or unmatured, asserted or unasserted, accrued or unaccrued, existing or hereafter arising, in Law, equity, contract, tort, or otherwise, whether arising under federal or state statutory or common Law, or any other applicable international, foreign, or domestic Law, rule, statute, regulation, treaty, right, duty, requirement, or otherwise, that such holders or their Estates, Affiliates, heirs, executory, administrators, successors, assigns, and managers would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any Claim against, or Interest in, the Debtors, the Reorganized Debtors, and their Estates, based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Reorganized Debtors and their Estates (including the capital structure, management, ownership, or operation thereof), the purchase, sale, or rescission of any security of the Debtors, the Reorganized Debtors, or the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in this Plan, the Existing Credit Facility, the business or contractual arrangements between or among any Debtor and any Released Party, the ownership and/or operation of the Debtors by any Released Party or the distribution of any Cash or other property of the Debtors to any Released Party, the assertion or enforcement of rights and remedies against the Debtors, the Debtors' in- or out-of-court restructuring efforts, any Avoidance Actions (but excluding Avoidance Actions brought as counterclaims or defenses to Claims asserted against the Debtors), intercompany transactions between or among a Debtor and an Affiliate of a Debtor and another Debtor or Affiliate of a Debtor, the Chapter 11 Cases, any adversary proceedings, the formulation, preparation, dissemination, negotiation, entry into, or filing of the TSA and related prepetition transactions, the Definitive Documents, the Disclosure Statement, the Plan (including, for the avoidance of doubt, the Plan Supplement), before or during the Chapter 11 Cases, or any

other Definitive Document, or any Restructuring Transactions, any contract, instrument, release, or other agreement or document (including any legal opinion requested by any Entity regarding any transaction, contract, instrument, document or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or the Confirmation Order in lieu of such legal opinion) relating to any of the foregoing, created or entered into in connection with the TSA, the Definitive Documents, the Disclosure Statement, the Plan (including, for the avoidance of doubt, the Plan Supplement), before or during the Chapter 11 Cases, or any Restructuring Transactions, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of consummation of the Plan, the administration and implementation of the Plan and the Restructuring Transactions, including the issuance or distribution of securities pursuant to the Restructuring Transactions and/or Plan, or the distribution of property pursuant to the Restructuring Transactions and/or the Plan or any other related agreement, or upon any other act or omission, transaction, agreement, event, or other occurrence related or relating to any of the foregoing taking place on or before the Plan Effective Date.

Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release (a) any post-Plan Effective Date obligations of any party or Entity under the Plan, the Confirmation Order, any Restructuring Transaction, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan, or any Claim or obligation arising under the Plan, and (c) any Released Party from any Claim or Cause of Action arising from an act or omission that is determined by a Final Order to have constituted actual fraud, willful misconduct, or gross negligence.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Debtor Release, which includes by reference each of the related provisions and definitions contained in the Plan, and further, shall constitute the Bankruptcy Court's finding that the Debtor Release is:  (a) in exchange for the good and valuable consideration provided by each of the Released Parties, including, without limitation, the Released Parties' substantial contributions to facilitating the Restructuring Transactions and implementing the Plan; (b) a good faith settlement and compromise of the Claims released by the Debtor Release; (c) in the best interests of the Debtors and all holders of Claims and Interests; (d) fair, equitable, and reasonable; (e) given and made after due notice and opportunity for hearing; and (f) a bar to any of the Debtors, the Reorganized Debtors, or their Estates asserting any Claim or Cause of Action released pursuant to the Debtor Release.

*Releases by the Releasing Parties*.

Notwithstanding anything contained in this Plan to the contrary, pursuant to section 1123(b) of the Bankruptcy Code, in exchange for good and valuable consideration, the adequacy of which is hereby confirmed, on and after the Plan Effective Date, in each case except for Claims arising under, or preserved by, the Plan, to the fullest extent permitted under applicable Law, each Released Party is, and is deemed to be, hereby conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged by each and all of the Releasing Parties (other than the Debtors and the Reorganized Debtors), in each case on behalf of themselves and their respective successors, assigns, and representatives, and any and all Entities who may purport to assert any Claim or Cause of Action, directly or derivatively, by, through, for, or because of the foregoing Entities, from any and all Claims and Causes of Action whatsoever (including any

