**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

```
-------------------------------------------------------- x
                                                          :
In re:                                                    :   Chapter 11
                                                          :
RUNITONETIME LLC, et al.,                                 :   Case No. 25-90191 (ARP)
                                                          :
              Debtors.¹                                   :   (Jointly Administered)
                                                          :
-------------------------------------------------------- x
```

**EMERGENCY MOTION OF DEBTORS FOR ENTRY OF INTERIM AND
FINAL ORDERS (I) AUTHORIZING POSTPETITION FINANCING AND
USE OF CASH COLLATERAL AND (II) GRANTING RELATED RELIEF**

---

**Emergency relief has been requested. Relief is requested not later than 1:00 p.m. (prevailing Central Time) on July 15, 2025.**

**If you object to the relief requested or you believe that emergency consideration is not warranted, you must appear at the hearing if one is set, or file a written response prior to the date that relief is requested in the preceding paragraph. Otherwise, the Court may treat the pleading as unopposed and grant the relief requested.**

**A hearing will be conducted on this matter on July 15, 2025, at 1:00 p.m. (prevailing Central Time) in Courtroom 401, 4th floor, 515 Rusk Street, Houston, Texas 77002. Participation at the hearing will only be permitted by an audio and video connection.**

**Audio communication will be by use of the Court's dial-in facility. You may access the facility at (832) 917-1510. Once connected, you will be asked to enter the conference room number. Judge Perez's conference room number is 282694. Video communication will be by use of the GoToMeeting platform. Connect via the free GoToMeeting application or click the link on Judge Perez's homepage. The meeting code is "JudgePerez". Click the settings icon in the upper right corner and enter your name under the personal information setting.**

**Hearing appearances must be made electronically in advance of both electronic and in-person hearings. To make your appearance, click the "Electronic Appearance" link on Judge Perez's homepage. Select the case name, complete the required fields and click "Submit" to complete your appearance.**

---

The above-captioned debtors in possession (collectively, the "*Debtors*")

respectfully state as follows in support of this motion (this "*Motion*")[2]:

---

[1]   A complete list of the Debtors in the Chapter 11 Cases may be obtained on the website of the Debtors' proposed claims and noticing agent at https://restructuring.ra.kroll.com/RunItOneTime/. The Debtors' mailing address is 12530 NE 144th Street, Kirkland, Washington 98304.

[2]   Capitalized terms used but not defined herein have the respective meanings given to them in the First Day Declaration, the Sellinger Declaration, or the DIP Term Sheet (each as defined herein), as applicable.

## RELIEF REQUESTED

1.    By this Motion, the Debtors seek entry of an interim order (the "***Interim Order***"),

substantially in the form attached hereto, and a final order (the "***Final Order***"[3] and together with

the Interim Order, the "***DIP Orders***")[4]:

(i)    authorizing (a) RunItOneTime LLC (the "***Borrower***") to obtain, and each of the Debtors other than the Borrower (collectively, the "***Guarantors***") to guarantee, on a joint and several basis, in each case, a senior secured superpriority postpetition debtor-in-possession financing facility (the "***DIP Facility***") composed of new money loans (the "***New Money DIP Loans***") and DIP Rolled-Up Loans (as defined below) to be advanced and made available to the Borrower pursuant to the terms and conditions set forth in the *Term Sheet* attached to the Interim Order as **Exhibit 1** (as the same may be amended, restated, supplemented, waived, or otherwise modified from time to time, the "***DIP Term Sheet***"), among the Debtors, the lenders party thereto (the "***DIP Lenders***"), and Alter Domus (US) LLC, as administrative agent and collateral agent under the DIP Facility (in such capacities, the "***DIP Agent***" and, together with the DIP Lenders, the "***DIP Secured Parties***"), in an initial aggregate principal amount of $22,500,000 (the "***DIP Commitments***"), which shall consist of:

(a)    an aggregate principal amount of up to $7,500,000 in New Money DIP Loans which shall be made available on an interim basis (the "***Interim New Money DIP Loans***") upon entry of the Interim Order and satisfaction of the other applicable conditions to any Interim New Money DIP Loans;

(b)    an aggregate principal amount of New Money DIP Loans in an amount equal to the "Acceptable Incremental Amount" as set forth in the DIP Term Sheet (the "***Final New Money DIP Loans***") upon (i) entry of the Final Order and satisfaction of the Milestones (as defined below), (ii) agreement on the "Acceptable Incremental Amount" as set forth in the DIP Term Sheet, and (iii) satisfaction of the other applicable funding conditions to any Final New Money DIP Loans;

(c)    a deemed "roll-up" of two dollars of outstanding principal amount of First Out Term Loans under the Prepetition Credit Agreement (the "***Prepetition First Out Obligations***") and the aggregate amount of accrued but unpaid interest on such Prepetition First Out Obligations, for each dollar of Interim New Money DIP Loans (the "***Interim DIP Rolled-Up Loans***") which Interim DIP Rolled-Up Loans, upon entry of the Interim Order, shall be

---

[3]    Prior to the Final Hearing, the Debtors will file the form of Final Order, which order shall be in form substantially similar to the Interim Order and otherwise reasonably acceptable in form and substance to the Debtors and the DIP Secured Parties.

[4]    To the extent of any conflict between the descriptions and definitions in this Motion and the DIP Order, the DIP Term Sheet, or DIP Documents, then the DIP Orders, as applicable, will control.

deemed borrowings of term loans under the DIP Documents (as defined below) in exchange for cancellation of the respective Prepetition First Out Obligations of the DIP Lenders providing the Interim New Money Loans, in each case in accordance with the DIP Term Sheet and the Interim Order (such deemed funding and exchange, the "***Interim Roll-Up***"); and

(d)   upon entry of the Final Order (as defined below), approval of a "roll-up" loan tranche under the DIP Documents equal to a maximum amount of two-times the sum of the Interim New Money DIP Loans and the Final New Money DIP Loans (the "***Final DIP Rolled-Up Loans***", and, together with the Interim DIP Rolled-Up Loans, the "***DIP Rolled-Up Loans***" and the DIP Rolled-Up Loans, together with all New Money DIP Loans, collectively, the "***DIP Loans***"), which Final DIP Rolled-Up Loans, on entry of the Final Order, will be authorized to be deemed borrowings in exchange for cancellation of the respective Prepetition First Out Obligations (now owned or hereafter acquired) or Interim DIP Rolled-Up Loans, as applicable, of the DIP Lenders providing the Final New Money DIP Loans, in each case in accordance with the DIP Documents (such deemed borrowing, exchange, and cancellation, the "***Final Roll-Up***" and together with the Interim Roll-Up, the "***Roll-Up***");

(ii)   authorizing the Debtors to execute, deliver, enter into, and perform their respective obligations under (a) the DIP Term Sheet and (b) any other agreements (including any debtor-in-possession credit agreement), instruments, pledge agreements, mortgages, guarantees, security agreements, intellectual property security agreements, control agreements, financing statements, notes, and documents related thereto, (the foregoing, collectively, as each document may be amended, supplemented, or otherwise modified from time to time in accordance with the terms hereof and thereof, including the Interim Order, the Final Order (if entered), together the DIP Term Sheet, and any other related loan documents, the "***DIP Documents***");

(iii)   authorizing the Debtors to use the proceeds of the DIP Facility in accordance with the Interim Order, the DIP Documents, and the Approved Budget (as defined below, subject to Permitted Variances (as defined below)), including (a) to pay certain interest, costs, fees, and expenses related to the Chapter 11 Cases and (b) to fund the working capital needs and expenditures of the Debtors during the Chapter 11 Cases;

(iv)   authorizing the Debtors to use Prepetition Collateral (as defined below), including Cash Collateral (as defined below), subject to the restrictions set forth in the DIP Documents and the Interim Order;

(v)   providing adequate protection to the Prepetition Secured Parties (as defined below) of their interests in the Prepetition Collateral (including Cash Collateral);

(vi)   granting to the DIP Agent, for the benefit of the DIP Secured Parties, and authorizing the Debtors to incur, valid, enforceable, non-avoidable, and automatically and fully-perfected DIP Liens in all DIP Collateral (each as defined

in the Interim Order), including all property constituting Prepetition Collateral (as defined below), to secure the DIP Obligations (as defined in the DIP Term Sheet), which DIP Liens shall be subject to the Carve-Out (as defined below) and the relative rankings and priorities set forth in the Interim Order, and as further set forth on **Exhibit 2**;

(vii)    granting to the DIP Agent, for the benefit of the DIP Secured Parties, and authorizing the Debtors to incur, allowed superpriority administrative expense claims against each of the Debtors, on a joint and several basis, in respect of all DIP Obligations;

(viii)    waiving the equitable doctrine of "marshaling" and other similar doctrines (a) upon entry of the Interim Order, with respect to the DIP Collateral for the benefit of any party other than the DIP Secured Parties and (b) subject to and effective only upon entry of the Final Order (but retroactive to the Petition Date), with respect to the Prepetition Collateral for the benefit of any party other than the Prepetition Secured Parties;

(ix)    subject to and effective only upon entry of the Final Order (but retroactive to the Petition Date), waiving (a) the Debtors' right to surcharge the DIP Collateral pursuant to section 506(c) of the Bankruptcy Code and (b) the "equities of the case" exception under section 552(b) of the Bankruptcy Code;

(x)    modifying or vacating the automatic stay imposed by section 362 of the Bankruptcy Code or otherwise to the extent necessary to implement and effectuate the terms and provisions set forth in the Interim Order and in the DIP Documents, and waiving any applicable stay (including under Bankruptcy Rule 6004) with respect to the effectiveness and enforceability of the Interim Order, and providing for the immediate effectiveness of the Interim Order;

(xi)    scheduling a final hearing (the "***Final Hearing***") to consider entry of a final order (the "***Final Order***") authorizing and approving, among other things, the relief requested in the Motion on a final basis, which order shall be in form substantially similar to the Interim Order and otherwise reasonably acceptable in form and substance to the Debtors, and acceptable in form and substance to the DIP Secured Parties and the Prepetition Secured Parties, and approving the form of notice with respect to the Final Hearing; and

(xii)    granting related relief.

2.    In support of this Motion, the Debtors submit the *Declaration of Jeff Seery in Support of Chapter 11 Petitions and First Day Relief* (the "***First Day Declaration***") and the *Declaration of Michael Sellinger in Support of the Debtors' Emergency Motion to Obtain Postpetition Debtor-in-Possession Financing* (the "***Sellinger Declaration***"), each filed contemporaneously herewith and incorporated herein by reference. The Debtors' initial 13-week

budget reflecting the anticipated minimum cash required to be maintained under applicable gaming law, anticipated cash receipts, operating disbursements, operating cash flow, non-operating disbursements (including restructuring fees and debt servicing), and net cash flow is attached as **Exhibit 3** to the Interim Order (the "***Approved Budget***").

## JURISDICTION AND VENUE

3.      The United States Bankruptcy Court for the Southern District of Texas (the "***Court***") has jurisdiction to consider this Motion under 28 U.S.C. § 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b) and the Court may enter a final order consistent with Article III of the United States Constitution.  Venue is proper under 28 U.S.C. §§ 1408 and 1409.

4.      The statutory and legal predicates for the relief requested herein are sections 105, 361, 362, 363, 364, 503, 506, 507 and 552 of title 11 of the United States Code (the "***Bankruptcy Code***"), Rules 2002, 4001, 6003, 6004, and 9014 of the Federal Rules of Bankruptcy Procedure (the "***Bankruptcy Rules***"), rules 2002-1, 4001-1(b), 4002-1 and 9013-1 of the Bankruptcy Local Rules for the Southern District of Texas (the "***Bankruptcy Local Rules***"); and the Procedures for Complex Cases in the Southern District of Texas (the "***Complex Case Procedures***").

