IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

------------------------------------------------------------ x
: 
In re:                                                        :    Chapter 11
                                                              :
RUNITONETIME LLC, *et al.*,                                   :    Case No. 25-90191 (ARP)
                                                              :
               Debtors.¹                                      :    (Joint Administration Requested)
                                                              :
------------------------------------------------------------ x

**DECLARATION OF MICHAEL SELLINGER,
IN SUPPORT OF THE DEBTORS' MOTION TO OBTAIN
POSTPETITION DEBTOR-IN-POSSESSION FINANCING**

I, Michael Sellinger, hereby declare as follows:

1. I submit this declaration (this "**Declaration**") in support of the [*Emergency Motion of Debtors for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Obtain Senior Secured Priming Superpriority Postpetition Financing and (B) Use Cash Collateral, (II) Granting Liens and Providing Claims with Superpriority Administrative Expense Status, (III) Granting Adequate Protection to the Prepetition Secured Parties, (IV) Modifying the Automatic Stay, and (V) Granting Related Relief*] (the "**DIP Motion**"),² which seeks approval of debtor-in-possession financing in the form of a $7.5 million new money commitment, a roll-up of $15 million in Prepetition First Out Obligations, and the consensual use of Cash Collateral.

---

¹ A complete list of the Debtors in the Chapter 11 Cases may be obtained on the website of the Debtors' proposed claims and noticing agent at https://cases.ra.kroll.com/runitonetime. The Debtors' mailing address is 12530 NE 144th Street, Kirkland, Washington 98304.

² Capitalized terms used but not defined herein have the meanings given to them in the DIP Motion or the *Declaration of Jeff Seery in Support of Chapter 11 Petitions and First Day Relief* (the "**First Day Declaration**"), filed contemporaneously herewith.

2. I am a Managing Director of GLC Advisors & Co., LLC and GLC Securities, LLC (together, "**GLC**"), an investment banking firm with offices located at 600 Lexington Avenue, New York, New York 10022.

3. Except as otherwise indicated, the statements in this Declaration are based on: (a) my personal knowledge of the Debtors' operations and finances; (b) review of relevant documents by me and the GLC team that I supervise; (c) information provided to me by the GLC team that I supervise and other employees of GLC (as defined below); (d) information provided to me and the GLC team that I supervise by members of the above-captioned debtors' (collectively, the "**Debtors**" or the "**Company**") management team and employees or the Debtors' other advisors; (e) records kept in the ordinary course of business by the Debtors and provided by the Debtors or their representatives to GLC; and (f) my views and beliefs based upon my experience as a restructuring professional. I am authorized to submit this Declaration on behalf of the Debtors. If called upon to testify, I can and will testify competently as to the facts set forth herein.

## BACKGROUND AND QUALIFICATIONS

4. GLC is a leading independent investment banking firm, with offices in New York, Los Angeles, San Francisco and Denver. GLC is frequently ranked among the top restructuring advisors in the United States by Refinitiv (f/k/a Thomson Reuters). GLC's professionals include those who have previously served as the heads of restructuring and leveraged finance teams at: Credit Suisse First Boston LLC; Donaldson, Lufkin & Jenrette Securities Corporation; Morgan Stanley & Co. International PLC; Smith Barney Inc.; and UBS Investment Bank. GLC is highly qualified to advise on strategic alternatives and its professionals have extensive experience in deals involving complex financial and operational restructurings.

