United States Bankruptcy Court
Southern District of Texas

**ENTERED**

July 16, 2025

Nathan Ochsner, Clerk

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

```
------------------------------------------------------- x
                                                        :
In re:                                                  :   Chapter 11
                                                        :
RUNITONETIME LLC, et al.,                               :   Case No. 25-90191 (ARP)
                                                        :
                Debtors.¹                               :   (Jointly Administered)
                                                        :
------------------------------------------------------- x
```

### INTERIM ORDER (I) AUTHORIZING POSTPETITION FINANCING AND
### USE OF CASH COLLATERAL AND (II) GRANTING RELATED RELIEF

Upon the emergency motion (the "***Motion***")² of the Debtors, each of which is a debtor and debtor in possession in the above-captioned chapter 11 cases (the "***Chapter 11 Cases***"), pursuant to sections 105, 361, 362, 363, 364, 503, 506, 507, and 552 of title 11 of the United States Code (the "***Bankruptcy Code***"), Rules 2002, 4001, 6003, 6004, and 9014 of the Federal Rules of Bankruptcy Procedure (the "***Bankruptcy Rules***"), Rules 2002-1, 4001-1(b), 4002-1 and 9013-1 of the Bankruptcy Local Rules for the United States Bankruptcy Court for the Southern District of Texas (the "***Local Rules***"), and the Procedures for Complex Chapter 11 Cases (the "***Complex Case Procedures***") promulgated by the United States Bankruptcy Court for the Southern District of Texas, Houston Division (this "***Court***") seeking entry of an interim order (together with all exhibits hereto, this "***Interim Order***"):

    (i)        authorizing (a) RunItOneTime LLC (the "***Borrower***") to obtain, and each of the Debtors other than the Borrower (collectively, the "***Guarantors***") to guarantee, on a joint and several basis, in each case, a senior secured superpriority postpetition debtor-in-possession financing facility (the "***DIP Facility***") composed of new

---

¹    A complete list of the Debtors in the Chapter 11 Cases may be obtained on the website of the Debtors' proposed claims and noticing agent at https://cases.ra.kroll.com/runitonetime. The relief requested herein is sought for each of the Debtors. The Debtors' mailing address is 12530 NE 144th Street, Kirkland, Washington 98304.

²    Capitalized terms used but not defined herein have the meanings given to them in the Motion or the DIP Term Sheet (as defined herein), as applicable.

money loans (the "**New Money DIP Loans**")[3] and DIP Rolled-Up Loans (as defined below) to be advanced and made available to the Borrower pursuant to the terms and conditions set forth in the *Term Sheet* attached hereto as **Exhibit 1** (as the same may be amended, restated, supplemented, waived, or otherwise modified from time to time, the "**DIP Term Sheet**"), among the Debtors, the lenders party thereto (the "**DIP Lenders**"), and Alter Domus (US) LLC, as administrative agent and collateral agent under the DIP Facility (in such capacities, the "**DIP Agent**" and, together with the DIP Lenders, the "**DIP Secured Parties**"), in an initial aggregate principal amount of $25,500,000 (the "**DIP Commitments**"), which shall consist of:

(a)    an aggregate principal amount of up to $8,500,000 in New Money DIP Loans which shall be made available on an interim basis (the "**Interim New Money DIP Loans**") upon entry of this Interim Order and satisfaction of the other applicable conditions to any Interim New Money DIP Loans;

(b)    an aggregate principal amount of New Money DIP Loans in an amount equal to the "Acceptable Incremental Amount" as set forth in the DIP Term Sheet (the "**Final New Money DIP Loans**") upon entry of the Final Order (as defined below) and satisfaction of the Milestones, agreement on the "Acceptable Incremental Amount" as set forth in the DIP Term Sheet, and of the other applicable funding conditions to any Final New Money DIP Loans;

(c)    a deemed "roll-up" of two dollars of Prepetition First Out Obligations (as defined below) and the aggregate amount of accrued but unpaid interest on such Prepetition First Out Obligations, for each dollar of Interim New Money DIP Loans (the "**Interim DIP Rolled-Up Loans**") which Interim DIP Rolled-Up Loans, upon entry of this Interim Order, shall be deemed borrowings of term loans under the DIP Documents in exchange for cancellation of the respective Prepetition First Out Obligations of the DIP Lenders providing the Interim New Money Loans, in each case in accordance with the DIP Term Sheet and this Order (such deemed funding and exchange, the "**Interim Roll-Up**"); and

(d)    upon entry of the Final Order (as defined below), approval of a "roll-up" loan tranche under the DIP Documents equal to a maximum amount of two-times the sum of the Interim New Money DIP Loans and the Final New Money DIP Loans (the "**Final DIP Rolled-Up Loans**", and, together with the Interim DIP Rolled-Up Loans, the "**DIP Rolled-Up Loans**" and the DIP Rolled-Up Loans, together with all New Money DIP Loans, collectively, the "**DIP Loans**"), which Final DIP Rolled-Up Loans, on entry of the Final

---

[3]    The New Money DIP Loans shall initially be provided by the Fronting Lender and thereafter such New Money DIP Loans shall be assigned by the Fronting Lender to each DIP Lender subject to customary fronting terms set forth in the Backstop Commitment Agreement  So long as the Fronting Lender is a holder of New Money DIP Loans, the Fronting Lender shall be included in the definition of DIP Lenders and DIP Secured Parties.  For the avoidance of doubt, and notwithstanding anything to the contrary herein, the Fronting Lender, by acting in such capacity, does not make any commitments, undertake any obligations. or waive any rights, including whether to take or not take any action or to exercise or seek to exercise any rights or remedies, in each case in connection with any other claims or interests it may hold against any of the Debtors.

Order, will be authorized to be deemed borrowings in exchange for cancellation of the respective Prepetition First Out Obligations (now owned or hereafter acquired) or Interim DIP Rolled-Up Loans of the DIP Lenders providing the Final New Money DIP Loans, in each case in accordance with the DIP Documents (such deemed borrowing, exchange, and cancellation, the "***Final Roll-Up***" and together with the Interim Roll-Up, the "***Roll-Up***");

(ii)   authorizing the Debtors to execute, deliver, enter into, and perform their respective obligations under (a) the DIP Term Sheet and (b) any other agreements (including any debtor-in-possession credit agreement), instruments, pledge agreements, mortgages, guarantees, security agreements, intellectual property security agreements, control agreements, financing statements, notes, and documents related thereto, (the foregoing, collectively, as each document may be amended, supplemented, or otherwise modified from time to time in accordance with the terms hereof and thereof, including this Interim Order, the Final Order (if entered), the DIP Term Sheet, and any other related loan documents, the "***DIP Documents***");

(iii)  authorizing the Debtors to use the proceeds of the DIP Facility in accordance with this Interim Order, the DIP Documents, and the Approved Budget (as defined below, subject to Permitted Variances), including (a) to pay certain interest, costs, fees, and expenses related to the Chapter 11 Cases and (b) to fund the working capital needs and expenditures of the Debtors during the Chapter 11 Cases;

(iv)   authorizing the Debtors to use Prepetition Collateral (as defined below), including Cash Collateral (as defined below), subject to the restrictions set forth in the DIP Documents and this Interim Order;

(v)    providing adequate protection to the Prepetition Secured Parties (as defined below) of their interests in the Prepetition Collateral (including Cash Collateral);

(vi)   granting to the DIP Agent, for the benefit of the DIP Secured Parties, and authorizing the Debtors to incur, valid, enforceable, non-avoidable, and automatically and fully-perfected DIP Liens (as defined below) in all DIP Collateral (as defined below), including all property constituting Prepetition Collateral, to secure the DIP Obligations (as defined in the DIP Documents), which DIP Liens shall be subject to the Carve-Out (as defined below) and the relative rankings and priorities set forth in this Interim Order, and as further set forth on **Exhibit 2**;

(vii)  granting to the DIP Agent, for the benefit of the DIP Secured Parties, and authorizing the Debtors to incur, allowed superpriority administrative expense claims against each of the Debtors, on a joint and several basis, in respect of all DIP Obligations;

(viii) waiving the equitable doctrine of "marshaling" and other similar doctrines (a) upon entry of this Interim Order, with respect to the DIP Collateral for the benefit of any party other than the DIP Secured Parties and (b) subject to and effective only upon entry of the Final Order (but retroactive to the Petition Date), with respect to the Prepetition Collateral for the benefit of any party other than the Prepetition Secured Parties;

(ix)     subject to and effective only upon entry of the Final Order (but retroactive to the Petition Date), waiving (a) the Debtors' right to surcharge the DIP Collateral pursuant to section 506(c) of the Bankruptcy Code and (b) the "equities of the case" exception under section 552(b) of the Bankruptcy Code;

(x)      modifying or vacating the automatic stay imposed by section 362 of the Bankruptcy Code or otherwise to the extent necessary to implement and effectuate the terms and provisions set forth in this Interim Order and in the DIP Documents, and waiving any applicable stay (including under Bankruptcy Rule 6004) with respect to the effectiveness and enforceability of this Interim Order, and providing for the immediate effectiveness of this Interim Order;

(xi)     scheduling a final hearing (the "*Final Hearing*") to consider entry of a final order (the "*Final Order*") authorizing and approving, among other things, the relief requested in the Motion on a final basis, which order shall be in form substantially similar to this Interim Order and otherwise reasonably acceptable in form and substance to the Debtors, and acceptable in form and substance to the DIP Secured Parties and the Prepetition Secured Parties, and approving the form of notice with respect to the Final Hearing; and

(xii)    granting related relief.

The Court having considered the interim relief requested in the Motion, the exhibits attached thereto, the *Declaration of Jeff Seery in Support of Chapter 11 Petitions and First Day Relief* (the "*First Day Declaration*"), the *Declaration of Michael Sellinger in Support of the Debtors' Motion to Obtain Postpetition Financing* (the "*DIP Declaration*"), the DIP Documents, and the evidence submitted and arguments made at the interim hearing held on July 15, 2025 (the "*Interim Hearing*"); and due and sufficient notice of the Interim Hearing having been given in accordance with Bankruptcy Rules 2002 and 4001(b), (c), and (d) and all applicable Local Rules; and the Interim Hearing having been held and concluded; and all objections to the interim relief requested in the Motion having been withdrawn, resolved, or overruled by the Court; and it appearing that the interim relief requested in the Motion is fair and reasonable and in the best interests of the Debtors and their estates, necessary to avoid immediate and irreparable harm to the Debtors and their estates, and essential for the continued operation of the Debtors' businesses and the preservation of the value of the Debtors' assets; and it appearing that the Debtors' entry into

the DIP Documents is a sound exercise of the Debtors' business judgment; and after due deliberation and consideration, and good and sufficient cause appearing therefor.

**BASED UPON THE RECORD ESTABLISHED AT THE INTERIM HEARING, THE COURT MAKES THE FOLLOWING FINDINGS OF FACT AND CONCLUSIONS OF LAW:[4]**

A.     **Petition Date**.  On July 14, 2025 (the "***Petition Date***"), each Debtor filed a voluntary petition (each, a "***Petition***") under chapter 11 of the Bankruptcy Code with this Court.

B.     **Debtors in Possession**.  The Debtors continue to operate their businesses and manage their properties as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No trustee or examiner has been appointed in any of the Chapter 11 Cases.

C.     **Jurisdiction and Venue**.  This Court has jurisdiction over the Chapter 11 Cases, the Motion, and the parties and property affected hereby pursuant to 28 U.S.C. §§ 157 and 1334.  Venue of the Chapter 11 Cases and the Motion in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409, and this matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).  The predicates for the relief sought herein are sections 105, 361, 362, 363, 364, 503, 506, 507, and 552 of the Bankruptcy Code, Bankruptcy Rules 2002, 4001, 6003, 6004, and 9014, Local Rules 2002-1, 4001-1(b), 4002-1 and 9013-1, and the Complex Case Procedures.

D.     **Committee Formation**.  As of the date hereof, the United States Trustee for the Southern District of Texas (the "***U.S. Trustee***") has not appointed an official committee of unsecured creditors in these Chapter 11 Cases pursuant to section 1102 of the Bankruptcy Code (a "***Creditors' Committee***").

---

[4]     The findings and conclusions set forth herein constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014.  If any of the findings of fact constitute conclusions of law, they are adopted as conclusions of law.  If any of the conclusions of law constitute findings of fact, they are adopted as findings of fact.

E.      **Notice**.  The Interim Hearing was held pursuant to Bankruptcy Rule 4001(b)(2) and (c)(2).  Proper, timely, appropriate, and sufficient notice of the Motion has been provided in accordance with the Bankruptcy Code, the Bankruptcy Rules, and the Local Rules, and no other or further notice of the Motion or the entry of this Interim Order shall be required.  The interim relief granted herein is necessary to avoid immediate and irreparable harm to the Debtors and their estates pending the Final Hearing.

F.      **Debtors' Stipulations**.  Without prejudice to the rights of any party in interest, as set forth in paragraph 30 of this Interim Order, and subject to the limitations therein, and in exchange for and as a material inducement to the Prepetition Secured Parties (as defined below) to agree to consent to access to cash collateral, and subordination of the Prepetition Liens (as defined below) to the Carve-Out (as defined below) and DIP Liens (as defined below),the Debtors acknowledge, admit, stipulate, and agree that:

(i)      **Prepetition Secured Facility**.

(a)      **Prepetition Credit Agreement**.  As of the Petition Date, pursuant to and in accordance with the *Credit Agreement* dated as of September 3, 2021 (as amended, restated, amended and restated, supplemented, or otherwise modified from time to time, the "***Prepetition Credit Agreement***", and, together with all security, pledge and guaranty agreements and all other documents and instruments executed at any time in connection therewith, the "***Prepetition Credit Documents***"), between the Borrower, the "Guarantors" (as defined in the Prepetition Credit Agreement and together with the Borrower, and as set forth on Schedule 1 hereto, the "***Prepetition Loan Parties***"), the lenders party thereto from time to time (the "***Prepetition Lenders***"), and Alter Domus (US) LLC, as administrative agent and collateral agent (in such capacities, the "***Prepetition Agent***" and, together with the Prepetition Lenders, the "***Prepetition Secured Parties***")), the Prepetition Lenders provided the Term Loans (as defined in the Prepetition Credit Agreement) to the Prepetition Obligors (the "***Prepetition Secured Facility***").

(b)      **Prepetition Secured Obligations**.  As of the Petition Date, the Prepetition Loan Parties and the "Licensed Operator Guarantor Equity Pledgors" (as defined in the Prepetition Credit Agreement, and as set forth on Schedule 2 hereto, the "***Prepetition Equity Pledgors***" and, together with the Prepetition Loan Parties, the "***Prepetition Obligors***") were justly and lawfully liable and indebted to the Prepetition Secured Parties, without defense, challenge, objection, claim, counterclaim, or offset of any kind, in the aggregate principal amount of not less than $305,854,469, which consists of not less than, (i) approximately $77,000,000 in outstanding principal amount of First Out Term Loans (as defined in the Prepetition Credit Agreement) under

the Prepetition Credit Agreement (the "***Prepetition First Out Obligations***"), (ii) approximately $214,726,510 in outstanding principal amount of Second Out Term Loans (as defined in the Prepetition Credit Agreement) under the Prepetition Credit Agreement (the "***Prepetition Second Out Obligations***"), (iii) approximately $202,257 in outstanding principal amount of Third Out Term Loans (as defined in the Prepetition Credit Agreement) under the Prepetition Credit Agreement (the "***Prepetition Third Out Obligations***"), (iv) approximately $13,925,702 in outstanding principal amount of Fourth Out Term Loans (as defined in the Prepetition Credit Agreement) under the Prepetition Credit Agreement (the "***Prepetition Fourth Out Obligations***" and together with the Prepetition First Out Obligations, the Prepetition Second Out Obligations, and the Prepetition Third Out Obligations, the "***Prepetition Term Loan Obligations***"), *plus*, in each case, any other amounts due and payable under the Prepetition Credit Agreement, including accrued and unpaid interest thereon, premiums, reimbursement obligations, fees, costs, expenses and disbursements, indemnification obligations, guarantee obligations, and other claims under the Prepetition Credit Agreement (collectively, with the Prepetition Term Loan Obligations, the "***Prepetition Secured Obligations***").

(c)      **Prepetition Liens**.  As more fully set forth in the Prepetition Credit Documents, before the Petition Date, to secure the Prepetition Secured Obligations, (i) the Prepetition Loan Parties granted to the Prepetition Agent, for the benefit of the Prepetition Secured Parties, valid, binding, properly perfected, and enforceable first priority continuing liens on and security interests in substantially all of their assets and property (collectively, the "***Prepetition Loan Parties Secured Liens***"), including a first-priority security interest in all of their right, title, and interest in, to, and under all of the "Collateral" as defined in the Prepetition Credit Agreement, and all proceeds, products thereof, and accessions thereto, in each case whether then owned or owing to or thereafter acquired or arising (the "***Prepetition Loan Parties Secured Collateral***") and (ii) the Prepetition Equity Pledgors pledged to the Prepetition Agent, for the benefit of the Prepetition Secured Parties, valid, binding, properly perfected, and enforceable first priority continuing liens on and security interests in all of their right, title, and interest in, to, and under all of the "Pledged Collateral" (as defined in the *Equity Pledge Agreement*, dated as of September 3, 2021 (as may be amended supplemented, or otherwise modified from time to time in accordance with the terms hereof and thereof), collectively, the "***Regulated Equity***" and such liens and security interests, together with the Prepetition Loan Parties Secured Liens, the "***Prepetition Liens***"), and all proceeds, products thereof, and accessions thereto, in each case whether then owned and owing to or thereafter acquired or arising, in each case in clauses (i) and (ii), other than "Excluded Property" (as defined in the Security Agreement (as defined in the Prepetition Credit Agreement)) (together with the Prepetition Loan Parties Secured Collateral, the "***Prepetition Collateral***").

(ii)      **Validity, Perfection, and Priority of Prepetition Liens and Prepetition Secured Obligations**.  (a) The Prepetition Liens are valid, binding, enforceable, non-avoidable, and perfected liens, with priority over any and all other liens, other than liens expressly permitted to be senior to such Prepetition Liens under the Prepetition Credit Documents, and only to the extent such permitted liens were existing, valid, enforceable, properly perfected, and non-

avoidable as of the Petition Date or perfected after the Petition Date as permitted by 546(b) of the Bankruptcy Code (collectively, the "***Permitted Prior Liens***"); (b) the Prepetition Secured Obligations constitute legal, valid, binding, and non-avoidable obligations of the Prepetition Secured Parties, enforceable in accordance with the terms of the Prepetition Credit Documents, and the Prepetition Secured Obligations constitute allowed, secured claims within the meaning of sections 502 and 506 of the Bankruptcy Code; (c) no portion of the Prepetition Liens, the Prepetition Secured Obligations, or any payments made to any Prepetition Secured Party or applied or paid on account of the Prepetition Secured Obligations before or after the Petition Date is subject to any contest, set-off, avoidance, impairment, disallowance, recharacterization, reduction, subordination (whether equitable, contractual, or otherwise), recoupment, recovery, rejection, attack, effect, counterclaims, cross-claims, defenses, or any other challenge or claim (as defined in the Bankruptcy Code) of any kind, any cause of action or any other challenge of any nature under or pursuant to the Bankruptcy Code or any other applicable domestic or foreign law or regulation or otherwise by any person or entity; (d) the Debtors and their estates hold no claims, counterclaims, defenses, setoff rights, or causes of action, including Avoidance Actions (as defined below), of any kind against any of the Prepetition Secured Parties or any of their respective Representatives (as defined below), whether with respect to the Prepetition Secured Obligations and the Prepetition Liens or otherwise; and (e) subject to paragraph 30 of this Interim Order, the Debtors have, on behalf of each of their estates and any party that may try to claim by, through, or on behalf of the Debtors or their estates, disclaimed, waived, discharged and released any right they may have to: (A) challenge the validity, enforceability, priority, security, and perfection of any of the Prepetition Secured Obligations, the Prepetition Credit Documents, or the Prepetition Liens, respectively; and (B) assert any and all claims (as defined in the Bankruptcy Code) or causes

of action against any of the Prepetition Secured Parties, and each of their respective officers, directors, equity holders, members, partners, subsidiaries, affiliates, funds, managers, managing members, employees, advisors, principals, attorneys, professionals, accountants, investment bankers, consultants, agents, and other representatives (in each case, in their respective capacities as such), whether arising at law or in equity, including any recharacterization, subordination, avoidance, or other claim arising under or pursuant to section 105 or chapter 5 of the Bankruptcy Code or applicable state or federal law, in each case, arising out of, based upon or related to the Prepetition Credit Documents, the Prepetition Liens or the Prepetition Secured Obligations, as applicable.  The Prepetition Liens were granted to or for the benefit of the Prepetition Secured Parties for fair consideration and reasonably equivalent value, and were granted contemporaneously with, or covenanted to be provided as inducement for, the making of the loans or the commitments and other financial accommodations secured thereby, or for other accommodations provided by the Prepetition Secured Parties.

(iii)    **No Control**.  None of the Prepetition Secured Parties or DIP Secured Parties control, or have controlled, any of the Debtors or their properties or operations, have authority to determine the way any Debtors' operations are conducted, or are control persons or insiders of the Debtors or any of their affiliates.

(iv)    **No Claims or Causes of Action**. No claims or causes of action held by the Debtors or their estates exist against, or with respect to, the Prepetition Secured Parties or any of their respective Representatives (in each case, in their capacity as such) under or relating to any agreements by and among the Debtors and any Prepetition Secured Party as of the Petition Date. The Debtors have waived, discharged, and released any right to challenge any of the Prepetition

Secured Obligations, the priority of the Debtors' obligations thereunder, and the validity, extent, and priority of the Prepetition Liens.

(v)     **Cash Collateral**.  All the Debtors' cash, whether existing as of the Petition Date or thereafter, wherever located (including all cash on deposit or maintained by the Debtors in any account or accounts but subject to paragraph 29), any amounts generated by the sale or other disposition of Prepetition Collateral, and all income, proceeds, products, rents or profits of any Prepetition Collateral, constitutes or will constitute "cash collateral" of the Prepetition Secured Parties within the meaning of section 363(a) of the Bankruptcy Code (the "***Cash Collateral***").

(vi)     **Indemnification**.  The Prepetition Secured Parties and DIP Secured Parties have acted in good faith, and without negligence or violation of public policy or law, in respect of all actions taken by them in connection with or related in any way to negotiating, implementing, documenting, or obtaining the approval of the DIP Facility and the use of Cash Collateral, including in respect of the granting of the DIP Liens and the Adequate Protection Liens (as defined below), any challenges or objections to the DIP Facility or the use of Cash Collateral, and all documents related to any and all transactions contemplated by the foregoing, including the DIP Documents.  Accordingly, subject only to paragraph 30, the Prepetition Secured Parties  and DIP Secured Parties are entitled to indemnification as provided and to the extent set forth under the DIP Documents; *provided*, that no such Indemnified Parties (as defined in the DIP Documents) will be indemnified for any cost, expense, or liability to the extent determined in a final, non-appealable judgment of a court of competent jurisdiction to have resulted primarily from such parties' gross negligence or willful misconduct.

(vii)     **Debtors' Release**.  Effective upon entry of this Interim Order (and subject to paragraph 30), the Debtors, on behalf of themselves and their respective estates (including any

successor trustee or other estate representative in these Chapter 11 Cases and any party acting by, through, or under any of the Debtors or their estates), hereby absolutely, irrevocably, and unconditionally release, waive, and forever discharge and acquit the DIP Secured Parties, the Prepetition Secured Parties, their respective participants and affiliates, and their former or current officers, partners, directors, managers, members, principals, employees, agents, related funds, affiliates, investors, financing sources, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, and other professionals and the respective successors and assigns thereof, in each case solely in their capacities as such (collectively, the "***Released Parties***"), from any and all claims, demands, offsets, defenses, counterclaims, set off rights, objections, challenges, causes of action, liabilities, losses, damages, responsibilities, disputes, remedies, actions, suits, controversies, indebtedness, reimbursement obligations (including, attorneys' fees), costs, expenses, or judgments of every type, whether known or unknown, asserted or unasserted, suspected or unsuspected, accrued or unaccrued, fixed or contingent, or pending or threatened, of any kind or nature whatsoever, whether arising under common law, statute, or regulation or by contract or in equity (including any so-called "lender liability" or equitable subordination claims or defenses, recharacterization, subordination, avoidance, any claim or cause of action arising under or pursuant to section 105 or chapter 5 of the Bankruptcy Code or under any other similar provisions of applicable state or federal law, or any other claim or cause of action arising under the Bankruptcy Code or applicable non-bankruptcy law), in each case, arising under, in connection with, or related to the extent, amount, validity, enforceability, priority, security, perfection, and avoidability of the DIP Facility, the DIP Obligations, the DIP Liens, the DIP Documents, the Prepetition Secured Facilities, the Prepetition Secured Obligations, the Prepetition Liens, and the Prepetition Credit Documents, and the obligations owing and the financial obligations made

thereunder, the negotiation thereof and of the deal reflected thereby, in each case that the Debtors at any time had, now have or may have, or that their successors or assigns hereafter can or may have against any of the Released Parties for or by reason of any act, omission, matter, cause, or thing whatsoever arising at any time on or before the date of this Interim Order, except to the extent such claim, damage, loss, liability, or expense is found in a final non-appealable judgment by a court of competent jurisdiction to have resulted primarily from such Released Party's actual fraud, gross negligence or willful misconduct.  The foregoing release shall not constitute a release of any rights or obligations under this Interim Order or under the DIP Documents.

