## Exhibit A

**Master Lease**

*Execution Version*

# **<u>MASTER LEASE</u>**

TABLE OF CONTENTS
TO
MASTER LEASE

Page

### ARTICLE I

| | | |
|---|---|---|
| 1.1 | Leased Property. | 1 |
| 1.2 | Single, Indivisible Lease. | 2 |
| 1.3 | Term. | 2 |
| 1.4 | Renewal Terms. | 2 |
| 1.5 | Advertisement. | 3 |

### ARTICLE II

| | | |
|---|---|---|
| 2.1 | Definitions. | 3 |

### ARTICLE III

| | | |
|---|---|---|
| 3.1 | Rent. | 31 |
| 3.2 | Late Payment of Rent. | 31 |
| 3.3 | Method of Payment of Rent. | 32 |
| 3.4 | Net Lease. | 32 |

### ARTICLE IV

| | | |
|---|---|---|
| 4.1 | Impositions. | 32 |
| 4.2 | Utilities. | 33 |
| 4.3 | Impound Account. | 34 |

### ARTICLE V

| | | |
|---|---|---|
| 5.1 | No Termination, Abatement, etc. | 34 |

### ARTICLE VI

| | | |
|---|---|---|
| 6.1 | Ownership of the Leased Property. | 35 |
| 6.2 | Operating Property. | 36 |
| 6.3 | Guarantors. | 36 |

### ARTICLE VII

| | | |
|---|---|---|
| 7.1 | Condition of the Leased Property. | 37 |
| 7.2 | Use of the Leased Property. | 37 |
| 7.3 | Competing Business. | 38 |
| 7.4 | Sublease. | 39 |

## ARTICLE VIII

8.1     Representations and Warranties..................................................................... 40
8.2     Compliance with Legal and Insurance Requirements, etc............................. 40
8.3     Zoning and Uses. ......................................................................................... 41

## ARTICLE IX

9.1     Maintenance and Repair. ............................................................................. 41
9.2     Encroachments, Restrictions, Mineral Leases, etc...................................... 44

## ARTICLE X

10.1    Construction of Capital Improvements to the Leased Property..................... 44
10.2    Construction Requirements for All Capital Improvements. .......................... 45
10.3    Landlord's Right of First Offer to Fund. ...................................................... 46
10.4    Room Renovation. ....................................................................................... 48

## ARTICLE XI

11.1    Liens............................................................................................................. 49

## ARTICLE XII

12.1    Permitted Contests. ..................................................................................... 51

## ARTICLE XIII

13.1    General Insurance Requirements. ................................................................. 52
13.2    Ground Lease Insurance. ............................................................................. 54
13.3    Additional Insurance.................................................................................... 54
13.4    Waiver of Subrogation................................................................................. 54
13.5    Policy Requirements. ................................................................................... 55
13.6    Increase in Limits......................................................................................... 55
13.7    Blanket Policy.............................................................................................. 55
13.8    No Separate Insurance. ................................................................................ 56
13.9    Post-Closing Insurance Period ..................................................................... 56

## ARTICLE XIV

14.1    Property Insurance Proceeds........................................................................ 56
14.2    Tenant's Obligations Following Casualty. ................................................... 57
14.3    No Abatement of Rent. ................................................................................ 57
14.4    Waiver.......................................................................................................... 57
14.5    Insurance Proceeds Paid to Landlord or Facility Mortgagee........................ 57

**ARTICLE XV**

15.1   Condemnation. ........................................................................................ 58
15.2   Award Distribution. ............................................................................... 58
15.3   Temporary Taking. ................................................................................ 59
15.4   [Reserved]. ............................................................................................ 59
15.5   Termination of Master Lease; Abatement of Rent. ............................... 59

**ARTICLE XVI**

16.1   Events of Default. .................................................................................. 59
16.2   Certain Remedies. .................................................................................. 62
16.3   Damages. ................................................................................................ 64
16.4   Receiver. ................................................................................................ 65
16.5   Waiver. ................................................................................................... 65
16.6   Application of Funds.............................................................................. 65

**ARTICLE XVII**

17.1   Permitted Leasehold Mortgagees........................................................... 65
17.2   Landlord's Right to Cure Tenant's Default. ........................................... 73
17.3   Landlord's Right to Cure Debt Agreement............................................ 73

**ARTICLE XVIII**

18.1   Sale of the Leased Property. .................................................................. 73

**ARTICLE XIX**

19.1   Holding Over. ........................................................................................ 74

**ARTICLE XX**

20.1   Risk of Loss. .......................................................................................... 74

**ARTICLE XXI**

21.1   General Indemnification. ....................................................................... 75

**ARTICLE XXII**

22.1   Subletting and Assignment. ................................................................... 75
22.2   Permitted Assignments. ......................................................................... 77
22.3   Permitted Sublease Agreements. ........................................................... 80
22.4   Required Assignment and Subletting Provisions................................... 80
22.5   Costs....................................................................................................... 81
22.6   No Release of Tenant's Obligations; Exception..................................... 81

**ARTICLE XXIII**

23.1   Officer's Certificates and Financial Statements. .............................................. 82
23.2   Confidentiality; Public Offering Information. ................................................... 84
23.3   Restricted Payments; Indebtedness; Additional Escrow ..................................... 85
23.4   Landlord Obligations. ...................................................................................... 87

**ARTICLE XXIV**

24.1   Landlord's Right to Inspect. ............................................................................ 88

**ARTICLE XXV**

25.1   No Waiver. ...................................................................................................... 88

**ARTICLE XXVI**

26.1   Remedies Cumulative. ..................................................................................... 89

**ARTICLE XXVII**

27.1   Acceptance of Surrender. ................................................................................. 89

**ARTICLE XXVIII**

28.1   No Merger. ...................................................................................................... 89

**ARTICLE XXIX**

29.1   Conveyance by Landlord. ................................................................................. 89

**ARTICLE XXX**

30.1   Quiet Enjoyment. ............................................................................................ 89

**ARTICLE XXXI**

31.1   Landlord's Financing. ...................................................................................... 90
31.2   Attornment. ..................................................................................................... 91
31.3   Compliance with Facility Mortgage Documents. .............................................. 91

**ARTICLE XXXII**

32.1   Environmental Violations. ................................................................................ 93
32.2   Notices. ........................................................................................................... 93
32.3   Remediation. ................................................................................................... 93
32.4   Indemnity by Tenant. ....................................................................................... 94
32.5   Environmental Inspections. .............................................................................. 95
32.6   Representations and Warranties ........................................................................ 96

32.7    Storage Tanks..................................................................................................... 96
32.8    Survival ............................................................................................................... 97

## ARTICLE XXXIII

33.1    Memorandum of Lease ......................................................................................... 97
33.2    Tenant Financing ................................................................................................. 97

## ARTICLE XXXIV

## ARTICLE XXXV

35.1    Notices. ................................................................................................................ 97

## ARTICLE XXXVI

36.1    Transfer of Operating Property and Operational Control of the Facilities. ...................... 98
36.2    Determination of Successor Tenant and Gaming Assets FMV. ....................... 99
36.3    Operation Transfer. ........................................................................................... 101

## ARTICLE XXXVII

37.1    Attorneys' Fees. ................................................................................................ 101

## ARTICLE XXXVIII

38.1    Brokers. .............................................................................................................. 101

## ARTICLE XXXIX

39.1    Anti-Terrorism Representations......................................................................... 102

## ARTICLE XL

40.1    REIT Protections................................................................................................ 102

## ARTICLE XLI

41.1    Tenant Bankruptcy............................................................................................. 103

## ARTICLE XLII

42.1    Survival. ............................................................................................................. 105
42.2    Severability. ....................................................................................................... 105
42.3    Non-Recourse; Consequential Damages............................................................ 105
42.4    Successors and Assigns...................................................................................... 106
42.5    Governing Law. ................................................................................................. 106
42.6    Waiver of Trial by Jury...................................................................................... 106
42.7    Entire Agreement. .............................................................................................. 106

42.8     Headings. ........................................................................................................ 107

42.9     Counterparts. ................................................................................................... 107

42.10   Interpretation. .................................................................................................. 107

42.11   Time of Essence. ............................................................................................. 107

42.12   Further Assurances. ......................................................................................... 107

42.13   Gaming Regulations. ....................................................................................... 107

42.14   Certain Provisions of Nevada Law. ................................................................ 108

42.15   Certain Provisions of Utah Law. ..................................................................... 109

42.16   Certain Provisions of Colorado Law. .............................................................. 109

42.17   Tenant and Landlord; Joint and Several ......................................................... 109

**EXHIBITS AND SCHEDULES**

EXHIBIT A – LIST OF FACILITIES

EXHIBIT B – LEGAL DESCRIPTIONS

EXHIBIT C – GAMING LICENSES

EXHIBIT D – FORM OF GUARANTY OF MASTER LEASE

EXHIBIT E – FORM OF NONDISTURBANCE AND ATTORNMENT AGREEMENT

EXHIBIT F – FORM OF SUBORDINATION, NONDISTURBANCE AND ATTORNMENT AGREEMENT

EXHIBIT G – LEGAL DESCRIPTION OF GROUND LEASE PREMISES

EXHIBIT H – LEGAL DESCRIPTION OF PARCEL A


SCHEDULE A – LANDLORD ENTITIES

SCHEDULE B – TENANT ENTITIES

SCHEDULE C – DISCLOSURE ITEMS

SCHEDULE D – PROPERTY AGREEMENTS

SCHEDULE E – OPERATING SUBTENANTS

SCHEDULE F – ONGOING CAPITAL IMPROVEMENTS

SCHEDULE 6.3 – GUARANTORS

SCHEDULE 9.1(a) – IMMEDIATE REPAIRS

SCHEDULE 10.1 – ALTERATION THRESHOLDS

SCHEDULE 10.4 – ROOM RENOVATION SCOPE OF WORK

SCHEDULE 15.5 – PERCENT ALLOCATION OF RENT

# MASTER LEASE

This MASTER LEASE (this "**Master Lease**") is entered into as of September 3, 2021, by and among the entities listed on <u>Schedule A</u> attached hereto (collectively, and together with their respective permitted successors and assigns, "**Landlord**"), and the entities listed on <u>Schedule B</u> attached hereto (collectively, and together with their respective permitted successors and assigns, "**Tenant**").

## RECITALS

A.      On the date hereof, Landlord acquired the Leased Property.

B.      Landlord desires to lease to Tenant, and Tenant desires to lease from Landlord, the Leased Property on the terms, and subject to the conditions, set forth in this Master Lease.

C.      A list of the four (4) facilities covered by this Master Lease as of the date hereof is attached hereto as <u>Exhibit A</u> (each a "**Facility**," and collectively, the "**Facilities**").

D.      Capitalized terms used in this Master Lease and not otherwise defined herein are defined in <u>Article II</u> hereof.

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

## ARTICLE I

**1.1      Leased Property.**  Upon and subject to the terms and conditions hereinafter set forth, Landlord leases to Tenant and Tenant leases from Landlord all of Landlord's rights and interest in and to the following (collectively, the "**Leased Property**"):

(a)      the fee and leasehold interests in the real property or properties described in <u>Exhibit B</u> attached hereto (collectively, the "**Land**");

(b)      all buildings, structures, Fixtures (as hereinafter defined) and other improvements of every kind now or hereafter located on the Land or connected thereto including, but not limited to, alleyways and connecting tunnels, sidewalks, utility pipes, conduits and lines (on-site and off-site to the extent Landlord has obtained any interest in the same), parking areas and roadways appurtenant to such buildings and structures (collectively, the "**Leased Improvements**");

(c)      all easements, rights and appurtenances relating to the Land and the Leased Improvements; and

(d)      all equipment, machinery, fixtures, and other items of property, including all components thereof, that (i) are now or hereafter located in, on or used in connection with and permanently affixed to or otherwise incorporated into the Leased Improvements and (ii) qualify as

Long-Lived Assets, together with all replacements, modifications, alterations and additions thereto (collectively, the "**Fixtures**").

The Leased Property is leased subject to all covenants, conditions, restrictions, easements and other matters affecting the Leased Property as of the Commencement Date (including, without limitation, the Ground Lease) and such subsequent covenants, conditions, restrictions, easements and other matters as may be agreed to by Landlord or Tenant in accordance with the terms of this Master Lease, whether or not of record, including any matters which would be disclosed by an inspection or accurate survey of the Leased Property.

1.2     **Single, Indivisible Lease.**  Notwithstanding anything contained herein to the contrary, this Master Lease constitutes one indivisible lease of the Leased Property and not separate leases governed by similar terms.  The Leased Property constitutes one economic unit, and the Rent and all other provisions have been negotiated and agreed to be based on a demise of all of the Leased Property to Tenant as a single, composite, inseparable transaction and would have been substantially different had separate leases or a divisible lease been intended.  Except as expressly provided in this Master Lease for specific, isolated purposes (and then only to the extent expressly otherwise stated), all provisions of this Master Lease apply equally and uniformly to all of the Leased Property as one unit.  An Event of Default with respect to any portion of the Leased Property is an Event of Default as to all of the Leased Property.  The parties intend that the provisions of this Master Lease shall at all times be construed, interpreted and applied so as to carry out their mutual objective to create an indivisible lease of all of the Leased Property and, in particular (but without limitation), that, for purposes of any assumption, rejection or assignment of this Master Lease under 11 U.S.C. Section 365, or any successor or replacement thereof or any analogous state law, this is one indivisible and non-severable lease and executory contract dealing with one legal and economic unit and that this Master Lease must be assumed, rejected or assigned as a whole with respect to all (and only as to all) of the Leased Property.  The parties may amend this Master Lease from time to time to include property with respect to one or more additional Facilities as part of the Leased Property and such future addition to the Leased Property shall not in any way change the indivisible and nonseverable nature of this Master Lease and all of the foregoing provisions shall continue to apply in full force.

1.3     **Term.**  The "**Term**" of this Master Lease is the Initial Term *plus* all Renewal Terms, to the extent exercised.  The initial term of this Master Lease (the "**Initial Term**") commenced on September 3, 2021 (the "**Commencement Date**") and shall end on September 30, 2041, subject to renewal as set forth in Section 1.4 below.

1.4     **Renewal Terms.**  The term of this Master Lease may be extended for four (4) separate "**Renewal Terms**" of seven (7) years each if:  (a) at least eighteen (18), but not more than twenty-four (24) months prior to the end of the then current Term, Tenant delivers to Landlord a Notice that it desires to exercise its right to extend this Master Lease for one (1) Renewal Term (a "**Renewal Notice**"); and (b) no Event of Default shall have occurred and be continuing on the date Landlord receives the Renewal Notice (the "**Exercise Date**") or on the last day of the then current Term.  During any such Renewal Term, except as otherwise specifically provided for herein, all of the terms and conditions of this Master Lease shall remain in full force and effect.

Tenant may exercise such options to renew with respect to all (and not less than all) of the Leased Property as of the applicable Exercise Date.

   **1.5** **Advertisement.** (a) If the applicable notice period set forth in <u>Section 1.4</u> elapses without Tenant having exercised its option to extend the then current Term, (b) less than twenty-four months remaining in the final Renewal Term or (c) an Event of Default has occurred and is continuing, then Landlord shall have the right during the remainder of the Term then in effect or during the pendency of such Event of Default, as applicable, to (i) advertise the availability of any of the Leased Property for sale or reletting and to erect upon such Leased Property signs (at Landlord's sole cost and expense, and at a location that will not interfere with Tenant's business), indicating such availability and (ii) show such Leased Property to prospective purchasers or tenants or their agents at such reasonable times upon prior reasonable notice to Tenant.

**ARTICLE II**

   **2.1** **Definitions.** For all purposes of this Master Lease, except as otherwise expressly provided or unless the context otherwise requires: (i) the terms defined in this <u>Article II</u> have the meanings assigned to them in this Article and include the plural as well as the singular; (ii) all accounting terms not otherwise defined herein have the meanings assigned to them in accordance with GAAP; (iii) all references in this Master Lease to designated "Articles," "Sections" and other subdivisions are to the designated Articles, Sections and other subdivisions of this Master Lease; (iv) the word "including" shall have the same meaning as the phrase "including, without limitation," and other similar phrases; (v) the words "herein," "hereof" and "hereunder" and other words of similar import refer to this Master Lease as a whole and not to any particular Article, Section or other subdivision; (vi) all Exhibits, Schedules and other attachments annexed to the body of this Master Lease are hereby deemed to be incorporated in and made an integral part of this Master Lease; (vii) the word "or" is not exclusive; (viii) for the calculation of any financial ratios or tests referenced in this Master Lease (including the Adjusted Revenue to Rent Ratio, Indebtedness to EBITDA Ratio, Rent Service Coverage Ratio and Total Leverage Ratio), neither this Master Lease nor any other Gaming Lease, regardless of their respective treatment under GAAP, shall be deemed to be an operating lease (and shall not be treated as Indebtedness) and the Rent or rent payable hereunder or thereunder shall be treated as an operating expense and shall not constitute Indebtedness or interest expense.

   "<u>Accounts</u>": All accounts, including deposit accounts and any Facility Mortgage Reserve Account (to the extent actually funded by Tenant), all rents, profits, income, revenues or rights to payment or reimbursement derived from the use of any space within the Leased Property and/or from goods sold or leased or services rendered from the Leased Property (including, without limitation, from goods sold or leased or services rendered from the Leased Property by any subtenant) and all accounts receivable, in each case whether or not evidenced by a contract, document, instrument or chattel paper and whether or not earned by performance, including, without limitation, the right to payment of management fees and all proceeds of the foregoing.

US-DOCS\124041687.41

"Additional Charges":  All Impositions, all amounts owed by Landlord under the Ground Lease and all other amounts, liabilities and obligations which Tenant assumes or agrees to pay under this Master Lease and, in the event of any failure on the part of Tenant to pay any of those items (except (i) to the extent that such failure is due to the wrongful acts or omissions of Landlord and (ii) where Tenant shall have furnished Landlord with no less than ten (10) days' Notice of any such act or omission of which Tenant is aware), every fine, penalty, interest and cost which may be added for non-payment or late payment of such items.

"Additional Escrow Account Cap":  As defined in Section 23.3(c)(i).

"Additional Escrow Account":  An escrow account established by Tenant with a reputable, nationally recognized title insurance company selected by Tenant and approved by Landlord (such approval not to be unreasonably withheld, conditioned or delayed).

"Additional Escrow Account Instructions":  Whenever Tenant has caused Excess Cash Flow to be deposited into an Additional Escrow Account in accordance with Section 23.3(c), irrevocable escrow instructions (reasonably satisfactory to Landlord) to the title company holding the Additional Escrow Account to (i) hold the funds deposited into such account in escrow, (ii) release directly to Landlord an amount of such funds that is equal to the difference between the full amount of an installment of Rent that Tenant has failed to pay when due and any amount paid by Tenant to Landlord with respect to such installment of Rent promptly upon written demand by Landlord certifying that Tenant has not paid the full amount of such installment of Rent when due (without any further instructions, action or approval from Tenant) and (iii) release directly to Tenant's Parent all of such funds promptly upon the receipt of written instructions from Landlord (which Landlord shall execute and promptly deliver following the Specified Covenant Termination Date or the expiration or termination of this Master Lease).

"Adjusted Revenue":  For any Test Period, Net Revenue (i) *minus* expenses other than Specified Expenses and (ii) *plus* Specified Proceeds, if any; provided, however, that for purposes of calculating Adjusted Revenue, Net Revenue shall not include Gaming Revenues, Retail Sales or Promotional Allowances of any subtenants of Tenant or any deemed payments under subleases of this Master Lease, licenses or other access rights from Tenant to its operating subsidiaries.  Adjusted Revenue for the Leased Property shall be calculated on a pro forma basis to give effect to any increase or decrease in Rent as a result of the addition or removal of Leased Property to this Master Lease since the beginning of any Test Period of Tenant as if each such increase or decrease had been effected on the first day of such Test Period.  For purposes of calculating the Adjusted Revenue to Rent Ratio, if any Facility is closed to the public for more than fifteen (15) days as a result of an Unavoidable Delay which prevents the operation of, or causes a circumstance which has a material adverse effect on the ability to operate, such Facility for the Primary Intended Use during any fiscal quarter of any Test Period, then (i) the Adjusted Revenue attributable to such Facility in respect of such fiscal quarter shall be excluded from the calculation of Adjusted Revenue for such Test Period and (ii) the Adjusted Revenue attributable to such Facility during any fiscal quarters of such Test Period during which such Facility is not closed to the public for more than fifteen (15) days shall be annualized as follows for purposes of calculating Adjusted Revenue for such Test Period: (A) if such Facility is not closed to the public for more than fifteen (15) days in any of the remaining three (3) fiscal quarters of such Test Period, then the aggregate Adjusted Revenue attributable to such Facility for such quarters shall be

US-DOCS\124041687.41

multiplied by 4/3, (B) if such Facility is not closed to the public for more than fifteen (15) days in only two (2) fiscal quarters of such Test Period, then the aggregate Adjusted Revenue attributable to such Facility for such quarters shall be multiplied by 2 and (C) if such Facility is not closed to the public for more than fifteen (15) days in only one (1) fiscal quarter of such Test Period, then the Adjusted Revenue attributable to such Facility for such quarter shall be multiplied by 4.

"<u>Adjusted Revenue to Rent Ratio</u>":  As at any date of determination, the ratio of (a) Adjusted Revenue for the Test Period most recently ended prior to such date for which financial statements are available to (b) the Rent as of the last day of such Test Period.  For purposes of calculating the Adjusted Revenue to Rent Ratio, Adjusted Revenue shall be calculated on a pro forma basis (and shall be calculated to give effect to (x) pro forma adjustments reasonably contemplated by Tenant and (y) such other pro forma adjustments consistent with Regulation S-X under the Securities Act) to give effect to any material acquisitions and material asset sales consummated by Tenant or any Guarantor during any Test Period of Tenant as if each such material acquisition had been effected on the first day of such Test Period and as if each such material asset sale had been consummated on the day prior to the first day of such Test Period.  In addition, Adjusted Revenue and Rent shall be calculated on a pro forma basis to give effect to any increase or decrease in Rent as a result of the addition of Leased Property to, or the removal of Leased Property from, this Master Lease during any Test Period as if such increase or decrease had been effected on the first day of such Test Period.

"<u>Administrative Agent</u>":  As defined in the definition of Tenant Existing Debt Agreement.

"<u>Affiliate</u>":  When used with respect to any corporation, limited liability company, or partnership, the term "Affiliate" shall mean (i) any person which, directly or indirectly, controls or is controlled by or is under common control with such corporation, limited liability company or partnership and (ii) with respect to Tenant and/or Guarantor, each Operating Subtenant under a Specified Operating Sublease in effect at the time of determination.  For the purposes of this definition, "control" (including the correlative meanings of the terms "controlled by" and "under common control with"), as used with respect to any Person, shall mean ownership of more than 50% of the outstanding voting stock of a corporation or other majority equity and control interest if such Person is not a corporation or the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such person, through the ownership of voting securities, partnership interests or other equity interests.

"<u>AG</u>":  Angelo, Gordon & Co., LP.

"<u>Alteration Threshold</u>" means the amount set forth on <u>Schedule 10.1</u> with respect to the applicable Facility.

"<u>Award</u>":  All compensation, sums or anything of value awarded, paid or received on a total or partial Taking.

"<u>Bankruptcy Code</u>" means the United States Bankruptcy Reform Act of 1998, as amended, or any similar law or statute of the United States or any state thereof.

US-DOCS\124041687.41

"Beginning CPI":  As defined in the definition of Renewal Term CPI-Based Escalator.

"Business Day":  Each Monday, Tuesday, Wednesday, Thursday and Friday which is not a day on which national banks in the City of New York, New York or Las Vegas, Nevada are authorized, or obligated, by law or executive order, to close.

"Capital Improvements":  With respect to any Facility, any improvements or alterations or modifications of the Leased Improvements, including, without limitation, capital improvements and structural alterations, modifications or improvements, or one or more additional structures annexed to any portion of any of the Leased Improvements of such Facility, or the expansion of existing improvements, which are constructed on any parcel or portion of the Land of such Facility, during the Term, including construction of a new wing or new story, all of which shall constitute a portion of the Leased Improvements and Leased Property hereunder in accordance with Section 10.3.  Notwithstanding the foregoing, for purposes of Article X only, "Capital Improvements" shall not include (x) those certain improvements, alterations, modifications or expansions set forth on Schedule F which commenced prior to the Term, it being agreed, for the avoidance of doubt, such improvements, alterations, modifications or expansions shall be deemed part of the Leased Property and the Facilities for all purposes hereunder or (y) the installation, modification, repair or replacement of machinery and other furniture, fixtures and equipment at a Facility unless, the nature of such installation, modification, repair or replacement (or any potion thereof) would require an alteration or modification to a structural component of the Leased Improvements.  For the avoidance of doubt, for the purposes of Section 10.1, the items described in the preceding clause (y) shall not count against the Alteration Threshold whether or not undertaken in connection with a Capital Improvement project.

"Capital Lease Obligations":  With respect to any Person and its Subsidiaries on a consolidated basis for any period, the obligations of such Person and its Subsidiaries on a consolidated basis to pay rent or other amounts under any lease of (or other similar arrangement conveying the right to use) real or personal property, or a combination thereof, which obligations have been or should be classified and accounted for as capital leases on a balance sheet of such Person under GAAP (as in effect on the date hereof) and, for purposes hereof, the amount of such obligations at any time shall be the capitalized amount thereof at such time determined in accordance with GAAP (as in effect on the date hereof).

"Cash":  Cash and cash equivalents and all instruments evidencing the same or any right thereto and all proceeds thereof.

"Casualty Event":  Any loss of title or any loss of or damage to or destruction of, or any condemnation or other taking (including by any governmental authority) of, any asset for which Tenant or any of its Subsidiaries (directly or through Tenant's Parent) receives cash insurance proceeds or proceeds of a condemnation award or other similar compensation (excluding proceeds of business interruption insurance).  "Casualty Event" shall include, but not be limited to, any taking of all or any part of any real property of Tenant or any of its Subsidiaries or any part thereof, in or by condemnation or other eminent domain proceedings pursuant to any applicable law, or by reason of the temporary requisition of the use or occupancy of all or any part of any real

property of Tenant or any of its Subsidiaries or any part thereof by any governmental authority, civil or military.

"Change in Control":  (i) Any Person or "group" (within the meaning of Rules 13d-3 and 13d-5 under the Securities Exchange Act of 1934, as amended from time to time, and any successor statute) other than one or more EP Affiliates (a) shall have acquired direct or indirect beneficial ownership or control of fifty percent (50%) or more, on a fully diluted basis, of the direct or indirect voting power in the Equity Interests of Tenant's Parent entitled to vote in an election of the members of the board of directors or equivalent body of Tenant's Parent or (b) shall have caused the election of a majority of the members of the board of directors or equivalent body of Tenant's Parent, which such members have not been nominated by a majority of the members of the board of directors or equivalent body of Tenant's Parent as such were constituted immediately prior to such election, (ii) except as permitted or required hereunder, the direct or indirect sale by Tenant or Tenant's Parent of all or substantially all of Tenant's assets, whether held directly or through Subsidiaries, relating to the Facilities in one transaction or in a series of related transactions (excluding sales to Tenant or its Subsidiaries), (iii) (a) Tenant ceasing to be a majority-owned Subsidiary (directly or indirectly) of Tenant's Parent or (b) Tenant's Parent ceasing to control, directly or indirectly, more than fifty percent (50%) of the voting power in the Equity Interests of Tenant or (iv) Tenant's Parent consolidates with, or merges with or into, any Person, or any Person consolidates with, or merges with or into, Tenant's Parent, in any such event pursuant to a transaction in which any of the outstanding Equity Interests of Tenant's Parent ordinarily entitled to vote in an election of the members of the board of directors or equivalent body of Tenant's Parent or such other Person is converted into or exchanged for cash, securities or other property, other than any such transaction where the Equity Interests of Tenant's Parent ordinarily entitled to vote in an election of the members of the board of directors or equivalent body of Tenant's Parent outstanding immediately prior to such transaction constitute or are converted into or exchanged into or exchanged for a majority (determined by voting power in an election of the members of the board of directors or equivalent body) of the outstanding Equity Interests ordinarily entitled to vote in an election of the members of the board of directors or equivalent body of such surviving or transferee Person (immediately after giving effect to such transaction).

"Code":  The Internal Revenue Code of 1986 and, to the extent applicable, the Treasury Regulations promulgated thereunder, each as amended from time to time.

"Commencement Date":  As defined in Section 1.3.

"Competing Facility":  A Gaming Facility within the Restricted Area acquired or operated by Tenant or any Affiliate of Tenant; provided, however, that a "Competing Facility" shall not include any Gaming Facility which Tenant, any Affiliate of Tenant or Z Casino Black Hawk Operator LLC owns or operates as of the Commencement Date or is under contract to acquire as of the Commencement Date.

"Condemnation:  The exercise of any governmental power, whether by legal proceedings or otherwise, by a Condemnor or a voluntary sale or transfer by Landlord to any Condemnor, either under threat of condemnation or while legal proceedings for condemnation are pending.

"Condemnor":  Any public or quasi-public authority, or private corporation or individual, having the power of Condemnation.

"Confidential Information": Any and all financial, technical, proprietary, confidential, and other information, including data, reports, interpretations, forecasts, analyses, compilations, studies, summaries, extracts, records, know-how, statements (written or oral) or other documents of any kind, that contain information concerning the business and affairs of a party or its affiliates, divisions and subsidiaries, which such party or its Related Persons provide to the other party or its Related Persons, whether furnished before or after the Commencement Date, and regardless of the manner in which it was furnished, and any material prepared by a party or its Related Persons, in whatever form maintained, containing, reflecting or based upon, in whole or in part, any such information; provided, however, that "Confidential Information" shall not include information which: (i) was or becomes generally available to the public other than as a result of a disclosure by the other party or its Related Persons in breach of this Master Lease; (ii) was or becomes available to the other party or its Related Persons on a non-confidential basis prior to its disclosure hereunder, provided that the other party or its Related Persons did not actually know that the source of the information was bound by a confidentiality agreement or otherwise prohibited from transmitting such information by a contractual, legal or fiduciary duty; or (iii) was independently developed by the other party without the use of any Confidential Information.

"Consolidated Interest Expense":  For any period, interest expense of any Person and its Subsidiaries for such period as determined on a consolidated basis for such Person and its Subsidiaries in accordance with GAAP.

"CPI":  The United States Department of Labor, Bureau of Labor Statistics Revised Consumer Price Index for All Urban Consumers (1982-84=100), U.S. City Average, All Items, or, if that index is not available at the time in question, the index designated by such Department as the successor to such index, and if there is no index so designated, an index for an area in the United States that most closely corresponds to the entire United States, published by such Department, or if none, by any other instrumentality of the United States.

"CPI Increase":  The quotient of (i) the CPI published for the beginning of each Lease Year, divided by (ii) the CPI published for the beginning of the first Lease Year.  If the quotient is less than one, the CPI Increase shall be equal to one.

"Date of Taking":  The date the Condemnor has the right to possession of the property being condemned.

"Debt Agreement":  If designated by Tenant to Landlord in writing to be included in the definition of "Debt Agreement," one or more (A) debt facilities or commercial paper facilities, providing for revolving credit loans, term loans, receivables financing (including through the sale of receivables to lenders or to special purpose entities formed to borrow from lenders against such receivables) or letters of credit, (B) debt securities, indentures or other forms of debt financing (including convertible or exchangeable debt instruments or bank guarantees or bankers' acceptances), or (C) instruments or agreements evidencing any other indebtedness, in each case, with the same or different borrowers or issuers and, in each case, (i) entered into from time to time

by Tenant and/or its Affiliates (including Tenant's Parent), (ii) as amended, supplemented, modified, extended, restructured, renewed, refinanced, restated, replaced or refunded in whole or in part from time to time, (iii) which may be secured by assets of Tenant and its Subsidiaries, including, but not limited to, their Cash, Accounts, Operating Property, real property and leasehold estates in real property (including this Master Lease), and (iv) which shall provide Landlord, in accordance with Section 17.3 hereof, the right to receive copies of notices of Specified Debt Agreement Defaults thereunder and opportunity to cure any breaches or defaults by Tenant thereunder within the cure period, if any, that exists under such Debt Agreement.  For the avoidance of doubt, the Tenant Existing Debt Agreement is a Debt Agreement.

"Debt Service": With respect to any Person and its Subsidiaries on a consolidated basis for any period, Consolidated Interest Expense for such period plus scheduled principal amortization (excluding the repayment of principal at maturity) of the consolidated Indebtedness of such Person and its Subsidiaries for such period.

"Discretionary Transferee":   A transferee that meets all of the following requirements set forth in clauses (a) through (d) below:  (a) such transferee has (1) at least five (5) years of experience (directly or through one or more of its Subsidiaries) operating or managing one or more casinos with revenues in the immediately preceding fiscal year of at least One Hundred Fifty Million Dollars ($150,000,000) in the aggregate (or retains a manager with such qualifications, which manager shall not be replaced other than in accordance with Article XXII hereof) that is not in the business, and that does not have an Affiliate in the business, of leasing properties to gaming operators, or (2) in the case of a Permitted Leasehold Mortgagee Foreclosing Party only, agreement(s) in place in a form reasonably satisfactory to Landlord to retain for a period of eighteen (18) months (or more) after the effective time of the transfer at least (i) eighty percent (80%) of Tenant and its Subsidiaries' personnel employed at the Facilities who have employment contracts as of the date of the relevant agreement to transfer and (ii) seventy percent (70%) of Tenant's and Tenant's Parent's ten (10) (in the aggregate between both Tenant and Tenant's Parent) most highly compensated corporate employees as of the date of the relevant agreement to transfer based on total compensation determined in accordance with Item 402 of Regulation S-K of the Securities and Exchange Act of 1934, as amended (or in a manner that is consistent with such Item 402 in the event that neither Tenant nor Tenant's Parent are subject thereto); (b) such transferee (directly or through one or more of its Subsidiaries) is licensed or certified by each Gaming Authority with jurisdiction over any portion of the Leased Property as of the date of any proposed assignment or transfer to such entity (or will be so licensed upon its assumption of this Master Lease); (c) such transferee is Solvent, and, other than in the case of a Permitted Leasehold Mortgagee Foreclosing Party, if such transferee has a Parent Company, the Parent Company of such transferee is Solvent, and (d) (i) other than in the case of a Permitted Leasehold Mortgagee Foreclosing Party, (x) the Parent Company of such transferee or, if such transferee does not have a Parent Company, such transferee, has sufficient assets so that, after giving effect to its assumption of Tenant's obligations hereunder or the applicable assignment (including pursuant to a Change in Control under Section 22.2(iii)(b) or Section 22.2(iii)(c)), its Indebtedness to EBITDA Ratio on a consolidated basis in accordance with GAAP is less than ■ on a pro forma basis based on projected earnings and after giving effect to the proposed transaction or (y) an entity that has an investment grade credit rating from a nationally recognized rating agency with respect to such entity's long term, unsecured debt has provided a Guaranty, or (ii) in the case of a Permitted Leasehold Mortgagee Foreclosing Party, (x) it has an Indebtedness to

EBITDA Ratio of less than ■ on a pro forma basis based on projected earnings and after giving effect to the proposed transaction or (y) an entity that has an investment grade credit rating from a nationally recognized rating agency with respect to such entity's long term, unsecured debt has provided a Guaranty.

"Dollars" and "$":  The lawful money of the United States.

"EBITDA":  For any Test Period, the consolidated net income or loss of a Person on a consolidated basis with its Subsidiaries for such period, determined in accordance with GAAP, adjusted by excluding (1) income tax expense, (2) consolidated interest expense (net of interest income), (3) depreciation and amortization expense, (4) any income, gains or losses attributable to the early extinguishment or conversion of indebtedness or cancellation of indebtedness, (5) gains or losses on discontinued operations and asset sales, disposals or abandonments, (6) impairment charges or asset write-offs, including, without limitation, those related to goodwill or intangible assets, long-lived assets, and investments in debt and equity securities, in each case, in accordance with GAAP, (7) transaction costs for the entry into this Master Lease, the negotiation and consummation of the financing transactions in connection therewith and the other transactions contemplated in connection with the foregoing consummated on or before the Commencement Date, (8) other non-recurring transaction costs, (9) non-cash valuation adjustments, (10) any expenses related to the repurchase of stock options, (11) expenses related to the grant of stock options, restricted stock or other equivalent or similar instruments, (12) any non-cash items of expense (other than to the extent such non-cash items of expense require or result in an accrual or reserve for future cash expenses), (13) extraordinary gains or losses and (14) other unusual or non-recurring gains or items of income or loss.

"EBITDAR":  For any Test Period, EBITDA for such Test Period, as further adjusted by excluding "rent expense" from consolidated net income in the calculation thereof.

"Eligible Account":  A separate and identifiable account that is either (a) an account or accounts maintained with a federal or state-chartered depository institution or trust company which complies with the definition of Eligible Institution or (b) a segregated trust account or accounts maintained with a federal or state chartered depository institution or trust company acting in its fiduciary capacity that has a Moody's rating of at least "Baa2" and which, in the case of a state chartered depository institution or trust company, is subject to regulations substantially similar to 12 C.F.R. §9.10(b), having in either case a combined capital and surplus of at least Fifty Million and No/100 Dollars ($50,000,000.00) and subject to supervision or examination by federal or state authority.  An Eligible Account will not be evidenced by a certificate of deposit, passbook or other instrument.

"Eligible Institution":  Either (a) a depository institution or trust company insured by the Federal Deposit Insurance Corporation, the short-term unsecured debt obligations or commercial paper of which are rated at least "A-1+" by S&P and "P-1" by Moody's in the case of accounts in which funds are held for thirty (30) days or less (or, in the case of letters of credit and accounts in which funds are held for more than thirty (30) days, the long-term unsecured debt obligations of which are rated at least "A+" by S&P and "Aa3" by Moody's), or (b) Wells Fargo Bank, National Association, JPMorgan Chase Bank, N.A. or Bank of America, N.A. or any of their affiliates or successors provided that the rating by S&P and Moody's for the short term

unsecured debt obligations or commercial paper and long term unsecured debt obligations of the same does not decrease below the ratings set forth in clause (a) hereof.

"Encumbrance":  Any mortgage, deed of trust, lien, encumbrance or other matter affecting title to any of the Leased Property, or any portion thereof or interest therein.

"End of Term Gaming Asset Transfer Notice":  As defined in Section 36.1.

"Environmental Costs":  As defined in Section 32.4.

"Environmental Laws":    Means (a) whenever enacted or promulgated, any applicable federal, state, foreign or local law, statute, ordinance, rule, regulation, license, permit, authorization, approval, consent, court order, judgment, decree, injunction, or code, (i) relating to pollution (or the cleanup thereof), or the protection of air, water vapor, surface water, groundwater, drinking water supply, land (including land surface or subsurface), plant, aquatic and animal life from injury caused by a Hazardous Substance, or (ii) concerning exposure to, or the use, containment, storage, recycling, reclamation, reuse, treatment, generation, discharge, transportation, processing, handling, labeling, production, disposal or remediation of any Hazardous Substance, and (b) any common law or equitable doctrine (including, without limitation, injunctive relief and tort doctrines such as negligence, nuisance, trespass and strict liability) that may impose liability or obligations for injuries or damages due to or threatened as a result of the presence of, exposure to, or inadvertent ingestion of, any Hazardous Substance.  The term Environmental Law includes, without limitation, the Comprehensive Environmental Response, Compensation and Liability Act ("CERCLA"), the Clean Air Act, the Clean Water Act, the Solid Waste Disposal Act, the Toxic Substance Control Act, the Federal Insecticide, Fungicide and Rodenticide Act, the Occupational Safety and Health Act, the National Environmental Policy Act and the Hazardous Materials Transportation Act, each as amended and hereafter in effect and any similar state or local Law.

"Environmental Violation"  Means, with respect to the Leased Property, any liability (a) for response costs and for costs of removal and remedial action incurred by the United States Government, any state or local governmental unit or any other Person, in each case under Environmental Law, or damages from injury to or destruction or loss of natural resources, including the reasonable costs of assessing such injury, destruction or loss, incurred pursuant to Sections 107 or 113 of CERCLA, or any successor section or act or provision of any similar state or local Law and (b) for costs and expenses of abatement, correction or clean-up, fines, damages, response costs or penalties which arise from the provisions of any of the other Environmental Laws.

"EP Affiliate":  Individually or collectively, (a) Eric Persson, (b) for so long as Eric Persson controls Tenant's Parent, Eric Persson's estate, spouse, ex-spouse, heirs, ancestors, children, step-children, lineal descendants, legatees or legal representatives (in their capacities as such), the trustee (in its capacity as such) of a bona fide trust of which Eric Persson or one or more of the foregoing are the beneficiaries or grantors thereof or any beneficiary of a will or other estate planning instrument of Eric Persson or any of the foregoing (the foregoing, collectively, "EP Estate Planning Persons"), (c) after Eric Persson's death or at any time when a declaration of legal incapacity with respect to Eric Persson is in effect, any EP Estate Planning Person and (d) any

entity majority owned and controlled, directly or indirectly, by one or more Persons (collectively) referred to in the preceding clauses.  Notwithstanding the foregoing, any such party that is required to be licensed by the appropriate gaming and other licensing authorities in any relevant jurisdiction and is not so licensed shall not be considered an EP Affiliate.  For the purposes of this definition, the term "control" (including the correlative meaning of the term "controlled by") shall mean the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, partnership interests or other equity interests or by contract.

"<u>Equity Interests</u>":  With respect to any Person, any and all shares, interests, participations or other equivalents, including membership interests (however designated, whether voting or non-voting), of equity of such Person, including, if such Person is a partnership, partnership interests (whether general or limited) and any other interest or participation that confers on a Person the right to receive a share of the profits and losses of, or distributions of assets of, such partnership.

"<u>Equity Rights</u>":  With respect to any Person, any then outstanding subscriptions, options, warrants, commitments, preemptive rights or agreements of any kind (including any stockholders' or voting trust agreements) for the issuance, sale, registration or voting of any additional Equity Interests of any class, or partnership or other ownership interests of any type in, such Person; <u>provided</u>, <u>however</u>, that a debt instrument convertible into or exchangeable or exercisable for any Equity Interests shall not be deemed an Equity Right.

"<u>Event of Default</u>":  As defined in Section 16.1.

"<u>Excess Cash Flow</u>":  Of any Person, without duplication, for each applicable period, the EBITDAR of such Person and its Subsidiaries on a consolidated basis for such applicable period,

<u>minus</u>, without duplication:

(a)     All rent (including all Rent) due and actually paid in cash during such applicable period by such Person and its Subsidiaries (plus, if applicable, late charges, Additional Charges and all other amounts paid in cash to a landlord under any lease (including this Master Lease);

(b)     all Taxes (and, without duplication, Tax Distributions) paid in cash by such Person and its Subsidiaries on a consolidated basis during such applicable period;

(c)     without duplication of any prepayments that are reflected in the calculation of Debt Service, the amount of any prepayments of term Indebtedness during such applicable period and the amount of any prepayments of revolving Indebtedness during such applicable period so long as, in the case of prepayments of revolving Indebtedness, such prepayment is accompanied by a permanent reduction of the revolving commitment under such Indebtedness in an amount not less than the amount of such prepayment;

(d)     Debt Service for such applicable period;

(e)      all payments in respect of Capital Lease Obligations to the extent not deducted in the computation of EBITDAR or Consolidated Interest Expense;

(f)      all payments relating to Gaming Licenses that are paid to any Gaming Authority;

(g)      all financing costs (including any origination fees, exit fees and swap expenses) of the consolidated Indebtedness of such Person and its Subsidiaries for such period, provided that (1) there shall be no deduction under this clause (f) for financing costs that are directly attributable to the closing of a financing transaction and capitalizable as deferred financing costs under GAAP, and (2) to the extent the closing of a financing transaction results in debt modification accounting under GAAP, there shall be no deduction under this clause (f) for any cash expenditures associated with such transaction;

(h)      all cash amounts expended by such Person and its Subsidiaries during such period in connection with any Capital Improvements or for the installation or restoration and repair or other improvement of items;

(i)      all amounts included in (or, as the case may be, added back to) EBITDAR that constitute a cash expenditure;

plus, without duplication:

(j)      to the extent deducted in the computation of EBITDAR, cash interest income.

"Exercise Date":  As defined in Section 1.4.

"Expert":  An independent third party professional, with expertise in respect of a matter at issue, appointed by the agreement of Landlord and Tenant or otherwise in accordance with Article XXXIV hereof.

"Facilit(y)(ies)":  As defined in Recital C.

"Facility Mortgage":  As defined in Section 13.1.

"Facility Mortgage Documents":  With respect to each Facility Mortgage and Facility Mortgagee, the applicable Facility Mortgage, loan agreement, debt agreement, credit agreement or indenture, lease, note, collateral assignment instruments, guarantees, indemnity agreements and other documents or instruments evidencing, securing or otherwise relating to the loan made, credit extended, or lease or other financing vehicle entered into pursuant thereto.

"Facility Mortgage Reserve Account":  As defined in Section 31.3(b).

"Facility Mortgagee":  As defined in Section 13.1.

"Financial Statements":  (i) For a Fiscal Year, consolidated statements of Tenant's Parent and its consolidated subsidiaries (as defined by GAAP) of income, stockholders' equity and

comprehensive income and cash flows for such period and for the period from the beginning of the Fiscal Year to the end of such period and the related consolidated balance sheet as at the end of such period, together with the notes thereto, all in reasonable detail and setting forth in comparative form the corresponding figures for the corresponding period in the preceding Fiscal Year and prepared in accordance with GAAP and audited by a "big four" or other nationally recognized accounting firm, and (ii) for a fiscal quarter, unaudited consolidated statements of Tenant's Parent's income, stockholders' equity and comprehensive income and cash flows for such period and for the period from the beginning of the Fiscal Year to the end of such period and the related consolidated balance sheet as at the end of such period, together with the notes thereto, all in reasonable detail and setting forth in comparative form the corresponding figures for the corresponding period in the preceding Fiscal Year and prepared in accordance with GAAP.

"Fiscal Year":  The annual period commencing January 1 and terminating December 31 of each year.

"Fixtures":  As defined in Section 1.1(d).

"Foreclosure Assignment":  As defined in Section 22.2(iii)(d).

"Foreclosure COC":  As defined in Section 22.2(iii)(d).

"Foreclosure Purchaser":  As defined in Section 31.1.

"GAAP":  Generally accepted accounting principles consistently applied in the preparation of financial statements, as in effect from time to time (except with respect to any financial ratio defined or described herein or the components thereof, for which purposes GAAP shall refer to such principles as in effect as of the Commencement Date).

"Gaming":  Casino, racetrack, racino, card room, video lottery terminal, historic horse racing, sportsbook or other gaming or racing activities, including, but not limited to, the operation of slot machines, video lottery terminals, historic horse racing machines, sportsbooks, table games, pari-mutuel wagering or other types of wagering (including, but not limited to, sports wagering).

"Gaming Assets FMV":  As defined in Section 36.1.

"Gaming Authority" means any governmental authority with regulatory control, authority or jurisdiction (including licensing, permit or contract authority) over the conduct of casino, sports wagering, pari-mutuel wagering, gambling or other Gaming activities or operations or the ownership of a direct or indirect interest in any Person conducting such activities or operations in any jurisdiction.

"Gaming Facility":  A facility at which there are operations of slot machines, table games, a sportsbook, or pari-mutuel wagering.

"Gaming Lease":  A lease entered into by any applicable Person or any of its Subsidiaries to occupy and use real property, vessels or similar assets for, or primarily in connection with, the operation of a Gaming Facility located thereat.

"<u>Gaming License</u>":   Any license, permit, approval, registration, finding of suitability or other authorization issued by a state regulatory agency to operate, carry on or conduct any gambling game, gaming device, slot machine, race book or sports pool on the Leased Property, or required by any Gaming Regulation, including each of the licenses, permits or other authorizations set forth on <u>Exhibit C</u>, as amended from time to time, and those related to any Facilities that are added to this Master Lease after the Commencement Date.

"<u>Gaming Regulation(s)</u>": Any and all laws, statutes, ordinances, rules, regulations, policies, orders, codes, decrees or judgments, and Gaming License conditions or restrictions, as amended from time to time, now or hereafter in effect or promulgated, pertaining to the operation, control, maintenance or Capital Improvement of a Gaming Facility or the conduct of a person or entity holding a Gaming License, including, without limitation, any requirements imposed by a regulatory agency, commission, board or other governmental body pursuant to the jurisdiction and authority granted to it under applicable law.

"<u>Gaming Revenues</u>":  As defined in the definition of Net Revenue.

"<u>Greenfield Project</u>":  As defined in Section 7.3(a).

"<u>Ground Lease</u>": That certain Ground Lease dated as of the Commencement Date by and between Landlord and Ground Lessor.

"<u>Ground Lease Premises</u>": The portion of Parcel A more particularly described in <u>Exhibit G</u> attached hereto (the "<u>Ground Lease Land</u>"), together with the improvements thereon, and all easements, appurtenances and other rights and privileges now or hereafter belonging or appertaining to the Ground Lease Land.

"<u>Ground Lessor</u>": Maverick Wendover LLC, a Nevada limited liability company.

"<u>Guarantor</u>":  Any entity that guaranties the payment or collection of all or any portion of the amounts payable by Tenant, or the performance by Tenant of all or any of its obligations, under this Master Lease, including any replacement guarantor consented to by Landlord in connection with the assignment of this Master Lease or a sublease of Leased Property pursuant to Article XXII.

"<u>Guaranty</u>":  That certain Guaranty of Master Lease dated as of the Commencement Date, the form of which is attached as <u>Exhibit D</u> hereto, as the same may be amended, supplemented or replaced from time to time, by and among Tenant's Parent, Landlord, the Operating Subtenants and certain Subsidiaries of Tenant from time to time party thereto, and any other guaranty in form and substance reasonably satisfactory to Landlord executed by a Guarantor in favor of Landlord (as the same may be amended, supplemented or replaced from time to time) pursuant to which such Guarantor agrees to guaranty all of the obligations of Tenant hereunder.

"<u>Hazardous Substances</u>":  Means any substance, material, product, petroleum, petroleum product, derivative, compound or mixture, mineral (including asbestos), chemical, gas, medical waste, or other pollutant, in each case whether naturally occurring, man-made or the by-product of any process, that is toxic, harmful or hazardous or acutely hazardous to the environment or public health or safety, including, without limitation, any toxic or hazardous waste, pollutant,

contaminant, industrial waste, petroleum or petroleum-derived substances or waste, radon, radioactive materials, asbestos, asbestos containing materials, urea formaldehyde foam insulation, lead, mold and other microbial contamination, and polychlorinated biphenyls.

"Immaterial Subsidiary Guarantor":  Any Subsidiary of Tenant having assets with an aggregate fair market value of less than five percent (5%) of the aggregate fair market value of the assets of Tenant and its Subsidiaries on a consolidated basis as of the most recent date on which Financial Statements have been delivered to Landlord pursuant to Section 23.1(b); provided, however, that in no event shall the aggregate fair market value of the assets of all Immaterial Subsidiary Guarantors exceed ten percent (10%) of the aggregate fair market value of the assets of Tenant and its Subsidiaries on a consolidated basis as of the most recent date on which Financial Statements have been delivered to Landlord pursuant to Section 23.1(b).  Notwithstanding the foregoing, under no circumstances shall the Operating Subtenants constitute Immaterial Subsidiary Guarantors.

"Impositions":  Collectively, all taxes, including real and personal property, capital stock, franchise, margin, commerce and other state taxes of Landlord, ad valorem, sales, use, gross receipts, transaction privilege, rent or similar taxes; assessments including assessments for public improvements or benefits, whether or not commenced or completed prior to the Commencement Date and whether or not to be completed within the Term; all obligations of Landlord and its Affiliates under the documents listed on Schedule D hereto; water, sewer and other utility levies and charges; excise tax levies; fees including license, permit, inspection, authorization and similar fees; and all other governmental charges, in each case whether general or special, ordinary or extraordinary, or foreseen or unforeseen, of every character in respect of the Leased Property and/or the Rent and Additional Charges and all interest and penalties thereon attributable to any failure in payment by Tenant (other than failures arising from the acts or omissions of Landlord) which at any time prior to, during or in respect of the Term hereof may be assessed or imposed on or in respect of or be a lien upon (i) Landlord or Landlord's interest in the Leased Property, (ii) the Leased Property or any part thereof or any rent therefrom or any estate, right, title or interest therein, (iii) any occupancy, operation, use or possession of, or sales from or activity conducted on or in connection with the Leased Property or the leasing or use of the Leased Property or any part thereof, including gaming and live entertainment taxes, (iv) Tenant or Tenant's interest in the Leased Property; provided, however, that Impositions shall not include and nothing contained in this Master Lease shall be construed to require Tenant to pay (a) any tax based on net or overall gross income (whether denominated as a franchise or capital stock or other tax) imposed on Landlord or any other Person, (b) any transfer or net revenue tax of Landlord or any other Person except Tenant and its successors, (c) any tax imposed with respect to the sale, exchange or other disposition by Landlord of any Leased Property or the proceeds thereof, or (d) any principal, interest or other amounts due on, or any mortgage recording taxes or other amounts relating to the incurrence of, any indebtedness on or secured by the Leased Property owed to a Facility Mortgagee for which Landlord or its Subsidiaries is the obligor; provided, further, Impositions shall include any tax, assessment, tax levy or charge set forth in clause (a) or (b) that is levied, assessed or imposed in lieu of, or as a substitute for, any Imposition.

"Indebtedness":  Of any Person, without duplication, (a) all indebtedness of such Person for borrowed money, whether or not evidenced by bonds, debentures, notes or similar instruments, (b) all obligations of such Person as lessee under capital leases which have been or

should be recorded as liabilities on a balance sheet of such Person in accordance with GAAP, (c) all obligations of such Person to pay the deferred purchase price of property or services (excluding trade accounts payable in the ordinary course of business), (d) all indebtedness secured by a lien on the property of such Person, whether or not such indebtedness shall have been assumed by such Person, (e) all obligations, contingent or otherwise, with respect to the face amount of all letters of credit (whether or not drawn) and banker's acceptances issued for the account of such Person, (f) all obligations under any agreement with respect to any swap, forward, future or derivative transaction or option or similar arrangement involving, or settled by reference to, one or more rates, currencies, commodities, equity or debt instruments or securities or economic, financial or pricing indices or measures of economic, financial or pricing risk or value or any similar transaction or combination of transactions, (g) all guarantees by such Person of any of the foregoing and (h) all indebtedness of the nature described in the foregoing clauses (a)-(g) of any partnership of which such Person is a general partner.

"Indebtedness to EBITDA Ratio":  As at any date of determination, the ratio of (a) Indebtedness of the applicable (x) Discretionary Transferee or Parent Company of the Discretionary Transferee or (y) in the case of a Permitted Leasehold Mortgagee Foreclosing Party, the Permitted Leasehold Mortgagee Foreclosing Party (such Discretionary Transferee, Parent Company or Permitted Leasehold Mortgagee Foreclosing Party, as applicable the "**Relevant Party**") on a consolidated basis, as of the last day of the Test Period most recently ended prior to such date for which financial statements are available (excluding Indebtedness of the type referenced in clauses (e) or (f) of the definition of Indebtedness or Indebtedness referred to in clauses (d) or (g) of the definition of Indebtedness to the extent relating to Indebtedness of the type referenced in clauses (e) or (f) of the definition of Indebtedness), to (b) EBITDA of the Relevant Party for such Test Period.  For purposes of calculating the Indebtedness to EBITDA Ratio, EBITDA shall be calculated on a pro forma basis (and shall be calculated, except for pro forma adjustments reasonably contemplated by the potential transferee which may be included in such calculations, otherwise in accordance with Regulation S-X under the Securities Act) to give effect to any material acquisitions and material asset sales consummated by the Relevant Party and its Subsidiaries since the beginning of any Test Period of the Relevant Party as if each such material acquisition had been effected on the first day of such Test Period and as if each such material asset sale had been consummated on the day prior to the first day of such period. In addition, for the avoidance of doubt, (i) if the Relevant Party or any Subsidiary of the Relevant Party has incurred any Indebtedness or repaid, repurchased, acquired, defeased or otherwise discharged any Indebtedness since the end of the most recent Test Period for which financial statements are available, Indebtedness shall be calculated (for purposes of this definition) after giving effect on a pro forma basis to such incurrence, repayment, repurchase, acquisition, defeasance or discharge and the applications of any proceeds thereof as if it had occurred prior to the first day of such Test Period and (ii) the Indebtedness to EBITDA Ratio shall give pro forma effect to the transactions whereby the applicable Discretionary Transferee becomes party to this Master Lease or the Change in Control transactions permitted under Section 22.2(iii) and shall include the Indebtedness and EBITDA of Tenant and its Subsidiaries for the relevant period.

"Initial Term":  As defined in Section 1.3.

"Initial Term Escalator":  An amount equal to ███

US-DOCS\124041687.41

"<u>Insurance Requirements</u>":  The terms of any insurance policy required by this Master Lease and all requirements of the issuer of any such policy and of any insurance board, association, organization or company necessary for the maintenance of any such policy.

"<u>Investment Fund</u>": A bona fide private equity fund or bona fide investment vehicle arranged by and managed by or controlled by, or under common control with, a private equity fund (excluding any private equity fund investment vehicle the primary assets of which are Tenant and its Subsidiaries and/or this Master Lease and assets related thereto) that is engaged in making, purchasing, funding or otherwise or investing in a diversified portfolio of businesses and companies and is organized primarily for the purpose of making equity investments in companies.

"<u>Land</u>":  As defined in Section 1.1(a).

"<u>Landlord</u>":  As defined in the preamble.

"<u>Landlord Party</u>": As defined in the definition of Licensing Event.

"<u>Landlord Representatives</u>":  As defined in Section 23.4.

"<u>Landlord Tax Returns</u>":  As defined in Section 4.1(b).

"<u>Lease Year</u>":   The first Lease Year of the Initial Term shall be the period commencing on the Commencement Date and ending on the last day of the calendar month in which the first (1st) anniversary of the Commencement Date occurs, and each subsequent Lease Year shall be each period of twelve (12) full calendar months after the last day of the prior Lease Year.

"<u>Leased Improvements</u>":  As defined in Section 1.1(b).

"<u>Leased Property</u>":  As defined in Section 1.1.

"<u>Leased Property Rent Adjustment Event</u>":  As defined in Section 15.5.

"<u>Leasehold Estate</u>":  As defined in Section 17.1(a).

"<u>Legal Requirements</u>":    All federal, state, county, municipal and other governmental statutes, laws, rules, policies, guidance, codes, orders, regulations, ordinances, permits, licenses, covenants, conditions, restrictions, judgments, decrees and injunctions (including common law, Gaming Regulations and Environmental Laws) affecting either the Leased Property, the Operating Property and all Capital Improvements or the construction, use or alteration thereof, whether now or hereafter enacted and in force, including, without limitation, any which may (i) require repairs, modifications or alterations in or to the Leased Property and Operating Property, (ii) in any way adversely affect the use, occupancy, possession, operation, maintenance and enjoyment thereof, or (iii) regulate the transport, handling, use, storage or disposal or require the cleanup or other treatment of any Hazardous Substance.

"<u>Licensing Event</u>":

(a)        With respect to Tenant, (i) a written notice from any Gaming Authority to Tenant or any of its Affiliates (each, a "**Tenant Party**") or to a Landlord Party (as defined below) stating that the association of a Tenant Party with a Landlord Party will result in (A) a disciplinary action to be taken with respect to, a loss of, or an inability to reinstate any Gaming License or any other material rights or material entitlements held or required to be held by Landlord or any of its Affiliates (each, a "**Landlord Party**") under any Gaming Regulations or (B) a violation of any Gaming Regulations to which a Landlord Party is subject; or (ii) a written notice from any Gaming Authority requiring that a Tenant Party be licensed, registered, qualified or found suitable under any Gaming Regulations, and such Tenant Party does not become so licensed, registered, qualified or found suitable or, after becoming so licensed, registered, qualified or found suitable, fails to remain so licensed, registered, qualified or found suitable, in each case, within any time period set forth in the written notice or otherwise required by the Gaming Authority pursuant to applicable Gaming Regulations provided, the same causes cessation of Gaming activity at a Facility and would reasonably be expected to have a material adverse effect on the Facilities taken as a whole; and

(b)        With respect to Landlord, (i) a written notice from any Gaming Authority to a Landlord Party or to a Tenant Party stating that the association of a Landlord Party with a Tenant Party will result in (A) a disciplinary action to be taken with respect to, a loss of, or an inability to reinstate any Gaming License or any other material rights or material entitlements held or required to be held by a Tenant Party under any Gaming Regulations or (B) a violation of any Gaming Regulations to which a Tenant Party is subject; or (ii) a written notice from any Gaming Authority requiring that a Landlord Party be licensed, registered, qualified or found suitable under any Gaming Regulations, and such Landlord Party does not become so licensed, registered, qualified or found suitable or, after becoming so licensed, registered, qualified or found suitable, fails to remain so licensed, registered, qualified or found suitable, in each case, within any time period set forth in the written notice or otherwise required by the Gaming Authority pursuant to applicable Gaming Regulations provided the same causes cessation of Gaming activity at a Facility and would reasonably be expected to have a material adverse effect on the Facilities taken as a whole.

"Liquor Authority":  As defined in Section 42.13(a).

"Liquor Laws":  As defined in Section 42.13(a).

"Long-Lived Assets":  (i) With respect to property owned by (a) Colorado MG 1031 LLC, a Colorado limited liability company, with respect to the Facilities commonly known as the Grand Z Casino Hotel (located at 321 Gregory Street, Central City, Colorado) and Johnny Z's Casino (located at 132 Lawrence Street, Central City, Colorado) and (b) Maverick Wendover LLC, a Nevada limited liability company, with respect to the Facilities commonly known as the Wendover Nugget Hotel & Casino (located at 101 Wendover Boulevard, West Wendover, Nevada) and the Red Garter Hotel & Casino (located at 1225 Wendover Boulevard, West Wendover, Nevada), in each case, immediately prior to the Commencement Date, all property capitalized in accordance with GAAP with an expected life of not less than fifteen (15) years as initially reflected on the books and records of Colorado MG 1031 LLC or Maverick Wendover LLC (as applicable) at or about the time of acquisition thereof or (ii) with respect to those assets purchased, replaced or otherwise maintained by Tenant after the Commencement Date, such asset

capitalized in accordance with GAAP with an expected life of not less than fifteen (15) years as of or about the time of the acquisition thereof, as classified by Tenant in accordance with GAAP.

"Master Lease":  As defined in the preamble.

"Material Indebtedness":  At any time, Indebtedness of any one or more of Tenant (and its Subsidiaries) and any Guarantor in an aggregate principal amount exceeding ten percent (10%) of Adjusted Revenue of Tenant and its Subsidiaries on a consolidated basis over the most recent Test Period for which financial statements are available.  As of the Commencement Date, until financial statements are available for the initial Test Period, such amount shall be Six Million Nine Hundred Thousand Dollars ($6,900,000.00).

"Net Award" means, with respect to any of the Leased Property, (a) for purposes of Article XV, in the event of a Condemnation, the entire award payable to Landlord and/or Tenant by reason of such Condemnation, less any sums paid pursuant to a separate claim by Tenant for (i) any furniture, fixtures and equipment owned by Tenant and affected by such Condemnation, or (ii) Tenant's relocation expenses and (b) for purposes of Article XIV, with respect to any property loss or damage to the Leased Property, the entire proceeds of any property policy of insurance required to be carried hereunder payable by reason of such property loss or damage (except business interruption proceeds not allocated to rent expenses).

"Net Revenue":  With respect to any Facility, the sum of, without duplication, (i) the amount received by Tenant (and its Subsidiaries and its subtenants) from patrons at such Facility for Gaming, less refunds and free promotional play provided to the customers and invitees of Tenant (and its Subsidiaries and subtenants) pursuant to a rewards, marketing, and/or frequent users program, and less amounts returned to patrons through winnings at such Facility (the amounts in this clause (i), "**Gaming Revenues**"); and (ii) the gross receipts of Tenant (and its Subsidiaries and subtenants) for all goods and merchandise sold, the charges for all services performed, or any other revenues generated by Tenant (and its Subsidiaries and subtenants) in, at, or from such Facility for cash, credit, or otherwise (without reserve or deduction for uncollected amounts), but excluding any Gaming Revenues (the amounts in this clause (ii), "**Retail Sales**"); less (iii) the retail value of accommodations, food and beverage, and other services furnished without charge to guests of Tenant (and its Subsidiaries and subtenants) at such Facility (the amounts in this clause (iii), "**Promotional Allowance**").  For the avoidance of doubt, gaming taxes and casino operating expenses (such as salaries, income taxes, employment taxes, supplies, equipment, cost of goods and inventory, rent, office overhead, marketing and advertising and other general administrative costs) will not be deducted in arriving at Net Revenue.  Net Revenue will be calculated on an accrual basis for these purposes, as required under GAAP.  For the absence of doubt, if Gaming Revenues, Retail Sales or Promotional Allowances of a Subsidiary or subtenant, as applicable, are taken into account for purposes of calculating Net Revenue, any rent received by Tenant from such Subsidiary or subtenant, as applicable, pursuant to any sublease with such Subsidiary or subtenant, as applicable, shall not also be taken into account for purposes of calculating Net Revenue.  Notwithstanding the foregoing, with respect to any Specified Sublease, Net Revenue shall not include Gaming Revenues or Retail Sales from the subtenants under such subleases and shall include the rent received by Tenant or its subsidiaries thereunder.  "Net Revenue" with respect to the Leased Property means the aggregate amount of Net Revenue for all of the Facilities.

"New Lease":  As defined in Section 17.1(f).

"Notice":  A notice given in accordance with Article XXXV.

"Notice of Termination".  As defined in Section 17.1(f).

"NRS": As defined in Section 42.14.

"OFAC":  As defined in Section 39.1.

"Officer's Certificate":  A certificate of Tenant or Landlord, as the case may be, signed by an officer of such party authorized to so sign by resolution of its board, manager or sole member or by the terms of its by-laws or operating agreement, as applicable.

"Operating Property":  With respect to each Facility, all assets (other than the Leased Property and property not owned (or leased) by Tenant or its Subsidiaries or Operating Subtenants) primarily related to or used in connection with the operation of the business conducted on or about the Leased Property, together with all replacements, modifications, additions, alterations and substitutes therefor.

"Operating Subtenant":  A subtenant under any Specified Operating Sublease.  A list of the Operating Subtenants as of the Commencement Date is attached hereto as Schedule E.

"Overdue Rate":  On any date, a rate equal to five (5) percentage points above the Prime Rate, but in no event greater than the maximum rate then permitted under applicable law.

"Parcel A": The property in Wendover, Utah owned by Ground Lessor, and more particularly described in Exhibit H attached hereto.

"Parent Company":  With respect to any Discretionary Transferee, any Person (other than an Investment Fund) (x) as to which such Discretionary Transferee is a Subsidiary; and (y) which is not a Subsidiary of any other Person (other than an Investment Fund).

"Payment Date":  Any due date for the payment of the installments of Rent or any other sums payable under this Master Lease.

"Percent CPI Change":  As defined in the definition of Renewal Term CPI-Based Escalator.

"Permitted Encumbrances" means those covenants, restrictions, reservations, liens, conditions and easements and other encumbrances listed on Schedule C.

"Permitted Facility Sublease":  A sublease for all or substantially all of any Facility that is permitted under Section 22.3(c)(ii) without Landlord's consent.

"Permitted Indebtedness":  As defined in Section 23.3(b).

"Permitted Leasehold Mortgage":  A document creating or evidencing an encumbrance on Tenant's leasehold interest (or a subtenant's subleasehold interest) in the Leased

Property, granted to or for the benefit of a Permitted Leasehold Mortgagee as security for the obligations under a Debt Agreement.

"Permitted Leasehold Mortgagee":  The lender or agent or trustee or similar representative on behalf of one or more lenders or noteholders or other investors under a Debt Agreement, in each case as and to the extent such Person has the power to act on behalf of all lenders under such Debt Agreement pursuant to the terms thereof; provided such lender, agent or trustee or similar representative (but not necessarily the lenders, noteholders or other investors which it represents) is a banking or other financial institution in the business of generally acting as a lender, agent or trustee or similar representative (in each case, on behalf of a group of lenders) under debt agreements or instruments similar to the Debt Agreement.  For the avoidance of doubt, the Administrative Agent is a Permitted Leasehold Mortgagee.

"Permitted Leasehold Mortgagee Designee":  An entity designated by a Permitted Leasehold Mortgagee and acting for the benefit of the Permitted Leasehold Mortgagee, or the lenders, noteholders or investors represented by the Permitted Leasehold Mortgagee.

"Permitted Leasehold Mortgagee Foreclosing Party":  A Permitted Leasehold Mortgagee that forecloses on a Permitted Leasehold Mortgage and assumes this Master Lease or a Subsidiary of a Permitted Leasehold Mortgagee that assumes this Master Lease in connection with a foreclosure of a Permitted Leasehold Mortgage by a Permitted Leasehold Mortgagee.

"Person" or "person":  Any individual, corporation, limited liability company, partnership, joint venture, association, joint stock company, trust, unincorporated organization, government or any agency or political subdivision thereof or any other form of entity.

"Pre-Opening Expense":  With respect to any fiscal period, the amount of expenses (including Consolidated Interest Expense) incurred with respect to capital projects which are appropriately classified as "pre-opening expenses" on the applicable financial statements of Tenant's Parent and its Subsidiaries for such period.

"Primary Intended Use":  With respect to each Facility, Gaming use consistent with (a) such Facility's current use (as specified on Exhibit A attached hereto) or (b) prevailing gaming industry use at any time, together with all ancillary uses consistent or complementary with Gaming use and operations (including hotels, resorts, convention and meeting centers, retail, entertainment, restaurants, bars, etc.).

"Prime Rate":  On any date, a rate equal to the annual rate on such date publicly announced by JPMorgan Chase Bank, N.A. (provided that if JPMorgan Chase Bank, N.A. ceases to publish such rate, the Prime Rate shall be determined according to the Prime Rate of another nationally known money center bank reasonably selected by Landlord), to be its prime rate for ninety (90)-day unsecured loans to its corporate borrowers of the highest credit standing, but in no event greater than the maximum rate then permitted under applicable law.

"Prior Month":  As defined in the definition of Renewal Term CPI-Based Escalator.

"Proceeding":  As defined in Section 23.1(b)(v).

US-DOCS\124041687.41

"Prohibited Persons":  As defined in Section 39.1.

"Promotional Allowance":  As defined in the definition of Net Revenue.

"Purchase and Sale Agreement": That certain Agreement of Purchase and Sale, dated as of September 3, 2021, by and among Maverick Z Casinos LLC, Maverick Wendover LLC, AG Park Place Investments 1 LLC and AG Park Place Investments 1 LLC 2.

"Qualified Successor Tenant":  As defined in Section 36.2.

"Refinancing Escrow Account":  An escrow account established by Tenant with Fidelity National Title Insurance Company (or its successor).

"Refinancing Escrow Account Instructions":  Whenever Tenant is required to deposit funds into the Refinancing Escrow Account in accordance with Section 23.3(d), irrevocable escrow instructions (reasonably satisfactory to Landlord) to Fidelity National Title Insurance Company (or its successor) to (i) hold the funds deposited into such account in escrow, (ii) if Tenant fails to pay the full amount of any installment of Rent when due, release directly to Landlord an amount of such funds that is equal to the shortfall in Tenant's Rent payment promptly upon written demand by Landlord certifying that (a) Tenant has not paid the full amount of such installment of Rent when due and (b) the amount of such shortfall and (iii) release directly to Tenant all of such funds promptly upon the receipt of written instructions from Landlord (which Landlord shall execute and promptly deliver following the refinancing of the Tenant Existing Financing or the expiration or termination of this Master Lease).  If at any time an Event of Default shall have occurred and be continuing, Landlord shall be entitled, at its sole and absolute discretion, to draw on the funds held in the Refinancing Escrow Account and to apply the proceeds in payment of (i) any Rent or other charges for the payment of which Tenant shall be in default, (ii) any expense incurred by Landlord in curing any default of Tenant, and/or (iii) any other sums due to Landlord in connection with any default or the curing thereof, including, without limitation, any damages incurred by Landlord by reason of such default, including any rights of Landlord under Article XVI or to do any combination of the foregoing, all in such order or priority as Landlord shall so determine in its sole and absolute discretion and Tenant acknowledges and agrees that such proceeds shall not constitute assets or funds of Tenant or its estate, or be deemed to be held in trust for Tenant, but shall be, for all purposes, the property of Landlord (or Facility Mortgagee, to the extent assigned).  Tenant further acknowledges and agrees that (1) Landlord's application of the proceeds of the funds held in the Refinancing Escrow Account towards the payment of Rent or the reduction of any damages due Landlord in accordance with Article XVI of this Master Lease constitutes a fair and reasonable use of such proceeds, and (2) the application of such proceeds by Landlord towards the payment of Rent or any other sums due under this Master Lease shall not constitute a cure by Tenant of the applicable default; provided that an Event of Default shall not exist if Tenant restores the funds held in the Refinancing Escrow Account to its full amount within five (5) days and in accordance with the requirements of Section 23.3(d), so that the original amount of the funds held in the Refinancing Escrow Account shall be again on deposit with Landlord.

"Refinancing Indebtedness":  With respect to any Indebtedness, any refinancing thereof; *provided* that any such refinancing Indebtedness shall be in a principal amount that does

not exceed the principal amount so refinanced, *plus*, accrued interest, *plus*, any reasonable premium or other payment required to be paid in connection with such refinancing, *plus*, the amount of fees and expenses of the applicable obligor incurred in connection with such refinancing, *plus*, any unutilized commitments thereunder.

"Related Persons": With respect to a party, such party's Affiliates and Subsidiaries and the directors, officers, employees, agents, advisors and controlling persons of such party and its Affiliates and Subsidiaries.

"Relevant Party": As defined in the definition of Indebtedness to EBITDA Ratio.

"Renewal Notice": As defined in Section 1.4.

"Renewal Term": A period for which the Term is renewed in accordance with Section 1.4.

"Renewal Term CPI-Based Escalator": With respect to any Renewal Term,



"Renewal Term Escalator": With respect to any Renewal Term, an amount, determined on the first day of such Renewal Term, equal to ████████████████████████████████

"Rent": An annual amount that is payable as provided in Article III, calculated as follows:

(a)     Rent During the Initial Term.

(i)     For the first Lease Year of the Initial Term, the Rent shall be equal to ████████████████████████████████████████████████████████

(ii)    For the second Lease Year of the Initial Term and each Lease Year thereafter that commences during the Initial Term, the Rent for such Lease Year shall be equal to the product of (i) the annual Rent in effect on the last day of the preceding Lease Year *multiplied by* (ii) the Initial Term Escalator.

(b)     Rent During Renewal Terms.  For each Lease Year that commences during any Renewal Term, the Rent for such Lease Year shall be equal to the product of (i) the annual

Rent in effect on the last day of the preceding Lease Year *multiplied by* (ii) the Renewal Term Escalator for such Renewal Term.

(c)    <u>Other Adjustments to Rent</u>.

(i)    As applicable during the Term, the Rent shall be increased pursuant to <u>Section 10.3(c)</u> of this Master Lease in respect of Capital Improvements funded by Landlord (and Rent, as so increased, shall, in each case, be subject to escalation thereafter as provided in the foregoing <u>clauses (a)</u> and <u>(b)</u>).

(ii)    Rent shall be subject to further adjustment as and to the extent provided in <u>Section 15.5</u> of this Master Lease.

"<u>Rent Service Coverage Ratio</u>":  For any Test Period, the ratio of (a) the EBITDAR of Tenant from the Facilities for such Test Period (and, to the extent applicable, the EBITDAR of any predecessor owner(s) of the Facilities during any portion of such Test Period that occurs prior to the Commencement Date) to (b) the Rent for such Test Period (provided, however, if any portion of such Test Period occurs prior to the Commencement Date, then, for purposes of the foregoing calculation, the Rent in effect on the Commencement Date shall be given pro forma effect so as to be deemed to have also been payable during the portion of such Test Period that occurs prior to the Commencement Date).  For purposes of calculating the Rent Service Coverage Ratio, EBITDAR shall be calculated on a pro forma basis (and shall be calculated to give effect to (x) pro forma adjustments reasonably contemplated by Tenant and (y) such other pro forma adjustments consistent with Regulation S-X under the Securities Act) to give effect to any material acquisitions and material asset sales consummated by Tenant or its Subsidiaries since the beginning of any Test Period of Tenant as if each such material acquisition had been effected on the first day of such Test Period and as if each such material asset sale had been consummated on the day prior to the first day of such Test Period.  In addition, EBITDAR and Rent shall be calculated on a pro forma basis to give effect to any increase or decrease in Rent as a result of the addition of Leased Property to, or the removal of Leased Property from, this Master Lease during any Test Period as if such increase or decrease had been effected on the first day of such Test Period.

"<u>Representative</u>":  With respect to the lenders or holders under a Debt Agreement, a Person designated as agent or trustee or a Person acting in a similar capacity or as representative for such lenders or holders.

"<u>Restoration Fund</u>":  As defined in Section 14.5.

"<u>Restricted Area</u>":  The geographical area that at any time during the Term is within a sixty (60) mile radius of any Facility covered under this Master Lease at such time.

"<u>Restricted Information</u>":  As defined in Section 23.1(c).

"<u>Restricted Payment</u>":  With respect to any Person: dividends (in cash, property or obligations) on, or other payments or distributions on account of, or the setting apart of money for a sinking or other analogous fund for, or the purchase, redemption, retirement, repurchase or other acquisition of, any Equity Interests or Equity Rights (other than outstanding securities convertible

into Equity Interests) in such Person, but excluding (a) dividends, payments or distributions paid through the issuance of additional shares of Equity Interests in such Person and any redemption, retirement or exchange of any Equity Interest through, or with the proceeds of, the issuance of Equity Interests in such Person and (b) any Tax Distributions with respect to such Person or its Subsidiaries.

"Retail Sales":  As defined in the definition of Net Revenue.

"Review Criteria":  As defined in Section 22.1(b).

"Room Renovation":  The renovation of each hotel room on the top two (2) floors of the Facility commonly known as the Wendover Nugget Hotel & Casino located at 101 Wendover Boulevard, West Wendover, Nevada, as more particularly described in the scope of work attached hereto as Schedule 10.4.

"Room Renovation Disbursement Instructions":  That certain Escrow Agreement dated as of the Commencement Date, by and among Landlord, Tenant and First American Title Insurance Company

"Room Renovation Escrow Account":  The segregated Eligible Account of Landlord that was established by Landlord solely for the purpose of holding, and shall only hold, funds to pay for the Room Renovation pursuant to the Room Renovation Disbursement Instructions.

"SEC":  The United States Securities and Exchange Commission.

"Securities Act":  The Securities Act of 1933, as amended, or any successor statute, and the rules and regulations promulgated thereunder.

"Site Assessments":  As defined in Section 32.5.

"Site Reviewers" :  As defined in Section 32.5.

"Solvent":  With respect to any Person on a particular date, that on such date (a) the fair value of the property of such Person, on a going-concern basis, is greater than the total amount of liabilities (including contingent liabilities) of such Person, (b) the present fair salable value of the assets of such Person, on a going-concern basis, is not less than the amount that will be required to pay the probable liability of such Person on its debts (including contingent liabilities) as they become absolute and matured, (c) such Person has not incurred, and does not intend to, and does not believe that it will, incur, debts or liabilities beyond such Person's ability to pay such debts and liabilities as they mature, (d) such Person is not engaged in business or a transaction, and is not about to engage in business or a transaction, for which such Person's property would constitute an unreasonably small capital and (e) such Person is "solvent" within the meaning given that term and similar terms under applicable laws relating to fraudulent transfers and conveyances. For purposes of this definition, the amount of any contingent liability shall be computed as the amount that, in light of all the facts and circumstances existing at such time, represents the amount that can reasonably be expected to become an actual or matured liability (irrespective of whether

such contingent liabilities meet the criteria for accrual under Accounting Standards Codification No. 450).

"<u>Specified Covenant Termination Date</u>":   The date on which the following condition is satisfied: the Rent Service Coverage Ratio has been greater than or equal to ████ and the Total Net Leverage Ratio has been less than or equal to ████ as of the end of two (2) consecutively ending Test Periods ending after the Commencement Date for which financial statements are available.

"<u>Specified Debt Agreement Default</u>": Any event or occurrence under a Debt Agreement or Material Indebtedness that enables or permits the lenders or holders (or Representatives of such lenders or holders) to accelerate the maturity of the Indebtedness outstanding under a Debt Agreement or Material Indebtedness.

"<u>Specified Expenses</u>":   For any Test Period, (i) Rent incurred for the same Test Period, and (ii) the (1) income tax expense, (2) consolidated interest expense, (3) depreciation and amortization expense, (4) any nonrecurring, unusual, or extraordinary items of income, cost or expense, including, but not limited to, (a) any gains or losses attributable to the early extinguishment or conversion of indebtedness, (b) gains or losses on discontinued operations and asset sales, disposals or abandonments, and (c) impairment charges or asset write-offs including, without limitation, those related to goodwill or intangible assets, long-lived assets, and investments in debt and equity securities, in each case, pursuant to GAAP, (5) any non-cash items of expense (other than to the extent such non-cash items of expense require an accrual or reserve for future cash expenses (<u>provided</u> that if such accrual or reserve is for contingent items, the outcome of which is subject to uncertainty, such non-cash items of expense may, at the election of Tenant, be added to net income and deducted when and to the extent actually paid in cash)), (6) any Pre-Opening Expenses, (7) transaction costs for the entry into this Master Lease, the negotiation and consummation of the financing transactions in connection therewith and the other transactions contemplated in connection with the foregoing consummated on or before the Commencement Date, (8) non-cash valuation adjustments, (9) any non-cash expenses related to the repurchase of stock options, and (10) expenses related to the grant of stock options, restricted stock, or other equivalent or similar instruments; in the case of each of (1) through (10), of Tenant and its Subsidiaries on a consolidated basis for such period.

"<u>Specified Operating Sublease</u>":   Any Specified Sublease that is designated as a "Specified Operating Sublease" on the list of the Specified Subleases attached hereto as <u>Schedule C</u>.

"<u>Specified Proceeds</u>":   For any Test Period, to the extent not otherwise included in Net Revenue, the amount of insurance proceeds (calculated net of any applicable deductible and the reasonable out-of-pocket costs and expenses actually incurred by Tenant, if any, to collect such proceeds) received during such period by Tenant or its Subsidiaries in respect of any Casualty Event; <u>provided</u>, <u>however</u>, that, for purposes of this definition, (i) with respect to any Facility subject to such Casualty Event which had been in operation for at least one complete fiscal quarter, the amount of insurance proceeds plus the Net Revenue (excluding such insurance proceeds), if any, attributable to the Facility subject to such Casualty Event for such period shall not exceed an amount equal to the Net Revenue attributable to such Facility for the Test Period ended

immediately prior to the date of such Casualty Event (calculated on a pro forma annualized basis to the extent such Facility was not operational for the full previous Test Period) and (ii) with respect to any Facility subject to such Casualty Event which had not been in operation for at least one complete fiscal quarter, the amount of insurance proceeds plus the Net Revenue attributable to such Facility for such period shall not exceed the Net Revenue reasonably projected by Tenant to be derived from such Facility for such period.

"Specified Sublease":  Any lease in effect on the Commencement Date with respect to all or part of the Leased Property and with respect to which Tenant is a sublessor or Operating Subtenant is a sub-sublessor.  A list of the Specified Subleases is attached on Schedule C hereto.

"State":  With respect to each Facility, the state or commonwealth in which such Facility is located.

"Subdivision": As defined in Section 7.4(b).

"Subsidiary":  As to any Person, (i) any corporation more than fifty percent (50%) of whose stock of any class or classes having by the terms thereof ordinary voting power to elect a majority of the directors of such corporation (irrespective of whether or not at the time stock of any class or classes of such corporation shall have or might have voting power by reason of the happening of any contingency) is at the time of determination owned by such Person and/or one or more Subsidiaries of such Person, and (ii) any partnership, limited liability company, association, joint venture or other entity in which such person and/or one or more Subsidiaries of such person has more than a fifty percent (50%) equity interest at the time of determination.  Unless otherwise qualified, all references to a "Subsidiary" or to "Subsidiaries" in this Master Lease shall refer to a Subsidiary or Subsidiaries of Tenant.

"Successor Tenant":  As defined in Section 36.1.

"Successor Tenant Rent":  As defined in Section 36.2.

"Taking":  As defined in Section 15.1(a).

"Taxes":  All present or future taxes, levies, imposts, duties (including stamp duties), deductions, withholdings or similar charges (including ad valorem charges) imposed by any governmental authority, and all interest, additions to tax and penalties related thereto.

"Tax Distributions":  (a) With respect to any taxable year for which a Person is treated as a partnership or disregarded entity for U.S. federal tax purposes, the payment of distributions to any direct or indirect owner of such Person with respect to the federal, state and local tax liabilities of such Person's direct and/or indirect owners (as the case may be) related to their shares of such Person's taxable income (determined, if such Person is a disregarded entity, as if such Person were a partnership), assuming that they were subject to tax at the highest combined U.S. federal, state and local marginal tax rate applicable to an individual or corporation and (b) with respect to any taxable year for which such Person is not treated as a partnership or disregarded entity for U.S. federal tax purposes and is a member of a consolidated, combined, or similar group of corporations for tax purposes, the payment of dividends or other distributions to any direct or indirect parent of such Person that files a consolidated, combined or similar tax return

that includes such Person and its Subsidiaries (by virtue of such parent being the common parent of a consolidated, combined or similar tax group of which such Person and/or its Subsidiaries are members) in an amount equal to the portion of the group's tax liability attributable to the income of such Person and its Subsidiaries, which amount shall in any case not exceed the amount that such Person and its Subsidiaries would have been required to pay in respect of federal, state or local taxes (as the case may be) if such Person and its Subsidiaries paid such taxes as a stand-alone taxpayer (or standalone group).

"Tenant": As defined in the preamble.

"Tenant Capital Improvement": A Capital Improvement funded by Tenant, as compared to Landlord. For the avoidance of doubt, each Capital Improvement made in connection with the Room Renovation shall be a "Tenant Capital Improvement" hereunder.

"Tenant COC": As defined in Section 22.2(iii).

"Tenant Competitor": As of any date of determination, any Person (other than Tenant and its Affiliates) that is engaged, or is an Affiliate of a Person that is engaged, in the ownership or operation of a Gaming business; provided, however, (i) for purposes of the foregoing, ownership of the real estate and improvements where a Gaming business is conducted, without ownership of the Gaming business itself, shall not be deemed to constitute the ownership of a Gaming business and (ii) any investment fund or other Person with an investment representing equity ownership in a Tenant Competitor shall not be deemed to be a Tenant Competitor for purposes of this definition unless such Person's (together with its Affiliates') direct or indirect equity interest in a Tenant Competitor that owns or operates a Gaming business located within a 100 mile radius of any Facility is greater than 50%.

"Tenant Database Data" Any and all information or data contained in, or derived from information or data contained in, any reservations database, operational database, player database or player loyalty program of Tenant, Tenant's Parent or any of their respective Affiliates, including, without limitation, any and all guest or customer profiles, contact information (e.g., addresses, phone numbers, facsimile numbers and email addresses), histories, preferences, game play and patronage patterns, experiences, results and demographic information, whether or not any of the foregoing constitutes personally identifiable information, together with any and all other guest or customer information.

"Tenant Existing Debt Agreement": That certain Second Amended and Restated Loan Agreement dated as of March 20, 2020, by and among Tenant's Parent and certain of its Subsidiaries from time to time party thereto, as borrowers thereunder, HG Vora Special Opportunities Master Fund, Ltd. and the other lenders from time to time party thereto, as lenders thereunder, and Ankura Trust Company, LLC, as administrative agent for the lenders thereunder (in such capacity, together with its successors and assigns, the "Administrative Agent"), as the same may be amended or modified from time to time.

"Tenant Existing Financing": The financing provided under the Tenant Existing Debt Agreement.

"Tenant Parent COC": As defined in Section 22.2(iii).

US-DOCS\124041687.41

"Tenant Party": As defined in the definition of Licensing Event.

"Tenant Refinancing" shall mean a refinancing of the Tenant Existing Financing which has the effect of retiring all debt under Tenant Existing Financing and results in a new corporate financing with a maturity date of at least five (5) years from the Commencement Date.

"Tenant Representatives":  As defined in Section 23.4.

"Tenant's Parent":  Maverick Gaming LLC, a Nevada limited liability company, and any permitted successor thereto.

"Term":  As defined in Section 1.3.

"Termination Notice":  As defined in Section 17.1(d).

"Test Period":  With respect to any Person, for any date of determination, the period of the four (4) most recently ended consecutive fiscal quarters of such Person.

"Total Net Leverage Ratio": For any Test Period, the ratio of (a) the sum of (i) the Indebtedness of Tenant's Parent and its Subsidiaries on a consolidated basis as of the end of such Test Period, less (ii) the lesser of (x) Ten Million Dollars ($10,000,000) and (y) the aggregate amount of all cash or cash equivalents of Tenant's Parent and its Subsidiaries on a consolidated basis that do not appear as "restricted" on a consolidated balance sheet of Tenant's Parent and its Subsidiaries as of the end of such Test Period to (b) EBITDA of Tenant's Parent and its Subsidiaries for such Test Period.  For purposes of calculating the Total Net Leverage Ratio, EBITDA shall be calculated on a pro forma basis (and shall be calculated to give effect to such other pro forma adjustments consistent with Regulation S-X under the Securities Act) to give effect to any material acquisitions and material asset sales consummated by Tenant's Parent or its Subsidiaries since the beginning of such Test Period as if each such material acquisition had been effected on the first day of such Test Period and as if each such material asset sale had been consummated on the day prior to the first day of such Test Period.  In addition, for the avoidance of doubt, if Tenant's Parent or any of its Subsidiaries has incurred any Indebtedness or repaid, repurchased, acquired, defeased or otherwise discharged any Indebtedness since the end of the most recent Test Period for which financial statements are available, Indebtedness shall be calculated (for purposes of this definition) after giving effect on a pro forma basis to such incurrence, repayment, repurchase, acquisition, defeasance or discharge and the applications of any proceeds thereof as if it had occurred prior to the first day of such Test Period.

"Unavoidable Delay":  Any of the following events which prevents a party from performing its obligations hereunder: epidemics, pandemics, strikes, lock-outs, inability to procure materials, power failure, acts of God, governmental restrictions, enemy action, civil commotion, fire, unavoidable casualty, condemnation or other causes beyond the reasonable control of the party responsible for performing an obligation hereunder; provided that lack of funds or failure to make any monetary payment shall not be deemed a cause beyond the reasonable control of a party.

"Unsuitable for Its Primary Intended Use":  A state or condition of any Facility such that by reason of damage or destruction, or a partial taking by Condemnation, such Facility cannot, following restoration thereof (to the extent commercially practical), be operated on a

commercially practicable basis for its Primary Intended Use, taking into account, among other relevant factors, the amount of square footage and the estimated revenue affected by such damage or destruction.

"<u>Wendover Diesel Equipment</u>" means the Wendover Diesel Tanks and the related pumps, pipes and equipment.

"<u>Wendover Diesel Tanks</u>": As defined in <u>Section 32.7(b)</u>.

"<u>Wendover Service Station</u>" means Miller's Wendover Service Station.

## ARTICLE III

      **3.1**    **Rent.**   During the Term, Tenant will pay to Landlord the Rent and Additional Charges in lawful money of the United States of America and legal tender for the payment of public and private debts, in the manner provided in Section 3.3.  The Rent during any Lease Year is payable monthly in advance in consecutive equal monthly installments on the first (1st) Business Day of each calendar month during that Lease Year.  Notwithstanding anything to the contrary in the foregoing sentence: (a) Rent due for the first Lease Year shall be prorated by multiplying such Rent amount by a fraction equal to (i) the number of days in such Lease Year <u>divided by</u> (ii) 365 (it being understood however, for the avoidance of doubt, that the amount of each monthly installment of Rent for the first Lear Year shall be calculated without giving effect to such proration) and (b) on the Commencement Date, a prorated portion of the amount of the monthly installment of Rent for the month in which the Commencement Date occurs shall be paid by Tenant for the period from the Commencement Date until the last day of such calendar month, based on the number of days during such period.  Unless otherwise agreed by the parties (including herein), (a) Rent and Additional Charges shall be prorated as to any partial months at the beginning and end of the Term and (b) in the event of any reduction of Rent pursuant to <u>Article XV</u>, the monthly installments of Rent applicable to any portion of the applicable Lease Year occurring from and after such reduction shall be recalculated to give effect thereto.  The parties will agree on an allocation of the Rent on a declining basis for federal income tax purposes within the 115/85 safe harbor of Section 467 of the Code, assuming a projected schedule of Rent for this purpose.

      **3.2**    **Late Payment of Rent.**  Tenant hereby acknowledges that late payment by Tenant to Landlord of Rent will cause Landlord to incur costs not contemplated hereunder, the exact amount of which is presently anticipated to be extremely difficult to ascertain.  Accordingly, if any installment of Rent other than Additional Charges payable to a Person other than Landlord shall not be paid within five (5) days after its due date, Tenant will pay Landlord on demand a late charge equal to the lesser of (a) five percent (5%) of the amount of such installment or (b) the maximum amount permitted by law; provided, however, that in no event shall any late charge be assessed on the full amount of Rent due pursuant to Section 16.3.  The parties agree that this late charge represents a fair and reasonable estimate of the costs that Landlord will incur by reason of late payment by Tenant.  The parties further agree that such late charge is Rent and not interest and such assessment does not constitute a lender or borrower/creditor relationship between Landlord and Tenant.  Thereafter, if any installment of Rent other than Additional Charges payable to a Person other than Landlord shall not be paid within ten (10) days after its due date, the amount unpaid, including any late charges previously accrued, shall bear interest at the Overdue Rate from

US-DOCS\124041687.41

the due date of such installment to the date of payment thereof, and Tenant shall pay such interest to Landlord on demand.  The payment of such late charge or such interest shall not constitute waiver of, nor excuse or cure, any default under this Master Lease, nor prevent Landlord from exercising any other rights and remedies available to Landlord.

        **3.3**    **Method of Payment of Rent.**  Rent and Additional Charges to be paid to Landlord shall be paid by electronic funds transfer debit transactions through wire transfer of immediately available funds and shall be initiated by Tenant for settlement on or before the Payment Date.  Landlord shall provide Tenant with appropriate wire transfer information in a Notice from Landlord to Tenant.  If Landlord directs Tenant to pay any Rent to any party other than Landlord, Tenant shall send to Landlord simultaneously with such payment, a copy of the transmittal letter or invoice and a check whereby such payment is made or such other evidence of payment as Landlord may reasonably require.

        **3.4**    **Net Lease.**  Landlord and Tenant acknowledge and agree that (i) this Master Lease is and is intended to be what is commonly referred to as a "net, net, net" or "triple net" lease, and (ii) the Rent shall be paid absolutely net to Landlord, so that this Master Lease shall yield to Landlord the full amount or benefit of the installments of Rent and Additional Charges throughout the Term with respect to each Facility, all as more fully set forth in Article IV and subject to any other provisions of this Master Lease which expressly provide for adjustment or abatement of Rent or other charges.  If Landlord commences any proceedings for non-payment of Rent, Tenant will not interpose any counterclaim or cross complaint or similar pleading of any nature or description in such proceedings unless Tenant would lose or waive such claim by the failure to assert it.  This shall not, however, be construed as a waiver of Tenant's right to assert such claims in a separate action brought by Tenant.  The covenants to pay Rent and other amounts hereunder are independent covenants, and Tenant shall have no right to hold back, offset or fail to pay any such amounts for default by Landlord or for any other reason whatsoever, except as provided in Section 3.1.

## ARTICLE IV

        **4.1**    **Impositions.**  (a)Subject to Article XII relating to permitted contests, Tenant shall pay, or cause to be paid, (i) all Impositions (other than real property taxes) on or before the due date and (ii) real property taxes in respect of the Leased Property on or before the later of (x) the due date and (y) the date that is thirty (30) days prior to the date that such taxes become delinquent.  Tenant shall make such payments directly to the taxing authorities where feasible, and promptly furnish to Landlord copies of official receipts or other satisfactory proof evidencing such payments.  Tenant's obligation to pay Impositions shall be absolutely fixed upon the date such Impositions become a lien upon the Leased Property or any part thereof subject to Article XII.  If any Imposition may, at the option of the taxpayer, lawfully be paid in installments, whether or not interest shall accrue on the unpaid balance of such Imposition, Tenant may pay the same, and any accrued interest on the unpaid balance of such Imposition, in installments as the same respectively become due and before any fine, penalty, premium, further interest or cost may be added thereto.  For the avoidance of doubt, Tenant shall be responsible for the payment of all Impositions that are due and payable as of the Commencement Date (regardless as to whether such Impositions are attributable to a period preceding the Commencement Date).

(b)     Landlord or AG shall prepare and file all tax returns and reports as may be required by Legal Requirements with respect to Landlord's net income, gross receipts, franchise taxes and taxes on its capital stock and any other returns required to be filed by or in the name of Landlord (the "**Landlord Tax Returns**"), and Tenant or Tenant's Parent shall prepare and file all other tax returns and reports as may be required by Legal Requirements with respect to or relating to the Leased Property (including all Capital Improvements), and the Operating Property owned by Tenant or its Subsidiaries.

(c)     Any refund due from any taxing authority in respect of any Imposition paid by or on behalf of Tenant or Tenant's Affiliates shall be paid over to or retained by Tenant.

(d)     Landlord and Tenant shall, upon request of the other, provide such data as is maintained by the party to whom the request is made with respect to the Leased Property as may be necessary to prepare any required returns and reports.  If any property covered by this Master Lease is classified as personal property for tax purposes, Tenant shall file all personal property tax returns in such jurisdictions where it must legally so file.  Landlord, to the extent it possesses the same, and Tenant, to the extent it possesses the same, shall provide the other party, upon request, with cost and depreciation records necessary for filing returns for any property so classified as personal property.  Where Landlord is legally required to file personal property tax returns, Tenant shall be provided with copies of any assessment notices indicating a value in excess of the reported value in sufficient time for Tenant to file a protest.

(e)     Billings for reimbursement by Tenant to Landlord of personal property or real property taxes and any taxes due under the Landlord Tax Returns, if and to the extent Tenant is responsible for such taxes under the terms of this Section 4.1, shall be accompanied by copies of a bill therefor and payments thereof which identify the personal property or real property or other tax obligations of Landlord with respect to which such payments are made.

(f)     Impositions imposed or assessed in respect of the tax-fiscal period during which the Term terminates shall be adjusted and prorated between Landlord and Tenant, whether or not such Imposition is imposed or assessed before or after such termination, and Tenant's obligation to pay its prorated share thereof in respect of a tax-fiscal period during the Term shall survive such termination.  Landlord will not voluntarily enter into agreements that would reasonably be expected to result in additional material Impositions without Tenant's consent, which shall not be unreasonably withheld, conditioned or delayed.

4.2     **Utilities.**  Tenant shall pay or cause to be paid all charges for electricity, power, gas, oil, water, internet, telephone and other utilities used in the Leased Property (including all Capital Improvements).  Tenant shall also pay or reimburse Landlord for all costs and expenses of any kind whatsoever which at any time with respect to the Term hereof with respect to any Facility may be imposed against Landlord by reason of any of the covenants, conditions and/or restrictions affecting the Leased Property or any portion thereof, or with respect to easements, licenses or other rights over, across or with respect to any adjacent or other property which benefits the Leased Property or any Capital Improvement, including any and all costs and expenses associated with any utility, drainage and parking easements.  Landlord will not enter into agreements that would reasonably be expected to materially encumber the Leased Property without Tenant's consent, which shall not be unreasonably withheld, conditioned or delayed.  Tenant will

not enter into agreements that will encumber the Leased Property after the expiration of the Term without Landlord's consent, which shall not be unreasonably withheld (it being understood that it shall not be reasonable to withhold consent to encumbrances that do not adversely affect the value of the Leased Property or the Facility); <u>provided</u> Landlord is given reasonable opportunity to participate in the process leading to such agreement.

    **4.3**  **Impound Account.** At Landlord's option following the occurrence and during the continuation of an Event of Default; and <u>provided</u> Tenant is not already being required to impound such payments in accordance with the requirements of Section 31.3(b) below, Tenant shall be required to deposit, at the time of any payment of Rent, an amount equal to one-twelfth of the sum of (i) Tenant's estimated annual real and personal property taxes required pursuant to Section 4.1 hereof (as reasonably determined by Landlord), and (ii) Tenant's estimated annual maintenance expenses and insurance premium costs pursuant to Articles IX and XIII hereof (as reasonably determined by Landlord). Such amounts shall be applied to the payment of the obligations in respect of which said amounts were deposited in such order of priority as Landlord shall reasonably determine, on or before the respective dates on which the same or any of them would become delinquent. Such amount shall be deposited in an interest-bearing segregated account with a banking institution and the reasonable cost of such bank for administering such impound account shall be paid by Tenant. Nothing in this Section 4.3 shall be deemed to affect any right or remedy of Landlord hereunder.

## ARTICLE V

    **5.1**  **No Termination, Abatement, etc.** Except as otherwise specifically provided in this Master Lease, Tenant shall remain bound by this Master Lease in accordance with its terms and shall not seek or be entitled to any abatement, deduction, deferment or reduction of Rent, or set-off against the Rent. Except as may be otherwise specifically provided in this Master Lease, the respective obligations of Landlord and Tenant shall not be affected by reason of (i) any damage to or destruction of the Leased Property or any portion thereof from whatever cause or any Condemnation of the Leased Property, any Capital Improvement or any portion thereof; (ii) the lawful or unlawful prohibition of, or restriction upon, Tenant's use of the Leased Property, any Capital Improvement or any portion thereof, the interference with such use by any Person or by reason of eviction by paramount title; (iii) any claim that Tenant has or might have against Landlord by reason of any default or breach of any warranty by Landlord hereunder or under any other agreement between Landlord and Tenant or to which Landlord and Tenant are parties; (iv) any bankruptcy, insolvency, reorganization, consolidation, readjustment, liquidation, dissolution, winding up or other proceedings affecting Landlord or any assignee or transferee of Landlord; or (v) for any other cause, whether similar or dissimilar to any of the foregoing, other than a discharge of Tenant from any such obligations as a matter of law. Tenant hereby specifically waives all rights arising from any occurrence whatsoever which may now or hereafter be conferred upon it by law (a) to modify, surrender or terminate this Master Lease or quit or surrender the Leased Property or any portion thereof, or (b) which may entitle Tenant to any abatement, reduction, suspension or deferment of the Rent or other sums payable by Tenant hereunder except in each case as may be otherwise specifically provided in this Master Lease. Except as expressly provided herein, Tenant is not waiving any rights or remedies, including the right to bring a separate action against Landlord for any breaches by Landlord of its obligations hereunder. The obligations of

US-DOCS\124041687.41

Landlord and Tenant hereunder shall be separate and independent covenants and agreements and the Rent and all other sums payable by Tenant hereunder shall continue to be payable in all events unless the obligations to pay the same shall be terminated pursuant to the express provisions of this Master Lease or by termination of this Master Lease as to all or any portion of the Leased Property other than by reason of an Event of Default.  Tenant's agreement that, except as may be otherwise specifically provided in this Master Lease, any eviction by paramount title as described in item (ii) above shall not affect Tenant's obligations under this Master Lease, shall not in any way discharge or diminish any obligation of any insurer under any policy of title or other insurance.

## ARTICLE VI

**6.1** <u>**Ownership of the Leased Property.**</u>  (a)  Landlord and Tenant acknowledge and agree that they have executed and delivered this Master Lease with the understanding that (i) the Leased Property is the property of Landlord, (ii) Tenant has only the right to the possession and use of the Leased Property upon the terms and conditions of this Master Lease, (iii) this Master Lease is a "true lease," is not a financing lease, capital lease, mortgage, equitable mortgage, deed of trust, trust agreement, security agreement or other financing or trust arrangement, and the economic realities of this Master Lease are those of a true lease, (iv) the business relationship created by this Master Lease and any related documents is and at all times shall remain that of landlord and tenant, (v) this Master Lease has been entered into by each party in reliance upon the mutual covenants, conditions and agreements contained herein, and (vi) none of the agreements contained herein is intended, nor shall the same be deemed or construed, to create a partnership between Landlord and Tenant, to make them joint venturers, to make Tenant an agent, legal representative, partner, subsidiary or employee of Landlord, or to make Landlord in any way responsible for the debts, obligations or losses of Tenant.

(b)  Each of the parties hereto covenants and agrees, subject to Section 6.1(c), not to (i) file any income tax return or other associated documents; (ii) file any other document with or submit any document to any governmental body or authority; (iii) enter into any written contractual arrangement with any Person; or (iv) release any financial statements of Tenant, in each case that takes a position other than that this Master Lease is a "true lease" with Landlord as owner of the Leased Property and Tenant as the tenant of the Leased Property, including (x) treating Landlord as the owner of such Leased Property eligible to claim depreciation deductions under Sections 167 or 168 of the Code with respect to such Leased Property, (y) Tenant reporting its Rent payments as rent expense under Section 162 of the Code, and (z) Landlord reporting the Rent payments as rental income under Section 61 of the Code, in each case except as otherwise required by a change in law or a "determination" within the meaning of Section 1313(a) of the Code (or similar provision of state or local law).

(c)  If Tenant should reasonably conclude that GAAP or the SEC require treatment different from that set forth in Section 6.1(b) for applicable non-tax purposes, then (x) Tenant shall promptly give prior Notice to Landlord, accompanied by a written statement that references the applicable pronouncement that controls such treatment and contains a brief description and/or analysis that sets forth in reasonable detail the basis upon which Tenant reached such conclusion, and (y) notwithstanding Section 6.1(b), Tenant may comply with such requirements.

US-DOCS\124041687.41

(d)     The Rent is the fair market rent for the use of the Leased Property and was agreed to by Landlord and Tenant on that basis, and the execution and delivery of, and the performance by Tenant of its obligations under, this Master Lease does not constitute a transfer of all or any part of the Leased Property.

(e)     Tenant waives any claim or defense based upon the characterization of this Master Lease as anything other than a true lease and as a master lease of all of the Leased Property. Tenant stipulates and agrees (1) not to challenge the validity, enforceability or characterization of the lease of the Leased Property as a true lease and/or as a single, unseverable instrument pertaining to the lease of all, but not less than all, of the Leased Property, and (2) not to assert or take or omit to take any action inconsistent with the agreements and understandings set forth in Section 3.4 or this Section 6.1, in each case, except as otherwise required by a change in law or a "determination" within the meaning of Section 1313(a) of the Code (or similar provision of state or local law).

**6.2     Operating Property.**  Tenant shall, during the entire Term, own (or lease) and maintain (or cause its Subsidiaries and/or subtenants to own (or lease) and maintain) on the Leased Property adequate and sufficient Operating Property or other property, and shall maintain (or cause its Subsidiaries and/or subtenants to maintain) all of such Operating Property or other property in good order, condition and repair, in all cases as shall be necessary and appropriate in order to operate the Facilities for the Primary Intended Use in compliance with all applicable licensure and certification requirements and in compliance with all applicable Legal Requirements, Insurance Requirements and Gaming Regulations.  If any Operating Property or such other property requires replacement in order to comply with the foregoing, Tenant shall replace (or cause its Subsidiaries and/or subtenants to replace) it with similar property of the same or better quality at Tenant's (or such Subsidiary's or subtenant's) sole cost and expense.  Subject to the foregoing, Tenant and its Subsidiaries and subtenants may sell, transfer, convey or otherwise dispose of Operating Property or other property in their discretion in the ordinary course of their respective business and Landlord shall have no rights to such Operating Property or other property.  Tenant shall, upon Landlord's request, from time to time but not more frequently than one time per Lease Year, provide Landlord with a list of the material Operating Property located at each of the Facilities.  In the case of any such Operating Property that is leased (rather than owned) by Tenant (or its Subsidiaries or Operating Subtenants), Tenant shall use commercially reasonable efforts to ensure (or cause its Subsidiaries and/or Operating Subtenants to ensure) that the lease agreements pursuant to which Tenant (or its Subsidiaries and/or Operating Subtenants) leases such Operating Property are assignable to third parties in connection with any transfer by Tenant (or its Subsidiaries and/or Operating Subtenants) to a replacement lessee or operator at the end of the Term.  Tenant shall remove (or cause to be removed) all Operating Property from the Leased Property at the end of the Term, except to the extent Tenant (or its Subsidiaries and/or Operating Subtenants) has transferred ownership of such Operating Property to a Successor Tenant or Landlord.  Any Operating Property left on the Leased Property at the end of the Term whose ownership was not transferred to a Successor Tenant or Landlord shall be deemed abandoned by Tenant and shall become the property of Landlord.

**6.3     Guarantors.**  Each of Tenant's Parent and each of Tenant's Affiliates set forth on Schedule 6.3 hereto shall initially be a Guarantor under this Master Lease and shall execute and deliver to Landlord the Guaranty attached hereto as Exhibit D.  In addition, if any material Gaming License, other material license or other material asset that is located at the Leased

US-DOCS\124041687.41

Property or used exclusively in connection with the Leased Property and, in each case, necessary to operate any portion of the Leased Property, is owned by an Affiliate of Tenant, Tenant shall, within two (2) Business Days after the date such Affiliate acquires such Gaming License, other material license or other material asset, (a) notify Landlord thereof and (b) cause such Affiliate (if it is not already a Guarantor) to become a Guarantor by joining the Guaranty in accordance with the terms thereof.

**ARTICLE VII**

7.1     **Condition of the Leased Property.**   Tenant acknowledges receipt and delivery of possession of the Leased Property and confirms that Tenant has examined and otherwise has knowledge of the condition of the Leased Property prior to the execution and delivery of this Master Lease and has found the same (except as included in the disclosures on Schedule C hereto) to be in good order and repair and, to the best of Tenant's knowledge, free from Hazardous Substances not in compliance with Legal Requirements and satisfactory for its purposes hereunder.  Regardless, however, of any examination or inspection made by Tenant and whether or not any patent or latent defect or condition was revealed or discovered thereby, Tenant is leasing the Leased Property "as is" in its present condition.  Subject to Section 32.6, Tenant waives any claim or action against Landlord in respect of the condition of the Leased Property, including any defects or adverse conditions not discovered or otherwise known by Tenant as of the Commencement Date.  LANDLORD MAKES NO WARRANTY OR REPRESENTATION, EXPRESS OR IMPLIED, IN RESPECT OF THE LEASED PROPERTY OR ANY PART THEREOF, EITHER AS TO ITS FITNESS FOR USE, DESIGN OR CONDITION FOR ANY PARTICULAR USE OR PURPOSE OR OTHERWISE, OR AS TO THE NATURE OR QUALITY OF THE MATERIAL OR WORKMANSHIP THEREIN, OR THE EXISTENCE OF ANY HAZARDOUS SUBSTANCE ON THE LEASED PROPERTY OR ANY PART THEREOF, IT BEING AGREED THAT ALL SUCH RISKS, LATENT OR PATENT, ARE TO BE BORNE SOLELY BY TENANT INCLUDING ALL RESPONSIBILITY AND LIABILITY FOR ANY REMEDIATION AND COMPLIANCE WITH ALL ENVIRONMENTAL LAWS, EXCEPT AS SET FORTH IN SECTION 32.6 HEREOF.

7.2     **Use of the Leased Property.**  (a)     Tenant shall use or cause to be used the Leased Property for its Primary Intended Use.  Tenant shall not use the Leased Property or any portion thereof or any Capital Improvement thereto for any other use without the prior written consent of Landlord, which consent Landlord may withhold in its sole discretion.  Landlord acknowledges that operation of each Facility for its Primary Intended Use may require a Gaming License under applicable Gaming Regulations and that without such a license no Person may operate, control or participate in the conduct of the Gaming and/or racing operations at the Facilities.

(b)     Tenant shall be responsible for obtaining and maintaining all permits, licenses, certificates of occupancy, or any other items required by any Legal Requirement with respect to Tenant's use and occupancy of each of the Leased Property.  Tenant shall not use or occupy or permit any of the Leased Property to be used or occupied, nor do or permit anything to be done in or on any of the Leased Property, in a manner which would or would reasonably be expected to (i) violate any Legal Requirement, Permitted Encumbrance or the Ground Lease, (ii)

US-DOCS\124041687.41

make void or voidable or cause any insurer to cancel any insurance required by this Master Lease, or make it difficult or impossible to obtain any such insurance at commercially reasonable rates, (iii) make void or voidable, cancel or cause to be cancelled or release any of the Warranties (as defined the Purchase and Sale Agreement), (iv) cause structural injury to any of the Improvements, or (v) materially diminish the market value or materially impair the usefulness of such Leased Property. Tenant shall not commit or suffer to be committed any waste on the Leased Property (including any Capital Improvement thereto) or cause or permit any nuisance thereon or to, except as required by law, take or suffer any action or condition that will diminish the ability of the Leased Property to be used for a Primary Intended Use after the expiration or earlier termination of the Term.

(c)     Tenant shall neither suffer nor permit the Leased Property or any portion thereof to be used in such a manner as (i) might reasonably tend to impair Landlord's title thereto or to any portion thereof or (ii) may make possible a claim of adverse use or possession, or an implied dedication of the Leased Property or any portion thereof.

(d)     Tenant shall continuously operate each Facility for the Primary Intended Use (except as a result of casualty, condemnation or Unavoidable Delay that affects such Facility); provided, that Tenant shall be permitted to cease operations at a Facility or Facilities with Landlord's prior written consent (which consent may be withheld in Landlord's sole discretion).

### 7.3    **Competing Business.**

(a)     Tenant's Obligations for Greenfields.  Tenant agrees that during the Term, neither Tenant nor any of its Affiliates shall (i) build or otherwise participate in the development of a new Gaming Facility (including a facility that has been shut down for a period of more than twelve (12) months) located within a Restricted Area of a Facility (a "**Greenfield Project**") or (ii) acquire or operate any Competing Facility, unless Tenant shall first offer Landlord the opportunity to include the Greenfield Project or the Competing Facility, as the case may be, as a Leased Property under this Master Lease on terms to be negotiated by the parties (which terms with respect to Landlord funding the development of any such Greenfield Project shall include the terms set forth in Section 10.3 hereof regarding Capital Improvements).  Within thirty (30) days of Landlord's receipt of notice from Tenant providing the opportunity to fund and include as Leased Property under this Master Lease a Greenfield Project or a Competing Facility, as the case may be, on terms to be negotiated by the parties, Landlord shall notify Tenant as to whether it intends to participate in such Greenfield Project or acquire such Competing Facility, as applicable, and, if Landlord indicates such intent, the parties shall negotiate in good faith the terms and conditions upon which this would be effected, including the terms of any amendment to this Master Lease and any development, funding or purchase agreement, which Landlord might require.  Should Landlord notify Tenant that it does not intend to pursue such Greenfield Project or Competing Facility (or should Landlord decline to notify Tenant of its affirmative response within such thirty (30) day period), or if the parties, despite good faith efforts on both sides, fail to reach agreement on the terms under which such opportunity would be jointly pursued under this Master Lease and such new Greenfield Project or Competing Facility, would become a portion of the Leased Property hereunder, in any event, within forty-five (45) days after Landlord's notice to Tenant of Landlord's intent to participate in such Greenfield Project or Competing Facility, then Tenant shall

US-DOCS\124041687.41

have no further obligation to Landlord with respect to, and may pursue, such Greenfield Project or Competing Facility, as applicable.  Notwithstanding anything to the contrary in this Section 7.3(a), Tenant and its Affiliates shall not be restricted under this Section 7.3(a) from expanding any Facility under this Master Lease (subject to Tenant's compliance with the terms of Section 10.3 and the other provisions of Article X).

        (b)      <u>Landlord's Obligations for Greenfields</u>.  Landlord agrees that during the Term, neither Landlord nor any of its Affiliates shall, without the prior written consent of Tenant (which consent may be withheld in Tenant's sole discretion), build or otherwise participate in the development of a Greenfield Project within the Restricted Area.  Notwithstanding anything to the contrary in this Section 7.3(b), (i) Landlord and its Affiliates shall not be restricted under this Section 7.3(b) from acquiring, financing or providing refinancing for any facility that is in operation or has been in operation at any time during the twelve month period prior to the time in question, and (ii) subject to the provisions of Section 7.3(d) hereof, Landlord and its Affiliates shall not be restricted under this Section 7.3(b) from expanding any Competing Facility existing at the time in question.

        (c)      <u>Tenant's Rights Regarding Facility Expansions</u>.  Tenant shall be permitted to construct Capital Improvements in accordance with the terms of Article X hereof.

        (d)      <u>Landlord's Rights Regarding Facility Expansions</u>.  Landlord shall be permitted to finance expansions of any Competing Facility within the Restricted Area that is already in existence at any time in question.

        (e)      <u>Landlord's Rights to Acquire or Finance Existing Facilities</u>.  Landlord shall not be restricted under this Section 7.3 from acquiring or providing any kind of financing or refinancing to any Competing Facility within the Restricted Area that is already in existence at any time in question.

        (f)      <u>No Restrictions Outside of Restricted Area</u>.  Each of Landlord and Tenant shall not be restricted from participating in opportunities, including, without limitation, developing, building, purchasing or operating Gaming Facilities, outside the Restricted Area at any time.

        **7.4**    **Sublease.**  Tenant acknowledges and agrees that this Master Lease constitutes a sublease of Landlord's right, title and interest held under and pursuant to the Ground Lease.  In consideration of the foregoing, Tenant acknowledges and agrees that:

        (a)      Upon the exercise by Landlord of its right to record either Deed 1 or Deed 2 in the Official Records (as each such term is defined in the Ground Lease), this Master Lease shall immediately and unconditionally constitute a direct lease between Landlord and Tenant with respect to (i) the portion of the Leased Property which comprises the Ground Lease Premises if Landlord records Deed 1 in the Official Records, or (ii) Parcel A if Landlord records Deed 2 in the Official Records and the Leased Property hereunder shall be amended to include any additional property which comprises Parcel A which is not part of the Leased Property as of the date hereof, and (A) Tenant shall continue to be bound to Landlord under all of the terms, covenants and conditions this Master Lease for the balance of the term thereof remaining, and any extensions

or renewals hereof which may be effected in accordance with any renewal option contained in this Master Lease, (B) Tenant hereby attorns to Landlord (as fee owner of the Leased Property), such attornment to be effective and self-operative without the execution of any further instruments on the part of any of the parties hereto, and (C) Tenant will execute a written agreement whereunder Tenant acknowledges and confirms the foregoing and attorns to the Landlord and affirms each of Tenant's obligations under this Master Lease with respect to the Leased Property; such amendment shall also contain any changes needed in this Master Lease to clarify that such portion of the Leased Property is no longer subject to the Ground Lease.  If Landlord exercises its right to record Deed 2 in the Official Records during the term of this Lease, then, notwithstanding anything to the contrary set forth herein, the then-current use(s) of Parcel A at such time shall be permitted hereunder.

(b)    Until such time, if any, as Landlord has elected to record Deed 2 in the Official Records (as each such term is defined in the Ground Lease), Landlord and Tenant shall cooperate to complete a legal subdivision of the Ground Lease Premises or a lot line adjustment or similar procedure such that Tenant may convey the Ground Lease Premises to Landlord in fee simple and in accordance with the law of State of Utah with respect to subdivisions of land (the "**Subdivision**") as soon as reasonably practicable.  Notwithstanding anything to the contrary herein, all actions taken in connection with the Subdivision, including hiring counsel, shall be subject to the joint approval of Landlord and Tenant.  The Subdivision plat shall be prepared by an engineering firm and the legal services necessary to undertake the Subdivision shall be provided by counsel, in each case, approved jointly by Landlord and Tenant.  No Subdivision plat may be filed by the Tenant without the prior written consent of Landlord, which consent, as to timing of filing of plat only, Landlord shall have no obligation to grant and which consent, if granted, may be conditioned in such manner as Landlord, in its sole discretion, shall determine to be appropriate.  Landlord and Tenant agree to join in, cooperate with and sign applications as required by the governmental entity or agency having proper jurisdiction in connection with a Subdivision plat.  Tenant shall incur and pay for all costs and expenses in respect of the Subdivision.  If Landlord shall not have previously recorded Deed 1 in the Official Records (as each such term is defined in the Ground Lease), Landlord shall have the right to elect to record Deed 2 in the Official Records (as each such term is defined in the Ground Lease) (the date, if any, that Landlord elects to record Deed 2 in the Official Records in accordance herewith and the Ground Lease, the "<u>Deed 2 Delivery Date</u>").

## ARTICLE VIII

8.1    <u>**Representations and Warranties.**</u>  Each party represents and warrants to the other that  (i) this Master Lease and all other documents executed or to be executed by it in connection herewith have been duly authorized and shall be binding upon it; (ii) it is duly organized, validly existing and in good standing under the laws of the state of its formation and is duly authorized and qualified to perform this Master Lease within the State(s) where any portion of the Leased Property is located; and (iii) neither this Master Lease nor any other document executed or to be executed in connection herewith violates the terms of any other agreement of such party.

8.2    <u>**Compliance with Legal and Insurance Requirements, etc.**</u>  Subject to Article XII regarding permitted contests, Tenant, at its expense, shall promptly (a) comply with all

Legal Requirements (including all applicable Environmental Laws) and Insurance Requirements regarding the use, operation, maintenance, repair and restoration of the Leased Property (including all Capital Improvements thereto) and Operating Property whether or not compliance therewith may require structural changes in any of the Leased Improvements or interfere with the use and enjoyment of the Leased Property, (b) procure and maintain (or cause to be procured and maintained) all Gaming Licenses and other authorizations required for the use of the Leased Property (including all Capital Improvements) and Operating Property for the applicable Primary Intended Use and any other use of the Leased Property (including Capital Improvements then being made) and Operating Property, and for the proper erection, installation, operation and maintenance of the Leased Property and Operating Property and (c) comply in all material respects with all Gaming Regulations.  In an emergency or in the event of a breach by Tenant of its obligations under this Section 8.2 which is not cured within any applicable cure period, Landlord may, but shall not be obligated to, enter upon the Leased Property and take such reasonable actions and incur such reasonable costs and expenses to effect such compliance as it deems advisable to protect its interest in the Leased Property, and Tenant shall reimburse Landlord for all such reasonable costs and expenses incurred by Landlord in connection with such actions.  Tenant covenants and agrees that the Leased Property and Operating Property shall not be used for any unlawful purpose.

       **8.3**    **Zoning and Uses.**  Without the prior written consent of Landlord, which shall not be unreasonably withheld unless the action for which consent is sought could adversely affect the Primary Intended Use of a Facility (in which event Landlord may withhold its consent in its sole and absolute discretion), Tenant shall not (i) initiate or support any limiting change in the permitted uses of the Leased Property (or to the extent applicable, limiting zoning reclassification of the Leased Property); (ii) seek any variance under existing land use restrictions, laws, rules or regulations (or, to the extent applicable, zoning ordinances) applicable to the Leased Property or use or permit the use of the Leased Property other than for the Primary Intended Use; (iii) impose or permit or suffer the imposition of any restrictive covenants, easements or encumbrances (other than Permitted Leasehold Mortgages) upon the Leased Property in any manner that adversely affects in any material respect the value or utility of the Leased Property; (iv) execute or file any subdivision plat or similar recorded map affecting the Leased Property, or institute, or permit the institution of, proceedings to alter any tax lot comprising the Leased Property; or (v) permit or suffer the Leased Property to be used by the public or any Person in such manner as might make possible a claim of adverse usage or possession or of any implied dedication or easement (provided that the proscription in this clause (v) is not intended to and shall not restrict Tenant in any way from complying with any obligation it may have under applicable Legal Requirements, including, without limitation, Gaming Regulations, to afford to the public access to the Leased Property).

## ARTICLE IX

    **9.1**    **Maintenance and Repair.**

       (a) Tenant shall complete the repairs listed on Schedule 9.1(a) (the "Immediate Repairs") no later than September 3, 2022.  If Tenant does not complete the Immediate Repairs by such date, then Tenant shall deliver to Landlord (or Facility Mortgagee if required by any Facility Mortgage) a letter of credit in an amount equal to the cost of the remaining Immediate Repairs.  If

such a letter of credit is issued, then upon completion of the Immediate Repairs and Tenant's delivery of (i) lien waivers in respect thereof that are in statutory form (if applicable) and reasonably satisfactory to Landlord and (ii) a certificate of Tenant, signed by the president or a vice president (or equivalent officer) of Tenant, stating that the Immediate Repairs have been fully completed and comply with the applicable requirements of this Master Lease and with all Legal Requirements, Landlord shall (or shall cause the applicable Facility Mortgagee to, if applicable) execute such instruments as are necessary to return the letter of credit to Tenant; provided, however, that (A) no Event of Default shall exist, (B) all materials installed and work and labor performed in connection with the Immediate Repairs shall have been paid in full, and (C) no mechanics' or materialmen's liens, stop orders, notices of pendency or litigation with respect to the Immediate Repairs shall have been filed or threatened against any of the applicable Leased Property and remain undischarged (unless fully bonded to the reasonable satisfaction of Landlord).

(b)      Tenant, at its expense and without the prior consent of Landlord, shall maintain (or cause to be maintained) the Leased Property and Operating Property, and every portion thereof, and all private roadways, sidewalks and curbs appurtenant to the Leased Property and which are under Tenant's control, in good order and repair whether or not the need for such repairs occurs as a result of Tenant's use, any prior use, the elements or the age of the Leased Property and Operating Property and, with reasonable promptness, make (or cause to be made) all reasonably necessary and appropriate repairs thereto of every kind and nature, including those necessary to ensure continuing compliance with all Legal Requirements, whether interior or exterior, structural or non-structural, ordinary or extraordinary, foreseen or unforeseen or arising by reason of a condition existing prior to the Commencement Date.  All repairs shall be at least equivalent in quality to the original work.  Tenant will not take or omit to take any action the taking or omission of which would reasonably be expected to materially impair the value or the usefulness of the Leased Property or any part thereof or any Capital Improvement thereto for its Primary Intended Use.  Tenant shall provide Landlord with an engineering or property condition report (at Tenant's sole cost and expense and in form and substance reasonably satisfactory to Landlord) not more than twenty-four (24) months nor less than twelve (12) months prior to the end of the Term and shall make any repairs or replacements indicated therein that are required to cause the condition of the Leased Property to be in the form required pursuant to Section 9.1(e) no later than the last day of the Term.

(c)      Landlord shall not under any circumstances be required to (i) build or rebuild any improvements on the Leased Property; (ii) make any repairs, replacements, alterations, restorations or renewals of any nature to the Leased Property, whether ordinary or extraordinary, structural or non-structural, foreseen or unforeseen, or to make any expenditure whatsoever with respect thereto; or (iii) maintain the Leased Property in any way.  Tenant hereby waives, to the extent permitted by law, the right to make repairs at the expense of Landlord pursuant to any law in effect at the time of the execution of this Master Lease or hereafter enacted.

(d)      Nothing contained in this Master Lease and no action or inaction by Landlord shall be construed as (i) constituting the consent or request of Landlord, expressed or implied, to any contractor, subcontractor, laborer, materialman or vendor to or for the performance of any labor or services or the furnishing of any materials or other property for the construction, alteration, addition, repair or demolition of or to the Leased Property or any part thereof or any Capital Improvement thereto; or (ii) giving Tenant any right, power or permission to contract for

US-DOCS\124041687.41

or permit the performance of any labor or services or the furnishing of any materials or other property in such fashion as would permit the making of any claim against Landlord in respect thereof or to make any agreement that may create, or in any way be the basis for, any right, title, interest, lien, claim or other encumbrance upon the estate of Landlord in the Leased Property, or any portion thereof or upon the estate of Landlord in any Capital Improvement thereto.  NOTICE IS HEREBY GIVEN THAT LANDLORD SHALL NOT BE LIABLE FOR ANY LABOR, SERVICES OR MATERIALS FURNISHED OR TO BE FURNISHED TO TENANT OR TO ANYONE HOLDING OR OCCUPYING ANY OF THE LEASED PROPERTY THROUGH OR UNDER TENANT, AND THAT NO MECHANICS' OR OTHER LIENS FOR ANY SUCH LABOR, SERVICES OR MATERIALS SHALL ATTACH TO OR AFFECT THE INTEREST OF LANDLORD IN AND TO ANY OF THE LEASED PROPERTY.  LANDLORD MAY AT ANY TIME POST ANY NOTICES ON ANY OF THE LEASED PROPERTY REGARDING SUCH NON-LIABILITY OF LANDLORD.

(e)     Tenant shall, upon the expiration or earlier termination of the Term, vacate and surrender the Leased Property (including all Capital Improvements, subject to the provisions of Article X), in each case with respect to each Facility, to Landlord in the condition in which such Leased Property was originally received from Landlord and Capital Improvements were originally introduced to such Facility, except as repaired, rebuilt, restored, altered or added to as permitted or required by the provisions of this Master Lease (including Section 14.2 and 15.1) and except for ordinary wear and tear.

(f)     Without limiting Tenant's obligations to maintain (or cause to be maintained) the Leased Property and Operating Property under this Master Lease, within thirty (30) days after the end of each calendar year (commencing with the calendar year ending December 31, 2022), Tenant shall provide Landlord with evidence satisfactory to Landlord in the reasonable exercise of Landlord's discretion that Tenant has in such calendar year spent or caused to be spent, with respect to the Leased Property, the Operating Property and/or the Facilities, an aggregate amount equal to at least 1% of Tenant's actual Net Revenue from the Facilities for such calendar year on installation or restoration and repair or other improvement of items, which installations, restorations and repairs and other improvements are capitalized in accordance with GAAP with an expected life of not less than three (3) years; provided that, in the event an Unavoidable Delay occurs or the Facilities are closed to the public for any other reason during the time during which Tenant is required to make (or cause to be made) the foregoing expenditures and such Unavoidable Delay or closure actually prevents or delays Tenant's performance of such installations, restorations, repairs or other improvements, then the relevant period in which Tenant was obligated to perform such installations, restorations, repairs or other improvements shall be extended, on a day-for-day basis, for the same amount of time that such Unavoidable Delay or closure actually delayed Tenant's ability to perform such installations, restorations, repairs or other improvements.  For the avoidance of doubt, all amounts spent by Tenant or disbursed from the Room Renovation Escrow Account in connection with the Room Renovation during any applicable calendar year shall be credited towards the minimum amount of capital expenditures required by this Section 9.1(e) for such calendar year.  If Tenant fails to make at least the above amount of capital expenditures and fails within sixty (60) days after receipt of a written demand from Landlord to either (i) cure such deficiency or (ii) obtain Landlord's written approval, in its reasonable discretion, of a repair and maintenance program satisfactory to cure such deficiency, then the same shall be deemed an Event of Default hereunder.

9.2 **Encroachments, Restrictions, Mineral Leases, etc.** If any of the Leased Improvements shall, at any time, encroach upon any property, street or right-of-way, or shall violate any restrictive covenant or other agreement affecting the Leased Property, or any part thereof or any Capital Improvement thereto, or shall impair the rights of others under any easement or right-of-way to which the Leased Property is subject, or the use of the Leased Property or any Capital Improvement thereto is impaired, limited or interfered with by reason of the exercise of the right of surface entry or any other provision of a lease or reservation of any oil, gas, water or other minerals, then Tenant shall, promptly upon the request of Landlord or any Person affected by any such encroachment, violation or impairment, in each case, if the Deed 2 Delivery Date occurs, except for any encroachment or other matters relating to the Wendover Diesel Equipment or Wendover Service Station, either (A) obtain from all necessary parties waivers or settlements of all claims, liabilities and damages resulting from each such encroachment, violation, hindrance, obstruction or impairment, whether the same shall affect Landlord, Tenant or both, or (B) take such action as shall be necessary to remove all such encroachments, hindrances or obstructions and to end all such violations or impairments, including, if necessary, making alterations or modifications to the Leased Improvements. Tenant's obligations under this Section 9.2 shall be in addition to and shall in no way discharge or diminish any obligation of any insurer under any policy of title or other insurance of Landlord or Tenant and Tenant shall be entitled to any amounts recovered under any such policy of title or other insurance up to the maximum amount paid by Tenant under this Section 9.2 and Landlord, upon request by Tenant, agrees to use reasonable efforts to seek recovery under any policy of title or other insurance under which Landlord is an insured party for all losses, liabilities, obligations, claims, damages, penalties, causes of action, costs and expenses (including reasonable attorneys', consultants' and experts' fees and expenses) based on or arising by reason of any such encroachment, violation or impairment as set forth in this Section 9.2; provided, however, that in no event shall Landlord be obligated to institute any litigation, arbitration or other legal proceedings in connection therewith unless Landlord is reasonably satisfied that Tenant has the financial resources needed to fund the costs of such litigation.

## ARTICLE X

10.1 **Construction of Capital Improvements to the Leased Property.** Tenant shall, with respect to any Facility, have the right to make a Capital Improvement, including, without limitation, any Capital Improvement required by Section 8.2 or 9.1(a), without the consent of Landlord if the Capital Improvement (i) is of equal or better quality than the existing Leased Improvements it is improving, altering or modifying, (ii) does not consist of adding new structures or enlarging existing structures, (iii) is not structural in nature, (iv) does not have an effect on the structure (or any structural elements) of any existing Leased Improvements, (v) costs less than the Alteration Threshold with respect to the applicable Facility, and (vi) would not reasonably be expected to have a material adverse effect on such Facility. Tenant shall provide Landlord copies of the plans and specifications in respect of all Capital Improvements, which plans and specifications shall be prepared in a high-grade professional manner and shall adequately demonstrate compliance with clauses (i)-(vi) of the preceding sentence with respect to projects that do not require Landlord's written consent and shall be in such form as Landlord may reasonably require for any other projects. All other Capital Improvements shall be subject to Landlord's review and approval, which approval shall not be unreasonably withheld. At the time

of approving any Capital Improvement pursuant to this Section 10.1, Landlord shall have the right to advise Tenant in writing that Tenant will be required to remove any Capital Improvement so consented to at the end of the Term, except for any Capital Improvement that is required by Law. For any Capital Improvement which does not require the approval of Landlord, Tenant shall, prior to commencing construction of such Capital Improvement, provide to Landlord a written description of such Capital Improvement and on an ongoing basis supply Landlord with related documentation and information as Landlord may reasonably request (including plans and specifications of any such Capital Improvements).  If Tenant desires to make a Capital Improvement for which Landlord's approval is required, Tenant shall submit to Landlord in reasonable detail a general description of the proposal, the projected cost of construction and such plans and specifications, permits, licenses, contracts and other information concerning the proposal as Landlord may reasonably request.  Such description shall indicate the use or uses to which such Capital Improvement will be put and the impact, if any, on current and forecasted gross revenues and operating income attributable thereto.  It shall be reasonable for Landlord to condition its approval of any Capital Improvement upon any or all of the following terms and conditions:

(a)     Such construction shall be effected pursuant to detailed plans and specifications approved by Landlord, which approval shall not be unreasonably withheld;

(b)     Such construction shall be conducted under the supervision of a licensed architect or engineer selected by Tenant and approved by Landlord, which approval shall not be unreasonably withheld;

(c)     Landlord's receipt, from the general contractor and, if reasonably requested by Landlord, a major subcontractor(s), of a performance and payment bond (or, if Tenant elects, in lieu of a performance and payment bond covering any major subcontractor, Sub-guard insurance, which policy shall be in form reasonably satisfactory to Landlord and which shall include a financial interest endorsement naming Landlord as a beneficiary) for the full value of such construction, which such bond shall name Landlord as an additional obligee and otherwise be in form and substance and issued by a Person reasonably satisfactory to Landlord;

(d)     In the case of a Tenant Capital Improvement, such construction shall not be undertaken unless Tenant demonstrates to the reasonable satisfaction of Landlord the financial ability to complete the construction without adversely affecting its cash flow position or financial viability; and

(e)     No Capital Improvement will result in the Leased Property becoming a "limited use" property for purposes of United States federal income taxes.

10.2     **Construction Requirements for All Capital Improvements.**  Whether or not Landlord's review and approval is required, for all Capital Improvements:

(a)     Such construction shall not be commenced until Tenant shall have procured and paid for all municipal and other governmental permits and authorizations required to be obtained prior to such commencement, including those permits and authorizations required pursuant to any Gaming Regulations, and Landlord shall join in the application for such permits or authorizations whenever such action is necessary; provided, however, that (i) any such joinder

shall be at no cost or expense to Landlord; and (ii) any plans required to be filed in connection with any such application which require the approval of Landlord as hereinabove provided shall have been so approved by Landlord;

(b)     (i) Such construction shall not, and Tenant's licensed architect or engineer shall certify to Landlord that such architect or engineer believes that the design of such construction (as illustrated through the applicable corresponding construction documents) shall not, impair the structural strength of any component of the applicable Facility or overburden the electrical, water, plumbing, HVAC or other building systems of any such component in a manner that would violate applicable building codes or prudent industry practices, and (ii) Tenant's general contractor shall certify to Landlord that such construction is in compliance with such design and corresponding construction documents;

(c)     Tenant's licensed architect or engineer shall certify to Landlord that such architect or engineer believes that the detailed plans and specifications conform to, and comply with, in all material respects all applicable building, subdivision and zoning codes, laws, ordinances and regulations imposed by all governmental authorities having jurisdiction over the Leased Property of the applicable Facility;

(d)     During and following completion of such construction, the parking and other amenities which are located in the applicable Facility or on the Land of such Facility shall remain adequate for the operation of such Facility for its Primary Intended Use and in no event shall such parking be less than that which is required by law (including any variances with respect thereto); provided, however, with Landlord's prior consent and at no additional expense to Landlord, (i) to the extent additional parking is not already a part of a Capital Improvement, Tenant may construct additional parking on the Land; or (ii) Tenant may acquire or lease off-site parking to serve such Facility as long as such parking shall be reasonably proximate to, and dedicated to, or otherwise made available to serve, such Facility;

(e)     All work done in connection with such construction shall be done (i) promptly and using materials and resulting in work that is at least as good product and condition as the remaining areas of the applicable Facility, (ii) in conformity with all Legal Requirements, including, without limitation, any applicable minority or women owned business requirements, (iii) in such a manner that the market value of such Leased Property shall not be lessened by any such work or its usefulness impaired in any material respect, (iv) in compliance with the requirements of all insurance policies required to be maintained by Tenant hereunder, (v) with Tenant promptly discharging or removing all liens filed against such Leased Property arising out of such work and (vi) with Tenant procuring and paying for all permits and licenses required in connection with any such work; and

(f)     Promptly following the completion of such construction, Tenant shall deliver to Landlord "as built" drawings of such addition, certified as accurate by the licensed architect or engineer selected by Tenant to supervise such work, and copies of any new or revised certificates of occupancy.

**10.3     Landlord's Right of First Offer to Fund.**  Tenant shall request that Landlord provide a proposal to fund or finance the construction and acquisition of any Capital

Improvement constituting Long-Lived Assets (along with reasonably related fees and expenses, such as title fees, costs of permits, legal fees and other similar transaction related costs) if (a) the cost of such Capital Improvement is expected to be in excess of Two Million Five Hundred Thousand Dollars ($2,500,000) and (b) Tenant does not intend to fund the cost of such Capital Improvement with Cash on-hand.  If Tenant requests that Landlord provide a proposal to fund or finance a proposed Capital Improvement in accordance with the foregoing sentence, then Tenant shall provide to Landlord any information about such proposed Capital Improvement which Landlord may reasonably request (including any specifics regarding the terms upon which Tenant will be seeking financing for such Capital Improvement).  Landlord may, but shall be under no obligation to, provide a proposal that is requested by Tenant pursuant to this Section 10.3.  Within ten (10) Business Days of receipt of a request to provide a proposal to fund or finance a proposed Capital Improvement pursuant to this Section 10.3, Landlord shall notify Tenant in writing as to whether it will fund or finance all or a portion of such proposed Capital Improvement and, if so, the terms and conditions upon which it would do so (including the terms with respect to any increases in Rent hereunder due to such Capital Improvement).  If Landlord provides Tenant with a written proposal in accordance with the foregoing sentence, Tenant shall have ten (10) Business Days to accept or reject such proposal.  If Landlord provides Tenant with a timely written proposal in accordance with this Section 10.3 and Tenant rejects such proposal, then Tenant shall not be permitted to utilize outside financing for such proposed Capital Improvement on terms and conditions which are materially less favorable to Tenant than the terms and conditions of Landlord's proposal without first requesting a new funding or financing proposal from Landlord in accordance with this Section 10.3.  If Landlord declines to fund or finance such proposed Capital Improvement (or fails to provide Tenant with a written proposal within the applicable ten (10) Business Day period), then Tenant shall be permitted to seek outside financing or utilize then existing available financing for such proposed Capital Improvement for a six-month period, after which six-month period (if Tenant has not secured outside financing or determined to utilize then existing available financing) Tenant shall again be required to first request a funding or financing proposal from Landlord.  If Tenant constructs a Capital Improvement with Cash on-hand or then existing available financing or outside financing obtained in accordance with this Section 10.3, such Capital Improvement shall be deemed part of the Leased Property and the Facilities.  If Landlord agrees to fund a proposed Capital Improvement and Tenant accepts the terms thereof, such Capital Improvement shall be deemed part of the Leased Property and the Facilities for all purposes and Tenant shall provide Landlord with the following prior to any advance of funds:

       (a)     any information, certificates, licenses, permits or documents reasonably requested by Landlord which are necessary and obtainable to confirm that Tenant will be able to use the Capital Improvement upon completion thereof in accordance with the Primary Intended Use, including all required federal, state or local government licenses and approvals;

       (b)     an Officer's Certificate and, if requested, a certificate from Tenant's architect providing appropriate backup information, setting forth in reasonable detail the projected or actual costs related to such Capital Improvements;

       (c)     an amendment to this Master Lease (and any development or funding agreement agreed to in accordance with this Section 10.3), in a form reasonably agreed to by Landlord and Tenant, which may include, among other things, an increase in the Rent in amounts

as agreed upon by the parties hereto pursuant to the agreed funding proposal terms described above and other provisions as may be necessary or appropriate;

(d)     a deed conveying title to Landlord to any land acquired for the purpose of constructing the Capital Improvement free and clear of any liens or encumbrances except those approved by Landlord, and accompanied by an ALTA survey thereof satisfactory to Landlord;

(e)     for each advance, endorsements to any outstanding policy of title insurance covering the Leased Property or commitments therefor reasonably satisfactory in form and substance to Landlord (i) updating the same without any additional exception (other than in respect of Permitted Encumbrances and other encumbrances permitted hereunder) except as may be approved by Landlord, and (ii) increasing the coverage thereof by an amount equal to the cost of the Capital Improvement, except to the extent covered by the owner's policy of title insurance referred to in paragraph (f) below;

(f)     if appropriate, an owner's policy of title insurance insuring the fair market value of fee simple title to any land and improvements conveyed to Landlord free and clear of all liens and encumbrances (other than Permitted Encumbrances and other encumbrances permitted hereunder)  except as approved by Landlord, underlined provided that if the requirement in this paragraph (f) is not satisfied (or waived by Landlord), Tenant shall be entitled to seek third party financing or use available financing in lieu of seeking such advance from Landlord;

(g)     if requested by Landlord, an appraisal by a member of the Appraisal Institute of the Leased Property indicating that the fair market value of the Leased Property upon completion of the Capital Improvement will exceed the fair market value of the Leased Property immediately prior thereto by an amount not less than ninety-five percent (95%) of the cost of the Capital Improvement, underlined provided that if the requirement in this paragraph (g) is not satisfied (or waived by Landlord), Tenant shall be entitled to seek third party financing or use available financing in lieu of seeking such advance from Landlord; and

(h)     such other billing statements, invoices, certificates, endorsements, opinions, site assessments, surveys, resolutions, ratifications, lien releases and waivers and other instruments and information reasonably required by Landlord.

**10.4     Room Renovation.**  On or before November 3, 2021, Tenant shall deposit ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ into the Room Renovation Escrow Account, which the parties agree is a reasonable estimate of the costs to complete the Room Renovation.  Tenant shall be entitled to receive, and Landlord shall disburse to Tenant upon request, funds from the Room Renovation Escrow Account in accordance with the Room Renovation Disbursement Instructions.  Notwithstanding the foregoing provisions of this Article X or any other provisions of this Master Lease to the contrary, Tenant shall not be required to obtain the consent of Landlord or any holder of a Facility Mortgage in connection with the Room Renovation, nor shall Tenant be required to request that Landlord provide a proposal to fund or finance the Room Renovation pursuant to Section 10.3; provided, however, any amendments or modifications to the scope of the Room Renovations shall require the prior written consent of Landlord.

US-DOCS\124041687.41

## ARTICLE XI

11.1 **Liens.** Subject to the provisions of Article XII relating to permitted contests, Tenant will not directly or indirectly create or allow to remain and will promptly discharge at its expense any lien, encumbrance, attachment, title retention agreement or claim upon the Leased Property or any Capital Improvement thereto or upon the Gaming Licenses (including indirectly through a pledge of shares in the direct or indirect entity owning an interest in the Gaming Licenses) or any attachment, levy, claim or encumbrance in respect of the Rent, excluding, however, (i) this Master Lease; (ii) the matters that existed as of the Commencement Date with respect to such Facility and disclosed on Schedule C hereto; (iii) restrictions, liens and other encumbrances which are consented to in writing by Landlord (such consent not to be unreasonably withheld); (iv) liens for Impositions which Tenant is not required to pay hereunder; (v) subleases permitted by Article XXII; (vi) liens for Impositions not yet delinquent or being contested in accordance with Article XII, provided that Tenant has provided appropriate reserves as required under GAAP and any foreclosure or similar remedies with respect to such Impositions have not been instituted and no notice as to the institution or commencement thereof has been issued except to the extent such institution or commencement is stayed no later than the earlier of (x) ten (10) Business Days after such notice is issued or (y) five (5) Business Days prior to the institution or commencement thereof; (vii) liens of mechanics, laborers, materialmen, suppliers or vendors for sums either disputed or not yet due, provided that (1) the payment of such sums shall not be postponed under any related contract for more than thirty (30) days after the completion of the action giving rise to such lien unless being contested in accordance with Article XII and such reserve or other appropriate provisions as shall be required by law or GAAP shall have been made therefor and no foreclosure or similar remedies with respect to such liens has been instituted and no notice as to the institution or commencement thereof have been issued except to the extent such institution or commencement is stayed no later than the earlier of (x) ten (10) Business Days after such notice is issued or (y) five (5) Business Days prior to the institution or commencement thereof; or (2) any such liens are in the process of being contested as permitted by Article XII; (viii) any liens created by Landlord; (ix) liens related to equipment leases or equipment financing which is used or useful in the business conducted on the Leased Property, provided that the payment of any sums due under such equipment leases or equipment financing shall either (1) be paid as and when due in accordance with the terms thereof, or (2) be in the process of being contested as permitted by Article XII and provided that a lien holder's removal of any such equipment from the Leased Property shall be made in accordance with the requirements set forth in this Section 11.1; (x) liens granted as security for the obligations of Tenant, any subtenant of the Leased Property and/or any of their respective Affiliates under a Debt Agreement; provided, however, in no event shall the foregoing be deemed or construed to permit Tenant to encumber its leasehold interest (or a subtenant to encumber its subleasehold interest) in the Leased Property or its direct or indirect interest (or the interest of any of its Subsidiaries) in the Gaming Licenses (other than, in each case, to a Permitted Leasehold Mortgagee, for which no consent shall be required), without the prior written consent of Landlord, which consent may be granted or withheld in Landlord's sole discretion; and provided, further, that Tenant shall be required to provide Landlord with fully executed copies of any and all Permitted Leasehold Mortgages and related principal Debt Agreements; (xi) easements, rights-of-way, restrictions (including zoning restrictions), covenants, encroachments, protrusions and other similar charges or encumbrances, and minor title deficiencies on or with respect to any Leased Property, in each case whether now or hereafter in existence; and (xii) liens granted as security for the obligations of Landlord and its

US-DOCS\124041687.41

Affiliates under any Facility Mortgage.  For the avoidance of doubt, the parties acknowledge and agree that Tenant has not granted any liens in favor of Landlord as security for its obligations hereunder (except to the extent contemplated in the final paragraph of this Section 11.1) and nothing contained herein shall be deemed or construed to prohibit the issuance of a lien on the Equity Interests in Tenant (it being agreed that any foreclosure by a lien holder on such interests in Tenant shall be subject to the restriction on Change in Control set forth in Article XXII) or to prohibit Tenant from pledging its Accounts and other Operating Property and other property of Tenant, including fixtures and equipment installed by Tenant at the Facilities, as collateral in connection with financings from equipment lenders (or to Permitted Leasehold Mortgagees); underline provided that Tenant shall in no event pledge to any Person that is not granted a Permitted Leasehold Mortgage hereunder any of the Operating Property to the extent that such Operating Property cannot be removed from the Leased Property without damaging or impairing the Leased Property (other than in a de minimis manner).  For the further avoidance of doubt, by way of example, Tenant shall not grant to any lender (other than a Permitted Leasehold Mortgagee) a lien on, and any and all lien holders (including a Permitted Leasehold Mortgagee) shall not have the right to remove, carpeting, internal wiring, elevators, or escalators at the Leased Property, but lien holders may have the right to remove (and Tenant shall have the right to grant a lien on) manual or electronic gaming machines and other gaming equipment (including, without limitation, electronic equipment used to monitor and/or operate gaming machines and other gaming equipment) and electronic or other equipment used to operate player affinity systems, even if the removal thereof from the Leased Property could result in damage; provided any such damage is repaired by the lien holder or Tenant in accordance with the terms of this Master Lease.

Landlord and Tenant intend that this Master Lease be an indivisible true lease that affords the parties hereto the rights and remedies of landlord and tenant hereunder and does not represent a financing arrangement.  This Master Lease is not an attempt by Landlord or Tenant to evade the operation of any aspect of the law applicable to any of the Leased Property.  Except as otherwise required by a change in tax law or any change in accounting rules or regulations or a "determination" within the meaning of Section 1313(a) of the Code (or similar provision of state or local law), Landlord and Tenant hereby acknowledge and agree that this Master Lease shall be treated as an operating lease for all purposes and not as a synthetic lease, financing lease or loan and that Landlord shall be entitled to all the benefits of ownership of the Leased Property, including depreciation for all federal, state and local tax purposes.

If, notwithstanding (a) the form and substance of this Master Lease and (b) the intent of the parties, and the language contained herein providing that this Master Lease shall at all times be construed, interpreted and applied to create an indivisible lease of all of the Leased Property, any court of competent jurisdiction finds that this Master Lease is a financing arrangement, this Master Lease shall be considered a secured financing agreement and Landlord's title to the Leased Property shall constitute a perfected first priority lien in Landlord's favor on the Leased Property to secure the payment and performance of all the obligations of Tenant hereunder (and to that end, Tenant hereby grants, assigns and transfers to Landlord a lien and security interest in all right, title or interest in or to any and all of the Leased Property, as security for the prompt and complete payment and performance when due of Tenant's obligations hereunder) and Tenant shall execute such further documentation reasonably required by Landlord to perfect Landlord's security interest or create a lien.  Tenant authorizes Landlord, at the expense of Tenant, to make any filings or take other actions as Landlord reasonably determines are necessary or advisable in

order to effect fully this Master Lease or to more fully perfect or renew the rights of Landlord, and to subordinate to Landlord the lien of any Permitted Leasehold Mortgagee, with respect to the Leased Property (it being understood that nothing herein shall affect the rights of a Permitted Leasehold Mortgagee under Article XVII hereof). At any time and from time to time upon the request of Landlord, and at the expense of Tenant, Tenant shall promptly execute, acknowledge and deliver such further documents and do such other acts as Landlord may reasonably request in order to effect fully this Master Lease or to more fully perfect or renew the rights of Landlord with respect to the Leased Property. Upon the exercise by Landlord of any power, right, privilege or remedy pursuant to this Master Lease which requires any consent, approval, recording, qualification or authorization of any governmental authority, Tenant will execute and deliver, or will cause the execution and delivery of, all applications, certifications, instruments and other documents and papers that Landlord may be required to obtain from Tenant for such consent, approval, recording, qualification or authorization.

## ARTICLE XII

      **12.1**   **Permitted Contests.** Provided that no Event of Default exists, Tenant, upon prior written notice to Landlord, on its own or in Landlord's name, at Tenant's expense, may contest, by appropriate legal proceedings conducted in good faith and with due diligence, the amount, validity or application, in whole or in part, of any licensure or certification decision (including pursuant to any Gaming Regulation), Imposition, Legal Requirement, Insurance Requirement, lien, attachment, levy, encumbrance, charge or claim; provided, however, that (i) in the case of an unpaid Imposition, lien, attachment, levy, encumbrance, charge or claim, the commencement and continuation of such proceedings shall suspend the collection thereof from Landlord and from the Leased Property or any Capital Improvement thereto; (ii) neither the Leased Property or any Capital Improvement thereto, the Rent therefrom nor any part or interest in either thereof would be in any danger of being sold, forfeited, attached or lost pending the outcome of such proceedings; (iii) in the case of a Legal Requirement, neither Landlord nor Tenant would be in any danger of civil or criminal liability for failure to comply therewith pending the outcome of such proceedings; (iv) if any such contest shall involve a sum of money or potential loss in excess of Two Hundred Fifty Thousand Dollars ($250,000), upon request of Landlord, Tenant shall deliver to Landlord an opinion of counsel reasonably acceptable to Landlord to the effect set forth in clauses (i), (ii) and (iii) above, to the extent applicable (it being agreed that the matters set forth in clause (i) can be addressed by Tenant paying the contested amount prior to any such contest); (v) in the case of a Legal Requirement, Imposition, lien, encumbrance or charge, Tenant shall give such reasonable security as may be required by Landlord to prevent any sale or forfeiture of the Leased Property or any Capital Improvement thereto or the Rent by reason of such non-payment or noncompliance; (vi) in the case of an Insurance Requirement, the coverage required by Article XIII shall be maintained; (vii) Tenant shall keep Landlord reasonably informed as to the status of the proceedings; and (viii) if such contest be finally resolved against Landlord or Tenant, Tenant shall promptly pay the amount required to be paid, together with all interest and penalties accrued thereon, or comply with the applicable Legal Requirement or Insurance Requirement. Landlord, at Tenant's expense, shall execute and deliver to Tenant such authorizations and other documents as may reasonably be required in any such contest, and, if reasonably requested by Tenant or if Landlord so desires, Landlord shall join as a party therein. The provisions of this Article XII shall not be construed to permit Tenant to contest the payment of Rent or any other amount (other than

Impositions or Additional Charges which Tenant may from time to time be required to impound with Landlord) payable by Tenant to Landlord hereunder.  Tenant shall indemnify, defend, protect and save Landlord harmless from and against any liability, cost or expense of any kind that may be imposed upon Landlord in connection with any such contest and any loss resulting therefrom, and shall, promptly after the final determination of such contest, fully pay and discharge the amounts which shall be levied, assessed, charged or imposed or be determined to be payable therein or in connection therewith, together with all penalties, fines, interest and costs thereof or in connection therewith, and perform all acts the performance of which shall be ordered or decreed as a result thereof.  No such contest shall subject Landlord to the risk of any criminal liability.

## ARTICLE XIII

   **13.1** <u>**General Insurance Requirements.**</u> During the Term, Tenant shall at all times keep (or cause to be kept) the applicable Leased Property, and all property located in or on the Leased Property in which Tenant has an insurable interest and for which coverage is provided under ISO CP 00 10 or equivalent form, including the applicable Leased Improvements, Capital Improvements, Fixtures and Operating Property, insured with the kinds and amounts of insurance described below.  Each element of insurance described in this Article XIII shall be maintained with respect to the applicable Leased Property of each Facility and the Operating Property and operations thereon.  Such insurance shall be written by companies permitted to conduct business in the applicable State.  All third-party liability type policies must include Landlord and any other party identified by Landlord in writing from time to time along with each of their respective members, partners, officers, directors, shareholders, employees, agents and representatives") as an "additional insured" (collectively, the "**Additional Insureds**").  Each property policy shall name Landlord as "loss payee" for its interests in each Facility covered under such policy.  Business interruption coverage shall include Landlord as "loss payee" with respect to Rent only.  Property losses shall be payable to Landlord and/or Tenant as provided in Article XIV.  In addition, (i) the policies shall include as an "additional insured" and/or "loss payee" each Permitted Leasehold Mortgagee and (ii) the policies, as appropriate and where practicable, shall include as an "additional insured" or "loss payee" the holder of any mortgage, deed of trust or other security agreement ("**Facility Mortgagee**") securing any indebtedness or any other Encumbrance placed on the Leased Property in accordance with the provisions of Article XXXI ("**Facility Mortgage**"), in each case, in the case of any such inclusion of such Person as a "loss payee", by way of a standard form of mortgagee's loss payable endorsement, such as the standard New York mortgage clause or equivalent.  Except as otherwise set forth herein, any property insurance loss adjustment settlement shall require the written consent of Landlord (such consent not to be unreasonably withheld or delayed), Tenant, and each Facility Mortgagee (to the extent required under the applicable Facility Mortgage Documents) unless the amount of the loss net of the applicable deductible is less than Five Hundred Thousand Dollars ($500,000) in which event no consent shall be required.  Evidence of insurance shall be deposited with Landlord and, if requested, with any Facility Mortgagee(s).  The insurance policies required to be carried by Tenant hereunder shall insure against all the following risks with respect to each Facility:

   (a) Loss or damage by the perils covered under the Causes of Loss – Special Form (ISO CP 10 30) or an alternative form providing substantially equivalent coverage, including, but not limited to, sprinkler leakage, in an amount not less than the insurable value on

US-DOCS\124041687.41

a replacement cost basis and including building ordinance coverage, terrorism, water damage, sprinkler leakage, debris removal, flood (including back-up of sewers and drains, seepage and surface water), earthmovement and demolition; provided, that some property coverages might be sub-limited in an amount less than the replacement cost as long as the sub-limits are commercially reasonable and prudent as deemed by Tenant;

(b)     Comprehensive Boiler and Machinery/Equipment Breakdown Insurance on any of the equipment or any other equipment on or in the Leased Property, in an amount not less than the full replacement cost per accident and shall include at least Five Hundred Thousand Dollars ($500,000) per incidence for Off-Premises Service Interruption, Expediting Expenses, Ammonia Contamination, and Hazardous Materials Clean-Up Expense

(c)      If any portion of the buildings located on the Land is currently or at any time in the future is located in a federally designated "moderate flood hazard area" or "special flood hazard area," flood hazard insurance in an amount equal to the maximum amount of such insurance available under the National Flood Insurance Act of 1968, the Flood Disaster Protection Act of 1973 or the National Flood Insurance Reform Act of 1994, as each may be amended;

(d)     Loss of rental value in an amount not less than twelve (12) months' Rent payable hereunder or business interruption in an amount not less than twelve (12) months of income and normal operating expenses, including 90-days ordinary payroll in such amount as determined by Tenant to be reasonable given the nature of its operations, and Rent payable hereunder with an extended period of indemnity coverage of at least three hundred and sixty five days (365) days necessitated by the occurrence of any of the hazards described in Sections 13.1(a), 13.1(b) or 13.1(c),;

(e)     Claims for bodily injury or property damage under a policy of commercial general liability insurance written on an ISO CG 00 01 or an alternative providing substantially similar coverage on an occurrence basis, with amounts not less than One Million Dollars ($1,000,000) each occurrence and Two Million Dollars ($2,000,000) in the general aggregate , and Two Million Dollars ($2,000,000) Products/Completed Operations annual aggregate on a per location basis and on an occurrence basis and coverage shall also include, liquor liability, elevators/escalators (if any), independent contractors, contractual liability for all insured contracts as defined by the most current version of ISO's CG 00 01 form (or equivalent), terrorism, and Products/Completed Operations Liability coverage, which shall be maintained for not less than the greater period under which a claim may be properly asserted under the applicable statute of limitations or repose; Business Automobile Liability Insurance (including Owned – if any; Non-Owned and Hired Automobile Liability) in an amount of One Million Dollars ($1,000,000) Combined Single Limit each accident;

(f)     Workers' Compensation insurance in the amount required by applicable law;

(g)     Employers' Liability insurance covering all persons employed by Tenant in in the amount of One Million Dollars ($1,000,000) per accident, One Million Dollars ($1,000,000) per illness, per employee, and One Million Dollars ($1,000,000)  per illness, in the aggregate;

(h)     Excess/Umbrella Liability in an amount of not less than Twenty-Five Million ($25,000,000) on a per location basis which includes follow form coverage for Commercial General Liability, Business Automobile Liability and Employers' Liability coverages. Such Excess/Umbrella Liability policy must be endorsed to provide that this insurance must be primary to, and non-contributory with, any other insurance on which Landlord and the Additional Insureds are an insured, whether such other insurance is primary, excess, self-insurance, or insurance on any other basis and this endorsement must cause the Tenant's Excess/Umbrella Liability coverage to be vertically exhausted, whereby such coverage is not subject to any "Other Insurance" provision under Tenant's Commercial General Liability or Umbrella/Excess Liability policies;

(i)     During such time as Tenant is constructing any improvements, Tenant, at its sole cost and expense, shall carry, or cause to be carried (i) workers' compensation insurance and employers' liability insurance covering all persons employed in connection with the improvements in statutory limits, (ii) completed operations coverage under the commercial general liability insurance policy referred to above, (iii) builder's risk insurance, completed value form (or its equivalent), covering all physical loss, in an amount and subject to policy conditions satisfactory to Landlord, and (iv) such other insurance, in such amounts, as Landlord deems reasonably necessary to protect Landlord's interest in the Leased Property from any act or omission of Tenant's contractors or subcontractors;

(j)     Garage Keepers Liability Insurance in an amount of One Million Dollars ($1,000,000).

(k)     Subject to exceptions and standards approved in writing from time to time by Landlord, Tenant shall contractually require of all contractors, subcontractors, service providers and vendors who perform work or services to the Leased Improvements to, at their own expense, maintain insurance coverages equivalent to those standard in the industry but in no event less than the primary general liability (excluding the per location aggregate requirement) and workers' compensation limits required for Tenant herein. Each contractor, subcontractor, service provider, and vendor shall be required to include the same additional insured, primary and non-contributory, and waiver of subrogation, as required of Tenant herein and Tenant will cause such coverage to be maintained for not less than the greater period under which a claim may be properly asserted under the applicable statute of limitations or repose.

**13.2     Ground Lease Insurance.** In addition to the insurance described above, Tenant shall maintain such additional insurance as may be required pursuant to the Ground Lease.

**13.3     Additional Insurance.**  In addition to the insurance described above, Tenant shall maintain such additional insurance upon notice from Landlord as may be reasonably required from time to time by any Facility Mortgagee and shall further at all times maintain adequate workers' compensation coverage and any other coverage required by Legal Requirements for all Persons employed by Tenant on the Leased Property in accordance with Legal Requirements.

**13.4     Waiver of Subrogation.**  All insurance policies carried by either party covering the Leased Property or Operating Property, including, without limitation, contents, fire

and liability insurance, shall expressly have each insurer waive any right of subrogation on the part of the insurer against the other party as well as Additional Insureds.  Each party, respectively, shall pay any additional costs or charges for obtaining such waiver.

**13.5**    **Policy Requirements.**  All of the policies of insurance referred to in this Article XIII shall be issued by insurance companies with a minimum rating of "A-:VII" in the most recent version of Best's Key Rating Guide, or a minimum rating of "BBB" from Standard & Poor's or equivalent or other carriers otherwise acceptable by Landlord.  Tenant shall pay all of the premiums therefor within the time period(s) required thereby, and shall deliver certificates thereof to Landlord prior to the Commencement Date (or with respect to any renewal policy or other policy entered into after the Commencement Date, within three (3) Business Days of the inception date of such policy), and in the event of the failure of Tenant either to effect such insurance in the names herein called for or to pay the premiums therefor, or to deliver such certificates thereof to Landlord, at the times required, Landlord shall be entitled, but shall have no obligation, to effect such insurance and pay the premiums therefor, in which event the cost thereof, together with interest thereon at the Overdue Rate, shall be repayable to Landlord upon demand therefor.  Tenant shall obtain, to the extent available on commercially reasonable terms, the agreement of each insurer, by endorsement on the policy or policies issued by it, or by independent instrument furnished to Landlord, that it will give to Landlord thirty (30) days' (or ten (10) days' in the case of non-payment of premium) written notice before the policy or policies in question shall be materially altered, allowed to expire or cancelled.  Notwithstanding any provision of this Article XIII to the contrary, Landlord acknowledges and agrees that the coverage required to be maintained by Tenant may be provided under one or more policies with various deductibles and self-insurance retentions by Tenant or its Affiliates.  Upon written request by Landlord, Tenant shall provide Landlord copies of the property insurance policies when issued by the insurers providing such coverage (provided, however, Tenant shall have the right to redact from such copies any proprietary or confidential information set forth in such property insurance policies).  All insurance required herein shall be primary and non-contributory to any insurance available to Landlord and Additional Insureds.

**13.6**    **Increase in Limits.**  If, from time to time after the Commencement Date, Landlord determines, in the exercise of its reasonable business judgment, that the limits of the bodily injury or property damage under a policy of commercial general liability insurance then carried pursuant to Section 13.1(e) hereof are insufficient relative to Landlord's reasonable estimate of the exposure related thereto, then Landlord may give Tenant Notice of acceptable limits for such insurance to be carried, and from and after the renewal date for the applicable insurance policy that follows receipt of such Notice, such insurance shall be carried with limits as prescribed by Landlord in such Notice until further increased pursuant to the provisions of this Section 13.6; provided, that (i) Landlord may only give Tenant one such Notice per calendar year, and any such Notice shall be delivered more than 120 days prior to the next renewal date for the applicable insurance policy and (ii) in no event will Tenant be required to carry insurance in an amount which exceeds the product of (a) the amounts set forth in Section 13.1(e) hereof and (b) the CPI Increase.

**13.7**    **Blanket Policy.**  Notwithstanding anything to the contrary contained in this Article XIII, Tenant's obligations to carry the insurance provided for herein may be brought within the coverage of a so-called blanket policy or policies of insurance carried and maintained by Tenant; <u>provided</u> that the requirements of this Article XIII (including satisfaction of the Facility

Mortgagee's requirements and the approval of the Facility Mortgagee) are otherwise satisfied, and provided further that Tenant maintains specific allocations acceptable to Landlord.

      **13.8**    **No Separate Insurance.**  Tenant shall not, on Tenant's own initiative or pursuant to the request or requirement of any third party, (i) take out separate insurance concurrent in form or contributing in the event of loss with that required in this Article XIII to be furnished by, or which may reasonably be required to be furnished by, Tenant or (ii) increase the amounts of any then-existing insurance by securing an additional policy or additional policies, unless all parties having an insurable interest in the subject matter of the insurance, including in all cases Landlord and all Facility Mortgagees, are included therein as additional insureds and the loss is payable under such insurance in the same manner as losses are payable under this Master Lease. Notwithstanding the foregoing, nothing herein shall prohibit Tenant from insuring against risks not required to be insured hereby, and as to such insurance, Landlord and any Facility Mortgagee need not be included therein as additional insureds, nor must the loss thereunder be payable in the same manner as losses are payable hereunder except to the extent required to avoid a default under the Facility Mortgage.

      **13.9**    **Post-Closing Insurance Period**.  Notwithstanding anything to the contrary set forth in this Master Lease, so long as Tenant maintains its insurance program with respect to the Leased Property as is in effect on the Commencement Date (or the applicable portion of such insurance program that has not been replaced or superseded by insurance complying with this Article XIII) Tenant shall not be required to comply with the flood (including N.F.I.P.), earth movement, earthquake, garage keepers legal liability or Section 13.1(d) requirements of this Article XIII until September 30, 2021; provided, however, notwithstanding anything to the contrary set forth in the foregoing, Tenant shall maintain its business interruption insurance with respect to the Facilities as in effect on the Commencement Date until September 30, 2021. In addition, limits of insurance maintained by Tenant on the Commencement Date that do not otherwise comply with this Article XIII are acceptable until September 30, 2021.

**ARTICLE XIV**

      **14.1**    **Property Insurance Proceeds.**  The Net Award shall be paid to Landlord, Facility Mortgagee or Tenant (as applicable) in accordance with Section 14.5, and made available to Tenant upon request for the reasonable out-of-pocket costs of preservation, stabilization, emergency restoration, business interruption, reconstruction and repair, as the case may be, of any damage to or destruction of the Leased Property, or any portion thereof; provided, however, that the portion of the Net Award that is attributable to Tenant's obligation to pay Rent shall be applied against Rents due by Tenant hereunder; and provided, further, that if the Net Award is Five Hundred Thousand Dollars ($500,000) or less, and if no Event of Default has occurred and is continuing, the proceeds shall be paid directly to Tenant and, subject to the limitations set forth in this Article XIV used for the repair of any damage to the Leased Property, it being understood and agreed that Tenant shall have no obligation to rebuild any Tenant Capital Improvement, provided that the Leased Property is rebuilt in a manner substantially similar to the condition in which it existed prior to the related casualty or otherwise in a manner reasonably satisfactory to Landlord. Any excess proceeds of insurance remaining after the completion of the restoration or reconstruction of the Leased Property to substantially the same condition as existed immediately

56

before the damage or destruction and with materials and workmanship of like kind and quality and to Landlord's reasonable satisfaction shall be provided to Landlord within fifteen (15) days after such restoration or reconstruction has been completed.  All salvage resulting from any risk covered by insurance for damage or loss to the Leased Property shall belong to Landlord.  Other than during the continuance of an Event of Default, Tenant shall have the right to prosecute and settle insurance claims, provided that Tenant shall consult with and involve Landlord in the process of adjusting any insurance claims under this Article XIV in which Landlord has an interest and any final settlement with the insurance company shall be subject to Landlord's consent to the extent such consent is required pursuant to Article XIII, such consent not to be unreasonably withheld.

      **14.2**    **Tenant's Obligations Following Casualty.**  (a)    If a Facility and/or any Tenant Capital Improvements to a Facility are damaged, whether or not from a risk covered by insurance carried by Tenant, Tenant shall give Landlord prompt notice of the occurrence of any such casualty and, except as otherwise provided herein, (i) Tenant shall restore such Leased Property (excluding any Tenant Capital Improvement, it being understood and agreed that Tenant shall not be required to repair any Tenant Capital Improvement, provided that the Leased Property is rebuilt in a manner reasonably satisfactory to Landlord), to substantially the same condition as existed immediately before such damage and (ii) such damage shall not terminate this Master Lease.

      (b)    If the cost of restoring the affected Leased Property exceeds the amount of proceeds received from the insurance required to be carried hereunder, Tenant shall provide Landlord with evidence reasonably acceptable to Landlord that Tenant has available to it any excess amounts needed to restore such Facility.  Such excess amounts necessary to restore such Facility shall be paid by Tenant.

      (c)    If Tenant has not restored the affected Leased Property and operations consistent with a Primary Intended Use have not recommenced by the date that is the second anniversary of the date of any casualty, all remaining insurance proceeds shall be paid to and retained by Landlord free and clear of any claim by or through Tenant.

      **14.3**    **No Abatement of Rent.**  This Master Lease shall remain in full force and effect and Tenant's obligation to pay the Rent and all other charges required by this Master Lease shall remain unabated during the period required for adjusting insurance, satisfying Legal Requirements, repair and restoration.

      **14.4**    **Waiver.**  Tenant waives any statutory rights of termination which may arise by reason of any damage or destruction of the Leased Property but such waiver shall not affect any contractual rights granted to Tenant under this Article XIV.

      **14.5**    **Insurance Proceeds Paid to Landlord or Facility Mortgagee.**  Notwithstanding anything herein to the contrary, in the event that the Net Award with respect to any of the Leased Property is in excess of Five Hundred Thousand Dollars ($500,000), then Landlord (or, if the terms of the Facility Mortgage require that Facility Mortgagee hold and disburse such amount, Facility Mortgagee) shall hold the Net Award in a fund (the "**Restoration Fund**") and, provided no Event of Default is then continuing, Landlord shall cause funds in an amount equal to the Restoration Fund to be disbursed to Tenant upon Tenant's delivery to Landlord

or the Facility Mortgagee (as applicable) of the items described in clauses (a), (b), (f) and (h) of Section 10.3 with respect to the work performed to repair and restore the Leased Property.  If any sum remains in the Restoration Fund after completion of the restoration, such sum shall be retained by (and shall be the property of) Landlord.  All work required to be performed by Tenant hereunder shall be performed in accordance with Article X.

## ARTICLE XV

15.1    **Condemnation.**   Tenant shall provide Landlord prompt written notice of Tenant's receipt of a notice of Condemnation relating to any of the Leased Property

(a)    Total Taking.  If the Leased Property of a Facility is totally and permanently taken by Condemnation (a "**Taking**"), Tenant shall, within thirty (30) days after Tenant receives notice of such Taking, give to Landlord written notice of Tenant's election to terminate this Master Lease with respect to the applicable Leased Property.  If Tenant elects to terminate this Master Lease pursuant to this Section 15.1(a), then this Master Lease shall terminate with respect to the applicable Leased Property as of the Date of Taking with respect to such applicable Leased Property.  Tenant shall continue to cooperate with Landlord after any such termination to obtain the Net Award with respect to the applicable Taking.

(b)    Partial Taking.   If a portion of the Leased Property of, and any Tenant Capital Improvements to, a Facility are taken by Condemnation, this Master Lease shall remain in effect provided the affected Facility is not thereby rendered Unsuitable for its Primary Intended Use. If the affected Facility is rendered Unsuitable for its Primary Intended Use, such event shall constitute a Taking under Section 15.1(a) hereof.

(c)    Restoration.   If there is a partial Taking of the Leased Property of, and any Tenant Capital Improvements to, a Facility and this Master Lease remains in full force and effect with respect to such Facility, then there shall be no abatement or reduction of any Rent.  In such event, Tenant shall restore such Leased Property (as nearly as possible under the circumstances) to a complete architectural unit of the same general character and condition as such Leased Property existing immediately prior to such Taking.  Landlord shall make available to Tenant the Award for restoration of the Leased Property (excluding any Tenant Capital Improvements, it being understood and agreed that Tenant shall not be required to repair or restore any Tenant Capital Improvements, provided that the Leased Property is restored in a manner reasonably satisfactory to Landlord and, whether or not Tenant elects to restore such Tenant Capital Improvements, the portion of such Award attributable thereto shall also be paid to Tenant), and Tenant shall accomplish all necessary restoration whether or not the amount provided by the Condemnor for restoration is sufficient and the Rent shall be reduced by such amount as may be agreed upon by Landlord and Tenant or, if they are unable to reach such an agreement within a period of thirty (30) days after the occurrence of the Taking, then the Rent for such Facility shall be proportionately reduced, based on the proportion of the Facility that was subject to the partial Taking and pursuant to the formula set forth in Section 15.5 hereof.

15.2    **Award Distribution.**   Except as set forth below and except to the extent of restoration proceeds to be made available to Tenant as provided in Section 15.1(c) hereof, the entire Award shall belong to and be paid to Landlord.  Tenant shall, however, be entitled to pursue

US-DOCS\124041687.41

its own claim with respect to the Taking for Tenant's lost profits value and moving expenses, and the portion of the Award, if any, allocated to any Tenant Capital Improvements (subject to Tenant's restoring the Leased Property not subject to a Taking in a manner reasonably satisfactory to Landlord) and Operating Property shall be and remain the property of Tenant free of any claim thereto by Landlord.

       15.3    **Temporary Taking.**  The taking of the Leased Property, or any part thereof, shall constitute a taking by Condemnation only when the use and occupancy by the taking authority has continued for longer than 180 consecutive days.  During any shorter period, which shall be a temporary taking, all the provisions of this Master Lease shall remain in full force and effect and the Award allocable to the Term shall be paid to Tenant.

       15.4    **[Reserved].**

       15.5    **Termination of Master Lease; Abatement of Rent.**  In the event this Master Lease is terminated with respect to the affected portion of the Leased Property as a result of a Taking (such termination, a "**Leased Property Rent Adjustment Event**"), then (x) the Rent due hereunder from and after the effective date of any such Leased Property Rent Adjustment Event shall be reduced in accordance with <u>Schedule 15.5</u> and (y) Landlord shall retain any claim which Landlord may have against Tenant for failure to insure such Leased Property as required by Article XIII.

## ARTICLE XVI

       16.1    **Events of Default.**  Any one or more of the following shall constitute an "**Event of Default**":

     (a)     (i)    Tenant shall fail to pay any installment of Rent within two (2) Business Days of when due; or

            (ii)    Tenant shall fail to pay any Additional Charge within five (5) Business Days after notice from Landlord of Tenant's failure to make such payment of such Additional Charge when due (and such notice of failure from Landlord may be given any time after such payment is more than one (1) Business Day late);

     (b)    a default shall occur under any Guaranty, where the default is not cured within any applicable grace period set forth therein or, if no cure periods are provided, within fifteen (15) days after notice from Landlord (or in the case of a breach of Paragraph 8 of the Guaranty, the cure periods provided herein with respect to such action or omission);

     (c)    Tenant or any Guarantor shall:

     (i)    admit in writing in a legal proceeding its inability to pay its debts generally as they become due;

     (ii)    file a petition in bankruptcy or a petition to take advantage of any insolvency act;

US-DOCS\124041687.41

   (iii)  make an assignment for the benefit of its creditors;

   (iv)  consent to the appointment of a receiver of itself or of the whole or any substantial part of its property; or

   (v)  file a petition or answer seeking reorganization or arrangement under the United States bankruptcy laws or any other applicable law or statute of the United States of America or any state thereof pertaining to debtor relief or insolvency;

   (d)  Tenant or any Guarantor (other than an Immaterial Subsidiary Guarantor) shall be adjudicated as bankrupt or a court of competent jurisdiction shall enter an order or decree appointing, without the consent of Tenant or any Guarantor (other than an Immaterial Subsidiary Guarantor), a receiver of Tenant or any Guarantor (other than an Immaterial Subsidiary Guarantor) or of the whole or substantially all of Tenant's or any Guarantor's (other than an Immaterial Subsidiary Guarantor's) property, or approving a petition filed against Tenant or any Guarantor (other than an Immaterial Subsidiary Guarantor) seeking reorganization or arrangement of Tenant or any Guarantor (other than an Immaterial Subsidiary Guarantor) under the United States bankruptcy laws or any other applicable law or statute of the United States of America or any state thereof, and such judgment, order or decree shall not be vacated or set aside or stayed within sixty (60) days from the date of the entry thereof;

   (e)  Tenant or any Guarantor (other than an Immaterial Subsidiary Guarantor) shall be liquidated or dissolved (except that any Guarantor may be liquidated or dissolved into another Guarantor or Tenant or, so long as its assets are distributed following such liquidation or dissolution, to another Guarantor or Tenant);

   (f)  the estate or interest of Tenant in the Leased Property or any part thereof shall be levied upon or attached in any proceeding relating to more than Two Hundred Fifty Thousand Dollars ($250,000) and the same shall not be vacated, discharged or stayed pending appeal (or bonded or otherwise similarly secured payment) within the later of ninety (90) days after commencement thereof or thirty (30) days after receipt by Tenant of notice thereof from Landlord; provided, however, that such notice shall be in lieu of and not in addition to any notice required under applicable law and the foregoing shall not apply to the lien of real estate Taxes on the Leased Property to the extent that such Taxes are not delinquent or are being contested in accordance with the provisions of Section 12.1 of this Master Lease;

   (g)  Tenant voluntarily ceases operations for its Primary Intended Use at a Facility (except as a result of Unavoidable Delay, material damage, destruction or Condemnation that affects such Facility) in violation of Section 7.2;

   (h)  (i)  any of the representations or warranties made by Tenant under Section 8.1 or by any Guarantor in a Guaranty proves to be untrue when made; or

   (ii)  any of the representations or warranties made by Tenant under Section 32.6 proves to be untrue when made in any material respect;

(i)      any applicable license or other agreements necessary for a Facility's operation for its Primary Intended Use, including any Gaming License, are at any time terminated or revoked or suspended for more than thirty (30) days (and causes cessation of gaming activity at a Facility) and such termination, revocation or suspension is not stayed pending appeal and such termination, revocation or suspension, as applicable, would reasonably be expected to have a material adverse effect on Tenant, the Facilities, or on the Leased Property, taken as a whole;

(j)      except to a permitted assignee pursuant to Section 22.2 or an Operating Subtenant, permitted subtenant or Subsidiary of Tenant pursuant to Section 22.3, or with respect to the granting of a permitted pledge hereunder to a Permitted Leasehold Mortgagee, the sale or transfer, without Landlord's consent, of all or any portion of any Gaming License or similar certificate or license relating to the Leased Property;

(k)      Tenant or any Guarantor, by its acts or omissions, causes the occurrence of a default under any provision (to the extent Tenant has knowledge of such provision and Tenant's or such Guarantor's obligations with respect thereto) of any Facility Mortgage, related documents or obligations thereunder by which Tenant is bound in accordance with Section 31.1 or has agreed under the terms of this Master Lease to be bound, which default is not cured within the applicable time period, if the effect of such default is to cause, or to permit the holder or holders of that Facility Mortgage or Indebtedness secured by that Facility Mortgage (or a trustee or agent on behalf of such holder or holders), to cause, that Facility Mortgage (or the Indebtedness secured thereby) to become or be declared due and payable (or redeemable) prior to its stated maturity (excluding in any case any default related to the financial performance of Tenant or any Guarantor);

(l)      if Tenant or any Guarantor shall fail to pay, bond, escrow or otherwise similarly secure payment of one or more final judgments aggregating in excess of $25,000,000.00, which judgments are not discharged or effectively waived or stayed for a period of 60 consecutive days;

(m)      an assignment of Tenant's interest in this Master Lease (including pursuant to a Change in Control) shall have occurred without the consent of Landlord to the extent such consent is required under Article XXII or Tenant is otherwise in default of the provisions set forth in Section 22.1 below;

(n)      Tenant shall fail to (i) maintain (or cause to be maintained) the policies of insurance that are required under Article XIII or (ii) comply with any other requirement set forth in Article XIII if such failure is not cured by Tenant within five (5) Business Days after the earlier to occur of (x) Tenant obtaining knowledge thereof and (y) Tenant's receipt of written notice thereof from Landlord;

(o)      Tenant shall fail to deliver the estoppel described in Section 23.1(a) within the time period specified therein and such failure is not cured by Tenant within five (5) Business Days after Tenant receives written notice thereof from Landlord;

US-DOCS\124041687.41

(p)     An "Event of Default" (as such term is defined in the Ground Lease) by "Landlord" (as such term is defined in the Ground Lease) shall be deemed an Event of Default by Tenant hereunder; and

(q)     if Tenant shall fail to observe or perform any other term, covenant or condition of this Master Lease and such failure is not cured by Tenant within thirty (30) days after written notice thereof from Landlord, unless such failure cannot with due diligence be cured within a period of thirty (30) days, in which case such failure shall not be deemed to be an Event of Default if Tenant proceeds promptly and with due diligence to cure the failure and diligently completes the curing thereof within sixty (60) days after such notice from Landlord; provided, however, that such notice shall be in lieu of and not in addition to any notice required under applicable law.

No Event of Default (other than a failure to make payment of money) shall be deemed to exist under this Section 16.1 during any time the curing thereof is prevented by an Unavoidable Delay, provided that upon the cessation of such Unavoidable Delay, Tenant remedies the default without further delay.

**16.2    Certain Remedies.**  (a) If an Event of Default shall have occurred and be continuing, Landlord may (i) terminate this Master Lease and the Term shall terminate and all rights of Tenant under this Master Lease shall cease, (ii) repossess the Leased Property without terminating this Master Lease, (iii) seek damages as provided in Section 16.3 hereof, and/or (iv) exercise any other right or remedy hereunder, at law or in equity available to Landlord as a result of any Event of Default.  Tenant shall pay as Additional Charges all costs and expenses incurred by or on behalf of Landlord, including reasonable attorneys' fees and expenses, as a result of any Event of Default hereunder.  If an Event of Default shall have occurred and be continuing, whether or not this Master Lease has been terminated pursuant to the first sentence of this Section 16.2, Tenant shall, to the extent permitted by law (including applicable Gaming Regulations), if required by Landlord to do so, immediately surrender to Landlord possession of all or any portion of the Leased Property (including any Tenant Capital Improvements of the Facilities) as to which Landlord has so demanded and quit the same and Landlord may, to the extent permitted by law (including applicable Gaming Regulations), enter upon and repossess such Leased Property and any Capital Improvement thereto by reasonable force, summary proceedings, ejectment or otherwise, and, to the extent permitted by law (including applicable Gaming Regulations), may remove Tenant and all other Persons and any of the Operating Property from such Leased Property (including any such Tenant Capital Improvement thereto).  Notwithstanding anything to the contrary herein contained, in lieu of or in addition to any of the remedies contained herein, if Landlord shall not have previously recorded Deed 1 in the Official Records (as each such term is defined in the Ground Lease), then Landlord shall have the right pursuant to Section 7.4(b) to elect to record Deed 2 in the Official Records (as each such term is defined in the Ground Lease) at any time during the Term of this Master Lease.

(b)     Landlord may recover from Tenant all costs and expenses, including reasonable attorneys' fees, court costs, expert witness fees, costs of tests and analyses, travel and accommodation expenses, deposition and trial transcripts, copies and other similar costs and fees, paid or incurred by Landlord as a result of such Event of Default, regardless of whether or not legal proceedings are actually commenced.

US-DOCS\124041687.41

(c)     Landlord may immediately or at any time thereafter, and with or without notice, except as required herein, set off any money of Tenant or Guarantor held by Landlord under this Master Lease or the Guaranty against any sum owing by Tenant or Guarantor hereunder.

(d)     Notwithstanding anything to the contrary herein contained, in lieu of or in addition to any of the foregoing remedies and damages, Landlord may exercise any remedies and collect any damages available to it at law or in equity.  If Landlord is unable to obtain full satisfaction pursuant to the exercise of any remedy, it may pursue any other remedy which it has hereunder or at law or in equity, including, without limitation, specific performance.

(e)     No termination of this Master Lease, repossession or re-letting of any of the Leased Property, exercise of any remedy or collection of any damages pursuant to this Section 16.2 shall relieve Tenant of any obligations of Tenant which survive such expiration or termination by their own terms.

(f)     WITH RESPECT TO ANY REMEDY OR PROCEEDING OF LANDLORD OR TENANT HEREUNDER, TENANT HEREBY WAIVES THE SERVICE OF NOTICE WHICH MAY BE REQUIRED BY AN APPLICABLE LAW AND WAIVES ANY RIGHT TO A TRIAL BY JURY.

(g)     Upon the occurrence of any Event of Default, Landlord shall have the right (but no obligation) to perform any act required of Tenant hereunder and charge to Tenant all costs and expenses incurred in connection therewith, together with interest at the Overdue Rate, which amount shall be deemed Additional Rent and shall be immediately due and payable to Landlord. If performance of such act requires that Landlord enter any of the Leased Property, Landlord may enter such Leased Property for such purpose.

(h)     Tenant shall be and remain liable for all sums aforesaid, and Landlord may recover such damages from Tenant and institute and maintain successive actions or legal proceedings against Tenant for the recovery of such damages.  Nothing herein contained shall be deemed to require Landlord to wait to begin such action or other legal proceedings until the date when the Term would have expired by its own terms had there been no such Event of Default.

(i)     Except as otherwise provided herein, all remedies are cumulative and concurrent and no remedy is exclusive of any other remedy.  Each remedy may be exercised at any time an Event of Default has occurred and is continuing and may be exercised from time to time.  No remedy shall be exhausted by any exercise thereof.

(j)     No failure by either Landlord or Tenant to insist upon the strict performance by the other of any covenant, agreement, term or condition of this Master Lease, or to exercise any right or remedy consequent upon a breach thereof, and no acceptance of full or partial payment of Rent or other monetary obligation during the continuance of any such breach shall constitute a waiver of any such breach or of such covenant, agreement, term or condition.  No consent or waiver, express or implied, by either Landlord or Tenant to or of any breach by the other of any covenant, condition or duty under this Master Lease shall be construed as a consent or waiver to or of any other breach of the same or any other covenant, condition or duty, unless in writing signed by the party waiving same.

**16.3**    **Damages.**    None of (i) the termination of this Master Lease, (ii) the repossession of the Leased Property (including any Capital Improvements to any Facility), (iii) the failure of Landlord to relet the Leased Property or any portion thereof, (iv) the reletting of all or any portion of the Leased Property, or (v) the inability of Landlord to collect or receive any rentals due upon any such reletting, shall relieve Tenant of its liabilities and obligations hereunder, all of which shall survive any such termination, repossession or reletting.  Landlord and Tenant agree that Landlord shall have no obligation to mitigate Landlord's damages under this Master Lease. If any such termination of this Master Lease occurs (whether or not Landlord terminates Tenant's right to possession of the Leased Property), Tenant shall forthwith pay to Landlord all Rent due and payable under this Master Lease to and including the date of such termination.  Thereafter:

Tenant shall forthwith pay to Landlord, at Landlord's option, as and for liquidated and agreed current damages for the occurrence of an Event of Default, either:

(A)    the sum of:

(i)    the worth at the time of award of the unpaid Rent which had been earned at the time of termination to the extent not previously paid by Tenant under this Section 16.3;

(ii)    the worth at the time of award of the amount by which the unpaid Rent which would have been earned after termination until the time of award exceeds the amount of such rental loss that Tenant proves was in fact avoided or could have been reasonably avoided;

(iii)    the worth at the time of award of the amount by which the unpaid Rent for the balance of the Term after the time of award exceeds the amount of such rental loss that Tenant proves was in fact avoided or could be reasonably avoided; *plus*

(iv)    any other amount necessary to compensate Landlord for all the detriment proximately caused by Tenant's failure to perform its obligations under this Master Lease or which in the ordinary course of things would be likely to result therefrom; provided, however, no compensation shall be due for consequential damages or diminution in value of the Land or the Buildings resulting from the Event of Default; provided, further, that Tenant shall be responsible for consequential damages resulting solely from Tenant's holding over and remaining in all or any portion of the Leased Property following the expiration or earlier termination of this Master Lease (or any partial termination thereof with respect to a particular Facility).

As used in clauses (i) and (ii) above, the "worth at the time of award" shall be computed by allowing interest at the Overdue Rate.  As used in clause (iii) above, the "worth at the time of award" shall be computed by discounting such amount at the discount rate of the Federal Reserve Bank of New York at the time of award plus one percent (1%) and reducing such amount by the portion of the unpaid Rent that Tenant proves could be reasonably avoided.

or

(B)     if Landlord chooses not to terminate Tenant's right to possession of the Leased Property (whether or not Landlord terminates this Master Lease), each installment of said Rent and other sums payable by Tenant to Landlord under this Master Lease as the same becomes due and payable, together with interest at the Overdue Rate from the date when due until paid, and Landlord may enforce, by action or otherwise, any other term or covenant of this Master Lease (and Landlord may at any time thereafter terminate Tenant's right to possession of the Leased Property and seek damages under subparagraph (A) hereof, to the extent not already paid for by Tenant under this subparagraph (B)).

16.4    **Receiver.**   Upon the occurrence and continuance of an Event of Default, and upon commencement of proceedings to enforce the rights of Landlord hereunder, but subject to any limitations of applicable law, including any Gaming Regulations, Landlord shall be entitled, as a matter of right, to the appointment of a receiver or receivers acceptable to Landlord of the Leased Property and of the revenues, earnings, income, products and profits thereof, pending the outcome of such proceedings, with such powers as the court making such appointment shall confer.

16.5    **Waiver.**   If Landlord initiates judicial proceedings or if this Master Lease is terminated by Landlord pursuant to this Article XVI, Tenant waives, to the extent permitted by applicable law, (i) any right of redemption, re-entry or repossession; and (ii) the benefit of any laws now or hereafter in force exempting property from liability for rent or for debt.

16.6    **Application of Funds.**   Any payments received by Landlord under any of the provisions of this Master Lease during the existence or continuance of any Event of Default which are made to Landlord rather than Tenant due to the existence of an Event of Default shall be applied to Tenant's obligations in the order which Landlord may reasonably determine or as may be prescribed by the laws of the State.

# ARTICLE XVII

## 17.1    Permitted Leasehold Mortgagees.

(a)     On one or more occasions without Landlord's prior consent Tenant may mortgage or otherwise encumber Tenant's estate in and to the Leased Property (the "**Leasehold Estate**") to one or more Permitted Leasehold Mortgagees under one or more Permitted Leasehold Mortgages and pledge its right, title and interest under this Master Lease and/or Equity Interests in Tenant or its direct or indirect equity owners as security for such Permitted Leasehold Mortgages or any Debt Agreement secured thereby; provided that, except as provided in Section 17.1(b)(i)(3), no Person shall be considered a Permitted Leasehold Mortgagee unless (1) such Person delivers to Landlord a written agreement (in form and substance reasonably satisfactory to Landlord) providing (i) that (unless this Master Lease has been terminated as to a particular Facility) such Permitted Leasehold Mortgagee and any lenders for whom it acts as representative, agent or trustee, will not use or dispose of (or consent to the use or disposal of) any Gaming License for use at a location other than at the Facility to which such Gaming License relates as of the date such Person becomes a Permitted Leasehold Mortgagee (or, in the case of any Facility added to this Master Lease after such date, as of the date that such Facility is added to this Master Lease), and

(ii) an express acknowledgement that, in the event of the exercise by the Permitted Leasehold Mortgagee of its rights under the Permitted Leasehold Mortgage, the Permitted Leasehold Mortgagee shall be required to (except for a transfer that meets the requirements of Section 22.2(iii)) secure the approval of Landlord for the replacement of Tenant with respect to the affected portion of the Leased Property and contain the Permitted Leasehold Mortgagee's acknowledgment that such approval may be granted or withheld by Landlord in accordance with the provisions of Article XXII of this Master Lease, and (2) the underlying Permitted Leasehold Mortgage includes an express acknowledgement that any exercise of remedies thereunder that would affect the Leasehold Estate shall be subject to the terms of this Master Lease.

(b)     Notice to Landlord.

(i)     (1)     If Tenant shall, on one or more occasions, mortgage Tenant's Leasehold Estate and if the holder of such Permitted Leasehold Mortgage shall provide Landlord with written notice of such Permitted Leasehold Mortgage together with a true copy of such Permitted Leasehold Mortgage and the name and address of the Permitted Leasehold Mortgagee, Landlord and Tenant agree that, following receipt of such written notice by Landlord, the provisions of this Section 17.1 shall apply in respect to each such Permitted Leasehold Mortgage.

(2)     In the event of any assignment of a Permitted Leasehold Mortgage or in the event of a change of address of a Permitted Leasehold Mortgagee or of an assignee of such Mortgage, written notice of the new name and address shall be provided to Landlord.

(3)     Landlord hereby acknowledges and agrees that Administrative Agent has satisfied all conditions precedent set forth in this Section 17.1 to be, and for all purposes under this Master Lease is, a Permitted Leasehold Mortgagee.

(ii)     Landlord shall promptly upon receipt of a communication purporting to constitute the notice provided for by subsection (b)(i) above acknowledge by an executed and notarized instrument receipt of such communication as constituting the notice provided for by subsection (b)(i) above and confirming the status of the Permitted Leasehold Mortgagee as such or, in the alternative, notify Tenant and the Permitted Leasehold Mortgagee of the rejection of such communication as not conforming with the provisions of this Section 17.1 and specify the specific basis of such rejection.

(iii)     After Landlord has received the notice provided for by subsection (b)(i) above, Tenant, upon being requested to do so by Landlord, shall with reasonable promptness provide Landlord with copies of the note or other obligation secured by such Permitted Leasehold Mortgage and of any other documents pertinent to the Permitted Leasehold Mortgage as specified by Landlord.  If requested to do so by Landlord, Tenant shall thereafter also provide Landlord from time to time with a copy of each amendment or other modification or supplement to such instruments.  All recorded documents shall be accompanied by the appropriate recording stamp or other certification of the custodian of the relevant recording office as to their authenticity as true and correct copies of official records and all nonrecorded documents shall be accompanied by a certification by Tenant that such documents are true and correct copies of the originals.  From time to time upon being requested to do so by Landlord, Tenant shall also notify Landlord of the date

and place of recording and other pertinent recording data with respect to such instruments as have been recorded.

(c)     Default Notice.  Landlord, upon providing Tenant any notice of:  (i) default under this Master Lease or (ii) a termination of this Master Lease, shall at the same time provide a copy of such notice to every Permitted Leasehold Mortgagee for which notice has been properly provided to Landlord pursuant to Section 17.1(b) hereof.  No such notice by Landlord to Tenant shall be deemed to have been duly given unless and until a copy thereof has been sent, in the manner prescribed in Section 35.1 of this Master Lease, to every Permitted Leasehold Mortgagee for which notice has been properly provided to Landlord pursuant to Section 17.1(b) hereof.  From and after such notice has been sent to a Permitted Leasehold Mortgagee, such Permitted Leasehold Mortgagee shall have the same period, with respect to its remedying any default or acts or omissions which are the subject matter of such notice or causing the same to be remedied, as is given Tenant after the giving of such notice to Tenant, plus in each instance, the additional periods of time specified in subsections (d) and (e) of this Section 17.1 to remedy, commence remedying or cause to be remedied the defaults or acts or omissions which are the subject matter of such notice specified in any such notice.  Landlord shall accept such performance by or at the instigation of such Permitted Leasehold Mortgagee as if the same had been done by Tenant.  Tenant authorizes each Permitted Leasehold Mortgagee (to the extent such action is authorized under the applicable Debt Agreement) to take any such action at such Permitted Leasehold Mortgagee's option and does hereby authorize entry upon the premises by the Permitted Leasehold Mortgagee for such purpose.

(d)     Notice to Permitted Leasehold Mortgagee.  Anything contained in this Master Lease to the contrary notwithstanding, if any default shall occur which entitles Landlord to terminate this Master Lease, Landlord shall have no right to terminate this Master Lease on account of such default unless, following the expiration of the period of time given Tenant to cure such default or the act or omission which gave rise to such default, Landlord shall notify every Permitted Leasehold Mortgagee for which notice has been properly provided to Landlord pursuant to Section 17.1(b) hereof of Landlord's intent to so terminate at least thirty (30) days in advance of the proposed effective date of such termination if such default is capable of being cured by the payment of money, and at least ninety (90) days in advance of the proposed effective date of such termination if such default is not capable of being cured by the payment of money ("**Termination Notice**").  The provisions of subsection (e) below of this Section 17.1 shall apply if, during such thirty (30) or ninety (90) days (as the case may be) Termination Notice period, any Permitted Leasehold Mortgagee shall:

(i)     notify Landlord of such Permitted Leasehold Mortgagee's desire to nullify such Termination Notice; and

(ii)     pay or cause to be paid all Rent, Additional Charges, and other payments (i) then due and in arrears as specified in the Termination Notice to such Permitted Leasehold Mortgagee and (ii) which may become due during such thirty (30) or ninety (90) day (as the case may be) period (as the same may become due); and

(iii)     comply or in good faith, with reasonable diligence and continuity, commence to comply with all nonmonetary requirements of this Master Lease then in default and

reasonably susceptible of being complied with by such Permitted Leasehold Mortgagee, provided, however, that such Permitted Leasehold Mortgagee shall not be required during such ninety (90) day period to cure or commence to cure any default consisting of Tenant's failure to satisfy and discharge any lien, charge or encumbrance against Tenant's interest in this Master Lease or the Leased Property, or any of Tenant's other assets junior in priority to the lien of the mortgage or other security documents held by such Permitted Leasehold Mortgagee; and

(iv)     during such thirty (30) or ninety (90) day period, the Permitted Leasehold Mortgagee shall respond, with reasonable diligence, to requests for information from Landlord as to the Permitted Leasehold Mortgagee's (and related lenders') intent to pay such Rent and other charges and comply with this Master Lease.

(e)     <u>Procedure on Default</u>.

(i)     If Landlord shall elect to terminate this Master Lease by reason of any Event of Default of Tenant that has occurred and is continuing, and a Permitted Leasehold Mortgagee shall have proceeded in the manner provided for by subsection (d) of this Section 17.1, the specified date for the termination of this Master Lease as fixed by Landlord in its Termination Notice shall be extended for a period of six (6) months; provided that such Permitted Leasehold Mortgagee shall, during such six-month period (and during the period of any continuance referred to in subsection (e)(ii) below):

(1) pay or cause to be paid the Rent, Additional Charges and other monetary obligations of Tenant under this Master Lease as the same become due, and continue its good faith efforts to perform or cause to be performed all of Tenant's other obligations under this Master Lease, excepting (A) obligations of Tenant to satisfy or otherwise discharge any lien, charge or encumbrance against Tenant's interest in this Master Lease or the Leased Property or any of Tenant's other assets junior in priority to the lien of the mortgage or other security documents held by such Permitted Leasehold Mortgagee and (B) past nonmonetary obligations then in default and not reasonably susceptible of being cured by such Permitted Leasehold Mortgagee; and

(2) if not enjoined or stayed pursuant to a bankruptcy or insolvency proceeding or other judicial order, diligently continue to pursue acquiring or selling Tenant's interest in this Master Lease and the Leased Property by foreclosure of the Permitted Leasehold Mortgage or other appropriate means and diligently prosecute the same to completion.

(ii)     If at the end of such six (6) month period such Permitted Leasehold Mortgagee is complying with subsection (e)(i) above, this Master Lease shall not then terminate, and the time for completion by such Permitted Leasehold Mortgagee of its proceedings shall continue (provided that for the time of such continuance, such Permitted Leasehold Mortgagee is in compliance with subsection (e)(i) above) (x)

so long as such Permitted Leasehold Mortgagee is enjoined or stayed pursuant to a bankruptcy or insolvency proceeding or other judicial order and if so enjoined or stayed, thereafter for so long as such Permitted Leasehold Mortgagee proceeds to complete steps to acquire or sell Tenant's interest in this Master Lease by foreclosure of the Permitted Leasehold Mortgage or by other appropriate means with reasonable diligence and continuity but not to exceed twelve (12) months after the Permitted Leasehold Mortgagee is no longer so enjoined or stayed from prosecuting the same and in no event longer than twenty-four (24) months from the date of Landlord's initial notification to Permitted Leasehold Mortgagee pursuant to Section 17.1(d) hereof, and (y) if such Permitted Leasehold Mortgagee is not so enjoined or stayed, thereafter for so long as such Permitted Leasehold Mortgagee proceeds to complete steps to acquire or sell Tenant's interests in this Master Lease by foreclosure of the Permitted Leasehold Mortgage or by other appropriate means with reasonable diligence and continuity but not to exceed twelve (12) months from the date of Landlord's initial notification to Permitted Leasehold Mortgagee pursuant to Section 17.1(d) hereof.  Nothing in this subsection (e) of this Section 17.1, however, shall be construed to extend this Master Lease beyond the original term thereof as extended by any options to extend the term of this Master Lease properly exercised by Tenant or a Permitted Leasehold Mortgagee in accordance with Section 1.4, nor to require a Permitted Leasehold Mortgagee to continue such foreclosure proceeding after the default has been cured.  If the default shall be cured pursuant to the terms and within the time periods allowed in subsections (d) and (e) of this Section 17.1 and the Permitted Leasehold Mortgagee shall discontinue such foreclosure proceedings, this Master Lease shall continue in full force and effect as if Tenant had not defaulted under this Master Lease.

(iii)     If a Permitted Leasehold Mortgagee is complying with subsection (e)(i) of this Section 17.1, upon the acquisition of Tenant's Leasehold Estate herein by a Discretionary Transferee this Master Lease shall continue in full force and effect as if Tenant had not defaulted under this Master Lease, provided that such Discretionary Transferee cures all outstanding defaults that can be cured through the payment of money and all other defaults that are reasonably susceptible of being cured.

(iv)     For the purposes of this Section 17.1, the making of a Permitted Leasehold Mortgage shall not be deemed to constitute an assignment or transfer of this Master Lease nor of the Leasehold Estate hereby created, nor shall any Permitted Leasehold Mortgagee, as such, be deemed to be an assignee or transferee of this Master Lease or of the Leasehold Estate hereby created so as to require such Permitted Leasehold Mortgagee, as such, to assume the performance of any of the terms, covenants or conditions on the part of Tenant to be performed hereunder; but the purchaser at any sale of this Master Lease (including a Permitted Leasehold Mortgagee if it is the purchaser at foreclosure) and of the Leasehold Estate hereby created in any proceedings for the foreclosure of any Permitted Leasehold Mortgage, or the assignee or transferee of this Master Lease and of the Leasehold Estate hereby created under any instrument of assignment or transfer in lieu of the foreclosure of any Permitted Leasehold Mortgage, shall be subject to Article XXII

US-DOCS\124041687.41

Case 25-90191   Document 83-1   Filed in TXSB on 07/25/25   Page 79 of 121

hereof (including the requirement that such purchaser assume the performance of the terms, covenants or conditions on the part of Tenant to be performed hereunder and meet the qualifications of Discretionary Transferee or be reasonably consented to by Landlord in accordance with Section 22.2(i) hereof).

(v)     Any Permitted Leasehold Mortgagee or other acquirer of the Leasehold Estate of Tenant pursuant to foreclosure, assignment in lieu of foreclosure or other proceedings in accordance with the requirements of Section 22.2(iii) of this Master Lease may, upon acquiring Tenant's Leasehold Estate, without further consent of Landlord, sell and assign the Leasehold Estate in accordance with the requirements of Section 22.2(iii) of this Master Lease and enter into Permitted Leasehold Mortgages in the same manner as the original Tenant, subject to the terms hereof.

(vi)    Notwithstanding any other provisions of this Master Lease, any sale of this Master Lease and of the Leasehold Estate hereby created in any proceedings for the foreclosure of any Permitted Leasehold Mortgage, or the assignment or transfer of this Master Lease and of the Leasehold Estate hereby created in lieu of the foreclosure of any Permitted Leasehold Mortgage, shall be deemed to be a permitted sale, transfer or assignment of this Master Lease and of the Leasehold Estate hereby created to the extent that the successor tenant under this Master Lease is a Discretionary Transferee and the transfer otherwise complies with the requirements of Section 22.2(iii) of this Master Lease or the transferee is reasonably consented to by Landlord in accordance with Section 22.2(i) hereof.

(f)     New Lease.  In the event of the termination of this Master Lease other than due to a default as to which the Permitted Leasehold Mortgagee had the opportunity (without legal impediment) to, but did not, cure the default as set forth in Sections 17.1(d) and 17.1(e) above, including pursuant to the disaffirmance or rejection of this Master Lease by Tenant in a bankruptcy, Landlord shall provide each Permitted Leasehold Mortgagee with written notice that this Master Lease has been terminated ("**Notice of Termination**"), together with a statement of all sums which would at that time be due under this Master Lease but for such termination, and of all other defaults, if any, then known to Landlord.  Landlord agrees to enter into a new lease ("**New Lease**") of the Leased Property with such Permitted Leasehold Mortgagee or its Permitted Leasehold Mortgagee Designee (in each case if a Discretionary Transferee) or any other transferee permitted to be assigned this Master Lease without consent of Landlord pursuant to Section 22.2(iii)(d), for the remainder of the term of this Master Lease, effective as of the date of termination, at the rent and additional rent, and upon the terms, covenants and conditions (including all options to renew but excluding requirements which have already been fulfilled) of this Master Lease, <u>provided</u>:

(i)     Such Permitted Leasehold Mortgagee or its Permitted Leasehold Mortgagee Designee shall make a binding, written, irrevocable commitment to Landlord for such New Lease within thirty (30) days after the date such Permitted Leasehold Mortgagee receives Landlord's Notice of Termination of this Master Lease given pursuant to this Section 17.1(f);

(ii)    Such Permitted Leasehold Mortgagee or its Permitted Leasehold Mortgagee Designee shall pay or cause to be paid to Landlord at the time of the execution and delivery of such New Lease, any and all sums which would at the time of execution and delivery thereof be

due pursuant to this Master Lease but for such termination and, in addition thereto, all reasonable expenses, including reasonable attorney's fees, which Landlord shall have incurred by reason of such termination and the execution and delivery of the New Lease and which have not otherwise been received by Landlord from Tenant or other party in interest under Tenant; and

(iii)    Such Permitted Leasehold Mortgagee or its Permitted Leasehold Mortgagee Designee shall agree to remedy any of Tenant's defaults of which said Permitted Leasehold Mortgagee was notified by Landlord's Notice of Termination (or in any subsequent notice) and which can be cured through the payment of money or are reasonably susceptible of being cured by Permitted Leasehold Mortgagee or its Permitted Leasehold Mortgagee Designee.

(g)    <u>New Lease Priorities</u>.  If more than one Permitted Leasehold Mortgage shall request a New Lease pursuant to subsection (f)(i) of this Section 17.1, Landlord shall enter into such New Lease with the Permitted Leasehold Mortgagee whose mortgage is senior in lien, or with its Permitted Leasehold Mortgagee Designee acting for the benefit of such Permitted Leasehold Mortgage prior in lien foreclosing on Tenant's interest in this Master Lease.  Landlord, without liability to Tenant or any Permitted Leasehold Mortgagee with an adverse claim, may rely upon a title insurance policy issued by a reputable title insurance company as the basis for determining the appropriate Permitted Leasehold Mortgagee who is entitled to such New Lease.

(h)    <u>Permitted Leasehold Mortgagee Need Not Cure Specified Defaults</u>.  Nothing herein contained shall require any Permitted Leasehold Mortgagee as a condition to its exercise of the right hereunder to cure any default of Tenant not reasonably susceptible of being cured by such Permitted Leasehold Mortgagee or its Permitted Leasehold Mortgagee Designee (including, but not limited to, the default referred to in Section 16.1(c), (d), (e), (f) (if the levy or attachment is in favor of such Permitted Leasehold Mortgagee (<u>provided</u> such levy is extinguished upon foreclosure or similar proceeding or in a transfer in lieu of any such foreclosure) or is junior to the lien of such Permitted Leasehold Mortgagee and would be extinguished by the foreclosure of the Permitted Leasehold Mortgage that is held by such Permitted Leasehold Mortgagee) or (l) (if the judgment is in favor of a Permitted Leasehold Mortgagee other than a Permitted Leasehold Mortgagee holding a Permitted Leasehold Mortgage that is senior to the lien of such Permitted Leasehold Mortgagee) and any other sections of this Master Lease which may impose conditions of default not susceptible to being cured by a Permitted Leasehold Mortgagee or a subsequent owner of the Leasehold Estate through foreclosure hereof), in order to comply with the provisions of Sections 17.1(d) and 17.1(e), or as a condition of entering into the New Lease provided for by Section 17.1(f).

(i)    <u>Casualty Loss</u>.  A standard mortgagee clause naming each Permitted Leasehold Mortgagee for which notice has been properly provided to Landlord pursuant to Section 17.1(b) hereof may be added to any and all insurance policies required to be carried by Tenant hereunder on condition that the insurance proceeds are to be applied in the manner specified in this Master Lease and the Permitted Leasehold Mortgage shall so provide; except that the Permitted Leasehold Mortgage may provide a manner for the disposition of such proceeds, if any, otherwise payable directly to Tenant (but not such proceeds, if any, payable jointly to Landlord and Tenant or to Landlord, to the Facility Mortgagee or to a third-party escrowee) pursuant to the provisions of this Master Lease.

(j) <u>Arbitration; Legal Proceedings</u>.  Landlord shall give prompt notice to each Permitted Leasehold Mortgagee (for which notice has been properly provided to Landlord pursuant to Section 17.1(b) hereof) of any arbitration or legal proceedings between Landlord and Tenant involving obligations under this Master Lease.

(k) <u>No Merger</u>.  The fee title to the Leased Property and the Leasehold Estate of Tenant therein created by this Master Lease shall not merge but shall remain separate and distinct, notwithstanding the acquisition of said fee title and said Leasehold Estate by Landlord or by Tenant or by a third party, by purchase or otherwise.

(l) <u>Notices</u>.  Notices from Landlord to the Permitted Leasehold Mortgagee for which notice has been properly provided to Landlord pursuant to Section 17.1(b) hereof shall be provided in the method provided in Section 35.1 hereof to the address or fax number furnished Landlord pursuant to subsection (b) of this Section 17.1, and those from the Permitted Leasehold Mortgagee to Landlord shall be mailed to the address designated pursuant to the provisions of Section 35.1 hereof.  Such notices, demands and requests shall be given in the manner described in this Section 17.1 and in Section 35.1 and shall in all respects be governed by the provisions of those sections.

(m) <u>Limitation of Liability</u>.  Notwithstanding any other provision hereof to the contrary, (i) Landlord agrees that any Permitted Leasehold Mortgagee's liability to Landlord in its capacity as Permitted Leasehold Mortgagee hereunder howsoever arising shall be limited to and enforceable only against such Permitted Leasehold Mortgagee's interest in the Leasehold Estate and such Permitted Leasehold Mortgagee's interest in such other collateral granted to such Permitted Leasehold Mortgagee to secure the obligations under its Debt Agreement to the extent such other collateral is acquired by such Permitted Leasehold Mortgagee by foreclosure or in lieu of foreclosure; provided, however, if necessary to satisfy Landlord's claim the Permitted Leasehold Mortgagee shall use diligent efforts to foreclose or acquire by a deed in lieu of such foreclosure such other collateral granted to such Permitted Leasehold Mortgagee, and (ii) each Permitted Leasehold Mortgagee agrees that Landlord's liability to such Permitted Leasehold Mortgagee hereunder howsoever arising shall be limited to and enforceable only against Landlord's interest in the Leased Property, and no recourse against Landlord shall be had against any other assets of Landlord whatsoever.

(n) <u>Sale Procedure</u>.  If an Event of Default shall have occurred and be continuing, the Permitted Leasehold Mortgagee for which notice has been properly provided to Landlord pursuant to Section 17.1(b) hereof with the most senior lien on the Leasehold Estate shall have the right to make all determinations and agreements on behalf of Tenant under Article XXXVI (including, without limitation, requesting that the sale process described in Article XXXVI be commenced, the determination and agreement of the Gaming Assets FMV, the Successor Tenant Rent, and the potential Successor Tenants that should be included in the process, and negotiation with such Successor Tenants), in each case, in accordance with and subject to the terms and provisions of Article XXXVI, including, without limitation, the requirement that Successor Tenant meet the qualifications of Discretionary Transferee.

(o) <u>Third Party Beneficiary</u>. Each Permitted Leasehold Mortgagee (for so long as such Permitted Leasehold Mortgagee holds a Permitted Leasehold Mortgage) is an intended

third-party beneficiary of this Article XVII entitled to enforce the same as if a party to this Master Lease.

        **17.2**    **Landlord's Right to Cure Tenant's Default.**  If Tenant shall fail to make any payment or to perform any act required to be made or performed hereunder when due or within any cure period provided for herein, Landlord, without waiving or releasing any obligation or default, may, but shall be under no obligation to, upon prior written notice to Tenant specifying the default to be cured and that it is curing such default under this Section 17.2 make such payment or perform such act for the account and at the expense of Tenant, and may, to the extent permitted by law, enter upon the Leased Property for such purpose and take all such action thereon as, in Landlord's opinion, may be necessary or appropriate therefor.  No such entry shall be deemed an eviction of Tenant.  All sums so paid by Landlord and all costs and expenses, including reasonable attorneys' fees and expenses, so incurred, together with interest thereon at the Overdue Rate from the date on which such sums or expenses are paid or incurred by Landlord, shall be paid by Tenant to Landlord on demand as an Additional Charge.

        **17.3**    **Landlord's Right to Cure Debt Agreement.**  Tenant agrees to use commercially reasonable efforts to include in any agreement related to Material Indebtedness and any Debt Agreement (or the principal or controlling agreement relating to such Material Indebtedness or series of related Debt Agreements) obtained by or entered into by Tenant after the Commencement Date a provision requiring the lender or lenders thereunder (or the Representatives of such lenders) to provide a copy to Landlord of any notices issued by such lender or lenders thereunder or the Representative of such lenders to Tenant of a Specified Debt Agreement Default.  In addition, Tenant agrees to use commercially reasonable efforts to include in any such agreement related to Material Indebtedness and any Debt Agreement (or the principal or controlling agreement relating to such Material Indebtedness or series of related Debt Agreements) a provision with the effect that should Tenant shall fail to make any payment or to perform any act required to be made or performed under an agreement related to Material Indebtedness or under the Debt Agreement when due or within any cure period provided for therein (if any), Landlord may, subject to applicable Gaming Regulations and the terms hereof, upon prior written notice to Tenant specifying the default and that it is curing such default under this Section 17.3, cure any such default by making such payment to the applicable lenders or Representative or otherwise performing such acts within the cure period thereunder (if any) for the account of Tenant, to the extent such default is susceptible to cure by Landlord; provided that Landlord's right to cure such default shall not be any greater than the rights of the obligors under such Material Indebtedness or Debt Agreement to cure such default.  Landlord and Tenant agree that all sums so paid by Landlord and all costs and expenses, including reasonable attorneys' fees and expenses, so incurred, together with interest thereon at the Overdue Rate from the date on which such sums or expenses are paid or incurred by Landlord, shall be for the account of Tenant and paid by Tenant to Landlord on demand.

## ARTICLE XVIII

        **18.1**    **Sale of the Leased Property.**  Landlord may sell, assign, transfer or convey, directly or indirectly, without Tenant's consent, the Leased Property, in whole or in part, to one or more Persons, provided that, so long as no Event of Default has occurred or is continuing,

Landlord shall not (i) sell or transfer any of the Leased Property to any Tenant Competitor or (ii) consummate a transaction pursuant to which Landlord shall become a Tenant Competitor.  If multiple Persons shall own the fee interest in the Leased Property with respect to any Facility, such Persons shall own the applicable Leased Property as tenants in common and all such Persons shall execute a joinder to this Master Lease, as "Landlord", on a joint and several basis. If Landlord (including any successor owner of the Leased Property) shall convey the applicable Leased Property in accordance with the terms of this Master Lease, other than as security for a debt, and the applicable grantee or transferee expressly assumes all obligations of Landlord arising after the date of the conveyance, Landlord shall thereupon be released from all future liabilities and obligations of Landlord under this Master Lease with respect to the transferred portion of the Leased Property arising or accruing from and after the date of such conveyance or other transfer and all such future liabilities and obligations relating to such transferred Leased Property shall thereupon be binding upon such applicable grantee or transferee.  Any transfer by Landlord under this Section 18.1 shall be subject to all of the rights of Tenant under this Master Lease and all applicable Legal Requirements, including any Gaming Regulations, and no such transfer shall be effective until any applicable approvals with respect to Gaming Regulations, if applicable, are obtained in a manner that ensures that there is no material impact on the validity of any of the Gaming Licenses or the ability of Tenant to continue to use the Facilities for Gaming activities in substantially the same manner as immediately prior to such transfer.  Tenant shall attorn to and recognize any successor Landlord in connection with any transfer(s) that are made in accordance with this Section 18.1 as Tenant's "landlord".

## ARTICLE XIX

**19.1    Holding Over.**  If Tenant shall for any reason remain in possession of the Leased Property of a Facility after the expiration or earlier termination of the Term without the consent, or other than at the request, of Landlord, such possession shall be as a month-to-month tenant during which time Tenant shall pay as Rent each month the monthly Rent applicable to the prior Lease Year for such Facility multiplied by (A) 150% for the first three months of such holdover and (B) 200% for any succeeding months of such holdover, together with all Additional Charges and all other sums payable by Tenant pursuant to this Master Lease.  During such period of month-to-month tenancy, Tenant shall be obligated to perform and observe all of the terms, covenants and conditions of this Master Lease, but shall have no rights hereunder other than the right, to the extent given by law to month-to-month tenancies, to continue its occupancy and use of the Leased Property of, and/or any Tenant Capital Improvements to, such Facility.  Nothing contained herein shall constitute the consent, express or implied, of Landlord to the holding over of Tenant after the expiration or earlier termination of this Master Lease.

## ARTICLE XX

**20.1    Risk of Loss.**  The risk of loss or of decrease in the enjoyment and beneficial use of the Leased Property as a consequence of the damage or destruction thereof by fire, the elements, casualties, thefts, riots, wars or otherwise, or in consequence of foreclosures, attachments, levies or executions (other than by Landlord and Persons claiming from, through or

under Landlord) is assumed by Tenant, and except as otherwise provided herein no such event shall entitle Tenant to any abatement of Rent.

## ARTICLE XXI

21.1 **General Indemnification.** In addition to the other indemnities contained herein, and notwithstanding the existence of any insurance carried by or for the benefit of Landlord or Tenant, and without regard to the policy limits of any such insurance, Tenant shall protect, indemnify, save harmless and defend Landlord from and against all liabilities, obligations, claims, damages, penalties, causes of action, costs and expenses, including reasonable attorneys', consultants' and experts' fees and expenses, imposed upon or incurred by or asserted against Landlord by reason of:  (i) except to the extent caused solely as a result of Landlord's gross negligence or willful misconduct, any accident, injury to or death of Persons or loss of or damage to property occurring on or about the Leased Property or adjoining sidewalks under the control of Tenant; (ii) any use, misuse, non-use, condition, maintenance or repair by Tenant of the Leased Property; (iii) any failure on the part of Tenant to perform or comply with any of the terms of this Master Lease; (iv) the non-performance of any of the terms and provisions of any and all existing and future subleases of the Leased Property to be performed by any party thereunder; (v) any claim for malpractice, negligence or misconduct committed by any Person on or working from the Leased Property; (vi) the violation by Tenant of (A) any Legal Requirement, (B) any contract or agreement to which Tenant is a party, or (C) any Permitted Encumbrance; and (vii) any default by Landlord with respect to the Facility Mortgage, to the extent caused by an Event of Default by Tenant under this Master Lease; (viii) any casualty in any manner arising from any of the Leased Property, whether or not Landlord has or should have knowledge or notice of any defect or condition causing or contributing to said casualty.  Any amounts which become payable by Tenant under this Article XXI shall be paid within ten (10) days after liability therefor is determined by a final non appealable judgment or settlement or other agreement of the parties, and if not timely paid shall bear interest at the Overdue Rate from the date of such determination to the date of payment.  Tenant, at its sole cost and expense, shall contest, resist and defend any such claim, action or proceeding asserted or instituted against Landlord.  In the event of an Event of Default, Landlord shall have the right to select counsel, and the reasonable fees and expenses of such counsel shall be paid by Tenant.  For purposes of this Article XXI, any acts or omissions of Tenant, or by employees, agents, assignees, contractors, subcontractors or others acting for or on behalf of Tenant (whether or not they are negligent, intentional, willful or unlawful), shall be strictly attributable to Tenant.  The obligations of Tenant under this Section 21.1 shall survive any termination, expiration or rejection in bankruptcy of this Master Lease.

## ARTICLE XXII

22.1 **Subletting and Assignment.**

(a)    Tenant shall not, without Landlord's prior written consent, which, except as specifically set forth herein, may be withheld in Landlord's sole and absolute discretion, voluntarily or by operation of law assign (which term includes any transfer, sale, encumbering, pledge or other transfer or hypothecation) this Master Lease, sublet all or any part of the Leased

Property of any Facility or engage the services of any Person (other than (i) an Affiliate of Tenant that becomes, or is also, a Guarantor or (ii) an Operating Subtenant) for the management or operation of an entire Facility (provided that the foregoing shall not restrict a transferee of Tenant from retaining a manager necessary for such transferee's satisfying the requirement set forth in clause (a)(1) of the definition of "Discretionary Transferee").  Tenant acknowledges that Landlord is relying upon the expertise of Tenant in the operation of the Facilities and that Landlord entered into this Master Lease with the expectation that Tenant would remain in and operate such Facilities (or cause such Facilities to be operated by an Operating Subtenant) during the entire Term and for that reason, except as set forth herein, Landlord retains sole and absolute discretion in approving or disapproving any assignment or sublease.  Any Change in Control shall constitute an assignment of Tenant's interest in this Master Lease within the meaning of this Article XXII and the provisions requiring consent contained herein shall apply.

(b)     If Tenant desires to assign this Master Lease to any Person other than in connection with an assignment which does not require Landlord's prior written consent, then Tenant shall, not less than forty-five (45) days prior to the date on which it desires to make such assignment, submit to Landlord information regarding the following with respect to the proposed assignee and the terms of the proposed assignment (collectively, the "**Review Criteria**"): (i) credit worthiness, (ii) ownership structure, (iii) management experience, (iv) operating history, if applicable, and (v) proposed use of each of the Leased Property.  Landlord shall approve or disapprove such proposed assignment not later than the thirtieth (30th) day following receipt of all such information.  Landlord shall be deemed to have acted reasonably in granting or withholding consent if such grant or disapproval is based on Landlord's review of the Review Criteria and application of prudent business judgment thereto.

(c)     If Tenant assigns all of its rights and interest under this Master Lease (other than a deemed assignment resulting from a Change in Control), the assignee under such assignment shall expressly assume all of the obligations of Tenant hereunder, actual or contingent, arising after the date of such assignment, by a written instrument delivered to Landlord at the time of such assignment.

(d)     Tenant shall, within ten (10) days after the execution and delivery of any assignment or sublease, deliver a duplicate original copy thereof to Landlord which, in the event of an assignment (other than a deemed assignment resulting from a Change in Control), shall be in recordable form.  With respect to any assignment or sublease which is permitted without Landlord's consent pursuant to Sections 22.2 and 22.3, at least thirty (30) days prior to the effective date of such assignment or sublease, Tenant shall provide to Landlord information reasonably required by Landlord to confirm that such transaction satisfies the criteria of a permitted assignment or sublease pursuant to Sections 22.2 and 22.3, as the case may be.

(e)     Notwithstanding anything to the contrary contained in this Article XXII, except in connection with any assignment that is being made pursuant to Section 22.2(iii)(d), Tenant shall not have the right to assign this Master Lease (voluntarily or involuntarily, whether by operation of law or otherwise, including through merger or consolidation) or sublet all or any part of any of the Leased Property to any Person at any time that an Event of Default exists or would exist after giving effect to such assignment or sublet.

US-DOCS\124041687.41

**22.2** **Permitted Assignments.** Notwithstanding the foregoing, and subject to Section 40.1, Tenant may:

(i)     with Landlord's prior written consent, which shall not be unreasonably withheld, allow to occur or undergo a Change in Control (including, without limitation, a transfer or assignment of this Master Lease to any third party in conjunction with a sale by Tenant of all or substantially all of Tenant's assets relating to the Facilities);

(ii)     without Landlord's prior written consent, assign this Master Lease or sublease the Leased Property to Tenant's Parent, a wholly-owned Subsidiary of Tenant's Parent or a wholly-owned Subsidiary of Tenant if all of the following are first satisfied: (w) such Affiliate becomes a party to the Guaranty as a Guarantor and in the case of an assignment of this Master Lease, such assignee becomes party to and bound by this Master Lease; (x) Tenant remains fully liable hereunder; (y) the use of the Leased Property continues to comply with the requirements of this Master Lease; and (z) Landlord in its reasonable discretion shall have approved the form and content of all documents for such assignment or sublease and received an executed counterpart thereof; and

(iii)     without Landlord's prior written consent:

(a) undergo a Change in Control of the type referred to in clause (i)(a), (i)(b), (ii) (with respect to Tenant's Parent) or (iv), in each case, of the definition of Change in Control (such Change in Control, a "**Tenant Parent COC**") or in clause (ii) (with respect to Tenant) of the definition of Change in Control if (1) a Person acquiring such beneficial ownership or control, or acquiring Tenant's Parent's assets or Tenant's assets (as applicable), is a Discretionary Transferee and (2) the Parent Company of such Discretionary Transferee, if any, has become a Guarantor and provided a Guaranty on terms substantially similar to the Guaranty or otherwise reasonably satisfactory to Landlord or, if such Discretionary Transferee does not have a Parent Company, such Discretionary Transferee has become a Guarantor and provided a Guaranty on terms substantially similar to the Guaranty or otherwise reasonably satisfactory to Landlord;

(b) undergo a Change in Control whereby a Person acquires beneficial ownership and control of 50% or more of the Equity Interests in Tenant in connection with a Change in Control that does not constitute a Tenant Parent COC or a Foreclosure COC (such Change in Control, a "**Tenant COC**") if (1) such Person is a Discretionary Transferee, (2) the Parent Company of such Discretionary Transferee, if any, has become a Guarantor and provided a Guaranty on terms substantially similar to the Guaranty or otherwise reasonably satisfactory to Landlord or, if such Discretionary Transferee does not have a Parent Company, such Discretionary Transferee has become a Guarantor and provided a Guaranty on terms reasonably satisfactory to Landlord, and (3) the Adjusted Revenue to Rent Ratio with respect to all of the Facilities (determined at the proposed effective time of the Change in Control) is at least ███ ;

US-DOCS\124041687.41

(c) assign this Master Lease to any Person in an assignment that does not constitute a Foreclosure Assignment if (1) such Person is a Discretionary Transferee, (2) such Discretionary Transferee agrees in writing to assume the obligations of Tenant under this Master Lease without amendment or modification other than as provided below, (3) the Parent Company of such Discretionary Transferee, if any, has become a Guarantor and provided a Guaranty on terms substantially similar to the Guaranty or otherwise reasonably satisfactory to Landlord or, if such Discretionary Transferee does not have a Parent Company, such Discretionary Transferee has become a Guarantor and provided a Guaranty on terms substantially similar to the Guaranty or otherwise reasonably satisfactory to Landlord, and (4) the Adjusted Revenue to Rent Ratio with respect to all of the Facilities (determined at the proposed effective time of the assignment) is at least ███████; or

(d) (i) assign this Master Lease by way of foreclosure of the Leasehold Estate, an assignment-in-lieu of foreclosure to any Person or an assignment (by sale or through a plan of reorganization) pursuant to any applicable bankruptcy or insolvency law to any Person, (any such assignment, a "**Foreclosure Assignment**") or (ii) undergo a Change in Control whereby a Person acquires beneficial ownership and control of 100% of the Equity Interests in Tenant as a result of the purchase at a foreclosure on a permitted pledge of, or an assignment (by sale or through a plan of reorganization) pursuant to any applicable bankruptcy or insolvency law to any Person of, the Equity Interests in Tenant or an assignment in lieu of such foreclosure (a "**Foreclosure COC**") or (iii) effect the first subsequent sale or assignment of the Leasehold Estate or Change in Control after a Foreclosure Assignment or a Foreclosure COC whereby a Person so acquires the Leasehold Estate or beneficial ownership and control of 100% of the Equity Interests in Tenant or the Person who acquired the Leasehold Estate in connection with the Foreclosure Assignment, in each case, effected by a Permitted Leasehold Mortgagee or a Permitted Leasehold Mortgagee Foreclosing Party, to the extent such Permitted Leasehold Mortgagee or Permitted Leasehold Mortgagee Designee has been diligently attempting to expedite such first subsequent sale from the time it has initiated foreclosure proceedings taking into account the interest of such Permitted Leasehold Mortgagee or Permitted Leasehold Mortgagee Designee in maximizing the proceeds of such disposition if (1) such Person is a Discretionary Transferee, (2) in the case of any Foreclosure Assignment, if such Discretionary Transferee is not a Permitted Leasehold Mortgagee Designee such Discretionary Transferee agrees in writing to assume the obligations of Tenant under this Master Lease without amendment or modification other than as provided below (which written assumption, in the case of a Permitted Leasehold Mortgagee Foreclosing Party, may be made by a Subsidiary of a Permitted Leasehold Mortgagee or a Permitted Leasehold Mortgagee Designee) and (3) if such Discretionary Transferee is not a Permitted Leasehold Mortgagee Foreclosing Party, the Parent Company of such Discretionary Transferee, if any, has become a Guarantor and provided a Guaranty on terms substantially similar to the Guaranty or otherwise reasonably satisfactory to Landlord or, if such Discretionary Transferee does not have a Parent Company, such Discretionary Transferee has become a Guarantor and provided a Guaranty on

terms substantially similar to the Guaranty or otherwise reasonably satisfactory to Landlord;

provided that no such Change in Control or assignment referred to in this Section 22.2(iii) shall be permitted without Landlord's prior written consent unless, and in which case such consent shall not be unreasonably withheld, (A) the use of the Leased Property at the time of such Change in Control or assignment and immediately after giving effect thereto is permitted by Section 7.2 hereof, and (B) Landlord in its reasonable discretion shall have approved the form and content of all documents for such assignment and assumption and received an executed counterpart thereof (provided no such approval shall be required in the case of a Tenant Parent COC or a Tenant COC, so long as (A) Tenant remains obligated under this Master Lease and the Guaranty remains in effect except with respect to any release of a Guarantor permitted pursuant to the last paragraph of this Section 22.2, (B) the requirements for a Guaranty from the Parent Company or Discretionary Transferee under clause (a) or (b) above are met, and (C) any modifications to this Master Lease required pursuant to the next succeeding paragraph are made); and

(iv)    without Landlord's prior written consent, pledge or mortgage its Leasehold Estate to a Permitted Leasehold Mortgagee and permit a pledge of the equity interests in Tenant to be pledged to a Permitted Leasehold Mortgagee.

Upon the effectiveness of any Change in Control or assignment permitted pursuant to this Section 22.2), such Discretionary Transferee (and, if applicable, its Parent Company) and Landlord shall make such amendments and other modifications to this Master Lease as are reasonably requested by either party to give effect to such Change in Control or assignment and such technical amendments as may be necessary or appropriate in the reasonable opinion of such requesting party in connection with such Change in Control or assignment, including, without limitation, changes to the definition of Change in Control to substitute the Parent Company (or, if the Discretionary Transferee does not have a Parent Company, the Discretionary Transferee) for Tenant's Parent therein and in the provisions of this Master Lease regarding delivery of financial statements and other reporting requirements with respect to Tenant's Parent.  After giving effect to any such Change in Control or assignment, unless the context otherwise requires, references to Tenant and Tenant's Parent hereunder shall be deemed to refer to the Discretionary Transferee or its Parent Company, as applicable.

Upon the consummation of any transaction permitted under this Section 22.2 (other than a Foreclosure CoC or a Foreclosure Assignment) pursuant to which any Guarantor ceases to be an Affiliate of Tenant, such Guarantor shall be released from all of its obligations under the Guaranty upon the satisfaction of the terms and conditions set forth in this Section 22.2 with respect to such transaction, including, without limitation, the delivery of the documentation required to effect such transaction pursuant hereto, including, if applicable, a replacement Guaranty on the terms required by this Section 22.2, and, if required under this Section 22.2, Landlord shall have consented to the consummation of such transaction in writing.

**22.3** **Permitted Sublease Agreements.** Notwithstanding the provisions of Section 22.1, but subject to compliance with the provisions of this Section 22.3 and of Section 40.1, (a) <u>provided</u> that no Event of Default shall have occurred and be continuing, Tenant shall be permitted to sublease any or all Gaming or other operations at a Facility to (i) a wholly-owned Subsidiary of Tenant that becomes a Guarantor by executing the Guaranty in form and substance reasonably satisfactory to Landlord and/or (ii) an Operating Subtenant, (b) each Specified Sublease, and any extension of the term thereof in accordance with <u>Section 22.4</u>, on substantially the same terms and conditions as set forth therein shall be permitted without any further consent from Landlord, and (c) <u>provided</u> that no Event of Default shall have occurred and be continuing, Tenant may enter into any sublease agreement (including any management agreement or similar agreements with sports betting and/or online gaming operators) with respect to all or any portion (including any portion used for gaming purposes) of any Facility without the prior written consent of Landlord, <u>provided, further</u> that, (i) all sublease agreements entered into in reliance on this <u>Section 22.3(c)</u> are made in furtherance of the Primary Intended Use and (ii) any sublease entered into in reliance on this <u>Section 22.3(c)</u> with respect to all or substantially all of any Facility shall be subject to the prior written consent of Landlord (in its sole discretion). After an Event of Default has occurred and while it is continuing, Landlord may collect rents from any subtenant and apply the net amount collected to the Rent, but no such collection shall be deemed (i) a waiver by Landlord of any of the provisions of this Master Lease, (ii) the acceptance by Landlord of such subtenant as a tenant or (iii) a release of Tenant from the future performance of its obligations hereunder. If reasonably requested by Tenant in connection with a sublease permitted under this <u>Section 22.3</u>, Landlord and such sublessee shall enter into a subordination, non-disturbance and attornment agreement with respect to such sublease in a form reasonably satisfactory to Landlord (and if a Facility Mortgage is then in effect, Landlord shall use reasonable efforts to cause the Facility Mortgagee to enter into such subordination, non-disturbance and attornment agreement).

Tenant shall give Landlord at least thirty (30) days' prior written notice before entering into any Permitted Facility Sublease, which notice shall be accompanied by the proposed form of such Permitted Facility Sublease. In addition, Tenant shall furnish Landlord reasonably promptly with such materials as Landlord may reasonably request in order to determine that the requirements of this <u>Section 22.3</u> with respect to such Permitted Facility Sublease are satisfied. Reasonably promptly following entry into any such Permitted Facility Sublease, Tenant shall provide Landlord with a copy of the executed Permitted Facility Sublease, and Tenant shall furnish Landlord with copies of any amendments of, or supplements to, any Permitted Facility Sublease with reasonable promptness after the execution thereof.

**22.4** **Required Assignment and Subletting Provisions.** Any assignment and/or sublease (excluding a Specified Sublease until such Specified Sublease is amended, modified or extended, in which case such amendment or modification shall incorporate the requirements of Section 22.4) must provide that:

(i)     in the case of a sublease, it shall be subject and subordinate to all of the terms and conditions of this Master Lease;

(ii)     the use of the applicable Facility (or portion thereof) shall not conflict with any Legal Requirement or any other provision of this Master Lease;

US-DOCS\124041687.41

(iii)    in the case of a Specified Operating Sublease, (A) require the Operating Subtenant to provide such information that is required for Tenant to comply with the financial reporting requirements set forth in Article XXIII and (B) not extend beyond the then current Term minus one day;

(iv)    in the case of a sublease, bind the subtenant to the applicable covenants contained in Sections 7.2, 8.2, 9.1 and 32.1 with respect to the portion of the Leased Property that is subleased by such subtenant;

(v)    except as otherwise provided herein, no subtenant or assignee shall be permitted to further sublet all or any part of the applicable Leased Property or assign this Master Lease or its sublease except insofar as the same would be permitted if it were a sublease by Tenant under this Master Lease (it being understood that any subtenant under Section 22.3(a) may pledge and mortgage its subleasehold estate (or allow the pledge of its equity interests) to a Permitted Leasehold Mortgagee);

(vi)    in the case of a sublease, in the event of cancellation or termination of this Master Lease for any reason whatsoever or of the surrender of this Master Lease (whether voluntary, involuntary or by operation of law) prior to the expiration date of such sublease, including extensions and renewals granted thereunder, then, subject to Article XXXVI, at Landlord's option, the subtenant shall make full and complete attornment to Landlord for the balance of the term of the sublease, which attornment shall be evidenced by an agreement in form and substance satisfactory to Landlord and which the subtenant shall execute and deliver within five (5) days after request by Landlord and the subtenant shall waive the provisions of any law now or hereafter in effect which may give the subtenant any right of election to terminate the sublease or to surrender possession in the event any proceeding is brought by Landlord to terminate this Master Lease; and

(vii)    in the event the subtenant receives a written notice from Landlord stating that this Master Lease has been cancelled, surrendered or terminated, then, subject to Article XXXVI, the subtenant shall thereafter be obligated to pay all rentals accruing under said sublease directly to Landlord (or as Landlord shall so direct); all rentals received from the subtenant by Landlord shall be credited against the amounts owing by Tenant under this Master Lease.

**22.5    Costs.**  Tenant shall reimburse Landlord for Landlord's reasonable costs and expenses incurred after the Commencement Date in conjunction with the processing and documentation of any assignment, subletting or management arrangement, including reasonable attorneys', architects', engineers' or other consultants' fees whether or not such sublease, assignment or management agreement is actually consummated.

**22.6    No Release of Tenant's Obligations; Exception.**  No assignment (other than a permitted transfer pursuant to Section 22.2(i) or 22.2(iii)(c) or Section 22.2(iii)(d)(1) or Section 22.2(iii)(d)(3), in connection with a sale or assignment of the Leasehold Estate), subletting or management agreement shall relieve Tenant of its obligation to pay the Rent and to perform all of the other obligations to be performed by Tenant hereunder.  The liability of Tenant and any immediate and remote successor in interest of Tenant (by assignment or otherwise), and the due performance of the obligations of this Master Lease on Tenant's part to be performed or observed,

shall not in any way be discharged, released or impaired by any (i) stipulation which extends the time within which an obligation under this Master Lease is to be performed, (ii) waiver of the performance of an obligation required under this Master Lease that is not entered into for the benefit of Tenant or such successor, or (iii) failure to enforce any of the obligations set forth in this Master Lease, <u>provided</u> that Tenant shall not be responsible for any additional obligations or liability arising as the result of any modification or amendment of this Master Lease by Landlord and any assignee of Tenant that is not an Affiliate of Tenant.  No assignment or sublease shall impose any additional obligations on Landlord under this Master Lease.

**ARTICLE XXIII**

**23.1**     <u>**Officer's Certificates and Financial Statements**</u>.

      (a)     <u>Officer's Certificate</u>.  Each of Landlord and Tenant shall, at any time and from time to time upon receipt of not less than ten (10) Business Days' prior written request from the other party hereto, furnish an Officer's Certificate certifying (i) that this Master Lease is unmodified and in full force and effect, or that this Master Lease is in full force and effect as modified and setting forth the modifications; (ii) the Rent and Additional Charges payable hereunder and the dates to which the Rent and Additional Charges payable have been paid; (iii) that the address for notices to be sent to the party furnishing such Officer's Certificate is as set forth in this Master Lease (or, if such address for notices has changed, the correct address for notices to such party); (iv) whether or not, to its actual knowledge, such party or the other party hereto is in default in the performance of any covenant, agreement or condition contained in this Master Lease (together with back-up calculation and information reasonably necessary to support such determination) and, if so, specifying each such default of which such party may have knowledge; (v) that Tenant is in possession of the Leased Property (other than portions that are subleased or assigned to third parties in accordance with this Master Lease); and (vi) responses to such other questions or statements of fact as such other party, any purchaser or any current or prospective Facility Mortgagee or Permitted Leasehold Mortgagee shall reasonably request.  Any such certificate furnished pursuant to this Article XXIII may be relied upon by the receiving party and any current or prospective Facility Mortgagee, Permitted Leasehold Mortgagee or purchaser of the Leased Property.  Each Guarantor or Tenant, as the case may be, shall deliver a written notice to Landlord within two (2) Business Days of obtaining knowledge of the occurrence of a default hereunder.  Such notice shall include a detailed description of the default and the actions such Guarantor or Tenant has taken or shall take, if any, to remedy such default.

      (b)     <u>Statements</u>.  Tenant shall furnish the following statements to Landlord:

      (i)     Within 120 days after the end of Tenant's Parent's Fiscal Years (commencing with the Fiscal Year ending December 31, 2021) or, if Tenant's Parent is required to file an annual report on Form 10-K with the SEC, concurrently with the filing by Tenant's Parent of such report, whichever is earlier:  (x) Tenant's Parent's Financial Statements; (y) a certificate, executed by the chief financial officer or treasurer of Tenant's Parent certifying that, to such person's knowledge after due inquiry, no default has occurred under this Master Lease or, if such person has knowledge after due inquiry that a default has occurred, specifying the nature and extent thereof and any corrective action taken or proposed to be taken with respect thereto; and (z) a report with respect to Tenant's Parent's Financial Statements from Tenant's Parent's accountants, which report shall

be unqualified as to the scope of audit of Tenant's Parent and its Subsidiaries and shall provide in substance that (a) such consolidated financial statements present fairly the consolidated financial position of Tenant's Parent and its Subsidiaries as at the dates indicated and the results of their operations and cash flow for the periods indicated in conformity with GAAP and (b) that the examination by Tenant's Parent's accountants in connection with such Financial Statements has been made in accordance with generally accepted auditing standards;

(ii)     Within forty-five (45) days after the end of each of the first three (3) fiscal quarters of Tenant's Parent's Fiscal Year (commencing with the fiscal quarter ending September 30, 2021) or, if Tenant's Parent is required to file a quarterly report on Form 10-Q with the SEC, concurrently with the filing by Tenant's Parent of such report, whichever is earlier, a copy of Tenant's Parent's Financial Statements for such period, together with a certificate, executed by the chief financial officer or treasurer of Tenant's Parent (i) certifying that no default has occurred or, if such a default has occurred, specifying the nature and extent thereof and any corrective action taken or proposed to be taken with respect thereto and (ii) certifying that such Financial Statements fairly present, in all material respects, the financial position and results of operations of Tenant's Parent and its Subsidiaries on a consolidated basis in accordance with GAAP (subject to normal year-end adjustments and the absence of footnotes);

(iii)     As soon as is reasonably practicable following Landlord's request from time to time, (a) five-year forecasts of Tenant's income statement and balance sheet covering such quarterly and annual periods as may be reasonably requested by Landlord, and in a format consistent with Tenant's Parent's quarterly and annual financial statements filed with the SEC to the extent that Tenant's Parent is required to file such statements with the SEC, and such additional financial information and projections as may be reasonably requested by Landlord in connection with syndications, private placements, or public offerings of AG's or Landlord's debt securities or loans or equity or hybrid securities and (b) such additional information and unaudited quarterly financial information concerning the Leased Property and Tenant as Landlord or AG may require for its ongoing filings with the SEC under both the Securities Act and the Securities Exchange Act of 1934, as amended (including, but not limited to, 10-Q Quarterly Reports, 10-K Annual Reports and registration statements to be filed by Landlord or AG during the Term of this Master Lease) to the extent Landlord and/or AG are required to make filings with the SEC, the Internal Revenue Service and any other federal, state or local regulatory agency with jurisdiction over AG or its Subsidiaries subject to Section 23.1(c) below;

(iv)     Within thirty-five (35) days after the end of each calendar month, a copy of Tenant's unaudited income statement for such month and Tenant's unaudited balance sheet as of the end of such month (which may be subject to quarterly and year-end adjustments and the absence of footnotes); provided, however, that with respect to each calendar quarter, Tenant shall provide such unaudited financial reports for the final month thereof as soon as is reasonably practicable following the closing of the books for such month and in sufficient time so that Landlord or its Affiliate is able to include the operational results for the entire quarter in its current Form 10-Q or Form 10-K (or supplemental report filed in connection therewith), if applicable;

(v)     Within thirty-five (35) days after the end of each calendar month, a copy of an unaudited income statement for each Facility that shows the results of Tenant's and the applicable Operating Subtenant's operations for the preceding month on a combined basis;

US-DOCS\124041687.41

(vi)     Prompt Notice to Landlord of any action, proposal or investigation by any agency or entity, or complaint to such agency or entity, (any of which is called a "**Proceeding**"), known to Tenant, the result of which Proceeding would reasonably be expected to be to revoke or suspend or terminate or modify in a way adverse to Tenant, or fail to renew or fully continue in effect, any license or certificate or operating authority pursuant to which Tenant carries on any part of the Primary Intended Use of all or any portion of the Leased Property;

(vii)    As soon as it is prepared and in no event later than sixty (60) days after the end of each Fiscal Year, a capital and operating budget for each Facility for the Fiscal Year in which it is delivered; and

(viii)   Tenant further agrees to provide the financial and operational reports to be delivered to Landlord under this Master Lease in such electronic format(s) as may reasonably be required by Landlord from time to time in order to facilitate Landlord's internal financial and reporting database.  Tenant also agrees that Landlord shall have audit rights with respect to such information to the extent required to confirm Tenant's compliance with the terms of this Master Lease (including, without limitation, calculation of Net Revenues).

(c)     Notwithstanding the foregoing provisions of Section 23.1, Tenant shall not be obligated to provide (1) information that is subject to the quality assurance immunity or is subject to attorney-client privilege or the attorney work product doctrine ("**Restricted Information**") or (2) any Tenant Database Data.  Landlord shall retain audit rights with respect to Restricted Information to the extent required to confirm Tenant's compliance with the terms of this Master Lease (and AG's compliance with SEC, Internal Revenue Service and other legal and regulatory requirements) and <u>provided</u> that appropriate measures are in place to ensure that only Landlord's auditors and attorneys (and not Landlord or AG or any of Landlord's other Affiliates) are provided access to such information.  In addition, Landlord shall not disclose any Restricted Information or Tenant Database Data to any Person or any employee, officer or director of any Person (other than AG or a Subsidiary of Landlord) that directly or indirectly owns or operates any gaming business or is a competitor of Tenant, Tenant's Parent or any Affiliate of Tenant.

## 23.2    Confidentiality; Public Offering Information.

(a)     The parties recognize and acknowledge that they may receive certain Confidential Information of the other party.  Each party agrees that neither such party nor any of its Representatives acting on its behalf shall, during or within five (5) years after the term of the termination or expiration of this Master Lease, directly or indirectly use any Confidential Information of the other party or disclose Confidential Information of the other party to any person for any reason or purpose whatsoever, except as reasonably required in order to comply with the obligations and otherwise as permitted under the provisions of this Master Lease.  Notwithstanding the foregoing, in the event that a party or any of its Representatives is requested or becomes legally compelled (pursuant to any legal, governmental, administrative or regulatory order, authority or process) to disclose any Confidential Information of the other party, it will, to the extent reasonably practicable and not prohibited by law, provide the party to whom such Confidential Information belongs prompt written notice of the existence, terms or circumstances of such event so that the party to whom such Confidential Information belongs may seek a protective order or other appropriate remedy or waive compliance with the provisions of this Section 23.2(a).  In the event

that such protective order or other remedy is not obtained or the party to whom such Confidential Information belongs waives compliance with this Section 23.2(a), the party compelled to disclose such Confidential information will furnish only that portion of the Confidential Information or take only such action as is legally required and will use commercially reasonable efforts to obtain reliable assurance that confidential treatment will be accorded any Confidential Information so furnished.  The party compelled to disclose the Confidential Information shall cooperate with any action reasonably requested by the party to whom such Confidential Information belongs to obtain a protective order or other reliable assurance that confidential treatment will be accorded to the Confidential Information.

(b)     Notwithstanding anything to the contrary in Section 23.2(a), Tenant specifically agrees that Landlord may include financial information and such information concerning the operation of the Facilities, in each case, which is publicly available or approved by Tenant in writing (which approval may not be unreasonably withheld) in offering memoranda or prospectuses or confidential information memoranda, or similar publications or marketing materials, rating agency presentations, investor presentations or disclosure documents in connection with syndications, private placements or public offerings of AG's or Landlord's securities or loans or securities or loans of any direct or indirect parent entity of Landlord, and any other reporting requirements under applicable federal and state laws, including those of any successor to Landlord, <u>provided</u> that the recipients thereof shall be obligated to maintain the confidentiality thereof pursuant to Section 23.2(a) or pursuant to confidentiality provisions substantially similar thereto and to comply with all federal, state and other securities laws applicable with respect to such information.  Unless otherwise agreed by Tenant, neither Landlord nor AG shall revise or change the wording of information previously publicly disclosed by Tenant and furnished to Landlord or AG or any direct or indirect parent entity of Landlord pursuant to Section 23.1 or this Section 23.2 and Landlord's Form 10-Q or Form 10-K (or supplemental report filed in connection therewith) shall not disclose the operational results of the Facilities prior to Tenant's Parent's, Tenant's or its Affiliate's public disclosure thereof so long as Tenant's Parent, Tenant or such Affiliate reports such information in a timely manner consistent with historical practices and SEC disclosure requirements.  Tenant agrees to provide such other reasonable information and, if necessary, participation in road shows and other presentations at Landlord's or AG's sole cost and expense, with respect to Tenant and the Leased Property to facilitate a public or private debt or equity offering or syndication by Landlord or AG or any direct or indirect parent entity of Landlord or AG or to satisfy AG's or Landlord's SEC disclosure requirements or the disclosure requirements of any direct or indirect parent entity of Landlord or AG.  In this regard, Landlord shall provide to Tenant a copy of any information prepared by Landlord to be published, and Tenant shall have a reasonable period of time (not to exceed three (3) Business Days) after receipt of such information to notify Landlord of any corrections.

### 23.3     <u>Restricted Payments; Indebtedness; Additional Escrow</u>.

(a)     If, at any time on or after the Commencement Date but prior to the Specified Covenant Termination Date, the aggregate amount of funds that Tenant has deposited or caused to be deposited in the Additional Escrow Account is less than the then-applicable Additional Escrow Account Cap, then Tenant's Parent shall not make any Restricted Payments to its direct or indirect members, partners or shareholders and Tenant shall not make any Restricted Payments other than

to Tenant's Parent and wholly owned Subsidiaries of Tenant's Parent.  Any sums received in violation of the foregoing sentence shall be held in trust for the benefit of Landlord and shall be deposited promptly with Landlord.

(b)     Tenant shall not incur, assume or guarantee any Indebtedness for borrowed money, other than Permitted Indebtedness.  "Permitted Indebtedness" means (i) any Indebtedness incurred, assumed or guaranteed by Tenant on or prior to the Commencement Date, (ii) any Indebtedness incurred, assumed or guaranteed by Tenant if, at the time of such incurrence, assumption or guarantee, the Rent Service Coverage Ratio for the Test Period most recently ended prior to such date for which financial statements are available is greater than or equal to ████, calculated on a pro forma basis assuming that such Indebtedness was incurred, assumed or guaranteed, as applicable, on the first day of such Test Period, (iii) any Indebtedness incurred, assumed or guaranteed by Tenant if, at the time of such incurrence, assumption or guarantee, the Total Net Leverage Ratio for the Test Period most recently ended prior to such date for which financial statements are available is less than or equal to ████, calculated on a pro forma basis assuming that such Indebtedness was incurred, assumed or guaranteed, as applicable, on the first day of such Test Period and (iv) any Refinancing Indebtedness in respect of any Indebtedness incurred pursuant to clauses (i) through (iii) above or in respect of Refinancing Indebtedness previously incurred pursuant to this clause (iv).  For purposes of calculating compliance with this covenant in connection with any unfunded debt commitment, compliance shall be determined at the time such unfunded debt commitment is extended (and not at the time Indebtedness is incurred pursuant to such commitment) and determined as if such unfunded debt commitment was fully funded at such time.

(c)

(i)     If, on or after the Commencement Date but prior to the Specified Covenant Termination Date, the Rent Service Coverage Ratio for any Test Period (ending on or after the Commencement Date but prior to the Specified Covenant Termination Date) for which financial statements are available is less than ████, then Tenant shall (x) promptly establish the Additional Escrow Account in accordance with Additional Escrow Account Instructions (to the extent not previously established) and (y) following the establishment of the Additional Escrow Account (to the extent not previously established), cause to be deposited into the Additional Escrow Account Excess Cash Flow generated by Tenant's Parent and, without duplication, Tenant in respect of the last fiscal quarter of such Test Period and any subsequent fiscal quarter until Tenant has caused to be deposited into the Additional Escrow Account an aggregate amount equal to, for each Test Period in respect of which the Rent Service Coverage Ratio is less than ████, the product of (I) three (3) *multiplied by* (II) the amount of the next monthly installment of Rent that is due under this Master Lease.  Tenant shall cause any deposits that are required by clause (y) of the immediately preceding sentence to be made on a quarterly basis, and each such quarterly deposit shall be made no later than fifteen (15) days after the applicable financial statements for the applicable fiscal quarter (for which Excess Cash Flow is being calculated) are available.  For the avoidance of doubt, the foregoing escrow requirement shall be cumulative, such that for each Test Period triggering an escrow requirement pursuant to this Section 23.3(c)(i) Tenant shall be required to cause the deposits described above to be made.  The cumulative amount that Tenant is required to deposit into the Additional Escrow Account pursuant to this Section 23.3(c)(i) shall be referred to herein as the "Additional Escrow Account Cap".

US-DOCS\124041687.41

(ii)     Any funds held in the Additional Escrow Account shall remain in such account except (x) if Tenant fails to pay the full amount of any installment of Rent when due, then funds equal to the difference between the full amount of such installment of Rent and any amount paid by Tenant to Landlord with respect to such installment of Rent shall be released directly to Landlord in accordance with the terms and conditions of the Additional Escrow Account Instructions and shall be applied to pay such installment of Rent (and Landlord shall instruct the escrow holder accordingly in accordance with the Additional Escrow Account Instructions) and (y) to the extent that such funds are otherwise required to be released to Landlord or Tenant in accordance with the Additional Escrow Account Instructions.   On the Specified Covenant Termination Date, all of Tenant's obligations under this Section 23.3(c) shall automatically terminate (and, for the avoidance of doubt, such obligations shall not be subsequently reinstated for any reason whatsoever).  Promptly following the Specified Covenant Termination Date or upon the expiration or earlier termination of this Master Lease, Tenant and Landlord shall execute a joint written instruction letter that instructs the title company holding the Additional Escrow Account to promptly release all funds in such account directly to Tenant.

(d)

(i)     If the Tenant Refinancing does not occur on or before January 3, 2022, then Tenant shall (x) promptly establish the Refinancing Escrow Account in accordance with Refinancing Escrow Account Instructions and (y) simultaneously with the establishment of the Refinancing Escrow Account and the execution by the applicable parties of the Refinancing Escrow Account Instructions, deposit into the Refinancing Escrow Account funds equal to the next six (6) monthly installments of Rent due under this Master Lease.   Thereafter, if the Tenant Refinancing does not occur on or before May 3, 2022, then Tenant shall promptly deposit into the Refinancing Escrow Account additional funds equal to the next six (6) monthly installments of Rent due under this Master Lease.

(ii)     Any funds held in the Refinancing Escrow Account shall remain in such account and shall be held as additional security for Tenant's performance of its obligations under the Lease and released in accordance with the Refinancing Escrow Account Instructions. Upon consummation of the Tenant Refinancing and delivery of evidence reasonably satisfactory to Landlord of the same, all of Tenant's obligations under this Section 23.3(d) shall automatically terminate (and, for the avoidance of doubt, such obligations shall not be subsequently reinstated for any reason whatsoever).  Promptly following the date that the Tenant Existing Financing is refinanced or upon the expiration or earlier termination of this Master Lease, Tenant and Landlord shall execute a joint written instruction letter that instructs the title company holding the Refinancing Escrow Account to promptly release all funds in such account directly to Tenant.

**23.4     Landlord Obligations.**  Landlord acknowledges and agrees that certain of the information contained in the Financial Statements may be non-public financial or operational information with respect to Tenant, Operating Subtenants and/or the Leased Property.  Landlord further agrees (i) to maintain the confidentiality of such non-public information; provided, however, that, notwithstanding the foregoing and notwithstanding anything to the contrary in Section 23.2(a) hereof or otherwise herein, Landlord shall have the right to share such information with AG and their respective officers, employees, directors, Facility Mortgagee, agents and lenders party to material debt instruments entered into by AG or Landlord, actual or prospective arrangers,

underwriters, investors or lenders with respect to Indebtedness or Equity Interests that may be issued by AG or Landlord, rating agencies, accountants, attorneys and other consultants (the "**Landlord Representatives**"), underlined that each such Landlord Representative is advised of the confidential nature of such information and agrees, to the extent such information is not publicly available, to maintain the confidentiality thereof pursuant to Section 23.2(a) or pursuant to confidentiality provisions substantially similar thereto and to comply with all federal, state and other securities laws applicable with respect to such information and (ii) that neither it nor any Landlord Representative shall be permitted to engage in any transactions with respect to the stock or other equity or debt securities or syndicated loans of Tenant, Tenant's Parent or any Operating Subtenant based on any such non-public information provided by or on behalf of Landlord or AG (provided that this provision shall not govern the provision of information by Tenant, Tenant's Parent or any Operating Subtenant).  In addition to the foregoing, Landlord agrees that, upon request of Tenant, it shall from time to time provide such information as may be reasonably requested by Tenant with respect to Landlord's capital structure and/or any financing secured by this Master Lease or the Leased Property in connection with Tenant's review of the treatment of this Master Lease under GAAP.  In connection therewith, Tenant agrees to maintain the confidentiality of any such non-public information; provided, however, Tenant shall have the right to share such information with Tenant's Parent, Tenant's other Affiliates, any Operating Subtenant and each of their respective officers, employees, directors, Permitted Leasehold Mortgagees, agents and lenders party to material debt instruments entered into by Tenant, Tenant's Parent, Tenant's other Affiliates or any Operating Subtenant, actual or prospective arrangers, underwriters, investors or lenders with respect to Indebtedness or Equity Interests that may be issued by Tenant, Tenant's Parent, Tenant's other Affiliates or any Operating Subtenant, rating agencies, accountants, attorneys and other consultants (the "**Tenant Representatives**") so long as such Tenant Representative is advised of the confidential nature of such information and agrees, to the extent such information is not publicly available, to maintain the confidentiality thereof pursuant to Section 23.2(a) or pursuant to confidentiality provisions substantially similar thereto and to comply with all federal, state and other securities laws applicable with respect to such information.

## ARTICLE XXIV

24.1   **Landlord's Right to Inspect.**  Upon reasonable advance notice to Tenant and subject to the rights of hotel guests and subtenants under subleases, Tenant shall permit Landlord and its authorized representatives to inspect the Leased Property during usual business hours.  Landlord shall take care to minimize disturbance of the operations on the Leased Property, except in the case of emergency.

## ARTICLE XXV

25.1   **No Waiver.**  No delay, omission or failure by Landlord or Tenant to insist upon the strict performance of any term hereof or to exercise any right, power or remedy hereunder and no acceptance of full or partial payment of Rent by Landlord during the continuance of any default or Event of Default, shall impair any such right or constitute a waiver of any such breach

or of any such term.  No waiver of any breach shall affect or alter this Master Lease, which shall continue in full force and effect with respect to any other then existing or subsequent breach.

## ARTICLE XXVI

26.1 **Remedies Cumulative.**  To the extent permitted by law, each legal, equitable or contractual right, power and remedy of Landlord now or hereafter provided either in this Master Lease or by statute or otherwise shall be cumulative and concurrent and shall be in addition to every other right, power and remedy and the exercise or beginning of the exercise by Landlord of any one or more of such rights, powers and remedies shall not preclude the simultaneous or subsequent exercise by Landlord of any or all of such other rights, powers and remedies.

## ARTICLE XXVII

27.1 **Acceptance of Surrender.**  No surrender to Landlord of this Master Lease or of any Leased Property or any part thereof, or of any interest therein, shall be valid or effective unless agreed to and accepted in writing by Landlord, and no act by Landlord or any representative or agent of Landlord, other than such a written acceptance by Landlord, shall constitute an acceptance of any such surrender.

## ARTICLE XXVIII

28.1 **No Merger.**  There shall be no merger of this Master Lease or of the leasehold estate created hereby by reason of the fact that the same Person may acquire, own or hold, directly or indirectly, (i) this Master Lease or the leasehold estate created hereby or any interest in this Master Lease or such leasehold estate and (ii) the fee estate in the Leased Property.

## ARTICLE XXIX

29.1 **Conveyance by Landlord.**  If Landlord or any successor owner of the Leased Property shall convey the Leased Property in accordance with Section 18.1 and the other terms of this Master Lease other than as security for a debt, and the grantee or transferee expressly assumes all obligations of Landlord arising after the date of the conveyance, Landlord or such successor owner, as the case may be, shall thereupon be released from all future liabilities and obligations of Landlord under this Master Lease arising or accruing from and after the date of such conveyance or other transfer and all such future liabilities and obligations shall thereupon be binding upon the new owner.

## ARTICLE XXX

30.1 **Quiet Enjoyment.**  So long as Tenant shall pay the Rent as the same becomes due and shall fully comply with all of the terms of this Master Lease and fully perform

US-DOCS\124041687.41

its obligations hereunder, Tenant shall peaceably and quietly have, hold and enjoy the Leased Property for the Term, free of any claim or other action by Landlord or anyone claiming by, through or under Landlord, but subject to all liens and encumbrances of record as of the Commencement Date or thereafter provided for in this Master Lease or consented to by Tenant. No failure by Landlord to comply with the foregoing covenant shall give Tenant any right to cancel or terminate this Master Lease or abate, reduce or make a deduction from or offset against the Rent or any other sum payable under this Master Lease, or to fail to perform any other obligation of Tenant hereunder.  Notwithstanding the foregoing, Tenant shall have the right, by separate and independent action to pursue any claim it may have against Landlord as a result of a breach by Landlord of the covenant of quiet enjoyment contained in this Article XXX or any other covenant of Landlord set forth in this Master Lease.

**ARTICLE XXXI**

31.1    **Landlord's Financing.**  Without the consent of Tenant, Landlord may from time to time, directly or indirectly, create or otherwise cause to exist any Facility Mortgage upon the Leased Property or any portion thereof or interest therein.  This Master Lease is and at all times shall be subject and subordinate to any such Facility Mortgage which may now or hereafter affect the Leased Property or any portion thereof or interest therein and to all renewals, modifications, consolidations, replacements, restatements and extensions thereof or any parts or portions thereof; provided, however, that the subjection and subordination of this Master Lease and Tenant's leasehold interest hereunder to any Facility Mortgage shall be conditioned upon the execution by the holder of each Facility Mortgage and delivery to Tenant of a nondisturbance and attornment agreement substantially in the form attached hereto as Exhibit E (provided that upon the request of Landlord such nondisturbance and attornment agreement shall also incorporate subordination provisions referenced above, as contemplated below, and be in substantially the form attached hereto as Exhibit F, and be executed by Tenant as well as Landlord), which will bind such holder of such Facility Mortgage and its successors and assigns as well as any person who acquires any portion of the Leased Property in a foreclosure or similar proceeding or in a transfer in lieu of any such foreclosure or a successor owner of the Leased Property (each, a "**Foreclosure Purchaser**") and which provides that so long as there is not then outstanding and continuing an Event of Default under this Master Lease, the holder of such Facility Mortgage, and any Foreclosure Purchaser shall disturb neither Tenant's leasehold interest or possession of the Leased Property in accordance with the terms hereof, nor any of its rights, privileges and options, and shall give effect to this Master Lease, including the provisions of Article XVII which benefit any Permitted Leasehold Mortgagee (as if such Facility Mortgagee or Foreclosure Purchaser were the landlord under this Master Lease (it being understood that if an Event of Default has occurred and is continuing at such time such parties shall be subject to the terms and provisions hereof concerning the exercise of rights and remedies upon such Event of Default including the provisions of Articles XVI and XXXVI)).  In connection with the foregoing and at the request of Landlord, Tenant shall promptly execute a subordination, nondisturbance and attornment agreement, in form and substance substantially in the form of Exhibit F or otherwise reasonably satisfactory to Tenant, and the Facility Mortgagee or prospective Facility Mortgagee, as the case may be, which will incorporate the terms set forth in the preceding sentence.  Except for the documents described in the preceding sentences, this provision shall be self-operative and no further instrument of subordination shall be required to give it full force and effect.  If, in connection with obtaining any Facility Mortgage for the Leased

Property or any portion thereof or interest therein, a Facility Mortgagee or prospective Facility Mortgagee shall request reasonable cooperation from Tenant, Tenant shall provide the same at no cost or expense to Tenant, it being understood and agreed that Landlord shall be required to reimburse Tenant for all such costs and expenses so incurred by Tenant, including, but not limited to, its reasonable attorneys' fees.

      31.2    **Attornment.**  If Landlord's interest in the Leased Property or any portion thereof or interest therein is sold, conveyed or terminated upon the exercise of any remedy provided for in any Facility Mortgage Documents (or in lieu of such exercise), or otherwise by operation of law:  (a) at the request and option of the new owner or superior lessor, as the case may be, Tenant shall attorn to and recognize the new owner or superior lessor as Tenant's "landlord" under this Master Lease or enter into a new lease substantially in the form of this Master Lease with the new owner or superior lessor, and Tenant shall take such actions to confirm the foregoing within ten (10) days after request; and (b) the new owner or superior lessor shall not be (i) liable for any act or omission of Landlord under this Master Lease occurring prior to such sale, conveyance or termination; (ii) subject to any offset, abatement or reduction of rent because of any default of Landlord under this Master Lease occurring prior to such sale, conveyance or termination; (iii) bound by any previous modification or amendment to this Master Lease or any previous prepayment of more than one month's rent, unless such modification, amendment or prepayment shall have been approved in writing by such Facility Mortgagee (to the extent such approval was required at the time of such amendment or modification or prepayment under the terms of the applicable Facility Mortgage Documents) or, in the case of such prepayment, such prepayment of rent has actually been delivered to such new owner or superior lessor or in either case, such modification, amendment or prepayment occurred before Landlord provided Tenant with notice of the Facility Mortgage and the identity and address of the Facility Mortgagee; or (iv) liable for any security deposit or other collateral deposited or delivered to Landlord pursuant to this Master Lease unless such security deposit or other collateral has actually been delivered to such new owner or superior lessor.

      31.3    **Compliance with Facility Mortgage Documents.**  (a) Tenant acknowledges that any Facility Mortgage Documents executed by Landlord or any Affiliate of Landlord may impose certain obligations on the "borrower" or other counterparty thereunder to comply with or cause the operator and/or lessee of a Facility to comply with all representations, covenants and warranties contained therein relating to such Facility and the operator and/or lessee of such Facility, including covenants relating to (i) the maintenance and repair of such Facility; (ii) maintenance and submission of financial records and accounts of the operation of such Facility and related financial and other information regarding the operator and/or lessee of such Facility and such Facility itself; (iii) the procurement of insurance policies with respect to such Facility; and (iv) without limiting the foregoing, compliance with all applicable Legal Requirements relating to such Facility and the operation of the business thereof.  For so long as any Facility Mortgages encumber the Leased Property or any portion thereof or interest therein, Tenant covenants and agrees, at its sole cost and expense and for the express benefit of Landlord, to operate the applicable Facility(ies) in compliance with the terms and conditions of this Master Lease for the benefit of Landlord so that Landlord is in compliance with such representations, warranties and covenants as the same apply to the Leased Property and to timely perform all of the obligations of Tenant under this Master Lease relating thereto.  To the extent that any of duties and obligations of Landlord under such Facility Mortgage are beyond Tenant's obligations under

this Master Lease or may not properly be performed by Tenant, Tenant shall cooperate with and assist Landlord, at Landlord's expense, in the performance thereof (other than payment of any indebtedness evidenced or secured thereby); provided, however, notwithstanding the foregoing, (A) this Section 31.3(a) shall not be deemed to, and shall not, impose on Tenant obligations which (i) increase Tenant's monetary obligations under this Master Lease, (ii) adversely increase Tenant's non-monetary obligations under this Master Lease in any material respect, or (iii) diminish Tenant's rights or remedies under this Master Lease in any material respect and (B) in the event of a conflict between the obligations, duties, rights and/or remedies of Tenant hereunder or under the Facility Mortgage Documents, this Master Lease shall govern.  For purposes of the foregoing, any proposed implementation of new financial covenants shall be deemed to diminish Tenant's rights under this Master Lease in a material respect (it being understood that Landlord may agree to such financial covenants in any Facility Mortgage Documents and such financial covenants will not impose obligations on Tenant).  If any new Facility Mortgage Documents to be executed by Landlord or any Affiliate of Landlord would impose on Tenant any obligations under this Section 31.3(a), Landlord shall provide copies of the same to Tenant for informational purposes (but not for Tenant's approval) prior to the execution and delivery thereof by Landlord or any Affiliate of Landlord; provided, however, that neither Landlord nor its Affiliates shall enter into any new Facility Mortgage Documents imposing obligations on Tenant with respect to impounds that are more restrictive than obligations imposed on Tenant pursuant to this Master Lease.

(b)     Without limiting or expanding Tenant's obligations pursuant to Section 31.3(a), during the Term of this Master Lease, Tenant acknowledges and agrees that, except as expressly provided elsewhere in this Master Lease, it shall undertake at its own cost and expense the performance of any and all repairs, replacements, capital improvements, maintenance items and all other requirements relating to the condition of a Facility that are required by any Facility Mortgage Documents or by Facility Mortgagee, and Tenant shall be solely responsible and hereby covenants to fund and maintain any and all impound, escrow or other reserve or similar accounts required under any Facility Mortgage Documents as security for or otherwise relating to any operating expenses of a Facility, including any capital repair or replacement reserves and/or impounds or escrow accounts for taxes or insurance premiums (each a "**Facility Mortgage Reserve Account**"); provided, however, this Section 31.3(b) shall not (i) increase Tenant's monetary obligations under this Master Lease, (ii) adversely increase Tenant's non-monetary obligations under this Master Lease in any material respect, (iii) diminish Tenant's rights or remedies under this Master Lease in any material respect, or (iv) impose obligations to fund such reserve or similar accounts in excess of amounts required under this Master Lease in respect of reserve or similar accounts under the circumstances required under this Master Lease; and provided, further, that any amounts which Tenant is required to fund into a Facility Mortgage Reserve Account with respect to satisfaction of any repair or replacement reserve requirements imposed by a Facility Mortgagee or Facility Mortgage Documents shall be credited on a dollar for dollar basis against the mandatory expenditure obligations of Tenant for such applicable Facility(ies) under Section 9.1(e) and, if Landlord defaults under such Facility Mortgage and such amounts funded into a Facility Mortgage Reserve Account are applied by the Facility Mortgagee for purposes other than their intended purposes for such operating expenses, such amounts shall be credited on a dollar for dollar basis against Rents next coming due.  During the Term of this Master Lease and provided that no Event of Default shall have occurred and be continuing hereunder, Tenant shall, subject to the terms and conditions of such Facility Mortgage Reserve

Account and the requirements of the Facility Mortgagee(s) thereunder (and the related Facility Mortgage Documents), have access to and the right to apply or use (including for reimbursement) to the same extent as Landlord all monies held in each such Facility Mortgage Reserve Account for the purposes and subject to the limitations for which such Facility Mortgage Reserve Account is maintained, and Landlord agrees to reasonably cooperate with Tenant in connection therewith. Landlord hereby acknowledges that funds deposited by Tenant in any Facility Mortgage Reserve Account are the property of Tenant and Landlord is obligated to return the portion of such funds not previously released to Tenant within fifteen (15) days following the earlier of (x) the expiration or earlier termination of this Master Lease with respect to such applicable Facility, (y) the maturity or earlier prepayment of the applicable Facility Mortgage and obligations secured thereby, or (z) an involuntary prepayment or deemed prepayment arising out of the acceleration of the amounts due to a Facility Mortgagee or secured under a Facility Mortgage as a result of the exercise of remedies under the applicable Facility Mortgage or Facility Mortgage Documents; provided, however, that the foregoing shall not be deemed or construed to limit or prohibit Landlord's right to bring any damage claim against Tenant for any breach of its obligations under this Master Lease that may have resulted in the loss of any impound funds held by a Facility Mortgagee.

## ARTICLE XXXII

32.1    **Environmental Violations.**  During the Term, Tenant shall not at any time (i) cause, permit, or suffer to occur, any Environmental Violation or any environmental lien due to the acts of Tenant or any sublessee or other Person occupying any of the Leased Property under or through Tenant, (ii) permit any sublessee or other Person occupying any of the Leased Property under or through Tenant to cause, permit or suffer to occur any Environmental Violation.  At the request of Landlord, Tenant shall  promptly remediate or undertake any other appropriate response action to correct any existing Environmental Violation.   Without the prior written consent of Landlord, Tenant shall not consent to any drilling or exploration for or extraction, removal, or production of any minerals from the surface or the subsurface of the Land.

32.2    **Notices.**  On the earlier of (i) three (3) Business Days after obtaining knowledge thereof or (ii) contemporaneous with notice being provided to any governmental authority, Tenant shall provide to Landlord notice of any written documents pertaining to, the following:  (i) any Environmental Violation (or alleged Environmental Violation); (ii) a spill or release of any Hazardous Substances that could reasonably be expected to result in a claim or liability under Environmental Law; (iii) noncompliance with any of the covenants contained in this Article XXXII; (iv) any enforcement, cleanup, removal, or other governmental or regulatory action under Environmental Law instituted, completed or threatened with respect to the Leased Property; (v) any claim made or threatened by any Person against Tenant with respect to the Leased Property relating to damage, contribution, cost recovery, compensation, loss, or injury resulting from a release of Hazardous Substance; and (vi) any reports made to any federal state or local environmental agency arising out of or in connection with any Hazardous Substances in, on, under or removed from the Leased Property.

32.3    **Remediation.**

(a)     Tenant shall comply with all reasonable requests of Landlord with respect to an Environmental Violation, including without limitation (i) a request to effectuate a remediation of any Environmental Violation, (ii) a request for Tenant to comply with any Environmental Laws or to comply with any directive from a governmental authority, or (iii) a reasonable request to take any action necessary to protect human health and the environment.

(b)     If an Environmental Violation occurs or is found to exist and the cost of remediation of such Environmental Violation is likely to exceed Two Million and No/100 Dollars ($2,000,000.00), Tenant shall either (x) demonstrate Tenant's or the Guarantors' financial wherewithal to fund any such remediation (including by providing reasonable cash flow projections reflecting that Tenant or Guarantor will be able to fund the cost of such remediation as the same is expected to become due and payable), as determined by Landlord in its reasonable discretion or (y) if Tenant fails to demonstrate financial wherewithal pursuant to the immediately preceding sentence, provide Landlord with financial assurance that Tenant will effect such remediation in accordance with applicable Environmental Laws.  If applicable, Tenant shall provide such financial assurance within ten (10) days after Landlord's request therefor.

(c)     Notwithstanding any other provision of this Master Lease, if an Environmental Violation occurs or is found to exist during the Term and the Term would otherwise terminate or expire, then, at the option of Landlord, the Term shall be automatically extended beyond the date of termination or expiration and this Master Lease shall remain in full force and effect on a month-to-month basis beyond such date until the earlier to occur of (i) the completion of all remedial action in accordance with applicable Environmental Laws or (ii) the date specified in a written notice from Landlord to Tenant terminating this Master Lease.

**32.4    Indemnity by Tenant.** Tenant shall indemnify, defend, protect, save, hold harmless, and reimburse Landlord for, from and against any and all costs, losses (including, losses of use), liabilities, damages, assessments, lawsuits, deficiencies, demands, claims and expenses (collectively, "**Environmental Costs**") (whether or not arising out of third-party claims and regardless of whether liability without fault is imposed, or sought to be imposed, on Landlord) incurred in connection with, arising out of, resulting from or incident to, directly or indirectly, before (except to the extent first discovered after the end of the Term) or during (but not after) the Term or such portion thereof during which the Leased Property is leased to Tenant, (i) the production, use, generation, storage, treatment, transporting, disposal, discharge, release or other handling or disposition of any Hazardous Substances from, in, on, under or about the Leased Property, including any effect of such Hazardous Substances on any Person or property within or outside the boundaries of the Leased Property, (ii) the presence of any Hazardous Substances in, on, under or about the Leased Property and (iii) the violation of any Environmental Law. "**Environmental Costs**" include costs of remediation (including costs of response, removal, containment and cleanup), investigation, design, engineering and construction, damages (including actual but excluding consequential damages or loss of value) for personal injuries and for injury to, destruction of or loss of property or natural resources, relocation or replacement costs, penalties, fines, charges or expenses, reasonable attorney's fees, expert fees, consultation fees, and court costs, and all amounts paid in investigating, defending or settling any of the foregoing.

Without limiting the scope or generality of the foregoing, Tenant expressly agrees that, in the event of a breach by Tenant in its obligations under this Article XXXII that is not cured

within any applicable notice and cure period, Tenant shall reimburse Landlord for any and all reasonable costs and expenses incurred by Landlord in connection with, arising out of, resulting from or incident to, directly or indirectly, during (but not after) the Term or such portion thereof during which the Leased Property is leased to Tenant of the following:

(a)     in investigating any and all matters relating to any Hazardous Substances, in, on, from, under or about the Leased Property;

(b)     in bringing the Leased Property into compliance with all Legal Requirements; and

(c)     in remediating any Hazardous Substances used, stored, generated, released or disposed of in, on, from, under or about the Leased Property or off-site other than in the ordinary course of the business conducted at the Leased Property and in compliance with applicable Legal Requirements.

If any claim is made by Landlord for reimbursement for Environmental Costs incurred by it hereunder, Tenant agrees to pay such claim promptly, and in any event to pay such claim within ten (10) calendar days after receipt by Tenant of written notice thereof and any amount not so paid within such ten (10) calendar day period shall bear interest at the Overdue Rate from the date due to the date paid in full.

32.5   **Environmental Inspections.**  Upon prior written notice from Landlord, Tenant shall permit such persons as Landlord may designate ("Site Reviewers") to visit any of the Leased Property during normal business hours and in a manner which does not unreasonably interfere with Tenant's operations and perform environmental site investigations and assessments ("Site Assessments") on such Leased Property in any of the following circumstances:  (i) in connection with any sale, financing or refinancing of such Leased Property; (ii) within the six month period prior to the expiration of the Term; (iii) if required by Facility Mortgagee or the terms of any credit facility to which Landlord is bound; (iv) if an Event of Default exists; (v) if required under any applicable Law; or (vi) at any other time that, in the opinion of Landlord or Facility Mortgagee, a reasonable basis exists to believe that an Environmental Violation or any condition that could reasonably be expected to result in any Environmental Violation exists.  Such Site Assessments may include both above and below ground testing for the presence of Hazardous Substances.  Tenant shall supply to the Site Reviewers such historical and operational information regarding such Leased Property as may be reasonably requested by the Site Reviewers to facilitate the Site Assessments, and shall make available for meetings with the Site Reviewers appropriate personnel having knowledge of such matters.  Any and all reports prepared for or by Landlord with respect to any of the Leased Property shall be for the sole benefit of Landlord, and no other Person shall have the right to rely on any such reports.   All costs and expenses incurred by Landlord under this Section 32.5 shall be paid on demand as Additional Charges by Tenant to Landlord.  Failure to conduct an environmental inspection or to detect unfavorable conditions if such inspection is conducted shall in no fashion be intended as a release of any liability for environmental conditions subsequently determined to be associated with or to have occurred during Tenant's tenancy.  To the extent Tenant may be liable pursuant to this Article XXXII, Tenant shall remain liable for any environmental condition related to or having occurred during

US-DOCS\124041687.41

its tenancy regardless of when such conditions are discovered and regardless of whether or not Landlord conducts an environmental inspection at the termination of this Master Lease.

32.6    **Representations and Warranties**.  Except for those matters set forth in the environmental reports disclosed on <u>Schedule C</u>, Tenant represents and warrants that (i) it is not aware of any Environmental Violation or suspected Environmental Violation at any of the Leased Property as of the date of this Master Lease and (ii) Tenant has disclosed to Landlord all known or suspected Environmental Violations and the presence of Hazardous Substances existing on any of the Leased Property prior to the date of this Master Lease.

32.7    **Storage Tanks**.

(a)  If directed by Landlord, Tenant shall, at its sole cost and expense, remove or close any tanks (other than, if the Deed 2 Delivery Date occurs, the Wendover Diesel Tanks) containing Hazardous Substances (above or underground) at each of the Leased Property prior to the termination or expiration of the Term.  Tenant shall (in each case, if the Deed 2 Delivery Date occurs, except for the Wendover Diesel Equipment):  (i) remove any such tanks, their contents, and associated equipment and piping at each of the Leased Property in accordance with Environmental Law; (ii) close any such tanks in accordance with Environmental Law; (iii) perform any Site Assessments reasonably necessary to determine whether the prior use of or removal or closure procedures with respect to any such tanks resulted in an Environmental Violation; (iv) remediate all Environmental Violation associated with any such tanks in accordance with this section; and (v) notify as required all appropriate Governmental Authorities of the closure and removal of any regulated tanks in accordance with Environmental Law.

(b)  Tenant shall, with respect to any other tanks containing Hazardous Substances that are permitted to remain on the Leased Property at the termination or expiration of the Term, take all appropriate actions to ensure that the tanks are in good working order, are emptied of all contents (if requested by Landlord, except for, if the Deed 2 Delivery Date occurs, the Wendover Diesel Tanks, which shall not be required to be emptied), are in compliance with all Environmental Laws, and do not constitute an Environmental Violation, in each case, at the termination or expiration of the Term.  If the Deed 2 Delivery Date occurs, then no later than March 30 of each year of the Term of this Master Lease (beginning with the first such date to occur after the Deed 2 Delivery Date), Tenant shall deliver to Landlord evidence that the two, approximately 20,000 gallon underground storage tanks containing diesel fuel located on the eastern side of the Facility commonly known as the Wendover Nugget Hotel & Casino (located at 101 Wendover Boulevard, West Wendover, NV and adjacent property located in Wendover, UT), and operated (at the inception of the Master Lease) by Miller's Wendover service station (the "<u>Wendover Diesel Tanks</u>"), comply with all requirements imposed under Environmental Law.  Such evidence shall include: a copy of the tanks' current registration, proof of the tanks' satisfaction of financial assurance requirements, copies of the tanks' demonstration of satisfaction monthly leak detection requirements for the months of October, November, and December of the preceding calendar year, and copies of records of all necessary, periodic equipment integrity testing.  Prior to the termination or expiration of the Term, Tenant shall provide Landlord with such documentation reasonably requested by Landlord evidencing Tenant's compliance with this <u>Section 32.7</u>.

32.8   **Survival**.  The obligations set forth in this Article XXXII shall survive the expiration or earlier termination of this Master Lease.

## ARTICLE XXXIII

33.1   **Memorandum of Lease**.  Landlord and Tenant shall enter into one or more short form memoranda of this Master Lease, in form suitable for recording in each county or other applicable location in which the Leased Property is located.  Tenant shall pay all costs and expenses of recording any such memorandum and shall fully cooperate with Landlord in removing from record any such memorandum upon the expiration or earlier termination of the Term with respect to the applicable Facility.

33.2   **Tenant Financing**.  If, in connection with granting any Permitted Leasehold Mortgage or entering into a Debt Agreement, Tenant shall reasonably request reasonable cooperation from Landlord, Landlord shall provide the same at no cost or expense to Landlord, it being understood and agreed that Tenant shall be required to reimburse Landlord for all such costs and expenses so incurred by Landlord, including, but not limited to, its reasonable out-of-pocket attorneys' fees.

## ARTICLE XXXIV

[RESERVED]

## ARTICLE XXXV

35.1   **Notices.**  Any notice, request or other communication to be given by any party hereunder shall be in writing and shall be sent by (a) registered or certified mail, postage prepaid and return receipt requested, (b) by hand delivery or express courier service, (c) by an overnight express service, or (d) by electronic mail with a confirmation copy by one of the means specified in clauses (a)-(c) above, to the following address:

|  |  |
|---|---|
| To Tenant: | c/o Maverick Gaming LLC |
| | 2926 Montessori Street |
| | Las Vegas, Nevada 89117 |
| | Attention:  Eric Persson |
| | Email:  ep@maverickgaming.com |
| | |
| With a copy to: | Latham & Watkins LLP |
| (that shall not | 12670 High Bluff Drive |
| constitute notice) | San Diego, CA 92130 |
| | Attention: Sony Ben-Moshe |
| | Email:  sony.ben-moshe@lw.com |

To Landlord:                      AG Park Place Investments 1 LLC
                                  AG Park Place Investments 1 LLC 2
                                  c/o Angelo, Gordon & Co., L.P.
                                  245 Park Avenue, 26th Floor
                                  New York, New York 10167-0094
                                  Attention: Brian Shearer
                                  ██████████████████████

                                  AG Park Place Investments 1 LLC
                                  AG Park Place Investments 1 LLC 2
                                  c/o Angelo, Gordon & Co., L.P.
                                  245 Park Avenue, 26th Floor
                                  New York, New York 10167-0094
                                  Attention: Mark Bernstein
                                  ██████████████████████

And with copy to                 Paul Hastings LLP
(which shall not                 2050 M Street NW
constitute notice):              Washington, DC 20036
                                  Attention:  Michael K. Berman, Esq.
                                  Email: michaelberman@paulhastings.com

or to such other address as either party may hereafter designate.  Notice shall be deemed to have been given on the date of delivery if such delivery is made on a Business Day, or if not, on the first Business Day after delivery.  If delivery is refused, Notice shall be deemed to have been given on the date delivery was first attempted.

## ARTICLE XXXVI

**36.1    Transfer of Operating Property and Operational Control of the Facilities.**  Upon the written request (an "**End of Term Gaming Asset Transfer Notice**") of Landlord either immediately prior to or in connection with the expiration or earlier termination of the Term, or of Tenant in connection with a termination of this Master Lease that occurs (i) either on the last date of the Initial Term or the last date of any Renewal Term or (ii) in the event Landlord exercises its right to terminate this Master Lease or repossess the Leased Property in accordance with the terms of this Master Lease and, provided that, in each of the foregoing clauses (i) or (ii), Tenant complies with the provisions of Section 36.3, Tenant shall transfer (or cause to be transferred) upon the expiration of the Term, or as soon thereafter as Landlord shall request, the business operations conducted by Tenant, Tenant's Subsidiaries and the Operating Subtenants at the Facilities (including, for the avoidance of doubt, all Operating Property relating to each of the Facilities other than tradenames and trademarks, but including all customer lists and all other Facility specific information and assets) to a successor lessee or operator (or lessees or operators) of the Facilities (collectively, the "**Successor Tenant**") designated pursuant to Section 36.2 for consideration to be received by Tenant (or its Subsidiaries or the Operating Subtenants) from the

Successor Tenant in an amount equal to the fair market value of such business operations conducted at the Facilities and the applicable Operating Property (including any Tenant Capital Improvements not funded by Landlord in accordance with Section 10.3) (the "**Gaming Assets FMV**") as negotiated and agreed by Tenant and the Successor Tenant; provided, however, that in the event an End of Term Gaming Asset Transfer Notice is delivered hereunder, then, notwithstanding the expiration or earlier termination of the Term, until such time that Tenant transfers (or causes to be transferred) the business operations conducted at the Facilities and the applicable Operating Property to a Successor Tenant, Tenant shall (or shall cause its Subsidiaries and the Operating Subtenants to) continue to (and Landlord shall permit Tenant to maintain possession of the Leased Property to the extent necessary to) operate the Facilities in accordance with the applicable terms of this Master Lease and the course and manner in which Tenant (or its Subsidiaries or the Operating Subtenants) has operated the Facilities prior to the end of the Term (including, but not limited to, the payment of Rent hereunder).  If Tenant and a potential Successor Tenant designated by Landlord cannot agree on the Gaming Assets FMV within a reasonable time not to exceed thirty (30) days after receipt of an End of Term Gaming Asset Transfer Notice hereunder, then such Gaming Assets FMV shall be determined, and Tenant's (and/or its Subsidiaries' and/or the Operating Subtenants') transfer of the applicable Operating Property to a Successor Tenant in consideration for a payment in such amount shall be determined and transferred, in accordance with the provisions of Section 36.2.

### 36.2    Determination of Successor Tenant and Gaming Assets FMV.

If not effected pursuant to Section 36.1, then the determination of the Gaming Assets FMV, and the transfer of the Operating Property to a Successor Tenant in consideration for the Gaming Assets FMV, shall be effected by (i) first, determining in accordance with Section 36.2(a) the rent that Landlord would be entitled to receive from Successor Tenant assuming a lease term of ten (10) years (the "**Successor Tenant Rent**") pursuant to a lease agreement containing substantially the same terms and conditions of this Master Lease (other than, in the case of a new lease at the end of the final Renewal Term, the terms of this Article XXXVI, which will not be included in such new lease), (ii) second, identifying and designating in accordance with the terms of Section 36.2(b), a pool of qualified potential Successor Tenants (each, a "**Qualified Successor Tenant**") prepared to lease the Facilities at the Successor Tenant Rent and to bid for the business operations (which will include a one (1) year transition license for tradenames and trademarks used at the Facilities) conducted at the Facilities and the Operating Property, and (iii) third, in accordance with the terms of Section 36.2(c), determining the highest price a Qualified Successor Tenant would agree to pay for the Operating Property and setting such highest price as the Gaming Assets FMV in exchange for which Tenant shall be required to transfer (or cause its Subsidiaries and/or the Operating Subtenants to transfer) the Operating Property and Landlord will enter into a lease with such Qualified Successor Tenant on substantially the same terms and conditions of this Master Lease (other than, in the case of a new lease at the end of the final Renewal Term, the terms of this Article XXXVI, which will not be included in such new lease) through the remaining term of this Master Lease (assuming that this Master Lease will not have terminated prior to its natural expiration at the end of the final Renewal Term) or ten (10) years, whichever is greater for a rent calculated pursuant to Section 36.2(a) hereof.  Notwithstanding anything to the contrary in this Article XXXVI, the transfer of the Operating Property will be conditioned upon the Successor Tenant obtaining the Gaming Licenses or the approval of the applicable regulatory agencies of the transfer of the Gaming Licenses and any other gaming assets to the Successor Tenant and/or the

issuance of new gaming licenses as required by applicable Gaming Regulations and the relevant regulatory agencies both with respect to operating and suitability criteria, as the case may be.

(a)  <u>Determining Successor Tenant Rent</u>.  Landlord and Tenant shall first attempt to agree on the amount of Successor Tenant Rent that it will be assumed Landlord will be entitled to receive for a term of ten (10) years and pursuant to a lease containing substantially the same terms and conditions of this Master Lease (other than, in the case of a new lease at the end of the final Renewal Term, the terms of this Article XXXVI, which will not be included in such new lease).  If Landlord and Tenant cannot agree on the Successor Tenant Rent amount within a reasonable time not to exceed sixty (60) days after receipt of an End of Term Gaming Asset Transfer Notice hereunder, then the Successor Tenant Rent shall be set as follows:

(i)  for the period preceding the day immediately preceding the forty-eighth (48th) anniversary of the Commencement Date, the annual Successor Tenant Rent shall be an amount equal to the annual Rent that would have accrued under the terms of this Master Lease for such period (assuming this Master Lease will have not been terminated prior to its natural expiration); and

(ii)  for the period following the day immediately preceding the forty-eighth (48th) anniversary of the Commencement Date, the Successor Tenant Rent shall be calculated in the same manner as Rent is calculated under this Master Lease.

(b)  <u>Designating Potential Successor Tenants</u>.  Landlord will select one and Tenant will select three additional (for a total of up to four) potential Qualified Successor Tenants prepared to lease the Facilities for the Successor Tenant Rent, each of whom must meet the criteria established for a Discretionary Transferee (and none of whom may be Tenant or an Affiliate of Tenant (it being understood and agreed that there shall be no restriction on Landlord or any Affiliate of Landlord from being a potential Qualified Successor Tenant), except in the case of termination of this Master Lease on the day immediately preceding the forty-eighth (48th) anniversary of the Commencement Date).  Landlord and Tenant must designate their proposed Qualified Successor Tenants within ninety (90) days after receipt of an End of Term Gaming Asset Transfer Notice hereunder.  In the event that Landlord or Tenant fails to timely designate such party's allotted number of potential Qualified Successor Tenants, the other party may designate additional potential Qualified Successor Tenants such that the total number of potential Qualified Successor Tenants does not exceed four; <u>provided</u> that, in the event the total number of potential Qualified Successor Tenants is less than four, the transfer process will still proceed as set forth in Section 36.2(c) below.

(c)  <u>Determining Gaming Assets FMV</u>.  Tenant will have a three (3) month period to negotiate an acceptable sales price for the Operating Property with one of the Qualified Successor Tenants, which three (3) month period will commence immediately upon the conclusion of the steps set forth above in Section 36.2(b). If Tenant does not reach an agreement prior to the end of such three (3) month period, Tenant shall conduct an auction for the Operating Property among the four potential successor lessees, and Tenant will be required to transfer (or cause the transfer of) the Operating Property to the highest bidder.

US-DOCS\124041687.41

**36.3** **Operation Transfer.**  Upon designation of a Successor Tenant (pursuant to either Section 36.1 or 36.2, as the case may be), Tenant shall (and shall cause its Subsidiaries and Operating Subtenants to) reasonably cooperate and take all actions reasonably necessary (including providing all reasonable assistance to Successor Tenant) to effectuate the transfer of operational control of the Facilities to Successor Tenant in an orderly manner so as to minimize to the maximum extent possible any disruption to the continued orderly operation of the Facilities for its Primary Intended Use.  Notwithstanding the expiration or earlier termination of the Term and anything to the contrary herein, unless Landlord consents to the contrary, until such time that Tenant transfers (or causes to be transferred) the Operating Property and operational control of the Facilities to a Successor Tenant in accordance with the provisions of this Article XXXVI, Tenant shall (or shall cause its Subsidiaries and Operating Subtenants to) continue to (and Landlord shall permit Tenant to maintain possession of the Leased Property to the extent necessary to) operate the Facilities in accordance with the applicable terms of this Master Lease and the course and manner in which Tenant (or its Subsidiaries or Operating Subtenants) has operated the Facilities prior to the end of the Term (including, but not limited to, the payment of Rent hereunder).  Concurrently with the transfer of the Operating Property to Successor Tenant, Landlord and Successor Tenant shall execute a new master lease in accordance with the terms as set forth in the final clause of the first sentence of Section 36.2 hereof.

## ARTICLE XXXVII

**37.1** **Attorneys' Fees.**  If Landlord or Tenant brings an action or other proceeding against the other to enforce or interpret any of the terms, covenants or conditions hereof or any instrument executed pursuant to this Master Lease, or by reason of any breach or default hereunder or thereunder, the party prevailing in any such action or proceeding and any appeal thereupon shall be paid all of its costs and reasonable outside attorneys' fees incurred therein.  In addition to the foregoing and other provisions of this Master Lease that specifically require Tenant to reimburse, pay or indemnify against Landlord's attorneys' fees, Tenant shall pay, as Additional Charges, all of Landlord's reasonable outside attorneys' fees incurred in connection with the enforcement of this Master Lease (except to the extent provided above), including reasonable attorneys' fees incurred in connection with the review, negotiation or documentation of any subletting, assignment, or management arrangement or any consent requested in connection therewith, and the collection of past due Rent.

## ARTICLE XXXVIII

**38.1** **Brokers.**  Tenant warrants that it has not had any contact or dealings with any Person or real estate broker which would give rise to the payment of any fee or brokerage commission in connection with this Master Lease, and Tenant shall indemnify, protect, hold harmless and defend Landlord from and against any liability with respect to any fee or brokerage commission arising out of any act or omission of Tenant.  Landlord warrants that it has not had any contact or dealings with any Person or real estate broker which would give rise to the payment of any fee or brokerage commission in connection with this Master Lease, and Landlord shall indemnify, protect, hold harmless and defend Tenant from and against any liability with respect to any fee or brokerage commission arising out of any act or omission of Landlord.

US-DOCS\124041687.41

# ARTICLE XXXIX

**39.1**   **Anti-Terrorism Representations.**  Tenant hereby represents and warrants that neither Tenant, nor, to the knowledge of Tenant, any persons or entities holding any legal or beneficial interest whatsoever in Tenant, are (i) the target of any sanctions program that is established by Executive Order of the President or published by the Office of Foreign Assets Control, U.S. Department of the Treasury ("**OFAC**"); (ii) designated by the President or OFAC pursuant to the Trading with the Enemy Act, 50 U.S.C. App. § 5, the International Emergency Economic Powers Act, 50 U.S.C. §§ 1701-06, the Patriot Act, Public Law 107-56, Executive Order 13224 (September 23, 2001) or any Executive Order of the President issued pursuant to such statutes; or (iii) named on the following list that is published by OFAC:  "List of Specially Designated Nationals and Blocked Persons" (collectively, "**Prohibited Persons**").  Tenant hereby represents and warrants to Landlord that no funds tendered to Landlord by Tenant under the terms of this Master Lease are or will be directly or indirectly derived from activities that may contravene U.S. federal, state or international laws and regulations, including anti-money laundering laws.  If the foregoing representations are untrue at any time during the Term and Landlord suffers actual damages as a result thereof, an Event of Default will be deemed to have occurred, without the necessity of notice to Tenant.

Tenant will not during the Term of this Master Lease knowingly engage in any transactions or dealings, or knowingly be otherwise associated with, any Prohibited Persons in connection with the use or occupancy of the Leased Property.  A breach of the representations contained in this Section 39.1 by Tenant as a result of which Landlord suffers actual damages shall constitute a material breach of this Master Lease and shall entitle Landlord to any and all remedies available hereunder, or at law or in equity.

# ARTICLE XL

The provisions of this Article XL shall apply if, and for so long as, Landlord or any direct or indirect controlling parent entity of Landlord is a "real estate investment trust" (within the meaning of Section 856(a) of the Code), and shall not apply at any time that the foregoing condition is not satisfied.

**40.1**   **REIT Protections.**  (a)        The parties hereto intend that Rent and other amounts paid by Tenant hereunder will qualify as "rents from real property" within the meaning of Section 856(d) of the Code, or any similar or successor provision thereto and this Master Lease shall be interpreted consistent with this intent.

(b)        Anything contained in this Master Lease to the contrary notwithstanding, Tenant shall not without Landlord's advance written consent (which consent shall not be unreasonably withheld) (i) sublet, assign or enter into a management arrangement for the Leased Property on any basis such that the rental or other amounts to be paid by the subtenant, assignee or manager thereunder would be based, in whole or in part, on any formula such that any portion of any amount received by Landlord would fail to qualify as "rents from real property" within the meaning of Section 856(d) of the Code, or any similar or successor provision thereto; (ii) furnish or render any services to the subtenant, assignee or manager or manage or operate the Leased

US-DOCS\124041687.41

Property so subleased, assigned or managed; (iii) sublet, assign or enter into a management arrangement for the Leased Property to any Person (other than a "taxable REIT subsidiary" (within the meaning of Section 856(l) of the Code)) in which Landlord or parent thereof owns an interest, directly or indirectly (by applying constructive ownership rules set forth in Section 856(d)(5) of the Code); or (iv) sublet, assign or enter into a management arrangement for the Leased Property in any other manner which could cause any portion of the amounts received by Landlord pursuant to this Master Lease or any sublease to fail to qualify as "rents from real property" within the meaning of Section 856(d) of the Code, or any similar or successor provision thereto, or which could cause any other income of Landlord to fail to qualify as income described in Section 856(c)(2) of the Code.  The requirements of this Section 40.1(b) shall likewise apply to any further subleasing by any subtenant.

(c)     Anything contained in this Master Lease to the contrary notwithstanding, the parties acknowledge and agree that Landlord, in its sole discretion, may assign this Master Lease or any interest herein to another Person (including without limitation, a "taxable REIT subsidiary" (within the meaning of Section 856(l) of the Code)) in order to maintain Landlord's status as a "real estate investment trust" (within the meaning of Section 856(a) of the Code); provided, however, Landlord shall be required to (i) comply with any applicable legal requirements related to such transfer and (ii) give Tenant notice of any such assignment; and provided, further, that any such assignment shall be subject to all of the rights of Tenant hereunder.

(d)     Anything contained in this Master Lease to the contrary notwithstanding, upon request of Landlord, Tenant shall cooperate with Landlord, in good faith and at no cost or expense to Tenant, and provide such documentation and/or information as may be in Tenant's possession or under Tenant's control and otherwise readily available to Tenant as shall be reasonably requested by Landlord in connection with the verification of the "real estate investment trust" (within the meaning of Section 856(a) of the Code) compliance requirements applicable to Landlord or any direct or indirect parent entity of Landlord.  Anything contained in this Master Lease to the contrary notwithstanding, Tenant shall take such reasonable actions as may be requested by Landlord from time to time in order to ensure compliance with the Internal Revenue Service requirement that Rent allocable for purposes of Section 856 of the Code to personal property, if any, at the beginning and end of a calendar year does not exceed fifteen percent (15%) of the total Rent due hereunder as long as such compliance does not (i) increase Tenant's monetary obligations under this Master Lease, (ii) materially and adversely increase Tenant's nonmonetary obligations under this Master Lease or (iii) materially diminish Tenant's rights under this Master Lease.

(e)     Notwithstanding anything to the contrary set forth in this Article XL, the Specified Subleases (as amended, modified or extended in accordance with the other provisions of this Master Lease) and the transactions thereunder shall not be prohibited by this Article XL.

## ARTICLE XLI

### 41.1   **Tenant Bankruptcy.**

(a)     As a material inducement to Landlord executing this Master Lease, Tenant acknowledges and agrees that Landlord is relying upon (i) the financial condition and specific operating experience of Tenant and Tenant's obligation to use or cause to be used each of the Leased Property specifically for the Primary Intended Use, (ii) Tenant's timely performance of all of its obligations under this Master Lease notwithstanding the entry of an order for relief under the Bankruptcy Code for Tenant and (iii) all defaults under this Master Lease being cured promptly and this Master Lease being assumed within sixty (60) days of any order for relief entered under the Bankruptcy Code for Tenant, or this Master Lease being rejected within such sixty (60) day period and the entire Leased Property surrendered to Landlord.

(b)     Accordingly, in consideration of the mutual covenants contained in this Master Lease and for other good and valuable consideration, Tenant hereby agrees that:

(i)     All obligations that accrue or become due under this Master Lease (including the obligation to pay Rent), during the pendency of a petition filed under the Bankruptcy Code, a proceeding under any similar law or statute relating to bankruptcy, insolvency, reorganization, winding up or adjustment of debts is initiated (collectively, an "Action") shall be timely performed exactly as provided in this Master Lease and any failure to so perform shall be harmful and prejudicial to Landlord;

(ii)     Any and all obligations under this Master Lease that accrue or become due during the pendency of an Action and that are not paid as required by this Master Lease shall, in the amount of such rents, constitute administrative expense claims allowable under the Bankruptcy Code with priority of payment at least equal to that of any other actual and necessary expenses incurred during the pendency of the Action;

(iii)     Subject to Article XVII, any extension of the time period within which Tenant may assume or reject this Master Lease without an obligation to cause all obligations accruing or coming due under this Master Lease during the pendency of an Action to be performed as and when required under this Master Lease shall be harmful and prejudicial to Landlord;

(iv)     Subject to Article XVII, any time period during the pendency of an Action that is designated as the period within which Tenant must cure all defaults and compensate Landlord for all pecuniary losses which extends beyond the date of assumption of this Master Lease shall be harmful and prejudicial to Landlord;

(v)     Any assignment of this Master Lease during the pendency of an Action that is not in accordance with Article XXII must result in all terms and conditions of this Master Lease being assumed by the assignee without alteration or amendment, and any such assignment which results in an amendment or alteration of the terms and conditions of this Master Lease without the express written consent of Landlord shall be harmful and prejudicial to Landlord;

(vi)     Any proposed assignment of this Master Lease during the pendency of an Action that is not in accordance with Article XXII and is to an assignee:  (a) that will not use any of the Leased Property specifically for the Primary Intended Use, (b) that does not possess financial condition, operating performance and experience characteristics equal to or better than the financial condition, operating performance and experience of the Tenant as of the

Commencement Date, or (c) that does not provide guarantors of the Tenant's obligations hereunder with financial condition equal to or better than the financial condition of the original guarantors of this Master Lease as of the Commencement Date, shall be harmful and prejudicial to Landlord;

       (vii)    The rejection (or deemed rejection) of this Master Lease in an Action for any reason whatsoever shall constitute cause for immediate relief from the automatic stay provisions of the Bankruptcy Code, and Tenant stipulates that such automatic stay shall be lifted immediately and possession of the entire Leased Property will be delivered to Landlord immediately without the necessity of any further action by Landlord;

       (viii)    No provision of this Master Lease shall be deemed a waiver of Landlord's rights or remedies under the Bankruptcy Code or applicable law to oppose any assumption and/or assignment of this Master Lease not in accordance with the terms hereof, to require timely performance of Tenant's obligations under this Master Lease, or to regain possession of any or all of the Leased Property as a result of the failure of Tenant to comply with the terms and conditions of this Master Lease or the Bankruptcy Code;

       (ix)    Notwithstanding anything in this Master Lease to the contrary, all amounts payable by Tenant to or on behalf of Landlord under this Master Lease, whether or not expressly denominated as such, shall constitute "rent" for the purposes of the Bankruptcy Code; and

       (x)    For purposes of this Article XLI addressing the rights and obligations of Landlord and Tenant in the event that an Action is commenced, the term "Tenant" shall include Tenant's successor in bankruptcy, whether a trustee, Tenant as debtor in possession or other responsible person.

## ARTICLE XLII

       **42.1**    **Survival.**    Anything contained in this Master Lease to the contrary notwithstanding, all claims against, and liabilities and indemnities of, Tenant or Landlord arising prior to the expiration or earlier termination of the Term shall survive such expiration or termination.

       **42.2**    **Severability.**    If any term or provision of this Master Lease or any application thereof shall be held invalid or unenforceable, the remainder of this Master Lease and any other application of such term or provision shall not be affected thereby.

       **42.3**    **Non-Recourse; Consequential Damages.**    Tenant specifically agrees to look solely to the Leased Property for recovery of any judgment from Landlord (and Landlord's liability hereunder shall be limited solely to its interest in the Leased Property, and no recourse under or in respect of this Master Lease shall be had against any other assets of Landlord whatsoever). It is specifically agreed that (a) no constituent partner or shareholder in Landlord or officer or employee of Landlord shall ever be personally liable for any such judgment or for the payment of any monetary obligation to Tenant and (b) no shareholder that is an individual, officer or employee of Tenant shall ever be personally liable for any such judgment or for payment of any monetary obligation to Landlord. The provision contained in the foregoing sentence is not intended to, and shall not, limit any right that Tenant might otherwise have to obtain injunctive

US-DOCS\124041687.41

relief against Landlord, or any action not involving the personal liability of Landlord. Furthermore, except as otherwise expressly provided herein, in no event shall either party ever be liable to the other party for any indirect or consequential damages suffered by the claiming party from whatever cause.

42.4    **Successors and Assigns.**    This Master Lease shall be binding upon Landlord and its successors and assigns and, subject to the provisions of Article XXII, upon Tenant and its successors and assigns.

42.5    **Governing Law.**    THIS MASTER LEASE WAS NEGOTIATED IN THE STATE OF NEW YORK, WHICH STATE THE PARTIES AGREE HAS A SUBSTANTIAL RELATIONSHIP TO THE PARTIES AND TO THE UNDERLYING TRANSACTION EMBODIED HEREBY.  ACCORDINGLY, IN ALL RESPECTS THIS MASTER LEASE (AND ANY AGREEMENT FORMED PURSUANT TO THE TERMS HEREOF) SHALL BE GOVERNED BY, AND CONSTRUED AND ENFORCED IN ACCORDANCE WITH, THE INTERNAL LAWS OF THE STATE OF NEW YORK (WITHOUT REGARD TO PRINCIPLES OR CONFLICTS OF LAW) AND ANY APPLICABLE LAWS OF THE UNITED STATES OF AMERICA, EXCEPT THAT ALL PROVISIONS HEREOF RELATING TO THE CREATION OF THE LEASEHOLD ESTATE AND ALL REMEDIES SET FORTH IN ARTICLE XVI RELATING TO RECOVERY OF POSSESSION OF THE LEASED PROPERTY OF ANY FACILITY (SUCH AS AN ACTION FOR UNLAWFUL DETAINER, IN REM ACTION OR OTHER SIMILAR ACTION) SHALL BE CONSTRUED AND ENFORCED ACCORDING TO, AND GOVERNED BY, THE LAWS OF THE STATE IN WHICH THE LEASED PROPERTY OR PORTION THEREOF IS LOCATED.

42.6    **Waiver of Trial by Jury.**    EACH OF LANDLORD AND TENANT ACKNOWLEDGES THAT IT HAS HAD THE ADVICE OF COUNSEL OF ITS CHOICE WITH RESPECT TO ITS RIGHTS TO TRIAL BY JURY UNDER THE CONSTITUTION OF THE UNITED STATES AND THE STATE.  EACH OF LANDLORD AND TENANT HEREBY EXPRESSLY WAIVES ANY RIGHT TO TRIAL BY JURY OF ANY CLAIM, DEMAND, ACTION OR CAUSE OF ACTION (i) ARISING UNDER THIS MASTER LEASE (OR ANY AGREEMENT FORMED PURSUANT TO THE TERMS HEREOF) OR (ii) IN ANY MANNER CONNECTED WITH OR RELATED OR INCIDENTAL TO THE DEALINGS OF LANDLORD AND TENANT WITH RESPECT TO THIS MASTER LEASE (OR ANY AGREEMENT FORMED PURSUANT TO THE TERMS HEREOF) OR ANY OTHER INSTRUMENT, DOCUMENT OR AGREEMENT EXECUTED OR DELIVERED IN CONNECTION HEREWITH, OR THE TRANSACTIONS RELATED HERETO OR THERETO, IN EACH CASE WHETHER NOW EXISTING OR HEREINAFTER ARISING, AND WHETHER SOUNDING IN CONTRACT OR TORT OR OTHERWISE; EACH OF LANDLORD AND TENANT HEREBY AGREES AND CONSENTS THAT ANY SUCH CLAIM, DEMAND, ACTION OR CAUSE OF ACTION SHALL BE DECIDED BY A COURT TRIAL WITHOUT A JURY, AND THAT EITHER PARTY MAY FILE A COPY OF THIS SECTION WITH ANY COURT AS CONCLUSIVE EVIDENCE OF THE CONSENT OF EACH SUCH PARTY TO THE WAIVER OF ITS RIGHT TO TRIAL BY JURY.

42.7    **Entire Agreement.**    This Master Lease and the Exhibits and Schedules hereto constitute the entire and final agreement of the parties with respect to the subject matter

US-DOCS\124041687.41

hereof, and may not be changed or modified except by an agreement in writing signed by the parties. Landlord and Tenant hereby agree that all prior or contemporaneous oral understandings, agreements or negotiations relative to the leasing of the Leased Property are merged into and revoked by this Master Lease.

       **42.8**    **Headings.** All titles and headings to sections, subsections, paragraphs or other divisions of this Master Lease are only for the convenience of the parties and shall not be construed to have any effect or meaning with respect to the other contents of such sections, subsections, paragraphs or other divisions, such other content being controlling as to the agreement among the parties hereto.

       **42.9**    **Counterparts.** This Master Lease may be executed in any number of counterparts, each of which shall be a valid and binding original, but all of which together shall constitute one and the same instrument. The words "execution," "execute," "signed," "signature," and words of like import in or related to any document to be signed in connection with this Master Lease and the transactions contemplated hereby shall be deemed to include electronic signatures, which shall be of the same legal effect, validity or enforceability as a manually executed signature to the extent and as provided for in any applicable law, including the Federal Electronic Signatures in Global and National Commerce Act, the New York State Electronic Signatures and Records Act or any other similar state laws based on the Uniform Electronic Transactions Act.

       **42.10**   **Interpretation.** Both Landlord and Tenant have been represented by counsel and this Master Lease and every provision hereof has been freely and fairly negotiated. Consequently, all provisions of this Master Lease shall be interpreted according to their fair meaning and shall not be strictly construed against any party.

       **42.11**   **Time of Essence.** TIME IS OF THE ESSENCE OF THIS MASTER LEASE AND EACH PROVISION HEREOF IN WHICH TIME OF PERFORMANCE IS ESTABLISHED.

       **42.12**   **Further Assurances.** The parties agree to promptly sign all documents reasonably requested to give effect to the provisions of this Master Lease.

       **42.13**   **Gaming Regulations.** (a)Notwithstanding anything to the contrary in this Master Lease, this Master Lease and any agreement formed pursuant to the terms hereof are subject to: (i) the Gaming Regulations; and (ii) the laws involving the sale, distribution and possession of alcoholic beverages (the "**Liquor Laws**"). Without limiting the foregoing, each of Tenant, Landlord, and each of Tenant's or Landlord's successors and assigns acknowledges that (i) it is subject to being called forward by (a) the Gaming Authority or (b) any governmental authority enforcing the Liquor Laws (the "**Liquor Authority**"), in each of their discretion, for licensing or a finding of suitability or to file or provide other information, and (ii) all rights, remedies and powers under this Master Lease and any agreement formed pursuant to the terms hereof, including with respect to the entry into and ownership and operation of the Gaming Facilities, and the possession or control of gaming equipment, alcoholic beverages or a gaming or liquor license, may be exercised only to the extent that the exercise thereof does not violate any applicable provisions of the Gaming Regulations and Liquor Laws and only to the extent that required approvals (including prior approvals) are obtained from the requisite governmental authorities.

US-DOCS\124041687.41

(b)     Notwithstanding anything to the contrary in this Master Lease or any agreement formed pursuant to the terms hereof, each of Tenant, Landlord, and each of Tenant's or Landlord's successors and assigns agrees, all at Tenant's sole cost and expense, to reasonably cooperate with each Gaming Authority and each Liquor Authority in connection with the administration of their regulatory jurisdiction over the parties hereto, including, without limitation, the provision of such documents or other information in such party's actual possession, or to which it has access and control, as may be requested by any such Gaming Authorities and/or Liquor Authorities relating to Tenant, Landlord, Tenant's or Landlord's successors and assigns or to this Master Lease or any agreement formed pursuant to the terms hereof.

(c)     If there shall occur a Licensing Event, then the party with respect to which such Licensing Event occurs shall notify the other party, as promptly as practicable after becoming aware of such Licensing Event (but in no event later than twenty (20) days after becoming aware of such Licensing Event).  In such event, the party with respect to which such Licensing Event has occurred (all at such party's sole cost and expense) shall, and shall cause any applicable Affiliates to resolve such Licensing Event within the time period required by the applicable Gaming Authorities.

**42.14   Certain Provisions of Nevada Law.**  Pursuant to Section 108.234 of the Nevada Revised Statutes, as amended from time to time ("NRS"), Landlord hereby informs Tenant that Tenant must comply with the requirements of NRS § 108.2403 and NRS § 108.2407 prior to contracting for and commencing any work of improvement to be constructed, altered or repaired in, on or about the Leased Property.  Tenant shall take, except as otherwise provided in this Master Lease, all actions necessary under laws of the State of Nevada to ensure that no liens encumbering Landlord's interest in the Leased Property arise as a result of Tenant's work, which actions shall include, without limitation, the recording of a notice of posted security in the Official Records of Elko County, Nevada, in accordance with NRS § 108.2403(1)(a), and either (i) establish a construction disbursement account pursuant to NRS § 108.2403(1)(b)(1), or (ii) furnish and record, in accordance with NRS § 108.2403(1)(b)(2), a surety bond for the prime contract for Tenant's work at the Leased Property that meets the requirements of NRS § 108.2415.  Tenant shall notify Landlord of the name and address of Tenant's prime contractor who will be performing Tenant's work as soon as it is known, but in no event later than ten (10) days prior to entering into contract with the prime contractor for the construction, alteration or repair of the work of improvement.  Tenant shall notify Landlord immediately upon the signing of any contract with the prime contractor for Tenant's work or other construction, alteration or repair of any portion of the Leased Property or any improvements to the Leased Property, which notification shall include the name and physical address of the prime contractor to enable Landlord to properly serve a recorded notice of non-responsibility upon the prime contractor pursuant to NRS § 108.234(4).  Tenant may not begin any alteration or other work in the Leased Property until Tenant has delivered evidence satisfactory to Landlord that Tenant has complied with the terms of this Section 42.14.  Failure by Tenant to comply with the terms of this Section 42.14 shall permit Landlord to declare an Event of Default and to terminate this Master Lease.  Further, Landlord shall have the right to post and maintain any notices of non-responsibility.  In the event this Master Lease is terminated pursuant to the foregoing, neither Party hereunder shall have any liability to the other under this Master Lease except for then-outstanding obligations and obligations that expressly survive the early termination or expiration of this Master Lease.

42.15   **Certain Provisions of Utah Law.**   In the event that Tenant authorizes or conducts any work in the State of Utah, Tenant shall provide such notices and conduct such work as required by Utah Code Sections 38-1a-101; et. Seq.

42.16   **Certain Provisions of Colorado Law**.   During the course of any alterations or other work by Tenant, Tenant shall post and keep posted (until the completion of Tenant's work), in a conspicuous place upon the Leased Property, and shall personally serve upon all contractors and subcontractors performing any such alterations or other work, a notice consistent with Colorado Revised Statute Section 38-22-105, stating that Landlord's interest in the Leased Property shall not be subject to any lien for said work.

42.17   **Tenant and Landlord; Joint and Several**.   All Persons comprising Tenant under this Master Lease shall be jointly and severally liable for all of the obligations of all Persons comprising Tenant under this Master Lease.   In addition, all Persons comprising Landlord under this Master Lease shall be jointly and severally liable for all of the obligations of all Persons comprising Landlord under this Master Lease.

[SIGNATURES ON FOLLOWING PAGE]

IN WITNESS WHEREOF, this Master Lease has been executed by Landlord and Tenant as of the date first written above.

**LANDLORD:**

**AG PARK PLACE INVESTMENTS 1 LLC,**
a Delaware limited liability company

By: Angelo, Gordon & Co., L.P., its manager

By: _____
Name:   Christopher Moore
Title:    Authorized Signatory

**AG PARK PLACE INVESTMENTS 1 LLC 2,**
a Delaware limited liability company

By: Angelo, Gordon & Co., L.P., its manager

By: _____
Name:   Christopher Moore
Title:    Authorized Signatory

[Signature Page – Master Lease]

**TENANT:**

**MAVERICK Z CASINOS LLC,**
a Nevada limited liability company

By:    Maverick Colorado LLC, its Manager

        By:    Maverick Gaming LLC, its Manager

                By:_____
                Name:  Eric Persson
                Title:  Lead Manager

**MAVERICK WENDOVER LLC,**
a Nevada limited liability company

By:    Maverick NV LLC, its Manager

        By:    Maverick Gaming LLC, its Manager

                By:_____
                Name:  Eric Persson
                Title:  Lead Manager

[Signature Page – Master Lease]

## EXHIBIT A

## LIST OF FACILITIES

| Name | Location | Use |
|---|---|---|
| Wendover Nugget Hotel & Casino | 101 Wendover Boulevard, West Wendover, NV and adjacent property located in Wendover, UT | Land-based Gaming |
| Red Garter Hotel & Casino | 1225 Wendover Boulevard, West Wendover, NV | Land-based Gaming |
| Grand Z Casino Hotel | 321 Gregory Street, Central City, CO | Land-based Gaming |
| Johnny Z's Casino | 132 Lawrence Street, Central City, CO | Land-based Gaming |

EXHIBIT A