**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

---------------------------------------------------------- x
                                                           :
In re:                                                     :   Chapter 11
                                                           :
RUNITONETIME LLC, *et al.*,                                :   Case No. 25-90191 (ARP)
                                                           :
        Debtors.[1]                                        :   (Jointly Administered)
                                                           :
---------------------------------------------------------- x

**DEBTORS' <u>EMERGENCY</u> MOTION FOR ENTRY OF ORDERS
(I) ESTABLISHING BIDDING, NOTICING, AND ASSUMPTION AND
ASSIGNMENT PROCEDURES, (II) APPROVING THE SALE OF CERTAIN
OR ALL OF THE DEBTORS' ASSETS, AND (III) GRANTING RELATED RELIEF**

> **Emergency relief has been requested.  Relief is requested not later than 1:00 p.m. (prevailing Central Time) on August 18, 2025.**
>
> **If you object to the relief requested or you believe that emergency consideration is not warranted, you must appear at the hearing if one is set, or file a written response prior to the date that relief is requested in the preceding paragraph. Otherwise, the Court may treat the pleading as unopposed and grant the relief requested.**

The above-captioned debtors in possession (collectively, the "***Debtors***") respectfully state as follows in support of this motion (this "***Motion***")[2]:

**RELIEF REQUESTED**

1.      By this Motion, the Debtors seek entry of the following:

    (a)     an order, substantially in the form attached hereto (the "***Bidding Procedures Order***"):

        (i)     authorizing and approving the proposed bidding procedures substantially in the form attached to the Bidding Procedures Order as **<u>Exhibit 1</u>**

---

[1]     A complete list of the Debtors in the Chapter 11 Cases may be obtained on the website of the Debtors' claims and noticing agent at https://restructuring.ra.kroll.com/RunItOneTime/. The Debtors' mailing address is 12530 NE 144th Street, Kirkland, Washington 98304.

[2]     The facts and circumstances supporting this Motion are set forth in the *Declaration of Jeff Seery in Support of Chapter 11 Petitions and First Day Relief* [Docket No. 18] (the "***First Day Declaration***") and a supplemental declaration in support of the Motion to be filed in advance of the hearing to consider the Motion.

(the "***Bidding Procedures***") in connection with a sale or disposition of certain or substantially all of the Debtors' assets (the "***Assets***") in one or more sale transactions (each, a "***Sale Transaction***" and collectively, the "***Sale***");

(ii)    approving the procedures for the Debtors, in their discretion, to select one or more potential bidders to act as stalking horse bidders (each a "***Stalking Horse Bidder***" and the bids of any Stalking Horse Bidder, each a "***Stalking Horse Bid***") for certain of the Debtors' Assets and to enter into related asset purchase agreement(s) with any such Stalking Horse Bidder (each such asset purchase agreement, a "***Stalking Horse Agreement***") containing Bid Protections (as defined below), to the extent set forth in the Bidding Procedures;

(iii)    authorizing and approving the form and manner of notice of the Auction(s), if any, for the sale or sales of the Assets (the "***Auction***"), if any, the Sale and the hearing or hearings to consider approval of a Sale Transaction (each, a "***Sale Hearing***"), including the notice substantially in the form attached as **Exhibit 2** to the Bidding Procedures Order (the "***Sale Notice***");

(iv)    authorizing and approving procedures for the assumption and assignment of certain executory contracts and unexpired leases in connection with the Sale (the "***Assumption and Assignment Procedures***") and approving the form and manner of notice thereof, attached as **Exhibit 3** to the Bidding Procedures Order (the "***Cure Notice***");

(v)    establishing certain dates and deadlines in connection with the Sale process, including the Sale Hearing(s); and

(vi)    granting related relief; and

(b)    following entry of, and compliance with, the Bidding Procedures Order, one or more orders (each, a "***Sale Order***")[3] at the Sale Hearing(s), authorizing and approving the following:

(i)    the Sale Transaction(s) with the Successful Bidder(s) (as defined below) (and upon entry of the Sale Order approving the applicable Sale Transaction, the "***Buyer***"), free and clear of all liens, claims, interests, and encumbrances to the extent set forth in the Successful Bidder Purchase Agreement (as defined below);

(ii)    the assumption and assignment of the Assigned Contracts (as defined below) as set forth in the applicable Successful Bidder Purchase Agreement; and

---

[3]    The proposed form of Sale Order will be filed with the Court prior to the applicable Sale Hearing.

(iii)    granting related relief.

2.    As set forth in more detail below, the Debtors are seeking approval following proposed timeline for the Sale process set forth in the Bidding Procedures:

| Event | Proposed Date |
|---|---|
| **LeaseCo Marketing Determination Date** | Wednesday, August 20, 2025 |
| **Indication of Interest Deadline** | Wednesday, August 20, 2025, at 4:00 p.m. (prevailing Central Time) |
| **Stalking Horse Designation Deadline** | Monday, August 25, 2025, at 4:00 p.m. (prevailing Central Time) |
| **Stalking Horse Objection Deadline** | Tuesday, September 2, 2025, at 4:00 p.m. (prevailing Central Time) |
| **LeaseCo Stalking Horse Designation Deadline** | Monday, September 8, 2025, at 4:00 p.m. (prevailing Central Time) |
| **LeaseCo Stalking Horse Objection Deadline** | Monday, September 15, 2025, at 4:00 p.m. (prevailing Central Time) |
| **Cure Notice Deadline** | Monday, September 8, 2025 |
| **Bid Deadline** | Wednesday, September 17, 2025, at 4:00 p.m. (prevailing Central Time) |
| **Auction(s) (if necessary)** | Friday, September 19, 2025, at 10:00 a.m. (prevailing Central Time) |
| **Deadline to File Notice of Successful Bidder** | As soon as reasonably practicable after the close of the Auction with respect to the applicable Sale Transaction, and, in any event, no later than 5:00 p.m. (prevailing Central Time) on the date that is one day after the close of such Auction with respect to such Sale Transaction. In the event there is no Auction with respect to a Sale Transaction, the Debtors shall file the Notice of Successful Bidder identifying the Successful Bidder on September 19, 2025. |

| Event | Proposed Date |
|---|---|
| **Cure Objection Deadline** | By 4:00 p.m. (prevailing Central Time) on the day that is 14 days after service of the Cure Notice or a Supplemental Cure Notice, as applicable. |
| **Sale Objection Deadline** | Tuesday, September 23, 2025, at 4:00 p.m. (prevailing Central Time |
| **Sale Hearing (subject to Court availability)** | Friday, September 26, 2025[4] |

## JURISDICTION AND VENUE

3.     The United States Bankruptcy Court for the Southern District of Texas (the "***Court***") has jurisdiction to consider this Motion under 28 U.S.C. § 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b) and the Court may enter a final order consistent with Article III of the United States Constitution. Venue is proper under 28 U.S.C. §§ 1408 and 1409.

4.     The statutory and legal predicates for the relief requested herein are sections 105, 363, 365, 503, and 507 of title 11 of the United States Code (the "***Bankruptcy Code***"), rules 2002, 6004, 6006, and 9007 of the Federal Rules of Bankruptcy Procedure (the "***Bankruptcy Rules***"), rule 9013-1 of the Bankruptcy Local Rules for the Southern District of Texas (the "***Bankruptcy Local Rules***"), and the Procedures for Complex Cases in the Southern District of Texas (the "***Complex Case Procedures***").

## BACKGROUND

5.     On July 14, 2025 (the "***Petition Date***"), the Debtors each commenced with the Court a voluntary case (the "***Chapter 11 Cases***") under chapter 11 of the Bankruptcy Code.  The

---

[4]     The Debtors request that the Sale Hearing may be continued by the Debtors, in consultation with the Consultation Parties and in accordance with the Bidding Procedures, from time to time, either by Court docket entry or by the Debtors filing a notice on the Court's docket, without further notice to creditors or parties in interest.  Further, the Debtors request to reserve the right to seek an expedited Sale Hearing or multiple Sale Hearings as may be useful or necessary to effectuate any Sale Transaction(s).

Debtors continue to operate their business and manage their properties as debtors in possession under sections 1107(a) and 1108 of the Bankruptcy Code.  On July 25, 2025, the U.S. Trustee appointed an official committee of unsecured creditors (the "***Committee***") [Docket No. 81].  No trustee, examiner, or statutory committee has been appointed in the Chapter 11 Cases.

6.     The Debtors are a privately held gaming and entertainment company focused on acquiring undervalued gaming assets and implementing operational changes to improve profitability.  The Debtors own and operate a portfolio of casinos, card rooms, hotels, and other gaming- and hospitality-related assets across Washington State, Nevada, and Colorado, including 17 card rooms in Washington State and several casinos and hotels in Nevada and Colorado, reflecting a total of approximately 2,500 slot machines, 320 table games, 1,200 hotel rooms, and 30 restaurants.  The Debtors' operating businesses also include the EGads! fabrication and installation business, a gaming and hospitality industry leader in the design, fabrication, assembly and installation of casino interiors, custom signage, lighting, and architectural treatments, and the Utah Trailways charter company, which facilitates customer gaming excursions from Salt Lake City, Utah, to the Debtors' operating properties in Wendover, Nevada.

7.     Additional factual background regarding the Debtors, including their business, their capital structure, and the events leading to the commencement of the Chapter 11 Cases is set forth in the First Day Declaration and incorporated herein by reference.

