**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

---------------------------------------------------------- x
                                           :

In re:                                 :    Chapter 11
                                           :

RUNITONETIME LLC, *et al.*,        :    Case No. 25-90191 (ARP)
                                           :

Debtors.[1]                   :    (Jointly Administered)
                                           :

---------------------------------------------------------- x

**DECLARATION OF MACK F. ROSSOFF IN SUPPORT**
**OF DEBTORS' EMERGENCY MOTION FOR ENTRY OF ORDERS**
**(I) ESTABLISHING BIDDING, NOTICING, AND ASSUMPTION AND**
**ASSIGNMENT PROCEDURES, (II) APPROVING THE SALE OF CERTAIN**
**OR ALL OF THE DEBTORS' ASSETS, AND (III) GRANTING RELATED RELIEF**

I, Mack F. Rossoff, hereby declare as follows:

1.      I am a Senior Advisor of GLC Advisors & Co., LLC and GLC Securities, LLC (together, "**GLC**"), proposed investment banker to RunItOneTime LLC and its debtor affiliates (collectively, the "**Debtors**" or the "**Company**") in the above-captioned chapter 11 cases (the "**Chapter 11 Cases**").

2.      I submit this declaration (this "**Declaration**") in support of the *Debtors' Emergency Motion for Entry of Orders (I) Establishing Bidding, Noticing, and Assumption and Assignment Procedures, (II) Approving the Sale of Certain or All of the Debtors' Assets, and (III) Granting Related Relief* [Docket No. 93] (the "**Bidding Procedures Motion**").[2]

---

[1]   A complete list of the Debtors in the Chapter 11 Cases may be obtained on the website of the Debtors' claims and noticing agent at https://restructuring.ra.kroll.com/RunItOneTime/. The Debtors' mailing address is 12530 NE 144th Street, Kirkland, Washington 98304.

[2]   Capitalized terms used but not defined herein have the meanings given to them in the Bidding Procedures Motion or the *Declaration of Jeff Seery in Support of Chapter 11 Petitions and First Day Relief* [Docket No. 18] (the "**First Day Declaration**").

3.      Except as otherwise indicated, the statements in this Declaration are based on: (a) my personal knowledge of the Debtors' operations and finances; (b) review of relevant documents by me and the GLC team that I supervise; (c) information provided to me by the GLC team that I supervise and other employees of GLC (as defined below); (d) information provided to me and the GLC team that I supervise by members of the Debtors' management team and employees or the Debtors' other advisors; (e) records kept in the ordinary course of business by the Debtors and provided by the Debtors or their representatives to GLC; and (f) my views and beliefs based upon my experience as a restructuring professional. I am authorized to submit this Declaration on behalf of the Debtors. If called upon to testify, I can and will testify competently as to the facts set forth herein.

## BACKGROUND AND QUALIFICATIONS

4.      GLC is a leading independent investment banking firm, with offices in New York, Los Angeles, San Francisco and Denver. GLC is frequently ranked among the top restructuring advisors in the United States by Refinitiv (f/k/a Thomson Reuters). GLC's professionals include those who have previously served as the heads of restructuring and leveraged finance teams at: Credit Suisse First Boston LLC; Donaldson, Lufkin & Jenrette Securities Corporation; Morgan Stanley & Co. International PLC; Smith Barney Inc.; and UBS Investment Bank. GLC is highly qualified to advise on strategic alternatives and its professionals have extensive experience in deals involving complex financial and operational restructurings.

5.      GLC and its professionals have worked with financially troubled companies and their stakeholders in a variety of industries in complex financial restructurings, both in chapter 11 cases and out-of-court proceedings. GLC's professionals have served as advisors to companies, creditors, and other stakeholders in dozens of restructurings, including acting as the investment banker to debtors, creditors, ad hoc groups and creditors' committees.

2

6.      I have a broad range of experience in investment banking assignments, including extensive experience with postpetition marketing processes. Prior to joining GLC, I served as the Managing Director of Rossoff & Company LLC, a boutique investment bank I founded in 2009. Rossoff & Company specialized in gaming assignments. Prior to founding Rossoff & Company, I was a Managing Director in Banc of America Securities, LLC's M&A group. Prior to that, I served as head of M&A at Wit Soundview Group; Head of Global Media and Entertainment Investment Banking at JP Morgan; Head of Investment Banking at Schroder & Co. Inc.; Managing Director and Co-Head of Investment Banking at Dillon Read & Co.; and as an original partner and Co-Head of Investment Banking at Wasserstein Perella & Co. I began my investment banking career with The First Boston Corporation. I have a Bachelors of Arts from Princeton University and a Masters of Business Administration from Harvard Business School.

