United States Bankruptcy Court
Southern District of Texas

**ENTERED**

August 27, 2025

Nathan Ochsner, Clerk

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

---

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| | : | |
| RUNITONETIME LLC, *et al.*, | : | Case No. 25-90191 (ARP) |
| | : | |
| Debtors.[1] | : | (Jointly Administered) |
| | : | |

---

### FINAL ORDER (I) AUTHORIZING POSTPETITION FINANCING
### AND USE OF CASH COLLATERAL AND (II) GRANTING RELATED RELIEF

Upon the emergency motion (the "***Motion***")[2] of the Debtors, each of which is a debtor and debtor in possession in the above-captioned chapter 11 cases (the "***Chapter 11 Cases***"), pursuant to sections 105, 361, 362, 363, 364, 503, 506, 507, and 552 of title 11 of the United States Code (the "***Bankruptcy Code***"), Rules 2002, 4001, 6003, 6004, and 9014 of the Federal Rules of Bankruptcy Procedure (the "***Bankruptcy Rules***"), Rules 2002-1, 4001-1(b), 4002-1 and 9013-1 of the Bankruptcy Local Rules for the United States Bankruptcy Court for the Southern District of Texas (the "***Local Rules***"), and the Procedures for Complex Chapter 11 Cases (the "***Complex Case Procedures***") promulgated by the United States Bankruptcy Court for the Southern District of Texas, Houston Division (this "***Court***") seeking entry of a final order (together with all exhibits thereto, the "***Final Order***"):

(i)     authorizing, on a final basis, (a) RunItOneTime LLC (the "***Borrower***") to obtain, and each of the Debtors other than the Borrower (collectively, the "***Guarantors***") to guarantee, on a joint and several basis, in each case, a senior secured superpriority postpetition debtor-in-possession financing facility

---

[1]     A complete list of the Debtors in the Chapter 11 Cases may be obtained on the website of the Debtors' proposed claims and noticing agent at https://cases.ra.kroll.com/runitonetime. The relief requested herein is sought for each of the Debtors. The Debtors' mailing address is 12530 NE 144th Street, Kirkland, Washington 98304.

[2]     Capitalized terms used but not defined herein have the meanings given to them in the Motion or the DIP Credit Agreement (as defined herein), as applicable.

(the "***DIP Facility***") composed of new money loans (the "***New Money DIP Loans***")[3] and DIP Rolled-Up Loans (as defined below) to be advanced and made available to the Borrower pursuant to the terms and conditions set forth in the *Credit Agreement* attached hereto as **Exhibit 1** (as the same may be amended, restated, supplemented, waived, or otherwise modified from time to time, the "***DIP Credit Agreement***"), among the Debtors, the lenders party thereto (the "***DIP Lenders***"), and Alter Domus (US) LLC, as administrative agent and collateral agent under the DIP Facility (in such capacities, the "***DIP Agent***" and, together with the DIP Lenders, the "***DIP Secured Parties***"), in an aggregate principal amount of up to $46,510,000 of New Money DIP Loans and the "roll-up" of Prepetition First Out Obligations as set forth below (the "***DIP Commitments***"), which shall consist of:

(a)    an aggregate principal amount of $8,500,000 in New Money DIP Loans, which was made available on an interim basis (the "***First Interim New Money DIP Loans***") upon entry of the First Interim Order and satisfaction of the other applicable conditions to any First Interim New Money DIP Loans;

(b)    an additional aggregate principal amount of $10,500,000 in New Money DIP Loans, which was made available on a further interim basis (the "***Second Interim New Money DIP Loans***" and together with the First Interim New Money DIP Loans, the "***Interim New Money DIP Loans***") upon entry of the Second Interim Order and satisfaction of the other applicable conditions to any Second Interim New Money DIP Loans;

(c)    an aggregate principal amount of New Money DIP Loans in an amount up to $27,510,000, which constitutes the "Acceptable Incremental Amount" as set forth in the DIP Credit Agreement (the "***Final New Money DIP Loans***") upon entry of the Final Order (as defined below) and satisfaction of the Milestones and of the other applicable funding conditions to any Final New Money DIP Loans;

(d)    upon entry of the First Interim Order, a deemed "roll-up" of two dollars of Prepetition First Out Obligations (as defined below) and the aggregate amount of accrued but unpaid interest on such Prepetition First Out Obligations, for each dollar of First Interim New Money DIP Loans (the "***First Interim DIP Rolled-Up Loans***") which First Interim DIP Rolled-Up Loans were deemed borrowings of term loans under the DIP Documents in exchange for cancellation of the respective Prepetition First Out Obligations of the DIP Lenders providing the First Interim New Money DIP

---

[3]    The New Money DIP Loans shall initially be provided by the Fronting Lender and thereafter such New Money DIP Loans shall be assigned by the Fronting Lender to each DIP Lender subject to customary fronting terms set forth in the Backstop Commitment Agreement.  So long as the Fronting Lender is a holder of New Money DIP Loans, the Fronting Lender shall be included in the definition of DIP Lenders and DIP Secured Parties.  For the avoidance of doubt, and notwithstanding anything to the contrary herein, the Fronting Lender, by acting in such capacity, does not make any commitments, undertake any obligations. or waive any rights, including whether to take or not take any action or to exercise or seek to exercise any rights or remedies, in each case in connection with any other claims or interests it may hold against any of the Debtors.

Loans, in each case in accordance with the DIP Documents and the First Interim Order (such deemed funding and exchange, the "***First Interim Roll-Up***");

(e)     upon entry of the Second Interim Order, a deemed "roll-up" of two dollars of (i) Prepetition First Out Obligations (as defined below) and the aggregate amount of accrued but unpaid interest on such Prepetition First Out Obligations or (ii) First Interim DIP Rolled-Up Loans (if such DIP Lender has insufficient Prepetition First Out Obligations to exchange) and the aggregate amount of accrued but unpaid interest on such Interim DIP Rolled-Up Loans, for each dollar of Second Interim New Money DIP Loans (the "***Second Interim DIP Rolled-Up Loans***" and together with the First Interim DIP Rolled-Up Loans, the "***Interim DIP Rolled-Up Loans***") which Second Interim DIP Rolled-Up Loans, upon entry of the Second Interim Order, were deemed borrowings of term loans under the DIP Documents in exchange for cancellation of the respective Prepetition First Out Obligations (now owned or hereafter acquired) or First Interim DIP Rolled-Up Loans of the DIP Lenders providing the Second Interim New Money DIP Loans, in each case in accordance with the DIP Documents and the Second Interim Order (such deemed funding and exchange, the "***Second Interim Roll-Up***" and together with the First Interim Roll-Up, the "***Interim Roll-Up***"); and

(f)     upon entry of the Final Order, a deemed "roll-up" loan tranche of two dollars of (i) Prepetition First Out Obligations and the aggregate amount of accrued but unpaid interest on account of such Prepetition First Out Obligations or (ii) First Interim DIP Rolled-Up Loans (if such DIP Lender has insufficient Prepetition First Out Obligations to exchange) for each dollar of Final New Money DIP Loans (the "***Final DIP Rolled-Up Loans***", and, together with the Interim DIP Rolled-Up Loans, the "***DIP Rolled-Up Loans***" and the DIP Rolled-Up Loans, together with all New Money DIP Loans, collectively, the "***DIP Loans***"), which DIP Rolled-Up Loans, on entry of this Final Order, are authorized to be deemed borrowings in exchange for cancellation of the respective Prepetition First Out Obligations (now owned or hereafter acquired) or First Interim DIP Rolled-Up Loans (if such DIP Lender has insufficient Prepetition First Out Obligations to exchange) of the DIP Lenders providing the Final New Money DIP Loans, in each case in accordance with the DIP Documents (such deemed borrowing, exchange, and cancellation, the "***Final Roll-Up***" and together with the Interim Roll-Up, the "***Roll-Up***");

(ii)    authorizing, on a final basis, the Debtors to execute, deliver, enter into, and perform their respective obligations under (a) the DIP Credit Agreement and (b) any other agreements (including any debtor-in-possession credit agreement), instruments, pledge agreements, mortgages, guarantees, security agreements, intellectual property security agreements, control agreements, financing statements, notes, and documents related thereto, (the foregoing, collectively, as each document may be amended, supplemented, or otherwise modified from time to time in accordance with the terms hereof and thereof, including the DIP Credit Agreement, the DIP

Term Sheet (as defined in the DIP Credit Agreement), the Security Agreement (as defined in the DIP Credit Agreement), the Backstop Commitment Letter (as defined in the DIP Credit Agreement), the Second Interim Backstop Commitment Letter (as defined in the DIP Credit Agreement), the Second Interim Order, the Final Backstop Commitment Letter (as defined in the DIP Credit Agreement), this Final Order, and any other related loan documents, the "***DIP Documents***");

(iii)     authorizing the Debtors to use the proceeds of the DIP Facility in accordance with this Final Order, the DIP Documents, and the Approved Budget (as defined below, subject to Permitted Variances), including (a) to pay certain interest, costs, fees, and expenses related to the Chapter 11 Cases and (b) to fund the working capital needs and expenditures of the Debtors during the Chapter 11 Cases;

(iv)     authorizing the Debtors to use Prepetition Collateral (as defined below), including Cash Collateral (as defined below), subject to the restrictions set forth in the DIP Documents and this Final Order;

(v)     providing adequate protection to the Prepetition Secured Parties (as defined below) of their interests in the Prepetition Collateral (including Cash Collateral);

(vi)     granting to the DIP Agent, for the benefit of the DIP Secured Parties, and authorizing the Debtors to incur, valid, enforceable, non-avoidable, and automatically and fully-perfected DIP Liens (as defined below) in all DIP Collateral (as defined below), including all property constituting Prepetition Collateral, to secure the DIP Obligations (as defined in the DIP Documents), which DIP Liens shall be subject to the Carve-Out (as defined below) and the relative rankings and priorities set forth in this Final Order, and as further set forth on **Exhibit 2**;

(vii)     granting to the DIP Agent, for the benefit of the DIP Secured Parties, and authorizing the Debtors to incur, allowed superpriority administrative expense claims against each of the Debtors, on a joint and several basis, in respect of all DIP Obligations;

(viii)     waiving the equitable doctrine of "marshaling" and other similar doctrines (a) upon entry of the First Interim Order with respect to the DIP Collateral for the benefit of any party other than the DIP Secured Parties and (b) upon entry of this Final Order (but retroactive to the Petition Date), with respect to the Prepetition Collateral for the benefit of any party other than the Prepetition Secured Parties;

(ix)     upon entry of this Final Order (but retroactive to the Petition Date), waiving (a) the Debtors' right to surcharge the DIP Collateral pursuant to section 506(c) of the Bankruptcy Code and (b) the "equities of the case" exception under section 552(b) of the Bankruptcy Code;

(x)     modifying or vacating the automatic stay imposed by section 362 of the Bankruptcy Code or otherwise to the extent necessary to implement and effectuate the terms and provisions set forth in this Final Order and in the DIP Documents, and waiving any applicable stay (including under Bankruptcy Rule 6004) with respect to the effectiveness and enforceability of this Final Order; and

(xi)     granting related relief.

The Court having considered the relief requested in the Motion, the exhibits attached thereto, the *Declaration of Jeff Seery in Support of Chapter 11 Petitions and First Day Relief* [Docket No. 18] (the "***First Day Declaration***"), the *Declaration of Michael Sellinger in Support of the Debtors' Motion to Obtain Postpetition Financing* [Docket No. 20] (the "***First DIP Declaration***"), the *Declaration of Jeff Seery in Support of Debtors' Motion to Obtain Postpetition Financing* [Docket No. 102-6] (the "***Second DIP Declaration***"), the DIP Documents, and the evidence submitted and arguments made at the interim hearings held on July 15, 2025 (the "***First Interim Hearing***") and August 6, 2025 (the "***Second Interim Hearing***" and together with the First Interim Hearing, the "***Interim Hearings***"); and the Court having entered the First Interim Order on July 16, 2025 [Docket No. 65] and the Second Interim Order on August 6, 2025 [Docket No. 110]; and due and sufficient notice of the final hearing to consider entry of this Final Order (the "***Final Hearing***") having been given in accordance with Bankruptcy Rules 2002 and 4001(b), (c), and (d) and all applicable Local Rules; and all objections to the final relief requested in the Motion having been withdrawn, resolved, or overruled by the Court or otherwise consensually resolved between the Debtors, the Creditors' Committee, and the DIP Lenders; and it appearing that the relief requested in the Motion is fair and reasonable and in the best interests of the Debtors and their estates, and essential for the continued operation of the Debtors' businesses and the preservation of the value of the Debtors' assets; and it appearing that the Debtors' entry into the DIP Documents is a sound exercise of the Debtors' business judgment; and after due deliberation and consideration, and good and sufficient cause appearing therefor.

**BASED UPON THE RECORD ESTABLISHED AT THE FINAL HEARING, THE COURT MAKES THE FOLLOWING FINDINGS OF FACT AND CONCLUSIONS OF LAW:[4]**

A.      **Petition Date**.  On July 14, 2025 (the "***Petition Date***"), each Debtor filed a voluntary petition (each, a "***Petition***") under chapter 11 of the Bankruptcy Code with this Court.

B.      **Debtors in Possession**.  The Debtors continue to operate their businesses and manage their properties as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No trustee or examiner has been appointed in any of the Chapter 11 Cases.

C.      **Jurisdiction and Venue**.  This Court has jurisdiction over the Chapter 11 Cases, the Motion, and the parties and property affected hereby pursuant to 28 U.S.C. §§ 157 and 1334.  Venue of the Chapter 11 Cases and the Motion in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409, and this matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).  The predicates for the relief sought herein are sections 105, 361, 362, 363, 364, 503, 506, 507, and 552 of the Bankruptcy Code, Bankruptcy Rules 2002, 4001, 6003, 6004, and 9014, Local Rules 2002-1, 4001-1(b), 4002-1 and 9013-1, and the Complex Case Procedures.

D.      **Committee Formation**.  On July 25, 2025, the United States Trustee for the Southern District of Texas (the "***U.S. Trustee***") appointed an official committee of unsecured creditors in these Chapter 11 Cases pursuant to section 1102 of the Bankruptcy Code (a "***Creditors' Committee***").

E.      **Notice**.  Proper, timely, appropriate, and sufficient notice of the Motion and the Final Hearing has been provided in accordance with the Bankruptcy Code, the Bankruptcy Rules, and

---

[4]      The findings and conclusions set forth herein constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014.  If any of the findings of fact constitute conclusions of law, they are adopted as conclusions of law.  If any of the conclusions of law constitute findings of fact, they are adopted as findings of fact.

the Local Rules, as set forth in the *Affidavits of Service* [Docket Nos. 40, 67, 87] and no other or

further notice of the Motion or the entry of this Final Order shall be required.

F.     **Debtors' Stipulations**.  Without prejudice to the rights of any party in interest, as

set forth in paragraph 30 of this Final Order, and subject to the limitations therein, and in exchange

for and as a material inducement to the Prepetition Secured Parties (as defined below) to agree to

consent to access to cash collateral, and subordination of the Prepetition Liens (as defined below)

to the Carve-Out (as defined below) and DIP Liens (as defined below),the Debtors acknowledge,

admit, stipulate, and agree that:

(i)     **Prepetition Secured Facility**.

(a)     **Prepetition Credit Agreement**.  As of the Petition Date, pursuant to
and in accordance with the *Credit Agreement* dated as of September 3, 2021 (as amended, restated,
amended and restated, supplemented, or otherwise modified from time to time,
the "***Prepetition Credit Agreement***", and, together with all security, pledge and guaranty
agreements and all other documents and instruments executed at any time in connection therewith,
the "***Prepetition Credit Documents***"), between the Borrower, the "Guarantors" (as defined in the
Prepetition Credit Agreement and together with the Borrower, and as set forth on <u>Schedule 1</u>
hereto, the "***Prepetition Loan Parties***"), the lenders party thereto from time to time
(the "***Prepetition Lenders***"), and Alter Domus (US) LLC, as administrative agent and collateral
agent (in such capacities, the "***Prepetition Agent***" and, together with the Prepetition Lenders,
the "***Prepetition Secured Parties***"), the Prepetition Lenders provided the Term Loans (as defined
in    the    Prepetition    Credit    Agreement)    to    the    Prepetition    Obligors
(the "***Prepetition Secured Facility***").

(b)     **Prepetition Secured Obligations**.  As of the Petition Date, the
Prepetition Loan Parties and the "Licensed Operator Guarantor Equity Pledgors" (as defined in the
Prepetition    Credit    Agreement,    and    as    set    forth    on    <u>Schedule 2</u>    hereto,
the "***Prepetition Equity Pledgors***" and, together with the Prepetition Loan Parties,
the "***Prepetition Obligors***") were justly and lawfully liable and indebted to the Prepetition Secured
Parties, without defense, challenge, objection, claim, counterclaim, or offset of any kind, in the
aggregate principal amount of not less than $305,854,469, which consists of not less than, (i)
approximately $77,000,000 in outstanding principal amount of First Out Term Loans (as defined
in the Prepetition Credit Agreement) under the Prepetition Credit Agreement (the "***Prepetition
First Out Obligations***"), (ii) approximately $214,726,510 in outstanding principal amount of
Second Out Term Loans (as defined in the Prepetition Credit Agreement) under the Prepetition
Credit Agreement (the "***Prepetition Second Out Obligations***"), (iii) approximately $202,257 in
outstanding principal amount of Third Out Term Loans (as defined in the Prepetition Credit
Agreement) under the Prepetition Credit Agreement (the "***Prepetition Third Out Obligations***"),
(iv) approximately $13,925,702 in outstanding principal amount of Fourth Out Term Loans (as

defined in the Prepetition Credit Agreement) under the Prepetition Credit Agreement (the "**Prepetition Fourth Out Obligations**" and together with the Prepetition First Out Obligations, the Prepetition Second Out Obligations, and the Prepetition Third Out Obligations, the "**Prepetition Term Loan Obligations**"), *plus*, in each case, any other amounts due and payable under the Prepetition Credit Agreement, including accrued and unpaid interest thereon, premiums, reimbursement obligations, fees, costs, expenses and disbursements, indemnification obligations, guarantee obligations, and other claims under the Prepetition Credit Agreement (collectively, with the Prepetition Term Loan Obligations, the "**Prepetition Secured Obligations**").

(c)       **Prepetition Liens**.  As more fully set forth in the Prepetition Credit Documents, before the Petition Date, to secure the Prepetition Secured Obligations, (i) the Prepetition Loan Parties granted to the Prepetition Agent, for the benefit of the Prepetition Secured Parties, valid, binding, properly perfected, and enforceable first priority continuing liens on and security interests in substantially all of their assets and property (collectively, the "**Prepetition Loan Parties Secured Liens**"), including a first-priority security interest in all of their right, title, and interest in, to, and under all of the "Collateral" as defined in the Prepetition Credit Agreement, and all proceeds, products thereof, and accessions thereto, in each case whether then owned or owing to or thereafter acquired or arising (the "**Prepetition Loan Parties Secured Collateral**") and (ii) the Prepetition Equity Pledgors pledged to the Prepetition Agent, for the benefit of the Prepetition Secured Parties, valid, binding, properly perfected, and enforceable first priority continuing liens on and security interests in all of their right, title, and interest in, to, and under all of the "Pledged Collateral" (as defined in the *Equity Pledge Agreement*, dated as of September 3, 2021 (as may be amended supplemented, or otherwise modified from time to time in accordance with the terms hereof and thereof), collectively, the "**Regulated Equity**" and such liens and security interests, together with the Prepetition Loan Parties Secured Liens, the "**Prepetition Liens**"), and all proceeds, products thereof, and accessions thereto, in each case whether then owned and owing to or thereafter acquired or arising, in each case in clauses (i) and (ii), other than "Excluded Property" (as defined in the Security Agreement (as defined in the Prepetition Credit Agreement)) (together with the Prepetition Loan Parties Secured Collateral, the "**Prepetition Collateral**").

(ii)       **Validity, Perfection, and Priority of Prepetition Liens and Prepetition Secured Obligations**.  (a) The Prepetition Liens are valid, binding, enforceable, non-avoidable, and perfected liens, with priority over any and all other liens, other than liens expressly permitted to be senior to such Prepetition Liens under the Prepetition Credit Documents, and only to the extent such permitted liens were existing, valid, enforceable, properly perfected, and non-avoidable as of the Petition Date or perfected after the Petition Date as permitted by 546(b) of the Bankruptcy Code (collectively, the "**Permitted Prior Liens**"); (b) the Prepetition Secured Obligations constitute legal, valid, binding, and non-avoidable obligations of the Prepetition

Secured Parties, enforceable in accordance with the terms of the Prepetition Credit Documents, and the Prepetition Secured Obligations constitute allowed, secured claims within the meaning of sections 502 and 506 of the Bankruptcy Code; (c) no portion of the Prepetition Liens, the Prepetition Secured Obligations, or any payments made to any Prepetition Secured Party or applied or paid on account of the Prepetition Secured Obligations before or after the Petition Date is subject to any contest, set-off, avoidance, impairment, disallowance, recharacterization, reduction, subordination (whether equitable, contractual, or otherwise), recoupment, recovery, rejection, attack, effect, counterclaims, cross-claims, defenses, or any other challenge or claim (as defined in the Bankruptcy Code) of any kind, any cause of action or any other challenge of any nature under or pursuant to the Bankruptcy Code or any other applicable domestic or foreign law or regulation or otherwise by any person or entity; (d) the Debtors and their estates hold no claims, counterclaims, defenses, setoff rights, or causes of action, including Avoidance Actions (as defined below), of any kind against any of the Prepetition Secured Parties or any of their respective Representatives (as defined below), whether with respect to the Prepetition Secured Obligations and the Prepetition Liens or otherwise; and (e) the Debtors have, on behalf of each of their estates and any party that may try to claim by, through, or on behalf of the Debtors or their estates, disclaimed, waived, discharged and released any right they may have to: (A) challenge the validity, enforceability, priority, security, and perfection of any of the Prepetition Secured Obligations, the Prepetition Credit Documents, or the Prepetition Liens, respectively; and (B) assert any and all claims (as defined in the Bankruptcy Code) or causes of action against any of the Prepetition Secured Parties, and each of their respective officers, directors, equity holders, members, partners, subsidiaries, affiliates, funds, managers, managing members, employees, advisors, principals, attorneys, professionals, accountants, investment bankers, consultants, agents, and other

representatives (in each case, in their respective capacities as such), whether arising at law or in equity, including any recharacterization, subordination, avoidance, or other claim arising under or pursuant to section 105 or chapter 5 of the Bankruptcy Code or applicable state or federal law, in each case, arising out of, based upon or related to the Prepetition Credit Documents, the Prepetition Liens or the Prepetition Secured Obligations, as applicable.  The Prepetition Liens were granted to or for the benefit of the Prepetition Secured Parties for fair consideration and reasonably equivalent value, and were granted contemporaneously with, or covenanted to be provided as inducement for, the making of the loans or the commitments and other financial accommodations secured thereby, or for other accommodations provided by the Prepetition Secured Parties.

(iii)     **No Control**.  None of the Prepetition Secured Parties or DIP Secured Parties control, or have controlled, any of the Debtors or their properties or operations, have authority to determine the way any Debtors' operations are conducted, or are control persons or insiders of the Debtors or any of their affiliates.

(iv)     **No Claims or Causes of Action**. No claims or causes of action held by the Debtors or their estates exist against, or with respect to, the Prepetition Secured Parties or any of their respective Representatives (in each case, in their capacity as such) under or relating to any agreements by and among the Debtors and any Prepetition Secured Party as of the Petition Date. The Debtors have waived, discharged, and released any right to challenge any of the Prepetition Secured Obligations, the priority of the Debtors' obligations thereunder, and the validity, extent, and priority of the Prepetition Liens.

(v)     **Cash Collateral**.  All the Debtors' cash, whether existing as of the Petition Date or thereafter, wherever located (including all cash on deposit or maintained by the Debtors in any account or accounts but subject to paragraph 29), any amounts generated by the sale or other

disposition of Prepetition Collateral, and all income, proceeds, products, rents or profits of any Prepetition Collateral, constitutes or will constitute "cash collateral" of the Prepetition Secured Parties within the meaning of section 363(a) of the Bankruptcy Code (the "**Cash Collateral**").

(vi)     **Indemnification**.  The Prepetition Secured Parties and DIP Secured Parties have acted in good faith, and without negligence or violation of public policy or law, in respect of all actions taken by them in connection with or related in any way to negotiating, implementing, documenting, or obtaining the approval of the DIP Facility and the use of Cash Collateral, including in respect of the granting of the DIP Liens and the Adequate Protection Liens (as defined below), any challenges or objections to the DIP Facility or the use of Cash Collateral, and all documents related to any and all transactions contemplated by the foregoing, including the DIP Documents.  Accordingly, subject only to paragraph 30, the Prepetition Secured Parties  and DIP Secured Parties are entitled to indemnification as provided and to the extent set forth under the DIP Documents; *provided*, that no such Indemnified Parties (as defined in the DIP Documents) will be indemnified for any cost, expense, or liability to the extent determined in a final, non-appealable judgment of a court of competent jurisdiction to have resulted primarily from such parties' gross negligence or willful misconduct, or any other exception set forth in the DIP Credit Agreement.

(vii)     **Debtors' Release**.  The Debtors, on behalf of themselves and their respective estates (including any successor trustee or other estate representative in these Chapter 11 Cases and any party acting by, through, or under any of the Debtors or their estates), hereby absolutely, irrevocably, and unconditionally release, waive, and forever discharge and acquit the DIP Secured Parties, the Prepetition Secured Parties, their respective participants and affiliates, and their former or current officers, partners, directors, managers, members, principals, employees, agents, related

funds, affiliates, investors, financing sources, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, and other professionals and the respective successors and assigns thereof, in each case solely in their capacities as such (collectively, the "***Released Parties***"), from any and all claims, demands, offsets, defenses, counterclaims, set off rights, objections, challenges, causes of action, liabilities, losses, damages, responsibilities, disputes, remedies, actions, suits, controversies, indebtedness, reimbursement obligations (including, attorneys' fees), costs, expenses, or judgments of every type, whether known or unknown, asserted or unasserted, suspected or unsuspected, accrued or unaccrued, fixed or contingent, or pending or threatened, of any kind or nature whatsoever, whether arising under common law, statute, or regulation or by contract or in equity (including any so-called "lender liability" or equitable subordination claims or defenses, recharacterization, subordination, avoidance, any claim or cause of action arising under or pursuant to section 105 or chapter 5 of the Bankruptcy Code or under any other similar provisions of applicable state or federal law, or any other claim or cause of action arising under the Bankruptcy Code or applicable non-bankruptcy law), in each case, arising under, in connection with, or related to the extent, amount, validity, enforceability, priority, security, perfection, and avoidability of the DIP Facility, the DIP Obligations, the DIP Liens, the DIP Documents, the Prepetition Secured Facilities, the Prepetition Secured Obligations, the Prepetition Liens, and the Prepetition Credit Documents, and the obligations owing and the financial obligations made thereunder, the negotiation thereof and of the deal reflected thereby, in each case that the Debtors at any time had, now have or may have, or that their successors or assigns hereafter can or may have against any of the Released Parties for or by reason of any act, omission, matter, cause, or thing whatsoever arising at any time on or before the date of this Final Order, except to the extent such claim, damage, loss, liability, or expense is found in a final non-appealable judgment by a

court of competent jurisdiction to have resulted primarily from such Released Party's actual fraud, gross negligence or willful misconduct. The foregoing release shall not constitute (a) a release of any rights or obligations under the Interim Orders, this Final Order, or under the DIP Documents, or (b) a release of any estate claims or cause of action against the Debtors or their former or current officers, partners, directors, managers, members, principals, employees, agents, related funds, affiliates, investors, financing sources (other than the Released Parties), financial advisors, attorneys, accountants, investment bankers, consultants, representatives, and other professionals and the respective successors and assigns thereof, each in their capacities as such.

G.   **Findings Regarding Postpetition Financing and Use of Cash Collateral**.

(i)   **Good Cause**.  Good and sufficient cause has been shown for the entry of this Final Order and for authorization of the Debtors to obtain financing under the DIP Facility. The execution and delivery of the DIP Documents and the implementation of the DIP Facility are in the best interests of the Debtors and their estates.

(ii)   **Priming of the Prepetition Liens**.  The priming of the Prepetition Liens under section 364(d) of the Bankruptcy Code, as contemplated by the DIP Documents and as provided herein and on **Exhibit 2** hereto, will enable the Debtors to obtain the DIP Facility and to continue to operate their business during the pendency of the Chapter 11 Cases, to the benefit of their estates and creditors. The Prepetition Secured Parties are entitled to receive adequate protection against any aggregate postpetition "decrease in the value" (as that phrase is used in section 361 of the Bankruptcy Code) of the Prepetition Secured Parties' respective liens and interests in the Prepetition Collateral (including Cash Collateral) for any reason allowed under the Bankruptcy Code ("***Diminution in Value***"), as set forth in this Final Order pursuant to sections 361, 362, 363, and 364 of the Bankruptcy Code; *provided* that nothing in this Final Order shall

constitute a finding of Diminution in Value and the Diminution in Value (if any) shall only be determined by the Court after notice and a hearing (for the avoidance of doubt, the rights of the Creditors' Committee and all other parties in interest in respect of whether Diminution in Value has occurred and the extent of the Diminution in Value are reserved).

(iii)      **Need for Postpetition Financing and Use of Cash Collateral**.  The Debtors need the DIP Facility and to continue to use the DIP Collateral, including Cash Collateral, to, among other things, (a) permit the orderly continuation of the operation of their businesses, (b) maintain business relationships with customers, employees, vendors, and suppliers, (c) satisfy other working capital and operational needs, (d) pay professional fees, expenses, and obligations benefitting from the Carve-Out to the extent provided herein, and (e) pay costs, fees, and expenses associated with or payable under the DIP Documents.  The access by the Debtors to sufficient working capital and liquidity through the use of Cash Collateral and other Prepetition Collateral, incurrence of new indebtedness under the DIP Documents, and other financial accommodations provided under the DIP Documents are necessary and vital to the preservation and maintenance of the going concern values of the Debtors.  The terms of the DIP Facility pursuant to the DIP Documents and this Final Order are fair and reasonable, reflect each Debtor's exercise of sound business judgment, and are supported by reasonably equivalent value and fair consideration.

(iv)      **No Credit Available on More Favorable Terms**.  The DIP Facility is the best source of debtor-in-possession financing available to the Debtors under the circumstances. Given their current financial condition, the Debtors have been and continue to be unable to obtain financing and other financial accommodations from sources other than the DIP Lenders on terms more favorable than those provided under the DIP Facility and the DIP Documents.  The Debtors are unable to obtain adequate unsecured credit allowable under section 503(b)(1) of the

Bankruptcy Code as an administrative expense. The Debtors have also been unable to obtain sufficient (a) unsecured credit having priority over that of administrative expenses of the kind specified in sections 503(b), 507(a), and 507(b) of the Bankruptcy Code; (b) credit secured solely by a lien on property of the Debtors and their estates that is not otherwise subject to a lien; or (c) credit secured solely by a junior lien on property of the Debtors and their estates that is subject to a lien. Adequate financing on a postpetition basis on better terms is not available without granting the DIP Agent, for the benefit of the DIP Secured Parties, (1) perfected priming security interests in and liens on (each as provided herein and in the DIP Documents) the DIP Collateral, with the priorities set forth herein; (2) superpriority claims; and (3) the other protections set forth in the Interim Orders and this Final Order.

(v)     **Adequate Protection**. Subject to the reservation of rights of parties in interest set forth in paragraph 20 of this Final Order, the Prepetition Secured Parties are entitled, pursuant to sections 361, 362, 363, 364, 507, and 552(b)(2) of the Bankruptcy Code, to adequate protection ("**_Adequate Protection_**"), as and to the extent set forth in this Final Order, of their interest in all Prepetition Collateral, including Cash Collateral, on account of the Diminution in Value (if any) of the Prepetition Secured Parties' interests in the Prepetition Collateral (including Cash Collateral). Based on the Motion, the First Day Declaration, the DIP Declaration, the Second DIP Declaration, and the record presented to the Court at the Interim Hearings and the Final Hearing, the terms of the proposed adequate protection arrangements and of the use of the Prepetition Collateral (including Cash Collateral) are fair and reasonable, reflect the Debtors' prudent exercise of business judgment, and constitute reasonably equivalent value and fair consideration for the use of the Prepetition Collateral.

(vi)   **Limited Consent**.  The requisite DIP Secured Parties and the requisite Prepetition Lenders have consented to the Debtors' use of Prepetition Collateral (including Cash Collateral), and the Debtors' entry into the DIP Documents and the priming liens granted to the DIP Secured Parties, in each case, in accordance with the Approved Budget (subject to Permitted Variances) and subject to the terms and conditions in this Final Order and the DIP Documents.

(vii)   **Good Faith Pursuant to Section 364(e)**.  Subject to the rights of parties in interest set forth in paragraph 30 of this Final Order (with respect to the Prepetition Secured Parties), the DIP Facility and the use of Prepetition Collateral (including Cash Collateral) were negotiated in good faith and at arm's-length among the Debtors, the DIP Secured Parties, the Prepetition Secured Parties, and their respective advisors.  The Debtors' continued use of Prepetition Collateral (including Cash Collateral) to fund the administration of the Debtors' estates and continued operation of their businesses (including the incurrence and payment of any adequate protection obligations and the granting of adequate protection liens), in accordance with the terms hereof, and the credit to have been extended by the DIP Secured Parties under the DIP Facility shall be deemed to have been so allowed, advanced, made, used and extended in good faith, and for valid business purposes and uses, within the meaning of section 364(e) of the Bankruptcy Code, and in express reliance upon the protections offered by section 364(e) of the Bankruptcy Code. Subject to the rights of parties in interest set forth in paragraph 30 of this Final Order (with respect to the Prepetition Secured Parties), the DIP Secured Parties and the Prepetition Secured Parties (and their successors and assigns) shall be entitled to the full protection of section 364(e) of the Bankruptcy Code if this Final Order or any provision hereof is vacated, reversed, or modified on appeal or otherwise.

(viii)   **Notice of Hearing**.  Notice of the Final Hearing and the relief requested in the Motion has been provided by the Debtors, whether by electronic mail, overnight courier, or hand delivery to certain parties in interest, including the Notice Parties (as defined below) and no other notice is required in connection with the relief set forth in this Final Order.  Based upon the foregoing findings and conclusions, the Motion, and the record before the Court with respect to the Motion, and after due consideration and good and sufficient cause appearing therefor,

   **IT IS HEREBY ORDERED THAT:**

1.   <u>**Final Approval**</u>.  The relief requested in the Motion is authorized and approved, in each case, subject to the terms and conditions set forth in the DIP Documents and this Final Order. All objections to the Motion with respect to the entry of this Final Order that have not been withdrawn, waived, settled, or resolved are hereby denied and overruled.

2.   <u>**Authorization of the DIP Facility and the DIP Documents**</u>.

(a)   The Debtors continue to be expressly authorized without the need for any further corporate action to execute, enter into, and perform all obligations under the DIP Documents, to borrow (as applicable), incur, guarantee, perform and pay the DIP Obligations, to grant security for the payment and performance of the DIP Obligations, and to take any other and further acts related to the performance of the DIP Documents in accordance with, and subject to the terms of this Final Order.  The DIP Documents and this Final Interim Order shall govern the financial and credit accommodations to be provided to the Debtors by the DIP Lenders in connection with the DIP Facility.  The DIP Facility shall be used for all purposes permitted under the DIP Documents and this Final Order, including to (i) provide working capital and pay for other general corporate purposes of the Debtors, (ii) pay administration costs of the Chapter 11 Cases and claims or amounts approved by the Bankruptcy Court, and (iii) consummate the Roll-Up, in each case in

17

accordance with the Approved Budget (subject to Permitted Variances), the Interim Orders, this Final Order, and the DIP Documents.

(b)     Subject to the terms and conditions of this Final Order, the DIP Agent continues to be authorized to execute, enter into, and perform all rights and duties of the DIP Agent under the DIP Documents.

(c)     Upon execution and delivery of the DIP Documents, each of the DIP Documents were and shall constitute valid, binding, and non-avoidable obligations of the Debtors, fully enforceable against the Debtors, their estates, and any successors thereto, including any trustee or other estate representative appointed in the Chapter 11 Cases or any case under chapter 7 of the Bankruptcy Code upon the conversion of these Chapter 11 Cases or in any other proceedings superseding or relating to any of the foregoing and upon the dismissal of any of these Chapter 11 Cases or any such successor cases (each, a "*Successor Case*" and collectively, the "*Successor Cases*"), in accordance with the terms of the DIP Documents and this Final Order.  No obligation, payment, transfer, or grant of security under the DIP Documents, the Interim Orders, or this Final Order to the DIP Secured Parties, or any of their respective representatives shall be stayed, restrained, voidable, or recoverable under the Bankruptcy Code or under any applicable law (including under sections 502(d), 544, 547, and 548 through 550 of the Bankruptcy Code, any applicable Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act, Uniform Voidable Transactions Act, or other similar state statute or common law), or subject to any defense, reduction, recoupment, recharacterization, subordination, disallowance, impairment, cross-claim, claim, or counterclaim.

(d)     No DIP Secured Party shall have any obligation or responsibility to monitor the Debtors' use of the DIP Loans, and each DIP Secured Party may rely upon the Debtors'

representations as to whether the amount of DIP Loans requested at any time and the use thereof are in accordance with the requirements of the Interim Orders, this Final Order, the DIP Documents, and Bankruptcy Rule 4001(c)(2).

3.     **Authorization of the DIP Fees**.  The Debtors are authorized to use the proceeds of the DIP Facility to pay in accordance with the DIP Documents the fees, interest, costs, expenses due or payable under the DIP Documents, including commitment fees, upfront fees, exit fees, backstop fees, or premiums, agency fees, professional fees and expenses (including legal fees and expenses of the DIP Lenders, the DIP Agent, and the Fronting Lender, in each case subject to the notice provisions set forth in paragraph 27 of this Final Order) and any other fees pursuant to the DIP Documents (the "***DIP Fees and Expenses***").

4.     **Approval of Roll-Up**.

(a)     Upon entry of the Interim Orders, the Court authorized the Interim Roll-Up and the First Interim and Second Interim DIP Rolled-Up Loans.  Upon the borrowing of the Final New Money DIP Loans, the Debtors shall be deemed, automatically, and without any further action, to substitute and exchange a subsequent portion of the outstanding Prepetition First Out Obligations (and, in the case of any DIP Lender with insufficient Prepetition First Out Obligations to exchange, the First Interim DIP Rolled-Up Loans) and aggregate amount of accrued but unpaid interest with respect to such Prepetition First Out Obligations or Interim DIP Rolled-Up Loans, as applicable, for term loans under the DIP Documents on a cashless basis in accordance with the Roll-Up and subject to the terms and conditions set forth in the DIP Documents.  Such portion of the Prepetition First Out Obligations or First Interim DIP Rolled-Up Loans and accrued but unpaid interest subject to the Roll-Up shall be deemed substituted and exchanged under this paragraph 4 and deemed indefeasibly prepaid (subject only to paragraph 4(b) below and the rights of parties in interest set

forth in paragraph 30 of this Final Order), and the term loans under the DIP Documents substituted thereby shall be deemed exchanged therefor by each DIP Lender.  The cashless substitution and exchange of Prepetition First Out Obligations or First Interim DIP Rolled-Up Loans and accrued but unpaid interest thereon by "rolling up" such amounts into DIP Obligations in accordance with the Roll-Up as described in this paragraph 4 shall be authorized as compensation for, in consideration for, as a necessary inducement for, and on account of the agreement of the DIP Lenders to fund the New Money DIP Loans and not as adequate protection for, or otherwise on account of, the Prepetition Secured Facility.

(b)     Notwithstanding the foregoing paragraph 4(a) or anything to the contrary in this Final Order, if it is determined by a final, non-appealable order that the Roll-Up resulted in the payment of a portion of Prepetition Secured Obligations that are subject to a successful Challenge (including any successful Challenge relating to the Prepetition Secured Obligations themselves or the Prepetition Liens purportedly securing such Prepetition Secured Obligations), then this Court may unwind or otherwise recharacterize the Roll-Up solely with respect to such portion of Prepetition Secured Obligations, in each case as determined by final order of this Court. If the Roll-Up (or a portion thereof) is subject to a successful Challenge, then the DIP Rolled-Up Loans subject to such Challenge shall be deemed converted into Prepetition First Out Obligations on a pro rata basis in the following order: (i) first, the First Interim DIP Rolled-Up Loans and (ii) second, any Incremental DIP Rolled-Up Loans (as defined in the DIP Credit Agreement); *provided* that the Court's ability to unwind or otherwise recharacterize the Prepetition Secured Obligations and/or the Roll-Up in the event of a successful Challenge shall be fully preserved.  All defenses to any efforts to unwind or otherwise recharacterize the Roll-Up are expressly reserved.

5.     **Authorization to Use Cash Collateral; Budget Covenants**.

(a)     The Debtors are authorized to use Cash Collateral solely in accordance with the Approved Budget and subject to the terms and conditions of the DIP Documents and this Final Order subject to Permitted Variances; *provided* that the Prepetition Secured Parties are granted the Adequate Protection as hereinafter set forth.  Subject to the rights of parties in interest set forth in paragraph 30 of this Final Order, the Prepetition Liens on the Prepetition Collateral shall continue to attach to the Cash Collateral irrespective of the commingling of the Cash Collateral with other cash of the Debtors (if any).  Subject to the rights of parties in interest set forth in paragraph 30 of this Final Order, any failure by the Debtors on or after the Petition Date to comply with the segregation requirements of section 363(c)(4) of the Bankruptcy Code in respect of any Cash Collateral shall not be used as a basis to challenge the Prepetition Secured Obligations, or the extent, validity, enforceability, or perfected status of the Prepetition Liens.   The Debtors' authorization to use Cash Collateral shall end on the Termination Declaration Date in accordance with paragraph 12.

(b)     Any outstanding and undisputed stub rent due in connection with the (i) AG Master Lease and (ii) the *Second Amended & Restated Master Lease* dated July 6, 2023, by and among Project Evergreen WA LLC and Project Evergreen NV Owner LLC, as landlord, and certain Debtors as tenant (as amended, restated, amended and restated, supplemented, or otherwise modified from time to time in accordance with its terms) (the "***Blue Owl Master Lease***") shall be paid within three business days after entry of this Final Order.  Neither this Final Order nor the Approved Budget alters the Debtors' obligations under the Blue Owl Master Lease (including, without limitation, the payment of rent in accordance with the terms of the Blue Owl Master Lease)

or will be deemed to be an assumption or rejection of the Blue Owl Master Lease, and all parties reserve their rights with respect to the foregoing.

(c)     The Debtors have prepared and delivered to the DIP Secured Parties the initial 13-week budget attached to the First Interim Order as <u>Exhibit 3</u> (the "***Initial Budget***"). The Initial Budget was modified, amended, and updated from time to time in accordance with the DIP Documents and once approved in accordance therewith supplemented and replaced the Initial Budget (each modified, amended or updated version of the Initial Budget being a "***Subsequent Budget***" and together with the Initial Budget, without duplication, an "***Approved Budget***"); *provided*, that nothing herein shall be construed to limit the rights of the Creditors' Committee to object to any material amendment, restatement, amendment and restatement, modification, waiver, or supplement to the Approved Budget that is materially adverse to the estates or reduces the amounts allocated to the fees and expenses of the Creditors' Committee's professionals.   The current Approved Budget is attached hereto as **<u>Exhibit 3</u>**. The current Approved Budget reflects the Debtors' minimum cash required to be maintained under applicable Gaming Laws, anticipated cash receipts, operating disbursements, operating cash flow, non-operating disbursements (including restructuring fees and debt servicing), and net cash flow for such 13-week period.   The Debtors believe that the current Approved Budget is reasonable under the facts and circumstances known to them, taken as a whole.   The proceeds of the DIP Facility and the Cash Collateral shall be used solely in accordance with the Approved Budget (subject to Permitted Variances).   The DIP Secured Parties and the Prepetition Secured Parties are relying, in part, upon the Debtors' agreement to comply with limits on cash expenditures in the Approved Budget (subject to Permitted Variances), the other DIP Documents and this Final Order in determining to enter the DIP Facility provided for in this Final Order.

(d)     The Debtors shall only use proceeds of the DIP Facility and expend Cash Collateral and other DIP Collateral proceeds in accordance with the Approved Budget (and in the case of the costs and expenses of the DIP Agent and Prepetition Agent, in accordance with the DIP Documents and this Final Order without being limited by the Approved Budget), subject to the following permitted variances ("**Permitted Variances**") and affirmative covenants, which were tested initially on the first Friday after conclusion of the second full week after the Petition Date (the "**First Testing Date**") and testing the period from the Petition Date through and including, July 27, 2025 (the "**First Testing Period**") and continuing on each Friday thereafter (the date of each such test, a "**Subsequent Testing Date**") and testing the period that is the shorter of (i) the period between the Petition Date and the Friday immediately preceding the Subsequent Testing Date and (ii) the four-week period immediately preceding the Friday immediately preceding the Subsequent Testing Date (such period, the "**Subsequent Testing Period**"): (w) for the First Testing Period and each Subsequent Testing Period, the aggregate total operating, non-operating, and restructuring disbursements of the Debtors (calculated in the same manner as the sum of the "Total Disbursements" in the Approved Budget, including fees and expenses of the Debtors' professionals but excluding the fees and expenses of the DIP Secured Parties' professionals) shall not exceed 115% of the aggregate total budgeted amount of operating, non-operating and restructuring disbursements for such First Testing Period and Subsequent Testing Period, as set forth in the Approved Budget, (x) the sum of all actual cash receipts of the Debtors (calculated in the same manner as the "Total Receipts" in the Approved Budget were calculated) (A) for the First Testing Period shall not be less than 75% and (B) for each Subsequent Testing Period shall not be less than 85%, in either case of the sum of the Total Receipts for such testing period, as set forth in the Approved Budget; and (y) at any time, the Debtors shall not permit aggregate cash and cash

equivalents of the Debtors (taking into account both restricted and unrestricted cash) to be less than $16,000,000.  The foregoing budget-related covenants are collectively referred to herein as the "***Budget Covenants***."

6.    **Carve-Out**.  Subject to the terms and conditions contained in this paragraph 6, each of the DIP Liens and the Prepetition Liens shall be subject and subordinate to payment of the Carve-Out in accordance with the terms of this Final Order.

(a)    For purposes of this Final Order, "***Carve-Out***" means (i) all unpaid fees required to be paid in these Chapter 11 Cases to the Clerk of the Court and to the Office of the United States Trustee under 28 U.S.C. § 1930(a)(6) plus interest pursuant to 31 U.S.C. § 3717 (without regard to the notice set forth in (iii) below); (ii) all reasonable and documented fees and expenses up to $75,000 incurred by a trustee under section 726(b) of the Bankruptcy Code without regard to the notice as set forth in (iii) below; and (iii) to the extent allowed at any time, whether by interim order, procedural order, final order, or otherwise, but subject to final allowance by the Court under sections 327, 328, 330, or 363 of the Bankruptcy Code, the unpaid fees, costs, and disbursements (including any unpaid restructuring or sale fee of any investment bankers if earned and payable as of the Carve-Out Trigger Notice Date pursuant to the terms and conditions of an engagement letter approved by the Court in the Chapter 11 Cases) (the "***Allowed Professional Fees***") of professionals retained by the Debtors in these Chapter 11 Cases (collectively, the "***Debtor Professionals***") and the Creditors' Committee (the "***Committee Professionals***" and, together with the Debtor Professionals, the "***Estate Professionals***") that are incurred at any time before or on the first business day following delivery by the DIP Agent of a Carve-Out Trigger Notice (as defined below) at the direction of the Required DIP Lenders, and are allowed by this Court and remain unpaid after application of any retainers being held by such professionals for

24

each Estate Professional, up to the amounts for such Estate Professional included in the Approved Budget (subject to application of the Permitted Variance) through the date of the Carve-Out Trigger Notice, plus any unpaid restructuring or sale fee of any investment bankers if earned and payable as of the Carve-Out Trigger Notice Date pursuant to the terms and conditions of an engagement letter approved by the Court and not otherwise already included in the Approved Budget (the amounts set forth in the foregoing clauses (i), (ii), and (iii), the "***Pre-Carve-Out Trigger Notice Cap***"); *provided* that the Pre-Carve-Out Trigger Notice Cap shall only include up to $100,000 pursuant to the Investigation Expenses Budget Cap (as defined below); (iv) the Allowed Professional Fees of the Estate Professionals that are incurred after the first business day following delivery of a Carve-Out Trigger Notice by the DIP Agent, in an aggregate amount not to exceed $350,000, to be shared ratably among all holders of Allowed Professional Fees (the amounts set forth in clause (iv), the "***Post-Carve-Out Trigger Notice Cap***" and together with the Pre-Carve-Out Trigger Notice Cap, the "***Carve-Out Cap***").  The term "***Carve-Out Trigger Notice***" shall mean a written notice delivered by email (or other electronic means) by the DIP Agent (at the direction of the Required DIP Lenders) to the Debtors, their lead counsel, the U.S. Trustee, and lead counsel to the Creditors' Committee, which notice may be delivered at any time on or after the Termination Declaration Date (as defined below), expressly stating that the Post-Carve-Out Trigger Notice Cap is triggered.  The term "***Carve-Out Trigger Notice Date***" shall mean the day on which a Carve-Out Trigger Notice is delivered by the DIP Agent to the foregoing parties.

(b)     *Carve-Out Reserve.*  The Debtors shall, on a weekly basis, transfer cash proceeds of the DIP Facility or Cash Collateral into a segregated account for the Estate Professionals (the "***Professional Fees Account***") in the amount equal to the lesser of (i) the good faith estimates of fees accrued by all such professionals for the prior week and (ii) 115% of the

weekly amount included for such professionals in the Approved Budget attached hereto as **Exhibit 3** (subject to compliance with the Budget Covenants).  If any professional's accrued and unpaid fee estimates exceed the amount allocated to such professional in the Professional Fees Account in a given week (an "***Overage***"), then the Debtors may (subject to complying with the Budget Covenants) in any subsequent week transfer cash proceeds to the Professional Fees Account up to 115% of the weekly amount included for such professionals in the Approved Budget (less the professional's fee estimate for such week) to be applied to the prior Overage.  The Professional Fees Account shall be held in trust and used solely to satisfy Allowed Professional Fees, subject to the terms herein (*provided*, that, for the avoidance of doubt, to the extent that after payment in full of any professional based on its allocable portion of the Professional Fees Account pursuant to the Approved Budget, then any excess funds shall be available to pay any professional whose Allowed Professional Fees are over its allocable portion of the Professional Fees Account). On the Carve-Out Trigger Notice Date, the Debtors shall utilize all cash on hand, including funds in the Professional Fees Account, and any available cash thereafter held by any Debtor, to fund a reserve in an amount equal to the Carve-Out Cap, which shall be earmarked and held in trust to pay the beneficiaries of the Carve-Out (the "***Carve-Out Reserve***").  All funds in the Carve-Out Reserve shall be used first to pay the obligations clauses (i)-(iii) in the above definition of "Carve-Out" until paid in full (*provided*, that, for the avoidance of doubt, to the extent that after payment in full of any professional based on its allocable portion of the Professional Fees Account pursuant to the Approved Budget, then any excess funds shall be available to pay any professional whose Allowed Professional Fees are over its allocable portion of the Professional Fees Account), second to pay the obligations in clauses (iv)-(v) in the above definition of "Carve-Out" until paid

in full, third, to pay the DIP Lenders until the DIP Obligations are paid in full, and fourth, to pay the Prepetition Secured Parties until the Prepetition Secured Obligations are paid in full.

(c)     *Payment of Carve-Out on or After the Carve-Out Trigger Notice Date.*  Any payment or reimbursement made on or after the occurrence of the Carve-Out Trigger Notice Date in respect of any Allowed Professional Fees shall permanently reduce the Carve-Out Cap on a dollar-for-dollar basis.

(d)     The amounts in the Carve-Out Reserve shall be available only to satisfy Allowed Professional Fees and other amounts included in the Carve-Out until such amounts are paid in full.  Notwithstanding anything to the contrary herein, the failure of the Carve-Out Reserve to satisfy in full the amount set forth in the Carve-Out shall not affect the priority of the Carve-Out.

(e)     None of the Prepetition Secured Parties or the DIP Secured Parties shall be responsible for funding the Professional Fees Account or the Carve-Out Reserve or be responsible for the payment or reimbursement of any fees or disbursements of any Estate Professional incurred in connection with the Chapter 11 Cases or any Successor Cases.

(f)     Nothing herein shall be construed to (i) impair the ability of any party to object to any of the fees, expenses, reimbursement, or compensation of any professionals or (ii) alter any requirement that an Estate Professional file and serve fee applications or otherwise comply with the Bankruptcy Code, Bankruptcy Rules, Local Rules, or Complex Case Procedures relating to payment of fees and reimbursement of expenses of Estate Professionals, or with any interim compensation order or retention order entered by this Court.

(g)     For the avoidance of doubt, notwithstanding anything to the contrary in this Final Order, the Carve-Out shall be senior to (i) all liens, security interests, and superpriority claims granted hereunder, under the DIP Documents, or the Prepetition Loan Documents and (ii) any and

all other forms of adequate protection, liens, or claims (including, without limitation, the 507(b) Claims) related to the Prepetition Secured Obligations.

7.      **No Obligation to Extend Credit**.  The DIP Secured Parties have no obligation to make any commitment, loan, or advance to any Debtor, other than subject to the terms and in accordance with the terms of the applicable DIP Documents and this Final Order.

8.      **Amendment of the DIP Documents**.  Each of the DIP Documents may from time to time be amended, modified, or supplemented by the applicable parties thereto without further order of the Court if the amendment, modification, or supplement is non-material and in accordance with the DIP Documents.  In the case of a material amendment, modification, or supplement to the DIP Documents made by the parties thereto that is adverse to the Debtors' estates, the Debtors shall provide notice (which shall be provided through electronic mail) to counsel to the Creditors' Committee, the U.S. Trustee, the DIP Agent, the DIP Secured Parties and the Prepetition Secured Parties (collectively, the "***Notice Parties***"), each of whom shall have five (5) business days from the date of such notice (the "***Amendment Notice Period***") to object in writing to such amendment, modification, or supplement, it being understood that waivers for the benefit of the Debtors and extensions of any Milestones (as defined below) and similar deadlines will not be considered "material" for purposes hereof, and may become immediately effective.  If no objection from a Notice Party to the amendment, modification, or supplement is timely received during the Amendment Notice Period (or if all Notice Parties otherwise acknowledge that they have no objection to such amendment, modification, or supplement before the expiration of the Amendment Notice Period), then the Debtors may proceed to immediately execute the amendment, modification, or supplement.  If a Notice Party timely objects to such amendment, modification, or supplement, and such objection is not subsequently consensually resolved, then

approval of the Court (which may be sought on an expedited basis) will be necessary to effectuate the amendment, modification, or supplement.  Any material amendment, modification, or supplement that becomes effective in accordance with this paragraph 8 shall be filed with the Court.

9.      **DIP Superpriority Claims**.  Subject and subordinate to the Carve-Out, effective as of entry of the First Interim Order, continuing by the Second Interim Order, and as continuing through and ratified by this Final Order, pursuant to section 364(c)(1) of the Bankruptcy Code, all of the DIP Obligations shall constitute allowed superpriority administrative expense claims of the DIP Agent for the benefit of the DIP Secured Parties against the Debtors on a joint and several basis (without the need to file any proof of claim or request for allowance or payment of administrative expenses) with priority as set forth in **Exhibit 2** and otherwise over any and all claims against each of the Debtors, now existing or hereafter arising, of any kind whatsoever, including all administrative expenses of the kind specified in sections 503(b) and 507(b) of the Bankruptcy Code and any and all administrative expenses or other claims arising under sections 105, 326, 328, 330, 331, 365, 503(b), 506(c), 507(a), 507(b), 726, 1113, or 1114 of the Bankruptcy Code (including the Adequate Protection Obligations), whether or not such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy, or attachment, or otherwise, which allowed claims (the "***DIP Superpriority Claims***") shall for purposes of section 1129(a)(9)(A) of the Bankruptcy Code be considered administrative expenses allowed under section 503(b) and 507(a)(2) of the Bankruptcy Code, and which DIP Superpriority Claims shall be payable from and have recourse to all prepetition and postpetition property of the Debtors and all proceeds thereof in accordance with the DIP Documents and this Final Order ((a) excluding Avoidance Actions (as defined below) but including the proceeds of Avoidance

Actions (the "***Avoidance Proceeds***") and (b) excluding any claims or causes of action against the Prepetition Secured Parties and their officers, directors, equity holders, members, partners, subsidiaries, affiliates, funds, managers, managing members, employees, advisors, principals, attorneys, professionals, accountants, investment bankers, consultants, agents, and other representatives (in each case, solely in their respective capacities as such) (collectively, the "***Lender Claims***") but including the proceeds of the Lender Claims (the "***Lender Claims Proceeds***")), and subject only to the liens on such property and the Carve-Out as set forth in this Final Order and the DIP Documents; *provided* that for the avoidance of doubt but subject to paragraph 17 of this Final Order, DIP Liens, DIP Superpriority Claims, DIP Obligations, Adequate Protection Liens, 507(b) Claims, and Adequate Protection Obligations shall be payable from and have recourse to the Avoidance Proceeds and the Lender Claims Proceeds; *provided*, *further*, that the DIP Superiority Claims and DIP Obligations shall not have recourse to the Professional Fees Account or the Carve-Out Reserve.

10.   **DIP Liens**.

(a)   As security for the DIP Obligations, subject and subordinate to the Carve-Out, the DIP Agent, for the benefit of the DIP Secured Parties was granted, by the First Interim Order, and continues to be granted (effective and perfected upon the date of entry of the First Interim Order and without the necessity of the execution, recordation, or filing by the Debtors or the DIP Agent of mortgages, security agreements (including intellectual property security agreements), lockbox or control agreements, pledge agreements, financing statements, or any other instruments and without the necessity of possession or control by the DIP Secured Parties) valid, binding, enforceable, non-avoidable, and automatically and properly perfected liens and security interests (the "***DIP Liens***") in all property consisting of DIP Collateral (as defined below), as

collateral security for the prompt and complete performance and payment when due (whether at the stated maturity, by acceleration or otherwise) of all DIP Obligations, subject to the rankings and priorities set forth below and on **Exhibit 2** hereto:

(i)      **Liens on Unencumbered Assets**.  As security for the DIP Obligations, immediately upon, and effective as of, entry of the First Interim Order, as continuing through and ratified by this Final Order, the DIP Agent, for the benefit of itself and each of the other DIP Secured Parties, pursuant to section 364(c)(2) of the Bankruptcy Code, were and hereby are granted DIP Liens on all DIP Collateral, that, on or as of the Petition Date, is not subject to (i) a valid, perfected, and non-avoidable lien or (ii) a valid and non-avoidable lien in existence as of the Petition Date that is perfected after the Petition Date as permitted by section 546(b) of the Bankruptcy Code (the "**Unencumbered Assets**");

(ii)      **DIP Priming Liens**.  Pursuant to section 364(d)(1) of the Bankruptcy Code, as security for the DIP Obligations, immediately upon, and effective as of, entry of the First Interim Order, as continuing through and ratified by this Final Order, the DIP Agent, for the benefit of itself and each of the other DIP Secured Parties, were and hereby are granted a valid, binding, continuing, enforceable, nonavoidable, fully-perfected first-priority priming security interest (subject only to the Carve-Out and the priorities set forth on **Exhibit 2**) in and lien on the DIP Collateral constituting Prepetition Collateral (the "**DIP Priming Liens**"), which shall be (a) subject and subordinate to the Carve-Out in all respects, (b) subject to Permitted Prior Liens, (c) solely with respect to the Regulated Equity held by the Prepetition Equity Pledgors, shall not become effective as to such Regulated Equity until compliance with Nevada Gaming Control Act, the Regulations of the Nevada Gaming Commission and Nevada Gaming Control Board, the Colorado Limited Gaming Act, and the Rules of the Colorado Limited Gaming Control Commission (collectively, the "**Gaming Laws**"), and (d) senior in all respects to the Prepetition Liens, the Adequate Protection Liens, and any lien, security interest, or mortgage that is avoided and preserved for the benefit of the Debtors and their estates under section 551 of the Bankruptcy Code.  The Prepetition Liens shall be primed by and made subject and subordinate to the Carve-Out, the DIP Priming Liens, and the Adequate Protection Liens only; and

(iii)      **DIP Junior Liens**.  Pursuant to section 364(c)(3) of the Bankruptcy Code, as security for the DIP Obligations, immediately upon, and effective as of, entry of the First Interim Order, as continuing through and ratified by this Final Order, the DIP Agent, for the benefit of itself and each of the other DIP Secured Parties, were and hereby are granted continuing, valid, binding, enforceable, nonavoidable, and automatically and properly perfected security interests in and liens upon all DIP Collateral that is subject to Permitted Prior Liens, which security interests and liens in favor of the DIP Agent shall be in accordance with the priorities set forth on **Exhibit 2** including (a) the Carve-Out and (b) the Permitted Prior Liens; *provided*, that nothing in this Final Order will be construed as a stipulation, finding or acknowledgment of the existence, validity, enforceability or priority of any actual or purported Permitted Prior Liens, and all rights of the Debtors, the DIP

Secured Parties and the Prepetition Secured Parties with respect to such matters are fully reserved.

(iv)    **DIP Collateral**.   The term "***DIP Collateral***" means the Debtors' interest in all assets and properties (whether tangible, intangible, real, personal or mixed), whether now owned by or owing to, or hereafter acquired by, or arising in favor of, the Debtors (including under any trade names, styles, or derivations thereof), and whether owned or consigned by or to, or leased from or to, the Debtors, and regardless of where located, including all of the Debtors' rights, title and interest in: (i) all Prepetition Collateral; (ii) all cash and cash equivalents; (iii) as to the "OpCo Debtors" listed on Schedule 1 hereto, all gaming devices as contemplated by the Nevada Revised Statute 463.0155 and Colorado Code of Regulations Section 44-30-103(13), along with all non-gaming assets; (iv) all rent proceeds payable to the "PropCo Debtors" set forth on Schedule 1 under the (A) Lease, dated March 28, 2019, by and between Maverick Wendover LLC and Red Garter Operator, LLC, (B) Lease, dated March 28, 2019, by and between Maverick Wendover LLC and Wendover Nugget Operator, LLC, (C) Lease, dated May 31, 2019, by and between Maverick Elko LLC and Gold Country Operator LLC, (D) Lease, dated May 31, 2019, by and between Maverick Elko LLC and Red Lion Operator LLC, (E) Lease, dated December 11, 2019, by and between Maverick Z Casinos LLC and Grand Z Casino Operator LLC, (F) Lease, dated December 11, 2019, by and between Maverick Z Casinos LLC and Z Casino Black Hawk Operator LLC, and (G) Lease, dated December 11, 2019, by and between Maverick Z Casinos LLC and Johnny Z Casino Operator, LLC (together with the leases listed in the foregoing clauses (A) through (F), the "***Operator Leases***"); (v) all funds in any deposit account, securities account or other account of the Debtors and all money, cash, cash equivalents, instruments and other property deposited therein or credited thereto from time to time; (vi) all accounts and other receivables; (vii) all contract rights; (viii) all instruments, documents and chattel paper; (ix) all securities (whether or not marketable); (ix) all goods, as-extracted collateral, furniture, machinery, equipment, inventory, and fixtures; (x) all real property interests; (xi) the Debtors' interests in leaseholds and the Debtors' interests in the proceeds of any leaseholds (and excluding the underlying leased property), (xii) all franchise rights; (xiii) all patents, tradenames, trademarks (other than intent-to-use trademarks), copyrights, licenses, and all other intellectual property; (xiv) all general intangibles, tax or other refunds, or insurance proceeds; (xv) all equity interests, capital stock, limited liability company interests, partnership interests and financial assets; (xvi) all investment property; (xvii) all supporting obligations of any of the foregoing; (xviii) all letters of credit issued to the Debtors and letter of credit rights; (xix) all commercial tort claims; (xx) all other claims and causes of action and the proceeds thereof; (xxi) all books and records (including customers lists, credit files, computer programs, printouts and other computer materials and records); and (xxii) all proceeds and products of each of the foregoing and all accessions to, substitutions and replacements for, and rents, profits and products of, each of the foregoing including the Avoidance Proceeds and Lender Claims Proceeds; *provided*, that the term "DIP Collateral" shall not include (a) the Professional Fees Account and any amounts held therein; (b) the Carve-Out Reserve and any amounts held therein; (c) claims and causes of action under sections 502(d), 544, 545, 547, 548, 549, 550, or 553 of the Bankruptcy Code, or any other avoidance actions under the Bankruptcy Code or applicable state law equivalents (collectively, the "***Avoidance Actions***"); (d) the Lender Claims; and

(e) the Excluded Assets (as defined in the DIP Documents); *provided, however*, that the DIP Collateral shall include the proceeds of the items described in clauses (c) through (e).

(b)    Other than as set forth herein (including with respect to the Carve-Out), the DIP Liens shall not be made subject to or *pari passu* with any lien or security interest heretofore granted in the Chapter 11 Cases or any Successor Case.  The DIP Liens shall be valid and enforceable against any trustee or estate representative appointed in the Chapter 11 Cases or any Successor Case, upon the conversion of any of the Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code (or in any other Successor Case), or upon the dismissal of any of the Chapter 11 Cases or any Successor Case.

11.    **Modification of Automatic Stay**.  The automatic stay imposed under section 362(a) of the Bankruptcy Code is hereby modified as necessary to effectuate all of the terms and provisions of this Final Order, including to: (a) permit the Debtors to grant the DIP Liens, Adequate Protection Liens, and DIP Superpriority Claims; (b) permit the Debtors to perform such acts as the DIP Secured Parties or the Prepetition Secured Parties, as applicable, may reasonably request to assure the perfection and priority of the liens granted herein; (c) permit the Debtors to incur all liabilities and obligations to the DIP Secured Parties and the Prepetition Secured Parties under the DIP Documents, the DIP Facility, and this Final Order, as applicable; (d) permit the DIP Secured Parties to exercise their rights, including, subject to the terms of this Final Order, remedies against the Debtors and their Collateral in the event of a Default or Event of Default under the DIP Documents; and (e) authorize the Debtors to pay, and the DIP Secured Parties and Prepetition Secured Parties to retain and apply, payments made in accordance with the DIP Documents.

12.    **Termination of DIP Facility and Use of Cash Collateral**.

(a)    Except for payment of the Carve-Out as provided in this Final Order, the DIP Secured Parties may enforce all of their rights, consistent with the Bankruptcy Code and applicable

Gaming Laws, under the applicable DIP Documents (subject to this paragraph 12) without further order of, or application to, the Court upon the occurrence of an Event of Default on which written notice of the occurrence of such an Event of Default is given by the DIP Agent (upon instruction from the Required DIP Lenders) to counsel to the Debtors, the U.S. Trustee, and counsel to the Creditors' Committee appointed in the Chapter 11 Cases (the "***Default Notice***") and filed on the docket of the Chapter 11 Cases, but not before the expiration of five (5) business days after the delivery and filing of such Default Notice in accordance with the foregoing (such period, being the "***Remedies Notice Period***"), unless such occurrence and continuation of an Event of Default is cured before the expiration of the Remedies Notice Period.

(b)     During the Remedies Notice Period, the Debtors (x) may use Cash Collateral in accordance with the Approved Budget to pay payroll obligations (other than severance), sales tax, and other necessary expenses that are agreed between the Debtors and the DIP Agent (acting at the direction of the Required DIP Lenders) in writing (email being sufficient); (y) are prohibited from requesting any further advances under the DIP Facility; and (z) may cure any Event of Default.  During the Remedies Notice Period, the Debtors, the Creditors' Committee, and any party in interest shall be entitled to seek an emergency hearing with the Court during the Remedies Notice Period for the purpose of (i) contesting whether, in fact, an Event of Default has occurred and is continuing or (ii) obtaining non-consensual use of Cash Collateral; *provided*, that if such hearing cannot be held before the expiration of the Remedies Notice Period, then the Remedies Notice Period shall be automatically extended through the conclusion of such hearing but in no event later than ten (10) business days after delivery of the Default Notice unless ordered otherwise by the Court; *provided*, *further*, that nothing herein shall alter the evidentiary burden with respect

to any termination of the automatic stay or limit the range of remedies that the Court may order upon default.

(c)     Upon expiration of the Remedies Notice Period and following a hearing regarding the Stay Relief Motion (as defined below), the DIP Agent, on behalf of and acting at the direction of the Required DIP Lenders shall, subject to the Carve-Out and consistent with the Bankruptcy Code and applicable Gaming Laws and non-bankruptcy law, be permitted to exercise all remedies set forth herein, in the DIP Documents, and the Prepetition Credit Documents, as applicable, and as otherwise available at law without further order or application or motion to the Court, including: (i) declaring the termination, reduction, or restriction of any further DIP Commitment to the extent any such DIP Commitment remains, (ii) declaring all DIP Obligations to be immediately due, owing, and payable, without presentment, demand, protest, or other notice of any kind, all of which are expressly waived by the Debtors, notwithstanding anything herein or in any DIP Document to the contrary, (iii) declaring the termination of the applicable DIP Documents as to any future liability or obligation of the DIP Secured Parties (but, for the avoidance of doubt, without affecting any of the DIP Liens or the DIP Obligations), and (iv) declaring the termination, reduction, or restriction on the ability of the Debtors to use Cash Collateral (any such declaration of the foregoing (i) through (iv) provided in writing by the DIP Agent (upon instruction from the Required DIP Lenders) to counsel to the Debtors, the U.S. Trustee, and counsel to the Creditors' Committee appointed in the Chapter 11 Cases, a "***Termination Declaration***" and the date of such Termination Declaration, the "***Termination Declaration Date***").  On and after the Termination Declaration Date and other than as required by paragraph 6 of this Final Order with respect to the Carve-Out: (A) the Debtors shall be prohibited from requesting any further draws of DIP Loans under the DIP Facility; (B) all DIP Obligations

shall be immediately due and payable, all commitments to extend credit under the DIP Facility will terminate, and all treasury and cash management, hedging obligations, and bank product obligations shall be cash collateralized; (C) all authority to use Cash Collateral shall cease; and (D) upon satisfaction of the Carve-Out funding obligations set forth in paragraph 6, the DIP Secured Parties shall be entitled to exercise rights and remedies under the DIP Documents in accordance with this Final Order and applicable Gaming Laws and non-bankruptcy law.

(d)    Prior to exercising any remedies, the DIP Agent shall be required to file a motion with the Court seeking emergency relief (the "**Stay Relief Motion**") on no less than five (5) business days' written notice, which notice period may be concurrent with the Remedies Notice Period, to (i) the Court, (ii) counsel for the Debtor, (iii) counsel for the Creditors' Committee, and (iv) the U.S. Trustee for a further order of the Court modifying the automatic stay in the Chapter 11 Cases to permit the DIP Agent on behalf of and acting at the direction of the Required DIP Lenders, to exercise the rights and remedies against the Prepetition Collateral or DIP Collateral, including foreclosing upon and selling all or a portion of such collateral.   Upon the Court's ruling on the Stay Relief Motion, the Court may fashion an appropriate remedy upon a determination that an uncured Event of Default exists beyond any remedies period, including that the DIP Agent shall be entitled to exercise all rights and remedies with respect to the Prepetition Collateral or DIP Collateral provided for in this Final Order, as permitted by the Court.

13.    **Proceeds of Subsequent Financing**.  If the Debtors, their estates, any trustee, any examiner with enlarged powers, or any responsible officer subsequently appointed in any of the Chapter 11 Cases or any Successor Cases shall obtain credit or incur debt pursuant to sections 364(b), (c), or (d) of the Bankruptcy Code in violation of this Final Order or the DIP Documents (such credit or debt, the "**Subsequent Financing**") at any time before the repayment

in full in cash of all of the DIP Obligations, the satisfaction of the DIP Superpriority Claims and the Adequate Protection Claims (subject to the reservation of rights of parties in interest set forth in paragraph 20 of this Final Order), and the termination of the DIP Lenders' commitments to extend credit under the DIP Documents, then all cash proceeds up to the amount of the DIP Obligations derived from such Subsequent Financing shall immediately be turned over to the DIP Agent to be applied to the DIP Obligations pursuant to the DIP Documents and in the priorities set forth herein.  For the avoidance of doubt, none of the Prepetition Secured Parties or DIP Secured Parties consent to the priming of the Prepetition Liens or the DIP Liens resulting from any Subsequent Financing.

14.     **Credit Bidding**.  The Prepetition Secured Parties and the DIP Secured Parties shall, subject to the rights of parties in interest set forth in paragraph 30 (including, without limitation, with respect to any credit bid of the Roll-Up), the DIP Documents, the Prepetition Credit Documents, and the priority of liens and claims set forth herein, be authorized to credit bid, consistent with the applicable DIP Documents and Prepetition Credit Documents, up to the full amount of the outstanding Prepetition Secured Obligations and DIP Obligations, as applicable, in any sale or disposition of Prepetition Collateral or DIP Collateral (each, a "***Credit Bid***") subject to section 363(k) of the Bankruptcy Code, and the provision of cash consideration sufficient to satisfy the Carve-Out and any senior liens on the collateral that is subject to the Credit Bid except to the extent otherwise agreed by the holder of such senior lien in their sole and absolute discretion; *provided* that if the Creditors' Committee commences a timely Challenge before the Bid Deadline (as defined in the Sale Procedures Order) in accordance with paragraph 30 of this Final Order, then the Prepetition Secured Parties will not be permitted to credit bid on the assets subject to such timely Challenge (but will be permitted to credit bid for all other assets constituting the Prepetition

Collateral that is not subject to a timely Challenge) until such time that the Challenge has been resolved by the Court or as agreed by the parties. The Prepetition Secured Parties and DIP Secured Parties shall each be deemed a "qualified bidder" with respect to their rights to acquire all or any of the Prepetition Collateral and DIP Collateral by Credit Bid.

15.     **Surcharging Collateral**.   Subject to and effective only upon entry of this Final Order providing for such relief (but retroactive to the Petition Date), without limiting the scope of the Carve-Out, no costs or expenses of administration of these Chapter 11 Cases or any Successor Cases or future proceeding that may result therefrom, including liquidation in bankruptcy or other proceedings under the Bankruptcy Code, shall be charged against or recovered from the DIP Collateral or the Prepetition Collateral (including Cash Collateral), the DIP Secured Parties, or the Prepetition Secured Parties pursuant to section 506(c) of the Bankruptcy Code or any similar principle of law, without the prior written consent of the requisite DIP Secured Parties and the requisite Prepetition Secured Parties, as applicable, and no consent shall be implied from any other action, inaction, or acquiescence by the DIP Secured Parties or the Prepetition Secured Parties, as applicable, and nothing contained in the Interim Orders or this Final Order shall be deemed to be a consent by the DIP Secured Parties or the Prepetition Secured Parties to any charge, lien, assessment, or claims against the DIP Collateral or the Prepetition Collateral under section 506(c) of the Bankruptcy Code or otherwise.  For the avoidance of doubt and notwithstanding anything to the contrary herein or in the DIP Documents, the Creditors' Committee's right to object to any proposed sale of estate assets that is expected to leave the estate administratively insolvent is fully preserved and is not prejudiced by entry of this Final Order; *provided* that nothing in this DIP Order will be interpreted to require any Credit Bid to pay or satisfy any administrative expense claims.

16.     **Section 552(b) of the Bankruptcy Code**.  The DIP Secured Parties and Prepetition Secured Parties shall each be entitled to all of the rights and benefits of section 552(b) of the Bankruptcy Code and upon entry of this Final Order (but retroactive to the Petition Date), in no event shall the "equities of the case" exception in section 552(b) of the Bankruptcy Code apply to the Prepetition Secured Parties with respect to proceeds, products, offspring, or profits of any Prepetition Collateral; *provided*, that nothing in this paragraph shall prejudice the rights of any party in interest (including the Creditors' Committee) under paragraph 30 of this Final Order, including, without limitation, the right to Challenge what constitutes, or does not constitute, proceeds, products, offspring, and profits of Prepetition Collateral.

17.     **Marshaling**.  The DIP Secured Parties will not be subject to the equitable doctrine of "marshaling" or any other similar doctrine with respect to any of the DIP Collateral and, upon entry of this Final Order (but retroactive to the Petition Date), none of the Prepetition Secured Parties shall be subject to the equitable doctrine of "marshaling" or any similar doctrine with respect to the Prepetition Secured Obligations or the Prepetition Collateral; *provided*, that, notwithstanding anything otherwise to the contrary in the First Interim Order, the Second Interim Order, or this Final Order, the Debtors, DIP Secured Parties, and the Prepetition Secured Parties shall use commercially reasonable efforts to satisfy the DIP Obligations, DIP Superpriority Claims, and Adequate Protection Obligations from DIP Collateral other than the Avoidance Proceeds, the Lender Claims Proceeds, and the Debtors' estate claims and causes of action (including potential claims against insiders) (collectively, the "***Designated Assets***") before satisfying such obligations from the Designated Assets.  The Debtors and the DIP Secured Parties shall repay the New Money DIP Loans first before repaying the DIP Rolled-Up Loans.

18.   **Maintenance of DIP Collateral**.   The Debtors shall take all steps necessary to preserve and maintain the value of the DIP Collateral, including: (a) insuring the DIP Collateral as required under the DIP Facility or the Prepetition Credit Documents, as applicable; and (b) maintaining the cash management system which has been reasonably agreed to by the requisite DIP Secured Parties (subject to any applicable order of the Court) consistent with their fiduciary duties.   To the fullest extent provided by applicable law, the DIP Agent (on behalf of the applicable DIP Secured Parties) shall be, and shall be deemed to be, without any further action or notice, named as additional insureds and lender's loss payees on each insurance policy maintained by the Debtors that in any way relates to the DIP Collateral.

19.   **Ongoing Information Obligation**.

(a)   <u>Ongoing Updates</u>.   The Debtors shall promptly (and in each case not less than on a weekly basis) provide each of Ropes & Gray LLP as counsel to the Backstop Parties and Morrison & Foerster LLP as counsel to the Creditors' Committee with updates on (i) the Approved Budget and any other reports or information delivered by the Debtors, (ii) the financial operations and performance of the Debtors' business, (iii) progress in achieving the Milestones, and any winddown, liquidation, or going concern sale or marketing process or efforts, (iv) the status of the Chapter 11 Cases generally, and (v) such other matters relating to the Debtors as the DIP Secured Parties (or their respective agents or advisors) or the Creditors' Committee shall reasonably request.

(b)   <u>Access to Books and Records</u>.   The Debtors shall provide to the DIP Agent and the Prepetition Agent (and, in each case, their respective consultants, advisors, and professionals) reasonable access to the Debtors' books and records, assets, and properties, for purposes of

monitoring the Debtors' businesses, evaluating compliance with the budget, and monitoring the value of the DIP Collateral during normal business hours.

(c)      Financial Reporting.  The Debtors shall provide periodic financial reporting to the Creditors' Committee, the DIP Agent, the Prepetition Agent, and counsel to the Creditors' Committee consistent with the Debtors' financial reporting obligations under the Prepetition Credit Agreement as in effect before the Petition Date.

20.      **Adequate Protection of Prepetition Secured Parties**.  Subject and subordinate in all respects to the Carve-Out, the Prepetition Secured Parties are entitled, pursuant to sections 361, 362, 363(e), 364(d)(1), and 507 of the Bankruptcy Code, to adequate protection of their interests in all DIP Collateral, including Cash Collateral, against the Diminution in Value[5] (if any) of their interests in the Prepetition Collateral, and the Prepetition Secured Parties continue to be granted the following, in each case subject and subordinate in all respects to the Carve-Out (collectively, the "*Adequate Protection Obligations*"):

(a)      **Adequate Protection Liens**.  The Prepetition Agent, for the benefit of the Prepetition Secured Parties, continues to be granted (effective and perfected upon the date of the First Interim Order, as ratified by this Final Order, and without the necessity of the execution of any mortgages, security agreements, control agreements, pledge agreements, financing statements, or other agreements) a valid, perfected security interest in and lien on all of the DIP Collateral, in each case subject and subordinate only to (i) the Carve-Out, (ii) the Permitted Prior Liens, and (iii) the DIP Liens (the "*Adequate Protection Liens*").  The relative priority of the Adequate Protection Liens shall be as set forth in **Exhibit 2** attached hereto.  Other than as set forth herein,

---

[5]  Nothing in this Final Order shall constitute a finding of Diminution in Value and the Diminution in Value shall only be determined by the Court after notice and a hearing (for the avoidance of doubt, the rights of the Creditors' Committee and all other party in interest in respect of whether Diminution in Value has occurred and the extent of the Diminution in Value are reserved).

the Adequate Protection Liens shall not be made subject to or *pari passu* with any lien or security interest heretofore granted in the Chapter 11 Cases or any Successor Case.  The Adequate Protection Liens shall be valid and enforceable against any trustee or estate representative appointed in the Chapter 11 Cases or any Successor Case, upon the conversion of any of the Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code (or in any other Successor Case), or upon the dismissal of any of the Chapter 11 Cases or any Successor Case.

        (b)    **507(b) Claims**.  The Prepetition Agent, for the benefit of the Prepetition Secured Parties, continues to be granted (effective upon the date of the First Interim Order and as ratified by this Final Order) an allowed superpriority administrative expense claim in the amount of the Diminution in Value (if any) of their interests in the Prepetition Collateral against the estates of each Debtor (other than RunItOneTime HoldCo, Inc.) pursuant to section 507(b) of the Bankruptcy Code with priority in payment over any and all administrative expenses of the kind specified or ordered pursuant to any provision of the Bankruptcy Code (the "***507(b) Claims***"), which 507(b) Claims shall be payable from and have recourse to all prepetition and postpetition property of the Debtors and all proceeds thereof; *provided*, that the 507(b) Claims shall not have recourse to the Professional Fees Account or the Carve-Out Reserve until the beneficiaries thereof have been paid in full their allowed claims.  The 507(b) Claims shall be subject and subordinate only to the DIP Superpriority Claims granted in respect of the DIP Obligations and the Carve-Out. Except to the extent expressly set forth in this Final Order or the DIP Documents, as applicable, the Prepetition Secured Parties shall not receive or retain any payments, property, or other amounts in respect of the 507(b) Claims unless and until the DIP Obligations (other than contingent indemnification obligations as to which no claim has been asserted) and any claims having a

priority senior to or *pari passu* with the DIP Superpriority Claims have indefeasibly been paid in cash in full, and all DIP Commitments have been terminated.

(c)    **Adequate Protection Fees and Expenses**.    The Debtors (other than RunItOneTime HoldCo, Inc.) shall, as adequate protection, pay for the benefit of the Prepetition Secured Parties, any reasonable and documented prepetition and postpetition fees and out-of-pocket expenses of the Prepetition Secured Parties, including the reasonable and documented fees and out-of-pocket expenses of (A) Ropes & Gray, LLP, (B) Orrick, Herrington & Sutcliffe LLP, (D) one Nevada and Colorado gaming counsel to the Prepetition Secured Parties, (E) Porter Hedges LLP, (F) Norton Rose Fulbright US LLP (in its capacity as counsel for the Prepetition Agent and DIP Agent), and (G) any other advisors retained by the requisite DIP Lenders with the consent (not to be unreasonably withheld) of the Debtors, with notice and an opportunity to object to counsel to the Creditors' Committee (the "***Adequate Protection Fees and Expenses***"), which Adequate Protection Fees and Expenses shall be allowed under section 507(b) of the Bankruptcy Code.  Reimbursement of the Adequate Protection Fees and Expenses shall be subject to the review procedure set forth in paragraph 27 of this Final Order.  The rights of parties in interest to argue that the Adequate Protection Fees and Expenses should be subject to recharacterization as principal to the extent that this Court finds that no Diminution in Value occurred during the pendency of these Chapter 11 Cases is hereby reserved.

(d)    The adequate protection herein is without prejudice to the Prepetition Agent, acting at the express written direction of the requisite Prepetition Secured Parties, to request further or different adequate protection and the Debtors or any other party in interest may contest any such request.

21.     **Perfection of DIP Liens and Adequate Protection Liens**.

(a)     The DIP Secured Parties and the Prepetition Secured Parties were, by the First Interim Order, and hereby are (or continue to be) authorized, but not required, to file, record, or enter into (and to execute in the name of the Debtors, as their true and lawful attorneys, with full power of substitution, to the maximum extent permitted by law) financing statements, intellectual property filings, mortgages, notices of lien, or similar instruments in any jurisdiction, or take possession of or control over cash or securities or other property, or take any other action to validate and perfect the liens and security interests granted to them hereunder.  All such financing statements, trademark filings, copyright filings, mortgages, notices of lien, or similar instruments shall be deemed to have been filed or recorded at the time of and on the Petition Date. Regardless of whether the DIP Agent (on behalf of the applicable DIP Secured Parties) or the Prepetition Agent (on behalf of the applicable Prepetition Secured Parties) shall, in their respective sole discretion, choose to file, record, or enter into such financing statements, intellectual property filings, mortgages, notices of lien, or similar instruments, or take possession of or control over any cash or securities or other property, or otherwise confirm perfection of the liens and security interests granted to them hereunder, such liens and security interests shall be deemed valid, automatically perfected, allowed, enforceable, non-avoidable, and not subject to challenge, dispute, or subordination (subject to the priorities and the rights of parties in interest set forth in paragraph 30 set forth in this Final Order).  Upon the request of the DIP Agent or the Prepetition Agent, as applicable, each of the Prepetition Secured Parties and the Debtors, without any further consent of any party, continue to be authorized, but not directed, to take, execute, deliver, and file such instruments (in each case, without representation or warranty of any kind) to enable the DIP Agent or the Prepetition Agent to further validate, perfect, preserve, and enforce the DIP Liens and

44

the applicable Adequate Protection Liens, respectively.  Subject to the reservation of rights of parties in interest in paragraph 20 of this Final Order, the Adequate Protection Liens continue to be valid and enforceable against any trustee or other estate representative appointed in the Chapter 11 Cases or any Successor Cases, upon the conversion of any of the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code (or in any other Successor Cases), or upon the dismissal of any of the Chapter 11 Cases or Successor Cases.  The Adequate Protection Liens shall not be subject to sections 506(c), 510, 549, or 550 of the Bankruptcy Code.  No lien or interest avoided and preserved for the benefit of any Debtor's estate pursuant to section 551 of the Bankruptcy Code shall be made *pari passu* with or senior to the Adequate Protection Liens.

(b)    A certified copy of this Final Order may, in the discretion of either the DIP Agent or the Prepetition Agent, as applicable, be filed with or recorded in filing or recording offices in addition to or in lieu of such financing statements, intellectual property filings, mortgages, notices of lien, or similar instruments, and all filing offices are instructed to accept such certified copy of this Final Order for filing or recording, as applicable.

(c)    To the extent that any Prepetition Secured Party is the secured party under any account control agreements, listed as loss payee or additional insured under any of the Debtors' insurance policies or is the secured party under any other agreement, the beneficiary of a landlord waiver or other collateral access agreement or party to a credit card notification, the DIP Agent, on behalf of the DIP Secured Parties, continues to be deemed to be the secured party under such account control agreements or loss payee or additional insured under the Debtors' insurance policies and the secured party under each such agreement (in any such case with the same priority of liens and claims thereunder relative to the priority of (i) the Prepetition Liens and Adequate Protection Liens and (ii) the DIP Liens, as set forth herein), and shall (A) have all rights and powers

45

in each case attendant to that position (including rights of enforcement, but subject in all respects to the terms of this Final Order), and (B) subject to the terms of this Final Order, act in that capacity and distribute any proceeds recovered or received in respect of any of the foregoing to the payment in full of the DIP Obligations.

22.    **Milestones**.  The Debtors shall comply with the milestones set forth in the DIP Documents and attached to this Final Order as **Exhibit 4** (the "***Milestones***"), in each case as may be modified or extended in accordance with the terms thereof.  The failure of the Debtors to comply with any of the Milestones shall (a) constitute an Event of Default under the DIP Documents and this Final Order; (b) subject to the expiration of the Remedies Notice Period (as defined below) and without limiting the effect of the other provisions of paragraph 12 of this Final Order, result in the automatic termination of the Debtors' ability to use Cash Collateral under this Final Order; and (c) permit the DIP Agent, subject to paragraph 29 and paragraph 12, to exercise the rights and remedies provided for in this Final Order and the DIP Documents.

23.    **Prepetition Secured Party Standstill**

(a)    If the DIP Obligations are outstanding or the DIP Lenders have any DIP Commitments under the DIP Documents, then the Prepetition Secured Parties shall: (i) have no right to and shall take no action to foreclose upon, or recover in connection with, the liens granted thereto pursuant to the Prepetition Credit Documents, the Interim Orders, or this Final Order, or otherwise seek to exercise or enforce any rights or remedies against such DIP Collateral, including in connection with the Prepetition Liens or the Adequate Protection Liens; (ii) not take any action in opposition to any transfer, disposition, or sale of, or release of liens on, such DIP Collateral (but not any proceeds of such transfer, disposition, or sale to the extent remaining after payment in cash in full of the DIP Obligations and termination of the DIP Commitments), to the extent such transfer,

disposition, sale, or release is authorized under the DIP Documents; (iii) not file any new financing statements, trademark filings, copyright filings, mortgages, notices of lien, or similar instruments, or otherwise take any action to perfect their security interests in such DIP Collateral unless, solely as to this clause (iii), the DIP Secured Parties file financing statements or other documents to perfect the liens granted pursuant to the Interim Orders or this Final Order, or as may be required by applicable law to continue the perfection of valid and non-avoidable liens or security interests as of the Petition Date or to reflect the succession of the Prepetition Agent, and (iv) at the request of the DIP Agent, deliver or cause to be delivered, at the Debtors' reasonable cost and expense, any termination statements, releases, or assignments in favor of the DIP Secured Parties or other documents reasonably necessary to effectuate or evidence the release, termination, or assignment of liens on any portion of such DIP Collateral subject to any transfer, sale, or disposition permitted by the DIP Documents, the Interim Orders, and this Final Order.

(b)     If any Prepetition Secured Party has possession of any DIP Collateral or has control with respect to any DIP Collateral (including deposit accounts), or has been noted as a secured party on any certificate of title for a titled good constituting DIP Collateral, then such Prepetition Secured Party shall be deemed to maintain such possession or notation or exercise such control as a gratuitous bailee or gratuitous sub-collateral agent solely for perfection for the benefit of the DIP Secured Parties, and it shall comply with the instructions of the DIP Agent with respect to the exercise of such control.  The Prepetition Agent is not and shall not be deemed to be a fiduciary of any kind for the DIP Secured Parties, and the DIP Secured Parties hereby waive and release the Prepetition Agent from all claims and liabilities arising pursuant to any Prepetition Agent's role under this paragraph 23(b) as gratuitous sub-collateral bailee and agent with respect to the DIP Collateral.

24.     Any proceeds of DIP Collateral received by any Prepetition Secured Party in connection with the exercise of any right or remedy relating to the DIP Collateral or otherwise received by any Prepetition Secured Party shall be segregated and held in trust for the benefit of and forthwith paid over to the DIP Agent for the benefit of the applicable DIP Secured Parties in the same form as received, with any necessary endorsements, or as a court of competent jurisdiction may otherwise direct.   The DIP Agent is hereby authorized to make any such endorsements as agent for any such Prepetition Secured Party.

25.     **Preservation of Rights Granted under this Final Order**.

(a)     Notwithstanding any order that may be entered dismissing any of the Chapter 11 Cases under section 1112 of the Bankruptcy Code or converting any other Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code: (i) the DIP Superpriority Claims, the 507(b) Claims, the DIP Liens, and the Adequate Protection Liens, and any claims related to the foregoing, shall continue in full force and effect and shall maintain their priorities as provided in this Final Order until all DIP Obligations and Adequate Protection Obligations shall have been paid in full in cash (and such DIP Superpriority Claims, 507(b) Claims, DIP Liens, and Adequate Protection Liens shall, notwithstanding such dismissal, remain binding on all parties in interest), (ii) the other rights granted by the Interim Orders and this Final Order shall not be affected, and (iii) this Court shall retain jurisdiction, notwithstanding such dismissal, for the purposes of enforcing the claims, liens, and security interests referred to in this paragraph and otherwise in the Interim Orders and this Final Order.

(b)     If any or all of the provisions of the Interim Orders or this Final Order are hereafter reversed, modified, vacated, or stayed, then such reversal, modification, vacatur, or stay shall not affect:  (i) the validity, priority, or enforceability of the DIP Obligations or Adequate

Protection Obligations incurred before the actual receipt of written notice by the DIP Agent or the Prepetition Agent, as applicable, of the effective date of such reversal, modification, vacatur, or stay or (ii) the validity, priority or enforceability of the DIP Superpriority Claims, the 507(b) Claims, the DIP Liens, the DIP Obligations, the Adequate Protection Liens, the Adequate Protection Obligations, the Prepetition Liens, or the Prepetition Secured Obligations. Notwithstanding any such reversal, modification, vacatur, or stay of any use of DIP Collateral (including any Cash Collateral), any DIP Superpriority Claims, 507(b) Claims, DIP Obligations, DIP Liens, Adequate Protection Obligations, or Adequate Protection Liens incurred by the Debtors to the DIP Secured Parties or the Prepetition Secured Parties, as the case may be, before the actual receipt of written notice by the DIP Agent or the Prepetition Agent, as applicable, of the effective date of such reversal, modification, vacation, or stay shall be governed in all respects by the original provisions of this Final Order, and the DIP Secured Parties and the Prepetition Secured Parties (subject to the rights of parties in interest set forth in paragraph 30 of this Final Order) shall be entitled to all rights, remedies, privileges, and benefits granted to parties acting in "good faith" under section 364(e) of the Bankruptcy Code, the Interim Orders, this Final Order, and the DIP Documents with respect to all uses of Cash Collateral, the DIP Obligations, the DIP Superpriority Claims, and the Adequate Protection Obligations.

26.     **Limitation on Use of DIP Facility Proceeds and Collateral**.  No DIP Loans, DIP Collateral, Cash Collateral, or any portion of the Carve-Out, may be used directly or indirectly by any Debtor, any statutory or non-statutory committee (including the Creditors' Committee), or any trustee appointed in the Chapter 11 Cases or any Successor Case, including any chapter 7 case, or any other person, party, or entity (a) in connection with the investigation, initiation, or prosecution of any claims, causes of action, adversary proceedings, or other litigation (i) against any of the DIP

Secured Parties or the Prepetition Secured Parties, or their respective predecessors in interest, officers, directors, employees, agents, affiliates, representatives, attorneys, or advisors, or any action purporting to do the foregoing in respect of the Prepetition Secured Obligations, the Prepetition Liens, the DIP Obligations, the DIP Liens, the DIP Superpriority Claims, the Adequate Protection Liens, the Adequate Protection Obligations, or the 507(b) Claims granted to the Prepetition Secured Parties under the Interim Orders and this Final Order, or (ii) challenging the amount, validity, perfection, priority or enforceability of or asserting any defense, counterclaim or offset with respect to, the Prepetition Secured Obligations, the DIP Obligations, the DIP Superpriority Claims, the Adequate Protection Obligations, or the 507(b) Claims or the liens, claims, rights, or security interests granted under the Interim Orders, this Final Order, the DIP Documents, or the Prepetition Credit Documents including, in each case for lender liability or pursuant to section 105, 510, 544, 547, 548, 549, 550, or 552 of the Bankruptcy Code, applicable non-bankruptcy law, or otherwise; (b) except as expressly permitted by paragraph 12 of this Final Order, to prevent, hinder, or otherwise delay the Prepetition Secured Parties' or the DIP Secured Parties', as applicable, enforcement or realization on the Prepetition Secured Obligations, DIP Obligations, DIP Superpriority Claims, Adequate Protection Obligations, 507(b) Claims, DIP Collateral, and the liens, claims, and rights granted to such parties under the Interim Orders and this Final Order, each in accordance with the DIP Documents, the Prepetition Credit Documents, or the Interim Orders; (c) to seek to modify any of the rights and remedies granted to the Prepetition Secured Parties or the DIP Secured Parties under the Interim Orders, this Final Order, the Prepetition Credit Documents, or the DIP Documents, as applicable, other than in accordance with the DIP Documents; (d) to apply to the Court for authority to approve superpriority claims or grant liens (other than the liens permitted pursuant to the DIP Documents) or security interests in the

DIP Collateral or any portion thereof that are senior to, or *pari passu* with, the DIP Liens, DIP Obligations, DIP Superpriority Claims, Adequate Protection Liens, the Adequate Protection Obligations, and 507(b) Claims, unless all DIP Obligations, Prepetition Secured Obligations, Adequate Protection Obligations, and claims granted to the DIP Secured Parties or Prepetition Secured Parties under the Interim Orders and this Final Order have been paid in full in cash or as otherwise agreed to in writing by the requisite DIP Secured Parties and the requisite Prepetition Secured Parties, (e) to seek to pay any amount on account of any claims arising before the Petition Date unless such payments are agreed to in writing by the requisite DIP Secured Parties and the requisite Prepetition Secured Parties or are otherwise included in the Approved Budget, or (f) for any purpose specified in the "DIP Facility; Use of Proceeds" section(s) of the DIP Documents; *provided*, that the Creditors' Committee may use the proceeds of the DIP Loans, DIP Collateral, and Cash Collateral, in an amount not to exceed $100,000 (the "***Investigation Budget Cap***") only to investigate, but not litigate, (x) the claims and liens of the Prepetition Secured Parties and the AG Landlord (as defined in the DIP Credit Agreement), (y) potential claims, counterclaims, causes of action or defenses against the Prepetition Secured Parties, or (z) potential claims, counterclaims, causes of action, or defenses against the AG Landlord or the AG Master Lease (each as defined in the DIP Credit Agreement).  This paragraph shall not otherwise restrict the DIP Facility from being used, subject to the Approved Budget (including any Permitted Variances) and the Investigation Budget Cap (solely to the extent applicable as set forth in the foregoing definition), to pay or reimburse Allowed Professional Fees of the Creditors' Committee incurred in connection with the customary discharge of its fiduciary duties in these Chapter 11 Cases (including Allowed Professional Fees incurred in connection with the DIP Motion, negotiation of this Final Order, and prosecution of an objection to any sale of the Debtors' assets, any disclosure statement, and any

chapter 11 plan proposed in these Chapter 11 Cases) in matters that do not relate to or involve (i) the Debtors' Stipulations and Releases, (ii) the validity and enforceability of the DIP Obligations or the DIP Liens, (iii) any motion, adversary proceeding, or objection based on a Challenge (as defined below) or any subject matters that would constitute a Challenge, including any objection to any Credit Bid or sale of the Debtors' assets that relates to or involves a Challenge or the subject matters of a Challenge, or (iv) any adversary proceeding in which any DIP Lender or any of its affiliates, in any capacity, are defendants.

27.     **Payment of Fees and Expenses**.  After the Petition Date, the DIP Fees and Expenses and the Adequate Protection Fees and Expenses shall be subject to the review procedures set forth in this paragraph 27 without the need for filing an application seeking compensation for services or reimbursement of expenses with the Court.  Professionals for the DIP Secured Parties and Prepetition Secured Parties shall not be required to comply with the U.S. Trustee fee guidelines, but shall (subject to the proviso at the end of this sentence) be required to provide to the Notice Parties invoices for such fees and expenses in summary fashion, which shall include a general, brief description of the nature of the matters for which services were performed, a list of the professionals who worked on such matters, and the number of hours each professional billed; *provided*, *however*, that notwithstanding the foregoing, the DIP Fees and Expenses incurred prior to, and which remain unpaid as of, the Closing Date (as defined in the DIP Documents) shall be paid indefeasibly by the Debtors upon the occurrence of the Closing Date without the DIP Secured Parties being required to deliver an invoice in summary form as set forth in this paragraph 27.  Any Notice Party may object to such fees and expenses for which summary invoices are required to be delivered to the Notice Parties in accordance with the preceding sentence and any such objection must be in writing and state with particularity the grounds therefor and must be submitted to the

applicable professional within ten (10) business days of receipt of such invoice (the "**Review Period**"). If no written objection is received by 5:00 p.m. (prevailing Central Time) on the last date of the Review Period or otherwise resolved by the applicable parties, the Debtors shall pay such invoices within five (5) business days after conclusion of the Review Period. If an objection to a professional's invoice is received within the Review Period, then the Debtors shall promptly pay the undisputed amount of the invoice, and this Court shall have jurisdiction to determine the disputed portion of such invoice if the parties are unable to resolve the dispute consensually. All DIP Fees and Expenses and Adequate Protection Fees and Expenses paid by any of the Debtors in accordance with the terms of the Interim Orders were approved and in accordance with the terms of this Final Order are hereby approved in full and shall not be subject to recharacterization, avoidance, subordination, disgorgement, or any similar form of recovery by the Debtors or any other person.

28. **Limits to Lender Liability**. Nothing in the Interim Orders, this Final Order, or the DIP Documents shall in any way be construed or interpreted to impose upon the DIP Secured Parties or any Prepetition Secured Party any liability for any claims arising from the prepetition or postpetition activities of the Debtors in the operation of their business or in connection with their restructuring efforts. So long as the DIP Secured Parties comply with their obligations under the DIP Documents and their obligations, if any, under applicable law (including the Bankruptcy Code), (a) the DIP Secured Parties shall not in any way or manner be liable or responsible for (i) the safekeeping or monitoring of the DIP Collateral, (ii) any loss or damage thereto occurring or arising in any manner or fashion from any cause, (iii) any diminution in the value thereof, or (iv) any act or default of any carrier, servicer, bailee, custodian, forwarding agency or other person, and (b) all risk of loss, damage, or destruction of the DIP Collateral shall be borne by the Debtors.

29.     **Gaming Laws**.  Notwithstanding anything in this Final Order to the contrary, the DIP Secured Parties and Prepetition Secured Parties agree as follows with respect to the DIP Liens, DIP Collateral, and Adequate Protection Liens: (a) if any exercise of remedies pursuant to the Interim Orders or this Final Order would result in possession by the DIP Agent or the Prepetition Agent of or against "personal property gaming collateral" (as defined in Nevada Gaming Code Reg. 8A.010(4)) or "gaming device" or "gaming equipment" (as defined in Colorado Revised Statutes § 44-30-103(13)), then such property will be (i) held in trust for the benefit of the DIP Lenders or the Prepetition Lenders (as applicable) pending the receipt of regulatory approvals under applicable Gaming Laws and (ii) upon receipt of such approvals will immediately vest in the DIP Lenders or Prepetition Lenders (as applicable) automatically under this Final Order without further action; and (b) the Debtors shall maintain minimum cage cash and petty cash in accordance with the requirements of applicable Gaming Laws, subject to periodic deposit requirements as required by the DIP Documents.

30.     **Effect of Stipulations on Third Parties**.  The Debtors' stipulations and releases contained in paragraph F of the Interim Orders and this Final Order (the "***Debtors' Stipulations and Releases***") shall be binding on the Debtors for all purposes. The Debtors' Stipulations and Releases shall also be binding on (a) all of the Debtors' successor in interest and assigns (including any chapter 7 or chapter 11 trustee or examiner appointed or other representative elected for any of the Debtors in these Chapter 11 Cases or any Successor Case), subject to the tolling provisions set forth below and (b) all creditors and other parties in interests and all of their respective successors and assigns, including any statutory or non-statutory committees appointed or formed in the Chapter 11 Cases, and any other person acting or seeking to act on behalf of the Debtors' estates, in all circumstances and for all purposes unless:

(a)    such committee, chapter 7 trustee, chapter 11 trustee, or any other person or entity with requisite standing (subject in all respects to any agreement or applicable law that may limit or affect such entity's right or ability to do so), has timely filed an adversary proceeding or contested matter (subject to the limitations contained herein, including, *inter alia*, in this paragraph) by the earlier of: (i) with respect to the Creditors' Committee, September 23, 2025, and (ii) with respect to any other party in interest with requisite standing (other than the Debtors), September 14, 2025 (the time period established by the foregoing clauses (i) and (ii), as may be extended in accordance with this Final Order, the "***Challenge Period***"); *provided*, *however*, that if, before the end of the Challenge Period, the cases convert to a chapter 7 or a chapter 11 trustee is appointed then, in each such case, (x) the Challenge Period shall be extended for a period of 60 days solely with respect to any such chapter 7 or chapter 11 trustee, and (y) such chapter 7 trustee or chapter 11 trustee may continue to prosecute any Challenge timely commenced by the Creditors' Committee (and any such chapter 7 trustee shall be deemed to have "stepped into the shoes" of the Creditors' Committee with respect to any such Challenge); *provided*, *further*, that the Challenge Period may be extended without further order of the Court upon the agreement (which may be via email) of the Creditors' Committee or other applicable third party and the Prepetition Lenders or with respect to the Creditors' Committee, for cause shown; *provided further* that if the Creditors' Committee files a motion seeking standing to bring a Challenge (as defined below), which attaches one or more draft complaints that detail the alleged Challenges for which the Creditors' Committee seeks standing to file, prior the expiration of the Challenge Period, the expiration of the Challenge Period shall be tolled solely for the Creditors' Committee solely with respect to the claims identified in such complaint until 11:59 p.m. (prevailing Central Time) on the date that is one business day after such standing motion is adjudicated by the Court: (A) objecting

to or challenging the amount, validity, perfection, enforceability, priority or extent of the Prepetition Secured Obligations, the portion of the DIP Obligations consisting of the Roll Up, or the Prepetition Liens, (B) objecting to or challenging any of the Debtors' Stipulations and Releases set forth in paragraph F of this Final Order or any finding in this Final Order regarding actions taken by the Prepetition Secured Parties prior to the Petition Date (other than with respect to the DIP Facility), including without limitation paragraph G(vii) of this Final Order, or (C) otherwise asserting or prosecuting any action for preferences, fraudulent transfers or conveyances, other avoidance claims or any other claims, counterclaims or causes of action, objections, contests or defenses (collectively, the "***Challenges***") against any of the Prepetition Secured Parties or their respective affiliates and subsidiaries and each of their respective former, current, or future officers, partners, directors, managers, members, principals, employees, agents, related funds, affiliates, investors, financing sources, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, and other professionals and the respective successors and assigns thereof, in each case solely in their respective capacity as such (each a "***Representative***" and collectively, the "***Representatives***") in connection with the Prepetition Credit Documents, the Prepetition Secured Obligations, the Prepetition Liens, the Prepetition Collateral, and the portion of the DIP Obligations consisting of the Roll Up; and

(b)       there is a final non-appealable order in favor of the plaintiff sustaining any such Challenge in any such timely filed adversary proceeding or contested matter; *provided*, *however*, that any pleadings filed in connection with any Challenge shall set forth with specificity the basis for such challenge or claim and any challenges or claims not so specified before the expiration of the Challenge Period shall be deemed forever, waived, released and barred.

31.     If no such Challenge is timely and properly filed during the Challenge Period or the Court does not rule in favor of the plaintiff with respect to the Challenge then: (a) the Debtors' Stipulations and Releases shall be binding on all parties in interest; (b) the obligations of the Debtors under the Prepetition Credit Agreements, including the Prepetition Secured Obligations, shall constitute allowed claims not subject to defense, claim, counterclaim, recharacterization, subordination, offset or avoidance, for all purposes in the Chapter 11 Cases, and any subsequent chapter 7 cases; (c) the Prepetition Liens on the Prepetition Collateral shall be deemed to have been, as of the Petition Date, legal, valid, binding, perfected, security interests and liens, not subject to recharacterization, subordination, avoidance or other defense and (d) the Prepetition Secured Obligations and the Prepetition Liens on the Prepetition Collateral shall not be subject to any other or further claim or challenge by any statutory or non-statutory committee, any other party in interest, or any successor thereto (including any chapter 7 trustee or chapter 11 trustee or examiner appointed or elected for any of the Debtors) and any defenses, claims, causes of action, counterclaims and offsets by any statutory or non-statutory committee, any other party in interest, or any successor thereto (including any chapter 7 trustee or chapter 11 trustee or examiner appointed or elected for any of the Debtors), whether arising under the Bankruptcy Code or otherwise, against any of the Prepetition Secured Parties and their Representatives arising out of or relating to any of the Prepetition Credit Documents shall be deemed forever waived, released and barred.  If any such Challenge is timely filed during the Challenge Period, then the Debtors' Stipulations and Releases contained in paragraph F of the Interim Order and this Final Order shall nonetheless remain binding and preclusive on any statutory or non-statutory committee, and on any other person or entity, except to the extent that such stipulations, admissions, agreements and releases were expressly and successfully challenged in such Challenge as set forth in a final, non-appealable

order of a court of competent jurisdiction.  Nothing in the Interim Orders or this Final Order vests or confers on any person standing or authority to pursue any claim or cause of action belonging to the Debtors or their estates, including Challenges with respect to the Prepetition Credit Documents, the Prepetition Secured Obligations or the Prepetition Liens.  Any motion seeking standing shall attach a draft complaint or other pleading that sets forth such Challenge, and any Challenge not included therein shall be deemed forever waived, released, and barred.  None of the foregoing challenge provisions set forth in this paragraph shall apply to any DIP Secured Party, in their capacities as such, and in no event shall the DIP Facility, DIP Obligations, DIP Superpriority Claims, or DIP Liens be subject to challenge pursuant to this paragraph on avoidance or any other grounds by any party; *provided*, that the portion of the DIP Obligations consisting of the Roll Up shall be subject to challenge pursuant to the terms of this Final Order.

32.     **Joint and Several Liability**.  Nothing in the Interim Orders or this Final Order shall be construed to constitute a substantive consolidation of any of the Debtors' estates, it being understood, however, that each of the Debtors shall be jointly and severally liable for the obligations hereunder and all DIP Obligations in accordance with the terms hereof and of the DIP Facility and the DIP Documents.

33.     **Final Order Governs**.  In the event of any inconsistency between the provisions of the Interim Orders, this Final Order, the DIP Documents, or any other order entered by this Court as of the date hereof, the provisions of this Final Order shall govern.

34.     **Proof of Claim**.  None of the Prepetition Secured Parties or DIP Secured Parties shall be required to file proofs of claim or requests for administrative expenses in any of the Chapter 11 Cases or Successor Cases to assert claims for payment of the Prepetition Secured Obligations arising under the Prepetition Credit Documents or the DIP Obligations arising under

the DIP Documents.  The statements of claim in respect of the Prepetition Secured Obligations and the DIP Obligations set forth in the Interim Orders and this Final Order (including the DIP Documents and the Debtors' Stipulations and Releases) are deemed sufficient and do constitute timely filed proofs of claim or requests for administrative expenses in respect of such debt and such secured status against each of the applicable Debtors, and each of the Prepetition Secured Parties and DIP Secured Parties shall be treated under Bankruptcy Code section 502(a) as if it had timely filed a proof of claim or request for administrative expense.

35.     **Binding Effect; Successors and Assigns**.  Subject to the rights of parties in interest set forth in paragraph 30 of this Final Order, the DIP Documents and the provisions of the Interim Orders and this Final Order, including all findings herein and therein, shall be binding upon all parties in interest in these Chapter 11 Cases, including the DIP Secured Parties and the Prepetition Secured Parties, any statutory or non-statutory committee, and the Debtors and their respective successors and assigns (including any chapter 7 or chapter 11 trustee hereinafter appointed or elected for the estate of any of the Debtors, an examiner appointed pursuant to section 1104 of the Bankruptcy Code, or any other fiduciary appointed as a legal representative of any of the Debtors or with respect to the property of the estate of any of the Debtors) and shall inure to the benefit of the DIP Secured Parties, the Prepetition Secured Parties, and the Debtors and their respective successors and assigns; *provided*, that the DIP Secured Parties and the Prepetition Secured Parties shall have no obligation to permit the use of the DIP Collateral (including Cash Collateral) by, or to extend any financing to, any chapter 7 trustee, chapter 11 trustee or similar responsible person appointed for the estates of the Debtors.

36.     **Limitation of Liability**.  Subject to the rights of parties in interest set forth in paragraph 30 of this Final Order, in determining to make any loan, commitment, or other extension

59

of credit under the DIP Documents or to permit the use of Cash Collateral or in exercising any rights or remedies as and when permitted pursuant to the Interim Orders, this Final Order, or the DIP Documents, none of the DIP Secured Parties or the Prepetition Secured Parties, each in their capacity as such, by reason of entering into the DIP Facility or the Prepetition Credit Documents and taking any actions permitted under the DIP Documents, the Prepetition Credit Documents, the Interim Orders, or this Final Order, shall (a) be deemed to be in "control" of the operations or participating in the management of the Debtors, (b) owe any fiduciary duty to the Debtors, any other DIP Secured Party or any other Prepetition Secured Party, their respective creditors, shareholders or estates, or (c) be deemed to be acting as a "Responsible Person" or "Owner" or "Operator" with respect to the operation or management of the Debtors (as such terms or similar terms are used in the United States Comprehensive Environmental Response, Compensation and Liability Act, 29 U.S.C. §§ 9601, et seq., as amended, or any similar federal or state statute). Nothing in this paragraph shall impact or limit the rights of any governmental authority. Subject to the rights of parties in interest set forth in paragraph 30 of this Final Order, furthermore, nothing in the Interim Orders, this Final Order, the DIP Documents or the Prepetition Credit Documents shall in any way be construed or interpreted to impose or allow the imposition upon the DIP Secured Parties or the Prepetition Secured Parties of any liability for any claims arising from the prepetition or postpetition activities of any of the Debtors and their direct or indirect subsidiaries.

37. **Effectiveness**. This Final Order shall constitute findings of fact and conclusions of law and shall take effect and be fully enforceable immediately upon entry hereof. Notwithstanding Bankruptcy Rules 4001(a)(3), 6004(h), 6006(d), 7062, or 9014, or any Local Rule, or Rule 62(a) of the Federal Rules of Civil Procedure, this Final Order shall be immediately effective and

enforceable upon its entry and there shall be no stay of execution or effectiveness of this Final Order.

38.    **Headings**.  Section headings used herein are for convenience only and are not to affect the construction of or to be taken into consideration in interpreting this Final Order.

39.    **Payments Held in Trust**.  Except as expressly permitted in this Final Order or the DIP Documents, including any amounts funded to the Carve-Out Reserve, in the event that any person or entity receives any payment on account of a security interest in DIP Collateral, receives any DIP Collateral or any proceeds of DIP Collateral or receives any other payment with respect thereto from any other source before payment in full in cash of all DIP Obligations under the DIP Documents and termination of the DIP Commitments in accordance with the DIP Documents, such person or entity shall be deemed to have received, and shall hold, any such payment or proceeds of DIP Collateral in trust for the benefit of the DIP Secured Parties and shall immediately turn over such proceeds to the DIP Agent, or as otherwise instructed by this Court, for application in accordance with the DIP Documents and this Final Order.  For the avoidance of doubt, this paragraph 39 will not apply to payments made or assets transferred by the Debtors as authorized under the Bankruptcy Code or any order of the Court.

40.    **Good Faith**.  Each of the DIP Secured Parties and Prepetition Secured Parties have acted in good faith (including for the purposes of sections 363(m) and 364(e) of the Bankruptcy Code) in connection with the Interim Orders and this Final Order and their reliance on the Interim Orders and this Final Order has been and is in good faith.

41.    **Survival**.  The provisions of the Interim Orders and this Final Order and any actions taken pursuant hereto and thereto shall survive entry of any order which may be entered: (a) confirming any plan of reorganization in the Chapter 11 Cases; (b) converting any of the

Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code; (c) dismissing any of the Chapter 11 Cases or any Successor Case; or (d) pursuant to which the Bankruptcy Court abstains from hearing the Chapter 11 Cases or any Successor Case.  The terms and provisions of the Interim Orders and this Final Order, including the claims, liens, security interests and other protections granted to the Prepetition Secured Parties and the DIP Secured Parties pursuant to the Interim Orders, the Final Order, or the Prepetition Credit Documents (other than as modified hereby), notwithstanding the entry of any such order, shall continue in the Chapter 11 Cases, in any Successor Case, or following dismissal of any of the Chapter 11 Cases or any Successor Case, and shall maintain their priority as provided by the Interim Orders and this Final Order until all DIP Obligations, all Prepetition Secured Obligations, all Adequate Protection Claims, and any adequate protection payment obligations pursuant to the DIP Documents and this Final Order have been paid in full.

42.    **Retention of Jurisdiction**.    The Court shall retain exclusive jurisdiction to implement, interpret, and enforce the provisions of this Final Order, and this retention of jurisdiction shall survive the confirmation and consummation of any chapter 11 plan for any one or more of the Debtors notwithstanding the terms or provisions of any such chapter 11 plan or any order confirming any such chapter 11 plan.

43.    **Determination of Requisite Parties**.  Any determination as to whether a consent, modification, permission, or amendment required or permitted under this Final Order has been granted by the "requisite" DIP Secured Parties or the "requisite" Prepetition Secured Parties will be determined by reference to the applicable DIP Documents or Prepetition Credit Agreement.

44.      **Bankruptcy Rules**.  The requirements of Bankruptcy Rules 4001, 6003, and 6004 and Local Rule 4001, in each case to the extent applicable, are satisfied by the contents of the Motion.

Signed: August 27, 2025

Alfredo R Pérez
United States Bankruptcy Judge

## SCHEDULE 1

**PropCo Debtors**
1. RunItOneTime HoldCo, Inc. (f/k/a Maverick Gaming HoldCo, Inc.)
2. RunItOneTime LLC (f/k/a Maverick Gaming LLC)
3. Maverick Colorado LLC
4. Maverick Z Casinos LLC
5. Colorado MG 1031 LLC
6. Maverick Washington LLC
7. Maverick Gold LLC
8. Nevada Gold & Casinos, Inc.
9. NG Washington III, LLC
10. NG Washington, LLC
11. NG Washington II Holdings, LLC
12. NG Washington II, LLC
13. Maverick Wizards LLC
14. 15743 Ambaum LLC
15. Maverick Roman LLC
16. The Royal Club Limited Liability Company
17. Skyway Center LLC
18. Maverick Indianola LLC
19. Maverick All Star LLC
20. Myers LLC
21. Maverick Evergreen LLC
22. Maverick Acquisition Canada ULC
23. Washington Gaming, Inc.
24. 14040 Gaming, LLC
25. Riverside Casino, Inc.
26. Gaming Consultants, Inc.
27. Gaming Management, Inc.
28. Puget Sound Gaming, LLC
29. Epstein Gaming LLC
30. LA Center Gaming, LLC
31. Pete's Flying Aces, Inc.
32. Tacoma Casino, L.L.C.
33. Maverick American LLC
34. Great American Gaming Corporation
35. Evergreen Entertainment Corporation
36. Grant Central Properties Everett LLC
37. Pair O'Dice Investments LLC
38. Grand Central Properties Tukwila LLC
39. Grand Central Properties Tacoma LLC
40. Grand Central Casino, Inc.
41. Maverick Caribbean LLC
42. Maverick Tukwila LLC
43. Maverick Yakima LLC

44. Maverick Kirkland II LLC
45. Maverick Kirkland LLC
46. Maverick Lakewood LLC
47. Maverick NV LLC
48. Maverick Elko LLC
49. Maverick Wendover LLC
50. CCI Leasing, LLC
51. Wendover Transportation, LLC
52. Utah Trailways Charter Bus Company, LLC
53. Casino Caravans, Inc.
54. Maverick Design LLC
55. e.gads, LLC
56. Maverick Poker Operator LLC
57. RunItOneTime Texas LLC

**OpCo Debtors**
58. Colorado Resorts Operator LLC
59. Elko Resorts Operator, LLC
60. Wendover Resorts Operator, LLC
61. Grand Z Casino Operator LLC
62. Johnny Z Casino Operator LLC
63. Z Casino Black Hawk Operator LLC
64. Gold Country Operator, LLC
65. High Desert Operator LLC
66. Red Lion Operator, LLC
67. Red Garter Operator, LLC
68. Wendover Nugget Operator, LLC

## **SCHEDULE 2**

### **Prepetition Equity Pledgors**

1. Colorado Resorts Operator LLC
2. Elko Resorts Operator, LLC
3. Wendover Resorts Operator, LLC

## EXHIBIT 1

**DIP Credit Agreement**

**SENIOR SECURED SUPERPRIORITY PRIMING
DEBTOR-IN-POSSESSION CREDIT AGREEMENT**

Dated as of July 28, 2025

among

**RUNITONETIME HOLDCO INC.,**
**as a debtor and debtor-in-possession under Chapter 11 of the Bankruptcy Code,**

as Holdings

**RUNITONETIME LLC**,
**as a debtor and debtor-in-possession under Chapter 11 of the Bankruptcy Code,**

as Borrower,

**THE SUBSIDIARIES AND AFFILIATES OF BORROWER PARTY HERETO**,
**as debtors and debtors-in-possession under Chapter 11 of the Bankruptcy Code,**

as Guarantors,

**THE LENDERS PARTY HERETO**,

and

**ALTER DOMUS (US) LLC,**

as Administrative Agent and as Collateral Agent,

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

ARTICLE I. DEFINITIONS, ACCOUNTING MATTERS AND RULES OF CONSTRUCTION .......... 2

    Section 1.01    Certain Defined Terms............................................................................. 2
    Section 1.02    Accounting Terms and Determinations ................................................ 35
    Section 1.03    Classes and Types of Loans ................................................................. 35
    Section 1.04    Rules of Construction .......................................................................... 35
    Section 1.05    Pro Forma Calculations ....................................................................... 36
    Section 1.06    [Reserved] ............................................................................................ 36
    Section 1.07    [Reserved] ............................................................................................ 36
    Section 1.08    [Reserved] ............................................................................................ 36
    Section 1.09    Rates .................................................................................................... 36
    Section 1.10    Divisions ............................................................................................. 37

ARTICLE II. LOANS............................................................................................................. 37

    Section 2.01    Amount and Terms of Commitments and Loans ................................. 37
    Section 2.02    Borrowings .......................................................................................... 40
    Section 2.03    [Reserved] ............................................................................................ 40
    Section 2.04    Termination and Reductions of Commitment....................................... 40
    Section 2.05    Fees ...................................................................................................... 40
    Section 2.06    Lending Offices ................................................................................... 41
    Section 2.07    Several Obligations of Lenders ........................................................... 41
    Section 2.08    Notes; Register .................................................................................... 41
    Section 2.09    Optional Prepayments ......................................................................... 42
    Section 2.10    Mandatory Prepayments ...................................................................... 42
    Section 2.11    Replacement of Lenders ...................................................................... 44
    Section 2.12    [Reserved] ............................................................................................ 45
    Section 2.13    [Reserved] ............................................................................................ 45
    Section 2.14    [Reserved] ............................................................................................ 45

ARTICLE III. PAYMENTS OF PRINCIPAL AND INTEREST ................................................. 45

    Section 3.01    Repayment of Loans ............................................................................ 45
    Section 3.02    Interest ................................................................................................. 45

ARTICLE IV. PAYMENTS; PRO RATA TREATMENT; COMPUTATIONS; ETC. ........................ 46

    Section 4.01    Payments.............................................................................................. 46
    Section 4.02    [Reserved] ............................................................................................ 47
    Section 4.03    Computations ....................................................................................... 47
    Section 4.04    Minimum Amounts .............................................................................. 47
    Section 4.05    Certain Notices .................................................................................... 47
    Section 4.06    Non-Receipt of Funds by Administrative Agent ................................. 48
    Section 4.07    Right of Setoff, Sharing of Payments; Etc........................................... 48

ARTICLE V. YIELD PROTECTION, ETC. ............................................................................. 49

    Section 5.01    Increased Costs .................................................................................... 49
    Section 5.02    Inability To Determine Interest Rate .................................................... 50

## TABLE OF CONTENTS

**Page**

Section 5.03  Illegality ............................................................................................... 51
Section 5.04  Treatment of Affected Loans ................................................................ 51
Section 5.05  Compensation ....................................................................................... 52
Section 5.06  Net Payments ....................................................................................... 52
Section 5.07  Benchmark Replacement Setting ......................................................... 55

ARTICLE VI. GUARANTEES ........................................................................................... 57

Section 6.01  The Guarantees .................................................................................... 57
Section 6.02  Obligations Unconditional .................................................................. 58
Section 6.03  Reinstatement ...................................................................................... 60
Section 6.04  Subrogation; Subordination ................................................................ 60
Section 6.05  Remedies .............................................................................................. 60
Section 6.06  Continuing Guarantee ......................................................................... 61
Section 6.07  General Limitation on Guarantee Obligations .................................... 61
Section 6.08  Release of Guarantors ......................................................................... 61
Section 6.09  [Reserved] ........................................................................................... 61
Section 6.10  Right of Contribution .......................................................................... 61

ARTICLE VII. CONDITIONS PRECEDENT ..................................................................... 62

Section 7.01  Conditions to Closing Date ................................................................. 62
Section 7.02  Conditions to All Extensions of Credit ............................................... 63
Section 7.03  Conditions to Withdrawals From Funding Account ............................ 64

ARTICLE VIII. REPRESENTATIONS AND WARRANTIES ............................................ 64

Section 8.01  Corporate Existence; Compliance with Law ....................................... 64
Section 8.02  Financial Condition; Etc ..................................................................... 65
Section 8.03  Litigation ............................................................................................. 65
Section 8.04  No Breach; No Default. ....................................................................... 65
Section 8.05  Action .................................................................................................. 66
Section 8.06  Approvals. ............................................................................................ 66
Section 8.07  ERISA and Labor Matters ................................................................... 66
Section 8.08  Taxes .................................................................................................... 67
Section 8.09  Investment Company Act. ................................................................... 67
Section 8.10  Environmental Matters ........................................................................ 67
Section 8.11  Use of Proceeds. .................................................................................. 68
Section 8.12  Subsidiaries and Licensed Operator Guarantors. ................................ 68
Section 8.13  Ownership of Property; Liens .............................................................. 69
Section 8.14  Security Interest; Absence of Financing Statements; Etc ................... 69
Section 8.15  Licenses and Permits ........................................................................... 69
Section 8.16  Disclosure ............................................................................................ 70
Section 8.17  No Fraudulent Transfer ....................................................................... 70
Section 8.18  [Reserved] ........................................................................................... 70
Section 8.19  Intellectual Property ............................................................................ 70
Section 8.20  Bankruptcy Matters ............................................................................. 70
Section 8.21  [Reserved] ........................................................................................... 71
Section 8.22  Insurance .............................................................................................. 71

## TABLE OF CONTENTS

**Page**

Section 8.23    Real Estate. .................................................................................................... 71
Section 8.24    Leases. .......................................................................................................... 72
Section 8.25    Mortgaged Real Property .............................................................................. 72
Section 8.26    [Reserved] ..................................................................................................... 72
Section 8.27    Anti-Corruption Laws and Sanctions............................................................ 72

ARTICLE IX. AFFIRMATIVE COVENANTS ...................................................................... 73

Section 9.01    Existence; Business Properties ..................................................................... 73
Section 9.02    Insurance ....................................................................................................... 74
Section 9.03    Taxes; Performance of Obligations .............................................................. 74
Section 9.04    Financial Statements, Etc. ............................................................................ 75
Section 9.05    Maintaining Records; Access to Properties and Inspections ....................... 78
Section 9.06    Use of Proceeds ............................................................................................ 79
Section 9.07    Compliance with Environmental Law ........................................................... 79
Section 9.08    Pledge or Mortgage of Real Property ........................................................... 80
Section 9.09    Security Interests; Further Assurances.......................................................... 81
Section 9.10    AG Master Lease .......................................................................................... 82
Section 9.11    Additional Credit Parties .............................................................................. 82
Section 9.12    [Reserved] ..................................................................................................... 83
Section 9.13    [Reserved] ..................................................................................................... 83
Section 9.14    Post-Closing Matters.................................................................................... 83
Section 9.15    Ratings. ......................................................................................................... 83
Section 9.16    Bankruptcy Case Filings .............................................................................. 83
Section 9.17    Orders ........................................................................................................... 83
Section 9.18    Information Rights ........................................................................................ 83
Section 9.19    Business Operations ..................................................................................... 83
Section 9.20    Milestones..................................................................................................... 83
Section 9.21    CRO and Liquidity Employee Orders........................................................... 83
Section 9.22    TSA............................................................................................................... 84
Section 9.23    AG Master Lease .......................................................................................... 84

ARTICLE X. NEGATIVE COVENANTS ............................................................................... 84

Section 10.01    Indebtedness ............................................................................................... 84
Section 10.02    Liens ........................................................................................................... 86
Section 10.03    AG Master Lease ........................................................................................ 90
Section 10.04    Investments, Loans and Advances............................................................... 90
Section 10.05    Mergers, Consolidations and Sales of Assets ............................................. 92
Section 10.06    Restricted Payments.................................................................................... 93
Section 10.07    Transactions with Affiliates........................................................................ 95
Section 10.08    Minimum Liquidity..................................................................................... 97
Section 10.09    Certain Payments of Indebtedness............................................................... 97
Section 10.10    Limitation on Certain Restrictions Affecting Subsidiaries.......................... 97
Section 10.11    Limitation on Lines of Business .................................................................. 98
Section 10.12    Limitation on Changes to Fiscal Year ......................................................... 98

# TABLE OF CONTENTS

**Page**

ARTICLE XI. EVENTS OF DEFAULT ................................................................................................. 98

    Section 11.01    Events of Default ................................................................................. 98
    Section 11.02    Application of Proceeds ...................................................................... 100

ARTICLE XII. AGENTS ...................................................................................................................... 101

    Section 12.01    Appointment ..................................................................................... 101
    Section 12.02    Rights as a Lender ............................................................................ 101
    Section 12.03    Exculpatory Provisions ..................................................................... 101
    Section 12.04    Reliance by Agents ........................................................................... 102
    Section 12.05    Delegation of Duties ......................................................................... 103
    Section 12.06    Resignation of Administrative Agent and Collateral Agent .............. 103
    Section 12.07    Nonreliance on Agents and Other Lenders ....................................... 104
    Section 12.08    Indemnification ................................................................................. 104
    Section 12.09    No Other Duties ................................................................................ 104
    Section 12.10    Holders ............................................................................................. 105
    Section 12.11    Administrative Agent May File Proofs of Claim................................ 105
    Section 12.12    Collateral Matters ............................................................................ 105
    Section 12.13    Withholding Tax ............................................................................... 106
    Section 12.14    [Reserved]......................................................................................... 106
    Section 12.15    Erroneous Payments ........................................................................ 106
    Section 12.16    Certain ERISA Matters ..................................................................... 108
    Section 12.17    Credit Bidding................................................................................... 109

ARTICLE XIII. MISCELLANEOUS.................................................................................................... 111

    Section 13.01    Waiver............................................................................................... 111
    Section 13.02    Notices ............................................................................................. 111
    Section 13.03    Expenses, Indemnification, Etc. ........................................................ 113
    Section 13.04    Amendments and Waiver................................................................... 115
    Section 13.05    Benefit of Agreement; Assignments; Participations.......................... 119
    Section 13.06    Survival............................................................................................ 121
    Section 13.07    Captions ........................................................................................... 121
    Section 13.08    Counterparts; Interpretation; Effectiveness ...................................... 121
    Section 13.09    Governing Law; Submission to Jurisdiction; Waivers; Etc. .............. 122
    Section 13.10    Confidentiality ................................................................................. 123
    Section 13.11    Independence of Representations, Warranties and Covenants .......... 124
    Section 13.12    Severability ...................................................................................... 124
    Section 13.13    Gaming Laws ................................................................................... 124
    Section 13.14    USA Patriot Act ............................................................................... 124
    Section 13.15    [Reserved]......................................................................................... 125
    Section 13.16    No Advisory or Fiduciary Responsibility ......................................... 125
    Section 13.17    Lender Action .................................................................................. 125
    Section 13.18    Interest Rate Limitation .................................................................... 125
    Section 13.19    Payments Set Aside .......................................................................... 126
    Section 13.20    Acknowledgement and Consent to Bail-In of Affected Financial
                         Institutions ....................................................................................... 126
    Section 13.21    [Reserved]......................................................................................... 127

**ANNEXES:**

ANNEX A                  -   Loan Amounts


**SCHEDULES:**

SCHEDULE 1.01(A)    -   Guarantors
SCHEDULE 1.01(B)    -   Real Property
SCHEDULE 8.03       -   Litigation
SCHEDULE 8.07       -   ERISA
SCHEDULE 8.10       -   Environmental Matters
SCHEDULE 8.12(a)    -   Subsidiaries
SCHEDULE 8.12(b)    -   Licensed Operator Guarantors
SCHEDULE 8.13(a)    -   Ownership
SCHEDULE 8.15       -   Licenses and Permits
SCHEDULE 8.19       -   Intellectual Property
SCHEDULE 8.23(a)    -   Applicable Real Property
SCHEDULE 8.23(b)    -   Real Property Takings, Etc.
SCHEDULE 8.25(a)    -   No Certificates of Occupancy; Violations, Etc.
SCHEDULE 8.25(b)    -   Encroachment, Boundary, Location, Possession Disputes
SCHEDULE 9.14       -   Post-Closing Matters
SCHEDULE 9.20       -   Milestones
SCHEDULE 10.01      -   Existing Indebtedness
SCHEDULE 10.02      -   Permitted Prior Liens
SCHEDULE 10.04      -   Investments
SCHEDULE 10.07      -   Transactions with Affiliates
SCHEDULE 13.02      -   Notices


**EXHIBITS:**

EXHIBIT A                -   Form of Note
EXHIBIT B                -   Form of Notice of Borrowing
EXHIBIT C                -   Initial Approved Budget
EXHIBIT D                -   Forms of U.S. Tax Compliance Certificate
EXHIBIT E                -   Form of Compliance Certificate
EXHIBIT F                -   Form of Joinder Agreement
EXHIBIT G                -   DIP Term Sheet
EXHIBIT H                -   Interim DIP Order
EXHIBIT I                -   Form of Assignment Agreement
EXHIBIT J                -   Form of Notice of Continuation/Conversion
EXHIBIT K                -   Second Interim DIP Order
EXHIBIT L                -   Final DIP Order

**SENIOR SECURED SUPERPRIORITY PRIMING DEBTOR-IN-POSSESSION CREDIT AGREEMENT**, dated as of July 28, 2025 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, this "**Agreement**"), among RunItOneTime HoldCo Inc., a Washington corporation ("**Holdings**"), RunItOneTime LLC, a Washington limited liability company ("**Borrower**"), the Guarantors (as defined below) party hereto from time to time, the Lenders (as defined below) from time to time party hereto, Alter Domus (US) LLC ("**Alter Domus**"), as administrative agent (in such capacity, together with its successors in such capacity, "**Administrative Agent**") and as collateral agent (in such capacity, together with its successors in such capacity, "**Collateral Agent**").

WHEREAS, on September 3, 2021, the Borrower, the Guarantors party thereto, the Lenders party thereto, and Alter Domus, as administrative agent and collateral agent (in such capacities, the "**Prepetition Agent**") entered into that certain Credit Agreement (as amended pursuant to that certain Amendment No. 1, dated as of December 23, 2021, that certain Amendment No. 2, dated as of February 27, 2023, that certain Amendment No. 3, dated as of June 21, 2023, and that certain Amendment No. 4, dated as of April 3, 2024, and as further amended, restated, amended and restated, supplemented, or otherwise modified and in effect prior to the date hereof, the "**Prepetition Credit Agreement**").

WHEREAS, on July 14, 2025, (the "**Petition Date**"), the Credit Parties and certain of their Subsidiaries (the "**Debtors**" and each, a "**Debtor**") filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code with the United States Bankruptcy Court for the Southern District of Texas (the "**Bankruptcy Court**") and are continuing in the possession of their assets and continuing to operate their respective businesses and manage their respective properties as debtors and debtors in possession under sections 1107(a) and 1108 of the Bankruptcy Code.

WHEREAS, on the Interim Effective Date, the Fronting Lender funded the Initial New Money DIP Loans under and pursuant to the Interim DIP Order and the DIP Term Sheet and the Loans under this Agreement and the DIP Term Sheet were afforded the fully perfected Liens and other priorities set forth in the Security Agreement (if any) and the Interim DIP Order and to be used during the Bankruptcy Cases for the purposes set forth therein and herein. Pursuant to the DIP Term Sheet, which is hereby ratified, as reaffirmed by execution and delivery of this Agreement and the other Credit Documents and entry of the applicable DIP Order, the Guarantors, as applicable, agreed to guarantee the Obligations, on and subject to the terms and priorities set forth in the DIP Orders and the other Credit Documents.

WHEREAS, pursuant to the terms of the DIP Term Sheet, the Borrower, Guarantors, Lenders party hereto and the Agent have entered into this Agreement to further memorialize the terms and conditions set forth in the DIP Term Sheet. Each of the terms, conditions and other provisions of the DIP Term Sheet are hereby incorporated by reference. In the event of a conflict between this Agreement and the DIP Term Sheet, this Agreement shall control.

WHEREAS, the Lenders are willing to make available the Loans described herein, subject to and in accordance with the terms and conditions set forth in this Agreement.

NOW, THEREFORE, in consideration of the mutual agreements, provisions and covenants contained herein, the parties agree as follows:

# ARTICLE I.

## DEFINITIONS, ACCOUNTING MATTERS AND RULES OF CONSTRUCTION

**Section 1.01    Certain Defined Terms**.  As used herein, the following terms shall have the following meanings:

"**ABR Loans**" shall mean Loans that bear interest at rates based upon the Alternate Base Rate.

"**ABR Term SOFR Determination Day**" has the meaning set forth in the definition of "Term SOFR".

"**Acceptable Incremental Amount**" means a principal amount of Incremental New Money DIP Loans (excluding Second Interim New Money DIP Loans) satisfactory to the Required Backstop Parties in their sole discretion.

"**Acceptable Final Budget**" means a forecast of anticipated cash receipts and disbursements, to be set forth on a weekly and monthly basis, including the anticipated uses of the Loans, through the conclusion of an Acceptable Restructuring.

"**Acceptable Restructuring**" means a bankruptcy plan, sale process, or other disposition of the Bankruptcy Cases or the Debtors' assets in form and substance satisfactory to the Required Backstop Parties in their sole discretion.

"**Acquisition**" shall mean, with respect to any Person, any transaction or series of related transactions for the (a) acquisition of all or substantially all of the Property of any other Person, or of any business or division of any other Person (other than any then-existing Company), (b) acquisition of more than 50% of the Equity Interests of any other Person, or otherwise causing any other Person to become a Subsidiary of such Person or (c) merger or consolidation of such Person or any other combination of such Person with any other Person (other than any of the foregoing between or among any then-existing Companies).

"**Acceptable Disclosure Statement**" means the disclosure statement relating to an Acceptable Plan of Reorganization in form and substance reasonably acceptable to the Required Lenders and the Debtors or as may be amended or modified in a manner reasonably acceptable to the Required Lenders and the Debtors.

"**Acceptable Plan of Reorganization**" means a Plan of Reorganization that (a) is in form and substance reasonably acceptable to the Debtors, the Collateral Agent, and the Required Lenders (including containing a release in favor of the Collateral Agent, the Prepetition Agent, the Lenders, the Prepetition Lenders, and their Affiliates and their officers, directors, employees, agents and attorneys-in-fact of such Persons and Affiliates (collectively, "**Related Persons**" and each, a "**Related Person**")) or as may be amended or modified in a manner reasonably acceptable to the Collateral Agent, the Required Lenders and the Debtors, and (b) is in form and substance reasonably acceptable to the Debtors and the Required Lenders and contains a provision for the termination of the commitments under the Prepetition Obligations and treatment of the Obligations in accordance with the TSA; *provided*, that any Plan of Reorganization providing for the indefeasible payment in full in cash of the Obligations and the "Obligations" (as defined in the Prepetition Credit Agreement) under the Prepetition Credit Agreement, and providing for the release set forth in clause (a) above, shall be deemed an Acceptable Plan of Reorganization.

"**Additional Credit Party**" has the meaning set forth in Section 9.11.

"**Additional Lease**" shall mean any lease entered into for the purpose of Borrower or any of its Subsidiaries to acquire the right to occupy and use real property or similar assets for, or in connection with, the construction, development or operation of Gaming Facilities.

"**Adequate Protection**" has the meaning ascribed to such term in the DIP Orders.

"**Adequate Protection Liens**" has the meaning ascribed to such term in the DIP Orders.

"**Adjusted Maximum Amount**" has the meaning set forth in Section 6.10.

"**Adjusted Term SOFR**" means, for purposes of any calculation, the rate per annum equal to Term SOFR for such calculation; provided that if Adjusted Term SOFR as so determined shall ever be less than the Floor, then Adjusted Term SOFR shall be deemed to be the Floor.

"**Administrative Agent**" has the meaning set forth in the introductory section hereof.

"**Administrative Agent's Office**" means such office or account as the Administrative Agent may from time to time designate by notice to the Borrower and the Lenders.

"**Affected Classes**" has the meaning set forth in Section 13.04(b)(i).

"**Affected Financial Institution**" shall mean (a) any EEA Financial Institution or (b) any UK Financial Institution.

"**Affiliate**" shall mean, with respect to any Person, another Person that directly, or indirectly through one or more intermediaries, Controls or is Controlled by or is under common Control with the Person specified; provided that as to any Credit Party or any Subsidiary thereof, the term "Affiliate" shall expressly exclude the Persons constituting Lenders as of the Closing Date and their respective Affiliates (determined as provided herein without regard to this proviso). "**Control**" shall mean the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a Person, whether through the ability to exercise voting power, by contract or otherwise. "**Controlling**" and "**Controlled**" have meanings correlative thereto.

"**AG Ground Lease**" shall mean that certain Ground Lease, dated as of September 1, 2021, by and among Maverick Wendover LLC, a Nevada limited liability company, as landlord, and AG Landlord, as tenant, as amended from time to time.

"**AG Landlord**" shall mean, collectively, for so long as they are the lessor under the AG Master Lease, AG Park Place Investments 1 LLC and AG Park Place Investments 1 LLC 2 and any successor to either in such capacity.

"**AG Leased Properties**" shall mean all "Leased Property" (as defined in the AG Master Lease). The AG Leased Properties on the Closing Date are the Real Properties located at: (a) 101 Wendover Boulevard, West Wendover, NV 89883, together with (i) the entirety of the parcels located in Wendover, UT that are commonly known as APNs 01-267-0-0014, 01-267-0-0007, 01-267-0-0001, 01-269-0-0042 and 01-267-0-0006 and (ii) the Wendover Parking Subparcel, (b) 1225 Wendover Boulevard, West Wendover, NV 89883, (c) 321 Gregory Street, Central City, CO 80427, and (d) 132 Lawrence Street, Central City, CO 80427; provided that, for the avoidance of doubt, the Wendover Service Station Subparcel shall not be an AG Leased Property until such time, if any, as it shall become "Leased Property" under and pursuant to the terms of the AG Master Lease.

"**AG Master Lease**" shall mean that certain Master Lease, dated as of September 1, 2021, by and among AG Landlord and the AG Tenants, as amended from time to time.

"**AG Tenants**" shall mean, for so long as it is a tenant under the AG Master Lease, each of Maverick Z Casinos LLC, a Nevada limited liability company, and Maverick Wendover LLC, a Nevada limited liability company, and any successor thereof in such capacity.

"**Agent**" shall mean the Administrative Agent and/or Collateral Agent, as applicable.

"**Agent Fee Letter**" means that certain fee letter, dated as of the Interim Effective Date, by and between the Agent and the Borrower, as may be amended, amended and restated, replaced, supplemented or otherwise modified from time to time.

"**Agent Party**" has the meaning set forth in Section 13.02(e).

"**Agent Related Parties**" shall mean each Agent and any sub-agent thereof and their respective Affiliates, directors, officers, employees, agents and advisors.

"**Agreement**" has the meaning set forth in the introductory section hereof.

"**Alter Domus**" has the meaning set forth in the introductory section hereof.

"**Alternate Base Rate**" shall mean, for any day, a rate per annum equal to the greatest of (a) the Prime Rate in effect on such day, (b) the Federal Funds Effective Rate in effect on such day plus ½ of 1.0% and (c) the Adjusted Term SOFR for a one month Interest Period beginning on such day (or if such day is not a Business Day, the immediately preceding Business Day) plus 1.0%. Any change in the Alternate Base Rate due to a change in the Prime Rate, the Federal Funds Effective Rate or the Adjusted Term SOFR shall be effective from and including the effective date of such change in the Prime Rate, the Federal Funds Effective Rate or the Adjusted Term SOFR, respectively. Notwithstanding the foregoing, if the Alternate Base Rate shall ever be less than 3.0%, then the Alternate Base Rate shall be deemed to be 3.0%.

"**Amendment No. 1**" means that certain Amendment No. 1 to Senior Secured Superpriority Priming Debtor-In-Possession Credit Agreement, dated as of August 6, 2025, by and among the Borrower, Holdings, the other Credit Parties party thereto, the Lenders party thereto and the Agents.

"**Amendment No. 1 Effective Date**" has the meaning given to such term in Amendment No. 1.

"**Amendment No. 2**" means that certain Amendment No. 2 to Senior Secured Superpriority Priming Debtor-In-Possession Credit Agreement, dated as of August [27], 2025, by and among the Borrower, Holdings, the other Credit Parties party thereto, the Lenders party thereto and the Agents.

"**Amendment No. 2 Effective Date**" has the meaning given to such term in Amendment No. 2.

"**Anti-Corruption Laws**" shall mean the United States Foreign Corrupt Practices Act of 1977, as amended, the UK Bribery Act 2010, as amended, and all other laws, rules, and regulations of any jurisdiction applicable to Borrower or any of its Subsidiaries from time to time concerning or relating to bribery or corruption.

"**Applicable Lending Office**" shall mean, for each Lender and for each Type of Loan, the "Lending Office" or account of such Lender (or of an Affiliate of such Lender) (a) that is a lender on the Closing Date, designated for such Type of Loan on its signature page hereto, (b) set forth in the Assignment

Agreement for any Person that becomes a "Lender" hereunder pursuant to an Assignment Agreement or (c) such other office or account of such Lender (or of an Affiliate of such Lender) as such Lender may from time to time specify to Administrative Agent and Borrower as the office or account by which its Loans of such Type are to be made and maintained.

"**Applicable Margin**" shall mean 12.50%.

"**Applicable Real Property**" shall mean any Real Property owned or leased by any Credit Party located in the United States. For the avoidance of doubt, "Applicable Real Property" shall include each Real Property described on Schedule 1.01(B).

"**Approved Budget**" shall mean (i) the Initial Approved Budget and (ii) each Proposed Budget that is approved by the Required Lenders in accordance with Section 9.04(f); provide that for the avoidance of doubt, if the Required Lenders do not approve a Proposed Budget in accordance with Section 9.04(f), the then-current Approved Budget shall remain the Approved Budget until a new Proposed Budget is so approved.

"**Asset Sale**" shall mean (a) any conveyance, sale, lease, transfer or other disposition (including by way of merger or consolidation and including any sale and leaseback transaction) of any Property (including accounts receivable and Equity Interests of any Person owned by Borrower or any of its Subsidiaries but not any Equity Issuance) (whether owned on the Closing Date or thereafter acquired) by Borrower or any of its Subsidiaries to any Person (other than (i) with respect to any Credit Party, to any Credit Party, and (ii) with respect to any other Company, to any Company) and (b) any issuance or sale by any Subsidiary of its Equity Interests to any Person (other than to Borrower or any other Subsidiary); provided that the following shall not constitute an "Asset Sale": (v) any conveyance, sale, lease, transfer or other disposition of inventory, in any case in the ordinary course of business, (w) Real Property leases and other leases, licenses, subleases or sublicenses, in each case, granted to others in the ordinary course of business and which do not materially interfere with the business of Borrower and the Subsidiaries taken as a whole, (x) any conveyance, sale, lease, transfer or other disposition of obsolete or worn out assets or assets no longer useful in the business of the Credit Parties, in each case in the ordinary course of business (y) licenses of Intellectual Property entered into in the ordinary course of business and (z) any conveyance, sale, transfer or other disposition of cash and/or Cash Equivalents.

"**Assignment Agreement**" shall mean an Assignment and Assumption Agreement substantially in the form attached as Exhibit I hereto, or such other form as approved by the Administrative Agent.

"**Automatic Stay**" means the automatic stay provided under section 362 of the Bankruptcy Code.

"**Available Tenor**" has the meaning set forth in Section 5.07(f).

"**Backstop Commitment**" has the meaning set forth in the DIP Term Sheet.

"**Backstop Commitment Letter**" shall mean that certain Commitment Letter, dated as of July 15, 2025, by and among the Borrower, the Backstop Parties and the Fronting Lender.

"**Backstop Parties**" shall mean each of HG Vora Capital Management, LLC (on behalf of certain funds and accounts managed or advised by it), Angelo Gordon & Co., L.P. (on behalf of certain funds and accounts managed or advised by it), and PGIM Inc. acting through its Fixed Income division (on behalf of certain funds and accounts managed or advised by it).

"**Bail-In Action**" shall mean the exercise of any Write-Down and Conversion Powers by the applicable Resolution Authority in respect of any liability of an Affected Financial Institution.

"**Bail-In Legislation**" shall mean, (a) with respect to any EEA Member Country implementing Article 55 of Directive 2014/59/EU of the European Parliament and of the Council of the European Union, the implementing law for such EEA Member Country from time to time which is described in the EU Bail-In Legislation Schedule and (b) with respect to the United Kingdom, Part I of the United Kingdom Banking Act 2009 (as amended from time to time) and any other law, regulation or rule applicable in the United Kingdom relating to the institution of unsound or failing banks, investment firms or other financial institutions or their affiliates (other than through liquidation, administration or other insolvency proceedings).

"**Bankruptcy Cases**" means the cases of the Debtors filed under Chapter 11 of the Bankruptcy Code in the Bankruptcy Court from and after the Petition Date including any and all proceedings arising in or related to such cases.

"**Bankruptcy Code**" means Title 11 of the United States Code entitled "Bankruptcy," as now and hereafter in effect, or any successor statute thereunder, and/or as the context may require.

"**Bankruptcy Court**" has the meaning set forth in the introductory section hereof.

"**Bankruptcy Rules**" means (x) the Federal Rules of Bankruptcy Procedure as promulgated by the United States Supreme Court under section 2075 of title 28 of the United States Code and any Local Bankruptcy Rules of the Bankruptcy Court, in each case, as amended from time to time and applicable to the Bankruptcy Case, and/or as the context may require, (y) equivalent legislation in any jurisdiction applicable to the Credit Parties.

"**Benchmark**" has the meaning set forth in Section 5.07(f).

"**Benchmark Replacement**" has the meaning set forth in Section 5.07(f).

"**Benchmark Replacement Conforming Changes**" has the meaning set forth in Section 5.07(f).

"**Benchmark Transition Event**" has the meaning set forth in Section 5.07(f).

"**Beneficial Ownership Certification**" shall mean a certification regarding beneficial ownership as required by the Beneficial Ownership Regulation.

"**Beneficial Ownership Regulation**" shall mean 31 C.F.R. § 1010.230.

"**Benefit Plan**" shall mean any of (a) an "employee benefit plan" (as defined in ERISA) that is subject to Title I of ERISA, (b) a "plan" as defined in and subject to Section 4975 of the Code or (c) any Person whose assets include (for purposes of ERISA Section 3(42) or otherwise for purposes of Title I of ERISA or Section 4975 of the Code) the assets of any such "employee benefit plan" or "plan".

"**Borrower**" has the meaning set forth in the introductory section hereof.

"**Borrower Materials**" has the meaning set forth in Section 9.04.

"**Borrowing**" shall mean Loans of the same Class and Type made, converted or continued on the same date and, in the case of SOFR Loans, as to which a single Interest Period is in effect.

"**Business Day**" shall mean any day, except a Saturday or Sunday, on which commercial banks are not authorized or required to close in New York.

"**Capital Expenditures**" shall mean, for any period any expenditures by Borrower or its Subsidiaries for the acquisition or leasing of fixed or capital assets (including Capital Lease Obligations) that should be capitalized in accordance with GAAP and any expenditures by such Person for maintenance, repairs, restoration or refurbishment of the condition or usefulness of Property of such Person that should be capitalized in accordance with GAAP.

"**Capital Lease**" as applied to any Person, shall mean any lease of any Property by that Person as lessee that, in conformity with GAAP, is required to be classified and accounted for as a capital lease on the balance sheet of that Person; provided, however, that, (a) for the avoidance of doubt, any lease that is accounted for by any Person as an operating lease as of the Closing Date and any similar lease entered into after the Closing Date by any Person may, in the sole discretion of Borrower, be accounted for as an operating lease and not as a Capital Lease and (b) each Gaming Lease shall be accounted for as an operating lease and not as a Capital Lease.

"**Capital Lease Obligations**" shall mean, for any Person, all obligations of such Person to pay rent or other amounts under a Capital Lease, and, for purposes of this Agreement, the amount of such obligations shall be the capitalized amount thereof, determined in accordance with GAAP; provided, however, that (a) for the avoidance of doubt, any lease that is accounted for by any Person as an operating lease as of the Closing Date and any similar lease entered into after the Closing Date by any Person may, in the sole discretion of Borrower, be accounted for as an operating lease and not as a Capital Lease and (b) each Gaming Lease shall be accounted for as an operating lease and not as a Capital Lease.

"**Carve-Out**" has the meaning ascribed to such term in the DIP Orders.

"**Cash Equivalents**" shall mean, for any Person: (a) direct obligations of the United States, or of any agency thereof, or obligations guaranteed as to principal and interest by the United States, or by any agency thereof, in either case maturing not more than one year from the date of acquisition thereof by such Person; (b) time deposits, certificates of deposit or bankers' acceptances (including eurodollar deposits) issued by (i) any bank or trust company organized under the laws of the United States or any state thereof and having capital, surplus and undivided profits of at least $500.0 million that is assigned at least a "B" rating by Thomson Financial BankWatch or (ii) any Lender or bank holding company owning any Lender (in each case, at the time of acquisition); (c) commercial paper maturing not more than one year from the date of acquisition thereof by such Person and (i) issued by any Lender or bank holding company owning any Lender or (ii) rated at least "A-2" or the equivalent thereof by S&P or at least "P-2" or the equivalent thereof by Moody's, (in each case, at the time of acquisition); (d) repurchase obligations with a term of not more than thirty (30) days for underlying securities of the types described in clause (a) above or (e) below entered into with a bank meeting the qualifications described in clause (b) above (in each case, at the time of acquisition); (e) securities with maturities of one year or less from the date of acquisition issued or fully guaranteed by any state, commonwealth or territory of the United States, or by any political subdivision or taxing authority thereof or by any foreign government, and rated at least "A" by S&P or "A" by Moody's (in each case, at the time of acquisition); (f) securities with maturities of six months or less from the date of acquisition backed by standby letters of credit issued by any Lender or any commercial bank satisfying the requirements of clause (b) above (in each case, at the time of acquisition); (g) money market mutual funds that invest primarily in the foregoing items (determined at the time such investment in such fund is made); (h) solely with respect to any Foreign Subsidiary, (i) marketable direct obligations issued by, or unconditionally guaranteed by, the country in which such Foreign Subsidiary maintains its chief executive office or principal place of business, or issued by any agency of such country and backed by the full faith and credit of such country, and rated at least "A" or the equivalent thereof by S&P or "A2"

or the equivalent thereof by Moody's (in each case, at the time of acquisition), (ii) time deposits, certificates of deposit or bankers' acceptances issued by any commercial bank which is organized and existing under the laws of the country in which such Foreign Subsidiary maintains its chief executive office and principal place of business, or payable to a Company promptly following demand and maturing within one year of the date of acquisition and (iii) other customarily utilized high-quality or cash equivalent-type Investments in the country where such Foreign Subsidiary maintains its chief executive office or principal place of business; (i) such local currencies held by any Credit Party or any Subsidiary from time to time in the ordinary course of business; or (j) investment funds investing at least 90% of their assets in securities of the types described in clauses (a) through (i) above.

"**Cash Management Agreement**" shall mean any agreement to provide cash management services, including treasury, depository, overdraft, credit or debit card, electronic funds transfer and other cash management arrangements.

"**Cash Management Order**" has the meaning set forth in Section 7.01(c).

"**Casualty Event**" shall mean any loss of title or any loss of or damage to or destruction of, or any condemnation or other taking (or settlement in lieu thereof) (including by any Governmental Authority) of, any Property.  "Casualty Event" shall include, but not be limited to, any taking of all or any part of any Real Property of Borrower or any of its Subsidiaries or any part thereof, in or by condemnation or other eminent domain proceedings pursuant to any Law (or settlement in lieu thereof), or by reason of the temporary requisition of the use or occupancy of all or any part of any Real Property of Borrower or any of its Subsidiaries or any part thereof by any Governmental Authority, civil or military.

"**CERCLA**" shall mean the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended, 42 U.S.C. § 9601 *et seq.*

"**CFC**" shall mean a "controlled foreign corporation" within the meaning of Section 957 of the Code.

"**Change in Law**" shall mean the occurrence, after the date of this Agreement, of any of the following:  (a) the adoption or taking effect of any law, rule, regulation or treaty, (b) any change in any law, rule, regulation or treaty or in the administration, interpretation, implementation or application thereof by any Governmental Authority or (c) the making or issuance of any request, rule, guideline or directive (whether or not having the force of law) by any Governmental Authority; provided that notwithstanding anything herein to the contrary, (x) the Dodd-Frank Wall Street Reform and Consumer Protection Act and all requests, rules, guidelines or directives thereunder or issued in connection therewith and (y) all requests, rules, guidelines or directives promulgated by the Bank for International Settlements, the Basel Committee on Banking Supervision (or any successor or similar authority) or the United States or foreign regulatory authorities, in each case pursuant to Basel III, shall in each case be deemed to be a "Change in Law", regardless of the date enacted, adopted or issued.

"**Charges**" has the meaning set forth in Section 13.18.

"**Class**" has the meaning set forth in Section 1.03.

"**Closing Date**" shall mean July 28, 2025, which is the first date on which all conditions precedent in Section 7.01 are satisfied or waived in accordance with Section 7.01.

"**Code**" shall mean the Internal Revenue Code of 1986, as amended.

"**Collateral**" shall mean all of the Pledged Collateral, the Mortgaged Real Property, all Property encumbered pursuant to Sections 9.08, 9.11 and 9.15, and all other Property of a Credit Party whether now owned or hereafter acquired, upon which a Lien securing the Obligations is granted or purported to be granted under any Security Document or the DIP Orders.  "Collateral" shall not include any assets or Property that has been released (in accordance with the Credit Documents) from the Lien granted to Collateral Agent pursuant to the Security Documents or the DIP Orders, unless and until such time as such assets or Property are or are required by the Credit Documents to again become subject to a Lien in favor of Collateral Agent.

"**Collateral Agent**" has the meaning set forth in the introductory section hereof.

"**Commitment**" shall mean (a) the Backstop Commitment and (b) any commitment after the Closing Date with respect to Incremental New Money DIP Loans.

"**Committee**" shall mean an official committee of unsecured creditors appointed in the Bankruptcy Cases.

"**Committee Investigation Amount**" shall mean $50,000.

"**Committee Professionals**" means the persons or firms retained by the Committee pursuant to section 328 or 1103 of the Bankruptcy Code.

"**Confirmation Order**" means the order of the Bankruptcy Court confirming the Plan under section 1129 of the Bankruptcy Code, which such order shall be consistent with this Agreement and the definitive documentation in all material respects and shall not have been stayed.

"**Companies**" shall mean Holdings, Borrower and its Subsidiaries; and "**Company**" shall mean any one of them.

"**Contingent Obligation**" shall mean, as to any Person, any obligation of such Person guaranteeing or intended to guarantee any Indebtedness ("**primary obligations**") of any other Person (the "**primary obligor**") in any manner, whether directly or indirectly, including any obligation of such Person, whether or not contingent, (a) to purchase any such primary obligation or any property constituting direct or indirect security therefor; (b) to advance or supply funds (i) for the purchase or payment of any such primary obligation or (ii) to maintain working capital or equity capital of the primary obligor or otherwise to maintain the net worth or solvency of the primary obligor; (c) to purchase property, securities or services primarily for the purpose of assuring the owner of any such primary obligation of the ability of the primary obligor to make payment of such primary obligation; or (d) otherwise to assure or hold harmless the holder of such primary obligation against loss in respect thereof; provided, however, that the term Contingent Obligation shall not include endorsements of instruments for deposit or collection in the ordinary course of business and any lease guarantees executed by any Company in the ordinary course of business.  The amount of any Contingent Obligation shall be deemed to be an amount equal to the stated or determinable amount of the primary obligation in respect of which such Contingent Obligation is made (or, if less, the maximum amount of such primary obligation for which such Person may be liable pursuant to the terms of the instrument evidencing such Contingent Obligation) or, if not stated or determinable, the maximum reasonably anticipated potential liability in respect thereof (assuming such Person is required to perform thereunder) as determined by such Person in good faith.

"**Contractual Obligation**" shall mean as to any Person, any provision of any security issued by such Person or of any mortgage, deed of trust, security agreement, pledge agreement, promissory note, indenture, credit or loan agreement, guaranty, securities purchase agreement, instrument, lease, contract,

agreement or other contractual obligation to which such Person is a party or by which it or any of its Property is bound or subject.

"**Control Agreement**" means each account control agreement, account pledge, charge over accounts or similar agreement, which, in each case, is in form and substance reasonably satisfactory to the Required Lenders and the Collateral Agent.

"**Covered Taxes**" shall mean all (a) Taxes, other than Excluded Taxes, imposed on or with respect to any payment made by or on account of any obligation of any Credit Party under this Agreement, any Note, any Guarantee or any other Credit Document and (b) to the extent not otherwise described in the foregoing clause (a), Other Taxes.

"**Credit Documents**" shall mean (a) this Agreement, (b) the Notes, (c) the Security Documents, (d) the Agent Fee Letter, (e) the DIP Term Sheet, (g) the Escrow Agreement, and (h) each other agreement entered into by any Credit Party  with the Administrative Agent, Collateral Agent and/or any Lender, in connection herewith or therewith evidencing or governing the Obligations, all as amended from time to time, but shall not include a Swap Contract or Cash Management Agreement.

"**Credit Parties**" shall mean the Borrower and the Guarantors.

"**Debt Issuance**" shall mean the incurrence by Borrower or any Subsidiary of any Indebtedness after the Closing Date (other than as permitted by Section 10.01).  The issuance or sale of any debt instrument convertible into or exchangeable or exercisable for any Equity Interests shall be deemed a Debt Issuance for purposes of Section 2.10(a).

"**Debtor**" has the meaning set forth in the introductory section hereof.

"**Debtor Relief Laws**" shall mean the Bankruptcy Code, and all other liquidation, conservatorship, bankruptcy, assignment for the benefit of creditors, moratorium, rearrangement, receivership, judicial management, insolvency, reorganization (by way of voluntary arrangement, scheme of arrangement or otherwise) or affecting creditors' rights generally or similar debtor relief Laws of the United States or other applicable jurisdiction from time to time in effect.

"**Declined Amounts**" has the meaning set forth in Section 2.10(b).

"**Default**" shall mean any event or condition that constitutes an Event of Default or that would become, with notice or lapse of time or both, an Event of Default.

"**Default Rate**" shall mean a *per annum* rate equal to, in the case of principal on any Loan, the rate which is 3.00% in excess of the rate borne by such Loan immediately prior to the respective payment default or other Event of Default.

"**DIP Orders**" or "**DIP Order**" means, the Interim DIP Order, the Second Interim DIP Order and/or the Final DIP Order, as applicable, and as each may be amended, restated, amended and restated, supplemented or otherwise modified with the prior written consent of the Required Lenders.

"**DIP Term Sheet**" means that certain DIP Term Sheet, filed with the Bankruptcy Court on the Petition Date and as in effect on the date hereof, attached hereto as Exhibit G.

"**Disclosure Statement**" means the disclosure statement in form and substance acceptable to the Required Lenders.

10

"**Discharged**" shall mean Indebtedness that has been defeased (pursuant to a contractual or legal defeasance) or discharged pursuant to the prepayment or deposit of amounts sufficient to satisfy such Indebtedness as it becomes due or irrevocably called for redemption (and regardless of whether such Indebtedness constitutes a liability on the balance sheet of the obligors thereof); provided, however, that the Indebtedness shall be deemed Discharged if the payment or deposit of all amounts required for defeasance or discharge or redemption thereof have been made even if certain conditions thereto have not been satisfied, so long as such conditions are reasonably expected to be satisfied within 95 days after such prepayment or deposit.

"**Disqualification**" shall mean, with respect to any Person:

(a)     the failure of such Person to timely file pursuant to applicable Gaming Laws (i) any application required of such Person by any Gaming Authorities in connection with any licensing required of such Person as a lender to Borrower pursuant to applicable Gaming Laws or (ii) any application or other papers, in each case, required by any Gaming Authority in connection with a determination by such Gaming Authority of the suitability of such Person as a lender to Borrower;

(b)     the withdrawal by such Person (except where requested or permitted by any Gaming Authority) of any such application or other required papers;

(c)     any final determination by a Gaming Authority pursuant to applicable Gaming Laws (i) that such Person is "unsuitable" as a lender to Borrower, (ii) that such Person shall be "disqualified" as a lender to Borrower or (iii) denying the issuance to such Person of a license or finding of suitability or other approval; or

(d)     the failure of such Person to otherwise obtain a license or finding of suitability or other approval required by a Gaming Authority pursuant to applicable Gaming Laws that has had, or is reasonably likely to have a Material Adverse Effect.

"**Disqualified Capital Stock**" shall mean, with respect to any Person, any Equity Interest of such Person that, by its terms (or by the terms of any security into which it is convertible or for which it is exchangeable), or upon the happening of any event, matures (excluding any maturity as the result of an optional redemption by the issuer thereof) or is mandatorily redeemable or redeemable at the sole option of the holder thereof, pursuant to a sinking fund or otherwise (other than solely (w) for Qualified Capital Stock or upon a sale of assets, casualty event or a change of control, in each case, subject to the prior payment in full of the Obligations, (x) as a result of a redemption required by Gaming Law, (y) as a result of a redemption that by the terms of such Equity Interest is contingent upon such redemption not being prohibited by this Agreement or (z) with respect to Equity Interests issued to any plan for the benefit of, or to, present or former directors, officers, consultants or employees that is required to be repurchased by the issuer thereof in order to satisfy applicable statutory or regulatory obligations as a result of such director's, officer's, consultant's, or employee's termination, resignation, retirement, death or disability), or exchangeable or convertible into debt securities of the issuer thereof at the sole option of the holder thereof, in whole or in part, on or prior to the date that is 91 days after the Maturity Date then in effect at the time of issuance thereof.

"**Dollars**" and "**$**" shall mean the lawful money of the United States.

"**EEA Financial Institution**" shall mean (a) any credit institution or investment firm established in any EEA Member Country which is subject to the supervision of an EEA Resolution Authority, (b) any entity established in an EEA Member Country which is a parent of an institution described in clause (a) of this definition, or (c) any financial institution established in an EEA Member Country which is a subsidiary

11

of an institution described in <u>clauses (a)</u> or <u>(b)</u> of this definition and is subject to consolidated supervision with its parent.

"**EEA Member Country**" shall mean any of the member states of the European Union, Iceland, Liechtenstein, and Norway.

"**EEA Resolution Authority**" shall mean any public administrative authority or any Person entrusted with public administrative authority of any EEA Member Country (including any delegee) having responsibility for the resolution of any EEA Financial Institution.

"**Electing Lender**" has the meaning specified in Section 2.01(a)(ii).

"**Election Deadline**" means 12:00 p.m. (New York City time) on July 18, 2025.

"**Employee Benefit Plan**" shall mean an employee benefit plan (as defined in Section 3(3) of ERISA) that is maintained or contributed to by any ERISA Entity.

"**Environment**" shall mean ambient air, indoor air, surface water and groundwater (including potable water, navigable water and wetlands), the land surface or subsurface strata, natural resources, the workplace or as otherwise defined in any Environmental Law.

"**Environmental Action**" shall mean (a) any notice, claim, demand or other written or, to the knowledge of any Responsible Officer of Borrower, oral communication alleging liability of Borrower or any of its Subsidiaries for investigation, remediation, removal, cleanup, response, corrective action or other costs, damages to natural resources, personal injury, property damage, fines or penalties resulting from, related to or arising out of (i) the presence, Release or threatened Release in or into the Environment of Hazardous Material at any location or (ii) any violation of Environmental Law, and shall include, without limitation, any claim seeking damages, contribution, indemnification, cost recovery, compensation or injunctive relief resulting from, related to or arising out of the presence, Release or threatened Release of Hazardous Material or alleged injury or threat of injury to human health, safety or the Environment arising under Environmental Law and (b) any investigation, monitoring, removal or remedial activities undertaken by or on behalf of Borrower or any of its Subsidiaries, arising under Environmental Law whether or not such activities are carried out voluntarily.

"**Environmental Law**" shall mean any and all applicable treaties, laws, statutes, ordinances, regulations, rules, decrees, judgments, orders, consent orders, consent decrees and other binding legal requirements, and the common law, relating to protection of public health or the Environment, the use, generation, treatment, Release or threatened Release of Hazardous Material, natural resources or natural resource damages, or occupational safety or health.

"**Equity Interests**" shall mean, with respect to any Person, any and all shares, interests, participations or other equivalents, including membership interests (however designated, whether voting or non-voting), of equity of such Person, including, if such Person is a partnership, partnership interests (whether general or limited) and any other interest or participation that confers on a Person the right to receive a share of the profits and losses of, or distributions of assets of, such partnership, whether outstanding on the Closing Date or issued after the Closing Date; <u>provided</u>, <u>however</u>, that a debt instrument convertible into or exchangeable or exercisable for any Equity Interests or Swap Contracts entered into as a part of, or in connection with, an issuance of such debt instrument shall not be deemed an Equity Interest.

"**Equity Issuance**" shall mean (a) any issuance or sale after the Closing Date by Borrower or any Licensed Operator Guarantor of any Equity Interests (including any Equity Interests issued upon exercise

of any Equity Rights) or any Equity Rights (other than to Borrower or any other Subsidiary), or (b) the receipt by Borrower or any Licensed Operator Guarantor after the Closing Date of any capital contribution (whether or not evidenced by any Equity Interest issued by the recipient of such contribution) (other than from Borrower or any other Subsidiary).  The issuance or sale of any debt instrument convertible into or exchangeable or exercisable for any Equity Interests shall be deemed a Debt Issuance and not an Equity Issuance for purposes of the definition of "Equity Issuance Proceeds"; provided, however, that such issuance or sale shall be deemed an Equity Issuance upon the conversion or exchange of such debt instrument into Equity Interests.

"**Equity Issuance Proceeds**" shall mean, with respect to any Equity Issuance, the aggregate amount of all cash received in respect thereof by the Person consumming such Equity Issuance net of all investment banking fees, discounts and commissions, legal fees, consulting fees, accountants' fees, underwriting discounts and commissions and other fees and expenses actually incurred in connection therewith; provided that, with respect to any Equity Interests issued upon exercise of any Equity Rights, the Equity Issuance Proceeds with respect thereto shall be determined without duplication of any Equity Issuance Proceeds received in respect of such Equity Rights.

"**Equity Rights**" shall mean, with respect to any Person, any then-outstanding subscriptions, options, warrants, commitments, preemptive rights or agreements of any kind (including any stockholders' or voting trust agreements) for the issuance, sale, registration or voting of any additional Equity Interests of any class, or partnership or other ownership interests of any type in, such Person; provided, however, that a debt instrument convertible into or exchangeable or exercisable for any Equity Interests shall not be deemed an Equity Right.

"**ERISA**" shall mean the Employee Retirement Income Security Act of 1974, as amended from time to time.

"**ERISA Entity**" shall mean any member of the ERISA Group.

"**ERISA Event**" shall mean (a) any "reportable event," as defined in Section 4043 of ERISA or the regulations issued thereunder, with respect to a Pension Plan (other than an event for which the 30-day notice requirement is waived); (b) with respect to any Pension Plan, the failure to satisfy the minimum funding standard under Section 412 of the Code or Section 302 of ERISA, whether or not waived, the failure by any ERISA Entity to make by its due date a required installment under Section 430(j) of the Code with respect to any Pension Plan or the failure to make any required contribution to a Multiemployer Plan; (c) the filing pursuant to Section 412(c) of the Code or Section 302(c) of ERISA of an application for a waiver of the minimum funding standard with respect to any Pension Plan; (d) the incurrence by any ERISA Entity of any liability under Title IV of ERISA with respect to the termination of any Pension Plan; (e) the receipt by any ERISA Entity from the PBGC or a plan administrator of any notice indicating an intent to terminate any Pension Plan or to appoint a trustee to administer any Pension Plan; (f) the occurrence of any event or condition which would reasonably constitute grounds under ERISA for the termination of or the appointment of a trustee to administer, any Pension Plan; (g) the incurrence by any ERISA Entity of any liability with respect to the withdrawal or partial withdrawal from any Pension Plan or Multiemployer Plan; (h) the receipt by an ERISA Entity of any notice, or the receipt by any Multiemployer Plan from any ERISA Entity of any notice, concerning the imposition of Withdrawal Liability on any ERISA Entity or a determination that a Multiemployer Plan is, or is expected to be, insolvent, within the meaning of Title IV of ERISA or is in "endangered" or "critical" status, within the meaning of Section 432 of the Code or Section 305 of ERISA; (i) the making of any amendment to any Pension Plan which would be reasonably likely to result in the imposition of a lien or the posting of a bond or other security; (j) the withdrawal of any ERISA Entity from a Pension Plan subject to Section 4063 of ERISA during a plan year in which such ERISA Entity was a "substantial employer" as defined in Section 4001(a)(2) of ERISA or a cessation of

operations that is treated as such a withdrawal under Section 4062(e) of ERISA; or (k) the occurrence of a nonexempt prohibited transaction (within the meaning of Section 4975 of the Code or Section 406 of ERISA) which would reasonably be expected to result in liability to Borrower or any of its Subsidiaries.

"**ERISA Group**" shall mean Borrower and its Subsidiaries and all members of a controlled group of corporations and all trades or businesses (whether or not incorporated) under common control which, together with Borrower or any of its Subsidiaries, are treated as a single employer under Section 414(b) or (c) of the Code.

"**Erroneous Payment**" has the meaning set forth in <u>Section 12.15(a)</u>.

"**Erroneous Payment Deficiency Assignment**" has the meaning set forth in <u>Section 12.15(d)</u>.

"**Erroneous Payment Impacted Class**" has the meaning set forth in <u>Section 12.15(d)</u>.

"**Erroneous Payment Return Deficiency**" has the meaning set forth in <u>Section 12.15(d)</u>.

"**Erroneous Payment Subrogation Rights**" has the meaning set forth in <u>Section 12.15(d)</u>.

"**Escrow Agreement**" shall mean that certain Escrow Agreement, dated as of July 16, 2025, by and among Alter Domus, as escrow agent, the Borrower and the Administrative Agent, as may be amended, amended and restated, replaced, supplemented or otherwise modified from time to time.

"**EU Bail-In Legislation Schedule**" shall mean the EU Bail-In Legislation Schedule published by the Loan Market Association (or any successor Person), as in effect from time to time.

"**Events of Default**" has the meaning set forth in <u>Section 11.01</u>.

"**Exchange Act**" shall mean the Securities Exchange Act of 1934, as amended, and the rules and regulations of the SEC promulgated thereunder.

"**Excluded Subsidiary**" shall mean (a) any Subsidiary that is prohibited by applicable law, rule or regulation (including, without limitation, any Gaming Laws) or by any agreement, instrument or other undertaking to which such Subsidiary is a party or by which it or any of its property or assets is bound from guaranteeing the Obligations, and in each case, only for so long as such prohibition exists; <u>provided</u> that any such agreement, instrument or other undertaking, in the case of a Subsidiary acquired after the Closing Date, was not entered into in connection with or anticipation of such acquisition, (b) any Subsidiary for which guaranteeing the Obligations would require consent, approval, license or authorization from any Governmental Authority (including, without limitation, any Gaming Authority), unless such consent, approval, license or authorization has been received and is in effect, (c) any not-for-profit Subsidiaries, and (d) any captive insurance Subsidiaries; <u>provided</u> that, notwithstanding the foregoing, none of the Licensed Operator Guarantors shall be Excluded Subsidiaries. For the avoidance of doubt, on the Closing Date there are no Excluded Subsidiaries.

"**Excluded Taxes**" shall mean all of the following Taxes imposed on or with respect to any Agent, any Lender, or any other recipient of any payment to be made by or on account of any obligation of any Credit Party or required to be deducted from a payment to such recipient, in each case, under any Credit Document, (a) income or franchise (or similar) Taxes imposed on (or measured by) such recipient's net income or net profits (however denominated) and branch profits Taxes, in each case, (i) imposed by a jurisdiction as a result of such recipient being organized under the Laws of, or having its principal office or, in the case of any Lender, its Applicable Lending Office located in such jurisdiction (or any political

subdivision thereof) or (ii) that are Other Connection Taxes, (b) in the case of any Lender, any U.S. federal withholding tax that is imposed on amounts payable to or for the account of such Lender with respect to an applicable interest in a Loan or Commitment pursuant to a Law in effect on the date on which (i) such Lender acquires such interest in the applicable Commitment (or, to the extent a Lender acquires an interest in a Loan not funded pursuant to a prior Commitment, acquires such interest in such Loan) (in each case, other than pursuant to an assignment requested by the Borrower under Section 2.11(a)) or (ii) such Lender designates a new Applicable Lending Office, except in each case to the extent that additional amounts with respect to such withholding Tax were payable pursuant to Section 5.06(a) either to such Lender's assignor immediately before such Lender acquired the applicable interest in the applicable Loan or Commitment or to such Lender immediately before it designated the new Applicable Lending Office, (c) Taxes attributable to such recipient's failure to comply with Section 5.06(c), and (d) any withholding Tax imposed under FATCA; provided, that for purposes of clause (b)(i), a Lender shall be treated as having acquired its interests when such Lender acquired its interest in the Loans.

"**fair market value**" shall mean, with respect to any Property, a price (after taking into account any liabilities relating to such Property), as determined in good faith by Borrower, that could be negotiated in an arm's-length free market transaction, for cash, between a willing seller and a willing and able buyer, neither of which is under any compulsion to complete the transaction.

"**Fair Share**" has the meaning set forth in Section 6.10.

"**FATCA**" shall mean Sections 1471 through 1474 of the Code, as of the date of this Agreement (or any amended or successor version that is substantively comparable and not materially more onerous to comply with), any current or future regulations thereunder or official interpretations thereof, any agreements entered into pursuant to current Section 1471(b)(1) of the Code (or any amended or successor version described above) and any fiscal or regulatory legislation, rules or official administrative guidance adopted pursuant to any intergovernmental agreement, treaty or convention among Governmental Authorities implementing the foregoing.

"**Federal Funds Effective Rate**" shall mean, for any day, the rate calculated by the NYFRB based on such day's federal funds transactions by depositary institutions, as determined in such manner as the NYFRB shall set forth on its public website from time to time, and published on the next succeeding Business Day by the NYFRB as the federal funds effective rate; provided that if such rate is not published for any day that is a Business Day, the term "Federal Funds Effective Rate" shall mean the rate for a federal funds transaction quoted at 11:00 a.m. on such day received by Administrative Agent from a federal funds broker of recognized standing selected by it; provided, further, that if the aforesaid rate shall be less than zero, such rate shall be deemed to be zero for purposes of this Agreement.

"**Final Backstop Commitment**" has the meaning set forth in the Final Backstop Commitment Letter.

"**Final Backstop Commitment Letter**" shall mean that certain Final Backstop Commitment Letter, dated as of August [27], 2025, by and among the Borrower, the Final Backstop Parties and the Fronting Lender.

"**Final Backstop Parties**" shall mean each of HG Vora Capital Management, LLC (on behalf of certain funds and accounts managed or advised by it) and Angelo Gordon & Co., L.P. (on behalf of certain funds and accounts managed or advised by it).

"**Final DIP Order**" means an order of the Bankruptcy Court approving the Loans, this Agreement and the other Credit Documents on a final basis, which order shall be (a) substantially in the form of

Exhibit L attached as Annex IV to Amendment No. 2, and (b) in full force and effect and shall not have been reversed, vacated, stayed or subject to appeal.

"**Final DIP Order Entry Date**" means the date on which the Final DIP Order is entered by the Bankruptcy Court.

"**Final Electing Lender**" has the meaning given to such term in Section 2.01(c)(ii).

"**Final Election Deadline**" means 12:00pm (New York City time) on [•], 2025.

"**Final New Money DIP Loans**" has the meaning given to such term in Section 2.01(c)(i).

"**Final Roll-Up DIP Loans**" has the meaning given to such term in Section 2.01(c)(iii).

"**Final DIP Loans**" shall mean the Final New Money DIP Loans and the Final Roll-Up DIP Loans.

"**Flood Insurance Laws**" shall mean, collectively, (a) the National Flood Insurance Act of 1968 as now or hereafter in effect or any successor statute thereto, (b) the Flood Disaster Protection Act of 1973 as now or hereafter in effect or any successor statue thereto, (c) the National Flood Insurance Reform Act of 1994 as now or hereafter in effect or any successor statute thereto, (d) the Flood Insurance Reform Act of 2004 as now or hereafter in effect or any successor statute thereto and (e) the Biggert-Waters Flood Insurance Reform Act of 2012 as now or hereafter in effect or any successor statute thereto.

"**Floor**" shall mean a rate of interest equal to 2.0%.

"**Foreign Subsidiary**" shall mean each Subsidiary that is organized under the laws of a jurisdiction other than the United States or any state thereof, or the District of Columbia.

"**Fronting Lender**" means Barclays Bank PLC, as fronting lender for the Backstop Parties and the Electing Lenders.

"**Funding Credit Party**" has the meaning set forth in Section 6.10.

"**Funding Account**" shall mean the account established by Alter Domus, as escrow agent, at Wells Fargo Bank, N.A. which shall, at all times, be subject to the Escrow Agreement.

"**Funding Date**" shall mean the date of the making of any extension of credit hereunder.

"**GAAP**" shall mean generally accepted accounting principles set forth as of the relevant date in the opinions and pronouncements of the Accounting Principles Board of the American Institute of Certified Public Accountants and statements and pronouncements of the Financial Accounting Standards Board (or agencies with similar functions of comparable stature and authority within the U.S. accounting profession), including, without limitation, any Accounting Standards Codifications, which are applicable to the circumstances as of the date of determination.

"**Gaming Approval**" shall mean any and all approvals, authorizations, permits, consents, rulings, orders or directives of any Governmental Authority (including, without limitation, any Gaming Authority) in favor of Borrower or any of its Subsidiaries (a) necessary to enable Borrower or any of its Subsidiaries to engage in, operate or manage the casino, gambling or gaming business or otherwise continue to conduct, operate or manage such business substantially as is presently conducted, operated or managed or contemplated to be conducted, operated or managed following the Closing Date (after giving effect to the

Transactions), (b) required by any Gaming Law or (c) necessary as is contemplated on the Closing Date (after giving effect to the Transactions), to accomplish the financing and other transactions contemplated hereby after giving effect to the Transactions.

"**Gaming Authority**" shall mean any Governmental Authority with regulatory, licensing or permitting authority or jurisdiction over any gaming business or enterprise or any Gaming Facility, or with regulatory, licensing or permitting authority or jurisdiction over any gaming operation (or proposed gaming operation) owned, managed, leased or operated by Borrower or any of its Subsidiaries.

"**Gaming Facility**" shall mean any gaming establishment and other property or assets ancillary thereto or used in connection therewith, including, without limitation, any casinos, hotels, resorts, race tracks, off-track wagering sites, gambling taverns, distributed gaming locations, theaters, parking facilities, recreational vehicle parks, timeshare operations, retail shops, restaurants, other buildings, land, golf courses and other recreation and entertainment facilities, marinas, vessels, barges, ships and related equipment.

"**Gaming Laws**" shall mean all applicable provisions of all: (a) constitutions, treaties, statutes or laws governing Gaming Facilities and rules, regulations, codes and ordinances of, and all administrative or judicial orders or decrees or other laws pursuant to which, any Gaming Authority possesses regulatory, licensing or permit authority over gambling, gaming or Gaming Facility activities conducted, operated or managed by Borrower or any of its Subsidiaries within its jurisdiction; (b) Gaming Approvals; and (c) orders, decisions, determinations, judgments, awards and decrees of any Gaming Authority.

"**Gaming Lease**" shall mean (a) any lease entered into for the purpose of Borrower or any of its Subsidiaries to acquire (including pursuant to a sale and leaseback transaction) the right to occupy and use real property, vessels or similar assets for, or in connection with, the construction, development or operation of Gaming Facilities, including, without limitation, the AG Master Lease and any Additional Lease and (b) any Licensed Operator Guarantor OpCo/PropCo Lease.

"**Gaming License**" shall mean any Gaming Approval or other casino, gambling or gaming license issued by any Gaming Authority in favor of Borrower or any of its Subsidiaries covering any such activity at any Gaming Facility.

"**Governmental Authority**" shall mean any government or political subdivision of the United States or any other country, whether federal, state, provincial or local, or any agency, authority, board, bureau, central bank, commission, office, division, department or instrumentality thereof or therein, including, without limitation, any court, tribunal, grand jury or arbitrator, in each case whether foreign or domestic, or any entity exercising executive, legislative, judicial, regulatory or administrative functions of or pertaining to such government or political subdivision including, without limitation, any Gaming Authority.

"**Governmental Real Property Disclosure Requirements**" shall mean any Requirement of Law requiring notification of the buyer, mortgagee or assignee of real property, or notification, registration or filing to or with any Governmental Authority, in connection with the sale, lease, mortgage, assignment or other transfer (including, without limitation, any transfer of control) of any real property, establishment or business, of the actual or threatened presence or release in or into the Environment, or the use, disposal or handling of Hazardous Material on, at, under or near the real property, facility or business to be sold, mortgaged, assigned or transferred.

"**Guarantee**" shall mean the guarantee of each Guarantor pursuant to Article VI.

"**Guaranteed Obligations**" has the meaning set forth in Section 6.01.

17

"**Guarantors**" shall mean Holdings and each of the other Persons listed on Schedule 1.01(A) attached hereto as of the Closing Date (including, for the avoidance of doubt, the Licensed Operator Guarantors) and each Subsidiary that may hereafter execute a Joinder Agreement pursuant to Section 9.11, together with their successors and permitted assigns, and "**Guarantor**" shall mean any one of them; provided, however, that notwithstanding the foregoing, Guarantors shall not include any Person that has been released as a Guarantor in accordance with the terms of the Credit Documents.

"**Hazardous Material**" shall mean any material, substance, waste, constituent or compound that is classified, regulated or otherwise characterized under any Environmental Law as hazardous, toxic, a contaminant or a pollutant or by other words of similar intent or meaning, including, without limitation, petroleum (including, without limitation, crude oil or any fraction thereof or any petroleum product or waste).

"**Historical Financial Statements**" has the meaning set forth in Section 8.02.

"**Holdings**" has the meaning set forth in the introductory section hereof.

"**Impacted Loans**" has the meaning set forth in Section 5.02.

"**Increased Amount**" of any Indebtedness shall mean any increase in the amount of such Indebtedness in connection with any accrual of interest, the accretion of accreted value, the amortization of original issue discount, the payment of interest in the form of additional Indebtedness or in the form of common stock of Borrower, the accretion of original issue discount or liquidation preference and increases in the amount of Indebtedness outstanding solely as a result of fluctuations in the exchange rate of currencies.

"**Incremental Backstop Fee**" has the meaning ascribed to such term in Section 2.05(f).

"**Incremental Funding Fee**" has the meaning ascribed to such term in Section 2.05(d).

"**Incremental New Money DIP Loans**" shall mean, collectively, the Final New Money DIP Loans made or converted (or deemed made, advanced or converted) pursuant to Section 2.01(c)(i) and the Second Interim New Money DIP Loans.

"**Incremental Roll-Up DIP Loans**" shall mean, collectively, the Final Roll-Up DIP Loans made or converted (or deemed made, advanced or converted) pursuant to Section 2.01(c)(iii) and the Second Interim Roll-up DIP Loans.

"**Incremental Roll-Up Ratio**" has the meaning ascribed to such term in the DIP Term Sheet.

"**Incremental Upfront Fee**" has the meaning ascribed to such term in Section 2.05(e).

"**incur**" shall mean, with respect to any Indebtedness or other obligation of any Person, to create, issue, incur (including by conversion, exchange or otherwise), permit to exist, assume, guarantee or otherwise become liable in respect of such Indebtedness or other obligation (and "**incurrence**," "**incurred**" and "**incurring**" shall have meanings correlative to the foregoing).

"**Indebtedness**" of any Person shall mean, without duplication, (a) all obligations of such Person for borrowed money; (b) all obligations of such Person evidenced by bonds, debentures, notes or similar instruments; (c) all obligations of such Person under conditional sale or other title retention agreements relating to property purchased by such Person; (d) all obligations of such Person issued or assumed as the

18

deferred purchase price of property or services (excluding (i) trade accounts payable and accrued obligations incurred in the ordinary course of business, (ii) the financing of insurance premiums, (iii) any such obligations payable solely through the issuance of Equity Interests and (iv) any earn-out obligation until such obligation appears in the liabilities section of the balance sheet of such Person in accordance with GAAP (excluding disclosure on the notes and footnotes thereto); provided that any earn-out obligation that appears in the liabilities section of the balance sheet of such Person shall be excluded, to the extent (x) such Person is indemnified for the payment thereof and such indemnification is not disputed or (y) amounts to be applied to the payment therefor are in escrow); (e) all Indebtedness (excluding prepaid interest thereon) of others secured by any Lien on property owned or acquired by such Person, whether or not the obligations secured thereby have been assumed; provided, however, that if such obligations have not been assumed, the amount of such Indebtedness included for the purposes of this definition will be the amount equal to the lesser of the fair market value of such property and the amount of the Indebtedness secured; (f) with respect to any Capital Lease Obligations of such Person, the capitalized amount thereof that would appear on a balance sheet of such Person prepared as of such date in accordance with GAAP; (g) all net obligations of such Person in respect of Swap Contracts; (h) all obligations of such Person as an account party in respect of letters of credit and bankers' acceptances, except obligations in respect of letters of credit issued in support of obligations not otherwise constituting Indebtedness shall not constitute Indebtedness except to the extent such letter of credit is drawn and not reimbursed within three (3) Business Days of such drawing; (i) all obligations of such Person in respect of Disqualified Capital Stock or preferred equity (or similar instruments) of a Subsidiary of such Person; and (j) all Contingent Obligations of such Person in respect of Indebtedness of others of the kinds referred to in clauses (a) through (i) above.  The Indebtedness of any Person shall include the Indebtedness of any partnership in which such Person is a general partner unless recourse is limited, in which case the amount of such Indebtedness shall be the amount such Person is liable therefor (except to the extent the terms of such Indebtedness expressly provide that such Person is not liable therefor).  The amount of Indebtedness of the type described in clause (d) shall be calculated based on the net present value thereof.  The amount of Indebtedness of the type referred to in clause (g) above of any Person shall be zero unless and until such Indebtedness shall be terminated, in which case the amount of such Indebtedness shall be the then termination payment due thereunder by such Person.  For the avoidance of doubt, it is understood and agreed that (v) [reserved], (w) [reserved], (x) casino "chips" and gaming winnings of customers, (y) any obligations of such Person in respect of Cash Management Agreements and (z) any obligations of such Person in respect of employee deferred compensation and benefit plans shall not constitute Indebtedness.  Operating leases shall not constitute Indebtedness hereunder regardless of whether required to be recharacterized as Capitalized Leases pursuant to GAAP and Gaming Leases (and any Guarantee or support arrangement in respect thereof) shall not constitute Indebtedness hereunder regardless of the characterization thereof pursuant to GAAP.

"**Indemnitee**" has the meaning set forth in Section 13.03(b).

"**Initial Approved Budget**" shall mean the initial Approved Budget approved by the Required Lenders on or prior to the Closing Date, attached as Exhibit C hereto.

"**Initial Backstop Fee**" has the meaning ascribed to such term in Section 2.05(c).

"**Initial Funding Fee**" has the meaning ascribed to such term in Section 2.05(a).

"**Initial New Money DIP Loans**" has the meaning ascribed to such term in Section 2.01(a)(i).

"**Initial Roll-Up DIP Loans**" has the meaning ascribed to such term in Section 2.01(a)(iii).

"**Initial Upfront Fee**" has the meaning ascribed to such term in Section 2.05(b).

"**Intellectual Property**" has the meaning set forth in <u>Section 8.19</u>.

"**Interest Period**" shall mean, as to each SOFR Loan, the period commencing on the date such SOFR Loan is disbursed or converted to or continued as a SOFR Loan and ending on the last Business Day of the calendar month in which such SOFR Loan is disbursed, converted or continued; <u>provided</u> that:

(a)       any Interest Period that would otherwise end on a day that is not a Business Day shall be extended to the next succeeding Business Day unless, in the case of a SOFR Loan, such Business Day falls in another calendar month, in which case such Interest Period shall end on the next preceding Business Day;

(b)       any Interest Period pertaining to a SOFR Loan that begins on the last Business Day of a calendar month (or on a day for which there is no numerically corresponding day in the calendar month at the end of such Interest Period) shall end on the last Business Day of the next succeeding calendar month; and

(c)       no Interest Period for a Class shall extend beyond the maturity date for such Class.

"**Interest Rate Protection Agreement**" shall mean, for any Person, an interest rate swap, cap or collar agreement or similar arrangement between such Person and one or more financial institutions providing for the transfer or mitigation of interest risks either generally or under specific contingencies.

"**Interim DIP Order**" means the Interim DIP Order of the Bankruptcy Court approving the Credit Parties' borrowing of the Loans, this Agreement and the other Credit Documents on an interim basis, in the form attached hereto as <u>Exhibit H</u>, entered on July 16, 2025 Docket No. 65, as the same may be amended, modified or supplemented from time to time with the consent of the Required Lenders.

"**Interim DIP Order Entry Date**" means the date on which the Interim DIP Order is entered by the Bankruptcy Court.

"**Interim Effective Date**" means July 16, 2025.

"**Investments**" of any Person shall mean (a) any loan or advance of funds or credit by such Person to any other Person, (b) any Contingent Obligation by such Person in respect of the Indebtedness or other obligation of any other Person (<u>provided</u> that upon termination of any such Contingent Obligation, no Investment in respect thereof shall be deemed outstanding, except as contemplated in <u>clause (e)</u> below), (c) any purchase or other acquisition of any Equity Interests or indebtedness or other securities of any other Person, (d) any capital contribution by such Person to any other Person, (e) without duplication of any amounts included under <u>clause (b)</u> above, any payment under any Contingent Obligation by such Person in respect of the Indebtedness or other obligation of any other Person or (f) the purchase or other acquisition (in one transaction or a series of transaction) of all or substantially all of the property and assets or business of another Person or assets constituting a business unit, line of business or division of such Person.

"**IRS**" shall mean the United States Internal Revenue Service.

"**Joinder Agreements**" shall mean each Joinder Agreement substantially in the form of <u>Exhibit F</u> attached hereto or such other form as is reasonably acceptable to Administrative Agent and each Joinder Agreement to be entered into pursuant to the Security Agreement.

"**Joint Venture**" shall mean any Person, other than an individual or a Wholly Owned Subsidiary of Borrower, in which Borrower or a Subsidiary of Borrower (directly or indirectly) holds or acquires an

ownership interest (whether by way of capital stock, partnership or limited liability company interest, or other evidence of ownership).

"**Junior Prepayments**" has the meaning set forth in <u>Section 10.09</u>.

"**Landlord**" shall mean each of AG Landlord and any landlord under any Additional Lease or other Gaming Lease.

"**Laws**" shall mean, collectively, all common law and all international, foreign, federal, state and local statutes, treaties, rules, guidelines, regulations, ordinances, codes and administrative or judicial precedents, including without limitation the interpretation thereof by any Governmental Authority charged with the enforcement thereof.

"**Lenders**" shall mean (a) each Person listed on <u>Annex A</u> and (b) any Person that becomes a "Lender" hereunder pursuant to an Assignment Agreement, in each case, other than any such Person that ceases to be a Lender pursuant to an Assignment Agreement.

"**Licensed Operator Affiliate**" shall mean any Affiliate of Borrower that is not directly or indirectly owned by the Borrower and that holds requisite Gaming Licenses in order to operate the Gaming Facilities of Borrower and its Subsidiaries and becomes, or is intended to become (as determined by Borrower) party to a Licensed Operator Guarantor OpCo/PropCo Lease and is designated as a "Licensed Operator Affiliate" by the Borrower, and any successor thereof.

"**Licensed Operator Guarantors**" shall mean each Person listed on <u>Schedule 1.01(A)</u> attached hereto as of the Closing Date and indicated as a "Licensed Operator", and each other Licensed Operator Affiliate that may hereafter execute a Joinder Agreement pursuant to <u>Section 9.11</u>, together with their successors and permitted assign provided, however, that notwithstanding the foregoing, Licensed Operator Guarantors shall not include any Person that has been released as a Guarantor in accordance with the terms of the Credit Documents.

"**Licensed Operator Guarantor OpCo/PropCo Lease**" shall mean any lease entered into among Borrower and its Subsidiaries (or Persons who substantially contemporaneously with the execution of such lease become Subsidiaries) for the purpose of a Licensed Operator Guarantor to operate, construct and/or develop Gaming Facilities and/or related or ancillary Property owned or leased by a Borrower or a Subsidiary.

"**Lien**" shall mean, with respect to any Property, any mortgage, deed of trust, lien, pledge, security interest, or assignment, hypothecation or encumbrance for security of any kind, or any filing of any financing statement under the UCC or any other similar notice of lien under any similar notice or recording statute of any Governmental Authority (other than such financing statement or similar notices filed for informational or precautionary purposes only), or any conditional sale or other title retention agreement or any lease in the nature thereof; <u>provided</u> that in no event shall any operating lease or any Gaming Lease be deemed to be a Lien.

"**Liquor Authority**" has the meaning set forth in <u>Section 13.13(a)</u>.

"**Liquor Laws**" has the meaning set forth in <u>Section 13.13(a)</u>.

"**Loan**" or "**Loans**" means the New Money DIP Loans or the Roll-Up DIP Loans made or converted (or deemed made, advanced or converted) by one or more of the Lenders to the Borrower from

time to time pursuant and in accordance with <u>Section 2.01</u>, including as may be assigned in whole or in part from time to time in accordance with the terms and conditions hereof.

"**Losses**" of any Person shall mean the losses, liabilities, claims (including those based upon negligence, strict or absolute liability and liability in tort), damages, reasonable expenses, obligations, penalties, actions, judgments, penalties, fines, suits, reasonable and documented costs or disbursements (including reasonable fees and expenses of one primary counsel for the Secured Parties collectively, and one special gaming and local counsel reasonably required in any applicable jurisdiction for the Secured Parties collectively (and solely in the case of an actual or perceived conflict of interest, where the Persons affected by such conflict inform Borrower in writing of the existence of an actual or perceived conflict of interest prior to retaining additional counsel, one additional of each such counsel for each group of similarly situated Secured Parties), in connection with any Proceeding commenced or threatened in writing, whether or not such Person shall be designated a party thereto) at any time (including following the payment of the Obligations) incurred by, imposed on or asserted against such Person.

"**Maintenance Capital Expenditures**" shall mean Capital Expenditures for the maintenance, repair, restoration, refurbishment or replacement of tangible property of the Borrower or its Subsidiaries.

"**Margin Stock**" shall mean margin stock within the meaning of Regulation T, Regulation U and Regulation X.

"**Maturity Date**" shall mean the earliest of: (i) nine (9) months from the Interim Effective Date, which date may be extended by the Required Lenders (and without the consent of any other Lender) if the sole condition remaining to be satisfied for an Acceptable Restructuring is the receipt of regulatory approvals, (ii) the effective date of a Plan of Reorganization that has been confirmed by an order of the Bankruptcy Court, (iii) 25 days after the Interim DIP Order Entry Date unless on or before such day the Final DIP Order Entry Date shall have occurred, and (iv) consummation of a sale of all or substantially all of the assets of the Credit Parties.

"**Material Adverse Effect**" shall mean (a) a material adverse effect on the business, assets, financial condition or results of operations of Borrower and its Subsidiaries (taken as a whole) excluding in any event the effect of filing the Bankruptcy Cases, the events and conditions leading up to and customarily resulting from the commencement and continuation of the Bankruptcy Cases, the effects thereof and any action required to be taken under the Credit Documents or the DIP Orders, and the Bankruptcy Cases themselves, (b) a material adverse effect on the ability of the Credit Parties to satisfy their material payment Obligations under the Credit Documents or (c) a material adverse effect on the legality, binding effect or enforceability of any Credit Document against any material Credit Party to which it is a party or any of the material rights and remedies of any Secured Party thereunder or the legality, priority or enforceability of the Liens on a material portion of the Collateral.

"**Maverick Canada**" means Maverick Acquisition Canada ULC, a British Columbia unlimited liability company.

"**Maximum Rate**" has the meaning set forth in <u>Section 13.18</u>.

"**Milestone**" and "**Milestones**" means each of the reporting and Chapter 11 milestones set forth on <u>Schedule 9.20</u> hereto.

"**Moody's**" shall mean Moody's Investors Service, Inc., or any successor entity thereto.

"**Mortgage**" shall mean an agreement, including, but not limited to, a mortgage, deed of trust or any other document, creating and evidencing a first Lien (subject only to the Permitted Liens) in favor of Collateral Agent on behalf of the Secured Parties on each Mortgaged Real Property, which shall be reasonably acceptable to Administrative Agent and the Required Lenders, with such schedules and including such provisions as shall be necessary to conform such document to applicable or local law or as shall be customary under local law, as the same may at any time be amended in accordance with the terms thereof and hereof and such changes thereto as shall be reasonably acceptable to Administrative Agent.

"**Mortgaged Real Property**" shall mean each Real Property, if any, which shall be subject to a Mortgage delivered on or after the Closing Date pursuant to Section 9.08, 9.11 or 9.15 or upon which a Lien is granted to secure the Obligations pursuant to the DIP Orders (in each case, unless and until such Real Property is no longer subject to a Mortgage or such DIP Orders).

"**Multiemployer Plan**" shall mean a multiemployer plan within the meaning of Section 4001(a)(3) of ERISA (a) to which any ERISA Entity is then making or accruing an obligation to make contributions, (b) to which any ERISA Entity has within the preceding five plan years made contributions, including any Person which ceased to be an ERISA Entity during such five year period or (c) with respect to which any Company is reasonably likely to incur liability under Title IV of ERISA.

"**NAIC**" shall mean the National Association of Insurance Commissioners.

"**Net Available Proceeds**" shall mean:

(a)      in the case of any Asset Sale, the aggregate amount of all cash payments (including any cash payments received by way of deferred payment of principal pursuant to a note or otherwise, but only as and when received) received by Borrower or any Subsidiary directly or indirectly in connection with such Asset Sale, net (without duplication) of (A) the amount of all reasonable fees and expenses and transaction costs paid by or on behalf of Borrower or any Subsidiary in connection with such Asset Sale (including, without limitation, any underwriting, brokerage or other customary selling commissions and legal, advisory and other fees and expenses, including survey, title and recording expenses, transfer taxes and expenses incurred for preparing such assets for sale, associated therewith); (B) any Taxes or Permitted Tax Distributions paid or estimated in good faith to be payable by or on behalf of any Company as a result of, or which are otherwise attributable to, such Asset Sale (after application of all credits and other offsets that arise from such Asset Sale); (C) any repayments by or on behalf of any Company of Indebtedness (other than Indebtedness hereunder) to the extent such Indebtedness is secured by a Lien on such Property that is permitted by the Credit Documents and that is not junior to the Lien thereon securing the Obligations and such Indebtedness is required to be repaid as a condition to the purchase or sale of such Property; (D) amounts required to be paid to any Person (other than any Company) owning a beneficial interest in the subject Property; and (E) amounts reserved, in accordance with GAAP, against any liabilities associated with such Asset Sale and retained by Borrower or any of its Subsidiaries after such Asset Sale and related thereto, including pension and other post-employment benefit liabilities, purchase price adjustments, liabilities related to environmental matters and liabilities under any indemnification obligations associated with such Asset Sale, all as reflected in an Officer's Certificate delivered to Administrative Agent;

(b)      in the case of any Casualty Event, the aggregate amount of cash proceeds of insurance, condemnation awards and other compensation (excluding proceeds constituting business interruption insurance or other similar compensation for loss of revenue, but including the proceeds of any disposition of Property pursuant to Section 10.05(k)) received by the Person whose Property was subject to such Casualty Event in respect of such Casualty Event net of (A) fees and expenses incurred by or on behalf of Borrower or any Subsidiary in connection with recovery thereof, (B) any repayments by or on behalf of any Company of Indebtedness (other than Indebtedness hereunder) to the extent such Indebtedness is

secured by a Lien on such Property that is permitted by the Credit Documents and that is not junior to the Lien thereon securing the Obligations and such Indebtedness is required to be repaid as a result of such Casualty Event, and (C) any Taxes or Permitted Tax Distributions paid or payable by or on behalf of any Company in respect of, or which are otherwise attributable to, the amount so recovered (after application of all credits and other offsets arising from such Casualty Event) and amounts required to be paid to any Person (other than any Company) owning a beneficial interest in the subject Property; provided, that in the case of a Casualty Event with respect to Property that is subject to a Gaming Lease or any other lease entered into for the purpose of, or with respect to, operating or managing Gaming Facilities and related assets, such cash proceeds shall not constitute Net Available Proceeds to the extent, and for so long as, such cash proceeds are required, by the terms of such lease, (x) to be paid to the holder of any mortgage, deed of trust or other security agreement securing indebtedness of the lessor, (y) to be paid to, or for the account of, the lessor or deposited in an escrow account to fund rent and other amounts due with respect to such Property and costs to preserve, stabilize, repair, replace or restore such Property (in accordance with the provisions of the applicable lease) or (z) to be applied to rent and other amounts due under such lease or to fund costs and expenses of repair, replacement or restoration of such Property, or the preservation or stabilization of such Property (in accordance with the provisions of the applicable lease); and

(c)     in the case of any Debt Issuance or Equity Issuance, the aggregate amount of all cash received in respect thereof by the Person consummating such Debt Issuance or Equity Issuance in respect thereof net of all investment banking fees, discounts and commissions, legal fees, consulting fees, accountants' fees, underwriting discounts and commissions and other fees and expenses, actually incurred in connection therewith.

"**New Money Lenders**" shall mean, collective, the Lenders holding New Money DIP Loans.

"**New Money DIP Loans**" shall mean, collectively, the Initial New Money DIP Loans and any Incremental New Money DIP Loans (including the Second Interim New Money DIP Loans and the Final New Money DIP Loans).

"**Non-Credit Party**" and "**Non-Credit Parties**" shall mean any Subsidiary or Subsidiaries of Borrower that is not a Credit Party or are not Credit Parties.

"**Non-U.S. Lender**" has the meaning set forth in Section 5.06(b)(ii).

"**Notes**" shall mean a promissory note of the Borrower payable to any Lender or its registered assigns, in substantially the form of Exhibit A.

"**Notice of Borrowing**" shall mean a notice of borrowing substantially in the form of Exhibit B or such other form as is reasonably acceptable to Administrative Agent.

"**Notice of Continuation/Conversion**" shall mean a notice of continuation/conversion substantially in the form of Exhibit J or such other form as is reasonably acceptable to Administrative Agent.

"**NYFRB**" shall mean the Federal Reserve Bank of New York.

"**Obligations**" shall mean all amounts, liabilities and obligations, direct or indirect, contingent or absolute, of every type or description, and at any time existing, owing by any Credit Party to any Secured Party or any of its Agent Related Parties or their respective successors, transferees or assignees pursuant to the terms of any Credit Document, whether or not the right of such Person to payment in respect of such obligations and liabilities is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured,

unmatured, disputed, undisputed, legal, equitable, secured or unsecured and whether or not such claim is discharged, stayed or otherwise affected by any bankruptcy case or insolvency or liquidation proceeding.

"**Officer's Certificate**" shall mean, as applied to any entity, a certificate executed on behalf of such entity (or such entity's manager or member or general partner, as applicable) by its chairman of the board of directors (or functional equivalent) (if an officer), its chief executive officer, its president, any of its vice presidents, its chief financial officer, its chief accounting officer or its treasurer or controller (in each case, or an equivalent officer) in their official (and not individual) capacities.

"**Organizational Document**" shall mean, relative to any Person, its certificate of incorporation, its certificate of formation, its certificate of partnership, its by-laws, its partnership agreement, its limited liability company agreement, its memorandum or articles of association, share designations or similar organization documents and all shareholder agreements, voting trusts and similar arrangements applicable to any of its authorized Equity Interests.

"**Other Connection Taxes**" shall mean, with respect to any Agent, any Lender or any other recipient of any payment to be made by or on account of any obligation of any Credit Party under any Credit Document, Taxes imposed as a result of a present or former connection between such recipient and the jurisdiction imposing such Tax (other than connections arising from such recipient having executed, delivered, become a party to, performed its obligations under, received payments under, received or perfected a security interest under, engaged in any other transaction pursuant to or enforced any Credit Document, or sold or assigned an interest in any Loan or Credit Document).

"**Other Taxes**" shall mean any present or future stamp, court or documentary, intangible, recording, filing or similar Taxes which arise from any payment made under or from the execution, delivery, performance, enforcement, filing, recordation or registration of, or otherwise with respect to, any Credit Document, except any such Taxes that are Other Connection Taxes imposed with respect to an assignment (other than an assignment made pursuant to <u>Section 2.11(a)</u>).

"**Paid in Full**" or "**Payment in Full**" and any other similar terms, expressions or phrases shall mean, at any time, (a) with respect to obligations other than the Obligations or the "Secured Obligations" (as defined in the Security Agreement), the payment and satisfaction in full of all of such obligations and (b) with respect to the Obligations or the "Secured Obligations" (as defined in the Security Agreement), the irrevocable termination of all Commitments, the payment and satisfaction in full in cash of all Obligations (except Unasserted Obligations), including principal, interest, fees, expenses, costs (including post-petition interest, fees, expenses, and costs even if such interest, fees, expenses and costs are not an allowed claim enforceable against any Credit Party in a bankruptcy case under applicable law) and premium (if any). For purposes of this definition, "**Unasserted Obligations**" shall mean, at any time, indemnity and other contingent obligations in respect of which no claim or demand for payment has been made at such time.

"**Patriot Act**" has the meaning set forth in <u>Section 13.14</u>.

"**Payment Recipient**" has the meaning set forth in <u>Section 12.15(a)</u>.

"**PBGC**" shall mean the Pension Benefit Guaranty Corporation referred to and defined in ERISA, or any successor thereto.

"**Pension Plan**" shall mean an employee pension benefit plan (other than a Multiemployer Plan) that is covered by Title IV of ERISA or subject to the minimum funding standards under Section 412 of the Code or Section 302 of ERISA and is maintained or contributed to by any ERISA Entity or with respect to which any Company is reasonably likely to incur liability under Title IV of ERISA.

"**Periodic Term SOFR Determination Day**" has the meaning set forth in the definition of "Term SOFR".

"**Permits**" has the meaning set forth in Section 8.15.

"**Permitted Business**" shall mean any business of the type in which Borrower and its Subsidiaries are engaged or proposed to be engaged on the date of this Agreement, or any business reasonably related, incidental or ancillary thereto (including assets or businesses complementary thereto).

"**Permitted Liens**" has the meaning set forth in Section 10.02.

"**Permitted Prior Liens**" has the meaning ascribed in (i) the Interim DIP Order (prior to entry of the Final DIP Order), and (ii) upon entry of the Final DIP Order, the Final DIP Order.

"**Permitted Tax Distributions**" has the meaning set forth in Section 10.06(f).

"**Permitted Variance**" shall mean a Variance from the then-current Approved Budget during any Testing Period that (x) does not exceed the total aggregate amount in such Approved Budget of disbursements (other than fees and expenses of the Lenders) by more than 15% and (y) is not less than 75% for the first Testing Period and 85% for each Testing Period thereafter, of the aggregate cash receipts in such Approved Budget.

"**Person**" shall mean any individual, corporation, company, association, partnership, limited liability company, joint venture, trust, unincorporated organization or Governmental Authority or any other entity.

"**Pledged Collateral**" shall mean the "Pledged Collateral" as defined in the Security Agreement.

"**Prepetition Agent**" has the meaning set forth in the introductory section hereof.

"**Prepetition Collateral**" has the meaning specified in the DIP Orders.

"**Prepetition Credit Agreement**" has the meaning set forth in the introductory section hereof.

"**Prepetition Credit Documents**" means the "Credit Documents" under and as defined in the Prepetition Credit Agreement.

"**Prepetition First Out Term Lenders**" means the "First Out Loan Lenders" under and as defined in the Prepetition Credit Agreement.

"**Prepetition First Out Loans**" means the "First Out Loans" under and as defined in the Prepetition Credit Agreement.

"**Prepetition Lenders**" means the "Lenders" under and as defined in the Prepetition Credit Agreement.

"**Prepetition Obligations**" means the "Obligations" under and as defined in the Prepetition Credit Agreement.

"**Prepetition Required Lenders**" means the "Required Lenders" under and as defined in the Prepetition Credit Agreement.

"**Prepetition Secured Obligations**" means the "Secured Obligations" under and as defined in the Prepetition Credit Documents.

"**Prepetition Secured Parties**" means each "Secured Party" under and as defined in the Prepetition Credit Agreement.

"**Prime Rate**" shall mean the rate of interest per annum equal to the rate last quoted by The Wall Street Journal as the "U.S. prime rate" or, if The Wall Street Journal ceases to quote such rate, the highest per annum interest rate published by the Board of Governors in Federal Reserve Statistical Release H.15 (519) (Selected Interest Rates) as the "bank prime loan" rate or, if such rate is no longer quoted therein, any similar rate quoted therein (as reasonably determined by the Administrative Agent) or any similar release by the Board of Governors (as reasonably determined by the Administrative Agent). Each change in the Prime Rate shall be effective on the date such change is publicly announced as effective.

"**Prior Mortgage Liens**" shall mean, with respect to each Mortgaged Real Property, the Liens identified in Schedule B annexed to the applicable Mortgage (or Schedule B to the applicable Mortgage securing the Prepetition Obligations) as such Schedule B may be amended from time to time to the reasonable satisfaction of Administrative Agent.

"**Proceeding**" shall mean any claim, counterclaim, action, judgment, suit, hearing, governmental investigation, arbitration or proceeding, including by or before any Governmental Authority and whether judicial or administrative.

"**Property**" shall mean any right, title or interest in or to property or assets of any kind whatsoever, whether real, personal or mixed and whether tangible or intangible and including all contract rights, income or revenue rights, real property interests, trademarks, trade names, equipment and proceeds of the foregoing and, with respect to any Person, Equity Interests or other ownership interests of any other Person.

"**Proposed Budget**" has the meaning given to such term in Section 9.04(f).

"**PTE**" shall mean a prohibited transaction class exemption issued by the U.S. Department of Labor, as any such exemption may be amended from time to time.

"**Public Company Costs**" shall mean costs relating to compliance with the provisions of the Sarbanes-Oxley Act of 2002, the Securities Act of 1933 and the Exchange Act, as applicable to companies with equity or debt securities held by the public, the rules of national securities exchange companies with listed equity or debt securities, directors' or managers' compensation, fees and expense reimbursement, costs relating to investor relations, shareholder meetings and reports to shareholders or debtholders, directors' and officers' insurance and other executive costs, legal and other professional fees, listing fees and other expenses arising out of or incidental to an entity's status as a reporting company.

"**Public Lender**" has the meaning set forth in Section 9.04.

"**Purchase Money Obligation**" shall mean, for any Person, the obligations of such Person in respect of Indebtedness incurred for the purpose of financing all or any part of the purchase price of any Property (including Equity Interests of any Person) or the cost of installation, construction or improvement of any property or assets and any refinancing thereof; provided, however, that such Indebtedness is incurred (except in the case of a refinancing) within 270 days after such acquisition of such Property or the incurrence of such costs by such Person.

"**Qualified Capital Stock**" shall mean, with respect to any Person, any Equity Interests of such Person which is not Disqualified Capital Stock.

"**Qualified Contingent Obligation**" shall mean Contingent Obligations permitted by Section 10.04 in respect of (a) Indebtedness of any Joint Venture in which Borrower or any of its Subsidiaries owns (directly or indirectly) at least 25% of the Equity Interest of such Joint Venture or (b) Indebtedness of casinos, "racinos", full-service casino resorts, non-gaming resorts, entertainment or retail developments, distributed gaming applications or taverns (and properties ancillary or related thereto (or owners of casinos, "racinos", full-service casino resorts, non-gaming resorts, entertainment or retail developments, distributed gaming applications or taverns)) with respect to which Borrower or any of its Subsidiaries has (directly or indirectly through Subsidiaries) entered into a management, development or similar contract and such contract remains in full force and effect at the time such Contingent Obligations are incurred.

"**Real Property**" shall mean, as to any Person, all the right, title and interest of such Person in and to land, improvements and appurtenant fixtures, including leaseholds (it being understood that for purposes of Schedule 8.23(a), Borrower shall not be required to describe such improvements and appurtenant fixtures in such Schedule).

"**redeem**" shall mean redeem, repurchase, repay, defease (covenant or legal), Discharge or otherwise acquire or retire for value; and "**redemption**" and "**redeemed**" have correlative meanings.

"**refinance**" shall mean refinance, renew, extend, exchange, convert, replace, defease (covenant or legal) (with proceeds of Indebtedness), Discharge (with proceeds of Indebtedness) or refund (with proceeds of Indebtedness), in whole or in part, including successively; and "**refinancing**" and "**refinanced**" have correlative meanings.

"**Register**" has the meaning set forth in Section 2.08(c).

"**Regulation D**" shall mean Regulation D (12 C.F.R. Part 204) of the Board of Governors of the Federal Reserve System of the United States (or any successor), as the same may be amended, modified or supplemented and in effect from time to time and all official rulings and interpretations thereunder or thereof.

"**Regulation T**" shall mean Regulation T (12 C.F.R. Part 220) of the Board of Governors of the Federal Reserve System of the United States (or any successor), as the same may be amended, modified or supplemented and in effect from time to time and all official rulings and interpretations thereunder or thereof.

"**Regulation U**" shall mean Regulation U (12 C.F.R. Part 221) of the Board of Governors of the Federal Reserve System of the United States (or any successor), as the same may be amended, modified or supplemented and in effect from time to time and all official rulings and interpretations thereunder or thereof.

"**Regulation X**" shall mean Regulation X (12 C.F.R. Part 224) of the Board of Governors of the Federal Reserve System of the United States (or any successor), as the same may be amended, modified or supplemented and in effect from time to time and all official rulings and interpretations thereunder or thereof.

"**Related Indemnified Person**" has the meaning set forth in Section 13.03(b).

"**Related Parties**" shall mean, with respect to any Person, such Person's Affiliates and the partners, directors, officers, employees, agents, trustees, administrators, managers, advisors and representatives of such Person and of such Person's Affiliates.

"**Release**" shall mean any spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping, disposing, depositing, dispersing, emanating or migrating of any Hazardous Material in, into, onto or through the Environment or within, from or into any building, structure, facility or fixture.

"**Relevant Governmental Body**" has the meaning set forth in Section 5.07(f).

"**Removal Effective Date**" has the meaning set forth in Section 12.06(b).

"**Replaced Lender**" has the meaning set forth in Section 2.11(a).

"**Replacement Lender**" has the meaning set forth in Section 2.11(a).

"**Required Backstop Parties**" has the meaning set forth in the DIP Term Sheet.

"**Required Lenders**" shall mean Lenders having more than 50% of the aggregate sum of Loans and unutilized Commitments of all Lenders then outstanding.

"**Requirement of Law**" shall mean, as to any Person, any Law or determination of an arbitrator or any Governmental Authority, in each case applicable to or binding upon such Person or any of its Property or to which such Person or any of its Property is subject.

"**Resignation Effective Date**" has the meaning set forth in Section 12.06(a).

"**Resolution Authority**" shall mean an EEA Resolution Authority or, with respect to any UK Financial Institution, a UK Resolution Authority.

"**Responsible Officer**" shall mean (i) the chief executive officer of Borrower, the president of Borrower (if not the chief executive officer), any vice president of Borrower, the chief financial officer, the chief accounting officer or treasurer of Borrower or, with respect to financial matters, the chief financial officer, the chief accounting officer, senior financial officer or treasurer of Borrower and (ii) as to any document delivered by a Subsidiary, any Person authorized by all necessary corporate, limited liability company and/or other action of such Subsidiary to act on behalf of such Subsidiary.

"**Restricted Amount**" has the meaning set forth in Section 2.10(a)(vi).

"**Restricted Payment**" shall mean dividends (in cash, Property or obligations) on, or other payments or distributions (including return of capital) on account of, or the setting apart of money for a sinking or other analogous fund for, or the purchase, redemption, retirement, defeasance, termination, repurchase or other acquisition of, any Equity Interests or Equity Rights (other than any payment made relating to any Transfer Agreement) in Borrower or any of its Subsidiaries, but excluding dividends, payments or distributions paid through the issuance of additional shares of Qualified Capital Stock and any redemption, retirement or exchange of any Qualified Capital Stock in Borrower or such Subsidiary through, or with the proceeds of, the issuance of Qualified Capital Stock in Borrower or any of its Subsidiaries; provided that any Qualified Capital Stock so issued by a Subsidiary is pledged to Collateral Agent to secure the Obligations in accordance with the Security Documents or the DIP Orders.

"**Reverse Trigger Event**" shall mean the transfer of Equity Interests of any Subsidiary or any Gaming Facility from trust or other similar arrangement to Borrower or any of its Subsidiaries from time to time.

"**Revocation**" has the meaning set forth in Section 9.12(b).

"**Roll-Up Lender**" shall mean each Lender holding Roll-Up DIP Loans.

"**Roll-Up DIP Loans**" shall mean, collectively, the Initial Roll-Up DIP Loans, and any Incremental Roll-Up DIP Loans (including the Second Interim Roll-Up DIP Loans).

"**S&P**" shall mean Standard & Poor's Rating Services, a division of The McGraw-Hill Companies, or any successor thereto.

"**Sanction(s)**" shall mean all economic or financial sanctions or trade embargoes imposed, administered or enforced from time to time by (a) the U.S. government, including those administered by the Office of Foreign Assets Control of the U.S. Department of the Treasury or the U.S. Department of State, (b) the United Nations Security Council, the European Union, or His Majesty's Treasury of the United Kingdom or (c) other relevant sanctions authority.

"**Sanctioned Country**" shall mean, at any time, a country, region or territory which is itself the subject or target of any comprehensive Sanctions (including, at the time of this Agreement, Crimea, Cuba, Iran, North Korea and Syria).

"**Sanctioned Person**" shall mean, at any time, (a) any Person listed in any Sanctions-related list of designated Persons maintained by the Office of Foreign Assets Control of the U.S. Department of the Treasury, the U.S. Department of State, the United Nations Security Council, the European Union, or His Majesty's Treasury of the United Kingdom, (b) any Person located, organized or resident in a Sanctioned Country or (c) any Person owned 50% or more or controlled by any such Person or Persons described in the foregoing clauses (a) or (b).

"**SEC**" shall mean the Securities and Exchange Commission of the United States or any successor thereto.

"**Second Interim Backstop Commitment**" has the meaning set forth in the Second Interim Backstop Commitment Letter.

"**Second Interim Backstop Commitment Letter**" shall mean that certain Second Interim Backstop Commitment Letter, dated as of August 6, 2025, by among the Borrower, the Second Interim Backstop Parties and the Fronting Lender.

"**Second Interim Backstop Parties**" shall mean each of HG Vora Capital Management, LLC (on behalf of certain funds and accounts managed or advised by it) and Angelo Gordon & Co., L.P. (on behalf of certain funds and accounts managed or advised by it).

"**Second Interim DIP Order**" means the Second Interim DIP Order of the Bankruptcy Court approving the Credit Parties' borrowing of the Second Interim DIP Loans and Amendment No. 1 on an interim basis, in the form attached to Amendment No. 1 as Annex III, entered on August 6, 2025 at Docket No. 110, as the same may be amended, modified or supplemented from time to time with the consent of the Required Lenders.

"**Second Interim DIP Order Entry Date**" means the date on which the Second Interim DIP Order is entered by the Bankruptcy Court.

"**Second Interim Effective Date**" means August 6, 2025.

"**Second Interim Election Deadline**" means 12:00 p.m. (New York City time) on August 13, 2025.

"**Second Interim New Money DIP Loans**" has the meaning given to such term in Section 2.01(b)(i).

"**Second Interim Roll-Up DIP Loans**" has the meaning given to such term in Section 2.01(b)(iii).

"**Second Interim DIP Loans**" shall mean the Second Interim New Money DIP Loans and the Second Interim Roll-Up DIP Loans.

"**Section 9.04 Financials**" shall mean the financial statements delivered, or required to be delivered, pursuant to Sections 9.04(a) or (b), together with the accompanying certificate of a Responsible Officer of Borrower delivered, or required to be delivered, pursuant to Section 9.04(c).

"**Secured Parties**" shall mean the Agents and the Lenders.

"**Securities Act**" shall mean the Securities Act of 1933, as amended, and all rules and regulations of the SEC promulgated thereunder.

"**Security Agreement**" shall mean a security agreement, dated on or after Closing Date, among the Credit Parties and Collateral Agent (if any), as the same may be amended in accordance with the terms thereof and hereof.

"**Security Documents**" shall mean the DIP Orders, the Security Agreement (if any), any Mortgages and any other security document or pledge agreement, instrument or other document required by applicable local law or otherwise executed and delivered by a Credit Party to grant or perfect a security interest in any Property acquired or developed that is of the kind and nature that would constitute Collateral of such Person on the Closing Date, and any other document, agreement or instrument utilized to pledge or grant as collateral (or perfect any Lien thereon) for the Obligations any Property of whatever kind or nature.

"**SOFR**" means a rate equal to the secured overnight financing rate as administered by the SOFR Administrator.

"**SOFR Administrator**" means the Federal Reserve Bank of New York (or a successor administrator of the secured overnight financing rate).

"**SOFR Loan**" means a Loan that bears interest at a rate based on Adjusted Term SOFR, other than pursuant to clause (c) of the definition of "Alternate Base Rate".

"**Special Committee**" means the Special Committee of the Board of Directors of the Borrower.

"**Subsidiary**" shall mean, as to any Person, (i) any corporation more than 50% of whose stock of any class or classes having by the terms thereof ordinary voting power to elect a majority of the directors of such corporation (irrespective of whether or not at the time stock of any class or classes of such corporation shall have or might have voting power by reason of the happening of any contingency) is at the time owned by such Person and/or one or more Subsidiaries of such Person and (ii) any partnership, limited

liability company, association, joint venture or other entity in which such Person and/or one or more Subsidiaries of such Person has more than a 50% equity interest at the time; provided that the Licensed Operator Guarantors shall be deemed to be Subsidiaries of Borrower for all purposes under this Agreement and the other Credit Documents.  Unless otherwise qualified, all references to a "Subsidiary" or to "Subsidiaries" in this Agreement shall refer to a Subsidiary or Subsidiaries of Borrower.

"**Swap Contract**" shall mean any agreement entered into in the ordinary course of business (as a bona fide hedge and not for speculative purposes) (including any master agreement and any schedule or agreement, whether or not in writing, relating to any single transaction) that is an interest rate swap agreement, basis swap, forward rate agreement, commodity swap, commodity option, equity or equity index swap or option, bond option, interest rate option, foreign exchange agreement, rate cap, collar or floor agreement, currency swap agreement, cross-currency rate swap agreement, swap option, currency option or any other similar agreement (including any option to enter into any of the foregoing) and is designed to protect any Company against fluctuations in interest rates, currency exchange rates, commodity prices, or similar risks (including any Interest Rate Protection Agreement).  For the avoidance of doubt, the term "Swap Contract" includes, without limitation, any call options, warrants and capped calls entered into as part of, or in connection with, an issuance of convertible or exchangeable debt by Borrower or its Subsidiaries.

"**Taking**" shall mean a taking or voluntary conveyance during the term of this Agreement of all or part of any Mortgaged Real Property, or any interest therein or right accruing thereto or use thereof, as the result of, or in settlement of, any condemnation or other eminent domain proceeding by any Governmental Authority affecting any Mortgaged Real Property or any portion thereof, whether or not the same shall have actually been commenced.

"**Tax Returns**" has the meaning set forth in Section 8.08.

"**Taxes**" shall mean all present or future taxes, levies, imposts, duties, deductions, withholdings (including backup withholding), assessments, fees or other similar charges imposed by any Governmental Authority, including any interest, additions to tax or penalties applicable thereto.

"**TSA**" means that certain Transaction Support Agreement and all exhibits attached thereto, dated as of June 26, 2025, by and among the Credit Parties, the Lenders party thereto and Eric Persson.

"**Term SOFR**" shall mean:

(a)     for any calculation with respect to a SOFR Loan, the Term SOFR Reference Rate for a tenor comparable to the applicable Interest Period on the day (such day, the "**Periodic Term SOFR Determination Day**") that is two (2) U.S. Government Securities Business Days prior to the first day of such Interest Period, as such rate is published by the Term SOFR Administrator; provided, however, that if as of 5:00 p.m. (New York City time) on any Periodic Term SOFR Determination Day the Term SOFR Reference Rate for the applicable tenor has not been published by the Term SOFR Administrator and a Benchmark Replacement has not replaced the Term SOFR Reference Rate pursuant to Section 5.07, then Term SOFR will be the Term SOFR Reference Rate for such tenor as published by the Term SOFR Administrator on the first preceding U.S. Government Securities Business Day for which such Term SOFR Reference Rate for such tenor was published by the Term SOFR Administrator so long as such first preceding U.S. Government Securities Business Day is not more than three (3) U.S. Government Securities Business Days prior to such Periodic Term SOFR Determination Day, and

(b)     for any calculation with respect to an ABR Loan on any day, the Term SOFR Reference Rate for a tenor of one month on the day (such day, the "**ABR Term SOFR Determination Day**") that is

two (2) U.S. Government Securities Business Days prior to such day, as such rate is published by the Term SOFR Administrator; provided, however, that if as of 5:00 p.m. (New York City time) on any ABR Term SOFR Determination Day the Term SOFR Reference Rate for the applicable tenor has not been published by the Term SOFR Administrator and a Benchmark Replacement has not replaced the Term SOFR Reference Rate pursuant to Section 5.07, then Term SOFR will be the Term SOFR Reference Rate for such tenor as published by the Term SOFR Administrator on the first preceding U.S. Government Securities Business Day for which such Term SOFR Reference Rate for such tenor was published by the Term SOFR Administrator so long as such first preceding U.S. Government Securities Business Day is not more than three (3) U.S. Government Securities Business Days prior to such Periodic Term SOFR Determination Day.

"**Term SOFR Administrator**" shall mean CME Group Benchmark Administration Limited (CBA) (or a successor administrator of the Term SOFR Reference Rate selected by the Administrative Agent in its reasonable discretion.

"**Term SOFR Reference Rate**" shall mean the forward-looking term rate based on SOFR.

"**Testing Period**" means (a) the period from the Petition Date through and including July 27, 2025 and (b) each subsequent four-week period following delivery of the prior Variance Report.

"**Trade Date**" has the meaning set forth in Section 13.05(k)(i).

"**Transactions**" shall mean, collectively, (a) the entering into of this Agreement and the other Credit Documents and the borrowings hereunder on the Closing Date, the Amendment No. 1 Effective Date and the Amendment No. 2 Effective Date and (b) the payment of fees and expenses in connection with the foregoing.

"**Transfer Agreement**" shall mean any trust or similar arrangement required by any Gaming Authority from time to time with respect to the Equity Interests of any Subsidiary (or any Person that was a Subsidiary) or any Gaming Facility.

"**Trigger Event**" shall mean the transfer of shares of Equity Interests of any Subsidiary or any Gaming Facility into trust or other similar arrangement required by any Gaming Authority from time to time.

"**Type**" has the meaning set forth in Section 1.03.

"**U.S. Person**" shall mean a "United States person" as defined in Section 7701(a)(30) of the Code.

"**UCC**" shall mean the Uniform Commercial Code as from time to time in effect in the applicable state or other jurisdiction.

"**UK Financial Institution**" shall mean any BRRD Undertaking (as such term is defined under the PRA Rulebook (as amended from time to time) promulgated by the United Kingdom Prudential Regulation Authority) or any person falling within IFPRU 11.6 of the FCA Handbook (as amended from time to time) promulgated by the United Kingdom Financial Conduct Authority, which includes certain credit institutions and investment firms, and certain affiliates of such credit institutions or investment firms.

"**UK Resolution Authority**" shall mean the Bank of England or any other public administrative authority having responsibility for the resolution of any UK Financial Institution.

"**un-reallocated portion**" has the meaning set forth in Section 2.14(a)(ii).

"**United States**" shall mean the United States of America.

"**U.S. Government Securities Business Day**" means any day except for (a) a Saturday, (b) a Sunday or (c) a day on which the Securities Industry and Financial Markets Association recommends that the fixed income departments of its members be closed for the entire day for purposes of trading in United States government securities.

"**U.S. Tax Compliance Certificate**" has the meaning set forth in Section 5.06(c)(ii).

"**Variance**" has the meaning set forth in the definition of "Variance Report".

"**Variance Report**" shall mean a report describing in reasonable detail the Credit Parties' aggregate cash receipts and aggregate cash disbursements as compared to the projected, aggregate cash receipts and disbursements (other than fees and expenses of the Lenders) provided by the then-applicable Approved Budget for each Testing Period (each such difference, a "**Variance**").

"**Weighted Average Life to Maturity**" shall mean, on any date and with respect to the aggregate amount of any Indebtedness (or any applicable portion thereof), an amount equal to (a) the scheduled repayments of such Indebtedness to be made after such date, multiplied by the number of days from such date to the date of such scheduled repayments divided by (b) the aggregate principal amount of such Indebtedness.

"**Wendover Parking Subparcel**" shall mean the "Ground Lease Premises" (as defined in the AG Master Lease).

"**Wendover Service Station Subparcel**" shall mean the portion of "Parcel A" (as defined in the AG Master Lease) that does not consist of the "Ground Lease Premises" (as defined in the AG Master Lease).

"**Wholly Owned Subsidiary**" shall mean, with respect to any Person, any corporation, partnership, limited liability company or other entity of which all of the Equity Interests (other than, in the case of a corporation, directors' qualifying shares or nominee shares required under applicable law) are directly or indirectly owned or controlled by such Person and/or one or more Wholly Owned Subsidiaries of such Person; provided that the Licensed Operator Guarantors shall be deemed to be Wholly Owned Subsidiaries of the Borrower for all purposes under this Agreement and the other Credit Documents.  Unless the context clearly requires otherwise, all references to any Wholly Owned Subsidiary shall mean a Wholly Owned Subsidiary of Borrower.

"**Withdrawal Liability**" shall mean liability by an ERISA Entity to a Multiemployer Plan as a result of a complete or partial withdrawal from such Multiemployer Plan, as such terms are defined in Part 1 of Subtitle E of Title IV of ERISA.

"**Write-Down and Conversion Powers**" shall mean, (a) with respect to any EEA Resolution Authority, the write-down and conversion powers of such EEA Resolution Authority from time to time under the Bail-In Legislation for the applicable EEA Member Country, which write-down and conversion powers are described in the EU Bail-In Legislation Schedule, and (b) with respect to the United Kingdom, any powers of the applicable Resolution Authority under the Bail-In Legislation to cancel, reduce, modify or change the form of a liability of any UK Financial Institution or any contract or instrument under which that liability arises, to convert all or part of that liability into shares, securities or obligations of that person or any other person, to provide that any such contract or instrument is to have effect as if a right had been

exercised under it or to suspend any obligation in respect of that liability or any of the powers under that Bail-In Legislation that are related to or ancillary to any of those powers.

**Section 1.02    Accounting Terms and Determinations**.  Except as otherwise provided in this Agreement, all computations and determinations as to accounting or financial matters (including financial covenants) shall be made in accordance with GAAP as in effect on the Closing Date consistently applied for all applicable periods, and all accounting or financial terms shall have the meanings ascribed to such terms by GAAP.  If at any time any change in GAAP would affect the computation of any financial ratio or requirement set forth in any Credit Document, and Borrower notifies Administrative Agent that Borrower requests an amendment to any provision hereof to eliminate the effect of any change occurring after the date hereof in GAAP or in the application thereof on the operation of such provision (or if Administrative Agent notifies Borrower that the Required Lenders request an amendment to any provision hereof for such purpose), regardless of whether any such notice is given before or after such change in GAAP or in the application thereof, then such provision shall be interpreted on the basis of GAAP as in effect and applied immediately before such change shall have become effective until such notice shall have been withdrawn or such provision amended in accordance herewith.  If at any time any change in GAAP would affect the computation of any financial ratio or requirement set forth in any Credit Document, and Borrower, Administrative Agent or the Required Lenders shall so request, Administrative Agent, the Lenders and Borrower shall negotiate in good faith to amend such ratio or requirement to preserve the original intent thereof in light of such change in GAAP (subject to the approval of the Required Lenders, not to be unreasonably withheld).  Notwithstanding the foregoing, for all purposes of this Agreement, no Gaming Lease (nor any Guarantee or support arrangement in respect thereof) shall constitute Indebtedness, a Lien, a Capital Lease or a Capital Lease Obligation regardless of how such lease may be treated under GAAP.

**Section 1.03    Classes and Types of Loans**.  Loans hereunder are distinguished by "Class" and by "Type."  The "Class" of a Loan (or of a Commitment to make a Loan) refers to whether such Loan is an Initial New Money DIP Loan, an Initial Roll-Up DIP Loan, an Incremental New Money DIP Loan or an Incremental Roll-Up DIP Loan, each of which constitutes a Class.  The "Type" of a Loan refers to whether such Loan is an ABR Loan or a SOFR Loan, each of which constitutes a Type.  Loans may be identified by both Class and Type.

**Section 1.04    Rules of Construction**.

(a)    In each Credit Document, unless the context clearly requires otherwise (or such other Credit Document clearly provides otherwise), references to (i) the plural include the singular, the singular include the plural and the part include the whole; (ii) Persons include their respective permitted successors and assigns or, in the case of governmental Persons, Persons succeeding to the relevant functions of such Persons; (iii) statutes and regulations include any amendments, supplements or modifications of the same from time to time and any successor statutes and regulations; (iv) unless otherwise expressly provided, any reference to any action of any Secured Party by way of consent, approval or waiver shall be deemed modified by the phrase "in its/their reasonable discretion"; (v) time shall be a reference to time of day in New York, New York; (vi) Obligations shall not be deemed "outstanding" if such Obligations have been Paid in Full; and (vii) except as expressly provided in any Credit Document any item required to be delivered or performed on a day that is not a Business Day shall not be required until the next succeeding Business Day.

(b)    In each Credit Document, unless the context clearly requires otherwise (or such other Credit Document clearly provides otherwise), (i) "**amend**" shall mean "amend, restate, amend and restate, supplement or modify"; and "**amended**," "**amending**" and "**amendment**" shall have meanings correlative to the foregoing; (ii) in the computation of periods of time from a specified date to a later specified date, "**from**" shall mean "from and including"; "**to**" and "**until**" shall mean "to but excluding"; and "**through**"

shall mean "to and including"; (iii) "**hereof**," "**herein**" and "**hereunder**" (and similar terms) in any Credit Document refer to such Credit Document as a whole and not to any particular provision of such Credit Document; (iv) "**including**" (and similar terms) shall mean "including without limitation" (and similarly for similar terms); (v) "**or**" has the inclusive meaning represented by the phrase "and/or"; (vi) references to "**the date hereof**" shall mean the date first set forth above; (vii) "**asset**" and "**property**" shall have the same meaning and effect and refer to all Property; and (viii) a "**fiscal year**" or a "**fiscal quarter**" is a reference to a fiscal year or fiscal quarter of Borrower.

(c)     In this Agreement unless the context clearly requires otherwise, any reference to (i) an Annex, Exhibit or Schedule is to an Annex, Exhibit or Schedule, as the case may be, attached to this Agreement and constituting a part hereof, and (ii) a Section or other subdivision is to a Section or such other subdivision of this Agreement.

(d)     Unless otherwise expressly provided herein, (i) references to Organizational Documents, agreements (including the Credit Documents) and other contractual instruments shall be deemed to include all subsequent amendments, restatements, amendments and restatements, extensions, supplements, reaffirmations and other modifications thereto, but only to the extent that such amendments, restatements, amendments and restatements, extensions, supplements, reaffirmations and other modifications are permitted by the Credit Documents; and (ii) references to any Requirement of Law shall include all statutory and regulatory provisions consolidating, amending, replacing, supplementing or interpreting such Requirement of Law.

(e)     This Agreement and the other Credit Documents are the result of negotiations among and have been reviewed by counsel to Agents, Borrower and the other parties, and are the products of all parties. Accordingly, they shall not be construed against the Lenders or Agents merely because of Agents' or the Lenders' involvement in their preparation.

**Section 1.05     Pro Forma Calculations**.

(a)     [Reserved].

(b)     [Reserved].

(c)     Any *pro forma* calculation shall be calculated in accordance with Regulation S-X of the Securities Act of 1933, as amended.

(d)     [Reserved].

**Section 1.06     [Reserved]**.

**Section 1.07     [Reserved]**.

**Section 1.08     [Reserved]**.

**Section 1.09     Rates**.  The Administrative Agent does not warrant or accept responsibility for, and shall not have any liability with respect to (a) the continuation of, administration of, submission of, calculation of or any other matter related to the Alternate Base Rate, the Term SOFR Reference Rate, Adjusted Term SOFR or Term SOFR, or any component definition thereof or rates referred to in the definition thereof, or any alternative, successor or replacement rate thereto (including any Benchmark Replacement), including whether the composition or characteristics of any such alternative, successor or replacement rate (including any Benchmark Replacement) will be similar to, or produce the same value or

36

economic equivalence of, or have the same volume or liquidity as, the Alternate Base Rate, the Term SOFR Reference Rate, Adjusted Term SOFR, Term SOFR or any other Benchmark prior to its discontinuance or unavailability, or (b) the effect, implementation or composition of any Benchmark Replacement Conforming Changes.  The Administrative Agent and its affiliates or other related entities may engage in transactions that affect the calculation of the Alternate Base Rate, the Term SOFR Reference Rate, Term SOFR, Adjusted Term SOFR, any alternative, successor or replacement rate (including any Benchmark Replacement) or any relevant adjustments thereto, in each case, in a manner adverse to the Borrower.  The Administrative Agent may select information sources or services in its reasonable discretion to ascertain the Alternate Base Rate, the Term SOFR Reference Rate, Term SOFR, Adjusted Term SOFR or any other Benchmark, in each case pursuant to the terms of this Agreement, and shall have no liability to the Borrower, any Lender or any other person or entity for damages of any kind, including direct or indirect, special, punitive, incidental or consequential damages, costs, losses or expenses (whether in tort, contract or otherwise and whether at law or in equity), for any error or calculation of any such rate (or component thereof) provided by any such information source or service.

**Section 1.10    Divisions**.  For all purposes under the Credit Documents, in connection with any division or plan of division under Delaware law (or any comparable event under a different jurisdiction's laws): (a) if any asset, right, obligation or liability of any Person becomes the asset, right, obligation or liability of a different Person, then it shall be deemed to have been transferred from the original Person to the subsequent Person, and (b) if any new Person comes into existence, such new Person shall be deemed to have been organized on the first date of its existence by the holders of its equity interests at such time.

## ARTICLE II.

## LOANS

**Section 2.01    Amount and Terms of Commitments and Loans**.

(a)    Initial New Money DIP Loans and Initial Roll-Up DIP Loans.

(i)    Subject to the terms and conditions set forth in the DIP Term Sheet and the Interim DIP Order, on the Interim Effective Date, the Fronting Lender, on behalf of the Backstop Parties, funded super-priority priming term loans to the Borrower in an amount equal to $8,500,000 (such loans, the "**Initial New Money DIP Loans**").

(ii)    Each Backstop Party and the Borrower hereby acknowledge and agree that each Prepetition First Out Term Lender that is not a Backstop Party has the opportunity to participate (in such capacity, an "**Electing Lender**") with the other Electing Lenders to provide its pro rata portion (based on the Prepetition First Out Term Loans held by such Electing Lender) of the Initial New Money DIP Loans and to become a Lender hereunder, in each case, on or prior to the Election Deadline pursuant to the terms and conditions set forth in the DIP Term Sheet.

(iii)    Subject to the terms of the DIP Term Sheet and the Interim DIP Order, each Lender (or its designee) holding Initial New Money DIP Loans (excluding the Fronting Lender but including, for the avoidance of doubt, each Backstop Party and each Electing Lender) shall be deemed to have advanced on the Interim Effective Date additional super-priority priming term loans to the Borrower in an aggregate principal amount of up to $17,648,671.94, which amount constitutes principal of and accrued but unpaid interest to the Petition Date on the Prepetition First Out Term Loans (such loans, the "**Initial Roll-Up DIP Loans**"), which such Initial Roll-Up DIP Loans shall be deemed to have been converted on a cashless dollar-for-dollar basis from the

principal of and accrued but unpaid interest on the Prepetition First Out Term Loans held by such Lenders.

(iv)     On and as of the Closing Date, the Initial New Money DIP Loans and Initial Roll-Up DIP Loans held by each Lender are set forth on <u>Annex A</u> hereto. Each Prepetition Lender (or its designee) holding Initial Roll-Up DIP Loans on the Closing Date as set forth on Annex A hereto shall be deemed as of the Closing Date to have executed this Agreement and shall become a Lender hereunder on and as of the Closing Date. From and after the Closing Date, the Initial New Money DIP Loans the Initial Roll-Up DIP Loans shall be governed by and subject to the terms and conditions of this Agreement and the other Credit Documents.

(b)     <u>Second Interim New Money DIP Loans and Second Interim Roll-Up DIP Loans</u>.

(i)     Subject to the entry and terms of the Second Interim DIP Order, on the Amendment No. 1 Effective Date, the Fronting Lender, on behalf of the Second Interim Backstop Parties, shall fund super-priority priming term loans to the Borrower in an amount equal to $10,500,000 (such loans, the "**Second Interim New Money DIP Loans**").

(ii)     Each Second Interim Backstop Party and the Borrower hereby acknowledge and agree that each Lender that is not a Second Interim Backstop Party has the opportunity to participate (in such capacity, an "**Second Interim Electing Lender**") with the other Second Interim Electing Lenders to provide its pro rata portion (based on the Loans held by such Lender) of the Second Interim New Money DIP Loans, in each case, on or prior to the Second Interim Election Deadline pursuant to the terms and conditions set forth in the Second Interim Backstop Commitment Letter.

(iii)     Subject to the terms of the Second Interim Backstop Commitment Letter and the Second Interim DIP Order, each Lender (or its designee) holding Second Interim New Money DIP Loans or a Commitment to fund Second Interim New Money DIP Loans (excluding the Fronting Lender but including, for the avoidance of doubt, each Second Interim Backstop Party and each Second Interim Electing Lender) shall be deemed to have advanced on the Second Interim Effective Date additional super-priority priming term loans to the Borrower in an aggregate principal amount of up to $21,801,300.63, which amount constitutes principal of and accrued but unpaid interest to the Petition Date on the Prepetition First Out Term Loans or the Initial Roll-Up DIP Loans (such loans, the "**Second Interim Roll-Up DIP Loans**"), which such Second Interim Roll-Up DIP Loans shall be deemed to have been funded on the Amendment No. 1 Effective Date (or, in the case of clause (C) below, such later date as specified in clause (C)) and deemed to have been converted on a cashless dollar-for-dollar basis from the following loans held by any Lender providing the Second Interim New Money DIP Loans, in the following order of priority: (A) first, from any Prepetition First Out Term Loans held by such Lender (together with its affiliates and related funds), (B) second, from any Initial Roll-Up DIP Loans held by such Lender (together with its affiliates and related funds), and (C) third, upon written notice to the Administrative Agent, from any Prepetition First Out Term Loans acquired by such Lender from time to time after the funding date of the Incremental New Money DIP Loans (provided that, for the avoidance of doubt, in no event shall any Lender (together with its affiliates and related funds) providing Second Interim New Money DIP Loans receive Second Interim Roll-Up DIP Loans in a principal amount in excess of the Incremental Roll-Up Ratio with respect to the principal amount of Second Interim New Money DIP Loans funded by such Lender (together with its affiliates and related funds). The Administrative Agent (with the consent of the Required Backstop Parties) and the Borrower shall be authorized to amend this Agreement and the Annexes hereto to the extent necessary to effectuate such Second Interim New Money DIP Loans and Second Interim Roll-Up DIP Loans, without the consent of any other Lender.

(iv)    On and as of the Amendment No. 1 Effective Date, the Second Interim New Money DIP Loans and Second Interim Roll-Up DIP Loans held by each Lender are set forth on <u>Annex A</u> hereto. From and after the Amendment No. 1 Effective Date, the Second Interim New Money DIP Loans and the Second Interim Roll-Up DIP Loans shall be governed by and subject to the terms and conditions of this Agreement and the other Credit Documents, including Amendment No. 1.

(c)    <u>Final New Money DIP Loans and Final Roll-Up DIP Loans</u>.

(i)    Subject to (A) receipt and approval in their sole discretion by the Required Backstop Parties of an Acceptable Final Budget and proposed Acceptable Restructuring and (B) the entry and terms of the Final DIP Order, on the Amendment No. 2 Effective Date, the Fronting Lender, on behalf of the Final Backstop Parties, shall fund super-priority priming term loans to the Borrower in an amount equal to $27,510,000 (such loans, the "**Final New Money DIP Loans**").

(ii)    Each Final Backstop Party and the Borrower hereby acknowledge and agree that each Lender that is not a Final Backstop Party has the opportunity to participate (in such capacity, an "**Final Electing Lender**") with the other Final Electing Lenders to provide its pro rata portion (based on the Loans held by such Lender) of the Final New Money DIP Loans, in each case, on or prior to the Final Election Deadline pursuant to the terms and conditions set forth in the Final Backstop Commitment Letter.

(iii)    Subject to the terms of the Final Backstop Commitment Letter and the Final DIP Order, each Lender (or its designee) holding Final New Money DIP Loans or a Commitment to fund Final New Money DIP Loans (excluding the Fronting Lender but including, for the avoidance of doubt, each Final Backstop Party and each Final Electing Lender) shall be deemed to have advanced on the Amendment No. 2 Effective Date additional super-priority priming term loans to the Borrower in an aggregate principal amount of up to $57,119,407.65, which amount constitutes principal of and accrued but unpaid interest to the Petition Date on the Prepetition First Out Term Loans or the Initial Roll-Up DIP Loans (such loans, the "**Final Roll-Up DIP Loans**"), which such Final Roll-Up DIP Loans shall be deemed to have been funded on the Amendment No. 2 Effective Date (or, in the case of clause (C) below, such later date as specified in clause (C)) and deemed to have been converted on a cashless dollar-for-dollar basis from the following loans held by any Lender providing the Final New Money DIP Loans, in the following order of priority: (A) first, from any Prepetition First Out Term Loans held by such Lender (together with its affiliates and related funds), (B) second, from any Initial Roll-Up DIP Loans held by such Lender (together with its affiliates and related funds), which conversion in respect of Initial Roll-Up DIP Loans shall be effective upon the expiration of the then-current Interest Period with respect to such Initial Roll-Up DIP Loans, and (C) third, upon written notice to the Administrative Agent, from any Prepetition First Out Term Loans acquired by such Lender from time to time after the funding date of the Incremental New Money DIP Loans (provided that, for the avoidance of doubt, in no event shall any Lender (together with its affiliates and related funds) providing Final New Money DIP Loans receive Final Roll-Up DIP Loans in a principal amount in excess of the Incremental Roll-Up Ratio with respect to the principal amount of Final New Money DIP Loans funded by such Lender (together with its affiliates and related funds). The Administrative Agent (with the consent of the Required Backstop Parties) and the Borrower shall be authorized to amend this Agreement and the Annexes hereto to the extent necessary to effectuate such Final New Money DIP Loans and Final Roll-Up DIP Loans, without the consent of any other Lender.

(iv)    On and as of the Amendment No. 2 Effective Date, the Final New Money DIP Loans and Final Roll-Up DIP Loans held by each Lender are set forth on <u>Annex A</u> hereto. From and after the Amendment No. 2 Effective Date, the Final New Money DIP Loans and the Final

Roll-Up DIP Loans shall be governed by and subject to the terms and conditions of this Agreement and the other Credit Documents, including Amendment No. 2.

(d)     Unwinding of Roll-Up DIP Loans Due to Successful Challenge. If any Roll-Up DIP Loans are unwound due to a successful Challenge (as defined in the DIP Orders), then the Roll-Up DIP Loans subject to such Challenge shall be deemed converted into Prepetition First Out Loans on a pro rata basis in the following order: (i) first, the Initial Roll-Up DIP Loans and (ii) second, any Incremental Roll-Up DIP Loans.

Section 2.02     **Borrowings**.  Borrower shall give Administrative Agent notice of each borrowing hereunder as provided in Section 4.05 in the form of a Notice of Borrowing.  Unless otherwise agreed to by Administrative Agent in its sole discretion, not later than 12:00 p.m. (Noon), New York time, on the date specified for each borrowing in Section 4.05, each Lender (including, for the avoidance of doubt, the Fronting Lender, as applicable) shall make available the amount of the Loan or Loans to be made by it on such date to Administrative Agent, at the Administrative Agent's Office, in immediately available funds, which such funds shall be deposited solely into the Funding Account.  The amounts so received by Administrative Agent shall, subject to the terms and conditions of this Agreement, be made available to Borrower not later than 4:00 p.m., New York time, on the actual applicable Funding Date, by depositing the same by wire transfer of immediately available funds into the Funding Account.

Section 2.03     **[Reserved]**.

Section 2.04     **Termination and Reductions of Commitment**.

(a)     Any Commitment once terminated or reduced may not be reinstated.

(b)     Each reduction or termination of any of the Commitments pursuant to this Section 2.04 shall be applied ratably among the Lenders with such a Commitment, as the case may be, in accordance with their respective Commitment, as applicable.

Section 2.05     **Fees**.

(a)     Initial Funding Fee.  The Borrower paid on the Interim Effective Date a funding fee equal to 3.00% of the Initial New Money DIP Loans committed to by the Backstop Parties pursuant to the Backstop Commitment Letter (the "**Initial Funding Fee**"), which such Initial Funding Fee was paid in kind and earned on the Initial Effective Date by the Backstop Parties, solely on account of such Backstop Parties' funding of, and other undertakings relating to, the Initial New Money DIP Loans.

(b)     Initial Upfront Fee.  The Borrower paid on the Interim Effective Date an upfront fee equal to 4.00% of the Initial New Money DIP Loans funded on the Initial Effective Date (the "**Initial Upfront Fee**"), which such Initial Upfront Fee was paid in kind and earned on the Initial Effective Date by the Lenders, solely on account of such Lenders' funding of, and other undertakings relating to, the Initial New Money DIP Loans.

(c)     Initial Backstop Fee.  The Borrower paid on the Interim Effective Date a backstop fee equal to 3.00% of the Initial New Money DIP Loans committed to by the Backstop Parties pursuant to the Backstop Commitment Letter (the "**Initial Backstop Fee**"), which such Initial Backstop Fee was paid in kind and earned on the Initial Effective Date by the Backstop Parties, solely on account of such Backstop Parties' Backstop Commitment.

(d)      Incremental Funding Fee.  The Borrower agrees to pay on the funding of the Incremental New Money DIP Loans (including the Final New Money DIP Loans and the Second Interim New Money DIP Loans), a funding fee equal to 3.00% of the Incremental New Money DIP Loans committed to by any Backstop Parties (the "**Incremental Funding Fee**"), which such Incremental Funding Fee is payable in kind and earned on the funding thereof by such Backstop Parties providing such commitments, solely on account of such Backstop Parties' funding of, and other undertakings relating to, the Incremental New Money DIP Loans.

(e)      Incremental Upfront Fee.  The Borrower agrees to pay on the funding of the Incremental New Money DIP Loans (including the Final New Money DIP Loans and the Second Interim New Money DIP Loans), an upfront fee equal to 4.00% of the Incremental New Money DIP Loans funded by any Lender (the "**Incremental Upfront Fee**"), which such Incremental Upfront Fee is payable in kind and earned on the funding thereof, solely on account of such Lenders' funding of, and other undertakings relating to, the Incremental New Money DIP Loans.

(f)      Incremental Backstop Fee.  The Borrower agrees to pay on the funding of the Incremental New Money DIP Loans (including the Final New Money DIP Loans and Second Interim New Money DIP Loans), a backstop fee equal to 3.00% of the Incremental New Money DIP Loans committed to by any Backstop Parties (the "**Incremental Backstop Fee**"), which such Incremental Backstop Fee is payable in kind and earned on the funding thereof by the Backstop Parties, solely on account of such Backstop Parties' commitment with respect to such Incremental New Money DIP Loans.

(g)      Other Fees.  The Borrower shall pay to the Administrative Agent such fees as shall have been separately agreed upon in the Agent Fee Letter or otherwise in writing in the amounts and at the times so specified.  Such fees shall be fully earned when paid and shall not be refundable for any reason whatsoever (except as expressly agreed between the Borrower and the Administrative Agent).

**Section 2.06    Lending Offices**.  The Loans of each Type made by each Lender shall be made and maintained at such Lender's Applicable Lending Office for Loans of such Type.

**Section 2.07    Several Obligations of Lenders**.  The failure of any Lender to make any Loan to be made by it on the date specified therefor shall not relieve any other Lender of its obligation to make its Loan on such date, but neither any Lender nor Administrative Agent shall be responsible for the failure of any other Lender to make a Loan to be made by such other Lender, and no Lender shall have any obligation to Administrative Agent or any other Lender for the failure by such Lender to make any Loan required to be made by such Lender.

**Section 2.08    Notes; Register**.

(a)      At the request of any Lender, its Loans of a particular Class shall be evidenced by a promissory note, payable to such Lender (or its nominee) and otherwise duly completed, substantially in the form of Exhibit A of such Lender's Loans.

(b)      The date, amount, Type, interest rate and duration of the Interest Period (if applicable) of each Loan of each Class made by each Lender to Borrower and each payment made on account of the principal thereof, shall be recorded by such Lender (or its nominee) on its books and, prior to any transfer of any Note evidencing the Loans of such Class held by it, endorsed by such Lender (or its nominee) on the schedule attached to such Note or any continuation thereof; provided, however, that the failure of such Lender (or its nominee) to make any such recordation or endorsement or any error in such recordation or endorsement shall not affect the obligations of Borrower to make a payment when due of any amount owing hereunder or under such Note.

(c)     Borrower hereby designates Administrative Agent to serve as its nonfiduciary agent, solely for purposes of this Section 2.08, to maintain a register (the "**Register**") on which it will record the name and address of each Lender, the Commitment from time to time of each of the Lenders, the principal amount of the Loans made by each of the Lenders (and the related interest thereon) and each repayment in respect of the principal amount of the Loans of each Lender.  Failure to make any such recordation or any error in such recordation shall not affect Borrower's obligations in respect of such Loans.  The entries in the Register shall be prima facie evidence of the information noted therein (absent manifest error), and the parties hereto shall treat each Person whose name is recorded in the Register as the owner of a Loan or other obligation hereunder as the owner thereof for all purposes of the Credit Documents, notwithstanding any notice to the contrary.  The Register shall be available for inspection by Borrower or any Lender at any reasonable time and from time to time upon reasonable prior notice.  No assignment shall be effective unless recorded in the Register; provided, however, that Administrative Agent agrees to record in the Register any assignment entered into pursuant to the term hereof promptly after the effectiveness of such assignment.

**Section 2.09     Optional Prepayments** .

(a)     Subject to Section 4.04, Borrower shall have the right to prepay Loans (without premium or penalty, except as provided in Section 2.09(c)), or to convert Loans of one Type into Loans of another Type or to continue Loans of one Type as Loans of the same Type, at any time or from time to time.  Borrower shall give Administrative Agent notice of each such prepayment, conversion or continuation as provided in Section 4.05 (and, upon the date specified in any such notice of prepayment, the amount to be prepaid shall become due and payable hereunder; provided that Borrower may make any such notice conditional upon the occurrence of a Person's acquisition or sale or any incurrence of indebtedness or issuance of Equity Interests).  Each Notice of Continuation/Conversion shall be substantially in the form of Exhibit J.  If SOFR Loans are prepaid or converted other than on the last day of an Interest Period therefor, Borrower shall at such time pay all expenses and costs required by Section 5.05.  Notwithstanding the foregoing, and without limiting the rights and remedies of the Lenders under Article XI, in the event that any Event of Default shall have occurred and be continuing, Administrative Agent may (and, at the request of the Required Lenders, shall), upon written notice to Borrower, have the right to suspend the right of Borrower to convert any Loan into a SOFR Loan, or to continue any Loan as a SOFR Loan, in which event all Loans shall be converted (on the last day(s) of the respective Interest Periods therefor) or continued, as the case may be, as ABR Loans.

(b)     The amount of any optional prepayments described in Section 2.09(a) shall be applied (i) first, to prepay the New Money DIP Loans until all such New Money DIP Loans are repaid in full, (ii) second, to prepay any Incremental Roll-Up DIP Loans until all such Incremental Roll-Up DIP Loans are repaid in full, and (iii) third, to prepay any Initial Roll-Up DIP Loans until all such Initial Roll-Up DIP Loans are repaid in full.

**Section 2.10     Mandatory Prepayments**.

(a)     Borrower shall prepay the Loans as follows (each such prepayment to be effected in each case in the manner, order and to the extent specified in Section 2.10(b) below):

(i)     **Casualty Events**.  Within five (5) Business Days after Borrower or any Subsidiary receives any Net Available Proceeds from any Casualty Event with respect to any Collateral or any disposition pursuant to Section 10.05(k) of any Collateral (or notice of collection by Administrative Agent of the same), in an aggregate principal amount equal to 100% of such Net Available Proceeds (it being understood that applications pursuant to this Section 2.10(a)(i) shall not be duplicative of Section 2.10(a)(iii) below).

(ii)     **Debt Issuance**.  Within five (5) Business Days after any Debt Issuance on or after the Closing Date, in an aggregate principal amount equal to 100% of the Net Available Proceeds of such Debt Issuance.

(iii)    **Asset Sales**.  Within five (5) Business Days after receipt by Borrower or any of its Subsidiaries of any Net Available Proceeds from any Asset Sale or other disposition of any Collateral not expressly permitted hereunder in an aggregate principal amount equal to 100% of the Net Available Proceeds from such Asset Sale or other disposition (it being understood that applications pursuant to this Section 2.10(a)(iii) shall not be duplicative of Section 2.10(a)(i) above).

(iv)    [Reserved].

(v)     [Reserved].

(vi)    **Prepayments Not Required**.  Notwithstanding any other provisions of this Section 2.10(a), to the extent that any of or all the Net Available Proceeds of any Asset Sale or Casualty Event with respect to any property or assets of Foreign Subsidiaries are prohibited or delayed by applicable local law from being repatriated to the United States, an amount equal to the portion of such Net Available Proceeds so affected will not be required to be applied to repay Loans at the times provided in this Section 2.10(a) so long as applicable local law does not permit repatriation to the United States (Borrower hereby agreeing to cause the applicable Foreign Subsidiary to promptly take all commercially reasonable actions required by the applicable local law to permit such repatriation), and once such repatriation of any of such affected Net Available Proceeds is permitted under the applicable local law, an amount equal to such Net Available Proceeds shall be applied pursuant to Section 2.10(b) (to the extent required by Section 2.10(a)(i) or (iii) above) within five (5) Business Days of such repatriation.  To the extent Borrower determines in good faith that repatriation of any of or all the Net Available Proceeds of any Asset Sale or Casualty Event with respect to any property or assets of Foreign Subsidiaries would result in a material Tax liability (as determined by Borrower in its reasonable discretion) to Borrower or any of its Subsidiaries (including any material withholding Tax (as determined by Borrower in its reasonable discretion)), the applicable mandatory prepayment shall be reduced by the Net Available Proceeds (the "**Restricted Amount**") until such time as Borrower determines in good faith that repatriation of the Restricted Amount may occur without incurring such material Tax liability, at which time, an amount equal to any such Net Available Proceeds shall be applied pursuant to Section 2.10(b) within five (5) Business Days of such repatriation.

(vii)   [Reserved].

(b)     The amount of any mandatory prepayments described in Section 2.10(a) shall be applied (i) first, to prepay the New Money DIP Loans until all such New Money DIP Loans are repaid in full, (ii) second, to prepay any Incremental Roll-Up DIP Loans until all such Incremental Roll-Up DIP Loans are repaid in full, and (iii) third, to prepay any Initial Roll-Up DIP Loans until all such Initial Roll-Up DIP Loans are repaid in full.

Notwithstanding the foregoing, any Lender holding Loans may elect, by written notice to Administrative Agent at least three (3) Business Days prior to the prepayment date, to decline all or any portion of any prepayment of its Loans, pursuant to Section 2.10(a)(i) or (iii) which amounts may be retained by Borrower (the "**Declined Amounts**").

Notwithstanding the foregoing, if the amount of any prepayment of Loans required under this Section 2.10 shall be in excess of the amount of the ABR Loans at the time outstanding, only the portion of the amount of such prepayment as is equal to the amount of such outstanding ABR Loans shall be immediately prepaid and, at the election of Borrower, the balance of such required prepayment shall be either (i) deposited in a deposit account and applied to the prepayment of SOFR Loans on the last day of the then next-expiring Interest Period for SOFR Loans (with all interest accruing thereon for the account of Borrower) or (ii) prepaid immediately, together with any amounts owing to the Lenders under Section 5.05. Notwithstanding any such deposit in a deposit account, interest shall continue to accrue on such Loans until prepayment.

**Section 2.11    Replacement of Lenders**.

(a)    Borrower shall have the right to replace any Lender (the "**Replaced Lender**") with one or more other persons (collectively, the "**Replacement Lender**"), if (x) such Lender is charging Borrower increased costs pursuant to Section 5.01 or requires Borrower to pay any Covered Taxes or additional amounts to such Lender or any Governmental Authority for the account of such Lender pursuant to Section 5.06 or such Lender becomes incapable of making SOFR Loans as provided in Section 5.03 when other Lenders are generally able to do so, (y) [reserved] or (z) such Lender is subject to a Disqualification; provided, however, that (i) at the time of any such replacement, the Replacement Lender shall enter into one or more Assignment Agreements (and with all fees payable pursuant to Section 13.05(b) to be paid by the Replacement Lender or Borrower) pursuant to which the Replacement Lender shall acquire all of the Commitments and outstanding Loans of the Replaced Lender, (ii) at the time of any such replacement, the Replaced Lender shall receive an amount equal to the sum of (A) the principal of, and all accrued interest on, all outstanding Loans of such Lender (other than any Loans not being acquired by a Replacement Lender), (B) [reserved], and (C) all accrued, but theretofore unpaid, fees owing to the Lender pursuant to Section 2.05 with respect to the Loans being assigned, as the case may be and (iii) all obligations of Borrower owing to such Replaced Lender (other than those specifically described in clause (i) above in respect of Replaced Lenders for which the assignment purchase price has been, or is concurrently being, paid, and other than those relating to Loans or Commitments not being acquired by a Replacement Lender, but including any amounts which would be paid to a Lender pursuant to Section 5.05 if Borrower were prepaying a SOFR Loan), as applicable, shall be paid in full to such Replaced Lender, as applicable, concurrently with such replacement, as the case may be.  Upon the execution of the respective Assignment Agreement, the payment of amounts referred to in clauses (i), (ii) and (iii) above, as applicable, and the receipt of any consents that would be required for an assignment of the subject Loans and Commitments to such Replacement Lender in accordance with Section 13.05, the Replacement Lender, if any, shall become a Lender hereunder and the Replaced Lender, as applicable, shall cease to constitute a Lender hereunder and be released of all its obligations as a Lender, except with respect to indemnification provisions applicable to such Lender under this Agreement, which shall survive as to such Lender and, in the case of any Replaced Lender, except with respect to Loans and Commitments of such Replaced Lender not being acquired by the Replacement Lender; provided, that if the applicable Replaced Lender does not execute the Assignment Agreement within three (3) Business Days (or such shorter period as is acceptable to Administrative Agent) after Borrower's request, execution of such Assignment Agreement by the Replaced Lender shall not be required to effect such assignment.

(b)    If Borrower receives a notice from any applicable Gaming Authority that any Lender is subject to a Disqualification (and such Lender is notified by Borrower and Administrative Agent in writing of such Disqualification), Borrower shall have the right to replace such Lender with a Replacement Lender in accordance with Section 2.11(a) or prepay the Loans held by such Lender, in each case, in accordance with any applicable provisions of Section 2.11(a), even if a Default or an Event of Default exists (notwithstanding anything contained in such Section 2.11(a) to the contrary).  Any such prepayment shall be deemed an optional prepayment, as set forth in Section 2.09 and shall not be required to be made on a

*pro rata* basis with respect to Loans of the same Class as the Loans held by such Lender.  Notice to such Lender shall be given at least ten (10) days before the required date of transfer or prepayment (unless a shorter period is required by any Requirement of Law), as the case may be, and shall be accompanied by evidence demonstrating that such transfer or redemption is required pursuant to Gaming Laws.  Upon receipt of a notice in accordance with the foregoing, the Replaced Lender shall cooperate with Borrower in effectuating the required transfer or prepayment within the time period set forth in such notice, not to be less than the minimum notice period set forth in the foregoing sentence (unless a shorter period is required under any Requirement of Law).  Further, if the transfer or prepayment is triggered by notice from the Gaming Authority that the Lender is subject to a Disqualification, commencing on the date the Gaming Authority serves the notice of Disqualification upon Borrower, to the extent prohibited by law:  (i) such Lender shall no longer receive any interest on the Loans; (ii) such Lender shall no longer exercise, directly or through any trustee or nominee, any right conferred by the Loans; and (iii) such Lender shall not receive any remuneration in any form from Borrower for services or otherwise in respect of the Loans.

Section 2.12    **[Reserved]**.

Section 2.13    **[Reserved]**.

Section 2.14    **[Reserved]**.

## ARTICLE III.

## PAYMENTS OF PRINCIPAL AND INTEREST

Section 3.01    **Repayment of Loans**.

(a)    **New Money DIP Loans**.  Borrower hereby promises to pay to Administrative Agent for the account of the Lenders with New Money DIP Loans, the outstanding principal amount of New Money DIP Loans on the Maturity Date.

(b)    **Roll-Up DIP Loans**.  Borrower hereby promises to pay to Administrative Agent for the account of the Lenders with Roll-Up DIP Loans, the outstanding principal amount of Roll-Up DIP Loans on the Maturity Date.

Section 3.02    **Interest**.

(a)    Borrower hereby promises to pay to Administrative Agent for the account of each Lender interest on the unpaid principal amount of each Loan made or maintained by such Lender to Borrower for the period from and including the date of such Loan to but excluding the date such Loan shall be paid in full at the following rates *per annum*:

(i)    during such periods as such Loan is an ABR Loan, the Alternate Base Rate (as in effect from time to time), *plus* the Applicable Margin applicable to such Loan, and

(ii)    during such periods as such Loan is a SOFR Loan, for each Interest Period relating thereto, the Adjusted Term SOFR for such Loan for such Interest Period, *plus* the Applicable Margin applicable to such Loan.

(b)    To the extent permitted by Law:

(i)      upon the occurrence and during the continuance of an Event of Default, all overdue amounts of principal and interest shall automatically and without any action by any Person, bear interest at the Default Rate; and

(ii)      Interest which accrues under this paragraph shall be payable on demand.

(c)      Accrued interest on each Loan shall be payable monthly (i) with respect to the New Money DIP Loans, in cash in arrears on the last Business Day of each calendar month and on the Maturity Date and (ii) with respect to the Roll-Up DIP Loans, in cash in arrears on the last Business Day of each calendar month and on the Maturity Date; provided that 11.50% of the Applicable Margin shall be payable in kind and capitalized on the principal amount of such Roll-Up DIP Loans on such date, rather than paid in cash. Promptly after the determination of any interest rate provided for herein or any change therein, Administrative Agent shall give notice thereof to the Lenders to which such interest is payable and to Borrower.

## ARTICLE IV.

## PAYMENTS; PRO RATA TREATMENT; COMPUTATIONS; ETC.

### Section 4.01    Payments.

(a)      All payments of principal, interest and other amounts to be made by Borrower under this Agreement and the Notes, and, except to the extent otherwise provided therein, all payments to be made by the Credit Parties under any other Credit Document, shall be made in Dollars, in immediately available funds, without deduction, set-off or counterclaim, to Administrative Agent at the Administrative Agent's Office, not later than 2:00 p.m., New York time, on the date on which such payment shall become due (each such payment made after such time on such due date may, at the discretion of Administrative Agent, be deemed to have been made on the next succeeding Business Day).  Administrative Agent shall distribute any such payments received by it for the account of any other Person to the appropriate recipient promptly following receipt thereof.

(b)      Borrower shall, at the time of making each payment under this Agreement or any Note for the account of any Lender, specify (in accordance with Sections 2.09 and 2.10, if applicable) to Administrative Agent (which shall so notify the intended recipient(s) thereof) the Class and Type of Loans or other amounts payable by Borrower hereunder to which such payment is to be applied.

(c)      Each payment received by Administrative Agent under this Agreement or any Note for the account of any Lender shall be paid by Administrative Agent to such Lender, in immediately available funds, (x) if the payment was actually received by Administrative Agent prior to 12:00 p.m. (Noon), New York time on any day, on such day and (y) if the payment was actually received by Administrative Agent after 12:00 p.m. (Noon), New York time, on any day, by 1:00 p.m., New York time, on the following Business Day (it being understood that to the extent that any such payment is not made in full by Administrative Agent Administrative Agent shall pay to such Lender, upon demand, interest at the Federal Funds Effective Rate from the date such amount was required to be paid to such Lender pursuant to the foregoing clauses until the date Administrative Agent as applicable, pays such Lender the full amount).

(d)      If the due date of any payment under this Agreement or any Note would otherwise fall on a day that is not a Business Day, such date shall be extended to the next succeeding Business Day, and interest shall be payable for any principal so extended for the period of such extension at the rate then borne by such principal.

Section 4.02      [Reserved].

Section 4.03      **Computations**.  Interest on SOFR Loans and commitment fees shall be computed on the basis of a year of 360 days and actual days elapsed (including the first day but excluding the last day) occurring in the period for which such amounts are payable and interest on ABR Loans shall be computed on the basis of a year of 365 or 366 days, as the case may be, and actual days elapsed (including the first day but excluding the last day) occurring in the period for which such amounts are payable.

Section 4.04      **Minimum Amounts**.  Except for mandatory prepayments made pursuant to Section 2.10 and conversions or prepayments made pursuant to Section 5.04, each Borrowing, conversion and partial prepayment of principal of Loans shall be in an amount at least equal to (a) in the case of Loans, $1.0 million with respect to ABR Loans and $1.0 million with respect to SOFR Loans and in multiples of $100,000 in excess thereof or, if less, the remaining Loans or Commitments, as applicable, of the applicable Class and (b) [reserved].  Anything in this Agreement to the contrary notwithstanding, the aggregate principal amount of SOFR Loans having the same Interest Period shall be in an amount at least equal to $1.0 million and in multiples of $100,000 in excess thereof and, if any SOFR Loans or portions thereof would otherwise be in a lesser principal amount for any period, such Loans or portions, as the case may be, shall be ABR Loans during such period.

Section 4.05      **Certain Notices**.  Notices by Borrower to Administrative Agent of terminations or reductions of the Commitments, of Borrowings, conversions, continuations and optional prepayments of Loans of Classes of Loans, of Types of Loans and the duration of Interest Periods shall be irrevocable and shall be effective only if received by Administrative Agent in writing not later than 1:00 p.m., New York time, on at least the number of Business Days or U.S. Government Securities Business Days, as applicable, prior to the date of the relevant termination, reduction, Borrowing, conversion, continuation or prepayment or the first day of such Interest Period specified in the table below (unless otherwise agreed to by Administrative Agent in its sole discretion), provided that Borrower may make any such notice conditional upon the occurrence of a Person's acquisition or sale or any incurrence of indebtedness or issuance of Equity Interests.

NOTICE PERIODS

| Notice | Number of Days Prior |
|---|---|
| Termination or reduction of Commitments | 3 Business Days |
| Borrowing of, or conversions into, ABR Loans | 1 Business Day |
| Optional prepayment of ABR Loans | 1 Business Day |
| Borrowing, mandatory or optional prepayment of, conversions into, continuations as, or duration of Interest Periods for, SOFR Loans | 3 Business Days |

Each such notice of termination or reduction shall specify the amount and the Class of the Commitments to be terminated or reduced.  Each such Notice of Borrowing, conversion, continuation or prepayment shall specify the Class of Loans to be borrowed, converted, continued or prepaid and the amount (subject to Section 4.04) and Type of each Loan to be borrowed, converted, continued or prepaid and the date of borrowing, conversion, continuation or prepayment (which shall, in the case of SOFR Loans, be a U.S. Government Securities Business Day, and in the case of each other Type of Loan, shall be a Business Day).  Each such notice of the duration of an Interest Period shall specify the Loans to which such

Interest Period is to relate.  Administrative Agent shall promptly notify the Lenders of the contents of each such notice.  In the event that Borrower fails to select the Type of Loan within the time period and otherwise as provided in this <u>Section 4.05</u>, such Loan (if outstanding as a SOFR Loan) will be automatically converted into an ABR Loan on the last day of the then current Interest Period for such Loan or (if outstanding as an ABR Loan) will remain as, or (if not then outstanding) will be made as, an ABR Loan.  In the event that Borrower has elected to borrow or convert Loans into SOFR Loans but fails to select the duration of any Interest Period for any SOFR Loans within the time period and otherwise as provided in this <u>Section 4.05</u>, such SOFR Loan shall have an Interest Period of one month.

        **Section 4.06**     **<u>Non-Receipt of Funds by Administrative Agent</u>**.

        (a)     Unless Administrative Agent shall have received notice from a Lender prior to the proposed date of any Borrowing of SOFR Loans (or, in the case of any Borrowing of ABR Loans, prior to 12:00 noon on the date of such Borrowing) that such Lender will not make available to Administrative Agent such Lender's share of such Borrowing, Administrative Agent may assume that such Lender has made such share available on such date in accordance with <u>Section 2.02</u> (or, in the case of a Borrowing of ABR Loans, that such Lender has made such share available in accordance with and at the time required by <u>Section 2.02</u>) and may, in reliance upon such assumption, make available to Borrower a corresponding amount.  In such event, if a Lender has not in fact made its share of the applicable Borrowing available to Administrative Agent, then the applicable Lender and Borrower severally agree to pay to Administrative Agent forthwith on demand such corresponding amount in immediately available funds with interest thereon, for each day from and including the date such amount is made available to Borrower to but excluding the date of payment to Administrative Agent, at (A) in the case of a payment to be made by such Lender, the Federal Funds Effective Rate, plus any administrative, processing or similar fees customarily charged by Administrative Agent in connection with the foregoing, and (B) in the case of a payment to be made by Borrower, the interest rate applicable to ABR Loans.  If Borrower and such Lender shall pay such interest to Administrative Agent for the same or an overlapping period, Administrative Agent shall promptly remit to Borrower the amount of such interest paid by Borrower for such period.  If such Lender pays its share of the applicable Borrowing to Administrative Agent, then the amount so paid shall constitute such Lender's Loan included in such Borrowing.  Any payment by Borrower shall be without prejudice to any claim Borrower may have against a Lender that shall have failed to make such payment to Administrative Agent.

        (b)     Unless Administrative Agent shall have received notice from Borrower prior to the date on which any payment is due to Administrative Agent for the account of the Lenders hereunder that Borrower will not make such payment, Administrative Agent may assume that Borrower has made such payment on such date in accordance herewith and may, in reliance upon such assumption, distribute to the Lenders the amount due.  In such event, if Borrower has not in fact made such payment, then each of the Lenders severally agrees to repay to Administrative Agent forthwith on demand the amount so distributed to such Lender in immediately available funds with interest thereon, for each day from and including the date such amount is distributed to it to but excluding the date of payment to Administrative Agent, at the Federal Funds Effective Rate.  A notice of Administrative Agent to any Lender or Borrower with respect to any amount owing under this subsection (b) shall be conclusive, absent manifest error.

        **Section 4.07**     **<u>Right of Setoff, Sharing of Payments; Etc.</u>**

        (a)     If any Event of Default shall have occurred and be continuing, each Credit Party agrees that, in addition to (and without limitation of) any right of setoff, banker's lien or counterclaim a Lender may otherwise have, each Lender shall be entitled, at its option (to the fullest extent permitted by law), subject to obtaining the prior written consent of Administrative Agent, to set off and apply any deposit (general or special, time or demand, provisional or final), or other indebtedness, held by it for the credit or

account of such Credit Party at any of its offices, in Dollars or in any other currency, against any principal of or interest on any of such Lender's Loans or any other amount payable to such Lender hereunder that is not paid when due (regardless of whether such deposit or other indebtedness is then due to such Credit Party), in which case it shall promptly notify such Credit Party thereof; provided, however, that such Lender's failure to give such notice shall not affect the validity thereof; and provided, further, that no such right of setoff, banker's lien or counterclaim shall apply to any funds held for further distribution to any Governmental Authority.

(b)     Each of the Lenders agrees that, if it should receive (other than pursuant to Section 2.09(b), Section 2.10(b), Section 2.11, Article V or Section 13.04 or as otherwise specifically provided herein) any amount hereunder (whether by voluntary payment, by realization upon security, by the exercise of the right of setoff or banker's lien, by counterclaim or cross action, by the enforcement of any right under the Credit Documents (including any guarantee), or otherwise) which is applicable to the payment of the principal of, or interest on, the Loans or fees, the sum of which with respect to the related sum or sums received by other Lenders is in a greater proportion than the total of such amounts then owed and due to such Lender bears to the total of such amounts then owed and due to all of the Lenders immediately prior to such receipt, then such Lender receiving such excess payment shall purchase for cash without recourse or warranty from the other Lenders an interest in the Obligations to such Lenders in such amount as shall result in a proportional participation by all of the Lenders in such amount; provided, however, that if all or any portion of such excess amount is thereafter recovered from such Lender, such purchase shall be rescinded and the purchase price restored to the extent of such recovery, but without interest.  Borrower consents to the foregoing arrangements.

(c)     Borrower agrees that any Lender so purchasing such a participation may exercise all rights of setoff, banker's lien, counterclaim or similar rights with respect to such participation as fully as if such Lender were a direct holder of Loans or other amounts (as the case may be) owing to such Lender in the amount of such participation.

(d)     Nothing contained herein shall require any Lender to exercise any such right or shall affect the right of any Lender to exercise, and retain the benefits of exercising, any such right with respect to any other Indebtedness or obligation of any Credit Party.  If, under any applicable Debtor Relief Law, any Lender receives a secured claim in lieu of a setoff to which this Section 4.07 applies, such Lender shall, to the extent practicable, exercise its rights in respect of such secured claim in a manner consistent with the rights of the Lenders entitled under this Section 4.07 to share in the benefits of any recovery on such secured claim.

## ARTICLE V.

## YIELD PROTECTION, ETC.

**Section 5.01     Increased Costs**.

(a)     If any Change in Law shall:

(i)     subject any Lender to any Tax with respect to this Agreement, any Note, or any Loan made by it, any deposits, reserves, other liabilities or capital attributable thereto or change the basis of taxation of payments to such Lender in respect thereof by any Governmental Authority (except, in each case, for any Covered Taxes or Excluded Taxes);

(ii)     impose, modify or hold applicable any reserve, special deposit, compulsory loan, insurance charge or similar requirement against assets held by, deposits or other liabilities in or for

the account of, advances, loans or other extensions of credit by, or any other acquisition of funds by, any office of such Lender, in each case, that is not otherwise included in the determination of the Adjusted Term SOFR hereunder; or

       (iii)     impose on any Lender or any other condition, cost or expense (other than Taxes) affecting this Agreement or SOFR Loans made by such Lender;

and the result of any of the foregoing is to materially increase the cost to such Lender of making, converting into, continuing or maintaining SOFR Loans (or of maintaining its obligation to make any SOFR Loans), then, in any such case, Borrower shall, within 10 days of written demand therefor, pay such Lender any additional amounts necessary to compensate such Lender for such increased cost; provided that requests for additional compensation due to increased costs shall be limited to circumstances generally affecting the banking market and for which it is the general policy or practice of such requesting Lender to demand such compensation in similar circumstances under comparable provisions of other similar agreements.  If any Lender becomes entitled to claim any additional amounts pursuant to this subsection, it shall promptly notify Borrower, through Administrative Agent, of the event by reason of which it has become so entitled.

       (b)     A certificate as to any additional amounts setting forth the calculation of such additional amounts pursuant to this Section 5.01 submitted by such Lender, through Administrative Agent, to Borrower shall be conclusive in the absence of clearly demonstrable error.  Without limiting the survival of any other covenant hereunder, this Section 5.01 shall survive the termination of this Agreement and the payment of the Notes and all other Obligations payable hereunder.

       (c)     In the event that any Lender shall have determined that any Change in Law affecting such Lender or any Applicable Lending Office of such Lender or the Lender's holding company with regard to capital or liquidity requirements does or shall have the effect of reducing the rate of return on such Lender's or such holding company's capital as a consequence of its obligations hereunder, the Commitments of such Lender or the Loans made by such Lender, to a level below that which such Lender or such holding company could have achieved but for such Change in Law (taking into consideration such Lender's policies and the policies of such Lender's holding company with respect to capital adequacy), then from time to time, after submission by such Lender or Borrower (with a copy to Administrative Agent) of a written request therefor (setting forth in reasonable detail the amount payable to the affected Lender and the basis for such request), Borrower shall promptly pay to such Lender such additional amount or amounts as will compensate such Lender for such reduction; provided that requests for additional compensation due to increased costs shall be limited to circumstances generally affecting the banking market and for which it is the general policy or practice of such requesting Lender to demand such compensation in similar circumstances under comparable provisions of other similar agreements.

       (d)     Failure or delay on the part of any Lender to demand compensation pursuant to this Section 5.01 shall not constitute a waiver of such Lender's right to demand such compensation; provided, however, that Borrower shall not be required to compensate a Lender pursuant to this Section 5.01 for any increased costs or reductions incurred more than ninety (90) days prior to the date that such Lender notifies Borrower of the change in law giving rise to such increased costs incurred or reductions suffered and of such Lender's intention to claim compensation therefor; provided, further, that if the Change in Law giving rise to such increased costs or reductions is retroactive, then the 90-day period referred to above shall be extended to include the period of retroactive effect thereof.

      Section 5.02    Inability To Determine Interest Rate.  Subject to Section 5.07, if prior to the first day of any Interest Period: (a) Administrative Agent shall have determined in good faith (which determination shall be conclusive and binding upon Borrower) that, by reason of circumstances affecting the relevant market, adequate and reasonable means do not exist for ascertaining Term SOFR for such

Interest Period or (b) the Required Lenders determine in good faith that the Adjusted Term SOFR for any requested Interest Period with respect to a proposed SOFR Loan does not adequately and fairly reflect the cost to such Lenders of funding such SOFR Loans (in each case, "**Impacted Loans**"), Administrative Agent shall give electronic mail or telephonic notice thereof to Borrower and the Lenders as soon as practicable thereof.  If such notice is given, Borrower may revoke any pending request for a Borrowing of, conversion to or continuation of SOFR Loans, or if Borrower does not make such revocation, (x) any SOFR Loans requested to be made on the first day of such Interest Period shall be made as ABR Loans, (y) any Loans that were to have been converted on the first day of such Interest Period to SOFR Loans shall be converted to, or continued as, ABR Loans and (z) any outstanding SOFR Loans shall be converted, on the first day of such Interest Period, to ABR Loans.  Until such notice has been withdrawn by Administrative Agent (which Administrative Agent agrees to do if the circumstances giving rise to such notice cease to exist), no further SOFR Loans shall be made, or continued as such, nor shall Borrower have the right to convert Loans to, SOFR Loans.

Notwithstanding the foregoing but subject to Section 5.07, if there are Impacted Loans as provided above, Administrative Agent, in consultation with Borrower and the affected Lenders, may establish an alternative interest rate for the Impacted Loans, in which case, such alternative rate of interest shall apply with respect to the Impacted Loans (to the extent Borrower does not elect to maintain such Impacted Loans as ABR Loans) until (1) Administrative Agent revokes the notice delivered with respect to the Impacted Loans (which Administrative Agent agrees to do if the circumstances giving rise to Impacted Loans cease to exist), (2) Administrative Agent or the Required Lenders notify Administrative Agent and Borrower that such alternative interest rate does not adequately and fairly reflect the cost to such Lenders of funding the Impacted Loans, or (3) any Lender determines that any Law has made it unlawful, or that any Governmental Authority has asserted that it is unlawful, for such Lender or its Applicable Lending Office to make, maintain or fund Loans whose interest is determined by reference to such alternative rate of interest or to determine or charge interest rates based upon such rate or any Governmental Authority has imposed material restrictions on the authority of such Lender to do any of the foregoing and provides Administrative Agent and Borrower written notice thereof.

**Section 5.03**     **Illegality**.  Notwithstanding any other provision of this Agreement, in the event that any change after the date hereof in any Requirement of Law or in the interpretation or application thereof shall make it unlawful for any Lender or its Applicable Lending Office to honor its obligation to make or maintain SOFR Loans (and, in the sole opinion of such Lender, the designation of a different Applicable Lending Office would either not avoid such unlawfulness or would be disadvantageous to such Lender), then such Lender shall promptly notify Borrower thereof (with a copy to Administrative Agent) and such Lender's obligation to make or continue, or to convert Loans of any other Type into, SOFR Loans shall be suspended until such time as such Lender may again make and maintain SOFR Loans (in which case the provisions of Section 5.04 shall be applicable).

**Section 5.04**     **Treatment of Affected Loans**.  If the obligation of any Lender to make SOFR Loans or to continue, or to convert ABR Loans into, SOFR Loans shall be suspended pursuant to Section 5.03, such Lender's SOFR Loans shall be automatically converted into ABR Loans on the last day(s) of the then current Interest Period(s) for such SOFR Loans (or on such earlier date as such Lender may specify to Borrower with a copy to Administrative Agent as is required by law) and, unless and until such Lender gives notice as provided below that the circumstances specified in Section 5.03 which gave rise to such conversion no longer exist:

(a)     to the extent that such Lender's SOFR Loans have been so converted, all payments and prepayments of principal which would otherwise be applied to such Lender's SOFR Loans shall be applied instead to its ABR Loans; and

(b)      all Loans which would otherwise be made or continued by such Lender as SOFR Loans shall be made or continued instead as ABR Loans and all ABR Loans of such Lender which would otherwise be converted into SOFR Loans shall remain as ABR Loans.

If such Lender gives notice to Borrower with a copy to Administrative Agent that the circumstances specified in Section 5.03 which gave rise to the conversion of such Lender's SOFR Loans pursuant to this Section 5.04 no longer exist (which such Lender agrees to do promptly upon such circumstances ceasing to exist) at a time when SOFR Loans are outstanding, such Lender's ABR Loans shall be automatically converted, on the first day(s) of the next succeeding Interest Period(s) for such outstanding SOFR Loans, to the extent necessary so that, after giving effect thereto, all Loans held by the Lenders holding SOFR Loans and by such Lender are held *pro rata* (as to principal amounts, Types and Interest Periods) in accordance with their respective Commitments.

### Section 5.05      Compensation.

(a)      Borrower agrees to indemnify each Lender and to hold each Lender harmless from any loss or expense (excluding any loss of profits or margin) which such Lender may sustain or incur as a consequence of (1) default by Borrower in payment when due of the principal amount of or interest on any SOFR Loan, (2) default by Borrower in making a borrowing of, conversion into or continuation of SOFR Loans after Borrower has given a notice requesting the same in accordance with the provisions of this Agreement (other than as a result of a default by a Lender in funding such Loans), (3) Borrower making any prepayment other than on the date specified in the relevant prepayment notice, or (4) the conversion or the making of a payment or a prepayment (including any repayments or prepayments made pursuant to Sections 2.09 or 2.10 or as a result of an acceleration of Loans pursuant to Section 11.01 or as a result of the replacement of a Lender pursuant to Section 2.11 or 13.04(b)) of SOFR Loans on a day which is not the last day of an Interest Period with respect thereto, including in each case, any such loss (excluding any loss of profits or margin) or expense arising from the reemployment of funds obtained by it or from fees payable to terminate the deposits from which such funds were obtained; provided that no such amounts under this Section 5.05(a) shall be payable by Borrower in connection with any termination in accordance with Section 2.12(b) of any Interest Period of one month or shorter; provided, further, that no such amounts under this Section 5.05(a) shall be payable by Borrower in connection with the institution of a Benchmark Replacement pursuant to Section 5.07.

(b)      Any Lender requesting compensation pursuant to this Section 5.05 will furnish to Administrative Agent and Borrower a certificate setting forth the basis and amount of such request and such certificate, absent manifest error, shall be conclusive.  Without limiting the survival of any other covenant hereunder, this covenant shall survive the termination of this Agreement and the payment of the Obligations and all other amounts payable hereunder.

### Section 5.06      Net Payments.

(a)      All payments by or on account of any obligation of any Credit Party  under any Credit Document shall be made without deduction or withholding any Taxes, except as required by applicable Laws. If any applicable Laws require the deduction or withholding of any Tax in respect of any such payment by Administrative Agent, a Credit Party or any other applicable withholding agent, then (i) the applicable withholding agent shall withhold or make such deductions as are determined by the applicable withholding agent to be required, (ii) the applicable withholding agent shall timely pay the full amount withheld or deducted to the relevant Governmental Authority in accordance with applicable Law, and (iii) to the extent that the withholding or deduction is made on account of Covered Taxes, the sum payable by the applicable Credit Party shall be increased as necessary so that after any required withholding or deductions are made (including withholding or deductions applicable to additional sums payable under this

Section 5.06), the applicable Lender (or, in the case of payments made to Administrative Agent for its own account, Administrative Agent) receives an amount equal to the sum it would have received had no such withholding or deduction been made.  Borrower shall furnish to Administrative Agent within 45 days after the date the payment of any Taxes by a Credit Party pursuant to this Section 5.06 documentation reasonably satisfactory to Administrative Agent evidencing such payment by the applicable Credit Party.  The Credit Parties shall jointly and severally indemnify and hold harmless Administrative Agent and each Lender, and reimburse Administrative Agent or such Lender (as applicable) upon its written request, for the amount of any Covered Taxes payable or paid by such Lender or Administrative Agent (including Covered Taxes imposed or asserted on amounts payable under this Section 5.06) and for any other reasonable out-of-pocket expenses arising therefrom or with respect thereto, in each case, whether or not such Covered Taxes were correctly or legally imposed.   Such written request shall include a certificate of such Lender or Administrative Agent setting forth in reasonable detail the basis of such request and such certificate, absent manifest error, shall be conclusive.

(b)      In addition, Borrower agrees to (and shall timely) pay all Other Taxes.

(c)      (i)      Any Lender that is entitled to an exemption from or reduction of withholding Tax with respect to payments made under any Credit Document shall deliver to Borrower and Administrative Agent, at the time or times reasonably requested by Borrower or Administrative Agent, such properly completed and executed documentation reasonably requested by Borrower or Administrative Agent as will permit such payments to be made without withholding or at a reduced rate of withholding.  In addition, any Lender, if reasonably requested by Borrower or Administrative Agent, shall deliver such other documentation prescribed by applicable Law or reasonably requested by Borrower or Administrative Agent as will enable Borrower or Administrative Agent to determine whether or not such Lender is subject to backup withholding or information reporting requirements.

(ii)      Each Lender that is not a U.S. Person (a "**Non-U.S. Lender**") agrees to the extent it is legally eligible to do so to deliver to Borrower and Administrative Agent on or prior to the date it becomes a party to this Agreement, and from time to time upon the reasonable request of Borrower or Administrative Agent, whichever of the following is applicable: (1) in the case of a Non-U.S. Lender claiming the benefits of an income tax treaty to which the United States is a party, two executed original copies of IRS Form W-8BEN or IRS Form W-8BEN-E establishing an exemption from, or reduction of, U.S. federal withholding Tax; (2) two executed original copies of IRS Form W-8ECI; (3) in the case of a Non-U.S. Lender claiming the benefits of the exemption for portfolio interest under Section 881(c) or 871(h) of the Code, (x) a certificate substantially in the form of Exhibit D-1 to the effect that such Non-U.S. Lender is not a "bank" within the meaning of Section 881(c)(3)(A) of the Code, a "10-percent shareholder" of Borrower within the meaning of Section 871(h)(3)(B) of the Code, or a CFC related to Borrower as described in Section 881(c)(3)(C) of the Code and that no interest payments in connection with any Credit Documents are effectively connected with the Non-U.S. Lender's conduct of a U.S. trade or business (a "**U.S. Tax Compliance Certificate**") and (y) two executed original copies of IRS Form W-8BEN or IRS Form W-8BEN-E; or (4) to the extent a Non-U.S. Lender is not the beneficial owner (for example, where such Foreign Lender is a partnership or a participating Lender), two executed original copies of IRS Form W-8IMY, accompanied by IRS Form W-8ECI, IRS Form W-8BEN, IRS Form W-8BEN-E, a U.S. Tax Compliance Certificate substantially in the form of Exhibit D-2 or D-3, IRS Form W-9, and/or other certification documents from each beneficial owner, as applicable; provided that if the Non-U.S. Lender is a partnership (and not a participating Lender) and one or more direct or indirect partners of such Non-U.S. Lender are claiming the portfolio interest exemption, such Non-U.S. Lender may provide a U.S. Tax Compliance Certificate substantially in the form of Exhibit D-4 on behalf of each such direct and indirect partner.  Any Non-U.S. Lender shall, to the extent it is legally eligible to do so, deliver to Borrower and

Administrative Agent (in such number of copies as shall be requested by the recipient) on or about the date on which such Non-U.S. Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of Borrower or Administrative Agent), executed copies of any other documentation prescribed by applicable Law as a basis for claiming exemption from or a reduction in U.S. federal withholding Tax, duly completed, together with such supplementary documentation as may be prescribed by applicable Law to permit Borrower or Administrative Agent to determine the withholding or deduction required to be made, if any.

(iii)     Each Lender that is a U.S. Person shall deliver on or about the date on which such Lender becomes a party to this Agreement (and thereafter at the time(s) and in the manner(s) prescribed by applicable Law or otherwise upon the reasonable request of Borrower or Administrative Agent), to Borrower and Administrative Agent (as applicable), a properly completed and duly executed IRS Form W-9, or any successor form, certifying that such Person is exempt from U.S. federal backup withholding.

(iv)     If a payment made to a Lender under any Credit Document would be subject to U.S. federal withholding Tax imposed by FATCA if such Lender were to fail to comply with the applicable reporting requirements of FATCA (including those contained in Section 1471(b) or 1472(b) of the Code, as applicable), such Lender shall deliver to Borrower and Administrative Agent at the time or times prescribed by Law and at such time or times reasonably requested by Borrower or Administrative Agent such documentation prescribed by applicable Law (including as prescribed by Section 1471(b)(3)(C)(i) of the Code) and such additional documentation reasonably requested by Borrower or Administrative Agent as may be necessary for Borrower and Administrative Agent to comply with their obligations under FATCA, to determine whether such Lender has complied with such Lender's obligations under FATCA, and to determine the amount to deduct and withhold, if any, from such payment. For purposes of this Section 5.06(c)(iv), FATCA shall include any amendments made to FATCA after the date of this Agreement.

(v)     Each Lender agrees that if any documentation it previously delivered expires or becomes obsolete or inaccurate in any respect, it shall update such documentation or promptly notify Borrower and Administrative Agent in writing of its legal ineligibility to do so. Notwithstanding any other provision of this Section 5.06(c), a Lender shall not be required to deliver any documentation that such Lender is not legally eligible to deliver.  Each Lender hereby authorizes Administrative Agent to deliver to the Credit Parties and to any successor Administrative Agent any documentation provided by such Lender to Administrative Agent pursuant to this Section 5.06(c).

(d)     On or before the date Administrative Agent becomes a party to this Agreement, if Administrative Agent is a U.S. Person, it shall deliver to Borrower two executed originals of IRS Form W-9 certifying that it is exempt from U.S. federal backup withholding.  Otherwise, Administrative Agent (including any successor Administrative Agent that is not a U.S. Person) shall deliver two duly completed copies of IRS Form W-8ECI (with respect to any payments to be received on its own behalf) and IRS Form W-8IMY (for all other payments) certifying that it is a "U.S. branch" and that the payments it receives for the account of Lenders are not effectively connected with the conduct of its trade or business in the United States and that it is using such form as evidence of its agreement with the Credit Parties to be treated as a U.S. Person with respect to such payments (and the Credit Parties and Administrative Agent agree to so treat Administrative Agent as a U.S. Person with respect to such payments), with the effect that Borrower may make payments to Administrative Agent, to the extent such payments are received by Administrative Agent as an intermediary, without deduction or withholding of any Taxes imposed by the United States. Notwithstanding anything to the contrary in this Section 5.06(d), Administrative Agent shall not be required

to provide any documentation that Administrative Agent is not legally eligible to deliver as a result of a Change in Law after the Closing Date.

(e)     Any Lender requiring Borrower to pay any Covered Taxes or additional amounts to such Lender or any Governmental Authority for the account of such Lender pursuant to this Section 5.06 agrees to use (at the Credit Parties' reasonable expense) reasonable efforts (consistent with its internal policy and legal and regulatory restrictions) to change the jurisdiction of its Applicable Lending Office if, in the judgment of such Lender, the making of such change would avoid the need for, or materially reduce the amount of, any such Covered Taxes or additional amounts that may thereafter accrue and would not be otherwise materially disadvantageous to such Lender.

(f)     If Administrative Agent or any Lender receives a cash refund in respect of an overpayment of Taxes from a Governmental Authority with respect to, and actually resulting from, an amount of Taxes actually paid to or on behalf of Administrative Agent or such Lender by Borrower or any other Credit Party , then Administrative Agent or such Lender shall notify Borrower of such refund and forward the proceeds of such refund (or relevant portion thereof) (and including any interest paid by the Governmental Authority with respect to such refund) to Borrower as reduced by any reasonable out-of-pocket expense incurred by Administrative Agent or such Lender in connection with obtaining such refund (including any Taxes imposed with respect to such refund); provided, however, that Borrower, upon the request of Administrative Agent or such Lender, shall repay the amount paid over to Borrower (plus any penalties, interest or other charges imposed by the relevant Governmental Authority) to Administrative Agent or such Lender in the event Administrative Agent or such Lender is required to repay such refund to such Governmental Authority.  This Section 5.06(f) shall not be construed to require Administrative Agent or any Lender to make available its tax returns (or any other information relating to its taxes that it deems confidential) to Borrower or any other Person.  Notwithstanding anything to the contrary in this Section 5.06(f), in no event will Administrative Agent or any Lender be required to pay any amount to any Credit Party pursuant to this Section 5.06(f) the payment of which would place Administrative Agent or such Lender in a less favorable net after-Tax position than it would have been in if the Tax subject to indemnification and giving rise to such refund had not been deducted, withheld or otherwise imposed and the indemnification payments or additional amounts with respect to such Tax had never been paid.

(g)     For the avoidance of doubt, for purposes of this Section 5.06, the term "applicable Law" includes FATCA.

**Section 5.07     Benchmark Replacement Setting**.  Notwithstanding anything to the contrary herein or in any other Credit Document:

(a)     [Reserved].

(b)     Replacing Future Benchmarks.  Upon the occurrence of a Benchmark Transition Event, the Benchmark Replacement will replace the then-current Benchmark for all purposes hereunder and under any Credit Document in respect of any Benchmark setting at or after 5:00 p.m. on the fifth (5th) Business Day after the date notice of such Benchmark Replacement is provided to the Lenders without any amendment to, or further action or consent of any other party to, this Agreement or any other Credit Document so long as Administrative Agent has not received, by such time, written notice of objection to such Benchmark Replacement from Lenders comprising the Required Lenders.  At any time that the administrator of the then-current Benchmark has permanently or indefinitely ceased to provide such Benchmark or such Benchmark has been announced by the regulatory supervisor for the administrator of such Benchmark pursuant to public statement or publication of information to be no longer representative of the underlying market and economic reality that such Benchmark is intended to measure and that representativeness will not be restored, Borrower may revoke any request for a borrowing of, conversion

to or continuation of Loans to be made, converted or continued that would bear interest by reference to such Benchmark until Borrower's receipt of notice from Administrative Agent that a Benchmark Replacement has replaced such Benchmark, and, failing that, Borrower will be deemed to have converted any such request into a request for a borrowing of or conversion to ABR Loans.  During the period referenced in the foregoing sentence, the component of Alternate Base Rate based upon the Benchmark will not be used in any determination of Alternate Base Rate.

(c)     Benchmark Replacement Conforming Changes.  In connection with the implementation and administration of a Benchmark Replacement, Administrative Agent will have the right in its reasonable discretion in consultation with Borrower to make Benchmark Replacement Conforming Changes from time to time and, notwithstanding anything to the contrary herein or in any other Credit Document, any amendments implementing such Benchmark Replacement Conforming Changes will become effective without any further action or consent of any other party to this Agreement or any other Credit Document.

(d)     Notices; Standards for Decisions and Determinations.  Administrative Agent will promptly notify Borrower and the Lenders of (i) the implementation of any Benchmark Replacement and (ii) the effectiveness of any Benchmark Replacement Conforming Changes.  Any determination, decision or election that may be made by Administrative Agent or, if applicable, any Lender (or group of Lenders) pursuant to this Section, including any determination with respect to a tenor, rate or adjustment or of the occurrence or non-occurrence of an event, circumstance or date and any decision to take or refrain from taking any action, will be conclusive and binding absent manifest error and may be made in its or their sole discretion and without consent from any other party hereto, except, in each case, as expressly required pursuant to this Section.  The parties hereto shall each use commercially reasonable efforts to ensure that the implementation hereunder of a Benchmark Replacement does not result in a deemed exchange of any loans for purposes of Treasury Regulations Section 1.1001-3 (or any successor provisions).

(e)     Unavailability of Tenor of Benchmark.  At any time (including in connection with the implementation of a Benchmark Replacement), (i) if the then-current Benchmark is a term rate (including Term SOFR), then Administrative Agent may remove any tenor of such Benchmark that is unavailable or non-representative for Benchmark (including Benchmark Replacement) settings and (ii) Administrative Agent may reinstate any such previously removed tenor for Benchmark (including Benchmark Replacement) settings.

(f)     Definitions.  As used in this Section 5.07:

"**Available Tenor**" shall mean, as of any date of determination and with respect to the then-current Benchmark, as applicable, (x) if the then-current Benchmark is a term rate, any tenor for such Benchmark that is or may be used for determining the length of an Interest Period or (y) otherwise, any payment period for interest calculated with reference to such Benchmark, as applicable, pursuant to this Agreement as of such date.

"**Benchmark**" shall mean, initially, the Term SOFR Reference Rate; provided that if a replacement of the Benchmark has occurred pursuant to this Section 5.07, then "Benchmark" means the applicable Benchmark Replacement to the extent that such Benchmark Replacement has replaced such prior benchmark rate.  Any reference to "Benchmark" shall include, as applicable, the published component used in the calculation thereof.

"**Benchmark Replacement**" shall mean, for any Available Tenor, the sum of (A) the alternate benchmark rate and (B) an adjustment (which may be a positive or negative value or zero), in each case, that has been selected by Administrative Agent and Borrower as the replacement for such Available Tenor of such Benchmark giving due consideration to any evolving or then-

prevailing market convention, including any applicable recommendations made by the Relevant Governmental Body, for U.S. dollar-denominated syndicated credit facilities at such time; provided that, if the Benchmark Replacement as determined pursuant to clause (i) or (ii) above would be less than the Floor, the Benchmark Replacement will be deemed to be the Floor for the purposes of this Agreement and the other Credit Documents.

"**Benchmark Replacement Conforming Changes**" shall mean, with respect to any Benchmark Replacement, any technical, administrative or operational changes (including changes to the definition of "Alternate Base Rate," the definition of "Business Day," the definition of "Interest Period," the definition of "U.S Government Securities Business Day," timing and frequency of determining rates and making payments of interest, timing of borrowing requests or prepayment, conversion or continuation notices, the applicability and length of lookback periods, the applicability of breakage provisions, the applicability of statutory reserve adjustment provisions, and other technical, administrative or operational matters) that Administrative Agent reasonably determines in consultation with Borrower may be appropriate to reflect the adoption and implementation of such Benchmark Replacement and to permit the administration thereof by Administrative Agent in a manner substantially consistent with market practice (or, if Administrative Agent reasonably determines in consultation with Borrower that adoption of any portion of such market practice is not administratively feasible or if Administrative Agent reasonably determines in consultation with Borrower that no market practice for the administration of such Benchmark Replacement exists, in such other manner of administration as Administrative Agent reasonably determines in consultation with Borrower is reasonably necessary in connection with the administration of this Agreement and the other Credit Documents).

"**Benchmark Transition Event**" shall mean, the occurrence of a public statement or publication of information by or on behalf of the administrator of the then-current Benchmark, the regulatory supervisor for the administrator of such Benchmark, the Board of Governors of the Federal Reserve System, the NYFRB, an insolvency official with jurisdiction over the administrator for such Benchmark, a resolution authority with jurisdiction over the administrator for such Benchmark or a court or an entity with similar insolvency or resolution authority over the administrator for such Benchmark, announcing or stating that (a) such administrator has ceased or will cease on a specified date to provide all Available Tenors of such Benchmark, permanently or indefinitely, provided that, at the time of such statement or publication, there is no successor administrator that will continue to provide any Available Tenor of such Benchmark or (b) all Available Tenors of such Benchmark are or will no longer be representative of the underlying market and economic reality that such Benchmark is intended to measure and that representativeness will not be restored.

"**Relevant Governmental Body**" shall mean the Federal Reserve Board or the NYFRB, or a committee officially endorsed or convened by the Federal Reserve Board or the NYFRB, or any successor thereto.

**ARTICLE VI.**

**GUARANTEES**

**Section 6.01    The Guarantees**.  Each (a) Guarantor, jointly and severally with each other Guarantor, hereby guarantees as primary obligor and not as surety to each Secured Party and its successors and assigns the prompt payment and performance in full when due (whether at stated maturity, by acceleration, demand or otherwise) of the principal of and interest (including any interest, fees, costs, expenses, or charges that would accrue but for the provisions of the Bankruptcy Code or other applicable

57

Debtor Relief Law after the filing of any bankruptcy or insolvency petition) on the Loans made by the Lenders to, and the Notes held by each Lender of, Borrower, and (b) Credit Party, jointly and severally with each other Credit Party, hereby guarantees as primary obligor and not as surety to each Secured Party and its successors and assigns the prompt payment and performance in full when due (whether at stated maturity, by acceleration or otherwise) of the principal of and interest (including any interest, fees, costs, expenses or charges that would accrue but for the provisions of the Bankruptcy Code or other applicable Debtor Relief Law after the filing of any bankruptcy or insolvency petition) of all other Obligations from time to time owing to the Secured Parties by any other Credit Party under any Credit Document, in each case now or hereinafter created, incurred or made, whether absolute or contingent, liquidated or unliquidated and strictly in accordance with the terms thereof (such obligations being guaranteed pursuant to clauses (a) and (b) above being herein collectively called the "**Guaranteed Obligations**" (it being understood that the Guaranteed Obligations of Borrower shall be limited to those referred to in clause (b) above and the Guaranteed Obligations of each other Guarantor shall not include any Obligations with respect to which such Guarantor is the primary obligor)).  Each Credit Party, jointly and severally with each other Credit Party, hereby agrees that if any other Credit Party shall fail to pay in full when due (whether at stated maturity, by acceleration or otherwise) any of the Guaranteed Obligations, such Credit Party will promptly pay the same, without any demand or notice whatsoever, and that in the case of any extension of time of payment or renewal of any of the Guaranteed Obligations, the same will be promptly paid in full when due (whether at extended maturity, by acceleration or otherwise) in accordance with the terms of such extension or renewal.

   **Section 6.02**  **Obligations Unconditional**. The obligations of the Credit Parties under Section 6.01 shall constitute a guaranty of payment (and not of collection) and are absolute, irrevocable and unconditional, joint and several, irrespective of the value, genuineness, validity, regularity or enforceability of the Guaranteed Obligations under this Agreement, the Notes or any other agreement or instrument referred to herein or therein, or any substitution, release or exchange of any other guarantee of or security for any of the Guaranteed Obligations, and, to the fullest extent permitted by applicable law, irrespective of any other circumstance whatsoever that might otherwise constitute a legal or equitable discharge or defense of a surety or guarantor (except for Payment in Full).  Without limiting the generality of the foregoing, it is agreed that the occurrence of any one or more of the following shall not alter or impair the liability of any of the Credit Parties with respect to its respective guaranty of the Guaranteed Obligations which shall remain absolute, irrevocable and unconditional under any and all circumstances as described above:

    (i) at any time or from time to time, without notice to the Credit Parties, the time for any performance of or compliance with any of the Guaranteed Obligations shall be extended, or such performance or compliance shall be waived;

    (ii) the maturity of any of the Guaranteed Obligations shall be accelerated, or any of the Guaranteed Obligations shall be amended in any respect, or any right under the Credit Documents or any other agreement or instrument referred to herein or therein shall be amended or waived in any respect or any other guarantee of any of the Guaranteed Obligations or any security therefor shall be released or exchanged in whole or in part or otherwise dealt with;

    (iii) the release of any other Credit Party pursuant to Section 6.08;

    (iv) any renewal, extension or acceleration of, or any increase in the amount of the Guaranteed Obligations, or any amendment, supplement, modification or waiver of, or any consent to departure from, the Credit Documents;

(v)     any failure or omission to assert or enforce or agreement or election not to assert or enforce, delay in enforcement, or the stay or enjoining, by order of court, by operation of law or otherwise, of the exercise or enforcement of, any claim or demand or any right, power or remedy (whether arising under any Credit Documents, at law, in equity or otherwise) with respect to the Guaranteed Obligations or any agreement relating thereto, or with respect to any other guaranty of or security for the payment of the Guaranteed Obligations;

(vi)    any settlement, compromise, release, or discharge of, or acceptance or refusal of any offer of payment or performance with respect to, or any substitutions for, the Guaranteed Obligations or any subordination of the Guaranteed Obligations to any other obligations;

(vii)   the validity, perfection, non-perfection or lapse in perfection, priority or avoidance of any security interest or lien, the release of any or all collateral securing, or purporting to secure, the Guaranteed Obligations or any other impairment of such collateral;

(viii)  any exercise of remedies with respect to any security for the Guaranteed Obligations (including, without limitation, any collateral, including the Collateral securing or purporting to secure any of the Guaranteed Obligations) at such time and in such order and in such manner as Administrative Agent and the Secured Parties may decide and whether or not every aspect thereof is commercially reasonable and whether or not such action constitutes an election of remedies and even if such action operates to impair or extinguish any right of reimbursement or subrogation or other right or remedy that any Credit Party would otherwise have and without limiting the generality of the foregoing or any other provisions hereof, each Credit Party hereby expressly waives any and all benefits which might otherwise be available to such Credit Party as a surety under applicable law, including, without limitation, California Civil Code Sections 2809, 2810, 2819, 2939, 2845, 2848, 2849, 2850, 2855, 2899 and 3433, and in the event that Nevada law applies to this Agreement or any portion hereof, Guarantors, and each of them, hereby waive the provisions of Section 40.430 of the Nevada Revised Statutes; or

(ix)    any other circumstance whatsoever (other than Payment in Full) which may or might in any manner or to any extent vary the risk of any Credit Party as a guarantor in respect of the Guaranteed Obligations or which constitutes, or might be construed to constitute, an equitable or legal discharge of any Credit Party as a guarantor of the Guaranteed Obligations, or of such Credit Party under the guarantee contained in this Article VI or of any security interest granted by any Credit Party in its capacity as a guarantor of the Guaranteed Obligations, whether in a proceeding under the Bankruptcy Code or under any other Debtor Relief Law, or in any other instance.

The Credit Parties hereby expressly waive diligence, presentment, demand of payment, protest, marshaling and all notices whatsoever, and any requirement that any Secured Party thereof exhaust any right, power or remedy or proceed against any Credit Party under this Agreement, the Notes or any other agreement or instrument referred to herein or therein, or against any other Person under any other guarantee of, or security for, any of the Guaranteed Obligations.  The Credit Parties waive any and all notice of the creation, renewal, extension, waiver, termination or accrual of any of the Guaranteed Obligations and notice of or proof of reliance by any Secured Party thereof upon this guarantee or acceptance of this guarantee, and the Guaranteed Obligations, and any of them, shall conclusively be deemed to have been created, contracted or incurred in reliance upon this guarantee, and all dealings between the Credit Parties and the Secured Parties shall likewise be conclusively presumed to have been had or consummated in reliance upon this guarantee.  This guarantee shall be construed as a continuing, absolute, irrevocable and unconditional guarantee of payment and performance without regard to any right of offset with respect to the Guaranteed Obligations at any time or from time to time held by the Secured Parties, and the obligations and liabilities

of the Credit Parties hereunder shall not be conditioned or contingent upon the pursuit by the Secured Parties or any other Person at any time of any right or remedy against any Credit Party or against any other Person which may be or become liable in respect of all or any part of the Guaranteed Obligations or against any collateral security or guarantee therefor or right of offset with respect thereto.  This guarantee shall remain in full force and effect and be binding in accordance with and to the extent of its terms upon the Credit Parties and the successors and assigns thereof, and shall inure to the benefit of the Secured Parties, and their respective successors and assigns, notwithstanding that from time to time during the term of this Agreement there may be no Guaranteed Obligations outstanding.

For the avoidance of doubt, nothing in this Section 6.02 shall permit amendments to the Credit Documents or an acceleration of the Obligations other than as set forth in the Credit Documents.

Section 6.03    **Reinstatement**.  The obligations of the Credit Parties under this Article VI shall be automatically reinstated if and to the extent that for any reason any payment by or on behalf of any Credit Party in respect of the Guaranteed Obligations is rescinded or avoided or must be otherwise restored by any holder of any of the Guaranteed Obligations, whether as a result of any proceedings in bankruptcy or reorganization or otherwise.  The Credit Parties jointly and severally agree that they will indemnify each Secured Party on demand for all reasonable costs and expenses (including reasonable fees of counsel) incurred by such Secured Party in connection with such rescission, avoidance or restoration, including any such costs and expenses incurred in defending against any claim alleging that such payment constituted a preference, fraudulent transfer or similar payment under any bankruptcy, insolvency or similar law, other than any costs or expenses resulting from the gross negligence, bad faith or willful misconduct of, or material breach by, such Secured Party.

Section 6.04    **Subrogation; Subordination**.  Each Credit Party hereby agrees that until the Payment in Full of the Guaranteed Obligations it shall not exercise any right or remedy arising by reason of any performance by it of its guarantee in Section 6.01, whether by subrogation, contribution or otherwise, against any Credit Party of any of the Guaranteed Obligations or any security for any of the Guaranteed Obligations.  The payment of any amounts due with respect to any indebtedness of any Credit Party now or hereafter owing to any Credit Party by reason of any payment by such Credit Party under the Guarantee in this Article VI is hereby subordinated to the prior Payment in Full in cash of the Guaranteed Obligations.  Upon the occurrence and during the continuance of an Event of Default, each Credit Party agrees that it will not demand, sue for or otherwise attempt to collect any such indebtedness of any other Credit Party to such Credit Party until the Obligations shall have been Paid in Full in cash.  If an Event of Default has occurred and is continuing, and any amounts are paid to the Credit Parties in violation of the foregoing limitation, such amounts shall be collected, enforced and received by such Credit Party as trustee for the Secured Parties and be paid over to Administrative Agent on account of the Guaranteed Obligations without affecting in any manner the liability of such Credit Party under the other provisions of the guaranty contained herein.

Section 6.05    **Remedies**.  The Credit Parties jointly and severally agree that, as between the Credit Parties and the Lenders, the obligations of any Credit Party under this Agreement and the Notes may be declared to be forthwith due and payable as provided in Article XI (and shall be deemed to have become automatically due and payable in the circumstances provided in said Article XI) for purposes of Section 6.01, notwithstanding any stay, injunction or other prohibition preventing such declaration (or such obligations from becoming automatically due and payable arising under the Bankruptcy Code or any other Debtor Relief Law) as against such other Credit Parties and that, in the event of such declaration (or such obligations being deemed to have become automatically due and payable), such obligations (whether or not due and payable by Borrower) shall forthwith become due and payable by the other Credit Parties for purposes of Section 6.01.

Section 6.06   **Continuing Guarantee**.  The guarantee in this Article VI is a continuing guarantee of payment and performance, and shall apply to all Guaranteed Obligations whenever arising.

Section 6.07   **General Limitation on Guarantee Obligations**.  In any action or proceeding involving any state corporate law, or any Debtor Relief Law, if the obligations of any Credit Party under Section 6.01 would otherwise be held or determined to be void, avoidable, invalid or unenforceable, or subordinated to the claims of any other creditors, on account of the amount of its liability under Section 6.01, then, notwithstanding any other provision to the contrary, the amount of such liability shall, without any further action by such Credit Party, any Secured Party or any other Person, be automatically limited and reduced to the highest amount that is valid and enforceable and not subordinated to the claims of other creditors as determined in such action or proceeding.

Section 6.08   **Release of Guarantors**.  If, in compliance with the terms and provisions of the Credit Documents, (i) the Equity Interests of any Guarantor are directly or indirectly sold or otherwise transferred such that such Guarantor no longer constitutes a Subsidiary (a "**Transferred Guarantor**") to a Person or Persons, none of which is Borrower or a Subsidiary pursuant to a transaction not prohibited hereunder, or (ii) any Subsidiary is designated as or becomes an Excluded Subsidiary, in each case of clauses (i) and (ii), (A) subject to the consent of the Required Lenders (other than in the case of an Excluded Subsidiary described in clauses (a) (as a result of applicable Gaming Law) or (b) (as a result of a requirement of Gaming Authorities) of the definition thereof) and (B) pursuant to a transaction not prohibited hereunder, such Transferred Guarantor or Excluded Subsidiary, as applicable, upon the consummation of such sale, transfer or designation or such Person becoming an Excluded Subsidiary, as applicable, shall be automatically released from its obligations under this Agreement (including under Section 13.03 hereof) and the other Credit Documents, and its obligations to pledge and grant any Collateral owned by it pursuant to any Security Document or the DIP Orders, and the pledge of Equity Interests in any Transferred Guarantor and any other Person the Equity Interests of whom constitute Excluded Assets (as such term is defined in the DIP Term Sheet or in the Security Agreement (if any)) to Collateral Agent pursuant to the Security Documents shall be automatically released, and, so long as Borrower shall have provided the Agents such certifications or documents as any Agent shall reasonably request, Collateral Agent shall take such actions as are necessary to effect and evidence each release described in this Section 6.08 in accordance with the relevant provisions of the Security Documents and this Agreement.

Section 6.09   **[Reserved]**.

Section 6.10   **Right of Contribution**.  Each Credit Party hereby agrees that to the extent that a Credit Party (a "**Funding Credit Party**") shall have paid more than its Fair Share (as defined below) of any payment made hereunder, such Credit Party shall be entitled to seek and receive contribution from and against any other Credit Party hereunder which has not paid its Fair Share of such payment. Each Credit Party's right of contribution shall be subject to the terms and conditions of Section 6.04.  The provisions of this Section 6.10 shall in no respect limit the obligations and liabilities of any Credit Party to the Secured Parties, and each Credit Party shall remain liable to the Secured Parties for the full amount guaranteed by such Credit Party hereunder.  "**Fair Share**" means, with respect to a Credit Party as of any date of determination, an amount equal to (i) the ratio of (A) the Adjusted Maximum Amount (as defined below) with respect to such Credit Party to (B) the aggregate of the Adjusted Maximum Amounts with respect to all Credit Parties multiplied by (ii) the aggregate amount paid or distributed on or before such date by all Funding Credit Parties under this Article VI in respect of the Guaranteed Obligations.  "**Adjusted Maximum Amount**" means, with respect to a Credit Party as of any date of determination, the maximum aggregate amount of the obligations of such Credit Party under this Article VI; provided that, solely for purposes of calculating the "Adjusted Maximum Amount" with respect to any Credit Party for purposes of this Section 6.10, any assets or liabilities of such Credit Party arising by virtue of any rights to subrogation, reimbursement or indemnification or any rights to or obligations of contribution hereunder shall not be

considered as assets or liabilities of such Credit Party.  The amounts payable as contributions hereunder shall be determined as of the date on which the related payment or distribution is made by the applicable Funding Credit Party.

## ARTICLE VII.

## CONDITIONS PRECEDENT

**Section 7.01    Conditions to Closing Date**.  The occurrence of the Closing Date hereunder is subject to the satisfaction of the following:

(a)    **Corporate Documents**.    Administrative Agent shall have received copies of the Organizational Documents of each Credit Party  and evidence of all corporate or other applicable authority for each Credit Party  (including resolutions or written consents and incumbency certificates) with respect to the execution, delivery and performance of such of the Credit Documents to which each such Credit Party is intended to be a party as of the Closing Date, certified as of the Closing Date as complete and correct copies thereof by a Responsible Officer of each Credit Party  (or the member or manager or general partner of such Credit Party).

(b)    **Officer's Certificate**.  Administrative Agent shall have received an Officer's Certificate of Borrower, dated the Closing Date, certifying that the conditions set forth in Section 7.02(e) have been satisfied.

(c)    **Bankruptcy Cases**.  The Bankruptcy Cases shall have been commenced in the Bankruptcy Court and all of the "first day orders" (including a cash management order (the "**Cash Management Order**")) and all related pleadings filed at or about the time of commencement of the Bankruptcy Cases shall have been provided to counsel to the Required Backstop Parties and shall be in form and substance reasonably acceptable to the Required Backstop Parties.

(d)    **Interim DIP Order**.  The Bankruptcy Court shall have entered an Interim DIP Order that shall be in form and substance consistent with the DIP Term Sheet and this Agreement and otherwise in form and substance acceptable to the Required Backstop Parties and the Debtors (and, to the extent affecting its capacity as such, the Fronting Lender), shall be in full force and effect, and shall not (in whole or in part) have been reversed, modified, amended, stayed, vacated, appealed, or subject to a stay pending appeal.  The Credit Parties shall be in compliance in all material respects with the Interim DIP Order.

(e)    **Notes**.  Administrative Agent shall have received copies of the Notes, duly completed and executed, for each Lender that requested a Note at least three (3) Business Days prior to the Closing Date.

(f)    **Credit Agreement**.  Administrative Agent shall have received this Agreement (a) executed and delivered by a duly authorized officer of each Credit Party and (b) executed and delivered by a duly authorized officer of each Person that is a Lender on the Closing Date.

(g)    **Filings and Lien Searches**.  Administrative Agent shall have received UCC financing statements in form appropriate for filing in the jurisdiction of organization of each Credit Party.

(h)    **Security Documents**.  As of the Initial Effective Date, the Interim DIP Order shall have been effective to create in favor of the Collateral Agent a legal, valid and enforceable first priority security interest in and Lien upon the Collateral and the Collateral Agent, for its benefit and the benefit of each Lender, shall have been granted a perfected lien on the Collateral by the Interim DIP Order on the terms and conditions set forth herein and in the DIP Term Sheet.

(i)        **Notice of Borrowing**.  Administrative Agent shall have received a Notice of Borrowing duly executed by Borrower.

(j)        **[Reserved]**.

(k)        **Initial Approved Budget.**  The Lenders shall have received, and the Required Lenders shall have approved, the Initial Approved Budget.

(l)        **No Material Adverse Effect**.  Since the Petition Date there shall not have been any event, occurrence, development or state of circumstances or facts that has had or would reasonably be expected to have, individually or in the aggregate a Material Adverse Effect.

(m)        **Payment of Fees and Expenses**.  To the extent invoiced at least two (2) Business Days prior to the Closing Date (unless otherwise agreed by Borrower), all costs, fees, expenses (including, without limitation, reasonable legal fees and expenses of Ropes & Gray LLP, Norton Rose Fulbright US LLP, Dentons US LLP and of special gaming and local counsel in any applicable jurisdiction, if any) of Administrative Agent,  the Fronting Lender, and (in the case of fees only) the Lenders required to be paid by this Agreement, the DIP Term Sheet, or by the Agent Fee Letter, in each case, payable to or by Administrative Agent and/or Lenders in respect of the Transactions, shall have been, or shall substantially concurrently with the initial extension of credit hereunder be, paid to the extent due.

(n)        **KYC Information and Beneficial Ownership Regulation**.  On or prior to the Closing Date, Administrative Agent shall have received at least three (3) Business Days prior to the Closing Date all documentation and other information reasonably requested in writing at least ten (10) Business Days prior to the Closing Date by Administrative Agent that Administrative Agent reasonably determines is required by regulatory authorities from the Credit Parties  under applicable "know your customer" and anti-money laundering rules and regulations, including without limitation the Patriot Act and a Beneficial Ownership Certificate to the extent expressly required under the Beneficial Ownership Regulation.

**Section 7.02**    **Conditions to All Extensions of Credit**. The obligations of the Lenders to make any Loan or otherwise extend any credit to Borrower upon the occasion of each Borrowing (including, for the avoidance of doubt, any deemed borrowing of Roll-Up DIP Loans) or other extension of credit hereunder on and after the Closing Date is subject to the conditions precedent that:

(a)        **DIP Orders**. The Interim DIP Order or the Final DIP Order, as applicable, shall be in full force and effect and shall not (in whole or in part) have been reversed, modified, amended, stayed, vacated, appealed, or subject to a stay pending appeal.

(b)        **Bankruptcy Cases Compliance**. The Credit Parties shall be in material compliance with each order entered in the Bankruptcy Cases, including the DIP Orders and the Cash Management Order.

(c)        **TSA**. The TSA will be in full force and effect.

(d)        **Budget**. The Credit Parties shall be in compliance with their obligations in connection with the delivery of the applicable Approved Budget and Variance Reports (as set forth herein and in the DIP Orders), and the Credit Parties shall be in compliance with the Approved Budget (subject to Permitted Variances).

(e)        **Representations and Warranties; No Event of Default**. The following statements shall be true and correct:  (i) the representations and warranties contained in this Agreement and the other Credit Documents are true and correct in all material respects (unless otherwise qualified by materiality, in which

case such representations and warranties shall be true and correct in all respects) on and as of each date the Credit Parties request to borrow Loans, as though made on and as of such date, except to the extent that any such representation or warranty expressly relates to an earlier date (in which case such representation or warranty shall be true and correct in all material respects (unless otherwise qualified by materiality, in which case such representations and warranties shall be true and correct in all respects) on and as of such earlier date) and (ii) no default or Event of Default shall have occurred and be continuing on such date.

(f)      **Notice of Borrowing**. Administrative Agent shall have received a written Notice of Borrowing, duly completed and complying with <u>Section 4.05</u>. Each Notice of Borrowing delivered by Borrower hereunder shall constitute a representation and warranty by Borrower that on and as of the date of such notice and on and as of the relevant borrowing date (immediately before and after giving effect to such borrowing and the application of the proceeds thereof) that the applicable conditions in <u>Section 7.02</u> have been satisfied.

**Section 7.03      <u>Conditions to Withdrawals From Funding Account</u>**. The Borrower may request a withdrawal of any amounts on deposit in the Funding Account subject to the fulfillment of each of the following conditions precedent:

(a)      **No Default or Event of Default**. Both immediately prior to the making of such Loan or other extension of credit and also after giving effect thereto and to the intended use thereof no Default or Event of Default shall have occurred and be continuing.

(b)      **Written Request**. The Administrative Agent shall have received a written request (which may be by electronic mail) for such withdrawal signed by the CRO that includes (i) reasonably detailed information as to the intended use of the proceeds of such withdrawal (which use shall be substantially consistent with the Approved Budget as then in effect), (ii) the amount of the requested withdrawal, and (iii) the date of the requested withdrawal (which shall be no sooner than the two (2) Business Days following the date of such request (or such shorter period as the Administrative Agent may be willing to accommodate from time to time)).

The Required Lenders agree to promptly approve (or direct their counsel to approve) any "Release Notice" (or similar request) pursuant to the Escrow Agreement for withdrawals from the Funding Account requested by the Administrative Agent upon satisfaction of the foregoing conditions.

**ARTICLE VIII.**

**<u>REPRESENTATIONS AND WARRANTIES</u>**

Each Credit Party represents for itself and on behalf of its Subsidiaries and warrants to Administrative Agent, Collateral Agent and Lenders that, at and as of each Funding Date, in each case immediately before and immediately after giving effect to the transactions to occur on such date (<u>provided</u>, that such representations and warranties made on the Closing Date shall be made giving effect to the Transactions):

**Section 8.01      <u>Corporate Existence; Compliance with Law</u>**.

(a)      Borrower and each Subsidiary (i) is a corporation, partnership, limited liability company or other entity duly organized, validly existing and in good standing under the laws of the jurisdiction of its organization (other than, as of the Closing Date, Maverick Acquisition Canada ULC); (ii)(1) has all requisite corporate or other power and authority, and (2) subject to receipt of any required Bankruptcy Court approvals or authorizations, has all governmental licenses, authorizations, consents and approvals necessary

to own its Property and carry on its business as now being conducted; and (iii) is qualified to do business and is in good standing in all jurisdictions in which the nature of the business conducted by it makes such qualification necessary (other than, as of the Closing Date, Maverick Acquisition Canada ULC); except, in the case of <u>clauses (ii)(2)</u> and <u>(iii)</u> where the failure thereof individually or in the aggregate would not reasonably be expected to have a Material Adverse Effect.

(b)  Neither Borrower nor any Subsidiary nor any of its Property is in violation of, nor will the continued operation of Borrower's or such Subsidiary's Property as currently conducted violate, any Requirement of Law (including, without limitation, Gaming Laws, the Patriot Act and any zoning or building ordinance, code or approval or permits or any restrictions of record or agreements affecting the Real Property) or is in default with respect to any judgment, writ, injunction, decree or order of any Governmental Authority, where such violations or defaults would reasonably be expected to have a Material Adverse Effect.

(c)  Neither Borrower nor any Guarantor is an Affected Financial Institution.

**Section 8.02  Financial Condition; Etc**.  Borrower has delivered to Administrative Agent or made publicly available (a) the audited consolidated balance sheets and related consolidated statements of operations, cash flows and shareholders' equity of Borrower and its Subsidiaries (before giving effect to the Transactions) for each of the fiscal years ended December 31, 2023 and December 31, 2024, and (b) the unaudited consolidated balance sheets and related statements of operations and cash flows of Borrower and its Subsidiaries (before giving effect to the Transactions) for each fiscal quarter ending after December 31, 2024 and at least 45 days prior to the Closing Date (the "**Historical Financial Statements**").  All of said financial statements, including in each case the related schedules and notes, are true, complete and correct in all material respects and have been prepared in accordance with GAAP consistently applied and present fairly in all material respects the financial position of Borrower and its Subsidiaries as of the respective dates of said balance sheets and the results of their operations for the respective periods covered thereby, subject (in the case of interim statements) to normal period-end audit adjustments and the absence of footnotes.

**Section 8.03  Litigation**.  Except (x) the Bankruptcy Cases or (y) as set forth on <u>Schedule 8.03</u>, there is no Proceeding (other than any normal overseeing reviews of the Gaming Authorities) pending against, or to the knowledge of any Responsible Officer of Borrower, threatened in writing against, Borrower or any of the Subsidiaries or any of their respective Properties before any Governmental Authority or private arbitrator that (i) either individually or in the aggregate, would reasonably be expected to have a Material Adverse Effect or (ii) as of the Closing Date only, challenges the validity or enforceability of any of the Credit Documents.

**Section 8.04  No Breach; No Default.**

None of the execution, delivery and performance by any Credit Party of any Credit Document to which it is a party nor the consummation of the transactions herein and therein contemplated (including the Transactions) do or will (i) conflict with or result in a breach of, or require any consent (which has not been obtained and is in full force and effect) under (x) any Organizational Document of any Credit Party or (y) any applicable Requirement of Law (including, without limitation, any Gaming Law) or (z) any order, writ, injunction or decree of any Governmental Authority binding on any Credit Party or tortiously interfere with, result in a breach of, or require termination of, any term or provision of any Contractual Obligation of any Credit Party or (ii) constitute (with due notice or lapse of time or both) a default under any such Contractual Obligation or (iii) result in or require the creation or imposition of any Lien (except for the Liens created pursuant to the Security Documents) upon any Property of any Credit Party pursuant to the terms of any

65

such Contractual Obligation, except with respect to (i)(y), (i)(z), (ii) or (iii) which would not reasonably be expected to result in a Material Adverse Effect.

(a)  No Default or Event of Default has occurred and is continuing hereunder or under the DIP Term Sheet.

**Section 8.05    Action**.  Subject to entry and effectiveness of the DIP Orders, Borrower and each Subsidiary has all necessary corporate or other organizational power, authority and legal right to execute, deliver and perform its obligations under each Credit Document to which it is a party and to consummate the transactions herein and therein contemplated; the execution, delivery and performance by Borrower and each Subsidiary of each Credit Document to which it is a party and the consummation of the transactions herein and therein contemplated have been duly authorized by all necessary corporate, partnership or other organizational action on its part; and this Agreement has been duly and validly executed and delivered by each Credit Party and constitutes, and each of the Credit Documents to which it is a party when executed and delivered by such Credit Party will constitute, its legal, valid and binding obligation, enforceable against each Credit Party, as applicable, in accordance with its terms, except as such enforceability may be limited by (a) any Debtor Relief Laws or other bankruptcy, insolvency, fraudulent conveyance or transfer, reorganization, moratorium or similar laws of general applicability from time to time in effect affecting the enforcement of creditors' rights and remedies and (b) the application of general principles of equity (regardless of whether such enforceability is considered in a proceeding in equity or at law).

**Section 8.06    Approvals**.  Subject to entry and effectiveness of the DIP Orders, no authorizations, approvals or consents of, and no filings or registrations with, any Governmental Authority or any securities exchange are necessary for the execution, delivery or performance by Borrower or any Subsidiary of the Credit Documents to which it is a party or for the legality, validity or enforceability hereof or thereof or for the consummation of the Transactions, except for: (i) authorizations, approvals or consents of, and filings or registrations with any Governmental Authority or any securities exchange previously obtained, made, received or issued, (ii) filings and recordings in respect of the Liens created pursuant to the Security Documents and the DIP Orders, (iii) the filings referred to in Section 8.14, (iv) waiver by the Gaming Authorities of any qualification requirement on the part of the Lenders who do not otherwise qualify and are not banks or licensed lending institutions, (v) consents, authorizations and filings that have been obtained or made and are in full force and effect or the failure of which to obtain would not reasonably be expected to have a Material Adverse Effect and (vi) any required approvals (including prior approvals) of the requisite Gaming Authorities that any Agent, Lender or participant is required to obtain from, or any required filings with, requisite Gaming Authorities to exercise their respective rights and remedies under this Agreement and the other Credit Documents (as set forth in Section 13.13).

**Section 8.07    ERISA and Labor Matters**.

(a)  No ERISA Event has occurred or is reasonably expected to occur that, when taken together with all other such ERISA Events for which liability is reasonably expected to occur, would reasonably be expected to result in a Material Adverse Effect.  Except as set forth on Schedule 8.07, as of the Closing Date, no ERISA Entity maintains or contributes to any Pension Plan or Multiemployer Plan.  Each Company is in compliance with the presently applicable provisions of ERISA and the Code with respect to each Employee Benefit Plan (other than to the extent such failure to comply would not reasonably be expected to have a Material Adverse Effect).  Using actuarial assumptions and computation methods consistent with Part I of Subtitle E of Title IV of ERISA, the aggregate liabilities of any ERISA Entity to all Multiemployer Plans in the event of a complete withdrawal therefrom, as of the close of the most recent fiscal year of each such Multiemployer Plan that precedes the Closing Date, would not reasonably be expected to result in a Material Adverse Effect.

66

(b)       [Reserved].

(c)       Except as, individually or in the aggregate, would not reasonably be expected to have a Material Adverse Effect, (i) there are no strikes or other labor disputes against Borrower or any of its Subsidiaries pending or, to the knowledge of Borrower, threatened and (ii) the hours worked by and payments made to employees of Borrower or any of its Subsidiaries have not been in violation of the Fair Labor Standards Act or any other applicable loan dealing with such matters.

Section 8.08       **Taxes**.  Except as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect, (i) all tax returns, statements, reports and forms or other documents (including estimated Tax or information returns and including any required, related or supporting information) (collectively, the "**Tax Returns**") required to be filed with any taxing authority by, or with respect to, Borrower and each of the Subsidiaries have been timely filed (taking into account any applicable due date extensions) in accordance with all applicable Laws and each such Tax Return is accurate and complete; (ii) other than Taxes which are being contested in good faith by appropriate proceedings and for which adequate reserves have been provided in accordance with GAAP (and such proceedings operate to suspend collection (excluding, for the avoidance of doubt, any bond, deposit or other amount payable as security pending the outcome of any such proceedings) of the contested Taxes and enforcement of a Lien in respect thereof), Borrower and each of the Subsidiaries has timely paid (taking into account any applicable due date extensions) all Taxes shown as due and payable on Tax Returns that have been so filed or that are otherwise due and payable (including in its capacity as a withholding agent); and (iii) Borrower and each of the Subsidiaries has made adequate provision to the extent required under GAAP for all Taxes payable by Borrower or such Subsidiary for which no Tax Return has yet been filed. Neither Borrower nor any of the Subsidiaries has received written notice of any proposed or pending Tax assessment, audit or deficiency against Borrower or such Subsidiary that would, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

Section 8.09       **Investment Company Act.**  Neither Borrower nor any of the Subsidiaries is an "investment company," or a company "controlled" by an "investment company" required to be regulated under the Investment Company Act of 1940, as amended.

Section 8.10       **Environmental Matters**.  Except as set forth on Schedule 8.10 or as would not, individually or in the aggregate, reasonably be expected to result in a Material Adverse Effect:  (i) each of Borrower and the Subsidiaries and each of their businesses, operations and Real Property is in compliance with, and each has no liability under any Environmental Law; (ii) each of Borrower and the Subsidiaries has obtained all Permits required for the conduct of their businesses and operations, and the ownership, operation and use of their assets, all as currently conducted, under any Environmental Law, all such Permits are valid and in good standing and to the knowledge of any Responsible Officer of Borrower or any of the Subsidiaries, no expenditures or operational adjustments would reasonably be expected to be required during the next five years in order to renew or modify such Permits; (iii) there has been no Release or threatened Release of Hazardous Material on, at, under or from any real property or facility presently or formerly owned, leased, operated or, to the knowledge of any Responsible Officer of Borrower or any of the Subsidiaries, used for waste disposal by Borrower or any of the Subsidiaries, or any of their respective predecessors in interest that would reasonably be expected to result in liability to Borrower or any of the Subsidiaries under any Environmental Law; (iv) there is no Environmental Action pending or, to the knowledge of any Responsible Officer of Borrower or any of the Subsidiaries, threatened, against Borrower or any of the Subsidiaries, or relating to real property currently or formerly owned, leased, operated or, to the knowledge of any Responsible Officer of Borrower or any of the Subsidiaries, used for waste disposal, by Borrower or any of the Subsidiaries or relating to the operations of Borrower or the Subsidiaries; (v) to the knowledge of any Responsible Officer of Borrower or any of the Subsidiaries, no circumstances exist that would reasonably be expected to (a) form the basis of an Environmental Action against Borrower or

any of the Subsidiaries, or any of their Real Property, facilities or assets or (b) cause any such Real Property, facilities or assets to be subject to any restriction on ownership, occupancy, or use under any Environmental Law; (vi) no real property or facility presently or formerly owned, operated or leased by Borrower or any of the Subsidiaries and, to the knowledge of any Responsible Officer of Borrower or any of the Subsidiaries, no real property or facility presently or formerly used for waste disposal by Borrower or any of the Subsidiaries or owned, leased, operated or used for waste disposal by any of their respective predecessors in interest is (a) listed or proposed for listing on the National Priorities List promulgated pursuant to CERCLA or (b) included on any similar list maintained by any Governmental Authority including, without limitation, any such list relating to petroleum; and (vii) the execution, delivery and performance of this Agreement and the consummation of the transactions contemplated hereby will not affect the validity or require the transfer of any Permit held by Borrower or any of the Subsidiaries under any Environmental Law, and will not require any notification, registration, filing, reporting, disclosure, investigation, remediation or cleanup pursuant to any Governmental Real Property Disclosure Requirements with respect to each of Borrower and the Subsidiaries or any of their respective predecessors in interest.

**Section 8.11   Use of Proceeds.**

(a)      Borrower will use the proceeds of the Loans to:

(i)      pay professional fees and other restructuring charges of the Bankruptcy Cases, including statutory fees of the United States Trustee and allowed professional fees and expenses of an unsecured creditors' committee appointed in the Bankruptcy Cases (if any)

(ii)      pay professional fees and expenses (including legal, financial advisor, appraisal, and valuation-related fees and expenses) incurred by the Administrative Agent, the Fronting Lender and/or the Lenders, including those incurred in connection with the preparation, negotiation, documentation, and Bankruptcy Court approval of this Agreement, the DIP Term Sheet and the Loans hereunder and thereunder;

(iii)      pay fees of the Committee Professionals in an amount not to exceed the Committee Investigation Amount;

(iv)      provide for the working capital, and for other general corporate purposes of the Debtors; and

(v)      pay administration costs of the Bankruptcy Cases and claims or amounts approved by the Bankruptcy Court.

(b)      Neither Borrower nor any of the Subsidiaries is engaged principally, or as one of its important activities, in the business of extending credit for the purpose, whether immediate, incidental or ultimate, of buying or carrying Margin Stock. No part of the proceeds of any extension of credit (including any Loans) hereunder will be used directly or indirectly and whether immediately, incidentally or ultimately to purchase or carry any Margin Stock or to extend credit to others for such purpose or to refund Indebtedness originally incurred for such purpose or for any other purpose, in each case, that entails a violation of, or is inconsistent with, the provisions of Regulation T, Regulation U or Regulation X. The pledge of any Equity Interests by any Credit Party pursuant to the Security Agreement or the DIP Orders does not violate such regulations.

**Section 8.12   Subsidiaries and Licensed Operator Guarantors.**

(a)        Schedule 8.12(a) sets forth a true and complete list of the following: (i) all the Subsidiaries (other than Licensed Operator Guarantors) of Borrower as of the Closing Date; (ii) the name and jurisdiction of incorporation or organization of each such Subsidiary as of the Closing Date; and (iii) as to each such Subsidiary, the percentage and number of each class of Equity Interests of such Subsidiary owned by Borrower and its respective Subsidiaries as of the Closing Date.

(b)        Schedule 8.12(b) sets forth a true and complete list of the following: (i) all the Licensed Operator Guarantors as of the Closing Date; and (ii) the name and jurisdiction of incorporation or organization of each such Licensed Operator Guarantor as of the Closing Date.

**Section 8.13    Ownership of Property; Liens**.  Except as set forth on Schedule 8.13(a), (a) Borrower and each of the Subsidiaries has good and valid title to, or a valid (with respect to Real Property) leasehold interest in (or subleasehold interest in or other right to occupy), all material assets and Property (including Mortgaged Real Property) (tangible and intangible) owned or occupied by it (except insofar as marketability may be limited by any laws or regulations of any Governmental Authority affecting such assets), and (b) all such assets and Property are subject to no Liens other than Permitted Liens.  All of the assets and Property owned by, leased to or used by Borrower and each of the Subsidiaries in its respective businesses are in good operating condition and repair in all material respects (ordinary wear and tear and casualty and force majeure excepted) except in each case where the failure of such asset to meet such requirements would not reasonably be expected to result in a Material Adverse Effect.

**Section 8.14    Security Interest; Absence of Financing Statements; Etc**.

(a)        Subject to applicable Gaming Laws, the Security Documents (if any) once executed and delivered (including the DIP Orders, upon effectiveness thereof), will create, in favor of Collateral Agent for the benefit of the Secured Parties, as security for the Obligations, a valid and enforceable security interest in and Lien upon all of the Collateral (subject to any applicable provisions set forth herein or in the Security Documents with respect to limitations or exclusions from the requirement to perfect the security interests and Liens on the collateral described therein), which security interests and Liens in the Collateral shall be (i) automatically perfected and (ii) superior to and prior to the rights of all third Persons and subject to no Liens other than Permitted Liens, in the case of each of (i) and (ii), to the extent set forth in the DIP Orders.

(b)        Notwithstanding the foregoing, the Credit Parties hereby confirm that the DIP Liens (as defined in the Interim DIP Order), created in favor of Collateral Agent for the benefit of the Secured Parties pursuant to the Interim DIP Order, are hereby ratified as valid, binding, enforceable, non-avoidable, and automatically and properly perfected liens and security interests in the DIP Collateral (as defined in the Interim DIP Order) and shall continue in full force and effect subject to the terms of the Security Documents when the same become effective.

(c)        Notwithstanding anything herein (including this Section 8.14) or in any other Credit Document to the contrary, neither Borrower nor any other Credit Party makes any representation or warranty as to (A) the effects of perfection or non-perfection, the priority or the enforceability of any pledge of or security interest in any Equity Interests of any Foreign Subsidiary, or as to the rights and remedies of the Agents or any Lender with respect thereto, under foreign Law or (B) the pledge or creation of any security interest, or the effects of perfection or non-perfection, the priority or the enforceability of any pledge of or security interest to the extent such pledge, security interest, perfection or priority is not required pursuant to this Agreement or any other Credit Document.

**Section 8.15    Licenses and Permits**.  Except as set forth on Schedule 8.15, Borrower and each of its Subsidiaries hold all material governmental permits, licenses, authorizations, consents and approvals

69

(including Gaming Approvals) necessary for Borrower and its Subsidiaries to own, lease, and operate their respective Properties and to operate their respective businesses as now being conducted (collectively, the "**Permits**"), except for Permits the failure of which to obtain would not reasonably be expected to have a Material Adverse Effect.  None of the Permits has been modified in any way since the Closing Date that would reasonably be expected to have a Material Adverse Effect.  Except as set forth on <u>Schedule 8.15</u>, all Permits are in full force and effect except where the failure to be in full force and effect would not reasonably be expected to have a Material Adverse Effect.  Except as set forth on <u>Schedule 8.15</u>, neither Borrower nor any of its Subsidiaries has received written notice that any Gaming Authority has commenced proceedings to suspend, revoke or not renew any such Permits where such suspensions, revocations or failure to renew would reasonably be expected to have a Material Adverse Effect.

**Section 8.16**     <u>Disclosure</u>.  The information, reports, financial statements, exhibits and schedules furnished in writing by or on behalf of any Credit Party to any Secured Party prior to the Closing Date in connection with this Agreement and the other Credit Documents, but in each case excluding all projections and general industry or economic data, when taken as a whole and giving effect to all supplements and updates, do not contain any untrue statement of material fact or omit to state a material fact necessary in order to make the statements herein or therein, in light of the circumstances under which they were made, not materially misleading.  As of the Closing Date, the information included in any Beneficial Ownership Certificate is true and correct in all respects.

**Section 8.17**     <u>No Fraudulent Transfer</u>.  In connection with the transactions contemplated by this Agreement or the other Credit Documents, no property has been transferred, concealed or removed by any Credit Party or any of its Subsidiaries and no obligation is being incurred by any Credit Party or any of their Subsidiaries in each case, with the intent to hinder, delay or defraud other present or future creditors of such Credit Party or Subsidiary.

**Section 8.18**     [Reserved].

**Section 8.19**     <u>Intellectual Property</u>.  Except as set forth on <u>Schedule 8.19</u>, Borrower and each of its Subsidiaries owns or possesses adequate licenses or otherwise has the right to use all of the patents, patent applications, trademarks, trademark applications, service marks, service mark applications, trade names, copyrights, trade secrets, know-how and processes (collectively, "**Intellectual Property**") that are necessary for the operation of its business as presently conducted except where failure to own or have such right would not reasonably be expected to have a Material Adverse Effect.  Except as set forth on <u>Schedule 8.19</u>, as of the Closing Date, no claim is pending or, to the knowledge of any Responsible Officer of Borrower, threatened to the effect that Borrower or any of its Subsidiaries infringes or conflicts with the asserted rights of any other Person under any material Intellectual Property, except for such claims that would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.  Except as set forth on <u>Schedule 8.19</u>, as of the Closing Date, no claim is pending or, to the knowledge of any Responsible Officer of Borrower, threatened to the effect that any such material Intellectual Property owned or licensed by Borrower or any of its Subsidiaries or which Borrower or any of its Subsidiaries otherwise has the right to use is invalid or unenforceable, except for such claims that would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

**Section 8.20**     <u>Bankruptcy Matters</u>.

(a)     The Bankruptcy Cases were commenced on the Petition Date in accordance with applicable laws and proper notice thereof was given for (i) the motion seeking approval of the Credit Documents and the Interim DIP Order and Final DIP Order, (ii) the hearing for the entry of the Interim DIP Order, and (iii) the hearing for the entry of the Final DIP Order.

(b)         After the entry of the Interim DIP Order, and pursuant to and to the extent provided in the Interim DIP Order and the Final DIP Order, the Obligations will constitute allowed administrative expense claims in the Bankruptcy Cases having priority over all administrative expense claims and unsecured claims against the Debtors now existing or hereafter arising, of any kind whatsoever, including all administrative expense claims of the kind specified in sections 105, 326, 330, 331, 503(b), 506(c), 507(a), 507(b), 546(c), 726, 1114 or any other provision of the Bankruptcy Code or otherwise, as provided under section 364(c)(l) of the Bankruptcy Code, subject to (i) the Carve-Out and (ii) the priorities set forth in the Interim DIP Order or Final DIP Order, as applicable, subject to any Permitted Liens.

(c)         After the entry of the Interim DIP Order and delivery and execution of this Agreement, the Obligations shall at all times be secured and perfected pursuant to, and have the superpriority claims and Liens as set forth in, the DIP Orders and herein and to the extent such Collateral is not subject to valid, enforceable, perfected and non-avoidable Liens as of the Petition Date, and in any case, (i) subject to Permitted Liens and (ii) excluding Avoidance Actions (but including, upon entry of the Final DIP Order, the proceeds thereof).

(d)         The Interim DIP Order (with respect to the period on and after entry of the Interim DIP Order and prior to entry of the Final DIP Order) or the Final DIP Order (with respect to the period on and after entry of the Final DIP Order), as the case may be, is in full force and effect and has not been reversed, stayed (whether by statutory stay or otherwise), vacated, or, without the Required Lenders' (and with respect to any provision that affects the rights, privileges, immunities or duties of the Collateral Agent, Collateral Agent's) consent, modified or amended.

(e)         The Credit Parties are in compliance in all respects with the DIP Orders.

(f)         The Credit Parties have not failed to disclose any material assumptions with respect to the Approved Budget and affirm the reasonableness of the assumptions in the Approved Budget in all material respects.

**Section 8.21      [Reserved]**.

**Section 8.22      Insurance**.  Borrower and each of its Subsidiaries (other than Maverick Canada) are insured by insurers of recognized financial responsibility (determined as of the date such insurance was obtained) against such losses and risks (other than wind and flood damage) and in such amounts as are prudent and customary in the businesses in which it is engaged, except to the extent that such insurance is not available on commercially reasonable terms.  Borrower and each of its Subsidiaries maintain all insurance required by Flood Insurance Laws (but shall not, for the avoidance of doubt, be required to obtain insurance with respect to wind and flood damage unless and to the extent required by such Flood Insurance Laws).

**Section 8.23      Real Estate.**

(a)         Schedule 8.23(a) sets forth a true, complete and correct list of all Applicable Real Property owned and all Applicable Real Property leased by Borrower or any of its Subsidiaries as of the Closing Date, including a brief description thereof, including, in the case of leases, the street address (to the extent available) and landlord name.  Borrower has delivered to Collateral Agent true, complete and correct copies of all such leases (other than the AG Master Lease).

(b)         Except as set forth on Schedule 8.23(b), as of the Closing Date, to the best of knowledge of any Responsible Officer of Borrower no Taking has been commenced or is contemplated with respect to all or any portion of the Applicable Real Property or for the relocation of roadways providing access to

such Applicable Real Property that either individually or in the aggregate would reasonably be expected to have a Material Adverse Effect.

**Section 8.24    Leases.**

(a)    [Reserved].

(b)    Borrower and its Subsidiaries have paid all material payments required to be made by it under (i) so long as the AG Master Lease is then in effect, such AG Master Lease and (ii) any other leases of Applicable Real Property where any of the Collateral is or may be located from time to time (in each case, other than any amount the validity of which is currently being contested in good faith by appropriate proceedings and with respect to which reserves in conformity with GAAP have been provided on the books of Borrower or such Subsidiary, as the case may be, and any amounts that are due but not yet delinquent), except, in each case, where failure to make such payments would not reasonably be expected to have a Material Adverse Effect.

(c)    Each of the AG Master Lease and any other material leases of Applicable Real Property is in full force and effect and will be or is, as applicable, legal, valid, binding and enforceable against the Credit Party party thereto, in accordance with its terms, in each case, except as such enforceability may be limited by (x) any Debtor Relief Laws or other bankruptcy, insolvency, fraudulent conveyance or transfer, reorganization, moratorium or similar laws of general applicability from time to time in effect affecting the enforcement of creditors' rights and remedies and (y) the application of general principles of equity (regardless of whether such enforceability is considered in a proceeding in equity or at law), except as would not reasonably be expected to have a Material Adverse Effect.

(d)    None of the AG Master Lease and any other leases of Applicable Real Property have been amended, modified or assigned in any manner that would reasonably be expected to result in a Material Adverse Effect.  Borrower has not received written notice of any existing breach, default, event of default or, to the best of knowledge of any Responsible Officer of Borrower, event that, with or without notice or lapse of time or both, would constitute a breach, default or an event of default by any Credit Party party to the AG Master Lease or any other leases of Applicable Real Property that would reasonably be expected to have a Material Adverse Effect.

**Section 8.25    Mortgaged Real Property**.  Except as would not reasonably be expected to have a Material Adverse Effect, with respect to each Mortgaged Real Property, as of the Closing Date (a) except as set forth on Schedule 8.25(a), there has been issued a valid and proper certificate of occupancy or other local equivalent, if any, for the use then being made of such Mortgaged Real Property to the extent required by applicable Requirements of Law and there is no outstanding citation, notice of violation or similar notice indicating that the Mortgaged Real Property contains conditions which are not in compliance with local codes or ordinances relating to building or fire safety or structural soundness and (b) except as set forth on Schedule 8.25(b), there are no material disputes regarding boundary lines, location, encroachment or possession of such Mortgaged Real Property and no Responsible Officer of Borrower has actual knowledge of any state of facts existing which could give rise to any such claim other than those that would not reasonably be expected to have a Material Adverse Effect; provided, however, that with respect to any Mortgaged Real Property in which Borrower or a Subsidiary has a leasehold estate, the foregoing certifications shall be to Borrower's knowledge only.

**Section 8.26    [Reserved]**.

**Section 8.27    Anti-Corruption Laws and Sanctions**. Borrower has implemented and maintains in effect policies and procedures reasonably designed to promote material compliance by Borrower, its

Subsidiaries and their respective directors, officers, employees and agents with Anti-Corruption Laws and applicable Sanctions, and Borrower, its Subsidiaries and, to the knowledge of Borrower or its Subsidiaries, their respective officers, directors and employees, are in compliance with Anti-Corruption Laws and applicable Sanctions in all material respects and are not knowingly engaged in any activity that would reasonably be expected to result in Borrower or its Subsidiaries being designated as a Sanctioned Person. None of (a) Borrower, any Subsidiary or, to the knowledge of Borrower or such Subsidiary, any of their respective directors, officers or employees, or (b) to the knowledge of Borrower, any agent of Borrower or any of its Subsidiaries that will act in any capacity in connection with or benefit from the credit facility established hereby, is a Sanctioned Person.  No Borrowing, use of proceeds or other transaction contemplated by this Agreement will violate any Anti-Corruption Law or applicable Sanctions.

## ARTICLE IX.

## AFFIRMATIVE COVENANTS

Each Credit Party, for itself and on behalf of its Subsidiaries, covenants and agrees with Administrative Agent, Collateral Agent and Lenders that until the Obligations have been Paid in Full (and each Credit Party covenants and agrees that it will cause its Subsidiaries to observe and perform the covenants herein set forth applicable to any such Subsidiary until the Obligations have been Paid in Full):

**Section 9.01    Existence; Business Properties**.

(a)    Borrower and each of its Subsidiaries shall do or cause to be done all things necessary to preserve, renew and keep in full force and effect its legal existence (in the case of Borrower, in the United States), except in a transaction permitted by Section 10.05 or, in the case of any Subsidiary, where the failure to perform such obligations, individually or in the aggregate, would not reasonably be expected to result in a Material Adverse Effect.

(b)    Borrower and each of its Subsidiaries shall do or cause to be done all things necessary to obtain, preserve, renew, extend and keep in full force and effect the rights, licenses, permits, franchises, authorizations, approvals, patents, copyrights, trademarks and trade names (including Gaming Approvals) material to the conduct of its business except where the failure to do so, individually or in the aggregate, would not reasonably be expected to result in a Material Adverse Effect; comply with all applicable Requirements of Law (including any and all Gaming Laws and any and all zoning, building, ordinance, code or approval or any building permits or any restrictions of record or agreements affecting the Real Property) and decrees and orders of any Governmental Authority, whether now in effect or hereafter enacted, except where the failure to comply, individually or in the aggregate, would not reasonably be expected to result in a Material Adverse Effect and at all times maintain and preserve all of its property and keep such property in good repair, working order and condition (ordinary wear and tear and casualty and force majeure excepted) except where the failure to do so individually or in the aggregate would not reasonably be expected to result in a Material Adverse Effect; provided, however, that nothing in this Section 9.01(b) shall prevent (i) sales, conveyances, transfers or other dispositions of assets, consolidations or mergers by or involving any Company or any other transaction in accordance with Section 10.05; (ii) the withdrawal by any Company of its qualification as a foreign corporation in any jurisdiction where such withdrawal, individually or in the aggregate, would not reasonably be expected to result in a Material Adverse Effect; or (iii) the abandonment by any Company of any rights, Permits, authorizations, copyrights, trademarks, trade names, franchises, licenses and patents that such Company reasonably determines are not useful to its business.

(c)      Borrower will maintain in effect and enforce policies and procedures reasonably designed to promote material compliance by Borrower, its Subsidiaries and their respective directors, officers, employees and agents with Anti-Corruption Laws and applicable Sanctions.

**Section 9.02      Insurance.**

(a)      Each of Borrower and its Subsidiaries (other than Maverick Canada) shall maintain, with (x) Affiliates of Borrower (other than with respect to any primary and non-contributory insurance) or (y) insurers of recognized financial responsibility (determined at the time such insurance is obtained), insurance on its Property in at least such amounts and against at least such risks as are customarily insured against by companies engaged in the same or a similar business and operating similar properties in localities where such Person operates; and furnish to Administrative Agent, upon written request, information as to the insurance carried; provided that Borrower and its Subsidiaries shall not be required to maintain insurance with respect to wind and flood damage on any property for any insurance coverage period unless, and to the extent, such insurance is required by an applicable Requirement of Law.  Subject to Section 9.15, Collateral Agent shall be named as an additional insured on all third-party liability insurance policies of Borrower and each of its Subsidiaries (other than directors and officers liability insurance, insurance policies relating to employment practices liability, crime or fiduciary duties, kidnap and ransom insurance policies, and insurance as to fraud, errors and omissions), and Collateral Agent shall be named as mortgagee/loss payee on all property insurance policies of each such Person.

(b)      Borrower and each of its Subsidiaries (other than Maverick Canada) shall deliver to Administrative Agent on behalf of the Secured Parties, (i) on or prior to the Closing Date, a certificate dated on or prior (but close) to the Closing Date showing the amount and types of insurance coverage as of such date, (ii) promptly following receipt of any notice from any insurer of cancellation of a material policy or material change in coverage from that existing on the Closing Date, a copy of such notice (or, if no copy is available, notice thereof), and (iii) promptly after such information has been received in written form by Borrower or any of its Subsidiaries, information as to any claim for an amount in excess of $10.0 million with respect to any property and casualty insurance policy maintained by Borrower or any of its Subsidiaries.

(c)      If any portion of any Mortgaged Real Property is at any time located in an area identified by the Federal Emergency Management Agency (or any successor agency) as a special flood hazard area with respect to which flood insurance has been made available under the Flood Insurance Laws, then Borrower shall, or shall cause the applicable Credit Party to (i) to the extent required pursuant to the Flood Insurance Laws, maintain, or cause to be maintained, with a financially sound and reputable insurer (determined at the time such insurance is obtained), flood insurance in an amount and otherwise sufficient to comply with all applicable rules and regulations promulgated pursuant to such Flood Insurance Laws and (ii) deliver to Administrative Agent evidence of such compliance in form and substance reasonably acceptable to Administrative Agent.

(d)      In the event that the proceeds of any insurance claim are paid after Collateral Agent has exercised its right to foreclose after an Event of Default, such proceeds shall be paid to Collateral Agent to satisfy any deficiency remaining after such foreclosure.  Collateral Agent shall retain its interest in the policies required to be maintained pursuant to this Section 9.02 during any redemption period.

**Section 9.03      Taxes; Performance of Obligations.**  Except as would not reasonably be expected to have a Material Adverse Effect, Borrower and each of its Subsidiaries shall timely file all material Tax Returns required to be filed by it and pay and discharge promptly when due all material Taxes, assessments and governmental charges or levies imposed upon it or in respect of its property (including in its capacity as a withholding agent), before the same shall become delinquent or in default (following the expiration of

any cure period applicable thereto); provided, however, that such payment and discharge shall not be required with respect to any such Tax, assessment, charge, levy or claim so long as the validity or amount thereof shall be contested in good faith by appropriate proceedings and Borrower and each of its Subsidiaries shall have set aside on its books adequate reserves with respect thereto to the extent required under GAAP.

Section 9.04    **Financial Statements, Etc**.  Borrower shall deliver to Administrative Agent for distribution by Administrative Agent to the Lenders (unless a Lender expressly declines in writing to accept):

(a)    **Quarterly Financials**.  As soon as available, but in any event within forty-five (45) days (and in the case of the fiscal quarter ended June 30, 2025, sixty (60) days) after the end of each fiscal quarter of Borrower beginning with the fiscal quarter ended June 30, 2025 (other than the last fiscal quarter in any fiscal year) or such later time as agreed to by the Administrative Agent (at the direction of the Required Lenders), (x) a consolidated balance sheet of Borrower and its Subsidiaries as at the end of such fiscal quarter, and the related consolidated statements of income or operations for such fiscal quarter and for the portion of the fiscal year then ended and consolidated statements of cash flows for such fiscal quarter and the portion of the fiscal year then ended, setting forth in each case in comparative form the figures for the corresponding fiscal quarter of the previous fiscal year and the corresponding portion of the previous fiscal year, all in reasonable detail and certified by a Responsible Officer of Borrower as fairly presenting in all material respects the financial condition, results of operations and cash flows of Borrower and its Subsidiaries in accordance with GAAP, subject only to normal year-end audit adjustments and the absence of footnotes, and which in each case shall include (i) regional reporting (for the Washington; Nevada; Colorado; and EGads regions) of revenue and (ii) segment reporting (for the hotel; food and beverage; gaming; retail, entertainment and other; and EGads segments) of revenue and (y) management's discussion and analysis of the important operational and financial developments of Borrower and the Subsidiaries during such fiscal quarter;

(b)    **Annual Financials**.  As soon as available, but in any event within one hundred twenty (120) days after the end of each fiscal year of Borrower beginning with the fiscal year ended December 31, 2025, (x) consolidated balance sheets of Borrower and its Subsidiaries as at the end of such fiscal year, and the related consolidated statements of income or operations, shareholders' equity and cash flows for such fiscal year, setting forth in each case in comparative form the figures for the previous fiscal year, and which in each case shall include (i) regional reporting (for the Washington; Nevada; Colorado; and EGads regions) of revenue and (ii) segment reporting (for the hotel; food and beverage; gaming; retail, entertainment and other; and EGads segments) of revenue, and, in the case of each such consolidated financial statements, audited and accompanied by a report and opinion of either Ernst & Young US LLP or any other independent registered public accounting firm of nationally recognized standing, which report and opinion shall be prepared in accordance with generally accepted auditing standards and (y) management's discussion and analysis of the important operational and financial developments of Borrower and the Subsidiaries during such fiscal year;

(c)    **Auditor's Certificates; Compliance Certificate**.  At the time it furnishes each set of financial statements pursuant to Section 9.04(a), Section 9.04(b) or Section 9.04(n), a certificate of a Responsible Officer of Borrower in the form of Exhibit E hereto (I) to the effect that no Default has occurred and is continuing (or, if any Default has occurred and is continuing, describing the same in reasonable detail and describing the action that the Companies have taken and propose to take with respect thereto) and (II) in the case solely of financial statements pursuant to Section 9.04(n), setting forth the cash and Cash Equivalents of Holdings and its Subsidiaries as of the close of business on each Business Day during such month;

(d)     **Notice of Default**.  Promptly after any Responsible Officer of any Company knows that any Default has occurred, a notice of such Default describing the same in reasonable detail and a description of the action that the Companies have taken and propose to take with respect thereto;

(e)     **Environmental Matters**.  Written notice of any claim, Release of Hazardous Material, condition, circumstance, occurrence or event arising under Environmental Law which would reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect;

(f)     **Budget and Variance Reporting**.  The parties hereto agree to comply with the following budget and variance reporting procedures:

(i)     on the Friday of every week, commencing with July 25, 2025, an updated 13-week cash flow forecast for the Credit Parties in a form consistent with past practice, broken down by week, which shall include the anticipated uses of the proceeds of the Loans for such period (each, a "**Proposed Budget**"), which Proposed Budget shall modify and supersede any prior Approved Budget upon the approval of the Required Lenders in their reasonable discretion (which approval may be delivered by e-mail correspondence);

(ii)     after approval of each Proposed Budget, the Borrower shall direct the Administrative Agent (and hereby grants its consent to the Administrative Agent) to distribute such Proposed Budget to all Lenders;

(iii)     on the Friday of each week, commencing for the week ending July 25, 2025, a Variance Report; and

(iv)     together with delivery of each Proposed Budget, a report regarding all accrued fees of the Debtors' legal and financial advisors incurred during the prior four-week period.

(g)     **Auditors' Reports**.  Promptly upon receipt thereof, copies of all annual, interim or special reports issued to Borrower or any Subsidiary by independent certified public accountants in connection with each annual, interim or special audit of Borrower's or such Subsidiary's books made by such accountants, including any management letter commenting on Borrower's or such Subsidiary's internal controls issued by such accountants to management in connection with their annual audit; provided, however, that such reports shall only be made available to Administrative Agent and to those Lenders who request such reports through Administrative Agent;

(h)     **Lien Matters; Casualty and Damage to Collateral**.

(i)     Prompt written notice of (i) the incurrence of any Lien (other than a Permitted Lien) on the Collateral or any part thereof, (ii) any Casualty Event or other insured damage to any material portion of the Collateral or (iii) the occurrence of any other event that in Borrower's judgment is reasonably likely to materially adversely affect the aggregate value of the Collateral; and

(ii)     [Reserved];

(i)     **Notice of Material Adverse Effect**.  Written notice of the occurrence of any event or occurrence that has had or would reasonably be expected to have a Material Adverse Effect;

(j)     **ERISA Information**.  Promptly after the occurrence of any ERISA Event that, alone or together with any other ERISA Events that have occurred, would reasonably be expected to result in a

76

Material Adverse Effect, a written notice specifying the nature thereof, what action the Companies or other ERISA Entity have taken, are taking or propose to take with respect thereto, and, when known, any action taken or threatened by the IRS, Department of Labor, PBGC or Multiemployer Plan sponsor with respect thereto;

(k)     **Litigation**.   Promptly after Borrower's knowledge thereof, notice of the filing or commencement of any action, suit, litigation or proceeding (other than the Bankruptcy Cases), whether at law or in equity by or before any Governmental Authority against Borrower or any of its Subsidiaries thereof that would reasonably be expected to result in a Material Adverse Effect;

(l)     **Patriot Act and Beneficial Ownership Certificate**.   Promptly (i) following Administrative Agent's or any Lender's request therefor, all documentation and other information that Administrative Agent or such Lender reasonably requests in order to comply with its ongoing obligations under the applicable "know your customer" and anti-money laundering rules and regulations, including the Patriot Act, and (ii) following Borrower's knowledge thereof, notice of any change in the information provided in the Beneficial Ownership Certification that would result in a change to the list of beneficial owners identified in parts (c) or (d) of such certification; and

(m)     **Miscellaneous**.   Promptly, such financial information, reports, documents and other information with respect to Borrower or any of its Subsidiaries as Administrative Agent or the Required Lenders may from time to time reasonably request, (which, in the case of any forecasts or projections of the performance of the Borrower and its Subsidiaries shall be certified by the Chief Restructuring Officer of the Borrower as having been prepared in good faith based on assumptions believed by Borrower to be reasonable at the time made and delivered, it being recognized by the Lenders that such financial information as it relates to future events is not to be viewed as fact and that actual results during the period or periods covered by such financial information may differ from the projected results set forth therein by a material amount and no Credit Party, however, makes any representation as to the ability of any Company to achieve the results set forth in any such projections); *provided* that, notwithstanding the foregoing, nothing in this Section 9.04 shall require delivery of financial information, reports, documents or other information which constitutes attorney work product or is subject to confidentiality agreements or to the extent disclosure thereof would reasonably be expected to result in loss of attorney client privilege with respect thereto.

(n)     **Monthly Financials**.   As soon as available, and in any event within thirty (30) days (and in the case of the fiscal month ended July 31, 2025, forty-five (45) days) after the end of each month commencing with the month ended July 31, 2025 (other than the last month in any fiscal quarter) or such later time as agreed to by the Administrative Agent (at the direction of the Required Lenders), the consolidated balance sheet of the Borrower and its Subsidiaries as at the end of such month and the related consolidated statement of income of the Borrower and its Subsidiaries for such month and for the period from the beginning of the then current fiscal year to the end of such month, all in reasonable detail, together with an Officer's Certificate of Borrower.

Notwithstanding the foregoing, the obligations in Section 9.04(a) and 9.04(b) may be satisfied with respect to financial information of Borrower and the Subsidiaries by (a) furnishing Borrower's (or any direct or indirect parent of Borrower's) Form 10-K or 10-Q, as applicable, filed with the SEC; *provided* that in the case of Section 9.04(b), such Form 10-K is furnished together with an auditor's report and opinion satisfying the requirements of Section 9.04(b) or (b) furnishing the applicable financial statements of any direct or indirect parent company of Borrower; *provided* that, to the extent such information relates to a direct or indirect parent of Borrower, such information is accompanied by unaudited consolidating or other information that explains in reasonable detail the differences between the information relating to such

parent, on the one hand, and the information relating to Borrower and the Subsidiaries on a standalone basis, on the other hand.

Reports and documents required to be delivered pursuant to Section 9.04 may be delivered electronically and if so delivered, shall be deemed to have been delivered on the date (i) on which Borrower posts such reports and/or documents, or provides a link thereto on Borrower's website on the Internet at the website address specified below Borrower's name on the signature hereof or such other website address as provided in accordance with Section 13.02; or (ii) on which such reports and/or documents are posted on Borrower's behalf on an Internet or intranet website, if any, to which each Lender and Administrative Agent have access (whether a commercial, third-party website (including the website of the SEC) or whether sponsored by Administrative Agent); provided that: if requested by Administrative Agent, Borrower shall provide to Administrative Agent by electronic mail electronic versions (i.e., soft copies) of such reports and/or documents and Administrative Agent shall post such reports and/or documents and notify (which may be by facsimile or electronic mail) each Lender of the posting of any such reports and/or documents. Notwithstanding anything contained herein, unless otherwise agreed by Administrative Agent, in every instance Borrower shall be required to provide the compliance certificate required by Section 9.04(c)(ii) to Administrative Agent in the form of an original paper copy or a .pdf or facsimile copy of the original paper copy.

Borrower hereby acknowledges that (a) Administrative Agent will make available to the Lenders materials and/or information provided by or on behalf of Borrower hereunder (collectively, "**Borrower Materials**") by posting Borrower Materials on SyndTrak (or a substantially similar electronic transmission system) or another similar electronic system (the "**Platform**") and (b) certain of the Lenders (each, a "**Public Lender**") may have personnel who do not wish to receive material non-public information with respect to Borrower or its Affiliates, or the respective securities of any of the foregoing, and who may be engaged in investment and other market-related activities with respect to such Persons' securities. Borrower hereby agrees that it will use commercially reasonable efforts to identify that portion of Borrower Materials that may be distributed to the Public Lenders and that (w) all such Borrower Materials shall be clearly and conspicuously marked "PUBLIC" which, at a minimum, shall mean that the word "PUBLIC" shall appear prominently on the first page thereof; (x) by marking Borrower Materials "PUBLIC," Borrower shall be deemed to have authorized Administrative Agent and the Lenders to treat such Borrower Materials as not containing any material non-public information (although it may be sensitive and proprietary) with respect to Borrower or its securities for purposes of United States Federal and state securities laws (provided however, that to the extent such Borrower Materials constitute information of the type subject to Section 13.10, they shall be treated as set forth in Section 13.10); (y) all Borrower Materials marked "PUBLIC" are permitted to be made available through a portion of the Platform designated "Public Side Information;" and (z) Administrative Agent shall be entitled to treat any Borrower Materials that are not marked "PUBLIC" as being suitable only for posting on a portion of the Platform not designated "Public Side Information."

**Section 9.05    Maintaining Records; Access to Properties and Inspections**.  Borrower and its Subsidiaries shall keep proper books of record and account in which entries true and correct in all material respects and in material conformity with GAAP and all material Requirements of Law are made.  Borrower and its Subsidiaries will, subject to applicable Gaming Laws, permit any representatives designated by Administrative Agent or any Lender to visit and inspect the financial records and the property of Borrower or such Subsidiary at reasonable times, upon reasonable notice and as often as reasonably requested, and permit any representatives designated by Administrative Agent or any Lender to discuss the affairs, finances and condition of such Subsidiaries with the officers thereof and independent accountants therefor (provided Borrower has the opportunity to participate in such meetings); provided that, in the absence of a continuing Default or Event of Default, only one such inspection by such representatives (on behalf of Administrative Agent and/or any Lender) shall be permitted in any fiscal year (and such inspection shall be at

Administrative Agent and/or such Lenders' expense, as applicable).  Notwithstanding anything to the contrary in this Agreement, no Company will be required to disclose, permit the inspection, examination or making of extracts, or discussion of, any document, information or other matter that (i) in respect of which disclosure to Administrative Agent (or its designated representative) or any Lender is then prohibited by law or contract or (ii) is subject to attorney-client or similar privilege or constitutes attorney work product.

Section 9.06    **Use of Proceeds**.  Borrower shall use the proceeds of the Loans only for the purposes set forth in Section 8.11.  Borrower will not request any Borrowing, and Borrower shall not use, and shall procure that its Subsidiaries and its or their respective directors, officers, employees and agents shall not use, the proceeds of any Borrowing (A) in furtherance of an offer, payment, promise to pay, or authorization of the payment or giving of money, or anything else of value, to any Person in violation of any Anti-Corruption Laws, (B) for the purpose of funding, financing or facilitating any activities, business or transaction of or with any Sanctioned Person, or in any Sanctioned Country, to the extent such activities, business or transaction would be prohibited by Sanctions if conducted by a corporation incorporated in the United States or in a European Union member state, or (C) in any manner that would result in the violation of any Sanctions applicable to any party hereto.

Section 9.07    **Compliance with Environmental Law**.  Borrower and its Subsidiaries shall (a) comply with Environmental Law, unless failure to do so would not reasonably be expected to have a Material Adverse Effect; (b) in the event of any Hazardous Material at, on, under or emanating from any Real Property which could result in liability under or a violation of any Environmental Law, in each case which would reasonably be expected to have a Material Adverse Effect, undertake, and/or use commercially reasonable efforts to cause any of their respective tenants or occupants to undertake, at no cost or expense to Administrative Agent, Collateral Agent or any Lender, any action required pursuant to Environmental Law to mitigate and eliminate such condition; provided, however, that no Company shall be required to comply with any order or directive which is being contested in good faith and by proper proceedings so long as it has maintained adequate reserves with respect to such compliance to the extent required in accordance with GAAP; and (c) at the written request of Administrative Agent, in its reasonable discretion, provide, at no cost or expense to Administrative Agent, Collateral Agent or any Lender, an environmental site assessment (including, without limitation, the results of any soil or groundwater or other testing conducted at Administrative Agent's request) concerning any Real Property now or hereafter owned, leased or operated by Borrower or any of its Subsidiaries, conducted by an environmental consulting firm proposed by such Credit Party and approved by Administrative Agent in its reasonable discretion indicating the presence or absence of Hazardous Material and the potential cost of any required action in connection with any Hazardous Material on, at, under or emanating from such Real Property; provided, however, that such request may be made only if (i) there has occurred and is continuing an Event of Default, or (ii) circumstances exist that reasonably could be expected to form the basis of an Environmental Action against Borrower or any Subsidiary or any Real Property of Borrower or any of its Subsidiaries which would reasonably be expected to have a Material Adverse Effect; if Borrower or any of its Subsidiaries fails to provide the same within sixty (60) days after such request was made (or in such longer period as may be approved by Administrative Agent, in its reasonable discretion), Administrative Agent may but is under no obligation to conduct the same, and Borrower or its Subsidiary shall grant and hereby grants to Administrative Agent and its agents, advisors and consultants access at reasonable times, and upon reasonable notice to Borrower, to such Real Property and specifically grants Administrative Agent and its agents, advisors and consultants an irrevocable non-exclusive license, subject to the rights of tenants, to undertake such an assessment, all at no cost or expense to Administrative Agent, Collateral Agent or any Lender.  Administrative Agent will use its commercially reasonable efforts to obtain from the firm conducting any such assessment usual and customary agreements to secure liability insurance and to treat its work as confidential and shall promptly provide Borrower with all documents relating to such assessment.

Section 9.08     __Pledge or Mortgage of Real Property__ .

(a)     Subject to compliance with applicable Gaming Laws, if, after the Closing Date the Required Lenders shall require that any Credit Party deliver a Security Document with respect to any Property (other than any Real Property) that is not otherwise subject to a Security Document, such Credit Party shall (subject to any applicable provisions set forth in the Security Documents or this Agreement with respect to limitations on grant of security interests in certain types of assets or Pledged Collateral and limitations or exclusions from the requirement to perfect Liens on such assets or Pledged Collateral) promptly (i) execute and deliver to Collateral Agent such amendments to the Security Documents or such other documents as Collateral Agent (at the direction of the Required Lenders) deems necessary or advisable in order to grant to Collateral Agent, for the benefit of the Secured Parties, security interests in such Property and (ii) take all actions necessary or advisable to grant to Collateral Agent, for the benefit of the Secured Parties, a perfected first priority security interest (except to the extent limited by applicable Requirements of Law (including, without limitation, any Gaming Laws)), subject to no Liens other than Permitted Liens, in each case, to the extent such actions are required by any Security Document.

(b)     If, after the Closing Date, (I) the Required Lenders shall require that any Credit Party deliver a Mortgage with respect to any Applicable Real Property or (II) any Credit Party (x) acquires a fee or leasehold interest in Applicable Real Property, (y) develops a Gaming Facility on any fee or leasehold interest in Applicable Real Property, or (z) acquires a leasehold interest in any Real Property, in each case, with respect to which a Mortgage was not previously entered into in favor of Collateral Agent, such Credit Party shall promptly notify Collateral Agent and, if requested by the Required Lenders, within ninety (90) days of such request (in each case, or such longer period that is reasonably acceptable to Administrative Agent), (i) take such actions and execute such documents as Collateral Agent or the Required Lenders shall reasonably require to confirm the Lien of an existing Mortgage, if applicable, or to create a new Mortgage on such Real Property and (ii) cause to be delivered to Collateral Agent, for the benefit of the Secured Parties, all documents and instruments reasonably requested by Collateral Agent or as shall be necessary in the opinion of counsel to Collateral Agent to create on behalf of the Secured Parties a valid, perfected, mortgage Lien, subject only to Permitted Liens.

(c)     Notwithstanding anything contained in Sections 9.08(a) and 9.08(b) to the contrary, in each case, it is understood and agreed that no Lien(s) and/or Mortgage(s) in favor of Collateral Agent on any after acquired Property of the applicable Credit Party shall be required to be granted or delivered at such time as provided in such Sections (as applicable) as a result of such Lien(s) and/or Mortgage(s) being prohibited by (i) the applicable Gaming Authorities or applicable Law; provided, however, that Borrower has used its commercially reasonable efforts to obtain such approvals or (ii) Contractual Obligations (except to the extent invalidated by the applicable provisions of the UCC), only to the extent such restriction is permitted hereunder and such restriction is binding on such assets (x) on the Closing Date or (y) on the date that the applicable person becomes a Subsidiary of Borrower) (or is a refinancing or replacement of any such contractual obligation provided that such restriction is no more restrictive in any material respect than the refinanced or replaced contractual obligation).

(d)     With respect to Lien(s) and/or Mortgage(s) relating to any Property acquired (or leased) by any Credit Party after the Closing Date or any Property of any Additional Credit Party or with respect to any Guarantee of any Additional Credit Party, in each case that were not granted or delivered pursuant to Section 9.08(c) or to the second paragraph in Section 9.11, as the case may be, at such time as Borrower reasonably believes such prohibition no longer exists, Borrower shall (and with respect to any items requiring approval from Gaming Authorities, Borrower shall use commercially reasonable efforts to seek the approval from the applicable Gaming Authorities for such Lien(s), Mortgage(s) and/or Guarantee and, if such approval is so obtained), comply with Sections 9.08(a) and/or 9.08(b) or with Section 9.11, as the case may be.

**Section 9.09    Security Interests; Further Assurances**.

(a)        Each Credit Party shall, promptly, upon the reasonable request of Collateral Agent, and so long as such request (or compliance with such request) does not violate any Gaming Law or, if necessary, is approved by the Gaming Authority (which Borrower hereby agrees to use commercially reasonable efforts to obtain), at Borrower's expense, execute, acknowledge and deliver, or cause the execution, acknowledgment and delivery of, and thereafter register, file or record, or cause to be registered, filed or recorded, in an appropriate governmental office, any document or instrument supplemental to or confirmatory of the Security Documents or otherwise deemed by Collateral Agent reasonably necessary or desirable to create, protect or perfect or for the continued validity, perfection and priority of the Liens on the Collateral covered or purported to be covered thereby, including, but not limited to, entering into Control Agreements on all bank accounts of the Credit Parties (subject to any applicable provisions set forth herein and in the Security Documents with respect to limitations on grant of security interests in certain types of Pledged Collateral and limitations or exclusions from the requirement to perfect Liens on such Pledged Collateral and any applicable Requirements of Law including, without limitation, any Gaming Laws) subject to no Liens other than Permitted Liens; provided that, notwithstanding anything to the contrary herein or in any other Credit Document, (i) the Credit Parties shall not be required to grant a security interest in any asset or perfect a security interest in any Collateral to the extent the cost, burden or other consequences (including any material adverse Tax consequences (as determined by Borrower in its reasonable discretion)) of obtaining or perfecting a security interest in such assets exceeds the practical benefit of such collateral to the Lenders as reasonably determined by Borrower and Administrative Agent, (ii) the Credit Parties shall not be required to grant a security interest in any Excluded Assets (as defined in the DIP Term Sheet or in the Security Agreement (if any)), and (iii) no action outside the United States shall be required for any asset located outside of the United States and no foreign law security or pledge agreements or foreign intellectual property filing or search shall be required.  In the case of the exercise by Collateral Agent or the Lenders or any other Secured Party of any power, right, privilege or remedy pursuant to any Credit Document following the occurrence and during the continuation of an Event of Default which requires any consent, approval, registration, qualification or authorization of any Governmental Authority, Borrower and each of its Subsidiaries shall use commercially reasonable efforts to execute and deliver all applications, certifications, instruments and other documents and papers that Collateral Agent or the Lenders may be so required to obtain.  If Collateral Agent reasonably determines that it is required by applicable Requirement of Law to have appraisals prepared in respect of the Real Property of any Credit Party constituting Collateral, Borrower shall provide to Collateral Agent appraisals that satisfy the applicable requirements of the Real Estate Appraisal Reform Amendments of FIRREA.

(b)        Without limiting the generality of Section 9.09(a), it is the intent of the parties hereto that all AG Leased Property be subject to a valid, enforceable and perfected Lien in favor of Collateral Agent within the periods required hereunder (including Sections 9.08 and 9.15). Administrative Agent, Collateral Agent and Borrower agree to cooperate in causing the AG Leased Property to be subject to such Liens, and Borrower agrees to execute such Security Documents and amendments or supplements thereto, and take such other actions, as may be reasonably necessary, or reasonably requested by Collateral Agent, to subject the AG Leased Property to a valid, enforceable and perfected Lien in favor of Collateral Agent for the benefit of the Secured Parties within such time periods.

(c)        Notwithstanding anything to the contrary herein or in any other Credit Document, no title insurance or endorsement to any policy of title insurance shall be required to be procured, provided, executed or delivered with respect to any Mortgaged Real Property in connection with this Agreement.

(d)        Notwithstanding anything to the contrary in this Agreement or the other Credit Documents, in the case of any Real Property that is subject to a Licensed Operator Guarantor Opco/Propco Lease, if the Credit Party that is the lessor under such Licensed Operator Guarantor Opco/Propco Lease grants a

Mortgage on its fee or leasehold (as applicable) interest in such Real Property, the Credit Party that is the tenant under such Licensed Operator Guarantor Opco/Propco Lease shall not be required to grant a Mortgage on the leasehold or subleasehold (as applicable) interest in such Real Property.

Section 9.10   **AG Master Lease**.  Borrower shall cause each sublease and each use agreement entered into between any AG Tenant and any other Credit Party (including, for the avoidance of doubt, any Licensed Operator Guarantor) with respect to Real Property that is leased from AG Landlord pursuant to the AG Master Lease, to at all times during the term of the AG Master Lease to be subject and subordinate to such AG Master Lease (and to all matters to which such AG Master Lease is subject and subordinate).

Section 9.11   **Additional Credit Parties** .  Upon (i) any Credit Party creating or acquiring any Subsidiary (other than any Excluded Subsidiary) after the Closing Date, (ii) on and after the Closing Date, any Person being or becoming a Subsidiary (other than an Excluded Subsidiary) or (iii) any Subsidiary of a Credit Party ceasing to be an Excluded Subsidiary (any such Person referenced above, an "**Additional Credit Party**"), the Credit Parties shall, assuming and to the extent that it does not violate any Gaming Law or assuming and to the extent it obtains the approval of the Gaming Authority to the extent such approval is required by applicable Gaming Laws (which Borrower hereby agrees to use commercially reasonable efforts to obtain), (A) cause each such Additional Credit Party to promptly (but in any event within 30 days), execute and deliver all such agreements, guarantees, documents and certificates (including Joinder Agreements, any amendments to the Credit Documents) as Administrative Agent may reasonably request in order to have such Additional Credit Party become a Guarantor and (B) promptly (I) execute and deliver or cause any applicable Affiliate of Borrower to execute and deliver to Collateral Agent such amendments to or additional Security Documents as Collateral Agent deems necessary or advisable in order to grant to Collateral Agent for the benefit of the Secured Parties, a perfected security interest in the Equity Interests of such Additional Credit Party which are owned by such Person subject to the terms of this Agreement and the Security Documents, (II) [reserved], (III) cause such Additional Credit Party to take such actions necessary or advisable (including executing and delivering a Joinder Agreement) to grant to Collateral Agent for the benefit of the Secured Parties, a perfected security interest in the collateral described in (subject to any requirements set forth herein and in the Security Documents with respect to limitations on grant of security interests in certain types of assets or Pledged Collateral and limitations or exclusions from the requirement to perfect Liens on such Pledged Collateral and excluding acts with respect to perfection of security interests and Liens not required under, or excluded from the requirements under, this Agreement and the Security Documents) the Security Agreement and all other Property of such Additional Credit Party in accordance with the provisions of Section 9.08 hereof with respect to such Additional Credit Party, or by law or as may be reasonably requested by Collateral Agent; provided, however, that Borrower shall use its commercially reasonable efforts to obtain such approvals for any Mortgage(s) and Lien(s) (including pledge of the Equity Interests of such Subsidiary) to be granted by such Additional Credit Party and for the Guarantee of such Additional Credit Party as soon as reasonably practicable.  All of the foregoing actions shall be at the sole cost and expense of the Credit Parties.

Upon the Borrower, any Credit Party or any Affiliate of the Borrower creating or acquiring the Equity Interests in any Licensed Operator Affiliate, the Borrower or such Credit Party shall (or cause any applicable Affiliate of Borrower to) execute and deliver to Collateral Agent such amendments to or additional Security Documents as Collateral Agent deems necessary or advisable in order to grant to Collateral Agent for the benefit of the Secured Parties, a perfected security interest in the Equity Interests of such Licensed Operator Affiliate subject to the terms of this Agreement and the Security Documents.

Notwithstanding the foregoing in this Section 9.11 to the contrary, it is understood and agreed that no Lien(s), Mortgage(s) and/or Guarantee of the applicable Additional Credit Party shall be required to be granted or delivered at such time as provided in the paragraph above in this Section 9.11 as a result of such Lien(s), Mortgage(s) and/or Guarantee being prohibited by (i) the applicable Gaming Authorities, any other

applicable Governmental Authorities or applicable Law; provided, however, that Borrower has used its commercially reasonable efforts to obtain such approvals for such Lien(s), Mortgage(s) and/or Guarantee or (ii) any Contractual Obligation (except to the extent superseded by the applicable provisions of the UCC) only to the extent such restriction is permitted hereunder and such restriction is binding on such assets (x) on the Closing Date or (y) on the date that the applicable person becomes a Subsidiary of (Holdings) (or is a refinancing or replacement of any such contractual obligation provided that such restriction is no more restrictive in any material respect than the refinanced or replaced contractual obligation).

**Section 9.12    [Reserved]**.

**Section 9.13    [Reserved]**

**Section 9.14    Post-Closing Matters**.  Borrower will cause each of the documents and other agreements set forth on Schedule 9.14 to be delivered or performed, as applicable, within the respective time frames specified therein (or, in each case, such later date as is permitted by the Required Lenders in their sole discretion).

**Section 9.15    Ratings.**  The Borrower shall use commercially reasonable efforts to obtain, within 60 days of the Closing Date, and maintain at all times on and after the Closing Date a rating of the Loans from S&P and Moody's.

**Section 9.16    Bankruptcy Case Filings**. The Debtors shall use commercially reasonable efforts to provide to the Agent and the legal advisors to the Lenders promptly after the same is available, copies of all pleadings, motions, applications and other documents filed by or on behalf of any other Credit Party with the Bankruptcy Court in the Bankruptcy Cases, including all motions for "first day" and "second day" relief.

**Section 9.17    Orders**.  The Debtors shall comply with each order entered by the Bankruptcy Court in the Bankruptcy Cases.

**Section 9.18    Information Rights**. The Credit Parties shall provide the Agent, the Lenders, and their respective advisors and representatives with reasonable access to information (including historical information) and management and executive personnel regarding strategic planning, cash and liquidity management, and operational and restructuring activities, except to the extent access to such information would compromise the Credit Parties' attorney-client privilege or would not be permitted by applicable Gaming Laws.

**Section 9.19    Business Operations**. The Credit Parties shall not modify or alter (i) in any material manner the nature and type of its business or the manner in which such business is conducted or (ii) in any manner materially adverse to the Agent or the Lenders, the Credit Parties' organizational documents, except as required by the Bankruptcy Code.

**Section 9.20    Milestones**.  The Credit Parties and their Subsidiaries shall comply with at all times and agree to complete, or cause to be completed, Milestones in the manner, and within the time periods, specified therefor in the Interim DIP Order and with respect to the reporting and other items described in Schedule 9.20, time periods specified next to such items specified on Schedule 9.20 (as may be extended by the Required Lenders in writing (including via email)).

**Section 9.21    CRO and Liquidity Employee Orders**.  From and after the Petition Date, the Credit Parties shall, at all times, (a) with respect to the Credit Parties other than the Licensed Operator Affiliates (as defined in the TSA) have a duly appointed and acting chief restructuring officer acceptable to

the Required Lenders, and on terms (including as to remuneration) acceptable to the Required Lenders (the "**CRO**"; any successor thereto or replacement thereof acceptable to the Agent and the Required Lenders) and (b) with respect to the Credit Parties that are Licensed Operator Affiliates, an employee with authority to manage all cash receipts and disbursements acceptable to the Required Lenders and on terms (including as to remuneration) acceptable to the Required Lenders (the "**Liquidity Employee**"; any successor thereto or replacement thereof acceptable to the Agent and the Required Lenders). The CRO shall: (i) have direct and complete access to the Credit Parties' managers, officers, advisors, employees, and other representatives, and shall at all times be entitled to take all action necessary or appropriate to be fully informed with respect to the Credit Parties' financial condition, operations, customers and business prospects; (ii) oversee the sales required pursuant to the terms of this Agreement on behalf of the Credit Parties, including all activities of any investment banker retained by the Credit Parties; and (iii) respond to all reasonable information requests or inquiries of the Agent and the Required Lenders and their respective representatives concerning any and all matters relating to the activities of such CRO; provided that, no such authority or control shall constitute Gaming Decisions (as defined in the TSA), unless the CRO has obtained the requisite approvals to make Gaming Decisions, in which case such authority and control shall be vested in the CRO

Section 9.22    **TSA**.  The Credit Parties shall, at all times, comply with the terms and provisions of the TSA.

Section 9.23    **AG Master Lease**.  The Credit Parties shall, at all times, be in compliance with the terms of the AG Master Lease, including, for the avoidance of doubt, with respect to any payment due thereunder.

## ARTICLE X.

## NEGATIVE COVENANTS

Each Credit Party, for itself and on behalf of its Subsidiaries, covenants and agrees with Administrative Agent, Collateral Agent and Lenders that until the Obligations have been Paid in Full (and each Credit Party covenants and agrees that it will cause its Subsidiaries to observe and perform the covenants herein set forth applicable to any such Subsidiary until the Obligations have been Paid in Full):

Section 10.01    **Indebtedness**.  Borrower and its Subsidiaries will not incur any Indebtedness, except:

(a)    the Obligations under this Agreement and the other Credit Documents;

(b)    Indebtedness outstanding on the Closing Date and listed on Schedule 10.01;

(c)    Indebtedness under any Swap Contracts (including, without limitation, any Interest Rate Protection Agreements); provided that such Swap Contracts are entered into for bona fide hedging activities and not for speculative purposes;

(d)    intercompany Indebtedness (including, for the avoidance of doubt, preferred stock) of Borrower and the Subsidiaries to Borrower or other Subsidiaries to the extent permitted pursuant to Section 10.04;

(e)    Indebtedness representing deferred compensation to employees of Borrower and the Subsidiaries incurred in the ordinary course of business;

(f)     Indebtedness in respect of workers' compensation claims, self-insurance obligations, performance bonds, surety, appeal or similar bonds, completion guarantees and letters of credit provided by Borrower or any of its Subsidiaries in the ordinary course of its business (including to support Borrower's or any of its Subsidiaries' applications for Gaming Licenses or for the purposes referenced in this clause (f));

(g)     Indebtedness arising from the honoring by a bank or other financial institution of a check, draft or similar instrument drawn against insufficient funds in the ordinary course of business; provided, however, that such Indebtedness is extinguished within five (5) Business Days of its incurrence;

(h)     Indebtedness (other than Indebtedness referred to in Section 10.01(b)) in respect of Purchase Money Obligations and Capital Lease Obligations and refinancings and renewals thereof, in an aggregate principal amount not to exceed at any time outstanding, the lesser of (i) $10.0 million and (ii) the amount permitted for such Indebtedness in the then-applicable Approved Budget;

(i)     Indebtedness arising in connection with endorsement of instruments for deposit in the ordinary course of business;

(j)     guarantees by Borrower or Subsidiaries of Indebtedness otherwise permitted to be incurred by Borrower or any Subsidiary under this Section 10.01;

(k)     [reserved];

(l)     [reserved];

(m)     [reserved];

(n)     [reserved];

(o)     [reserved];

(p)     [reserved];

(q)     [reserved];

(r)     Indebtedness consisting of the financing of insurance premiums in the ordinary course of business;

(s)     [reserved];

(t)     [reserved];

(u)     [reserved];

(v)     [reserved];

(w)     [reserved];

(x)     [reserved];

(y)     [reserved];

(z)      [reserved];

(aa)     [reserved]; and

(bb)     all premium (if any, including tender premiums), expenses, defeasance costs, interest (including post-petition interest), fees, expenses, charges and additional or contingent interest on obligations described in paragraphs (a) through (aa) above.

For purposes of determining compliance with this Section 10.01, the amount of any Indebtedness denominated in any currency other than Dollars shall be calculated based on customary currency exchange rates in effect, in the case of such Indebtedness incurred (in respect of term Indebtedness) or committed (in respect of revolving Indebtedness) on or prior to the Closing Date, on the Closing Date and, in the case of such Indebtedness incurred (in respect of term Indebtedness) or committed (in respect of revolving Indebtedness) after the Closing Date, on the date that such Indebtedness was incurred (in respect of term Indebtedness) or committed (in respect of revolving Indebtedness); provided that if such Indebtedness is incurred to refinance other Indebtedness denominated in a currency other than Dollars (or in a different currency from the Indebtedness being refinanced), and such refinancing would cause the applicable Dollar-denominated restriction to be exceeded if calculated at the relevant currency exchange rate in effect on the date of such refinancing, such Dollar-denominated restriction shall be deemed not to have been exceeded so long as the principal amount of such refinancing Indebtedness does not exceed (i) the outstanding or committed principal amount, as applicable, of such Indebtedness being refinanced plus (ii) the aggregate amount of fees, underwriting discounts, premiums (including tender premiums), defeasance costs and other costs and expenses incurred in connection with such refinancing.

For purposes of determining compliance with this Section 10.01, if the use of proceeds from any incurrence, issuance or assumption of Indebtedness is to fund the refinancing of any Indebtedness, then such refinancing shall be deemed to have occurred substantially simultaneously with such incurrence, issuance or assumption so long as (1) such refinancing occurs on the same Business Day as such incurrence, issuance or assumption, (2) if such proceeds will be offered (through a tender offer or otherwise) to the holders of such Indebtedness to be refinanced, the proceeds thereof are deposited with a trustee, agent or other representative for such holders pending the completion of such offer on the same Business Day as such incurrence, issuance or assumption (and such proceeds are ultimately used in the consummation of such offer or otherwise used to refinance Indebtedness), (3) if such proceeds will be used to fund the redemption, discharge or defeasance of such Indebtedness to be refinanced, the proceeds thereof are deposited with a trustee, agent or other representative for such Indebtedness pending such redemption, discharge or defeasance on the same Business Day as such incurrence, issuance or assumption or (4) the proceeds thereof are otherwise set aside to fund such refinancing pursuant to procedures reasonably agreed with Administrative Agent.  In addition, with respect to any Indebtedness that was permitted to be incurred hereunder on the date of such incurrence, any Increased Amount of such Indebtedness shall also be permitted hereunder after the date of such incurrence.

**Section 10.02   Liens**.  Neither Borrower nor any Subsidiary shall create, incur, grant, assume or permit to exist, directly or indirectly, any Lien on any Property now owned or hereafter acquired by it or on any income or revenues or rights in respect of any thereof, except (the "**Permitted Liens**"):

(a)      Liens for Taxes, assessments or governmental charges or levies not yet delinquent and Liens for Taxes, assessments or governmental charges or levies, which are being contested in good faith by appropriate proceedings and for which adequate reserves have been established in accordance with GAAP;

(b)      Liens in respect of property of Borrower or any Subsidiary imposed by law, which were incurred in the ordinary course of business and do not secure Indebtedness for borrowed money, such as

carriers', warehousemen's, materialmen's, landlord's and mechanics' liens, maritime liens and other similar Liens arising in the ordinary course of business (i) for amounts not yet overdue for a period of sixty (60) days or (ii) for amounts that are overdue for a period in excess of sixty (60) days that are being contested in good faith by appropriate proceedings (inclusive of amounts that remain unpaid as a result of bona fide disputes with contractors, including where the amount unpaid is greater than the amount in dispute), so long as adequate reserves have been established in accordance with GAAP;

(c)  (x) Liens securing Indebtedness incurred pursuant to Section 10.01(b) and listed on Schedule 10.02 and (y) Permitted Prior Liens provided, however, that, in each case, (i) such Liens do not encumber any Property of Borrower or any Subsidiary other than (x) any such Property subject thereto on the Closing Date, (y) after-acquired property that is affixed or incorporated into Property covered by such Lien and (z) proceeds and products thereof, and (ii) the amount of Indebtedness secured by such Liens does not increase, except as contemplated by Section 10.01(b);

(d)  easements, rights-of-way, restrictions (including zoning restrictions), covenants, encroachments, protrusions and other similar charges or encumbrances, and minor title deficiencies on or with respect to any Real Property, in each case whether now or hereafter in existence, not (i) securing Indebtedness and (ii) individually or in the aggregate materially interfering with the conduct of the business of Borrower and its Subsidiaries, taken as a whole; provided that upon request by Borrower, Administrative Agent shall, in its reasonable discretion, direct Collateral Agent on behalf of the Secured Parties to subordinate its Mortgage on any related Real Property to such easements, rights-of-way, restrictions (including zoning restrictions), covenants, encroachments, protrusions and other similar charges or encumbrances in such form as is reasonably satisfactory to Administrative Agent and Borrower;

(e)  Liens arising out of judgments or awards not resulting in an Event of Default;

(f)  Liens (other than any Lien imposed by ERISA) (i) imposed by law or deposits made in connection therewith in the ordinary course of business in connection with workers' compensation, unemployment insurance and other types of social security, (ii) incurred in the ordinary course of business to secure the performance of tenders, statutory obligations (other than excise taxes), surety, stay, customs and appeal bonds, statutory bonds, bids, leases, government contracts, trade contracts, rental obligations (limited, in the case of rental obligations, to security deposits and deposits to secure obligations for taxes, insurance, maintenance and similar obligations), utility services, performance and return of money bonds and other similar obligations (exclusive of obligations for the payment of borrowed money), (iii) arising by virtue of deposits made in the ordinary course of business to secure liability for premiums to insurance carriers or (iv) Liens on deposits made to secure Borrower's or any of its Subsidiaries' Gaming License applications or to secure the performance of surety or other bonds issued in connection therewith; provided, however, that to the extent such Liens are not imposed by Law, such Liens shall in no event encumber any Property other than cash and Cash Equivalents or, in the case of clause (iii), proceeds of insurance policies;

(g)  leases, subleases, franchise agreements, licenses, occupancy or concession agreements with respect to the assets or Properties of any Credit Party or its respective Subsidiaries, in each case entered into in the ordinary course of such Credit Party's or Subsidiary's business so long as each such lease, sublease, franchise agreement, license, occupancy or concession agreement entered into after the date hereof with respect to Real Property constituting Collateral are subordinate in all respects to the Liens granted and evidenced by the Security Documents or the DIP Orders and do not, individually or in the aggregate, (x) interfere in any material respect with the ordinary conduct of the business of the Credit Parties and their respective Subsidiaries, taken as a whole, or (y) materially impair the use (for its intended purposes) or the value of the Properties of the Credit Parties and their respective Subsidiaries, taken as a whole; provided that upon the request of Borrower, Collateral Agent shall enter into a customary

subordination and non-disturbance and attornment agreement in connection with any such lease, sublease, franchise agreement, license, occupancy or concession agreement;

(h)　　Liens arising out of conditional sale, title retention, consignment or similar arrangements for the sale of goods entered into by Borrower or such Subsidiary in the ordinary course of business;

(i)　　[reserved];

(j)　　bankers' Liens, rights of setoff and other similar Liens existing solely with respect to cash and Cash Equivalents on deposit in one or more accounts maintained by Borrower or any Subsidiary, in each case granted in the ordinary course of business in favor of the bank or banks with which such accounts are maintained, securing amounts owing to such bank with respect to cash management and operating account arrangements, including those involving pooled accounts and netting arrangements, provided, however, that, unless such Liens are non-consensual and arise by operation of law, in no case shall any such Liens secure (either directly or indirectly) the repayment of any Indebtedness;

(k)　　[reserved];

(l)　　[reserved];

(m)　　licenses of Intellectual Property granted by Borrower or any Subsidiary in the ordinary course of business and consistent with past practices and not interfering in any material respect with the ordinary conduct of the business of Borrower and its Subsidiaries, taken as a whole;

(n)　　Liens pursuant to the Credit Documents;

(o)　　[reserved];

(p)　　Liens arising under applicable Gaming Laws; provided, however, that no such Lien constitutes a Lien securing repayment of Indebtedness for borrowed money;

(q)　　(i) Liens pursuant to any Gaming Lease or any other leases entered into for the purpose of, or with respect to, operating or managing gaming facilities and related assets, which Liens are granted with respect to the leased property, any gaming assets and/or other property of the lessee under the applicable lease and granted to the landlord under such lease for the purpose of securing the obligations of the tenant under such lease to such landlord and (ii) Liens on cash and Cash Equivalents (and on the related escrow accounts or similar accounts, if any) required to be paid to the lessors (or lenders to such lessors) under such leases or maintained in an escrow account or similar account pending application of such proceeds in accordance with the applicable lease;

(r)　　[reserved];

(s)　　Prior Mortgage Liens with respect to the applicable Mortgaged Real Property so long as such Liens do not secure Indebtedness;

(t)　　Liens on cash and Cash Equivalents deposited to Discharge, redeem or defease Indebtedness that was permitted to so be repaid and on any cash and Cash Equivalents held by a trustee under any indenture or other debt agreement issued in escrow pursuant to customary escrow arrangements pending the release thereof;

(u)      Liens arising from precautionary UCC financing statements filings regarding operating leases or consignment of goods entered into in the ordinary course of business;

(v)      [reserved];

(w)      [reserved];

(x)      [reserved];

(y)      [reserved];

(z)      Liens arising in connection with transactions relating to the selling or discounting of accounts receivable in the ordinary course of business;

(aa)      licenses, leases or subleases granted to other Persons not materially interfering with the conduct of the business of Borrower and its Subsidiaries taken as a whole;

(bb)      any interest or title of a lessor, sublessor, licensee or licensor under any lease or license agreement expressly permitted by this Agreement;

(cc)      Liens created by any applicable Transfer Agreement;

(dd)      [reserved];

(ee)      [reserved];

(ff)      Liens on Property of any Subsidiary that is not a Credit Party and on the Equity Interests of any applicable Non-Credit Party which Liens secure Indebtedness of Non-Credit Parties permitted under Section 10.01;

(gg)      (i) Liens on Property of Borrower or any Subsidiary in favor of Borrower or any other Subsidiary and (ii) Liens pursuant to Licensed Operator Guarantor OpCo/PropCo Leases; and

(hh)      Liens to secure any refinancing, refunding, extension, renewal or replacement (or successive refinancings, refundings, extensions, renewals or replacements) as a whole, or in part, of any Indebtedness secured by any Lien permitted by this Section 10.02; provided, however, that (x) such new Lien shall be limited to all or part of the same type of property that secured the original Lien (plus improvements on and accessions to such property, proceeds and products thereof, customary security deposits and any other assets pursuant to after-acquired property clauses to the extent such assets secured (or would have secured) the Indebtedness being refinanced), (y) the Indebtedness secured by such Lien at such time is not increased to any amount greater than the sum of (A) the outstanding principal amount (or accreted value, if applicable) of such Indebtedness or, if greater, committed amount of the applicable Indebtedness at the time the original Lien became a Lien permitted hereunder and (B) any unpaid accrued interest and premium (including tender premiums) thereon and an amount necessary to pay associated underwriting discounts, defeasance costs, fees, commissions and expenses related to such refinancing, refunding, extension, renewal or replacement, and (z) Indebtedness secured by Liens ranking junior to the Liens securing the Obligations may not be refinanced pursuant to this clause (hh) with Liens ranking pari passu to the Liens securing the Obligations.

In connection with the granting of Liens of the types described in clauses (c), (d), (g), (n), (o), (p), (q), (s), (t), (aa), (bb), (ff), (gg) and (hh) of this Section 10.02 by Borrower of any of its Subsidiaries,

Administrative Agent and Collateral Agent shall be authorized to take any actions deemed appropriate by it in connection therewith (including, without limitation, by entering into or amending appropriate lien subordination, non-disturbance, attornment or intercreditor agreements).

Without the consent of the Required Lenders, no Credit Party shall consent to the granting of Adequate Protection Liens or payments, super-priority administrative expense claims or liens having priority senior to or *pari passu* with those claims and Liens in favor of the Collateral Agent (for the benefit of the Secured Parties) securing the Obligations or of the Prepetition Agent securing the Prepetition Obligations in any of the Bankruptcy Cases other than those expressly described and permitted by the Interim DIP Order.

**Section 10.03    AG Master Lease**.  Neither Borrower any party thereto will terminate or allow or consent to the termination of the AG Master Lease or will enter into any amendment, waiver or modification to the AG Master Lease, in each case, without the prior written consent of the Required Lenders.

**Section 10.04    Investments, Loans and Advances**.  Neither Borrower nor any Subsidiary will, directly or indirectly, make any Investment, except for the following:

(a)    Investments, contemplated Investments, and commitments to make Investments outstanding on the Closing Date and, in each case, identified on Schedule 10.04 and any Investments received in respect thereof without the payment of additional consideration (other than through the issuance of or exchange of Qualified Capital Stock);

(b)    Investments in cash and Cash Equivalents;

(c)    Borrower may enter into Swap Contracts to the extent permitted by Section 10.01(c);

(d)    Investments (i) by Borrower in any Subsidiary, (ii) by any Subsidiary in Borrower and (iii) by a Subsidiary in another Subsidiary (provided that Investments pursuant to clauses (i) and (iii) by Credit Parties in Non-Credit Parties shall not exceed $500,000; provided that, in each case, any intercompany loan (it being understood and agreed that intercompany receivables or advances made in the ordinary course of business do not constitute loans) shall be evidenced by a promissory note and, to the extent that the payee, holder or lender of such intercompany loan is a Credit Party, such promissory note shall be pledged (and delivered) by such Credit Party to Collateral Agent (or the Prepetition Agent as bailee for the Collateral Agent) on behalf of the Secured Parties;

(e)    Borrower and its Subsidiaries may sell or transfer assets to the extent permitted by Section 10.05;

(f)    Investments in securities of trade creditors or customers or suppliers received pursuant to any plan of reorganization or similar arrangement upon the bankruptcy or insolvency of such trade creditors or customers or suppliers or in settlement of delinquent or overdue accounts in the ordinary course of business or Investments acquired by Borrower as a result of a foreclosure by Borrower or any of the Subsidiaries with respect to any secured Investments or other transfer of title with respect to any secured Investment in default;

(g)    Investments made by Borrower or any Subsidiary as a result of consideration received in connection with an Asset Sale (or transfer or disposition not constituting an Asset Sale) made in compliance with Section 10.05;

(h)    [reserved];

(i)        [reserved];

(j)        extensions of trade credit (including to gaming customers) and prepayments of expenses in each case in the ordinary course of business;

(k)        [reserved];

(l)        [reserved];

(m)        [reserved];

(n)        payments with respect to any Qualified Contingent Obligations, so long as, at the time such Qualified Contingent Obligation was incurred or, if earlier, the agreement to incur such Qualified Contingent Obligations was entered into, such Investment was permitted under this Agreement;

(o)        Investments of a Subsidiary acquired after the Closing Date or of a Person merged or consolidated with or into Borrower or a Subsidiary, in each case in accordance with the terms of this Agreement to the extent that such Investments were not made in contemplation of or in connection with such acquisition, merger or consolidation and were in existence (or were committed) on the date of such acquisition, merger or consolidation;

(p)        Investments in the nature of pledges or deposits (i) with respect to leases or utilities provided to third parties in the ordinary course of business or (ii) under Sections 10.02(f), (j) or (t);

(q)        advances of payroll payments to employees of Borrower and the Subsidiaries in the ordinary course of business;

(r)        the occurrence of a Reverse Trigger Event under any applicable Transfer Agreement;

(s)        [reserved];

(t)        [reserved];

(u)        Guarantees by Borrower or any Subsidiary of operating leases (other than Capital Lease Obligations) and Gaming Leases or of other obligations that do not constitute Indebtedness for borrowed money, in each case entered into by Borrower or any Subsidiary in the ordinary course of business and consistent with past practices;

(v)        Investments to the extent that payment for such Investments is made with Equity Interests in Borrower (other than Disqualified Capital Stock) or with the proceeds thereof;

(w)        any Investment (i) deemed to exist as a result of a Person distributing a note or other intercompany debt or other Property to a parent of such Person (to the extent there is no cash consideration or services rendered for such distribution) and (ii) consisting of intercompany current liabilities in connection with the cash management, tax and accounting operations of Borrower and its Subsidiaries;

(x)        [reserved];

(y)        Restricted Payments permitted by Section 10.06 and Junior Prepayments permitted by Section 10.09;

(z)        Investments in connection with the Transactions;

(aa)    [reserved];

(bb)    [reserved]; and

(cc)    Investments pursuant to any agreements described in <u>Section 10.07(e)</u>.

Any Investment in any person other than a Credit Party that is otherwise permitted by this <u>Section 10.04</u> may be made through intermediate Investments in Subsidiaries that are not Credit Parties and such intermediate Investments shall be disregarded for purposes of determining the outstanding amount of Investments pursuant to any clause set forth above.  The amount of any Investment made other than in the form of cash or cash equivalents shall be the fair market value thereof valued at the time of the making thereof, and without giving effect to any subsequent write-downs or write-offs thereof.

**Section 10.05   <u>Mergers, Consolidations and Sales of Assets</u>**.   Neither Borrower nor any Subsidiary will wind up, liquidate or dissolve its affairs or enter into any transaction of merger or consolidation (other than solely to change the jurisdiction of organization or type of organization (to the extent in compliance with the applicable provisions of the Security Agreement)), or convey, sell, lease or sublease (as lessor or sublessor), transfer or otherwise dispose of any substantial part of its business, property or assets, except for:

(a)    Maintenance Capital Expenditures; provided that any such Maintenance Capital Expenditures shall not exceed, at any time, the amount set forth in the then-applicable Approved Budget (subject to Permitted Variances);

(b)    (i) Sales or dispositions of used, worn out, obsolete or surplus Property or Property no longer useful in the business of Holdings and its Subsidiaries by Holdings and its Subsidiaries and (ii) the abandonment or other sale of Intellectual Property that is, in the reasonable judgment of Borrower, no longer economically practicable to maintain or useful in the conduct of the business of Holdings and its Subsidiaries taken as a whole, in each case of clauses (i) and (ii), in the ordinary course of business;

(c)    Liens permitted by <u>Section 10.02</u>, Investments may be made to the extent permitted by <u>Sections 10.04</u>, Restricted Payments may be made to the extent permitted by <u>Section 10.06</u> and Junior Prepayments may be made to the extent permitted by <u>Section 10.09</u>;

(d)    Borrower and the Subsidiaries may dispose of cash and Cash Equivalents solely to the extent set forth in the then-applicable Approved Budget (subject to Permitted Variances);

(e)    Borrower and the Subsidiaries may lease (as lessor or sublessor) real or personal property in the ordinary course of business to the extent permitted under <u>Section 10.02</u>, including pursuant to Licensed Operator Guarantor OpCo/PropCo Leases;

(f)    licenses and sublicenses by Borrower or any of its Subsidiaries of software and Intellectual Property in the ordinary course of business;

(g)    any Credit Party may transfer or lease Property to or acquire or lease Property from any Credit Party;

(h)    voluntary terminations of Swap Contracts and other assets or contracts in the ordinary course of business;

(i)      conveyances, sales, leases, transfers or other dispositions which do not constitute Asset Sales;

(j)      any taking by a Governmental Authority of assets or property, or any part thereof, under the power of eminent domain or condemnation;

(k)      Borrower and its Subsidiaries may make sales, transfers or other dispositions of property subject to a Casualty Event;

(l)      any transfer of Equity Interests of any Subsidiary or any Gaming Facility in connection with the occurrence of a Trigger Event;

(m)      the dedication of space or other dispositions of Property in connection with and in furtherance of constructing structures or improvements reasonably related to the development, construction and operation of any project; provided that in each case such dedication or other dispositions are in furtherance of, and do not materially impair or interfere with the operations of Borrower and the Subsidiaries;

(n)      dedications or dispositions of, or the granting of easements, rights of way, rights of access and/or similar rights, to any Governmental Authority, utility providers, cable or other communication providers and/or other parties providing services or benefits to any project, any Real Property held by Borrower or the Subsidiaries or the public at large that would not reasonably be expected to interfere in any material respect with the operations of Borrower and the Subsidiaries; provided that upon request by Borrower, Administrative Agent shall, in its reasonable discretion, direct Collateral Agent on behalf of the Secured Parties to subordinate its Mortgage on such Real Property to such easement, right of way, right of access or similar agreement in such form as is reasonably satisfactory to Administrative Agent and Borrower; and

(o)      dispositions contemplated by the TSA to the extent approved by the Required Lenders.

Notwithstanding anything in this Agreement or any other Credit Document to the contrary, in no event shall any Credit Party be permitted to transfer or dispose of any material assets that are used in the ordinary course of business by the Borrower and its Subsidiaries to any Non-Credit Party.

To the extent any Collateral is sold, transferred or otherwise disposed of as permitted by this Section 10.05 or in connection with a transaction approved by the Required Lenders, in each case, to a Person other than a Credit Party, such Collateral shall be sold, transferred or otherwise disposed of free and clear of the Liens created by the Security Documents and the DIP Orders, and Collateral Agent shall take all actions reasonably requested by Borrower in order to effect the foregoing at the sole cost and expense of Borrower and without recourse or warranty by Collateral Agent (including the execution and delivery of appropriate UCC termination statements and such other instruments and releases as may be necessary and appropriate to effect such release). To the extent any such sale, transfer or other disposition results in a Guarantor no longer constituting a Subsidiary of Borrower, the Obligations of such Guarantor and all obligations of such Guarantor under the Credit Documents shall terminate and be of no further force and effect, and each of Administrative Agent and Collateral Agent shall take such actions, at the sole expense of Borrower, as are requested by Borrower in connection with such termination.

**Section 10.06   Restricted Payments**. Neither Borrower nor any of its Subsidiaries shall, directly or indirectly, declare or make any Restricted Payment at any time, except, without duplication:

(a)     any Subsidiary of Borrower may declare and make Restricted Payments to Borrower or any other Credit Party (other than Holdings);

(b)     Borrower and its Subsidiaries may engage in transactions to the extent permitted by Section 10.05;

(c)     Borrower and its Subsidiaries may make Restricted Payments to allow the payment of cash in lieu of the issuance of fractional shares upon the exercise of options or, warrants or rights or upon the conversion or exchange of or into Equity Interests, or payments or distributions to dissenting stockholders pursuant to applicable law;

(d)     to the extent constituting Restricted Payments, Borrower may make payments to counterparties under Swap Contracts entered into in connection with the issuance of convertible or exchangeable debt;

(e)     [reserved];

(f)     Borrower and the Subsidiaries may make payments of amounts necessary to repurchase or retire Equity Interests of Borrower or any Subsidiary to the extent required by any Gaming Authority in order to avoid the suspension, revocation or denial of a Gaming License by that Gaming Authority; provided that, in the case of any such repurchase of Equity Interests of Borrower or any Subsidiary, if such efforts do not jeopardize any Gaming License, Borrower or any such Subsidiary will have previously used commercially reasonable efforts to attempt to find a suitable purchaser for such Equity Interests and no suitable purchaser acceptable to the applicable Gaming Authority and Borrower was willing to purchase such Equity Interests on terms acceptable to the holder thereof within a time period acceptable to such Gaming Authority;

(g)     Borrower and its Subsidiaries may make Restricted Payments, for (i) (x) franchise, excise and similar taxes, and other fees and expenses, required to maintain its corporate, legal and organizational existence and (y) distributions to such direct or indirect parent's equity owners in proportion to their equity interests sufficient to allow each such equity owner to receive an amount at least equal to the aggregate amount of its out-of-pocket costs to any unaffiliated third parties directly attributable to creating (including any incorporation or registration fees) and maintaining the existence of the applicable equity owner (including doing business fees, franchise taxes, excise taxes and similar taxes, fees, or expenses), and legal and accounting and other costs directly attributable to maintaining its corporate, legal, or organizational existence and complying with applicable legal requirements, including such costs attributable to the preparation of tax returns or compliance with tax laws, (ii) [reserved], (iii) for each taxable period (or portion thereof) from and after the Closing Date during which Borrower is treated as a pass-through entity for applicable income Tax purposes, a maximum amount equal to the product of (x) the taxable income of the Borrower (including its share of pass-through subsidiary income to the extent allocated to the Borrower) for such taxable year reduced by prior period tax losses of the Borrower to the extent such losses were not previously taken into account for purposes of this clause (iii), and (y) the sum of (A) the highest federal marginal Tax rate for a U.S. individual or corporation doing business solely in the U.S. and (B) a blended state tax rate (calculated in good faith by Borrower subject to reasonable simplifications) based upon the states in which income is earned by the Borrower (including its pass-through subsidiaries to the extent allocable to the Borrower) and without regard to the residence of any person allocated  share of such income; provided that clause (iii)(x) shall not include, and no Restricted Payments may be made under this clause (iii) with respect to, any cancellation of indebtedness income; provided, further, that any amount calculated pursuant to this clause (iii) shall be reduced by amounts the Borrower or any Subsidiary is required to pay or remit on behalf of, or otherwise with respect to, any income allocable to an equity owner of the Borrower, including, but not limited to, pursuant to Section 1446 of the Code and any corresponding provision of state

or local tax law (Restricted Payments made pursuant to clause (i), clause (ii) and clause (iii), "**Permitted Tax Distributions**"), (iv) customary salary, bonus, severance (including, in each case, payroll, social security and similar taxes in respect thereof) and other benefits payable to, and indemnities provided on behalf of, officers, employees, directors, consultants and managers of any direct or indirect parent of Borrower to the extent such salaries, bonuses, and other benefits are attributable to the ownership or operation of Borrower and the Subsidiaries, including Borrower's and the Subsidiaries' proportionate share of such amount relating to such parent being a public company and Public Company Costs, (v) general corporate, administrative, compliance or other operating (including, without limitation, expenses related to auditing or other accounting matters and director indemnities, fees and expenses) and overhead costs and expenses of any direct or indirect parent of Borrower to the extent such costs and expenses are attributable to the ownership or operation of Borrower and the Subsidiaries, including Borrower's and the Subsidiaries' proportionate share of such amount relating to such parent company being a public company and Public Company Costs, and (vi) amounts required for any direct or indirect parent of Borrower to pay fees and expenses incurred by any direct or indirect parent of Borrower related to the maintenance by such parent entity of its corporate or other entity existence; provided that the aggregate amount of Restricted Payments made pursuant to clauses (iv), (v) and (vi) in any fiscal year of the Borrower shall not exceed $2.5 million; *provided, further*, that (I) at least ten (10) days prior to making a Permitted Tax Distribution, the Borrower shall provide the Administrative Agent, for distribution to the Lenders, with the Borrower's calculation of the Permitted Tax Distribution and support for such calculation, and (II) the Borrower shall provide the Administrative Agent, for distribution to the Lenders, with all information reasonably requested by the Administrative Agent (acting at the direction of the Required Lenders) in determining the accuracy of such calculation;

(h)      Borrower and its Subsidiaries may make Restricted Payments to (i) facilitate the making of an Investment, Restricted Payment, disposition or other transfer between Borrower and any Subsidiaries directly or indirectly owned by Borrower, on the one hand, and any Licensed Operator Guarantor or any Subsidiaries directly or indirectly owned by any Licensed Operator Guarantor, on the other hand, so long as such Investment, Restricted Payment, disposition or other transfer would otherwise be permitted by this Agreement and the proceeds of such Restricted Payment are subsequently downstreamed to Borrower or such Licensed Operator Guarantor or such applicable Subsidiary directly or indirectly owned by Borrower or by any Licensed Operator Guarantor, as applicable, or (ii) finance any Investment permitted to be made pursuant to Section 10.04; provided that (x) such Restricted Payment shall be made substantially concurrently with the closing of such Investment and (y) such parent shall, immediately following the closing thereof, cause (1) all property acquired (whether assets or Equity Interests) to be contributed to Borrower or a Subsidiary or (2) the merger, consolidation or amalgamation (to the extent permitted in Section 10.05) of the person formed or acquired into a Borrower or a Subsidiary in order to consummate such Investment, in each case, in accordance with the requirements of Section 9.08; and

(i)      Licensed Operator Guarantors may make Restricted Payments in amounts that would be permitted to be made as Restricted Payments by Borrower under this Section 10.06 (it being understood that any such Restricted Payments by Licensed Operator Guarantors under this clause (i) shall constitute usage of such Restricted Payment capacity by Borrower).

**Section 10.07   Transactions with Affiliates**.  Neither Borrower nor any of its Subsidiaries shall enter into any transaction, including, without limitation, any purchase, sale, lease or exchange of Property, the rendering of any service or the payment of any management, advisory or similar fees, with any Affiliate (other than Borrower or any Subsidiary); provided, however, that notwithstanding the foregoing, Borrower and its Subsidiaries:

(a)      may enter into indemnification and employment and severance agreements and arrangements with directors, officers and employees and may pay customary fees and reasonable out of

pocket costs to, and indemnities provided on behalf of, directors, officers, board managers and employees of Borrower and its Subsidiaries in the ordinary course of business to the extent attributable to the ownership or operation of Borrower and its Subsidiaries;

(b)        may enter into the Transactions and the transactions listed on Schedule 10.07 hereto as in effect or as contemplated on the Closing Date or any amendment thereto so long as such amendment is not adverse to the Lenders in any material respect;

(c)        may make Investments, Asset Sales (and transfers and dispositions that do not constitute Asset Sales) and Restricted Payments permitted hereunder;

(d)        may enter into the transactions contemplated by each applicable Transfer Agreement;

(e)        may enter into customary expense sharing and tax sharing arrangements entered into between Borrower, the Subsidiaries, and Joint Ventures in the ordinary course of business pursuant to which such Subsidiaries and Joint Ventures shall reimburse Borrower or the other applicable Subsidiaries for certain shared expenses and Taxes;

(f)        may enter into transactions upon fair and reasonable terms no less favorable to Borrower or such Subsidiary, as the case may be, than it would obtain in a comparable arm's length transaction with a Person that is not an Affiliate; provided that with respect to any transaction (or series of related transactions) involving consideration of more than $100,000, such transaction shall be approved by the Special Committee;

(g)        may enter into any transactions between or among Borrower and its Subsidiaries on the one hand and Joint Ventures on the other hand that are entered into in the ordinary course of business of Borrower and its Subsidiaries and Joint Ventures  and, in the good faith judgment of Borrower are necessary or advisable in connection with the ownership or operation of the business of Borrower and its Subsidiaries and Joint Ventures , including, but not limited to, (i) payroll, cash management, purchasing, insurance and hedging arrangements and (ii) management, technology and licensing arrangements;

(h)        may enter to transactions with persons who have entered into an agreement, contract or arrangement with Borrower or any of its Subsidiaries to manage, own or operate a Gaming Facility because Borrower and its Subsidiaries have not received the requisite Gaming Approvals or are otherwise not permitted to manage, own or operate such Gaming Facility under applicable Gaming Laws; provided that such transactions shall have been approved by a majority of the directors of Borrower;

(i)         may enter into transactions with any Person, which is an Affiliate solely due to a director or directors of such Person (or a parent company of such Person) also being a director or directors of Borrower;

(j)        may enter into transactions with a Person who is not an Affiliate immediately before the consummation of such transaction that becomes an Affiliate as a result of such transaction;

(k)        [reserved]; and

(l)        [reserved].

**Section 10.08    Minimum Liquidity**.  Borrower shall not permit cash and Cash Equivalents of Holdings and its Subsidiaries on a consolidated basis to be less than $16,000,000 at any time.

**Section 10.09    Certain Payments of Indebtedness**. None of Holdings, the Borrower or any of their respective Subsidiaries shall   make any payment of principal or interest or otherwise on account of any Indebtedness or payables, other than as contemplated in the Approved Budget or in the DIP Orders.

**Section 10.10    Limitation on Certain Restrictions Affecting Subsidiaries**.  None of Borrower or any of its Subsidiaries shall, directly or indirectly, create any consensual encumbrance or restriction on the ability of any Subsidiary of Borrower to (i) pay dividends or make any other distributions on such Subsidiary's Equity Interests or any other interest or participation in its profits owned by Borrower or any of its Subsidiaries, or pay any Indebtedness or any other obligation owed to Borrower or any of its Subsidiaries, (ii) make Investments in or to Borrower or any of its Subsidiaries, (iii) transfer any of its Property to Borrower or any of its Subsidiaries or (iv) in the case of any Guarantor, guarantee the Obligations hereunder or, in the case of any Credit Party, subject its portion of the Collateral to the Liens securing the Obligations in favor of the Secured Parties, except that each of the following shall be permitted:

(a)    any such encumbrances or restrictions existing under or by reason of (w) the Licensed Operator Guarantors and their Subsidiaries not being directly or indirectly owned by Borrower, (x) applicable Law (including any Gaming Law and any regulations, order or decrees of any Gaming Authority or other applicable Governmental Authority), (y) the Credit Documents, or (z) any Gaming Lease (and any guaranty or support agreement related thereto);

(b)    restrictions on the transfer of Property, or the granting of Liens on Property, in each case, subject to Permitted Liens;

(c)    customary restrictions on subletting or assignment of any lease or sublease governing a leasehold interest of any Company;

(d)    restrictions on the transfer of any Property, or the granting of Liens on Property, subject to a contract with respect to an Asset Sale or other transfer, sale, conveyance or disposition permitted under this Agreement;

(e)    restrictions contained in the Prepetition Credit Documents and documents governing existing Indebtedness listed on Schedule 10.01;

(f)    [reserved];

(g)    [reserved];

(h)    [reserved];

(i)    customary restrictions in joint venture arrangements (including tax protection agreements) or management contracts; provided, that such restrictions are limited to the assets of such joint ventures and the Equity Interests of the Persons party to such joint venture arrangements or the assignment of such management contract, as applicable;

(j)    customary non-assignment provisions or other customary restrictions arising under licenses, leases and other contracts entered into in the ordinary course of business; provided, that such restrictions are limited to the assets subject to such licenses, leases and contracts and the Equity Interests of the Persons party to such licenses and contracts;

(k)    [reserved];

(l)    [reserved]; and

(m)    restrictions contained in subordination provisions applicable to intercompany debt owed by the Credit Parties; provided, that such intercompany debt is subordinated to the Obligations on terms at least as favorable to the Lenders as the subordination of such intercompany debt to any other obligations.

**Section 10.11   Limitation on Lines of Business**.  Neither Borrower nor any Subsidiary shall directly or indirectly engage to any material extent (determined on a consolidated basis) in any line or lines of business activity other than Permitted Business.

**Section 10.12   Limitation on Changes to Fiscal Year**.  Neither Borrower nor any Subsidiary shall change its fiscal year end to a date other than December 31 of each year.

## ARTICLE XI.

## EVENTS OF DEFAULT

**Section 11.01   Events of Default**.  If one or more of the following events (herein called "**Events of Default**") shall occur and be continuing:

(a)    **Nonpayment**. Failure by the Borrower to pay (i) any principal on the Loans when due or (b) any interest, other fee, charge, amount or liability provided for herein, within three (3) Business Days following the due date thereof, in each case whether on the Maturity Date, by reason of acceleration pursuant to the terms of this Agreement, by notice of intention to prepay or by required prepayment;

(b)    **Breach of Representation**. Any representation or warranty made or deemed made by the Borrower or any Guarantor in this Agreement or any other Credit Document or in any certificate, document or financial or other statement furnished at any time in connection herewith or therewith shall prove to have been incorrect or misleading in any material respect on the date when made or deemed to have been made;

(c)    **Noncompliance**. Except as otherwise provided for herein, (i) failure or neglect of the Borrower, any Guarantor or any Person to perform, keep or observe any term, provision, condition, covenant contained in Articles IX or X or with the Milestones, (ii) failure or neglect of the Borrower or any Guarantor to perform, keep or observe any other term, provision, condition or covenant, contained herein or in any other Credit Document or other agreement or arrangement, now or hereafter entered into between any Credit Party, and the Agent or any Lender which is not cured within fifteen (15) days from any Credit Party having become aware of the occurrence of such failure or neglect or (iii) there shall occur any payment default under the AG Master Lease;

(d)    **Budget**. The proceeds of any Loan shall have been expended in a manner which is not in accordance with the then-applicable Approved Budget (subject to Permitted Variances);

(e)    **Security Documents**. The DIP Orders and the Security Documents shall cease to create valid and perfected liens on the Collateral with such priority required by this Agreement and as set forth in the DIP Orders;

(f)    **Entry of Order**. The entry of the Final DIP Order shall not have occurred within twenty-five (25) calendar days after the Interim DIP Order Entry Date;

(g)     **Conversion to Chapter 7**. An order with respect to any of the Bankruptcy Cases shall be entered by the Bankruptcy Court converting such Bankruptcy Case to a chapter 7 case;

(h)     **Prepetition Claims**. Any Credit Party shall file a motion seeking, or the Bankruptcy Court shall enter, an order (i) approving payment of any prepetition claim in excess of $100,000 in the aggregate other than (x) as provided for in the "first day" and "second day" orders and included in the then-applicable Approved Budget or (y) otherwise consented to by the Required Lenders in writing; (ii) granting relief from the automatic stay applicable under section 362 of the Bankruptcy Code to any holder of any security interest to permit foreclosure on any assets having a book value in excess of $50,000 in the aggregate; or (iii) except with respect to Prepetition Obligations as provided in the DIP Orders, approving any settlement or other stipulation in excess of $50,000 in the aggregate not approved by the Required Lenders and not included in the Budget with any secured creditor of any Credit Party providing for payments as Adequate Protection or otherwise to such secured creditor;

(i)     **Appointment of Trustee or Examiner**. An order with respect to any of the Bankruptcy Cases shall be entered by the Bankruptcy Court appointing, or any Credit Party, any Subsidiary of a Credit Party, or any Affiliate of a Credit Party shall file an application for an order with respect to any Bankruptcy Case seeking the appointment of, (i) a trustee under section 1104 or (ii) an examiner with enlarged powers (powers beyond those set forth in section 1106(a)(3) and (4) of the Bankruptcy Code) under section 1106(b) of the Bankruptcy Code;

(j)     **Dismissal of Bankruptcy Cases**. An order shall be entered by the Bankruptcy Court dismissing any of the Bankruptcy Cases which does not contain a provision for termination of the Lenders' commitments and payment in full of all Obligations;

(k)     **Order With Respect to Bankruptcy Cases**. An order with respect to any of the Bankruptcy Cases shall be entered by the Bankruptcy Court without the express prior written consent of the Required Lenders (and, with respect to any provisions that materially affect the rights or duties of the Agent, the Agent), (i) to revoke, reverse, stay, modify, supplement, or amend any of the DIP Orders in a manner inconsistent with this Agreement that is not otherwise consented to by the Required Lenders (and with respect to amendments, modifications, or supplements that affect the rights or duties of the Agent, the Agent); (ii) to permit any administrative expense or any claim (now existing or hereafter arising, of any kind or nature whatsoever) to have administrative priority as to the Credit Parties equal or superior to the priority of the Loans (other than the Carve-Out and claims related to the Permitted Prior Liens) or the Adequate Protection Claims (as defined the DIP Orders), other than the Carve-Out or the administrative expense claims on account of the Loans or (iii) to grant or permit the grant of a Lien on the Collateral that is senior to the Liens in favor of the Collateral Agent (for the benefit of the Secured Parties);

(l)     **Application for Order by Third Party**. An application for any of the orders described in clauses (f), (g), (i), (j), (k), (m), (p) and (r) of this Section 11.01 shall be made by a person other than the Credit Parties and such application is not contested by the Credit Parties in good faith or any person obtains a non-appealable Final DIP Order charging any of the Collateral under section 506(c) of the Bankruptcy Code against the Agent or the Lenders or obtains a Final DIP Order adverse to the Agent or the Lenders;

(m)     **Right to File Chapter 11 Plan**. The entry of an order by the Bankruptcy Court terminating or modifying the exclusive right of any Credit Party to file a Plan of Reorganization pursuant to section 1121 of the Bankruptcy Code, without the prior written consent of the Required Lenders;

(n)     **Liens**. (i) Any Credit Party shall attempt to invalidate, reduce, or otherwise impair the Liens or security interests of the Agent and/or the Lenders or to subject any Collateral to assessment pursuant to section 506(c) of the Bankruptcy Code; (ii) any Lien or security interest created by this

Agreement or the DIP Orders with respect to Collateral shall, for any reason, cease to be valid; or (iii) any action is commenced by the Credit Parties that contests the validity, perfection, or enforceability of any of the Liens and security interests of the Agent and/or the Lenders created by any of the Interim DIP Order, the Final DIP Order, or this Agreement;

(o)    **Invalidation of Claims**. Any Credit Party or affiliate of any such Credit Party shall seek to, or shall support (in any such case by way of any motion or other pleading filed with the Bankruptcy Court or any other writing to another party-in-interest executed by or on behalf of the Credit Parties) any other person's motion to disallow in whole or in part the Lenders' claims in respect of the Obligations or contest any provision of this Agreement;

(p)    **Challenge**.  The challenge by any Debtor to the validity, extent, perfection or priority of any Liens granted under or obligations arising under the Prepetition Credit Documents**;**

(q)    **Modifications**. The terms of the Acceptable Restructuring or the Confirmation Order, is amended, supplemented, or otherwise modified in a manner that materially affects the rights or duties of the Lenders and/or the Agent without the prior written consent of the Required Lenders (and with respect to amendments, modifications, or supplements that affect the rights or duties of the Agent, the Agent); or

(r)    **Payments**. Any Credit Party or any of their Affiliates shall have filed a motion seeking the entry of, or the Bankruptcy Court shall have entered, an order approving a payment to any person that would be materially inconsistent with the treatment of any such person under the Acceptable Restructuring, without the prior written consent of the Required Lenders;

then, and in every such event, and at any time thereafter during the continuance of such event, Administrative Agent, at the request of the Required Lenders, shall, by notice to Borrower, take any or all of the following actions, at the same or different times:  (i) terminate forthwith the Commitments, (ii) declare the Loans then outstanding to be forthwith due and payable in whole or in part, whereupon the principal of the Loans so declared to be due and payable, together with accrued interest thereon and any unpaid accrued fees and all other liabilities and Obligations of Borrower accrued hereunder and under any other Credit Document shall become forthwith due and payable, without presentment, demand, protest or any other notice of any kind, all of which are hereby expressly waived by Borrower, anything contained herein or in any other Credit Document to the contrary notwithstanding and (iii) exercise any other right or remedy provided under the Credit Documents or at law or in equity;

Notwithstanding the foregoing, (a) Administrative Agent shall provide AG Landlord with copies of notices issued by Administrative Agent or the Lenders of any event or occurrence under the Credit Documents that enables or permits the Lenders (or Administrative Agent) to accelerate the maturity of the Indebtedness outstanding under the Credit Documents and (b) in the event of a default by Borrower or any of its Subsidiaries in the performance of any of their respective Obligations under any of the Credit Documents, including, without limitation, any default in the payment of any sums payable under any such agreement, then, in each and every such case, subject to applicable Gaming Regulations (as defined in the AG Master Lease) and the terms of the AG Master Lease, AG Landlord shall have the right, but not the obligation, to cure or remedy the default or defaults or cause the default or defaults to be cured or remedied (to the extent susceptible to cure or remedy) prior to the end of any applicable notice and cure periods set forth in such Credit Documents, and any such tender of payment or performance by AG Landlord shall be accepted by Administrative Agent, Collateral Agent and Lenders and shall constitute payment and/or performance by the applicable Company for purposes of the Credit Documents.

**Section 11.02    Application of Proceeds**.  The proceeds received by Collateral Agent in respect of any sale of, collection from or other realization upon all or any part of the Collateral pursuant to the

exercise by Collateral Agent of its remedies, or otherwise received after acceleration of the Loans, shall be applied, in full or in part, together with any other sums then held by Collateral Agent pursuant to this Agreement, promptly by Collateral Agent as follows: (i) <u>first</u>, ratably to pay the Obligations in respect of any fees, expense reimbursements, indemnities and other amounts then due and payable to the Agent until paid in full; (ii) <u>second</u>, ratably to pay the Obligations in respect of any fees, expense reimbursements, indemnities and other amounts then due and payable to the Lenders until paid in full; (iii) <u>third</u>, ratably to pay interest then due and payable in respect of the New Money DIP Loans until paid in full; (iv) <u>fourth</u>, ratably to pay principal of the New Money DIP Loans until paid in full; (v) <u>fifth</u>, ratably to pay interest then due and payable in respect of the Incremental Roll-Up DIP Loans until paid in full; (vi) <u>sixth</u>, ratably to pay principal of the Incremental Roll-Up DIP Loans until paid in full; (vii) <u>seventh</u>, ratably to pay interest then due and payable in respect of the Initial Roll-Up DIP Loans until paid in full; (viii) <u>eighth</u>, ratably to pay principal of the Initial Roll-Up DIP Loans until paid in full;  and (ix) <u>ninth</u>, to the ratable payment of all other Obligations then due and payable until paid in full.

In the event that any such proceeds are insufficient to pay in full the items described in this <u>Section 11.02</u>, the Credit Parties shall remain liable, jointly and severally, for any deficiency.

## ARTICLE XII.

## <u>AGENTS</u>

**Section 12.01   <u>Appointment</u>**.  Each of the Lenders hereby irrevocably appoints Alter Domus to act on its behalf as Administrative Agent and Collateral Agent hereunder and under the other Credit Documents, and authorizes Administrative Agent and Collateral Agent to take such actions on its behalf and to exercise such powers as are delegated to Administrative Agent or Collateral Agent by the terms hereof or thereof, together with such actions and powers as are reasonably incidental thereto, including, in accordance with regulatory requirements of any Gaming Authority consistent with the intents and purposes of this Agreement and the other Credit Documents. The provisions of this Article are solely for the benefit of the Agents and the Lenders, and neither Borrower nor any other Credit Party shall have rights as a third party beneficiary of any of the provisions of this <u>Article XII</u>, except to the extent set forth in this <u>Section 12.01</u>, <u>Section 12.06</u> and <u>Section 12.07(b)</u>.  It is understood and agreed that the use of the term "agent" herein or in any other Credit Documents (or any other similar term) with reference to any Agent is not intended to connote any fiduciary or other implied (or express) obligations arising under agency doctrine of any applicable Law. Instead such term is used as a matter of market custom, and is intended to create or reflect only an administrative relationship between contracting parties.

**Section 12.02   <u>Rights as a Lender</u>**.  Any Person serving as an Agent hereunder shall have the same rights and powers in its capacity as a Lender (if applicable) as any other Lender and may exercise the same as though it were not an Agent, and the term "Lender" or "Lenders" shall, unless otherwise expressly indicated or unless the context otherwise requires, include the Person serving as such Agent hereunder in its individual capacity.  Such Person and its Affiliates may accept deposits from, lend money to, own securities of, act as the financial advisor or in any other advisory capacity for and generally engage in any kind of business with Borrower or any Subsidiary or other Affiliate thereof as if such Person were not an Agent hereunder and without any duty to account therefor to the Lenders.

**Section 12.03   <u>Exculpatory Provisions</u>**.  No Agent shall have any duties or obligations except those expressly set forth herein and in the other Credit Documents, and each Agent's duties hereunder shall be administrative in nature.  Without limiting the generality of the foregoing, no Agent:

(a)       shall be subject to any fiduciary or other implied duties with respect to any Credit Party, any Lender or any other Person, regardless of whether a Default has occurred and is continuing;

(b)        shall have any duty to take any discretionary action or exercise any discretionary powers, except discretionary rights and powers expressly contemplated hereby or by the other Credit Documents that the Agent is required to exercise as directed in writing by the Required Lenders (or such other number or percentage of the Lenders as shall be expressly provided for herein or in the other Credit Documents), provided that no Agent shall be required to take any action that, in its opinion or the opinion of its counsel, may expose such Agent to liability or that is contrary to any Credit Document or applicable law, including for the avoidance of doubt any action that may be in violation of the automatic stay under any Debtor Relief Law; and

(c)        shall, except as expressly set forth herein and in the other Credit Documents, have any duty to disclose, and shall not be liable for the failure to disclose, any information relating to any of Borrower or any of its respective Affiliates that is communicated to or obtained by the Person serving as such Agent or any of its Affiliates in any capacity.

No Agent shall be liable for any action taken or not taken by it (i) with the consent or at the request of the Required Lenders (or, such other number or percentage of the Lenders as shall be necessary, or as Administrative Agent shall believe in good faith shall be necessary, under the circumstances as provided in Sections 11.01 and 13.04) or (ii) in the absence of its own gross negligence or willful misconduct as determined by a court of competent jurisdiction by final and non-appealable judgment.  No Agent shall be deemed to have knowledge of any Default or Event of Default unless and until notice describing such Default is given in writing to such Agent by Borrower or a Lender.

No Agent shall be responsible for or have any duty to ascertain or inquire into (i) any statement, warranty or representation made in or in connection with this Agreement or any other Credit Document, (ii) the contents of any certificate, report or other document delivered hereunder or thereunder or in connection herewith or therewith, (iii) the performance or observance of any of the covenants, agreements or other terms or conditions set forth herein or therein or the occurrence of any Default, (iv) the validity, enforceability, effectiveness or genuineness of this Agreement, any other Credit Document or any other agreement, instrument or document, (v) the satisfaction of any condition set forth in Article VII or elsewhere herein, other than to confirm receipt of items expressly required to be delivered to such Agent or (vi) any representation or warranty regarding the existence, value or collectability of the Collateral, the existence, priority or perfection of the Collateral Agent's Lien thereon, or any certificate prepared by any Credit Party in connection therewith, nor shall any Agent be responsible or liable to the Lenders for any failure to monitor or maintain any portion of the Collateral.

Neither the Administrative Agent nor the Collateral Agent shall be required to qualify in any jurisdiction in which it is not presently qualified to perform its obligations as Administrative Agent or Collateral Agent, as applicable.

**Section 12.04    Reliance by Agents**.  Each Agent shall be entitled to rely upon, and shall not incur any liability for relying upon, any notice, request, certificate, consent, statement, instrument, document or other writing (including any electronic message, Internet or intranet website posting or other distribution) believed by it to be genuine and to have been signed, sent or otherwise authenticated by the proper Person. Each Agent also may rely upon any statement made to it orally or by telephone and believed by it to have been made by the proper Person, and shall not incur any liability for relying thereon.  In determining compliance with any condition hereunder to the making of a Loan that by its terms must be fulfilled to the satisfaction of a Lender, each Agent may presume that such condition is satisfactory to such Lender unless such Agent shall have received notice to the contrary from such Lender prior to the making of such Loan. Each Agent may consult with legal counsel (who may be counsel for Borrower), independent accountants and other experts selected by it, and shall not be liable for any action taken or not taken by it in accordance with the advice of any such counsel, accountants or experts.

**Section 12.05   Delegation of Duties.** Each Agent may perform any and all of its duties and exercise its rights and powers hereunder or under any other Credit Document by or through any one or more sub agents appointed by such Agent.  Each Agent and any such sub agent may perform any and all of its duties and exercise its rights and powers by or through their respective Related Parties.  The exculpatory provisions of this Article shall apply to any such sub agent and to the Related Parties of each Agent and any such sub agent, and shall apply to their respective activities in connection with the syndication of the credit facilities provided for herein as well as activities as an Agent.  No Agent shall be responsible for the negligence or misconduct of any sub-agents except to the extent that a court of competent jurisdiction determines in a final and non-appealable judgment that an Agent acted with gross negligence or willful misconduct in the selection of such sub-agents.

**Section 12.06   Resignation of Administrative Agent and Collateral Agent**

(a)        Administrative Agent and Collateral Agent may at any time give notice of their resignation to the Lenders and Borrower.  Upon receipt of any such notice of resignation, the Required Lenders shall have the right, with the prior written consent of Borrower (unless an Event of Default has occurred and is continuing) to appoint a successor, which shall be a bank with an office in the United States, or an Affiliate of any such bank with an office in the United States.  If no such successor shall have been so appointed by the Required Lenders and shall have accepted such appointment within 30 days after the retiring Administrative Agent and Collateral Agent gives notice of their resignation (or such earlier day as shall be agreed by the Required Lenders and Borrower (unless an Event of Default has occurred and is continuing)) (the "**Resignation Effective Date**"), then the retiring Administrative Agent and Collateral Agent may (but shall not be obligated to) on behalf of the Lenders, appoint a successor Administrative Agent and Collateral Agent meeting the qualifications (including consent of Borrower, if applicable) set forth above.  Whether or not a successor has been appointed, such resignation shall become effective in accordance with such notice on the Resignation Effective Date.

(b)        The Required Lenders may, to the extent permitted by applicable law, by notice in writing to Borrower and such Person remove such Person as Administrative Agent and Collateral Agent and, in consultation with Borrower, appoint a successor.  If no such successor shall have been so appointed by the Required Lenders and shall have accepted such appointment within 30 days (or such earlier day as shall be agreed by the Required Lenders) (the "**Removal Effective Date**"), then such removal shall nonetheless become effective in accordance with such notice on the Removal Effective Date.

(c)        With effect from the Resignation Effective Date or the Removal Effective Date (as applicable) (1) the retiring or removed Administrative Agent and Collateral Agent shall be discharged from its duties and obligations hereunder and under the other Credit Documents (except that in the case of any collateral security held by Administrative Agent or Collateral Agent on behalf of the Secured Parties under any of the Credit Documents, the retiring or removed Administrative Agent or Collateral Agent, as applicable, shall continue to hold such collateral security until such time as a successor Administrative Agent and Collateral Agent is appointed) and (2) except for any indemnity payments or other amounts then owed to the retiring or removed Administrative Agent or Collateral Agent, all payments, communications and determinations provided to be made by, to or through Administrative Agent or Collateral Agent shall instead be made by or to each Secured Party directly, until such time, if any, as the Required Lenders appoint a successor Administrative Agent and Collateral Agent as provided for above.  Upon the acceptance of a successor's appointment as Administrative Agent and Collateral Agent hereunder, such successor shall succeed to and become vested with all of the rights, powers, privileges and duties of the retiring (or removed) Administrative Agent and Collateral Agent (other than any rights to indemnity payments or other amounts owed to the retiring or removed Administrative Agent or Collateral Agent as of the Resignation Effective Date or the Removal Effective Date, as applicable), and the retiring or removed Administrative Agent and Collateral Agent shall be discharged from all of its duties and obligations hereunder or under the

other Credit Documents (if not already discharged therefrom as provided above in this Section).  The fees payable by Borrower to a successor Administrative Agent and Collateral Agent shall be the same as those payable to its predecessor unless otherwise agreed between Borrower and such successor.  After the retiring or removed Administrative Agent's and Collateral Agent's resignation or removal hereunder and under the other Credit Documents, the provisions of this Article and Section 13.03 shall continue in effect for the benefit of such retiring or removed Administrative Agent and Collateral Agent, their sub agents and their respective Related Parties in respect of any actions taken or omitted to be taken by any of them while the retiring or removed Administrative Agent and Collateral Agent was acting as Administrative Agent or Collateral Agent.

(d)     [Reserved].

(e)     To the extent required by applicable Gaming Laws or the conditions of any Gaming Approval, Administrative Agent and Collateral Agent shall notify the applicable Gaming Authorities of any change in the Administrative Agent or Collateral Agent.  Borrower shall provide advice and assistance to Administrative Agent and Collateral Agent in making such notifications.

**Section 12.07    Nonreliance on Agents and Other Lenders**.

(a)     Each Lender acknowledges that it has, independently and without reliance upon any Agent or any other Lender or any of their Related Parties and based on such documents and information as it has deemed appropriate, made its own credit analysis and decision to enter into this Agreement.  Each Lender also acknowledges that it will, independently and without reliance upon any Agent or any other Lender or any of their Related Parties and based on such documents and information as it shall from time to time deem appropriate, continue to make its own decisions in taking or not taking action under or based upon this Agreement, any other Credit Document or any related agreement or any document furnished hereunder or thereunder.

**Section 12.08    Indemnification**.  The Lenders agree to reimburse and indemnify each Agent in its capacity as such ratably according with its "percentage" as used in determining the Required Lenders at such time or, if the Commitments have terminated and all Loans have been repaid in full, as determined immediately prior to such termination and repayment, from and against any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, reasonable expenses or disbursements of any kind whatsoever which may at any time (including, without limitation, at any time following the payment of the Obligations) be imposed on, incurred by or asserted against such Agent in its capacity as such in any way relating to or arising out of this Agreement or any other Credit Document, or any documents contemplated by or referred to herein or the transactions contemplated hereby or any action taken or omitted to be taken by such Agent under or in connection with any of the foregoing, but only to the extent that any of the foregoing is not paid by Borrower or any of its Subsidiaries; provided, however, that no Lender shall be liable to any Agent for the payment of any portion of such liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements resulting from the gross negligence or willful misconduct of such Agent (as determined by a court of competent jurisdiction in a final and non-appealable decision).  If any indemnity furnished to any Agent for any purpose shall, in the opinion of such Agent be insufficient or become impaired, such Agent may call for additional indemnity and cease, or not commence, to do the acts indemnified against until such additional indemnity is furnished.  The agreements in this Section 12.08 shall survive the payment of all Obligations.

**Section 12.09    No Other Duties**.  Anything herein to the contrary notwithstanding, none of Administrative Agent or the Collateral Agent shall have any powers, duties or responsibilities under this Agreement or any of the other Credit Documents, except in its capacity, as applicable, as Administrative Agent, Collateral Agent or a Lender hereunder.

**Section 12.10** **Holders**.  Administrative Agent may deem and treat the payee of any Note as the owner thereof for all purposes hereof unless and until a written notice of the assignment, transfer or endorsement thereof, as the case may be, shall have been filed with Administrative Agent.  Any request, authority or consent of any Person or entity who, at the time of making such request or giving such authority or consent, is the holder of any Note shall be conclusive and binding on any subsequent holder, transferee, assignee or indorsee, as the case may be, of such Note or of any Note or Notes issued in exchange therefor.

**Section 12.11** **Administrative Agent May File Proofs of Claim.**  In case of the pendency of any proceeding under any Debtor Relief Law or any other judicial proceeding relative to any Credit Party , Administrative Agent (irrespective of whether the principal of any Loan shall then be due and payable as herein expressed or by declaration or otherwise and irrespective of whether Administrative Agent shall have made any demand on Borrower) shall be entitled and empowered, by intervention in such proceeding or otherwise:

(a) to file and prove a claim for the whole amount of the principal and interest owing and unpaid in respect of the Loans and all other Obligations that are owing and unpaid and to file such other documents as may be necessary or advisable in order to have the claims of the Secured Parties (including any claim for the reasonable compensation, expenses, disbursements and advances of the Secured Parties and their respective agents and counsel and all other amounts due the Secured Parties under Sections 2.05 and 13.03) allowed in such judicial proceeding; and

(b) to collect and receive any monies or other property payable or deliverable on any such claims and to distribute the same;

and any custodian, receiver, assignee, trustee, liquidator, sequestrator or other similar official in any such judicial proceeding is hereby authorized by each Lender (and each Secured Party by accepting the benefits of the Collateral) to make such payments to Administrative Agent and, in the event that Administrative Agent shall consent to the making of such payments directly to the Secured Parties, to pay to Administrative Agent any amount due for the reasonable compensation, expenses, disbursements and advances of Administrative Agent and its agents and counsel, and any other amounts due Administrative Agent under Sections 2.05 and 13.03.

Nothing contained herein shall be deemed to authorize Administrative Agent to authorize or consent to or accept or adopt on behalf of any Secured Party any plan of reorganization, arrangement, adjustment or composition affecting the Obligations or the rights of any Secured Party or to authorize Administrative Agent to vote in respect of the claim of any Secured Party in any such proceeding.

**Section 12.12** **Collateral Matters**

(a) Each Lender (and each other Secured Party by accepting the benefits of the Collateral) authorizes and directs Collateral Agent to enter into the Security Documents for the benefit of the Secured Parties and to hold and enforce the Liens on the Collateral on behalf of the Secured Parties.  Collateral Agent is hereby authorized on behalf of all of the Secured Parties, without the necessity of any notice to or further consent from any Secured Party, from time to time prior to an Event of Default, to take any action with respect to any Collateral or Security Documents which may be necessary to perfect and maintain perfected the security interest in and liens upon the Collateral granted pursuant to the Security Documents.  The Lenders (and each other Secured Party by accepting the benefits of the Collateral) hereby authorize Collateral Agent to take the actions set forth in Section 13.04(g).  Upon request by Administrative Agent at any time, the Lenders will confirm in writing Collateral Agent's authority to release particular types or items of Collateral pursuant to this Section 12.12.

(b)      Collateral Agent shall have no obligation whatsoever to the Lenders, the other Secured Parties or any other Person to assure that the Collateral exists or is owned by any Credit Party  or is cared for, protected or insured or that the Liens granted to Collateral Agent pursuant to the applicable Security Documents have been properly or sufficiently or lawfully created, perfected, protected or enforced or are entitled to any particular priority, or to exercise or to continue exercising at all or in any manner or under any duty of care, disclosure or fidelity any of the rights, authorities and powers granted or available to Collateral Agent in Section 12.01 or in this Section 12.12 or in any of the Security Documents, it being understood and agreed that in respect of the Collateral or any part thereof, or any act, omission or event related thereto, Collateral Agent may act in any manner it may deem appropriate, in its sole discretion, given Collateral Agent's own interest in the Collateral or any part thereof as one of the Lenders and that Collateral Agent shall have no duty or liability whatsoever to the Lenders or the other Secured Parties, except for its gross negligence or willful misconduct (as determined by a court of competent jurisdiction in a final and non-appealable decision).

**Section 12.13**   **Withholding Tax**.  To the extent required by any applicable Requirement of Law, an Agent may withhold from any payment to any Lender, an amount equivalent to any applicable withholding Tax.  Without limiting or expanding the provisions of Section 5.06, each Lender shall indemnify the relevant Agent, and shall make payable in respect thereof within thirty (30) calendar days after demand therefor, against any and all Taxes and any and all related losses, claims, liabilities and expenses (including fees, charges and disbursements of any counsel for the Agent) incurred by or asserted against the Agent by the IRS or any other Governmental Authority as a result of the failure of the Agent to properly withhold Tax from amounts paid to or for the account of any Lender for any reason (including, without limitation, because the appropriate form was not delivered or not property executed, or because such Lender failed to notify Administrative Agent of a change in circumstance that rendered the exemption from, or reduction of withholding Tax ineffective).  A certificate as to the amount of such payment or liability delivered to any Lender by Administrative Agent shall be conclusive absent manifest error.  Each Lender hereby authorizes Administrative Agent to set off and apply any and all amounts at any time owing to such Lender under this Agreement or any other Credit Document against any amount due Administrative Agent under this Section 12.13.  The agreements in this Section 12.13 shall survive the resignation and/or replacement of Administrative Agent, any assignment of rights by, or the replacement of, a Lender, and the repayment, satisfaction or discharge of all Loans and all other amounts payable hereunder.

**Section 12.14**   **[Reserved]**.

**Section 12.15**   **Erroneous Payments**.

(a)      If Administrative Agent notifies a Lender or Secured Party, or any Person who has received funds on behalf of a Lender or Secured Party (any such Lender, Secured Party or other recipient, a "**Payment Recipient**") that Administrative Agent has determined in its sole discretion (whether or not after receipt of any notice under immediately succeeding clause (b)) that any funds received by such Payment Recipient from Administrative Agent or any of its Affiliates were erroneously transmitted to, or otherwise erroneously or mistakenly received by, such Payment Recipient (whether or not known to such Lender, Secured Party or other Payment Recipient on its behalf) (any such funds, whether received as a payment, prepayment or repayment of principal, interest, fees, distribution or otherwise, individually and collectively, an "**Erroneous Payment**") and demands the return of such Erroneous Payment (or a portion thereof), such Erroneous Payment shall at all times remain the property of Administrative Agent and shall be segregated by the Payment Recipient and held in trust for the benefit of Administrative Agent, and such Lender or Secured Party shall (or, with respect to any Payment Recipient who received such funds on its behalf, shall cause such Payment Recipient to) promptly, but in no event later than two (2) Business Days thereafter, return to Administrative Agent the amount of any such Erroneous Payment (or portion thereof) as to which such a demand was made, in same day funds (in the currency so received), together with interest thereon in

respect of each day from and including the date such Erroneous Payment (or portion thereof) was received by such Payment Recipient to the date such amount is repaid to Administrative Agent in same day funds at the greater of the Federal Funds Effective Rate and a rate determined by Administrative Agent in accordance with banking industry rules on interbank compensation from time to time in effect.  A notice of Administrative Agent to any Payment Recipient under this <u>clause (a)</u> shall be conclusive, absent manifest error.

(b)      Without limiting immediately preceding <u>clause (a)</u>, each Lender or Secured Party, or any Person who has received funds on behalf of a Lender or Secured Party, hereby further agrees that if it receives a payment, prepayment or repayment (whether received as a payment, prepayment or repayment of principal, interest, fees, distribution or otherwise) from Administrative Agent (or any of its Affiliates) (x) that is in a different amount than, or on a different date from, that specified in a notice of payment, prepayment or repayment sent by Administrative Agent (or any of its Affiliates) with respect to such payment, prepayment or repayment, (y) that was not preceded or accompanied by a notice of payment, prepayment or repayment sent by Administrative Agent (or any of its Affiliates), or (z) that such Lender or Secured Party, or other such recipient, otherwise becomes aware was transmitted, or received, in error or by mistake (in whole or in part) in each case:

(i)      (A) in the case of immediately preceding <u>clauses (x)</u> or <u>(y)</u>, an error shall be presumed to have been made (absent written confirmation from Administrative Agent to the contrary) or (B) an error has been made (in the case of immediately preceding <u>clause (z)</u>), in each case, with respect to such payment, prepayment or repayment; and

(ii)      such Lender or Secured Party shall (and shall cause any other recipient that receives funds on its respective behalf to) promptly (and, in all events, within one (1) Business Day of its knowledge of such error) notify Administrative Agent of its receipt of such payment, prepayment or repayment, the details thereof (in reasonable detail) and that it is so notifying Administrative Agent pursuant to this <u>Section 12.15(b)(ii)</u>.

(c)      Each Lender or Secured Party hereby authorizes Administrative Agent to set off, net and apply any and all amounts at any time owing to such Lender or Secured Party under any Credit Document, or otherwise payable or distributable by Administrative Agent to such Lender or Secured Party from any source, against any amount due to Administrative Agent under immediately preceding <u>clause (a)</u> or under the indemnification provisions of this Agreement.

(d)      In the event that an Erroneous Payment (or portion thereof) is not recovered by Administrative Agent for any reason, after demand therefor by Administrative Agent in accordance with immediately preceding <u>clause (a)</u>, from any Lender that has received such Erroneous Payment (or portion thereof) (and/or from any Payment Recipient who received such Erroneous Payment (or portion thereof) on its respective behalf) (such unrecovered amount, an "**Erroneous Payment Return Deficiency**"), upon Administrative Agent's notice to such Lender at any time, (i) such Lender shall be deemed to have assigned its Loans (but not its Commitments) of the relevant Class with respect to which such Erroneous Payment was made (the "**Erroneous Payment Impacted Class**") in an amount equal to the Erroneous Payment Return Deficiency (or such lesser amount as Administrative Agent may specify) (such assignment of the Loans (but not Commitments) of the Erroneous Payment Impacted Class, the "**Erroneous Payment Deficiency Assignment**") at par plus any accrued and unpaid interest (with the assignment fee to be waived by Administrative Agent in such instance), and is hereby (together with Borrower) deemed to execute and deliver an Assignment Agreement (or, to the extent applicable, an agreement incorporating an Assignment Agreement by reference pursuant to a Platform as to which Administrative Agent and such parties are participants) with respect to such Erroneous Payment Deficiency Assignment, and such Lender shall deliver any Notes evidencing such Loans to Borrower or Administrative Agent, (ii) Administrative Agent as the

assignee Lender shall be deemed to acquire the Erroneous Payment Deficiency Assignment, (iii) upon such deemed acquisition, Administrative Agent as the assignee Lender shall become a Lender, hereunder with respect to such Erroneous Payment Deficiency Assignment and the assigning Lender shall cease to be a Lender, hereunder with respect to such Erroneous Payment Deficiency Assignment, excluding, for the avoidance of doubt, its obligations under the indemnification provisions of this Agreement and its applicable Commitments which shall survive as to such assigning Lender and (iv) Administrative Agent may reflect in the Register its ownership interest in the Loans subject to the Erroneous Payment Deficiency Assignment. Administrative Agent may, in its discretion, sell any Loans acquired pursuant to an Erroneous Payment Deficiency Assignment and upon receipt of the proceeds of such sale, the Erroneous Payment Return Deficiency owing by the applicable Lender shall be reduced by the net proceeds of the sale of such Loan (or portion thereof), and Administrative Agent shall retain all other rights, remedies and claims against such Lender (and/or against any recipient that receives funds on its respective behalf). For the avoidance of doubt, no Erroneous Payment Deficiency Assignment will reduce the Commitments of any Lender and such Commitments shall remain available in accordance with the terms of this Agreement. In addition, each party hereto agrees that, except to the extent that Administrative Agent has sold a Loan (or portion thereof) acquired pursuant to an Erroneous Payment Deficiency Assignment, and irrespective of whether Administrative Agent may be equitably subrogated, Administrative Agent shall be contractually subrogated to all the rights and interests of the applicable Lender or Secured Party under the Credit Documents with respect to each Erroneous Payment Return Deficiency (the "**Erroneous Payment Subrogation Rights**").

(e)      The parties hereto agree that an Erroneous Payment shall not pay, prepay, repay, discharge or otherwise satisfy any Obligations owed by Borrower or any other Credit Party , except, in each case, to the extent such Erroneous Payment is, and solely with respect to the amount of such Erroneous Payment that is, comprised of funds received by Administrative Agent from Borrower or any other Credit Party for the purpose of making such Erroneous Payment.

(f)      To the extent permitted by applicable law, no Payment Recipient shall assert any right or claim to an Erroneous Payment, and hereby waives, and is deemed to waive, any claim, counterclaim, defense or right of set-off or recoupment with respect to any demand, claim or counterclaim by Administrative Agent for the return of any Erroneous Payment received, including without limitation waiver of any defense based on "discharge for value" or any similar doctrine.

(g)      Each party's obligations, agreements and waivers under this <u>Section 12.15</u> shall survive the resignation or replacement of Administrative Agent, any transfer of rights or Obligations by, or the replacement of, a Lender, the termination of the Commitments and/or the repayment, satisfaction or discharge of all Obligations (or any portion thereof) under any Credit Document.

(h)      Notwithstanding anything to the contrary in this <u>Section 12.15</u>, it is understood and agreed that this <u>Section 12.15</u> shall not create any obligations or liabilities, directly or indirectly, of the Credit Parties or any of their respective Affiliates in respect of any Erroneous Payment under any of the provisions of this Agreement or any other Credit Document (including, for the avoidance of doubt, with respect to any Obligations that remain outstanding pursuant to the terms of this Agreement).

**Section 12.16   Certain ERISA Matters**.

(a)      Each Lender (x) represents and warrants, as of the date such Person became a Lender party hereto, to, and (y) covenants, from the date such Person became a Lender party hereto to the date such Person ceases being a Lender party hereto, for the benefit of, Administrative Agent and not, for the avoidance of doubt, to or for the benefit of Borrower or any other Credit Party, that at least one of the following is and will be true:

(i)      such Lender is not using "plan assets" (within the meaning of Section 3(42) of ERISA or otherwise) of one or more Benefit Plans with respect to such Lender's entrance into, participation in, administration of and performance of the Loans, the Commitments or this Agreement,

(ii)      the transaction exemption set forth in one or more PTEs, such as PTE 84-14 (a class exemption for certain transactions determined by independent qualified professional asset managers), PTE 95-60 (a class exemption for certain transactions involving insurance company general accounts), PTE 90-1 (a class exemption for certain transactions involving insurance company pooled separate accounts), PTE 91-38 (a class exemption for certain transactions involving bank collective investment funds) or PTE 96-23 (a class exemption for certain transactions determined by in-house asset managers), is applicable with respect to such Lender's entrance into, participation in, administration of and performance of the Loans, the Commitments and this Agreement,

(iii)      (A) such Lender is an investment fund managed by a "Qualified Professional Asset Manager" (within the meaning of Part VI of PTE 84-14), (B) such Qualified Professional Asset Manager made the investment decision on behalf of such Lender to enter into, participate in, administer and perform the Loans, the Commitments and this Agreement, (C) the entrance into, participation in, administration of and performance of the Loans, the Commitments and this Agreement satisfies the requirements of sub-sections (b) through (g) of Part I of PTE 84-14 and (D) to the best knowledge of such Lender, the requirements of subsection (a) of Part I of PTE 84-14 are satisfied with respect to such Lender's entrance into, participation in, administration of and performance of the Loans, the Commitments and this Agreement, or

(iv)      such other representation, warranty and covenant as may be agreed in writing between Administrative Agent, in its sole discretion, and such Lender.

(b)      In addition, unless either (1) clause (a)(i) of this Section 12.16 is true with respect to a Lender or (2) a Lender has provided another representation, warranty and covenant in accordance with clause (a)(iv) of this Section 12.16, such Lender further represents and warrants, as of the date such Person became a Lender party hereto, to, and (y) covenants, from the date such Person became a Lender party hereto to the date such Person ceases being a Lender party hereto, for the benefit of, Administrative Agent and not, for the avoidance of doubt, to or for the benefit of Borrower or any other Credit Party, that Administrative Agent is not a fiduciary with respect to the assets of such Lender involved in such Lender's entrance into, participation in, administration of and performance of the Loans, the Commitments and this Agreement (including in connection with the reservation or exercise of any rights by Administrative Agent under this Agreement, any Credit Document or any documents related hereto or thereto).

## Section 12.17   Credit Bidding.

(a)      The Secured Parties hereby irrevocably authorize the Administrative Agent, at the direction of the Required Lenders, to credit bid all or any portion of the Secured Obligations (including by accepting some or all of the Collateral in satisfaction of some or all of the Secured Obligations pursuant to a deed in lieu of foreclosure or otherwise) and in such manner purchase (either directly or through one or more acquisition vehicles) all or any portion of the Collateral (i) at any sale thereof conducted under the provisions of the Bankruptcy Code, including under Sections 363, 1123 or 1129 of the Bankruptcy Code, or any similar laws in any other jurisdictions to which a Credit Party is subject, or (ii) at any other sale, foreclosure or acceptance of collateral in lieu of debt conducted by (or with the consent or at the direction of) the Administrative Agent (whether by judicial action or otherwise) in accordance with any applicable law. In connection with any such credit bid and purchase, the Secured Obligations owed to the Secured

Parties shall be entitled to be, and shall be, credit bid by the Administrative Agent at the direction of the Required Lenders on a ratable basis (with Secured Obligations with respect to contingent or unliquidated claims receiving contingent interests in the acquired assets on a ratable basis that shall vest upon the liquidation of such claims in an amount proportional to the liquidated portion of the contingent claim amount used in allocating the contingent interests) for the asset or assets so purchased (or for the equity interests or debt instruments of the acquisition vehicle or vehicles that are issued in connection with such purchase). In connection with any such bid, (A) the Administrative Agent shall be authorized to form one or more acquisition vehicles and to assign any successful credit bid to such acquisition vehicle or vehicles, (B) each of the Secured Parties' ratable interests in the Secured Obligations which were credit bid shall be deemed without any further action under this Agreement to be assigned to such vehicle or vehicles for the purpose of closing such sale, (C) the Administrative Agent shall be authorized to adopt documents providing for the governance of the acquisition vehicle or vehicles (provided that any actions by the Administrative Agent with respect to such acquisition vehicle or vehicles, including any disposition of the assets or equity interests thereof, shall be governed, directly or indirectly, by, and the governing documents shall provide for, control by the vote of the Required Lenders or their permitted assignees under the terms of this Agreement or the governing documents of the applicable acquisition vehicle or vehicles, as the case may be, irrespective of the termination of this Agreement and without giving effect to the limitations on actions by the Required Lenders contained in Section 13.04 of this Agreement), (D) the Administrative Agent on behalf of such acquisition vehicle or vehicles shall be authorized to issue to each of the Secured Parties, ratably on account of the relevant Secured Obligations which were credit bid, interests, whether as equity, partnership interests, limited partnership interests or membership interests, in any such acquisition vehicle and/or debt instruments issued by such acquisition vehicle, all without the need for any Secured Party or acquisition vehicle to take any further action, and (E) to the extent that Secured Obligations that are assigned to an acquisition vehicle are not used to acquire Collateral for any reason (as a result of another bid being higher or better, because the amount of Secured Obligations assigned to the acquisition vehicle exceeds the amount of Secured Obligations credit bid by the acquisition vehicle or otherwise), such Secured Obligations shall automatically be reassigned to the Secured Parties pro rata with their original interest in such Secured Obligations and the equity interests and/or debt instruments issued by any acquisition vehicle on account of such Secured Obligations shall automatically be cancelled, without the need for any Secured Party or any acquisition vehicle to take any further action. Notwithstanding that the ratable portion of the Secured Obligations of each Secured Party are deemed assigned to the acquisition vehicle or vehicles as set forth in clause (B) above, each Secured Party shall execute such documents and provide such information regarding the Secured Party (and/or any designee of the Secured Party which will receive interests in or debt instruments issued by such acquisition vehicle) as the Administrative Agent may reasonably request in connection with the formation of any acquisition vehicle, the formulation or submission of any credit bid or the consummation of the transactions contemplated by such credit bid.

(b)     The Lenders party hereto on and after the Closing Date, solely in their capacity as Prepetition Secured Parties hereby irrevocably authorize the Administrative Agent, solely in its capacity as Prepetition Agent, at the direction of the Prepetition Required Lenders, to credit bid all or any portion of the Prepetition Secured Obligations (including by accepting some or all of the Prepetition Collateral in satisfaction of some or all of the Prepetition Secured Obligations pursuant to a deed in lieu of foreclosure or otherwise) and in such manner purchase (either directly or through one or more acquisition vehicles) all or any portion of the Prepetition Collateral (i) at any sale thereof conducted under the provisions of the Bankruptcy Code, including under Sections 363, 1123 or 1129 of the Bankruptcy Code, or any similar laws in any other jurisdictions to which a Credit Party is subject, or (ii) at any other sale, foreclosure or acceptance of collateral in lieu of debt conducted by (or with the consent or at the direction of) the Prepetition Agent (whether by judicial action or otherwise) in accordance with any applicable law. In connection with any such credit bid and purchase, the Prepetition Secured Obligations owed to the Prepetition Secured Parties shall be entitled to be, and shall be, credit bid by the Prepetition Agent at the direction of the Prepetition Required Lenders on a ratable basis (with Prepetition Secured Obligations with

respect to contingent or unliquidated claims receiving contingent interests in the acquired assets on a ratable basis that shall vest upon the liquidation of such claims in an amount proportional to the liquidated portion of the contingent claim amount used in allocating the contingent interests) for the asset or assets so purchased (or for the equity interests or debt instruments of the acquisition vehicle or vehicles that are issued in connection with such purchase). In connection with any such bid, (A) the Prepetition Agent shall be authorized to form one or more acquisition vehicles and to assign any successful credit bid to such acquisition vehicle or vehicles, (B) each of the Prepetition Secured Parties' ratable interests in the Prepetition Secured Obligations which were credit bid shall be deemed without any further action under the Prepetition Credit Agreement to be assigned to such vehicle or vehicles for the purpose of closing such sale, (C) the Prepetition Agent shall be authorized to adopt documents providing for the governance of the acquisition vehicle or vehicles (provided that any actions by the Prepetition Agent with respect to such acquisition vehicle or vehicles, including any disposition of the assets or equity interests thereof, shall be governed, directly or indirectly, by, and the governing documents shall provide for, control by the vote of the Prepetition Required Lenders or their permitted assignees under the terms of the Prepetition Credit Agreement or the governing documents of the applicable acquisition vehicle or vehicles, as the case may be, irrespective of the termination of the Prepetition Credit Agreement and without giving effect to the limitations on actions by the Prepetition Required Lenders contained in Section 13.04 of the Prepetition Credit Agreement), (D) the Prepetition Agent on behalf of such acquisition vehicle or vehicles shall be authorized to issue to each of the Prepetition Secured Parties, ratably on account of the relevant Prepetition Secured Obligations which were credit bid, interests, whether as equity, partnership interests, limited partnership interests or membership interests, in any such acquisition vehicle and/or debt instruments issued by such acquisition vehicle, all without the need for any Prepetition Secured Party or acquisition vehicle to take any further action, and (E) to the extent that Prepetition Secured Obligations that are assigned to an acquisition vehicle are not used to acquire Collateral for any reason (as a result of another bid being higher or better, because the amount of Prepetition Secured Obligations assigned to the acquisition vehicle exceeds the amount of Prepetition Secured Obligations credit bid by the acquisition vehicle or otherwise), such Prepetition Secured Obligations shall automatically be reassigned to the Prepetition Secured Parties pro rata with their original interest in such Prepetition Secured Obligations and the equity interests and/or debt instruments issued by any acquisition vehicle on account of such Prepetition Secured Obligations shall automatically be cancelled, without the need for any Prepetition Secured Party or any acquisition vehicle to take any further action. Notwithstanding that the ratable portion of the Prepetition Secured Obligations of each Prepetition Secured Party are deemed assigned to the acquisition vehicle or vehicles as set forth in clause (B) above, each Prepetition Secured Party shall execute such documents and provide such information regarding the Prepetition Secured Party (and/or any designee of the Prepetition Secured Party which will receive interests in or debt instruments issued by such acquisition vehicle) as the Prepetition Agent may reasonably request in connection with the formation of any acquisition vehicle, the formulation or submission of any credit bid or the consummation of the transactions contemplated by such credit bid.

## ARTICLE XIII.

## MISCELLANEOUS

**Section 13.01   Waiver**.  No failure on the part of Administrative Agent, Collateral Agent or any other Secured Party to exercise and no delay in exercising, and no course of dealing with respect to, any right, power or privilege under any Credit Document shall operate as a waiver thereof, nor shall any single or partial exercise of any right, power or privilege under any Credit Document preclude any other or further exercise thereof or the exercise of any other right, power or privilege.  The remedies provided herein are cumulative and not exclusive of any remedies provided by Law.

**Section 13.02   Notices**.

(a)      **General**.   Unless otherwise expressly provided herein, all notices and other communications provided for hereunder shall be in writing (including by facsimile or electronic mail).  All such written notices shall be mailed certified or registered mail, faxed or delivered to the applicable address, telecopy or facsimile number or (subject to Section 13.02(b) below) electronic mail address, and all notices and other communications expressly permitted hereunder to be given by telephone shall be made to the applicable telephone number, as follows:

(i)      if to any Credit Party or any Agent, to the address, facsimile number, electronic mail address or telephone number specified for such Person on Schedule 13.02 hereto;

(ii)      if to any other Lender, to the address, facsimile number, electronic mail address or telephone number separately specified by such Person.

Notices sent by hand or overnight courier service, or mailed by certified or registered mail, shall be deemed to have been given when received; notices sent by facsimile shall be deemed to have been given when sent (except that, if not given during normal business hours for the recipient, shall be deemed to have been given at the opening of business on the next business day for the recipient).  Notices delivered through electronic communications to the extent provided in Section 13.02(b) below, shall be effective as provided in such Section 13.02(b).

(b)      **Electronic Communications**.   Notices and other communications to the Lenders hereunder may be delivered or furnished by electronic communication (including e-mail and Internet or intranet websites) pursuant to procedures approved by Administrative Agent; provided, however, that the foregoing shall not apply to notices to any Lender pursuant to Article II, Article III or Article IV if such Lender has notified Administrative Agent that it is incapable of receiving notices under such Article by electronic communication.  Each Agent or any Credit Party may, in its discretion, agree to accept notices and other communications to it hereunder by electronic communications pursuant to procedures approved by it, provided that approval of such procedures may be limited to particular notices or communications.

Unless Administrative Agent otherwise prescribes, (i) notices and other communications sent to an electronic mail address shall be deemed received upon the sender's receipt of an acknowledgement from the intended recipient (such as by the "return receipt requested" function, as available, return electronic mail address or other written acknowledgement); provided, however, that if such notice or other communication is not sent during the normal business hours of the recipient, such notice or communication shall be deemed to have been sent at the opening of business on the next business day for the recipient, and (ii) notices or communications posted to an Internet or intranet website shall be deemed received upon the deemed receipt by the intended recipient at its e-mail address (as described in the foregoing clause (i)) of notification that such notice or communication is available and identifying the website address therefor.

(c)      **Change of Address, Etc**.  Each Credit Party and each Agent may change its respective address, facsimile number, electronic mail address or telephone number for notices and other communications hereunder by notice to the other parties hereto.  Each other Lender may change its address, facsimile number, electronic mail address or telephone number for notices and other communications hereunder by notice to Borrower and the Administrative Agent.

(d)      **Reliance by Agents and Lenders**.  Agents and the Lenders shall be entitled to rely and act upon any notices (including telephonic Notices of Borrowing) purportedly given by or on behalf of Borrower even if (i) such notices were not made in a manner specified herein, were incomplete or were not preceded or followed by any other form of notice specified herein, or (ii) the terms thereof, as understood by the recipient, varied from any confirmation thereof.  Borrower shall indemnify each Indemnitee from all Losses resulting from the reliance by such Indemnitee on each notice purportedly given by or on behalf of

112

Borrower (except to the extent resulting from such Indemnitee's own gross negligence or willful misconduct or material breach of any Credit Document) and believed by such Indemnitee in good faith to be genuine. All telephonic notices to and other communications with Administrative Agent or Collateral Agent may be recorded by Administrative Agent or Collateral Agent, as the case may be, and each of the parties hereto hereby consents to such recording.

(e)     **The Platform**. THE PLATFORM IS PROVIDED "AS IS" AND "AS AVAILABLE." THE AGENT PARTIES (AS DEFINED BELOW) DO NOT WARRANT THE ACCURACY OR COMPLETENESS OF THE BORROWER MATERIALS OR THE ADEQUACY OF THE PLATFORM, AND EXPRESSLY DISCLAIM LIABILITY FOR ERRORS IN OR OMISSIONS FROM THE BORROWER MATERIALS. NO WARRANTY OF ANY KIND, EXPRESS, IMPLIED OR STATUTORY, INCLUDING ANY WARRANTY OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, NON-INFRINGEMENT OF THIRD PARTY RIGHTS OR FREEDOM FROM VIRUSES OR OTHER CODE DEFECTS, IS MADE BY ANY AGENT PARTY IN CONNECTION WITH THE BORROWER MATERIALS OR THE PLATFORM. In no event shall any Agent or any of their respective Affiliates, directors, officers, employees, counsel, agents, trustees, investment advisors and attorneys-in-fact (collectively, the "**Agent Parties**") have any liability to Borrower, any other Credit Party, any Lender or any other Person for losses, claims, damages, liabilities or expenses of any kind (whether in tort, contract or otherwise) arising out of Borrower's or Administrative Agent's transmission of Borrower Materials through the Internet, except to the extent that such losses, claims, damages, liabilities or expenses are determined by a court of competent jurisdiction by a final and non-appealable judgment to have resulted from the gross negligence or willful misconduct of, or material breach of any Credit Document by, such Agent Party; provided, however, that in no event shall any Agent Party have any liability to Borrower, any other Credit Party, any Lender or any other Person for indirect, special, incidental, consequential or punitive damages (as opposed to direct or actual damages).

### Section 13.03   Expenses, Indemnification, Etc.

(a)     The Credit Parties, jointly and severally, agree to pay or reimburse:

(i)     Agents, the Fronting Lender, and the other Lenders for all of their reasonable and documented out-of-pocket costs and expenses (including, but not limited to, the reasonable fees, expenses and disbursements of Norton Rose Fulbright US LLP, Ropes & Gray LLP, Dentons US LLP, and each special gaming counsel to the Lenders) in connection with (1) the negotiation, preparation, execution and delivery of the Credit Documents and the extension and syndication of credit (including the Loans and Commitments) hereunder and (2) the negotiation, preparation, execution and delivery of any modification, supplement, amendment or waiver of any of the terms of any Credit Document (whether or not consummated or effective) requested by the Credit Parties;

(ii)     each Agent, the Fronting Lender, and each other Lender for all reasonable and documented out-of-pocket costs and expenses of such Agent or Lender (provided that any legal expenses shall be limited to the reasonable fees, expenses and disbursements of one primary legal counsel for Lenders and Agents selected by Administrative Agent and of one special gaming and local counsel for Lenders and Agents selected by Administrative Agent in each applicable jurisdiction reasonably deemed necessary by Administrative Agent (and solely in the case of an actual or perceived conflict of interest, where the Persons affected by such conflict inform Borrower in writing of the existence of an actual or perceived conflict of interest prior to retaining additional counsel, one additional of each such counsel for each group of similarly situated Secured Parties)) in connection with (1) any enforcement or collection proceedings resulting from any Default, including all manner of participation in or other involvement with (x) bankruptcy, insolvency, receivership, foreclosure, winding up or liquidation proceedings, (y) judicial or regulatory

proceedings and (z) workout, restructuring or other negotiations or proceedings (whether or not the workout, restructuring or transaction contemplated thereby is consummated), (2) following the occurrence and during the continuance of an Event of Default, the enforcement of any Credit Document, and (3) the enforcement of this Section 13.03; and

(iii)     Administrative Agent or Collateral Agent, as applicable but without duplication, for all reasonable and documented costs, expenses, assessments and other charges (including reasonable fees and disbursements of one counsel in each applicable jurisdiction) incurred in connection with any filing, registration, recording or perfection of any security interest contemplated by any Credit Document, or any other document referred to therein.

Without limiting the rights of any Agent under this Section 13.03(a), each Agent, promptly after a request of Borrower from time to time, will advise Borrower of an estimate of any amount anticipated to be incurred by such Agent and reimbursed by Borrower under this Section 13.03(a).

(b)     The Credit Parties, jointly and severally, hereby agree to indemnify each Agent, the Fronting Lender, each other Lender and their respective Affiliates and their and their respective Affiliates', directors, trustees, officers, employees, representatives, advisors, partners and agents (each, an "**Indemnitee**") from, and hold each of them harmless against, any and all Losses incurred by, imposed on or asserted against any of them directly or indirectly arising out of or by reason of or relating to the negotiation, execution, delivery, performance, administration or enforcement of any Credit Document, any of the transactions contemplated by the Credit Documents (including the Transactions), any breach by any Credit Party  of any representation, warranty, covenant or other agreement contained in any Credit Document in connection with any of the Transactions, the use or proposed use of any of the Loans, or the use of any collateral security for the Obligations (including the exercise by any Agent or Lender of the rights and remedies or any power of attorney with respect thereto or any action or inaction in respect thereof), including all amounts payable by any Lender pursuant to Section 12.08**, IN ALL CASES, WHETHER OR NOT CAUSED BY OR ARISING, IN WHOLE OR IN PART, OUT OF THE COMPARATIVE, CONTRIBUTORY OR SOLE NEGLIGENCE OF THE INDEMNITEE**, but excluding (i) any such Losses arising from the gross negligence or willful misconduct or material breach of any Credit Documents by such Indemnitee or its Related Indemnified Persons (as determined by a court of competent jurisdiction in a final and non-appealable decision) and (ii) any such Losses relating to any dispute between or among Indemnitees that does not involve an act or omission by any Company or any of their respective Affiliates (other than any claims against Administrative Agent, Collateral Agent, any other agent or bookrunner named on the cover page hereto, in each case, acting in such capacities or fulfilling such roles); provided, however, this Section 13.03 shall not apply with respect to Taxes other than any Taxes that represent losses, claims, damages, etc. arising from any non-Tax claim.  For purposes of this Section 13.03(b), a "**Related Indemnified Person**" of an Indemnitee means (1) any controlling person or controlled affiliate of such Indemnitee, (2) the respective directors, officers, trustees, partners or employees of such Indemnitee or any of its controlling persons or controlled Affiliates and (3) the respective agents or advisors of such Indemnitee or any of its controlling persons or controlled Affiliates, in the case of this clause (3), acting at the instructions of such Indemnitee, controlling person or such controlled Affiliate; provided that each reference to a controlled Affiliate or controlling person in this sentence pertains to a controlled Affiliate or controlling person involved in the performance of the Indemnitee's obligations under the facilities.

Without limiting the generality of the foregoing, the Credit Parties, jointly and severally, will indemnify each Agent, the Fronting Lender, each other Lender and each other Indemnitee from, and hold each Agent, the Fronting Lender, each other Lender and each other Indemnitee harmless against, any Losses incurred by, imposed on or asserted against any of them arising under any Environmental Law to the extent such Losses arise from or relate to the parties' relationship under the Credit Documents (including the

exercise of remedies thereunder) including without limitation any actual or alleged presence, Release or threatened Release of any Hazardous Materials at, on or from any property currently or formerly owned, operated or leased by the Companies, or any other liability under Environmental Laws related in any way to the Credit Parties or any of their Subsidiaries; provided, however, that the indemnity hereunder shall be subject to the exclusions from indemnification set forth in this Section 13.03(b).

To the extent that the undertaking to indemnify and hold harmless set forth in this Section 13.03 or any other provision of any Credit Document providing for indemnification is unenforceable because it is violative of any Law or public policy or otherwise, the Credit Parties, jointly and severally, shall contribute the maximum portion that each of them is permitted to pay and satisfy under applicable Law to the payment and satisfaction of all indemnified liabilities incurred by any of the Persons indemnified hereunder.

To the fullest extent permitted by applicable Law, no party hereto shall assert, and the parties hereto hereby waive, any claim against any Person, on any theory of liability, for special, indirect, consequential or punitive damages (as opposed to direct or actual damages) arising out of, in connection with, or as a result of, this Agreement, any other Credit Document or any agreement or instrument contemplated hereby, the transactions contemplated hereby or thereby, any Loan or the use of the proceeds thereof; provided that nothing contained in this sentence shall limit the Credit Parties' indemnity and reimbursement obligations to the extent set forth in this Section 13.03 (including the Credit Parties' indemnity and reimbursement obligations to indemnify the Indemnitees for indirect, special, punitive or consequential damage that are included in any third party claim in connection with which such Indemnitee is entitled to indemnification hereunder).  No Indemnitee referred to in subsection (b) above shall be liable for any damages arising from the use by unintended recipients of any information or other materials distributed to such unintended recipients by such Indemnitee through telecommunications, electronic or other information transmission systems in connection with this Agreement or the other Credit Documents or the transactions contemplated hereby or thereby other than for direct or actual damages resulting from the gross negligence, bad faith or willful misconduct or material breach of any Credit Document by such Indemnitee as determined by a final and non-appealable judgment of a court of competent jurisdiction.

### Section 13.04   Amendments and Waiver.

(a)      Neither this Agreement nor any other Credit Document nor any terms hereof or thereof may be amended, modified, changed or waived, unless such amendment, modification, change or waiver is in writing signed by each of the Credit Parties, as applicable, that is party thereto and the Required Lenders (or Administrative Agent with the consent of the Required Lenders) (which may be in the form of an email or other written communication and which may come from primary counsel to the Lenders or the Borrower, as applicable); provided, however, that no such amendment, modification, change or waiver shall (and any such amendment, modification, change or waiver set forth below shall only require the approval of the Agents and/or Lenders whose consent is required therefor pursuant to such clauses):

(i)      extend the date for any scheduled payment of principal on any Loan or Note or extend the termination date of any of the Commitments, or reduce the rate or extend the time of payment of interest (other than as a result of any waiver of the applicability of any post-default increase in interest rates) or fees thereon, or forgive or reduce the principal amount thereof, without the consent of each Lender directly and adversely affected thereby (it being understood that the waiver of (or amendment to the terms of) any condition precedent, any Default or Event of Default or of any mandatory prepayment of the Loans or mandatory reduction in Commitments shall not constitute a postponement of any date scheduled for the payment of principal or interest or an extension or increase of any Commitment and any amendment or modification to the financial definitions in this Agreement shall not constitute a reduction in any rate of interest or fees for

purposes of this underline(i), notwithstanding the fact that such amendment or modification actually results in such a reduction);

(ii) release (x) all or substantially all of the Collateral (except as provided in the Security Documents) under all the Security Documents or (y) all or substantially all of the Guarantors from the Guarantees (except as expressly provided in this Agreement), without the consent of each Lender;

(iii) amend, modify, change or waive (x) any provision of Section 10.13 or this Section 13.04 without the consent of each Lender directly and adversely affected thereby or (y) any other provision of any Credit Document or any other provision of this Agreement that expressly provides that the consent of all Lenders or all affected Lenders is required, without the consent of each Lender directly and adversely affected thereby (in each case, except for technical amendments with respect to additional extensions of credit pursuant to this Agreement which afford the benefits or protections to such additional extensions of credit of the type provided to the Loans);

(iv) reduce the percentage specified in the definition of "Required Lenders" or "Required Backstop Parties" or otherwise amend the definition of "Required Lenders" or "Required Backstop Parties" without the consent of each Lender directly and adversely affected thereby (in each case, except for technical amendments with respect to additional extensions of credit pursuant to this Agreement which afford the benefits or protections to such additional extensions of credit of the type provided to the Loans);

(v) amend, modify, change or waive Section 4.02 or Section 4.07(b) in a manner that would alter the *pro rata* sharing of payments required thereby, without the consent of each Lender directly and adversely affected thereby (except for technical amendments with respect to additional extensions of credit pursuant to this Agreement which afford the protections to such additional extensions of credit of the type provided to the Loans);

(vi) modify the Incremental Roll-Up Ratio (other than as required by any order of the Bankruptcy Court) without the written consent of each Lender directly and adversely affected thereby; or

(vii) except as otherwise expressly set forth in this Agreement as in effect on the date hereof, (1) subordinate, or have the effect of subordinating, the Obligations in right of payment to any other Indebtedness of any Credit Party or (2) subordinate, or have the effect of subordinating, the Liens securing the Obligations to any other Liens on any Collateral securing any other Indebtedness of any Credit Party, in each case, without the written consent of each Lender directly and adversely affected thereby;

(viii) amend, modify or waive Section 2.09(b), Section 2.10(b), Section 11.02 or any other provision contained herein that would have the effect of altering the applicable order of payments required thereby without the written consent of each Lender directly and adversely affected thereby; provided, however, the Required Lenders may waive, in whole or in part, any prepayment so long as the applicable order of prepayments of any portion of such prepayment which is still required to be made is not altered;

provided, further, that no such amendment, modification, change or waiver shall (A) increase the Commitments of any Lender over the amount thereof then in effect without the consent of such Lender (it being understood that waivers or modifications of conditions precedent, covenants, Defaults or Events of Default or of a mandatory reduction in the total Commitments or a waiver of a mandatory prepayment shall

not constitute an increase of the Commitment of any Lender) or (B) without the consent of any applicable Agent, amend, modify, change or waive any provision as same relates to the rights or obligations of such Agent.

(b)       If, in connection with any proposed amendment, modification, change or waiver of or to any of the provisions of this Agreement, the consent of the Required Lenders (or in the case of a proposed amendment, modification, change or waiver affecting a particular Class, the Lenders holding a majority of the Loans and Commitments with respect to such Class) is obtained but the consent of one or more of such other Lenders whose consent is required is not obtained, then Borrower shall have the right, so long as all non-consenting Lenders whose individual consent is required or declining Lenders, as applicable, are treated as described in either clause (i) or (ii) below, to either:

(i)       replace each such non-consenting Lender or Lenders (or, at the option of Borrower, if such non-consenting Lender's consent is required with respect to a particular Class of Loans (or related Commitments), to replace only the Classes of Commitments and/or Loans of such non-consenting Lender with respect to which such Lender's individual consent is required (such Classes, the "**Affected Classes**")) with one or more Replacement Lenders, so long as, at the time of such replacement, each such Replacement Lender consents to the proposed amendment, modification, change or waiver, as applicable;  provided, further, that (i) at the time of any such replacement, the Replacement Lender shall enter into one or more Assignment Agreements (and with all fees payable pursuant to Section 13.05(b) to be paid by the Replacement Lender) pursuant to which the Replacement Lender shall acquire all of the Commitments and outstanding Loans of, the Replaced Lender (or, at the option of Borrower if the respective Lender's consent is required with respect to less than all Classes of Loans (or related Commitments), the Commitments, outstanding Loans of the Affected Classes), (ii) at the time of any replacement, the Replaced Lender shall receive an amount equal to the sum of (A) the principal of, and all accrued interest on, all outstanding Loans of such Lender (other than any Loans not being acquired by the Replacement Lender), (B) [reserved], and (C) all accrued, but theretofore unpaid, fees and other amounts owing to the Lender with respect to the Loans being so assigned and (iii) all obligations of Borrower owing to such Replaced Lender (other than those specifically described in clause (ii) above in respect of Replaced Lenders for which the assignment purchase price has been, or is concurrently being, paid, and other than those relating to Loans or Commitments not being acquired by the Replacement Lender, but including any amounts which would be paid to a Lender pursuant to Section 5.05 if Borrower were prepaying a SOFR Loan), as applicable, shall be paid in full to such Replaced Lender, as applicable, concurrently with such replacement.  Upon the execution of the respective Assignment Agreement, the payment of amounts referred to in clauses (i), (ii) and (iii) above, as applicable, and the receipt of any consents that would be required for an assignment of the subject Loans and Commitments to such Replacement Lender in accordance with Section 13.05, the Replacement Lender, if any, shall become a Lender hereunder and the Replaced Lender, as applicable, shall cease to constitute a Lender hereunder and be released of all its obligations as a Lender, except with respect to indemnification provisions applicable to such Lender under this Agreement, which shall survive as to such Lender and, in the case of any Replaced Lender, except with respect to Loans and Commitments of such Replaced Lender not being acquired by the Replacement Lender; provided, that if the applicable Replaced Lender does not execute the Assignment Agreement within one (1) Business Day (or such shorter period as is acceptable to Administrative Agent) after Borrower's request, execution of such Assignment Agreement by the Replaced Lender shall not be required to effect such assignment; or

(ii)      terminate such non-consenting Lender's Commitment and/or repay Loans held by such Lender (or, if such non-consenting or declining Lender's consent is required with respect to a particular Class of Loans, the Commitment and Loans of the Affected Class) upon one (1) Business

117

Day's (or such shorter period as is acceptable to Administrative Agent) prior written notice to Administrative Agent at the Administrative Agent's Office (which notice Administrative Agent shall promptly transmit to each of the Lenders). Any such prepayment of the Loans or termination of the Commitments of such Lender shall be made together with accrued and unpaid interest, fees and other amounts owing to such Lender (including all amounts, if any, owing pursuant to Section 5.05) (or if the applicable consent requires approval of all Lenders of a particular Class but not all Lenders, then Borrower shall terminate all Commitments and/or repay all Loans, in each case together with payment of all accrued and unpaid interest, fees and other amounts owing to such Lender (including all amounts, if any, owing pursuant to Section 5.05) under the applicable Class). Immediately upon any repayment of Loans by Borrower pursuant to this Section 13.04(b)(ii), such Loans repaid or acquired pursuant hereto shall be cancelled for all purposes and no longer outstanding (and may not be resold, assigned or participated out by Borrower) for all purposes of this Agreement and all other Credit Documents, including, but not limited to (A) the making of, or the application of, any payments to the Lenders under this Agreement or any other Credit Document, (B) the making of any request, demand, authorization, direction, notice, consent or waiver under this Agreement or any other Credit Document, (C) the providing of any rights to Borrower as a Lender under this Agreement or any other Credit Document, and (D) the determination of Required Lenders, or for any similar or related purpose, under this Agreement or any other Credit Document.

(c)     Administrative Agent and Borrower or the other applicable Credit Parties may (without the consent of Lenders) enter into amendments or modifications to (i) the Agent Fee Letter or (ii) this Agreement or any of the other Credit Documents, or enter into additional Credit Documents, as Administrative Agent reasonably deems appropriate in order to implement any Benchmark Replacement or otherwise effectuate the terms of Section 5.07 in accordance with the terms of Section 5.07. Notwithstanding anything to the contrary contained herein, such amendment shall become effective without any further consent of any other party to such Credit Document.

(d)     [Reserved].

(e)     Notwithstanding anything to the contrary herein, (i) upon five (5) Business Days' prior written notice to the Lenders, any Credit Document may be waived, amended, supplemented or modified pursuant to an agreement or agreements in writing entered into by Borrower and Administrative Agent (without the consent of any Lender, unless the Required Lenders shall have objected within such five (5) Business Day period) solely to effect administrative changes or to correct administrative errors or omissions or to cure an ambiguity, defect or error (including, without limitation, to revise the legal description of any Mortgaged Real Property based on surveys), (ii) any Credit Document may be waived, amended, supplemented or modified pursuant to an agreement or agreements in writing entered into by Borrower or the other applicable Credit Parties and Administrative Agent (without the consent of any Lender) to grant a new Lien for the benefit of the Secured Parties or extend an existing Lien over additional property or to make modifications which are not materially adverse to the Lenders and are requested or required by Gaming Authorities or Gaming Laws and (iii) any Credit Document may be waived, amended, supplemented or modified pursuant to an agreement or agreements in writing entered into by Borrower or the other applicable Credit Parties and Administrative Agent (without the consent of any Lender) to permit any changes requested or required by any Governmental Authority that are not materially adverse to the Lenders (including any changes relating to qualifications as a permitted holder of debt, licensing or limits on Property that may be pledged as Collateral or available remedies).

(f)     Notwithstanding anything to the contrary herein, the applicable Credit Party or Credit Parties and Administrative Agent and/or Collateral Agent may (in its or their respective sole discretion, or shall, to the extent required by any Credit Document) enter into any amendment or waiver of any Credit

Document, or enter into any new agreement or instrument, without the consent of any other Person, to effect the granting, perfection, protection, expansion or enhancement of any security interest in any Collateral or additional Property to become Collateral for the benefit of the Secured Parties, or as required by local law to give effect to, or protect any security interest for the benefit of the Secured Parties, in any Property or so that the security interests therein comply with applicable Requirements of Law or to release any Collateral which is not required under the Security Documents.

(g)     Notwithstanding anything to the contrary herein, Administrative Agent and Collateral Agent shall (A) release any Lien granted to or held by Administrative Agent or Collateral Agent upon any Collateral (i) upon Payment in Full of the Obligations, (ii) upon the sale, transfer or other disposition of Collateral to the extent required pursuant to the last paragraph in Section 10.05 (and Administrative Agent or Collateral Agent may rely conclusively on a certificate to that effect provided to it by any Credit Party upon its reasonable request without further inquiry) to any Person other than a Credit Party, (iii) if approved, authorized or ratified in writing by the Required Lenders (or all of the Lenders to the extent required by Section 13.04(a)), (iv) if the property subject to such Lien is owned by a Guarantor, upon release of such Guarantor from its obligations under its Guarantee pursuant to Section 6.08, (v) [reserved], (vi) subject to Liens permitted under Sections 10.02(i) or 10.02(k), in each case, to the extent the documents governing such Liens do not permit such Collateral to secure the Obligations, or (vii) as otherwise may be provided herein or in the relevant Security Documents, and (B) consent to and enter into (and execute documents permitting the filing and recording, where appropriate) the grant of easements and covenants and subordination rights with respect to real property, conditions, restrictions and declarations on customary terms, and subordination, non-disturbance and attornment agreements on customary terms reasonably requested by Borrower with respect to leases entered into by the Credit Parties and their Subsidiaries, to the extent requested by Borrower and not materially adverse to the interests of the Lenders or, with respect to any Gaming Lease, to the extent requested by the applicable Landlord.

### Section 13.05   Benefit of Agreement; Assignments; Participations.

(a)     This Agreement shall be binding upon and inure to the benefit of and be enforceable by the respective successors and assigns of the parties hereto; provided, however, no Credit Party may assign or transfer any of its rights, obligations or interest hereunder or under any other Credit Document (it being understood that a merger or consolidation not prohibited by this Agreement shall not constitute an assignment or transfer) without the prior written consent of all of the Lenders and provided, further, that, although any Lender may grant participations in its rights hereunder, such Lender shall remain a "Lender" for all purposes hereunder (and may not transfer or assign all or any portion of its Commitments, Loans or related Obligations hereunder except as provided in Section 13.05(b)) and the participant shall not constitute a "Lender" hereunder; and provided, further, that no Lender shall grant any participation (x) to a natural person (or any entity owned and operated for the primary benefit of a natural person) or a person which is subject to a Disqualification or (y) under which the participant shall have rights to approve any amendment to or waiver of this Agreement or any other Credit Document except to the extent such amendment or waiver would (i) extend the date for any scheduled payment on, or the final scheduled maturity of, any Loan or Note in which such participant is participating, or reduce the rate or extend the time of payment of interest or fees thereon (except in connection with a waiver of applicability of any post-default increase in interest rates) or reduce the principal amount thereof, or increase the amount of the participant's participation over the amount thereof then in effect (it being understood that a waiver of any condition precedent, Default or Event of Default or of a mandatory reduction in the total Commitments or of a mandatory prepayment shall not constitute a change in the terms of such participation, that an increase in any Commitment (or the available portion thereof) or Loan shall be permitted without the consent of any participant if the participant's participation is not increased as a result thereof and that any amendment or modification to the financial definitions in this Agreement shall not constitute a reduction in any rate of interest or fees for purposes of this clause (i), notwithstanding the fact that such amendment or modification

119

actually results in such a reduction), (ii) consent to the assignment or transfer by any Credit Party of any of its rights and obligations under this Agreement or other Credit Document to which it is a party or (iii) release all or substantially all of the Collateral under all of the Security Documents (except as expressly provided in the Credit Documents) or all or substantially all of the value of the Guarantees (except as expressly provided in the Credit Documents) supporting the Loans hereunder in which such participant is participating.  In the case of any such participation, except as described below, the participant shall not have any rights under this Agreement or any of the other Credit Documents (the participant's rights against such Lender in respect of such participation to be those set forth in the agreement executed by such Lender in favor of the participant relating thereto).  Borrower agrees that each participant shall be entitled to the benefits of Sections 5.01, and 5.06 (subject to the obligations and limitations of such Sections, including Section 5.06(c) (it being understood that the documentation required under Section 5.06(c) shall be delivered solely to the participating Lender)) to the same extent as if it were a Lender and had acquired its interest by assignment pursuant to paragraph (b) of this Section 13.05, provided that such participant (A) shall be subject to the provisions of Section 2.11 as if it were an assignee under paragraph (b) of this Section 13.05; and (B) shall not be entitled to receive any greater payment under Section 5.01 or 5.06, with respect to any participation, than its participating Lender would have been entitled to receive, except to the extent such entitlement to receive a greater payment results from a Change in Law that occurs after such participant acquired the applicable participation.  To the extent permitted by law, each participant also shall be entitled to the benefits of Section 4.07 as though it were a Lender.  Each Lender that sells a participation shall, acting solely for this purpose as a non-fiduciary agent of Borrower, maintain a register on which it enters the name and address of each participant and the principal amounts (and related interest amounts) of each participant's interest in the Loans or other obligations under this Agreement (the "**Participant Register**"); provided that no Lender shall have any obligation to disclose all or any portion of the Participant Register (including the identity of any Participant or any information relating to a Participant's interest in any commitments, loans, letters of credit or its other obligations under any Credit Document) to any Person except to the extent that such disclosure is necessary to establish that such commitment, loan or other obligation is in registered form under Section 5f.103-1(c) of the United States Treasury Regulations.  The entries in the Participant Register shall be conclusive, absent manifest error, and such Lender shall treat each Person whose name is recorded in the Participant Register as the owner of such participation for all purposes of this Agreement notwithstanding any notice to the contrary.

(b)    Each Lender shall have the right to assign all or any portion of its Loans or Commitments to any Person other than to a natural person (or any entity owned and operated for the primary benefit of a natural person) or a person which is subject to a Disqualification, subject to the Administrative Agent's consent, which such consent shall not be required for (x) any assignment to a Lender or any of its Affiliates or (y) subject to compliance with the terms and conditions set forth herein, any assignment from the Fronting Lender after the initial funding of any Loan; provided that, (1) except in the case of an assignment of the entire remaining amount of the assigning Lender's Commitments and/or Loans at the time held by such Lender or any assignment from the Fronting Lender after the initial funding of any Loan, the aggregate amount of the Commitments and/or Loans subject to any such assignment shall not be less than $1.0 million. For the avoidance of doubt, no consent of the Borrower shall be required for any assignment and no Affiliate of any Credit Party shall become Lender hereunder.  Each assignee shall become a party to this Agreement as a Lender by execution of an Assignment Agreement; provided that (I) Administrative Agent shall, unless it otherwise agrees in its sole discretion, receive at the time of each such assignment, from the assigning or assignee Lender, the payment of a non-refundable assignment fee of $3,500 (provided, however, that no such assignment fee shall be payable for assignments made by the Fronting Lender after the initial funding of any Loan), (II) no such transfer or assignment will be effective until recorded by Administrative Agent on the Register pursuant to Section 2.08, and (III) such assignments may be made on a pro rata basis among Commitments and/or Loans (and related Obligations).  Any assignment or transfer by a Lender of rights or obligations under this Agreement that does not comply with this Section 13.05, whether or not such assignment or transfer is reflected in the Register, shall be treated for purposes of this Agreement as a sale

by such Lender of a participation in such rights and obligations.  To the extent of any assignment permitted pursuant to this <u>Section 13.05(b)</u>, the assigning Lender shall be relieved of its obligations hereunder with respect to its assigned Commitments and outstanding Loans (<u>provided</u> that such assignment shall not release such Lender of any claims or liabilities that may exist against such Lender at the time of such assignment). At the time of each assignment pursuant to this <u>Section 13.05(b)</u> to a Person which is not already a Lender hereunder, the respective assignee Lender shall, to the extent legally eligible to do so, provide to Borrower and Administrative Agent the appropriate IRS Forms (and, if applicable, a U.S. Tax Compliance Certificate) as described in <u>Section 5.06(c)</u>, as applicable.

(c)     Nothing in this Agreement shall prevent or prohibit any Lender from pledging or assigning a security interest in its rights under this Agreement to secure obligations of such Lender, including any pledge or assignment of a security interest to a Federal Reserve Bank or other central banking authority. No pledge pursuant to this <u>Section 13.05(c)</u> shall release the transferor Lender from any of its obligations hereunder or permit the pledgee to become a lender hereunder without otherwise complying with <u>Section 13.05(b)</u>.

**Section 13.06    Survival**.  The obligations of the Credit Parties under <u>Sections 5.01</u>, <u>5.05</u>, <u>5.06</u>, <u>13.03</u> and <u>13.19</u>, the obligations of each Guarantor under <u>Section 6.03</u>, and the obligations of the Lenders under <u>Sections 5.06</u> and <u>12.08</u>, in each case shall survive the repayment of the Loans and the other Obligations and the termination of the Commitments and, in the case of any Lender that may assign any interest in its Commitments or Loans (and any related Obligations) hereunder, shall (to the extent relating to such time as it was a Lender) survive the making of such assignment, notwithstanding that such assigning Lender may cease to be a "Lender" hereunder.  In addition, each representation and warranty made, or deemed to be made by a notice of any extension of credit, herein or pursuant hereto shall be considered to have been relied upon by the other parties hereto and shall survive the execution and delivery of this Agreement and the Notes and the making of any extension of credit hereunder, regardless of any investigation made by any such other party or on its behalf and notwithstanding that Administrative Agent or any Lender may have had notice or knowledge of any Default or incorrect representation or warranty.

**Section 13.07    Captions**.  The table of contents and captions and Section headings appearing herein are included solely for convenience of reference and are not intended to affect the interpretation of any provision of this Agreement.

**Section 13.08    Counterparts; Interpretation; Effectiveness**.  This Agreement may be executed in counterparts (and by different parties hereto on different counterparts), each of which shall constitute an original, but all of which when taken together shall constitute a single contract.  This Agreement and the other Credit Documents, constitute the entire contract among the parties thereto relating to the subject matter hereof and supersede any and all previous agreements and understandings, oral or written, relating to the subject matter hereof.  This Agreement shall become effective when the Closing Date shall have occurred, and this Agreement shall have been executed and delivered by the Credit Parties and when Administrative Agent shall have received counterparts hereof which, when taken together, bear the signatures of each of the other parties hereto, and thereafter shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns.  Delivery of an executed counterpart of a signature page of this Agreement by facsimile or electronic mail shall be effective as delivery of a manually executed counterpart of this Agreement.  The words "execute," "execution," "signed," "signature," and words of like import in or related to any document to be signed in connection with this Agreement and the transactions contemplated hereby shall be deemed to include electronic signatures, the electronic matching of assignment terms and contract formations on electronic platforms approved by Administrative Agent, or the keeping of records in electronic form, each of which shall be of the same legal effect, validity or enforceability as a manually executed signature or the use of a paper-based recordkeeping system, as the case may be, to the extent and as provided for in any applicable Law, including the Federal Electronic

Signatures in Global and National Commerce Act, the New York State Electronic Signatures and Records Act, or any other similar state Laws based on the Uniform Electronic Transactions Act; provided that notwithstanding anything contained herein to the contrary Administrative Agent is under no obligation to agree to accept electronic signatures in any form or in any format unless expressly agreed to by Administrative Agent pursuant to procedures approved by it.

**Section 13.09    Governing Law; Submission to Jurisdiction; Waivers; Etc.**

(a)    **GOVERNING LAW**.    THIS AGREEMENT AND THE OTHER CREDIT DOCUMENTS AND ANY CLAIMS, CONTROVERSIES, DISPUTES, OR CAUSES OF ACTION (WHETHER ARISING UNDER CONTRACT LAW, TORT LAW OR OTHERWISE) BASED UPON OR RELATING TO THIS AGREEMENT OR THE OTHER CREDIT DOCUMENTS (EXCEPT AS TO ANY OTHER CREDIT DOCUMENT, AS EXPRESSLY SET FORTH IN SUCH OTHER CREDIT DOCUMENT), SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAW OF THE STATE OF NEW YORK AND, TO THE EXTENT APPLICABLE, THE BANKRUPTCY CODE, WITHOUT GIVING EFFECT TO ANY CHOICE OF LAW PRINCIPLES THAT WOULD APPLY THE LAW OF ANOTHER JURISDICTION.

(b)    **SUBMISSION TO JURISDICTION**.    EACH CREDIT PARTY IRREVOCABLY AND UNCONDITIONALLY AGREES THAT IT WILL NOT COMMENCE ANY ACTION, LITIGATION OR PROCEEDING OF ANY KIND OR DESCRIPTION, WHETHER AT LAW OR IN EQUITY, WHETHER IN CONTRACT OR IN TORT OR OTHERWISE, AGAINST ADMINISTRATIVE AGENT, ANY LENDER, ANY OF THEIR RESPECTIVE AFFILIATES, OR ANY OF THE PARTNERS, DIRECTORS, OFFICERS, EMPLOYEES, AGENTS OR ADVISORS OF THE FOREGOING IN ANY WAY RELATING TO THIS AGREEMENT OR ANY OTHER CREDIT DOCUMENT OR THE TRANSACTIONS RELATED HERETO OR THERETO, IN ANY FORUM OTHER THAN THE BANKRUPTCY COURT WHILE THE BANKRUPTCY CASES ARE PENDING, AND, AFTER THE BANKRUPTCY CASES ARE NO LONGER PENDING, COURTS OF THE STATE OF NEW YORK SITTING IN NEW YORK COUNTY AND OF THE UNITED STATES DISTRICT COURT OF THE SOUTHERN DISTRICT OF NEW YORK AND ANY APPELLATE COURT FROM ANY THEREOF, AND EACH OF THE PARTIES HERETO IRREVOCABLY AND UNCONDITIONALLY SUBMITS TO THE JURISDICTION OF SUCH COURTS AND AGREES THAT ALL CLAIMS IN RESPECT OF ANY SUCH ACTION, LITIGATION OR PROCEEDING MAY BE HEARD AND DETERMINED IN SUCH NEW YORK STATE COURT OR BANKRUPTCY COURT OR, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, IN SUCH FEDERAL COURT. EACH OF THE PARTIES HERETO AGREES THAT A FINAL JUDGMENT IN ANY SUCH ACTION, LITIGATION OR PROCEEDING SHALL BE CONCLUSIVE AND MAY BE ENFORCED IN OTHER JURISDICTIONS BY SUIT ON THE JUDGMENT OR IN ANY OTHER MANNER PROVIDED BY LAW. NOTHING IN THIS AGREEMENT OR IN ANY OTHER CREDIT DOCUMENT SHALL AFFECT ANY RIGHT THAT ADMINISTRATIVE AGENT OR ANY LENDER MAY OTHERWISE HAVE TO BRING ANY ACTION OR PROCEEDING RELATING TO THIS AGREEMENT OR ANY OTHER CREDIT DOCUMENT AGAINST ANY CREDIT PARTY  OR ITS PROPERTIES IN THE COURTS OF ANY JURISDICTION.

(c)    **WAIVER OF VENUE**.    EACH PARTY HERETO HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY OBJECTION THAT IT MAY NOW OR HEREAFTER HAVE TO THE LAYING OF VENUE OF ANY ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OTHER CREDIT DOCUMENT IN ANY COURT REFERRED TO IN PARAGRAPH (b) OF THIS SECTION. EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY WAIVES, TO THE

FULLEST EXTENT PERMITTED BY APPLICABLE LAW, THE DEFENSE OF AN INCONVENIENT FORUM TO THE MAINTENANCE OF SUCH ACTION OR PROCEEDING IN ANY SUCH COURT.

(d)      **SERVICE OF PROCESS**. EACH PARTY HERETO IRREVOCABLY CONSENTS TO SERVICE OF PROCESS IN THE MANNER PROVIDED FOR NOTICES IN <u>SECTION 13.02</u>. NOTHING IN THIS AGREEMENT WILL AFFECT THE RIGHT OF ANY PARTY HERETO TO SERVE PROCESS IN ANY OTHER MANNER PERMITTED BY APPLICABLE LAW.

(e)      **WAIVER OF JURY TRIAL**. EACH PARTY HERETO HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OTHER CREDIT DOCUMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY). EACH PARTY HERETO (i) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PERSON HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PERSON WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (ii) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT AND THE OTHER CREDIT DOCUMENTS BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.

**Section 13.10   Confidentiality**. Each Agent and each Lender agrees to keep information obtained by it pursuant to the Credit Documents confidential in accordance with such Agent's or such Lender's customary practices and agrees that it will only use such information in connection with the transactions contemplated hereby and not disclose any of such information other than (a) to such Agent's or such Lender's Affiliates and its and its Affiliates' respective employees, representatives, directors, attorneys, auditors, agents, professional advisors or trustees who are advised of the confidential nature thereof and instructed to keep such information confidential or to any direct or indirect creditor or contractual counterparty in swap agreements or such creditor's or contractual counterparty's professional advisor (so long as such creditor, contractual counterparty or professional advisor to such contractual counterparty agrees in writing to be bound by the provision of this <u>Section 13.10</u>) (it being understood that the disclosing Agent or Lender shall be responsible for such Person's compliance with this paragraph), (b) to the extent such information presently is or hereafter becomes available to such Agent or such Lender on a non-confidential basis from a Person not an Affiliate of such Agent or such Lender not known to such Agent or such Lender to be violating a confidentiality obligation by such disclosure, (c) to the extent disclosure is required by any Law, subpoena or judicial order or process (<u>provided</u> that notice of such requirement or order shall be promptly furnished to Borrower unless such notice is legally prohibited) or requested or required by bank, securities, insurance or investment company regulations or auditors or any administrative body or commission or self-regulatory organization (including the Securities Valuation Office of the NAIC) to whose jurisdiction such Agent or such Lender is subject, (d) to any rating agency to the extent required in connection with any rating to be assigned to such Agent or such Lender; <u>provided</u> that prior notice thereof is furnished to Borrower, (e) to pledgees under <u>Section 13.05(c)</u>, assignees, participants, prospective assignees or prospective participants, in each case who agree in writing to be bound by the provisions of this <u>Section 13.10</u> or by provisions at least as restrictive as the provisions of this <u>Section 13.10</u> (it being understood that any electronically recorded agreement from any Person listed above in this <u>clause (e)</u> in respect to any electronic information (whether posted or otherwise distributed on SyndTrak or any other electronic distribution system) shall satisfy the requirements of this <u>clause (e)</u>), (f) in connection with the exercise of remedies hereunder or under any Credit Document or to the extent required in connection with any litigation with respect to the Loans or any Credit Document or (g) with Borrower's prior written consent.

**Section 13.11   Independence of Representations, Warranties and Covenants**.   The representations, warranties and covenants contained herein shall be independent of each other and no exception to any representation, warranty or covenant shall be deemed to be an exception to any other representation, warranty or covenant contained herein unless expressly provided, nor shall any such exception be deemed to permit any action or omission that would be in contravention of applicable law.

**Section 13.12   Severability**.   Wherever possible, each provision of this Agreement shall be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this Agreement shall be prohibited by or invalid under applicable law, such provision shall be ineffective only to the extent of such prohibition or invalidity, without invalidating the remainder of such provisions or the remaining provisions of this Agreement.

**Section 13.13   Gaming Laws**.

(a)   Notwithstanding anything to the contrary in this Agreement or any other Credit Document, this Agreement and the other Credit Documents are subject to the Gaming Laws and the laws involving the sale, distribution and possession of alcoholic beverages and/or tobacco, as applicable (the "**Liquor Laws**"). Without limiting the foregoing, Administrative Agent, each other Agent, each Lender and each participant acknowledges that (i) it is the subject of being called forward by any Gaming Authority or any Governmental Authority enforcing the Liquor Laws (the "**Liquor Authority**"), in each of their discretion, for licensing or a finding of suitability or to file or provide other information, and (ii) all rights, remedies and powers under this Agreement and the other Credit Documents, including with respect to the entry into and ownership and operation of the Gaming Facilities, and the possession or control of gaming equipment, alcoholic beverages or a gaming or liquor license, may be exercised only to the extent that the exercise thereof does not violate any applicable provisions of the Gaming Laws and Liquor Laws and only to the extent that required approvals (including prior approvals) are obtained from the requisite Governmental Authorities.

(b)   Notwithstanding anything to the contrary in this Agreement or any other Credit Document, Administrative Agent, each other Agent, each Lender and each participant agrees to cooperate with each Gaming Authority and each Liquor Authority (and, in each case, to be subject to Section 2.11) in connection with the administration of their regulatory jurisdiction over Borrower and the other Credit Parties, including, without limitation, the provision of such documents or other information as may be requested by any such Gaming Authorities and/or Liquor Authorities relating to Administrative Agent, any other Agent, any of the Lenders or participants, Borrower and its Affiliates or to the Credit Documents.

(c)   Notwithstanding anything to the contrary in this Agreement or any other Credit Document, to the extent any provision of this Agreement or any other Credit Document excludes any assets from the scope of the Pledged Collateral, or from any requirement to take any action to make effective or perfect any security interest in favor of Collateral Agent or any other Secured Party in the Pledged Collateral, the representations, warranties and covenants made by the Credit Parties, or any Subsidiary in this Agreement or any other Credit Document with respect to the creation, perfection or priority (as applicable) of the security interest granted in favor of Collateral Agent or any other Secured Party (including, without limitation, Article VIII of this Agreement) shall be deemed not to apply to such assets.

**Section 13.14   USA Patriot Act**.   Each Lender that is subject to the Patriot Act (as hereinafter defined) to the extent required hereby, notifies Borrower and the Guarantors that pursuant to the requirements of the USA Patriot Act (Title III of Pub. L. 107-56 (signed into law October 26, 2001)) (the "**Patriot Act**") and the Beneficial Ownership Regulation, it is required to obtain, verify and record information that identifies Borrower and the Guarantors, which information includes the name and address of Borrower and the Guarantors and other information that will allow such Lender to identify Borrower and

the Guarantors in accordance with the Patriot Act and the Beneficial Ownership Regulation, and Borrower and the Guarantors agree to provide such information from time to time to any Lender.

    **Section 13.15  [Reserved]**.

    **Section 13.16  No Advisory or Fiduciary Responsibility**.  In connection with all aspects of each transaction contemplated hereby (including in connection with any amendment, waiver or other modification hereof or of any other Credit Document), Borrower and each other Credit Party  acknowledges and agrees, and acknowledges its Affiliates' understanding, that: (i) (A) the arranging and other services regarding this Agreement provided by Administrative Agent, Collateral Agent and the Lenders are arm's-length commercial transactions between Borrower, each other Credit Party, and their respective Affiliates, on the one hand, and Administrative Agent, Collateral Agent and the Lenders, on the other hand, (B) each of Borrower and the other Credit Parties has consulted its own legal, accounting, regulatory and tax advisors to the extent it has deemed appropriate, and (C) Borrower and each other Credit Party  is capable of evaluating, and understands and accepts, the terms, risks and conditions of the transactions contemplated hereby and by the other Credit Documents; (ii) (A) Administrative Agent, Collateral Agent and each Lender is and has been acting solely as a principal and, except as expressly agreed in writing by the relevant parties, has not been, is not, and will not be acting as an advisor, agent or fiduciary for Borrower, any other Credit Party or any of their respective Affiliates, or any other Person (except as expressly set forth in any commitment letters or engagement letters between Administrative Agent, Collateral Agent or such Lender and Borrower or such Credit Party or Affiliate thereof) and (B) neither Administrative Agent, Collateral Agent nor any Lender has any obligation to Borrower, any other Credit Party or any of their respective Affiliates with respect to the transactions contemplated hereby except those obligations expressly set forth herein and in the other Credit Documents or in other written agreements between Administrative Agent, Collateral Agent or any Lender on one hand and Borrower, any other Credit Party or any of their respective Affiliates on the other hand; and (iii) Administrative Agent, Collateral Agent and the Lenders and their respective Affiliates may be engaged in a broad range of transactions that involve interests that differ from, or conflict with, those of Borrower, the other Credit Parties and their respective Affiliates, and neither Administrative Agent, Collateral Agent nor any Lender has any obligation to disclose any of such interests to Borrower, any other Credit Party or any of their respective Affiliates.  Each Credit Party agrees that nothing in the Credit Documents will be deemed to create an advisory, fiduciary or agency relationship or fiduciary or other implied duty between Administrative Agent, Collateral Agent and the Lenders, on the one hand, and such Credit Party, its stockholders or its Affiliates, on the other.  To the fullest extent permitted by law, each of Borrower and each other Credit Party  hereby waives and releases any claims that it may have against Administrative Agent, Collateral Agent or any Lender with respect to any breach or alleged breach of agency or fiduciary duty in connection with any aspect of any transaction contemplated hereby (other than any agency or fiduciary duty expressly set forth in any commitment letter or engagement letter referenced in clause (ii)(A)).

    **Section 13.17  Lender Action**.  Each Lender agrees that it shall not take or institute any actions or proceedings, judicial or otherwise, for any right or remedy against any Credit Party or any other obligor under any of the Credit Documents (including the exercise of any right of setoff, rights on account of any banker's lien or similar claim or other rights of self-help), or institute any actions or proceedings, or otherwise commence any remedial procedures, with respect to any Collateral or any other property of any such Credit Party, without the prior written consent of Administrative Agent.  The provisions of this Section 13.17 are for the sole benefit of the Agents and Lenders and shall not afford any right to, or constitute a defense available to, any Credit Party.

    **Section 13.18  Interest Rate Limitation**.  Notwithstanding anything to the contrary contained in any Credit Document, the interest paid or agreed to be paid under the Credit Documents (collectively, the "**Charges**") shall not exceed the maximum rate of non-usurious interest permitted by applicable Law which

a court of competent jurisdiction shall, in a final determination, deem applicable hereto (the "**Maximum Rate**"). If any Agent or any Lender shall receive interest in an amount that exceeds the Maximum Rate, the excess interest shall be applied to the principal of the Loans or, if it exceeds such unpaid principal, refunded to Borrower. In determining whether the interest contracted for, charged, or received by an Agent or a Lender exceeds the Maximum Rate, such Person may, to the extent permitted by applicable Law, (a) characterize any payment that is not principal as an expense, fee, or premium rather than interest, (b) exclude voluntary prepayments and the effects thereof, and (c) amortize, prorate, allocate, and spread in equal or unequal parts the total amount of interest throughout the contemplated term of the Obligations hereunder. To the extent permitted by applicable Law, the interest and other Charges that would have been payable in respect of such Loan but were not payable as a result of the operation of this <u>Section 13.18</u> shall be cumulated and the interest and Charges payable to such Lender in respect of other Loans or periods shall be increased (but not above the Maximum Rate therefor) until such cumulated amount, together with interest thereon at the Federal Funds Effective Rate to the date of repayment, shall have been received by such Lender. Thereafter, interest hereunder shall be paid at the rate(s) of interest and in the manner provided in this Agreement, unless and until the rate of interest again exceeds the Maximum Rate, and at that time this <u>Section 13.18</u> shall again apply. In no event shall the total interest received by any Lender pursuant to the terms hereof exceed the amount that such Lender could lawfully have received had the interest due hereunder been calculated for the full term hereof at the Maximum Rate. If the Maximum Rate is calculated pursuant to this <u>Section 13.18</u>, such interest shall be calculated at a daily rate equal to the Maximum Rate divided by the number of days in the year in which such calculation is made. If, notwithstanding the provisions of this <u>Section 13.18</u>, a court of competent jurisdiction shall finally determine that a Lender has received interest hereunder in excess of the Maximum Rate, Administrative Agent shall, to the extent permitted by applicable Law, promptly apply such excess in the order specified in this Agreement and thereafter shall refund any excess to Borrower or as a court of competent jurisdiction may otherwise order.

**Section 13.19   <u>Payments Set Aside</u>**. To the extent that any payment by or on behalf of Borrower is made to any Agent or any Lender, or any Agent or any Lender exercises its right of setoff, and such payment or the proceeds of such setoff or any part thereof is subsequently invalidated, declared to be fraudulent or preferential, set aside or required (including pursuant to any settlement entered into by such Agent, such Lender in its discretion) to be repaid to a trustee, receiver or any other party, in connection with any proceeding under any Debtor Relief Law or otherwise, then (a) to the extent of such recovery, the obligation or part thereof originally intended to be satisfied shall be revived and continued in full force and effect as if such payment had not been made or such setoff had not occurred and the Agents' and the Lenders' Liens, security interests, rights, powers and remedies under this Agreement and each Credit Document shall continue in full force and effect, and (b) each Lender severally agrees to pay to Administrative Agent upon demand its applicable share of any amount so recovered from or repaid by any Agent, *plus* interest thereon from the date of such demand to the date such payment is made at a rate per annum equal to the Federal Funds Effective Rate from time to time in effect. In such event, each Credit Document shall be automatically reinstated (to the extent that any Credit Document was terminated) and Borrower shall take (and shall cause each other Credit Party to take) such action as may be requested by Administrative Agent and the Lenders to effect such reinstatement.

**Section 13.20   <u>Acknowledgement and Consent to Bail-In of Affected Financial Institutions</u>**. Notwithstanding anything to the contrary in any Credit Document or in any other agreement, arrangement or understanding among any such parties, each party hereto acknowledges that any liability of any Affected Financial Institution arising under any Credit Document may be subject to the Write-Down and Conversion Powers of an applicable Resolution Authority and agrees and consents to, and acknowledges and agrees to be bound by:

(a)      the application of any Write-Down and Conversion Powers by an applicable Resolution Authority to any such liabilities arising hereunder which may be payable to it by any party hereto that is an Affected Financial Institution; and

(b)      the effects of any Bail-In Action on any such liability, including, if applicable (i) a reduction in full or in part or cancellation of any such liability, (ii) a conversion of all, or a portion of, such liability into shares or other instruments of ownership in such Affected Financial Institution, its parent entity, or a bridge institution that may be issued to it or otherwise conferred on it, and that such shares or other instruments of ownership will be accepted by it in lieu of any rights with respect to any such liability under this Agreement or any other Credit Document or (iii) the variation of the terms of such liability in connection with the exercise of the Write-Down and Conversion powers of any applicable Resolution Authority.

**Section 13.21    [Reserved]**.

[Signature Pages Follow]

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed by their respective authorized officers as of the day and year first above written.

BORROWER:


RUNITONETIME LLC


By:
Name:
Title:


GUARANTORS:

RUNITONETIME HOLDCO, INC.


By:
Name:
Title:

[ADDITIONAL GUARANTORS TO BE ADDED]


By:
Name:
Title:

ALTER DOMUS (US) LLC,
as Administrative Agent and Collateral Agent


By:
Name:
Title:

BARCLAYS BANK PLC,
as Fronting Lender


By:
Name:
Title:

## EXHIBIT 2

### Priority of Liens and Claims

| | **Priority of Liens and Claims on**<br>**Prepetition Collateral and DIP Collateral (other than Unencumbered Assets)** |
|---|---|
| 1) | • Carve-Out |
| 2) | • Permitted Prior Liens |
| 3) | • DIP Liens (including the DIP Liens securing the DIP Rolled-Up Loans) |
| 4) | • Adequate Protection Liens granted to the Prepetition Agent for the benefit of the Prepetition Secured Parties |
| 5) | • Prepetition Liens |

| | **Priority of Liens and Claims on Unencumbered Assets of the Debtors** |
|---|---|
| 1) | • Carve-Out |
| 2) | • DIP Liens (including the DIP Liens securing the DIP Rolled-Up Loans) |
| 3) | • Adequate Protection Liens granted to the Prepetition Agent for the benefit of the Prepetition Secured Parties |

# **EXHIBIT 3**

**Approved Budget**

**Maverick Gaming**
*13-Week Cash Flow*

| Week Ending | 8/17/25 | 8/24/25 | 8/31/25 | 9/7/25 | 9/14/25 | 9/21/25 | 9/28/25 | 10/5/25 | 10/12/25 | 10/19/25 | 10/26/25 | 11/2/25 | 11/9/25 | 13-Week Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Total Receipts** | 5,158,966 | 5,014,490 | 5,208,247 | 5,660,603 | 5,381,694 | 5,482,461 | 5,395,547 | 5,458,543 | 5,309,281 | 5,309,281 | 4,841,737 | 5,027,220 | 4,977,539 | 68,225,607 |
| *Methodology Disbursements* | | | | | | | | | | | | | | |
| Site-Level Payroll & Benefits | 3,449,957 | 1,548,436 | 3,449,957 | 1,548,436 | 3,449,957 | 1,548,436 | 3,449,957 | 1,548,436 | 3,449,957 | 1,548,436 | 3,744,112 | 1,548,436 | 2,861,646 | 33,146,158 |
| Maverick Corporate Payroll & Benefits | - | 291,027 | - | 291,027 | - | 291,027 | - | 291,027 | - | 291,027 | 27,381 | 263,646 | - | 1,746,164 |
| Washington Corporate Payroll & Benefits | 112,014 | | 112,014 | | 112,014 | | 112,014 | | 112,014 | | 121,286 | | 93,471 | 774,829 |
| Rent | 852,202 | | 864,269 | 2,596,233 | | | | 2,596,233 | | | | | 953,563 | 7,862,500 |
| Insurance | | | | | | | | 5,179,468 | | | | | | 5,179,468 |
| Information Technology | 23,129 | 23,129 | 23,129 | 23,129 | 23,129 | 23,129 | 23,129 | 23,129 | 23,129 | 23,129 | 22,164 | 22,164 | 22,164 | 297,780 |
| Utilities | 390,758 | 122,694 | 122,694 | 122,694 | 122,694 | 122,694 | 122,694 | 122,694 | 113,033 | 113,033 | 113,033 | 113,033 | 113,033 | 1,834,108 |
| Other | 37,000 | 37,000 | 37,000 | 37,000 | 37,000 | 37,000 | 37,000 | 37,000 | 37,000 | 37,000 | 31,000 | 31,000 | 31,000 | 463,000 |
| **Total Methodology Disbursements** | 4,865,061 | 2,022,286 | 4,609,064 | 4,618,519 | 3,744,795 | 2,022,286 | 3,744,795 | 9,797,986 | 3,744,795 | 2,022,286 | 4,058,976 | 1,978,279 | 4,074,878 | 51,304,006 |
| *Non-Methodology Disbursements* | | | | | | | | | | | | | | |
| Gaming Participation & Equipment Fees | 551,932 | 251,448 | 251,448 | 251,448 | 167,632 | 167,632 | 167,632 | 167,632 | 167,632 | 167,632 | 154,119 | 154,119 | 154,119 | 2,774,421 |
| Food & Beverage | 645,771 | 359,036 | 359,036 | 359,036 | 239,357 | 239,357 | 239,357 | 239,357 | 239,357 | 239,357 | 214,027 | 214,027 | 214,027 | 3,801,104 |
| Repairs & Maintenance | 55,801 | 55,801 | 55,801 | 55,801 | 37,201 | 37,201 | 37,201 | 37,201 | 37,201 | 37,201 | 33,239 | 33,239 | 33,239 | 546,127 |
| Professional Services | 4,098 | 4,098 | 4,098 | 4,098 | 4,098 | 4,098 | 4,098 | 4,098 | 4,098 | 4,098 | 1,603 | 1,603 | 1,603 | 45,790 |
| Tax | 4,339,827 | | | | 1,275,000 | | | | 555,000 | 1,874,017 | | | 3,030,857 | 11,074,702 |
| Supplies | 40,590 | 40,590 | 40,590 | 40,590 | 27,060 | 27,060 | 27,060 | 27,060 | 27,060 | 27,060 | 25,403 | 25,403 | 25,403 | 400,928 |
| Advertising & Marketing | 117,555 | 56,444 | 56,444 | 56,444 | 37,630 | 37,630 | 37,630 | 37,630 | 37,630 | 37,630 | 35,372 | 35,372 | 35,372 | 618,783 |
| General Corporate | 20,263 | 20,263 | 20,263 | 20,263 | 20,263 | 20,263 | 20,263 | 20,263 | 20,263 | 20,263 | 49,232 | 19,232 | 19,232 | 290,331 |
| Maverick Corporate Allocation | 207,004 | 207,004 | 557,004 | 207,004 | 204,105 | 204,105 | 204,105 | 204,105 | 204,105 | 204,105 | 184,902 | 184,902 | 184,902 | 2,957,353 |
| Washington Corporate Allocation | 12,285 | 12,285 | 12,285 | 34,139 | 11,086 | 11,086 | 11,086 | 11,086 | 32,941 | 11,086 | 9,251 | 9,251 | 27,488 | 205,353 |
| Egads Material Costs | 498,285 | 87,038 | 271,708 | 705,791 | 115,263 | 95,689 | 233,734 | 86,068 | 113,483 | 113,483 | 113,483 | 113,483 | 135,000 | 2,682,507 |
| Egads Other | 20,000 | 20,000 | 20,000 | 20,000 | 20,000 | 20,000 | 20,000 | 20,000 | 20,000 | 20,000 | 20,000 | 20,000 | 20,000 | 260,000 |
| Cost-Out Initiatives | | | | | | | | (25,000) | (25,000) | (25,000) | (25,000) | (44,444) | (44,444) | (188,889) |
| **Total Non-Methodology Disbursements** | 6,513,412 | 1,114,007 | 1,648,677 | 1,754,615 | 2,158,694 | 864,120 | 1,002,166 | 851,354 | 1,411,914 | 2,730,931 | 815,632 | 3,797,045 | 805,941 | 25,468,509 |
| **Operating Cash Flow** | (6,219,507) | 1,878,197 | (1,049,494) | (712,531) | (521,795) | 2,596,054 | 648,587 | (5,190,791) | 152,572 | 566,063 | (32,872) | (748,104) | 96,719 | (8,546,908) |
| **Cumulative Operating Cash Flow** | (6,219,507) | (4,341,310) | (5,390,804) | (6,103,335) | (6,625,130) | (4,029,075) | (3,380,489) | (8,571,286) | (8,418,714) | (7,862,651) | (7,895,523) | (8,643,627) | (8,546,908) | (8,546,908) |
| *Critical Vendors & 503(b)(9)* | | | | | | | | | | | | | | |
| Critical Vendors | 1,633,080 | 1,170,577 | 1,170,577 | 1,170,577 | - | - | - | - | - | - | - | - | - | 5,144,811 |
| 503(b)(9) | 525,000 | 225,000 | 225,000 | 225,000 | | | | | | | | | | 1,200,000 |
| **Total Critical Vendors & 503(b)(9)** | 2,158,080 | 1,395,577 | 1,395,577 | 1,395,577 | - | - | - | - | - | - | - | - | - | 6,344,811 |
| *Non-Operating* | | | | | | | | | | | | | | |
| Past Due Gaming Tax | 2,107,000 | - | 675,000 | - | 305,000 | - | 675,000 | | | | | | | 3,762,000 |
| Past Due W2G Tax | | | 2,748,176 | | | | | | | | | | | 2,748,176 |
| DIP Loan and 1L Rollup Interest | | | 336,953 | | | | | 1,006,189 | | | | 1,009,974 | | 2,353,116 |
| Capital Expenditures | 80,000 | 80,000 | 80,000 | 80,000 | 80,000 | 80,000 | 80,000 | 80,000 | 80,000 | 80,000 | 80,000 | 80,000 | 80,000 | 1,040,000 |
| **Total Non-Operating Disbursements** | 2,187,000 | 80,000 | 3,840,129 | 80,000 | 385,000 | 80,000 | 755,000 | 1,086,189 | 80,000 | 80,000 | 80,000 | 1,089,974 | 80,000 | 9,903,292 |
| *Restructuring Disbursements* | | | | | | | | | | | | | | |
| Debtor Advisors | 655,000 | 630,000 | 800,000 | 1,531,626 | 526,176 | 681,176 | 488,676 | 1,079,926 | 354,926 | 509,926 | 354,926 | 274,176 | 919,176 | 8,805,714 |
| Lender Advisors | | | 914,500 | | 1,125,000 | | | | 847,500 | | | | | 2,887,000 |
| Court-Related | 280,000 | 280,000 | 450,000 | 287,500 | 287,500 | 287,500 | 287,500 | 215,000 | 215,000 | 480,000 | 215,000 | 215,000 | 141,250 | 3,641,250 |
| Wind Down – Regulatory | | | | | | | | | | | 52,492 | | | 52,492 |
| Wind Down – Closure Team | | | | | | | | | | | | 8,409 | 8,409 | 16,819 |
| Other | | | | | | | | | | | | | | |
| **Total Restructuring Disbursements** | 935,000 | 910,000 | 2,164,500 | 1,819,126 | 1,938,676 | 968,676 | 776,176 | 1,294,926 | 1,417,426 | 989,926 | 622,418 | 497,586 | 1,068,835 | 15,403,274 |
| **Total Disbursements** | 16,658,552 | 5,521,870 | 13,657,947 | 9,667,837 | 8,227,166 | 3,935,083 | 6,278,137 | 13,030,456 | 6,654,136 | 5,823,144 | 5,577,027 | 7,362,884 | 6,029,656 | 108,423,893 |
| *Liquidity* | | | | | | | | | | | | | | |
| Beginning "Usable" Book Cash Balance | 5,259,070 | 4,259,483 | 3,752,103 | 22,812,403 | 18,805,169 | 15,959,697 | 17,507,075 | 16,624,485 | 9,052,572 | 7,707,717 | 7,193,854 | 6,458,564 | 4,122,900 | 5,259,070 |
| Net Cash Flow | (11,499,586) | (507,380) | (8,449,700) | (4,007,234) | (2,845,472) | 1,547,378 | (882,590) | (7,571,913) | (1,344,855) | (513,863) | (735,290) | (2,335,664) | (1,052,117) | (40,198,286) |
| DIP Funding | 10,500,000 | | 27,510,000 | | | | | | | | | | | 38,010,000 |
| Ending "Usable" Book Cash Balance | 4,259,483 | 3,752,103 | 22,812,403 | 18,805,169 | 15,959,697 | 17,507,075 | 16,624,485 | 9,052,572 | 7,707,717 | 7,193,854 | 6,458,564 | 4,122,900 | 3,070,784 | 3,070,784 |
| *Debt Rollforward* | | | | | | | | | | | | | | |
| Beginning DIP Balance | 9,350,000 | 20,900,000 | 20,900,000 | 51,161,000 | 51,161,000 | 51,161,000 | 51,161,000 | 51,161,000 | 51,161,000 | 51,161,000 | 51,161,000 | 51,161,000 | 51,161,000 | 9,350,000 |
| DIP Funding | 10,500,000 | | 27,510,000 | | | | | | | | | | | 38,010,000 |
| PIK Upfront Fees (10%) | 1,050,000 | | 2,751,000 | | | | | | | | | | | 3,801,000 |
| Ending DIP Balance | 20,900,000 | 20,900,000 | 51,161,000 | 51,161,000 | 51,161,000 | 51,161,000 | 51,161,000 | 51,161,000 | 51,161,000 | 51,161,000 | 51,161,000 | 51,161,000 | 51,161,000 | 51,161,000 |
| DIP Cash Interest (SOFR + 12.5%) | - | - | 213,010 | - | - | - | - | 720,517 | - | - | - | 720,517 | - | 1,654,045 |
| Beginning 1L Balance | 17,042,808 | 38,042,808 | 38,042,808 | 63,482,591 | 63,482,591 | 63,482,591 | 63,482,591 | 63,482,591 | 64,323,736 | 64,323,736 | 64,323,736 | 64,323,736 | 65,176,025 | 17,042,808 |
| 1L Roll-up | 21,000,000 | | 25,074,841 | | | | | | | | | | | 46,074,841 |
| 1L PIK Interest (SOFR + 11.5%) | | | 364,942 | | | | | 841,144 | | | | 852,289 | | 2,058,376 |
| Ending 1L Balance | 38,042,808 | 38,042,808 | 63,482,591 | 63,482,591 | 63,482,591 | 63,482,591 | 63,482,591 | 64,323,736 | 64,323,736 | 64,323,736 | 64,323,736 | 65,176,025 | 65,176,025 | 65,176,025 |
| 1L Roll-up Interest (SOFR + 1.0%) | - | - | 123,943 | - | - | - | - | 285,672 | - | - | - | 289,457 | - | 699,071 |

**EXHIBIT 4**

**Milestones**

As may be extended by the Final Backstop Parties[1] in their sole discretion, each of the Debtors agrees to comply with the following Milestones:

(a)  by two (2) calendar days before the hearing to consider approval of the Final DIP Order, the Debtors shall have proposed, and the Final Backstop Parties shall have agreed to such proposal in their sole discretion, (x) an Acceptable Final Budget, (y) an Acceptable Restructuring, and (z) the Acceptable Incremental Amount and the corresponding principal amount of Incremental Roll-Up DIP Loans;

(b)  within forty-four (44) calendar days after the Petition Date, obtain entry by the Bankruptcy Court of the Final DIP Order, which will contain additional milestones agreed between the Debtors and the Final Backstop Parties necessary to pursue an Acceptable Restructuring;

(c)  have requested a hearing on the bid procedures motion (the "***Sale Procedures Motion***") to occur within thirty (30) days after the Petition Date;

(d)  obtain entry by the Bankruptcy Court of an order (in form and substance acceptable to the Final Backstop Parties) with respect to the Sale Procedures Motion no later than forty-four (44) calendar days after the Petition Date (the "***Sale Procedures Order***"), which Sale Procedures Order shall (w) approve the relief requested in the Sale Motion, (x) set a bid deadline of no later than sixty-five (65) calendar days after the Petition Date, (y) require an auction (if applicable) to occur no later than seventy (70) calendar days after the Petition Date, and (z) set a hearing date on the DIP Loan Parties' sale motion no later than seventy-five (75) calendar days after the Petition Date;

(e)  within eighty (80) calendar days after the Petition Date, satisfy all conditions precedent necessary to consummate a sale of all or substantially all of the Debtors' assets, other than approvals by the Washington, Nevada, and Colorado gaming regulators, unless the Final Backstop Parties agree to a different disposition of MainCo (as defined in the TSA);

(f)  have filed a motion to assume the AG Master Lease by 11:59 p.m. New York City time on July 25, 2025, and not withdrawn such motion;

(g)  no later than August 27, 2025, obtain entry from the Bankruptcy Court of an order authorizing the assumption of the AG Master Lease (the "***Assumption Order***");

(h)  within one Business Day of the entry of the Assumption Order, the Credit Parties shall have cured the AG Master Lease; and

(i)  the Credit Parties shall be in compliance with the AG Master Lease at all times.

---

[1]  Capitalized terms used but not defined in this <u>Exhibit 4</u> have the meanings provided in the DIP Credit Agreement.