## Exhibit 1

**Stalking Horse Agreement**

*Execution Version*

**ASSET PURCHASE AGREEMENT**

**BY AND AMONG**

**RUNITONETIME LLC,**

**MAVERICK GAMING LLC,**

**AND**

**THE OTHER PARTIES HERETO**

**DATED AS OF SEPTEMBER 4, 2025**

# TABLE OF CONTENTS

**Page**

ARTICLE I. DEFINITIONS; CERTAIN RULES OF CONSTRUCTION .................................................. 1

    1.1    Defined Terms ................................................................................................... 1
    1.2    Certain Matters of Construction.......................................................................... 1

ARTICLE II. PURCHASE AND SALE; BANKRUPTCY TRANSACTIONS ................................. 2

    2.1    Purchase and Sale; Acquired Assets .................................................................. 2
    2.2    Excluded Assets ................................................................................................. 3
    2.3    Assumption of Liabilities................................................................................... 3
    2.4    Excluded Liabilities ........................................................................................... 3
    2.5    Assumption/Rejection of Contracts; Assignment of Contracts ......................... 3
    2.6    Real Property Leases ......................................................................................... 5
    2.7    Assumption of Liabilities under Assigned Contracts ........................................ 5
    2.8    Approval by Bankruptcy Court........................................................................... 5
    2.9    "As Is" Transaction ........................................................................................... 6

ARTICLE III. PURCHASE CONSIDERATION; CLOSING ....................................................... 7

    3.1    Consideration; Closing Date Payment to Sellers ............................................... 7
    3.2    Deposit .............................................................................................................. 8
    3.3    Cash Count......................................................................................................... 8
    3.4    Net Working Capital Adjustment. ...................................................................... 9
    3.5    Prorations......................................................................................................... 11
    3.6    Closing ............................................................................................................ 11
    3.7    Items to be Delivered by Sellers at Closing..................................................... 11
    3.8    Items to be Delivered by Buyer at Closing ...................................................... 12
    3.9    Contingent Cash Payment ................................................................................ 12
    3.10   Express Indemnities ......................................................................................... 12

ARTICLE IV. REPRESENTATIONS AND WARRANTIES OF SELLERS........................................ 13

    4.1    Organization..................................................................................................... 13
    4.2    Power and Authority; Authorization................................................................. 13
    4.3    Enforceability................................................................................................... 13
    4.4    No Consents or Approvals ............................................................................... 13
    4.5    Reserved........................................................................................................... 13
    4.6    Reserved........................................................................................................... 13
    4.7    Absence of Certain Developments.................................................................... 13
    4.8    Title; Sufficiency of Assets; Condition of Acquired Assets ............................ 13
    4.9    Intellectual Property ......................................................................................... 14
    4.10   Real Property ................................................................................................... 14
    4.11   Reserved........................................................................................................... 14
    4.12   Tax Matters ...................................................................................................... 15
    4.13   Compliance with Laws .................................................................................... 16
    4.14   Permits ............................................................................................................. 16
    4.15   Reserved........................................................................................................... 16

4.16     Employees..................................................................................................... 16
4.17     Employee Benefits.......................................................................................... 17
4.18     Finder's or Broker's Fees................................................................................ 19
4.19     Reserved......................................................................................................... 19
4.20     Reserved......................................................................................................... 19
4.21     Insurance........................................................................................................ 19
4.22     Reserved......................................................................................................... 19
4.23     Target Cage Cash........................................................................................... 19
4.24     No Other Representations or Warranties........................................................ 19

ARTICLE V. REPRESENTATIONS AND WARRANTIES OF BUYER ............................................ 19

5.1      Organization................................................................................................... 20
5.2      Power and Authority; Authorization............................................................... 20
5.3      Enforceability................................................................................................. 20
5.4      No Consents or Approvals.............................................................................. 20
5.5      Non-Contravention......................................................................................... 20
5.6      Gaming Approvals.......................................................................................... 20
5.7      Finder's or Broker's Fees................................................................................ 21
5.8      Litigation........................................................................................................ 21
5.9      Financing........................................................................................................ 21
5.10     Solvency......................................................................................................... 21
5.11     No Other Representations or Warranties........................................................ 21

ARTICLE VI. COVENANTS OF THE PARTIES ................................................................................ 21

6.1      Buyer's Access to Premises and Information.................................................. 21
6.2      Conduct of Business Prior to the Closing....................................................... 21
6.3      Contact with Company Related Persons......................................................... 23
6.4      Closing Conditions; Reasonable Efforts........................................................ 23
6.5      Required Licenses........................................................................................... 24
6.6      Antitrust Matters............................................................................................ 24
6.7      Notice of Breach............................................................................................. 25
6.8      Bankruptcy Matters........................................................................................ 25
6.9      Receipt of Misdirected Assets; Liabilities...................................................... 25
6.10     Duplication of Records................................................................................... 26
6.11     Backup Bidder................................................................................................ 26
6.12     Disclosure Schedules...................................................................................... 26
6.13     General Seller Assistance............................................................................... 26
6.14     No Control...................................................................................................... 26
6.15     Employees & Benefit Plans............................................................................ 27

ARTICLE VII. CONDITIONS PRECEDENT TO BUYER'S PERFORMANCE .................................. 28

7.1      Buyer's Closing Conditions............................................................................ 28
7.2      Waiver of Conditions...................................................................................... 29
7.3      Support Agreement Conditions....................................................................... 29

ARTICLE VIII. CONDITIONS PRECEDENT TO SELLERS' PERFORMANCE ............................... 29

8.1      Sellers' Conditions.......................................................................................... 29

8.2      Waiver of Conditions ....................................................................................... 30

ARTICLE IX. TAXES ...................................................................................................... 30

9.1      Transfer Taxes ................................................................................................. 30
9.2      Allocation of Purchase Price ........................................................................... 31
9.3      Withholding ..................................................................................................... 31
9.4      Straddle Period ................................................................................................ 31
9.5      Cooperation ...................................................................................................... 32
9.6      *Pierce* ............................................................................................................. 32
9.7      Washington State Gaming Taxes ..................................................................... 32
9.8      IRS Form W-9 .................................................................................................. 32
9.9      Net Working Capital ........................................................................................ 32
9.10     [Reserved] ....................................................................................................... 32
9.11     Bulk Sales ........................................................................................................ 32

ARTICLE X. TERMINATION .......................................................................................... 32

10.1     Termination of Agreement ............................................................................... 32
10.2     Effect of Termination ....................................................................................... 34
10.3     Alternative Proposals ...................................................................................... 34

ARTICLE XI. SURVIVAL; POST-CLOSING MATTERS ............................................. 34

11.1     Survival; Certain Waivers ............................................................................... 34
11.2     Post-Closing Access. ....................................................................................... 35
11.3     Post-Closing Transition ................................................................................... 35

ARTICLE XII. MISCELLANEOUS ................................................................................. 35

12.1     Notices ............................................................................................................. 35
12.2     Entire Agreement; Modification; Waiver ......................................................... 36
12.3     Parties in Interest ............................................................................................ 36
12.4     Binding Effect; Assignment ............................................................................. 37
12.5     Signatures ........................................................................................................ 37
12.6     Governing Law; Jurisdiction ........................................................................... 37
12.7     Severability ...................................................................................................... 38
12.8     Expenses .......................................................................................................... 38
12.9     Disclosure; Confidentiality ............................................................................. 38
12.10    Further Assurances .......................................................................................... 39
12.11    Limitation of Liability ..................................................................................... 39
12.12    Waiver of Jury Trial ......................................................................................... 39
12.13    Specific Performance ....................................................................................... 39
12.14    Non-Recourse .................................................................................................. 40
12.15    Right of Set-Off ............................................................................................... 40
12.16    Fiduciary Obligations ...................................................................................... 40
12.17    Seller Representative ........................................................................................ 41
12.18    Legal Representation ........................................................................................ 42

**ANNEXES**

Annex A – Defined Terms

**SCHEDULES**

Disclosure Schedule

**EXHIBITS**

Exhibit A – Form of Assignment and Assumption Agreement

Exhibit B – Form of Bill of Sale

Exhibit C – Form of Intellectual Property Assignment Agreement

Exhibit D – Net Working Capital Sample Calculation

## ASSET PURCHASE AGREEMENT

This ASSET PURCHASE AGREEMENT (this "Agreement") is made and entered into as of September 4, 2025, by and among RunItOneTime LLC, a Washington limited liability company ("RunItOneTime"), and certain of its direct and indirect subsidiaries that are listed as "Sellers" on the signature pages hereto (collectively with RunItOneTime, the "Sellers"), RunItOneTime, in its capacity as the representative of Sellers (in such capacity, the "Seller Representative"), and Maverick Gaming LLC, a Nevada limited liability company ("Buyer", and together with Sellers and Seller Representative, the "Parties").

## RECITALS

WHEREAS, on July 14, 2025 (the "Petition Date"), each Seller and certain of their respective affiliates (collectively, the "Debtors") commenced voluntary cases under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Southern District of Texas, Houston Division ("Bankruptcy Court", and such cases, collectively, the "Bankruptcy Cases");

WHEREAS, Sellers wish to sell, transfer, convey, assign and deliver to Buyer, in accordance with sections 363 and 365 and all other applicable provisions of the Bankruptcy Code, all of the Acquired Assets (as defined below), together with the Assumed Liabilities (as defined below), upon the terms and subject to the conditions set forth in this Agreement;

WHEREAS, Buyer wishes to purchase and take delivery of the Acquired Assets and assume the Assumed Liabilities, upon such terms and subject to such conditions set forth in this Agreement;

WHEREAS, the Acquired Assets will be sold pursuant to a Sale Order (as defined below) of the Bankruptcy Court approving such sale under section 363 of the Bankruptcy Code, and such Sale Order will include the assumption and assignment of certain executory contracts and unexpired leases under section 365 of the Bankruptcy Code and pursuant to the terms and conditions of this Agreement; and

WHEREAS, the performance under this Agreement and Sellers' ability to consummate the Contemplated Transactions are subject to, among other things, the entry of the Sale Order by the Bankruptcy Court.

NOW, THEREFORE, in consideration of the mutual covenants, agreements, representations and warranties contained in this Agreement, the Parties hereby agree as follows:

## ARTICLE I.
## DEFINITIONS; CERTAIN RULES OF CONSTRUCTION

1.1     Defined Terms. Unless otherwise defined in this Agreement, all capitalized terms shall have the meanings set forth in Annex A hereto.

1.2     Certain Matters of Construction.

(a)     The Parties have participated jointly in the negotiation and drafting of this Agreement. In the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the Parties and no presumption or burden of proof shall arise favoring or disfavoring any Party by virtue of the authorship of any of the provisions of this Agreement.

(b)      Section and subsection headings are not to be considered part of this Agreement, are included solely for convenience, are not intended to be full or accurate descriptions of the content of the Sections or subsections of this Agreement and shall not affect the construction hereof.

(c)      Except as otherwise explicitly specified to the contrary herein, (i) the words "hereof," "herein," "hereunder" and words of similar import shall refer to this Agreement as a whole and not to any particular Section or subsection of this Agreement and reference to a particular Section of this Agreement shall include all subsections thereof, (ii) references to a Section, Exhibit, Annex, or Schedule means a Section of, or Exhibit, Annex, or Schedule to this Agreement, unless another agreement is specified, (iii) definitions shall be equally applicable to both the singular and plural forms of the terms defined, and references to the masculine, feminine or neuter gender shall include each other gender, (iv) the word "including" means including without limitation, (v) any reference to "$" or "dollars" means United States dollars, (vi) any accounting term not otherwise defined shall have its meaning prescribed by GAAP, (vii) unless the context clearly requires otherwise, when used herein "or" shall not be exclusive (*i.e.*, "or" shall mean "and/or"), and (viii) references to a particular statute or regulation include all rules and regulations thereunder and any successor statute, rule or regulation, in each case, as amended or otherwise modified from time to time.

(d)      Only that information which has been made available to Buyer in the "virtual data room" created for purposes of the sale of the Acquired Assets as such data room existed as of three (3) Business Days prior to the date hereof or otherwise delivered in writing to Buyer on the date immediately prior to the date hereof shall be considered to have been "delivered" or "made available" to Buyer for purposes of this Agreement; provided that this shall not include information or documents to be delivered under Article III or otherwise at the Closing, including this Agreement and any Ancillary Document, or any information or documents to be delivered following the Closing.

(e)      Any fact disclosed in any Schedule with respect to any representation or warranty set forth herein shall be deemed disclosed and incorporated by reference in any other Schedule with respect to any other representation or warranty set forth herein only to the extent such fact is disclosed in such a way as to make its relevance to the information called for by such other Schedule reasonably apparent on its face.

(f)      The Parties intend that each representation, warranty and covenant contained herein will have independent significance. If any Party has breached or violated, or if there is an inaccuracy in, any representation, warranty, or covenant contained herein in any respect, the fact that there exists another representation, warranty, or covenant relating to the same subject matter (regardless of the relative levels of specificity) which the Party has not breached or violated, or in respect of which there is not an inaccuracy, will not detract from or mitigate the fact that the Party has breached or violated, or there is an inaccuracy in, the first representation, warranty, or covenant.

(g)      Time is of the essence with regard to all dates and time periods set forth or referred to in this Agreement.

## ARTICLE II.
## PURCHASE AND SALE; BANKRUPTCY TRANSACTIONS

2.1      Purchase and Sale; Acquired Assets. Pursuant to sections 105, 363 and 365 of the Bankruptcy Code, subject to the entry and terms of the Sale Order and on the terms and subject to the conditions of this Agreement, at the Closing, each Seller shall sell, transfer, convey, assign and deliver, or cause to be sold, transferred, assigned, conveyed, and delivered, to Buyer, and Buyer shall purchase and acquire from such Seller, all of such Seller's right, title and interest in, to, and under, as of the Closing, the

Acquired Assets, free and clear of all Liens (other than Permitted Liens) and Liabilities (other than Assumed Liabilities), and interests existing as of the Closing.

2.2    Excluded Assets. Notwithstanding anything to the contrary in this Agreement, the Acquired Assets shall not include, and Sellers shall not sell, convey, transfer, assign, or deliver to Buyer, the Excluded Assets, which the applicable Sellers shall specifically retain.

2.3    Assumption of Liabilities. Subject to the terms and conditions of this Agreement, at the Closing, Buyer shall irrevocably assume and agree to pay, perform, and discharge when due, or otherwise satisfy in accordance with their terms, the Assumed Liabilities (and no other Liabilities).

2.4    Excluded Liabilities. Notwithstanding anything to the contrary in this Agreement, Buyer shall not assume and shall not be responsible to pay, perform, or discharge any Liabilities of any Seller or any of its Affiliates of any kind or nature whatsoever other than the Assumed Liabilities (all such Liabilities that are not Assumed Liabilities being referred to collectively herein as the "Excluded Liabilities"), and such Excluded Liabilities shall be retained by and remain the Liabilities of the applicable Seller or its Affiliates, as applicable.

2.5    Assumption/Rejection of Contracts; Assignment of Contracts.

(a)    Assumption and Assignment of Executory Contracts. In accordance with the Bidding Procedures Order and to the maximum extent permitted by the Bankruptcy Code, and subject to the other provisions of this Section 2.5, at the Closing, Sellers shall, pursuant to the Sale Order or other order of the Bankruptcy Court with respect to any Assigned Contract, assume and assign to Buyer (the consideration for which is included in the Purchase Price), all Assigned Contracts that may be assigned by Sellers to Buyer pursuant to sections 363 and 365 of the Bankruptcy Code, subject to the provision of adequate assurance by the Buyer as may be required under section 365 of the Bankruptcy Code and payment by the Buyer of the Cure Costs in respect of the Assigned Contracts. Any Contracts not listed as an Assigned Contract on Schedule 2.1 of the Disclosure Schedule may be rejected pursuant to section 365 of the Bankruptcy Code at any time.

(b)    Cure Costs.

(1)    Buyer shall pay or otherwise satisfy all Cure Costs and shall assume, and thereafter in due course and in accordance with their respective terms, pay and fully satisfy, discharge and perform all of the obligations under each Assigned Contract pursuant to section 365 of the Bankruptcy Code. Except for any Real Property Leases, Buyer is and shall remain obligated to timely consummate the Closing (including paying the Purchase Price in full at Closing) and comply with its obligations under this Agreement and any Ancillary Document and shall not have the right to terminate this Agreement as a result of the failure to assume and assign any such Contract. Notwithstanding anything to the contrary herein, no Seller Party shall be required to pay or assume any Cure Costs or provide any assurances, and no Seller shall be obligated to assume and assign any Contract with respect to which Buyer fails to pay the full Cure Costs at Closing or fails to satisfy the party to the proposed Assigned Contract and the Bankruptcy Court as to adequate assurance of future performance.

(2)    To the extent a counterparty to a Contract objects or otherwise challenges the Cure Costs determined by Sellers and asserts a different monetary amount that must be paid or nonmonetary obligations that otherwise must be satisfied, including pursuant to Section 365(b)(1)(A) and (B) of the Bankruptcy Code, in order for Buyer to assume such Contract (any such Contract, a "Disputed Contract"), and such objection or challenge has not been resolved prior to the Closing, then Buyer shall provide prompt written notice prior to the Closing Date (or such earlier date on which the Bankruptcy Code

or Bankruptcy Court otherwise would require a determination to assume or reject any such Contract) either (x) electing to remove any such Disputed Contract from Schedule 2.1 of the Disclosure Schedule, in which case the Contract will be an Excluded Contract and not assigned to Buyer or (y) requesting an extension of the period of time following the Closing to resolve any such dispute (such period, an "Extension Period"); provided that any such Extension Period shall be no longer than sixty (60) days following the Closing Date. If Buyer does not deliver written notice agreeing to assume such Disputed Contract and pay all Cure Costs associated with such Disputed Contract within three (3) Business Days prior to the expiration of the Extension Period or such dispute is not resolved by the expiration of the Extension Period, such Disputed Contract shall automatically be deemed an Excluded Contract. Without limiting the foregoing, in the event that a dispute relating to a Disputed Contract is resolved adversely to Buyer by the Bankruptcy Court, upon written notice from Buyer to Seller Representative within one (1) Business Day thereafter, such Disputed Contract shall thereafter be deemed an Excluded Contract for all purposes under this Agreement. Buyer shall be responsible for and reimburse Sellers for any Liabilities or obligations of Sellers arising following the Closing during any Extension Period, including any incremental costs or expenses (A) that arise out of Sellers' extension and continuation of the Bankruptcy Cases that is attributable to the Extension Period and (B) are incurred as a result of the any Seller's performance of its obligations under this Section 2.5(b)(2).

(3)     Buyer shall have the right to notify Sellers in writing up to three (3) Business Days prior to the Sale Hearing of any previously designated Assigned Contracts which Buyer no longer wishes to have assumed and assigned to Buyer and any such Contracts shall be deemed added or removed from the Schedules and from being an Assigned Contract, in each case without any adjustment to the Purchase Price.

(c)     Non-Assignment.

(1)     To the extent that any Acquired Asset, Assigned Contract or any claim, right or benefit arising thereunder or resulting therefrom (the "Non-Assignable Asset") is not capable of being sold, assigned, transferred or conveyed without the approval, consent or waiver of another party thereto, or any third party (including a Governmental Authority), or if such sale, assignment, transfer or conveyance or attempted sale, assignment, transfer or conveyance would constitute a breach thereof or a violation of any law, decree, order, regulation or other governmental edict, this Agreement shall not constitute a sale, assignment, transfer or conveyance thereof, or an attempted assignment, transfer or conveyance thereof, and the Closing shall proceed without any reduction in Purchase Price without the sale, transfer, assignment, conveyance or delivery of such asset. From the date hereof until the earlier of the termination of this Agreement and the Closing Date, Sellers shall, if requested by Buyer, use their respective commercially reasonable efforts, subject to the Conditions, and Buyer shall reasonably cooperate with Sellers, to obtain all necessary approvals, consents or waivers, or to resolve any such impediments to transfer as necessary to convey to Buyer each such Non-Assignable Asset as soon as practicable; provided, however, that neither any Seller nor Buyer shall be obligated to pay any fees or other consideration to obtain such third party consent for the transfer thereof, except for Cure Costs which shall be paid by Buyer and filing fees and other ordinary administrative or other charges provided for in the Assigned Contracts which shall be paid by Buyer to the third party from whom such approval, consent or waiver is requested.

(2)     To the extent that any of the approvals, consents or waivers referred to in Section 2.5(c)(1) herein have not been obtained by Sellers and Buyer as of the Closing, or until the impediments to transfer referred to in Section 2.5(c)(1) are resolved, Sellers shall, if requested by Buyer, for a period of time equal to the shorter of (I) the remaining term of such Non-Assignable Asset, if applicable, and (II) until the applicable Seller(s) are liquidated and wound down, use their respective commercially reasonable efforts to (x) obtain the consent of any such third party, (y) cooperate with Buyer in any reasonable and lawful arrangements designed to provide the benefits of such Non-Assignable Asset to Buyer so long as Buyer cooperates with Sellers in such arrangements and reimburses Sellers for all

expenses incurred by Sellers (including ongoing operating expenses of Sellers exclusively relating to such Non-Assignable Asset) and payments made by Sellers in connection therewith and indemnifies Sellers with respect thereto; and (z) enforce, at the reasonable request of Buyer and at the expense and for the account of Buyer, any rights of Sellers arising from such Non-Assignable Asset against the respective owner of or counterparty to such asset (including the right to elect to terminate any such Non-Assignable Asset in accordance with the terms thereof upon the advice of, and together with indemnification from, Buyer); provided, that (A) the foregoing shall not restrict or limit wind-down or liquidating plan of any Seller following the Closing Date and (B) the foregoing shall be subject to (1) any Orders entered, or approvals or authorizations granted or required, by or under the Bankruptcy Court or the Bankruptcy Code, obligations or limitations arising under or related to the DIP Facility or the DIP Credit Agreement, and each Seller's obligations to comply with any Order of the Bankruptcy Court (including the Bidding Procedures Order and the Sale Order) and each Seller's duty to seek and obtain the highest or otherwise best price for its assets as required by the Bankruptcy Code, (2) limitations on operations imposed by the Bankruptcy Court or the Bankruptcy Code or agreements governing Sellers' debtor-in-possession financing or use of cash collateral, and (3) limitations arising out of or related to the financial distress of Sellers and their respective Affiliates and the Bankruptcy Cases, including limitations on personnel, funds and other resources (the limitations to Sellers' obligation to use commercially reasonable efforts in accordance with this Section 2.5(c)(2) described in clauses (A) and (B), collectively, and as applicable as used herein, the "Conditions").

(3)    Notwithstanding anything to the contrary herein, no Seller shall be required to compensate any applicable third party, commence or participate in any proceeding or offer or grant any accommodation (financial or otherwise, including any accommodation or arrangement to indemnify, remain primarily, secondarily or contingently liable for any Liability) to any applicable third party in connection with Sellers' obligations under this Section 2.5 or otherwise. Receipt of any third-party consent, approval or waiver shall not be a condition to Buyer's obligation to timely consummate the Closing (including Buyer's obligation to pay the Purchase Price in full) or comply with Buyer's obligations under this Agreement or any Ancillary Document and the failure to receive any third party consent, approval or waiver or any actions taken by Sellers in connection therewith shall not give Buyer the right to terminate this Agreement.

2.6    Real Property Leases. Buyer has reviewed, or prior to the Closing will review, all Real Property Leases and, except as may be otherwise provided below, acknowledges that the amount of term remaining under each such lease (specifically excluding any option renewals) is acceptable to Buyer. At Buyer's request, Sellers will reasonably cooperate with Buyer in connection with any negotiations relating to renewals, extensions or amendments of the Real Property Leases.

2.7    Assumption of Liabilities under Assigned Contracts. At the Closing, Buyer shall assume, discharge and become liable for, all Liabilities arising after the Closing Date under the Assigned Contracts, but only to the extent such Liabilities are required to be performed and satisfied after the Closing Date and excluding Liabilities arising as a result of any breach of or default or failure to perform by any Seller under any Assigned Contract prior to the Closing, other than Cure Costs or as otherwise contemplated under Section 2.5 or any Assumed Liabilities.

2.8    Approval by Bankruptcy Court. This Agreement is subject to and conditioned upon approval by the Bankruptcy Court. At Closing, Sellers will convey to Buyer the Acquired Assets pursuant and subject to an Order, entered by the Bankruptcy Court approving the sale of the Acquired Assets, which order shall be in form and substance reasonably acceptable to Buyer, and shall include the following provisions: (x) pursuant to Section 363(f) of the Bankruptcy Code, sale of the Acquired Assets shall be free and clear of all Liens (other than Permitted Liens), Liabilities (other than Assumed Liabilities), interests and rights of set-off, whether known or unknown, disputed, fixed or contingent, or actual or otherwise, in

each case arising at any time prior to the Closing, in each case, to the greatest extent permitted by the Bankruptcy Code or applicable non-bankruptcy law, (y) Buyer shall be deemed a good faith purchaser, and (z) Buyer shall have no liability or obligation with respect to Excluded Liabilities and no successor liability (including with respect to any Withdrawal Liability or contribution obligations, whether arising prior to, on or after, the Closing Date, or with respect to the assumption of contribution history associated with any Multiemployer Plan), in each case, to the greatest extent permitted by the Bankruptcy Code or applicable non-bankruptcy law (the "Sale Order").  The Parties shall work in good faith to promptly prepare a mutually acceptable form of Sale Order after the date hereof.

2.9     "As Is" Transaction. Buyer hereby acknowledges and agrees, on its own behalf and on behalf of the Buyer Group, that the sale of the Acquired Assets is and will be made on an "as is, where is and with all faults" basis (except for the express representations contained in Article IV, as qualified, amended, supplemented and modified by the Disclosure Schedule and in accordance with the express terms and conditions (including limitations and exclusions) of this Agreement (the "Express Representations")). The occurrence of Closing shall constitute an acknowledgement by Buyer, on its own behalf and on behalf of the Buyer Group, that the Acquired Assets have been accepted without representation or warranty, express or implied (except for the Express Representations). Buyer, on its own behalf and on behalf of the Buyer Group, waives any right to assert any claim against any Seller, at Law or in equity, relating to any such matter, whether latent or patent, disclosed or undisclosed, known or unknown, in contract or tort, now existing or hereafter arising, other than resulting from such Seller's Fraud or willful misconduct. Except for the Express Representations, each Seller and any other Person on behalf of Sellers hereby specifically negate and disclaim any further representations, warranties, or guaranties of any kind or character, whether express or implied, oral or written, past, present, future, or otherwise, of, as to, concerning, or with respect to any Seller, the Acquired Assets, or the Assumed Liabilities or with respect to any information, statements, disclosures, documents, projections, forecasts or other material of any nature made available or provided by any Person, or elsewhere to Buyer or any of its Affiliates or advisors on behalf of Sellers or any of their respective Affiliates or Representatives, including (i) any implied representation of merchantability or fitness for any particular use or purpose, (ii) any implied representation regarding the use or operation of the Acquired Assets after the Closing in any manner, and (iii) any implied representation regarding the probable success or profitability of the Acquired Assets. Buyer further acknowledges that the information provided and to be provided with respect to Sellers, the Acquired Assets and the Assumed Liabilities was obtained from a variety of sources and, except as set forth in the Express Representations, no Seller, and no other Person on behalf of any Seller, (x) has made any independent investigation or verification of such information and (y) has made any express or implied, oral or written, representations as to the accuracy or completeness of such information. Notwithstanding the generality of the foregoing, Buyer, on its own behalf and on behalf of the Buyer Group, acknowledges and agrees that it and the Buyer Group have received from Sellers (and their respective Affiliates and Representatives) certain projections, forward-looking statements, forecasts, or other material made available to Buyer, its Affiliates or Representatives in the Data Room, teaser, confidential information memorandum, management presentations or other prospective or third-party information relating to Sellers, the Acquired Assets, the Business, the Excluded Assets, the Assumed Liabilities and the Excluded Liabilities (whether in written, electronic, or oral form) (collectively, "Projections"). Buyer, on behalf of itself and the Buyer Group, acknowledges that (1) such Projections are being provided solely for the convenience of Buyer and the Buyer Group to facilitate their own independent investigation; (2) there are uncertainties inherent in attempting to make such Projections; (3) Buyer and the Buyer Group are familiar with such uncertainties and are taking responsibility for making their own evaluation of the adequacy and accuracy of all such Projections (including the reasonableness of the assumptions underlying such Projections); (4) Buyer and the Buyer Group are taking full responsibility for making their own evaluation of the adequacy and accuracy of any such Projections provided to it in connection with the Contemplated Transactions (including the reasonableness of the assumptions underlying such Projections); (5) no Seller or any other Person makes any representations or warranties with respect to such Projections (other than Express Representations);

and (6) Buyer and the Buyer Group shall have no claim against anyone with respect thereto. Buyer, on its own behalf and on behalf of the Buyer Group, hereby disclaims reliance on any such Projections. Buyer acknowledges, on its own behalf and on behalf of the Buyer Group, that it has conducted to its reasonable satisfaction an independent investigation and verification of the Business including the Acquired Assets, its financial condition, results of operations, assets, Liabilities, properties, Contracts, environmental compliance, employee matters, regulatory compliance, business risks and prospects of Sellers, and, in making its determination to proceed with the Contemplated Transactions, Buyer has relied solely on the results of the Buyer Group's own independent investigation and verification, and has not relied on, is not relying on, and will not rely on, Sellers, the Projections or any information, statements, disclosures, documents, projections, forecasts or other material made available to Buyer or any of its Affiliates or Representatives in the Data Room or otherwise, in each case, whether written or oral, made or provided by, or as part of, any of the foregoing or Sellers or any of their respective Affiliates or Representatives, or any failure of any of the foregoing to disclose or contain any information, except for the Express Representations. Without limiting the foregoing, except for breach of the Express Representations and subject to the limitations set forth herein, neither any Seller nor any other Person will have or be subject to any Liability whatsoever to Buyer, or any other Person in the Buyer Group, resulting from the distribution to Buyer or any of its Affiliates or advisors, or Buyer's or any of its Affiliates' or advisors' reliance on, any such information. None of Sellers or any of their respective Representatives make or provide, and the Buyer Group hereby waives, any warranty or representation, express or implied, as to the quality, merchantability, fitness for a particular purpose, conformity to samples, or condition of Sellers' assets or any part thereof. This <u>Section 2.9</u> shall survive the termination of this Agreement and the Closing.

**ARTICLE III.**
**PURCHASE CONSIDERATION; CLOSING**

3.1     <u>Consideration; Closing Date Payment to Sellers</u>.

(a)     The aggregate consideration for the purchase and sale of the Acquired Assets will be equal to an amount calculated as follows (such aggregate consideration, the "<u>Purchase Price</u>"):

(1)     $13,000,000.00 (the "<u>Base Purchase Price</u>");

(2)     *plus* the Cure Costs;

(3)     *plus* the Net Working Capital Adjustment Amount (which may be a positive or negative number);

(4)     *plus* the assumption by Buyer of the Assumed Liabilities.