Avoidance Actions and any derivative claims asserted or assertable on behalf of any of the Debtors, the Reorganized Debtors, and their Estates), whether liquidated or unliquidated, fixed or contingent, known or unknown, foreseen or unforeseen, matured or unmatured, asserted or unasserted, accrued or unaccrued, existing or hereafter arising, in Law, equity, contract, tort, or otherwise, whether arising under federal or state statutory or common Law, or any other applicable international, foreign, or domestic Law, rule, statute, regulation, treaty, right, duty, requirement, or otherwise, that such holders or their Estates, Affiliates, heirs, executory, administrators, successors, assigns, and managers would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any Claim against, or Interest in, the Debtors, the Reorganized Debtors, and their Estates, based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Reorganized Debtors, and their Estates (including the capital structure, management, ownership, or operation thereof), the purchase, sale, or rescission of any security of the Debtors or the Reorganized Debtors the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in this Plan, the Existing Credit Facility, the business or contractual arrangements between or among any Debtor and any Released Party, the ownership and/or operation of the Debtors by any Released Party or the distribution of any Cash or other property of the Debtors to any Released Party, the assertion or enforcement of rights and remedies against the Debtors, the Debtors' in- or out-of-court restructuring efforts, any Avoidance Actions (but excluding Avoidance Actions brought as counterclaims or defenses to Claims asserted against the Debtors), intercompany transactions between or among a Debtor or an Affiliate of a Debtor and another Debtor or Affiliate of a Debtor, the Chapter 11 Cases, any adversary proceedings, the formulation, preparation, dissemination, negotiation, entry into, or filing of the TSA and related prepetition transactions, the Definitive Documents, the Plan (including, for the avoidance of doubt, the Plan Supplement), before or during the Chapter 11 Cases, or any Restructuring Transactions, contract, instrument, release, or other agreement or document (including any legal opinion requested by any Entity regarding any transaction, any contract, instrument, document or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or the Confirmation Order in lieu of such legal opinion) relating to any of the foregoing, created or entered into in connection with the TSA, the Definitive Documents, the Plan (including, for the avoidance of doubt, the Plan Supplement), before or during the Chapter 11 Cases, or any Restructuring Transactions, any preference, fraudulent transfer, or other avoidance claim arising pursuant to chapter 5 of the Bankruptcy Code or other applicable Law, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of consummation of the Plan, the administration and implementation of the Plan and the Restructuring Transactions, including the issuance or distribution of securities pursuant to the Restructuring Transactions and/or Plan, or the distribution of property pursuant to the Restructuring Transactions and/or the Plan or any other related agreement, or upon any other act or omission, transaction, agreement, event, or other occurrence related or relating to any of the foregoing taking place on or before the Plan Effective Date.

Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release (a) any post-Plan Effective Date obligations of any party or Entity under the Plan, the Confirmation Order, any Restructuring Transaction, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan or any Claim or obligation arising under the Plan, or (b) any Released Party from any Claim or Cause of Action arising from an act or omission that is determined by a Final Order to have constituted actual fraud, willful misconduct, or gross negligence.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Third-Party Release, which includes by reference each of the related provisions and definitions contained herein, and, further, shall constitute the Bankruptcy Court's finding that the Third-Party Release is:  (a) consensual; (b) essential to the Confirmation of the Plan; (c) given in exchange for the good and valuable consideration provided by each of the Released Parties, including, without limitation, the Released Parties' substantial contributions to facilitating the Restructuring Transactions and implementing the Plan; (d) a good faith settlement and compromise of the Claims released by the Third-Party Release; (e) in the best interests of the Debtors and their Estates; (f) fair, equitable, and reasonable; (g) given and made after due notice and opportunity for hearing; and (h) a bar to any of the Releasing Parties asserting any Claim or Cause of Action released pursuant to the Third-Party Release

*Exculpation.*

Notwithstanding anything contained in this Plan to the contrary, to the fullest extent permissible under applicable Law and without affecting or limiting either the Debtor Release or Third-Party Release, effective as of the Plan Effective Date, no Exculpated Party shall have or incur liability or obligation for, and each Exculpated Party is hereby released and exculpated from any Cause of Action for any claim arising from the Petition Date through the Plan Effective Date related to any act or omission in connection with, relating to, or arising out of, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, filing, or termination of the TSA and related prepetition transactions, the Definitive Documents, the Disclosure Statement, the Plan (including, for the avoidance of doubt, the Plan Supplement), any other Definitive Documents, or any Restructuring Transactions, contract, instrument, release or other agreement or document (including any legal opinion requested by any Entity regarding any transaction, contract, instrument, document or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or the Confirmation Order in lieu of such legal opinion) relating to any of the foregoing, created or entered into in connection with the TSA, the Definitive Documents, the Disclosure Statement, the Plan (including, for the avoidance of doubt, the Plan Supplement), or any Restructuring Transactions, any preference, fraudulent transfer, or other avoidance claim arising pursuant to chapter 5 of the Bankruptcy Code or other applicable Law, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of consummation of the Plan, the administration and implementation of the Plan, including the issuance or distribution of securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other related act or omission, transaction, agreement, event, or other occurrence taking place on or before the Plan Effective Date, except for Claims related to any act or omission that is determined in a Final Order by a court of competent jurisdiction to have constituted actual fraud, willful misconduct, or gross negligence, but in all respects such Entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan.