## BACKGROUND

5.      On the date hereof (the "***Petition Date***"), the Debtors each commenced with the Court a voluntary case (the "***Chapter 11 Cases***") under chapter 11 of the Bankruptcy Code.  The Debtors continue to operate their business and manage their properties as debtors in possession under sections 1107(a) and 1108 of the Bankruptcy Code.  No trustee, examiner, or statutory committee has been appointed in the Chapter 11 Cases.

6.      Contemporaneously with the filing of the Motion, the Debtors filed a motion requesting joint administration of the Chapter 11 Cases pursuant to Bankruptcy Rule 1015(b) and

Bankruptcy Local Rule 1015-1.  The factual background regarding the Debtors, including their business, their capital structure, and the events leading to the commencement of the Chapter 11 Cases is set forth in the First Day Declaration.

## PRELIMINARY STATEMENT

7.      By this Motion, the Debtors request authority to enter into a DIP Facility that would provide $ 7.5 million of new money financing upon entry of the Interim Order, and an amount to be agreed of additional new money loans upon entry of the Final Order, and the ability to use Cash Collateral.  Such financing is critical to the Debtors' ability to fund their operations for a four-week period at the outset of the Chapter 11 Cases, during which the Debtors and the Prepetition Lenders will continue negotiations on the appropriate sizing of a final DIP financing facility and work on a value-maximizing sale or plan process.

8.      The DIP Facility is the Debtors' only available means of continuing operations over the short term and pursuing a sale or plan process.  The Debtors entered the Chapter 11 Cases with approximately $500,000 cash on hand and, without access to the DIP Facility and Cash Collateral, will be unable to satisfy their next payroll, which is scheduled to be funded on Thursday, July 17. Accordingly, absent the relief requested herein, the Debtors' only available option will be to cease operations and immediately begin the process of liquidating their assets, to the detriment of the Debtors' stakeholders, employees, and all parties in interest.

9.      The proposed DIP Facility is the product of an appropriate "market check" by the Debtors, with the assistance of their investment banker, GLC Advisors, and good-faith, spirited arm's length negotiations resulting in the Debtors receiving the best financing proposal reasonably available to them to commence the Chapter 11 Cases. In parallel with those discussions, the

6

Debtors, through their advisors, canvassed the market for alternative, third-party DIP financing, as described in the Sellinger Declaration.

10.     However, the Debtors' liquidity position, lack of meaningful unencumbered value available to serve as collateral for a third-party financing proposal, and the Prepetition Lenders' unwillingness to consent to a third-party priming DIP facility severely limited the Debtors' options to fund the Chapter 11 Cases.  Despite those challenges, the Debtors extensively negotiated the terms of the DIP Facility with the DIP Lenders through an iterative, arms-length process.  The resulting terms, including the pricing of the DIP Facility and proposed 2-to-1 roll-up of First Out Term Loans into the DIP Facility, were the best obtainable by the Debtors under those challenging circumstances and essential inducements to the DIP Lenders' willingness to extend a "lifeline" to the Debtors through the proposed DIP Facility and use of Cash Collateral and to have the Debtors avoid severe, immediate, and irreparable harm.

11.     That lifeline will allow the Debtors (and their approximately 2,900 employees) to continue the day-to-day operations of their business and, as contemplated by the Restructuring, conduct a robust sale or plan process under the supervision of the Court that maximizes value for all stakeholders.  For these reasons and others stated herein, the Debtors respectfully submit that the relief requested in the Motion should be granted.

## CONCISE STATEMENT PURSUANT TO
## COMPLEX CASE PROCEDURES AND BANKRUPTCY RULE 4001[5]

12.     As required by Bankruptcy Rules 4001(b)(1)(B) and 4001(c)(1)(B), the proposed

DIP Facility or Interim Order contains the following provisions:

| Summary of Material Terms of DIP Facility | |
|---|---|
| **DIP Borrower and DIP Guarantors**<br><br>*Fed. R. Bankr. P. 4001(c)(1)(B)* | RunItOneTime LLC (f/k/a Maverick Gaming LLC) ("***Maverick***" or the "***DIP Borrower***").<br><br>RunItOneTime HoldCo, Inc., each Licensed Operator Guarantor Equity Pledgor and each of the guarantors (collectively, the "***DIP Guarantors***" and, together with the DIP Borrower, the "***DIP Loan Parties***") under the Prepetition Credit Agreement among the DIP Borrower, the other parties party thereto as guarantors (the "***Guarantors***"), the lenders party thereto from time to time (the "***Lenders***"), and Alter Domus (US) LLC, as DIP Agent.  The obligations under the Existing Facilities are referred to herein as the "***Existing Obligations***."<br><br>Each of the DIP Loan Parties shall be a debtor and debtor-in-possession (collectively, the "***Debtors***") in the Chapter 11 Cases.<br><br>*DIP Term Sheet, "DIP Borrower and DIP Guarantors"* |
| **DIP Lenders and DIP Agent**<br><br>*Fed. R. Bankr. P. 4001(c)(1)(B)* | Each of HG Vora Capital Management, LLC (on behalf of certain funds and accounts managed or advised by it, "***HG Vora***"), Angelo Gordon & Co., L.P. (on behalf of certain funds and accounts managed or advised by it, "***TPG AG***"), and PGIM Inc. acting through its Fixed Income division (on behalf of certain funds and accounts managed or advised by it, "***PGIM***", and, together with HG Vora and TPG AG, the "***Backstop Parties***" or individually, a "***Backstop Party***."<br><br>The Backstop Parties, together with any additional parties that become "Lenders" under the DIP Facility pursuant to any assignment agreement or similar arrangement after the Petition Date, shall, collectively, be referred to herein as the "***DIP Lenders***."<br><br>Alter Domus (US) LLC, in its capacity as administrative agent and collateral agent under the DIP Facility shall be referred to herein as the "***DIP Agent***."<br><br>*DIP Term Sheet, "DIP Lenders and DIP Agent"* |
| **DIP Facility Amount**<br><br>*Fed. R. Bankr. P. 4001(c)(1)(B)* | The DIP Facility is composed of:<br><br>(i) super-priority priming term loans (the "***Initial New Money DIP Loans***") up to the aggregate principal amount of $7.5 million, which shall be backstopped by the Backstop Parties pursuant to the Backstop Commitment Letter,<br><br>(ii) super-priority priming term loans (the "***Incremental New Money DIP Loans***", and together with the Initial New Money DIP Loans, the "***New Money DIP Loans***")), in an amount equal to the Acceptable Incremental Amount, which shall remain uncommitted unless and until the Required Backstop Parties agree to the Acceptable Incremental Amount, Acceptable Final Budget, and Acceptable Restructuring, on the terms and conditions set forth herein,<br><br>(iii) $15 million of super-priority priming term loans plus an additional amount equal to the aggregate amount of accrued but unpaid interest on the First Out Term Loans (as defined in the Existing Credit Agreement) being rolled up as of such date (the "***Initial Roll-Up DIP Loans***"), which such Initial Roll-Up DIP Loans will be deemed funded and deemed to have been converted on a cashless dollar- |

---

5     Capitalized terms used in this summary chart but not defined therein have the meanings given to them in the DIP Term Sheet or the Interim Order, as applicable.

| Summary of Material Terms of DIP Facility | |
|---|---|
| | for-dollar basis from the First Out Term Loans held by any DIP Lender providing Initial New Money DIP Loans (provided that, for the avoidance of doubt, in no event shall any DIP Lender providing Initial New Money DIP Loans receive Initial Roll-Up DIP Loans in a principal amount in excess of two (2) times the principal amount of Initial New Money DIP Loans funded by such DIP Lender), and |
| | (iv) super-priority priming term loans  in an amount equal to two (2) times the Acceptable Incremental Amount (such ratio, the "***Incremental Roll-Up Ratio***") plus an additional amount equal to the aggregate amount of accrued by unpaid interest on the First-Out Term Loans or the Initial Roll-up DIP Loans being rolled up as of such date (the "***Incremental Roll-Up DIP Loans***", and together with the Initial New Money DIP Loans, the Incremental New Money DIP Loans and the Initial Roll-Up DIP Loans, collectively, the "***DIP Loans***"), which such Incremental Roll-Up DIP Loans will be deemed funded and deemed to have been converted on a cashless dollar-for-dollar basis from the following Loans held by any DIP Lender providing the Incremental New Money DIP Loans, in the following order of priority: (i) first, from any First Out Term Loans held by such DIP Lender, (ii) second, from any Initial Roll-up DIP Loans held by such DIP Lender, and (iii) third, upon written notice to the DIP Agent, from any First Out Terms Loans acquired by such DIP Lender from time to time after the funding date of the Incremental New Money DIP Loans. |
| | In connection with the roll-up, any accrued and unpaid interest on the First Out Term Loans or Initial Roll-up DIP Loans being exchanged shall be capitalized on the applicable exchange date and added to the principal amount of Initial Roll-Up DIP Loans or Incremental Roll-Up DIP Loans. |
| | *DIP Term Sheet, "DIP Facility Amount"* |
| **Certain Fees**<br><br>*Fed. R. Bankr. P. 4001(c)(1)* | (a) A structuring fee equal to 3.00% of the Initial New Money DIP Loans committed to pursuant to the Backstop Commitment Letter, payable in kind and earned on the Initial Closing Date by the Backstop Parties. |
| | (b) An upfront fee equal to 4.00% of the Initial New Money DIP Loans funded on or after the Interim Order Entry Date, payable in kind and earned on the Initial Closing Date by the DIP Lenders. |
| | (c) A backstop fee equal to 3.00% of the Initial New Money DIP Loans committed to pursuant to the Backstop Commitment Letter, payable in kind and earned on the Initial Closing Date by the Backstop Parties. |
| | (d) A structuring fee equal to 3.00% of any Incremental New Money DIP Loans committed prior to, on or after the Final Order Entry Date, payable in kind upon the funding of the Incremental New Money DIP Loans and earned by any Backstop Party committing to fund such Incremental New Money DIP Loans. |
| | (e) An upfront fee equal to 4.00% of any Incremental New Money DIP Loans funded on or after the Final Order Entry Date, payable in kind upon the funding of the Incremental New Money DIP Loans and earned by any DIP Lender funding such Incremental New Money DIP Loans. |
| | (f) A backstop fee equal to 3.00% of any Incremental New Money DIP Loans committed to on or prior to the applicable funding date, payable in kind upon the funding of the Incremental New Money DIP Loans and earned by any Backstop Party committing to such Incremental New Money DIP Loans. |
| | *DIP Term Sheet, "Certain Fees"* |
| **Approved Budget**<br><br>*Fed. R. Bankr. P. 4001(c)(1)(B)* | A copy of the Approved Budget is attached as **Exhibit 3** to the Interim Order and **Exhibit C** to the First Day Declaration. |
| | The DIP Borrower shall provide a 13-week cash flow projection, including anticipated receipts and disbursements for such period (each as approved by the Required DIP Lenders in their sole discretion, a "***Budget***").  On the Friday of every week, commencing on July 25, 2025, the DIP Borrower shall |