5. GLC and its professionals have worked with financially troubled companies and their stakeholders in a variety of industries in complex financial restructurings, both in chapter 11

2

cases and out-of-court proceedings. GLC's professionals have served as advisors to companies, creditors, and other stakeholders in dozens of restructurings, including acting as the investment banker to debtors, creditors, ad hoc groups and creditors' committees. Among others, my personal experiences in such matters include: *In re Alpha Media Holdings LLC*, No. 21-30209, (Bankr. E.D. Va.); *In re Guitar Center, Inc.*, No. 20-34656, (Bankr. E.D. Va.); *In re iHeartMedia, Inc.*, No. 18-31274, (Bankr. S.D. Tex.); *In re Brookstone Holdings Corp.*, No. 18 11780, (Bankr. D. Del.); *In re Toys "R" Us, Inc.*, No. 17 34665, (Bankr. E.D. Va.); *In re RadioShack Corp.*, No. 15-10197, (Bankr. D. Del.); *In re Caesars Ent. Op. Co., Inc.*, No. 15-01145, (Bankr. N.D. Ill.); *In re Lightsquared Inc.*, No. 12-12080, (Bankr. S.D.N.Y.); *In re Ahern Rentals, Inc.*, No. 11-53860, (Bankr. D. Nev.). *In re The McClatchy Company*, No. 20-10418, (Bankr. S.D.N.Y.); *In re The Majestic Star Casino, LLC*, No. 09-14136 (Bankr. D. Del.); *In re Station Casinos, Inc.*, No. 09-52470 (D. Nev.).

6.  I have a broad range of experience in investment banking assignments, including extensive experience with postpetition debtor-in-possession financing. Prior to helping found GLC in 2009, I was a Director in UBS Group AG's restructuring and growth capital groups, where I focused on the restructuring of distressed debt and the new issuance of bank loans and high-yield bonds. Prior to joining UBS Group AG, I was an Associate in the restructuring group of Donaldson, Lufkin & Jenrette (predecessor in interest to Credit Suisse First Boston LLC), where I began my career as an investment banking analyst in Los Angeles. I have a Bachelors in Business Administration from the Stephen M. Ross School of Business at the University of Michigan, where I graduated with High Distinction.

7.  During the course of my career, I have participated in several court-supervised chapter 11 processes, including the provision of debtor-in-possession financing. My restructuring

3

experience includes representing debtors, creditor groups, purchasers, potential purchasers, and other significant stakeholders in a number of complex financial restructurings and bankruptcy-related processes, including, without limitation, the chapter 11 bankruptcy proceedings of Ahern Rentals, Brookstone, Caesars Entertainment, Guitar Center, iHeartMedia, LightSquared, Majestic Star, The McClatchy Companies, RadioShack, Station Casinos, and Toys "R" Us.

8. In my role as a Managing Director of GLC, I have been closely involved in the Debtors' financing, restructuring, and sale efforts to date. The GLC team that I supervise and I were responsible for assisting the Company in its negotiation of the Transaction Support Agreement and the proposed DIP Facility. As such, I have personal knowledge of the matters discussed herein, including the business and financial affairs of the Company.

## THE RETENTION OF GLC

9. The GLC team that I supervise and I began working with the Debtors in April 2025, as the Company's investment banker. GLC was engaged to lead the Debtors' restructuring process, to provide general restructuring advice to the Company, to aid the Debtors in obtaining debtor-in-possession financing, if necessary, and to pursue a potential restructuring of the Company's business through an investment, sale, or other process.

10. Through our prepetition services to the Debtors, the GLC team that I supervise and I have developed institutional knowledge regarding, among other things, the Debtors' operations and capital structure. The GLC team that I supervise and I have worked closely with the Debtors' management and other professionals and have become well-acquainted with the Debtors' businesses and operations, debt structure, creditors and related matters, including by (a) working cooperatively with the Debtors' other professionals to explore various strategic alternatives to address the Debtors' liquidity needs; (b) engaging with Debtors' management to understand the Debtors' business and operational goals; (c) reviewing the Debtors' debt and capital structure;

4

(d) evaluating financing options and other potential strategic alternatives; (e) assisting in negotiations related to the Transaction Support Agreement, and (f) preparing for the commencement of the Chapter 11 Cases.