G.    **Findings Regarding Postpetition Financing and Use of Cash Collateral**.

(i)    **Good Cause**.  Good and sufficient cause has been shown for the entry of this Interim Order and for authorization of the Debtors to obtain financing under the DIP Facility.  The execution and delivery of the DIP Documents and the implementation of the DIP Facility are in the best interests of the Debtors and their estates.

(ii)    **Priming of the Prepetition Liens**.  The priming of the Prepetition Liens under section 364(d) of the Bankruptcy Code, as contemplated by the DIP Documents and as provided herein and on **Exhibit 2** hereto, will enable the Debtors to obtain the DIP Facility and to continue to operate their business during the pendency of the Chapter 11 Cases, to the benefit of their estates and creditors.  The Prepetition Secured Parties are entitled to receive adequate protection against any aggregate postpetition diminution in value of the Prepetition Secured Parties' respective liens and interests in the Prepetition Collateral (including Cash Collateral) for any reason allowed under the Bankruptcy Code, including diminution in value resulting from (a) the depreciation, sale, lease, or use by the Debtors (or other decline in value) of such collateral (including Cash Collateral), (b) the imposition of the automatic stay, (c) the subordination of the

Prepetition Liens and the Prepetition Secured Obligations to the Carve-Out, the DIP Liens, and the DIP Obligations, and (d) the payment of any amounts under the Carve-Out (collectively, the "***Diminution in Value***"), in each case, as set forth in this Interim Order pursuant to sections 361, 362, 363, and 364 of the Bankruptcy Code.

(iii)     **Immediate Need for Postpetition Financing and Use of Cash Collateral**. The Debtors have an immediate and a critical need for the DIP Facility and to continue to use the Collateral, including Cash Collateral, to, among other things, (a) permit the orderly continuation of the operation of their businesses, (b) maintain business relationships with customers, employees, vendors, and suppliers, (c) satisfy other working capital and operational needs, (d) pay professional fees, expenses, and obligations benefitting from the Carve-Out to the extent provided herein, and (e) pay costs, fees, and expenses associated with or payable under the DIP Documents and this Interim Order.  The access by the Debtors to sufficient working capital and liquidity through the use of Cash Collateral and other Prepetition Collateral, incurrence of new indebtedness under the DIP Documents, and other financial accommodations provided under the DIP Documents are necessary and vital to the preservation and maintenance of the going concern values of the Debtors.  The Debtors' use of Cash Collateral alone would be insufficient to meet the Debtors' cash disbursement needs during the period of effectiveness of this Interim Order.  The terms of the proposed DIP Facility pursuant to the DIP Documents and this Interim Order are fair and reasonable, reflect each Debtors' exercise of sound business judgment, and are supported by reasonably equivalent value and fair consideration.

(iv)     **No Credit Available on More Favorable Terms**.  The DIP Facility is the best source of debtor-in-possession financing available to the Debtors under the circumstances. Given their current financial condition, the Debtors have been and continue to be unable to obtain

13

financing and other financial accommodations from sources other than the DIP Lenders on terms more favorable than those provided under the DIP Facility and the DIP Documents. The Debtors are unable to obtain adequate unsecured credit allowable under section 503(b)(1) of the Bankruptcy Code as an administrative expense. The Debtors have also been unable to obtain sufficient (a) unsecured credit having priority over that of administrative expenses of the kind specified in sections 503(b), 507(a), and 507(b) of the Bankruptcy Code; (b) credit secured solely by a lien on property of the Debtors and their estates that is not otherwise subject to a lien; or (c) credit secured solely by a junior lien on property of the Debtors and their estates that is subject to a lien. Adequate financing on a postpetition basis on better terms is not available without granting the DIP Agent, for the benefit of the DIP Secured Parties, (1) perfected priming security interests in and liens on (each as provided herein and in the DIP Documents) the DIP Collateral, with the priorities set forth herein; (2) superpriority claims; and (3) the other protections set forth in this Interim Order.

(v)     **Adequate Protection**. The Prepetition Secured Parties are entitled, pursuant to sections 361, 362, 363, 364, 507, and 552(b)(2) of the Bankruptcy Code, to adequate protection ("***Adequate Protection***"), as and to the extent set forth in this Interim Order, of their interest in all Prepetition Collateral, including Cash Collateral, on account of the Diminution in Value of the Prepetition Secured Parties' interests in the Prepetition Collateral (including Cash Collateral). Based on the Motion, the First Day Declaration, the DIP Declaration, and the record presented to the Court at the Interim Hearing, the terms of the proposed adequate protection arrangements and of the use of the Prepetition Collateral (including Cash Collateral) are fair and reasonable, reflect the Debtors' prudent exercise of business judgment, and constitute reasonably equivalent value and fair consideration for the use of the Prepetition Collateral.

(vi)     **Limited Consent**.  The requisite DIP Secured Parties and the requisite Prepetition Lenders have consented to the Debtors' use of Prepetition Collateral (including Cash Collateral), and the Debtors' entry into the DIP Documents and the priming liens granted to the DIP Secured Parties, in each case, in accordance with the Approved Budget (subject to Permitted Variances) and subject to the terms and conditions in this Interim Order and the DIP Documents.

(vii)     **Good Faith Pursuant to Section 364(e)**.  The DIP Facility and the use of Prepetition Collateral (including Cash Collateral) were negotiated in good faith and at arm's-length among the Debtors, the DIP Secured Parties, the Prepetition Secured Parties, and their respective advisors.  The Debtors' continued use of Prepetition Collateral (including Cash Collateral) to fund the administration of the Debtors' estates and continued operation of their businesses (including the incurrence and payment of any adequate protection obligations and the granting of adequate protection liens), in accordance with the terms hereof, and the credit to have been extended by the DIP Secured Parties under the DIP Facility shall be deemed to have been so allowed, advanced, made, used and extended in good faith, and for valid business purposes and uses, within the meaning of section 364(e) of the Bankruptcy Code, and in express reliance upon the protections offered by section 364(e) of the Bankruptcy Code.  The DIP Secured Parties and the Prepetition Secured Parties (and their successors and assigns) shall be entitled to the full protection of section 364(e) of the Bankruptcy Code if this Interim Order or any provision hereof is vacated, reversed, or modified on appeal or otherwise.

(viii)     **Relief Essential; Necessity of Immediate Entry**.  The Debtors have requested immediate entry of this Interim Order pursuant to Bankruptcy Rules 4001(b)(2) and 4001(c)(2) and the Local Rules and good cause has been shown for the immediate entry of this Interim Order.  For the reasons set forth in the Motion, the First Day Declaration, the DIP

Declaration, and the record presented to the Court at the Interim Hearing, absent granting the relief set forth in this Interim Order, the Debtors' estates would face significant business disruption resulting in immediate and irreparable harm.  Consummation of the DIP Facility and the use of Prepetition Collateral (including Cash Collateral) in accordance with this Interim Order and the DIP Documents are therefore in the best interests of the Debtors, their estates, and their creditors.

(ix)  **Interim Hearing**.  Notice of the Interim Hearing and the relief requested in the Motion has been provided by the Debtors, whether by electronic mail, overnight courier, or hand delivery to certain parties in interest, including the Notice Parties (as defined below) and no other notice is required in connection with the relief set forth in this Interim Order.  Based upon the foregoing findings and conclusions, the Motion, and the record before the Court with respect to the Motion, and after due consideration and good and sufficient cause appearing therefor,

**IT IS HEREBY ORDERED THAT:**

1.  **Interim Approval**.  The relief requested in the Motion is authorized and approved, in each case, subject to the terms and conditions set forth in the DIP Documents and this Interim Order.  All objections to the Motion with respect to the entry of this Interim Order that have not been withdrawn, waived, settled, or resolved are hereby denied and overruled.

2.  **Authorization of the DIP Facility and the DIP Documents**.

(a)  The Debtors are hereby authorized without the need for any further corporate action to execute, enter into, and perform all obligations under the DIP Documents, to borrow (as applicable), incur, guarantee, perform and pay the DIP Obligations, to grant security for the payment and performance of the DIP Obligations, and to take any other and further acts related to the performance of the DIP Documents.  The DIP Documents and this Interim Order shall govern the financial and credit accommodations to be provided to the Debtors by the DIP Lenders in

connection with the DIP Facility.  The DIP Facility shall be used for all purposes permitted under the DIP Documents and this Interim Order, including to (i) provide working capital and pay for other general corporate purposes of the Debtors, (ii) pay administration costs of the Chapter 11 Cases and claims or amounts approved by the Bankruptcy Court, and (iii) consummate the Interim Roll-Up, in each case in accordance with the Approved Budget (subject to Permitted Variances), this Interim Order, and the DIP Documents.

(b)      Subject to the terms and conditions of this Interim Order, the DIP Agent is hereby authorized to execute, enter into, and perform all rights and duties of the DIP Agent under the DIP Documents.

(c)      Upon execution and delivery of the DIP Documents, each of the DIP Documents shall constitute valid, binding, and non-avoidable obligations of the Debtors, fully enforceable against the Debtors, their estates, and any successors thereto, including any trustee or other estate representative appointed in the Chapter 11 Cases or any case under chapter 7 of the Bankruptcy Code upon the conversion of these Chapter 11 Cases or in any other proceedings superseding or relating to any of the foregoing and upon the dismissal of any of these Chapter 11 Cases or any such successor cases (each, a "***Successor Case***" and collectively, the "***Successor Cases***"), in accordance with the terms of the DIP Documents and this Interim Order.  For the avoidance of doubt, the DIP Term Sheet shall constitute valid, binding, and non-avoidable obligations of the Debtors pursuant to this paragraph upon the entry of this Interim Order and the funding of the New Money Term Loans thereunder by the Fronting Lender.  No obligation, payment, transfer, or grant of security under the DIP Documents or this Interim Order to the DIP Secured Parties, or any of their respective representatives shall be stayed, restrained, voidable, or recoverable under the Bankruptcy Code or under any applicable law (including under sections 502(d), 544, 547, and 548

17

through 550 of the Bankruptcy Code, any applicable Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act, Uniform Voidable Transactions Act, or other similar state statute or common law), or subject to any defense, reduction, recoupment, recharacterization, subordination, disallowance, impairment, cross-claim, claim, or counterclaim.

(d)     No DIP Secured Party shall have any obligation or responsibility to monitor the Debtors' use of the DIP Loans, and each DIP Secured Party may rely upon the Debtors' representations as to whether the amount of DIP Loans requested at any time and the use thereof are in accordance with the requirements of this Interim Order, the DIP Documents, and Bankruptcy Rule 4001(c)(2).

3.      **Authorization of the DIP Fees**.  The Debtors are authorized to use the proceeds of the DIP Facility to pay in accordance with the DIP Documents the fees, interest, costs, expenses due or payable under the DIP Documents, including commitment fees, upfront fees, exit fees, backstop fees, or premiums, agency fees, professional fees and expenses (including legal fees and expenses of the DIP Lenders, the DIP Agent, and the Fronting Lender) and any other fees pursuant to the DIP Documents (the "***DIP Fees and Expenses***").

4.      **Approval of Interim Roll-Up**.

(a)     Upon entry of this Interim Order, the Debtors shall be deemed, automatically, and without any further action, to substitute and exchange a portion of the outstanding Prepetition First Out Obligations and aggregate amount of accrued but unpaid interest with respect to such portion held by DIP Lenders for term loans under the DIP Documents on a cashless basis in accordance with the Interim Roll-Up and subject to the terms and conditions set forth in the DIP Documents. Such portion of the Prepetition First Out Obligations and accrued but unpaid interest thereon shall be deemed substituted and exchanged under this paragraph 4 and deemed indefeasibly prepaid

18

(subject only to paragraph 4(b) below), and the term loans under the DIP Documents substituted thereby shall be deemed exchanged therefor by each DIP Lender. The cashless substitution and exchange of Prepetition First Out Obligations and accrued but unpaid interest thereon by "rolling up" such amounts into DIP Obligations as described in this paragraph 4 shall be authorized as compensation for, in consideration for, as a necessary inducement for, and on account of the agreement of the DIP Lenders to fund the DIP Loans and not as adequate protection for, or otherwise on account of, the Prepetition Secured Facility.

(b)     Notwithstanding the foregoing paragraph 4(a), if it is determined by a final, non-appealable order that the Roll-Up resulted in the payment of a portion of Prepetition Secured Obligations that are subject to a successful Challenge (including any successful Challenge relating to the Prepetition Secured Obligations themselves or the Prepetition Liens purportedly securing such Prepetition Secured Obligations), then this Court may unwind or otherwise recharacterize the Roll-Up solely with respect to such portion of Prepetition Secured Obligations or fashion any other remedy it deems appropriate, in each case as determined by final order of this Court. All defenses to any efforts to unwind or otherwise recharacterize the Roll-Up are expressly reserved.

5.     **Authorization to Use Cash Collateral; Budget Covenants**.

(a)     The Debtors are authorized to use Cash Collateral solely in accordance with the Approved Budget and subject to the terms and conditions of the DIP Documents and this Interim Order subject to Permitted Variances; *provided* that the Prepetition Secured Parties are granted the Adequate Protection as hereinafter set forth. The Prepetition Liens on the Prepetition Collateral shall continue to attach to the Cash Collateral irrespective of the commingling of the Cash Collateral with other cash of the Debtors (if any). Any failure by the Debtors on or after the Petition Date to comply with the segregation requirements of section 363(c)(4) of the Bankruptcy Code in

respect of any Cash Collateral shall not be used as a basis to challenge the Prepetition Secured Obligations, or the extent, validity, enforceability, or perfected status of the Prepetition Liens. The Debtors' authorization to use Cash Collateral shall end on the Termination Declaration Date in accordance with paragraph 12.

(b)     The Debtors have prepared and delivered to the DIP Secured Parties an initial 13-week budget (the "***Initial DIP Budget***"), a copy of which is attached hereto as **Exhibit 3**. The Initial DIP Budget reflects the Debtors' minimum cash required to be maintained under applicable gaming law, anticipated cash receipts, operating disbursements, operating cash flow, non-operating disbursements (including restructuring fees and debt servicing), and net cash flow for such 13-week period.  The Initial DIP Budget may be modified, amended, and updated from time to time in accordance with the DIP Documents and once approved in accordance therewith shall supplement and replace the Initial DIP Budget (each replacement being a "***Subsequent Budget***" and together with the Initial Budget, without duplication, an "***Approved Budget***").  The Debtors believe that the Initial DIP Budget is reasonable under the facts and circumstances known to them, taken as a whole, as of the Petition Date.  The proceeds of the DIP Facility and the Cash Collateral shall be used solely in accordance with the Approved Budget (subject to Permitted Variances).  The DIP Secured Parties and the Prepetition Secured Parties are relying, in part, upon the Debtors' agreement to comply with limits on cash expenditures in the Approved Budget (subject to Permitted Variances), the other DIP Documents, and this Interim Order in determining to enter the DIP Facility provided for in this Interim Order.

(c)     The Debtors shall only use proceeds of the DIP Facility and expend Cash Collateral and other DIP Collateral proceeds in accordance with the Approved Budget (and in the case of the costs and expenses of the DIP Agent and Prepetition Agent, in accordance with the DIP Documents

and this Interim Order without being limited by the Approved Budget), subject to the following permitted variances ("***Permitted Variances***") and affirmative covenants, which shall be tested initially on the first Friday after conclusion of the second full week after the Petition Date (the "***First Testing Date***") and testing the period from the Petition Date through and including, July 27, 2025 (the "***First Testing Period***") and continuing on each Friday thereafter (the date of each such test, a "***Subsequent Testing Date***") and testing the period that is the shorter of (i) the period between the Petition Date and the Friday immediately preceding the Subsequent Testing Date and (ii) the four-week period immediately preceding the Friday immediately preceding the Subsequent Testing Date (such period, the "***Subsequent Testing Period***"): (x) for the First Testing Period and each Subsequent Testing Period, the aggregate total operating, non-operating, and restructuring disbursements of the Debtors (calculated in the same manner as the sum of the "Total Disbursements" in the Approved Budget, including fees and expenses of the Debtors' professionals but excluding the fees and expenses of the DIP Secured Parties' professionals) shall not exceed 115% of the aggregate total budgeted amount of operating, non-operating and restructuring disbursements for such First Testing Period and Subsequent Testing Period, as set forth in the Approved Budget, (y) the sum of all actual cash receipts of the Debtors (calculated in the same manner as the "Total Receipts" in the Approved Budget were calculated) (A) for the First Testing Period shall not be less than 75% and (B) for each Subsequent Testing Period shall not be less than 85%, in either case of the sum of the Total Receipts for such testing period, as set forth in the Approved Budget; and (z) at any time, the Debtors shall not permit aggregate cash and cash equivalents of the Debtors (taking into account both restricted and unrestricted cash) to be less than $16,000,000.  The foregoing budget-related covenants are collectively referred to herein as the "***Budget Covenants***."

6.    **Carve-Out**.  Subject to the terms and conditions contained in this paragraph 6, each of the DIP Liens and the Prepetition Liens shall be subject and subordinate to payment of the Carve-Out in accordance with the terms of this Interim Order.

(a)    For purposes of this Interim Order, "***Carve-Out***" means (i) all unpaid fees required to be paid in these Chapter 11 Cases to the Clerk of the Court and to the Office of the United States Trustee under 28 U.S.C. § 1930(a)(6) plus interest pursuant to 31 U.S.C. § 3717 (without regard to the notice set forth in (iii) below); (ii) all reasonable and documented fees and expenses up to $75,000 incurred by a trustee under section 726(b) of the Bankruptcy Code without regard to the notice as set forth in (iii) below; and (iii) subject to the terms and conditions of this Interim Order, to the extent allowed at any time, whether by interim order, procedural order, or otherwise, but subject to final allowance by the Court under sections 327, 328, 330, or 363 of the Bankruptcy Code, the reasonable and documented accrued and unpaid fees, costs, and disbursements (including any unpaid restructuring or sale fee of any investment bankers if earned and payable as of the Carve-Out Trigger Notice Date pursuant to the terms and conditions of an engagement letter approved by the Court in the Chapter 11 Cases) (the "***Allowed Professional Fees***") of professionals retained by the Debtors in these Chapter 11 Cases (collectively, the "***Debtor Professionals***") and the Creditors' Committee (the "***Committee Professionals***" and, together with the Debtor Professionals, the "***Estate Professionals***") that are incurred at any time before or on the first business day following delivery by the DIP Agent of a Carve-Out Trigger Notice (as defined below) at the direction of the Required DIP Lenders, and are allowed by this Court and remain unpaid after application of any retainers being held by such professionals for each Estate Professional, up to the amounts for the Estate Professional included in the Approved Budget (subject to application of the Permitted Variance) through the date of the Carve-Out Trigger

Notice, plus any unpaid restructuring or sale fee of any investment bankers if earned and payable as of the Carve-Out Trigger Notice Date pursuant to the terms and conditions of an engagement letter approved by the Court and not otherwise already included in the Approved Budget (the amounts set forth in the foregoing clauses (i), (ii), and (iii), the "***Pre-Carve-Out Trigger Notice Cap***"); *provided* that the Pre-Carve-Out Trigger Notice Cap shall only include up to $50,000 pursuant to the Investigation Expenses Budget Cap (as defined below); (iv) the Allowed Professional Fees of the Estate Professionals that are incurred after the first business day following delivery of a Carve-Out Trigger Notice by the DIP Agent, in an aggregate amount not to exceed $250,000 (the amounts set forth in clause (iv), the "***Post-Carve-Out Trigger Notice Cap***" and together with the Pre-Carve-Out Trigger Notice Cap, the "***Carve-Out Cap***").  The term "***Carve-Out Trigger Notice***" shall mean a written notice delivered by email (or other electronic means) by the DIP Agent (at the direction of the Required DIP Lenders) to the Debtors, their lead counsel, the U.S. Trustee, and lead counsel to any Creditors' Committee, which notice may be delivered at any time on or after the Termination Declaration Date (as defined below), expressly stating that the Post-Carve-Out Trigger Notice Cap is triggered.  The term "***Carve-Out Trigger Notice Date***" shall mean the day on which a Carve-Out Trigger Notice is delivered by the DIP Agent to the foregoing parties.

> (b)     *Carve-Out Reserves.*  The Debtors shall, on a weekly basis, transfer cash proceeds of the DIP Facility or Cash Collateral into a segregated account for the Estate Professionals (the "***Professional Fees Account***") in the amount equal to the lesser of (i) the good faith estimates of fees accrued by all such professionals for the prior week and (ii) 115% of the weekly amount included for such professionals in the Approved Budget (subject to compliance with the Budget Covenants).  If any professional's accrued and unpaid fee estimates exceed the

amount allocated to such professional in the Professional Fees Account in a given week (an "***Overage***"), then the Debtors may (subject to complying with the Budget Covenants) in any subsequent week transfer cash proceeds to the Professional Fees Account up to 115% of the weekly amount included for such professionals in the Approved Budget (less the professional's fee estimate for such week) to be applied to the prior Overage.  The Professional Fees Account shall be held in trust and used solely to satisfy Allowed Professional Fees, subject to the terms herein. On the Carve-Out Trigger Notice Date, the Debtors shall utilize all cash on hand, including funds in the Professional Fees Account, and any available cash thereafter held by any Debtor, to fund a reserve in an amount equal to the Carve-Out Cap, which shall be earmarked and held in trust to pay the beneficiaries of the Carve-Out (the "***Carve-Out Reserve***").  All funds in the Carve-Out Reserve shall be used first to pay the obligations clauses (i)-(iii) in the above definition of "Carve-Out" until paid in full, second to pay the obligations in clauses (iv)-(v) in the above definition of "Carve-Out" until paid in full, third, to pay the DIP Lenders until paid in full, and fourth, to pay the Prepetition Secured Parties until paid in full.

(c)     *Payment of Carve-Out on or After the Carve-Out Trigger Notice Date.*  Any payment or reimbursement made on or after the occurrence of the Carve-Out Trigger Notice Date in respect of any Allowed Professional Fees shall permanently reduce the Carve-Out Cap on a dollar-for-dollar basis.

(d)     The amounts in the Carve-Out Reserve shall be available only to satisfy Allowed Professional Fees and other amounts included in the Carve-Out until such amounts are paid in full.  Notwithstanding anything to the contrary herein, the failure of the Carve-Out Reserve to satisfy in full the amount set forth in the Carve-Out shall not affect the priority of the Carve-Out.

(e)     None of the Prepetition Secured Parties or the DIP Secured Parties shall be responsible for funding the Professional Fees Account or the Carve-Out Reserve or be responsible for the payment or reimbursement of any fees or disbursements of any Estate Professional incurred in connection with the Chapter 11 Cases or any Successor Cases.

(f)     Nothing herein shall be construed to (i) impair the ability of any party to object to any of the fees, expenses, reimbursement, or compensation of any professionals or (ii) alter any requirement that an Estate Professional file and serve fee applications or otherwise comply with the Bankruptcy Code, Bankruptcy Rules, Local Rules, or Complex Case Procedures relating to payment of fees and reimbursement of expenses of Estate Professionals, or with any interim compensation order or retention order entered by this Court.

(g)     For the avoidance of doubt, notwithstanding anything to the contrary in this Interim Order, the Carve-Out shall be senior to all liens, security interests, and superpriority claims granted hereunder, under the DIP Documents, or the Prepetition Loan Documents.

7.     **No Obligation to Extend Credit**.  The DIP Secured Parties have no obligation to make any commitment, loan, or advance to any Debtor, other than subject to the terms and in accordance with the terms of the applicable DIP Documents and this Interim Order.

8.     **Amendment of the DIP Documents**.  Each of the DIP Documents may from time to time be amended, modified, or supplemented by the applicable parties thereto without further order of the Court if the amendment, modification, or supplement is non-material and in accordance with the DIP Documents.  In the case of a material amendment, modification, or supplement to the DIP Documents made by the parties thereto that is adverse to the Debtors' estates, the Debtors shall provide notice (which shall be provided through electronic mail) to counsel to any Creditors' Committee, the U.S. Trustee, the DIP Agent, the DIP Secured Parties and

the Prepetition Secured Parties (collectively, the "***Notice Parties***"), each of whom shall have five (5) business days from the date of such notice (the "***Amendment Notice Period***") to object in writing to such amendment, modification, or supplement, it being understood that waivers for the benefit of the Debtors and extensions of any Milestones (as defined below) and similar deadlines will not be considered "material" for purposes hereof, and may become immediately effective. If no objection from a Notice Party to the amendment, modification, or supplement is timely received during the Amendment Notice Period (or if all Notice Parties otherwise acknowledge that they have no objection to such amendment, modification, or supplement before the expiration of the Amendment Notice Period), then the Debtors may proceed to immediately execute the amendment, modification, or supplement. If a Notice Party timely objects to such amendment, modification, or supplement, and such objection is not subsequently consensually resolved, then approval of the Court (which may be sought on an expedited basis) will be necessary to effectuate the amendment, modification, or supplement. Any material amendment, modification, or supplement that becomes effective in accordance with this paragraph 8 shall be filed with the Court.