## PRELIMINARY STATEMENT

8.     The Debtors commenced these Chapter 11 Cases, supported by their key stakeholders, the Ad Hoc Group and the Supporting Shareholder, to implement the value-maximizing transactions set forth in the Transaction Support Agreement. Among other things, the Transaction Support Agreement contemplates the Debtors' pursuit of an in-court restructuring and resolution of their liabilities, preceded by a comprehensive marketing, auction, and sale process

for substantially all of the Debtors' assets. The proposed Bidding Procedures and related relief sought in this Motion have been carefully designed with the goal of pursuing a Sale process that is competitive, fair, and will yield the highest value for the Debtors' estates and their creditors. Moreover, seeking the relief contemplated in this Motion is a necessary component to the overall Transaction Support Agreement, and a precondition to the DIP Lenders' willingness to authorize the Debtors' consensual use of Cash Collateral and provide financing pursuant to the DIP Facility.

9.      Given the various components of the Debtors' gaming enterprise, the Sale process has been structured first and foremost to provide sufficient flexibility for interested parties to participate and submit bids for all or any portion of the Assets, which the Debtors believe will increase and encourage bidding.

10.     The Debtors are currently in discussions with the DIP Lenders to address their go-forward financing needs for the Sale process and the remainder of the Chapter 11 Cases, and anticipate reaching agreement in the near term to ensure that the Sale process can continue in accordance with the milestones under the Interim DIP Order. The Debtors are seeking relief with respect to the Bidding Procedures now in accordance with the milestones agreed to by the DIP Lenders. In addition, the Debtors intend to move promptly to initiate and pursue a robust sale and marketing process consistent with the Bidding Procedures as soon as practicable to capitalize on forward momentum with interested parties and to preserve value by minimizing the administrative costs in connection with the chapter 11 process. Indeed, the Debtors have received preliminary interest for certain of their Assets and look forward to continuing negotiations with these and other interested parties and to effectuating a competitive sale process.

11.     The Debtors believe that the proposed Bidding Procedures and the related relief requested in the Motion will allow the Debtors to efficiently pursue the value-maximizing Sale

process contemplated by the Transaction Support Agreement and best position them to achieve their goals in the Chapter 11 Cases. The Debtors submit that the Sale process has been structured to maximize bidder interest in the Assets. The Debtors respectfully request that the Court grant the relief requested herein.

## THE PROPOSED SALE AND BIDDING PROCEDURES

### I.    The Bidding Procedures

12.    The Debtors believe the proposed Bidding Procedures are structured to enable the Debtors to pursue the most robust marketing, auction, and sale process available under the circumstances. The Bidding Procedures describe, among other things, the procedures for interested parties to access due diligence, the manner in which Prospective Bidders may become qualified for consideration by the Debtors and to participate in any Auction, the receipt and negotiation of Bids received, the conduct of any Auction, the selection and designation of Stalking Horse Bidder(s) for the Debtors' Assets, the selection and approval of the successful bidders for the Debtors' Assets, and the deadlines with respect to the foregoing.

13.    The Bidding Procedures are intended to promote a fair and robust, competitive sale process, consistent with the timeline of and milestones agreed to in connection with the Chapter 11 Cases and to confirm that any other Stalking Horse Bids the Debtors may designate are indeed the highest or otherwise best offer(s) at the time (or to enable the Debtors to identify an alternative bid to such Stalking Horse Bid that is higher or otherwise better). The Bidding Procedures contain the following key provisions:[5]

---

[5]    The following summary is qualified in its entirety by reference to the provisions of the Bidding Procedures.  In the event of any inconsistencies between the provisions of the Bidding Procedures and the summary, the terms of the Bidding Procedures shall govern.  Capitalized terms used in this summary and not otherwise defined herein shall have the meaning ascribed to them in the Bidding Procedures.

| Provision | Summary Description |
|---|---|
| **Description of the Assets** | Three principal segments:<br><br>(a)      "***PokerCo***" to be composed of Aces Poker Lakewood, Aces Poker Mountlake Terrace, Caribbean Casino, Caribbean Cardroom, including working capital required to operate the businesses (to the extent available);<br><br>(b)      "***LeaseCo***" to be composed of the Debtors' properties subject to the Blue Owl Master Lease, and, subject to and in accordance with notice issued on the LeaseCo Marketing Determination Date, non-PokerCo Washington properties subject to leases with other landlords; and<br><br>(c)      "***MainCo***" to be composed of the remainder of the Debtors' existing businesses, interests, and tangible and intangible assets.<br><br>Bids on individual assets within these segments (each, a "***Partial Bid***") are acceptable to the Debtors, in consultation with the Consultation Parties; *provided* that with respect to Partial Bids, if the Debtors do not receive Qualified Bids for all of the Assets within a particular segment, the Debtors reserve the right not to consider or otherwise proceed to an Auction (as defined below) for such Partial Bids.<br><br>The Debtors are in current discussions with the landlord for certain of the LeaseCo Assets and have not yet initiated a marketing process for the LeaseCo Assets. The Debtors shall make a determination as to the marketing of the LeaseCo Assets no later than August 20, 2025 (the "***LeaseCo Marketing Determination Date***"). If the Debtors decide to commence a marketing process for the LeaseCo Assets on or before the LeaseCo Marketing Determination Date, the Debtors shall promptly file a notice indicating such determination and provide no less than 25 days for such a marketing process to proceed in advance of the Bid Deadline. With respect to the LeaseCo Assets, any interested party that submits a Bid (as defined below) for the LeaseCo Assets will be eligible for consideration as a Qualified Bidder for the LeaseCo Assets, subject to the Debtors' discretion in consultation with the Consultation Parties. |
| **Qualification of Prospective Bidders** | **Preliminary Bid Documents**. To participate in the bidding process or otherwise be considered for any purpose hereunder, a person or entity interested in the Assets or any portion of the Assets (an "***Interested Party***"), must deliver to the Debtors' investment banker, GLC Advisors & Co. ("***GLC***"), (a) an executed confidentiality agreement in form and substance acceptable to the Debtors and (b) any other information that the Debtors may reasonably request (collectively, the "***Preliminary Bid Documents***").<br><br>**Selection of Prospective Bidders**. If the Debtors, in consultation with their advisors, determine that an Interested Party has timely delivered adequate Preliminary Bid Documents, such Interested Party shall be eligible to receive |

| Provision | Summary Description |
|---|---|
| | due diligence information as described below (each such Interested Party after timely delivering adequate Preliminary Bid Documents, a "***Prospective Bidder***"); *provided* that the Debtors will notify any Interested Party that has not submitted adequate Preliminary Bid Documents so that such Interested Party has the opportunity to remedy any inadequacies and become a Prospective Bidder. The Debtors, in consultation with their advisors, will determine whether each Interested Party has submitted adequate Preliminary Bid Documents and notify such Interested Party accordingly.<br><br>For the avoidance of doubt, the Existing Lenders or their designee or any Stalking Horse Bidder designated by the Debtors pursuant to these Bidding Procedures will be deemed to be a Prospective Bidder.<br><br>Only Prospective Bidders shall be eligible to receive due diligence information and reasonable access to the Debtors' confidential electronic data room concerning the Assets (the "***Data Room***").<br><br>**No Communications Among Bidders**. There must be no communications with respect to bids or potential bids between and amongst Prospective Bidders (including the Stalking Horse Bidders and Qualified Bidders), unless the Debtors have authorized such communication in writing in advance or with the participation of representatives of the Debtors or their advisors.  Should any Prospective Bidder attempt to communicate directly with a Consultation Party, such Consultation Pary shall immediately inform Debtors' counsel and financial advisor of such communication and include the Debtors' counsel or financial advisor in any future communications between the Prospective Bidder and Consultation Party.  The Debtors reserve the right, in their reasonable business judgment, to disqualify any Prospective Bidders that have engaged in communications between or amongst themselves or with any Consultation Party without the participation of the Debtors (or a representative of the Debtors) or the Debtors' prior written consent.  The Debtors further reserve their right, in their reasonable business judgment, to strip any Consultation Party that violates this provision of its consultation rights hereunder. |
| **Indications of Interest** | **Indication of Interest Deadline**. Each Prospective Bidder (other than the Existing Lenders or their designee) is required to submit a non-binding written indication of interest ("***Indication of Interest***") prior to **August 20, 2025, at 4:00 p.m. (prevailing Central Time)** (the "***Indication of Interest Deadline***").<br><br>**Indications of Interest Requirements**. Each Indication of Interest must include, among other things, the following information:<br><br>(a)      disclosure of the identity of the Prospective Bidder and a description of any and all connections that the Interested Party (including its affiliates and any related persons) may have to (i) the Debtors, (ii) any current or |

| Provision | Summary Description |
|---|---|
| | former directors and officers of the Debtors, (iii) the Debtors' non-Debtor affiliates, and (iv) the Debtors' primary creditors as identified by the Debtors; |
| | (b) a description of the key components of the Prospective Bidder's potential bid, including the specific Assets sought by the potential bid and any material Assets or liabilities excluded by such bid; |
| | (c) the proposed purchase price; |
| | (d) evidence acceptable to the Debtors demonstrating the financial wherewithal of the Prospective Bidder to close the transaction; |
| | (e) proposed plans for the business, including (i) if applicable, any steps to achieve compliance with all required gaming regulatory approvals, and (ii) intentions for employees; and |
| | (f) an estimate of the amount of time a Prospective Bidder requires to complete its due diligence review of the Debtors, obtain all necessary internal and external approvals, including regulatory approvals, execute a definitive agreement, and close the Transaction. |
| | Notwithstanding the foregoing, the Debtors shall, in consultation with the Consultation Parties, retain the ability to consider a timely Bid submitted by a Prospective Bidder that did not submit an Indication of Interest by the Indication of Interest Deadline or otherwise. |
| **Designation of Stalking Horse Bidders and Grant of Bid Protections** | **Designation Procedures.** The Debtors, in consultation with the Consultation Parties, may, in the exercise of their business judgment and as they may reasonably determine to be in the best interests of their estates, select a stalking horse bidder or stalking horse bidders (each, a "***Stalking Horse Bidder***") for any groupings or subgroupings of the Assets for the purposes of establishing one or more minimum acceptable bids with which to begin the applicable Auction with respect to certain or all of the foregoing Assets (each, a "***Stalking Horse Bid***"). The Debtors may provide any such Stalking Horse Bidder with Bid Protections (described below) pursuant to an agreement with such Stalking Horse Bidder (the "***Stalking Horse Agreement***"). <br><br> Any designation of Stalking Horse Bidder for any assets shall be made no later than 4:00 p.m. (prevailing Central Time) on August 25, 2025 (the "***Stalking Horse Designation Deadline***"). The Debtors shall file a notice of such Stalking Horse Agreement (the "***Stalking Horse Notice***") with the Court and provide such Stalking Horse Notice to: (a) the parties on the Debtors' Master Service List; (b) counsel to the Ad Hoc Group and Backstop Parties; (c) counsel to the Prepetition Agent; (d) counsel to the Committee; (e) all Interested Parties; and (f) all parties reasonably known to the Debtors to assert an interest in the assets. |