7.      During the course of my career, I have led over 150 transactions with a value in excess of $50 billion both in chapter 11 cases and out-of-court proceedings. My investment banking experience includes representing debtors, purchasers, potential purchasers, and other significant stakeholders in a number of complex transactions in the gaming industry, including, without limitation, the acquisition of Delaware Park Casino, the sale of Bally's Atlantic City; the sale of Harrah's Louisiana Downs Casino, Racing & Entertainment; the sale of Club Fortune Casino; the sale of Nevada Gold & Casinos, Inc. (NYSE:UWN); the acquisition of Aztar Corporation by Columbia Sussex; the Acquisition of London Clubs by Harrah's Entertainment; and the IPO of Everi Holdings.

8.      In my role as a Managing Director of GLC, I have been closely involved in the Debtors' financing, restructuring, and sale efforts to date. Accordingly, I have personal knowledge of the matters discussed herein, including the business and financial affairs of the Company.

**THE RETENTION OF GLC**

9.       The GLC team that I supervise and I began working with the Debtors in April 2025, as the Company's investment banker. GLC was engaged to lead the Debtors' restructuring process, to provide general restructuring advice to the Company, to aid the Debtors in obtaining debtor-in-possession financing, if necessary, and to pursue a potential restructuring of the Company's business through an investment, sale, or other process.

10.      Through our prepetition services to the Debtors, the GLC team that I supervise and I have developed institutional knowledge regarding, among other things, the Debtors' operations and capital structure. The GLC team that I supervise and I have worked closely with the Debtors' management and other professionals and have become well-acquainted with the Debtors' businesses and operations, debt structure, creditors and related matters, including by (a) working cooperatively with the Debtors' other professionals to explore various strategic alternatives to address the Debtors' liquidity needs; (b) engaging with Debtors' management to understand the Debtors' business and operational goals; (c) reviewing the Debtors' debt and capital structure; (d) evaluating financing options and other potential strategic alternatives; (e) assisting in negotiations related to the Transaction Support Agreement, and (f) preparing for the commencement of the Chapter 11 Cases.

11.      Accordingly, the GLC team that I supervise and I have developed significant relevant experience and expertise regarding the Debtors' businesses that will assist GLC in providing effective and efficient services in connection with the Chapter 11 Cases.

**SALE PROCESS AND POSTPETITION MARKETING**

12.      As described more fully in the First Day Declaration, the Transaction Support Agreement contemplates, among other things, a court-approved sale and marketing process pursuant to section 363 of the Bankruptcy Code for any or all of the Debtors' assets (the "*Assets*").

4

The details regarding the negotiation and entry into the Transaction Support Agreement can be found in the First Day Declaration.

13.     To facilitate the marketing of the Assets, I understand that the Transaction Support Agreement separates Debtors' business operations into three categories: (a) "PokerCo," which is composed of the following Washington card rooms: Aces Poker Lakewood, Aces Poker Mountlake Terrace, Caribbean Casino and Caribbean Cardroom (including any working capital available that is required to operate the businesses), (b) "LeaseCo," which is composed of the properties subject to the Blue Owl Master Lease, and (c) "MainCo," which is composed of the remainder of the Debtors' existing businesses, interests, and tangible and intangible assets.

14.     I understand that the Sale process contemplated by Transaction Support Agreement is also buttressed by a stalking horse bid for the PokerCo assets. Specifically, the Debtors and a designee of the Supporting Shareholder ("*EP BidCo*") intend to enter into a purchase agreement providing for the sale and purchase of PokerCo to EP BidCo for a purchase price of $13 million and such other terms as set forth in the Transaction Support Agreement. I understand that, subject to Court approval of the Bidding Procedures, the Debtors intend to seek approval of the foregoing under the stalking-horse designation procedures set forth in the Bidding Procedures.