(b)     At the Closing, Buyer shall (i) pay, or cause to be paid, to the Seller Representative by wire transfer of immediately available funds to one or more accounts as designated by the Seller Representative by written notice to Buyer at least two (2) Business Days prior to the Closing Date, an amount equal to the sum of (A) the Base Purchase Price, *plus* (B) if positive, the Estimated Working Capital Adjustment Amount, *minus* (C) if negative, the Estimated Working Capital Adjustment Amount, *minus* (D) the Deposit, *minus* (E) the Closing Adjustment Escrow Amount (collectively, the "<u>Closing Date Payment</u>"), and (ii) assume the Assumed Liabilities, and satisfy the Cure Costs, in accordance with the Sale Order.

(c)     Prior to the Closing, Buyer and the Seller Representative shall cause the Escrow Agent to create a separate, segregated, interest-bearing escrow account (the "<u>Closing Adjustment Escrow Account</u>") to be maintained by the Escrow Agent under a written agreement among the Seller Representative, Buyer and the Escrow Agent in form and substance reasonably acceptable to each of them

(the "Escrow Agreement"). Buyer, Seller Representative and the Escrow Agent shall enter into the Escrow Agreement on or before September 17, 2025. At the Closing, Buyer shall pay, or cause to be paid, to the Escrow Agent, the Closing Adjustment Escrow Amount, to be deposited by the Escrow Agent into the Closing Adjustment Escrow Account, to be held and distributed in accordance with the terms of this Agreement and the Escrow Agreement.

3.2     Deposit.

(a)     No later than 4:00 p.m. (prevailing Central Time) on September 17, 2025, Buyer shall make an earnest money deposit with the Escrow Agent, in the amount equal to $1,300,000.00 (the "Deposit"), by wire transfer of immediately available funds for deposit into a separate, segregated, non-interest-bearing escrow account maintained by the Escrow Agent under the Escrow Agreement in accordance with the Bidding Procedures Order (the "Deposit Escrow Account"). The Deposit Escrow Account shall be subject to the Escrow Agreement. The Deposit shall not be subject to any lien, attachment, trustee process or any other judicial process of any creditor of any Seller or Buyer and shall be applied in full, without any deduction for escrow costs, against payment of the Purchase Price on the Closing Date.

(b)     If this Agreement has been validly terminated by Seller Representative pursuant to Sections 10.1(e) or 10.1(f) (or by Buyer pursuant to Sections 10.1(b) or 10.1(c), in each case, in circumstances where Seller Representative would be entitled to terminate this Agreement pursuant to Sections 10.1(e) or 10.1(f)), then Sellers shall retain the Deposit together with all received investment income, if any (it being understood and agreed by the Parties that Sellers' right to the Deposit shall be in addition to any and all other remedies that Sellers may have against Buyer with respect to any breach, violation, or default by Buyer under this Agreement).

(c)     If this Agreement has been validly terminated by Buyer or Seller Representative, other than as contemplated by Section 3.2(b), then the Deposit, together with all received investment income, if any, shall be returned to Buyer within five (5) Business Days after such termination.

(d)     The Parties agree that Sellers' right to retain the Deposit, as set forth in Section 3.2(b), is not a penalty, but rather is liquidated damages in a reasonable amount that will compensate Sellers for their efforts and resources expended and the opportunities foregone while negotiating this Agreement and in reliance on this Agreement and on the expectation of the consummation of the Contemplated Transactions, which amount would otherwise be impossible to calculate with precision. If Buyer fails to take any action necessary to cause the delivery of the Deposit to Sellers pursuant to the Escrow Agreement under circumstances where Sellers are entitled to the Deposit and, in order to obtain such Deposit, Sellers commence a suit which results in a judgment in favor of Sellers, Buyer shall pay to Sellers an amount in cash equal to the costs and expenses (including attorney's fees) incurred by Sellers in connection with such suit.  If Sellers fail to take any action necessary to cause the delivery of the Deposit to Buyer pursuant to the Escrow Agreement under circumstances where Buyer is entitled to the Deposit and, in order to obtain such Deposit, Buyer commences a suit which results in a judgment in favor of Buyer, Sellers shall pay to Buyer an amount in cash equal to the costs and expenses (including attorney's fees) incurred by Buyer in connection with such suit.

(e)     If the Closing occurs, the Escrow Agent shall release from the Deposit Escrow Account to Sellers at the Closing an amount equal to the Deposit.

3.3     Cash Count. As of 12:01 AM (local time) on the Closing Date (or at such other day or time as mutually agreed by Buyer and Sellers or otherwise dictated by applicable Gaming Laws), Sellers shall, at the request of Buyer given not less than two (2) Business Days prior to the Closing Date, conduct a physical count of all Cage Cash (including reading the meters for the slot machines and running a slot

system report) and all Register Cash (such count, the "Cash Count"). The Cash Count shall be conducted in accordance with the policies, procedures and methodologies mutually agreed by the parties and otherwise in accordance with applicable Gaming Laws. Buyer shall be entitled to have its Representatives present during the Cash Count, which Representatives shall, to the extent permitted by applicable Law, have full access to the Cash Count proceedings and cooperate with Sellers' Representatives in good faith to resolve any disputes regarding the conduct of the Cash Count. The Cash Count will be used in connection with the preparation of the Closing Statement.

3.4     Net Working Capital Adjustment.

(a)     Not less than two (2) Business Days prior to the Closing Date and in no event more than five (5) Business Days prior to the Closing Date, the Seller Representative shall deliver, or cause to be prepared and delivered, to Buyer a written statement ("Estimated Closing Statement") setting forth Sellers' separate good faith calculations of the Closing Date Net Working Capital ("Estimated Net Working Capital") and the related Estimated Working Capital Adjustment Amount; provided that if there is any disagreement or dispute between Buyer and the Sellers with respect to the Estimated Closing Statement or the calculation of the Estimated Working Capital Adjustment Amount, such disagreement shall not delay or impede the Closing and Sellers' calculation of the Estimated Working Capital Adjustment Amount set forth in the Estimated Closing Statement shall control.

(b)     As soon as reasonably practicable following the Closing Date, and in any event within sixty (60) days thereof, Buyer shall prepare and deliver to the Seller Representative a written statement (the "Closing Statement") setting forth Buyer's calculation of the Closing Date Net Working Capital and the resulting Net Working Capital Adjustment Amount, determined without giving effect to the consummation of the transactions contemplated by this Agreement to occur at the Closing (including any adjustments as a result of the application of purchase accounting), as though the Closing occurred as of the time of such determination. Following the Closing, Buyer shall provide the Seller Representative and its Representatives access to the records, properties, personnel and (subject to the execution of customary work paper access letters if requested by such applicable party) auditors of Buyer and its Representatives relating to the preparation of the Closing Statement and shall cause the personnel of Buyer and its Representatives to cooperate with the Seller Representative in connection with its review of the Closing Statement.

(c)     If the Seller Representative disagrees with the calculation of the Closing Date Net Working Capital or the resulting Net Working Capital Adjustment Amount as set forth in the Closing Statement, it shall notify Buyer of such disagreement in writing (a "Dispute Notice"), setting forth in reasonable detail the particulars of such disagreement, within thirty (30) days after its receipt of the Closing Statement. In the event that the Seller Representative does not provide a Dispute Notice within such thirty (30)-day period, Sellers shall be deemed to have accepted the Closing Statement and the calculation of the Closing Date Net Working Capital and the resulting Net Working Capital Adjustment Amount delivered by Buyer, which shall be final, binding and conclusive for all purposes hereunder. In the event any Dispute Notice is timely provided, Buyer and the Seller Representative shall use commercially reasonable efforts for a period of thirty (30) days after Buyer's receipt of the Dispute Notice (or such longer period as they may mutually agree) to resolve any disagreements with respect to the calculations set forth in the Closing Statement, and any resolution agreed to in writing by Buyer and the Seller Representative shall be final and binding upon the Parties, and the Closing Statement shall be adjusted in accordance with such resolution. If, at the end of such period, Buyer and the Seller Representative are unable to resolve such disagreements, then an independent accounting or financial consulting firm of recognized national standing as may be mutually selected by Buyer and the Seller Representative (the "Auditor") shall resolve any remaining disagreements. The Auditor shall be instructed to determine as promptly as practicable, but in any event within forty-five (45) days after the date on which the Auditor is retained to resolve such dispute, based solely on written submissions provided by Buyer and the Seller Representative to the Auditor promptly

following the date on which the Auditor is retained, to resolve any remaining disagreements regarding the calculations set forth in the Closing Statement. In resolving any such dispute, the Auditor (i) may not assign a value to any item greater than the greatest value claimed for such item by either Buyer in the Closing Statement or Seller Representative in the timely delivered Dispute Notice or less than the smallest value claimed for such item by either Buyer in the Closing Statement or Seller Representative in the timely delivered Dispute Notice, (ii) shall base its determination solely on the terms and conditions of this Agreement and the written materials submitted by Buyer and the Seller Representative and any subsequent oral presentations, rebuttal submissions or responses to written questions submitted by the Auditor (and not on any independent review), (iii) shall be bound by the terms and conditions of this Agreement, and the applicable definitions contained herein, and (iv) shall deliver to Buyer and the Seller Representative a report setting forth its calculation thereof and its reasons for its determination and the resulting Closing Statement and the Net Working Capital Adjustment Amount taking into account such resolution. The Auditor shall not have any *ex parte* communications with Buyer or the Seller Representative or their respective Representatives. All negotiations pursuant to this Section 3.4(c) shall be treated as compromise and settlement negotiations for proposes of Rule 408 of the Federal Rules of Evidence and comparable state rules of evidence. The Parties acknowledge and agree that the Auditor shall function solely as an expert and not as an arbitrator. The fees and expenses of the Auditor shall be allocated between Buyer and Sellers based upon the percentage of such fees and expenses equal to the dollar value of the disputed amounts determined in favor of the other party by the Auditor divided by the aggregate dollar value of all disputed items submitted to the Auditor. For example, if the Seller Representative challenges the Closing Statement in the net amount of $1,000, and the Auditor determines that Buyer has a valid claim for $400 of the $1,000, Buyer shall bear 60% of the fees and expenses of the Auditor and Sellers shall bear the remaining 40% of the fees and expenses. All other costs and expenses incurred by the Parties in connection with resolving any dispute hereunder before the Auditor shall be borne by the Party incurring such cost and expense. The determination of the Auditor shall be final, conclusive and binding on the Parties. The date upon which the Closing Statement (including the Net Working Capital Adjustment Amount) is finally determined in accordance with this Section 3.4(c) is referred as to the "NWC Adjustment Amount Determination Date."

(d)     The "Net Working Capital Adjustment Amount," which may be positive or negative, shall mean (i)  the Closing Date Net Working Capital (as finally determined in accordance with Section 3.4), *minus* (ii) the Estimated Net Working Capital. If the Net Working Capital Adjustment Amount is a positive number, then the Purchase Price shall be increased by the Net Working Capital Adjustment Amount (the "Increase Amount"), and if the Net Working Capital Adjustment Amount is a negative number, then the Purchase Price shall be decreased by the absolute value of the Net Working Capital Adjustment Amount (the "Deficit Amount"). The Net Working Capital Adjustment Amount shall be paid in accordance with Section 3.4(e) or Section 3.4(f).

(e)     If there is an Increase Amount, then, promptly following the NWC Adjustment Amount Determination Date, and in any event within five (5) Business Days following the NWC Adjustment Amount Determination Date, Buyer shall pay, or cause to be paid, the Increase Amount in cash by wire transfer of immediately available funds to the Escrow Agent to be deposited into the Closing Adjustment Escrow Account to be held and distributed in accordance with the terms of this Agreement.

(f)     If there is a Deficit Amount, then, promptly following the NWC Adjustment Amount Determination Date, and in any event within five (5) Business Days following the NWC Adjustment Amount Determination Date, Buyer and the Seller Representative shall jointly instruct the Escrow Agent to pay, from the Closing Adjustment Escrow Funds, to Buyer an amount in cash by wire transfer of immediately available funds equal to the Deficit Amount to an account designated by Buyer.

(g)     Subject to the payment of the Deficit Amount (if any), the balance of the Closing Adjustment Escrow Funds shall be held by the Escrow Agent for a period thereafter ending ninety (90)

days after the Closing Date (or if such date is not a Business Day, the first Business Day thereafter), and during such period shall be available for and used to satisfy any indemnification obligations in accordance with and pursuant to Section 3.10.  After the expiration of such ninety (90) day period, to the extent there are any remaining Closing Adjustment Escrow Funds, each of Buyer and Seller Representative agree to jointly instruct the Escrow Agent to pay such remaining Closing Adjustment Escrow Funds to the Seller Representative by wire transfer of immediately available funds to an account designated by the Seller Representative for distribution to Sellers.

(h)     The Parties agree that any payment of the Net Working Capital Adjustment Amount shall be treated as an adjustment to the Purchase Price for applicable Tax purposes to the extent permitted by applicable Law.

3.5     Prorations. On the Closing Date, all utility charges and other similar periodic obligations and expenses (but not including those items reflected in the calculation of the Net Working Capital Adjustment Amount as finally determined pursuant to Section 3.4 and not including any Taxes addressed in Section 9.4), related to the Acquired Assets and/or Business will be prorated as of the Closing Date, with Sellers responsible for such charges, obligations and expenses for the period up to the Closing Date, and Buyer to be responsible for the period on and after the Closing Date. Whenever possible, such prorations will be based on actual, current payments by Sellers, and to the extent such actual amounts are not available, such prorations will be estimated as of the Closing Date based on actual amounts for the most recent comparable billing period. When the actual amounts become known, such prorations will be recalculated by Buyer and Sellers, and Buyer or Sellers, as the case may be, promptly (but not later than five (5) Business Days after notice of payment due) will make any additional payment or refund by wire transfer of immediately available funds so that the correct prorated amount is paid by each of Buyer and Sellers.

3.6     Closing. Subject to the terms and conditions of this Agreement, the consummation of the purchase and sale of the Acquired Assets and the assumption of the Assumed Liabilities (the "Closing") shall take place by video conference and electronic exchange of documents at 9:00 a.m. Pacific Time, which time shall be as promptly as practicable following, but not later than the second (2nd) Business Day following, full satisfaction or waiver (by the Party entitled to the benefit of such condition) of the closing conditions set forth in Article VII and Article VIII (other than those conditions that by their terms or nature are to be satisfied at the Closing, but subject to the satisfaction or waiver of those conditions at the Closing), or at such other place and time as Buyer and the Seller Representative may agree in writing. That date on which the Closing actually occurs is referred to herein as the "Closing Date." Subject to the provisions of Article X, the failure of any Party to consummate the Closing on the date and time determined pursuant to this Section 3.6 shall not result in the termination of this Agreement and shall not relieve such Party of any obligation under this Agreement.

3.7     Items to be Delivered by Sellers at Closing. At the Closing, the applicable Sellers shall execute and deliver, or cause to be executed and delivered, to Buyer:

(a)     A certificate from a duly authorized officer of Seller Representative dated as of the Closing Date certifying the satisfaction of the conditions set forth in Sections 7.1(b), 7.1(c), and 7.1(d);

(b)     Assignment and Assumption Agreement;

(c)     Bill of Sale;

(d)     Intellectual Property Assignment Agreement;

(e)     Reserved;

11

(f)    All Gaming Approvals;

(g)    Business Services Agreement;

(h)    All other documents, certificates and agreements reasonably necessary to evidence and effect the sale, assignment transfer and delivery of the Acquired Assets to Buyer and assumption of the Assumed Liabilities by Buyer, in each case, other than those related to the Non-Assignable Assets (which shall be subject to <u>Section 2.5(c)</u>);

(i)    A copy of the Sale Order which has become final and non-appealable; and

(j)    A copy of the Order of the Bankruptcy Court approving the Shareholder Services Agreement (which Order may be the Sale Order), which Order has become final and non-appealable.

3.8    <u>Items to be Delivered by Buyer at Closing</u>. At the Closing, Buyer shall execute and deliver, or cause to be executed and delivered, to Seller Representative:

(a)    A certificate from a duly authorized officer of Buyer dated as of the Closing Date certifying the satisfaction of the conditions set forth in <u>Sections 8.1(b)</u> and <u>8.1(c)</u>;

(b)    Assignment and Assumption Agreement;

(c)    Bill of Sale;

(d)    Intellectual Property Assignment Agreement;

(e)    All Gaming Approvals;

(f)    Business Services Agreement;

(g)    the Earnout Agreement shall be fully executed by the parties thereto and delivered to Seller Representative prior to Closing; and

(h)    All other documents, certificates and agreements reasonably necessary to evidence and effect the sale, assignment transfer and delivery of the Acquired Assets to Buyer and assumption of the Assumed Liabilities by Buyer, in each case, other than those related to the Non-Assignable Assets (which shall be subject to <u>Section 2.5(c)</u>).

3.9    <u>Contingent Cash Payment</u>.  If Buyer is the Successful Bidder, then prior to Closing, Buyer, on the one hand, and Seller Representative or its designee (together, "<u>EarnoutCo</u>"), on the other hand, shall enter into an agreement (the "<u>Earnout Agreement</u>") in form and substance reasonably acceptable to Buyer and EarnoutCo, granting EarnoutCo the contingent payment rights described in the Support Agreement.

3.10    <u>Express Indemnities</u>.  Notwithstanding anything to the contrary in this Agreement, Sellers shall indemnify and hold harmless Buyer for (A) any shortfall in the Cage Cash at the Closing from the Target Cage Cash Amount, and (B) any Liability imposed on Buyer or its Affiliates arising prior to the Closing under or relating to the Maverick CBA, any Withdrawal Liability, any Multiemployer Plan or any Employee Benefit Plan.

**ARTICLE IV.**
**REPRESENTATIONS AND WARRANTIES OF SELLERS**

Except as set forth in the Disclosure Schedule, Sellers, jointly and severally, hereby represent and warrant to Buyer as of the date hereof and as of the Closing as follows:

4.1     Organization. Each Seller is a corporation or limited liability company, as applicable, duly incorporated or organized, validly existing and in good standing (to the extent such concept is legally recognized under the laws of the jurisdiction of its incorporation or formation) under the laws of the jurisdiction of its incorporation or formation.

4.2     Power and Authority; Authorization. Each Seller has all requisite power and authority to enter into, deliver, and perform its obligations under this Agreement and each Ancillary Document to which it is (or will be prior to or at the Closing) a party, to carry out its obligations hereunder and thereunder, and to consummate the Contemplated Transactions, subject to the applicable Conditions, including the requisite Bankruptcy Court approvals. The execution, delivery and performance of this Agreement and the Ancillary Documents to which any Seller is a party, the performance by each Seller of its obligations hereunder and thereunder, and the consummation by each Seller of the Contemplated Transactions have been (or in the case of any Ancillary Document to be entered into prior to or at the Closing, will be when executed and delivered) duly authorized by all requisite action, subject to the applicable Conditions, including the requisite Bankruptcy Court approvals.

4.3     Enforceability. This Agreement and each of the Ancillary Documents to which any Seller is a party constitute (and in the case of any Ancillary Document to be entered into prior to or at the Closing, will constitute when executed and delivered) valid and legally binding obligation of each Seller, enforceable in accordance with the terms hereof or thereof, as applicable, except as such enforceability (a) may be limited by bankruptcy, insolvency, fraudulent transfer, reorganization, moratorium and other similar laws of general application affecting or relating to the enforcement of creditors' rights generally and (b) is subject to general principles of equity, whether considered in a proceeding at law or in equity (collectively, the "Enforceability Exceptions") and as subject to the applicable Conditions.

4.4     No Consents or Approvals. Except for the Gaming Approvals, the Transaction Consents or the other consents, approvals, authorizations or notices set forth on Schedule 4.4 of the Disclosure Schedule, no consent, approval, or authorization of, or notice, declaration, filing, or registration with, any Governmental Authority or any other third-party Person is required to be made or obtained by any Seller in connection with the execution, delivery, and performance of this Agreement and the Ancillary Documents or the consummation of the Contemplated Transactions.

4.5     Reserved.

4.6     Reserved.

4.7     Absence of Certain Developments. From and after June 25, 2025, there has not occurred any change, effect, event, occurrence, state of facts, development, or condition that has had, or would reasonably be expected to have, a Material Adverse Change.

4.8     Title; Sufficiency of Assets; Condition of Acquired Assets.

(a)     At Closing, subject to the applicable Conditions, requisite Bankruptcy Court approvals and assumption by the applicable Seller of any applicable Assigned Contracts (and satisfaction of any Cure Costs), Sellers, collectively, shall have sole and exclusive, good and marketable title to, or in

13

the case of property held under a Contract, a sole and exclusive, enforceable leasehold interest in, or adequate rights to use, all of the Acquired Assets, whether real, personal, mixed, tangible or intangible. The Acquired Assets constitute all the material assets, properties, and rights of every type and description (other than Shared Contracts and any Excluded Assets), together with certain rights to be made available under the Business Services Agreement, sufficient for the continued conduct of the Business after the Closing in substantially the same manner as conducted immediately prior to the commencement of the Bankruptcy Cases. At Closing, subject to the applicable Conditions, requisite Bankruptcy Court approvals and assumption by the applicable Seller of any applicable Contracts (and satisfaction of any Cure Costs), all of the Acquired Assets will be free and clear of Liens other than Permitted Liens.

4.9     Intellectual Property. Schedule 4.9 of the Disclosure Schedule sets forth a true, correct, and complete list of the Business Registered IP, Business Software, and other material Intellectual Property Assets. Except as set forth on Schedule 4.9 of the Disclosure Schedule, (a) Sellers collectively own and possess all rights, titles, and interests in and to, or to the Knowledge of Sellers, possess the valid and enforceable right to use, the Intellectual Property Assets and applications therefor and other Intellectual Property used in the operation of the Business as currently conducted; (b) no Seller has sent or received any written notices of infringement or misappropriation or invitations to license Intellectual Property to or from any third party with respect to such third party's or Seller's use of any Intellectual Property; (c) to the Knowledge of Sellers, no third party is materially infringing or misappropriating any Intellectual Property Assets; and (d) to the Knowledge of Sellers, no Seller has materially infringed upon or misappropriated any other Person's Intellectual Property. No rights of the Business in and to the Intellectual Property Assets will be adversely affected by the consummation of the Contemplated Transactions.

4.10    Real Property.

(a)     There is no real property owned in fee by any Seller or Debtor that is used or held for use in the Business.

(b)     The real property demised by the leases set forth in Schedule 4.10 of the Disclosure Schedule (the "Leased Real Property" or the "Real Property") constitutes all of the real property leased by Sellers and used or held for use in the Business. Except as set forth on such Schedule and except for Permitted Liens, there are no written or oral leases, subleases, licenses, concessions, occupancy agreements, or other Contracts granting to any other Person the right of use or occupancy of any of the Leased Real Property, and there is no Person (other than any Seller) in possession of any of the Leased Real Property. The Leased Real Property leases are in full force and effect, and the applicable Seller holds a valid and existing leasehold interest under each such lease, subject to proper authorization and execution of such lease by the other party and Enforceability Exceptions. Sellers have delivered or made available to Buyer true, correct, and complete copies of each of the leases described in Schedule 4.10 of the Disclosure Schedule, and none of such leases have been modified in any material respect, except to the extent that such modifications are disclosed by the copies delivered or made available to Buyer. No Seller or Affiliate thereof is in default in any material respect under any of such leases.

(c)     Sellers, collectively, own good title to, or hold pursuant to valid and enforceable leases, all of the Acquired Assets that are personal property free and clear of all Liens (except for Permitted Liens), except for personal property disposed of by Sellers in the Ordinary Course of Business since June 25, 2025.

4.11    Reserved.

4.12    Tax Matters. In the case of each Seller (and for clauses (a) and (c) – (j) below, only with respect to the Acquired Assets or the Business, and except as set forth on Schedule 4.12 of the Disclosure Schedule):

(a)    Each Seller has timely filed with the appropriate Taxing Authority (taking into account available extensions of time to file) all income and other material Tax Returns required to be filed by it. Each such Tax Return (taking into account all amendments thereto) is complete and correct in all material respects. All Taxes owed by Sellers that are due have been paid or have been adequately reserved against in accordance with GAAP. No Seller is currently the beneficiary of any extension of time within which to file any Tax Return (taking into account any extensions of time to file Tax Returns). There are no Liens for Taxes on any of the Acquired Assets other than Permitted Liens as described in clause (b) of the definition thereof, provided that any contested Liens for Taxes are disclosed on Schedule 4.12.

(b)    Each Seller has timely paid when due all applicable state, city or municipal quarterly gaming Taxes or gaming license fees relating to the Acquired Assets or the Business.

(c)    Each Seller has withheld, collected and paid over to the appropriate Taxing Authority, or is properly withholding for such payment, all Taxes required to have been withheld and paid in connection with any amounts paid or owing to any employee, independent contractor, creditor, member, or other third party, other than Taxes not due as of the date of the filing of the Bankruptcy Case as to which subsequent payment was not required by reason of the Bankruptcy Cases.

(d)    Each Seller has properly collected and remitted sales and similar Taxes with respect to sales made to its customers and has properly received and retained any appropriate Tax exemption certificates or other documentation for all such sales made without charging or remitting sales or similar Taxes that qualify as exempt from sales or similar Taxes.

(e)    No Seller has been notified in writing that it is currently under audit or examination by any Taxing Authority or that any Taxing Authority intends to conduct such an audit or examination, and no action, suit, investigation, claim or assessment is pending or, to the Knowledge of Sellers, proposed in writing with respect to any alleged deficiency in Taxes. All deficiencies asserted or assessments made as a result of any examinations by any Taxing Authority with respect to the Acquired Assets have been fully resolved or are being contested in good faith by appropriate proceedings.

(f)    No Seller has (i) waived any statute of limitations in respect of any Taxes or (ii) agreed to any extension of time with respect to any assessment or deficiency for Taxes (other than pursuant to extensions of time to file Tax Returns).

(g)    No private letter rulings, technical advice memoranda or similar agreement or rulings have been requested, entered into or issued by any taxing authority with respect to any Seller.

(h)    No Seller has entered into any listed transactions for purposes of Treasury Regulation Section 1.6011-4.

(i)    None of the Acquired Assets is (i) required to be treated as being owned by another person pursuant to the so-called "safe harbor lease" provisions of former Section 168(f)(8) of the Internal Revenue Code of 1954  (as in effect immediately before the enactment of the Code) or (ii) subject to a disqualified leaseback or long-term agreement as defined in Section 467 of the Code.

(j)    None of the Acquired Assets is tax-exempt use property within the meaning of Section 168(h) of the Code.

4.13    Compliance with Laws. Except as set forth on Schedule 4.13 of the Disclosure Schedule, and as subject to the applicable Conditions, in the past two (2) years, each Seller has complied in all material respects, with all applicable federal, state and local statutes, laws and regulations (including any applicable building, zoning, health, employment, environmental protection or other law, ordinance or regulation) affecting the Acquired Assets and the operation of the Business and has not been cited for any violation of any such law or regulation affecting the Acquired Assets and the operation of the Business, except, in each case, as would not constitute a Material Adverse Change. Sellers and their respective Affiliates, collectively, have in full force and effect all material licenses, permits and other authorizations required for the operation of the Business and in a manner consistent with Ordinary Course of Business, except where the failure to hold the same would not reasonably be expected to have a Material Adverse Change on the Business or the Acquired Assets, and no Seller has received notice of any material default or violation in respect of or under any of the foregoing which could reasonably be expected to have a Material Adverse Change on the Business or the Acquired Assets. In the past two (2) years, no Seller has received any non-compliance orders, warning letters, notices of violation, claims, suits, actions, proceedings, judgments, penalties, fines or judicial or administrative investigations of any nature pending or, to the Knowledge of Sellers, threatened against or involving the Business or the Acquired Assets, in each case, which would reasonably be expected to have a Material Adverse Change on the Business or the Acquired Assets and which remains outstanding.

4.14    Permits. Except as would not reasonably be expected to have a Material Adverse Change, other than in connection with or as a result of the Bankruptcy Cases, Sellers possess all Permits required for the conduct of the Business in the ordinary course and the ownership, use, and operation of the Acquired Assets in the Ordinary Course of Business.  Except as set forth on Schedule 4.14 of the Disclosure Schedule, (a) all material Permits are valid and in full force and effect, (b) no Seller or Affiliate thereof is in breach or violation of, or default under, any such material Permit, and (c) to the Knowledge of Sellers, no fact, situation, circumstance, condition or other basis exists which, with notice or lapse of time or both, would constitute a material breach, violation, or default under such Permit or give any Governmental Authority grounds to suspend, revoke or terminate any such Permit.

4.15    Reserved.

4.16    Employees.

(a)    Schedule 4.16(a)(i) of the Disclosure Schedule sets forth a complete list of each Business Employee as of the date of this Agreement and, for each such Business Employee, true and correct information as of such date as to the following: (i) name, (ii) job title, (iii) employing entity, (iv) date of hire, (v) rate of base compensation (hourly wage rate or annual salary, as applicable, (vi) status as active or inactive, and if applicable, the anticipated return date (if known), (vii) primary work location (including city and state), (viii) exempt or non-exempt status under the Fair Labor Standards Act and similar applicable Law, and (ix) whether represented by a Union (such Schedule, the "Business Employee Census"). Schedule 4.16(a)(ii) of the Disclosure Schedule sets forth a complete list of each Business Service Provider (other than any Business Employee listed on  Schedule 4.16(a)(i) of the Disclosure Schedule) engaged as of the date hereof by any Seller or an Affiliate thereof (with respect to the Business), and for each such Business Service Provider, as of the date hereof, true and correct information as to the following: (i) the rate of compensation, (ii) description of services provided, and (iii) if applicable, the term of service (whether as an independent contractor, consultant or otherwise) (such schedule, the "Contractor Census", and together with the Business Employee Census, the "Business Service Provider Census").

(b)    Except as would not reasonably be expected to have a Material Adverse Change on the Business or the Acquired Assets, Sellers are, and in the past twelve (12) months have been, in material  compliance  with  all  applicable  Law  respecting  employment  and  employment  practices,

termination of employment, workers and worker practices, or terms and conditions of employment in respect of the Business Service Providers and the Business.

(c)     The Union is the sole organized labor union representing any Business Employees in their capacity as such and the Maverick CBA is the only Collective Bargaining Agreement in effect covering any Business Employees in their capacity as such.  Except as set forth on <u>Schedule 4.16(c)</u> of the Disclosure Schedule, and except as would not reasonably be expected to have a Material Adverse Change on the Business or the Acquired Assets,  (i)  there are, and have been in the past three (3) years, no pending, or to the Knowledge of Sellers, threatened activities or proceedings of any Union to organize any Business Employees in respect of the Business; (ii) there are no, and have been in the past three (3) years, no unfair labor practice charges, grievances or complaints pending before the National Labor Relations Board or any similar Governmental Authority or, to the Knowledge of Sellers, threatened by or on behalf of any Business Employees or any Union; and (iii) there is, and in the past three (3) years there has been, no strike, slowdown, work stoppage, lockout, picketing, or other labor dispute pending or, to the Knowledge of Sellers, threatened in respect of, or against the Business.

(d)     To the Knowledge of Sellers, there are no material pending or threatened claims of sexual harassment, other unlawful harassment or unlawful discrimination against or involving the Sellers with respect to the Business or the Acquired Assets, or any Business Employee or Business Service Provider.