The Exculpated Parties have, and upon confirmation of the Plan shall be deemed to have, participated in good faith and in compliance with the applicable Laws with regard to the solicitation of votes and distribution of consideration pursuant to the Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable Law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan.

# **EXHIBIT B**

**Joinder Agreement**

## Joinder to Transaction Support Agreement

The undersigned ("Joinder Party") hereby acknowledges that it has read and understands the *Transaction Support Agreement*, dated June 25, 2025 (the "Agreement"),[1] between the "Company Parties" (as defined in the Agreement) and the Supporting Stakeholders, and upon execution and delivery of this joinder agrees to be bound by the terms and conditions thereof, and shall be deemed a "Supporting Stakeholder" under the terms of the Agreement.

The Joinder Party specifically agrees to be bound by the terms and conditions of the Agreement and makes all representations and warranties contained in the Agreement applicable to a Supporting Stakeholder as of the date hereof and any further date specified in the Agreement, in each case, applicable to a Supporting Stakeholder.

Date Executed: __, 2025

**[SUPPORTING STAKEHOLDER]**

By:_____
Name:
Title:
Address:
Email address(es):

---

[1] Capitalized terms used but not otherwise defined herein shall having the meanings ascribed to such terms in the Agreement.

## **Disclosure of Holdings Information**

As a condition for joining the Agreement you must disclose the below holdings information, which will be held by the Company Parties on a confidential basis and not shared with any other Supporting Stakeholder.

| Aggregate Amounts Beneficially Owned or Managed on Account of: | Amount |
|---|---|
| Existing Term Loans | $[●] |
| Other Claims against the Company Parties [Description] | $[●] |
| Existing Interests | $[●] |

**ACKNOWLEDGED AND AGREED**
**Company Parties**


By:_____
Name:
Title:

**Exhibit B**

**Organizational Chart**



**Exhibit C**

**Approved Budget**

Maverick Gaming
*Interim DIP Budget*

| | Post-Petition 7/20/25 | Post-Petition 7/27/25 | Post-Petition 8/3/25 | Post-Petition 8/10/25 | Post-Petition 4-Week Total |
|---|---|---|---|---|---|
| **Week Ending** | | | | | |
| **Receipts** | | | | | |
| Washington | $ 2,301,212 | $ 2,301,212 | $ 2,488,504 | $ 2,316,724 | $ 9,407,651 |
| Colorado | 805,339 | 805,339 | 818,150 | 826,236 | 3,255,064 |
| Wendover | 817,577 | 817,577 | 869,476 | 899,719 | 3,404,350 |
| Elko | 440,062 | 440,062 | 450,526 | 456,624 | 1,787,274 |
| Egads | 285,796 | 314,875 | 421,056 | 198,657 | 1,220,384 |
| **Total Operating Receipts** | $ 4,649,986 | $ 4,679,065 | $ 5,047,712 | $ 4,697,960 | $ 19,074,723 |
| Other | - | - | - | - | - |
| **Total Receipts** | $ 4,649,986 | $ 4,679,065 | $ 5,047,712 | $ 4,697,960 | $ 19,074,723 |
| ***Methodology Disbursements*** | | | | | |
| Payroll & Benefits | $ 3,545,010 | $ 1,849,334 | $ 3,545,010 | $ 1,849,334 | $ 10,788,688 |
| Rent | - | - | - | 2,618,087 | 2,618,087 |
| Insurance | - | - | - | - | - |
| Information Technology | 24,286 | 24,286 | 24,286 | 24,286 | 97,143 |
| Utilities | 100,478 | 100,478 | 100,478 | 100,478 | 401,911 |
| Other | 20,000 | 20,000 | 20,000 | 20,000 | 80,000 |
| **Total Methodology Disbursements** | $ 3,689,773 | $ 1,994,098 | $ 3,689,773 | $ 4,612,185 | $ 13,985,829 |
| ***Non-Methodology Disbursements*** | | | | | |
| Gaming Participation & Equipment Fees | $ 68,342 | $ 68,342 | $ 68,342 | $ 68,342 | $ 273,367 |
| Food & Beverage | 113,528 | 113,528 | 113,528 | 113,528 | 454,112 |
| Repairs & Maintenance | 18,169 | 18,169 | 18,169 | 18,169 | 72,675 |
| Professional Services | 13,833 | 13,833 | 13,833 | 13,833 | 55,332 |
| Tax | 350,000 | - | - | 2,748,176 | 3,098,176 |
| Supplies | 13,282 | 13,282 | 13,282 | 13,282 | 53,129 |
| Advertising & Marketing | 18,060 | 18,060 | 18,060 | 18,060 | 72,240 |
| General Corporate | 146,945 | 146,945 | 146,945 | 146,945 | 587,782 |
| Corporate Allocations | 44,764 | 44,764 | 44,764 | 44,764 | 179,057 |
| Egads Material Costs | 350,395 | 48,073 | 112,745 | 319,828 | 831,040 |
| Egads Other | 20,000 | 20,000 | 20,000 | 20,000 | 80,000 |
| **Total Non-Methodology Disbursements** | $ 1,157,318 | $ 504,996 | $ 569,668 | $ 3,524,927 | $ 5,756,909 |
| **Operating Cash Flow** | $ (197,105) | $ 2,179,971 | $ 788,271 | $ (3,439,153) | $ (668,015) |
| **Cumulative Operating Cash Flow** | (197,105) | 1,982,867 | 2,771,137 | (668,015) | (668,015) |
| **Critical Vendors & 503(b)(9)** | | | | | |
| Critical Vendors | $ 350,974 | $ 350,974 | $ 350,974 | $ 350,974 | $ 1,403,895 |
| 503(b)(9) | 110,205 | 110,205 | 110,205 | 110,205 | 440,820 |
| **Total Critical Vendors & 503(b)(9)** | $ 461,179 | $ 461,179 | $ 461,179 | $ 461,179 | $ 1,844,715 |
| ***Non-Operating*** | | | | | |
| DIP Loan and 1L Rollup Interest | $ - | $ - | $ 85,968 | $ - | $ 85,968 |
| Capital Expenditures | 25,000 | 25,000 | 25,000 | 25,000 | 100,000 |
| **Total Non-Operating Disbursements** | $ 25,000 | $ 25,000 | $ 110,968 | $ 25,000 | $ 185,968 |
| ***Restructuring Disbursements*** | | | | | |
| Restructuring Professionals | $ 1,255,000 | $ 912,500 | $ 1,075,000 | $ 985,000 | $ 4,227,500 |
| Other | - | - | - | - | - |
| **Total Restructuring Disbursements** | $ 1,255,000 | $ 912,500 | $ 1,075,000 | $ 985,000 | $ 4,227,500 |
| **Total Disbursements** | $ 6,588,270 | $ 3,897,773 | $ 5,906,587 | $ 9,608,291 | $ 26,000,921 |
| **Liquidity** | | | | | |
| Beginning Bank Cash Balance | $ 16,809,496 | $ 22,371,212 | $ 23,152,505 | $ 22,293,629 | $ 16,809,496 |
| (-) Restricted Cash - Regulatory Cash (as of 7/11/25) | (7,753,329) | (7,753,329) | (7,753,329) | (7,753,329) | (7,753,329) |
| (-) Restricted Cash - Progressive Funds (as of 7/11/25) | (5,982,391) | (5,982,391) | (5,982,391) | (5,982,391) | (5,982,391) |
| (-) Deposits in ATM & in Transit (as of 7/11/25) | (2,164,871) | (2,164,871) | (2,164,871) | (2,164,871) | (2,164,871) |
| (-) O/S Checks (as of 7/11/25) | (403,898) | (403,898) | (403,898) | (403,898) | (403,898) |
| **Beginning "Usable" Book Cash Balance** | $ 505,007 | $ 6,066,723 | $ 6,848,016 | $ 5,989,140 | $ 505,007 |
| Net Cash Flow | (1,938,284) | 781,293 | (858,876) | (4,910,332) | (6,926,198) |
| DIP Funding | 7,500,000 | | | | 7,500,000 |
| **Ending "Usable" Book Cash Balance** | $ 6,066,723 | $ 6,848,016 | $ 5,989,140 | $ 1,078,809 | $ 1,078,809 |
| **Debt Rollforward** | | | | | |
| **Beginning DIP Balance** | $ - | $ 8,250,000 | $ 8,250,000 | $ 8,250,000 | $ - |
| DIP Funding | 7,500,000 | - | - | - | 7,500,000 |
| PIK Upfront Fees (10%) | 750,000 | - | - | - | 750,000 |
| **Ending DIP Balance** | $ 8,250,000 | $ 8,250,000 | $ 8,250,000 | $ 8,250,000 | $ 8,250,000 |
| DIP Cash Interest (SOFR + 12.5%) | $ - | $ - | $ 53,625 | $ - | $ 53,625 |
| **Beginning 1L Balance** | $ - | $ 15,572,358 | $ 15,572,358 | $ 15,667,589 | $ - |
| 1L Roll-up | 15,572,358 | - | - | - | 15,572,358 |
| 1L PIK Interest (SOFR + 11.5%) | - | - | 95,231 | - | 95,231 |
| **Ending 1L Balance** | $ 15,572,358 | $ 15,572,358 | $ 15,667,589 | $ 15,667,589 | $ 15,667,589 |
| 1L Roll-up Interest (SOFR + 1.0%) | $ - | $ - | $ 32,343 | $ - | $ 32,343 |