| Summary of Material Terms of DIP Facility | |
|---|---|
| | provide an updated Budget for the subsequent 13-week period. If the DIP Borrower and the Required DIP Lenders cannot agree on an updated Budget, the then-current Budget shall remain in effect unless and until a new Budget is agreed to by the DIP Borrower and Required DIP Lenders.  The Budget attached to the Interim Order shall be the initial Approved Budget.<br><br>For the period ending on the Friday of the second full week following the Petition Date and continuing weekly thereafter, the DIP Loan Parties shall deliver to the DIP Agent a report (each, a "***Variance Report***") describing aggregate cash receipts and aggregate cash disbursements as compared to the projected, aggregate cash receipts and disbursements provided by the then-applicable Budget for each Testing Period (a "***Variance***"). The first Variance Report shall include the period from the Petition Date through and including July 27, 2025 (the "***First Testing Period***") and each subsequent Variance Report shall include the subsequent four-week period following delivery of the prior Variance Report (a "***Subsequent Testing Period***", and the Subsequent Testing Periods together with the First Testing Period, the "***Testing Periods***", and each, a "***Testing Period***").<br><br>"***Permitted Variance***" means a Variance from the then-current Budget during any Testing Period that (x) does not exceed the total aggregate amount in such Budget of disbursements by more than 15% and (y) is not less than 75% for the first Testing Period and 85% for each Testing Period thereafter, of the aggregate cash receipts in such Budget.<br><br>*DIP Term Sheet, "Budget; Permitted Variances"; Interim Order ¶ 5.* |
| **Adequate Protection**<br><br>*Fed. R. Bankr. P. 4001(c)(1)(B)(ii), (b)(1)(B)(i), (iv)* | Adequate protection to be made available to the Lenders under the Existing Facilities shall include (i) replacement liens on the Collateral, (ii) a superpriority administrative expense claim against the DIP Loan Parties junior to the claim in favor of the DIP Agent and DIP Lenders, and (iii) cash payment of all professional fees and expenses as described in the DIP Term Sheet. The adequate protection liens and claims do not extend to the assets and estates of Debtor RunItOneTime HoldCo, Inc. as it was not a prepetition obligor.<br><br>*DIP Term Sheet, "Adequate Protection"* |
| **Maturity**<br><br>*Fed. R. Bankr. P. 4001(c)(1)(B)* | All DIP Obligations shall be due and payable in full and in cash, and the commitments shall terminate, on the earlier to occur (the "***Maturity Date***") of (i) nine (9) months from the Initial Closing Date, which date may be extended by the Required DIP Lenders (and without the consent of any other DIP Lender) if the sole condition remaining to be satisfied for an Acceptable Restructuring is the receipt of regulatory approvals, (ii) the effective date of a Plan of Reorganization that has been confirmed by an order of the Bankruptcy Court, (iii) 25 days after the Interim Order Entry Date unless on or before such day the Final Order Entry Date shall have occurred, and (iv) consummation of a sale of all or substantially all of the assets of the DIP Loan Parties.<br><br>*DIP Term Sheet, "Maturity"* |
| **Interest Rate; Default Rate**<br><br>*Fed. R. Bankr. P. 4001(c)(1)(B)* | The interest rate, default rate, and fees under the DIP Facility are set forth in Annex I to the DIP Term Sheet and include (i) cash interest of Term SOFR (subject to a 2.00% floor) plus a margin of 12.50% per annum on the New Money DIP Loans, (ii) interest of Term SOFR (subject to a 2.00% floor) plus a margin of 12.50% per annum on the Roll-Up DIP Loans, of which (A) SOFR (subject to a 2.00% floor) plus a margin of 1.00% is payable in cash and (B) a margin of 11.50% is payable in kind, with (iii) a default interest rate of an additional 3.00% per annum above the applicable interest rate.<br><br>*DIP Term Sheet, Annex I* |
| **Priority of Claims and Liens; Collateral** | "***Collateral***" means each DIP Loan Party's interest in all assets and properties (whether tangible, intangible, real, personal or mixed), whether now owned by or owing to, or hereafter acquired by, or arising in favor of, such DIP Loan Party (including under any trade names, styles, or derivations thereof), and whether owned or consigned by or to, or leased from or to, the Debtors, and regardless |

| Summary of Material Terms of DIP Facility ||
|---|---|
| *Fed. R. Bankr. P. 4001(c)(1)(B)(i)*<br><br>*Complex Case Procedures, ¶ 8(d)* | of where located, including, among other things, (a) all other claims and causes of action and the proceeds thereof, other than claims and causes of action under section 502(d), 544, 545, 547, 548, 549, 550 or 553 of the Bankruptcy Code, or any other avoidance actions under the Bankruptcy Code (collectively, "***Avoidance Actions***") but, subject to entry of a Final Order providing for such relief, including any proceeds or property recovered, unencumbered or otherwise from Avoidance Actions, whether by judgment, settlement or otherwise ("***Avoidance Proceeds***"); *provided*, that the Collateral shall not include certain Excluded Assets set forth in the DIP Term Sheet.<br><br>*DIP Term Sheet, "Collateral and Priority"* |
| **Use of Cash Collateral or DIP Proceeds**<br><br>*Fed. R. Bankr. P. 4001(b)(1)(B)*<br><br>*Complex Case Procedures, ¶ 8(g)* | The proceeds of the New Money DIP Loans will be used in accordance with the terms of the Budget as then in effect, subject to Permitted Variances, to: (a) pay professional fees and other restructuring charges arising on account of the Chapter 11 Cases, including statutory fees of the United States Trustee and allowed professional fees and expenses of an unsecured creditors' committee appointed in the Chapter 11 Cases (the "***Committee***"); (b) pay professional fees and expenses incurred by the DIP Agent, the Fronting Lender and/or the DIP Lenders as provided under the DIP Facility, including those incurred in connection with the preparation, negotiation, documentation, and court approval of the DIP Facility; (c) provide for the working capital, and for other general corporate purposes of the Debtors; and (d) pay administration costs of the Chapter 11 Cases and claims or amounts approved by the Bankruptcy Court.<br><br>*DIP Term Sheet, "Use of Proceeds"* |
| **Conditions Precedent to Closing and Lending**<br><br>*Fed. R. Bankr. P. 4001(c)(1)(B)* | **<u>Conditions to the Initial Closing Date</u>**: Limited to:<br><br>1. **Interim Order/Bankruptcy Matters**.<br><br>    (a)  Commencement of the Chapter 11 Cases and filing of the "first day" and "second day" motions acceptable to the Required Backstop Parties.<br><br>    (b)  Entry of the Interim Order acceptable to the Required Backstop Parties.<br><br>2. **Budgets and Financial Information**. The Initial Budget shall be satisfactory to the Required Backstop Parties.<br><br>3. Customary closing conditions in connection with debtor-in-possession financings (e.g., delivery of corporate records and authority, financing statements, etc.)<br><br>**<u>Conditions to All DIP Loans</u>**: Among other things:<br><br>Interim Order and Final Order continue to be in effect; DIP Loan Parties in material compliance with DIP Orders and Cash Management Order; Transaction Support Agreement is in full force and effect; representations and warranties in DIP Loan Documents continue to be true in material respects.<br><br>*DIP Term Sheet, "Conditions Precedent"* |
| **Milestones**<br><br>*Fed. R. Bankr. P. 4001(c)(1)(B)(vi)* | As may be extended by the Required Backstop Lenders in their sole discretion, each of the Debtors agree to comply with the following milestones (the "***Milestones***"):<br><br>    (a)  commencement of the Chapter 11 Cases no later than July 14, 2025;<br><br>    (b)  no later than the Petition Date, file a "first day" motion and proposed order to approve the DIP Facility;<br><br>    (c)  no later than seven (7) calendar days after the Petition Date, deliver the DIP Credit Agreement;<br><br>    (d)  no later than seven (7) calendar days after the Petition Date, file a sale motion (the "***Sale Motion***") and bid procedures motion (the "***Sale Procedures Motion***") in form and substance acceptable to the Required Backstop Parties, providing for the sale process; |

| Summary of Material Terms of DIP Facility |
|---|

| | |
|---|---|
| | (e) obtain entry by the Bankruptcy Court of the Interim Order no later than two (2) business days after the Petition Date; |
| | (f) by the earlier of (i) twenty-one (21) calendar days after the Petition Date and (y) seven (7) calendar days before the hearing to consider approval of the Final Order, the Debtors shall have proposed, and the Required Backstop Parties shall have agreed to such proposal in their sole discretion, (i) a forecast of anticipated cash receipts and disbursements, to be set forth on a weekly and monthly basis, including the anticipated uses of the DIP Facility, through the conclusion of an Acceptable Restructuring (each as approved by the Required Backstop Parties in their sole discretion, an "***Acceptable Final Budget***"), (ii) a bankruptcy plan, sale process, or other disposition of the Chapter 11 Cases or the Debtors' assets in form and substance satisfactory to the Required Backstop Parties in their sole discretion (an "***Acceptable Restructuring***"), and (iii) the principal amount of the Incremental New Money DIP Loans in an amount satisfactory to the Required Backstop Parties in their sole discretion (the "***Acceptable Incremental Amount***") and Incremental Roll-Up DIP Loans; |
| | (g) within twenty-five (25) calendar days after the Petition Date, obtain entry of the Final Order; |
| | (h) if necessary for an Acceptable Restructuring and unless superseded by the Final Order, request a hearing on the Sale Procedures Motion to occur within thirty (30) days after the Petition Date; |
| | (i) if necessary for an Acceptable Restructuring and unless superseded by the Final Order, obtain entry of an order with respect to the Sale Procedures Motion no later than thirty-five (35) calendar days after the Petition Date (the "***Sale Procedures Order***"), which Sale Procedures Order shall (w) approve the relief requested in the Sale Motion, (x) set a bid deadline of no later than sixty-five (65) calendar days after the Petition Date, (y) require an auction (if applicable) to occur no later than seventy (70) calendar days after the Petition Date, and (z) set a hearing date on the DIP Loan Parties' Sale Motion no later than seventy-five (75) calendar days after the Petition Date; and |
| | (j) if necessary for an Acceptable Restructuring and unless superseded by the Final Order, within eighty (80) calendar days after the Petition Date, satisfy all conditions precedent necessary to consummate a sale of all or substantially all of the Debtors' assets, other than approvals by the Washington, Nevada, and Colorado gaming regulators, unless the Backstop Parties agree to a different disposition of MainCo (as defined in the Transaction Support Agreement). |
| | *DIP Term Sheet, "Covenants"* |
| **Debtors' Stipulations**<br><br>*Fed. R. Bankr. P. 4001(c)(1)(B)(iii)* | The Interim Order provides for customary stipulations regarding the Prepetition Credit Facility, including stipulations as to the amount of the Prepetition Secured Obligations and Prepetition Liens (each as defined in the Interim Order) as well as the following stipulations:<br><br>**No Control**. None of the Prepetition Secured Parties or DIP Secured Parties control, or have controlled, any of the Debtors or their properties or operations, have authority to determine the way any Debtors' operations are conducted, or are control persons or insiders of the Debtors or any of their affiliates.<br><br>**No Claims or Causes of Action**. No claims or causes of action held by the Debtors or their estates exist against, or with respect to, the Prepetition Secured Parties or any of their respective Representatives under or relating to any agreements by and among the Debtors and any Prepetition Secured Party as of the Petition Date. The Debtors have waived, discharged, and released any right to challenge any of the Prepetition Secured Obligations, the priority of the Debtors' obligations thereunder, and the validity, extent, and priority of the Prepetition Liens.<br><br>**Cash Collateral**. All the Debtors' cash, whether existing as of the Petition Date or thereafter, wherever located, any amounts generated by the sale or other disposition of Prepetition Collateral, |