11. Accordingly, the GLC team that I supervise and I have developed significant relevant experience and expertise regarding the Debtors' businesses that will assist GLC in providing effective and efficient services in connection with the Chapter 11 Cases.

## THE TERMS OF THE DIP FACILITY

12. The DIP Facility, which is being provided by the DIP Lenders, includes:[3]

(a) [superpriority priming term loans (the "***Initial New Money DIP Loans***") up to an aggregate principal amount of $7.5 million of new money available upon entry of the interim order approving the DIP Facility (the "***Interim DIP Order***"), to be provided and backstopped by certain of the DIP Lenders (the "***Backstop Parties***");

(b) $15 million of superpriority priming term loans plus an additional amount equal to the aggregate amount of accrued but unpaid interest on the First Out Term Loans being rolled up as of such date (the "***Initial Roll-Up DIP Loans***")) which will roll up the First Out Term Loans held by any DIP Lender providing Initial New Money DIP Loans (or any affiliated or related fund thereof) on a 2:1 basis;

(c) Incremental, superpriority priming (i) new money term loans (the "***Incremental New Money DIP Loans***" and together with the Initial New Money DIP Loans, the "***New Money DIP Loans***") and (ii) roll-up term loans (the "***Incremental Roll-Up DIP Loans***" and together with the Initial New Money DIP Loans, the Incremental New Money DIP Loans and the Initial Roll-Up DIP Loans, collectively, the "***DIP Loans***") that will roll up the following Loans held by any DIP Lender providing the Incremental New Money DIP Loans, in the following order of priority, (1) any First Out Term Loans held by such DIP Lender, (2) any Initial Roll-Up DIP Loans held by such DIP Lender, and (3) any First Out Term Loans acquired by such DIP Lenders on a 2:1 basis, together with interest accrued on such rolled-up First Out Term Loans. The Incremental New Money DIP Loans and Incremental Roll-Up DIP Loans are subject to agreement on (x) the principal amount of the incremental new money term loans (the "***Acceptable Incremental Amount***"), (y) a final budget (the "***Acceptable Final Budget***"), and (z) a restructuring process (i.e., plan of reorganization, sale process, or other disposition of the Chapter 11 Cases or the

---

[3] This summary is qualified in all respects by the terms of that certain DIP Term Sheet, dated as of July [14], 2025, and attached to the DIP Motion as **Exhibit 1** to the proposed interim order (the "***DIP Term Sheet***"). Capitalized terms used in this summary have the meanings ascribed to them in the DIP Term Sheet. In the event of a conflict between this summary and the terms of the DIP Term Sheet, the DIP Term Sheet shall control.

Debtors' assets) (the "***Acceptable Restructuring***"), in each case, that is acceptable to the Required Backstop Parties in their sole discretion, and are to be funded upon entry of the final order approving the DIP Facility (the "***Final DIP Order***");

(d) the consensual use of Cash Collateral;

(e) (i) cash interest of Term SOFR (subject to a 2.00% floor) plus a margin of 12.50% per annum on the New Money DIP Loans, (ii) interest of Term SOFR (subject to a 2.00% floor) plus a margin of 12.50% per annum on the Roll-Up DIP Loans, of which (A) SOFR (subject to a 2.00% floor) plus a margin of 1.00% is payable in cash and (B) a margin of 11.50% is payable in kind, with (iii) a default interest rate of an additional 3.00% per annum above the applicable interest rate;

(f) a structuring fee of 3.00% of the Initial New Money DIP Loans, earned on the Initial Closing Date and payable in kind;

(g) an upfront fee of 4.00% of the Initial New Money DIP Loans funded on entry of the Interim DIP Order, payable in kind;

(h) a backstop fee of 3.00% of the Initial New Money DIP Loans committed by the Backstop Parties;

(i) a structuring fee of 3.00% of any Incremental New Money DIP Loans committed prior to, on, or after the entry of the Final DIP Order, payable in kind;

(j) an upfront fee equal to 4.00% of any Incremental New Money DIP Loans funded on or after the entry of the Final DIP Order, payable in kind;

(k) a backstop fee equal to 3.00% of any Incremental New Money DIP Loans committed by any Backstop Party, payable in kind; and

(l) certain milestones for approval of the DIP Facility, documentation of the credit agreement for the DIP Facility, agreement to an Acceptable Restructuring, Acceptable Final Budget, and an Acceptable Incremental Amount, and a bankruptcy sale process.