9.      **DIP Superpriority Claims**. Subject and subordinate to the Carve-Out, effective as of entry of this Interim Order, pursuant to section 364(c)(1) of the Bankruptcy Code, all of the DIP Obligations shall constitute allowed superpriority administrative expense claims of the DIP Agent for the benefit of the DIP Secured Parties against the Debtors on a joint and several basis (without the need to file any proof of claim or request for allowance or payment of administrative expenses) with priority as set forth in **Exhibit 2** and otherwise over any and all claims against each of the Debtors, now existing or hereafter arising, of any kind whatsoever, including all administrative expenses of the kind specified in sections 503(b) and 507(b) of the Bankruptcy Code and any and

all administrative expenses or other claims arising under sections 105, 326, 328, 330, 331, 365, 503(b), 506(c), 507(a), 507(b), 726, 1113, or 1114 of the Bankruptcy Code (including the Adequate Protection Obligations), whether or not such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy, or attachment, or otherwise, which allowed claims (the "***DIP Superpriority Claims***") shall for purposes of section 1129(a)(9)(A) of the Bankruptcy Code be considered administrative expenses allowed under section 503(b) and 507(a)(2) of the Bankruptcy Code, and which DIP Superpriority Claims shall be payable from and have recourse to all prepetition and postpetition property of the Debtors and all proceeds thereof in accordance with the DIP Documents and this Interim Order (excluding Avoidance Actions but, subject to entry of the Final Order, including Avoidance Proceeds), and subject only to the liens on such property and the Carve-Out as set forth in this Interim Order and the DIP Documents.

10.    **DIP Liens**.

(a)    As security for the DIP Obligations, effective and automatically perfected as of the date of this Interim Order, and subject and subordinate to the Carve-Out, as set forth more fully in this Interim Order, the DIP Agent, for the benefit of the DIP Secured Parties, is hereby granted (without the necessity of the execution, recordation, or filing by the Debtors or the DIP Agent of mortgages, security agreements (including intellectual property security agreements), lockbox or control agreements, pledge agreements, financing statements, or any other instruments and without the necessity of possession or control by the DIP Secured Parties), valid, binding, enforceable, non-avoidable, and automatically and properly perfected liens and security interests (the "***DIP Liens***") in all property consisting of DIP Collateral (as defined below), as collateral security for the prompt and complete performance and payment when due (whether at

the stated maturity, by acceleration or otherwise) of all DIP Obligations, subject to the rankings

and priorities set forth below and on **Exhibit 2** hereto:

(i)     **Liens on Unencumbered Property**.    As security for the DIP Obligations, immediately upon, and effective as of, entry of this Interim Order, the DIP Agent, for the benefit of itself and each of the other DIP Secured Parties, pursuant to section 364(c)(2) of the Bankruptcy Code, shall be granted DIP Liens on all DIP Collateral, that, on or as of the Petition Date, is not subject to (i) a valid, perfected, and non-avoidable lien or (ii) a valid and non-avoidable lien in existence as of the Petition Date that is perfected after the Petition Date as permitted by section 546(b) of the Bankruptcy Code (the "*Unencumbered Property*");

(ii)    **DIP Priming Liens**.  Pursuant to section 364(d)(1) of the Bankruptcy Code, as security for the DIP Obligations, immediately upon, and effective as of, entry of this Interim Order, the DIP Agent, for the benefit of itself and each of the other DIP Secured Parties, shall be granted a valid, binding, continuing, enforceable, nonavoidable, fully-perfected first-priority priming security interest (subject only to the Carve-Out and the priorities set forth on **Exhibit 2**) in and lien on the DIP Collateral constituting Prepetition Collateral (the "*DIP Priming Liens*"), which shall be (a) subject and subordinate to the Carve-Out in all respects, (b) subject to Permitted Prior Liens, (c) solely with respect to the Regulated Equity held by the Prepetition Equity Pledgors, shall not become effective as to such Regulated Equity until compliance with Nevada Gaming Control Act, the Regulations of the Nevada Gaming Commission and Nevada Gaming Control Board, the Colorado Limited Gaming Act, and the Rules of the Colorado Limited Gaming Control Commission (collectively, the "*Gaming Laws*"), and (d) senior in all respects to the Prepetition Liens, the Adequate Protection Liens, and any lien, security interest, or mortgage that is avoided and preserved for the benefit of the Debtors and their estates under section 551 of the Bankruptcy Code.  The Prepetition Liens shall be primed by and made subject and subordinate to the Carve-Out, the DIP Priming Liens, and the Adequate Protection Liens only; and

(iii)   **DIP Junior Liens**.  Pursuant to section 364(c)(3) of the Bankruptcy Code, as security for the DIP Obligations, immediately upon, and effective as of, entry of this Interim Order, the DIP Agent, for the benefit of itself and each of the other DIP Secured Parties, are each hereby granted continuing, valid, binding, nonavoidable, and automatically and properly perfected security interests in and liens upon all DIP Collateral that is subject to Permitted Prior Liens, which security interests and liens in favor of the DIP Agent shall be in accordance with the priorities set forth on **Exhibit 2** including (a) the Carve-Out and (b) the Permitted Prior Liens; *provided*, that nothing in this Interim Order will be construed as a stipulation, finding or acknowledgment of the existence, validity, enforceability or priority of any actual or purported Permitted Prior Liens, and all rights of the Debtors, the DIP Secured Parties and the Prepetition Secured Parties with respect to such matters are fully reserved.

(iv)    **DIP Collateral**.  The term "*DIP Collateral*" means the Debtors' interest in all assets and properties (whether tangible, intangible, real, personal or mixed),

whether now owned by or owing to, or hereafter acquired by, or arising in favor of, the Debtors (including under any trade names, styles, or derivations thereof), and whether owned or consigned by or to, or leased from or to, the Debtors, and regardless of where located, including all of the Debtors' rights, title and interest in: (i) all Prepetition Collateral; (ii) all cash and cash equivalents; (iii) as to the "OpCo Debtors" listed on Schedule 1 hereto, all gaming devices as contemplated by the Nevada Revised Statute 463.0155 and Colorado Code of Regulations Section 44-30-103(13), along with all non-gaming assets; (iv) all rent proceeds payable to the "PropCo Debtors" set forth on Schedule 1 under the (A) Lease, dated March 28, 2019, by and between Maverick Wendover LLC and Red Garter Operator, LLC, (B) Lease, dated March 28, 2019, by and between Maverick Wendover LLC and Wendover Nugget Operator, LLC, (C) Lease, dated May 31, 2019, by and between Maverick Elko LLC and Gold Country Operator LLC, (D) Lease, dated May 31, 2019, by and between Maverick Elko LLC and Red Lion Operator LLC, (E) Lease, dated December 11, 2019, by and between Maverick Z Casinos LLC and Grand Z Casino Operator LLC, (F) Lease, dated December 11, 2019, by and between Maverick Z Casinos LLC and Z Casino Black Hawk Operator LLC, and (G) Lease, dated December 11, 2019, by and between Maverick Z Casinos LLC and Johnny Z Casino Operator, LLC (together with the leases listed in the foregoing clauses (A) through (F), the "***Operator Leases***"); (v) all funds in any deposit account, securities account or other account of the Debtors and all money, cash, cash equivalents, instruments and other property deposited therein or credited thereto from time to time; (vi) all accounts and other receivables; (vii) all contract rights; (viii) all instruments, documents and chattel paper; (ix) all securities (whether or not marketable); (ix) all goods, as-extracted collateral, furniture, machinery, equipment, inventory, and fixtures; (x) all real property interests; (xi) the Debtors' interests in leaseholds and the Debtors' interests in the proceeds of any leaseholds (and excluding the underlying leased property), (xii) all franchise rights; (xiii) all patents, tradenames, trademarks (other than intent-to-use trademarks), copyrights, licenses, and all other intellectual property; (xiv) all general intangibles, tax or other refunds, or insurance proceeds; (xv) all equity interests, capital stock, limited liability company interests, partnership interests and financial assets; (xvi) all investment property; (xvii) all supporting obligations of any of the foregoing; (xviii) all letters of credit issued to the Debtors and letter of credit rights; (xix) all commercial tort claims; (xx) all other claims and causes of action and the proceeds thereof, other than claims and causes of action under section 502(d), 544, 545, 547, 548, 549, 550 or 553 of the Bankruptcy Code, or any other avoidance actions under the Bankruptcy Code (collectively, "***Avoidance Actions***") but, subject to entry of a Final Order providing for such relief, including any proceeds or property recovered, unencumbered or otherwise from Avoidance Actions, whether by judgment, settlement or otherwise ("***Avoidance Proceeds***"); (xx) all books and records (including customers lists, credit files, computer programs, printouts and other computer materials and records); and (xxii) all proceeds and products of each of the foregoing and all accessions to, substitutions and replacements for, and rents, profits and products of, each of the foregoing; *provided*, that the DIP Collateral shall not include the Professional Fees Account, Carve-Out Reserve and any amounts held therein or Excluded Assets (as defined in the DIP Documents) but shall include the proceeds of Excluded Assets unless such proceeds or products of such Excluded Assets would constitute property or assets of the type otherwise described in the applicable definition of "***Excluded Assets***."

(b)     Other than as set forth herein (including with respect to the Carve-Out), the DIP Liens shall not be made subject to or *pari passu* with any lien or security interest heretofore granted in the Chapter 11 Cases or any Successor Case.  The DIP Liens shall be valid and enforceable against any trustee or estate representative appointed in the Chapter 11 Cases or any Successor Case, upon the conversion of any of the Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code (or in any other Successor Case), or upon the dismissal of any of the Chapter 11 Cases or any Successor Case.

11.     **Modification of Automatic Stay**.  The automatic stay imposed under section 362(a) of the Bankruptcy Code is hereby modified as necessary to effectuate all of the terms and provisions of this Interim Order, including to: (a) permit the Debtors to grant the DIP Liens, Adequate Protection Liens, and DIP Superpriority Claims; (b) permit the Debtors to perform such acts as the DIP Secured Parties or the Prepetition Secured Parties, as applicable, may reasonably request to assure the perfection and priority of the liens granted herein; (c) permit the Debtors to incur all liabilities and obligations to the DIP Secured Parties and the Prepetition Secured Parties under the DIP Documents, the DIP Facility, and this Interim Order, as applicable; (d) permit the DIP Secured Parties to exercise their rights, including remedies against the Debtors and their Collateral in the event of a Default or Event of Default under the DIP Documents and subject to the terms of this Interim Order, including paragraph 12 hereof; and (e) authorize the Debtors to pay, and the DIP Secured Parties and Prepetition Secured Parties to retain and apply, payments made in accordance with this Interim Order.

12.     **Termination of DIP Facility and Use of Cash Collateral**.

(a)     Except for payment of the Carve-Out as provided in this Interim Order, the DIP Secured Parties may enforce all of their rights under the applicable DIP Documents (subject

to this paragraph 12) without further order of, or application to, the Court upon the occurrence of an Event of Default on which written notice of the occurrence of such an Event of Default is given by the DIP Agent (upon instruction from the Required DIP Lenders) to counsel to the Debtors, the U.S. Trustee, and counsel to any Creditors' Committee appointed in the Chapter 11 Cases (the "**Default Notice**") and filed on the docket of the Chapter 11 Cases, but not before the expiration of five (5) business days after the delivery and filing of such Default Notice in accordance with the foregoing (such period, being the "**Remedies Notice Period**"), unless such occurrence and continuation of an Event of Default is cured before the expiration of the Remedies Notice Period.

(b)     During the Remedies Notice Period, the Debtors (x) may use Cash Collateral in accordance with the Approved Budget to pay payroll obligations (other than severance), sales tax, and other necessary expenses that are agreed between the Debtors and the DIP Agent (acting at the direction of the Required DIP Lenders) in writing (email being sufficient); (y) are prohibited from requesting any further advances under the DIP Facility; and (z) may cure any Event of Default.  During the Remedies Notice Period, the Debtors, any Creditors' Committee, and any party in interest shall be entitled to seek an emergency hearing with the Court during the Remedies Notice Period for the purpose of (i) contesting whether, in fact, an Event of Default has occurred and is continuing or (ii) obtaining non-consensual use of Cash Collateral; *provided*, that if such hearing cannot be held before the expiration of the Remedies Notice Period, then the Remedies Notice Period shall be automatically extended through the conclusion of such hearing but in no event later than ten (10) business days after delivery of the Default Notice unless ordered otherwise by the Court; *provided*, *further*, that nothing herein shall alter the evidentiary burden with respect

to any termination of the automatic stay or limit the range of remedies that the Court may order upon default.

(c)     Upon expiration of the Remedies Notice Period and following a Stay Relief Hearing, the DIP Agent, on behalf of and acting at the direction of the Required DIP Lenders shall, subject to the Carve-Out, be permitted to exercise all remedies set forth herein, in the DIP Documents, and the Prepetition Credit Documents, as applicable, and as otherwise available at law without further order or application or motion to the Court, including: (i) declaring the termination, reduction, or restriction of any further DIP Commitment to the extent any such DIP Commitment remains, (ii) declaring all DIP Obligations to be immediately due, owing, and payable, without presentment, demand, protest, or other notice of any kind, all of which are expressly waived by the Debtors, notwithstanding anything herein or in any DIP Document to the contrary, (iii) declaring the termination of the applicable DIP Documents as to any future liability or obligation of the DIP Secured Parties (but, for the avoidance of doubt, without affecting any of the DIP Liens or the DIP Obligations), and (iv) declaring the termination, reduction, or restriction on the ability of the Debtors to use Cash Collateral (any such declaration of the foregoing (i) through (iv) provided in writing by the DIP Agent (upon instruction from the Required DIP Lenders) to counsel to the Debtors, the U.S. Trustee, and counsel to any Creditors' Committee appointed in the Chapter 11 Cases, a "***Termination Declaration***" and the date of such Termination Declaration, the "***Termination Declaration Date***").  On and after the Termination Declaration Date and other than as required by paragraph 6 with respect to the Carve-Out: (A) the Debtors shall be prohibited from requesting any further draws of DIP Loans under the DIP Facility; (B) all DIP Obligations shall be immediately due and payable, all commitments to extend credit under the DIP Facility will terminate, and all treasury and cash management, hedging obligations, and bank product

obligations shall be cash collateralized; (C) all authority to use Cash Collateral shall cease; and (D) upon satisfaction of the Carve-Out funding obligations set forth in paragraph 6, the DIP Secured Parties shall be entitled to exercise rights and remedies under the DIP Documents in accordance with this Interim Order.

(d)     Prior to exercising any remedies, the DIP Agent shall be required to file a motion with the Court seeking emergency relief (the "*Stay Relief Motion*") on no less than five (5) business days' written notice, which notice period may be concurrent with the Remedies Notice Period, to (i) the Court, (ii) counsel for the Debtor, (iii) counsel for the Creditors' Committee (if any), and (iv) the U.S. Trustee for a further order of the Court modifying the automatic stay in the Chapter 11 Cases to permit the DIP Agent on behalf of and acting at the direction of the Required DIP Lenders, to exercise the rights and remedies against the Prepetition Collateral or DIP Collateral, including foreclosing upon and selling all or a portion of such collateral.  Upon the Court's ruling at the Stay Relief Motion, the Court may fashion an appropriate remedy upon a determination that a uncured Event of Default exists beyond any remedies period, including, that the DIP Agent shall be entitled to exercise all rights and remedies with respect to the Prepetition Collateral or DIP Collateral provided for in this Interim Order, as permitted by the Court.

13.     **Proceeds of Subsequent Financing**.  If the Debtors', their estates, any trustee, any examiner with enlarged powers, or any responsible officer subsequently appointed in any of the Chapter 11 Cases or any Successor Cases shall obtain credit or incur debt pursuant to sections 364(b), (c), or (d) of the Bankruptcy Code in violation of this Interim Order or the DIP Documents (such credit or debt, the "*Subsequent Financing*") at any time before the repayment in full in cash of all of the DIP Obligations, the satisfaction of the DIP Superpriority Claims and the Adequate Protection Claims, and the termination of the DIP Lenders' commitments to extend

credit under the DIP Facility and this Interim Order, then all cash proceeds up to the amount of the DIP Obligations derived from such Subsequent Financing shall immediately be turned over to the DIP Agent to be applied to the DIP Obligations pursuant to the DIP Documents and in the priorities set forth herein.  For the avoidance of doubt, none of the Prepetition Secured Parties or DIP Secured Parties consent to the priming of the Prepetition Liens or the DIP Liens resulting from any Subsequent Financing.

14.    **Credit Bidding**.  The Prepetition Secured Parties and the DIP Secured Parties shall, subject to the rights preserved in paragraph 30, the DIP Documents, the Prepetition Credit Documents, and the priority of liens and claims set forth herein, be authorized to credit bid, consistent with the applicable DIP Documents and Prepetition Credit Documents, up to the full amount of the outstanding Prepetition Secured Obligations and DIP Obligations, as applicable, in any sale or disposition of Prepetition Collateral or DIP Collateral (each, a "***Credit Bid***") pursuant to section 363(k) of the Bankruptcy Code, subject to the provision of cash consideration sufficient to satisfy the Carve-Out and any senior liens on the collateral that is subject to the Credit Bid except to the extent otherwise agreed by the holder of such senior lien in their sole and absolute discretion.  Subject to and effective only upon entry of the Final Order (but retroactive to the Petition Date), in no event shall the Prepetition Secured Parties and DIP Secured Parties' Credit Bid rights be limited "for cause" pursuant to section 363(k) of the Bankruptcy Code. The Prepetition Secured Parties and DIP Secured Parties shall each be deemed a "qualified bidder" with respect to their rights to acquire all or any of the Prepetition Collateral and DIP Collateral by Credit Bid.

15.    **Surcharging Collateral**.  Subject to and effective only upon entry of a Final Order providing for such relief (but retroactive to the Petition Date), without limiting the scope of the

Carve-Out, no costs or expenses of administration of these Chapter 11 Cases or any Successor Cases or future proceeding that may result therefrom, including liquidation in bankruptcy or other proceedings under the Bankruptcy Code, shall be charged against or recovered from the DIP Collateral or the Prepetition Collateral (including Cash Collateral), the DIP Secured Parties, or the Prepetition Secured Parties pursuant to section 506(c) of the Bankruptcy Code or any similar principle of law, without the prior written consent of the requisite DIP Secured Parties and the requisite Prepetition Secured Parties, as applicable, and no consent shall be implied from any other action, inaction, or acquiescence by the DIP Secured Parties or the Prepetition Secured Parties, as applicable, and nothing contained in this Interim Order shall be deemed to be a consent by the DIP Secured Parties or the Prepetition Secured Parties to any charge, lien, assessment, or claims against the DIP Collateral or the Prepetition Collateral under section 506(c) of the Bankruptcy Code or otherwise.

16.     **Section 552(b) of the Bankruptcy Code**.  The DIP Secured Parties and Prepetition Secured Parties shall each be entitled to all of the rights and benefits of section 552(b) of the Bankruptcy Code.  Subject to and effective only upon entry of a Final Order providing for such relief (but retroactive to the Petition Date), in no event shall the "equities of the case" exception in section 552(b) of the Bankruptcy Code apply to the Prepetition Secured Parties with respect to proceeds, products, offspring, or profits of any Prepetition Collateral.

17.     **Marshaling**.  Upon entry of this Interim Order, the DIP Secured Parties will not be subject to the equitable doctrine of "marshaling" or any other similar doctrine with respect to any of the DIP Collateral.  Subject to and effective only upon entry of a Final Order providing for such relief (but retroactive to the Petition Date), none of the Prepetition Secured Parties shall be subject

to the equitable doctrine of "marshaling" or any similar doctrine with respect to the Prepetition Secured Obligations or the Prepetition Collateral.

18. **Maintenance of DIP Collateral**.  The Debtors shall take all steps necessary to preserve and maintain the value of the DIP Collateral, including: (a) insuring the DIP Collateral as required under the DIP Facility or the Prepetition Credit Documents, as applicable; and (b) maintaining the cash management system which has been reasonably agreed to by the requisite DIP Secured Parties (subject to any applicable order of the Court) consistent with their fiduciary duties.  To the fullest extent provided by applicable law, the DIP Agent (on behalf of the applicable DIP Secured Parties) shall be, and shall be deemed to be, without any further action or notice, named as additional insureds and lender's loss payees on each insurance policy maintained by the Debtors that in any way relates to the DIP Collateral.

19. **Ongoing Information Obligation**.

(a) <u>Ongoing Updates</u>.  The Debtors shall promptly (and in each case not less than on a weekly basis) provide Ropes & Gray LLP as counsel to the Backstop Parties with updates on (i) the Approved Budget and any other reports or information delivered by the Debtors, (ii) the financial operations and performance of the Debtors' business, (iii) progress in achieving the Milestones, and any winddown, liquidation, or going concern sale or marketing process or efforts, (iv) the status of the Chapter 11 Cases generally, and (v) such other matters relating to the Debtors as the DIP Secured Parties (or their respective agents or advisors) shall reasonably request.

(b) <u>Access to Books and Records</u>.  The Debtors shall provide to the DIP Agent and the Prepetition Agent (and, in each case, their respective consultants, advisors, and professionals) reasonable access to the Debtors' books and records, assets, and properties, for purposes of

monitoring the Debtors' businesses, evaluating compliance with the budget, and monitoring the value of the DIP Collateral during normal business hours.

(c)   <u>Financial Reporting</u>.  The Debtors shall provide periodic financial reporting to the DIP Agent and the Prepetition Agent, consistent with the Debtors' financial reporting obligations under the Prepetition Credit Agreement as in effect prior to the Petition Date.

20.   **<u>Adequate Protection of Prepetition Secured Parties</u>**.  Subject and subordinate in all respects to the Carve-Out, the Prepetition Secured Parties are entitled, pursuant to sections 361, 362, 363(e), 364(d)(1), and 507 of the Bankruptcy Code, to adequate protection of their interests in all DIP Collateral, including Cash Collateral, against any Diminution in Value of their interests in the Prepetition Collateral, and the Prepetition Secured Parties are hereby granted the following, in each case subject and subordinate in all respects to the Carve-Out (collectively, the "***Adequate Protection Obligations***"):

(a)   **Adequate Protection Liens**.  The Prepetition Agent, for the benefit of the Prepetition Secured Parties, is hereby granted (effective and perfected upon the date of this Interim Order and without the necessity of the execution of any mortgages, security agreements, control agreements, pledge agreements, financing statements, or other agreements) a valid, perfected security interest in and lien on all of the DIP Collateral, in each case subject and subordinate only to (i) the Carve-Out, (ii) the Permitted Prior Liens, and (iii) the DIP Liens (the "***Adequate Protection Liens***").  The relative priority of the Adequate Protection Liens shall be as set forth in **<u>Exhibit 2</u>** attached hereto.  Other than as set forth herein, the Adequate Protection Liens shall not be made subject to or *pari passu* with any lien or security interest heretofore granted in the Chapter 11 Cases or any Successor Case.  The Adequate Protection Liens shall be valid and enforceable against any trustee or estate representative appointed in the Chapter 11 Cases or any

Successor Case, upon the conversion of any of the Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code (or in any other Successor Case), or upon the dismissal of any of the Chapter 11 Cases or any Successor Case.

(b)     **507(b) Claims**.   The Prepetition Agent, for the benefit of the Prepetition Secured Parties, is hereby granted an allowed superpriority administrative expense claim against the estates of each Debtor (other than RunItOneTime HoldCo, Inc.) pursuant to section 507(b) of the Bankruptcy Code with priority in payment over any and all administrative expenses of the kind specified or ordered pursuant to any provision of the Bankruptcy Code (the "***507(b) Claims***"), which 507(b) Claims shall be payable from and have recourse to all prepetition and postpetition property of the Debtors and all proceeds thereof.   The 507(b) Claims shall be subject and subordinate only to the DIP Superpriority Claims granted in respect of the DIP Obligations and the Carve-Out.   Except to the extent expressly set forth in this Interim Order or the DIP Documents, as applicable, the Prepetition Secured Parties shall not receive or retain any payments, property, or other amounts in respect of the 507(b) Claims unless and until the DIP Obligations (other than contingent indemnification obligations as to which no claim has been asserted) and any claims having a priority senior to or *pari passu* with the DIP Superpriority Claims have indefeasibly been paid in cash in full, and all DIP Commitments have been terminated.

(c)     **Adequate Protection Fees and Expenses**.   The Debtors (other than RunItOneTime HoldCo, Inc.) shall, as adequate protection, pay for the benefit of the Prepetition Secured Parties, any reasonable and documented prepetition and postpetition fees and out-of-pocket expenses of the Prepetition Secured Parties, including the reasonable and documented fees and out-of-pocket expenses of (A) Ropes & Gray, LLP, (B) Orrick, Herrington & Sutcliffe LLP, (D) one Nevada and Colorado gaming counsel to the Prepetition Secured Parties,

38

(E) Porter Hedges LLP, (F) Norton Rose Fulbright US LLP (in its capacity as counsel for the Prepetition Agent and DIP Agent), and (G) any other advisors retained by the requisite DIP Lenders with the consent (not to be unreasonably withheld) of the Debtors (the "***Adequate Protection Fees and Expenses***"), which Adequate Protection Fees and Expenses shall be allowed under section 507(b) of the Bankruptcy Code.  Reimbursement of the Adequate Protection Fees and Expenses shall be subject to the review procedure set forth in paragraph 27 of this Interim Order.