| Provision | Summary Description |
|---|---|
| | Parties in interest shall then have until 4:00 p.m. (prevailing Central Time) on September 2, 2025 (the "***Stalking Horse Objection Deadline***"), to object to the Debtors' designation of such Stalking Horse Bidder(s) and any Bid Protections offered to such Stalking Horse Bidder(s).<br><br>**Bid Protections.** Customary bid protections to include:<br><br>(a)  a break-up fee (the "***Break-Up Fee***") and<br><br>(b)  reimbursement of reasonable, documented and necessary out-of-pocket expenses incurred in connection with such Stalking Horse Bid (the "***Expense Reimbursement Amount***" and together with the Break-Up Fee, the "***Bid Protections***").<br><br>The amount of any consensual Break-Up Fee and the Expense Reimbursement Amount shall, in the aggregate, not exceed 1.5% of the cash portion of the applicable Transaction Purchase Price for such Stalking Horse Bid. |
| **Bid Deadline** | To be eligible for consideration as a Qualified Bid to participate in any Auction, each Prospective Bidder must deliver to the Debtors a written, irrevocable offer, solicitation, or proposal to acquire Assets (each, a "***Bid***") no later than **4:00 p.m. (prevailing Central Time) on September 17, 2025** (the "***Bid Deadline***"). |
| **Qualified Bids** | **Qualified Bid Requirements**. To constitute a Qualified Bid (as defined below), a Bid must satisfy such information as reasonably requested by the Debtors and the Consultation Parties, as well as certain conditions set forth in the Bidding Procedures, including, among others:<br><br>(a)  **Bid Irrevocable**. Each Bid (other than a credit bid by the Existing Lenders or their designee) must provide that it is irrevocable and binding in all respects until the closing of the Sale Transaction if such Prospective Bidder is the Successful Bidder, and that the Prospective Bidder agrees to serve as a backup bidder if such bidder's Bid is selected as the next highest or otherwise next best bid after the Successful Bid.<br><br>(b)  **Assets and Liabilities**. Each Bid must clearly identify the following: (i) the Assets to be purchased; and (ii) the liabilities and obligations to be assumed, including any indebtedness to be assumed, if any.<br><br>(c)  **Designation of Assigned Contracts and Leases.** Each Bid must identify any and all executory contracts and unexpired leases of the Debtors that the bidder wishes to be assumed and assigned to the bidder at closing. The Bid must confirm that the bidder will be responsible for |

| Provision | Summary Description |
|-----------|---------------------|
|  | any Cure Costs associated with such assumption, and include a good faith estimate of such Cure Costs. |
|  | (d)   **Purchase Price**. Each Bid (other than a credit bid by the Existing Lenders or their designee) must be for cash. The Bid must clearly set forth the cash purchase price, and any other non-cash consideration (with the form of such consideration specified), to be paid (the "***Transaction Purchase Price***"). |
|  | (e)   **Consolidated Bid**. Each Bid for less than all of the Assets must specify whether or not the Prospective Bidder is willing to aggregate its bid into an acceptable consolidated bid with other Prospective Bidders. |
|  | (f)   **Employment and Employee Obligations**. Each Bid must (i) specify the treatment and hiring of the Debtors' employees, including any unionized employees, and (ii) as applicable, the treatment of the Debtors' collective bargaining agreement ("***CBA***") with each union party thereto (the "***Unions***"). |
|  | (g)   **Minimum Bid.** Each Bid submitted must either: (i) provide for the payment of aggregate consideration, in the Debtors' good-faith business judgment, the value of which is in excess of at least the sum of (x) the purchase price under the applicable Stalking Horse Agreement and (y) any Bid Protections approved by the Court; or (ii) propose an alternative transaction that provides higher value or better terms than any Stalking Horse Bid, if any. |
|  | (h)   **Deposit**. Each Bid (except a credit bid by the Existing Lenders or their designee) must be accompanied by a good faith deposit in the form of cash in an amount equal to not less than 10% of the cash portion of the Transaction Purchase Price of the Bid, to be held in an escrow account to be identified and established by the Debtors (the "***Deposit***"). |
|  | (i)   **Executed Agreement**. Each Bid must be based on the proposed purchase agreement with respect to such Assets, which will be posted to the Data Room by the Debtors (a "***Purchase Agreement***")[6] and may be a Stalking Horse Purchase Agreement, and must include executed transaction documents pursuant to which the Potential Bidder proposes to effectuate a Sale Transaction (a "***Modified Purchase Agreement***"). Each Modified Purchase Agreement must provide a commitment to close within two business days after all closing conditions are satisfied. |

---

[6]   The Debtors will file the form Purchase Agreement in advance of the hearing to consider the Motion.

| Provision | Summary Description |
|---|---|
| | (j) **Regulatory and Third-Party Approvals**. Each Bid must include a statement or evidence (i) that the Prospective Bidder has made or will make in a timely manner all necessary regulatory (including all applicable gaming regulatory approvals) and antitrust filings and pay the fees associated with such filings and (ii) identifying all required governmental and regulatory approvals (including all applicable gaming regulatory approvals) and an explanation or evidence of the Prospective Bidder's plan and ability to obtain all governmental and regulatory approvals (including and disclosure of the identity of any proposed successor operator of the Assets under the proposed Sale Transaction) and the proposed timing for the Prospective Bidder to undertake the actions required to obtain such approvals. |
| | (k) **No Bid Protections or Fees**. Each Bid (other than a Stalking Horse Bid) must disclaim any right to receive a fee analogous to a break-up fee, expense reimbursement, "topping" or termination fee, or any other similar form of compensation. |
| | (l) **Time Frame for Closing**. Each Bid must be reasonably likely (based on antitrust or other regulatory issues, experience, and other considerations in the Debtors' business judgment) to be consummated, if selected as the Successful Bid, within a time frame reasonably acceptable to the Debtors and, in any event, subject to the Milestones contained in the DIP Orders. |
| | **Selection of Qualified Bidders**. A Bid received that meets the requirements set forth in the Bidding Procedures, as determined by the Debtors, in consultation with their advisors and the Consultation Parties, in the Debtors' reasonable business judgment will constitute a "*Qualified Bid*" for such Assets (and the Prospective Bidder submitting such Qualified Bid will constitute a "*Qualified Bidder*"). The Debtors may also, after consulting with the Consultation Parties, waive or modify any of the above requirements in the exercise of their reasonable business judgment. |
| | Notwithstanding anything to the contrary in the Bidding Procedures, the Existing Lenders credit bidding pursuant to Section VIII of the Bidding Procedures and any Stalking Horse Bidder(s) shall be deemed to be a Qualified Bidder, and any credit bid submitted by the Existing Lenders pursuant to Section VIII of the Bidding Procedures and any Stalking Horse Bid(s) shall be deemed to be a Qualified Bid, such that such Qualified Bidders shall not be required to submit an additional Qualified Bid. |
| | **Aggregate Bids**. The Debtors reserve the right, in the exercise of their business judgment and in consultation with the Consultation Parties, to work with (A) Prospective Bidders to aggregate two or more Bids into a single |

| Provision | Summary Description |
|-----------|---------------------|
|  | consolidated Bid prior to the Bid Deadline and (B) Qualified Bidders to aggregate two or more Qualified Bids into a single Qualified Bid prior to the conclusion of the Auction (if any). |
| **Auction** | **Auction**. The Debtors may conduct any Auction in any manner to facilitate a Sale Transaction for all or different subgroupings of the Assets and individual Assets, including conducting multiple Auctions for different subgroupings of the Assets and individual Assets. If two or more Qualified Bids (including a Stalking Horse Bid or credit bid) are received by the Bid Deadline, the Debtors may conduct the Auction with respect to the Debtors' Assets subject to such Qualified Bids. If only one Qualified Bid with respect to a Sale Transaction is received by the Bid Deadline, the Debtors may, after consulting with the Consultation Parties, select the Modified Purchase Agreement or Stalking Horse Agreement, as applicable, of such Qualified Bidder to be the Successful Bid and such Qualified Bidder shall be the Successful Bidder with respect to the applicable Sale Transaction, and will promptly file the Notice of Successful Bidder with respect to such Sale Transaction, but in no event later than September 19, 2025. To the extent there are no Qualified Bids or Stalking Horse Bids with respect to certain of the Debtors' assets, the Debtors will determine the next phase of the Sale and chapter 11 process with the consent of the Required DIP Lenders.<br><br>The Auction (if held) shall take place on **September 22, 2025, at 10:00 a.m. (prevailing Central Time)**, at a location as designated by the Debtors (in consultation with the Consultation Parties) or via a virtual meeting (either telephonic or via videoconference) the information to join which virtual meeting shall be provided by the Debtors to each Qualified Bidder prior to the Auction. The applicable Auction may be postponed, adjourned or cancelled as the Debtors (in consultation with the Consultation Parties) deem appropriate. Reasonable notice as is reasonably practicable under the circumstances of such postponement or adjournment and the time and place for the commencement or resumption of the applicable Auction or cancellation shall be given to all Qualified Bidders.<br><br>**Notice of Successful Bidder**. Immediately prior to the conclusion of the Auction, the Debtors shall (a) determine consistent with the Bidding Procedures, which Bid constitutes the highest or otherwise best Bid with respect to each Sale Transaction (each such bid, a "***Successful Bid***" and such Qualified Bidder's purchase agreement, the "***Successful Bidder Purchase Agreement***"); and (b) notify all Qualified Bidders at the Auction for the Assets under a Sale Transaction of the identity of the bidder that submitted the Successful Bid (each such bidder, the "***Successful Bidder***") and the amount of the purchase price and other material terms of the Successful Bid with respect to such Sale Transaction. The Debtors shall file a notice identifying the Successful Bidder and Backup Bidder (if selected) (the "***Notice of Successful Bidder***") with respect to each Sale Transaction by 5:00 p.m. (prevailing Central |