15.     In anticipation of commencing the Sale process (the "*Sale Process*") upon approval of the Bidding Procedures, GLC has worked diligently to engage with interested parties, make themselves available for calls with these interested parties upon request, and provide access to preliminary diligence materials with respect to the Debtors' Assets. Specifically, the Sale Process included (a) identifying the Assets, (b) developing marketing materials describing the Assets, their history, their use, and the opportunities the Assets present, (c) creating a virtual data room containing information about the Assets, (d) identifying and contacting potential strategic and

financial buyers for the Assets, (e) facilitating due diligence gathering with potential buyers, and (f) negotiating transaction structures with potential buyers interested in acquiring the Assets.

16.     In connection with its marketing efforts, GLC has contacted 112 prospective strategic and financial buyers that would potentially be interested in pursuing a transaction for the Assets since the Petition Date. GLC has, to date, marketed the following categories of Assets: (a) PokerCo, (b) the MainCo casino assets, comprised of two regional casino resorts in Wendover, Nevada and three casinos and one gas station in Colorado, and (c) "Egads!," the Debtor's custom design, fabrication, and assembly business (which is part of the MainCo segment). Thirty-four of the prospective buyers have executed non-disclosure agreements and were provided marketing materials and granted access to the virtual data room. Of those, 18 prospective buyers are still evaluating a potential acquisition of certain Assets of the Debtor. GLC continues to market the Assets on a postpetition basis pursuant to the Bidding Procedures, including responding to diligence requests, preparing analyses, and facilitating site visits.

17.     As noted above, the focus of GLC's efforts to date has been primarily with respect to the MainCo and PokerCo Assets. I understand that the Debtors are targeting making a determination as to the marketing process for the LeaseCo Assets by August 20, 2025.

## THE DIP FINANCING MILESTONES AND THE SALE TIMELINE

18.     I understand the Debtors anticipate seeking Court approval of additional committed new money DIP financing on a final basis in the coming weeks. The details regarding the marketing of and negotiations related to the Debtors' debtor-in-possession financing can be found in my colleague Michael Sellinger's declaration in support of the DIP Motion [Docket No. 20] (the "***Sellinger Declaration***").[3]

---

[3]     Capitalized terms used but not defined in this section have the meanings provided in the DIP Credit Agreement.

19.     I understand that a material condition of the DIP Lenders' agreement to enter into the DIP Facility is the Debtors' satisfaction of certain milestones (as may be extended by the Required Backstop Lenders in their sole discretion) (the "*Milestones*"). I am informed that the Milestones require the Debtors to conclude the Sale Process (other than obtaining certain gaming regulatory approvals) within 80 days from the Petition Date. Among other things, the Milestones require the Debtors to:

(a)     request a hearing on the Bidding Procedures Motion to occur within 30 days after the Petition Date;

(b)     obtain entry of the Bidding Procedures Order no later than 35 calendar days after the Petition Date, which order will:

(i)     approve the relief requested in the Bidding Procedures Motion,

(ii)    set a bid deadline of no later than 65 calendar days after the Petition Date,

(iii)   require an auction (if applicable) to occur no later than 70 calendar days after the Petition Date, and

(iv)    set a Sale Hearing no later than 75 calendar days after the Petition Date, and

(c)     within 80 calendar days after the Petition Date, satisfy all conditions precedent necessary to consummate a sale of all or substantially all of the Debtors' assets, other than approvals by the Washington, Nevada, and Colorado gaming regulators, unless the Backstop Parties agree to a different disposition of MainCo (as defined in the TSA).

20.     I understand that the failure of the Debtors to achieve the Milestones (a) constitutes an Event of Default under the DIP Documents and the DIP Orders; (b) results in the automatic termination of the Debtors' ability to use Cash Collateral; and (c) permits the DIP Agent to exercise the rights and remedies provided for in the DIP Orders and the DIP Documents.

21.     I am further informed that any extension of the Sale Process by any significant amount of time would likely require additional financing from the DIP Lenders, which they have not committed to provide.

**THE BIDDING PROCEDURES**

22.      GLC has been and is prepared to continue administering a postpetition marketing process consistent with the Proposed Bidding Procedures. I believe, based on my industry experience and familiarity with the Debtors' assets and business and the financing available to the Debtors, that the proposed Bidding Procedures are reasonable and will adequately facilitate an orderly conclusion to the Sale Process and are designed to elicit the highest or otherwise best bid for the Debtors' assets.