4.17   <u>Employee Benefits</u>.

(a)     <u>Schedule 4.17(a)</u> of the Disclosure Schedule sets forth a true, correct, and complete list of each material Employee Benefit Plan. With respect to each material written Employee Benefit Plan, Sellers have delivered to Buyer true, correct, and complete copies of such Employee Benefit Plan or a summary of its material terms.

(b)     Each Employee Benefit Plan, including any associated trust or other funding instrument, has been established, funded, maintained, operated and administered (in form and operation) in all material respects in accordance with its terms and with all applicable Law, including ERISA and the Code, and to the Knowledge of Sellers, there has not occurred any act, omission, event or condition that would reasonably be expected to give rise to any material Liability of any Seller thereunder other than the obligations to make normal payments and contributions thereunder. Each Employee Benefit Plan that is intended to qualify under Section 401(a) of the Code has received a favorable determination, advisory or opinion letter from the IRS regarding its qualification thereunder and, to the Knowledge of Sellers, nothing has occurred since the date of the most recent such determination, advisory or opinion letter that would reasonably be expected to adversely affect the qualified status of any of such Employee Benefit Plans.

(c)     Except as set forth in <u>Schedule 4.17(c)</u> of the Disclosure Schedule, no Seller has, within the six (6)-year period preceding the date of this Agreement sponsored, maintained or contributed to (or has been obligated to contribute to), or has any current or contingent liability or obligation (including on account of an ERISA Affiliate) under or with respect to any: (i) "employee benefit pension plan" (as defined in Section 3(2) of ERISA) subject to Title IV of ERISA, Section 412 of the Code or Section 302 of ERISA (other than any Multiemployer Plan), (ii) "multiple employer plan" as defined in Section 413(e) of the Code, (iii) "welfare benefit trust" or "voluntary employees beneficiary association" within the meaning of Sections 419, 419A or 501(a)(9) of the Code or (iv) a "multiple employer welfare arrangement" (as defined in Section 3(40) of ERISA). Other than as required under Sections 601 to 608 of ERISA or other applicable Law, (y) through the end of the month in which a termination of employment occurs, or (z) in connection with severance benefits, no Employee Benefit Plan provides post-termination or retiree health

17

benefits to any individual for any reason, and Sellers have no Liability to provide post-termination or retiree health benefits to any individual.

(d)     Schedule 4.17(d) of the Disclosure Schedule lists each multiemployer plan (within the meaning of Section 3(37) or 4001(a)(3) of ERISA) that any Seller or its ERISA Affiliates have at any time sponsored, maintained, contributes to, or with respect to which any Seller could reasonably be expected to have any Liability (including on account of an ERISA Affiliate) (each, a "Multiemployer Plan").

(e)     All contributions required to have been made by any Seller to any Multiemployer Plan have, in all material respects been timely made or properly accrued as required by the terms of the applicable Collective Bargaining Agreement and applicable Law. No Seller or any of its ERISA Affiliates (i) has taken any action that has resulted or would reasonably be expected to result in any Withdrawal Liability being assessed against Sellers (including on account of their ERISA Affiliates, (ii) has incurred or would reasonably be expected to incur any Withdrawal Liability, including in connection with a "mass withdrawal," "partial withdrawal," "complete withdrawal," or "plan amendment" as described in Section 4041A of ERISA, or has incurred or would reasonably be expected to incur any other termination liability to the Pension Benefit Guarantee Corporation with respect to any Multiemployer Plan, (iii) has received notice that any Multiemployer Plan to which it contributes, is required to contribute, or with respect to which it has any Liability (x) is, or is expected to be, "insolvent" within the meaning of Section 4245 of ERISA, (y) has initiated proceedings to terminate, or (z) is considered to be "endangered" or in "critical" status under Section 432 of the Code, or (iv) is part of an arrangement or agreement (other than this Agreement) with any other employer to withdraw from a Multiemployer Plan.

(f)     There are, and for the past three (3) years there have been, no Actions pending or, to the Knowledge of Sellers, threatened, from any Governmental Authority in connection with any Employee Benefit Plan (other than routine benefit claims).

(g)     Neither Sellers nor any of their respective Affiliates has ever sponsored, maintained, participated in, contributed to, or been required to sponsor, maintain, participate in or contribute to, any employee benefit plan, program, or other arrangement providing compensation or benefits to any current or former officer, employee, member, contractor, or consultant (or any dependent or beneficiary thereof) which is subject to the Laws of any jurisdiction outside of the United States.

(h)     Each Employee Benefit Plan that provides for nonqualified deferred compensation has been operated and maintained in all material respects in form and operation with Section 409A of the Code. Neither Sellers nor any Affiliate has any obligation to "gross-up" or otherwise indemnify any individual for any Tax, including under Sections 409A or 4999 of the Code.

(i)     Each Employee Benefit Plan that is a "group health plan" for purposes of the Affordable Care Act has been maintained and administered in compliance in all material respects with the Affordable Care Act. No Seller is reasonably expected to have any Liability for Taxes under Sections 4975 through 4980 or Sections 4980A through 4980I of the Code.

(j)     Neither the execution and delivery of this Agreement, nor the consummation of the Contemplated Transactions, either alone or in combination with another event, will: (i) accelerate the vesting, funding or time of payment of any compensation, equity award or other benefit to any Business Service Provider; or (ii) require a contribution to any Employee Benefit Plan in respect of any Business Employee.

4.18    Finder's or Broker's Fees. Other than GLC Advisors & Co., LLC, who has been engaged as Sellers' investment banker, no Seller or any of its Representatives has engaged a broker or finder in connection with the Contemplated Transactions, and no broker, finder, or other Person is entitled to any commission or finder's fee in connection with the Contemplated Transactions based on agreements, arrangements, or understandings made by or on behalf of any Seller or Affiliate thereof.

4.19    Reserved.

4.20    Reserved.

4.21    Insurance. As of the date hereof, all insurance policies held by, or for the benefit of, the Business (other than any policy maintained in connection with an Employee Benefit Plan) (the "Insurance Policies") are in full force and effect, and no Seller (or any of their Affiliates) is in material default with respect to its obligations under any of such Insurance Policies, except for such failure to be in full force and effect and for such defaults that would not be expected to have a Material Adverse Change. Except as disclosed on Schedule 4.21 of the Disclosure Schedule, no insurer (a) has questioned, denied or disputed coverage of any claim pending under any Insurance Policy or (b) has threatened to cancel any Insurance Policy.

4.22    Reserved.

4.23    Target Cage Cash. At the Closing: (i) the Business shall hold an amount of Cage Cash at each Real Property that is not less than the levels of Cage Cash that it maintains at each such Real Property in the Ordinary Course of Business; (ii) the aggregate amount of all Cage Cash held by the Business and constituting an Acquired Asset shall not be less than the Target Cage Cash Amount.

4.24    No Other Representations or Warranties. Except for the Express Representations, no Seller or any other Person on behalf of any Seller makes any representation or warranty, express or implied, at law or in equity, with respect to any Seller, the Acquired Assets, the Business, the employees or the Assumed Liabilities, or with respect to any information, statements, disclosures, documents, projections, forecasts or other material of any nature made available or provided by any Person (including in any presentations or other materials prepared by any Seller or its Representatives) or in that certain datasite administered by Firmex and/or GLC Advisors (the "Data Room") or elsewhere to Buyer or any of its Affiliates or Representatives on behalf of any Seller or any of its Affiliates or Representatives. Without limiting the foregoing, no Seller or any other Person will have or be subject to any Liability or other obligation whatsoever to Buyer, or any other Person, resulting from the distribution to Buyer or any of its Affiliates or Representatives, or Buyer's or any of its Affiliates' or Representatives' use of or reliance on, any such information, including the Projections, any information, statements, disclosures, documents, projections, forecasts or other material made available to Buyer or any of its Affiliates or Representatives in the Data Room or otherwise in expectation of the Contemplated Transactions or any discussions with respect to any of the foregoing information. Other than the Express Representations, the Sellers disclaim any and all other representations and warranties, whether express or implied.

## ARTICLE V.
## REPRESENTATIONS AND WARRANTIES OF BUYER

Buyer hereby represents and warrants to Sellers as of the date hereof and as of the Closing as follows:

5.1 <u>Organization</u>. Buyer is a limited liability company duly organized, validly existing, and in good standing (to the extent such concept is legally recognized under the laws of the jurisdiction in which it was incorporated or otherwise organized) under the laws of the State of Nevada.

5.2 <u>Power and Authority; Authorization</u>. Buyer has all requisite power and authority to enter into, deliver, and perform its obligations under this Agreement and each Ancillary Document to which it is (or will be prior to or at the Closing) a party, to carry out its obligations hereunder and thereunder, and to consummate the Contemplated Transactions. The execution, delivery and performance of this Agreement and the Ancillary Documents to which Buyer is a party, the performance by Buyer of its obligations hereunder and thereunder, and the consummation by Buyer of the Contemplated Transactions have been (or in the case of any Ancillary Document to be entered into prior to or at the Closing, will be when executed and delivered) duly authorized by all requisite action.

5.3 <u>Enforceability</u>. This Agreement and each of the Ancillary Documents to which Buyer is a party constitute (assuming due authorization, execution, and delivery by the other parties hereto and thereto, and in the case of any Ancillary Document to be entered into prior to or at the Closing, will constitute when executed and delivered) valid and legally binding obligation of Buyer, enforceable in accordance with the terms hereof or thereof, as applicable, except as such enforceability may be limited by Enforceability Exceptions.

5.4 <u>No Consents or Approvals</u>. Except for applicable Gaming Approvals, no consent, approval, or authorization of, or notice, declaration, filing, or registration with, any Governmental Authority or any other third-party Person is required to be made or obtained by Buyer in connection with the execution, delivery, and performance of this Agreement and the Ancillary Documents or the consummation of the Contemplated Transactions.

5.5 <u>Non-Contravention</u>. Neither the execution, delivery, and performance of this Agreement or any Ancillary Document by Buyer nor the consummation by Buyer of the Contemplated Transactions or the Ancillary Documents will result in or constitute (a) a violation of any Law or Order to which Buyer is subject, (b) a conflict or breach under Buyer's organizational documents, or (c) a breach or violation of, a default (or an event that, with notice or lapse of time or both, would constitute a default) under, a termination of or acceleration of the performance required by (or a right of termination or acceleration under), any action by or notice to or consultation with any Person, or a requirement of any offer to purchase or prepayment of any debt or liability under any Contract to which Buyer is a party or by which its assets are subject.

5.6 <u>Gaming Approvals</u>. Neither Buyer nor any of its officers, directors, partners, managers, members, principals, or Affiliates which may reasonably be considered in the process of determining the suitability of Buyer for a Gaming Approval by a Gaming Authority, or any holders of any Equity Interests in Buyer who will be required to be licensed or found suitable under applicable Gaming Laws (the foregoing Persons collectively, the "<u>Licensing Affiliates</u>"), has ever abandoned or withdrawn (in each case in response to a communication from a Gaming Authority regarding a likely or impending denial, suspension or revocation) or been denied or had suspended or revoked a Gaming Approval, or an application for a Gaming Approval, by a Gaming Authority. Buyer and each of its Licensing Affiliates which is licensed or holds any Gaming Approval pursuant to applicable Gaming Laws (collectively, the "<u>Licensed Parties</u>") are in good standing in each of the jurisdictions in which Buyer or such Licensed Party owns, operates, or manages gaming facilities or is otherwise required to be licensed. There are no facts which, if known to any Gaming Authority, would be reasonably likely to (i) result in the denial, revocation, limitation or suspension of a Gaming Approval of any of the Licensed Parties or (ii) result in a negative outcome to any finding of suitability proceedings of any of the Licensed Parties currently pending, or under the suitability proceedings necessary for the consummation of the Contemplated Transactions.

5.7     Finder's or Broker's Fees. Buyer has not engaged a broker or finder in connection with any transaction contemplated by this Agreement, and no broker, finder, or other Person is entitled to any commission or finder's fee in connection with any of the Contemplated Transactions based on agreements, arrangements, or understandings made by or on behalf of Buyer.

5.8     Litigation. There are no Actions or Orders pending or, to Buyer's knowledge, threatened against or affecting Buyer that will have a material adverse effect on Buyer's performance of its obligations under this Agreement or the consummation of the Contemplated Transactions.

5.9     Financing. Buyer has, and will have at the Closing, sufficient funds in an aggregate amount necessary to pay the Purchase Price, to perform the Assumed Liabilities as they become due in accordance with their terms and to consummate all of the other Contemplated Transactions, including the payment of the Purchase Price and all fees, expenses of and other amounts required to be paid by Buyer in connection with the Contemplated Transactions. Buyer is and shall be capable of satisfying the conditions contained in Sections 365(b)(1)(C) and 365(f) of the Bankruptcy Code with respect to the Assigned Contracts and the related Assumed Liabilities.

5.10     Solvency. Buyer is, and immediately after giving effect to the Contemplated Transactions shall be, solvent and at all times shall: (a) be able to pay its debts as they become due, (b) own property that has a fair saleable value greater than the amounts required to pay its debt (including a reasonable estimate of the amount of all contingent Liabilities), and (c) have adequate capital to carry on its business. No transfer of property is being made and no obligation is being incurred in connection with the Contemplated Transactions with the intent to hinder, delay or defraud either present or future creditors of Buyer or any Seller. In connection with the Contemplated Transactions, Buyer has not incurred, nor plans to incur, debts beyond its ability to pay as they become absolute and matured.

5.11     No Other Representations or Warranties. Except for the representations and warranties contained in this Article V, neither Buyer nor any other Person makes any other express or implied representation or warranty with respect to the transactions contemplated hereby, and Buyer disclaims any other representations or warranties, whether made by Buyer, any Affiliate of Buyer or any of Buyer's or its Affiliates' respective Representatives.

**ARTICLE VI.**
**COVENANTS OF THE PARTIES**

6.1     Buyer's Access to Premises and Information. From the date hereof until the earlier of the termination of this Agreement and the Closing Date, upon reasonable advance written request by Buyer, Sellers will permit Buyer and its Representatives to have reasonable access during normal business hours and in a manner so as not to interfere unreasonably with the regular business operation of Sellers, to all properties, accounts, Records, Contracts, and employees of Sellers relating to the Business, in each case, for the sole purpose of consummating the Contemplated Transactions and will be governed by all the terms and conditions of the Confidentiality Agreement; provided that (a) Buyer and its Representatives shall reasonably cooperate with Sellers to maintain confidentiality regarding the Contemplated Transactions during such access and (b) the foregoing shall not require any Party to waive, or take any action with the effect of waiving, its attorney-client privilege or any confidentiality obligation to which it is bound with respect thereto or take any action in violation of applicable Law; provided, however, that with respect to information that if disclosed would require any Seller to violate any applicable Law, the Parties shall reasonably cooperate to enable Buyer to have permissible access to such information.

6.2     Conduct of Business Prior to the Closing. Subject to the applicable Conditions, and except as (i) required by any applicable Laws (including any Order of the Bankruptcy Court) or any requirements

or limitations resulting from the Bankruptcy Cases, (ii) as expressly provided by this Agreement, (iii) as set forth in Schedule 6.2 of the Disclosure Schedules, or (iv) consented to in writing by Buyer (which consent shall not be unreasonably withheld, conditioned or delayed), from and after the date of this Agreement until the Closing, Sellers shall (x) conduct the Business in the Ordinary Course of Business and (y) use commercially reasonable efforts to conduct, maintain and preserve intact the Business and to preserve the rights, goodwill and relationships of its Business Service Providers, customers, lenders, suppliers, regulators and others having relationships with the Business. Without limiting the generality or effect of the foregoing, from the date hereof until the Closing Date, Sellers shall:

(a)     preserve and maintain all Permits required for the conduct of the Business as currently conducted or for the ownership and use in the Ordinary Course of Business of the Acquired Assets;

(b)     continue to collect Accounts Receivable in the Ordinary Course of Business, without discounting such Accounts Receivable;

(c)     continue to timely pay or satisfy all payables as and when due in the Ordinary Course of Business;

(d)     continue to maintain levels of Cage Cash at each of the Real Properties of the PokerCo Companies in the Ordinary Course of Business;

(e)     maintain the Acquired Assets in materially the same condition as they were on the date of this Agreement, subject to reasonable wear and tear;

(f)     not transfer, lease, license, mortgage, pledge, or otherwise dispose of any Acquired Assets other than dispositions in the Ordinary Course of Business or less than $50,000 in the aggregate;

(g)     not enter into any new Contract except in the Ordinary Course of Business or as specifically authorized by the Bankruptcy Court, in each case, if the obligations under such Contract for applicable Sellers is reasonably valued in the aggregate in excess of $50,000;

(h)     not waive, release, assign, settle, or compromise any Claims or Actions that are Acquired Assets;

(i)     continue in full force and effect without material modification all Insurance Policies, except as required by applicable Law;

(j)     defend and protect the properties and assets included in the Acquired Assets from infringement or usurpation;

(k)     not (A) materially increase the wages, salaries, or bonuses payable to any Business Service Provider except as may be directed by an order of the Bankruptcy Court, (B) [reserved], (C) enter into, adopt, materially amend or terminate, or materially increase any benefits under any material Employee Benefit Plan or any plan, program, arrangement, policy, practice or agreement that would have been a material Employee Benefit Plan if it had been in existence on the date of this Agreement, (D) grant or agree to grant any equity or equity-based award, deferred compensation, material severance, material termination, material change-in-control or material retention pay to any Business Service Provider except as may be directed by an order of the Bankruptcy Court, (E) make any loans to any Business Service Provider (other than advances of expenses made in the Ordinary Course of Business), or (F) accelerate or agree to materially accelerate the time of payment or vesting of, or the lapsing of restrictions with respect to, or fund or

22

otherwise secure the payment of, any compensation or benefits under any Employee Benefit Plan, except, in each case of (A) through (F), as required by a Collective Bargaining Agreement or by any Employee Benefit Plan, as applicable, or to comply with any applicable Laws or as may be directed by an order of the Bankruptcy Court;

(l)       not hire, engage, terminate (other than for cause) or furlough the employment or engagement of any Business Service Provider who earns or is reasonably expected to earn (or prior to such termination, did earn) annual cash compensation in excess of $120,000;

(m)      not, with respect to the Business, take any action that would constitute a "mass layoff" or "plant closing" within the meaning of, or would otherwise trigger notice requirements or liability under, the WARN Act;

(n)      not (A) recognize any union (other than the Union) as the bargaining representative for any Business Employee, or (B) enter into, amend, extend, or terminate any Collective Bargaining Agreement;

(o)      timely pay when due all applicable state, city or municipal quarterly gaming Taxes or gaming license fees relating to the Acquired Assets or the Business;

(p)      comply in all material respects with all Laws applicable to the conduct of the Business or the ownership and use of the Acquired Assets;

(q)      maintain all accounts held in the name of any PokerCo Company that are progressive jackpot or player supported jackpot accounts (collectively, the "Player Accounts") with the funds therein being disbursed solely in the Ordinary Course of Business; provided, that Buyer acknowledges and agrees that the progressive jackpot and/or player supported jackpot accounts may be paid out to players in the Ordinary Course of Business prior to the Closing if such jackpots are triggered;

(r)      take necessary action to allow for the legal transfer of such Player Accounts or to allow for Buyer to legally control such Player Accounts as of the Closing; and

(s)      not take or permit any action that would cause any of the changes, events or conditions described in Section 4.7 to occur.

6.3      Contact with Company Related Persons. Subject to and except as may otherwise be provided in the Shareholder Services Agreement, prior to the Closing, each Party shall not (and shall cause its Affiliates and Representatives to not) contact in any manner (a) any vendors, suppliers, customers, contractors or consultants, manufacturers, lessees, lessors, licensees or employees of the other Party or its Affiliates, or (b) any other Persons having a known business, regulatory or supervisory relationship with the other Party, in each case, regarding the other Party, the Business or the Contemplated Transactions without the prior written consent of the applicable Party (such consent not to be unreasonably withheld, conditioned or delayed), and any such permitted contacts shall be conducted in a manner which will not adversely interfere with the operations or business relationships of the applicable Party with such Persons.

6.4      Closing Conditions; Reasonable Efforts. From the date hereof until the Closing (or earlier termination of this Agreement), each Party shall (and in the case of Sellers, subject to the applicable Conditions) use commercially reasonable efforts (a) to take all such actions as are reasonably necessary to expeditiously satisfy the closing conditions set forth herein and to cause the Contemplated Transactions to be effected as soon as practicable, but in any event on or prior to the Outside Date, and (b) to cooperate

with the other Parties and their respective Affiliates and Representatives in connection with any step required to be taken as a part of its obligations hereunder.

      6.5    <u>Required Licenses</u>.

      (a)    To the extent any applications for Permits necessary for the ownership of the Acquired Assets or the operation of the Business by Buyer may be made prior to Closing, within a reasonable period of time, but no later than 7 days following entry of the Sale Order, each Party shall have completed and filed with the applicable Governmental Authorities all applications for such Permits. To the extent requested by the applicable Governmental Authority, each Party shall promptly respond and provide such additional information or documentation as may be requested. The applicable Party shall keep the other Parties informed regarding the status of such applications and provide such information as any such other Party may reasonably request in connection therewith. Buyer and Sellers each covenant and agree to comply with all applicable obligations with respect to the Permits and other matters set forth therein. For the avoidance of doubt, this <u>Section 6.5(a)</u> shall not include Gaming Approvals.

      (b)    Without limiting the generality of the foregoing, (i) no later than ten (10) Business Days following the date of Buyer being determined to be the Successful Bidder, Buyer and Seller Representative will meet and confer with the Gaming Authorities in order to determine what Gaming Approvals will be required in order to allow the Closing to take place, and (ii) Buyer and Sellers and their respective Representatives and Affiliates (as applicable), shall file, or cause to be filed, as soon as reasonably practicable after the date of such meeting(s) but no later than fourteen (14) days following entry of the Sale Order, all Gaming Approvals and shall act diligently and promptly to pursue the Gaming Approvals and shall cooperate with each other in connection with the making of all filings referenced in the preceding sentence, including providing copies of all such non-confidential documents to the non-filing parties hereto and their advisors prior to filing and, if requested, to accept all reasonable additions, deletions or changes suggested in connection therewith. Buyer and Sellers (as applicable) shall use reasonable best efforts to schedule and attend any hearings or meetings with Gaming Authorities to obtain the Gaming Approvals as promptly as possible. Buyer and Sellers shall have the right to review in advance and, to the extent practicable, each will consult all of the parties hereto on, in each case, subject to applicable Laws relating to the exchange of information (including any antitrust Laws and any Gaming Laws), all the non-confidential information relating to Buyer or Sellers, as the case may be, and any of their respective Affiliates or Representatives which appear in any filing made with, or written materials submitted to, any third party or any Governmental Authority in connection with the Contemplated Transactions. Without limiting the foregoing, Buyer and Sellers will notify all of the other parties hereto promptly of the receipt of material comments or requests from any Governmental Authority relating to Gaming Approvals, and will supply all of the other parties hereto with copies of all material non-confidential correspondence between the notifying party or any of its Representatives and Governmental Authorities with respect to Gaming Approvals. Buyer shall cause its Affiliates to make all filings and take all actions reasonably necessary or advisable to facilitate the receipt by Buyer of all required Gaming Approvals.

      6.6    <u>Antitrust Matters</u>. Each Seller and Buyer agrees to file all appropriate notifications and required filings pursuant to any applicable regulatory, antitrust or competition laws with respect to the Contemplated Transactions in the most expeditious manner practicable, and to supply promptly any additional information and documentary material that may be requested of such Party by the relevant Governmental Authorities in connection with any such applicable regulatory, antitrust or competition laws. Buyer agrees to take, and to cause its Affiliates to take, any and all steps necessary to avoid or eliminate as soon as possible each and every impediment under any such applicable regulatory, antitrust or competition laws that may be asserted by any United States or other Governmental Authority so as to enable the Parties to expeditiously consummate the Contemplated Transactions (and, for the avoidance of doubt, so as to avoid an in-depth or second-phase review by the relevant Governmental Authority), including

(i) committing to or effecting, by consent decree, hold separate order or otherwise, the sale or disposition of such assets, securities, facilities or other properties as are required to be divested in order to obtain all applicable merger control clearances under any applicable regulatory, antitrust or competition laws and (ii) defending through litigation on the merits, including appeals, any claim asserted in any court or other proceeding by any Person. Buyer shall pay the filing fees associated with filings under any applicable regulatory, antitrust or competition laws. Each Seller and Buyer agrees not to participate in any substantive meeting or discussion, either in person or by telephone, with any Governmental Authority in connection with the Contemplated Transactions unless it (a) consults with the other Parties in advance, if at all possible and (b) to the extent not prohibited by such Governmental Authority, gives the other Parties the opportunity to attend and participate. Sellers and Buyer will permit each other to review in advance of any proposed material written communications to any such Governmental Authority and incorporate the other Parties' reasonable comments and will supply each other with copies of all correspondence, filings or communications with Governmental Authorities, with respect to the Contemplated Transactions; provided, however, that to the extent any of the documents or information are commercially or competitively sensitive, Sellers or Buyer, as the case may be, may satisfy its obligations by providing such documents or information to the other Parties' outside antitrust counsel, with the understanding that such antitrust counsel shall not share such documents and information with its client.

6.7     Notice of Breach. From the date hereof until the Closing, each Party shall promptly notify the other Parties of any material breach by such Party of any representation, warranty or covenant made by such Party hereunder or occurrence of any event or circumstance which will reasonably result in such a breach.

6.8     Bankruptcy Matters.

(a)     Bankruptcy Filings. Sellers shall (A) reasonably cooperate with Buyer concerning the Sale Order and any other orders of the Bankruptcy Court relating to the Contemplated Transactions, (B) use commercially reasonable efforts to cause the Sale Hearing to be held no later than September 30, 2025; and (C) use commercially reasonable efforts to provide Buyer with copies of all applications, pleadings, notices, proposed orders and other documents relating to this Agreement or the Contemplated Transactions, at least one (1) day in advance of the proposed filing date so as to permit Buyer sufficient time to review and comment on such drafts and, with respect to all provisions that materially impact Buyer, such pleadings and proposed orders shall be reasonably acceptable to Buyer and consistent with this Agreement. Sellers shall give Buyer reasonable advance notice of any hearings regarding the motions required to obtain the issuance of the Sale Order.

(b)     Sellers shall use good faith, commercially reasonable efforts to comply with the requirements of the Bankruptcy Code, Federal Rules of Bankruptcy Procedure and any applicable local rules or orders, for service on and noticing of all known and unknown creditors, and any other parties entitled to receive notice, in connection with the Contemplated Transactions or the Sale Order, in each case as may be modified under the Bidding Procedures Order or otherwise approved by the Bankruptcy Court.

6.9     Receipt of Misdirected Assets; Liabilities. From and after the Closing, if any Party or any of its Affiliates receives any right, property or asset that is an Acquired Asset (in the case of any Seller) or Excluded Asset (in the case of Buyer), such Party shall promptly transfer or cause such Affiliates to promptly transfer such right, property or asset (and shall promptly endorse and deliver any such right, property, or asset that is received in the form of cash, checks or other documents) to the applicable other Party, and such other party shall be obliged to accept such return or transfer, without the payment of any consideration therefor, and such asset will be deemed the property of the applicable other Party held in trust by such Party for the applicable other Party until so transferred. From and after the Closing, if any Party or any of its Affiliates is subject to a Liability that should belong to another Party pursuant to the terms of this

Agreement, such Party shall promptly transfer or cause such Affiliates to promptly transfer such Liability to such other Party, and such other Party shall assume and accept such Liability without the payment of any further consideration therefor.

6.10    Duplication of Records. Prior to the Closing, the Seller Representative may make, and retain and use following the Closing, duplicate copies of any Records (including archival copies of all Assigned Contracts, books, records and other documents or materials conveyed hereunder); provided that such Seller shall, and shall cause its controlled Affiliates to, only use duplicated copies of Records solely (i) to comply with reporting, disclosure, filing or other requirements imposed on such Seller or its Affiliates by a Governmental Authority (including if so required under the Bankruptcy Code, Bankruptcy Court local rules or requested by the Bankruptcy Court), (ii) to prepare financial statements or Tax Returns, or in order to satisfy audit, accounting or other similar requirements of such Seller or its Affiliates, (iii) to defend any Action (including any Tax audit or examination) against or by any Seller or any of their respective Affiliates or (iv) as necessary to administer any wind-down, dissolution, liquidation, reorganization or plan of reorganization of such Seller or its Affiliates. In the event any Records are used both by the Business and the Retained Business, each Party agrees to use its commercially reasonable efforts to enter into mutually acceptable arrangements to share such Records with both the Seller Representative (on behalf of Sellers and their Affiliates) and any buyers of, or successors to, the Retained Business, including any trustee.

6.11    Backup Bidder. If an Auction is conducted, and Sellers do not choose Buyer as the Successful Bidder, but instead choose Buyer as the Backup Bidder in accordance with the Bidding Procedures Order, Buyer will serve as the Backup Bidder. If Buyer is chosen as the Backup Bidder, Buyer will be required to keep its bid to consummate the Contemplated Transactions on the terms and conditions set forth in this Agreement (as the same may be improved upon by Buyer prior to or at the Auction) open and irrevocable until the closing of the sale of the Acquired Assets to the Successful Bidder, subject to the Backup Bid Outside Date. If the Alternative Transaction with the Successful Bidder is terminated prior to the termination of this Agreement, Buyer will be deemed to be the Successful Bidder and will forthwith consummate the Contemplated Transactions on the terms and conditions set forth in this Agreement (as the same may be improved upon by Buyer prior to or at the Auction).

6.12    Disclosure Schedules.  The Sellers shall use good faith efforts to promptly provide the Disclosure Schedules applicable to Articles II, IV and VI, with such schedules to be provided to Buyer no later than fourteen (14) days before the Sale Hearing, and to be in form and substance reasonably acceptable to each Party.  Sellers, jointly and severally, hereby (a) represent and warrant to Buyer that the information set forth in the Disclosure Schedules will not be different in any material respect than if such schedules had been delivered as of the date of the Support Agreement (and true and correct as of such date), other than changes resulting from the Business operating in the Ordinary Course of Business or (b) agree to consider in good faith any amendments to this Agreement as may be reasonably necessary to deliver the Acquired Assets as of the date of the Support Agreement, after accounting for or giving effect to the Sale Order and other than changes resulting from the Business operating in the Ordinary Course of Business.

6.13    General Seller Assistance. Subject to compliance with applicable Law (including antitrust Laws and Gaming Laws), from the date of this Agreement until Closing, Sellers shall, and shall cause their respective Affiliates to, reasonably cooperate with Buyer and use their respective commercially reasonable efforts to assist Buyer in connection with the transition of the Business to Buyer.

6.14    No Control. Except as permitted by the terms of this Agreement or as reasonably necessary or appropriate to comply with all applicable Gaming Laws, prior to the Closing, Buyer or the Buyer Group shall not directly or indirectly control, supervise, direct or interfere with, or attempt to control, supervise, direct or interfere with, the Business. Until the Closing, the operations and affairs of the Business are the

sole responsibility of and under the complete control of Sellers, except as expressly provided for in this Agreement.