| Summary of Material Terms of DIP Facility | |
|---|---|
| | and all income, proceeds, products, rents or profits of any Prepetition Collateral, constitutes or will constitute "cash collateral" of the Prepetition Secured Parties within the meaning of section 363(a) of the Bankruptcy Code (the "***Cash Collateral***"). *Interim Order* ¶ F. |
| **Releases of Claims** *Fed. R. Bankr. P. 4001(c)(1)(B)(viii)* *Complex Case Procedures, ¶ 8(f)* | Each Debtor, for itself and its successors, assigns, parents, subsidiaries, affiliates, predecessors, employees, agents, heirs and executors, as applicable, hereby fully and unconditionally releases each of the DIP Agent,  the DIP Lenders, the Prepetition Agent, the Lenders under the Existing Facilities, and each of their respective directors, officers, employees, subsidiaries, affiliates, attorneys, agents, representatives, successors and assigns (collectively, the "***Released Parties***") from any and all claims, causes of action, costs or demands of whatever kind or nature, whether known or unknown, liquidated or unliquidated, fixed or contingent, asserted or unasserted, foreseen or unforeseen, or matured or unmatured, which such Debtor may have had against the Released Parties by reason of any act or omission on the part of the Released Parties occurring prior to the date hereof, in each case regarding or relating to this DIP Term Sheet, the DIP Facility, or any document or instrument relating thereto (collectively, the "***Released Matters***"); <u>provided</u>, that Released Matters shall not include any claims, causes of action, costs or demands of whatever kind or nature, whether known or unknown, liquidated or unliquidated, fixed or contingent, asserted or unasserted, foreseen or unforeseen, or matured or unmatured, resulting primarily from the gross negligence or willful misconduct of the Released Parties, as determined by a court of competent jurisdiction in a final and non-appealable judgment or order. Each Debtor represents and warrants that (i) it has no knowledge of any such claims by it against the Released Parties and (ii) that the foregoing constitutes a full and complete release of all such claims. *DIP Term Sheet, "Releases"* |
| **Waiver or Modification of Automatic Stay** *Fed. R. Bankr. P. 4001(c)(1)(B)(iv)* | The automatic stay imposed under section 362(a) of the Bankruptcy Code will be modified as necessary to effectuate all of the terms and provisions of the Interim Order, including to: (a) permit the Debtors to grant the liens and claims under the DIP Facility and perform necessary acts to assure the perfection and priority of the liens granted; (b) permit the Debtors to incur all liabilities and obligations to the DIP Secured Parties and the Prepetition Secured Parties under the DIP Facility; (c) permit the DIP Secured Parties to exercise their rights and remedies under an Event of Default; and (e) authorize the Debtors to make payments made in accordance with the Interim Order. *Interim Order* ¶ 11. |
| **Challenge Period** *Fed. R. Bankr. P. 4001(c)(1)(B)(iii), (viii)* | The Committee or any other person or entity with standing, must timely file an adversary proceeding or contested matter by the earlier of: (a)(i) if a Creditors' Committee has been appointed, then by the Creditors' Committee within 60 calendar days after appointment of the Creditors' Committee and (ii) with respect to any other party in interest with requisite standing (other than the Debtors), within 60 calendar days after entry of the Interim Order (the time period established by the foregoing clauses (i) and (ii) the "***Challenge Period***" as may be extended by agreement between the Committee or other applicable third party and the DIP Lenders); *provided*, *however*, that if, before the end of the Challenge Period, (x) the cases convert to a chapter 7, or (y) a chapter 11 trustee is appointed, then, in each such case, the Challenge Period shall be extended for a period of 60 days solely with respect to any such chapter 7 or chapter 11 trustee: (A) objecting to or challenging the amount, validity, perfection, enforceability, priority or extent of the Prepetition Secured Obligations or the Prepetition Liens or (B) otherwise asserting or prosecuting any action for preferences, fraudulent transfers or conveyances, other avoidance claims or any other claims, counterclaims or causes of action, objections, contests or defenses (collectively, the "***Challenges***") against any of the Prepetition Secured Parties or their respective affiliates and subsidiaries and Representatives in connection with the Prepetition Credit Documents; and (b) there is a final non-appealable order in favor of the plaintiff sustaining any such Challenge in any such timely filed adversary proceeding or contested matter. |

| Summary of Material Terms of DIP Facility | |
|---|---|
| | Interim Order ¶ 30(a). |
| **Carve-Out**<br><br>*Fed. R. Bankr. P. 4001(c)(1)(B)* | Subject to the terms and conditions contained in paragraph **Error! Reference source not found.** of the Interim Order, each of the DIP Liens and the Prepetition Liens shall be subject and subordinate to payment of the Carve-Out in accordance with the terms of the Interim Order.<br><br>For purposes of the Interim Order, "***Carve-Out***" means (i) all unpaid fees required to be paid in these Chapter 11 Cases to the Clerk of the Court and to the Office of the United States Trustee; (ii) all reasonable and documented fees and expenses up to $75,000 incurred by a chapter 7 trustee; and (iii) the reasonable and documented accrued and unpaid fees, costs, and disbursements (the "***Allowed Professional Fees***") of professionals retained by the Debtors in these Chapter 11 Cases (collectively, the "***Debtor Professionals***") and the Creditors' Committee (the "***Committee Professionals***" and, together with the Debtor Professionals, the "***Estate Professionals***") that are incurred at any time before or on the first business day following delivery by the DIP Agent of a Carve-Out Trigger Notice at the direction of the Required DIP Lenders, and are allowed by this Court and remain unpaid after application of any retainers being held by such professionals for each Estate Professional, up to the amounts for the Estate Professional included in the Approved Budget through the date of the Carve-Out Trigger Notice, plus any unpaid restructuring or sale fee of investment bankers if earned and payable as of the Carve-Out Trigger Notice Date pursuant to the terms and conditions of an engagement letter approved by the Court and not otherwise already included in the Approved Budget (the amounts set forth in the foregoing clauses (i), (ii), and (iii), the "***Pre-Carve-Out Trigger Notice Cap***"); *provided* that the Pre-Carve-Out Trigger Notice Cap shall only include up to $50,000 pursuant to the Investigation Expenses Budget Cap; (iv) the Allowed Professional Fees of the Estate Professionals that are incurred after the first business day following delivery of a Carve-Out Trigger Notice by the DIP Agent, in an aggregate amount not to exceed $250,000 (the amounts set forth in clause (iv), the "***Post-Carve-Out Trigger Notice Cap***" and together with the Pre-Carve-Out Trigger Notice Cap, the "***Carve-Out Cap***"). The term "***Carve-Out Trigger Notice***" shall mean a written notice delivered by email by the DIP Agent to the Debtors, their lead counsel, the U.S. Trustee, and lead counsel to any Creditors' Committee, which notice may be delivered at any time on or after the Termination Declaration Date, expressly stating that the Post-Carve-Out Trigger Notice Cap is triggered. The term "***Carve-Out Trigger Notice Date***" shall mean the day on which a Carve-Out Trigger Notice is delivered by the DIP Agent to the foregoing parties.<br><br>Interim Order ¶ 6. |
| **Indemnification**<br><br>*Fed. R. Bankr. P. 4001(c)(1)(B)(ix)* | The Prepetition Secured Parties and DIP Secured Parties are entitled to indemnification as provided and to the extent set forth under the DIP Documents; *provided*, that no such Indemnified Parties (as defined in the DIP Documents) will be indemnified for any cost, expense, or liability to the extent determined in a final, non-appealable judgment of a court of competent jurisdiction to have resulted primarily from such parties' gross negligence or willful misconduct.<br><br>Interim Order ¶ F(vi). |
| **Section 506(c) Waiver / Section 552(b) Waiver**<br><br>*Fed. R. Bankr. P. 4001(c)(1)(B)(x)* | Subject to and effective only upon entry of a Final Order providing for such relief (but retroactive to the Petition Date), no costs or expenses of administration of these Chapter 11 Cases or any Successor Cases or future proceeding that may result therefrom shall be charged against or recovered from the DIP Collateral or the Prepetition Collateral, the DIP Secured Parties, or the Prepetition Secured Parties pursuant to section 506(c) of the Bankruptcy Code or any similar principle of law, without the prior written consent of the requisite DIP Secured Parties and the requisite Prepetition Secured Parties.<br><br>Upon entry of the Interim Order, the DIP Secured Parties will not be subject to the equitable doctrine of "marshaling" or any other similar doctrine with respect to any of the DIP Collateral. Subject to and effective only upon entry of a Final Order providing for such relief (but retroactive to the Petition Date), none of the Prepetition Secured Parties shall be subject to the equitable doctrine of |

14

| Summary of Material Terms of DIP Facility | |
|---|---|
| | "marshaling" or any similar doctrine with respect to the Prepetition Secured Obligations or the Prepetition Collateral. |
| | The DIP Secured Parties and Prepetition Secured Parties shall each be entitled to all of the rights and benefits of section 552(b) of the Bankruptcy Code.  Subject to and effective only upon entry of a Final Order providing for such relief (but retroactive to the Petition Date), in no event shall the "equities of the case" exception in section 552(b) of the Bankruptcy Code apply to the Prepetition Secured Parties with respect to proceeds, products, offspring, or profits of any Prepetition Collateral. |
| | *Interim Order ¶¶ 15-17.* |
| **Events of Default**<br><br>*Fed. R. Bankr. P. 4001(c)(1)(B);* | The DIP Documents and the Interim Order contain events of default that are usual and customary for debtor-in-possession financings, in each case subject to a Remedies Notice Period (as further detailed below), including: non-payment of principal and interest; breach of representations, warranties and covenants; noncompliance with the Prepetition Credit Agreement and the milestones in the DIP Term Sheet; noncompliance with the Approved Budget (subject to Permitted Variances); the DIP Orders ceasing to create valid and perfected liens in the Collateral; non-entry of the Final Order; conversion to chapter 7; filing by any DIP Loan Party or entry of an order approving payment of prepetition claims other than provided in the "first day" and "second day" orders or consented to by the DIP Lenders; appointment of a trustee or examiner, and dismissal of the Chapter 11 Cases. |
| | Upon expiration of the Remedies Notice Period following an Event of Default, the DIP Agent, on behalf of and acting at the direction of the Required DIP Lenders shall, subject to the Carve-Out, be permitted to exercise all remedies set forth in the Interim Order and the DIP Documents, including: (i) declaring the termination, reduction, or restriction of any further DIP Commitment to the extent any such DIP Commitment remains, (ii) declaring all DIP Obligations to be immediately due, owing, and payable, without presentment, demand, protest, or other notice of any kind, all of which are expressly waived by the Debtors, notwithstanding anything herein or in any DIP Document to the contrary, (iii) declaring the termination of the applicable DIP Documents as to any future liability or obligation of the DIP Secured Parties, and (iv) declaring the termination, reduction, or restriction on the ability of the Debtors to use Cash Collateral (any such declaration of the foregoing (i) through (iv) provided in writing by the DIP Agent (a "***Termination Declaration***" and the date of such Termination Declaration, the "***Termination Declaration Date***"). |
| | On and after the Termination Declaration Date and other than as required by paragraph 6 with respect to the Carve-Out: (A) the Debtors shall be prohibited from requesting any further draws of DIP Loans under the DIP Facility; (B) all DIP Obligations shall be immediately due and payable, all commitments to extend credit under the DIP Facility will terminate, and all treasury and cash management, hedging obligations, and bank product obligations shall be cash collateralized; (C) all authority to use Cash Collateral shall cease; and (D) upon satisfaction of the Carve-Out funding obligations set forth in paragraph 6, the DIP Secured Parties shall be entitled to exercise rights and remedies under the DIP Documents in accordance with this Interim Order. |
| | *DIP Term Sheet, "Events of Default"; Interim Order ¶ 12.* |