## THE DEBTORS' NEED FOR POSTPETITON FINANCING AND ACCESS TO CASH COLLATERAL

13. The Debtors enter these Chapter 11 Cases with extremely limited cash on hand and the expectation that their currently available liquidity will be exhausted shortly after the Petition Date. The Debtors understand that the DIP Lenders will only fund the ongoing cost of operations in connection with an in-court process, supported by the DIP Facility. Accordingly, the Debtors have an immediate and a critical need for access to funds under the DIP Facility and to continue

6

to use Cash Collateral to, among other things, (a) permit the orderly continuation of the operation of their businesses, (b) maintain business relationships with customers, employees, vendors, and suppliers, (c) satisfy other working capital and operational needs, (d) pay professional fees, expenses, and obligations, and (e) pay costs, fees, and expenses associated with the Restructuring.

14. As of the Petition Date, the Debtors have approximately $500,000 of accessible cash (also commonly referred to as "excess cash"). Based on management's current liquidity forecast, this relatively de minimis amount of excess cash is insufficient to support the Debtors' operations through even the end of this week. Notably, the Debtors' have approximately $16.8 million of cash in the aggregate. However, the vast majority of this cash is subject to casino gaming regulatory restrictions (e.g., to comply with minimum cage case and player withholding requirements). As such, these casino gaming regulatory considerations greatly reduce the amount of cash available to the Debtors for alternative purposes. Given the Debtors' limited excess cash, the Debtors require immediate access to the DIP Facility along with use of Cash Collateral to avoid likely facing a liquidation and the attendant degradation in value of the Debtors' estates. Without access to both the DIP Facility and use of Cash Collateral, the Debtors will suffer immediate and irreparable harm—including (but not limited to) being unable to fund payroll, satisfy their vendors and suppliers, or fund their business operations—all of which will require the Debtors to cease operating immediately, to the detriment of all creditors and other parties in interest.

## THE DEBTORS' PREPETITION EFFORTS TO NEGOTIATE A RESTRUCTURING AND SECURE FINANCING

15. I understand that the Debtors' management evaluated and pursued a number of paths beginning in early 2025 to attempt to raise additional financing to sustain the Debtors' business operations. The Debtors, among other things, pursued new capital investments and considered asset sales to third-party investors. The Debtors explored various potential financing

alternatives with existing and third-party lenders and also engaged in negotiations with the Ad Hoc Group and various third parties regarding potential financing.

16. From April to June 2025, the Debtors negotiated the terms of an overall consensual restructuring transaction with the Ad Hoc Group, which culminated in the Debtors' entry into the Transaction Support Agreement on June 25, 2025. In connection with the execution of the Transaction Support Agreement, the Debtors and their advisors, including GLC, began discussions in earnest with the Ad Hoc Group and their advisors over the terms of potential out-of-court bridge or in-court DIP financing. Through these negotiations, it became clear that the Debtors would need significant additional capital to sustain their operations and the Ad Hoc Group would only provide additional financing through an in-court process. On July 7, 2025, the DIP Lenders—consisting of certain members of the Ad Hoc Group—delivered a DIP financing term sheet to the Debtors. Over the next several days, GLC assisted the Debtors with negotiating and ultimately agreeing to the terms of the DIP Facility.