(d)    The adequate protection herein is without prejudice to the Prepetition Agent, acting at the express written direction of the requisite Prepetition Secured Parties, to request further or different adequate protection and the Debtors or any other party in interest may contest any such request.

21.    **Perfection of DIP Liens and Adequate Protection Liens**.

(a)    The DIP Secured Parties and the Prepetition Secured Parties are hereby authorized, but not required, to file, record, or enter into (and to execute in the name of the Debtors, as their true and lawful attorneys, with full power of substitution, to the maximum extent permitted by law) financing statements, intellectual property filings, mortgages, notices of lien, or similar instruments in any jurisdiction, or take possession of or control over cash or securities or other property, or take any other action to validate and perfect the liens and security interests granted to them hereunder.  All such financing statements, trademark filings, copyright filings, mortgages, notices of lien, or similar instruments shall be deemed to have been filed or recorded at the time of and on the Petition Date.  Regardless of whether the DIP Agent (on behalf of the applicable DIP Secured Parties) or the Prepetition Agent (on behalf of the applicable Prepetition Secured Parties) shall, in their respective sole discretion, choose to file, record, or enter into such financing

statements, intellectual property filings, mortgages, notices of lien, or similar instruments, or take possession of or control over any cash or securities or other property, or otherwise confirm perfection of the liens and security interests granted to them hereunder, such liens and security interests shall be deemed valid, automatically perfected, allowed, enforceable, non-avoidable, and not subject to challenge, dispute, or subordination (subject to the priorities set forth in this Interim Order).  Upon the request of the DIP Agent or the Prepetition Agent, as applicable, each of the Prepetition Secured Parties and the Debtors, without any further consent of any party, is authorized, but not directed, to take, execute, deliver, and file such instruments (in each case, without representation or warranty of any kind) to enable the DIP Agent or the Prepetition Agent to further validate, perfect, preserve, and enforce the DIP Liens and the applicable Adequate Protection Liens, respectively.  The Adequate Protection Liens shall be valid and enforceable against any trustee or other estate representative appointed in the Chapter 11 Cases or any Successor Cases, upon the conversion of any of the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code (or in any other Successor Cases), or upon the dismissal of any of the Chapter 11 Cases or Successor Cases.  The Adequate Protection Liens shall not be subject to sections 506(c) (subject to entry of a Final Order providing for such relief), 510, 549, or 550 of the Bankruptcy Code.  No lien or interest avoided and preserved for the benefit of any Debtor's estate pursuant to section 551 of the Bankruptcy Code shall be made *pari passu* with or senior to the Adequate Protection Liens.

(b)     A certified copy of this Interim Order may, in the discretion of either the DIP Agent or the Prepetition Agent, as applicable, be filed with or recorded in filing or recording offices in addition to or in lieu of such financing statements, intellectual property filings, mortgages, notices of lien, or similar instruments, and all filing offices are hereby instructed to accept such certified copy of this Interim Order for filing or recording, as applicable.

(c)     To the extent that any Prepetition Secured Party is the secured party under any account control agreements, listed as loss payee or additional insured under any of the Debtors' insurance policies or is the secured party under any other agreement, the beneficiary of a landlord waiver or other collateral access agreement or party to a credit card notification, the DIP Agent, on behalf of the DIP Secured Parties, is also deemed to be the secured party under such account control agreements or loss payee or additional insured under the Debtors' insurance policies and the secured party under each such agreement (in any such case with the same priority of liens and claims thereunder relative to the priority of (i) the Prepetition Liens and Adequate Protection Liens and (ii) the DIP Liens, as set forth herein), and shall (A) have all rights and powers in each case attendant to that position (including rights of enforcement, but subject in all respects to the terms of this Interim Order), and (B) subject to the terms of this Interim Order, act in that capacity and distribute any proceeds recovered or received in respect of any of the foregoing to the payment in full of the DIP Obligations.

22.     **Milestones**.  The Debtors shall comply with the milestones set forth in the DIP Documents and attached hereto as **Exhibit 4** (the "*Milestones*"), in each case as may be modified or extended in accordance with the terms thereof.  The failure of the Debtors to comply with any of the Milestones shall (a) constitute an Event of Default under the DIP Documents and this Interim Order; (b) subject to the expiration of the Remedies Notice Period (as defined below) and without limiting the effect of the other provisions of paragraph 12 of this Interim Order, result in the automatic termination of the Debtors' ability to use Cash Collateral under this Interim Order; and

(c) permit the DIP Agent, subject to paragraph 29, to exercise the rights and remedies provided for in this Interim Order and the DIP Documents.

23. **Prepetition Secured Party Standstill**

(a)     If the DIP Obligations are outstanding or the DIP Lenders have any DIP Commitments under the DIP Documents, then the Prepetition Secured Parties shall: (i) have no right to and shall take no action to foreclose upon, or recover in connection with, the liens granted thereto pursuant to the Prepetition Credit Documents or this Interim Order, or otherwise seek to exercise or enforce any rights or remedies against such DIP Collateral, including in connection with the Prepetition Liens or the Adequate Protection Liens; (ii) not take any action in opposition to any transfer, disposition, or sale of, or release of liens on, such DIP Collateral (but not any proceeds of such transfer, disposition, or sale to the extent remaining after payment in cash in full of the DIP Obligations and termination of the DIP Commitments), to the extent such transfer, disposition, sale, or release is authorized under the DIP Documents; (iii) not file any new financing statements, trademark filings, copyright filings, mortgages, notices of lien, or similar instruments, or otherwise take any action to perfect their security interests in such DIP Collateral unless, solely as to this clause (iii), the DIP Secured Parties file financing statements or other documents to perfect the liens granted pursuant to this Interim Order, or as may be required by applicable law to continue the perfection of valid and non-avoidable liens or security interests as of the Petition Date or to reflect the succession of the Prepetition Agent, and (iv) at the request of the DIP Agent, deliver or cause to be delivered, at the Debtors' reasonable cost and expense, any termination statements, releases, or assignments in favor of the DIP Secured Parties or other documents reasonably necessary to effectuate or evidence the release, termination, or assignment of liens on any portion

of such DIP Collateral subject to any transfer, sale, or disposition permitted by the DIP Documents and this Interim Order.

(b)     If any Prepetition Secured Party has possession of any DIP Collateral or has control with respect to any DIP Collateral (including deposit accounts), or has been noted as a secured party on any certificate of title for a titled good constituting DIP Collateral, then such Prepetition Secured Party shall be deemed to maintain such possession or notation or exercise such control as a gratuitous bailee or gratuitous sub-collateral agent solely for perfection for the benefit of the DIP Secured Parties, and it shall comply with the instructions of the DIP Agent with respect to the exercise of such control.  The Prepetition Agent is not and shall not be deemed to be a fiduciary of any kind for the DIP Secured Parties, and the DIP Secured Parties hereby waive and release the Prepetition Agent from all claims and liabilities arising pursuant to any Prepetition Agent's role under this paragraph 23(b) as gratuitous sub-collateral bailee and agent with respect to the DIP Collateral.

24.     Any proceeds of DIP Collateral received by any Prepetition Secured Party in connection with the exercise of any right or remedy relating to the DIP Collateral or otherwise received by any Prepetition Secured Party shall be segregated and held in trust for the benefit of and forthwith paid over to the DIP Agent for the benefit of the applicable DIP Secured Parties in the same form as received, with any necessary endorsements, or as a court of competent jurisdiction may otherwise direct.  The DIP Agent is hereby authorized to make any such endorsements as agent for any such Prepetition Secured Party.

25.     **Preservation of Rights Granted under Interim Order**.

(a)     Notwithstanding any order that may be entered dismissing any of the Chapter 11 Cases under section 1112 of the Bankruptcy Code or converting any other Chapter 11 Cases to

cases under chapter 7 of the Bankruptcy Code: (i) the DIP Superpriority Claims, the 507(b) Claims, the DIP Liens, and the Adequate Protection Liens, and any claims related to the foregoing, shall continue in full force and effect and shall maintain their priorities as provided in this Interim Order until all DIP Obligations and Adequate Protection Obligations shall have been paid in full in cash (and such DIP Superpriority Claims, 507(b) Claims, DIP Liens, and Adequate Protection Liens shall, notwithstanding such dismissal, remain binding on all parties in interest), (ii) the other rights granted by this Interim Order shall not be affected, and (iii) this Court shall retain jurisdiction, notwithstanding such dismissal, for the purposes of enforcing the claims, liens, and security interests referred to in this paragraph and otherwise in this Interim Order.

(b)     If any or all of the provisions of this Interim Order are hereafter reversed, modified, vacated, or stayed, then such reversal, modification, vacatur, or stay shall not affect: (i) the validity, priority, or enforceability of the DIP Obligations or Adequate Protection Obligations incurred before the actual receipt of written notice by the DIP Agent or the Prepetition Agent, as applicable, of the effective date of such reversal, modification, vacatur, or stay or (ii) the validity, priority or enforceability of the DIP Superpriority Claims, the 507(b) Claims, the DIP Liens, the DIP Obligations, the Adequate Protection Liens, the Adequate Protection Obligations, the Prepetition Liens, or the Prepetition Secured Obligations.  Notwithstanding any such reversal, modification, vacatur, or stay of any use of DIP Collateral (including any Cash Collateral), any DIP Superpriority Claims, 507(b) Claims, DIP Obligations, DIP Liens, Adequate Protection Obligations, or Adequate Protection Liens incurred by the Debtors to the DIP Secured Parties or the Prepetition Secured Parties, as the case may be, before the actual receipt of written notice by the DIP Agent or the Prepetition Agent, as applicable, of the effective date of such reversal, modification, vacation, or stay shall be governed in all respects by the original provisions of this

Interim Order, and the DIP Secured Parties and the Prepetition Secured Parties shall be entitled to all rights, remedies, privileges, and benefits granted to parties acting in "good faith" under section 364(e) of the Bankruptcy Code, this Interim Order, and the DIP Documents with respect to all uses of Cash Collateral, the DIP Obligations, the DIP Superpriority Claims, and the Adequate Protection Obligations.

26.     **Limitation on Use of DIP Facility Proceeds and Collateral**.  No DIP Loans, DIP Collateral, Cash Collateral, or any portion of the Carve-Out, may be used directly or indirectly by any Debtor, any statutory or non-statutory committee (including any Creditors' Committee), or any trustee appointed in the Chapter 11 Cases or any Successor Case, including any chapter 7 case, or any other person, party, or entity (a) in connection with the investigation, initiation, or prosecution of any claims, causes of action, adversary proceedings, or other litigation (i) against any of the DIP Secured Parties or the Prepetition Secured Parties, or their respective predecessors in interest, officers, directors, employees, agents, affiliates, representatives, attorneys, or advisors, or any action purporting to do the foregoing in respect of the Prepetition Secured Obligations, the Prepetition Liens, the DIP Obligations, the DIP Liens, the DIP Superpriority Claims, the Adequate Protection Liens, the Adequate Protection Obligations, or the 507(b) Claims granted to the Prepetition Secured Parties under this Interim Order, or (ii) challenging the amount, validity, perfection, priority or enforceability of or asserting any defense, counterclaim or offset with respect to, the Prepetition Secured Obligations, the DIP Obligations, the DIP Superpriority Claims, the Adequate Protection Obligations, or the 507(b) Claims or the liens, claims, rights, or security interests granted under this Interim Order, the DIP Documents, or the Prepetition Credit Documents including, in each case for lender liability or pursuant to section 105, 510, 544, 547, 548, 549, 550, or 552 of the Bankruptcy Code, applicable non-bankruptcy law, or otherwise;

(b) except as expressly permitted by paragraph 12 of this Interim Order, to prevent, hinder, or otherwise delay the Prepetition Secured Parties' or the DIP Secured Parties', as applicable, enforcement or realization on the Prepetition Secured Obligations, DIP Obligations, DIP Superpriority Claims, Adequate Protection Obligations, 507(b) Claims, DIP Collateral, and the liens, claims, and rights granted to such parties under this Interim Order, each in accordance with the DIP Documents, the Prepetition Credit Documents, or this Interim Order; (c) to seek to modify any of the rights and remedies granted to the Prepetition Secured Parties or the DIP Secured Parties under this Interim Order, the Prepetition Credit Documents, or the DIP Documents, as applicable, other than in accordance with the DIP Documents; (d) to apply to the Court for authority to approve superpriority claims or grant liens (other than the liens permitted pursuant to the DIP Documents) or security interests in the DIP Collateral or any portion thereof that are senior to, or *pari passu* with, the DIP Liens, DIP Obligations, DIP Superpriority Claims, Adequate Protection Liens, the Adequate Protection Obligations, and 507(b) Claims, unless all DIP Obligations, Prepetition Secured Obligations, Adequate Protection Obligations, and claims granted to the DIP Secured Parties or Prepetition Secured Parties under this Interim Order, have been paid in full in cash or as otherwise agreed to in writing by the requisite DIP Secured Parties and the requisite Prepetition Secured Parties, (e) to seek to pay any amount on account of any claims arising before the Petition Date unless such payments are agreed to in writing by the requisite DIP Secured Parties and the requisite Prepetition Secured Parties or are otherwise included in the Approved Budget, or (f) for any purpose specified in the "DIP Facility; Use of Proceeds" section(s) of the DIP Documents; *provided*, that any Creditors' Committee may use the proceeds of the DIP Loans, DIP Collateral, and Cash Collateral, in an amount not to exceed $50,000 (the "***Investigation Budget Cap***") only to investigate, but not litigate, (y) the claims and liens of the Prepetition Secured Parties, and

(z) potential claims, counterclaims, causes of action or defenses against the Prepetition Secured Parties.

27.     **Payment of Fees and Expenses**.  After the Petition Date, the DIP Fees and Expenses and the Adequate Protection Fees and Expenses shall be subject to the review procedures set forth in this paragraph 27 without the need for filing an application seeking compensation for services or reimbursement of expenses with the Court.  Professionals for the DIP Secured Parties and Prepetition Secured Parties shall not be required to comply with the U.S. Trustee fee guidelines, but shall (subject to the proviso at the end of this sentence) be required to provide to the Notice Parties invoices for such fees and expenses in summary fashion, which shall include a general, brief description of the nature of the matters for which services were performed, a list of the professionals who worked on such matters, and the number of hours each professional billed; *provided*, *however*, that notwithstanding the foregoing, the DIP Fees and Expenses incurred prior to, and which remain unpaid as of, the Closing Date (as defined in the DIP Documents) shall be paid indefeasibly by the Debtors upon the occurrence of the Closing Date without the DIP Secured Parties being required to deliver an invoice in summary form as set forth in this paragraph 27.  Any Notice Party may object to such fees and expenses for which summary invoices are required to be delivered to the Notice Parties in accordance with the preceding sentence and any such objection must be in writing and state with particularity the grounds therefor and must be submitted to the applicable professional within ten (10) business days of receipt of such invoice (the "***Review Period***").  If no written objection is received by 5:00 p.m. (prevailing Central Time) on the last date of the Review Period or otherwise resolved by the applicable parties, the Debtors shall pay such invoices within five (5) business days after conclusion of the Review Period.  If an objection to a professional's invoice is received within the Review Period, then the Debtors shall promptly

pay the undisputed amount of the invoice, and this Court shall have jurisdiction to determine the disputed portion of such invoice if the parties are unable to resolve the dispute consensually. All DIP Fees and Expenses and Adequate Protection Fees and Expenses paid in accordance with the terms of this Interim Order by any of the Debtors are hereby approved in full and shall not be subject to recharacterization, avoidance, subordination, disgorgement, or any similar form of recovery by the Debtors or any other person.

28. **Limits to Lender Liability**. Nothing in this Interim Order, the DIP Documents, the Prepetition Credit Documents, or any other documents related to these transactions shall in any way be construed or interpreted to impose upon the DIP Secured Parties or any Prepetition Secured Party any liability for any claims arising from the prepetition or postpetition activities of the Debtors in the operation of their business or in connection with their restructuring efforts. So long as the DIP Secured Parties comply with their obligations under the DIP Documents and their obligations, if any, under applicable law (including the Bankruptcy Code), (a) the DIP Secured Parties shall not in any way or manner be liable or responsible for (i) the safekeeping or monitoring of the DIP Collateral, (ii) any loss or damage thereto occurring or arising in any manner or fashion from any cause, (iii) any diminution in the value thereof, or (iv) any act or default of any carrier, servicer, bailee, custodian, forwarding agency or other person, and (b) all risk of loss, damage, or destruction of the DIP Collateral shall be borne by the Debtors.

29. **Gaming Laws**. Notwithstanding anything in this Interim Order to the contrary, the DIP Secured Parties and Prepetition Secured Parties agree as follows with respect to the DIP Liens, DIP Collateral, and Adequate Protection Liens: (a) if any exercise of remedies pursuant to this Interim Order would result in possession by the DIP Agent or the Prepetition Agent of or against "personal property gaming collateral" (as defined in Nevada Gaming Code Reg. 8A.010(4)) or

"gaming device" or "gaming equipment" (as defined in Colorado Revised Statutes § 44-30-103(13)), then such property will be (i) held in trust for the benefit of the DIP Lenders or the Prepetition Lenders (as applicable) pending the receipt of regulatory approvals under applicable Gaming Laws and (ii) upon receipt of such approvals will immediately vest in the DIP Lenders or Prepetition Lenders (as applicable) automatically under this Interim Order without further action; and (b) the Debtors shall maintain minimum cage cash and petty cash in accordance with the requirements of applicable Gaming Laws, subject to periodic deposit requirements as required by the DIP Documents.

30.    **Effect of Stipulations on Third Parties**.  The Debtors' stipulations and releases contained in paragraph F of this Interim Order (the "***Debtors' Stipulations and Releases***") shall be binding on the Debtors and all of the Debtors' successor in interest and assigns (including any chapter 7 or chapter 11 trustee or examiner appointed or other representative elected for any of the Debtors in these Chapter 11 Cases or any Successor Case) for all purposes upon entry of the Interim Order.  The Debtors' Stipulations and Releases shall also be binding on all creditors and other parties in interests and all of their respective successors and assigns, including any statutory or non-statutory committees appointed or formed in the Chapter 11 Cases, and any other person acting or seeking to act on behalf of the Debtors' estates, in all circumstances and for all purposes unless:

(a)    such committee or any other person or entity with requisite standing (subject in all respects to any agreement or applicable law that may limit or affect such entity's right or ability to do so), has timely filed an adversary proceeding or contested matter (subject to the limitations contained herein, including, *inter alia*, in this paragraph) by the earlier of: (i) if a Creditors' Committee has been appointed, then by the Creditors' Committee within 60 calendar days after appointment of the Creditors' Committee and (ii) with respect to any other party in

interest with requisite standing (other than the Debtors), within 60 calendar days after entry of the Interim Order (the time period established by the foregoing clauses (i) and (ii), as may be extended in the sole discretion of the requisite Prepetition Secured Parties, the "***Challenge Period***"); *provided*, *however*, that if, before the end of the Challenge Period, (x) the cases convert to a chapter 7, or (y) a chapter 11 trustee is appointed, then, in each such case, the Challenge Period shall be extended for a period of 60 days solely with respect to any such chapter 7 or chapter 11 trustee; *provided further* that the Challenge Period may be extended without further order of the Court upon the agreement of a Creditors' Committee or other applicable third party and the DIP Lenders): (A) objecting to or challenging the amount, validity, perfection, enforceability, priority or extent of the Prepetition Secured Obligations or the Prepetition Liens or (B) otherwise asserting or prosecuting any action for preferences, fraudulent transfers or conveyances, other avoidance claims or any other claims, counterclaims or causes of action, objections, contests or defenses (collectively, the "***Challenges***") against any of the Prepetition Secured Parties or their respective affiliates and subsidiaries and each of their respective former, current, or future officers, partners, directors, managers, members, principals, employees, agents, related funds, affiliates, investors, financing sources, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, and other professionals and the respective successors and assigns thereof, in each case solely in their respective capacity as such (each a "***Representative***" and collectively, the "***Representatives***") in connection with the Prepetition Credit Documents, the Prepetition Secured Obligations, the Prepetition Liens, and the Prepetition Collateral; and

(b)      there is a final non-appealable order in favor of the plaintiff sustaining any such Challenge in any such timely filed adversary proceeding or contested matter; *provided*, *however*, that any pleadings filed in connection with any Challenge shall set forth with specificity

50

the basis for such challenge or claim and any challenges or claims not so specified before the expiration of the Challenge Period shall be deemed forever, waived, released and barred.

31.     If no such Challenge is timely and properly filed during the Challenge Period or the Court does not rule in favor of the plaintiff with respect to the Challenge then: (a) the Debtors' Stipulations and Releases shall be binding on all parties in interest; (b) the obligations of the Debtors under the Prepetition Credit Agreements, including the Prepetition Secured Obligations, shall constitute allowed claims not subject to defense, claim, counterclaim, recharacterization, subordination, offset or avoidance, for all purposes in the Chapter 11 Cases, and any subsequent chapter 7 cases; (c) the Prepetition Liens on the Prepetition Collateral shall be deemed to have been, as of the Petition Date, legal, valid, binding, perfected, security interests and liens, not subject to recharacterization, subordination, avoidance or other defense and (d) the Prepetition Secured Obligations and the Prepetition Liens on the Prepetition Collateral shall not be subject to any other or further claim or challenge by any statutory or non-statutory committee, any other party in interest, or any successor thereto (including any chapter 7 trustee or chapter 11 trustee or examiner appointed or elected for any of the Debtors) and any defenses, claims, causes of action, counterclaims and offsets by any statutory or non-statutory committee, any other party in interest, or any successor thereto (including any chapter 7 trustee or chapter 11 trustee or examiner appointed or elected for any of the Debtors), whether arising under the Bankruptcy Code or otherwise, against any of the Prepetition Secured Parties and their Representatives arising out of or relating to any of the Prepetition Credit Documents shall be deemed forever waived, released and barred.  If any such Challenge is timely filed during the Challenge Period, then the Debtors' Stipulations and Releases contained in paragraph F shall nonetheless remain binding and preclusive on any statutory or non-statutory committee, and on any other person or entity, except to the extent that such stipulations,

admissions, agreements and releases were expressly and successfully challenged in such Challenge as set forth in a final, non-appealable order of a court of competent jurisdiction.  Nothing in this Interim Order vests or confers on any person standing or authority to pursue any claim or cause of action belonging to the Debtors or their estates, including Challenges with respect to the Prepetition Credit Documents, the Prepetition Secured Obligations or the Prepetition Liens.  Any motion seeking standing (which ruling on standing, if appealed, shall not stay or delay the Chapter 11 Cases or confirmation of any chapter 11 plan) shall attach a draft complaint or other pleading that sets forth such Challenge, and any Challenge not included therein shall be deemed forever waived, released, and barred.  None of the foregoing challenge provisions set forth in this paragraph shall apply to any DIP Secured Party, in their capacities as such, and in no event shall the DIP Facility, DIP Obligations, DIP Superpriority Claims, or DIP Liens be subject to challenge pursuant to this paragraph on avoidance or any other grounds by any party.

32.  **Joint and Several Liability**.  Nothing in this Interim Order shall be construed to constitute a substantive consolidation of any of the Debtors' estates, it being understood, however, that each of the Debtors shall be jointly and severally liable for the obligations hereunder and all DIP Obligations in accordance with the terms hereof and of the DIP Facility and the DIP Documents.

33.  **Interim Order Governs**.  In the event of any inconsistency between the provisions of this Interim Order, the DIP Documents, or any other order entered by this Court, the provisions of this Interim Order shall govern.

34.  **Proof of Claim**.  None of the Prepetition Secured Parties or DIP Secured Parties shall be required to file proofs of claim or requests for administrative expenses in any of the Chapter 11 Cases or Successor Cases to assert claims for payment of the Prepetition Secured

Obligations arising under the Prepetition Credit Documents or the DIP Obligations arising under the DIP Documents.  The statements of claim in respect of the Prepetition Secured Obligations and the DIP Obligations set forth in this Interim Order (including the DIP Documents and the Debtors' Stipulations) are deemed sufficient and do constitute timely filed proofs of claim or requests for administrative expenses in respect of such debt and such secured status against each of the applicable Debtors, and each of the Prepetition Secured Parties and DIP Secured Parties shall be treated under Bankruptcy Code section 502(a) as if it had timely filed a proof of claim or request for administrative expense.