| Provision | Summary Description |
|---|---|
| | Time) as soon as reasonably practicable after closing of the Auction with respect to such Sale Transaction, if any, and in any event not later than one day after the closing of the Auction. In the event there is no Auction with respect to a Sale Transaction, the Debtors shall file the Notice of Successful Bidder identifying the Successful Bidder on September 19, 2025. |
| **Modifications of Bidding Procedures** | The Debtors (in consultation with the Consultation Parties) reserve the right to (a) determine which bidders are Qualified Bidders; (b) determine which bids are Qualified Bids; (c) determine whether to enter into a Stalking Horse Agreement; and (d) determine which Qualified Bid is the highest or otherwise best proposal and which is the next highest or otherwise best proposal with respect to a Sale Transaction, and (e) modify the Bidding Procedures in good faith or impose, at or prior to selection of the Successful Bidder, additional customary terms and conditions on the Sale of the Assets, including, without limitation: (i) extending any of the deadlines set forth in the Bidding Procedures; (ii) adjourning the Auction (if held) without further notice; (iii) adding or modifying procedural rules that are reasonably necessary or advisable under the circumstances for conducting the Auction or adjourning the Sale Hearing in open court (if held); (iv) canceling the Auction or electing not to hold an Auction; (v) rejecting any or all Bids or Qualified Bids; (vii) adjusting the applicable Minimum Overbid increment, including by requesting that Qualified Bidders submit last or final bids on a "blind basis." The Debtors shall provide reasonable notice of any such modification to any Qualified Bidder, including any Stalking Horse Bidder. Nothing in section XV of the Bid Procedures or elsewhere in these Bid Procedures will be construed to limit the rights of the Existing Lenders under the DIP Order of DIP Documents. |
| **Closing with Alternative Backup Bidders** | If an Auction is conducted, the Qualified Bidder with the next-highest or otherwise second-best Qualified Bid as compared to the Successful Bid at the Auction for the Assets under a Sale Transaction, as determined by the Debtors in the exercise of their reasonable business judgment (in consultation with the Consultation Parties) (the "***Backup Bid***"), shall be required to serve as a backup bidder (the "***Backup Bidder***") with respect to such Sale Transaction, and each Qualified Bidder with respect to a Sale Transaction shall agree and be deemed to agree to be the Backup Bidder with respect to such Sale Transaction if so designated; *provided* that if any Stalking Horse Bidder(s) are selected as the Backup Bid with respect to its Stalking Horse Bid(s), such bid must remain irrevocable only for so long as is required under the applicable Stalking Horse Agreement; *provided further* that neither the Existing Lenders nor their designee shall be required to serve as a backup bidder. |
| | The Backup Bid shall remain binding on the Backup Bidder until the earlier of (a) closing of a Sale Transaction for the applicable Assets pursuant to the Successful Bid or (b) the date that is 90 calendar days after the Sale Hearing (such date, the "***Backup Bid Outside Date***"). If a Successful Bidder fails to |

| Provision | Summary Description |
|---|---|
| | consummate the approved transactions contemplated by its Successful Bid prior to the Backup Bid Outside Date, the Debtors may select the Backup Bidder as the Successful Bidder with respect to such Sale Transaction, and such Backup Bidder shall be deemed a Successful Bidder for all purposes. |

14.     Importantly, the Bidding Procedures recognize the fiduciary obligations of the Debtors.  Specifically, the Bidding Procedures provide that nothing in the Bidding Procedures will require the board of directors, board of managers, or such similar governing body of a Debtor to take any action, or to refrain from taking any action, with respect to the Bidding Procedures, to the extent such board of directors, board of managers, or such similar governing body determines in good faith, after consultation with the Debtors' advisors, that taking such action, or refraining from taking such action, as applicable, would be inconsistent with applicable law or its fiduciary obligations under applicable law.  Accordingly, the Bidding Procedures do not impair the Debtors' ability to consider all Qualified Bid proposals and preserve the Debtors' right to modify the Bidding Procedures as necessary or appropriate to maximize value for their estates.

## II.    Supporting Shareholder and Management

15.     The Transaction Support Agreement provides for the marketing and sale of PokerCo under section 363 of the Bankruptcy Code.  Specifically, the Debtors and a designee of the Supporting Shareholder ("***EP BidCo***") intend to enter into a purchase agreement providing for the sale and purchase of PokerCo to EP BidCo for a purchase price of $13 million and such other terms as set forth in the Transaction Support Agreement.  Subject to Court approval of the Bidding Procedures, the Debtors intend to designate such purchase agreement a "stalking-horse" bid that will be subject to higher or otherwise better offers.

16.     As the Supporting Shareholder is a former executive of the Debtors, the Debtors intend to exclude the Supporting Shareholder and any other members of the Debtors' management

from the bid review process. Specifically, the proposed Bidding Procedures provide that any member of the Debtors' current or former management team, including, but not limited to, Mr. Eric Persson (the Supporting Shareholder), either as an individual or through a person or entity affiliated with the respective member of the Debtors' current or former management, participating in a bid to purchase the Assets, shall be excluded from evaluating bids from other parties and shall be screened from receipt of any non-public information regarding any competing bids and shall not advise the Debtors on the same.

**III.    Stalking Horse Bidder(s), the Bid Protections, and Stalking Horse Agreement(s)**

17.    The Bidding Procedures also provide that the Debtors, in consultation with the Consultation Parties, may select one or more Stalking Horse Bidder(s) for any groupings or subgroupings of the Assets, by filing a Stalking Horse Notice by the September 2, 2025 Stalking Horse Designation Deadline, identifying any such Stalking Horse Bidder(s) and any Bid Protections the Debtors propose to offer such Stalking Horse Bidder(s). The Debtors will then provide the Stalking Horse Notice to (a) the parties listed on the Debtors' Master Service List; (b) counsel to the Ad Hoc Group and Backstop Parties; (c) counsel to the Prepetition Agent; (d) counsel to the Committee; (e) all Interested Parties; and (f) all parties reasonably known to the Debtors to assert an interest in the assets. Parties in interest shall then have until 4:00 p.m. (prevailing Central Time) on September 8, 2025 (the "***Stalking Horse Objection Deadline***") to object to the Debtors' designation of such Stalking Horse Bidder(s) and any Bid Protections offered to such Stalking Horse Bidder(s).

18.    In the event that the Debtors designate a Stalking Horse Bidder and the Stalking Horse Bidder is not the Successful Bidder with respect to the Stalking Horse Bid, the Debtors request that they be authorized, but not directed, to provide certain Bid Protections to the Stalking Horse Bidder, including the Break-Up Fee and Expense Reimbursement Amount. The amount of

any consensual, negotiated Break-Up Fee and the Expense Reimbursement Amount shall, in the aggregate, not exceed 1.5% of the cash portion of the applicable Transaction Purchase Price for such Stalking Horse Bid, with such amount to be paid in accordance with the terms and conditions set forth in the applicable Stalking Horse Agreement and as approved by the Bankruptcy Court in the Bidding Procedures Order (the "***Bid Protections***").

19.     The Debtors submit that to entice potential bidders to serve as a Stalking Horse Bidder, which would help facilitate a competitive Auction by setting a minimum price for the applicable Assets covered by any such Stalking Horse Bid at the Auction, they will need to offer such Stalking Horse Bidder the Bid Protections. No other bidder, nor any party making a credit bid (irrespective of whether it is a Stalking Horse Bidder), will be entitled to any Bid Protections or any other expense reimbursement, break-up fee, termination fee or any other similar fee or payment under the Bidding Procedures.

20.     The Debtors submit that the Bid Protections are fair and reasonable in light of the circumstances because, in the event the Bid Protections are triggered, any Stalking Horse Bidder's efforts will have promoted more competitive bidding, and thereby increased the chances that the Debtors will receive the highest or otherwise best offer for the Sale Transaction contemplated by such Stalking Horse Bid, to the benefit of the Debtors' creditors. Accordingly, the Debtors seek authority to enter into a Stalking Horse Agreement or Stalking Horse Agreements containing such Bid Protections pursuant to the procedures described herein, without further order of the Court.