23.      I believe the Bidding Procedures are designed to promote active bidding from seriously interested parties and to elicit the highest or otherwise best offers available for the Assets, including by permitting the Debtors to enter into one or more Stalking Horse Bidder(s) for their Assets. I further believe the Bidding Procedures will allow the Debtors to solicit offers and conduct the Sale Process in a controlled, fair, and open fashion and are designed to encourage participation by financially capable bidders who can demonstrate the ability to take on the Assets, obligations, and liabilities being transferred.

24.      I believe the timeline contemplated by the Bidding Procedures is appropriate and reasonable under the circumstances of this case. I further believe that the Bidding Procedures as proposed will allow for a timely and efficient Auction process and provide any competing bidders with sufficient time to formulate and submit competing proposals.

25.      Further, I believe the Bidding Procedures are being proposed in good faith by the Debtors and am informed that they are the result of arm's-length negotiations with the Ad Hoc Group.

I.      **Necessity of the Proposed Timeline**

26.      The Bidding Procedures contemplate a timeline for the Sale Process which the Debtors, in consultation with their advisors, reasonably calculated to provide parties with sufficient

time and information to submit a bid under the circumstances and in light of the Debtors' available financing. Accordingly, I believe that the Sale timeline and marketing period thereunder is reasonable.

27.     In developing and negotiating the Sale timeline, the Debtors and their advisors took various factors into account, including, but not limited to, the potential need to navigate complex regulatory review processes (including gaming regulations) in multiple jurisdictions, the time needed to market the Assets given the nature and circumstances surrounding such Assets, and the time potential buyers would require to complete diligence and submit final bids.

28.     I believe the Sale timeline is appropriate considering the Debtors' constrained liquidity and reliance on DIP Financing. I understand that any extension of the Sale Process that is not in accordance with the DIP Facility without the consent of the requisite DIP Lenders will result in the Debtors' breach of the DIP Facility. I understand that any interruption in access to the funds advanced thereunder or the Debtors' use of cash collateral would immediately compromise the Debtors' ability to operate their businesses and undertake the Sale Process. I am not aware of any actional alternatives to the DIP Facility. I therefore believe that maintaining the Sale timeline as currently proposed is necessary to the success of the Sale Process.

## II.     Designation of Stalking Horse Bidders and Bid Protections

29.     I further understand that the Bidding Procedures Motion also seeks authority for the Debtors to designate one or more Stalking Horse Bidders, to enter into Stalking Horse Purchase Agreements with such Stalking Horse Bidders, and, in the exercise of their business judgment, to offer such Stalking Horse Bidders the Bid Protections.

30.     I believe that having this structure provides the Debtors with flexibility to set the floor from which other Prospective Bidders can submit higher or better offers, and substantially increases the likelihood that the Debtors will receive one or more Qualified Bids that enable the

Debtors to conduct a fair, open, and competitive Auction. In my opinion, having one or more Stalking Horse Bidders, to set a floor price for the Assets, or any applicable subset thereof, could serve to foster competitive bidding, thereby increasing the ultimate purchase price obtained for the Assets that will inure to the benefit of the Debtors' estates and stakeholders.

31.     I also understand that the Bidding Procedures authorize, but do not require, the Debtors to offer the Bid Protections to Stalking Horse Bidders. I understand that the Debtors intend only to offer Bid Protections to the extent that the Debtors, in consultation with their advisors, reasonably believe that such Bid Protections are necessary to induce such Stalking Horse Bidders to set a floor price for the Assets (or subset thereof) to which their bids apply.

32.     I believe that the proposed Bid Protections, which include an Expense Reimbursement and Break-Up Fee, are customary in transactions of this nature and appropriate in the context of these Chapter 11 Cases. Based on my experience in other chapter 11 cases, the amount of the Bid Protections, which is capped at 1.5% of the cash portion of the applicable Transaction Purchase Price for any such Stalking Horse Bid, is at or below the normal and customary range for bid protections offered to stalking horse bidders. Accordingly, I believe the Bid Protections are reasonable and appropriate given the size and complexity of the Assets.

## CONCLUSION

33.     As described above, I believe that, given the circumstances, the Sale Process and the Sale timeline proposed by the Debtors are fair to all parties involved and necessary to maximize the value of the Debtors' assets for the benefit of the Debtors' estates, creditors, and other parties in interest. Further, the Bid Protections will maximize the value received by the Debtors at the Auction, if necessary.

Pursuant to 28 U.S.C. § 1746, I declare under the penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.

Dated: August 13, 2025
New York, New York

*/s/ Mack F. Rossoff*

Mack F. Rossoff