6.15    Employees & Benefit Plans.

(a)     Buyer recognizes that the International Brotherhood of Teamsters (Teamsters Local Union Nos. 38, 117, 760 and 839) (the "Union") is the exclusive collective bargaining agent for certain Business Employees pursuant to the Maverick CBA.  For the avoidance of doubt, no Seller is a party to the Maverick CBA, and the Maverick CBA is an Excluded Contract.  Buyer agrees to negotiate in good faith with the Union for a new Collective Bargaining Agreement with respect to the Union Business Employees.  For the avoidance of doubt, Seller Representative consents to facilitate discussions among Buyer, the Union and Seller Representative with respect to the Contemplated Transactions from and after the date hereof.  Subject to the foregoing, at least five (5) Business Days prior to the Closing, Buyer or one of its Affiliates will make offers of employment, and commence employment as so offered, to Union Business Employees who are then employed by any Seller or its Affiliates, to be effective as of the Closing, on initial terms and conditions of employment set by Buyer. Any Union Business Employee who accepts such offer and commences employment with Buyer or its Affiliate immediately after the Closing is referred to herein as a "Union Transferred Employee." Effective as of the Closing, all Union Transferred Employees shall be deemed to have resigned from their employment with the Sellers and their Affiliates.

(b)     At least ten (10) Business Days prior to the Closing Date, Sellers shall provide Buyer with an updated Business Service Provider Census reflecting any new hires or engagements and terminations or departures of any Business Service Provider.

(c)     At any time after being selected as the Successful Bidder, but in any event no later than five (5) Business Days prior to the Closing Date, Buyer or one of its Affiliates shall make a written offer of at-will employment to all Non-Union Business Employees then employed by Sellers or an applicable Affiliate, to be effective as of the Closing Date, on terms and conditions substantially similar to the current terms and conditions of such Person's employment. Any Non-Union Business Employee who accepts such offer and commences employment with Buyer or its Affiliate immediately after the Closing is referred to herein as a "Non-Union Transferred Employee" (together with the Union Transferred Employees, the "Transferred Employees"). Effective as of the Closing, all Non-Union Transferred Employees shall be deemed to have resigned from their employment with the Sellers and their Affiliates.

(d)     Notwithstanding anything to the contrary herein, the hiring by Buyer or its Affiliate of any Business Employee as set forth in this Section 6.15 is conditioned upon the occurrence of the Closing, and upon satisfaction, at Buyer's reasonable discretion, of such reasonable standard hiring practices or requirements as Buyer or its Affiliate may include in its written offer or employment letter to such employees (including, without limitation, completion of Form I-9, minimum qualifications for specific positions and standard pre-employment screenings or background checks and similar requirements that are imposed on similarly situated employees of Buyer or its applicable Affiliate in the same or similar geographic area and business).

(e)     With respect to each other Business Service Provider who is not a Business Employee, and who is engaged by Sellers or any Affiliate prior to the Closing Date, Buyer or one of its Affiliates may, in their sole discretion, make a written offer of engagement, to be effective as of the Closing Date, on terms and conditions determined in Buyer or its Affiliate's sole discretion.

(f)     Prior to the Closing, Sellers shall, or shall cause their applicable Affiliates to, satisfy any pre-Closing notice, consultation, or consent right, if any, that is required to be provided or afforded to a Union after signing this Agreement and before the Closing.

(g)     Buyer shall not assume any Employee Benefit Plan or any Liabilities thereunder.

(h)     [Reserved.]

(i)     Notwithstanding the provisions of this <u>Section 6.15</u> or any provision of this Agreement, nothing in this <u>Section 6.15</u> or this Agreement is intended to or shall (i) create in any Person any third-party rights with respect to the subject matter contained in this <u>Section 6.15</u>, (ii) amend any Employee Benefit Plan or other benefit plan, program, policy, or arrangement, (iii) require Buyer or any of its Affiliates, or any Seller or any of its Affiliates, to continue any Employee Benefit Plan or other benefit plan, program, policy or arrangement beyond the time when it otherwise lawfully could be terminated or modified or as otherwise required herein or (iv) provide any Business Employee or any Transferred Employee with any rights to employment or continued employment.

## ARTICLE VII.
## CONDITIONS PRECEDENT TO BUYER'S PERFORMANCE

7.1    <u>Buyer's Closing Conditions</u>. The obligations of Buyer to consummate the Contemplated Transactions shall be subject to the satisfaction, at the Closing, of all the conditions set out below. Buyer may, in its sole discretion, waive any or all of these conditions in whole or in part by giving written notice to Seller Representative.

(a)     No Governmental Authority shall have enacted, issued, promulgated, enforced or entered any Order which is in effect and has the effect of making the Contemplated Transactions illegal, otherwise restraining or prohibiting consummation of such transactions or causing any of the Contemplated Transactions to be rescinded following completion thereof.

(b)     Sellers shall have obtained all consents, approvals, interim authorization, findings of qualification and/or suitability, licenses, permits, orders or authorizations of and registrations, declarations or filings with any Governmental Authority with jurisdiction in respect of the Gaming Laws (including Gaming Approvals) required or necessary to close the Contemplated Transactions shall be in full force and effect.

(c)     (i) The representations and warranties made by Sellers in <u>Article IV</u> (other than Fundamental Representations) shall be true and correct in all respects (disregarding all qualifications or limitations as to "materiality" or "Material Adverse Change" and words of similar import set forth therein) as of the Closing Date as though such representations and warranties had been made on and as of the Closing Date (except that representations and warranties that are made as of a specified date need be true and correct only as of such date), except where the failure of such representations and warranties to be true and correct has not had, and would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Change and (ii) the Fundamental Representations shall be true and correct in all respects, except for *de minimis* inaccuracies, as of the Closing Date as though such representations and warranties had been made on and as of the Closing Date (except that representations and warranties that are made as of a specified date need be true and correct in all respects only as of such date).

(d)     Sellers shall have performed and complied in all material respects with all of the covenants and agreements required by this Agreement to be performed or complied with by Sellers on or before the Closing.

(e)     The Bankruptcy Court shall have entered the Sale Order.

(f)     The Bankruptcy Court shall have entered an Order approving the Shareholder Services Agreement, in form and substance reasonably acceptable to Buyer.

(g)     Buyer shall have received the deliverables set forth in <u>Section 3.7</u> required to be delivered by Sellers to Buyer.

7.2     <u>Waiver of Conditions</u>. Upon the occurrence of the Closing, any condition set forth in this <u>Article VII</u> that was not satisfied as of the Closing will be deemed to have been waived for all purposes by Buyer as of and after the Closing. Buyer may not rely on the failure of any condition set forth in this <u>Article VII</u> to be satisfied if such failure was caused by Buyer's failure to perform any of its obligations under this Agreement.

7.3     <u>Support Agreement Conditions</u>. Notwithstanding anything to the contrary in this Agreement:

(a)     Any obligation of Buyer to perform under this Agreement or consummate the Contemplated Transactions is subject to the receipt at Closing by the Buyer of the executed Intellectual Property Assignment Agreement providing rights to Buyer and the Debtors consistent with the Support Agreement and otherwise in form and substance reasonably satisfactory to each Party; *provided*, *however*, that if the subject Intellectual Property is acquired by a third party in the course of the Debtors' pending sale process prior to the Closing, then the Intellectual Property Assignment Agreement may, with the agreement of the Debtors, be substituted for all purposes hereunder by an agreement between Buyer and such third party that provides Buyer with equivalent or better rights and is otherwise in form and substance reasonably acceptable to Buyer (or substituted agreement in accordance with the foregoing sentence); *provided*, *further*, that Buyer shall pay $100,000 at the Closing to the Debtors as additional consideration for the Intellectual Property Assignment Agreement (or to its counterparty to a substituted agreement in accordance with the foregoing sentence).

(b)     Any obligation of Buyer to perform under this Agreement or consummate the Contemplated Transactions is subject to the full execution and Bankruptcy Court approval of the Shareholder Services Agreement.

(c)     Any obligation of Buyer to perform under this Agreement or consummate the Contemplated Transactions is subject to the designation of this Agreement as the Stalking Horse Bid with respect to the Business, and approval thereof by the Bankruptcy Court, with the following bid protections: (i) in the event that this Agreement is not determined to be the Successful Bid or Backup Bid on or before September 30, 2025, or the Closing Date does not occur by the Outside Date and Buyer validly terminates this Agreement pursuant to <u>Section 10.1</u>, then within three (3) Business Days the Sellers shall pay $150,000 to Buyer, without deduction, setoff or counterclaim, as an expense reimbursement; (ii) [reserved]; (iii) no bid shall be considered as topping this Agreement unless it provides the Debtors with net present value of not less than $16 million (as shall be determined by the Debtors consistent with the Bidding Procedures Order); and (iv) if the Auction takes place, the Acquired Assets shall be auctioned as a single package (without additions thereto) with bidding increments of not less than $500,000.

## ARTICLE VIII.
## CONDITIONS PRECEDENT TO SELLERS' PERFORMANCE

8.1     <u>Sellers' Conditions</u>. The obligations of Sellers to consummate the Contemplated Transactions shall be subject to the satisfaction, at the Closing, of all the conditions set out below. Seller Representative may, in their sole discretion, waive any or all of these conditions in whole or in part by giving written notice to Buyer.

(a)     No Governmental Authority shall have enacted, issued, promulgated, enforced or entered any Order which is in effect and has the effect of making the Contemplated Transactions illegal, otherwise restraining or prohibiting consummation of such transactions or causing any of the Contemplated Transactions to be rescinded following completion thereof.

(b)     Buyer and the Buyer Group shall have obtained all consents, approvals, interim authorization, findings of qualification and/or suitability, licenses, permits, orders or authorizations of and registrations, declarations or filings with any Governmental Authority with jurisdiction in respect of the Gaming Laws (including Gaming Approvals) required or necessary to close the Contemplated Transactions shall be in full force and effect.

(c)     The representations and warranties made by Buyer in Article V shall be true and correct in all respects as of the Closing Date as though such representations and warranties had been made on and as of the Closing Date (except that representations and warranties that are made as of a specified date need be true and correct only as of such date), except to the extent that the failure of such representations and warranties to be true and correct has not had a material adverse effect on the ability of Buyer to consummate the Contemplated Transactions.

(d)     Buyer shall have performed and complied in all material respects with all of the covenants and agreements required by this Agreement to be performed or complied with by Buyer on or before the Closing.

(e)     The Bankruptcy Court shall have entered the Sale Order.

(f)     Seller Representative shall have received the deliverables set forth in Section 3.8 required to be delivered by Buyer to Seller Representative.

8.2     <u>Waiver of Conditions</u>. Upon the occurrence of the Closing, any condition set forth in this Article VIII that was not satisfied as of the Closing will be deemed to have been waived for all purposes by Sellers as of and after the Closing. No Seller may rely on the failure of any condition set forth in this Article VIII to be satisfied if such failure was caused by such Party's failure to perform any of its obligations under this Agreement.

## ARTICLE IX.
## TAXES

9.1     <u>Transfer Taxes</u>. Buyer shall bear all stamp, documentary, registration, value-added, transfer, sales, use, reporting, recording, filing and other similar fees, Taxes and charges including any interest and penalties with respect thereto ("<u>Transfer Taxes</u>") resulting from the transfer of the Acquired Assets and the assumption of the Assumed Liabilities effected pursuant to this Agreement to the extent determined to not be exempt in accordance with Section 1146 of the Bankruptcy Code. Buyer or the applicable Seller, as required by applicable Law, shall prepare and file all necessary Tax Returns or other documents with respect to all such Transfer Taxes, <u>provided</u> that any Seller that prepares (or causes to be prepared) a Transfer Tax Return shall provide Buyer with a draft of such Tax Return no less than five (5) days prior to its due date (or, if due within five (5) days of the Closing, as soon as reasonably practicable) for Buyer's review and comment and shall make any changes reasonably requested by Buyer. Buyer shall pay any Transfer Taxes either to the appropriate Seller (or Affiliate of the Seller) or to the relevant Governmental Authorities as required by applicable Law, or the Buyer shall reimburse any Seller (or its Affiliate) for any Transfer Taxes paid by any Seller (or its Affiliate).

9.2     Allocation of Purchase Price. Each Seller and Buyer agree that the purchase price (plus the Assumed Liabilities and other items to the extent properly taken into account for Tax purposes) shall be allocated for Tax purposes among the Acquired Assets in accordance with Section 1060 of the Code and the Treasury Regulations promulgated thereunder (and any similar provision of state, local or foreign law, as appropriate) (the "Allocation"). The Allocation shall be prepared and delivered by Buyer to Seller Representative within 30 days of the NWC Adjustment Amount Determination Date for Seller Representative's review and comment. If Seller Representative does not notify Buyer in writing of its objection or comment to any allocation set forth thereon within 30 days after Buyer's delivery of the Allocation, the Allocation prepared by Buyer shall be the final Allocation. If, within 30 days after Buyer's delivery of the Allocation, Seller Representative notifies Buyer in writing that Seller Representative objects to any allocation set forth thereon, Buyer and Seller Representative shall negotiate in good faith to resolve such objection. If Seller Representative and Buyer are unable to resolve all disputed items within 15 days after the delivery of the Seller Representative's written objection to Buyer, the Parties shall jointly retain a mutually agreed independent internationally recognized accounting firm (the "Accounting Firm") (which may in turn select an appraiser, if needed) to resolve any disputed item(s). The costs, fees and expenses of the Accounting Firm shall be borne by Buyer. The Accounting Firm shall resolve any such dispute within thirty 30 days after its retention, and the Allocation shall be adjusted to reflect any such resolution of any disputed item(s). Each Seller and Buyer agree that said Allocation (as finally determined pursuant to this Section 9.2) shall be used by Sellers and Buyer in reporting the transactions (including IRS Form 8594) covered by this Agreement for Tax purposes and neither any Seller nor Buyer will take any position (or will allow any of their respective Affiliates to take any position) (whether in audits, Tax Returns, or otherwise) that is inconsistent with the Allocation (as finally determined pursuant to this Section 9.2), except, in each case, to the extent otherwise required by a final determination pursuant to Section 1313(a) of the Code (or any comparable provision of state, local or foreign law) or as Buyer or Seller (as applicable) determines is necessary to settle a dispute with a Taxing Authority after making a good faith effort to defend the Allocation. In the event that a Taxing Authority disputes the final Allocation (as finally determined pursuant to this Section 9.2), the Party receiving notice of such dispute shall promptly notify the other Party hereto, and the Parties shall, and shall cause their respective Affiliates to, use commercially reasonable efforts to defend such final Allocation in any applicable proceeding. The Sellers and Buyer shall reasonably cooperate in determining any allocation necessary for the determination of the amount of any Transfer Tax payable prior to the determination of the final Allocation.

9.3     Withholding. Buyer and its Affiliates and designees shall be entitled to deduct and withhold any amounts as are required to be deducted and withheld under any applicable Tax Law in connection with payments required to be made pursuant to the terms of this Agreement. To the extent any such withheld amounts are properly deducted and withheld pursuant to applicable Tax Law, such amounts shall be treated for all purposes of this Agreement as having been paid to the Person in respect of which such withholding was made and shall be timely paid to the appropriate Taxing Authority. Buyer and its Affiliates and designees shall provide at least five (5) Business Days' notice to the applicable Person prior to making such withholding or deduction  (except to the extent that such applicable Person has failed to comply with Section 9.8), and the Parties shall reasonably cooperate with each other to minimize or eliminate any potential deductions and withholdings that may be required under applicable Tax Law.

9.4     Straddle Period.  In the case of any Straddle Period, Taxes shall be treated as attributable to the portion of such period that ends on the Closing Date as follows: (i) in the case of any sales, use, value-added, employment, or withholding Tax or other Taxes not described in clause (ii), or any Tax based on or measured by income, profits, gains, receipts, or activities, the level of any item shall be determined based on an interim closing of the books as of the end of the Closing Date (and for such purpose, the taxable period shall be deemed to terminate at such time), except that exemptions, allowances or deductions that are calculated on a periodic basis (including depreciation and amortization deductions), other than with respect to property placed in service after the Closing, shall be allocated on a *per diem* basis ending on the

Closing Date and (ii) in the case of real property, personal property and similar *ad valorem* Taxes (other than Transfer Taxes), shall be deemed to be the amount of such Taxes for the entire period multiplied by a fraction, the numerator of which is the number of calendar days in the portion of the period ending on the Closing Date and the denominator of which is the number of calendar days in the entire period.

9.5     <u>Cooperation</u>. Each Party and its Affiliates shall reasonably cooperate, as and to the extent reasonably requested by any other Party, in connection with the filing of Tax Returns and any Action, audit, litigation, or other proceeding with respect to Taxes.

9.6     *Pierce*. Each Seller agrees that neither such Seller nor its Affiliates shall report on any Tax Return a deemed payment or deduction in connection with the Contemplated Transactions under James M. Pierce Corp. v. Comm., 326 F.2d 67 (8th Cir. 1964), with respect to any prepaid amount (if any) of Sellers in respect of the Acquired Assets or the Business or with respect to any Acquired Asset the income recognition of which has been deferred pursuant to IRS Revenue Procedure 2004-34, 2004-22 I.R.B. 991, IRS Notice 2018-35, 2018-18 I.R.B. 522, Section 451(c) of the Code, or Treasury Regulations Section 1.451-8.

9.7     <u>Washington State Gaming Taxes</u>. The Sellers shall pay (or cause to be paid), when due, any applicable state, city or municipal quarterly gaming Taxes or gaming license fees relating to Washington State gaming license Taxes in respect of the Acquired Assets or the Business through and including the third quarter of 2025.

9.8     <u>IRS Form W-9</u>. Not later than eight (8) Business Days prior to the Closing Date, the Seller Representative shall deliver to Buyer a properly completed and duly executed IRS Form W-9 of each applicable Seller (or, if applicable, its regarded owner for U.S. federal income tax purposes).

9.9     <u>Net Working Capital</u>. Notwithstanding anything to the contrary herein, in order to avoid double counting, if any Taxes are accounted for as a liability in the calculation of Net Working Capital as finally determined pursuant to <u>Section 3.4</u>, (a) Sellers shall have no obligation under this Agreement to reimburse Buyer for such Taxes or fees (other than through the calculation of the Net Working Capital Adjustment Amount), and (b) if it is determined that such Taxes or fees were properly paid by Sellers to the applicable Governmental Authority and such Taxes or fees reduced the amount that would have otherwise been due to Sellers under <u>Section 3.4</u>, Buyer shall promptly reimburse such amount to Seller Representative upon the delivery by Seller Representative of reasonable written evidence that such Taxes or fees have been so paid to the applicable Governmental Authority.

9.10     [Reserved].

9.11     <u>Bulk Sales</u>. The Parties intend that, pursuant to Section 363(f) of the Bankruptcy Code, the transfer of the Acquired Assets shall be free and clear of any liens or claims arising out of the bulk transfer laws to the greatest extent permissible, and the Parties shall take such steps as may be necessary or appropriate to so provide in the Sale Order. In furtherance of the foregoing, each Party hereby waives compliance by the Parties with the "bulk sales," "bulk transfers" or similar laws and all other similar laws in all applicable jurisdictions in respect of the Contemplated Transactions.

**ARTICLE X.**
**TERMINATION**

10.1     <u>Termination of Agreement</u>. This Agreement may be terminated only in accordance with this <u>Section 10.1</u>. This Agreement may be terminated at any time prior to the Closing:

(a)  by mutual written consent of Buyer and Seller Representative;

(b)  by written notice of either Buyer or Seller Representative, upon the issuance of an Order by a court of competent jurisdiction restraining, enjoining, or otherwise prohibiting the consummation of the Contemplated Transactions or declaring unlawful the Contemplated Transactions, and such Order having become final, binding and non-appealable; provided that no termination may be made by a Party under this Section 10.1(b) if the issuance of such Order was caused by such Party's breach of, or failure to perform any of its obligations under, this Agreement;

(c)  by written notice of either Buyer or Seller Representative, if the Closing shall not have occurred on or before the Outside Date; provided, that a Party shall not be permitted to terminate this Agreement pursuant to this Section 10.1(c) if the failure of the Closing to have occurred by the Outside Date was caused by such Party's breach of, or failure to perform any of its obligations under, this Agreement or failure to negotiate in good faith or engage with respect to any Ancillary Document;

(d)  by written notice from Buyer to Seller Representative, if any Seller or Seller Representative has breached, or failed to perform, any of its representations, warranties, covenants or agreements set forth in this Agreement, in each case, such that the conditions set forth in Section 7.1(b) or 7.1(c) would not be satisfied; provided, that (i) if such breach or failure is curable by such Seller or Seller Representative, then Buyer may not terminate this Agreement under this Section 10.1(d) unless such breach or failure has not been cured by the date that is two (2) Business Days prior to the Outside Date and (ii) the right to terminate this Agreement pursuant to this Section 10.1(d) shall not be available to Buyer at any time that Buyer is in material breach of any representation, warranty, covenant or agreement hereunder;

(e)  by written notice from Seller Representative to Buyer, if Buyer has breached, or failed to perform, any of its representations, warranties, covenants or agreements set forth in this Agreement, in each case, such that the conditions set forth in Section 8.1(b) or 8.1(c) would not be satisfied; provided, that (i) if such breach or failure is curable by Buyer, then Seller Representative may not terminate this Agreement under this Section 10.1(e) unless such breach or failure has not been cured by the date that is two (2) Business Days prior to the Outside Date and (ii) the right to terminate this Agreement pursuant to this Section 10.1(e) will not be available to Seller Representative at any time that any Seller is in material breach of any representation, warranty, covenant or agreement hereunder;

(f)  by written notice from Seller Representative to Buyer if (i) all of the conditions set forth in Section 7.1 have been satisfied (other than conditions that by their nature are to be satisfied at the Closing, but subject to the satisfaction or waiver of such conditions at the Closing) or waived and (ii) Buyer fails to complete the Closing at the time required by Section 3.6;

(g)  by written notice from Seller Representative to Buyer, if the board of managers or similar governing body of any Seller determines in good faith, after consultation with outside legal counsel, that proceeding with the Contemplated Transactions or failing to terminate this Agreement would be inconsistent with such Person's or body's fiduciary duties.

(h)  automatically if the Bankruptcy Court enters an Order approving an Alternative Transaction and Sellers close on such Alternative Transaction;

(i)  by written notice of either Buyer or Seller Representative in the event the Bankruptcy Case is dismissed or converted to cases under Chapter 7 of the Bankruptcy Code; or

(j)  by written notice of either Buyer or Seller Representative if Buyer is not the Successful Bidder or the Backup Bidder at the Auction;

(k)      notwithstanding anything to the contrary in this Agreement, by written notice from Buyer to Seller Representative if the Intellectual Property Assignment Agreement (or such other agreement as provided by <u>Section 7.3(a)</u>), is not in effect on or before the Outside Date; or

(l)      notwithstanding anything to the contrary in this Agreement, by written notice from Buyer to Seller Representative if the Bankruptcy Court has not entered an Order approving the Shareholder Services Agreement by the Outside Date.

10.2    <u>Effect of Termination</u>. In the event of termination of this Agreement pursuant to <u>Section 10.1</u>, this Agreement shall forthwith become void and there shall be no liability on the part of any Party or any of its partners, officers, directors, managers, equity holders or shareholders; <u>provided</u> that (a) <u>Section 2.9</u>, this <u>Section 10.2</u>, <u>Section 12.9</u> and <u>Article XII</u> and the definitions referenced in such Sections and Articles, even if not included in such Sections and Articles, shall survive any such termination and (b) nothing herein shall relieve any Party from liability for any willful breach of any provision hereof.

10.3    <u>Alternative Proposals</u>. Notwithstanding anything in this Agreement to the contrary, Sellers may participate in discussions or negotiations with, or furnish information with respect to Sellers or the Business to any Person if (a) (i) such Person has submitted to Sellers a bona fide written proposal to acquire the stock or assets of Sellers, upon receipt of which Sellers shall give prompt written notice to Buyer and (ii) Sellers determine in their good faith judgment that taking such action is consistent with their fiduciary duties or (b) in accordance with the Bidding Procedures Order and the Bidding Procedures.

## ARTICLE XI.
## SURVIVAL; POST-CLOSING MATTERS

11.1    <u>Survival; Certain Waivers</u>. Except as provided in <u>Section 3.10</u>, each of the representations and warranties and the covenants and agreements (to the extent such covenant or agreement contemplates or requires performance by such Party prior to the Closing) of the Parties set forth in this Agreement or in any other document contemplated hereby, or in any certificate delivered hereunder or thereunder, will terminate effective immediately as of the Closing such that no claim for breach of any such representation, warranty, covenant or agreement, detrimental reliance or other right or remedy (whether in contract, in tort or at law or in equity) may be brought with respect thereto after the Closing. Each covenant and agreement that explicitly contemplates performance after the Closing, will, in each case and to such extent, expressly survive the Closing in accordance with its terms, and if no term is specified, then for three (3) years following the Closing Date, and nothing in this <u>Section 11.1</u> will be deemed to limit any rights or remedies of any Person for breach of any such surviving covenant or agreement. Buyer and each Seller acknowledge and agree, on their own behalf and on behalf of the Buyer Group or the Seller Parties, as the case may be, that the agreements contained in this <u>Section 11.1</u> (a) require performance after the Closing to the maximum extent permitted by applicable Law and will survive the Closing for three (3) years and (b) are an integral part of the Contemplated Transactions and that, without the agreements set forth in this <u>Section 11.1</u>, none of the Parties would enter into this Agreement. In furtherance of the foregoing, except as provided in <u>Section 3.10</u>, from and after the Closing, each Party hereby waives and fully and finally releases (on behalf of itself, each of its Affiliates and each of its Representatives), to the fullest extent permitted under Law, any and all rights, claims and causes of action for any breach of any representation or warranty or covenant or obligation to have been performed at or prior to the Closing set forth herein, or in any other document contemplated hereby, or in any certificate delivered hereunder or thereunder arising under or based upon any theory whatsoever, under any Law, contract, tort or otherwise. Notwithstanding anything to the contrary in this <u>Section 11.1</u> or elsewhere in this Agreement, nothing herein shall be deemed to limit the rights and remedies of any Party with respect to claims based on Fraud or of Buyer with respect to any claim that may be asserted under Section 509 of the Bankruptcy Code. Notwithstanding anything to the contrary in this Agreement, Sellers shall be able to wind-down the Business promptly after the Closing. Nothing in this

Section 11.1 shall prohibit any Seller from ceasing operations or winding up its affairs or of the Business following the Closing.

11.2    Post-Closing Access.

(a)    Notwithstanding anything to the contrary herein, from and after the Closing Date and for a period of three (3) years following the Closing Date, Buyer shall provide Sellers and their respective Representatives reasonable access, during normal business hours and upon reasonable advance notice of not less than forty-eight (48) hours before the requested date of access, and at Seller's (or the applicable Affiliate's) sole expense, to such Records that are Acquired Assets and to certain key employees for the purposes of (i) the preparation or amendment of Tax Returns, (ii) the determination of any matter relating to the rights or obligations of any Seller under this Agreement or (iii) as necessary to administer, or satisfy their obligations in connection with, the Bankruptcy Cases and the wind-down of Sellers and their assets, in each case in such a manner as not to unreasonably interfere with the conduct of the Business; provided, that such access shall not include any books, records, other documents and electronically stored information that are not (or were not) Acquired Assets as of the Closing, and shall not include any confidential or privileged information or work product of Buyer or its Affiliates; provided, further, that Buyer agrees it will, and will cause its employees to, provide Seller and their respective Affiliates with reasonable assistance, support and cooperation with respect to the actions and access described in this Section.  Notwithstanding anything to the contrary in this Agreement, Buyer and its Affiliates shall not be required to disclose any information to any Seller if such disclosure would (x) jeopardize any attorney-client or other legal privilege or (y) contravene any applicable Law or fiduciary duty.

(b)    Notwithstanding anything to the contrary herein, unless otherwise consented to in writing by Seller Representative, Buyer will not, for a period of three (3) years following the Closing Date, destroy, alter, or otherwise dispose of any of the Records that are Acquired Assets without first offering to surrender to Seller Representative such Records or any portion thereof that Buyer may intend to destroy, alter, or dispose of.

11.3    Post-Closing Transition.  The Sellers shall provide to Buyer, for a period not to exceed 90 days after the Closing, all services reasonably necessary to orderly transition the Business and the Transferred Employees after the Closing; provided, however that Sellers agree to provide to Buyer a license of longer term with respect to the Sonoma Assets.  Such services shall be provided on reasonable terms and conditions, solely at the cost of Buyer, pursuant to an agreement (the "Business Services Agreement") in form and substance reasonably acceptable to Buyer and the Seller Representative.

**ARTICLE XII.
MISCELLANEOUS**

12.1    Notices. Except as otherwise provided herein, and subject to any requirements as to timing or sequencing set forth herein (e.g., advance or prior notice requirements), all notices, requests, claims, demands, waivers and other communications concerning this Agreement or the Contemplated Transactions must be in writing and must be personally delivered or sent by nationally recognized overnight courier service (charges prepaid) or by email (with a subject line beginning with the phrase "Maverick PokerCo Notice") as set forth below:

Notices to Buyer:

Maverick Gaming LLC
Attention: Eric Persson
Email: erichpersson@gmail.com

35

with a copy (which shall not constitute notice) to:

Raines Feldman Littrell LLP
4675 MacArthur Court, Suite 1550
Newport Beach, CA 92660
Attention: Hamid R. Rafatjoo
Email: hrafatjoo@raineslaw.com

<u>Notices to any Seller or Seller Representative</u>:

RunItOneTime LLC
12530 NE 144th Street
Kirkland, WA 98034
Attention: Jeff Seery
Email: js@maverickgaming.com

with a copy (which shall not constitute notice) to:

Latham & Watkins LLP
12670 High Bluff Drive
San Diego, CA 92130
Attention: Michael Sullivan
Email: michael.sullivan@lw.com

Any Party may specify by written notice in accordance with this <u>Section 12.1</u> to each of the other Parties a different email or physical address at any time. Any notice, request, claim, demand, waiver, or other communication shall be effective and deemed to have been given (a) on the day such communication is sent by email (<u>provided</u> that the Party delivering such email does not promptly receive notice of unsuccessful transmission and such sent email is kept on file (whether electronically or otherwise) by the sending party); (b) on the next Business Day after such communication is deposited with an overnight courier service when sent by overnight courier service; or (c) on the day such communication is personally delivered. A copy of the email transmission containing the time, date, and recipient email address shall be rebuttable evidence of receipt by email in accordance with clause (a) above. Written confirmation of receipt provided by an overnight courier service shall be rebuttable evidence of delivery by an overnight courier service in accordance with clause (b) above.

12.2    <u>Entire Agreement; Modification; Waiver</u>. This Agreement, the Ancillary Documents, and the Disclosure Schedule, as may be amended and updated, together with all Exhibits and schedules hereto or thereto and agreements or instruments executed in connection herewith or therewith, together with the Confidentiality Agreement, constitute the entire agreement between the Parties pertaining to the subject matter hereof and supersedes all prior and contemporaneous discussions, negotiations, proposals, undertakings, agreements, representations and understandings of the Parties. No supplement, modification or amendment of this Agreement shall be binding unless executed in writing by all the Parties. No waiver of any of the provisions of this Agreement shall be deemed, or shall constitute, a waiver of any other provision, whether or not similar, and no waiver shall constitute a continuing waiver. No waiver shall be binding unless executed in writing by the Party making the waiver. No course of dealing, nor any failure or delay in exercising any right, shall be construed as a waiver, and no single or partial exercise of a right shall preclude any other or further exercise of that or any other right.