13.     As required by paragraph 8 of the Complex Case Procedures, the proposed DIP

Facility or Interim Order contains the following provisions:[6]

---

[6]     This statement is qualified in its entirety by reference to the applicable provisions of the DIP Documents.  To the extent there exists any inconsistency between this concise statement and the provisions of the DIP Documents or the DIP Orders, the provisions of the DIP Documents or the DIP Orders, as applicable, will control.  Capitalized

| Summary of Material Terms of DIP Facility | |
|---|---|
| **Sale or Plan Confirmation Milestones**<br><br>*Complex Case Procedures, ¶ 8(a)* | The DIP Term Sheet incorporates milestones with approval of the DIP Facility, documentation of the credit agreement for the DIP Facility, agreement to an Acceptable Restructuring, Acceptable Final Budget, and an Acceptable Incremental Amount, and a bankruptcy sale process.<br><br><u>Justification</u>: These milestones were heavily negotiated and required by the DIP Lenders as a condition to providing the DIP Facility and to provide for efficient administration of the Chapter 11 Cases given the Debtors' strained liquidity position. The Debtors believe the milestones should be approved because they are reasonable and achievable in the context of the Chapter 11 Cases. |
| **Cross-Collateralization**<br><br>*Complex Case Procedures, ¶ 8(b)* | No provision of the DIP Term Sheet or the Interim Order grants cross-collateralization protection. For an avoidance of doubt, the Roll-Up (described in further detail herein) is distinct from cross-collateralization and adequate protection liens, each of which are justified under the circumstances of the Chapter 11 Cases in accordance with similar provisions approved by bankruptcy courts, including those approved by courts in this District. |
| **Roll-Up**<br><br>*Complex Case Procedures, ¶ 8(c)* | As set forth above in paragraph 12 under the heading "DIP Facility Amount," the DIP Facility proposes a 2:1 rollup of (a) First Out Term Loans held by any DIP Lender providing Initial New Money DIP Loans and (b) in the following order of priority, (1) any First Out Term Loans held by such DIP Lender, (2) any Initial Roll-Up DIP Loans held by such DIP Lender, and (3) any First Out Term Loans acquired by such DIP Lenders, in each case, held by any DIP Lender providing Incremental New Money DIP Loans.<br><br><u>Justification</u>: The roll-up was an essential inducement to the DIP Lenders' willingness to extend the DIP Facility, and the DIP Facility is the only actionable source of financing for these Chapter 11 Cases. The roll-up is substantially consistent with the types of roll-ups previously approved by courts in this District. The roll-up is also without prejudice potential Challenges by the Committee or other party in interest. Accordingly, the Debtors believe that the proposed roll-up is reasonable and necessary under the circumstances. *See* Interim Order ¶ 4(b). |
| **Priority of Claims and Liens; Collateral; Liens on Avoidance Actions**<br><br>*Complex Case Procedures, ¶ 8(d)* | The Collateral includes, subject to entry of the Final Order, liens on Avoidance Actions and the proceeds thereof.<br><br><u>Justification</u>: The inclusion of proceeds of Avoidance Actions as Collateral under the DIP Facility is subject to the entry of the Final Order, so parties in interest will have sufficient notice and an opportunity to object. |
| **Default Provisions and Remedies**<br><br>*Complex Case Procedures, ¶ 8(e)* | The Interim Order provides that, upon an Event of Default and following the Remedies Notice Period, the DIP Lenders may immediately, among other things, (i) terminate the commitments under the DIP Facility, (ii) terminate the DIP Facility, or declare all Loans then outstanding due and payable; and (iii) terminate the Debtors' use of Cash Collateral.<br><br><u>Justification</u>: As voluntary postpetition creditors of the estate, who were under no obligation to provide the critical DIP Financing, the DIP Lenders should not be subject to the requirements that would be applicable to the exercise of remedies on prepetition claims. In addition, the DIP Lenders have agreed to a customary 5 business day notice period before exercising remedies and terminating the Debtors' ability to use cash collateral, which will afford the Committee or any other party in interest an opportunity to be heard on the issue of whether an Event of Default under the DIP Facility has actually occurred before exercising remedies. Further, order expressly provides that alter the |

---

terms used but not otherwise defined in this section have the meaning ascribed to such terms in the Interim Order or the DIP Documents.

| Summary of Material Terms of DIP Facility |
|---|

| | |
|---|---|
| | evidentiary burden with respect to any termination of the automatic stay or limit the range of remedies that the Court may order upon default. *See* Interim Order ¶ 12. |
| **Releases of Claims**<br><br>*Complex Case Procedures, ¶ 8(f)* | The DIP Term Sheet and Interim Order provide for the release and discharge of each of the Released Parties from, among other things, any and all liabilities, claims and causes of action relating to the Released Matters.<br><br>Justification: The release is a material inducement to the DIP Lenders to provide the DIP Facility and is being provided in exchange for consideration in the form of the DIP Facility and the DIP Lenders' consent to the Debtors' use of Cash Collateral, which is essential to the Debtors' ability to stabilize their operations in chapter 11. The Released Matters are also tailored to the circumstances and consistent with releases provided to similar postpetition lenders in other matters. The release complies with the requirements of paragraph 9 of the Complex Case Procedures because it is subject to Challenges. *See* Interim Order ¶ 30. |
| **Limitations on the Use of Cash Collateral or DIP Proceeds**<br><br>*Complex Case Procedures, ¶ 8(g)* | The DIP Term Sheet provides that no portion of the Loan's Parties' Cash Collateral, the proceeds of the DIP Facility, the Collateral, or the Carve-Out may be used:<br><br>(a)     for any purpose, or in any amount, not permitted by the Budget as then in effect or that is prohibited under the Bankruptcy Code or the DIP Orders;<br><br>(b)     directly or indirectly to finance in any way (i) any adversary action, suit, arbitration, proceeding, application, motion or other litigation of any type, or the investigation or preparation for any of the foregoing, that could be adverse to the interests of any or all of the DIP Agent, the DIP Lenders, the Prepetition Agent, or the Lenders under the Existing Facilities or (ii) any other action, which with the giving of notice or passing of time, could result in an Event of Default under the DIP Facility; or<br><br>(c)     to make any distribution under a plan of reorganization in the Chapter 11 Cases (a "***Plan of Reorganization***") that (i) has not been approved by the DIP Lenders or (ii) does not provide for the indefeasible payment of DIP Obligations and the obligations under the Existing Facilities in full and in cash unless expressly agreed in writing by the DIP Lenders;<br><br>*provided* that, advisors to the Committee, if one is appointed, may investigate the liens granted pursuant to, or any claims under or causes of action with respect to, the Existing Facilities at an aggregate expense for such investigation not to exceed $50,000, provided, that no portion of such amount may be used to prosecute any claims.<br><br>Justification: The requirements to use DIP Facility proceeds and Cash Collateral in accordance with the Approved Budget (subject to Permitted Variances), and the limitation on ability to use such funds to take actions adverse to the DIP Lenders, are customary and reasonable safeguards for the proposed DIP Lenders. |
| **Non-Consensual Priming Liens**<br><br>*Complex Case Procedures, ¶ 8(h)* | None. |
| **Any Other Provision That Limits Estate Fiduciaries to Fulfill Duties** | None. |

| Summary of Material Terms of DIP Facility | |
|---|---|
| *Complex Case Procedures*, ¶ 8(i) | |

## BACKGROUND

### I.  The Debtors' Prepetition Secured Indebtedness

14.  The Debtors are party to that certain Credit Agreement, dated as of September 3, 2021 (as amended by that certain Amendment No. 1, dated as of December 23, 2021, as further amended by that certain Amendment No. 2, dated as of February 27, 2023, as further amended by that certain Amendment No. 3, dated as of June 21, 2023, as further amended by that certain Amendment, Resignation, Waiver, and Appointment Agreement, dated as of February 20, 2024, and as further amended by that certain Amendment No. 4, dated as of April 3, 2024 (the "***Fourth Amendment***"), and further amended, restated, supplemented or otherwise modified from time to time, the "***Prepetition Credit Agreement***"), with the lenders party thereto (the "***Prepetition Lenders***") and Alter Domus (US) LLC (the "***Prepetition Agent***").

15.  The Prepetition Credit Agreement originally consisted of a syndicated credit facility (the "***Prepetition Credit Facility***") consisting of a $310 million term loan B and a $55 million revolving credit facility.  The facility was amended a number of times, and the Fourth Amendment effected a more broad-ranging restructuring.

16.  In sum, the Fourth Amendment (a) converted the existing $55 million revolver into $55 million of fully funded term loans with first priority under the Prepetition Credit Agreement (the "***First Out Term Loans***"), provided $10 million of new money additional First Out Term Loans and issued $12 million of additional First Out Term Loans as consideration for the lenders to agree to and provide the First Out Term Loans; (b) exchanged the majority of the then-$258 million outstanding under the existing term B loan into term loans with second priority under the

Prepetition Credit Agreement (the "***Second Out Term Loans***") at a 15% discount to par and a small minority of the existing term B loan into term loans with third priority under the Prepetition Credit Agreement (the "***Third Out Term Loans***", together with the First Out Term Loans and Second Out Term Loans, the "***Priority Term Loans***") at a 10% discount to par, (c) provided the Company the ability to make paid-in-kind (PIK) interest on the Second Out Term Loans and Third Out Term Loans through and including December 31, 2024, (d) loosened the Company's financial maintenance covenants; and (e) extended the maturity of the First Out Term Loans, Second Out Term Loans, and Third Out Term Loans to June 2028.  Holders of approximately $14 million of existing term B loans did not consent to the terms of the Fourth Amendment and retained their existing loans, which are behind the Priority Term Loans in priority (the "***Term B Loans***").

17.     As of the Petition Date, the outstanding balance under the Prepetition Credit Facility is $305,854,469 in the aggregate, divided as follows across the following tranches:

(a)     $77,000,000 outstanding principal amount of First Out Term Loans;

(b)     $214,726,510 outstanding principal amount of Second Out Term Loans;

(c)     $202,257 outstanding principal amount of Third Out Term Loans; and

(d)     $13,925,702 outstanding principal amount of Term B Loans.

18.     The Prepetition Credit Facility is secured by a first priority security interest in substantially all of the Debtors' assets.  The owners of the equity interests in the Leased Operator Affiliate Debtors have also granted pledges of such equity interests in the Leased Operator Affiliate Debtors as collateral under the Prepetition Credit Agreement.  Priority with respect to any payments or proceeds received by the Prepetition Agent in respect of any part of the Prepetition Collateral is each of the Priority Term Loans in order (i.e., First Out Term Loans, followed by Second Out Term Loans, followed by Third Out Term Loans) followed by the Term B Loans.

**II.      The Debtors Have an Immediate Need for Postpetition Financing.**

19.      As set forth in the First Day Declaration and the Sellinger Declaration, the Debtors

enter these Chapter 11 Cases with extremely limited cash on hand and the expectation that their

currently available liquidity will be exhausted shortly after the Petition Date.  The Debtors

understand that the DIP Lenders are only willing to fund the ongoing cost of operations in

connection with an in-court process, supported by the DIP Facility.  Accordingly, the Debtors have

an immediate and a critical need for access to funds under the DIP Facility and to continue to use

Cash Collateral to, among other things, (a) permit the orderly continuation of the operation of their

businesses, (b) maintain business relationships with customers, employees, vendors, and suppliers,

(c) satisfy other working capital and operational needs, and (d) pay costs, fees, and expenses

(including professional fees, expenses, and obligations) associated with the Restructuring.