17. In parallel with its negotiations with the Ad Hoc Group, GLC canvassed the market for potential alternative DIP financing sources. Specifically, GLC contacted 24 parties to solicit interest in a third-party funded DIP financing. While 21 parties responded to GLC's outreach, none of the contacted parties executed nondisclosure agreements, performed any due diligence to evaluate the financing opportunity, or submitted proposals. The Debtors' ability to raise postpetition financing from sources other than the Prepetition Lenders were limited given the circumstances. Specifically, the key assets used in the operation of the Debtors' business are, subject to certain limited exceptions, pledged as collateral to the Prepetition Lenders. In addition, I understand that the Debtors have limited unencumbered assets given the Prepetition Lenders' liens and that it can be challenging to pledge remaining unencumbered assets (e.g., casino gaming

licenses) as collateral to other lenders due to casino gaming regulatory restrictions. The Prepetition Lenders also made clear that they would not consent to their liens on such collateral being primed by a third-party DIP Facility, and the Debtors' ability to provide the Prepetition Lenders adequate protection against diminution in value so as to prevail in a "priming fight" with the Prepetition Lenders was highly unlikely. Thus, in order to obtain alternative third-party financing that would not entail a costly, risky, and likely unsuccessful priming fight at the outset of these cases, the Debtors would have needed to locate a lender willing to provide postpetition financing either on an unsecured or junior basis or secured by liens junior in priority to the liens securing the Prepetition Lenders' interests.

18. Ultimately the Debtors were unable to obtain any unsecured financing, credit secured by liens on any of the Debtors' limited unencumbered assets, or credit secured by junior liens. Despite the efforts of the Debtors and their advisors, it also became clear that no alternative source of financing would be available on an out-of-court basis. One party provided a non-binding junior DIP financing proposal on May 22, 2025, during the Company's initial evaluation of strategic options and before execution of the Transaction Support Agreement. Following execution of the Transaction Support Agreement, that party informed me and the GLC team that I supervise that it was no longer interested in providing such financing.

### THE PROPOSED DIP FACILITY AND USE OF CASH COLLATERAL WERE NEGOTIATED IN GOOD FAITH AND AT ARM'S LENGTH

19. GLC, along with the Debtors' other advisors, actively negotiated the terms and provisions of the proposed DIP Facility and use of Cash Collateral on behalf of the Debtors in the days leading up to the Petition Date. The process was marked by extensive, arm's-length negotiations to achieve the best available terms for the Debtors for what ultimately became the final terms of the proposed DIP Facility and use of Cash Collateral. During that time, the parties

9

exchanged multiple term sheet drafts and draft DIP orders in an effort to reach the best available terms under the circumstances, and such negotiations resulted in several concessions for the Debtors including reduced roll-up ratios, fees generally paid in kind instead of cash (including a material portion of interest being paid in kind), and more lenient variance testing.

20. The proposed terms of the DIP Facility and use of Cash Collateral were reviewed and ultimately approved by a special committee of independent directors (the "**Special Committee**"). Over the course of the DIP financing negotiations with the Ad Hoc Group, the GLC Team that I supervise and I had a number of discussions and meetings with the Special Committee, the Debtors' management team, and the Debtors' other advisors regarding the quantum of capital needed and the terms of the proposed DIP Facility and use of Cash Collateral.

21. Based on those discussions and meetings, GLC's industry expertise, and my restructuring experience and familiarity with DIP financings, I believe that the proposed DIP Facility and use of Cash Collateral are reasonable and fair under the circumstances of these Chapter 11 Cases.

22. Based on the feedback from the DIP Lenders during negotiations, I believe that the DIP Lenders would not provide postpetition financing to the Debtors without receiving (1) perfected priming security interests in and liens on the DIP Collateral; (2) superpriority claims; and (3) the other protections set forth in the DIP Documents and Interim DIP Order.