35.    **Binding Effect; Successors and Assigns**.  Subject only to paragraph 30, the DIP Documents and the provisions of this Interim Order, including all findings herein, shall be binding upon all parties in interest in these Chapter 11 Cases, including the DIP Secured Parties and the Prepetition Secured Parties, any statutory or non-statutory committee, and the Debtors and their respective successors and assigns (including any chapter 7 or chapter 11 trustee hereinafter appointed or elected for the estate of any of the Debtors, an examiner appointed pursuant to section 1104 of the Bankruptcy Code, or any other fiduciary appointed as a legal representative of any of the Debtors or with respect to the property of the estate of any of the Debtors) and shall inure to the benefit of the DIP Secured Parties, the Prepetition Secured Parties, and the Debtors and their respective successors and assigns; *provided*, that the DIP Secured Parties and the Prepetition Secured Parties shall have no obligation to permit the use of the DIP Collateral (including Cash Collateral) by, or to extend any financing to, any chapter 7 trustee, chapter 11 trustee or similar responsible person appointed for the estates of the Debtors.

36.    **Limitation of Liability**.  In determining to make any loan, commitment, or other extension of credit under the DIP Documents or to permit the use of Cash Collateral or in

exercising any rights or remedies as and when permitted pursuant to this Interim Order or the DIP Documents, none of the DIP Secured Parties or the Prepetition Secured Parties, each in their capacity as such, by reason of entering into the DIP Facility or the Prepetition Credit Documents and taking any actions permitted under the DIP Documents, the Prepetition Credit Documents or this Interim Order, shall (a) be deemed to be in "control" of the operations or participating in the management of the Debtors, (b) owe any fiduciary duty to the Debtors, any other DIP Secured Party or any other Prepetition Secured Party, their respective creditors, shareholders or estates, or (c) be deemed to be acting as a "Responsible Person" or "Owner" or "Operator" with respect to the operation or management of the Debtors (as such terms or similar terms are used in the United States Comprehensive Environmental Response, Compensation and Liability Act, 29 U.S.C. §§ 9601, et seq., as amended, or any similar federal or state statute).  Nothing in this paragraph shall impact or limit the rights of any governmental authority.  Furthermore, nothing in this Interim Order, the DIP Documents or the Prepetition Credit Documents shall in any way be construed or interpreted to impose or allow the imposition upon the DIP Secured Parties or the Prepetition Secured Parties of any liability for any claims arising from the prepetition or postpetition activities of any of the Debtors and their direct or indirect subsidiaries.

37.    **Effectiveness**.  This Interim Order shall constitute findings of fact and conclusions of law and shall take effect and be fully enforceable as of the Petition Date immediately upon entry hereof.  Notwithstanding Bankruptcy Rules 4001(a)(3), 6004(h), 6006(d), 7062, or 9014, or any Local Rule, or Rule 62(a) of the Federal Rules of Civil Procedure, this Interim Order shall be immediately effective and enforceable upon its entry and there shall be no stay of execution or effectiveness of this Interim Order.

38.     **Headings**.  Section headings used herein are for convenience only and are not to affect the construction of or to be taken into consideration in interpreting this Interim Order.

39.     **Payments Held in Trust**.  Except as expressly permitted in this Interim Order or the DIP Documents, including any amounts funded to the Carve-Out Reserve, in the event that any person or entity receives any payment on account of a security interest in DIP Collateral, receives any DIP Collateral or any proceeds of DIP Collateral or receives any other payment with respect thereto from any other source before payment in full in cash of all DIP Obligations under the DIP Documents and termination of the DIP Commitments in accordance with the DIP Documents, such person or entity shall be deemed to have received, and shall hold, any such payment or proceeds of DIP Collateral in trust for the benefit of the DIP Secured Parties and shall immediately turn over such proceeds to the DIP Agent, or as otherwise instructed by this Court, for application in accordance with the DIP Documents and this Interim Order.  For the avoidance of doubt, this paragraph 39 will not apply to payments made or assets transferred by the Debtors as authorized under the Bankruptcy Code or any order of the Court.

40.     **Good Faith**.  Each of the DIP Secured Parties and Prepetition Secured Parties have acted in good faith (including for the purposes of sections 363(m) and 364(e) of the Bankruptcy Code) in connection with this Interim Order and their reliance on this Interim Order has been and is in good faith.

41.     **Survival**.  The provisions of this Interim Order and any actions taken pursuant hereto shall survive entry of any order which may be entered: (a) confirming any plan of reorganization in the Chapter 11 Cases; (b) converting any of the Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code; (c) dismissing any of the Chapter 11 Cases or any Successor Case; or (d) pursuant to which the Bankruptcy Court abstains from hearing the Chapter 11 Cases

or any Successor Case.  The terms and provisions of this Interim Order, including the claims, liens, security interests and other protections granted to the Prepetition Secured Parties and the DIP Secured Parties pursuant to this Interim Order or the Prepetition Credit Documents (other than as modified hereby), notwithstanding the entry of any such order, shall continue in the Chapter 11 Cases, in any Successor Case, or following dismissal of any of the Chapter 11 Cases or any Successor Case, and shall maintain their priority as provided by this Interim Order until all DIP Obligations, all Prepetition Secured Obligations, all Adequate Protection Claims, and any adequate protection payment obligations pursuant to this Interim Order, have been paid in full.

42.     **Retention of Jurisdiction**.   The Court shall retain exclusive jurisdiction to implement, interpret, and enforce the provisions of this Interim Order, and this retention of jurisdiction shall survive the confirmation and consummation of any chapter 11 plan for any one or more of the Debtors notwithstanding the terms or provisions of any such chapter 11 plan or any order confirming any such chapter 11 plan.

43.     **Determination of Requisite Parties**.  Any determination as to whether a consent, modification, permission, or amendment required or permitted under this Interim Order has been granted by the "requisite" DIP Secured Parties or the "requisite" Prepetition Secured Parties will be determined by reference to the applicable DIP Documents or Prepetition Credit Agreement.

44.     **Bankruptcy Rules**.  The requirements of Bankruptcy Rules 4001, 6003, and 6004 and Local Rule 4001, in each case to the extent applicable, are satisfied by the contents of the Motion.

45.     **Final Hearing**.  The Final Hearing is scheduled for August 6, 2025 at 1:00 p.m. (prevailing Central Time) before this Court.  Any party in interest objecting to the relief sought at the Final Hearing shall serve and file a written objection thereto, which shall be served upon the

Notice Parties, the DIP Secured Parties, and the Prepetition Secured Parties, and shall also be filed with the Clerk of the United States Bankruptcy Court for the Southern District of Texas, in each case to allow actual receipt by the foregoing no later than August 4, 2025 at 4:00 p.m. (prevailing Central Time).

Signed: July 16, 2025

Alfredo R Pérez
United States Bankruptcy Judge

## SCHEDULE 1

**PropCo Debtors**
1. RunItOneTime HoldCo, Inc. (f/k/a Maverick Gaming HoldCo, Inc.)
2. RunItOneTime LLC (f/k/a Maverick Gaming LLC)
3. Maverick Colorado LLC
4. Maverick Z Casinos LLC
5. Colorado MG 1031 LLC
6. Maverick Washington LLC
7. Maverick Gold LLC
8. Nevada Gold & Casinos, Inc.
9. NG Washington III, LLC
10. NG Washington, LLC
11. NG Washington II Holdings, LLC
12. NG Washington II, LLC
13. Maverick Wizards LLC
14. 15743 Ambaum LLC
15. Maverick Roman LLC
16. The Royal Club Limited Liability Company
17. Skyway Center LLC
18. Maverick Indianola LLC
19. Maverick All Star LLC
20. Myers LLC
21. Maverick Evergreen LLC
22. Maverick Acquisition Canada ULC
23. Washington Gaming, Inc.
24. 14040 Gaming, LLC
25. Riverside Casino, Inc.
26. Gaming Consultants, Inc.
27. Gaming Management, Inc.
28. Puget Sound Gaming, LLC
29. Epstein Gaming LLC
30. LA Center Gaming, LLC
31. Pete's Flying Aces, Inc.
32. Tacoma Casino, L.L.C.
33. Maverick American LLC
34. Great American Gaming Corporation
35. Evergreen Entertainment Corporation
36. Grant Central Properties Everett LLC
37. Pair O'Dice Investments LLC
38. Grand Central Properties Tukwila LLC
39. Grand Central Properties Tacoma LLC
40. Grand Central Casino, Inc.
41. Maverick Caribbean LLC
42. Maverick Tukwila LLC

43. Maverick Yakima LLC
44. Maverick Kirkland II LLC
45. Maverick Kirkland LLC
46. Maverick Lakewood LLC
47. Maverick NV LLC
48. Maverick Elko LLC
49. Maverick Wendover LLC
50. CCI Leasing, LLC
51. Wendover Transportation, LLC
52. Utah Trailways Charter Bus Company, LLC
53. Casino Caravans, Inc.
54. Maverick Design LLC
55. e.gads, LLC
56. Maverick Poker Operator LLC
57. RunItOneTime Texas LLC

**OpCo Debtors**
58. Colorado Resorts Operator LLC
59. Elko Resorts Operator, LLC
60. Wendover Resorts Operator, LLC
61. Grand Z Casino Operator LLC
62. Johnny Z Casino Operator LLC
63. Z Casino Black Hawk Operator LLC
64. Gold Country Operator, LLC
65. High Desert Operator LLC
66. Red Lion Operator, LLC
67. Red Garter Operator, LLC
68. Wendover Nugget Operator, LLC

## **SCHEDULE 2**

### **Prepetition Equity Pledgors**

1. Colorado Resorts Operator LLC
2. Elko Resorts Operator, LLC
3. Wendover Resorts Operator, LLC

# EXHIBIT 1

## DIP Term Sheet

## DIP TERM SHEET

Set forth below is a summary of the principal terms and conditions (this "***DIP Term Sheet***") for a proposed debtor-in-possession financing facility (the "***DIP Facility***").

The terms and conditions for the extensions of credit described herein are dependent upon the satisfaction (or waiver) of the conditions set forth under the heading "Conditions Precedent".

| | |
|---|---|
| **DIP Borrower and DIP Guarantors:** | RunItOneTime LLC (f/k/a Maverick Gaming LLC) ("***Maverick***" or the "***DIP Borrower***"). |
| | RunItOneTime HoldCo, Inc., each Licensed Operator Guarantor Equity Pledgor (as defined in the Existing Credit Agreement (as defined below)) and each of the guarantors (collectively, the "***DIP Guarantors***" and, together with the DIP Borrower, the "***DIP Loan Parties***") under and as defined in that certain Credit Agreement, dated as of September 3, 2021 (as amended, restated, supplemented or otherwise modified from time to time, the "***Existing Credit Agreement***," and the credit facilities under the Existing Credit Agreement and the other Credit Documents (as defined in the Existing Credit Agreement), the "***Existing Facilities***"), among the DIP Borrower, the other parties party thereto as guarantors (the "***Guarantors***"), the lenders party thereto from time to time (the "***Lenders***"), and Alter Domus (US) LLC, as administrative and collateral agent (the "***Agent***"). The obligations under the Existing Facilities are referred to herein as the "***Existing Obligations***". |
| | Each of the DIP Loan Parties shall be a debtor and debtor-in-possession (collectively, the "***Debtors***") in the chapter 11 cases (the "***Chapter 11 Cases***") to be commenced (the date of commencement, the "***Petition Date***") in the United States Bankruptcy Court for the Southern District of Texas (the "***Bankruptcy Court***"). |
| **DIP Lenders and DIP Agent:** | Each of HG Vora Capital Management, LLC (on behalf of certain funds and accounts managed or advised by it, "***HG Vora***"), Angelo Gordon & Co., L.P. (on behalf of certain funds and accounts managed or advised by it, "***TPG AG***"), and PGIM Inc. acting through its Fixed Income division (on behalf of certain funds and accounts managed or advised by it, "***PGIM***", and, together with HG Vora and TPG AG, the "***Backstop Parties***" or individually, a "***Backstop Party***" provided, that the Initial New Money DIP Loans will be provided and funded by Barclays Bank PLC, as fronting lender (the "***Fronting Lender***") and subsequently assigned to the Backstop Parties pursuant to customary fronting terms and other procedures and documentation set forth in the Backstop Commitment Letter (as defined below) and otherwise as agreed between the Fronting Lender and each Backstop Party. Each Backstop Parties may allocate all or any portion of such Backstop Party's pro rata share of the Backstop Commitment (as defined below), the Initial New Money Loans or any fees applicable thereto to an affiliate or related fund thereof. |
| | Any costs, fees and expenses payable to the Fronting Lender (including fees and disbursements of counsel of the Fronting Lender) shall be paid solely by the DIP Borrower. |
| | In connection with this DIP Term Sheet, the Backstop Parties entered into that certain Backstop Commitment Letter between the Backstop Parties, the Fronting Lender and |

| | |
|---|---|
| | the DIP Borrower, pursuant to which the Backstop Parties committed to fund up to $8.5 million of Initial New Money DIP Loans (the "***Backstop Commitment***").<br><br>The Backstop Parties, together with any additional parties that become "Lenders" under the DIP Facility pursuant to any assignment agreement or similar arrangement after the Petition Date, shall, collectively, be referred to herein as the "***DIP Lenders***". Backstop Parties holding more than 50% of the sum of New Money DIP Loans, any Backstop Commitments of such Backstop Parties and any other backstop commitment with respect thereto shall be referred to herein as "***Required Backstop Parties***" and DIP Lenders holding more than 50% of the sum of the DIP Loans, the Backstop Commitments and any other backstop commitment with respect thereto shall be referred to herein as "***Required DIP Lenders***".<br><br>Alter Domus (US) LLC, in its capacity as administrative agent and collateral agent under the DIP Facility shall be referred to herein as the "***DIP Agent***". |
| **DIP Facility Amount:** | The DIP Facility shall be composed of:<br><br>(i) super-priority priming term loans (the "***Initial New Money DIP Loans***") up to the aggregate principal amount of $8.5 million, which shall be backstopped by the Backstop Parties pursuant to the Backstop Commitment Letter,<br><br>(ii) super-priority priming term loans (the "***Incremental New Money DIP Loans***", and together with the Initial New Money DIP Loans, the "***New Money DIP Loans***"), in an amount equal to the Acceptable Incremental Amount (as defined below), which shall remain uncommitted unless and until the Required Backstop Parties agree to the Acceptable Incremental Amount, Acceptable Final Budget, and Acceptable Restructuring (each as defined below), on the terms and conditions set forth herein,<br><br>(iii) $17 million of super-priority priming term loans plus an additional amount equal to the aggregate amount of accrued but unpaid interest on the First Out Term Loans (as defined in the Existing Credit Agreement) being rolled up as of such date (the "***Initial Roll-Up DIP Loans***"), which such Initial Roll-Up DIP Loans will be deemed funded and deemed to have been converted on a cashless dollar-for-dollar basis from the First Out Term Loans (as defined in the Existing Credit Agreement) held by any DIP Lender providing Initial New Money DIP Loans (or any affiliated or related fund thereof) (provided that, for the avoidance of doubt, in no event shall any DIP Lender (together with its affiliates and related funds) providing Initial New Money DIP Loans receive Initial Roll-Up DIP Loans in a principal amount in excess of two (2) times the principal amount of Initial New Money DIP Loans funded by such DIP Lender (together with its affiliates and related funds), and<br><br>(iv) super-priority priming term loans in an amount equal to two (2) times the Acceptable Incremental Amount (such ratio, the "***Incremental Roll-Up Ratio***") plus an additional amount equal to the aggregate amount of accrued by unpaid interest on the First-Out Term Loans or the Initial Roll-up DIP Loans being rolled up as of such date (the "***Incremental Roll-Up DIP Loans***", and together with the Initial New Money DIP Loans, the Incremental New Money DIP Loans and the Initial Roll-Up DIP Loans, collectively, the "***DIP Loans***"), which such Incremental Roll-Up DIP Loans will be deemed funded and deemed to have been converted on a cashless dollar-for-dollar basis from the following Loans held by any DIP Lender providing |

|  | the Incremental New Money DIP Loans, in the following order of priority: (i) first, from any First Out Term Loans held by such DIP Lender (together with its affiliates and related funds), (ii) second, from any Initial Roll-up DIP Loans held by such DIP Lender (together with its affiliates and related funds), and (iii) third, upon written notice to the DIP Agent, from any First Out Terms Loans acquired by such DIP Lender from time to time after the funding date of the Incremental New Money DIP Loans (provided that, for the avoidance of doubt, in no event shall any DIP Lender (together with its affiliates and related funds) providing Incremental New Money DIP Loans receive Incremental Roll-Up DIP Loans in a principal amount in excess of the Incremental Roll-Up Ratio with respect to the principal amount of Incremental New Money DIP Loans funded by such DIP Lender (together with its affiliates and related funds). |
|---|---|
|  | In connection with any roll-up described in clauses (iii) and (iv) above, any accrued and unpaid interest on the First Out Term Loans or Initial Roll-up DIP Loans being exchanged shall be capitalized on the applicable exchange date and added to the principal amount of Initial Roll-Up DIP Loans or Incremental Roll-Up DIP Loans, as the case may be. |
|  | Amounts paid or prepaid under the DIP Facility may not be reborrowed. |
|  | For the avoidance of doubt, the Incremental New Money DIP Loans are uncommitted, and, even if the conditions set forth herein are satisfied, neither the Fronting Lender nor any DIP Lender shall be obligated to fund any portion of the Incremental New Money DIP Loans. |
|  | To request a borrowing of New Money DIP Loans, the DIP Borrower shall notify DIP Agent of such request by delivering to DIP Agent a written notice of borrowing in the form attached hereto as <u>Annex II</u> (each, a "***Notice of Borrowing***") by electronic mail or overnight courier, not later than 12:00 p.m., New York time, three (3) Business Days before the date of the proposed borrowing; <u>provided</u> that any such notice given in connection with the borrowing of Initial New Money DIP Loans may be given not later than 12:00 p.m., New York time, one (1) business day prior to such borrowing. Each such written Notice of Borrowing shall be signed by Borrower and shall be irrevocable. Each such written borrowing request shall specify (i) the aggregate principal amount of the New Money DIP Loans to be borrowed, which amount will be in increments of not less than $100,000, (ii) the date of such anticipated borrowing, which shall be a Business Day, (iii) if applicable, the initial interest period to be applicable thereto, (iv) the location and number of Borrower's account to which funds are to be disbursed, and (v) that the conditions precedent in this DIP Term Sheet or the DIP Credit Agreement, as applicable, to such borrowing have been satisfied. |
|  | As used herein, "***DIP Obligations***" shall mean the DIP Loans, including all principal and accrued interest on the DIP Loans, all fees, and all reimbursement, indemnity, and other obligations under the DIP Facility. |
| **Offer to Participate:** | The Backstop Parties shall offer to each other First Out Term Lender (as defined in the Existing Credit Agreement) the opportunity to fund its *pro rata* portion of the Initial New Money DIP Loans after the Initial Closing Date. After the initial funding of the Initial New Money DIP Loans by the Fronting Lender, the Fronting Lender |

|  | shall assign to each DIP Lender that has elected to participate in the Initial New Money DIP Loans its pro rata share of (a) the Initial New Money DIP Loans and (b) all associated fees paid in kind pursuant to customary fronting terms and other procedures and documentation set forth in the Backstop Commitment Letter and otherwise as agreed between the Fronting Lender and the DIP Lenders.  Each First Out Term Lender may allocate all or any portion of its pro rata share of the Initial New Money Loans or any fees applicable thereto to an affiliate or related fund thereof. |
|---|---|
|  | Each DIP Lender who elects to participate in the Initial New Money DIP Loans shall receive its pro rata share of Initial Roll-Up DIP Loans, deemed funded as of the Interim Order Effective Date and held by DIP Lenders that take assignment of Initial New Money Term Loans from the Fronting Lender as set forth in the above paragraph.  Each DIP Lender may allocate all or any portion of its pro rata share of the Initial Roll-Up Loans to an affiliate or related fund thereof. |
|  | Subject to the occurrence of the Final Closing Date, the Backstop Parties who elect to provide a backstop commitment with respect to the Incremental New Money DIP Loans (pursuant to a backstop commitment letter or other documentation to be agreed between such Backstop Parties) shall offer to each other DIP Lender the opportunity to fund its *pro rata* portion of the Incremental New Money DIP Loans. After the initial funding of the Incremental New Money DIP Loans by the Fronting Lender, the Fronting Lender shall assign to each DIP Lender that has elected to participate in the Incremental New Money DIP Loans its pro rata share of (a) the Incremental New Money DIP Loans and (b) all associated fees paid in kind pursuant to customary fronting terms and other procedures and documentation set forth in any applicable backstop commitment letter and otherwise as agreed between the Fronting Lender and the DIP Lender.  Each DIP Lender may allocate all or any portion of its pro rata share of the Incremental New Money Loans or any fees applicable thereto to an affiliate or related fund thereof. |
|  | Subject to the occurrence of the Final Closing Date, each DIP Lender who elects to participate in the Incremental New Money DIP Loans shall receive its pro rata share of Incremental Roll-Up DIP Loans, deemed funded as of the date of funding of the Incremental New Money DIP Loans and held by DIP Lenders that take assignment of Incremental New Money Term Loans from the Fronting Lender as set forth in the above paragraph.   Each DIP Lender may allocate all or any portion of its pro rata share of the Incremental Roll-Up Loans to an affiliate or related fund thereof. |
| **Certain Fees:** | (a) A funding fee equal to 3.00% of the Initial New Money DIP Loans committed to pursuant to the Backstop Commitment Letter, payable in kind and earned on the Initial Closing Date by the Backstop Parties, solely on account of such Backstop Parties' funding of, and other undertakings relating to, the Initial New Money DIP Loans. |
|  | (b) An upfront fee equal to 4.00% of the Initial New Money DIP Loans funded on or after the Interim Order Entry Date, payable in kind and earned on the Initial Closing Date by the DIP Lenders solely on account of such DIP Lenders' funding of the Initial New Money DIP Loans. |

(c) A backstop fee equal to 3.00% of the Initial New Money DIP Loans committed to pursuant to the Backstop Commitment Letter, payable in kind and earned on the Initial Closing Date by the Backstop Parties, solely on account of such Backstop Party's Backstop Commitment.

(d) A funding fee equal to 3.00% of any Incremental New Money DIP Loans committed prior to, on or after the Final Order Entry Date, payable in kind upon the funding of the Incremental New Money DIP Loans and earned by any Backstop Party committing to fund such Incremental New Money DIP Loans, solely on account of such Backstop Party's funding of, and other undertakings relating to, the Incremental New Money DIP Loans.

(e) An upfront fee equal to 4.00% of any Incremental New Money DIP Loans funded on or after the Final Order Entry Date, payable in kind upon the funding of the Incremental New Money DIP Loans and earned by any DIP Lender funding such Incremental New Money DIP Loans, solely on account of such Lenders' funding of the Incremental New Money DIP Loans.

(f) A backstop fee equal to 3.00% of any Incremental New Money DIP Loans committed to on or prior to the applicable funding date, payable in kind upon the funding of the Incremental New Money DIP Loans and earned by any Backstop Party committing to such Incremental New Money DIP Loans, solely on account of such Backstop Party's backstop commitment with respect to the Incremental New Money DIP Loans.

The in-kind fees set forth in this section shall, to the extent such DIP Loans are funded by the Fronting Lender, be payable on the applicable Closing Date to the Fronting Lender for the account of each applicable DIP Lender. Such fees shall be passed on to the applicable DIP Lender (or any related fund, fund under common management, or managed account thereof) that provides the applicable portion of the DIP Facility.