## IV.     The Proposed Sale Timeline

21.     The Debtors respectfully request that the Court approve the following proposed timeline for the Sale process set forth in the Bidding Procedures:

| Event | Proposed Date |
|---|---|
| **LeaseCo Marketing Determination Date** | Wednesday, August 20, 2025 |
| **Indication of Interest Deadline[7]** | Wednesday, August 20, 2025, at 4:00 p.m. (prevailing Central Time) |
| **Stalking Horse Designation Deadline** | Monday, August 25, 2025, at 4:00 p.m. (prevailing Central Time) |
| **Stalking Horse Objection Deadline** | Tuesday, September 2, 2025, at 4:00 p.m. (prevailing Central Time) |
| **LeaseCo Stalking Horse Designation Deadline** | Monday, September 8, 2025, at 4:00 p.m. (prevailing Central Time) |
| **LeaseCo Stalking Horse Objection Deadline** | Monday, September 15, 2025, at 4:00 p.m. (prevailing Central Time) |
| **Cure Notice Deadline** | Monday, September 8, 2025 |
| **Bid Deadline** | Wednesday, September 17, 2025, at 4:00 p.m. (prevailing Central Time) |
| **Auction(s) (if necessary)** | Friday, September 19, 2025, at 10:00 a.m. (prevailing Central Time) |
| **Deadline to File Notice of Successful Bidder[8]** | As soon as reasonably practicable after the close of the Auction with respect to the applicable Sale Transaction, and, in any event, no later than 5:00 p.m. (prevailing Central Time) on the date that is one day after the close of such Auction with respect to Such Sale Transaction. In the event there is no Auction with respect to a Sale Transaction, the Debtors shall file the Notice of |

---

[7]   For the avoidance of doubt, to the extent the Debtors determine to commence a marketing process for the LeaseCo Assets, the Indication of Interest Deadline shall not apply, and all Bids for LeaseCo shall be subject to the Bid Deadline.

[8]   In the event that an Auction is cancelled, including, without limitation, because only one Qualified Bid (including a Stalking Horse Bid or credit bid) with respect to a Sale Transaction is received by the Bid Deadline, the Debtors shall file a Notice of Successful Bidder promptly identifying such Qualifying Bid as the Successful Bidder with respect to such Sale Transaction, but in no event later than September 19, 2025. To the extent there are no Qualified Bids or Stalking Horse Bids received with respect to certain of the Debtors' Assets, the Debtors will determine the next phase of the Sale and chapter 11 process in consultation with the Existing Lenders (as defined below).

| Event | Proposed Date |
|---|---|
| | Successful Bidder identifying the Successful Bidder on September 19], 2025. |
| **Cure Objection Deadline[9]** | By 4:00 p.m. (prevailing Central Time) on the day that is 14 days after service of the Cure Notice or a Supplemental Cure Notice, as applicable |
| **Sale Objection Deadline[10]** | The later of the date that is three days after the filing of the Notice of Successful Bidder or Tuesday, September 23, 2025, at 4:00 p.m. (prevailing Central Time) |
| **Sale Hearing (subject to Court availability)** | No later than Friday, September 26, 2025[11] |

22.    The Debtors believe that the above timeline is sufficient for a meaningful marketing process and will provide potential bidders with sufficient time to obtain information necessary to formulate a competitive bid, increasing the prospect that the Debtors will receive value-maximizing offers that will benefit the Debtors' estates and their stakeholders. The Debtors submit that, under the circumstances, the Sale process is reasonable in time and scope and will permit sufficient time for any interested bidders to conduct their due diligence with respect to the Assets and formulate bids on the Assets. Accordingly, the Debtors believe the requested timeline is in best interest of the Debtors' estates, will provide interested parties with sufficient opportunity to participate, and, therefore, should be approved.

---

[9]    The Cure Objection Deadline applies to any objections to the Debtors' proposed Cure Costs (as defined below) (each such objection, a "*Cure Objection*").

[10]    The Sale Objection Deadline applies to any objections to the Sale or to the assumption and assignment of the Assigned Contracts other than Cure Objections.

[11]    The Debtors request that the Sale Hearing may be continued by the Debtors, in consultation with the Consultation Parties and in accordance with the Bidding Procedures, from time to time, either by Court docket entry or by the Debtors filing a notice on the Court's docket, without further notice to creditors or parties in interest. Further, the Debtors request to reserve the right to seek an expedited Sale Hearing or multiple Sale Hearings as may be useful or necessary to effectuate any Sale Transaction(s).

## V.      Notice Procedures

23.     **Sale Notice.** As soon as reasonably practicable after entry of the Bidding Procedures Order, the Debtors will serve the Sale Notice, the Bidding Procedures Order, and the Bidding Procedures upon the following parties or, if known, their respective counsel (collectively, the "***Sale Notice Parties***"): (a) the Objection Notice Parties;[12] (b) all entities reasonably and actually known by the Debtors to have expressed a bona fide interest in acquiring any of the Assets during the year preceding the date hereof; (c) all entities known by the Debtors to have asserted any claims, liens, interests, or encumbrances in or upon any of the Assets; (d) all known parties to executory contracts and/or unexpired leases to be assumed and assigned, or rejected, as part of the Sale; (e) counsel to the Committee, (f) all federal, state, and local regulatory or taxing authorities or recording offices which have a reasonably known interest in the relief requested by the Motion, including any such gaming regulatory authorities; (g) each governmental agency that has a reasonably known interest with respect to the Sale and the transactions provided thereunder; (h) the United States Attorney for the Southern District of Texas; (i) the Internal Revenue Service; (j) the Federal Trade Commission; and (k) the Assistant Attorney General in charge of the Antitrust Division of the Department of Justice.

---

[12]  The "***Objection Notice Parties***" include (a) proposed counsel to the Debtors, Latham & Watkins LLP, 355 South Grand Avenue, Suite 100, Los Angeles, California 90071-1560 (Attn: Helena Tseregounis, and Nicholas Messana) (helena.tseregounis@lw.com, and nicholas.messana@lw.com) and 1271 Avenue of the Americas, New York, New York 10020 (Attn: Andrew Sorkin) (andrew.sorkin@lw.com); (b) proposed co-counsel to the Debtors, Hunton Andrews Kurth LLP, 600 Travis St., Houston, Texas 77002 (Attn: Timothy A. "Tad" Davidson II, Ashley L. Harper, and Philip M. Guffy) (taddavidson@hunton.com, ashleyharper@hunton.com, and pguffy@hunton.com); (c) counsel to the Ad Hoc Group and Backstop Parties, Ropes & Gray LLP, 1211 Avenue of the Americas, New York, New York 10036-8704 (Attn: Ryan P. Dahl, Daniel Gwen, and Margaret Alden) (ryan.dahl@ropesgray.com, daniel.gwen@ropesgray.com, and margaret.alden@ropesgray.com); (d) the U.S. Trustee, 515 Rusk Street, Suite 3516, Houston, Texas 77002 (Attn: Jayson Ruff and Vianey Garza) (jayson.b.ruff@usdoj.gov and vianey.garza@usdoj.gov); and (e) with respect to Sale Objection Deadline objections, any Successful Bidders.

24.     **Publication Notice.** Additionally, as soon as practicable after entry of the Bidding Procedures Order, the Debtors shall publish a notice, substantially in the form of the Sale Notice, once in the national edition of *The New York Times* or a similarly nationally circulated news publication and once in a locally circulated publication in each of Washington and Nevada. This publication notice is intended to provide notice of the Sale to any other potential interested parties and interested parties whose identities are unknown to the Debtors.

25.     **Notice of Successful Bidder.** In the event an Auction is conducted, the Debtors shall file a notice identifying the Successful Bidder and Backup Bidder (if selected) (the "***Notice of Successful Bidder***") with respect to each Sale Transaction by 5:00 p.m. (prevailing Central Time) as soon as reasonably practicable after closing of the Auction, if any, and in any event not later than one day after the closing of the Auction, as provided in the Bidding Procedures. In the event that the Auction is cancelled, the Debtors shall file a Notice of Successful Bidder promptly, but in no event later than September 19, 2025, identifying one or more Qualified Bids (including any Stalking Horse Bid), if any, as the Successful Bidder, or, if the Debtors have not selected a Successful Bidder, otherwise providing parties in interest with an update as to the next steps in the Sale process.

26.     The Debtors submit that the Sale Notice, proposed publication notice, and other forms of notice provided in the Bidding Procedures are reasonably calculated to provide all interested parties with timely and proper notice of the proposed Sale process, including: (a) the date, time and place of the Auction (if one is held); (b) the Bidding Procedures and the dates and deadlines related thereto; and (c) the dates and deadlines related to the Sale Hearing. Accordingly, the Debtors request that the form and manner of notice with respect to the Sale process, including

the Sale Notice, be approved and that the Court determine that no other or further notice regarding
the Sale process is required.

## VI.    Assumption and Assignment Procedures

27.    To facilitate the Sale, the Debtors are also seeking approval of Assumption and
Assignment Procedures to facilitate the fair and orderly assumption, assumption and assignment,
or rejection of the Debtors' executory contracts and unexpired leases as may be designated by a
Successful Bidder, subject to the payment of any amounts necessary to cure any defaults arising
under any Assigned Contract (the "***Cure Costs***"):

(a)    **Contracts Schedule and Cure Notice**. No later than September 8, 2025 (the "***Cure Notice Deadline***"), the Debtors shall (i) serve a notice of contract assumption in substantially the form attached to the Bidding Procedures Order as **Exhibit 3** (the "***Cure Notice***"), via first-class mail on all counterparties to all potential contracts or leases that may be assumed and assigned by any Stalking Horse Bidder(s) or any Qualified Bidder(s) in connection with the Sale (the "***Assigned Contracts***") and (ii) shall provide a copy of the Cure Notice to any Stalking Horse Bidder and the Consultation Parties, which copy may be provided via email and to such parties' legal counsel. The Cure Notice shall inform each recipient of the timing and procedures relating to the potential assumption and assignment of the Assigned Contracts to a Successful Bidder or Successful Bidders upon entry of the Sale Order, and, to the extent applicable, (i) Debtors' good faith estimates based on the Debtors' books and records of the Cure Costs (if any) required in connection with the executory contract or unexpired lease, as applicable, (ii) the Contract Objection Deadline, and (iii) the applicable Sale Objection Deadline; *provided, however*, that service of a Cure Notice does not constitute an admission that any contract or lease is an executory contact or unexpired lease, respectively, or that the stated Cure Cost related to any contract or lease constitutes a claim against the Debtors or a right against any Stalking Horse Bidder (all rights with respect thereto being expressly reserved). Further, the inclusion of a contract or lease, as applicable, on the Cure Notice is not a guarantee that such contract or lease, as applicable, will ultimately be assumed and assigned.