12.3    <u>Parties in Interest</u>. Except as otherwise expressly provided herein, including in <u>Section 12.14</u> (*Non-Recourse*) and <u>Section 12.18</u> (*Legal Representation*), nothing in this Agreement,

whether express or implied, is intended to confer any rights or remedies under or by reason of this Agreement on any Persons other than the Parties and their respective permitted successors and assigns.

12.4    <u>Binding Effect; Assignment</u>. This Agreement and the rights, interests, and obligations hereunder shall be binding upon Buyer, and, subject to the entry and terms of the Sale Order, on Sellers, and shall inure to the benefit of and be so binding on the Parties and their respective successors and permitted assigns, including any trustee or estate representative appointed in the Bankruptcy Cases or any successor Chapter 7 cases. No Party may assign or delegate this Agreement or any of its rights, interests, or obligations hereunder without the prior written consent of the other Parties, and any attempted assignment or delegation without such prior written consent shall be null and void *ab initio*; <u>provided</u> that (a) Buyer may assign this Agreement and any or all of its rights and interests hereunder or designate one or more Persons to perform its obligations hereunder, in each case, so long as Buyer is not relieved of any liability or obligations hereunder and (b) Buyer may assign this Agreement and any or all of its rights and interest hereunder to any purchaser of all or substantially all its assets or designate such purchaser to perform its obligations hereunder.

12.5    <u>Signatures</u>. The signatures of the Parties to this Agreement, or to any related document, may be delivered by electronic transmission (such as electronic mail of a PDF signature page or any electronic signature). This Agreement may be executed in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

12.6    <u>Governing Law; Jurisdiction</u>.

(a)    Except to the extent mandatory provisions of the Bankruptcy Code apply, this Agreement, and any Action that may be based upon, arising out of or related to this Agreement or the negotiation, execution or performance of this Agreement or the Contemplated Transactions will be governed by and construed in accordance with the internal Laws of the State of New York, as applicable to agreements executed and performed entirely within such State without regards to conflicts of law principles of the State of New York or any other jurisdiction that would cause the Laws of any jurisdiction other than the State of New York to apply.

(b)    Each of the Parties irrevocably agrees that any Action that may be based upon, arising out of, or related to this Agreement or the negotiation, execution or performance of this Agreement and the Contemplated Transactions brought by any other Party or its successors or assigns will be brought and determined in (i) the Bankruptcy Court and any federal court to which an appeal from the Bankruptcy Court may be validly taken or (ii) in the event the Bankruptcy Cases are closed, or if the Bankruptcy Court is unwilling or unable to hear such Action, in any state or federal court within Las Vegas, Nevada (the courts described <u>clauses (i)</u> and <u>(ii)</u>, the "<u>Chosen Courts</u>"), and each of the Parties hereby irrevocably submits to the exclusive jurisdiction of the Chosen Courts for itself and with respect to its property, generally and unconditionally, with regard to any such Action arising out of or relating to this Agreement and the Contemplated Transactions. Each of the Parties agrees not to commence any Action relating thereto except in the Chosen Courts, other than Actions in any court of competent jurisdiction to enforce any judgment, decree or award rendered by any Chosen Court, and no Party will file a motion to dismiss any Action filed in a Chosen Court on any jurisdictional or venue-related grounds, including the doctrine of *forum non-conveniens*. The Parties irrevocably agree that venue would be proper in any of the Chosen Courts, and hereby irrevocably waive any objection that any such court is an improper or inconvenient forum for the resolution of such Action. Each of the Parties further irrevocably and unconditionally consents to service of process in the manner provided for notices in <u>Section 12.1</u>. Nothing in this Agreement will affect the right of any Party to this Agreement to serve process in any other manner permitted by Law.

12.7    Severability. If any provision of this Agreement is held invalid or unenforceable by any arbitrator or court of final jurisdiction, it is the intent of the Parties that all other provisions of this Agreement be construed to remain fully valid, enforceable and binding on the Parties and such provision will be ineffective only to the extent of such prohibition or invalidity in such jurisdiction, without invalidating the remainder of such provision or the remaining provisions of this Agreement or in any other jurisdiction.

12.8    Expenses. Whether or not the Closing takes place, except as otherwise provided herein, each Party shall pay all costs and expenses incurred or to be incurred by it in negotiating and preparing this Agreement and in closing and carrying out the Contemplated Transactions.

12.9    Disclosure; Confidentiality. Notwithstanding anything herein to the contrary, Sellers and Buyer agree that prior to the Closing Date and after any termination of this Agreement, the Confidentiality Agreement shall remain in full force and effect in accordance with its terms. The Confidentiality Agreement shall terminate in its entirety at the Closing.

(a)    Each Seller shall not, and shall cause its Affiliates not to, and shall instruct, and shall cause each of its Affiliates to instruct, its respective Representatives not to, directly or indirectly, for a period of five (5) years after the Closing Date, without the prior written consent of Buyer, disclose to any third party (other than each other and their respective Representatives) any confidential information with respect to the Business, the Acquired Assets or the Assumed Liabilities; provided that the foregoing restriction shall not (i) apply to any information (x) generally available to, or known by, the public (other than as a result of disclosure in violation of this Section 12.9(a)), (y) that was independently developed by any Seller or its Affiliates without use of any confidential information with respect to the Business, or (z) that was made available to any Seller or its Affiliates by a third party with the right to disclose such information, or (ii) prohibit any disclosure (x) required by law so long as, to the extent legally permissible, the applicable Seller provides Buyer with reasonable prior notice of such disclosure, (y) necessary to be made in connection with the enforcement of any right or remedy relating to this Agreement, or (z) in connection with any filings or other disclosures required in connection with compliance with the Bankruptcy Court. Subject to the other provisions of this Agreement, press releases and other publicity materials relating to the Contemplated Transactions shall be released by the Parties only after review and with the consent of the other Parties. Notwithstanding the foregoing, any Seller may disclose to any of its lenders any of the provisions of this Agreement and the documents entered into or to be entered into in connection herewith.

(b)    The Buyer shall not, and shall cause its Affiliates not to, and shall instruct, and shall cause each of its Affiliates to instruct, its Representatives not to, directly or indirectly, for a period of five (5) years after the Closing Date, without the prior written consent of the applicable Seller, disclose to any third party (other than each other and their respective Representatives) any confidential information in its possession other than information relating to the Excluded Assets or the Excluded Liabilities; provided that the foregoing restriction shall not (i) apply to any information (x) generally available to, or known by, the public (other than as a result of disclosure in violation of this Section 12.9(b)), (y) that was independently developed by Buyer or its Affiliates without use of any confidential information, or (z) that was made available to Buyer or its Affiliates by a third party with the right to disclose such information, or (ii) prohibit any disclosure (x) required by law so long as, to the extent legally permissible, the Buyer or its Affiliate, as applicable, provides the Seller Representative with reasonable prior notice of such disclosure, (y) necessary to be made in connection with the enforcement of any right or remedy relating to this Agreement, or (z) in connection with any filings or other disclosures required in connection with compliance with the Bankruptcy Court. Subject to the other provisions of this Agreement, press releases and other publicity materials relating to the Contemplated Transactions shall be released by the Parties only after review and with the consent of the other Parties. Notwithstanding the foregoing, Buyer may disclose

38

to any of its lenders any of the provisions of this Agreement and the documents entered into or to be entered into in connection herewith.

12.10   <u>Further Assurances</u>. Each Party, as requested by any other Party, shall use commercially reasonable efforts to execute, acknowledge and deliver from time to time any further deeds, assignments, conveyances and other assurances, documents and instruments of transfer, reasonably requested by such other Party, and shall take any other action consistent with the terms of this Agreement that may reasonably be requested by the other, for the purpose of assigning, transferring, granting, conveying and confirming to such Party, or reducing to possession, any or all property to be conveyed and transferred under this Agreement or any Ancillary Document; <u>provided</u> that (i) Buyer or its Affiliates shall not be required to incur liabilities or obligations pursuant to any such arrangement beyond those liabilities and obligations included as Assumed Liabilities, (ii) Sellers and their respective Affiliates shall not be required to incur any Assumed Liabilities pursuant to any such arrangement and (iii) Buyer shall be entitled to communicate with Seller Representative rather than any Seller with respect to any requests or other matters under this <u>Section 12.10</u>.

12.11   <u>Limitation of Liability</u>. In no event will any Party or any of its Affiliates be liable for any special, incidental, indirect, exemplary, punitive or consequential damages (including lost profits, loss of revenue or lost sales) in connection with any claims, losses, damages or injuries arising out of related to this Agreement or the Contemplated Transactions.

12.12   <u>Waiver of Jury Trial</u>. EACH OF THE PARTIES HEREBY KNOWINGLY, VOLUNTARILY AND IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY LAW, ALL RIGHT TO TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM (WHETHER BASED ON CONTRACT, TORT OR OTHERWISE) WHETHER NOW EXISTING OR HEREAFTER ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OF THE CONTMPLATED TRANSACTIONS OR THE ACTIONS OF ANY PARTY TO THIS AGREEMENT IN THE NEGOTIATION, EXECUTION AND DELIVERY, PERFORMANCE OR ENFORCEMENT OF THIS AGREEMENT OR THE ANCILLARY DOCUMENTS. THE PARTIES AGREE THAT ANY OF THEM MAY FILE A COPY OF THIS PARAGRAPH WITH ANY COURT AS WRITTEN EVIDENCE OF THE KNOWING, VOLUNTARY AND BARGAINED-FOR AGREEMENT AMONG THE PARTIES IRREVOCABLY TO WAIVE THEIR RESPECTIVE RIGHTS TO TRIAL BY JURY IN ANY ACTION WHATSOEVER BETWEEN OR AMONG THEM RELATING TO THIS AGREEMENT, ANY ANCILLARY DOCUMENT OR ANY OF THE CONTEMPLATED TRANSACTIONS AND THAT SUCH ACTIONS WILL INSTEAD BE TRIED IN A COURT OF COMPETENT JURISDICTION BY A JUDGE SITTING WITHOUT A JURY.

12.13   <u>Specific Performance</u>. The Parties agree that irreparable damage, for which monetary relief, even if available, would not be an adequate remedy, would occur in the event that any provision of this Agreement is not performed in accordance with its specific terms or is otherwise breached, including if any of the Parties fails to take any action required of it hereunder to consummate the Contemplated Transactions. It is accordingly agreed that (a) Seller Representative and Buyer will be entitled to an injunction or injunctions, specific performance or other equitable relief to prevent breaches of this Agreement and to enforce specifically the terms and provisions hereof in the courts described in <u>Section 12.6</u> without proof of damages or otherwise, this being in addition to any other remedy to which they are entitled under this Agreement, and (b) the right of specific performance and other equitable relief is an integral part of the Contemplated Transactions and without that right, neither Sellers nor Buyer would have entered into this Agreement. The Parties acknowledge and agree that either Seller Representative or Buyer pursuing an injunction or injunctions or other Order to prevent breaches of this Agreement and to enforce specifically the terms and provisions of this Agreement in accordance with this <u>Section 12.13</u> will not be required to provide any bond or other security in connection with any such Order. The remedies

available to each Party pursuant to this Section 12.13 will be in addition to any other remedy to which they were entitled at law or in equity, and the election to pursue an injunction or specific performance will not restrict, impair or otherwise limit such Party from seeking to collect or collecting damages. If, prior to the Outside Date, any Party brings any action, in each case, in accordance with this Section 12.13, to enforce specifically the performance of the terms and provisions hereof by the other Parties, the Outside Date will automatically be extended (i) for the period during which such action is pending *plus* three (3) Business Days or (ii) by such other time period established by the court presiding over such action, as the case may be.

12.14    Non-Recourse. Notwithstanding anything herein to the contrary, except with respect to claims for Fraud:

(a)    this Agreement may only be enforced against, and any Action based upon, arising out of or related to this Agreement may only be brought against, the Persons that are expressly named as parties to this Agreement;

(b)    except to the extent named as a party to this Agreement, and then only to the extent of the specific obligations of such parties set forth in this Agreement, no past, present or future shareholder, member, partner, manager, director, officer, employee, Affiliate, agent, or Representative of any Party, or any past, present or future shareholder, member, partner, manager, director, officer, employee, Affiliate, agent, or Representative any of the foregoing (each, a "Non-Recourse Party") shall have any Liability (whether in contract, tort, equity or otherwise) for any of the representations, warranties, covenants, agreements or other obligations or Liabilities of any of the parties to this Agreement or for any claims, causes of action, obligations or liabilities arising under, out of, in connection with or related in any manner to this Agreement or the Ancillary Documents or based on, in respect of, or by reason of this Agreement or the Ancillary Documents or their negotiation, execution, performance or breach;

(c)    each Non-Recourse Party is and shall be an intended third-party beneficiary of this Section 12.14 and shall have the right to enforce such provisions to the same extent as if it were a party hereto; and

(d)    this Section 12.14 may not be terminated or modified in any manner that adversely affects any Non-Recourse Party without the prior written consent of such affected Non-Recourse Party.

12.15    Right of Set-Off. Notwithstanding anything to the contrary contained herein, Buyer and its Affiliates shall have the right to withhold and set off against any amount otherwise due to be paid by Buyer or its Affiliates to Sellers or their Affiliates (other than any licensed operator entities owned by the Supporting Shareholder) pursuant to this Agreement or any Ancillary Documents any amount to which Buyer or any of its Affiliates may be entitled pursuant to this Agreement or any Ancillary Documents that has not otherwise been paid to Buyer or any of its Affiliates.

12.16    Fiduciary Obligations. Nothing in this Agreement, or any document related to the Contemplated Transactions, will require any Seller or any of its directors, managers, officers or members, in each case, in their capacity as such, to take any action, or to refrain from taking any action, to the extent inconsistent with their fiduciary obligations or applicable Law. Sellers retain the right to pursue any transaction or restructuring strategy that, in Sellers' business judgment, will maximize the value of their estates. For the avoidance of doubt, (i) Sellers' ability to conduct the sale process (including any Auction) and to consider or advance alternative proposals shall not be impaired in any respect by this Agreement; (ii) any failure by a Seller to perform under this Agreement shall constitute a breach thereof (in the event such failure to perform would otherwise constitute a breach under this Agreement) notwithstanding anything to the contrary in this Section 12.16, provided there shall be no remedy or recourse under this

Agreement or otherwise in the event of such breach; and (iii) any termination of this Agreement by either Party may be solely pursuant to Section 10.1, including a Party determining it is inconsistent with their fiduciary obligations to not terminate consistent with this Section 12.16.

12.17    Seller Representative.

(a)       Each Seller irrevocably appoints RunItOneTime as its representative (solely in such capacity, the "Seller Representative") with power of designation and assignment as such Seller's true and lawful attorney-in-fact and agent with full power of substitution, to act for and on behalf of, and in the name of, such Seller with the full power, without the consent of such Seller, to exercise as Seller Representative in its sole discretion deems appropriate, the powers which such Seller could exercise under the provisions of this Agreement or any Ancillary Document and to take all actions necessary or appropriate in the judgment of Seller Representative in connection with this Agreement or any Ancillary Document. Without limiting the generality of the foregoing, each Seller hereby irrevocably grants Seller Representative full power and authority: (i) to give and receive notices and communications relating to the transactions and other matters contemplated by this Agreement and any Ancillary Documents; (ii) to execute and deliver, on behalf of such Seller, and to accept delivery of, on behalf of such Seller, such documents as may be deemed by Seller Representative, in its sole discretion, to be appropriate to consummate the Contemplated Transactions or any Ancillary Document; (iii) to make decisions on behalf of Sellers with respect to the transactions and other matters contemplated by this Agreement or any Ancillary Document; (iv) to receive funds, make payments of funds on behalf of Sellers, and give receipts for funds or to receive funds for the payment of expenses of Sellers or to deposit such funds in such accounts as Seller Representative deems appropriate and apply such funds in payment for such expenses; (v) to enforce, on behalf of such Seller, any claim against Buyer arising under this Agreement; (vi) to provide legal advice and to engage attorneys, accountants and other agents at the expense of Sellers; (vii) to amend this Agreement (other than this Section 12.17), any Ancillary Document, or any of the instruments to be delivered to Buyer by such Seller pursuant to this Agreement or any Ancillary Document; and (viii) to give such instructions and to take such action or refrain from taking such action, on behalf of such Seller, as Seller Representative deems, in its sole discretion, necessary or appropriate to carry out the provisions of this Agreement or any Ancillary Document, including the exercise of all rights granted to Sellers under this Agreement or any Ancillary Document. Buyer shall be entitled to rely exclusively upon any notices and other acts of Seller Representative as being final and legally binding acts of each Seller individually and Sellers collectively. The appointment and power of attorney granted by each Seller to Seller Representative shall be deemed coupled with an interest and all authority conferred hereby shall be irrevocable of any such Seller.

(b)       Each Seller acknowledges and agrees that Seller Representative shall not be liable to any Seller or Buyer for any act done or omitted hereunder as Seller Representative. Sellers shall jointly and severally indemnify Seller Representative and hold Seller Representative harmless from and against any losses incurred without gross negligence or bad faith on the part of Seller Representative and arising out of or in connection with the acceptance or administration of its duties under this Agreement. Without limiting the generality or effect of the foregoing, (i) Seller Representative may rely, and shall be fully protected in acting, upon a good faith legal opinion from its counsel or upon the advice or opinion of any attorney, accountant or consultant retained by Seller Representative in connection with any matter relating to this Agreement or the Contemplated Transactions, (ii) Seller Representative may rely, and shall be fully protected in relying, upon the genuineness of any document believed by it to be genuine and to be signed by the proper party or parties, and (iii) Seller Representative shall not be liable for any error in judgment in the construction of this Agreement. Each Seller's obligation with respect to Seller Representative under this Section 12.17(b) shall survive the Closing and continue indefinitely.

41

(c)     If Seller Representative shall be unable or unwilling to fulfill its responsibilities hereunder, then Sellers shall, within ten (10) days after such event, appoint a successor representative. Any such successor shall become "Seller Representative" for purposes of this Agreement.

12.18   <u>Legal Representation</u>.

(a)     Buyer agrees, on its own behalf and on behalf of each of its Affiliates and its and their respective successors and assigns (collectively, the "<u>Waiving Parties</u>"), that, following the Closing, Latham & Watkins LLP ("<u>Sellers' Counsel</u>") may serve as counsel to Sellers and their respective Affiliates in connection with any matters related to this Agreement or the Contemplated Transactions, including any litigation, claim or obligation arising out of or relating to this Agreement or such transactions. Buyer, on its own behalf and on behalf of the other Waiving Parties hereby (i) waives any claim they have or may have that Sellers' Counsel has a conflict of interest relating to this Agreement or is otherwise prohibited from engaging in such representation and (ii) agrees that, in the event that a dispute arises after the Closing between any of the Waiving Parties, on the one hand, and any Seller or any of its Affiliates, on the other hand, Sellers' Counsel may represent any Seller or any of its Affiliates in such dispute even though the interests of such Person may be directly adverse to the Waiving Parties. The Waiving Parties also further agree that, as to all communications among Sellers' Counsel and Sellers or their respective Affiliates, subsidiaries or Representatives, that relate in any way to this Agreement, the negotiation thereof, or the Contemplated Transactions, the attorney-client privilege and the expectation of client confidence belongs to Sellers and may be controlled by Seller Representative (collectively, "<u>Pre-Closing Privileges</u>") and shall not pass to or be claimed by Buyer or any other Waiving Party.

(b)     All such Pre-Closing Privileges, and the portion of any books and records and other documents of any Seller containing any advice or communication that is subject to any Pre-Closing Privilege ("<u>Pre-Closing Privileged Materials</u>"), shall be excluded from the Contemplated Transactions, and shall be retained by Sellers. Absent the prior written consent of Seller Representative (not to be unreasonably withheld, conditioned or delayed), neither Buyer nor any other Waiving Party shall have a right of access to Pre-Closing Privileged Materials. The Parties further agree and acknowledge that Sellers have taken reasonable efforts to segregate and retain Pre-Closing Privileged Materials, that the existence of any remaining Pre-Closing Privileged Materials found in the custody of Buyer after Closing will not be deemed a waiver of any Pre-Closing Privileges, and that the same will be returned to Seller Representative promptly after any discovery thereof.

(c)     Buyer acknowledges that it has consulted with independent counsel of its own choosing with respect to the meaning and effect of this <u>Section 12.18</u> and understands such meaning and effect.

[Signature Pages Follow]

IN WITNESS WHEREOF, the Parties to this Agreement have duly executed this Agreement on the day and year first above written.

**BUYER**

**MAVERICK GAMING LLC**,
a Nevada limited liability company

By: _____
Name:  Eric H. Persson
Title:   Manager

[SIGNATURE PAGES TO ASSET PURCHASE AGREEMENT]

**SELLER REPRESENTATIVE**

**RUNITONETIME LLC**,
a Washington limited liability company

By: _____
Name:  Jeff Seery
Title:   Chief Restructuring Officer

[SIGNATURE PAGES TO ASSET PURCHASE AGREEMENT]

**SELLERS**

**RUNITONETIME LLC**,
a Washington limited liability company

By: _____
Name:  Jeff Seery
Title:    Chief Restructuring Officer

**GRAND CENTRAL CASINO, INC.**,
a Washington corporation

By: _____
Name:  Jeff Seery
Title:    Chief Restructuring Officer

**MAVERICK KIRKLAND LLC**,
a Nevada limited liability company

By: _____
Name:  Jeff Seery
Title:    Chief Restructuring Officer

**MAVERICK KIRKLAND II LLC**,
a Nevada limited liability company

By: _____
Name:  Jeff Seery
Title:    Chief Restructuring Officer

**NG WASHINGTON III LLC**,
a Washington limited liability company

By: _____
Name:  Jeff Seery
Title:    Chief Restructuring Officer

[SIGNATURE PAGES TO ASSET PURCHASE AGREEMENT]

**GRAND CENTRAL PROPERTIES TACOMA LLC,**
a Washington limited liability company

By: _Jeff Seery_
Name:  Jeff Seery
Title:    Chief Restructuring Officer

**GREAT AMERICAN GAMING CORPORATION,**
a Washington corporation

By: _Jeff Seery_
Name:  Jeff Seery
Title:    Chief Restructuring Officer

**MAVERICK CARIBBEAN LLC,**
a Nevada limited liability company

By: _Jeff Seery_
Name:  Jeff Seery
Title:    Chief Restructuring Officer

**NEVADA GOLD AND CASINOS, INC.,**
a Nevada corporation

By: _Jeff Seery_
Name:  Jeff Seery
Title:    Chief Restructuring Officer

[SIGNATURE PAGES TO ASSET PURCHASE AGREEMENT]

**ANNEX A**

**DEFINED TERMS**

"<u>Accounting Firm</u>" has the meaning given to it in <u>Section 9.2</u>.

"<u>Accounts Receivable</u>" means all accounts receivable, rights to payment, notes receivable and other receivables (excluding income Tax receivables) of Sellers related to the Business, and any security interest, claim, remedy or other right related to any of the foregoing.

"<u>Acquired Assets</u>" means all of the assets, properties and rights owned or held for use by Sellers primarily used in the operation of the Business, other than Excluded Assets, whether real, personal, tangible, or intangible (including goodwill), accrued, contingent or otherwise, including the following:

(a)      all Accounts Receivable;

(b)      all (i) Cage Cash, (ii) Register Cash, (iii) Cash in Bank and (iv) other Cash and Cash Equivalents exclusively used in the Business;

(c)      all Assigned Contracts;

(d)      all Transferable Permits;

(e)      all Player Accounts (in each case, to be held for the players and solely to the extent transferable to Buyer under applicable law, and to the extent not transferable, treatment of the Player Accounts shall be included in the Business Services Agreement or otherwise disbursed after the Closing in accordance with applicable law at the direction of Buyer (for the avoidance of doubt, if and only if applicable law provides that the Player Accounts may not be legally transferred to Buyer or disbursed at the direction of Buyer post-Closing through the Business Services Agreement or otherwise, then the Player Accounts shall be deemed an Excluded Asset and Seller shall not be required to fund any progressive jackpot or player supported jackpot accounts for Buyer));

(f)      all Real Property Leases for Leased Real Property;

(g)      all Fixed Assets;

(h)      all Intellectual Property Assets;

(i)      all Inventory;

(j)      all goodwill associated with the Business or the Acquired Assets;

(k)      all transferable telephone numbers, facsimile numbers and related directory listings used in connection with the Business;

(l)      subject to <u>Section 6.10</u>, all Records (including all information, books and records to the extent primarily related to the Acquired Assets, the Business or the Assumed Liabilities, including files, invoices, credit and sales records, personnel records of Business Employees (subject to applicable Law), Customer Lists, Customer Database, player lists, supplier lists, prospect lists, manuals, drawings, studies, reports, handbooks, business plans and other plans and specifications, accounting and financial books and records, ledgers, sales literature, current price lists and discounts, promotional signs and literature, marketing and sales programs, current and former product specifications, equipment tracking databases and

A-1

regulatory, manufacturing and quality control records and procedures), to the extent such Records are within any Seller's possession (and specifically including the Transferred Employee Records, to the maximum extent transferrable in accordance with applicable Law), in each case, other than (i) any Tax Returns (and any related work papers) of any Seller or its Affiliates and (ii) any Tax Returns (and any related work papers) and other books and records relating to the Acquired Assets, the Business, or the Retained Business (x) that are reasonably necessary for any Seller or its Affiliates for Tax filing or reporting purposes, (y) that pertain to the Retained Business, or (z) that are otherwise reasonably necessary to the wind-down or liquidating plan of any Seller or its Affiliate or businesses of any Seller or its Affiliates after the Closing;

(m)     all rights in and to any Claims or Actions (other than D&O Claims), including any Avoidance Actions, that relate to the Acquired Assets, Assigned Contracts, Assumed Liabilities, or the Business; provided, however, that neither Buyer nor any Person claiming by, through or on behalf of Buyer (including by operation of law, sale, assignment, conveyance or otherwise) shall pursue, prosecute, litigate, institute or commence any such Avoidance Actions, or assert or use any such Avoidance Actions for defensive purposes;

(n)     all rights in and to any Claims that are Avoidance Actions against the Supporting Shareholder, Justin Beltram, or any of their respective Affiliates;

(o)     all marketing, advertising, and promotional materials;

(p)     all rights and obligations under non-disclosure or confidentiality, non-disparagement, non-compete or non-solicitation agreements relating to the Business with (a) Transferred Employees and (b) agents of any Seller or any Person;

(q)     [reserved];

(r)     all prepayments and prepaid expenses and security and other deposits, including deposits in connection with any Real Property Lease assigned to Buyer, credits, deferred charges, advance payments, refunds, and rebates, in each case, to the extent such assets relate to the Acquired Assets; and

(s)     insurance benefits under Insurance Policies, including rights and proceeds (other than, for the avoidance of doubt, under any director and officer insurance policy), solely to the extent relating to the Acquired Assets or the Assumed Liabilities (but only to the extent that such benefits relate to claims or potential claims arising from facts or circumstances existing or arising on or prior to the Closing which claims or potential claims have not been paid or resolved by Seller on or prior to the Closing); provided, that Seller shall retain: (i) all rights, title and interest in and to all Insurance Policies; and (ii) all insurance benefits, including rights and proceeds, with respect to any Excluded Assets.

"Action" means a claim, action, cause of action, lawsuit, arbitration, audit, litigation, subpoena, investigation, or other proceeding, of any nature, civil, criminal, administrative, regulatory or otherwise, whether at law or in equity that is commenced, brought, conducted, tried or heard by or before any Governmental Authority.

"Adjusted EBITDA" means, for any specified period, the sum (without duplication) of Consolidated Net Income for such specified period, *plus* (in each case to the extent deducted in calculating such Consolidated Net Income and adjusted to normalize any out-of-period items) net interest expense, income tax expense, depreciation expense, and amortization expense.

"<u>Affiliate</u>" means, with respect to any Person, any other Person that, directly or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, such Person, and the term "control" (including the terms "controlled by" and "under common control with") means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through ownership of voting securities, by Contract or otherwise.

"<u>Affordable Care Act</u>" means Pub. L. No. 111-148 and related laws and regulations, as amended from time to time.

"<u>Agreement</u>" has the meaning given to it in the Preamble.

"<u>Allocation</u>" has the meaning given to it in <u>Section 9.2</u>.

"<u>Alternative Transaction</u>" means any transaction (or series of transactions), whether direct or indirect, whereby any Person or group of Persons (other than Sellers and their respective Affiliates or Buyer and its Affiliates) acquires (i) beneficial ownership of a majority of the Equity Interests of the PokerCo Companies or (ii) a material portion of the Acquired Assets (but does not mean the sale of assets to customers conducted in the Ordinary Course of Business), in each case, whether by merger, sale of assets or equity, recapitalization, plan of reorganization or otherwise.

"<u>Ancillary Documents</u>" means the Assignment and Assumption Agreement, the Bill of Sale, Intellectual Property Assignment Agreement, the Shareholder Services Agreement, the Business Services Agreement, and all of the other agreements, certificates, instruments and documents required to be executed and delivered in connection with the Contemplated Transactions, in each case, including all exhibits, annexes, and schedules thereto.

"<u>Assigned Contracts</u>" means all Contracts listed on <u>Schedule 2.1</u> of the Disclosure Schedule.

"<u>Assignment and Assumption Agreement</u>" means that certain assignment and assumption agreement substantially in the form of <u>Exhibit A</u> hereto.