20.      As of the Petition Date, the Debtors have approximately $[500,000] of accessible

cash (also commonly referred to as "excess cash").  Based on management's current liquidity

forecast, this relatively de minimis amount of excess cash is insufficient to support the Debtors'

operations through even the end of this week.  While the Debtors have approximately $16.8 million

of cash in the aggregate, the vast majority of this cash is subject to casino gaming regulatory

restrictions (e.g., to comply with minimum cage case and player withholding requirements).  As

such, these casino gaming regulatory considerations greatly reduce the amount of cash available

to the Debtors for alternative purposes.

21.      Due to the foregoing, the Debtors have insufficient liquidity to manage their

working capital needs and pay the various disbursements identified in the Approved Budget.  The

disbursements set forth in the Approved Budget include, among other critical payments, payroll

and benefits and payments contemplated by the Debtors' proposed "first day" orders.  Any

disruption in paying the Debtors' employees and vendors will result in the attrition of the Debtors'

workforce and the destruction of key vendor relationships, which in turn will impact the Debtors' ability to attract and retain their customers.  Time is of the essence for the Debtors, given their upcoming payroll obligations and mounting pressure from trade and other creditors.

22.     Given the Debtors' limited excess cash, the Debtors require immediate access to the DIP Facility along with use of Cash Collateral to avoid likely facing a liquidation and the attendant degradation in value of the Debtors' estates.  Without access to both the Cash Collateral and the incremental liquidity provided by the DIP Facility, the Debtors would face severe, immediate and irreparable harm—including being unable to fund payroll, satisfy their vendors and suppliers, or fund their business operations—all of which will require the Debtors to cease operating immediately, to the detriment of all creditors and other parties in interest.

## III.     The Proposed DIP Facility Is the Best and Only Financing Option Available.

23.     Given the Debtors' prepetition capital structure, the challenges facing their business, and the facts and circumstances of the Chapter 11 Cases, the DIP Facility is the best and only available postpetition financing option to the Debtors.

24.     As described in the Sellinger Declaration, the Debtors' management evaluated and pursued a number of paths beginning in early 2025 to attempt to raise additional financing to sustain the Debtors' business operations.  The Debtors, among other things, pursued new capital investments and considered asset sales to third-party investors.  The Debtors explored potential financing alternatives with existing and third-party lenders and also engaged in negotiations with the Prepetition Lenders regarding potential financing.

25.     From April to June 2025, the Debtors negotiated the terms of an overall consensual restructuring transaction with the Ad Hoc Group, which culminated in the Debtors' entry into the Transaction Support Agreement on June 25, 2025.  In connection with the execution of the Transaction Support Agreement, the Debtors and their advisors, including GLC, began discussions

in earnest with the Ad Hoc Group and their advisors over the terms of potential out-of-court or in-court DIP financing.  Through these negotiations, it became clear that the Ad Hoc Group would only be willing to provide the additional financing required for the Debtors to continue operating and to execute the contemplated restructuring transactions through an in-court process.

26.     On July 7, 2025, certain members of the Ad Hoc Group delivered a DIP financing term sheet to the Debtors, which the parties negotiated over the ensuing week.  In parallel with its negotiations with the Ad Hoc Group, GLC canvassed the market for potential alternative DIP financing sources.  Specifically, GLC contacted 24 parties to solicit interest in a third-party funded DIP financing.  While 21 parties responded to GLC's outreach, none of the parties engaged substantively or submitted proposals.[7]

27.     The Debtors' ability to raise postpetition financing from sources other than the Prepetition Lenders was limited given the circumstances.  Specifically, the key assets used in the operation of the Debtors' business are, subject to certain limited exceptions, pledged as collateral to the Prepetition Lenders.  In addition, the few unencumbered assets the Debtors do have (e.g., casino gaming licenses) are generally not available to be pledged as collateral to lenders due to casino gaming regulatory requirements.

28.     The Prepetition Lenders also made clear that they would not consent to their liens on such collateral being primed by third-party financing, and the Debtors determined that a "priming fight" with the Prepetition Lenders was  unlikely to be a viable option (for both the Debtors and potential financing sources).  Thus, to obtain alternative third-party financing that would not entail a costly, risky, and likely unsuccessful priming fight at the outset of these cases,

---

[7]     One party provided a non-binding junior DIP financing proposal on May 22, 2025, during the Company's initial evaluation of strategic options and before execution of the Transaction Support Agreement. Following execution of the Transaction Support Agreement, that party informed the Debtors that it was no longer interested in providing such financing.

the Debtors would have needed to locate a lender willing to provide postpetition financing either on an unsecured or junior basis or secured by liens junior in priority to the liens securing the Prepetition Lenders' interests.  Ultimately the Debtors were unable to obtain any unsecured financing, credit secured by liens on any of the Debtors' limited unencumbered assets, or credit secured by junior liens.  Despite the efforts of the Debtors and their advisors, it also became clear that no alternative source of financing would be available on an out-of-court basis.

29.     Accordingly, the Debtors and their advisors actively negotiated the terms and provisions of the proposed DIP Facility and use of Cash Collateral in the days leading up to the Petition Date.  The process was marked by extensive, arm's-length negotiations to achieve the best available terms for the Debtors for what ultimately became the final terms of the proposed DIP Facility and use of Cash Collateral.  During that time, the parties exchanged multiple term sheet drafts and draft DIP orders in an effort to reach the best available terms under the circumstances, and such negotiations resulted in several concessions for the Debtors, including reduced roll-up ratios, fees generally paid in kind instead of cash (including a material portion of interest being paid in kind), more lenient variance testing, and an enhanced carve-out.  The proposed terms of the DIP Facility and use of Cash Collateral were reviewed and ultimately approved by a special committee of independent directors (the "***Special Committee***") in advance of the chapter 11 filing. Based on the foregoing efforts, the Debtors, in consultation with their advisors, believe that the DIP Facility, which provides incremental liquidity and access to Cash Collateral necessary to meet near-term obligations and avoid an imminent shutdown is, on the whole, the best postpetition financing option currently available to the Debtors.  Accordingly, the DIP Facility is in the best interests of the Debtors' estates and should be approved.

## BASIS FOR RELIEF REQUESTED

### I. The Debtors Should Be Authorized to Access the DIP Facility.

#### A. Entering into the DIP Facility Is a Sound Exercise of the Debtors' Business Judgment

30. Section 364 of the Bankruptcy Code authorizes a debtor to obtain secured or superpriority financing subject to satisfaction of certain requirements set forth below. Courts grant a debtor considerable deference in acting in accordance with its business judgment in obtaining postpetition secured credit, so long as the agreement to obtain such credit does not run afoul of the provisions of, and policies underlying, the Bankruptcy Code. *See, e.g.*, In re EXCO Res., Inc., No. 18-30155 (Bankr. S.D. Tex. Jan. 18, 2019) (order approving postpetition financing as exercise of debtors' business judgment); *In re Estrada*, No. 16-80003-G3-11, 2016 WL 745536, at *3 (Bankr. S.D. Tex. Feb. 24, 2016) ("In determining whether to approve a motion to obtain credit, courts generally permit debtors in possession to exercise their basic business judgment consistent with their fiduciary duties."); *In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) ("Cases consistently reflect that the court's discretion under section 364 is to be utilized on grounds that permit reasonable business judgment to be exercised so long as the financing agreement does not contain terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit a party-in-interest.").

31. The Fifth Circuit has described the business judgment standard as a flexible one, which will be satisfied if a debtor articulates a business justification and the decision furthers the interests of the debtor and other parties in interest. *See ASARCO, Inc. v. Elliott Mgmt. (In re ASARCO, L.L.C.)*, 650 F.3d 593, 601 (5th Cir. 2011) (in the context of section 363 of the Bankruptcy Code); *see also Institutional Creditors of Cont'l Air Lines, Inc. v. Cont'l Air Lines, Inc. (In re Cont'l Air Lines, Inc.)*, 780 F.2d 1223, 1226 (5th Cir. 1986).

32.     Further, in considering whether the terms of postpetition financing are fair and reasonable, courts also consider the terms in light of the relative circumstances of both the debtor and the potential lender.  *See In re Farmland Indus., Inc.*, 294 B.R. 855, 886 (Bankr. W.D. Mo. 2003); *see also Unsecured Creditors' Comm. Mobil Oil Corp. v. First Nat'l Bank & Trust Co. (In re Elingsen McLean Oil Co., Inc.)*, 65 B.R. 358, 365 n.7 (W.D. Mich. 1986) (recognizing a debtor may have to enter into "hard bargains" to acquire funds for its reorganization).

33.     The Debtors' determination to move forward with the DIP Facility is a sound exercise of their business judgment following a careful evaluation of all available options since the beginning of this calendar year.  With no actionable alternatives to entry into the DIP Facility, and the Debtors' liquidity position continuing to deteriorate, the Debtors ultimately determined that the DIP Facility represented the Debtors' best available option to maximize value and ensure access to the liquidity necessary to continue operations.  The terms and conditions of the DIP Facility, including the roll-up of prepetition funded debt, the fees, interest rates, and the Debtors' waivers of the equitable doctrine of "marshalling" and the right to surcharge the collateral under section 506(c) of the Bankruptcy Code, are the best available under the circumstances and specifically:

(a)     is being funded by a group of the Debtors' prepetition secured lenders who have a vested interest in the success of the Chapter 11 Cases (which mitigates the Debtors' concerns about the uncommitted nature of future incremental funding under the DIP Facility);

(b)     avoids any need to engage in litigation with such lenders at the outset of these Chapter 11 Cases over the terms of an alternative financing;

(c)     is structured to include structuring, backstop, and commitment fees paid in kind, to alleviate the Debtors' near-term debt service obligations;

(d)     is structured to be available to all Prepetition Lenders on a *pro rata* basis;

(e)     provides necessary liquidity to the Debtors for the outset of these Chapter 11 Cases, allowing the Debtors to substantially meet obligations to employees, vendors, and customers.

34.     This Court has routinely approved postpetition financing as a sound exercise of a debtor's business judgment under similar circumstances.  *See, e.g.*, *In re MLN US Holdco LLC*, No. 25-90090 (Bankr. S.D. Tex. Mar. 11, 2025) (CML) [ECF No. 61]; *In re The Container Store Group, Inc.*, No. 24-90627 (Bankr. S.D. Tex. Dec. 23, 2024) (ARP) [ECF No. 88]; *In re Conn's Inc.*, No. 24-33357 (Bankr. S.D. Tex. July 24, 2024) (ARP) [ECF No. 86]; *In re Cleveland Integrity Servs., Inc.*, No. 23-90052 (Bankr. S.D. Tex. Jan. 30, 2023) (CML) [ECF No. 37]; *In re Core Scientific, Inc.*, No. 22-90341 (Bankr. S.D. Tex. Dec. 23, 2022) (DRJ) [ECF No. 130].

35.     For the reasons set forth above, entry into the DIP Facility represents a proper and reasonable exercise of the Debtors' business judgment.

**B.      The Roll-Up is Necessary to Preserve the Value of the Debtors' Estates and Reflects the Debtors' Reasonable Business Judgement Obligations Under Section 363.**

36.     Section 363(b) of the Bankruptcy Code permits a debtor to use, sell, or lease property, other than in the ordinary course of business, with court approval.  Courts in the Fifth Circuit have recognized that it is appropriate to authorize the payment of prepetition obligations where doing so maximizes going-concern value.  *See, e.g.*, *In re CoServ, L.L.C.*, 273 B.R. 487, 497 (Bankr. N.D. Tex. 2002) (authorizing payment of certain prepetition claims pursuant to "doctrine of necessity"); *In re Equalnet Commc'ns Corp.*, 258 B.R. 368, 369-370 (Bankr. S.D. Tex. 2000) (business transactions critical to the survival of the business of the debtor are exceptions to the general rule of nonpayment of prepetition claims prior to plan confirmation).