23. The DIP Facility is a necessary component for the Debtors' operations during this interim period while the parties work on the appropriate sizing of a final DIP facility. The DIP Facility and consensual use of cash collateral provides the Debtors with the ability to (a) continue the day-to-day operations of their businesses, (b) fund an orderly transition into these Chapter 11 Cases and (c) begin to launch a robust sale or plan process that maximizes value for all

stakeholders. Notably, the DIP Facility eliminates the substantial litigation risk attendant to a third-party nonconsensual priming DIP financing because the Prepetition Lenders have consented to the priming of their liens and the Debtors' use of the Prepetition Lenders' Cash Collateral in connection with entering into the DIP Facility.

### THE TERMS AND CONDITONS OF THE DIP FACILITY AND USE OF CASH COLLATERAL ARE REASONABLE AND SHOULD BE APPROVED

24. Based on my experience in similar chapter 11 cases, the terms and conditions of the DIP Facility are appropriate given current market conditions, the Debtors' circumstances, and the Debtors' prepetition secured indebtedness. I believe the economic terms, including the applicable interest rates and the roll up of $15 million of Prepetition First Out Obligations in light of the $7.5 million of New Money DIP Loans, reflect current market conditions. Taken as a whole, the economic terms are not significantly different than other court-approved DIP facilities of comparable size and tenor for similarly situated debtors in recent years. Accordingly, the economic terms are reasonable considering the Debtors' financial condition and the costs, risk, and complexity associated with their Chapter 11 Cases.

25. Throughout negotiations with the Ad Hoc Group, it was clear that the proposed roll-up of the First Out Term Loans, including upon entry of the Interim DIP Order, is an essential feature of the DIP Facility, without which the DIP Lenders would not be willing to provide postpetition funding for the Debtors. Given that (i) the roll-up was an essential inducement to the DIP Lenders' willingness to extend the DIP Facility, and (ii) the DIP Facility is the only actionable source of financing for these Chapter 11 Cases, I believe that the proposed roll-up is reasonable and necessary under the circumstances.

26. I further believe the covenants and milestones included in the DIP Facility likewise are reasonable under the circumstances, do not provide the DIP Lenders with undue control over

11

these Chapter 11 Cases under the circumstances, and should give the Debtors an opportunity to consummate the Restructuring and analyze how best to maximize the value of the estates.

27. I believe that the priming of the Prepetition Credit Facility, as contemplated by the DIP Documents and as provided in the proposed Interim DIP Order, was also essential to the Debtors' ability to obtain the DIP Facility and to continue to operate their business during the pendency of the Chapter 11 Cases, to the benefit of their estates and creditors.

28. The DIP Facility is the only viable source of debtor-in-possession financing available to the Debtors, and the terms, under the circumstances, are therefore fair and reasonable, reflect each Debtor's exercise of sound business judgment, and are supported by reasonably equivalent value and fair consideration.

29. Overall, access to the DIP Facility and approved use of Cash Collateral in accordance with the terms of the DIP Facility and Interim DIP Order are the only means available for the Debtors to continue their business operations postpetition, fund the initial expenses associated with these Chapter 11 Cases, and continue to work with the Prepetition Lenders to determine how best to preserve and maximize the value of the Debtors' estates. Conversely, I understand and believe the failure to obtain approval of the DIP Facility will result in an immediate shut down of operations and therefore cause immediate and irreparable harm to the Debtors.

## CONCLUSION

30. In sum, it is my professional opinion that access to the DIP Facility and Cash Collateral will ensure that the Debtors have sufficient funds to begin to responsibly administer these Chapter 11 Cases, and to evaluate and identify how best to preserve and maximize the value of their estates. For the reasons set forth in this Declaration, I submit that it would be appropriate

for the Court to approve the DIP Facility and the use of Cash Collateral as contemplated by the DIP Motion.

*[Remainder of Page Intentionally Left Blank]*

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true and correct.

Dated: July 14, 2025  
New York, New York

/s/ *Michael Sellinger*  
Michael Sellinger  
Managing Director  
GLC Advisors