For avoidance of doubt, all such fees shall be capitalized and added to the balance of the New Money DIP Loans so funded and not netted against the cash proceeds thereof.

| | |
|---|---|
| **Use of Proceeds:** | Subject to the terms and conditions herein, the proceeds of the New Money DIP Loans will be used in accordance with the terms of, and subject to the limitations set forth in, the Budget (as defined below) as then in effect, subject to Permitted Variances (as defined below) to: (a) pay professional fees and other restructuring charges arising on account of the Chapter 11 Cases, including statutory fees of the United States Trustee and allowed professional fees and expenses of an unsecured creditors' committee appointed in the Chapter 11 Cases (if any) (the "***Committee***"); (b) pay professional fees and expenses (including legal, financial advisor, appraisal, and valuation-related fees and expenses) incurred by the DIP Agent, the Fronting Lender and/or the DIP Lenders as provided under the DIP Facility, including those incurred in connection with the preparation, negotiation, documentation, and court approval of the DIP Facility; (c) provide for the working capital, and for other general corporate purposes of the Debtors; and (d) pay administration costs of the Chapter 11 Cases and claims or amounts approved by the Bankruptcy Court. |

<table>
<tr>
<td></td>
<td>No portion of the Loan's Parties' "cash collateral" (as such term is defined in section 363(a) of the Bankruptcy Code) (the "<strong><em>Cash Collateral</em></strong>"), the proceeds of the DIP Facility, the Collateral (as defined below), or the Carve-Out (to be defined in the DIP Orders (as defined below)) may be used:

<blockquote>
(a)      for any purpose, or in any amount, not permitted by the Budget as then in effect or that is prohibited under the Bankruptcy Code or the DIP Orders;

(b)      directly or indirectly to finance in any way (i) any adversary action, suit, arbitration, proceeding, application, motion or other litigation of any type, or the investigation or preparation for any of the foregoing, that could be adverse to the interests of any or all of the DIP Agent, the DIP Lenders, the Agent under the Existing Facilities, or the Lenders under the Existing Facilities or (ii) any other action, which with the giving of notice or passing of time, could result in an Event of Default (as defined below) under the DIP Facility; or

(c)      to make any distribution under a plan of reorganization in the Chapter 11 Cases (a "<strong><em>Plan of Reorganization</em></strong>") that (i) has not been approved by the DIP Lenders or (ii) does not provide for the indefeasible payment of DIP Obligations and the obligations under the Existing Facilities in full and in cash unless expressly agreed in writing by the DIP Lenders;
</blockquote>

<u>provided</u> that, advisors to the Committee, if one is appointed, may investigate the liens granted pursuant to, or any claims under or causes of action with respect to, the Existing Facilities at an aggregate expense for such investigation not to exceed $50,000, <u>provided</u>, that no portion of such amount may be used to prosecute any claims.</td>
</tr>
<tr>
<td><strong>Interim Availability:</strong></td>
<td>During the period commencing on the date (the "<strong><em>Interim Order Entry Date</em></strong>") of the Bankruptcy Court's entry of an interim order approving the DIP Facility ("<strong><em>Interim Order</em></strong>") but prior to the entry of a final order approving the DIP Facility ("<strong><em>Final Order</em></strong>", and together with the Interim Order, as applicable, the "<strong><em>DIP Orders</em></strong>"; each such order shall be in form and substance acceptable to the Required Backstop Parties), the maximum amount available under the DIP Facility shall be limited to (i) the Initial New Money DIP Loans, the proceeds from which shall be deposited in the Funding Account (as defined below) and (ii) the Initial Roll-Up DIP Loans deemed funded upon entry of the Interim Order, in each case, subject to the terms, conditions and covenants set forth in this DIP Term Sheet.</td>
</tr>
<tr>
<td><strong>Full Availability:</strong></td>
<td>Upon (x) agreement on an Acceptable Incremental Amount, Acceptable Final Budget, and Acceptable Restructuring, on the terms and conditions set forth herein and (y) the Bankruptcy Court's entry of the Final Order (the "<strong><em>Final Order Entry Date</em></strong>"), (i) the full amount of the Incremental New Money DIP Loans shall be available, the proceeds from which shall be deposited in the Funding Account and (ii) all Incremental Roll-Up DIP Loans shall be deemed to have been funded on the Final Order Entry Date, in each case, subject to the terms, conditions and covenants set forth in this DIP Term Sheet.</td>
</tr>
</table>

| | |
|---|---|
| **Funding Account:** | All Initial New Money DIP Loans and, if applicable, Incremental New Money DIP Loans, shall be deposited in an account owned or controlled by the DIP Agent at a depository institution to be identified, and shall be held for the benefit of the DIP Borrower (the "***Funding Account***").  Funds on deposit in the Funding Account may be made available to the DIP Borrower subject to the conditions to withdrawal as specified below. |
| **Budget and Permitted Variances:** | The DIP Borrower shall provide a 13-week cash flow projection, prepared by the DIP Borrower in consultation with its advisors, broken down by week, including anticipated receipts and disbursements for such period on a line-by-line basis (each as approved by the Required DIP Lenders in their sole discretion, a "***Budget***").  On the Friday of every week, commencing on July 25, 2025, the DIP Borrower shall provide an updated Budget for the subsequent 13-week period (which Budget and each update thereto shall be in form and substance satisfactory to the Required DIP Lenders in their sole discretion). If the DIP Borrower and the Required DIP Lenders cannot agree on an updated Budget, the then-current Budget shall remain in effect unless and until a new Budget is agreed to by the DIP Borrower and Required DIP Lenders.  The Budget attached to the Interim Order shall be the agreed initial Budget.<br><br>For the period ending on the Friday of the second full week following the Petition Date (and delivered no later than the Friday of the third full week following the Petition Date), and continuing weekly thereafter, the DIP Loan Parties shall deliver to the DIP Agent a report (each, a "***Variance Report***") describing in reasonable detail the DIP Loan Parties' aggregate cash receipts and aggregate cash disbursements as compared to the projected, aggregate cash receipts and disbursements (other than fees and expenses of the DIP Lenders) provided by the then-applicable Budget for each Testing Period (each such difference, a "***Variance***"). The first Variance Report shall include the period from the Petition Date through and including July 27, 2025 (the "***First Testing Period***") and each subsequent Variance Report shall include the subsequent four-week period following delivery of the prior Variance Report (each such period, a "***Subsequent Testing Period***", and the Subsequent Testing Periods together with the First Testing Period, the "***Testing Periods***", and each, a "***Testing Period***").<br><br>"***Permitted Variance***" means a Variance from the then-current Budget during any Testing Period that (x) does not exceed the total aggregate amount in such Budget of disbursements (other than fees and expenses of the DIP Lenders) by more than 15% and (y) is not less than 75% for the first Testing Period and 85% for each Testing Period thereafter, of the aggregate cash receipts in such Budget.<br><br>The DIP Loan Parties hereby agree that during any Testing Period, the Variance from the then-current Budget shall not exceed the Permitted Variance. |
| **Prepayments:** | **Voluntary Prepayment**: The DIP Loan Parties may, at any time, repay all or a portion of the DIP Loans.<br><br>**Mandatory Prepayment**:<br><br>(a) <u>Asset Dispositions</u>. Immediately upon receipt by any DIP Loan Party of net cash proceeds from any asset disposition of Collateral outside of the ordinary course of business, the DIP Borrower shall prepay the DIP Loans in an amount equal to 100% |

of the net cash proceeds so received; provided that the DIP Borrower shall not be required to apply all or any portion of such net cash proceeds to prepay the DIP Loans if the Required DIP Lenders consent in their sole discretion, upon the request of the DIP Borrower.

(b) Insurance Proceeds. Immediately upon receipt by any DIP Loan Party of any net cash proceeds (i) under any insurance policy on account of damage or destruction of any Collateral of any DIP Loan Party, or (ii) as a result of any taking or condemnation of any Collateral of any DIP Loan Party, the DIP Borrower shall prepay the DIP Loans in an amount equal to 100% of the net cash proceeds so received; provided that the DIP Borrower shall not be required to apply all or any portion of such net cash proceeds to prepay the DIP Loans if the Required DIP Lenders consent in their sole discretion, upon the request of the DIP Borrower.

(c) Incurrence of Indebtedness. Immediately upon the incurrence or issuance by any DIP Loan Party of any non-permitted indebtedness, the DIP Borrower shall prepay the DIP Loans in an amount equal to 100% of the net cash proceeds of such indebtedness so received; *provided* that the DIP Borrower shall not be required to apply all or any portion of such net cash proceeds to prepay the DIP Loans if the Required DIP Lenders consent in their sole discretion, upon the request of the DIP Borrower; *provided*, *further* that the Debtors shall not incur or issue additional postpetition indebtedness (excluding, for the avoidance of doubt, trade, de minimis purchase money obligations, or similar credit incurred in the ordinary course of business) or grant or request authority to grant any lien or security interest to secure postpetition indebtedness unless permitted under the DIP Facility, or otherwise agreed by the Required DIP Lenders or the amount of such debt shall be sufficient to pay (and shall be used to pay) the DIP Loans in full in cash and to the extent the net cash proceeds so received do not pay in full in cash all obligations under the Existing Facilities, such indebtedness shall be junior, subject and subordinate, in all respects to all rights, title, interests, liens, claims, liabilities and obligations under the Existing Facilities.

The DIP Borrower shall deliver to the DIP Agent written notice of the DIP Borrower's intent to make any prepayment under this Section, no less than three (3) business days prior to the date of such prepayment, specifying the principal amount of such prepayment and the date on which such prepayment is to be made. All such prepayments shall be accompanied by accrued interest on the principal amount so prepaid.

All voluntary or mandatory prepayments of the DIP Loans shall be applied (i) first, to prepay the New Money DIP Loans until all such New Money DIP Loans are repaid in full, (ii) second, to prepay any Incremental Roll-Up DIP Loans until all such Incremental Roll-Up DIP Loans are repaid in full, and (iii) third, to prepay any Initial Roll-Up DIP Loans until all such Initial Roll-Up DIP Loans are repaid in full.

| | |
|---|---|
| **Payment Waterfall:** | Subject in all respects to the priorities and obligations with respect to, and other terms of, the Carve-Out, after the exercise of remedies provided for in this DIP Term Sheet (or after the Loans have automatically become immediately due and payable), any amounts received on account of the DIP Obligations shall be applied by the DIP Agent in the following order: (i) first, ratably to pay the DIP Obligations in respect of any fees, expense reimbursements, indemnities and other amounts then due and |

| | |
|---|---|
| | payable to the DIP Agent until paid in full; (ii) <u>second</u>, ratably to pay the DIP Obligations in respect of any fees, expense reimbursements, indemnities and other amounts then due and payable to the DIP Lenders until paid in full; (iii) <u>third</u>, ratably to pay interest then due and payable in respect of the New Money DIP Loans until paid in full; (iv) <u>fourth</u>, ratably to pay principal of the New Money DIP Loans until paid in full; (v) <u>fifth</u>, ratably to pay interest then due and payable in respect of the Incremental Roll-Up DIP Loans until paid in full; (vi) <u>sixth</u>, ratably to pay principal of the Incremental Roll-Up DIP Loans until paid in full; (vii) <u>seventh</u>, ratably to pay interest then due and payable in respect of the Initial Roll-Up DIP Loans until paid in full; (viii) <u>eighth</u>, ratably to pay principal of the Initial Roll-Up DIP Loans until paid in full;  and (ix) <u>ninth</u>, to the ratable payment of all other DIP Obligations then due and payable until paid in full. |
| **Collateral and Priority:** | "*Collateral*" means each DIP Loan Party's interest in all assets and properties (whether tangible, intangible, real, personal or mixed), whether now owned by or owing to, or hereafter acquired by, or arising in favor of, such DIP Loan Party (including under any trade names, styles, or derivations thereof), and whether owned or consigned by or to, or leased from or to, the Debtors, and regardless of where located, including, without limitation, all such DIP Loan Party's rights, title and interest in: (i) all collateral securing the Existing Facilities; (ii) all cash and cash equivalents; (iii) as to the "OpCo Debtors" listed on <u>Schedule 1</u> to the Interim Order, all gaming devices as contemplated by the Nevada Revised Statute 463.0155 and Colorado Code of Regulations Section 44-30-103(13), along with all non-gaming assets; (iv) all rent proceeds payable to the "PropCo Debtors" set forth on <u>Schedule 1</u> to the Interim Order under the (A) Lease, dated March 28, 2019, by and between Maverick Wendover LLC and Red Garter Operator, LLC, (B) Lease, dated March 28, 2019, by and between Maverick Wendover LLC and Wendover Nugget Operator, LLC, (C) Lease, dated May 31, 2019, by and between Maverick Elko LLC and Gold Country Operator LLC, (D) Lease, dated May 31, 2019, by and between Maverick Elko LLC and Red Lion Operator LLC, (E) Lease, dated December 11, 2019, by and between Maverick Z Casinos LLC and Grand Z Casino Operator LLC, (F) Lease, dated December 11, 2019, by and between Maverick Z Casinos LLC and Z Casino Black Hawk Operator LLC, and (G) Lease, dated December 11, 2019, by and between Maverick Z Casinos LLC and Johnny Z Casino Operator, LLC; (v) all funds in any deposit account, securities account or other account of the Debtors and all money, cash, cash equivalents, instruments and other property deposited therein or credited thereto from time to time; (vi) all accounts and other receivables; (vii) all contract rights; (viii) all instruments, documents and chattel paper; (ix) all securities (whether or not marketable); (ix) all goods, as-extracted collateral, furniture, machinery, equipment, inventory, and fixtures; (x) all real property interests; (xi) the Debtors' interests in leaseholds and the Debtors' interests in the proceeds of any leaseholds (and excluding the underlying leased property), (xii) all franchise rights; (xiii) all patents, tradenames, trademarks (other than intent-to-use trademarks), copyrights, licenses, and all other intellectual property; (xiv) all general intangibles, tax or other refunds, or insurance proceeds; (xv) all equity interests, capital stock, limited liability company interests, partnership interests and financial assets; (xvi) all investment property; (xvii) all supporting obligations of any of the foregoing; (xviii) all letters of credit issued to the Debtors and letter of credit rights; (xix) all commercial tort claims; (xx) all other claims and causes of action and the proceeds thereof, other than claims and causes of action under section 502(d), 544, 545, 547, 548, 549, 550 or 553 of the Bankruptcy Code, or any other avoidance actions under |

the Bankruptcy Code (collectively, "***Avoidance Actions***") but, subject to entry of a Final Order providing for such relief, including any proceeds or property recovered, unencumbered or otherwise from Avoidance Actions, whether by judgment, settlement or otherwise ("***Avoidance Proceeds***"); (xx) all books and records (including customers lists, credit files, computer programs, printouts and other computer materials and records); and (xxii) all proceeds and products of each of the foregoing and all accessions to, substitutions and replacements for, and rents, profits and products of, each of the foregoing; *provided*, that the Collateral shall not include the following ("***Excluded Assets***"):

(i)      any assets or property to the extent the grant of a security interest therein is prohibited or restricted by applicable law, rule or regulation (including, for the avoidance of doubt, pursuant to the terms of any gaming licenses), in each case in each case except to the extent such prohibition or restriction is ineffective under the Uniform Commercial Code (the "***UCC***") or other applicable laws (other than proceeds thereof, the assignment of which is expressly deemed effective under the UCC notwithstanding such prohibition) and so long as such prohibition, restriction or requirement was not created in contemplation hereof;

(ii)      any leases, contracts, agreements, licenses (including, for the avoidance of doubt, gaming licenses), franchises and permits, to the extent the grant of a security interest therein is prohibited or is restricted by applicable law or by the terms thereof, would result in a breach or termination pursuant to the terms thereof or abandonment, invalidation or unenforceability thereof, in each case in each case except to the extent such prohibition or restriction is ineffective under the UCC or other applicable laws (other than proceeds thereof, the assignment of which is expressly deemed effective under the UCC notwithstanding such prohibition) and so long as such prohibition, restriction or requirement was not created in contemplation hereof;

(iii)      any "intent to use" trademark applications prior to the filing of statement of use; and

(iv)      funds held in (A) the Carve-Out Reserve (as defined in the Interim Order) (except as to any reversionary interest of the Debtors related thereto) and (B) the Professional Fees Account (as defined in the Interim Order) (except as to any reversionary interest of the Debtors related thereto).

Notwithstanding anything to the contrary in the foregoing, all proceeds (including proceeds from the sale, assignment or transfer of any gaming license) and rights to proceeds of all of the foregoing Excluded Property shall not constitute Excluded Property except to the extent that such proceeds or rights to proceeds independently constitute Excluded Property.

All obligations of the DIP Loan Parties to the DIP Lenders and the DIP Agent under the DIP Facility shall, subject in all respects to the Carve-Out, at all times:

(a)  pursuant to section 364(c)(1) of the Bankruptcy Code, be entitled to joint and several superpriority administrative expense claim status against the DIP

Loan Parties in the Chapter 11 Cases, which claims in respect of the DIP Facility shall be superior to all other claims;

(b) pursuant to section 364(c)(2) of the Bankruptcy Code, have first priority liens on all unencumbered assets of the DIP Loan Parties (now or hereafter acquired and all proceeds thereof);

(c) pursuant to section 364(c)(3) of the Bankruptcy Code, have junior liens on all encumbered assets of the DIP Loan Parties (now or hereafter acquired and all proceeds thereof) subject to Permitted Prior Liens, other than as set forth in clause (d) immediately below; and

(d) pursuant to section 364(d) of the Bankruptcy Code, have first priority priming liens on all assets of the DIP Loan Parties (now or hereafter acquired and all proceeds thereof) that serve as collateral under the Existing Facilities, which liens shall be senior to the liens on the Collateral securing the Existing Facilities and the adequate protection liens on the Collateral granted under the DIP Orders.

It is understood and agreed that the priming liens described herein shall be (i) subject to the priorities set forth in the DIP Orders and (ii) as described in the DIP Orders, junior only to (x) the Carve-Out and (y) liens expressly permitted in the Existing Credit Agreement to be senior to the liens securing the Existing Facilities ("***Permitted Prior Liens***"), only to the extent such Permitted Prior Liens were existing, valid, enforceable, properly perfected, and non-avoidable as of the Petition Date or perfected after the Petition Date as permitted by 546(b) of the Bankruptcy Code.

All of the liens described herein with respect to the assets of the DIP Loan Parties shall be effective and perfected as of the Interim Order Entry Date and without the necessity of the execution, recording or filing of control agreements, mortgages, security agreements, pledge agreements, financing statements, or other agreements or instruments.

| | |
|---|---|
| **Carve-Out:** | "***Carve-Out***" shall have the meaning set forth in the DIP Orders.  For the avoidance of doubt, the Carve-Out shall be limited by the aggregate amount permitted under the then-applicable Budget through the applicable date. |
| **Adequate Protection:** | "***Adequate Protection***" shall have the meaning set forth in the DIP Orders. For the avoidance of doubt, Adequate Protection to be made available to the Lenders under the Existing Facilities shall include (i) replacement liens (junior to the liens of the DIP Agent and DIP Lenders) on the Collateral, (ii) a superpriority administrative expense claim against the DIP Loan Parties in the Chapter 11 Cases, which claim shall be junior to the claim in favor of the DIP Agent and DIP Lenders, and (iii) cash payment of all professional fees and expenses payable under the Existing Facilities for professionals retained by the Agent or a majority (by reference to the outstanding principal amount of Existing Obligations) of the Lenders. |
| **Reporting:** | The DIP Loan Parties will continue to provide the Agent, DIP Agent, Lenders and DIP Lenders with financial and other reporting as set forth in the Existing Credit Agreement and any reporting described therein. |

| | |
|---|---|
| **DIP Orders:** | The Interim Order shall, among other things, (i) provide that in no event shall the DIP Agent, the DIP Lenders, the Agent under the Existing Facilities be subject to the equitable doctrine of "marshaling" or any similar doctrine with respect to the Collateral and (ii) include stipulations by the DIP Loan Parties ratifying the extent, validity, priority, perfection, enforceability and non-avoidance of the Existing Obligations.  The Final Order shall, among other things, approve the Debtors' waiver of all section 506(c) claims and any "equities of the case" exception under section 552(b) of the Bankruptcy Code.  The DIP Orders shall in all cases be in form and substance satisfactory to the Required DIP Lenders and, to the extent affecting its capacity as such, the Fronting Lender. |
| **Closing Date:** | The closing date of the DIP Facility and the funding (or deemed funding, as applicable) of the Initial New Money Term Loans and the Initial Roll-Up Term Loans (the "***Initial Closing Date***") shall occur within two (2) business days of the Interim Order Entry Date and shall be the first business day on which the conditions precedent set forth herein governing the DIP Facility have been satisfied or waived by the DIP Agent and the Required DIP Lenders.<br><br>The funding (or deemed funding, as applicable) of the Incremental New Money Term Loans and the Incremental Roll-Up Term Loans (the "***Final Closing Date***") shall occur on or after the Final DIP Order Entry Date and shall be the first business day on which the conditions precedent set forth herein and in the DIP Credit Agreement (as defined below) have been satisfied or waived by the DIP Agent and the Required DIP Lenders. |
| **Maturity:** | All DIP Obligations shall be due and payable in full and in cash, and the commitments shall terminate, on the earlier to occur (the "***Maturity Date***") of (i) nine (9) months from the Initial Closing Date, which date may be extended by the Required DIP Lenders (and without the consent of any other DIP Lender) if the sole condition remaining to be satisfied for an Acceptable Restructuring is the receipt of regulatory approvals, (ii) the effective date of a Plan of Reorganization that has been confirmed by an order of the Bankruptcy Court, (iii) 25 days after the Interim Order Entry Date unless on or before such day the Final Order Entry Date shall have occurred, and (iv) consummation of a sale of all or substantially all of the assets of the DIP Loan Parties.<br><br>Any confirmation order entered in the Chapter 11 Cases ("***Confirmation Order***") shall not discharge or otherwise affect in any way the joint and several obligations of the DIP Loan Parties to the DIP Agent and the DIP Lenders under the DIP Facility, other than after (i) the payment in full and in cash to the DIP Agent and the DIP Lenders of all obligations under the DIP Facility on or before the effective date of such Plan of Reorganization and (ii) the payment in full and in cash to the Agent and Lenders of the Existing Obligations on or before the effective date of such Plan of Reorganization. |
| **Interest; Discount; Premiums; Fees:** | The interest rate, default rate, and fees under the DIP Facility are set forth in <u>Annex I</u> hereto.<br><br>Interest shall accrue on the principal balance of the DIP Loans, from time to time, based on a 360-day year and charged for the actual number of days outstanding.  DIP |

| | |
|---|---|
| | Borrower shall pay interest, default interest and any fees monthly in cash in arrears on the last business day of each calendar month and on the Maturity Date. |
| **Conditions Precedent:** | **Conditions to the Initial Closing Date**: Limited to:<br><br>1. **Interim Order/Bankruptcy Matters**.<br><br>    (a) The Chapter 11 Cases shall have been commenced in the Bankruptcy Court and all of the "first day orders" (including a cash management order (the "***Cash Management Order***")) and all related pleadings filed at or about the time of commencement of the Chapter 11 Cases shall have been provided to counsel to the Required Backstop Parties and shall be in form and substance reasonably acceptable to the Required Backstop Parties.<br><br>    (b) The Bankruptcy Court shall have entered an Interim Order that shall be in form and substance consistent with this DIP Term Sheet and otherwise in form and substance acceptable to the Required Backstop Parties and the Debtors (and, to the extent affecting its capacity as such, the Fronting Lender), shall be in full force and effect, and shall not (in whole or in part) have been reversed, modified, amended, stayed, vacated, appealed, or subject to a stay pending appeal.  The DIP Loan Parties shall be in compliance in all material respects with the Interim Order.<br><br>2. **Budgets and Financial Information**.  The DIP Lenders shall have received an initial Budget as of the Closing Date, which initial Budget shall be in form and substance satisfactory to the Required DIP Lenders.<br><br>3. **Customary Closing Documents and Conditions**.<br><br>    (a) All costs, fees, expenses (including reasonable and documented legal fees and expenses and agency fees) and other compensation contemplated by this DIP Term Sheet shall have been paid or reimbursed to the extent invoiced prior to the Initial Closing Date.<br><br>    (b) The DIP Loan Parties shall have complied with the following closing conditions:  (i) the delivery of corporate records and documents from public officials, secretary's certificates, and officer's certificates; (ii) evidence of authority; and (iii) obtaining of any material third-party and governmental consents necessary in connection with the DIP Facility, the financing thereunder, and related transactions.   The DIP Loan Parties and the transactions contemplated by this DIP Term Sheet shall be in compliance with all applicable laws and regulations.<br><br>    (c) The DIP Agent, Fronting Lender and the DIP Lenders shall have received, to the extent requested prior to the Initial Closing Date, all documentation and other information required by bank regulatory authorities under applicable "know-your-customer" and anti-money laundering rules and regulations, including the Patriot Act, in each case satisfactory to each DIP Lender, the DIP Agent and Fronting Lender. |

(d) The Interim Order shall be effective to create in favor of the DIP Agent a legal, valid and enforceable first priority security interest in and lien upon the Collateral and the DIP Agent, for its benefit and the benefit of each DIP Lender, shall have been granted a perfected lien on the Collateral by the Interim Order on the terms and conditions set forth herein.

(e) The DIP Agent shall have received appropriate UCC-1 financing statements for filing under the UCC of each jurisdiction of organization of each DIP Loan Party.

(f) The DIP Agent shall have received an agency fee letter (in form and substance satisfactory to the DIP Agent), duly executed and delivered on behalf of the DIP Borrower.

**Conditions to All DIP Loans**: Limited to:

1. The Interim Order or the Final Order, as applicable, shall be in full force and effect and shall not (in whole or in part) have been reversed, modified, amended, stayed, vacated, appealed, or subject to a stay pending appeal.

2. The DIP Loan Parties shall be in material compliance with each order entered in the Chapter 11 Cases, including the DIP Orders and the Cash Management Order.

3. The TSA will be in full force and effect.

4. The DIP Loan Parties shall be in compliance with their obligations in connection with the delivery of the Budget and Variance Reports (as set forth herein and in the DIP Order), and the DIP Loan Parties shall be in compliance with the Budget (subject to Permitted Variances).

5. The following statements shall be true and correct: (i) the representations and warranties contained in this DIP Term Sheet, the DIP Loan Documents and in the Existing Credit Agreement (as modified by this DIP Term Sheet) are true and correct in all material respects (unless otherwise qualified by materiality, in which case such representations and warranties shall be true and correct in all respects) on and as of each date the DIP Loan Parties request to borrow DIP Loans, as though made on and as of such date, except to the extent that any such representation or warranty expressly relates to an earlier date (in which case such representation or warranty shall be true and correct in all material respects (unless otherwise qualified by materiality, in which case such representations and warranties shall be true and correct in all respects) on and as of such earlier date) and (ii) no default or Event of Default shall have occurred and be continuing on such date.