(b)    **Cure Payments and Adequate Assurance of Future Performance.** The payment of the applicable Cure Costs by any party, as applicable, shall (i) effect a cure of all monetary defaults existing thereunder and (ii) compensate for any actual pecuniary loss to such counterparty resulting from such default.

(c)    **Modifications**. Until the consummation of a particular Sale Transaction, the Debtors reserve the right, in consultation with the Successful Bidder(s) once selected, and are authorized, but not directed, to (i) designate additional Assigned

Contracts, (ii) eliminate Assigned Contracts from those to be assumed and assigned to a Successful Bidder, or (iii) modify the previously stated Cure Cost associated with any contract or lease identified on a Cure Notice.

(d)     **Supplemental Notice**. To the extent that the proposed assignee of an Assigned Contract was not previously identified in the Cure Notice or in the event that (i) any contract or lease is added or removed from the list of Assigned Contracts or (ii) any previously stated Cure Costs are reduced, the Debtors will promptly, and in any event no later than two days after the Debtors, in consultation with the applicable Stalking Horse Bidder(s), Qualified Bidder(s), or Successful Bidder(s), make such determination, serve a supplemental cure notice (each, a "***Supplemental Cure Notice***") on each impacted counterparty. Each Supplemental Cure Notice will include the same information with respect to the applicable contract or lease as is required to be included in the Cure Notice.

(e)     **Objections**. The deadline to object to the Debtors' proposed Cure Costs is the date that is 14 days after service of the Cure Notice or Supplemental Cure Notice, as applicable (the "***Cure Objection Deadline***"). Following the Auction, the Debtors shall file the Notice of Successful Bidder identifying the Successful Bidder(s) and Backup Bidder(s) (if selected) with respect to each Sale Transaction by 5:00 p.m. (prevailing Central Time) as soon as reasonably practicable after closing of the Auction with respect to such Sale Transaction, if any, and in any event not later than one day after the closing of the Auction. In the event there is no Auction with respect to a Sale Transaction, the Debtors shall file the Notice of Successful Bidder identifying the Successful Bidder on September 19, 2025.The deadline to object *solely* to the identity of the Successful Bidder(s) or adequate assurance of future performance with respect to a counterparty's contract or lease provided by the Successful Bidder(s) is the date that is three days after the filing of the Notice of Successful Bidder (the "***Sale Objection Deadline***"). All objections shall: (1) be in writing, (2) state, with specificity, the legal and factual bases for such objection, (3) if such objection is to the Cure Cost, state with specificity what Cure Cost the counterparty believes is required (in all cases, with appropriate documentation in support thereof), (4) comply with the Bankruptcy Code, the Bankruptcy Rules, the Bankruptcy Local Rules, and all orders of the Court entered in these Chapter 11 Cases, and (5) be filed with the Court and served on the Objection Notice Parties by the applicable objection deadline. Any objections to the assumption and assignment of the Assigned Contracts will be heard at the Sale Hearing (to the extent such hearing has not occurred as of the applicable Cure Objection Deadline) or at a later hearing, as determined by the Debtors. The Debtors further request the ability to settle on a consensual basis any dispute regarding Cure Costs or the assumption or assignment of an Assigned Contract on any basis without further order of the Court.

For the avoidance of doubt, in the event that you receive a Supplemental Cure Notice that either (i) designates your contract or lease as an Assigned Contract for the first time or (ii) increases the previously stated Cure Costs associated with any such contract or lease, the Cure Objection Deadline shall be extended to no later

than 4:00 p.m. (prevailing Central Time) on the date that is 14 days after the filing and service of such Supplemental Cure Notice, solely to the extent such objection relates to the newly-designated Assigned Contract or the increased Cure Cost, as applicable.

(f)    **Reservation of Rights**. The inclusion of an Assigned Contract, or Cure Costs with respect thereto on a Cure Notice or any Supplemental Cure Notice shall not constitute or be deemed a determination or admission by the Debtors or any other party in interest that such Assigned Contract is an executory contract and/or unexpired lease of the Debtors within the meaning of section 365 of the Bankruptcy Code. The Debtors reserve all of their rights, claims, and causes of action with respect to each Assigned Contract listed on the Cure Notice or any Supplemental Cure Notice. The Debtors' inclusion or exclusion of any Assigned Contract on a Cure Notice or any Supplemental Cure Notice shall not be a guarantee that such contract or lease ultimately will or will not be an Assigned Contract.

28.    The Debtors request that unless a counterparty to an Assigned Contract files an objection to the Cure Cost of its Assigned Contract by the Cure Objection Deadline, such counterparty will be (a) deemed to have consented to such Cure Cost, and (b) forever barred and estopped from objecting to the Cure Costs.

29.    The Debtors further request that unless a counterparty to an Assigned Contract files an objection to the proposed assumption and assignment of its Assigned Contract by the Cure Objection Deadline or the Sale Objection Deadline, as applicable, such counterparty shall be (a) deemed to have consented to (i) the assumption and assignment of such Assigned Contract, and (ii) the related relief requested in the Motion, and (b) forever barred and estopped from objecting to the assumption and assignment of the Assigned Contract, adequate assurance of future performance, the relief requested in the Motion, whether applicable law excuses such counterparty from accepting performance by, or rendering performance to, the Buyer for purposes of section 365(c)(1) of the Bankruptcy Code, and from asserting any additional cure or other amounts against the Debtors or the Buyer with respect to such party's Assigned Contract.

**BASIS FOR RELIEF**

I.      **Approval of the Bidding Procedures and Sale Is Appropriate and in the Best Interests of the Debtors' Estates.**

30.      The Debtors have evaluated a number of qualitative and quantitative factors in designing a process that they believe will maximize the value of their estates, produce maximum recoveries, and result in a successful restructuring of their estates. This process includes the Bidding Procedures, which are designed to promote active bidding from seriously interested parties and to elicit the highest or otherwise best offers available for the Assets, including by permitting the Debtors to select one or more Stalking Horse Bidder(s) for the remainder of their Assets. The Bidding Procedures will allow the Debtors to solicit offers and conduct their sale process in a controlled, fair, and open fashion that will encourage participation by financially capable bidders who will offer the best package for the Assets and who can demonstrate the ability to take on the Assets, obligations, and liabilities being transferred. In particular, the Bidding Procedures contemplate an open auction process and provide potential bidding parties with sufficient time, under the circumstances, to perform due diligence and acquire the information necessary to submit a timely and well-informed bid.

31.      Section 363 of the Bankruptcy Code provides that "[t]he trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate[.]" 11 U.S.C. § 363(b)(1). A debtor must demonstrate a sound business justification for the sale or use of assets outside the ordinary course of business. *See, e.g.*, *In re BNP Petrol. Corp.*, 642 F. App'x 429, 434-35 (5th Cir. 2016) (citing *In re Cont'l Air Lines, Inc.*, 780 F.2d 1223, 1226 (5th Cir. 1986) ("[F]or the debtor-in-possession or trustee to satisfy its fiduciary duty to the debtor, creditors and equity holders, there must be some articulated business justification for using, selling, or leasing the property outside the ordinary course of business.")); *see also ASARCO, Inc. v. Elliott*

26

*Mgmt. (In re ASARCO L.L.C.)*, 650 F.3d 593 (5th Cir. 2011) ("Section 363 of the Bankruptcy Code addresses the debtor's use of property of the estate and incorporates a business judgment standard. . . . The business judgment standard in section 363 is flexible and encourages discretion."); *In re Crutcher Res. Corp.*, 72 B.R. 628, 631 (Bankr. N.D. Tex. 1987) ("A Bankruptcy Judge has considerable discretion in approving a § 363(b) sale of property of the estate other than in the ordinary course of business but the movant must articulate some business justification for the sale.").

32.     Additionally, section 105(a) of the Bankruptcy Code provides a bankruptcy court with broad powers in the administration of a case under the Bankruptcy Code. Provided that a bankruptcy court does not employ its equitable powers to achieve a result not contemplated, or prohibited, by the Bankruptcy Code, the exercise of its section 105(a) power is proper. *In re Fesco Plastics Corp.*, 996 F.2d 152, 154 (7th Cir. 1993); *Pincus v. Graduate Loan Ctr. (In re Pincus)*, 280 B.R. 303, 312 (Bankr. S.D.N.Y. 2002). Pursuant to section 105(a), a court may fashion an order or decree that helps preserve or protect the value of the debtor's assets. *See, e.g.*, *Chinichian v. Campolongo (In re Chinichian)*, 784 F.2d 1440, 1443 (9th Cir. 1986) ("Section 105 sets out the power of the bankruptcy court to fashion orders as necessary pursuant to the purposes of the Bankruptcy Code."); *see also In re Cooper Props. Liquidating Tr., Inc*., 61 B.R. 531, 537 (Bankr. W.D. Tenn. 1986) (noting that the bankruptcy court is "one of equity and as such it has a duty to protect whatever equities a debtor may have in property for the benefit of its creditors as long as that protection is implemented in a manner consistent with the bankruptcy laws.").

33.     The Debtors have a sound business justification for marketing and potentially selling the Assets pursuant to a competitive bidding process consistent with the Bidding Procedures. The Bidding Procedures allow for a timely and efficient Auction process, while

satisfying the various notice requirements of the Bankruptcy Rules and providing sufficient time, under the circumstances, for parties in interest to submit objections to the proposed Sale and for bidders to formulate and submit competing proposals.