"<u>Assumed Liabilities</u>" means the following Liabilities, in each case, only to the extent exclusively related to the Acquired Assets and not paid or satisfied prior to the Closing:

(a)     all Liabilities and obligations of any Seller for payment and performance under the Assigned Contracts but only to the extent that such Liabilities thereunder arise and are required to be performed from and after the Closing Date, and do not relate to any failure to perform, improper performance, warranty or other breach, default or violation by any Seller on or prior to the Closing Date;

(b)     accounts payable, trade payables, open purchase orders (except under any Excluded Contract), drafts or checks outstanding, accrued royalties and Liabilities arising from rebates, returns, recalls, chargebacks, coupons, discounts, failure to supply claims and similar obligations of any Seller that (i) remain unpaid and are not delinquent as of the Closing (including such payables are entitled to priority in payment in the Bankruptcy Case under Sections 503(b)(1)(A) and 507(a)(2) of the Bankruptcy Code) and that (ii) arose after the Petition Date and in the Ordinary Course of Business;

(c)     all timely filed or scheduled claims of Sellers' vendors for the value of goods received by the Sellers within twenty (20) days prior to the Petition Date which goods were sold to the Sellers in the Ordinary Course of Business but only to the extent such claims are entitled to priority in payment under Sections 503(b)(9) and 507(a)(2) of the Bankruptcy Code in the Bankruptcy Case as determined and

A-3

allowed by the Bankruptcy Court or otherwise agreed to by Sellers and Buyer, to the extent such claims remain unpaid as of the Closing;

(d)      all Liabilities and obligations of any Seller under the Transferable Permits, but only to the extent such obligations do not arise from or relate to any actual or alleged breach of such Transferable Permit or violation of law, in each case, arising as of, or related to the period prior to, Closing;

(e)      all Liabilities related to or arising from the employment of the Transferred Employees arising on or after the Closing (other than as a result of the occurrence of the Closing);

(f)      [reserved];

(g)      any Cure Costs to the extent that have not been paid on or before the Closing;

(h)      all Liability for (i) Taxes attributable to the ownership or operation of the Acquired Assets or the Business by Buyer (or any of its Affiliates) for any Post-Closing Tax Period (as determined pursuant to Section 9.4 in respect of the Post-Closing Tax Period of any Straddle Period) and (ii) any Transfer Taxes pursuant to Section 9.1;

(i)      all Liabilities with respect to utilities for the Real Property, arising on or after the Closing Date;

(j)      all Liabilities related to, resulting from or arising out of any (i) unredeemed refund amounts or similar items, (ii) customer deposits, or (iii) customer promotions and related programs (including customer loyalty programs and gift cards), in each case to the extent incurred in the Ordinary Course of Business;

(k)      all Liabilities (including all government charges or fees) arising out of the conduct of the business or the ownership or operation of the Acquired Assets, in each case, by Buyer from and after the Closing; and

(l)      all Liabilities set forth in Schedule 2.3 (in each case, consisting of Liabilities (or the applicable portion thereof) primarily relating to the Business).

In the event that any asset within the foregoing definition of "Assumed Liabilities" is also covered by the definition of "Excluded Liabilities" below, such asset or right (or applicable portion thereof) shall be considered solely an Excluded Liability.

"Auction" has the meaning ascribed in the Bidding Procedures Order.

"Avoidance Actions" means any and all actual or potential causes of action to void a transfer of property or an obligation incurred by any Seller pursuant to Chapter 5 of the Bankruptcy Code, including Sections 502(d), 510, 541, 542, 543, 544, 545, 547, 548, 549, 550, 551, and 553 or under analogous state or federal statutes and common law.

"Backup Bid" has the meaning ascribed in the Bidding Procedures Order.

"Backup Bid Outside Date" means October 31, 2025.

"Backup Bidder" means the next highest bidder or otherwise next best bid for the Acquired Assets after the Successful Bidder, as determined in accordance with the Bidding Procedures Order.

A-4

"Bankruptcy Cases" has the meaning given to it in the Recitals.

"Bankruptcy Code" means Title 11 of the United States Code, 11 U.S.C. §§ 101-1532, as amended.

"Bankruptcy Court" has the meaning given to it in the Recitals.

"Bidding Procedures Order" means such order entered by the Bankruptcy Court on August 28, 2025 at Docket No. 178, governing the Auction and approving the Sellers' proposed sale procedures for their assets in the Bankruptcy Cases.

"Bill of Sale" means that certain bill of sale substantially in the form of Exhibit B hereto.

"Business" means the businesses and operations of the Sellers referred to as "PokerCo" by the Support Agreement, specifically consisting of the following: (i) Ace's Poker Lakewood (address: 10117 S Tacoma Way, Lakewood, WA), (ii) Ace's Poker Mountlake Terrace (address: 7004 220th St SW, Mountlake Terrace, WA), (iii) Casino Caribbean (address: 12526 NE 144th St, Kirkland, WA), and (iv) Caribbean Cardroom (address: 12530 NE 144th St, Kirkland, WA).

"Business Day" means any day other than a Saturday, Sunday or other day on which banks in Houston, Texas, or New York, New York, are authorized or required by Law or executive order to be closed; provided, however, for clarification, banks in Houston, Texas, or New York, New York shall not be deemed to be authorized or required by law or executive order to close or be closed due to "stay at home", "shelter-in-place", "non-essential employee" or any other similar orders or restrictions or the closure of any physical branch locations at the direction of any governmental authority so long as the electronic funds transfer systems (including for wire transfers) of banks in Houston, Texas, or New York, New York are open for use by customers on such day.

"Business Employee" means any individual then employed by any Seller or Affiliate thereof who (i) primarily provides services to or in connection with the operation of the Business or (ii) is identified on Schedule 4.16 of the Disclosure Schedule.

"Business Employee Census" has the meaning given to it in Section 4.16(a).

"Business Registered IP" means all registrations and applications to register any patents, copyrights, trademarks, internet assets, and any other forms of registered Intellectual Property owned by or filed under the name of any PokerCo Company.

"Business Service Provider" means (i) any Business Employee and (ii) any individual independent contractor who is then-directly engaged by any Seller or Affiliate thereof and who, to the Knowledge of Sellers, primarily provides services to or in connection with the operation of the Business, or is otherwise necessary to the operation of the Business.

"Business Service Provider Census" has the meaning given to it in Section 4.16(a).

"Business Services Agreement" means the meaning ascribed in Section 11.3.

"Business Software" means all Software that is owned or purported to be owned by any Seller, including Software used or incorporated in any product or service of any Seller.

"Buyer" has the meaning given to it in the Preamble.

A-5

"<u>Buyer Group</u>" means Buyer, any Affiliate of Buyer, and each of their respective former, current or future Affiliates, officers, directors, employees, partners, members, managers, financing sources, agents, advisors and other Representatives, successors or permitted assigns.

"<u>Cage Cash</u>" means, without duplication, all Cash and Cash Equivalents located in cages, drop boxes, count rooms, safes, storage rooms, kiosks and slot machines and other gaming devices on the Real Property.  For the avoidance of doubt, Cage Cage is referred to in Exhibit D as "<u>Cash on Hand</u>."

"<u>Cash and Cash Equivalents</u>" of any Person as of any date means all cash and cash equivalents (including all unrestricted and restricted cash (including all cash posted to support letters of credit, performance bonds, cash held overseas or other similar obligations), negotiable instruments, marketable securities and deposits with third parties (including landlords)) of such Person and its Subsidiaries on such date. For the avoidance of doubt, Cash and Cash Equivalents will be calculated net of issued but uncleared checks and drafts and will include checks, other wire transfers and drafts deposited or available for deposit for the account of any Person and its Subsidiaries.

"<u>Cash in Bank</u>" means, without duplication, the Cash and Cash Equivalents specifically identified in <u>Exhibit D</u> attached hereto; <u>provided</u>, that (a) if any progressive jackpot or player supported jackpot accounts included in Cash in Bank are not legally permitted to be transferred to Buyer, then Buyer shall still provide applicable credit for such Player Accounts for purposes of this Agreement (including the Net Working Capital calculation) if the Parties may legally allow for Buyer to control and direct such funds post-Closing through the Business Services Agreement or otherwise; <u>provided</u>, <u>further</u>, that if the progressive jackpot or player supported jackpot accounts included in Cash in Bank are not legally permitted to be transferred to Buyer and the Parties are not permitted to legally permit Buyer to control or direct disbursement of such funds post-Closing, then a corresponding deduction for the amount included in such Player Accounts shall be taken into account for purposes of delivering the minimum amount of Cash in Bank at Closing and for purposes of the Target Net Working Capital (the "<u>Equitable Deduction</u>").

"<u>Chosen Courts</u>" has the meaning given to it in <u>Section 12.6(b)</u>.

"<u>Claims</u>" means all of Sellers' rights to any Action against third parties arising out of or in connection with the Acquired Assets, Assigned Contracts, Assumed Liabilities, or the Business and all warranties, rights and claims of any Seller under all existing third-party warranties relating to any and all of the Acquired Assets, Assigned Contracts, Assumed Liabilities, or the Business, including third-party warranties and indemnification rights.

"<u>Closing</u>" has the meaning given to it in <u>Section 3.6</u>.

"<u>Closing Adjustment Escrow Account</u>" has the meaning given to it in <u>Section 3.1(c)</u>.

"<u>Closing Adjustment Escrow Amount</u>" means $1,000,000.

"<u>Closing Adjustment Escrow Funds</u>" means, at any given time after the Closing, the funds then remaining in the Closing Adjustment Escrow Account, including any amount of interest actually earned thereon.

"<u>Closing Date</u>" has the meaning given to it in <u>Section 3.6</u>.

"<u>Closing Date Net Working Capital</u>" means the Net Working Capital as of 12:01 AM Pacific Time on the Closing Date.

"<u>Closing Date Payment</u>" has the meaning given to it in <u>Section 3.1(b)</u>.

"<u>Code</u>" means the United States Internal Revenue Code of 1986, as amended.

"<u>Collective Bargaining Agreement</u>" means any collective bargaining agreement or other labor-related Contract with a union.

"<u>Consolidated Net Income</u>" means, for any specified period, the aggregate of net income of Buyer for such specified period, on a consolidated basis, determined in accordance with GAAP.

"<u>Conditions</u>" has the meaning given to it in <u>Section 2.5(c)</u>.

"<u>Confidentiality Agreement</u>" means the confidentiality provisions of the Shareholder Services Agreement, which Buyer agrees to be bound by to the same extent as the Supporting Shareholder, subject to the same rights, arguments and defenses as may be applicable or available to the Supporting Shareholder.

"<u>Contemplated Transactions</u>" means the transactions contemplated by this Agreement, the Ancillary Documents, and all other transactions and agreements contemplated hereby and thereby.

"<u>Contractor Census</u>" has the meaning given to it in <u>Section 4.16(a)</u>.

"<u>Contracts</u>" means, with respect to any Person, all written contracts, agreements, leases, subleases, instruments, license agreements, sublicenses, deeds, mortgages, arrangements, promises, undertakings, obligations, understandings, or commitments of any kind, to which or by which such Person is a party or otherwise subject or bound or to which or by which any property, business, operation or right of such Person is subject or bound.

"<u>Cure Costs</u>" means cure costs required to be paid pursuant to Section 365 of the Bankruptcy Code or in connection with the assumption and assignment of Assigned Contracts.

"<u>Customer Database</u>" means all customer databases, customer lists, historical records of customers and any other customer information collected and used by Sellers in connection with marketing and promoting the Business.

"<u>Customer List</u>" means that portion of its Customer Database that includes the names and certain key tendencies or other information of customers listed in such Customer Database; <u>provided</u>, that the Customer List shall not include any information that is prohibited from being disclosed by applicable law.

"<u>Data Room</u>" has the meaning given to it in <u>Section 4.22</u>.

"<u>Debtors</u>" has the meaning given to it in <u>the Recitals</u>.

"<u>Deposit</u>" has the meaning given to it in <u>Section 3.2(a)</u>.

"<u>Deposit Escrow Account</u>" has the meaning given to it in <u>Section 3.2(a)</u>.

"<u>DIP Credit Agreement</u>" means that certain Senior Secured Superpriority Priming Debtor-in-Possession Credit Agreement, dated as of July 28, 2025, by and among RunItOneTime, Alter Domus (US) LLC, and the other parties thereto from time to time, as amended by that certain Amendment No. 1, dated as of August 7, 2025, by and among RunItOneTime, Alter Domus (US) LLC, and the other parties thereto, and as further amended, restated, amended and restated, supplemented, or otherwise modified from time to time.

A-7

"DIP Facility" means the senior secured superpriority priming debtor-in-possession financing facility provided to Sellers under the DIP Credit Agreement.

"Disclosure Schedule" means the disclosure schedules to be delivered in connection with this Agreement containing (a) exceptions to the representations and warranties set forth in Articles IV and V and (b) certain other schedules of information related to other provisions hereof.

"Disputed Contract" has the meaning given to it in Section 2.5(b).

"D&O Claims" means all rights of any Seller against any current or former directors, officers, members, partners, shareholders, managers, advisors, or other professionals of such Seller, including any Actions and Claims.

"Domain Name" means the maverickgaming.com domain name, including (i) its registrar accounts and administrative controls, (ii) all content, databases, backend systems, source code, and CMS credentials hosted under or associated with such domain; (iii) any server, hosting, or cloud infrastructure tied to such domain or their services, including associated account logins and credentials; (iv) all data, digital records, metadata, and analytics tied to use of such domain; and (v) all goodwill, trademarks, and naming rights inherent in or linked to such domain; provided, however, that on reasonable request from Seller Representative, Buyer shall link to any websites relating to the Retained Business, Excluded Liabilities or Excluded Assets from the Domain Name website.

"Employee Benefit Plan" means each "employee benefit plan," as defined in Section 3(3) of ERISA (whether or not subject to ERISA), and all other employee benefit and compensation plans or arrangements, including bonus or incentive plans, deferred compensation arrangements, equity or equity-based compensation, severance pay, salary continuation, sick leave, vacation pay, disability, hospitalization, medical, accident, disability and life insurance, retiree healthcare, retiree life insurance, pension, retirement, scholarship, cafeteria, dependent care, or other insurance or employee benefit or compensation programs, plans, policies, agreements or arrangements, whether written or oral, which are for the benefit of current or former Business Employees or to which any Seller contributes or has any material Liability, including due to an ERISA Affiliate, in respect of such Business Employees, other than (i) any Multiemployer Plan and (ii) any plans, programs, agreements or arrangements maintained or sponsored by, or to which contributions are mandated by, a Governmental Authority.

"Enforceability Exceptions" has the meaning given to it in Section 4.3.

"Equipment" means any and all equipment, computers, computer peripherals, hardware, accessories, furniture, furnishings, fixtures, office supplies, and vehicles.

"Equity Interest" means, with respect to any Person, (a) any shares or units of capital stock or voting securities, partnership or membership interest, unit of participation or other similar interest (however designated), whether voting or nonvoting, in such Person and (b) any option, warrant, purchase right, pre-emption right, conversion right, exchange right or other Contract which would entitle any other Person to acquire any such interest in such Person or otherwise entitle any other Person to share in the equity, profits, earnings, losses or gains of such Person (including equity appreciation, phantom equity, profit participation or other similar rights).

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended.

"ERISA Affiliate" means any entity that, together with any Seller, would be treated as a single employer under Section 4001 of ERISA or Section 414 of the Code.

A-8

"Escrow Agent" means a Person selected by the Seller Representative (but not any Seller or any Affiliate of Sellers, and not any Affiliate of any lender of the Sellers) with reasonable prior notice to and on prior written consent of Buyer (such consent not to be unreasonably withheld, delayed or conditioned).

"Escrow Agreement" has the meaning given to it in Section 3.1(c).

"Estimated Closing Statement" has the meaning given to it in Section 3.4(a).

"Estimated Net Working Capital" has the meaning given to it in Section 3.4(a).

"Estimated Working Capital Adjustment Amount", which may be positive or negative, means the Estimated Net Working Capital minus the Target Net Working Capital.

"Excluded Assets" means any assets of Sellers that are not Acquired Assets, including the following assets, properties, and rights of Sellers:

(a)    any asset, document, permit or Contract not used by the Business and not necessary for operation of the Business in the ordinary course;

(b)    all Claims and causes of action, and rights in and to any Claims or causes of action or other rights, that any Seller may have against any Person with respect to any Excluded Assets or any Excluded Liabilities, and any Claims of Sellers or other Debtors under this Agreement, any Ancillary Documents, or the Support Agreement;

(c)    all D&O Claims (excluding any Avoidance Actions that are identified above as Acquired Assets);

(d)    all Cash and Cash Equivalents other than as described in clause (b) of the definition of Acquired Assets;

(e)    all retainers or similar amounts paid to Representatives or other professional service providers of the Sellers or their respective Affiliates, and all bank accounts of Sellers or their respective Affiliates;

(f)    [Reserved];

(g)    all employee advances (but not including any such advances to Transferred Employees);

(h)    all Collective Bargaining Agreements, including but not limited to the Maverick CBA;

(i)    all current and prior insurance policies of any Seller, including, without limitation, all director and officer insurance policies, and all rights (ownership and otherwise), proceeds and benefits of any nature of Sellers with respect thereto, including all insurance recoveries thereunder and rights to assert claims with respect to any such insurance recoveries;

(j)    all Excluded Contracts;

(k)    the Purchase Price and all rights, claims and causes of action of any Seller under this Agreement or any agreement, certificate, instrument or other document executed and delivered between any Seller and Buyer in connection with the Contemplated Transactions, or any other agreement between any Seller and Buyer entered into on or after the date hereof;

(l)     any claim, right, or interest of any Seller in or to any refund, rebate, abatement, or other recovery for Taxes of (or allocated to) such Seller (or its Affiliates) under applicable Tax Law relating to, or pursuant to the definition, of Excluded Liabilities, together with any interest due thereon or penalty rebate arising therefrom;

(m)     every asset of any Seller that would otherwise constitute an Acquired Asset (if owned immediately prior to the Closing) if conveyed or otherwise disposed of during the period from the date hereof until the Closing (i) in the Ordinary Course of Business, (ii) as authorized by the Bankruptcy Court, or (iii) as otherwise permitted by the terms of this Agreement;

(n)     all Intellectual Property owned by a third party and used by Sellers under a license or other Contract (other than rights granted to Sellers pursuant to an Assigned Contract);

(o)     all Intellectual Property owned by any Seller that are not Intellectual Property Assets;

(p)     all documents prepared or received by any Seller or any of its Affiliates or their respective Representatives or on their behalf in connection with the sale of the Acquired Assets, this Agreement or the other Ancillary Documents, the Contemplated Transactions or the Bankruptcy Case, including (i) all records and reports prepared or received by any Seller or any of its Affiliates or their respective Representatives in connection with the sale of the Acquired Assets and the Contemplated Transactions, (ii) all bids and expressions of interest received from third parties with respect to the acquisition of any of Sellers' businesses or assets, (iii) all privileged materials, documents and records (including any work product) of any Seller or any of its Affiliates or their respective Representatives, (iv) copies of the documents, materials and data related to the Acquired Assets or Assumed Liabilities prior to the Closing Date, (v) confidentiality agreements with prospective purchasers of the Acquired Assets or the Assumed Liabilities or any portion thereof, and (vi) any other files or records to the extent relating exclusively to any Excluded Assets, Excluded Liabilities, the Retained Business or the Bankruptcy Case;

(q)     all documents (including information stored on the computer systems, data networks or servers of any Seller) (i) to the extent they primarily relate to any of the Excluded Assets, the Excluded Liabilities or the Retained Business, (ii) that are any Seller's financial accounting documents, minute books, organizational documents, stock certificates, stock registers and such other books and records of any Seller as pertaining to ownership, organization or existence of such Seller, Tax Returns (and any related work papers) excluded from "Acquired Assets" in <u>clause (l)</u> of that definition, corporate seal, checkbooks and canceled checks, or (iii) that any Seller is required by Law to retain;

(r)     any Equity Interests of any Seller or its Subsidiaries;

(s)     all Liabilities or other amounts owing from any Seller or any of its Affiliates (other than the Assumed Liabilities);

(t)     all Employee Benefit Plans, together with all funding arrangements related thereto (including all assets, trusts, insurance policies and administrative service Contracts related thereto), and all rights and obligations thereunder;

(u)     any books and records relating to any of the foregoing;

(v)     the "Sonoma Assets", including the Sonoma unregistered trademark; Sonoma main desktop app; windows desktop application developed on visual basic connected to Microsoft SQL Database system; pit station module, customer account screens, pit manager, offer management, customer drawings and reward; Sonoma Reports module for creating management, marketing, and system auditing reports;

Sonoma server configuration; Sonoma Android app; separate code base for delivering subset of Sonoma functions to android phones and tablets; Sonoma sign system; software desktop app to rotate sign screens through the casino based on graphics and information delivered from the Sign API; Sonoma poker modules; system of connecting Sonoma and signs for wait list management, high hands, and other jackpot signage needs; Sonoma Sign API; Sonoma SMS API; Sonoma API; software developed in latest visual studio platforms running on web server, connected to Sonoma DBMS system (A) for sign system to queue and serve the graphics and information to signage in local casinos, (B) for receiving SMS messages from customers, responding to SMS Link requests, (C) to handle connection to Android version and also other third party vendors such as FABI, Lighthouse, web forms communicate requested information and features; and

(w)     items set forth on Schedule 2.2 (in each case, consisting of assets (or an applicable portion thereof) not primarily used by or primarily relating to the Business).

(x)     "Excluded Contracts" means all Contracts of any Seller or other Debtor that are not Assigned Contracts, including but not limited to all Employee Benefit Plans, the Maverick CBA, the Support Agreement, and the Shareholder Services Agreement.

(y)     "Excluded Liabilities" has the meaning given to it in Section 2.4 and shall include, but not be limited to, the following:

(a)     any Liability (i) for Taxes of any Seller (or any member or Affiliate of any Seller); (ii) for Taxes relating to or arising from the Business or the Acquired Assets for any Pre-Closing Tax Period (as determined pursuant to Section 9.4 in respect of the Pre-Closing Tax Period of any Straddle Period); and (iii) of any Seller for the Taxes of any other Person under Treasury Regulation Section 1.1502-6 (or any similar provision of state, local or foreign law), as a transferee or successor, or by Contract (except with respect to any Assigned Contract);

(b)     all Liabilities of any Seller or other Debtor, including any Liabilities entitled to priority under Section 503(b) or Section 507 of the Bankruptcy Code, that are not expressly listed as Assumed Liabilities;

(c)     all Liabilities of any Seller arising or incurred in connection with the negotiation, preparation, investigation and performance of this Agreement, the Ancillary Documents and the Contemplated Transactions, including fees and expenses of counsel, accountants, consultants, advisers, and any other Person;

(d)     all Liabilities relating to or arising out of the Excluded Assets or Excluded Contracts;

(e)     all Liabilities in respect of any pending or threatened Action arising out of, relating to, or otherwise in respect of the operation or activities of the Business or the Acquired Assets to the extent such Action relates to such operation or activity first occurring on or prior to the Closing Date;

(f)     all Liabilities of any Seller or other Debtor arising under or in connection with any employee benefit plan providing benefits to any present or former employee of such Seller and all Liabilities of any Seller for any present or former employees, officers, directors, retirees, independent contractors, or consultants of such Seller, including any Liabilities associated with any claims for wages or other benefits, bonuses, accrued vacation, workers' compensation, or employee deferred compensation, including stock option plans, grants, and agreements, severance, retention, termination, or other payments, in each case, to the extent arising on or prior to the Closing, except as otherwise provided in this Agreement;

A-11

(g)      all Liabilities arising from or relating to any (x) Multiemployer Plan, including all Withdrawal Liabilities, pre-closing funding obligations, and penalties assessed by a Governmental Authority and (y) Employee Benefit Plan, in the case of (x) and (y), whether arising prior to, at or after, the Closing Date;

(h)      all Liabilities of any Seller or any Debtor arising out of or relating to the work conditions, recruitment, employment, engagement, compensation, benefits, or termination of any employment or engagement (including, for the avoidance of doubt, any such Liabilities that arise out of or relate to or result from the consummation of the Contemplated Transactions) associated with any (i) Person who or which was employed or engaged by any Seller or any of their Affiliates, or applied for employment or engagement with any Seller or any of their Affiliates (including, but not limited to, any Business Employee who becomes a Transferred Employee); and (ii) any (A) Business Service Provider and (B) other current or former employee, independent contractor or other service provider, or applicant for employment or engagement of any Seller or an Affiliate thereof, in each case, who does not become a Transferred Employee, whether arising prior to, on, or after, the Closing Date, including any Pre-Closing Employment Claim;

(i)      all Liabilities of any Seller arising out of or relating to under non-disclosure or confidentiality, non-disparagement, non-compete or non-solicitation agreements with any Person;

(j)      all Liabilities for injury to a Person that arises out of or relates to the Business prior to the Closing, including any loss, damage, or injury sustained by any Business Service Provider or other current or former employee or independent contractor of any Seller or any other Person while engaging in activities in connection with any Acquired Asset or the Business prior to the Closing;

(k)      all Liabilities set forth on Schedule 2.4;

(l)      all Liabilities to reimburse, or advance amounts to any present or former officer, director, employee, agent or other Person of any Seller (including with respect to any breach of fiduciary obligations by same);

(m)      all Liabilities under any Contracts that are not validly and effectively assigned to Buyer pursuant to this Agreement or the Sale Order;

(n)      all Liabilities of any Seller or other Debtor, or any of their respective Affiliates, arising from or relating to any debt, loans or credit facility, including but not limited to the DIP Facility or Prepetition Credit Agreement;

(o)      all Liabilities arising out of, in respect of, or in connection with the failure by any Seller or any of its Affiliates to comply with any Law or Order prior to the Closing;

(p)      all Liabilities arising out of or relating to items set forth on Schedule 2.2(v);

(q)      all Liabilities of any Seller or other Debtor for any fees or expenses owed by any Seller (or any member or Affiliate of any Seller) (i) to or for any professionals retained in connection with the Bankruptcy Cases pursuant to any Order of the Bankruptcy Court, including for the avoidance of doubt any amounts owed to Marnell Gaming Management, (ii) to or for the benefit of any member of the Special Committee (as such term is defined in the Support Agreement), or (iii) for any amounts owing under 28 U.S.C. § 1936;

A-12

(r)      all Liabilities of any Seller or other Debtor owing to any Transferred Employees, including all Liabilities for accrued but unused vacation, sick leave, paid time off, or similar benefits and all Liabilities for "final paycheck" amounts owing under applicable Law;

(s)      all Liabilities of any Seller or other Debtor, or any of their respective Affiliates, arising from or relating to any Collective Bargaining Agreement, including without limitation the Maverick CBA; and

(t)      all other Liabilities of any Seller that are not expressly included as Assumed Liabilities.

Notwithstanding the foregoing, any Excluded Liability with respect to Taxes shall be exclusively governed by clause (a) of this definition and any Liability or other amounts described in this definition shall not include any Liability for Taxes.

"Express Representations" has the meaning given to it in Section 2.9.

"Fixed Assets" means all machinery, Equipment, tools, signs, marketing material, tenant improvements, and all other items of tangible personal property located at any Real Property that is an Acquired Asset.

"Fraud" means a claim by a Party hereto for actual and intentional fraud of another Party with respect to the making of representations and warranties pursuant to Article IV (in the case of any representation or warranty made by the Sellers) or Article V (in the case of any representation or warranty made by Buyer); provided that actual and intentional fraud shall only be deemed to exist if a court of competent jurisdiction finally determines that the applicable Party made a knowing and intentional misrepresentation (under Article IV or Article V, as applicable) of a material fact with the intent that the other Party rely on such fact, coupled with damages caused by such other Party's detrimental reliance on such fact under circumstances that constitute common law fraud under the Laws of the State of Nevada.

"Fundamental Representations" means those representations contained in Section 4.1 (Organization), Section 4.2 (Power and Authority), Section 4.3 (Enforceability), and Section 4.18 (Finder's or Broker's Fees).

"GAAP" means U.S. generally accepted accounting principles, in effect from time to time and consistently applied.

"Gaming Approvals" means all Permits, registrations, findings of suitability, entitlements, waivers and exemptions issued by any Gaming Authority or under Gaming Laws necessary for or relating to conduct of gaming and related activities or the manufacture, distribution, service or sale of alcoholic beverages, the ownership or the operation, management, and development of any gaming operations, including the ownership, operation, management, and development of the Business or required to permit the parties hereto to consummate the Contemplated Transactions.

"Gaming Authority" means the Nevada Gaming Commission, the Nevada Gaming Control Board, Colorado Limited Gaming Control Commission, Washington State Gambling Commission, or any other Governmental Authority possessing and exercising jurisdiction over the Acquired Assets, the Business, any Seller, any of Sellers' respective Affiliates or constituent owners, or any officers, directors, partners, members, or managers of any of the foregoing, with respect to gaming activities.

"Gaming Laws" means any foreign, federal, tribal, state, county or local statute, law, ordinance, rule, regulation, permit, consent, approval, finding of suitability, license, judgment, Order, decree,

injunction or other authorization governing or relating to gaming and related activities and operations or the manufacture, distribution, service or sale of alcoholic beverages, including the rules and regulations of any Gaming Authority.

"Governmental Authority" means any (a) foreign, federal, state, local, municipal, or other government; (b) department, agency or instrumentality of a foreign or other government; (c) governmental or quasi-governmental authority of any nature; (d) any court or other tribunal; (e) body exercising, or entitled to exercise, any administrative, executive, judicial, legislative, police, regulatory or taxing authority or power of any nature, or (f) any mediator, arbitrator or arbitral body, including Gaming Authorities.

"Insurance Policies" has the meaning given to it in Section 4.21.

"Intellectual Property" means all of the following in any jurisdiction throughout the world: (a) all inventions (whether patentable or unpatentable and whether or not reduced to practice), all improvements thereto, and all patents, patent applications, and patent disclosures, together with all reissuances, continuations, continuations-in-part, revisions, extensions, and reexaminations thereof, (b) all trademarks, service marks, trade dress, logos, designs, shapes, configurations, slogans, trade names, corporate names, Internet domain names, and rights in telephone numbers, together with all translations, adaptations, derivations, and combinations thereof and including all goodwill associated therewith, (c) all copyrightable works, all copyrights, moral rights and other rights in any work of authorship, compilation or derivative work and all applications, registrations, and renewals in connection therewith, (d) all mask works and all applications, registrations, and renewals in connection therewith, (e) all trade secrets and confidential business information (including ideas, research and development, know-how, methods, recipes, formulas, compositions, manufacturing and production processes and techniques, technical and other data, designs, drawings, specifications, customer and supplier lists, pricing and cost information, and business and marketing plans and proposals), (f) proprietary rights in software (including source code, executable code, data, databases, and related documentation) and computer programs, (g) Internet domain names and social media accounts, including the Domain Name, and (h) all other intellectual property rights in the foregoing, including the right to sue and recover for past, present or future infringements, misappropriations or other conflict with any of the foregoing.

"Intellectual Property Assets" means all Intellectual Property owned, purported to be owned, used, or held for use by any PokerCo Company in connection with the Business, including each item of Business Registered IP and Business Software.

"Intellectual Property Assignment Agreement" means that agreement substantially in the form of Exhibit C hereto.

"Inventory" means all inventories of Sellers located at the Real Property, including all finished goods, works in process, raw and packaging materials, spare and replacement parts, dice, food, beverages (including all alcohol to the extent such alcohol is permitted to be transferred to Buyer under applicable Law), merchandise, gaming supplies, gaming device parts inventory, engineering, maintenance and housekeeping supplies, cleaning supplies, and all other materials and supplies to be used, sold, resold or distributed by the Business and owned by Sellers and located at the Real Property.

"IRS" means the Internal Revenue Service.

"Knowledge of Sellers" or words of like import means the actual knowledge after due inquiry of Jeff Seery and of another officer or employee identified prior to delivery of the Disclosure Schedules reasonably acceptable to the Parties.

"<u>Law</u>" means any federal, state, provincial, local, municipal, foreign or international, multinational or other law, statute, legislation, constitution, principle of common law, resolution, ordinance, code, edict, decree, proclamation, treaty, convention, rule, or regulation, issued, enacted, adopted, promulgated, implemented or otherwise put into effect by or under the authority of any Governmental Authority.

"<u>Leased Real Property</u>" means the premises located at: (i) 10117 S Tacoma Way, Lakewood, Washington, (ii) 7004 220th St SW, Mountlake Terrace, Washington, (iii) 12526 NE 144th St, Kirkland, Washington, and (iv) 12530 NE 144th St, Kirkland, Washington; all as further described in <u>Schedule 4.10(b)</u> of the Disclosure Schedule.