37.     Repayment of prepetition debt (often referred to as a "roll-up") has become a common feature of debtor-in-possession financing arrangements.  The importance of "roll-up" features in DIP facilities has been repeatedly recognized by courts in this district and others, and

such courts have granted relief similar to the relief requested herein.  *See, e.g.*, *In re Mosaic Sustainable Finance Corp.*, Case No. 25-90156 (CML) (Bankr. S.D. Tex. June 9, 2025) [ECF No. 39] (authorizing "roll up" of prepetition obligations upon entry of interim order); *In re Everstream Sols. LLC*, Case No. 25-90144 (CML) (Bankr. S.D. Tex. May 29, 2025) [ECF No. 67] (same); *In re Ascend Performance Materials Holdings*, No. 25-90127 (CML) (Bankr. S.D. Tex. Apr. 23, 2025) [ECF No. 96] (authorizing roll-up of $150 million in prepetition term loan obligations and a "creeping" roll-up of ABL obligations upon entry of the interim order); *In re MLN US Holdco LLC*, No. 25-90090 (CML) (Bankr. S.D. Tex. Mar. 11, 2025) [ECF No. 61] (authorizing roll-up of $62 million in prepetition obligations upon entry of the interim order); *In re DocuData Solutions, L.C.*, No. 25-90023 (CML) (Bankr. S.D. Tex. Mar. 4, 2025) [ECF No. 58] (authorizing roll-up of $75 million in prepetition obligations upon entry of the interim order); *In re Vertex Energy, Inc.*, No. 24-90507 (CML) (Bankr. S.D. Tex. Sept. 25, 2024) [ECF No. 53] (authorizing approximately $280 million DIP that included approximately $200 million in prepetition debt); *In re Hornblower Holdings LLC*, No. 24-90061 (MI) (Bankr. S.D. Tex. Feb. 22, 2024) [ECF No. 72] (authorizing refinancing of an aggregate $439.9 million in prepetition obligations upon entry of the interim order); *In re Diebold Holding Company, LLC*, No. 23-90602 (DRJ) (Bankr. S.D. Tex. June 2, 2023) [ECF No. 90] (authorizing refinancing of an aggregate $733 million in prepetition obligations upon entry of the interim order).

38.    The Roll-Up of the Prepetition First Out Obligations is a material component of the structure of the DIP Facility and was required by the DIP Lenders as a condition to their commitment to provide postpetition financing and consensual use of Cash Collateral.  The new money commitments under the DIP Facility will allow the Debtors to have the opportunity to stabilize their operations in chapter 11 and continue to work with the Prepetition Lenders to obtain

additional financing under the DIP Facility to administer the Chapter 11 Cases and pursue the Restructuring.  Absent the DIP Facility, the Debtors would have been required to shut down operations and initiate a liquidation of their assets, to the detriment of the Debtors and all stakeholders.  The continued support of the DIP Lenders and willingness to fund amidst ongoing diligence and negotiations enabled the Debtors to commence an orderly filing and continue operations.

39.     The terms of the Roll-Up are fair and reasonable under the circumstances.  ***First***, the 2:1 Roll-Up "ratio" (i.e., for every dollar in principal amount of, two dollars in principal amount of First Out Term Loans (together with accrued and unpaid interest thereon) will be "rolled up" into Initial Roll-Up DIP Loans)) is consistent with those in recently approved DIP financings where roll-ups were present.  *See, e.g.*, *In re Everstream Sols. LLC*, No. 25-90144 (CML) (Bankr. S.D. Tex. May 29, 2025) [ECF No. 67] (approving 2:1 roll-up of prepetition obligations on an interim basis); *In re Wellpath Holdings, Inc.*, No. 25-90113 (ARP) (Bankr. S.D. Tex. Nov. 14, 2024) [ECF No. 81] (same).

40.     ***Second***, the economic reality is that the Roll-Up in the proposed DIP Facility comes at a price, which in this case the Debtors believe to be reasonable.  The Prepetition Lenders have made clear that they are unwilling to fund a chapter 11 case in which the First Out Term Loans are subject to the risk of being "crammed down" under section 1129(b) of the Bankruptcy Code, and accordingly, are unwilling to provide the DIP Facility absent the proposed Roll-Up.

41.     ***Third,*** the Roll-Up is not designed to (and does not) prejudice potential Challenges to the rolled-up prepetition debt by a Committee or other party in interest.  In exchange for the Debtors' agreement to the Roll-Up, the DIP Lenders agreed to expressly preserve such rights in paragraph 4(b) of the proposed Interim Order, as well as the Court's ability to unwind or

recharacterize, or fashion any remedy it deems appropriate, with respect to any portion of the rolled-up prepetition loans that are the subject of a successful Challenge.

42.    In light of the Debtors' circumstances, the fact that the Roll-Up is an essential inducement to the DIP Lenders' extension of new money loans under the DIP Facility, and the safeguards for unsecured creditor rights contained in the proposed Interim Order (and described above), the Debtors' agreement to the Roll-Up is reasonable, appropriate, and reflects an exercise of the Debtors' sound business judgment.

## II.    The Debtors Should Be Authorized to Grant Priming Liens and Superpriority Claims to the DIP Lenders.

43.    The Debtors propose to obtain financing under the DIP Facility, in part, by granting superpriority claims and liens pursuant to sections 364(c) and 364(d) of the Bankruptcy Code. Significantly, the Debtors propose to provide first priority priming liens on substantially all of the Debtors' assets.  The Debtors also seek authority to grant the DIP Lenders superpriority claims.

44.    Section 364(c) provides that, if a debtor is unable to obtain unsecured credit allowable as an administrative expense under section 503(b)(1) of the Bankruptcy Code, a court "may authorize the obtaining of credit or the incurring of debt with priority over any or all administrative expenses." 11 U.S.C. § 364(c); *see also In re Crouse Group, Inc.*, 71 B.R. 544, 549 (Bankr. E.D. Pa. 1987) (secured credit under section 364(c) of the Bankruptcy Code is authorized, after notice and hearing, upon showing that unsecured credit cannot be obtained); *In re Snowshoe Co., Inc.*, 789 F.2d 1085, 1088 (4th Cir. 1986) (debtor need only demonstrate "by a good faith effort that credit was not available without" the protections of sections 364(c)).

45.    In addition, under section 364(d)(1) of the Bankruptcy Code, courts may, after notice and a hearing, authorize a debtor to obtain postpetition credit secured by a "priming" lien from affected secured parties if (a) the debtor obtains the consent of such parties or (b) the debtor

cannot obtain credit elsewhere and the interests of existing lienholders are adequately protected. *See* 11 U.S.C. § 364(d)(1).

46.     As set forth above and in the Sellinger Declaration, the Debtors are unable to obtain unsecured or junior secured credit.  The Debtors submit that the proposed DIP Facility is the best available financing option available under the circumstances.  Additionally, the DIP Lenders were not willing to consent to their liens on their collateral being primed by third-party financing and no party was willing to provide viable postpetition financing on an unsecured or junior basis. Following extended negotiations with the Prepetition Lenders, the Debtors were able to negotiate the proposed DIP Facility and obtain concessions that materially improved the terms of the proposed financing.  Thus, because of these negotiations, the Debtors determined that the DIP Facility is the best—and only—actionable option available to fund these cases under the circumstances.

47.     Furthermore, Prepetition Secured Parties (i.e., the term lenders) have consented to their prepetition liens and claims being primed on the terms set forth in the DIP Orders, in exchange for a negotiated adequate protection package.  That package includes: (a) replacement liens (junior to the liens of the DIP Agent and DIP Lenders) on the Collateral, (b) a superpriority administrative expense claim against the DIP Loan Parties in the Chapter 11 Cases (also junior to the claim in favor of the DIP Agent and DIP Lenders), and (c) payment of the reasonable and documented fees and expenses of their counsel and other professionals.  Additionally, the DIP Facility are necessary for the Debtors' immediate, continued operation in these Chapter 11 Cases.  For the reasons set forth above, the Debtors should be authorized to grant "priming" liens and superpriority claims to the DIP Lenders pursuant to the terms and conditions of the DIP Facility and Interim Order, as applicable.

### III. The Debtors Should Be Authorized to Pay All Fees and Expenses Required Under the DIP Facility.

48.     Under the DIP Documents, the Debtors have also agreed, subject to Court approval, to pay certain interest, fees and expenses as set forth above (the "***DIP Fees and Expenses***").  As set forth in the Sellinger Declaration, the DIP Fees and Expenses were the subject of arm's-length and good-faith negotiations between the Debtors and the DIP Lenders, are integral components of the overall terms of the DIP Facility, and were required by the proposed DIP Lenders as consideration for the extension of postpetition financing. The economic terms, including the applicable interest rates, reflect current market conditions. Taken as a whole, the economic terms are materially consistent with other court-approved DIP facilities of comparable size and tenor for similarly situated debtors in recent years.  Accordingly, the economic terms are reasonable considering the Debtors' financial condition and the costs, risk, and complexity associated with their Chapter 11 Cases.

49.     The DIP Fees and Expenses do not prejudice any parties in interest. The Debtors and their advisors solicited alternative postpetition financing as described above and as described in the Sellinger Declaration and were unable to find alternative financing on reasonable terms— without financing, the Debtors must cease operations. Moreover, the DIP Facility is being used to help stabilize the Debtors' operations as they enter chapter 11, pay creditors through the relief sought in the Debtors' "first day" motions and in the ordinary course, and provide breathing room for the Debtors and the Prepetition Lenders to work towards consummating the Refinancing set forth in the Transaction Support Agreement.  Accordingly, the benefits to the Debtors and their estates provided by the DIP Facility significantly outweigh the fees incurred by the Debtors thereunder.

50.     In light of the negotiation process for the DIP Facility described herein, the proposed DIP Facility is the Debtors' best—and in fact only—currently available postpetition financing option.  Accordingly, the Court should authorize the Debtors to pay the interest and fees provided under the DIP Documents in connection with the DIP Facility.

## IV.     The Carve-Out Is Appropriate.

51.     The proposed DIP Facility subjects the DIP Lenders' security interests, superpriority administrative expense claims, and the adequate protection claims and liens to a heavily-negotiated Carve-Out that ensures a source of payment for the costs of these cases (and specifically the allowed fees and expenses of estate professionals, subject to the Approved Budget (subject to Permitted Variances)) even in a scenario where the DIP Lenders and/or Prepetition Lenders seek to exercise remedies against their collateral.  Without the Carve-Out, the Debtors' estates or other parties in interest could be harmed because the professionals might otherwise be less willing to render the full suite of services required in a chapter 11 case.  *See In re Ames Dep't Stores*, 115 B.R. at 38 (observing that courts insist on carve-outs for professionals representing parties in interest because "[a]bsent such protection, the collective rights and expectations of all parties in interest are sorely prejudiced").]  Accordingly, the Debtors submit that the Carve-Out is reasonable and appropriate under the circumstances.

## V.     The Debtors' Consensual Use of Cash Collateral Should Be Approved.

52.     Section 363(c)(2) of the Bankruptcy Code provides that a debtor may not use, sell, or lease cash collateral unless "(a) each entity that has an interest in such cash collateral consents; or (b) the court, after notice and hearing, authorizes such use, sale, or lease in accordance with the provisions of this section." 11 U.S.C. § 363(c)(2).