6. The DIP Agent shall have received a written Notice of Borrowing.

| | |
|---|---|
| **CRO:** | From and after the Petition Date, the DIP Loan Parties shall, at all times, (i) with respect to the DIP Loan Parties other than the Licensed Operator Affiliates (as defined in that certain Transaction Support Agreement, dated as of June 25, 2025 (the "***TSA***"), by and among the DIP Loan Parties party thereto, the DIP Lenders party thereto and Eric Persson) have a duly appointed and acting chief restructuring officer acceptable to the Required DIP Lenders, and on terms (including as to remuneration) acceptable to the Required DIP Lenders (the "***CRO***"; any successor thereto or replacement thereof acceptable to the DIP Agent and the Required DIP Lenders) and (ii) with respect to the DIP Loan Parties that are Licensed Operator Affiliates, an employee with authority to manage all cash receipts and disbursements acceptable to the Required DIP Lenders and on terms (including as to remuneration) acceptable to the Required DIP Lenders (the "***Liquidity Employee***"; any successor thereto or replacement thereof acceptable to the DIP Agent and the Required DIP Lenders). The CRO shall: (a) have direct and complete access to the DIP Loan Parties' managers, officers, advisors, employees, and other representatives, and shall at all times be entitled to take all action necessary or appropriate to be fully informed with respect to the DIP Loan Parties' financial condition, operations, customers and business prospects; (b) oversee the sales required pursuant to the terms of the DIP Facility on behalf of the DIP Loan Parties, including all activities of any investment banker retained by the DIP Loan Parties; and (c) respond to all reasonable information requests or inquiries of the DIP Agent and the Required DIP Lenders and their respective representatives concerning any and all matters relating to the activities of such CRO; provided that, no such authority or control shall constitute Gaming Decisions (as defined in the TSA), unless the CRO has obtained the requisite approvals to make Gaming Decisions, in which case such authority and control shall be vested in the CRO. |
| **Conditions to Withdrawal from Funding Account:** | Limited to: (a) Submission of a withdrawal request that shall include reasonably detailed information as to the intended use of the amount requested to be withdrawn in form satisfactory to the Required DIP Lenders, (b) the intended use of amount requested to be withdrawn complies with the then-applicable Budget, and (c) no default or Event of Default shall have occurred and be continuing on such date. |
| **Covenants:** | Limited to: The provisions of Articles IX (other than Sections 9.12, 9.13, 9.14 and 9.15) and X (other than Section 10.08, 10.13 and 10.14(e), (h) and (i)) of the Existing Credit Agreement, together with all related definitions and ancillary provisions, all as in effect from time to time, are hereby incorporated herein by reference *mutatis mutandis* and shall be deemed to continue in effect (with any amendments, modifications or waivers thereof) for the benefit of the DIP Agent and the DIP Lenders and each DIP Loan Party covenants and agrees that it shall perform and observe each of the covenants set forth in Articles IX and X of the Existing Credit Agreement as if (i) each reference therein to "Agent" and "Lender" and similar expressions were references to the DIP Agent and each DIP Lender under this DIP Facility, (ii) each reference therein to "Default" or "Event of Default" and similar expressions were references to "Default" or "Event of Default", respectively, under this DIP Facility and (iii) each reference to "Agreement" were references to this DIP Facility. |

<u>Additional Covenants</u>: Limited to:

(a) <u>Ratings</u>.  The DIP Borrower shall use commercially reasonable efforts to obtain, within 60 days of the Closing Date, and maintain at all times on and after the Closing Date a rating of the DIP Loans from S&P and Moody's.

(b) <u>Chapter 11 Cases Filings</u>.  The Debtors shall use commercially reasonable efforts to provide to the DIP Agent and the legal advisors to the DIP Lenders promptly after the same is available, copies of all pleadings, motions, applications and other documents filed by or on behalf of any other DIP Loan Party with the Bankruptcy Court in the Chapter 11 Cases, including all motions for "first day" and "second day" relief.

(c) <u>Orders</u>.  The Debtors shall comply with each order entered by the Bankruptcy Court in the Chapter 11 Cases.

(d) <u>Information Rights.</u>  The Debtors shall provide the DIP Agent, the DIP Lenders, and their respective advisors and representatives with reasonable access to information (including historical information) and management and executive personnel regarding strategic planning, cash and liquidity management, and operational and restructuring activities, except to the extent access to such information would compromise the Debtors' attorney-client privilege or would not be permitted by appliable gaming law or regulation.

(e) <u>Business Operations</u>.  The Debtors shall not modify or alter (i) in any material manner the nature and type of its business or the manner in which such business is conducted or (ii) in any manner materially adverse to the DIP Agent or the DIP Lenders, the DIP Loan Parties' organizational documents, except as required by the Bankruptcy Code.

(f) <u>Subrogation</u>.  The Debtors shall not assert any right of subrogation or contribution against any other DIP Loan Party until all borrowings under the DIP Facility are paid in full as provided herein and the commitments are terminated.

(g) <u>No Payments</u>.  The Debtors shall not make any payment of principal or interest or otherwise on account of any prepetition indebtedness or payables, other than as contemplated as Adequate Protection herein or in the DIP Orders or payments (i) agreed in writing by the Required DIP Lenders and authorized by the Bankruptcy Court or (ii) authorized by the Bankruptcy Court pursuant to "first day" or "second day" relief (to the extent such relief was approved by the Required DIP Lenders).

(h) <u>TSA</u>.  The Debtors shall, at all times, comply with the terms and provisions of the TSA.

(i) <u>Master Leases</u>.  The DIP Loan Parties shall, at all times, be in compliance with the terms of the AG Master Lease (as defined in the Existing Credit Agreement).

(j)  <u>Minimum Liquidity</u>.  The DIP Loan Parties shall not permit aggregate cash and cash equivalents of the DIP Loan Parties to be less than $16 million at any time.

Milestone Covenants: Limited to:

Comply with the following milestones (the failure to comply or timely comply, as the case may be, constituting an immediate Event of Default), unless superseded by the Final Order:

(a)  commencement of the Chapter 11 Cases no later than July 14, 2025;

(b)  no later than the Petition Date, file a "first day" motion and proposed order to approve the DIP Facility;

(c)  no later than seven (7) calendar days after the Petition Date, each of the DIP Loan Parties shall deliver to the DIP Agent a fully executed credit agreement in form and substance satisfactory to the Required Backstop Parties (the "***DIP Credit Agreement***") (it being understood that such DIP Credit Agreement shall substantially conform to the terms and provisions of this DIP Term Sheet, with such other provisions as may be required by the Required Backstop Parties, and that each DIP Lender shall be deemed to have executed such DIP Credit Agreement and any other related loan documents (collectively, the "***DIP Loan Documents***") (and shall deliver executed signature pages thereto) to the extent such DIP Credit Agreement and related loan documents are approved by the Required Backstop Parties);

(d)  obtain entry by Bankruptcy Court of the Interim Order no later than two (2) business days after the Petition Date;

(e)  no later than seven (7) calendar days after the Petition Date, file a sale motion (the "***Sale Motion***") and bid procedures motion (the "***Sale Procedures Motion***") in form and substance acceptable to the Required Backstop Parties for (i) the sale of substantially all of the DIP Loan Parties' assets, (ii) the procedures for designating one or more stalking horse bidders and (iii) approving a credit bid of the Agent and DIP Agent on behalf of the Lenders and DIP Lenders, as a "qualified bidder" for all of the Debtors' assets under the Sales Procedure Motion;

(f)  by the earlier of (i) twenty-one (21) calendar days after the Petition Date and (y) seven (7) calendar days before the hearing to consider approval of the Final Order, the Debtors shall have proposed, and the Required Backstop Parties shall have agreed to such proposal in their sole discretion, (i) a forecast of anticipated cash receipts and disbursements, to be set forth on a weekly and monthly basis, including the anticipated uses of the DIP Facility, through the conclusion of an Acceptable Restructuring (each as approved by the Required Backstop Parties in their sole discretion, an "***Acceptable Final Budget***"), (ii) a bankruptcy plan, sale process, or other disposition of the Chapter 11 Cases or the Debtors' assets in form and substance satisfactory to the Required Backstop Parties in their sole discretion (an "***Acceptable Restructuring***"), and (iii) the principal amount of the Incremental New

17

<table>
<tr>
<td></td>
<td>

Money DIP Loans in an amount satisfactory to the Required Backstop Parties in their sole discretion (the "**Acceptable Incremental Amount**") and Incremental Roll-Up DIP Loans;

(g)   within twenty-five (25) calendar days after the Petition Date, obtain entry by the Bankruptcy Court of the Final Order, which will contain additional milestones agreed between the Debtors and the Required Backstop Parties necessary to pursue an Acceptable Restructuring;

(h)   if necessary for an Acceptable Restructuring and unless superseded by the Final Order, request a hearing on the Sale Procedures Motion to occur within thirty (30) days after the Petition Date;

(i)   if necessary for an Acceptable Restructuring and unless superseded by the Final Order, obtain entry by the Bankruptcy Court of an order (in form and substance acceptable to the Required Backstop Parties) with respect to the Sale Procedures Motion no later than thirty-five (35) calendar days after the Petition Date (the "**Sale Procedures Order**"), which Sale Procedures Order shall (w) approve the relief requested in the Sale Motion, (x) set a bid deadline of no later than sixty-five (65) calendar days after the Petition Date, (y) require an auction (if applicable) to occur no later than seventy (70) calendar days after the Petition Date, and (z) set a hearing date on the DIP Loan Parties' Sale Motion no later than seventy-five (75) calendar days after the Petition Date; and

(j)   if necessary for an Acceptable Restructuring and unless superseded by the Final Order, within eighty (80) calendar days after the Petition Date, satisfy all conditions precedent necessary to consummate a sale of all or substantially all of the Debtors' assets, other than approvals by the Washington, Nevada, and Colorado gaming regulators, unless the Backstop Parties agree to a different disposition of MainCo (as defined in the TSA).

</td>
</tr>
<tr>
<td>**Representations and Warranties:**</td>
<td>

Limited to: Each DIP Loan Party represents and warrants to the DIP Lenders and the DIP Agent that (i) the entry into this DIP Facility has been duly authorized and this DIP Facility has been duly and validly entered into and delivered by the Debtors and constitutes each Debtor's legal, valid and binding obligation, enforceable against it in accordance with its terms; and (ii) the provisions of Article VIII (other than Section 8.04(b) with respect to the absence of Default or Event of Default, Section 8.17 with respect to the solvency of the Debtors and Section 8.26 with respect to the absence of a Material Adverse Effect) of the Existing Credit Agreement, together with all related definitions and ancillary provisions, all as in effect from time to time, are hereby incorporated herein by reference *mutatis mutandis* for the benefit of the DIP Agent and the DIP Lenders, and the DIP Loan Parties hereby make each of the representations and warranties in Article VIII of the Existing Credit Agreement (other than Section 8.04(b) with respect to the absence of Default or Event of Default, Section 8.17 with respect to the solvency of the Debtors and Section 8.26 with respect to the absence of a Material Adverse Effect) as if (A) each reference therein to "this Agreement" included reference to this DIP Facility, (B) each reference therein to "Closing Date" were references to the date hereof and (C) each reference therein to "Obligations" includes all DIP Obligations.

</td>
</tr>
</table>

18

| | |
|---|---|
| **Events of Default:** | The events of default ("***Events of Default***") are limited to the following: |
| | (a) **Nonpayment**. Failure by the DIP Borrower to pay (a) any principal on the DIP Loans when due or (b) any interest, other fee, charge, amount or liability provided for herein, within three (3) business days following the due date thereof, in each case whether on the Maturity Date, by reason of acceleration pursuant to the terms of this DIP Term Sheet, by notice of intention to prepay or by required prepayment; |
| | (b) **Breach of Representation**. Any representation or warranty made or deemed made by the DIP Borrower or any DIP Guarantor in this DIP Term Sheet or any related agreement or in any certificate, document or financial or other statement furnished at any time in connection herewith or therewith shall prove to have been incorrect or misleading in any material respect on the date when made or deemed to have been made; |
| | (c) **Noncompliance**. Except as otherwise provided for herein, (i) failure or neglect of the DIP Borrower, any DIP Guarantor or any person to perform, keep or observe any term, provision, condition, covenant contained in Articles IX (other than Sections 9.12, 9.13, 9.14 and 9.15) or X (other than Section 10.08, 10.13 and 10.14(e), (h) and (i))  of the Existing Credit Agreement or with the Milestones contained in the DIP Term Sheet, (ii) failure or neglect of any DIP Borrower or any DIP Guarantor to perform, keep or observe any other term, provision, condition or covenant, contained herein or in the Existing Credit Agreement (other than Articles IX and X) or in any other agreement or arrangement, now or hereafter entered into between any DIP Loan Party or such person, and the DIP Agent or any DIP Lender which is not cured within fifteen (15) days from any DIP Loan Party having become aware of the occurrence of such failure or neglect or (iii) there shall occur any payment default under the AG Master Lease; |
| | (d) **Budget**. The proceeds of any DIP Loan shall have been expended in a manner which is not in accordance with the then-applicable Budget (subject to Permitted Variances). |
| | (e) **Collateral Documents**. The DIP Orders shall cease to create valid and perfected liens on the Collateral with such priority required by this DIP Term Sheet and as set forth in the DIP Orders. |
| | (f) **Entry of Order**. The entry of the Final Order shall not have occurred within twenty-five (25) calendar days after the Interim Order Entry Date. |
| | (g) **Conversion to Chapter 7**. An order with respect to any of the Chapter 11 Cases shall be entered by the Bankruptcy Court converting such Chapter 11 Case to a Chapter 7 case. |
| | (h) **Prepetition Claims**. Any DIP Loan Party shall file a motion seeking, or the Bankruptcy Court shall enter, an order (i) approving payment of any prepetition claim in excess of $100,000 in the aggregate other than (x) as provided for in the "first day" and "second day" orders and included in the then-applicable Budget or (y) otherwise consented to by the Required DIP Lenders in writing; (ii) granting relief from the automatic stay applicable under section 362 of the Bankruptcy Code to any holder of any security interest to permit foreclosure on any assets having a book value in excess |

of $50,000 in the aggregate; or (iii) except with respect to Existing Facilities as provided in the DIP Orders, approving any settlement or other stipulation in excess of $50,000 in the aggregate not approved by the Required DIP Lenders and not included in the Budget with any secured creditor of any DIP Loan Party providing for payments as Adequate Protection or otherwise to such secured creditor.

(i) **Appointment of Trustee or Examiner**. An order with respect to any of the Chapter 11 Cases shall be entered by the Bankruptcy Court appointing, or any DIP Loan Party, any subsidiary of a DIP Loan Party, or any affiliate of a DIP Loan Party shall file an application for an order with respect to any Chapter 11 Case seeking the appointment of, (i) a trustee under section 1104 or (ii) an examiner with enlarged powers (powers beyond those set forth in section 1106(a)(3) and (4) of the Bankruptcy Code) under section 1106(b) of the Bankruptcy Code.

(j) **Dismissal of Chapter 11 Cases**. An order shall be entered by the Bankruptcy Court dismissing any of the Chapter 11 Cases which does not contain a provision for termination of the DIP Lenders' commitments and payment in full of all DIP Obligations.

(k) **Order With Respect to Chapter 11 Cases**. An order with respect to any of the Chapter 11 Cases shall be entered by the Bankruptcy Court without the express prior written consent of the Required DIP Lenders (and, with respect to any provisions that materially affect the rights or duties of the DIP Agent, the DIP Agent), (i) to revoke, reverse, stay, modify, supplement, or amend any of the DIP Orders in a manner inconsistent with this DIP Term Sheet that is not otherwise consented to by the Required DIP Lenders (and with respect to amendments, modifications, or supplements that affect the rights or duties of the DIP Agent, the DIP Agent); (ii) to permit any administrative expense or any claim (now existing or hereafter arising, of any kind or nature whatsoever) to have administrative priority as to the DIP Loan Parties equal or superior to the priority of the DIP Loans (other than the Carve-Out and claims related to the Permitted Prior Liens) or the Adequate Protection Claims (as defined the DIP Orders), other than the Carve-Out or the administrative expense claims on account of the DIP Facility or (iii) to grant or permit the grant of a lien on the Collateral that is senior to the liens of the DIP Lenders.

(l) **Application for Order by Third Party**. An application for any of the orders described in clauses (f), (g), (i), (j), (k), (m), (p) and (r) of this section shall be made by a person other than the DIP Loan Parties and such application is not contested by the DIP Loan Parties in good faith or any person obtains a non-appealable final order charging any of the Collateral under section 506(c) of the Bankruptcy Code against the DIP Agent or the DIP Lenders or obtains a final order adverse to the DIP Agent or the DIP Lenders.

(m) **Right to File Chapter 11 Plan**. The entry of an order by the Bankruptcy Court terminating or modifying the exclusive right of any DIP Loan Party to file a Plan of Reorganization pursuant to section 1121 of the Bankruptcy Code, without the prior written consent of the Required DIP Lenders.

(n) **Liens**. (i) Any DIP Loan Party shall attempt to invalidate, reduce, or otherwise impair the liens or security interests of the DIP Agent and/or the DIP Lenders or to subject any Collateral to assessment pursuant to section 506(c) of the Bankruptcy

20

Code; (ii) any lien or security interest created by this DIP Term Sheet or the DIP Orders with respect to Collateral shall, for any reason, cease to be valid; or (iii) any action is commenced by the DIP Loan Parties that contests the validity, perfection, or enforceability of any of the liens and security interests of the DIP Agent and/or the DIP Lenders created by any of the Interim Order, the Final Order, or this DIP Term Sheet.

(o) **Invalidation of Claims**. Any DIP Loan Party or affiliate of any such DIP Loan Party shall seek to, or shall support (in any such case by way of any motion or other pleading filed with the Bankruptcy Court or any other writing to another party-in-interest executed by or on behalf of the DIP Loan Parties) any other person's motion to disallow in whole or in part the DIP Lenders' claims in respect of the obligations under the DIP Facility or contest any provision of this DIP Term Sheet.

(p) **Challenge**.  The challenge by the Debtor to the validity, extent, perfection or priority of any liens granted under or obligations arising under the Prepetition Documents;

(q) **Modifications**. The terms of the Acceptable Restructuring or the Confirmation Order, is amended, supplemented, or otherwise modified in a manner that materially affects the rights or duties of the DIP Lenders and/or the DIP Agent without the prior written consent of the Required DIP Lenders (and with respect to amendments, modifications, or supplements that affect the rights or duties of the DIP Agent, the DIP Agent).

(r) **Payments**. Any DIP Loan Party or any of their affiliates shall have filed a motion seeking the entry of, or the Bankruptcy Court shall have entered, an order approving a payment to any person that would be materially inconsistent with the treatment of any such person under the Acceptable Restructuring, without the prior written consent of the Required DIP Lenders.

(s) **TSA**. There shall (i) occur any breach of the TSA by any party thereto (other than the DIP Lenders) and such breach shall remain uncured for five (5) business days, (ii) a Supporting Lender Termination Event (as defined in the TSA), or (iii) the TSA is terminated in accordance with its terms.

(t) **CRO and Liquidity Employee**. The termination or any change to the role or responsibilities of the CRO (not including any voluntary resignation by the CRO), or the Liquidity Employee on or after the date hereof.  Any DIP Loan Party shall take any action that requires the prior recommendation of the CRO or the Liquidity Employee without obtaining such recommendation.

(u) **Payments**.  Any DIP Loan Parties or any subsidiary or DIP Loan Party controlled-affiliate of any DIP Loan Party shall pay Eric Persson (inclusive of all benefits or reimbursements) in excess of $550,000 in the aggregate (other than as permitted under the TSA).

(v) **License Revocation**.  There shall have occurred a revocation, failure to renew or suspension of, or the appointment of a receiver, supervisor or similar official with respect to, any casino, gambling or gaming license held by a DIP Loan Party immediately prior to the Petition Date covering any gaming establishment and other

| | |
|---|---|
| | property or assets ancillary thereto or used in connection therewith owned, leased, operated or used by the DIP Borrower or any DIP Loan Party. |
| **Remedies:** | Immediately upon an Event of Default, the DIP Agent (acting at the direction of the Required DIP Lenders) may take any and all action as set forth in the DIP Loan Documents and the Interim DIP Order (including paragraph 12 therein). |
| **Credit Bidding:** | The DIP Agent, upon the instruction of the Required DIP Lenders, shall have the right to credit bid up to the full amount of the outstanding DIP Obligations.  The Agent under the Existing Facilities, upon the instruction of a majority (by reference to the outstanding principal amount of Existing Obligations) of the Lenders, shall have the right to credit bid up to the full amount of the Existing Obligations (*provided*, that such credit bid, if effectuated, shall require the payment of the DIP Obligations in full in cash unless otherwise consented to by the Required DIP Lenders). |
| **Amendments:** | No amendment or waiver of any provision of this DIP Term Sheet or the DIP Facility, and no consent to any departure by the DIP Borrower or any other DIP Loan Party therefrom, shall be effective unless in writing and agreed by the Required DIP Lenders and the DIP Borrower (which may be in the form of an email or other written communication and which may come from primary counsel to the DIP Lenders or the DIP Borrower, as applicable) and acknowledged by the DIP Agent and each such waiver or consent shall be effective only in the specific instance and for the specific purpose for which given, *provided* that no such amendment, waiver or consent shall: |
| | a.  extend or increase the Backstop Commitment or any other backstop commitment (or other commitment) of any DIP Lender, without the written consent of each DIP Lender directly and adversely affected thereby (it being understood that a waiver of any condition precedent or the waiver of any default, mandatory prepayment of the DIP Loans shall not constitute an extension or increase of any Backstop Commitment or other backstop commitment (or other commitment) of any DIP Lender); |
| | b.  postpone any date scheduled for, or reduce the amount of interest payable in respect of any payment of principal (other than as set forth above in the "Maturity" section of this DIP Term Sheet) or interest with respect to any DIP Loan or with respect to any fee or premium payable pursuant to Annex I without the written consent of each DIP Lender directly and adversely affected thereby, it being understood that the waiver of (or amendment to the terms of) any mandatory prepayment, any condition precedent or any Event of Default shall not constitute a postponement of any date scheduled for, or a reduction in the amount of, any payment of interest or any payment of fees; |
| | c.  reduce the principal of, or the rate of interest specified herein on, any DIP Loan or any fees or other amounts payable hereunder or under any other DIP Loan Document without the written consent of each DIP Lender directly and adversely affected thereby; provided that only the consent of the Required DIP Lenders shall be necessary to amend the definition of "Default Rate"; |

|  |  |
|---|---|
|  | d.   change this provision on amendments or the definition of "Required DIP Lenders", "Required Backstop Parties" or any other provision specifying the number of DIP Lenders required to take any action under the DIP Facility without the written consent of each DIP Lender directly and adversely affected thereby;<br><br>e.   amend, modify or waive any provision of this DIP Term Sheet affecting the rights, duties or obligations of the DIP Agent without the prior written consent of the DIP Agent;<br><br>f.   modify the Incremental Roll-up Ratio (other than as required by any order of the Bankruptcy Court) without the written consent of each DIP Lender directly and adversely affected thereby;<br><br>g.   amend, modify or waive any provision of the "Payment Waterfall" section of this DIP Term Sheet that would alter the applicable of payments required thereby without the written consent of each DIP Lender directly and adversely affected thereby; or<br><br>h.   subordinate the Initial New Money DIP Loans or the Incremental New Money DIP Loans in right of payment to any other indebtedness of the DIP Loan Parties or subordinate the liens securing the Initial New Money DIP Loans or the Incremental New Money DIP Loans to any other liens on the Collateral securing any other indebtedness of the DIP Loan Parties, in each case, without the written consent of each DIP Lender holding Initial New Money DIP Loans or the Incremental New Money DIP Loans directly and adversely affected thereby. |
| **Reimbursement; Indemnity** | The DIP Borrower shall pay (i) all costs and expenses incurred by the DIP Agent and the DIP Lenders (including fees and disbursements of counsel (not including allocated costs of internal counsel)), in each case incurred in connection with the DIP Facility, and the preparation, execution, delivery and administration of this DIP Term Sheet and any amendments, modifications or waivers of the provisions hereof and (ii) all costs and expenses incurred by the DIP Agent or any DIP Lender, including the reasonable and documented out-of-pocket fees, charges and disbursements of counsel for the DIP Agent and the DIP Lenders, in connection with the preservation, enforcement or protection of any rights or remedies (A) in connection with the DIP Facility or this DIP Term Sheet (including all such reasonable and documented out-of-pocket costs and expenses incurred during any legal proceeding, including any proceeding under any debtor relief laws) or (B) in connection with the DIP Loans to be made hereunder, including all such reasonable and documented out-of-pocket costs and expenses incurred during any workout, restructuring or negotiations in respect of such DIP Loans.<br><br>The DIP Borrower shall defend, protect, indemnify, pay and save harmless DIP Agent, Fronting Lender and each DIP Lender and each of their respective officers, directors, affiliates, attorneys, employees and agents (each an "***Indemnified Party***") for and from and against any and all claims, demands, liabilities, obligations, losses, damages, penalties, fines, actions, judgments, suits, fees, costs, charges, expenses and |