34.     Further, the Bidding Procedures are being proposed in good faith by the Debtors and were the result of significant, arm's-length negotiations with the Ad Hoc Group, representing a majority of the Debtors' key stakeholders. The Debtors further submit that selection of any Successful Bidder and any Backup Bidder, including the results of the Auction, if any, will be the product of good faith, arm's-length negotiations with respect to the price and other terms of the Sale of the Assets between the Debtors and such Bidder(s).

35.     The Debtors also submit that the Sale timeline and marketing period thereunder is reasonable. As noted above, the Debtors, with the assistance of GLC and their other advisors, developed a reasonable Sale timeline based on the terms of the Transaction Support Agreement, including milestones required by the DIP Lenders and incorporated into the DIP Order. In developing and negotiating the Sale timeline outlined herein, the Debtors and their advisors took various factors into account, including, but not limited to, potential need to navigate complex regulatory review processes (including gaming regulations) in multiple jurisdictions, the time needed to market the Assets, the Debtors' constrained liquidity and reliance on DIP Financing, and the time potential buyers would need to complete diligence and submit final bids.

36.     As set forth above, the Debtors have demonstrated compelling and sound business justifications for a Sale of the Assets pursuant to the Bidding Procedures. The Debtors believe that the marketing and sale process is designed to maximize the value of the Assets for the benefit of the Debtors' estates, creditors, and other stakeholders. The Debtors therefore request that the Court approve the proposed Bidding Procedures and, ultimately, as requested by the Debtors, approve

any Sale Transactions presented to the Court at the Sale Hearing and authorize the Debtors to take

such other steps as are necessary to consummate any such Sale Transactions.

## II.      The Proposed Bid Protections for Stalking Horse Bidders Are Appropriate.

37.     The Debtors have also sought authority, but not direction, to offer the Bid

Protections to one or more Stalking Horse Bidder(s), as the Debtors believe that incentivizing

potential Bidders to serve as Stalking Horse Bidders is beneficial to the process and potentially

value-maximizing. The Bid Protections offered to any Stalking Horse Bidder will be incorporated

into a broader Stalking Horse Purchase Agreement and therefore be the product of good-faith,

arm's-length negotiations between the Debtors and such Stalking Horse Bidder. The Debtors will

seek to negotiate only those Bid Protections necessary to secure a Stalking Horse Bidder's

participation in the proposed Sale.

38.     Courts have acknowledged the approval of break-up fees and expense

reimbursements in connection with substantial sales in bankruptcy is warranted to compensate an

unsuccessful acquirer whose initial offer served as the basis and catalyst for higher or better offers.

*See In re ASARCO, L.L.C.*, 650 F.3d at 597-98, 601-03 & n.9; *see also In re JW Res., Inc.*, 536

B.R. 193, 195-96 (Bankr. E.D. Ky. 2015); *In re Hupp Indus., Inc.*, 140 B.R. 191, 195 (Bankr. N.D.

Ohio 1992). As identified by the *Hupp Indus.* court, courts consider various factors in determining

whether to authorize break-up fees, such as:

(a)     *whether the fee requested correlates with a maximization* of value to the debtor's estate;

(b)     whether the transaction in the negotiated agreement is an arm's-length transaction between the debtor's estate and the negotiating acquirer;

(c)     whether the principal secured creditors are supportive of the concession;

(d)     whether the subject break-up fee constitutes a fair and reasonable percentage of the proposed purchase price;

(e)      the existence of available safeguards beneficial to the debtor's estate; and

(f)      whether there exists a substantial adverse impact upon unsecured creditors, where such creditors are in opposition to the break-up fee.

*In re Hupp Indus.*, 140 B.R. at 194-96; *see also In re JW Res.*, 536 B.R. at 195 (citing with approval *Hupp Industries'* multi-factor test).

39.      To warrant court approval of such break-up fees and expenses, the Fifth Circuit has required a showing that the requested fees and expenses are supported by a sound business justification. *In re ASARCO L.L.C.*, 650 F.3d at 602-03 (favoring business judgment standard governing use of assets outside of the ordinary course of business, rather than the standard for administrative expenses, in assessing propriety of fees and expenses incurred by bidders).

40.      Here, any Bid Protections to be paid under the circumstances will satisfy the foregoing tests because they will be: (a) actual and necessary costs and expenses of preserving the Debtors' estates within the meaning of sections 503(b) and 507(a)(2) of the Bankruptcy Code; (b) commensurate to the real and substantial benefit conferred upon the Debtors' estates by any Stalking Horse Bidder(s); (c) reasonable and appropriate in light of the size and nature of the proposed Sale Transaction(s) and comparable transactions, to the commitments that have been made and the efforts that have been and will be expended by any Stalking Horse Bidder(s); (d) necessary to induce Stalking Horse Bidder(s) to continue to pursue the proposed Sale Transaction(s) and to continue to be bound by the applicable Stalking Horse Agreements; and (e) parties in interest have the right to object and be heard with respect to approval of such Bid Protections in connection with this Motion. *See, e.g.*, *In re Acis Cap. Mgmt., L.P.*, 604 B.R. 484, 520 (N.D. Tex. 2019), *aff'd*, 850 F. App'x 302 (5th Cir. 2021) (noting that 2.3% break-up fee was in line with break-up fees authorized by other courts, and citing cases approving break-up fees ranging from 1% to 3%); *In re ASARCO LLC*, 441 B.R. 813, 827 (S.D. Tex. 2010), *aff'd sub nom.*

30

*In re ASARCO, L.L.C.*, 650 F.3d 593 (5th Cir. 2011) (noting that courts in the Second Circuit have found bid protections totaling less than 3% as falling within "within the range of what courts in [that] jurisdiction have found to be acceptable break-up fees," (quoting *In re Metaldyne Corp.*, 409 B.R. 661, 670 (Bankr. S.D.N.Y. 2009)).

41.     Indeed, the Bid Protections, if any, will enable the Debtors to secure an adequate floor price for the Assets through one or more Stalking Horse Bidder(s), thereby ensuring that competing Bids would be materially higher or otherwise better than the Bids reflected in any Stalking Horse Agreements—a clear benefit to the Debtors' estates. The Debtors will only designate a Stalking Horse Bidder or offer Bid Protections in the event that the Debtors determine that doing so will promote competitive bidding and will not hamper bidding. Thus, the Bid Protections are actual and necessary to preserve the value of the estates. Moreover, it is unlikely any Stalking Horse Bidder(s) would be willing to agree to act in such capacity without being granted the Bid Protections. Without authorization to offer the Bid Protections, the Debtors may lose the opportunity to obtain the highest and best offer for the Assets and would certainly lose the downside protection that will be afforded by the existence of one or more Stalking Horse Bidder(s).

42.     Additionally, any Stalking Horse Bidder(s) will have expended, and will continue to expend considerable time, money, and energy in connection with the proposed Sale Transaction(s) and will engage in extended and lengthy good-faith, arm's-length negotiations if any Qualified Bids are received.

43.     Finally, payment of the Bid Protections in the context of a sale to another purchaser that outbids any Stalking Horse Bidder(s) will not diminish the Debtors' estate to the extent they become payable, as the Bidding Procedures require that any competing Bid must exceed any Stalking Horse Bid(s) by an amount in excess of such Bid Protections.

44.      For all of the foregoing reasons, the Debtors believe that granting any Bid Protections will maximize the value realized for the Assets to the benefit of the Debtors' estates, their creditors, and other parties in interest and should therefore be approved.

## III.     The Purchaser Should Be Granted the Protection of Section 363(m) of the Bankruptcy Code.

45.      Pursuant to section 363(m) of the Bankruptcy Code, a good-faith purchaser is one who purchases assets for value, in good faith, and without notice of adverse claims. *O'Dwyer v. O'Dwyer (In re O'Dwyer)*, 611 Fed. App'x 195, 200 (5th Cir. 2015); *see also In re Mark Bell Furniture Warehouse, Inc.*, 992 F.2d 7, 9 (1st Cir. 1993); *In re Willemain v. Kivitz*, 764 F.2d 1019, 1023 (4th Cir. 1985); *In re Congoleum Corp.*, No. 03-51524, 2007 WL 1428477, *2 (Bankr. D.N.J. May 11, 2007); *In re Abbotts Dairies of Penn., Inc.*, 788 F.2d 143, 147 (3d Cir. 1986) (to constitute lack of good faith, a party's conduct in connection with the sale must usually amount to fraud, collusion between the buyer and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders).

46.      In other words, a party would need to show fraud or collusion between the Successful Bidder(s) and the Debtors or other bidders to demonstrate a lack of good faith. An appropriate characterization of good faith in a bankruptcy sale is a lack of "fraud, collusion between the purchaser and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders." *In re Bleaufontaine, Inc.*, 634 F.2d 1383, 1388 n.7 (5th Cir. 1981) (quoting *In re Rock Indus. Mach. Corp.*, 572 F.2d 1195, 1198 (7th Cir. 1978)).

47.      The Debtors submit that the Successful Bidder(s) arising from the Auction (if any), will be "good faith" purchasers within the meaning of section 363(m) of the Bankruptcy Code and will comply with the Bidding Procedures, and the terms of any Successful Bidder Purchase

Agreement, will be negotiated at arm's-length and in good faith without any collusion or fraud.[13]
Accordingly, at the Sale Hearing to approve any such sale, the Debtors will be prepared to show
that the Purchaser is entitled to the full protections of section 363(m) of the Bankruptcy Code.

## IV.    The Sale of the Debtors' Assets Should Be Free and Clear of Liens and Claims Pursuant to Section 363(f) of the Bankruptcy Code.