"<u>Liabilities</u>" means, as to any Person, any debt, adverse claim, liability, duty, responsibility, obligation, commitment, assessment, cost, expense, loss, expenditure, charge, fee, penalty, fine or contribution obligation of such Person of any kind or nature whatsoever, whether known or unknown, asserted or unasserted, absolute or contingent, direct or indirect, accrued or unaccrued, liquidated or unliquidated, or due or to become due, and regardless of when sustained, incurred or asserted or when the relevant events occurred or circumstances existed.

"<u>Licensed Parties</u>" has the meaning given to it in <u>Section 5.6</u>.

"<u>Licensing Affiliates</u>" has the meaning given to it in <u>Section 5.6</u>.

"<u>Liens</u>" means any lien (as defined in Section 101(37) of the Bankruptcy Code), charge, easement, claim, encumbrance, mortgage, security interest, option, pledge, hypothecation, preemptive right, right of first refusal, or any other title defect or restriction on transfer or use, including without limitation, any lease or title retention agreement, any financing lease having substantially the same economic effect as any of the foregoing, and the filing of, or agreement to give, any financing statement perfecting a security interest under the Uniform Commercial Code of any jurisdiction.

"<u>Material Adverse Change</u>" means any event, change, fact, condition, circumstance or occurrence that, when considered either individually or in the aggregate together with all other adverse events, changes, facts, conditions, circumstances or occurrences, has had or would reasonably be expected to have a material adverse effect on (x) the business, operations, results of operations, properties, assets, or condition (financial or otherwise) of the Business, or (y) the ability of Sellers to consummate the Contemplated Transactions other than, in the case of <u>clause (x)</u>, the following: (i) events, changes, facts, conditions, circumstances or occurrences generally affecting the industry in which the Business operates, (ii) events, changes, facts, conditions, circumstances or occurrences generally affecting the United States economy or the United States debt, credit or securities markets (including any decline in the price of any security or any market index), (iii) any outbreak or escalation of hostilities or declared or undeclared acts of war or terrorism, (iv) any national or international calamity, pandemic, epidemic, earthquake, hurricane, tsunami, tornado, flood, mudslide, wild fire or other natural disaster, act of God or other force majeure event or any other similar event, (v) changes or proposed changes in Law after the date hereof, (vi) changes or proposed changes in GAAP (or interpretations thereof) after the date hereof, or (vii) any failure of the Business to meet projections, forecasts or revenue or earning predictions for any period after the date hereof (<u>provided</u> that the underlying causes of such failure may, to the extent applicable, be considered in determining whether there has been, or is reasonably be expected to be, a Material Adverse Change); <u>provided</u> that in the case of <u>clauses (i)</u> through <u>(vi)</u> that such effects do not, individually or in the aggregate, have a disproportionate adverse impact on the Business relative to other Persons in the industries or markets in which the Business operates.

"Maverick CBA" means that certain collective bargaining agreement by and between Maverick Washington LLC and Teamsters Local Union Nos. 38, 117, 760 and 839, affiliated with the International Brotherhood of Teamsters, for the period of March 1, 2023 – February 28, 2027.

"Multiemployer Plan" has the meaning given to it in Section 4.17(d).

"Net Working Capital" means, with respect to the Business, as calculated in accordance with GAAP applied on a basis consistent with the application of such principles in the preparation of Sellers' financial statements and consistent with the sample calculation to be attached hereto as Exhibit D (which sample shall be in form and substance mutually acceptable to the Parties), the sum of (a) all Cash and Cash Equivalents, Cash in Bank, Cage Cash, Register Cash, Accounts Receivable, Inventory, and prepaid expenses, and other current assets of the Business that, in each case, do not constitute Excluded Assets, *minus* (b) all accounts payable, accrued liabilities (including accrued gaming, property and sales taxes), accrued payroll, deferred income, Player Accounts (as applicable), and other current liabilities that, in each case, constitute Assumed Liabilities or for which Buyer otherwise becomes liable. It is agreed that Closing Date Net Working Capital shall include at least the following two cash items: (i) Cage Cash in an amount not less than the Target Cage Cash Amount and (ii) subject to any Equitable Deduction, Cash in Bank in an amount not less than $972,719.

"Non-Assignable Assets" has the meaning given to it in Section 2.5(c).

"Non-Recourse Party" has the meaning given to it in Section 12.14(b).

"Non-Union Business Employee" means any Business Employee who is not represented by a Union with respect to his or her employment by any Seller or Affiliate thereof.

"Non-Union Transferred Employee" has the meaning given to it in Section 6.15(c).

"Off-the-Shelf Software" means non-customized commercially available computer software (other than Open Source Software) obtained from a third-party on terms generally available to the public.

"Open Source Software" means any Software that is distributed (a) as "free software" (as defined by the Free Software Foundation), (b) as "open source software" or pursuant to any license identified as an "open source license" by the Open Source Initiative (opensource.org/licenses) or other license that substantially conforms to the Open Source Definition (opensource.org/osd), (c) under any licensing or distribution model similar to clauses (a) or (b) above, or (d) under a license that requires disclosure of source code or requires derivative works created based on the licensed Software to be made publicly available under the same license.

"Order" means any order, injunction, judgment, decree, ruling, writ, assessment or arbitration award of a Governmental Authority.

"Ordinary Course of Business" means the ordinary and usual course of operations of the Business consistent with past practice, taking into account the Sellers' financial condition, financial distress and the Bankruptcy Cases.

"Outside Date" means October 31, 2025; provided, that such date may be extended to the extent the only remaining conditions to Closing (other than conditions that by their nature are to be satisfied at the Closing) is the receipt of necessary regulatory approvals (including Gaming Approvals).

"Parties" has the meaning given to it in the Preamble.

A-16

"<u>Permits</u>" means, with respect to any Person, any license, franchise, permit, consent, approval, right, privilege, certificate or other similar authorization issued or otherwise granted by any Governmental Authority to which or by which such Person is subject or bound or to which or by which any property, business, operation or right of such Person is subject or bound.

"<u>Permitted Liens</u>" means (a) statutory liens of carriers, warehousemen, mechanics, materialmen and other similar common law liens incurred in the Ordinary Course of Business for sums not yet due and payable or which are being contested in good faith by appropriate proceedings or for which Sellers shall have provided bond or other security satisfactory to the title company; (b) Liens for Taxes not yet due and payable, being contested in good faith, or the nonpayment of which is permitted or required by the Bankruptcy Code, (c) [reserved]; (d) [reserved] (e) [reserved], (f) Liens for utilities not yet due and payable, being contested in good faith, or the nonpayment of which is permitted or required by the Bankruptcy Code, (g) easements, rights of way, restrictive covenants, encroachments and similar non-monetary encumbrances or non-monetary impediments against any of the Leased Real Property which do not, individually or in the aggregate, materially and adversely affect the operation in the ordinary course of the Acquired Assets and, in the case of Real Property, which do not, individually or in the aggregate, materially and adversely affect the use or occupancy of such Real Property as it relates to the operation in the ordinary course of the Acquired Assets, (h) applicable zoning Laws, building codes, land use restrictions and other similar restrictions imposed by Law which are not materially violated by the current use or occupancy of any Real Property, (i) if applicable, Liens by, through or under Buyer's financing for the transactions contemplated hereby, (j) [reserved], and (k) solely for the period of time prior to Closing, Liens that will be removed or released by operation of the Sale Order.

"<u>Person</u>" means any individual or any corporation, association, trust, partnership, unincorporated association, limited liability company, joint venture, joint stock or other company, trust, organization, Governmental Authority, Union, or other entity of any kind, in each case, whether or not having a separate legal personality.

"<u>Petition Date</u>" has the meaning given to it in the Recitals.

"<u>Player Accounts</u>" has the meaning given in Section 6.2(q) and specifically includes US Bank account nos. x5718, x5767, x5775, and x5809.

"<u>PokerCo Companies</u>" means, collectively, (i) Maverick Kirkland LLC, a Nevada limited liability company; (ii) Maverick Kirkland II LLC, a Nevada limited liability company; (iii) NG Washington III, LLC, a Washington limited liability company; and (iv) Grand Central Casino, Inc., a Washington corporation.

"<u>Post-Closing Tax Period</u>" means any Tax period beginning after the Closing Date and that portion of a Straddle Period beginning after the Closing Date.

"<u>Pre-Closing Employment Claim</u>" means any Claim against any Seller, any Affiliate thereof, or Buyer or its Affiliates, related to the employment or engagement by any Seller or its Affiliates of any Person as an employee, independent contractor or other service provider, or the termination of any such employment or engagement, or by any applicant for employment or engagement with Seller or any Affiliate thereof, in each case, to the extent arising on or prior to the Closing Date.

"<u>Pre-Closing Privileged Materials</u>" has the meaning given to it in <u>Section 12.18(b)</u>.

"<u>Pre-Closing Privileges</u>" has the meaning given to it in <u>Section 12.18(a)</u>.

"<u>Pre-Closing Tax Period</u>" means any Tax period ending on or before the Closing Date and that portion of any Straddle Period ending on the Closing Date.

"<u>Prepetition Credit Agreement</u>" has the meaning ascribed in the Bankruptcy Court order filed as Docket No. 65 in the Bankruptcy Cases.

"<u>Projections</u>" has the meaning given to it in <u>Section 2.9</u>.

"<u>Purchase Price</u>" has the meaning given to it in <u>Section 3.1</u>.

"<u>Real Property</u>" has the meaning given to it in <u>Section 4.10(b)</u>.

"<u>Real Property Leases</u>" means all of the unexpired leases of real property relating to the Leased Real Property.

"<u>Records</u>" means all past and present customer, supplier, or vendor records, files, documents, instruments, and all other books, records, policies, and procedures pertaining to the operation of the Business or the use of the other Acquired Assets.

"<u>Register Cash</u>" means, without duplication, all Cash and Cash Equivalents located in cash registers and other machines or devices used to collect or process cash transactions on the Real Property. For the sake of clarity, Register Cash excludes any Cage Cash.

"<u>Related Party Transactions</u>" has the meaning given to it in <u>Section 4.19.</u>

"<u>Representatives</u>" means, with respect to any Person, any directors, officers, employees, investment bankers, financial advisors, accountants, agents, attorneys, consultants, or other representatives of such Person.

"<u>Retained Business</u>" means the business of any Sellers or other Debtors that is not being acquired pursuant to this Agreement.

"<u>RunItOneTime</u>" has the meaning given to it in the Preamble.

"<u>Sale</u>" means, any direct or indirect sale, transfer, assignment, pledge, mortgage, exchange, hypothecation, grant of a security interest or other direct or indirect disposition or encumbrance of an interest (whether with or without consideration, whether voluntarily or involuntarily or by operation of law) or the acts thereof.

"<u>Sale Hearing</u>" means the hearing scheduled by the Bankruptcy Court to approve the sale of the Acquired Assets.

"<u>Sale Order</u>" has the meaning given to it in <u>Section 2.8</u>.

"<u>Seller Parties</u>" means Sellers and each of their respective former, current, or future Affiliates, officers, directors, employees, partners, members, equityholders, controlling or controlled Persons, managers, agents, advisors and other Representatives, successors or permitted assigns.

"<u>Seller Representative</u>" has the meaning given to it in <u>Section 12.18(a)</u>.

"<u>Sellers</u>" has the meaning given to it in the Preamble.

A-18

"Sellers' Counsel" has the meaning given to it in Section 12.18(a).

"Shared Contracts" means any Contracts that relate to or are used by both, on the one hand, the Business acquired pursuant to this Agreement and, on the other hand, other businesses of Sellers or their respective Affiliates that are not being acquired pursuant to this Agreement.

"Software" means all computer software, including source code, object code, algorithms, firmware, formulas, methods, databases, comments, user interfaces, administration, e-mail and customer relationship management tools, menus, buttons and icons, and all files, data, manuals, design notes and other items and documentation related thereto or associated therewith, and any derivative works, foreign language versions, fixes, upgrades, updates, enhancements, new versions or previous versions thereof, and all media and other tangible property necessary for the delivery or transfer thereof.

"Straddle Period" means any taxable period that includes but does not end on the Closing Date.

"Subsidiary" means, with respect to any Person, any corporation, limited liability company or other entity of which a majority of the total voting power of shares of stock or other Equity Interests entitled (without regard to the occurrence of any contingency) to vote in the election of directors, managers or trustees or other governing body or Person thereof is at the time owned or controlled, directly or indirectly, by such Person or one or more of the other Subsidiaries of such Person or a combination thereof or any partnership, association or other business entity of which a majority of the partnership or other similar ownership interest is at the time owned or controlled, directly or indirectly, by such Person or one or more Subsidiaries of such Person or a combination thereof. The term "Subsidiary" shall include all Subsidiaries of such Subsidiary.

"Successful Bid" has the meaning ascribed in the Bidding Procedures Order.

"Successful Bidder" means the bidder with the highest or otherwise best bid for the Acquired Assets, as determined in accordance with the Bidding Procedures Order.

"Support Agreement" means that certain Transaction Support Agreement dated as of June 25, 2025, a copy of which is attached as Exhibit A to the declaration filed as Docket No. 18 in the Bankruptcy Cases.

"Target Cage Cash Amount" means $953,484.

"Target Net Working Capital" means $876,178 (inclusive of the Target Cage Cash Amount and Cash in Bank of $972,719), as such amount may be adjusted to reflect Exhibit D as finalized, subject to any Equitable Deduction.

"Tax" or "Taxes" means any foreign, United States federal, state or local tax, including net income, alternative or add-on minimum tax, gross income, gross receipts, sales, use, *ad valorem*, value added, transfer, rates, imposts, asset, capital, net worth, franchise, profits, license, withholding, payroll, employment, excise, severance, stamp, registration, recording, transaction, business, gaming, gaming license, occupation, premium, property, environmental or windfall profit tax, custom, duty or other tax, levy, governmental fee, escheat or unclaimed property liability, or other like assessment or charge in the nature of a tax, together with any interest, penalty, addition to tax or additional amount imposed by any Law or Taxing Authority.

"Tax Returns" means any return, declaration, report, claim for refund, or information return or statement filed or required to be filed with any Taxing Authority, including any supplement or attachment thereto and including any amendment of any of the foregoing.

"<u>Taxing Authority</u>" means any Governmental Authority, domestic or foreign, having jurisdiction over the administration, assessment, determination, collection, or other imposition of any Taxes.

"<u>Transaction Consents</u>" means the approval of the Bankruptcy Court and the matters contemplated by <u>Schedule 4.4</u> of the Disclosure Schedule.

"<u>Transfer Taxes</u>" has the meaning given to it in <u>Section 9.1</u>

"<u>Transferable Permits</u>" means, to the extent transferable pursuant to applicable Law, any Seller's interest in any Permit held by such Seller in connection with the operation of the Business.

"<u>Transferred Employee</u>" has the meaning given to it in <u>Section 6.15(c)</u>.

"<u>Transferred Employee Records</u>" means all Forms I-9 for all Transferred Employees.

"<u>Shareholder Services Agreement</u>" means that certain agreement for transitional services by the Supporting Shareholder to the Sellers, to be in form and substance reasonably acceptable to Buyer and the Seller Representative.

"<u>Supporting Shareholder</u>" has the meaning ascribed in the Support Agreement.

"<u>Treasury Regulations</u>" means the regulations promulgated under the Code, as amended from time to time, including the corresponding provisions of any successor regulations.

"<u>Union</u>" has the meaning set forth in <u>Section 6.15(a)</u>.

"<u>Union Business Employee</u>" means any Business Employee who is represented by the Union.

"<u>Union Transferred Employee</u>" has the meaning given to it in <u>Section 6.15(a)</u>.

"<u>Waiving Parties</u>" has the meaning given to it in <u>Section 12.18(a)</u>.

"<u>WARN Act</u>" means the federal Worker Adjustment and Retraining Notification Act of 1988, as amended, and any similar foreign, state or local Law.

"<u>Withdrawal Liability</u>" means any Liability on account of a "complete withdrawal" (within the meaning of Section 4203 of ERISA) or a "partial withdrawal" (within the meaning of Section 4205 of ERISA) from any Multiemployer Plan.

**DISCLOSURE SCHEDULES**

(*to be provided*)

**EXHIBIT A**

**FORM OF ASSIGNMENT AND ASSUMPTION AGREEMENT**

## ASSIGNMENT AND ASSUMPTION AGREEMENT

This ASSIGNMENT AND ASSUMPTION AGREEMENT (including the exhibits hereto, this "**Assignment**") is made effective as of [●], 2025 ("**Assumption Date**") by RunItOneTime LLC, a Washington limited liability company, and its affiliates that are signatories hereto ("**Sellers**"), in favor of Maverick Gaming LLC, a Nevada limited liability company ("**Buyer**"). Capitalized terms used herein and not otherwise defined shall have the meanings ascribed to them in the Agreement (as defined below).

**WHEREAS**, Sellers and Buyer have entered into that certain Asset Purchase Agreement, dated as of [●], 2025 (as amended or otherwise modified from time to time in accordance with its terms, the "**Agreement**"); and

**WHEREAS**, pursuant to the Agreement, among other things, Sellers have agreed to transfer and assign to Buyer, and Buyer has agreed to assume from Sellers, each of the Assigned Contracts.

**NOW, THEREFORE**, for and in consideration of the premises set forth herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Sellers and Buyer agree as follows:

1.      On the terms and subject to the conditions set forth in the Agreement, effective as of the Assumption Date, Sellers hereby grant, convey, transfer and assign unto Buyer all right, title, benefit and interest of Sellers in, to and under the Assigned Contracts.

2.      Buyer hereby accepts all right, title, benefit and interest in, to and under the Assigned Contracts and assumes and agrees to perform all of the obligations, terms, covenants and conditions of Sellers that are Assumed Liabilities.

3.      BUYER ACKNOWLEDGES AND AGREES THAT SELLERS HAVE NOT MADE, DO NOT MAKE AND SPECIFICALLY DISCLAIM ANY REPRESENTATION OR WARRANTY WITH RESPECT TO THE ASSIGNED CONTRACTS EXCEPT AS SPECIFICALLY SET FORTH IN THE AGREEMENT.

4.      This Assignment will be binding upon and inure to the benefit of the Parties and their respective successors and permitted assigns.

5.      This Assignment can be amended, supplemented or changed, and any provision hereof can be waived, only by written instrument making specific reference to this Assignment and Assumption Agreement signed, in the case of an amendment, supplement or change, by the Parties, or in the case of a waiver, by the Party against whom enforcement of such waiver is sought.

6.      Nothing contained herein shall in any way modify the Agreement. In the event of any conflict or inconsistency between the terms of the Agreement and the terms hereof, the terms of the Agreement shall govern and control.

7.      Each Seller and Buyer agrees that at and after the Assumption Date, each shall execute and deliver, at the reasonable request of the other party hereto, such additional documents,

1

instruments, conveyances and assurances and take such further actions as such other party may reasonably request to carry out the provisions hereof and give effect to the transactions contemplated by this Assignment.

8.     This Assignment may be executed in one or more counterparts, each of which shall be deemed an original, and all of which shall constitute one and the same Assignment.

9.     The Sections of Article XII of the Agreement are each hereby incorporated by reference *mutatis mutandis*.

[*Signature Pages Follow*]

IN WITNESS WHEREOF, the parties hereto have executed or caused this Assignment to be executed as of the date first written above.

**<u>SELLERS</u>**

**RUNITONETIME LLC**

By: _____

     Name: **[●]**

     Title: **[●]**

**[●]**

By: _____

     Name: **[●]**

     Title:  **[●]**

**<u>BUYER</u>**

**MAVERICK GAMING LLC**

By: _____

     Name: **[●]**

     Title: **[●]**

*Signature Page to Assumption and Assignment Agreement*

**EXHIBIT B**

**FORM OF BILL OF SALE**

## BILL OF SALE

This Bill of Sale (this "**Bill of Sale**") is made and effective as of [●], 2025 (the "**Sale Date**") by RunItOneTime LLC, a Washington limited liability company, and its affiliates that are signatories hereto ("**Sellers**"), in favor of Maverick Gaming LLC, a Nevada limited liability company ("**Buyer**").   Capitalized terms used herein and not otherwise defined shall have the meanings ascribed to them in the Agreement (as defined below).

WHEREAS, Sellers and Buyer have entered into that certain Asset Purchase Agreement, dated as of [●], 2025 (as amended or otherwise modified from time to time in accordance with its terms, the "**Agreement**"); and

WHEREAS, pursuant to the Agreement, among other things, at the Closing, Sellers have agreed to transfer, sell, convey, and assign to Buyer, and Buyer has agreed to purchase and acquire from Sellers, all of Sellers' right, title and interest in, to and under the Acquired Assets.

NOW, THEREFORE, in consideration of the foregoing and the covenants and agreements set forth below and in the Agreement and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

1.     <u>Transfer and Assignment of the Acquired Assets</u>.  On the terms and subject to the conditions set forth in the Agreement, effective as of the Sale Date, Sellers hereby transfer, sell, convey and assign to Buyer, and Buyer hereby purchases and acquires from Sellers, all of Sellers' rights, title and interest in, to and under the Acquired Assets, free and clear of any and all Liens (other than Permitted Liens, if any).  Notwithstanding anything to the contrary contained herein, the Acquired Assets shall not include any of the Excluded Assets and the parties hereto agree that the Excluded Assets shall remain in the possession of the Sellers.

2.     <u>Further Assurances</u>.  Subject to the provisions of this Bill of Sale and the Agreement, each of the parties hereto agrees to execute, acknowledge, deliver, file and record such further certificates, amendments, instruments and documents, and to do all such other acts and things, as may be reasonably requested by any other party in order to carry out the intent and purpose of this Bill of Sale.

3.     <u>Condition of the Acquired Assets</u>.  BUYER ACKNOWLEDGES AND AGREES THAT IT IS ACQUIRING THE ACQUIRED ASSETS ON AN "AS IS, WHERE IS AN DWITH ALL FAULTS" BASIS, AND THAT SELLERS HAVE NOT MADE, DO NOT MAKE AND SPECIFICALLY DISCLAIM ANY REPRESENTATION OR WARRANTY WITH RESPECT TO THE TRANSFERRED ASSETS EXCEPT AS SPECIFICALLY SET FORTH IN THE AGREEMENT.

4.     <u>Subject to the Agreement.</u>  Nothing contained herein shall in any way modify the Agreement. Sellers and Buyer hereby acknowledge and agree that any representations, warranties, covenants, indemnities, limitations and other terms contained in the Agreement shall not be superseded or expanded hereby and shall remain in full force and effect to the fullest extent provided therein. In the event of any conflict or inconsistency between the terms of the Agreement and the terms hereof, the terms of the Agreement shall govern and control.

5.      <u>General Provisions</u>.  The Sections of Article XII of the Agreement are each hereby incorporated by reference *mutatis mutandis*.

4876-8220-0220 v.3

IN WITNESS WHEREOF, this Bill of Sale has been executed by the parties hereto as of the date first above written.

**SELLERS**

**RUNITONETIME LLC**

By: _____

    Name: **[●]**

    Title: **[●]**

**[●]**

By: _____

    Name: **[●]**

    Title:  **[●]**

**BUYER**

**MAVERICK GAMING LLC**

By: _____

    Name: **[●]**

    Title: **[●]**

*[Signature Page to Bill of Sale]*

**EXHIBIT C**

**FORM OF INTELLECTUAL PROPERTY ASSIGNMENT AGREEMENT**

## INTELLECTUAL PROPERTY ASSIGNMENT AGREEMENT

This INTELLECTUAL PROPERTY ASSIGNMENT AGREEMENT (this "*Agreement*") is dated as of [●], 2025, by and among RunItOneTime LLC, a Washington limited liability company and its affiliated debtors in the Bankruptcy Cases (collectively, "*Licensor*"), on the one hand, and Maverick Gaming LLC, a Nevada limited liability company ("*Licensee*"), on the other. Licensor and Licensee are sometimes referred to herein individually as a "*Party*" and collectively as the "*Parties*."

### RECITALS

**WHEREAS**, Licensor and Licensee are parties to that certain Asset Purchase Agreement dated as of the date hereof, pursuant to which Licensee is acquiring certain businesses and operations from Licensor (the "*APA*");

**WHEREAS**, Licensor owns all rights, title and interest in and to the Maverick/Aces IP (as defined below);

**WHEREAS**, Licensee desires to receive from Licensor, and Licensor desires to grant to Licensee, a license to use the Maverick/Aces IP for the purposes and on the terms and subject to the conditions set forth herein; and

**WHEREAS**, on the Transfer Date, subject to terms and conditions of this Agreement, including the Assignment Conditions being met on the Transfer Date, Licensor agrees to assign all of its rights in the Maverick/Aces IP to Licensee.

**NOW, THEREFORE**, the Parties agree as follows:

### ARTICLE I
### DEFINITIONS

1.1     The following capitalized terms as used in this Agreement have the meanings specified in this Article I (Definitions):

(a)     "*Action*" means any claim, suit, action, or proceeding.

(b)     "*Adjusted EBITDA*" means an amount (not less than zero) equal to net income *plus* net interest expense, income tax expense, depreciation expense, and amortization expense for Licensee on a consolidated basis, in each case, from any current or future poker partnerships using any Maverick/Aces Trademarks. The Adjusted EBITDA will account for all expenses incurred by Licensee and will be adjusted to normalize any out-of-period items.

(c)     "*Audit*" has the meaning set forth in Section 9.6 (Reporting, Records, and Audits).

(d)     "*Affiliate*" of any particular Person means any other Person controlling, controlled by or under common control with such particular Person, where "control" means the possession, directly or indirectly, of the power to direct the management and policies of a Person whether through the ownership of voting securities, contract or otherwise.

(e)     "*Agreement*" has the meaning set forth in the Preamble.

(f)     "*Assignment Condition*" has the meaning set forth in Section 8.2 (Assignment Conditions).

1

(g)        "**APA**" has the meaning set forth in the Preamble.

(h)        "**Bankruptcy Code**" means title 11 of the United States Code, 11 U.S.C. §§ 101-1532, as amended.

(i)        "**Bankruptcy Court**" means the United States Bankruptcy Court in which the Bankruptcy Cases are commenced or another United States Bankruptcy Court with jurisdiction over the Bankruptcy Cases.

(j)        "**Business Day**" means any day other than a Saturday, Sunday, "legal holiday" (as defined in Bankruptcy Rule 9006(a)) or another day on which commercial banks in New York are required or permitted under applicable Laws or regulations to close.

(k)        "**Bankruptcy Cases**" means the voluntary cases under chapter 11 of the Bankruptcy Code commenced by Licensor and certain of its subsidiaries and affiliates in the Bankruptcy Court.

(l)        "**Transfer Date**" means the earlier of (a) the occurrence of the effective date of a plan of reorganization in any of the Bankruptcy Cases; (b) the date that any of the Bankruptcy Cases is converted to a case under chapter 7 of the Bankruptcy Code or has a chapter 11 trustee appointed; or (c) 11:59 p.m. (ET) on March 31, 2026, except as may be extended on the prior written consent of Licensee not to be unreasonably withheld.

(m)        "**Confidential Information**" means any and all confidential information and materials (including the terms of this Agreement) disclosed by a Party to the other Party pursuant to this Agreement, whether in writing, or in oral, graphic, electronic, or any other form, whether or not designated, marked, or otherwise identified by the disclosing Party in writing as confidential or proprietary. Notwithstanding the foregoing, Confidential Information does not include information that: (a) is already known to Recipient without restriction on use or disclosure prior to receipt of such information from Discloser; (b) is or becomes part of the public domain other than by breach of this Agreement by, or other wrongful act of, Recipient; (c) is developed by Recipient independently of and without reference to any Confidential Information of Discloser; or (d) is received by Recipient from a third party Person who is not under any obligation to maintain the confidentiality of such information.

(n)        "**Contract**" means, with respect to any Person, any contract, agreement, deed, mortgage, lease, sublease, license, sublicense, or other commitment, promise, undertaking, obligation, arrangement, instrument, or understanding, whether written or oral, to which or by which such Person is a party or otherwise subject or bound or to which or by which any property, business, operation or right of such Person is subject or bound.

(o)        "**Discloser**" has the meaning set forth in Section 6.1 (Confidentiality).

(p)        "**Effective Date**" shall mean the Closing Date, as such term is defined in the APA.

(q)        "**Governmental Body**" means any applicable federal, state, local, or foreign government or any agency, bureau, board, commission, court or arbitral body, department, political subdivision, regulatory or administrative authority, tribunal or other instrumentality thereof, or any self-regulatory organization.

(r)        "**IP Assignment**" has the meaning set forth in Section 8.1 (Assignment).

2

(s)       "***Law***" means any federal, state, local, or foreign law (including, in each case, any common law), statute, code, ordinance, rule, regulation, decree, injunction, order, ruling, assessment, writ or other legal requirement, or judgment, in each case, that is validly adopted, promulgated, issued, or entered by a Governmental Body.

(t)       "***License Term***" means the period commencing on the Effective Date and ending on the Transfer Date.

(u)       "***Licensed Territory***" means the United States of America, consisting of the 50 states and the District of Columbia.

(v)       "***Licensee***" has the meaning set forth in the Preamble.

(w)       "***Licensor***" has the meaning set forth in the Preamble.

(x)       "***Losses***" means any and all losses, settlements, claims, actions, suits, proceedings, investigations, judgments, awards, damages, expenses (including reasonable outside attorneys' fees and costs), and other liabilities.

(y)       "***MainCo***" has the meaning ascribed in the Support Agreement.

(x)       "***Maverick/Aces Domain Names***" means (a) all domain names, including all registrar accounts and administrative controls, relating to the Maverick/Aces Trademarks; (b) all email accounts, MX records, and email server configurations associated with such domain names; (c) all website content, databases, backend systems, source code, and CMS credentials hosted under or associated with such domain names; (d) any server, hosting, or cloud infrastructure tied to such domain names or their services, including associated account logins and credentials; (e) all data, digital records, metadata, and analytics tied to use of such domain names; (f) all goodwill, trademarks, and naming rights inherent in or linked to such domain names.

(y)       "***Maverick/Aces IP***" means the Maverick/Aces Trademarks and all intellectual property developed using or relating to those brands and trademarks in connection with prior or current poker partnerships (or future poker partnerships during the term of this Agreement), including without limitation (i) with the goodwill of the business connected with the use of and symbolized by any of the foregoing, (ii) all Maverick/Aces Domain Names and related accounts and information, and (iii) all Maverick/Aces Trade Secrets.  For the avoidance of doubt, the Maverick/Aces IP does not include any intellectual property of e.gads, LLC as of the Effective Date.

(z)       "***Maverick/Aces Trade Secrets***" means all trade secrets, relationships, databases, business processes, and other proprietary and confidential information particular to the business of Licensor or its Affiliates and relating to the Maverick/Aces Trademarks, including information, formulas, patterns, compilations, programs, devices, inventions, information, technical data, metadata, software codes and designs, algorithms, developments, applications, tools, processes, formulas, techniques, works, engineering designs and drawings, hardware configuration information, graphics, sounds, video, music, audiovisual content, footage, agreements with third parties, lists of, or information relating to, customers, clients, and suppliers, methods, techniques and processes, that derive independent economic value, actual or potential, from not being generally known to the public or to other persons who can obtain economic value from its disclosure or use, and are the subject of efforts that are reasonable under the circumstances to maintain their secrecy. This includes information maintained in writing, electronically, orally, or by observation.