53.     Here, the Prepetition Lenders have consented to the Debtors' use of Cash Collateral in exchange for the adequate protection package set forth in the Interim Order (as described in

paragraph 11 above), and the other protections contained in the Interim Order and other DIP Documents.  The Debtors have an urgent need for the immediate use of the collateral under the Prepetition Credit Facility (the "***Prepetition Collateral***"), including Cash Collateral, and seek to use all Cash Collateral existing on or after the Petition Date pursuant to the terms of the DIP Documents.  The overall size of the DIP Facility was determined under the assumption that the Debtors would also have access to existing Cash Collateral and receipts generated postpetition (primarily related to continued collection of accounts receivable and proceeds from continued operations).  Thus, the DIP Facility alone (i.e., without use of Cash Collateral) would be insufficient to meet the Debtors' cash disbursement needs during the period of effectiveness of the proposed Interim Order.  The Debtors would be unable to meet their obligations over the next four weeks absent both the use of Cash Collateral and access to additional postpetition financing. Indeed, without such relief, the Debtors' businesses will likely be brought to an immediate halt, with damaging consequences for the Debtors and their estates and creditors.

54.     The Debtors believe that the terms and conditions on which they propose to use Cash Collateral (including the adequate protection package described above) are appropriate and reasonable and that such adequate protection is sufficient under the circumstances.  Therefore, the Debtors submit that they should be authorized to use the Cash Collateral on the terms set forth in the DIP Documents.

## VI.     The DIP Agent and the DIP Lenders Should Be Afforded Good-Faith Protection.

55.     Section 364(e) of the Bankruptcy Code protects a good-faith lender's right to collect on loans extended to a debtor, and its right in any lien securing those loans, even if the authority of the debtor to obtain such loans or grant such liens is later reversed or modified on appeal.  *See* 11 U.S.C. § 364(e).

56.     As explained herein and in the Sellinger Declaration, the DIP Documents are the result of extensive arms-length, negotiations between the Debtors and the DIP Lenders, who are not insiders or affiliates of the Debtors.  The proposed terms of the DIP Facility were reviewed and ultimately approved by the Special Committee, which is comprised of independent directors with significant restructuring experience.  Accordingly, the Debtors submit that the terms and conditions of the DIP Facility are reasonable under the circumstances, and the proceeds of the DIP Facility will be used only for purposes that are permissible under the Bankruptcy Code.  Accordingly, the Court should find that the DIP Lenders are "good faith" lenders within the meaning of section 364(e) of the Bankruptcy Code and are entitled to all of the protections afforded by that section.

**VII.    Modification of the Automatic Stay Is Warranted.**

57.     The Interim Order provides that the automatic stay under section 362(a) of the Bankruptcy Code shall be modified as necessary to effectuate all of the terms and provisions of the Interim Order, including to: (a) permit the Debtors to grant the DIP Liens, Adequate Protection Liens, and DIP Superpriority Claims; (b) permit the Debtors to perform such acts as the DIP Lenders or the Prepetition Lenders, as applicable, may reasonably request to assure the perfection and priority of the liens granted in the Interim Order; (c) permit the Debtors to incur all liabilities and obligations to the DIP Lenders and the Prepetition Lenders under the DIP Documents, the DIP Facility, and the Interim Order, as applicable; (d) upon the occurrence of an Event of Default, permit the DIP Lenders to deliver a Default Notice and exercise their rights under the DIP Documents subject to the terms of paragraph [12] of the Interim Order; and (e) authorize the Debtors to pay, and the DIP Lenders and Prepetition Lenders to retain and apply, payments made in accordance with the Interim Order.

58.     Notably, the Interim Order provides, during the Remedies Notice Period, the Debtors, any Creditors' Committee, and any party in interest shall be entitled to seek an emergency hearing with the Court during the Remedies Notice Period for the purpose of (i) contesting whether, in fact, an Event of Default has occurred and is continuing or (ii) obtaining non-consensual use of Cash Collateral; *provided*, that if such hearing cannot be held before the expiration of the Remedies Notice Period, then the Remedies Notice Period shall be automatically extended through the conclusion of such hearing but in no event later than ten business days after delivery of the Default Notice unless ordered otherwise by the Court; *provided*, *further*, that nothing herein shall alter the evidentiary burden with respect to any termination of the automatic stay or limit the range of remedies that the Court may order upon default.

59.     Stay modification provisions of this sort are common features of postpetition financing facilities and, in the Debtors' business judgment, are reasonable under the circumstances. Accordingly, the Debtors request that the Court modify the automatic stay solely to the extent contemplated by the DIP Documents and the DIP Orders.

**VIII.   The Debtors Require Immediate Access to the Proposed DIP Facility.**

60.     Bankruptcy Rules 4001(b)(2) and 4001(c)(2) provide that a final hearing on a motion to use cash collateral or obtain credit, respectively, may not be commenced earlier than 14 days after the service of such motion.  Upon request, however, the court may conduct a preliminary expedited hearing on the motion and authorize the use of cash collateral and the obtaining of credit on an interim basis "to the extent necessary to avoid immediate and irreparable harm to the estate pending a final hearing." Fed. R. Bankr. P. 4001(b)(2); (c)(2).

61.     Section 363(c)(3) of the Bankruptcy Code authorizes the court to conduct a preliminary hearing and to authorize the use of cash collateral "if there is a reasonable likelihood that the [debtor] will prevail at the final hearing under [section 363(e) of the Bankruptcy Code]."

11 U.S.C. § 363(c)(3).  Furthermore, the Complex Case Procedures provide that on motion by a debtor, a hearing will "routinely be conducted as a first-day hearing to consider either cash collateral use and/or interim debtor-in-possession financing."  Complex Case Procedures ¶ 5.

62.    As described above, the Debtors have an urgent and immediate need for cash in order to maintain business relationships with their vendors, suppliers, customers, and other parties, to make capital expenditures, and to satisfy other working capital and operational needs and otherwise finance their operations and the Chapter 11 Cases.  Given the immediate and irreparable harm to be suffered by the Debtors, their estates and their creditors absent interim relief, the Debtors request that, pending the Final Hearing, the Court schedule an interim hearing within one day of the Petition Date or as soon thereafter as practicable to consider the interim relief requested in this Motion.

## IX.    Request for a Final Hearing

63.    The DIP Term Sheet provides that a Final Order approving this Motion be entered within 25 calendar days after the Petition Date.  As such, pursuant to Bankruptcy Rules 4001(b)(2) and 4001(c)(2), the Debtors request that the Court set a date for the Final Hearing that is as soon as practicable, but in no event later than 25 days following the Petition Date, and fix the time and date before the Final Hearing for parties to file objections to this Motion.

### DEBTORS' COMPLIANCE WITH BANKRUPTCY RULE 6004(a) AND WAIVER OF BANKRUPTCY RULE 6004(a) AND (h)

64.    With respect to any aspect of the relief sought herein that constitutes a use of property under section 363(b) of the Bankruptcy Code, the Debtors request that the Court find that notice of this Motion is adequate under Bankruptcy Rule 6004(a) and waive the 14-day stay under Bankruptcy Rule 6004(h).  As described above, the relief that the Debtors seek in this Motion is necessary to avoid immediate and irreparable harm to the Debtors.  Thus, cause exists for the Court

to find that notice of this Motion satisfies Bankruptcy Rule 6004(a) and waive the 14-day stay under Bankruptcy Rule 6004(h).

## RESERVATION OF RIGHTS

65.     Nothing in this Motion is intended to be nor shall be deemed: (a) an implication or admission as to the amount of, basis for, or validity of any claim against the Debtors; (b) a waiver or limitation of the Debtors' or any other party in interest's right to dispute the amount of, basis for, or validity of any claim; (c) a waiver of the Debtors' or any other party in interest's rights under the Bankruptcy Code or any other applicable non-bankruptcy law; (d) a waiver of the obligation of any party in interest to file a proof of claim; (e) a promise or requirement to pay any particular claim; (f) a waiver of any claims or causes of action which may exist against any entity under the Bankruptcy Code or any other applicable law; (g) an admission as to the validity, priority, enforceability, or perfection of any lien on, security interest in, or other encumbrance on property of the Debtors' estates; (h) an admission that any lien satisfied pursuant to this Motion is valid (and all rights to contest the extent, validity, or perfection or seek avoidance of all such liens are expressly reserved); or (i) a request or authorization to assume, adopt, or reject any agreement, contract, or lease pursuant to section 365 of the Bankruptcy Code.  Likewise, if the Court grants the relief sought herein, any payment made pursuant to the Court's order is not intended to be and should not be construed as an admission to the validity of any claim or a waiver of the Debtors' or any other party in interest's rights to dispute such claim subsequently.

## NOTICE

66.     Notice of the Motion will be given to:  (a) the Office of the United States Trustee for the Southern District of Texas; (b) counsel to the Ad Hoc Group and Backstop Parties; (c) counsel to the Prepetition Agent; (d) the creditors listed on the Debtors' consolidated list of 30

creditors holding the largest unsecured claims; (h) the Gaming Regulators, (i) the United States Attorney for the Southern District of Texas; (j) the Internal Revenue Service; (k) the state attorneys general for states in which the Debtors conduct business; and (l) any party that has requested notice pursuant to Bankruptcy Rule 2002.  The Debtors submit that, under the circumstances, no other or further notice is required.

67.    A copy of this Motion is available on (a) the Court's website, at www.txs.uscourts.gov, and (b) the website maintained by the Debtors' proposed Claims and Noticing Agent, Kroll Restructuring Administration LLC, at https://restructuring.ra.kroll.com/RunItOneTime/.

[*Remainder of page intentionally left blank*]

**WHEREFORE**, the Debtors respectfully request that the Court enter the DIP Orders granting the relief requested in the Motion and such other and further relief as may be just and proper.

Dated:   July 14, 2025
          Houston, Texas

Respectfully submitted,

*/s/ Timothy A. ("Tad") Davidson II*

**HUNTON ANDREWS KURTH LLP**
Timothy A. ("Tad") Davidson II (Texas Bar No. 24012503)
Ashley L. Harper (Texas Bar No. 24065272)
Philip M. Guffy (Texas Bar No. 24113705)
600 Travis Street, Suite 4200
Houston, TX 77002
Telephone: (713) 220-4200
Email: taddavidson@hunton.com
       ashleyharper@hunton.com
       pguffy@hunton.com

- and -

**LATHAM & WATKINS LLP**
Jeffrey E. Bjork (*pro hac vice* pending)
Helena G. Tseregounis (*pro hac vice* pending)
Nicholas J. Messana (California Bar No. 332355)
355 South Grand Avenue, Suite 100
Los Angeles, California 90071-1560
Telephone: (213) 485-1234
E-mail: jeff.bjork@lw.com
       helena.tseregounis@lw.com
       nicholas.messana@lw.com

- and -

**LATHAM & WATKINS LLP**
Ray C. Schrock (NY Bar No. 4860631)
Andrew Sorkin (NY Bar No. 4597944)
1271 Avenue of the Americas
New York, NY 10020
Telephone: (212) 906-1200
E-mail: ray.schrock@lw.com
       andrew.sorkin@lw.com

*Proposed Attorneys for the Debtors and Debtors in Possession*

**CERTIFICATE OF SERVICE**

I certify that on July 14, 2025, a true and correct copy of the foregoing document was served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas on those parties registered to receive electronic notices.

*/s/ Timothy A. ("Tad") Davidson II*
Timothy A. ("Tad") Davidson II