| | |
|---|---|
| | disbursements of any kind or nature whatsoever (including fees and disbursements of counsel (not including allocated costs of internal counsel)) arising out of or in any way relating to or as a consequence, direct or indirect, of: (i) this DIP Term Sheet, the DIP Facility, any documents or instruments relating thereto, and/or the transactions contemplated hereby or thereby, (ii) any action or failure to act or action taken only after delay or the satisfaction of any conditions by any Indemnified Party in connection with and/or relating to the negotiation, execution, delivery or administration of the DIP Term Sheet, the DIP Facility established hereunder, any documents or instruments relating thereto, and/or the transactions contemplated hereby, (iii) any DIP Loan Party's failure to observe, perform or discharge any of its covenants, obligations, agreements or duties under or breach of any of the representations or warranties made in this DIP Term Sheet, (iv) the enforcement of any of the rights and remedies of DIP Agent, Fronting Lender or any DIP Lender under this DIP Term Sheet and any documents or instruments relating thereto, (v) any threatened or actual imposition of fines or penalties, or disgorgement of benefits, for violation of any anti-terrorism law by any DIP Loan Party or subsidiary of any DIP Loan Party, and (vi) any claim, litigation, proceeding or investigation instituted or conducted by any governmental body or instrumentality or any other person with respect to any aspect of, or any transaction contemplated by, or referred to in, or any matter related to, this DIP Term Sheet, the DIP Facility, any documents or instruments relating thereto, whether or not the DIP Agent, Fronting Lender or any DIP Lender is a party thereto. |
| **Release** | Each Debtor, for itself and its successors, assigns, parents, subsidiaries, affiliates, predecessors, employees, agents, heirs and executors, as applicable, hereby fully and unconditionally releases each of the DIP Agent,  the DIP Lenders, the Agent under the Existing Facilities, the Lenders under the Existing Facilities, and each of their respective directors, officers, employees, subsidiaries, affiliates, attorneys, agents, representatives, successors and assigns (collectively, the "***Released Parties***") from any and all claims, causes of action, costs or demands of whatever kind or nature, whether known or unknown, liquidated or unliquidated, fixed or contingent, asserted or unasserted, foreseen or unforeseen, or matured or unmatured, which such Debtor may have had against the Released Parties by reason of any act or omission on the part of the Released Parties occurring prior to the date hereof, in each case regarding or relating to this DIP Term Sheet, the DIP Facility, or any document or instrument relating thereto (collectively, the "***Released Matters***"); provided, that Released Matters shall not include any claims, causes of action, costs or demands of whatever kind or nature, whether known or unknown, liquidated or unliquidated, fixed or contingent, asserted or unasserted, foreseen or unforeseen, or matured or unmatured, resulting primarily from the gross negligence or willful misconduct of the Released Parties, as determined by a court of competent jurisdiction in a final and non-appealable judgment or order. Each Debtor represents and warrants that (i) it has no knowledge of any such claims by it against the Released Parties and (ii) that the foregoing constitutes a full and complete release of all such claims. |
| **Assignments:** | The DIP Lenders shall have the right to assign the DIP Loans, subject to the DIP Agent's consent other than (x) any assignment to a DIP Lender or any of its affiliates or (y) any assignment from the Fronting Lender after the initial funding of any DIP Loan. For the avoidance of doubt, no consent of the DIP Borrower shall be required for any assignment. No affiliate of any DIP Loan Party shall become a DIP Lender. |
| | The parties to each assignment shall execute and deliver to the DIP Agent customary assignment documentation reasonably acceptable to the DIP Agent, together with the |

| | |
|---|---|
| | processing and recordation fee of $3,500 (which may be waived in the DIP Agent's sole discretion), and the assignee DIP Lender shall deliver to the DIP Agent an administrative questionnaire, and all required tax forms and "know your customer" documentation; *provided,* that no processing and recordation fee shall be payable for assignments by the Fronting Lender to the DIP Lenders after the initial funding of any DIP Loan.<br><br>In order to comply with the laws, rules, regulations and executive orders in effect from time to time applicable to banking institutions, including, without limitation, those relating to the funding of terrorist activities and money laundering, including Section 326 of the USA PATRIOT Act of the United States, the DIP Agent is required to obtain, verify, record and update certain information relating to individuals and entities which maintain a business relationship with the DIP Agent.  Accordingly, DIP Borrower, each DIP Lender and all assignees hereby agree to provide to the DIP Agent, prior to the date hereof, prior to the effectiveness of any assignment and upon DIP Agent's request from time to time, as applicable, such identifying information and documentation as may be available for such party in order to enable the DIP Agent to collect information required by regulatory authorities under applicable "know your customer" and anti-money laundering rules and regulations, including comply with Section 326 of the USA PATRIOT Act of the United States.  For avoidance of doubt, all assignments hereunder shall be conditioned upon DIP Agent's receipt of all such information from each applicable party and DIP's satisfactory review of the same.<br><br>DIP Agent, acting for this purpose as a non-fiduciary agent of the DIP Borrower, shall maintain at one of its offices a copy of each DIP Loan assignment delivered to it and a register for the recordation of the names and addresses of the DIP Lenders and principal and interest amounts of the DIP Loans owing to each DIP Lender pursuant to the terms hereof from time to time (the "***Register***"). The entries in the Register shall be conclusive absent manifest error, and the DIP Borrower, the DIP Agent and the DIP Lenders shall treat each person whose name is recorded in the Register pursuant to the terms hereof as a DIP Lender hereunder for all purposes of this DIP Term Sheet, notwithstanding notice to the contrary. The Register shall be available for inspection by the DIP Borrower and any DIP Lender at any reasonable time and from time to time upon reasonable prior written notice. |
| **Agency** | The provisions of Article XII of the Existing Credit Agreement, together with all related definitions and ancillary provisions, all as in effect from time to time, are hereby incorporated herein by reference *mutatis mutandis* and shall be deemed to continue in effect (with any amendments, modifications or waivers thereof) for the benefit of the DIP Lenders, the DIP Agent, and the DIP Loan Parties, as applicable, as if (i) each reference therein to "Lender" and similar expressions were references to the DIP Lender under this DIP Facility, (ii) each reference therein to "Agent" and similar expressions were references to the DIP Agent under this DIP Facility, and (iii) each reference to "Agreement" were references to this DIP Facility.<br><br>The DIP Borrower agrees to pay to the DIP Agent for its own account, fees payable in the amounts and at the times separately agreed upon between the DIP Borrower and the DIP Agent pursuant to an agency fee letter between the DIP Borrower and the DIP Agent. |

| | |
|---|---|
| **Governing Law** | The DIP Loan Parties submit to the non-exclusive jurisdiction and venue of the Bankruptcy Court or, in the event that the Bankruptcy Court does not have or does not exercise jurisdiction, then in any state or federal court of competent jurisdiction in the state, county, and city of New York, borough of Manhattan, and shall waive any right to trial by jury.  New York law shall govern this DIP Term Sheet and the DIP Facility (other than security documents to be governed by local law, to be determined by the DIP Agent). |
| **Gaming Regulatory Matters:** | Each of the terms and conditions contained herein shall be subject in all respects to applicable Gaming Laws (as defined in the Existing Credit Agreement). If any such provisions are prohibited or invalid under applicable Gaming Laws (as defined in the Existing Credit Agreement), such provision shall be ineffective to the extent of such prohibition or invalidity without invalidating the remainder of such provisions. |

## Annex I

| | |
|---|---|
| **Interest Rates:** | New Money DIP Loans will bear interest at a rate equal to Term SOFR (subject to a 2.00% floor) plus a margin of 12.50% per annum, payable in cash. |
| | Initial Roll-Up DIP Loans and Incremental Roll-Up DIP Loans will bear interest at Term SOFR (subject to a 2.00% floor) plus a margin of 12.50% per annum, of which (i) SOFR (subject to a 2.00% floor) plus a margin of 1.00% shall be payable in cash and (ii) a margin of 11.50% shall be payable in kind. |
| **Default Interest**: | During the continuance of an Event of Default, the DIP Loans and all other outstanding obligations under the DIP Facility will bear interest at a rate of an additional 3% *per annum* above the interest rate otherwise applicable. |
| **Agency Fees**: | As agreed with the DIP Agent. |

"**SOFR**" means a rate equal to the secured overnight financing rate as administered by the SOFR Administrator.

"**SOFR Administrator**" means the Federal Reserve Bank of New York (or a successor administrator of the secured overnight financing rate).

"**Term SOFR**" shall mean the Term SOFR Reference Rate for a tenor comparable to the applicable interest period on the day (such day, the "**Periodic Term SOFR Determination Day**") that is two (2) U.S. Government Securities Business Days prior to the first day of such Interest Period, as such rate is published by the Term SOFR Administrator; provided, however, that if as of 5:00 p.m. (New York City time) on any Periodic Term SOFR Determination Day the Term SOFR Reference Rate for the applicable tenor has not been published by the Term SOFR Administrator, then Term SOFR will be the Term SOFR Reference Rate for such tenor as published by the Term SOFR Administrator on the first preceding U.S. Government Securities Business Day for which such Term SOFR Reference Rate for such tenor was published by the Term SOFR Administrator so long as such first preceding U.S. Government Securities Business Day is not more than three (3) U.S. Government Securities Business Days prior to such Periodic Term SOFR Determination Day.

"**Term SOFR Administrator**" means CME Group Benchmark Administration Limited as administrator of the Term SOFR Reference Rate (or a successor administrator of the Term SOFR Reference Rate selected by the DIP Agent with the consent of the DIP Borrower).

"**Term SOFR Reference Rate**" means the forward-looking term rate based on SOFR.

"**U.S. Government Securities Business Day**" means any day except for (a) a Saturday, (b) a Sunday or (c) a day on which the Securities Industry and Financial Markets Association recommends that the fixed income departments of its members be closed for the entire day for purposes of trading in United States government securities.

**Annex II**

**[Form of] Notice of Borrowing**

Date: [ ]

To:      DIP Agent under the DIP Term Sheet, dated as of July 15, 2025 (as amended, amended and restated, supplemented or otherwise modified from time to time, the "***DIP Term Sheet***"), among RunItOneTime LLC (f/k/a Maverick Gaming LLC), a Nevada limited liability company ("***DIP Borrower***"), the guarantors from time to time party thereto, the lenders from time to time party thereto, Alter Domus (US) LLC, as DIP Agent, and the other parties party thereto.

Ladies and Gentlemen:

The undersigned DIP Borrower, referring to the DIP Term Sheet (the terms defined therein, being used herein as defined therein), hereby gives you irrevocable notice that DIP Borrower desires to make a borrowing (the "***Proposed Borrowing***") under the DIP Term Sheet, and in connection therewith sets forth below the information relating to the Proposed Borrowing:

(A)      Proposed Borrowing:

      (i)      The Business Day of the Proposed Borrowing is [ ];

      (ii)      The aggregate amount of the Proposed Borrowing is $[ ];

      (iii)      The Proposed Borrowing shall consist of:

            [a $[ ] Initial New Money DIP Loan with an interest period of [ ][1]];
            [a $[ ] Incremental New Money DIP Loan with an interest period of [ ][2]];
            [a $[ ] Initial Roll-Up DIP Loan with an interest period of [ ][3]];
            [a $[ ] Incremental Roll-Up DIP Loan with an interest period of [ ][4]];

      (iv)      The proceeds of the Proposed Borrowing are to be deposited into [the account or accounts described in the letter attached hereto and in the respective amounts set forth therein][the following account:

          Bank:                    _____
          Account Name: _____
          Account #:            _____
          ABA #:                 _____

---

[1] To be the period commencing on the date of such Proposed Borrowing and ending on July 31, 2025.

[2] To be a period of one month or, if such Proposed Borrowing occurs on a day other than the first day of any calendar month, the period commencing on the date of such Proposed Borrowing and ending on the last Business Day of such calendar month.

[3] To be a period of one month or, if such Proposed Borrowing occurs on a day other than the first day of any calendar month, the period commencing on the date of such Proposed Borrowing and ending on the last Business Day of such calendar month.

[4] To be a period of one month or, if such Proposed Borrowing occurs on a day other than the first day of any calendar month, the period commencing on the date of such Proposed Borrowing and ending on the last Business Day of such calendar month.

(B)    Borrower hereby represents and warrants that both immediately before and immediately after giving effect to the Proposed Borrowing and the intended use thereof:

(i)    Each of the representations and warranties made by the DIP Loan Parties in the DIP Term Sheet is true and correct in all material respects on and as of the date of the making of such Proposed Borrowing with the same force and effect as if made on and as of such date (it being understood and agreed that any such representation or warranty which by its terms is made as of an earlier date is true and correct in all material respects only as such earlier date, and that any representation and warranty that is qualified as to "materiality," "Material Adverse Effect" or similar language is true and correct in all respects on the applicable date); and

(ii)    No Default or Event of Default has occurred and is continuing.

**RUNITONETIME LLC**

By:_____
Name:
Title:

**EXHIBIT 2**

**Priority of Liens and Claims**

| | Priority of Liens and Claims on<br>Prepetition Collateral and DIP Collateral (other than Unencumbered Assets) |
|---|---|
| 1) | • Carve-Out |
| 2) | • Permitted Prior Liens |
| 3) | • DIP Liens (including the DIP Liens securing the DIP Rolled-Up Loans) |
| 4) | • Adequate Protection Liens granted to the Prepetition Agent for the benefit of the Prepetition Secured Parties |
| 5) | • Prepetition Liens |

| | Priority of Liens and Claims on Unencumbered Assets of the Debtors |
|---|---|
| 1) | • Carve-Out |
| 2) | • DIP Liens (including the DIP Liens securing the DIP Rolled-Up Loans) |
| 3) | • Adequate Protection Liens granted to the Prepetition Agent for the benefit of the Prepetition Secured Parties |

## **EXHIBIT 3**

**Initial DIP Budget**

**Maverick Gaming**
*Interim DIP Budget*

| Week Ending | Post-Petition 7/20/25 | Post-Petition 7/27/25 | Post-Petition 8/3/25 | Post-Petition 8/10/25 | Post-Petition 4-Week Total |
|---|---|---|---|---|---|
| **Receipts** | | | | | |
| Washington | $ 2,301,212 | $ 2,301,212 | $ 2,488,504 | $ 2,316,724 | $ 9,407,651 |
| Colorado | 805,339 | 805,339 | 818,150 | 826,236 | 3,255,064 |
| Wendover | 817,577 | 817,577 | 869,476 | 899,719 | 3,404,350 |
| Elko | 440,062 | 440,062 | 450,526 | 456,624 | 1,787,274 |
| Egads | 285,796 | 314,875 | 421,056 | 198,657 | 1,220,384 |
| **Total Operating Receipts** | $ 4,649,986 | $ 4,679,065 | $ 5,047,712 | $ 4,697,960 | $ 19,074,723 |
| Other | - | - | - | - | - |
| **Total Receipts** | $ 4,649,986 | $ 4,679,065 | $ 5,047,712 | $ 4,697,960 | $ 19,074,723 |
| *Methodology Disbursements* | | | | | |
| Payroll & Benefits | $ 3,545,010 | $ 1,849,334 | $ 3,545,010 | $ 1,849,334 | $ 10,788,688 |
| Rent | - | - | - | 2,618,087 | 2,618,087 |
| Insurance | - | - | - | - | - |
| Information Technology | 24,286 | 24,286 | 24,286 | 24,286 | 97,143 |
| Utilities | 100,478 | 100,478 | 100,478 | 100,478 | 401,911 |
| Other | 20,000 | 20,000 | 20,000 | 20,000 | 80,000 |
| **Total Methodology Disbursements** | $ 3,689,773 | $ 1,994,098 | $ 3,689,773 | $ 4,612,185 | $ 13,985,829 |
| *Non-Methodology Disbursements* | | | | | |
| Gaming Participation & Equipment Fees | $ 68,342 | $ 68,342 | $ 68,342 | $ 68,342 | $ 273,367 |
| Food & Beverage | 113,528 | 113,528 | 113,528 | 113,528 | 454,112 |
| Repairs & Maintenance | 18,169 | 18,169 | 18,169 | 18,169 | 72,675 |
| Professional Services | 13,833 | 13,833 | 13,833 | 13,833 | 55,332 |
| Tax | 350,000 | - | - | 2,748,176 | 3,098,176 |
| Supplies | 13,282 | 13,282 | 13,282 | 13,282 | 53,129 |
| Advertising & Marketing | 18,060 | 18,060 | 18,060 | 18,060 | 72,240 |
| General Corporate | 146,945 | 146,945 | 146,945 | 146,945 | 587,782 |
| Corporate Allocations | 44,764 | 44,764 | 44,764 | 44,764 | 179,057 |
| Egads Material Costs | 350,395 | 48,073 | 112,745 | 319,828 | 831,040 |
| Egads Other | 20,000 | 20,000 | 20,000 | 20,000 | 80,000 |
| **Total Non-Methodology Disbursements** | $ 1,157,318 | $ 504,996 | $ 569,668 | $ 3,524,927 | $ 5,756,909 |
| **Operating Cash Flow** | (197,105) | 2,179,971 | 788,271 | (3,439,153) | (668,015) |
| **Cumulative Operating Cash Flow** | (197,105) | 1,982,867 | 2,771,137 | (668,015) | (668,015) |
| **Critical Vendors & 503(b)(9)** | | | | | |
| Critical Vendors | $ 350,974 | $ 350,974 | $ 350,974 | $ 350,974 | $ 1,403,895 |
| 503(b)(9) | 110,205 | 110,205 | 110,205 | 110,205 | 440,820 |
| **Total Critical Vendors & 503(b)(9)** | $ 461,179 | $ 461,179 | $ 461,179 | $ 461,179 | $ 1,844,715 |
| *Non-Operating* | | | | | |
| DIP Loan and 1L Rollup Interest | $ - | $ - | $ 97,271 | $ - | $ 97,271 |
| Capital Expenditures | 25,000 | 25,000 | 25,000 | 25,000 | 100,000 |
| **Total Non-Operating Disbursements** | $ 25,000 | $ 25,000 | $ 122,271 | $ 25,000 | $ 197,271 |
| *Restructuring Disbursements* | | | | | |
| Restructuring Professionals | $ 1,590,000 | $ 912,500 | $ 1,725,000 | $ 985,000 | $ 5,212,500 |
| Other | - | - | - | - | - |
| **Total Restructuring Disbursements** | $ 1,590,000 | $ 912,500 | $ 1,725,000 | $ 985,000 | $ 5,212,500 |
| **Total Disbursements** | $ 6,923,270 | $ 3,897,773 | $ 6,567,891 | $ 9,608,291 | $ 26,997,225 |
| **Liquidity** | | | | | |
| Beginning Bank Cash Balance | $ 16,809,496 | $ 23,036,212 | $ 23,817,505 | $ 22,297,325 | $ 16,809,496 |
| (-) Restricted Cash - Regulatory Cash (as of 7/11/25) | (7,753,329) | (7,753,329) | (7,753,329) | (7,753,329) | (7,753,329) |
| (-) Restricted Cash - Progressive Funds (as of 7/11/25) | (5,982,391) | (5,982,391) | (5,982,391) | (5,982,391) | (5,982,391) |
| (-) Deposits in ATM & in Transit (as of 7/11/25) | (2,164,871) | (2,164,871) | (2,164,871) | (2,164,871) | (2,164,871) |
| (-) O/S Checks (as of 7/11/25) | (403,898) | (403,898) | (403,898) | (403,898) | (403,898) |
| **Beginning "Usable" Book Cash Balance** | $ 505,007 | $ 6,731,723 | $ 7,513,016 | $ 5,992,837 | $ 505,007 |
| Net Cash Flow | (2,273,284) | 781,293 | (1,520,179) | (4,910,332) | (7,922,502) |
| DIP Funding | 8,500,000 | - | - | - | 8,500,000 |
| **Ending "Usable" Book Cash Balance** | $ 6,731,723 | $ 7,513,016 | $ 5,992,837 | $ 1,082,505 | $ 1,082,505 |
| **Debt Rollforward** | | | | | |
| **Beginning DIP Balance** | $ - | $ 9,350,000 | $ 9,350,000 | $ 9,350,000 | $ - |
| DIP Funding | 8,500,000 | - | - | - | 8,500,000 |
| PIK Upfront Fees (10%) | 850,000 | - | - | - | 850,000 |
| **Ending DIP Balance** | $ 9,350,000 | $ 9,350,000 | $ 9,350,000 | $ 9,350,000 | $ 9,350,000 |
| **DIP Cash Interest (SOFR + 12.5%)** | $ - | $ - | $ 60,775 | $ - | $ 60,775 |
| **Beginning 1L Balance** | $ - | $ 17,572,358 | $ 17,572,358 | $ 17,679,819 | $ - |
| 1L Roll-up | 17,572,358 | - | - | - | 17,572,358 |
| 1L PIK Interest (SOFR + 11.5%) | - | - | 107,462 | - | 107,462 |
| **Ending 1L Balance** | $ 17,572,358 | $ 17,572,358 | $ 17,679,819 | $ 17,679,819 | $ 17,679,819 |
| **1L Roll-up Interest (SOFR + 1.0%)** | $ - | $ - | $ 36,496 | $ - | $ 36,496 |

# EXHIBIT 4

## Milestones

As may be extended by the Required Backstop Lenders[5] in their sole discretion, each of the Debtors agree to comply with the following Milestones unless superseded by the Final Order:

(a)  commencement of the Chapter 11 Cases no later than July 14, 2025;

(b)  no later than the Petition Date, file a "first day" motion and proposed order to approve the DIP Facility;

(c)  no later than seven (7) calendar days after the Petition Date, each of the DIP Loan Parties shall deliver to the DIP Agent a fully executed credit agreement in form and substance satisfactory to the Required Backstop Parties (the "***DIP Credit Agreement***") (it being understood that such DIP Credit Agreement shall substantially conform to the terms and provisions of this DIP Term Sheet, with such other provisions as may be required by the Required Backstop Parties, and that each DIP Lender shall be deemed to have executed such DIP Credit Agreement and any other related loan documents (collectively, the "***DIP Loan Documents***") (and shall deliver executed signature pages thereto) to the extent such DIP Credit Agreement and related loan documents are approved by the Required Backstop Parties);

(d)  obtain entry by Bankruptcy Court of the Interim Order no later than two (2) business days after the Petition Date;

(e)  no later than seven (7) calendar days after the Petition Date, file a sale motion (the "***Sale Motion***") and bid procedures motion (the "***Sale Procedures Motion***") in form and substance acceptable to the Required Backstop Parties for (i) the sale of substantially all of the DIP Loan Parties' assets, (ii) the procedures for designating one or more stalking horse bidders and (iii) approving a credit bid of the Agent and DIP Agent on behalf of the Lenders and DIP Lenders, as a "qualified bidder" for all of the Debtors' assets under the Sales Procedure Motion;

(f)  by the earlier of (i) twenty-one (21) calendar days after the Petition Date and (y) seven (7) calendar days before the hearing to consider approval of the Final Order, the Debtors shall have proposed, and the Required Backstop Parties shall have agreed to such proposal in their sole discretion, (i) a forecast of anticipated cash receipts and disbursements, to be set forth on a weekly and monthly basis, including the anticipated uses of the DIP Facility, through the conclusion of an Acceptable Restructuring (each as approved by the Required Backstop Parties in their sole discretion, an "***Acceptable Final Budget***"), (ii) a bankruptcy plan, sale process, or other disposition of the Chapter 11 Cases or the Debtors' assets in form and substance satisfactory to the Required Backstop Parties in their sole discretion (an "***Acceptable Restructuring***"), and (iii) the principal amount of the Incremental New Money DIP Loans in an amount satisfactory to the Required Backstop Parties in their sole discretion (the "***Acceptable Incremental Amount***") and Incremental Roll-Up DIP Loans;

(g)  within twenty-five (25) calendar days after the Petition Date, obtain entry by the Bankruptcy Court of the Final Order, which will contain additional milestones agreed between the Debtors and the Required Backstop Parties necessary to pursue an Acceptable Restructuring;

(h)  if necessary for an Acceptable Restructuring and unless superseded by the Final Order, request a

---

[5] Capitalized terms used but not defined in this <u>Exhibit 4</u> have the meanings provided in the DIP Term Sheet.

hearing on the Sale Procedures Motion to occur within thirty (30) days after the Petition Date;

(i)     if necessary for an Acceptable Restructuring and unless superseded by the Final Order, obtain entry by the Bankruptcy Court of an order (in form and substance acceptable to the Required Backstop Parties) with respect to the Sale Procedures Motion no later than thirty-five (35) calendar days after the Petition Date (the "***Sale Procedures Order***"), which Sale Procedures Order shall (w) approve the relief requested in the Sale Motion, (x) set a bid deadline of no later than sixty-five (65) calendar days after the Petition Date, (y) require an auction (if applicable) to occur no later than seventy (70) calendar days after the Petition Date, and (z) set a hearing date on the DIP Loan Parties' Sale Motion no later than seventy-five (75) calendar days after the Petition Date; and

(j)     if necessary for an Acceptable Restructuring and unless superseded by the Final Order, within eighty (80) calendar days after the Petition Date, satisfy all conditions precedent necessary to consummate a sale of all or substantially all of the Debtors' assets, other than approvals by the Washington, Nevada, and Colorado gaming regulators, unless the Backstop Parties agree to a different disposition of MainCo (as defined in the TSA).