48.     Section 363(f) of the Bankruptcy Code permits the Debtors to sell assets free and
clear of all liens, claims, interests, charges, and encumbrances (with any such liens, claims,
interests, charges, charges, and encumbrances attaching to the net proceeds of the sale with the
same rights and priorities therein as in the sold assets). As section 363(f) of the Bankruptcy Code
is stated in the disjunctive, when proceeding pursuant to section 363(f), it is only necessary to meet
one of the five conditions set forth in section 363(f). *In re Nature Leisure Times, LLC*, No. 06-
41357, 2007 WL 4554276, at *3 (Bankr. E.D. Tex. Dec. 19, 2007) ("The language of § 363(f) is
in the disjunctive such that a sale free and clear of an interest can be approved if any one of the
aforementioned conditions contained in § 363(f) are satisfied.").[14] The Debtors believe that they

---

[13]   Section 363(m) of the Bankruptcy Code provides that:

> [t]he reversal or modification on appeal of an authorization under subsection (b) or (c) of this section of a sale or lease or property does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale or lease were stayed pending appeal.

11 U.S.C. § 363(m).

[14]   Section 363(f) of the Bankruptcy Code provides:

The trustee may sell property under subsection (b) or (c) of this section free and clear of any interest in such property of an entity other than the estate, ***only if***—

    (1)  applicable nonbankruptcy law permits sale of such property free and clear of such interest;

    (2)  such entity consents;

    (3)  such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;

    (4)  such interest is in bona fide dispute; **or**

    (5)  such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f) (emphasis added).

will be able to demonstrate at the Sale Hearing that they have satisfied one or more of these conditions.

**V.      The Form and Manner of Notice Should Be Approved.**

49.     Pursuant to Bankruptcy Rule 2002(a), the Debtors are required to provide their creditors with 21 days' notice of the Sale Hearing. Pursuant to Bankruptcy Rule 2002(c)(1), such notice must include the time and place of the Auction and the Sale Hearing and the deadline for filing any objections to the relief requested herein.

50.     The Debtors submit that notice of this Motion and the related hearing to consider entry of the Bidding Procedures Order, together with service of the Sale Notice and other forms of notice under the Bidding Procedures as provided for herein, constitutes good and adequate notice of the Auction, the Sale Hearing, the Sale process, and the proceedings with respect thereto in compliance with, and in satisfaction of, the applicable requirements of Bankruptcy Rules 2002, 6004, and 6006.

**VI.     The Assumption and Assignment of Executory Contracts and Unexpired Leases Should Be Approved.**

51.     To facilitate and effectuate the Sale, the Debtors seek authority to assume and assign or transfer the Assigned Contracts to the Successful Bidder(s) to the extent required by such bidder. Section 365 of the Bankruptcy Code authorizes a debtor to assume and assign its executory contracts and unexpired leases, subject to the approval of the court, provided that the defaults under such contracts and leases are cured and adequate assurance of future performance is provided. 11 U.S.C. § 365. The Debtors' decision to assume or reject an executory contract or unexpired lease must only satisfy the "business judgment rule" and will not be subject to review unless such decision is clearly an unreasonable exercise of such judgment. *See, e.g.*, *In re J.C. Penney Direct Mktg. Servs., L.L.C.*, 50 F.4th 532, 534 (5th Cir. 2022) ("A bankruptcy court reviews a debtor's

decision to assume or reject an executory contract or unexpired lease under the deferential business judgment standard.") (internal citations and quotation marks omitted); *see also Richmond Leasing Co. v. Capital Bank, N.A.*, 762 F.2d 1303, 1309 (5th Cir. 1985) (applying a business judgment standard to debtor's determination to assume unexpired lease). If the debtor's business judgment has been reasonably exercised, a court should approve the assumption or rejection of an unexpired lease or executory contract. *See In re J.C. Penney*, 50 F.4th at 534 (recognizing that "a bankruptcy court should only withhold approval [of the decision to assume or reject an executory contract or unexpired lease] when debtor's judgment is clearly erroneous, too speculative, or contrary to the provisions of the Bankruptcy Code.") (internal citations and quotation marks omitted); *see also Sharon Steel Corp. v. Nat'l Fuel Gas Distrib. Corp.*, 872 F.2d 36, 40 (3d Cir. 1989).

52.     The Debtors also request that any party that fails to object to the proposed assumption and assignment of any Assigned Contract be deemed to consent to the assumption and assignment of the applicable Assigned Contract pursuant to section 365 of the Bankruptcy Code on the terms set forth in the Sale Order, along with the Cure Costs identified in the Cure Notice or the Supplemental Cure Notice, as applicable. *See, e.g.*, *In re Tabone, Inc.*, 175 B.R. 855, 858 (Bankr. D.N.J. 1994) (by not objecting to sale motion, creditor deemed to consent).

53.     To the extent any defaults exist under any Assigned Contract, any such default will be promptly cured or adequate assurance that such default will be cured will be provided prior to assumption and assignment. If necessary, the Debtors will submit information prior to or at the Sale Hearing to show the financial credibility of the Successful Bidder(s), and willingness and ability to perform under the Assigned Contracts. The Sale Hearing will therefore provide the Court and other interested parties with the opportunity to evaluate and, if necessary, challenge the ability

of the Successful Bidder(s) to provide adequate assurance of future performance under the Assigned Contracts, as required under section 365(b)(1)(C) of the Bankruptcy Code.

54.     In addition, the Debtors submit that it is a sound exercise of their business judgment to assume and assign, as the case may be, the Assigned Contracts to the Successful Bidder(s) in connection with the consummation of the Sale, and that the assumption and assignment of the Assigned Contracts is in the best interests of the Debtors, their estates, their creditors, and all parties in interest. The Assigned Contracts that will be assumed and assigned to the Successful Bidder(s) are an integral part of the Assets being acquired by the Successful Bidder(s), and such assumption and assignment is reasonable and will enhance the value of the Debtors' estates. The Court should therefore authorize the Debtors to assume and assign the Assigned Contracts.

55.     The Debtors further submit that the Assumption and Assignment Procedures, including the Cure Notice and any Supplemental Cure Notices, are appropriate and reasonably tailored to provide counterparties to proposed Assigned Contracts with adequate notice of the proposed assumption and assignment as well as proposed Cure Costs, if any. The Debtors believe that implementation of the Assumption and Assignment Procedures is appropriate under the circumstances and should be approved.

**EMERGENCY CONSIDERATION**

56.     Pursuant to Bankruptcy Local Rule 9013-1(i) and the Complex Case Procedures, the Debtors request emergency consideration of this Motion. Given the Debtors' liquidity position and the milestones under the DIP Facility, it is imperative that the Debtors obtain authorization to pursue the postpetition marketing, auction, and sale process (as described herein), and the failure to obtain the relief requested in this Motion by August 18, 2025, would likely result in immediate and irreparable harm to the Debtors, their estates, creditors, and all parties in interest in the Chapter

11 Cases. Accordingly, the Debtors submit that emergency consideration of the Motion is appropriate.

### BANKRUPTCY RULES 6004(h) AND 6006(d)

57.     To implement the foregoing successfully, the Debtors request that the Court waive the 14-day stay of an order authorizing the use, sale, or lease of property pursuant to Bankruptcy Rule 6004(h) and the assumption and assignment of the Assigned Contracts pursuant to Bankruptcy Rule 6006(d). As described above, the relief requested herein is necessary to avoid immediate and irreparable harm to the Debtors. Accordingly, ample cause exists to justify a waiver of the 14-day stay imposed by Bankruptcy Rules 6004(h) and 6006(d).

### NOTICE

58.     Notice of this Motion will be provided to the parties on the Debtors' Master Service List along with the following parties or their respective counsel: (a) all Interested Parties and (b) all parties reasonably known to the Debtors to assert an interest in the assets.

59.     A copy of this Motion is available on (a) the Court's website, at www.txs.uscourts.gov, and (b) the website maintained by the Debtors' Claims and Noticing Agent, Kroll Restructuring Administration LLC, at https://restructuring.ra.kroll.com/RunItOneTime/.

*[Remainder of Page Intentionally Left Blank]*

**WHEREFORE**, the Debtors respectfully request that the Court enter the Bidding Procedures Order granting the relief requested in the Motion and such other and further relief as may be just and proper.

Dated:  August 1, 2025
       Houston, Texas

Respectfully submitted,

*/s/ Timothy A. ("Tad") Davidson II*

**HUNTON ANDREWS KURTH LLP**
Timothy A. ("Tad") Davidson II (Texas Bar No. 24012503)
Ashley L. Harper (Texas Bar No. 24065272)
Philip M. Guffy (Texas Bar No. 24113705)
600 Travis Street, Suite 4200
Houston, TX 77002
Telephone:  (713) 220-4200
Email:  taddavidson@hunton.com
      ashleyharper@hunton.com
      pguffy@hunton.com

- and –

**LATHAM & WATKINS LLP**
Jeffrey E. Bjork (admitted *pro hac vice*)
Helena G. Tseregounis (admitted *pro hac vice*)
Nicholas J. Messana (California Bar No. 332355)
355 South Grand Avenue, Suite 100
Los Angeles, California 90071-1560
Telephone:  (213) 485-1234
E-mail:  jeff.bjork@lw.com
      helena.tseregounis@lw.com
      nicholas.messana@lw.com

- and -

**LATHAM & WATKINS LLP**
Ray C. Schrock (NY Bar No. 4860631)
Andrew Sorkin (NY Bar No. 4597944)
1271 Avenue of the Americas
New York, NY 10020
Telephone: (212) 906-1200
E-mail:  ray.schrock@lw.com
      andrew.sorkin@lw.com

*Proposed Attorneys for the Debtors and
Debtors in Possession*

## CERTIFICATE OF SERVICE

I certify that on August 1, 2025, I caused a copy of the foregoing document to be served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas on those parties registered to receive electronic notices.

_/s/ Timothy A. ("Tad") Davidson II_
Timothy A. ("Tad") Davidson II