(aa)       "***Maverick/Aces Trademarks***" means the "Maverick" and "Aces" brands and all associated trademarks, including without limitation  the trademark registrations and applications set forth on <u>Exhibit A</u>

3

attached hereto, together with the goodwill of the business connected with the use of and symbolized by any of the foregoing.

(z)      "*Party*" or "*Parties*" has the meaning set forth in the Preamble.

(aa)      "*Permitted Uses*" means any use in connection with the operation of a cardroom, including but not limited to use in connection with the hosting or promotion of poker tournaments and other poker-related events managed or sponsored by Licensee and branding partnerships for products used in poker games (e.g., card tables, poker chips, and playing cards).

(bb)      "*Person*" means any individual, corporation, limited liability company, trust, joint venture, association, company, limited or general partnership, unincorporated organization, Governmental Body, or other entity.

(cc)      "*Recipient*" has the meaning set forth in Section 6.1 (Confidentiality Obligations).

(dd)      "*Representatives*" has the meaning set forth in Section 6.2 (Disclosure).

(ee)      "*Retained License*" has the meaning set forth in Section 8.3 (Retained License).

(ff)       "*Retained License Period*" means the period commencing on the Transfer Date and ending on the date that is the earlier of (a) the three (3)-year anniversary of the Transfer Date and (b) the sale of MainCo to anyone other than the Supporting Lenders (as such term is defined in the Support Agreement) or an Affiliate of the Supporting Lenders.

(gg)      "*Revenue Share*" has the meaning set forth in Section 9.2 (Revenue Sharing).

(hh)      "*Revenue Sharing Period*" means the period commencing on the Effective Date and ending on the three (3)-year anniversary of the Transfer Date.

(ii)      "*Standards of Quality*" means at least the same standards of quality, appearance, service, and other standards that were observed as of immediately prior to the Effective Date by Licensor with respect to the Maverick/Aces Trademarks, and in compliance with applicable Law.

(ii)      "*TSA*" means the Shareholder Services Agreement.

Capitalized terms used in this Agreement and not otherwise defined herein have the meanings set forth in the APA.

### ARTICLE II
### LICENSE

2.1      **License Grant**. Subject to the terms and conditions of this Agreement, including the payment of the amount due under Section 9.1 on the Effective Date, Licensor hereby grants to Licensee for the License Term a royalty-bearing, non-transferable (except to the extent permitted under Section 11.4 (Assignability)), non-exclusive, non-sublicensable license to use the Maverick/Aces IP solely for Permitted Uses within the Licensed Territory.

2.2      **License Exclusions**. The license granted in Section 2.1  (License Grant) expressly excludes the right, during the License Term, to use and register any state trademark registrations that incorporate the Maverick/Aces Trademarks.

4

2.3 **Licensing Restrictions**. During the License Term, Licensor shall not license any Maverick/Aces IP to any third party.

2.3 **Reservation of Rights**. All intellectual property rights of Licensor not expressly licensed to Licensee under this Agreement are reserved for the sole and exclusive benefit of Licensor.

### ARTICLE III
### QUALITY CONTROL AND STANDARDS

3.1 **Quality Standards**. Licensee acknowledges and agrees that maintaining the goodwill associated with the Maverick/Aces Trademarks during the License Term is of substantial importance to Licensor, and as such Licensor must have the right to ensure that all uses of the Maverick/Aces Trademarks meet the Standards of Quality. Accordingly, Licensee covenants and agrees that all uses of the Maverick/Aces Trademarks by or on behalf of Licensee during the License Term, including all goods, services, and activities associated therewith, will meet or exceed the Standards of Quality. Licensor covenants and agrees that all uses of the Maverick/Aces Trademarks by Licensor or its Affiliates during the License Term and Retained License Period, including all goods, services, and activities associated therewith, will meet or exceed the Standards of Quality.

3.2 **Restricted Use**. Licensee and Licensor will not, during the License Term, use the Maverick/Aces Trademarks in any manner or take any action that does or is reasonably expected to dilute or otherwise tarnish, diminish, or impair the value, goodwill, or reputation of Licensor, Licensee, or the Maverick/Aces Trademarks.

3.3 **Compliance with Laws**. Licensee and Licensor will comply with all applicable Laws in connection with (a) this Agreement and (b) the use of the Maverick/Aces Trademarks and other Maverick/Aces IP during the License Term.

3.4 **Samples**. From time to time during the License Term upon Licensor's reasonable request, Licensee will provide samples of its uses of the Maverick/Aces Trademarks to Licensor. In the event that Licensor provides notice to Licensee that any standards in this Article III (Quality Controls and Standards) are not met, then (without limiting any termination or other rights of Licensor hereunder) Licensee will use best efforts to cure such deficiencies promptly.

### ARTICLE IV
### OWNERSHIP, REGISTRATION, AND ENFORCEMENT

4.1 **Ownership**. Licensee acknowledges and agrees that, during the License Term, Licensor is the sole and exclusive owner of all rights, title, and interests in and to the Maverick/Aces Trademarks. Notwithstanding Article II (License) and Article VIII (Conditional Assignment), nothing contained in this Agreement will create, nor be construed as an assignment of, any right, title, or interest in or to the Maverick/Aces Trademarks to Licensee during the License Term. All goodwill arising from or created in connection with the use of the Maverick/Aces Trademarks by or on behalf of Licensee during the License Term will inure to the sole and exclusive benefit of Licensor.

4.2 **Registration**. Licensee will not (whether directly or indirectly in cooperation with third parties), during the License Term, (a) register or seek to register in any jurisdiction any Maverick/Aces Trademarks, or any trademark, or service mark confusingly similar to the Maverick/Aces Trademarks, (b) assert any claim of ownership of any Maverick/Aces Trademarks, by reason of Licensee's use thereof or otherwise, or (c) contest the validity or enforceability of the Maverick/Aces Trademarks or dispute Licensor's rights in the Maverick/Aces Trademarks. Licensee will, upon Licensor's reasonable request during the License Term and at Licensor's expense, furnish Licensor with specimens of use and related

information necessary to prosecute, maintain, or renew applications and registrations of the Maverick/Aces Trademarks. Licensor shall, at its sole expense, maintain all registrations of the Maverick/Aces Trademarks in full force and effect and prosecute all pending applications for registration of such marks.

4.3     **Enforcement**. Licensor has the sole and exclusive right (but not the obligation) during the License Term to bring legal claims and other enforcement actions against third-party infringement, violation, or misappropriation of any Maverick/Aces Trademarks, and shall take all such actions to the extent commercially reasonable. At Licensor's expense, Licensee will take all reasonable steps and provide such materials, cooperation, and assistance as reasonably requested to assist Licensor in enforcing the Maverick/Aces Trademarks.

## ARTICLE V
## REPRESENTATIONS AND WARRANTIES

5.1     **Mutual Representations and Warranties**. Each Party hereby represents and warrants to the other Party that (a) such Party has the requisite rights, authority, and power, and has taken all requisite actions, to execute and perform this Agreement, (b) this Agreement constitutes a legal, valid, and binding obligation of such Party, enforceable against such Party in accordance with its terms, except as such enforceability may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or other similar laws now or hereafter in effect, and (c) the rights granted by such Party to the other Party in this Agreement do not conflict with any agreement or rights of any Person.

5.2     **Additional Representations and Warranties**. Licensor represents and warrants and further agrees that: (a) Licensor is the sole and exclusive owner of all right, title, and interest in and to the Maverick/Aces Trademarks; (b) Licensor has the right to license and assign the Maverick/Aces Trademarks and Maverick/Aces IP in accordance with the terms of this Agreement; (c) the Maverick/Aces Trademarks are valid and subsisting; (d) the Maverick/Aces Trademarks include all trademarks and other intellectual property of Licensor relating to its operations as of the Effective Date, (e) as of the Effective Date, Licensor has not licensed any Maverick/Aces IP to any third party, and (f) to Licensor's knowledge, the Maverick/Aces Trademarks do not infringe upon any intellectual property or other rights of any third party.

5.3     **Disclaimer of Warranty.** EXCEPT AS OTHERWISE EXPLICITLY PROVIDED HEREIN, LICENSOR MAKES NO REPRESENTATIONS OR WARRANTIES HEREUNDER, EXPRESS OR IMPLIED, EITHER IN FACT OR BY OPERATION OF LAW, STATUTORY OR OTHERWISE, WITH RESPECT TO THE SUBJECT MATTER HEREOF, AND LICENSOR EXPRESSLY DISCLAIMS ANY IMPLIED WARRANTIES, INCLUDING ANY WARRANTY OF TITLE, NON-INFRINGEMENT, MERCHANTABILITY, OR FITNESS FOR A PARTICULAR PURPOSE.

## ARTICLE VI
## CONFIDENTIALITY

6.1     **Confidentiality Obligations**. Each of the Parties acknowledges that during the term of this Agreement such Party may receive (the "***Recipient***") Confidential Information from the other Party (the "***Discloser***"). Each Recipient will (a) not use the Confidential Information other than as necessary to exercise its rights and perform its obligations under this Agreement and (b) maintain the Confidential Information in strict confidence and, except as expressly permitted in Section 6.2 (Disclosure), not disclose the Confidential Information without the Discloser's prior written consent. Upon expiration or termination of this Agreement, Recipient will return to the Discloser or destroy all documents and records in its possession containing the Confidential Information of the Discloser; provided that Recipient will not be required to return or destroy any Confidential Information contained in any computer system back-up

6

records maintained in the ordinary course of business for business continuity or disaster recovery purposes. Notwithstanding anything to the contrary in this Agreement, the provisions of this <u>Section 6.1</u> (Confidentiality Obligations) will survive the termination of this Agreement.

6.2     <u>**Disclosure**</u>. The Recipient may disclose the Confidential Information to any of its (a) Affiliates, shareholders, partners, officers, directors, managers, employees, agents, contractors, advisors, financing sources, or representatives or (b) actual or potential acquirers, investors, co-investors, financing sources, or permitted sublicensees ((a) and (b) collectively, "***Representatives***") to the extent that disclosure is necessary for the purposes of this Agreement or in connection with a contemplated or actual merger, business combination, financing, investment, acquisition, licensing, or change-of-control transaction; <u>provided</u> that the Recipient ensures that any such Representative is informed in writing of the confidentiality requirements under this Agreement and further that such Representative is itself bound by a written nondisclosure agreement that is at least as restrictive as the one set forth in this <u>Article VI</u> (Confidentiality). The Recipient will be responsible for ensuring each Representative's compliance with, and will be liable for any breach by, a Representative of, this <u>Article VI</u> (Confidentiality). The Recipient may also disclose Confidential Information to the extent required by applicable Law, subpoena, court order, or legal process, including in connection with filings with the United States Securities and Exchange Commission and other Governmental Bodies; <u>provided</u> that the Recipient will promptly inform the Discloser of any such requirement and cooperate with any attempt by the Discloser to obtain a protective order or other similar treatment.

**ARTICLE VII**
**INDEMNIFICATION**

7.1     <u>**Indemnification Obligations**</u>. Each Party (the "***Indemnitor***") shall indemnify and hold the other Party (the "***Indemnitee***"), its parent, subsidiaries, and Affiliates, and its and their respective officers, directors, successors, and assigns, harmless from any and all Losses resulting from any Action related to or arising out of: (a) the material breach of any representation, warranty, covenant, agreement, undertaking or provision of this Agreement by Indemnitor; (b) Indemnitor's or its sublicensees' use of the Maverick/Aces Trademarks; and (c) the manufacture, distribution, advertising, marketing, and sale of products and services containing the Maverick/Aces Trademarks by the Indemnitor or its sublicensees, including, without limitation, any personal injury claims or product liability claims related to the foregoing. The Indemnitee shall promptly notify the Indemnitor of any Action to which the indemnity set forth in this <u>Section 7.1</u> (Indemnification Obligations) applies; <u>provided</u>, <u>however</u>, that the failure to promptly notify the Indemnitor shall diminish the Indemnitor's indemnification obligation only to the extent Indemnitor actually is prejudiced by such failure.

7.2     <u>**Indemnification Process**</u>. Licensee may, at its option, undertake the defense of an Action for which it has an obligation to indemnify Licensor pursuant to this Agreement by counsel of its own choosing, at its own expense, and shall provide written notice of any such undertaking within thirty (30) days of receipt of notice of the applicable Action to the Licensor. Licensor shall be permitted to participate in any such defense at its own cost and expense. Notwithstanding anything to the contrary in this <u>Article VII</u> (Indemnification), (a) Licensor shall not settle any such Action for which it is indemnified without the prior written consent of Licensee, which consent shall not be unreasonably withheld, conditioned, or delayed and (b) Licensee shall not enter into any settlement or compromise of any such Action or consent to the entry of any judgment for relief that includes any admission of liability by or on behalf of Licensor, other than solely for monetary damages to be borne by Licensee, without the prior written consent of Licensor, which consent shall not be unreasonably withheld, conditioned, or delayed.

7

**ARTICLE VIII**
**CONDITIONAL ASSIGNMENT**

8.1     **IP Assignment**. Upon the Transfer Date and provided that each Assignment Condition (defined below) is met, Licensor shall be deemed, without further action by any Party, to have assigned, transferred, conveyed, and delivered to Licensee (or to one or more designees identified in writing by Licensee to Licensor) all of Licensor's rights, title, and interests in and to the Maverick/Aces IP (the "***IP Assignment***"), subject to the rights retained by the Licensor through the Retained License. Licensor shall execute and deliver all documents, instruments, and agreements, and take such further actions, and Licensee is authorized to take such actions and execute such documents and instruments on behalf of Licensor, as may be reasonably necessary or desirable to effectuate and evidence the IP Assignment.

8.2     **Assignment Conditions**. The effectiveness of the assignment of the Maverick/Aces IP to Licensee pursuant to Section 8.1 (Assignment) is expressly conditioned upon each of the following conditions (each, an "***Assignment Condition***") being met on the Transfer Date:

(a)     Licensee has not breached any material provision of this Agreement that remains uncured more than 30 days after delivery of written notice thereof from Licensor to Licensee;

(b)     Eric Persson has not breached any material provision of the TSA that remains uncured more than 30 days after delivery of written notice thereof from Licensor to Licensee; and

(c)     Licensee shall deliver documentation to Licensor of the grantback license set forth in Section 8.3 (Retained License) in form and substance reasonably acceptable to Licensor.

8.3     **Retained License**. During the Retained License Period, Licensee shall grant and hereby grants to Licensor a non-exclusive, royalty-free license to use the Maverick/Aces IP solely for the same purpose and in a manner consistent with usage of such intellectual property by Licensor as of the Effective Date (the "***Retained License***"); *provided, however*, that the Licensor shall promptly transition from use of the Maverick/Aces Domain Names, with such transition to be completed within 60 days of the Transfer Date; *provided, further*, that the Licensor's use of the Retained License shall not impair or conflict with Licensee's operations.  For the avoidance of doubt, the Retained License shall be valid solely for facilities or locations operated by Licensor as of the Effective Date.  In addition to and without limiting anything in this paragraph, the Retained License is subject to the same restrictions and obligations as applicable to Licensee during the License Term under Article IV of this Agreement. The Retained License is personal to the Licensor and shall not be assignable without the prior written consent of Licensee.  Any attempted assignment of the Retained License without prior written consent of Licensee shall be null and void.

**ARTICLE IX**
**LICENSE FEE AND REVENUE SHARING**

9.1     **Upfront Payment**. As partial consideration for the rights granted by Licensor to Licensee pursuant to the terms of this Agreement, Licensee shall pay to Licensor a one-time, non-refundable payment equal to one hundred thousand dollars ($100,000), payable and due on the Effective Date.

9.2     **Revenue Sharing**. During the Revenue Sharing Period, in consideration for the rights granted by Licensor to Licensee pursuant to the terms of this Agreement, Licensee shall pay to the Licensor, on an annual basis, a revenue share amount equal to twenty-five percent (25%) of the Adjusted EBITDA (such amount, the "***Revenue Share***"). Licensee shall pay each Revenue Share for any year by April 15 of the following year. Licensee shall not enter into any transaction or series of transactions, whether directly or indirectly, (x) with any Affiliate of Licensee on terms which are less favorable to Licensee than if such transaction or series of transactions were a bona-fide arms'-length transaction between unaffiliated parties

8

or (y) the purpose or effect of which is to avoid or circumvent any amounts payable to Licensor in accordance with this <u>Section 9.2</u>.

9.3     **Method of Payment**. Unless otherwise agreed by the Parties, all payments due under this Agreement will be paid in U.S. Dollars by wire transfer or electronic funds transfer of immediately available funds to an account designated by the Licensor.

9.4     **Late Payments**. Any amount required to be paid by Licensee hereunder that is not paid on the date due, and not subject to a good faith dispute or an audit pursuant to <u>Section 9.6</u> (Reporting, Records, and Audits), shall bear interest at a rate equal to the U.S. dollar prime rate *plus* three percent (3%) (the "*Interest Rate*"), effective for the date that payment was first due as reported by the Wall Street Journal (U.S. Internet edition), or the highest rate permitted under applicable Law, whichever is lower. Such interest shall be computed on the basis of a year of three hundred sixty (360) days, calculated from the due date until the date of payment.

9.5     **Payment of Tax**. Each Party will be responsible for any income taxes, fees, duties, levies or similar amounts imposed on its share of income arising directly or indirectly under this Agreement.

9.6     **Reporting, Records, and Audits**. Licensee shall provide Licensor with annual statements reasonably detailing the calculation of Adjusted EBITDA and the corresponding Revenue Share. Licensee will keep and maintain accurate and complete records regarding Adjusted EBITDA in sufficient detail for Licensor to ascertain properly and to verify the payments due hereunder for a minimum of one (1) year following the end of the period to which they pertain. Upon thirty (30) days' prior written notice to Licensee, Licensor will have the right to inspect all records of Licensee applicable to the calculation of such Adjusted EBITDA during the prior year during normal business hours of Licensee (such inspection referred to as an "*Audit*"). Such Audit may not be conducted more than once in any calendar year. Licensor will conduct or use an independent auditor (reasonably acceptable to both Licensor and Licensee) to conduct or assist with an Audit. Upon completion of the audit, the auditor will provide both Licensor and Licensee a written report solely disclosing whether the reports submitted or payments made by Licensee are correct or incorrect and the specific details concerning any discrepancies. If the auditor determines that the report submitted or payments made by Licensee understated the amount due to Licensor, then Licensee will promptly pay such understated amount. If the auditor determines that the report payments made by Licensee understated the amount due to Licensor by ten percent (10%) or more, then Licensee will promptly pay such understated amount together with interest at the Interest Rate and the Licensor's reasonable out of pocket costs for performing such Audit. If the auditor determines that the report submitted or payments made by Licensee overstated the amount due to Licensor, then Licensor will promptly refund such overstated amount.

9.7     **Licensee Offset**. Notwithstanding anything to the contrary herein, any payment obligation of Licensee to Licensor may, at the sole discretion of Licensee, be reduced by any amounts owing by Licensor to Licensee under or relating to this Agreement.

## ARTICLE X
## TERM AND TERMINATION

10.1     **Term**. This Agreement will commence on the Effective Date and shall terminate upon the expiration of the last to expire of the Retained License Period and the Revenue Sharing Period, unless sooner terminated in accordance with this Agreement.

10.2     **Termination for Material Breach of this Agreement**. Either Party may terminate this Agreement upon thirty (30) days' written notice if the other Party materially breaches this Agreement and fails to fully cure such breach within such thirty (30)-day cure period.

9

10.3    **Effects of Termination or Expiration**. Within 90 days after the termination of this Agreement, the Licensee (if during the License Term) or the Licensor (if not during the License Term) will discontinue and cease all use of the Maverick/Aces IP and promptly destroy all materials bearing any Maverick/Aces IP (to the extent commercially reasonable). An authorized officer of such Party will promptly certify to the other Party in writing that such discontinued use, destruction, and delivery has taken place. Notwithstanding the termination or expiration of this Agreement or anything to the contrary set forth herein, nothing in this Agreement will relieve any Party from liability for any breach hereof prior to such termination, and any such termination or expiration will be without prejudice to any rights or remedies any Party may have with respect thereto.

10.4    **Survival**. Article VI (Confidentiality), Article VII (Indemnification), Section 9.3 (Method of Payment) through Section 9.6 (Reporting, Records, and Audit), Section 10.3 (Effects of Termination or Expiration), this Section 10.4 (Survival), and Article XI (General) will survive the termination or expiration of this Agreement.

**ARTICLE XI**
**GENERAL**

11.1    **Independent Contractor Relationship**. Nothing in this Agreement will be deemed to create any relationship between Licensor and Licensee other than that of independent parties contracting with each other solely for the purpose of carrying out the provisions of this Agreement. Neither of the Parties, nor any of their respective officers, directors, managers, employees, or consultants, will be deemed or construed to be the agent, officer, director, manager, employee, or consultant, representative, partner, member, or joint venturer of the other Party.

11.2    **Notices**. Any notice, request, demand, waiver, consent, approval, or other communication that is required or permitted hereunder will be in writing and will be deemed to have been duly given (a) when delivered in person, (b) on the next Business Day when sent by a nationally recognized overnight courier, or (c) by email with a subject line beginning with the phrase "Maverick IP – Notice" (in which case, it will be effective on the date of transmission if sent before 9:00 p.m. Eastern Time on a Business Day and on the next Business Day if sent after such time on a Business Day or at any time on a non-Business Day, provided no notice of non-delivery is generated), in each case to the recipient Party at the following addresses:

If to Licensor:

RunItOneTime LLC
2026 Montessori St
Las Vegas, NV 89117

with a copy to (which shall not constitute notice):

Latham & Watkins LLP
1271 Avenue of the Americas
New York, NY 10020
Attention: Helena Tseregounis, Nicholas J. Messana
Email: helena.tseregounis@lw.com, nicholas.messana@lw.com

If to Licensee:

Eric Persson
Email: erichpersson@gmail.com

10

with a copy to (which shall not constitute notice):

> Raines Feldman Littrell LLP
> 4675 MacArthur Ct, Suite 1550
> Newport Beach, CA 92660
> Attention: Hamid R. Rafatjoo
> Email: hrafatjoo@raineslaw.com

or to such other address or to the attention of such Person or Persons as the recipient Party has specified by prior written notice in accordance with this <u>Section 11.2</u> (Notices) to the sending Party. If more than one method for sending notice as set forth above is used, the earliest notice date established as set forth above will control.

11.3     **Amendment; Waiver**. This Agreement may be amended, modified, or supplemented at any time only by an instrument in writing signed by Licensor and Licensee. No waiver of any provision hereof will be effective unless signed in writing by the Party waiving its rights and benefits under such provision.

11.4     **Assignability**. Licensor may freely assign its rights with respect to the Revenue Share, and may freely assign its rights under this Agreement to MainCo in a sale to Supporting Lenders or an Affiliate thereof, but otherwise may not assign any rights or obligations under this Agreement without the prior written consent of Licensee. Licensee may not assign its rights and obligations under this Agreement without the prior written consent of Licensor; *provided, however*, that Licensee may freely assign its rights and obligations under this Agreement to any Person that acquires Licensee or all or substantially all of the assets of Licensee, or the surviving entity of any merger, consolidation, or reorganization between Licensee and any other Person. Any attempted assignment in contravention of this <u>Section 11.4</u> (Assignability) will be null and void. Subject to the foregoing, this Agreement and all of the provisions hereof will be binding upon and will inure to the benefit of the Parties and their respective successors and permitted assigns.

11.5     **No Third-Party Beneficiaries**. This Agreement is exclusively for the benefit of Licensor, and its successors and permitted assigns, with respect to the obligations of Licensee under this Agreement, and for the benefit of Licensee, and its successors and permitted assigns, with respect to the obligations of Licensor under this Agreement, and this Agreement will not be deemed to confer upon or give to any other third party any remedy, claim, liability, reimbursement, cause of action, or other right.

11.6     **Governing Law**. This Agreement, and all Actions arising out of, resulting from, or relating to the subject matter hereof or the transactions contemplated hereby or the actions of such Party in the negotiation, administration, performance, and enforcement hereof will be governed by, interpreted under, and construed in accordance with the Laws of the State of New York (including in respect of the statute of limitations or other limitations period applicable to any state Law claim, controversy, or dispute) that apply to agreements made and performed entirely within the State of New York, without regard to the conflicts of law provisions thereof or of any other jurisdiction, as to all matters, including matters of validity, construction, effect, performance, and remedies. Each Party agrees and acknowledges that the application of the Laws of the State of New York is reasonable and appropriate based upon the Parties' respective interests and contacts with the State of New York. Each of the Parties waives any right or interest in having the Laws of any other state, including specifically, state Law regarding the statute of limitation or other limitations period, apply to any Party's state Law claim, controversy, or dispute that in any way arises out of, results from, or relates to this Agreement, the subject matter hereof, or the transactions contemplated hereby.

11.7     **Consent to Jurisdiction; Service of Process**. Each Party hereby irrevocably agrees that any Action arising out of or relating to this Agreement, the subject matter hereof, or any transaction contemplated hereby or the actions of such Party in the negotiation, administration, performance, and enforcement hereof will be brought in the State of Nevada, and each Party hereby submits to the exclusive jurisdiction of such courts in any such Action. A final judgment in any such Action may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by Law. Each Party irrevocably and unconditionally waives any objection to the laying of venue of any Action arising out of or relating to this Agreement, the subject matter hereof, or any transaction contemplated hereby or the actions of such Party in the negotiation, administration, performance, and enforcement hereof in such courts, and hereby irrevocably and unconditionally waives and agrees not to plead or claim in any such court that any such Action brought in any such court has been brought in an inconvenient forum. Each Party further agrees that service of any process, summons, notice, or document sent to such Party pursuant to Section 11.2 will be effective service of process for any such Action.

11.8     **Waiver of Jury Trial**. EACH PARTY HEREBY IRREVOCABLY WAIVES ALL RIGHT TO TRIAL BY JURY IN ANY ACTION (WHETHER BASED ON CONTRACT, TORT, OR OTHERWISE) ARISING OUT OF OR RELATING TO THIS AGREEMENT, THE SUBJECT MATTER HEREOF, OR ANY OF THE TRANSACTIONS CONTEMPLATED HEREBY OR THE ACTIONS OF SUCH PARTY IN THE NEGOTIATION, ADMINISTRATION, PERFORMANCE, AND ENFORCEMENT HEREOF. EACH PARTY CERTIFIES AND ACKNOWLEDGES THAT (A) NO REPRESENTATIVE, AGENT OR ATTORNEY OF THE OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF ANY SUCH ACTION, SEEK TO ENFORCE THE FOREGOING WAIVER, (B) EACH PARTY UNDERSTANDS AND HAS CONSIDERED THE IMPLICATIONS OF THIS WAIVER, (C) EACH PARTY MAKES THIS WAIVER VOLUNTARILY, AND (D) EACH PARTY HAS BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION 11.8 (WAIVER OF JURY TRIAL).

11.9     **Entire Agreement**. This Agreement constitutes the entire agreement between the Parties with respect to the transfer of any Maverick/Aces IP to Licensee and supersedes all other prior agreements and understandings, both written and oral, between the Parties with respect to such subject matter.

11.10    **Counterparts**. This Agreement may be executed in counterparts, each of which will be deemed to be an original, but all of which taken together will constitute one and the same agreement. Delivery of an executed counterpart of a signature page to this Agreement by email will be as effective as delivery of a manually executed counterpart of this Agreement.

11.11    **Specific Performance**. Each Party acknowledges that the rights of each Party to consummate the transactions contemplated hereby are unique and recognizes and affirms that in the event of a breach of this Agreement by either Party, money damages would be inadequate and the non-breaching Party would have no adequate remedy at law. Accordingly, the Parties agree that such non-breaching Party will have the right, in addition to any other rights and remedies existing in its favor at law or in equity, to enforce its rights and the other Party's obligations hereunder not only by an action or actions for damages but also by an action or actions for specific performance, injunctive, or other equitable relief (without posting of bond or other security). Each Party further agrees that the only permitted objection that it may raise in response to any action for equitable relief is that it contests the existence of a breach or threatened breach of this Agreement.

11.12    **Severability**. If any provision of this Agreement (or portion thereof) is invalid, illegal, or incapable of being enforced by any rule of Law or public policy, all other provisions of this Agreement

(or the remaining portion thereof) will nevertheless remain in full force and effect. Upon such determination that any provision of this Agreement (or portion thereof) is invalid, illegal, or incapable of being enforced, the Parties will negotiate in good faith to modify this Agreement so as to effect the original intent of the Parties as closely as possible in a mutually agreeable manner in order that the transactions contemplated hereby be consummated as originally contemplated to the fullest extent possible.

      11.13    **Further Assurances**. On and after the Effective Date, upon the request of either Party, the other Party will take any further actions (including the execution and delivery of such further instruments and documents) as are necessary to carry out the purposes of this Agreement or the transactions contemplated hereby, in each case at the requesting Party's expense.

      11.14    **Construction**. Unless the context of this Agreement otherwise clearly requires, (a) references to the plural include the singular, and references to the singular include the plural, (b) references to one gender include the other gender, (c) references to "or" will be construed in the inclusive sense of "and/or", (d) the words "include", "includes" and "including" do not limit the preceding terms or words and will be deemed to be followed by the words "without limitation", (e) the terms "hereof", "herein", "hereunder", "hereto" and similar terms in this Agreement refer to this Agreement as a whole and not to any particular provision of this Agreement, (f) the terms "day" and "days" mean and refer to calendar day(s), (g) the terms "year" and "years" mean and refer to calendar year(s), (h) where a word or phrase is defined herein, each of its other grammatical forms will have a corresponding meaning, and (i) references to a particular statute or regulation include all rules and regulations thereunder and any successor statute, rule, or regulation, in each case as amended or otherwise modified from time to time. When calculating the period of time before which, within which, or following which any act is to be done or step taken pursuant to this Agreement, the date that is the reference date in calculating such period will be excluded. If the last day of such period is a non-Business Day, the period in question will end on the next succeeding Business Day. Unless otherwise set forth in this Agreement, references in this Agreement to any document, instrument, or agreement (including this Agreement) (i) include and incorporate all exhibits, schedules, and other attachments thereto, (ii) include all documents, instruments, or agreements issued or executed in replacement thereof, and (iii) mean such document, instrument, or agreement, or replacement or predecessor thereto, as amended, modified, or supplemented from time to time and in effect at any given time. All Article and Section references herein are to Articles and Sections of this Agreement, unless otherwise specified. The Article and Section headings contained in this Agreement are exclusively for the purpose of reference, are not part of the agreement of the Parties, and will not in any way affect the meaning or interpretation of this Agreement.

**SIGNATURE PAGE FOLLOWS**

IN WITNESS WHEREOF, Licensor and Licensee have executed this Agreement to be effective as of the Effective Date.

**RUNITONETIME LLC**


By: _____
        Name:
        Title:


**MAVERICK GAMING LLC**


By: _____
        Name:
        Title:

*Signature Page to Intellectual Property Assignment Agreement*